```
 1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE WESTERN DISTRICT OF TEXAS
 2                              AUSTIN DIVISION

 3   UNITED STATES OF AMERICA,           ) 1:23-MJ-00484-SH-1
                                         )
 4       Plaintiff,                      )
                                         )
 5   v.                                  ) AUSTIN, TEXAS
                                         )
 6   SAINT JOVITE YOUNGBLOOD,            )
                                         )
 7       Defendant.                      ) AUGUST 10, 2023

 8           ************************************************
                 TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
 9                  BEFORE THE HONORABLE MARK LANE
             ************************************************
10
     APPEARANCES:
11
     FOR THE PLAINTIFF:   DANIEL D. GUESS
12                        MATT HARDING
                          UNITED STATES ATTORNEY'S OFFICE
13                        903 SAN JACINTO BOULEVARD, SUITE 334
                          AUSTIN, TEXAS 78701
14
     FOR THE DEFENDANT:   CHARLOTTE ANNE HERRING
15                        JOSE I. GONZALEZ-FALLA
                          FEDERAL PUBLIC DEFENDER'S OFFICE
16                        504 LAVACA STREET, SUITE 960
                          AUSTIN, TEXAS 78701
17
     TRANSCRIBER:         ARLINDA RODRIGUEZ, CSR
18                        501 WEST 5TH STREET, SUITE 4152
                          AUSTIN, TEXAS 78701
19                        (512) 391-8791

20

21

22

23

24   Proceedings recorded by electronic sound recording, transcript

25   produced by computer.
```

1          (Proceedings began at 9:33 a.m.)

2          THE CLERK:  The court calls the following for a

3    preliminary and detention hearing:  1:23-MJ-484, *United States*

4    *of America v. Saint Jovite Youngblood.*

5          MR. HARDING:  Good morning, Your Honor.  Matt Harding

6    and Dan Guess for the United States.

7          MS. HERRING:  And Charlotte Herring and

8    Joe Gonzalez-Falla for Mr. Youngblood.

9          THE COURT:  Welcome to the attorneys.  Good morning

10   to you, Mr. Youngblood.  We're here on the government's

11   obligations with regard to the preliminary and detention

12   hearing.  Are you ready to proceed?

13          MR. HARDING:  We are, Your Honor.

14          THE COURT:  Call your first witness.

15          MR. HARDING:  The government will call

16   Lindsey Wilkinson

17      (Witness sworn)

18          THE COURT:  Make yourself comfortable, adjust that

19   microphone so it's pointed toward your face, and when you're

20   ready, give us your full name and spell your last name, please.

21          THE WITNESS:  Good morning.  My name is

22   Lindsey Wilkinson, W-i-l-k-i-n-s-o-n.

23                    ************************

24

25

1                        **LINDSEY WILKINSON,**

2   having been first duly sworn, testified as follows:

3                        **DIRECT EXAMINATION**

4   **BY MR. HARDING:**

5   Q.   Agent Wilkinson, if you want to pull that microphone a

6   little closer to yourself, you can sit back and make yourself

7   comfortable, as the judge said.

8            First off, could you please introduce yourself to the

9   judge, tell him what you do, and how long you've done it.

10  A.   I entered on duty with the FBI as a special agent in 2020.

11  I -- out of the academy, I was assigned to the San Antonio

12  Austin Resident Agency, where I am assigned to the White Collar

13  Crime Squad.

14  Q.   And can you summarize briefly some of your training and

15  experience in the area of investigations and white collar

16  investigations for the Court.

17  A.   Yes, sir.  I've had experience on surveillance operations,

18  providing -- as part of search warrants, executing arrest

19  warrants, and being involved investigative interviews.

20  Q.   And can you tell the Court what is your role in this

21  case -- in Mr. Youngblood's case?

22  A.   In this case I'm the case agent, so I have a lot of

23  firsthand knowledge that I was involved in, as well as I've

24  spoken with numerous law enforcement officers, I've read

25  reports, looked at records, and have conducted other law

1  enforcement activities in furtherance of the case.

2  Q.   So, because of your involvement, some of what you're going

3  to tell the Court today is based on personal knowledge, but

4  some is going to be, like you said, based on those other

5  sources of information?

6  A.   That's correct.

7  Q.   Okay.  Let's get right to it, then.  You know we're here

8  for both a preliminary and detention hearing.  How did the FBI

9  first become aware recently of Mr. Youngblood?

10 A.   The FBI took a report from our initial victim,

11 Mr. Eric Perardi.  He reported to the FBI being a victim of

12 both fraud -- an investment scheme and an extortion scheme.

13 Q.   Let me just stop you briefly.  We've used Mr. Perardi's

14 name by consent of Mr. Perardi.

15 A.   Yes, sir.

16 Q.   There are some other folks that we're going to discuss by

17 name as necessary.  But, in general, I'm going to ask that you,

18 when possible, not identify victims unless it's important to

19 the particular fact or point you're making.

20 A.   Yes, sir.

21 Q.   So, Mr. Perardi made the report to the FBI.  What was the

22 nature of that report?

23 A.   The nature of that report is that he had -- he had been

24 approached by Mr. Youngblood.  First his -- his -- let me back

25 up.  I apologize, Judge.

1          The -- Mr. Youngblood and Mr. Perardi had been

2    friends for about six or seven years.

3    Q.   Let me stop you really quickly.  I asked the question

4    poorly.  Give us the one-sentence version of what the report

5    was about, generally.

6    A.   Oh.  The report was that he had been extorted and

7    defrauded for investment schemes by Mr. Youngblood.

8    Q.   And based on the report that you received, did you conduct

9    a wide variety of follow-up investigation both by yourself and

10   with other agents?

11   A.   Yes, I did.

12   Q.   Okay.  We'll get into the details here in a minute.

13   A.   Okay.

14   Q.   But because the players -- there's a lot of players and

15   it's kind of convoluted, I want to start with Mr. Youngblood

16   and his family.  All right?

17   A.   Yes, sir.

18   Q.   Just to orient the Court.

19          This is Mr. Youngblood to my left, of course.

20   A.   Yes, sir.

21   Q.   He -- his name is Saint Jovite Youngblood, but he goes by

22   Kota Youngblood; is that correct?

23   A.   Yes.

24   Q.   He has a wife named Gloria?

25   A.   Yes.

1  Q.   And two sons?

2  A.   Yes.

3  Q.   And they -- one of the -- the elder son is named Eventine;

4  is that right?

5  A.   Yes, sir.

6  Q.   And he has another son that's younger?

7  A.   Yes, sir.

8  Q.   And those folks are all sitting right here to my left in

9  the back, in the first row of the gallery?

10 A.   Yes, sir.

11 Q.   Okay.  What was Mr. Youngblood's original birth name?

12 A.   It was Dennis Schuler, Jr.

13 Q.   Okay.  And who, then, are Mr. Youngblood's biological

14 parents?

15 A.   Linda and Dennis Schuler, Sr.

16 Q.   So we've got Mr. Youngblood, wife Gloria, two sons,

17 including eldest son Eventine, and parents Dennis and

18 Gloria Schuler?

19 A.   Yes, sir.

20 Q.   Okay.  Just we'll get to this in a minute.

21         Mr. Youngblood's parents are still alive?

22 A.   Yes, sir.

23 Q.   You've spoken -- you or other agents have spoken to them?

24 A.   Yes.

25 Q.   Okay.  Now let's get down to the details.

1          Mr. Perardi tells you, essentially, Mr. Youngblood is

2  extorting me and defrauding me.  You conduct all of the

3  investigation.  Can you tell us kind of in more detail now what

4  exactly the stories that Mr. Youngblood -- that Mr. Perardi was

5  told that led him to give money to Mr. Youngblood.

6  A.   So Mr. Perardi and Mr. Youngblood had known each other for

7  about six years.  Their sons played hockey together.  And

8  Mr. Perardi -- at some point Mr. Perardi's son was on a trip,

9  and he gets a call from one of his friends saying

10 Mr. Youngblood needs to speak with you immediately.  There's a

11 situation going on with your family.  And shortly after that,

12 Mr. Youngblood and Mr. Perardi connect back in Austin, Texas.

13          And that's when Mr. Youngblood makes representations

14 to Mr. Perardi that Mr. Perardi's in grave danger from the

15 cartel because his ex-wife had been affiliated with the cartel,

16 had taken out a hit on his family because she was the

17 beneficiary of an insurance -- insurance policy -- excuse me --

18 for Mr. Perardi.  And, as a result of that, he needed

19 protection and that Mr. Youngblood could provide that

20 protection to him.

21 Q.   Okay.  So let's start kind of at the beginning.

22          Mr. Youngblood does not reach out directly to

23 Mr. Perardi; is that correct?

24 A.   Correct.

25 Q.   He reached out through, sort of, intermediaries?

1  A.    Correct.

2  Q.    Based on your investigation, have multiple folks told you

3  that Mr. Perardi either does not own a phone -- excuse me --

4  Mr. Youngblood does not own a phone or does not prefer to talk

5  on the phone or text?

6  A.    Yes.

7  Q.    You also discovered through your investigation that

8  Mr. Youngblood prefers to work through intermediaries when

9  possible?

10  A.    Yes.

11  Q.    Okay.  So Mr. Youngblood tells Mr. Perardi, in essence,

12  your family is in danger because your ex-wife owes money to a

13  drug cartel.  I can protect you.

14       Why would Mr. Youngblood be in a position to stop a

15  drug cartel from killing Mr. Perardi's family?

16  A.    Mr. Youngblood claimed to be prior military, Special

17  Forces.  He said he had direct information from government

18  sources.

19       THE COURT:  Can I interrupt?  Are you getting this

20  from Youngblood?  Youngblood told Perardi this or a third party

21  told Perardi this?

22       THE WITNESS:  I have recorded statements to the

23  nature of both.  So these are from recorded statements with an

24  undercover, where he kind of reiterates and confirms

25  Mr. Perardi's story.  But then I do have some recordings of

1  these statements.

2          THE COURT:  Okay.  I thought we were just talking

3  about what Perardi was saying.  This is more big picture?

4          MR. HARDING:  Well, let's -- it is more big picture,

5  Judge.

6          THE COURT:  Okay.

7  Q.  (BY MR. HARDING) But knowing that we do have recorded

8  statements that corroborate this, let's stick right now with

9  just what Mr. Perardi tells you --

10  A.  Yes.

11  Q.  -- and your sort of follow-up investigation on that.

12          THE COURT:  And I hate -- it's on the record now, but

13  how do you spell Perardi?

14          MR. HARDING:  It's P-e-r-a-r-d-i, I believe.

15          THE WITNESS:  That's correct.

16          THE COURT:  P-e-r-

17          MR. HARDING:  -a-r-d-i.

18  Q.  And just for record purposes, Mr. Perardi is here in the

19  courtroom, correct?

20  A.  Yes, he is.

21  Q.  Okay.  At this point Mr. Perardi is telling you and other

22  agents --

23          And this is just sort of his initial report to you?

24  A.  Yes.

25  Q.  -- what's going on with Mr. Youngblood?

1   A.   Yes.

2   Q.   And, according to Mr. Perardi, later confirmed through

3   other means --

4   A.   Yes.

5   Q.   -- Mr. Youngblood claims to have been ex-military?

6   A.   He claims to have been ex-military and to be affiliated

7   with the U.S. Government to have contacts in the theater that

8   would be involved with the cartels and in some way be able to

9   protect his family.

10  Q.   Were you able to confirm whether or not Mr. Youngblood has

11  ever served in the United States Military?

12  A.   He has not.

13  Q.   And do you have any record of Mr. Youngblood ever being

14  employed by the United States Government?

15  A.   There is no record.

16  Q.   I'll ask this now with respect to Mr. -- the scheme

17  against Mr. Perardi, but it's fair to say Mr. Youngblood, as

18  we'll talk about, defrauded a large number of people with

19  similar stories, correct?

20  A.   Yes, sir.

21  Q.   In Mr. Perardi's case or in any other case, did you

22  determine that there was any actual, legitimate threat by a

23  drug cartel or any other source to these folks?

24  A.   No.

25  Q.   So that's sort of the extortion side of things.

1    A.    Yes, sir.

2    Q.    Give me money; I can protect you from the drug cartel.

3          You said there was also kind of an investment fraud

4    scheme.  Can you describe that for the Court.

5    A.    Yes, sir.

6    Q.    Again -- sorry -- based on what Mr. Perardi is telling you

7    at the time.

8    A.    So for Mr. Perardi's -- for -- for his specific situation,

9    it was extortion primarily, but also had an investment fraud

10   nexus, that all of the money he sent would then be an

11   investment in clocks, or he would be -- receive money in return

12   for gold bars and would receive an exorbitant return at the

13   end.  And it would also protect his family in the short term.

14   Q.    And, again, we'll get to this in a minute.  But at least

15   with respect to the gold bars side of things, that was later

16   confirmed via recorded conversations?

17   A.    Yes, sir.

18   Q.    Let's talk about clocks for a minute, because now we're

19   going to bring another player into this arena.  What was the --

20   what's the nexus between Mr. Youngblood and clocks?  Which

21   person?

22         THE WITNESS:  Is it all right if I use the

23   individual's name in this case?  I've already gotten approval,

24   Your Honor.

25         MR. HARDING:  Yes.  That --

1          THE COURT:  Oh, yeah.

2          THE WITNESS:  Okay.

3          THE COURT:  I -- he's the one that asked for it.  I

4    didn't.

5    A.   His name is James Holloway.  He had dealt with antique

6    clocks as his business for a long time.

7    Q.   And so Mr. Holloway will play a role throughout as we go

8    forward.

9    A.   Yes, sir.

10   Q.   But, essentially, the reason it was plausible that

11   Mr. Youngblood would have a line on clocks was through

12   Mr. Holloway?

13   A.   Yes, sir.

14   Q.   Have you identified Mr. Holloway as a person who was also

15   giving money to Mr. Youngblood under false pretenses?

16   A.   Yes, I have.

17   Q.   We'll get to this in a minute, but have you also

18   determined that that it's a common -- through the entire

19   investigation, it was a common practice of Mr. Youngblood to

20   use victims and other people who had given him money to also

21   further his schemes?

22   A.   Yes.

23   Q.   And we'll talk about some of those details or some of

24   those specific examples in a minute, will we not?

25   A.   Yes.

1  Q.   Okay.  On the same topic, was this sort of weird mixture

2  of extortion and investment fraud also sort of signature of

3  Mr. Youngblood that he committed against multiple victims?

4  A.   Yes.  We either saw it was extortion and investment,

5  investment then extortion, some combination, or one or the

6  other.

7  Q.   At some point along the way -- again, let's focus back on

8  Mr. Perardi for the moment -- did Mr. Youngblood offer

9  collateral as sort of security against these investments?

10 A.   Yes.  We saw it in Mr. Perardi's case and others.

11 Q.   Let's -- again, just sticking with Mr. Perardi's case for

12 now, what were two specific items that were offered to

13 Mr. Perardi as collateral for his supposed investments?

14 A.   He offered a bat, which he said was once the famous

15 baseball player Lou Gehrig's, and had his DNA on it.  And he

16 also offered a very old Civil War flag, which he represented to

17 be -- to Mr. Perardi as being almost $2 1/2 million.

18 Q.   We'll talk about the bat more in a minute, but let's stick

19 with the flag for a moment.  He claimed it was worth about

20 $2 1/2 million?

21 A.   Yes, sir.

22 Q.   Did Mr. Perardi, and later you, follow up on that claim?

23 A.   Yes, we did.

24 Q.   What did you learn?

25 A.   Mr. Perardi had reached out to an antique flag dealer; I

1  reached out to the same individual.  The individual actually

2  said he sold that flag to Mr. Youngblood and that the flag

3  itself was worth $85,000.  He said that he had sold it to

4  Mr. Youngblood for $75,000 but had not been paid in full for

5  it.

6  Q.  And, again, do we see a situation here where the money for

7  this flag does not come from Mr. Youngblood, but comes from

8  another individual?

9  A.  Yes.  Mr. Youngblood used another individual,

10  Marvin Connect (phonetic), to send the money.

11  Q.  And that flag seller was not here in Texas, correct?

12  A.  Correct.

13  Q.  And so the financial -- turning to sort of the one aspect

14  of the preliminary hearing, the financial transactions involved

15  in buying that flag or paying money for that flag crossed state

16  lines?

17  A.  Yes, it did.

18  Q.  And that flag was used in furtherance of this scheme?

19  A.  Yes.

20  Q.  I think you mentioned this already, but use of flags and

21  bats in particular, as well as other items, another signature

22  of Mr. Youngblood throughout many fraud schemes?

23  A.  Yes.  We heard about both of these items from numerous

24  victims.

25  Q.  All right.  So Mr. Perardi is told, Give me money so I can

1   protect your family.  By the way, you'll get a big return on

2   your investment.  Here's some collateral to secure you.

3            Does Mr. Perardi pay?

4   A.   Yes, he does.

5   Q.   I don't need exact dates and times or anything like that.

6   But approximately how much money does Mr. Perardi pay at first?

7   A.   So I have a couple of notes on that, but it was

8   approximately $70,000 beginning July 8th, 2022, followed with

9   an $86,000 payment July 21st, 2022, an $83,000 payment on

10  July 27th, 2022.

11  Q.   And was this money transferred directly from Mr. Perardi

12  to Mr. Youngblood?

13  A.   No, it wasn't.

14  Q.   Can you describe how that transaction was structured and

15  why it was structured that way.

16  A.   Mr. Youngblood directed Mr. Perardi to send the money to

17  James Holloway.  He said to represent it as an investment in

18  antique clocks.  And since that was Mr. Holloway's business and

19  he often conducted business with large cash transactions, that

20  would not raise suspicion at the bank.  So he said this was the

21  best way to send money to him.

22  Q.   And you have confirmed through records and speaking to

23  Mr. Holloway and others that, in fact, Mr. Perardi made these

24  payments to Mr. Holloway, Mr. Holloway then would often cash

25  these -- withdraw these deposits in cash?

1  A.   Yes.  And provide that cash to Mr. Youngblood.

2  Q.   Do you believe that this series of financial transactions,

3  the way they were structured, was designed in whole or in part

4  to conceal the nature, source, and control of the funds that

5  were being provided to Mr. Youngblood by Mr. Perardi through

6  Mr. Holloway?

7  A.   Yes, I do.  I believe it was to make sure there was no

8  paper trail to him and to conceal his involvement.

9  Q.   Again, is that a common practice that we have seen

10  Mr. Youngblood engage in throughout multiple victims in this

11  investigation?

12  A.   It is.

13  Q.   He also -- Mr. Youngblood also used other measures to help

14  avoid detection; is that correct?

15  A.   He did.

16  Q.   As we discussed, he would tell people he didn't have a

17  phone and use other people's phones?

18  A.   Yes.

19  Q.   Accordingly, he would not send any text messages from a

20  phone tied to him?

21  A.   Correct.  Or any emails.

22  Q.   Any emails.  His meetings would generally be phone calls

23  or face to face?

24  A.   Yes.

25  Q.   We talked about the use of intermediaries to conduct a lot

1  of these transactions.  And then did Mr. Youngblood create fake

2  online personas for himself or modify personas for himself?

3  A.  He did.  He instructed someone to create a number of fake

4  online articles about him, kind of showing different personas.

5  He also instructed someone to redact court articles and other

6  online articles about his true persona.

7  Q.  And now is as good a time as any.  Who was that person?

8  A.  That person was Lane Holloway who is the son of James

9  Holloway.

10 Q.  All right.  So we've got James Holloway, who owns the

11 clock company, and Lane Holloway, his son, who did some of

12 these things at Mr. Youngblood's request?

13 A.  Yes.

14 Q.  Fair to say Mr. Lane Holloway has an IT background and

15 is -- has -- is skilled in that area?

16 A.  Yes.

17 Q.  And just for the sake of ease, I'm going to ask, if you're

18 talking about James Holloway, just say "James" or

19 "James Holloway," and for Lane, you could just say "Lane" or

20 "Lane Holloway," because we will be talking about both.

21 A.  Okay.

22 Q.  You mentioned a fair number of significant payments that

23 Mr. Perardi made to Mr. Youngblood through Mr. Holloway in July

24 of '22, but those payments continued beyond July of 2022,

25 correct?

1   A.   Yes.

2   Q.   In approximately October of '22, Mr. Perardi tells

3   Mr. Youngblood, Listen, I've given you all the money I can?

4   A.   Yes.

5   Q.   What is -- what happens then between the two of them?

6   A.   Mr. Youngblood expresses that they need to find more money

7   and asks Perardi -- Mr. Perardi if there's any way he can find

8   more money.  He asks him to ask others for more money.  So

9   Mr. Perardi starts reaching out to family and friends for help.

10  Q.   And in some cases, at least, do those family and friends

11  make additional payments to Mr. Youngblood to help out

12  Mr. Perardi?

13  A.   Yes, they do.

14  Q.   Believing that Mr. Perardi's family was in danger?

15  A.   Yes.  Or they spoke with Mr. Youngblood and heard that

16  danger themselves.

17  Q.   So, in some cases, they met personally with

18  Mr. Youngblood, and he told them the same story he told

19  Mr. Perardi?

20  A.   Yes, sir.

21  Q.   Jumping forward -- well, approximately, just while we're

22  talking about it, how much money -- just with Mr. Perardi and

23  his associates, approximately how much money did they give to

24  Mr. Youngblood?

25  A.   Approximately $900,000.

1          THE COURT:  From when to when?

2          THE WITNESS:  So that first made payment was

3   approximately July of 2022, and Mr. Perardi came to the FBI in

4   April of '23.

5   Q.   Somewhere around that same time, April of '23, during that

6   time span, did there start to be derogatory and defamatory

7   posts being made about him and others?

8   A.   Yes.  We saw hundreds of posts, tens -- a large number of

9   posts online made regarding Mr. Perardi and many of his

10  associates or family members.

11  Q.   You know, I know a lot of these were pretty graphic.  Can

12  you give a couple of examples to the Court of the sorts of

13  defamatory social media posts that were made about Mr. Perardi

14  and/or his associates?

15  A.   Yes, sir.  So one in the complaint mentions that --

16  alludes to Mr. Perardi and his flunkies hitting on underage

17  girls and offering them drugs for sexual favors.  Others

18  mention Mr. Perardi or his family's involvement in the cartel.

19  Made references to associates being either -- having homophobic

20  tendencies -- or homosexual tendencies, I apologize, or being a

21  pedophile in some way.  So a couple of different

22  *[unintelligible]*.  Sex addicts as well, I think.

23  Q.   Did Mr. Perardi and his family also receive threatening

24  phone calls?

25  A.   They did.

1  Q.   And can you describe, again, just the general nature of

2  those phone calls?

3  A.   Yeah.  The general nature was -- Mr. Perardi received some

4  calls saying, I -- You know, "I heard one of your friends was

5  attacked last night."  You know, "Ticktock.  You need to pay

6  money."

7  Q.   And that related to a story that Mr. Youngblood claimed

8  that acid had been thrown in his face?

9  A.   Yes, it did.

10 Q.   And it's not immediately obvious what his -- what is the

11 connection between defamatory posts and this fraud scheme.

12 What was Mr. Youngblood telling Mr. Perardi about these posts,

13 and what was Mr. Perardi's reaction to these posts?

14 A.   Mr. Youngblood was telling Mr. Perardi this was the

15 cartel's way of -- of increasing pressure on him.  Mr. Perardi

16 has expressed that he felt certainly threatened.  It certainly

17 increased his payment -- or expedited his payments when he

18 would see numerous posts about his business and his family.

19 Q.   And, because these posts aren't strictly about him --

20 they're about associates and his ex-wife and other folks -- did

21 that cause those people to turn to Mr. Perardi in sort of a

22 negative way?

23 A.   Yes.  I would say he suffered emotional and financial and

24 reputational turmoil from most of these posts.

25 Q.   So, based on Mr. Perardi's statements to you and your sort

1   of preliminary investigation involving speaking to witnesses,

2   getting records and whatnot, I want to jump to May 1st of 2023

3   and an undercover operation that was conducted by the FBI.

4               Can you describe the basic nature or the purpose of

5   that operation for the Court.

6   A.   The purpose of that operation was to confirm, you know,

7   Mr. Perardi's claims, that these -- Mr. Youngblood had made

8   these statements to him.  We introduced an undercover in the

9   same way that, since Mr. Perardi had been introducing others --

10  other individuals in his life, we introduced an undercover as

11  another individual in Mr. Perardi's life that could provide

12  money to help him out.

13  Q.   So this was another source of cash -- as far as

14  Mr. Youngblood knew --

15  A.   Yes.

16  Q.   -- another source of cash to protect Mr. Perardi's family?

17  A.   That was the nature of the undercover.

18  Q.   This meeting was recorded?

19  A.   Yes, it was.

20  Q.   There were a few preliminary phone calls that were also

21  recorded; is that correct?

22  A.   Yes.

23  Q.   This happened on May 1st, 2023, the undercover operation?

24  A.   Yes.

25  Q.   Where was the meeting between the folks involved?

1   A.    It was at the Carrabba's restaurant in Austin.

2   Q.    And who was present during this meeting?

3   A.    It was Mr. Youngblood, Mr. Perardi, and our undercover.

4   Q.    Nobody else was there during that meeting?

5   A.    That's correct.

6   Q.    Okay.  And, again, this was audio recorded?

7   A.    Yes, it was.  And observed by surveillance -- FBI

8   surveillance?

9   Q.    We'll talk about some specifics in a moment.  But

10  throughout this conversation, who's running the show?  Who is

11  doing the talking, and who is laying out the plan?

12  A.    Mr. Youngblood is completely controlling the conversation.

13  Q.    So we mentioned this earlier, but Mr. Perardi told you a

14  bunch of things that he claims Mr. Youngblood told him, many of

15  which were corroborated by this recording; is that correct?

16  A.    Yes.

17  Q.    What did Mr. Youngblood say to our undercover about his

18  military experience?

19  A.    He said that he had been in the military for over a

20  decade; that he had served in -- he was Special Forces

21  previously.

22  Q.    And what was Mr. Youngblood's ask of our undercover, and

23  what was the purported purpose of this ask?

24  A.    He asked our undercover for $76,000 to help pay -- or

25  protect Mr. Perardi and his family from the cartel.

1  Q.   He claimed to help pay off the debt?

2  A.   To pay off the debt that Mr. Perardi's family owed to the

3  cartel, which is the reason he was in danger.

4  Q.   Did Mr. Youngblood provide details of the alleged threat

5  against Mr. Perardi and his family?  Let me ask that a

6  different way.

7           Mr. Youngblood during this conversation, he names

8  names of cartel people?

9  A.   Yes.

10 Q.   He names dollar amounts.  He claims to have personal

11 knowledge of this threat, correct?

12 A.   Yes.

13 Q.   Where did he claim to get this personal information from?

14 A.   He claims that he has information from government sources.

15 He had recordings from the NSA that he had personally heard,

16 and he had -- and he knew that the Treasury Department had been

17 investigating this matter into -- I just don't want to

18 complicate the story, but Toyota Cedar Park comes into play

19 because it's a business owned by someone in Mr. Perardi's

20 extended family.  So he had -- he had said that it had been

21 money laundering, and he said that there were -- they had been

22 investigating that entity and Mr. Perardi's family.

23 Q.   Let me stop you there.  You mentioned the derogatory posts

24 earlier?

25 A.   Yes.

WILKINSON - DIRECT

1   Q.   Some of those were against Toyota Cedar Park?

2   A.   Yes.

3   Q.   And they were because, according to those posts, they were

4   involved in cartels and money laundering and so on?

5   A.   Yes.

6   Q.   The exact same story that Mr. Youngblood is telling our

7   undercover?

8   A.   Yes.

9   Q.   Okay.  Do you have any indication or suggestion that the

10  Treasury Department has been investigating Cedar Park of

11  Toyota?

12  A.   I do not.

13  Q.   So Mr. Youngblood says $76,000 will guarantee the safety

14  of Mr. Perardi's family?

15  A.   Yes.  He indicated that they were -- that his contacts

16  were waiting for Mr. Youngblood's own word to take the case

17  down, and that this $76,000 would ensure that that would

18  happen.

19  Q.   Okay.  So that's the extortion side.  Did Mr. Youngblood

20  pitch sort of an investment scheme to the undercover?

21  A.   He did.  He said that he had gold that, basically, if the

22  undercover gave the $76,000, he could expect to double his

23  money in a short amount of time and that he would be able to

24  split a quarter of the gold that Mr. Youngblood would be able

25  to access.

1  Q.   And Mr. Youngblood's story was through his unidentified

2  government contacts, this money would allow him to get gold out

3  of Mexico or some other South American or Central American

4  area, and it would be split between?

5  A.   Between himself, Mr. Perardi, our undercover, and then one

6  of the other individual Mr. Perardi had been associated with.

7  Q.   Okay.  We talked about this before.  But, again, in terms

8  of confirmation, did Mr. Youngblood offer our undercover

9  collateral?

10 A.   He did.

11 Q.   And what collateral did he offer our undercover?

12 A.   He offered him the Lou Gehrig bat.

13 Q.   And that was -- excuse me.  Were you done?

14 A.   He -- he offered -- he told him it was a million-dollar

15 bat, and it was Lou Gehrig's.

16 Q.   And this was the bat that he had previously told

17 Mr. Perardi had Lou Gehrig's DNA on it.

18       Did he also mention the Civil War era flag or

19 Confederate flag as collateral?

20 A.   I don't recall specifically to the undercover --

21 Q.   Okay.

22 A.   -- at this moment.  I have to refresh my memory.

23 Q.   At some point, at the conclusion of this meeting,

24 Mr. Youngblood takes Mr. Perardi and meets with James Holloway

25 and gets the Lou Gehrig bat, correct?

1  A.    Yes.

2  Q.    And that was given to Mr. Perardi and/or our undercover?

3  A.    Yes.

4  Q.    And that's now in FBI evidence?

5  A.    Yes, it is.

6  Q.    Okay.  We'll talk about that bat again here toward the

7  end, but I want to talk about some more things that

8  Mr. Youngblood said to our undercover.

9           What did Mr. Youngblood tell our undercover about his

10 son Eventine?

11 A.    He told him that he had been killed approximately six

12 months ago.

13 Q.    And what was the reason that Mr. -- that his son Eventine

14 had been murdered?

15 A.    That he had been involved in -- with the cartel and had

16 been murdered as a result.

17 Q.    That's the son who's sitting here in the courtroom now?

18 A.    Yes, sir.

19 Q.    Mr. Youngblood claimed to have paid a substantial portion

20 of his own money to pay off Mr. Perardi's drug debt -- or

21 Mr. Perardi's alleged family's alleged drug debt, correct?

22 A.    He did.  He told our undercover he paid over $4 million to

23 pay off Mr. Perardi's debt out of his own money.

24 Q.    Just out of kindness?

25 A.    Because he cared about Mr. Perardi.

1  Q.   Where did he say he got that money from?

2  A.   He said he liquidated his grandfather's estate to pay

3  that.

4  Q.   I want to talk a little bit about the Pretrial Services

5  report, some of the statements in there versus some of the

6  statements that Mr. Youngblood made to our undercover.

7          Mr. Youngblood told Pretrial Services that he was

8  born in Fairview Park, Ohio.  Is that consistent with what

9  Mr. Youngblood told our undercover.

10  A.   No.  He told our undercover he was born in Okinawa.

11  Q.   Mr. Youngblood told Pretrial Services that he had lived in

12  Ohio and California before moving to Texas.  And in terms of

13  international residency, he had only traveled outside the

14  United States to Mexico.  Is that consistent what he told the

15  undercover?

16  A.   No.  He told our undercover he lived in multiple places

17  overseas and in the United States.

18  Q.   Those places included, Moscow, Hong Kong, Johannesburg,

19  Sudan, Morocco?

20  A.   That sounds right.

21  Q.   While we're talking about it, what did he say about his --

22  Mr. Youngblood has told Pretrial Services that he -- his

23  parents are Dennis and Linda, which is correct.

24  A.   They are Dennis and Linda.

25  Q.   What did he tell the undercover about what happened to --

1  about his parents?

2  A.   He told the undercover that his parents had been killed, I

3  believe.

4  Q.   In a car accident some time ago?

5  A.   When he was -- yeah.  When he was younger.

6  Q.   Is that true?

7  A.   No.  They are alive today.

8  Q.   Have you --

9  A.   I spoke with them last week, at least.

10  Q.   What did Mr. Youngblood say about what his father did for

11  a living?

12  A.   He told our undercover his father was an FBI agent or

13  employee of some sort.

14  Q.   Based on your investigation, is that true?

15  A.   No.

16  Q.   Mr. Youngblood told the Pretrial Services officer he

17  obtained his high school and has a vocational license to teach

18  jujitsu.  Is that consistent with what he told the undercover?

19  A.   He told our undercover he had a master's in quantum

20  physics.

21  Q.   Mr. Youngblood told Pretrial Services that he's worked for

22  Athabasca Holdings as a professional poker player for the past

23  10 years.  Is that consistent with what Mr. Youngblood told our

24  undercover?

25  A.   Mr. Youngblood told our undercover that he puts on his

1  tax -- I'm sorry -- his tax forms that he works for Athabasca

2  Holdings, but that that was a lie.

3  Q.   His claim to the undercover was he worked for some unnamed

4  government entity?

5  A.   Yes.  That he government contracted in a way.

6  Q.   Okay.  That's all recorded, correct?  All those

7  statements?

8  A.   Yes.

9  Q.   What was the plan?  So Mr. Youngblood tells the

10  undercover, Give me 76 grand.  I'll protect Mr. Perardi.

11  You'll also get a bunch of money back, including a quarter of

12  some gold I'm going to smuggle into the United States.

13          How do they leave it in terms of what the undercover

14  is going to do?

15  A.   The plan is that the undercover will bring the $76,000 in

16  cash the following day to Mr. Youngblood.

17  Q.   Directly to Mr. Youngblood?

18  A.   Yes, sir.

19  Q.   Mr. Youngblood claims he has to get on a plane to go meet

20  his people, and he needs that money the next morning?

21  A.   Yes.

22  Q.   So the next morning -- well, let me say the undercover and

23  Mr. Youngblood make -- set up a location to meet?

24  A.   Yes.

25  Q.   The next day you set up surveillance at that location?

 1  A.    Yes.

 2  Q.    Who is present at that location?

 3  A.    Mr. Youngblood and Marvin Connect.

 4  Q.    Just the two of them, as far as you saw?

 5  A.    Yes.

 6  Q.    Obviously, the undercover does not show up and give

 7  $76,000 to Mr. Youngblood, correct?

 8  A.    That's correct.

 9  Q.    The undercover makes an excuse, and that's the end of

10  that?

11  A.    And does not appear.

12  Q.    Okay.  That's a summary of the -- Mr. Youngblood's scheme

13  against Mr. Perardi and his associates?

14  A.    Yes.

15  Q.    Is that fair to say?

16  A.    Yes.

17  Q.    Only a summary --

18  A.    Yes.

19  Q.    -- but I do want to turn to what we referred to a few

20  times, which is Mr. Perardi's *[sic]* scheme against other

21  victims.

22  A.    Yes.

23  Q.    What was the approximate -- based on your investigation,

24  what are the approximate dates that you have identified that

25  Mr. Youngblood has engaged in one or more fraud schemes against

1    one or more people?

2    A.    As far back as 2010 to present day in 2023.

3    Q.    And, again, I think we've referred to this, but the MO --

4    Mr. Youngblood's MO is essentially the same: some combination

5    of either investment scheme and/or extortion involving the

6    cartel or some other threat, claims of prior military

7    service --

8    A.    Yes.

9    Q.    -- use of third parties and victims as sort of runners for

10   him --

11   A.    Yes.

12   Q.    -- use of collateral, use of defamatory publications.  All

13   of those things are present in some combination in all of these

14   schemes?

15   A.    Most -- I would say not present in every single one of

16   those, but, yes, they are -- we've seen them throughout.

17   Q.    Let me ask you, then -- let's start with the investment

18   prong.  Can you give the Court some idea -- again, there's a

19   lot of potential schemes here.  I don't want you to go through

20   all of them -- some examples of purported investments that

21   Mr. Youngblood has peddled to various people over the years.

22   A.    They typically involved sports memorabilia, such as the

23   baseball bats.  We've heard about ones from Babe Ruth,

24   Lou Gehrig, Mickey Mantle, and others.  Also Star Wars

25   memorabilia, famous artwork.  I think Rembrandt's been

1   mentioned.  And also other collectable items.  Gold -- gold

2   coins often came up.

3   Q.    In terms of claims of prior military service,

4   Mr. Youngblood made this claim to multiple people?

5   A.    Multiple people.  Purported to be Delta Force, Special --

6   Special Forces of different kinds, Army, 82nd Airborne.

7   Q.    Did he tell his father that he was in the military?

8   A.    He did.  He told his father that he was a Marine.

9   Q.    And what did his father say?

10  A.    His father was actually a Marine and said he believed it

11  would be a lie and kind of called him out on it or had some

12  kind of confrontation about it.

13  Q.    And, in fact, it was a lie, correct?

14  A.    Yes.  Yes.

15  Q.    And in terms of third parties or victims to facilitate his

16  schemes, we've already talked about James Holloway who, in

17  fairness, he gave money to Mr. Youngblood under false

18  pretenses.  He also did acts in furtherance of this scheme,

19  correct?

20  A.    Yes.

21  Q.    His categorization as either a victim or a suspect or

22  whatever is something that's not been finally determined at

23  this time, correct?

24  A.    The investigation is ongoing.

25  Q.    Right.  But are there other examples that you can think

 1  of, of third parties that were used in furtherance of any of

 2  these schemes?

 3  A.   Yes.  I think I mentioned Lane Holloway was directed by

 4  Mr. Youngblood to create a lot of these social -- or these

 5  social media posts.  And his family placed these threatening

 6  phone calls which furthered the scheme.

 7  Q.   Yeah.  We'll talk about that more in a minute.  Let's talk

 8  about the -- the one of the -- there's a victim that goes back

 9  to 2010 who paid a large amount of money to Mr. Youngblood over

10  the years, correct?

11  A.   Yes, sir.

12  Q.   I don't want you to use this person's name, but can you

13  describe in high level detail when this scheme started, what

14  the basic nature of the scheme was, and how much money this

15  person gave to Mr. Youngblood over the years.

16  A.   The basic nature of the scheme was similar, that it

17  involved investment and extortion.  He was -- he's an

18  individual out in Mr. Youngblood's former area of California

19  that he knew, and he gave approximately $5 million to

20  Mr. Youngblood.

21  Q.   Starting in about 2010?

22  A.   Starting in about 2010, I believe, continuing to about

23  2017, approximately.

24  Q.   And a large portion of that time, if not the entire time,

25  predates Mr. Youngblood's having met Mr. Holloway, correct?

1  A.  Yes.

2  Q.  In terms of use of collateral, how many -- how many famous

3  baseball player bats do we have in FBI evidence right now?

4  A.  We have four bats.

5  Q.  Did you hear this story multiple times from multiple

6  victims about purported extremely valuable bats offered as

7  collateral by Mr. Youngblood?

8  A.  Yes, we did.

9  Q.  In terms of defamatory publications, could you -- we've

10 talked about some of these, the posts on social media.  Were

11 there other examples through other schemes of other defamatory

12 posts of a similar nature?

13 A.  Yes.  So he also directed Lane Holloway to spread flyers

14 around the neighborhood, which these were kind of negative,

15 nasty, defamatory flyers, as well as to write emails to Toyota

16 Cedar Park -- or I'm sorry -- to Cedar Park based on kind of

17 these same similar defamatory comments.

18 Q.  Can you describe -- I mean, you've talked to a lot of

19 these victims.  They've told you some of the impacts these

20 posts have had on them, correct?

21 A.  Yes.

22 Q.  With respect to Cedar Park in particular or any other

23 entity or person, can you describe at a high level for the

24 Court the impact that these posts and flyers had on them?

25 A.  It seemed to have reputational damages, certainly for all

1    of the businesses involved.  Toyota of Cedar Park had to hire

2    security, were concerned for their employees, have expensed a

3    lot.  And other businesses and individuals involved seem to

4    suffer emotionally and possibly financially as well.

5    Q.   You mentioned the sort of investigation is ongoing.  But

6    approximate for me, if you would, or for the Court how many

7    victims -- individual victims or entities have you identified

8    over the course of this investigation so far?

9    A.   Over twenty victims.

10   Q.   I want to talk about sort of the class -- sort of the

11   types of people that Mr. Youngblood likes to target.  Did you

12   find in your investigation that he sometimes targets social

13   friends?

14   A.   He did.  He targeted a number of individuals from his

15   son's hockey team.

16   Q.   Including Mr. Perardi?

17   A.   Including Mr. Perardi and others.

18   Q.   Did you find that he also would target friends of friends,

19   sort of the greater friend network?

20   A.   He would.  He seemed to have -- he had a couple of

21   different avenues to find friends of friends.

22   Q.   And one of those examples, the -- some folks that knew

23   Mr. James Holloway through his clock business?

24   A.   Yes.

25   Q.   Also Mr. Youngblood would defraud and attempt to defraud

1  random people?

2  A.    Yes.

3  Q.    Could you give some examples to the Court?

4  A.    Yes.  Some examples is the woman that he knew from

5  doing -- going to estate sales.  He also went to a golf course,

6  so the owners or managers of the golf course.  Also an

7  individual he met on an airplane, the man he bought fish from

8  for his aquarium, and the bartender at the golf course as well.

9  Q.    Okay.  I want to talk about a couple of those.  Let's talk

10  about the man he met on the airplane.

11  A.    Yes.

12  Q.    Again, not using this individual's name, but how did --

13  how did this person remember Youngblood?  How did this person

14  know Mr. Youngblood?

15  A.    The individual said that they traveled to Las Vegas for

16  work frequently and would frequently see Mr. Youngblood on the

17  flight to Vegas from Austin.

18  Q.    At some point they sat next to each other on the plane,

19  correct?

20  A.    Yes.  Yes.

21  Q.    What did this person describe as their interaction?

22  A.    He described that Mr. Youngblood told him that he goes out

23  to Vegas routinely for work because he trains -- he's a -- he

24  works for the military -- or he in some way trains helicopter

25  pilots out in Vegas, and that he also has to go so often to pay

1  off debt to the cartel that his eldest son had created.

2  Q.   Did he make any statements about whether or not he

3  gambled?

4  A.   He said -- he told this individual he never gambled.

5  Q.   Never gambled.  This is the person who ultimately never

6  game -- as far as we know, never gave money to Mr. Youngblood?

7  A.   He did not.  Mr. Youngblood asked him to give money, and

8  the individual declined to do so.

9  Q.   I do want to mention briefly the folks at that golf course

10 your mentioned.  Can you tell the judge, were you there at the

11 golf course when you --

12 A.   Yes.

13 Q.   Can you tell the judge what happened when you went to the

14 golf course?

15 A.   So when I went to the golf course, I introduced myself as

16 a special agent and asked to speak to a manager.  And the

17 individual said, Are you here about Kota?

18 Q.   You hadn't mentioned Mr. Youngblood's name?

19 A.   I hadn't mentioned anything.  I just introduced myself and

20 my title.

21 Q.   Their reaction when they learned that you were law

22 enforcement was, "Are you here about Kota?"

23 A.   Was out of all their players and members, "Are you here

24 about Kota?"

25 Q.   You said you talked to a couple of folks at the golf

WILKINSON - DIRECT                                    38

1  course, including golf buddies; is that correct?

2  A.    Yes.

3  Q.    What did Mr. Youngblood tell these folks about -- well,

4  jumping ahead a little bit, at some point we execute a search

5  warrant at Mr. Youngblood's house, correct?

6  A.    We do.

7  Q.    Later he tells a story to some of his golf buddies about

8  what that was about, right?

9  A.    Yes.  He tells certainly the bartender at the golf course

10 that the reason the FBI executed a search warrant on his house

11 was that his -- the individual Marvin Connect had previously

12 lived with him, and that Marvin had done everything wrong, the

13 FBI was looking into Marvin, and that he was -- Mr. Youngblood

14 was completely innocent.  He in fact asked her to spread far

15 and wide throughout the club to make sure everyone knew he

16 didn't do anything; that Marvin was the individual --

17 Mr. Connect.

18          THE COURT:  Which club?

19          THE WITNESS:  Excuse me?

20          THE COURT:  Which club.

21          THE WITNESS:  I apologize.  I'm drawing a blank.

22 Q.    (BY MR. HARDING) Whereabouts is it?

23 A.    It's near his residence in Manor.

24 Q.    Okay.

25 A.    I just can't remember the -- Shadow Glen, possibly, Golf

1  Course?

2  Q.    Sure.

3  A.    If it's sounding right.

4  Q.    We mentioned James Holloway several times.  And, like I

5  said, he -- or we have talked about he's given money to

6  Mr. Youngblood.  He's taken acts in furtherance of the scheme

7  at the behest of Mr. Youngblood.  Can you describe what you

8  know of the relationship between Mr. James Holloway and

9  Mr. Youngblood?

10 A.    They -- Mr. -- or so James Holloway seemed to have met him

11 under some sort of business interaction dealing with clocks.

12 And from that Mr. Youngblood started asking him if he'd like to

13 make investments.  And so, in Mr. James Holloway's case, it

14 started with investments and helping to sell or interact with

15 the collateral, since Mr. James Holloway had experience in

16 antiques and clocks.

17 Q.    At some point does Mr. Youngblood ask Mr. Holloway --

18 Mr. James Holloway for a loan to pay for a certain expense?

19 A.    Yes.  He asked him for a $20,000 loan, I believe, to pay

20 for his sister's funeral.

21 Q.    Is Mr. Youngblood's sister dead?

22 A.    No, she's not.

23 Q.    Once, after that loan was requested, could you -- again,

24 fair to say that Mr. Youngblood tells a lot of things to a lot

25 of people, and the stories change over time?

1  A.   Yes.  And most of our victims reported intricate,

2  complicated stories that are difficult to follow.

3  Q.   Can you summarize the best you can sort of the basic

4  nature of the lies Mr. Youngblood told Mr. Holloway?

5  A.   Mr. Holloway had been told, after some of the investment

6  regarding the extortion claims, that his family was -- his son,

7  Lane Holloway, was in danger from the cartel.  That they had

8  been -- had been having some kind of dealings with the cartel,

9  and now his family at one point was kidnapped.  The --

10  Lane Holloway's family.  That his daughters were possibly --

11  one was going to be sold, I believe, to the cartel or to pay

12  off a debt to the cartel.  And then at some point they had been

13  murdered by the cartel.

14  Q.   So Mr. Youngblood at some point along the way tells

15  Mr. James Holloway your son, Lane Holloway, and their family --

16  his family are dead?

17  A.   Yes.

18  Q.   Murdered by the cartel?

19  A.   Yes.

20  Q.   Is that true?

21  A.   No, it's not.

22  Q.   Is Mr. Lane Holloway sitting here in the courtroom?

23  A.   He is sitting here in the courtroom.

24  Q.   Over the course of the scheme that you identified

25  involving Mr. James Holloway, approximately how much money did

1  Mr. James Holloway pay to Mr. Youngblood?

2  A.    Approximately over $2 million.

3  Q.    At some point along the way just, like with Mr. Perardi,

4  Mr. Youngblood -- Mr. James Holloway runs out of money,

5  correct?

6  A.    Yes.

7  Q.    And what -- when Mr. James Holloway tells Mr. Youngblood

8  I'm out of money, what does Mr. Youngblood say?

9  A.    He suggests he finds other individuals.  At some point he

10 suggests that he sell his home to get some finances out of it.

11 Q.    And does Mr. James Holloway find other individuals to give

12 money to Mr. Youngblood?

13 A.    Yes, he does.

14 Q.    Does he in fact sell his home so he can give money to

15 Mr. Youngblood?

16 A.    He does.

17 Q.    Let's talk about Lane Holloway, the son of James Holloway.

18        You've identified Mr. Lane Holloway as also a person

19 who has been victimized by Mr. Youngblood, correct?

20 A.    Yes.

21 Q.    Can you describe, again, at a general level as best you

22 can, what Mr. Youngblood told Mr. Lane Holloway to -- to

23 victimize him?

24 A.    Lane Holloway was told by Mr. Youngblood that Lane's

25 wife's family had connections to the cartel.  They were of

1  Hispanic descent and that individuals in their family were

2  involved with the cartel.  And, as a result him, him and his

3  family were in grave danger, including his daughters.

4  Q.   I want to stop you right there.  The story that

5  Mr. Youngblood tells to Lane Holloway is an almost

6  word-for-word repeat of what he tells Eric Perardi about his

7  threat from the cartel, correct?

8  A.   It's extremely similar.

9  Q.   Well, based on this information, what does Lane Holloway

10 do?

11 A.   Lane Holloway at some point decides to flee his home in

12 the middle of the night.

13 Q.   And why is that?

14 A.   Because he was afraid, and he was directed by

15 Mr. Youngblood to leave.  Told he was in grave danger and

16 picked up and left.

17 Q.   Told Mr. -- Mr. Youngblood told Mr. Lane Holloway,

18 essentially, he was in imminent danger --

19 A.   In imminent danger and needed to --

20 Q.   -- of being killed by the cartel?

21 A.   -- get out of the house almost immediately.

22 Q.   And so what does Lane Holloway and his family do?

23 A.   They pick up and leave their house immediately.

24 Q.   I want to pause there.  Months pass before they come back

25 to Texas, correct.

1   A.   Yes, sir.

2   Q.   Have you been to that house?

3   A.   I have.

4   Q.   Could you describe for the Court the state of that house

5   and how it was left?

6   A.   The house appeared to me to be completely abandoned.

7   There were cobwebs, you know, cockroaches.  It looked like no

8   one had lived in it.  We didn't dare open the fridge for the

9   smell, but it clearly looked like it had been abandoned and

10  certainly shuttered up from within before that, as if someone

11  was afraid of the outside.

12  Q.   Not -- not consistent with an orderly leaving of the house

13  on a vacation, for instance?

14  A.   Yes.

15  Q.   But more consistent with an immediate departure?

16  A.   Yes.

17  Q.   After Lane and his family leave town, what do they do --

18  A.   They --

19  Q.   -- to hide their identity?

20  A.   To hide their identity, they changed their names and ...

21  Q.   At some point after they changed their names -- well,

22  first why did they change their names?

23  A.   Mr. Youngblood told them they needed to change their names

24  for their safety, and he in fact encouraged Mr. Lane Holloway

25  to get a tattoo of this new name on himself to really prove

1   this new identity so that he couldn't be mistaken for his

2   former identity.

3   Q.   And does Lane get that tattoo?

4   A.   He does.

5   Q.   Ultimately, where do you find Lane Holloway and his

6   family?

7   A.   An FBI agent finds them in Florida.

8   Q.   And --

9   A.   In an extended stay hotel.

10  Q.   Okay.  Shortly after the FBI makes contact with

11  Mr. Lane Holloway and his family out in Florida, do we receive

12  contact from Mr. Youngblood or someone associated

13  Mr. Youngblood?

14  A.   We received contact from his attorney, Mark Chavez.

15  Q.   And what does Mark Chavez have to say about the situation?

16  A.   Mr. Chavez contacted the FBI saying his client told him he

17  had been harassed -- he had received many contacts from the FBI

18  and that Mr. Youngblood was in some way concerned about how

19  many contacts we had made of him.

20  Q.   How many contacts were supposed to have been made?

21  A.   We hadn't -- we hadn't reached out to Mr. Youngblood at

22  that point.

23  Q.   Okay.  So FBI agents find Lane Holloway in Florida.  The

24  same day or the next day, you get a call from Mr. Youngblood's

25  attorney?

1  A.   Yes.

2  Q.   And the claim is, at least as explained by the attorney,

3  your agents have been trying to reach Mr. Youngblood and he's

4  ready to talk, or something along those lines?

5  A.   Yes.

6  Q.   But, in fact, you had never made any attempt -- neither

7  you nor Florida had made any attempt to talk to Mr. Youngblood?

8  A.   We had not.  And we obviously didn't have a phone number

9  to reach out to, since he does not -- or has not carried a

10 phone.

11 Q.   Through his attorney, however, did FBI in Florida and FBI

12 in Austin offer to meet with Mr. Youngblood?

13 A.   We did.  And I believe this was over email communications,

14 but they offered a meeting in the Austin office between

15 Mr. Youngblood, his attorney, and the local Austin agents.

16 Q.   That never came to fruition?

17 A.   Never received a reply.

18 Q.   Did you have -- you've interviewed Mr. Holloway and his

19 wife?

20 A.   Yes.

21 Q.   Going back to the derogatory posts made against

22 Mr. Perardi and his associates, as well as the threatening

23 phone calls, were you able to determine who made those posts

24 and calls?

25 A.   We were.

1  Q.   And who did that?

2  A.   That was Mr. Lane Holloway, at Mr. Youngblood's direction.

3  Q.   Okay.  And, according to Mr. Lane Holloway, did -- did

4  Lane come up with the wording or ...

5  A.   Mr. Lane Holloway told us that Mr. Youngblood would

6  dictate this information over the phone.  He had numerous

7  handwritten notes that appeared to be jotted down by him.

8  Q.   These -- again, going back for preliminary hearing

9  purposes, these derogatory posts and threatening phone calls

10 were made while Mr. Lane Holloway and his family were in

11 Florida?

12 A.   Yes.

13 Q.   And so those would all be interstate communications, from

14 Florida to Texas, both the derogatory posts as well as the

15 phone calls?

16 A.   Yes.

17 Q.   And they were made in furtherance of the scheme --

18 A.   Yes.

19 Q.   -- as you described earlier, to force or raise the

20 pressure on Mr. Perardi to pay?

21 A.   Yes.

22 Q.   At this point, when you found Mr. Lane Holloway and his

23 family in Florida, what does James Holloway believe about Lane?

24 A.   He believed him to be dead.

25 Q.   Still?

1   A.    Yes.

2   Q.    What did you tell James Holloway?

3   A.    We told him that his son was alive.

4   Q.    What was his response to you?

5   A.    He didn't believe us and asked for proof.

6   Q.    And what proof did you give him?

7   A.    We put -- we let him overhear us speaking on the phone

8   with Lane Holloway and Mr. Holloway's wife -- Lane Holloway's

9   wife.

10  Q.    Now they have been reunited?

11  A.    They have.

12  Q.    On July 13th, 2023 we executed a search warrant at both

13  Mr. Youngblood's house and Mr. Holloway's house, as well as a

14  couple of other locations, correct?

15  A.    Yes.

16  Q.    I want to talk about the search warrant of

17  Mr. Youngblood's house.

18  A.    Okay.

19  Q.    First of all, when you approached the front door of

20  Mr. Youngblood's house, was there a note there?

21  A.    There was a sign on it saying "contact my attorney," and I

22  believe it had Mr. Chavez's contact information on it.

23  Q.    Okay.  I don't want to talk about everything you found in

24  the house, but did you find lots of items of what I'll call

25  collateral or items that seemed like they would be used by

1   Mr. Youngblood as collateral throughout the house?

2   A.   Yes.  There were a number of items like that.

3   Q.   And, consistent with the reports you'd received from the

4   various victims about the kinds of collateral that he would

5   offer?

6   A.   Yes.

7   Q.   Did you have an appraiser present to determine the value

8   of these objects?

9   A.   We did.  And they assessed that they are -- were not worth

10  anything of significant value.

11  Q.   Mr. Youngblood is present at the beginning of the search;

12  is that correct?

13  A.   He is.

14  Q.   He declines to make a statement to law enforcement at that

15  time?

16  A.   Yes.

17  Q.   At some point -- he's not detained, is he?

18  A.   No, he's not.

19  Q.   At some point he leaves the scene of the search warrant,

20  correct?

21  A.   Yes.  He was detained for the purpose of the law

22  enforcement clear and officer safety and then ...

23  Q.   Sure.  Other agents run into Mr. Youngblood later that

24  night, correct?

25  A.   Yes.

1  Q.   Or afternoon, I should say?

2  A.   Yes.

3  Q.   At some point --

4        The search warrant authorized the seizure of

5  electronic devices, including phones, correct?

6  A.   Yes.

7  Q.   -- you seized Gloria Youngblood's telephone?

8  A.   Yes.

9  Q.   At some point along the way, she asked to retrieve certain

10 contacts from the phone; is that correct?

11 A.   Yes.

12 Q.   And the first agent let her get a couple of contacts; is

13 that right?

14 A.   Yes.

15 Q.   And then told her you can't get any more?

16 A.   Yes.

17 Q.   She then asked a second agent and convinced that agent to

18 get additional contacts?

19 A.   I don't know if she asked, but the first agent had left,

20 so there was now another agent --

21 Q.   Sure.

22 A.   -- kind of watching over.

23 Q.   Somehow -- you weren't present.

24 A.   Yes.

25 Q.   Somehow she's getting access to her phone a second --

1  A.    Yes.

2  Q.    -- time to get additional contacts --

3  A.    For additional phone numbers.

4  Q.    -- out of the phone.

5        Were you able to identify at least most of the folks

6  that she was writing down the names of?

7  A.    Yeah.  I believe there were over 15 names.  It did include

8  the attorney and the accountant.  But it also included a number

9  of the victim names or others that we know have been involved

10  in the scheme.

11  Q.    Okay.  Did you find anything of significance in

12  Mr. Youngblood's safe?

13  A.    We found a note.  It was a printout of a kind of text

14  message and a timeline of events that Mr. Perardi has -- has

15  said that was written by him, and it more or less shows a

16  timeline of Mr. Perardi's entire -- the scheme that he's kind

17  of suffered from, what his experience has been, and things told

18  to him by Mr. Youngblood.  Also how much he's paid

19  Mr. Youngblood over time.

20  Q.    So, essentially, the story.  He's saying I'm giving you

21  this money for this, you've told me this.  That kind of thing?

22  A.    Yes.

23  Q.    Does that -- is it consistent -- is that document

24  consistent with -- in general, consistent with the things that

25  you've learned throughout your investigation --

1  A.   Yes.

2  Q.   -- regarding the reasons Mr. Perardi paid, the times he

3  paid, the amounts he paid?

4  A.   It was.

5  Q.   Mr. -- excuse me.  Gloria Youngblood told Pretrial

6  Services that in the house she possesses a 9-millimeter pistol

7  and .45 caliber pistol.  Is that consistent with what you found

8  during the search warrant?

9  A.   On the date of the search warrant, we found at least five

10 guns in the home.

11 Q.   Okay.  And those were not seized.  Those were returned

12 back to the Youngbloods?

13 A.   That's correct.  They were photographed in place.

14 Q.   While we're talking about guns and guns that were perhaps

15 not listed, did you -- did you have a chance to talk to another

16 individual about another firearm that Mr. Youngblood supposedly

17 gave to him?

18 A.   Yes.  The individual said that, at some point after the

19 search warrant, Mr. Youngblood came to his house, they had a

20 conversation, and Mr. Youngblood said, You'll find a Glock in

21 your pond outside.

22 Q.   And did that individual --

23 A.   He then looked for the Glock in the pond and did retrieve

24 a Glock from his pond.  This was reported by the individual.

25 Q.   Has that been turned over to FBI?

1  A.   Not yet.

2  Q.   Okay.

3  A.   We've receive the serial number and a photograph.

4  Q.   But having received the serial number, do you know whether

5  or not it was one of the firearms that was found in

6  Mr. Youngblood's house?

7  A.   It did not match the same serials.

8  Q.   Okay.  I want to turn then to Mr. Holloway's house, the

9  search warrant there.

10          Did Mr. Holloway have records of victim payments and

11  things of that nature?

12 A.   Yes.  He had a number of ledgers.

13 Q.   And you said you've identified over 20 victims in this

14 case.

15 A.   Yes.

16 Q.   Did all of the victims give money through Mr. Holloway?

17 A.   No.

18 Q.   Approximately how many would you say gave money through

19 Mr. Holloway?

20 A.   Offhand, maybe half.

21 Q.   Okay.

22 A.   A good -- some portion of them.

23 Q.   Did you find an interesting note written in Mr. Holloway's

24 wife's purse?

25 A.   Yes.  There was a note that more or less, "If the police

1  come, here's what you should tell them," and had a narrative

2  about it.

3  Q.   And -- what was the substance or the general substance of

4  what should be told to police?

5  A.   That they don't know Mr. Youngblood; they have no

6  involvement in it; that they -- I believe it said don't speak

7  with their children and don't have relationship with them.  So,

8  basically, they don't know anything.

9  Q.   According to Mr. and Mrs. Holloway, where did that note

10  come from?

11  A.   They said that Mr. Youngblood had told them this and that

12  Mr. Holloway -- Mr. James Holloway had written this down to

13  help them remember --

14  Q.   Okay.

15  A.   -- the narrative.

16  Q.   Okay.  So you mentioned that Mr. Youngblood leaves about

17  an hour into the search warrant.  That was conducted in the

18  morning hours; is that correct?

19  A.   Yes.

20  Q.   And it went through probably a good portion of the day?

21  A.   Yes.

22  Q.   So I'm going to jump to approximately 3:30 p.m. that

23  afternoon.  Does an event of significance occur at

24  James Holloway's home?

25  A.   Yes.  One of our agents just happened to have left a

 1  little after everyone else and saw Mr. Youngblood driving up to

 2  the residence.  He at that time called a supervisor who was

 3  right in the area and asked him to come back and assist him in

 4  this interaction.

 5  Q.   Was Mr. Youngblood by himself when he visited

 6  Mr. James Holloway's home?

 7  A.   No, he was not.  He had two individuals with him.

 8  Q.   What did the other agent and the supervisor believe was

 9  about to happen?

10  A.   They believed that Mr. Youngblood and the two individuals,

11  based on the totality and the appearance of the situation, were

12  there to intimidate Mr. Holloway.

13  Q.   And I don't want you to say anyone's name, but one of the

14  individuals who was there that day is sitting in the back of

15  the courtroom right now, correct?

16  A.   Yes.

17  Q.   Again, I'm not going to identify beyond saying whitish

18  hair towards the far left, a large man.

19  A.   Yes.

20  Q.   The other individual's also here in the courtroom as well,

21  correct?

22  A.   Yes.

23  Q.   And that second individual was armed with a pistol?

24  A.   Yes.

25  Q.   A legally carried pistol?

1  A.    Yes.

2  Q.    This person is, I believe and correct me if I'm wrong,

3  ex-military -- excuse me -- ex-law enforcement, maybe?

4  A.    Yes.  He had --

5  Q.    Okay.

6  A.    Yes.

7  Q.    But legally carrying a pistol?

8  A.    Yes.

9  Q.    Did you speak to both of those individuals who are with

10 Mr. Youngblood and ask them, What are you doing here?

11 A.    So the agent and the supervisory agent apparently split

12 them up and talked to them individually.  Asked Mr. Youngblood

13 to wait in his car while they talked to each individual.

14 Q.    And what did one individual say about the purpose of the

15 visit?

16 A.    One of the individuals said that they were there because

17 they were going to pick up -- or to go meet, I'm sorry, a woman

18 later that day.

19 Q.    This is the person who has been identified as a female

20 victim?

21 A.    Yes.

22 Q.    We'll just refer to her as the "female victim," I guess?

23 A.    Yes.  Yep.

24 Q.    He said they're going to visit this female victim for what

25 purpose?

1  A.    To pick up money from her.

2  Q.    This is not a person who lives with James Holloway?

3  A.    No.

4  Q.    When the scene is over with and everybody is let off on

5  their way, do you have information about the conversation that

6  occurred between the three people, Mr. Youngblood and the two

7  men, in the car afterwards?

8  A.    Yes.  One of the individuals told -- told us that

9  Mr. Youngblood was extremely upset that the individual had told

10  the FBI about the female victim.

11  Q.    So that was -- story one is we're going to the female

12  victim's house to pick up money?

13  A.    Yes.

14  Q.    And when Mr. Youngblood was told that's what he told the

15  FBI, he was upset?

16  A.    I don't believe it was at her house, but they were going

17  to meet her in some fashion.

18  Q.    Sure.  What did the other guy say?

19  A.    The other guy said that he was there as a -- to -- as a

20  favor to Mr. Youngblood, just to go to Mr. Holloway's house.

21  It later came out that, because he had previous law enforcement

22  experience, Mr. Youngblood asked him to look over the search

23  warrant at his own home and then asked him to look over the

24  search warrant at Mr. Holloway's home -- Mr. James Holloway's

25  home.

1  Q.   So his story is we're here to review search warrants?

2  A.   Yes.

3  Q.   And, again, this is what -- this is what's told to him by

4  Mr. Youngblood?

5  A.   Yes.  Yes.

6  Q.   You also spoke to Mr. Youngblood at a later date about the

7  purpose of that visit.  What did Mr. Youngblood tell you the

8  purpose of that visit was?

9  A.   Mr. Youngblood told us he was at James Holloway's home to

10 get back property Mr. James Holloway had stolen from him, and

11 the keys to his car and access to his home.

12 Q.   Both of those men who are with Mr. Youngblood, you've

13 identified these folks as people who have given money to

14 Mr. Youngblood, at least in some cases, under false pretenses?

15 A.   Yes.

16 Q.   Is that again consistent with Mr. Youngblood using these

17 folks in furtherance of his scheme?

18 A.   Yes.

19 Q.   And also victimizing them?

20 A.   Yes, it is.

21 Q.   What do you believe, based on the totality of the

22 circumstances, that Mr. Youngblood intended to do with or to

23 Mr. Holloway regarding that visit?

24 A.   I believe they were there to intimidate them, based on my

25 conversations with the other agents.

1  Q.   After that meeting -- so the three men are allowed to

2  leave, correct?

3  A.   Yes.

4  Q.   After that meeting, do you and other agents go speak to

5  that female victim?

6  A.   Yes.

7  Q.   And what does that female victim tell you about her

8  relationship with Mr. Youngblood and what she was going to do

9  that day?

10 A.   She had previously given Mr. Youngblood money.  She

11 believed Mr. Youngblood to be J. Holloway's son in some

12 capacity.  And that day she was going to give him additional

13 money.

14 Q.   And for what purpose?  An investment or ...

15 A.   She would -- she was -- she would receive in return

16 collateral, but she was just trying to help them in a

17 situation.  And I don't remember the context of that situation

18 at this moment.

19 Q.   Was it -- was she offered a samurai sword as some

20 collateral?

21 A.   Oh, he was.  That was part of the collateral, that she

22 would receive the samurai sword as well as a property

23 Mr. Youngblood owned.

24 Q.   And throughout this relationship, she had given money on

25 the basis of purported investments?

1  A.   Yes.

2  Q.   So after the execution of the search warrant, according to

3  at least one of those gentlemen and according to the female

4  victim, Mr. Youngblood was going to go to her house and pick up

5  over $20,000 related to some, as far as we know --

6  A.   He was going to meet up with her -- he was going to meet

7  up with her to --

8  Q.   Get money from her?

9  A.   -- get additional money.

10  Q.   Have other victims in this case -- and by the way, we've

11  mentioned over 20 victims.  Are a portion of them --

12  A.   Yes.

13  Q.   -- sitting here in the courtroom today?

14  A.   Yes.

15  Q.   Have you had a chance to speak to some of these folks and

16  maybe most of these folks?

17  A.   Yes.

18  Q.   Have they expressed concern about retaliation by

19  Mr. Youngblood or attempted witness tampering by Mr. Youngblood

20  if he's released on bond?

21  A.   A number of them directly contacted me expressing this

22  concern.  Mr. Youngblood they told me were -- was intimately

23  familiar with their lives, knew where they lived or maybe

24  intertwined with their children and through his children, and

25  were concerned of fear and retaliation -- or of retaliation.

1  Q.   Let's turn to the arrest of Mr. Youngblood.  At some point

2  we get a criminal complaint.  A couple of weeks ago we arrest

3  him at the airport, correct?

4  A.   Yes.

5  Q.   Where was Mr. Youngblood traveling or intending to travel

6  when you arrested him?

7  A.   To Las Vegas.

8  Q.   And what was he -- what -- how much cash did he have on

9  him, approximately, when you arrested him?

10  A.   A little over $18,000.

11  Q.   What did Mr. Youngblood tell you the source of that money

12  was?

13  A.   He told us it was from winning a lottery -- or I'm

14  sorry -- a gambling jackpot this year?

15  Q.   Okay.  We'll come back to that.  I'm sorry.  He claimed it

16  was from a jackpot from a casino?

17  A.   Yes.  From a casino winning.

18  Q.   And was the ARIA Casino?

19  A.   I don't know that he specifically said which casino --

20  Q.   Okay.

21  A.   -- but he claimed he won a jackpot, and he did present a

22  laminated card with the jackpot winnings.

23  Q.   Okay.  Have you had a chance to try to run down the actual

24  source of those funds?

25  A.   Yes.

1  Q.   And can you -- first can you describe, based on your

2  investigation, where you believe that money came from?

3  A.   Yeah.  Between the search warrant and right before the

4  arrest, I've identified that a thousand of it came from one

5  identified victim, about 12,000 of it came from another

6  individual that took out a loan for Mr. Youngblood and gave him

7  the cash.

8  Q.   And that individual is Marvin Connect?

9  A.   Yes.

10 Q.   The person that he wants everyone at the golf club to

11 believe is the reason for the search warrant executed at his

12 house?

13 A.   Yes.

14 Q.   And then how about --

15 A.   And the last -- and then there was another 6,000 that he

16 facilitated selling an antique clock and some kind of antique

17 desk for about $6,000.

18 Q.   All right.  Let's talk about the victim that you

19 identified who gave him $1,000.  What did Mr. Youngblood tell

20 this victim the money was for?

21 A.   He told the victim that he would be traveling to Montreal.

22 The victim had already given over $200,000 to Mr. Youngblood

23 over time.  Mr. Youngblood said that he needed this -- this

24 money because he was going to be traveling to Montreal, and

25 that he would in some way return with a huge flush of cash,

 1  millions of dollars, so that everything could be repaid.

 2  Q.   And he said he would be flying out that Sunday?

 3  A.   Yes.

 4  Q.   Was -- did you arrest him on a Sunday?

 5  A.   We did.

 6  Q.   Was Mr. Youngblood flying to Montreal?

 7  A.   He was flying to Las Vegas.

 8  Q.   Since Mr. Youngblood mentioned his gambling and told you

 9  the 18,000 in his wallet came from a jackpot he won, and you

10  mentioned he had sort of laminated card about a $300,000

11  jackpot he'd won from a casino --

12  A.   Yes.

13  Q.   -- you retained records from that casino, correct?

14  A.   Yes.

15  Q.   And, in fairness to Mr. Youngblood, he did win about

16  $200,000 in gambling in May of 2023 from that Casino, correct?

17  A.   He did.

18  Q.   But May of '23 was the only month in 2023 that he made --

19  that he made a profit from that casino, correct?

20  A.   Yes.

21  Q.   So that was May of '23.  In June of '23 he lost $280,000

22  at that casino?

23  A.   That's correct.  According to their records.

24  Q.   According to the records and the conversation that was had

25  with casino personnel?

1   A.   Yes.

2   Q.   He lost over $93,000 in July from that same casino?

3   A.   Yes.

4   Q.   And in the year of 2023, all told, from that one casino he

5   has lost, net, over $700,000?

6   A.   Yes.

7   Q.   He also lost about $150,000 from that casino in 2022,

8   correct?

9   A.   Yes.

10  Q.   Based on your investigation, did you -- have you

11  determined that Mr. -- Mr. Perardi -- excuse me --

12  Mr. Youngblood has claimed he makes 10- to 15-thousand dollars

13  as a professional poker player.  Has your investigation

14  uncovered any evidence that he makes that amount of money

15  playing poker or any other gambling?

16  A.   No, it has not.

17  Q.   All right.  I want to talk a little bit about -- again, go

18  back to Mr. Youngblood and his family.  You mentioned that

19  Dennis and Linda Schuler are Mr. Youngblood's biological

20  parents.  What did Mr. Youngblood tell his wife, Gloria, about

21  who Dennis and Linda Schuler were?

22  A.   That they were more or less adoptive parents because his

23  parents had died early in his life.

24  Q.   Did you hear a story about a conversation between Gloria

25  and Dennis Schuler?

1  A.   We did.  Mr. Dennis Schuler, Sr. reported that, at some

2  point, Gloria had asked if it was okay if she called him "dad"

3  even though he wasn't Mr. Youngblood's biological dad, and

4  Mr. Schuler, Sr. reported, What do you mean?  I am his

5  biological father.  And of course you could.

6  Q.   What did Mr. Youngblood tell his son Eventine about his

7  biological father?

8  A.   That he had died a long time ago, probably before

9  Eventine had been born.

10  Q.   And what did Mr. Youngblood say that his father did for a

11  living?

12  A.   That he was an FBI agent.

13  Q.   Again, that's not true?

14  A.   No.

15  Q.   Did Mr. -- did Eventine know the Schulers?

16  A.   He did know the Schulers.  He just did not know them to be

17  biological grandparents.

18  Q.   You had a chance to speak to Mr. Dennis Schuler, Sr. about

19  Mr. Youngblood, correct?

20  A.   Yes.

21  Q.   What did Mr. Dennis Schuler, Sr. have to say about

22  Mr. Youngblood's character, essentially?

23  A.   He said that he had been a perpetual liar most of his

24  life.  That he had told so many lies that, in high school at

25  some point he took out credit cards in Mr. Dennis Schuler,

 1  Sr.'s name, over 10 credit cards, and I think took out a

 2  $20,000 debt.  He said that his -- the rest of his life has

 3  watched his credit reports out of fear that his -- his name and

 4  credit would be abused by Mr. Youngblood.

 5          He told his father that he, I think I mentioned, was

 6  in the Marines.  He also told him that at one point that he

 7  needed money because the Russian Mafia was after him and that

 8  his finger had been cut off by the Russian Mafia.

 9  Q.   When told that Mr. Youngblood had been charged with fraud,

10  was his father surprised?

11  A.   No.  He said he wasn't surprised that his son was charged.

12  Q.   I want to go back.  We talked about the Lou Gehrig bat a

13  couple of times, the supposedly million-dollar bat that has

14  Lou Gehrig's DNA on it that was offered to Mr. Perardi and our

15  undercover as collateral.

16          The way I understand your testimony and the evidence

17  in this case is that Mr. Youngblood is claiming this bat is

18  extraordinarily valuable because it has Lou Gehrig's DNA on it.

19          Can you describe for the Court how this was packaged

20  and stored as far as you are aware?

21  A.   The undercover -- the bat specifically was wrapped in

22  plastic, and a number of the other victims' bats were reported

23  to be wrapped in plastic.

24  Q.   You've had a chance to examine it yourself?

25  A.   Yes.

1   Q.   Appeared to be wrapped in some sort of plastic wrap?

2   A.   Yes.

3   Q.   Was it stored in any sort of refrigerated containment?

4   A.   Not that we've been told.

5   Q.   Based on your -- like, from the time you had it in your

6   custody --

7   A.   Nothing that I've seen.

8   Q.   Mr. Youngblood didn't have it in any sort of hermetically

9   sealed chamber?

10  A.   No.

11  Q.   Have you had a chance to talk to the folks at the DNA lab

12  about the likelihood that DNA would survive -- well, also let

13  me say, we've talked about this.  Lou Gehrig played in the

14  '30s, correct?

15  A.   Yes.

16  Q.   So let's just use 1940 as a date.  We're talking 80-plus

17  years.  Does the lab have an opinion, or did they give you any

18  insight, about how likely it is DNA would survive 80 years in

19  those conditions?

20  A.   My conversation with the lab, they told me it's highly

21  unlikely that DNA could survive on that surface.  They

22  described that wood was a difficult surface to keep DNA on in

23  the best of conditions, and that certainly plastic could

24  actually increase bacterial growth on a bat and would therefore

25  kind of contaminate any DNA on it.

1  Q.   So it stands to reason anybody who believes this bat is

2  valuable because of its DNA, that's not the way you'd store it?

3  You would store it in a more safe way?

4  A.   Oh.  Absolutely.

5  Q.   Were you able to personally make a determination about the

6  value of this bat?

7  A.   We opened the bat, and it is, in fact, an old wood bat.

8  Q.   And do you believe it's worth a million dollars?

9  A.   I do not.

10  Q.   Are you an expert in antiquities or sport memorabilia?

11  A.   I am not.

12  Q.   Tell the Court how you reached the conclusion this bat is

13  not worth a million dollars.

14  A.   It is an old bat, but stamped on it on the front says "All

15  Star Softball."

16           MR. HARDING:  We'll pass the witness, Judge.

17           THE COURT:  I want to give you as much time as you

18  need, so I think this is a good time to take a short break.

19  Let's take a 10-minute break.  If you don't mind, be back on

20  the witness stand so we can get going.

21           THE WITNESS:  Yes.

22           THE COURT:  I want to apologize to the group that is

23  here for the --

24      (Audio recording stops)

25      (Recess from 10:45 to 10:57 a.m.)

**CROSS-EXAMINATION**

**BY MS. HERRING:**

Q.   Agent, I'm not going to go into as much detail as you've
already gone through --

A.   Okay.

Q.   -- but I'll try to just signal the topics I want to talk
about --

A.   Yes, ma'am.

Q.   -- and just ask a few follow-up questions.

        So you said that your work on this case started in
April of this year?

A.   Yes, ma'am.

Q.   And that was when Eric Perardi came to the FBI to report
that he'd been the victim of, you said, an extortion and fraud
scheme?

A.   Yes.

Q.   And you described this as both an extortion scheme and an
investment scheme?

A.   In Mr. Perardi's case, specifically.

Q.   And, in your experience, this is sort of an unusual
scheme; is that fair?

A.   Yes.

Q.   Extortion -- generally, when you hear about someone with a
concern about extortion, it's they're being asked to pay money
to make a threat go away, right?

1  A.   I think that's fair to say.

2  Q.   That's what extortion is at its most basic, right?

3  A.   Yeah.

4  Q.   And here it sounds like, in your investigation, what

5  individuals believed was that they were being asked to continue

6  to pay money, but these threats never went away.

7  A.   New components of that threat continued to arise.

8  Q.   And in this case people were making payments for threats

9  to go away, but also many of them believed they would receive

10  returns on their investment?

11  A.   In some of the victims' situations, yes.

12  Q.   And many of the main victims, if you will, right?

13  A.   Yes.

14  Q.   Have you ever seen a scheme in which sort of collateral is

15  put up as an extortion payment?

16  A.   Personally, I have not.

17  Q.   In your work as an FBI agent, you've not seen a scheme

18  like this before?

19  A.   I have not.

20  Q.   If a -- if the cartel, just -- understanding that your

21  investigation did not reveal any real threats by a cartel, but

22  under sort of this structure of what people were being told in

23  this case, if the cartel is wanting money, why would they agree

24  that that money could be invested in collateral?

25  A.   I don't believe the money was to be invested in

1  collateral, but the collateral would serve as an object they

2  could keep to ensure that they would later receive the -- the

3  windfall that they could expect in some victim cases.

4  Q.   If the money is going to a collateral --

5         In this case some kind of object, right?

6  A.   Uh-huh.

7  Q.   -- how is it going to the cartel?

8  A.   I believe the collateral was given after money of -- you

9  can rest assured that you will get money back because you're

10  holding this valuable item, if there is an issue.

11  Q.   So if you get threatened, you can also make a 30 percent

12  return on your investment?

13  A.   In the case of the undercover operation, he was told, I

14  think it was, a different number than 30 percent.  But it is --

15  he was told he'd double his money.  The undercover would.

16  Q.   And Mr. Perardi was told something like that as well,

17  although not 30 percent, but he would get money back --

18  A.   Yes.

19  Q.   -- right?

20         Is it unusual in your experience that individuals who

21  receive threats like this don't call any form of law

22  enforcement for a long time?

23  A.   I haven't had experience with a case with these factors.

24  Q.   In general, if someone is going to get -- has an immediate

25  threat, which in this case sounds like threats on the lives of

1  family members, it's pretty common that people call, whether

2  it's 911 or the FBI -- walk into the FBI, call the FBI, right?

3  A.  Yeah.  I would advise that if you felt in danger for your

4  life, imminently.

5  Q.  And I think you touched on briefly sort of the types of

6  people that were -- that you now consider to be victims in this

7  scheme, right?

8  A.  Yes, ma'am.

9  Q.  And many of those individuals are very financially well

10  off.  Is that fair?

11  A.  I think it's fair to say they were -- previously felt

12  financially secure or in retirement.

13  Q.  Many people owned their own businesses? ran businesses?

14  A.  Some of the -- a smaller handful owned or ran a business,

15  but many were retired.

16  Q.  Overall, an educated group of victims.  Is that fair?

17  A.  That's fair.

18  Q.  So is it unusual to you that, sort of, well-educated,

19  financially solvent people in Central Texas all think that they

20  would need to pay a fixer?

21  A.  Pay a what?  I'm sorry.

22  Q.  Some kind of fixer for a threat?

23  A.  I don't think I understand the term "fixer."

24  Q.  Well, paying off sort of a non-law enforcement official to

25  deal with a threat?

WILKINSON - CROSS

1 A.   I do think that the story is certainly bizarre and

2 intricate.

3 Q.   Hard to believe?

4 A.   Yes.

5 Q.   Right.  Did you find it hard to believe when you first

6 heard this?

7 A.   Especially with that first -- with only one victim

8 statement, yes.

9 Q.   What was your understanding as to why the individuals had

10 not sought police assistance?

11 A.   My understanding would be that Mr. Youngblood, you know,

12 in some way instructed them not to go to the police or directed

13 them that it would cause additional harm to their family.

14 Q.   Is that what victims have told you?

15 A.   I couldn't say what number of victims have represented

16 that, but at least on one occasion, when asked that.

17 Q.   For the other victims, you're just not sure why they

18 didn't go to the police?

19 A.   That's fair to say.

20 Q.   We're going to talk just briefly about -- you're calling

21 him the first victim, but that's Mr. Perardi, right?

22 A.   Yes.

23 Q.   Mr. Perardi is a very successful real estate developer in

24 Austin?

25 A.   Yes.

1  Q.   You've figured out he lives in a $1.5 million home, a

2  six-bedroom home?

3  A.   I don't know the extent of the home, but I know --

4  Q.   You have his address in your reports?

5  A.   Yes.

6  Q.   And he -- I think you learned through your investigation

7  his development company developed/created this

8  240,000-square-foot multi-retail, sports, and entertainment

9  facility in Cedar Park, The Crossover?

10 A.   The Crossover.

11 Q.   Right.  And he's worked on large medical office projects

12 in the Austin area?

13 A.   Yes, ma'am.  That's what Mr. Perardi reported to us.

14 Q.   And you have no reason not to believe that?

15 A.   I didn't look -- look into the financials of that company

16 for that purpose.

17 Q.   But you're aware -- I mean, this is his profile -- his

18 business has been responsible for raising over 60 million in

19 equity and over 170 million in debt financing for his projects?

20 A.   I haven't seen those numbers specifically that I can

21 recall offhand.  Is there a report that I could refresh my

22 memory from.

23 Q.   No.  Just in your -- I mean, you've met with Mr. Perardi

24 three times at least, right?

25 A.   Yes.  Yes.

1  Q.   So you're aware of what he does and what his business is?

2  A.   Yes.

3  Q.   So a very financially successful development firm?

4  A.   What he had represented as to us, yes.

5  Q.   And you haven't investigated anything that suggests

6  otherwise?

7  A.   Yes.

8  Q.   Did you know he's also the founding managing partner of a

9  capital investment company?

10  A.   I did not.

11  Q.   So when he comes to the FBI, the story he told you or the

12  threat that he told you about, as best as I could have pieced

13  it together, is something about his second ex-wife was using

14  drugs and was involved with the cartel, so the cartel was going

15  to go after him and his family and possibly kill him so that

16  she would get his life insurance money, right?

17  A.   His ex-wife and a family member of hers were connected to

18  the cartel or were involved in money laundering, and I think

19  the rest of your story.

20  Q.   And you eventually kind of heard other versions of this

21  story from, like, Eric Swanson, right?  Other individuals that

22  you met with that had been told a version of the same threat?

23  A.   We did hear from other individuals some version of it.

24  Q.   And sometimes that -- those versions involved saying that

25  Mr. Perardi's son was in danger?

1  A.    Yes.

2  Q.    Sometimes El Chapo was involved?

3  A.    I believe he compared him to -- compared the cartel

4  members involved to El Chapo.

5  Q.    Why would Mr. Perardi find it plausible that the cartel

6  was after him and his family?

7  A.    I'm not sure I could speak to how he would believe it.

8  But, you know, we've heard multiple narratives, and it was

9  clear that he believed it and that that story had been told to

10 other individuals as well.

11 Q.    You said when you heard the story, I mean, it sounded

12 bizarre to you?

13 A.    Yes.

14 Q.    Did you ever ask him why he thought that was a plausible

15 threat?

16 A.    I don't know if I specific -- I just -- I'm not sure how

17 to answer, if I did ask him that or if I just let him speak to

18 all the reasons he believed it to be a plausible threat, all

19 the recordings and different items he had to speak to that.

20 Q.    He presented you with evidence the threat had been made,

21 right?  The recordings --

22 A.    Yes.

23 Q.    -- the texts?

24 A.    Yes.

25 Q.    But you're not sure why he believed that that threat had

 1  any legs to it?

 2  A.    He -- he mentioned a couple of incidents that gave it

 3  legs.  He mentioned that his car had been broken into, and I

 4  believe that Mr. Youngblood had said that would -- that was

 5  perpetrated by the cartel.  Someone close to him's driver's

 6  license was stolen in that incident, and I believe

 7  Mr. Youngblood made a representation to him that now the cartel

 8  knew where she lived.  So they were fearful for that reason.

 9  So there were a couple of incidents like that he had reported

10  to us.

11  Q.    So just like Central Austin, your car is broken into, and

12  he found it plausible that the cartel had broken into his

13  vehicle?

14  A.    Uh-huh.  By his recall, it was because of statements made

15  by Mr. Youngblood, yes.

16  Q.    And why didn't he call the police when that happened, for

17  example?

18  A.    I think in that situation he did file a police report with

19  the local police.

20  Q.    Did you get a copy of that report?

21  A.    I don't believe I have yet.

22  Q.    So you don't know if he told the local police that the

23  cartel had broken into his car in Austin?

24  A.    I can't recall if it's in the file, if another agent has

25  tracked that down.  But I didn't -- I can't personally recall

1  that that's in our file.

2  Q.   Why didn't he call or contact the FBI back in, what, the

3  summer of 2022, when he said this -- these kinds of statements

4  by Mr. Youngblood started?

5  A.   Mr. Perardi reported that the reason he contacted us was

6  after the incident with the flag owner.  He said, when he

7  reached out to the flag owner and realized that the flag was a

8  fake, it started unraveling the story in his mind that this --

9  that there were too many lies.  And that's when he brought it

10 to the FBI.  I believe before that he didn't bring it because

11 he believed the story.

12 Q.   And why in your understanding would Mr. Perardi have

13 believed that his second ex-wife had any connection to the

14 cartel?

15 A.   Mr. Youngblood had told him he was taken out a hit on his

16 family -- or she had taken out a hit on him because of the

17 insurance policy.  He had also later made indications that his

18 ex -- Mr. Perardi's ex-wife's relative of hers had been

19 laundering money for the cartel through her business.

20 Q.   Why hadn't he changed the beneficiary of his life

21 insurance policy if he was divorced?

22 A.   I don't know when he -- when he did or did not.  I

23 couldn't speak to that.

24 Q.   Are you aware that, in Mr. Perardi's first divorce, when

25 he thought his wife had a drug abuse, substance use, mental

1   health problem, he sought a protective order in the Travis

2   County Court system?

3   A.   I was not aware.

4   Q.   You're not aware that, at that time, he sought permission

5   from the court and asked for modification of the custody

6   arrangements to make sure his children would be safe from his

7   first wife's substance use?

8   A.   I was not aware.

9   Q.   At some point, or kind of before approaching the FBI,

10  Mr. Perardi thought he was going to make money on this

11  investment in these collateral objects, right?

12  A.   On a number of the recordings, he mentions that it's --

13  it's the reason he's doing this is to keep his kids safe.

14  But --

15  Q.   But he also accepted money --

16  A.   Yes.

17  Q.   -- he got paid money back as well?

18  A.   He did receive an amount back from Mr. Youngblood.

19  Q.   On several occasions?

20  A.   Yes.  And I'm not sure of those amounts offhand.

21  Q.   Does $45,000 sound wrong to you?

22  A.   It doesn't sound wrong, but I'd have to refresh my memory

23  with the reports.  But he did receive small amounts over time.

24  Q.   Why or how did Mr. Perardi believe that Mr. Youngblood

25  would have protected him from the cartel?

1  A.    He -- Mr. -- you know, I can't speak to what he would

2  believe, but I know on some of the recorded statements

3  Mr. Youngblood talked about these different connections and

4  government entities or that he would put things in place that

5  would make that happen.

6  Q.    And you mentioned kind of these claims that Mr. Youngblood

7  was involved in various components of the military, we'll say.

8  A.    Yes.

9  Q.    And you heard that from multiple people?

10 A.    Yes.

11 Q.    And you didn't -- you haven't heard that from

12 Mr. Youngblood directly.  Those are from your -- all of your

13 interviews with all the many people involved in this case?

14 A.    We have it on recording to the undercover employee.

15 Q.    On that -- on the one meeting with the undercover?

16 A.    Yes.

17 Q.    Okay.  When Mr. Perardi first met with the FBI, he had

18 already hired a defense attorney?

19 A.    He had an attorney that also came to that meeting, yes.

20 Q.    And when he came to meet with the FBI, he had already kind

21 of gathered messages, recordings, screenshots, and gave it to

22 the FBI?

23 A.    After our first meeting, we did ask him to gather that.

24 So he -- he collected that information.  Or I don't know if he

25 had it previously, but gave it to us at another meeting.

WILKINSON - CROSS

1   Q.   And it was Mr. Perardi who brought in other individuals

2   when he ran out of money to relay the threat and ask them to

3   contribute money to protecting his family from the threat,

4   right?

5   A.   Yes.  Or he introduced them to Mr. Youngblood, who relayed

6   that threat to them personally.

7   Q.   And those individuals often also believed the threats were

8   real because Mr. Perardi told them that they were, right?

9   A.   Yes.  Or the individual who heard it from Mr. Youngblood.

10  Q.   How many of the individuals that you are -- sort of fall

11  in your victim bucket at this time were introduced to

12  Mr. Youngblood by Mr. Perardi?

13  A.   Can you just repeat it?  Can you repeat your question,

14  ma'am?  I'm sorry.

15  Q.   Of all of the individuals that you're currently thinking

16  of --

17  A.   Yes.

18  Q.   -- as victims --

19          And I understand that's a moving number.

20  A.   Yes.

21  Q.   -- how many of those individuals were introduced to

22  Mr. Youngblood by Mr. Perardi?

23  A.   I can think of Mr. Perardi himself and two others, and

24  then Mr. Perardi received money directly from other

25  individuals.  But he -- he took that money and gave it to

1  Mr. Youngblood in that situation.

2  Q.   And Mr. Perardi relayed the threat to those other

3  individuals, right?

4  A.   Well, as I mentioned, Mr. Youngblood did -- one individual

5  reported that Mr. Youngblood did directly talk with him about

6  this threat.

7  Q.   After Perardi had connected them or made the introduction?

8  A.   I don't know the sequence of events or if he spoke first.

9  Q.   None of the individuals involved in this case that you've

10 interviewed have reported being a victim of any physical

11 violence from Mr. Youngblood, right?

12 A.   That's correct.

13 Q.   And in my reading of your many reports so far, you don't

14 note any physically aggressive acts by Mr. Youngblood?

15 A.   So I -- excuse me.  I interviewed someone just yesterday

16 who reported an incident in which Mr. Youngblood and this

17 individual were at a -- kind of a casino gambling room in the

18 Austin area.  He reported that three young men came in and were

19 trying to steal from the casino -- or it is a card room I think

20 is more accurate.  And that, in that situation, Mr. Youngblood

21 jumped up, performed some kind of tactical defensive moves, and

22 said, Do you know what these tattoos on my arms are?  If you

23 do, then you know it means that you better get out of here and

24 leave.  So he described it as a physical altercation and was

25 impressed by Mr. Youngblood's physical actions in that

1  circumstance.

2  Q.   But those actions weren't against the person you

3  interviewed.  They were against --

4  A.   No.  It wasn't by a victim.  It was these three

5  individuals.

6  Q.   Okay.  And you mentioned the undercover meeting in -- I

7  think it was in May of this year?

8  A.   Yes.

9  Q.   And at that time Mr. Perardi had already come forward to

10 the FBI, right?

11 A.   Yes.

12 Q.   And you had him be a part of that meeting with the

13 undercover, right?

14 A.   Yes.

15 Q.   He made the introduction of that undercover to

16 Mr. Youngblood?

17 A.   Yes.

18 Q.   And so you didn't have any fear sending Mr. Perardi in,

19 again, to meet with Mr. Youngblood, that he would be physically

20 harmed?

21 A.   No.

22 Q.   And he didn't express any fear for his personal safety?

23 A.   Not that I recall.

24 Q.   The checks that were written by these individuals in

25 the -- in your investigation were made payable to

1  James Holloway, right?

2  A.    In a portion of the circumstances.

3  Q.    And what percentage of the checks written were made

4  payable to James Holloway?

5  A.    I -- there were a number of victims that gave checks to

6  Mr. Holloway, but that was not the only way money was sent.  I

7  think I mentioned money was also through Marvin Connect as

8  well.

9  Q.    So no checks were written made payable to Mr. Youngblood?

10 A.    I don't recall any checks being made payable to

11 Mr. Youngblood.

12 Q.    And it was your understanding over the course of your

13 investigation that individuals were led to believe that, if

14 they didn't pay the cartel, they would receive bad Yelp

15 reviews; is that right?

16 A.    That wasn't my understanding.  I think the Yelp reviews

17 continued to come, and that made them feel this pressure that

18 the cartel was continuing to target their family.

19 Q.    So the cartel is somehow connected to the Yelp reviews in

20 these individuals' minds?

21 A.    The individuals reported that they -- they felt that

22 these -- that Mr. Youngblood had told them these Yelp reviews

23 were being made in some way and connection to the cartel.

24 Q.    Have you, in your experience as on FBI agent, heard of the

25 cartels using Yelp reviews to enforce threats?

 1  A.   I have not.

 2  Q.   That's not what you would generally think of when you fear

 3  cartel threat enforcement activity?

 4  A.   I don't investigate the cartel, but I -- but I don't.

 5  Q.   When you interviewed Mr. Perardi's ex-wife, she told you

 6  that she believed that Mr. Perardi was behind the negative Yelp

 7  reviews, at least at the Toyota Cedar Park, right?

 8  A.   Yes.

 9  Q.   She believed that he's the only one who would have had

10  access to personal information about her?

11  A.   Yes.

12  Q.   And that was the information being used in those reviews?

13  A.   That there was personal information that she believed only

14  Mr. Perardi could have.

15  Q.   Mr. Perardi, you said he did receive some money back on

16  his investment.  Other individuals also received some payments

17  back for their investment?

18  A.   Yes.  Some portion of the victims did.

19  Q.   Do you know how many, or can you -- I mean, was it more

20  than Mr. Perardi?

21  A.   There was more than Mr. Perardi, yes, who received some

22  amount of money back from the these interactions.

23  Q.   So, as I understand it, kind of how you've written out in

24  the complaint, the -- the checks that were written payable to

25  Mr. Holloway went to Mr. Holloway first.  You pulled his bank

1  records and saw that?

2  A.   Yes, they were.

3  Q.   And he deposited those checks into his bank account?

4  A.   Yes.

5  Q.   And up until I think very recently, I mean, you believed

6  he was a coconspirator with Mr. Youngblood in this case, right?

7  A.   Yes.

8  Q.   He certainly facilitated Mr. Youngblood's actions?

9  A.   He certainly acted in furtherance.

10  Q.   He often was -- or at least on occasion was the only

11  person on the call, right?  Some -- some of your recorded phone

12  calls are only Mr. Holloway and the victims?

13  A.   Yes.

14  Q.   And he was the one accepting checks for tens of thousands

15  of dollars from all these people?

16  A.   Yes.  In some circumstances.

17  Q.   Mr. Holloway would meet up with some of the victims to

18  personally get the check handed off to him, right?

19  A.   Yes.

20  Q.   On some of those occasions, Mr. Youngblood was not with

21  him.  It was just Mr. Holloway, right?

22  A.   Yes.

23  Q.   And then it's Mr. Holloway's son Lane, or now William, who

24  makes derogatory posts, who eventually admits to you that he

25  made the derogatory business posts --

1  A.    Yes.

2  Q.    -- against many of the victims, right?

3  A.    Yes.

4  Q.    And Mr. Holloway's daughter-in-law admitted that she had

5  called and pretended to use a fake accent to threaten people?

6  A.    Yes.

7  Q.    And when they have now been confronted by the FBI, all --

8  Mr. Holloway, his son, his daughter-in-law say, Oh,

9  Mr. Youngblood made us do it or threatened us.  We felt we had

10  to do this.  Right?

11  A.    Yes.

12  Q.    And none of them had sought assistance from law

13  enforcement or the FBI?

14  A.    To my knowledge, they had not.

15  Q.    I think you said you did subpoena Mr. Holloway's bank

16  records, right?

17  A.    Yes.

18  Q.    You subpoenaed Mr. Perardi's bank records?

19  A.    Yes.

20  Q.    Did you subpoena or obtain bank records from

21  Mr. Youngblood?

22  A.    Yes.

23  Q.    And do those show checks being deposited?

24  A.    We're still waiting for a number of financial institutions

25  to get back to us with the response to the subpoenas.

1  Q.   So, to date, you don't have that information?

2  A.   Today I do not have all the financial records.

3  Q.   Do you have some of them?

4  A.   I don't have from what I believe is Mr. Youngblood's

5  primary bank.

6  Q.   In the records that you do have that you've reviewed, have

7  you seen checks in these types of amounts, 65-, 70-,

8  80-thousand dollars, deposited into those accounts?

9  A.   Into Mr. --

10 Q.   Youngblood's?

11 A.   -- Youngblood's accounts?  Not into Mr. Youngblood's

12 accounts.

13 Q.   Have you seen cash deposits of those amounts?

14 A.   I don't recall any cash deposits.  We have very limited at

15 this time.

16 Q.   You believe that Mr. Youngblood gambled away this money,

17 right?

18 A.   Yes.

19 Q.   Is that the FBI's current theory --

20 A.   Yes.

21 Q.   -- of where the money went?

22 A.   Yes.

23 Q.   Have you subpoenaed the records from the casinos where he

24 had the player's cards?

25 A.   Yes.  I think I've mentioned some of the records from ARIA

1   Casino earlier.

2   Q.    And you have those back?

3   A.    Yes.

4   Q.    And have you been able to kind of tabulate the amounts of

5   money he was playing with on particular days?

6   A.    Yeah.   The casino -- personnel from the casino helped walk

7   us through some of those numbers as well.

8   Q.    You got a search warrant for Mr. Holloway's home at the

9   same time you got one for Mr. Youngblood's, right?

10  A.    Yes.

11  Q.    And that was when you, I guess, believed Mr. Holloway is

12  facilitating this fraud, is a coconspirator in this fraud,

13  right?

14  A.    Yes.

15  Q.    You I think walked us through briefly what you found in

16  Mr. Youngblood's home.   What did you find in Mr. Holloway's

17  home related to this case?

18  A.    We found ledgers with records, some promissory notes of

19  some of the victims that we've discussed.

20  Q.    But he has not been arrested?

21  A.    He has not.

22  Q.    Does he have a non-prosecution agreement with the

23  government?

24  A.    No.   Not that I'm aware of.

25  Q.    Does Mr. Perardi?

1  A.   No.  Not that I'm aware of.

2  Q.   I want to talk now about the search of the home on the

3  13th -- of Mr. Youngblood's home.  When you went to that home,

4  was that a home you'd been surveilling?  Had you-all had, like,

5  a pole camera on it?

6  A.   We did not have a pole camera, but we had surveillance on

7  it on -- on occasion.

8  Q.   Leading up to the search?

9  A.   Yes.

10  Q.   And on the day of that search, you took, I imagine, a team

11  of agents with you?

12  A.   Yes.

13  Q.   And I think you said you seized Mr. Youngblood's wife's

14  passport and his passport, right?

15  A.   I believe that's correct.  I'd have to look at the search

16  records, but ...

17  Q.   You seized $4,000, maybe a little more, in currency from

18  his wife's wallet; is that right?

19  A.   I haven't specifically -- I can't see the records, but I

20  thought it was around 2,000, so that doesn't sound ...

21  Q.   But from -- from his wife?

22  A.   From the home is what I know.  I believe it was possibly

23  in the wife's purse.

24  Q.   And multiple phones, it looks like?

25  A.   Yes.

1    Q.    Were those from her purse also?

2    A.    I don't know specifically offhand.  I'd have to look at a

3    report.

4    Q.    And the FBI has had Mr. Youngblood's passport since the

5    13th of July?

6    A.    Yes.

7    Q.    You did not at the time have a search warrant for his

8    wife's cell phones?

9    A.    I believe the search warrant covered electronics in the

10   home.

11   Q.    The seizure of them.  But for actually searching the phone

12   itself, did you have a search warrant for the phone -- for the

13   contents of the phone?

14   A.    I believe it was -- I mean, Mr. Youngblood had been using

15   that phone and had statements about it, but I -- I'd have to

16   refresh my memory of the -- of the search warrant.

17   Q.    So the FBI has already extracted the contents of his

18   wife's phone?

19   A.    I know the FBI has extracted some of the phones.  I don't

20   know definitively if his wife's has been.  I believe it has,

21   though.

22   Q.    And you said you took an appraiser out with you --

23   A.    Yes.

24   Q.    -- when you did the warrant?

25              And the appraiser did not identify any, like,

1   valuable assets in the home?

2   A.   That's correct.

3   Q.   And you told us that there were firearms, but the FBI did

4   not seize those?

5   A.   That's correct.

6   Q.   And Mr. Youngblood was not arrested that day?

7   A.   That's correct.

8   Q.   And you felt comfortable leaving the firearms in the home?

9   A.   Yes.  We left the firearms in the home.

10  Q.   You didn't perceive a danger in doing that?

11  A.   I don't believe we had any reason to seize them.

12  Q.   Or any reason to believe that they were going to be used

13  in threats against any of the victims?

14  A.   Yes.

15  Q.   You did not have a reason to believe that?

16  A.   Correct.

17  Q.   When the FBI executed the search warrant, was

18  Mr. Youngblood given any instructions to not travel?

19  A.   No.  Not at the time of the search warrant that I'm aware

20  of.

21  Q.   To your knowledge, did anyone at the FBI convey to

22  Mr. Youngblood's lawyer that he shouldn't travel?

23  A.   I -- I have no knowledge of that.

24  Q.   You did say you knew he hired a lawyer after his home was

25  searched or before the home was searched?

1  A.  He had that note on the door that had indicated to contact

2  an attorney -- that attorney.

3  Q.  And at some point that attorney did speak to the U.S.

4  Attorney's Office.  Is that your understanding?

5  A.  That's my understanding.

6  Q.  And was he told that his client should -- needed to

7  self-surrender or turn himself in?

8  A.  I don't believe so.

9  Q.  And I didn't catch the date, but you mentioned kind of a

10 second interaction between the FB -- some FBI agents and

11 Mr. Youngblood maybe the same day or a few days after the

12 search warrant was executed?

13 A.  That was on the -- do you mean with Mr. Youngblood and the

14 two individuals at Mr. Holloway's house?

15 Q.  Yes.

16 A.  That was the same day as the search warrants.

17 Q.  So it was the same day?

18 A.  Yes.

19 Q.  So FBI agents interacted with Mr. Youngblood again that

20 day?

21 A.  Yes.

22 Q.  And you said that they separated all the three men --

23 A.  Yes.

24 Q.  -- who showed up?

25 A.  Yes.

1   Q.   And asked Mr. Youngblood to just wait in his car --

2   A.   Yes.

3   Q.   -- while they interviewed them?

4   A.   Yes.

5   Q.   And he did that?

6   A.   Yes.

7   Q.   He didn't take off?

8   A.   No.

9   Q.   And, since you've begun working on this case -- and you've

10  interviewed a substantial number of people, right?

11  A.   Yes.

12  Q.   And they all now have your, or someone in the FBI, contact

13  information, right?

14  A.   Yes.

15  Q.   You mentioned that many of them have called you to provide

16  additional information?

17  A.   Yes.

18  Q.   They know how to reach you?

19  A.   Yes.

20  Q.   And they're in touch with the victim coordinator at the

21  U.S. Attorneys Office?

22  A.   Many of them are, yes.

23  Q.   And they were all able to coordinate to come here?

24  A.   Yes.

25  Q.   I -- tell me if I'm wrong, but I assume that you've told

1  them that if they receive any kind of threat or suspicious

2  communication, they should report it immediately to the FBI?

3  A.   Yes.

4  Q.   So Mr. Youngblood was arrested.  Was it the 31st?

5  A.   I think it was July 30th.

6  Q.   And that was at the airport?

7  A.   It was.

8  Q.   And that was when he was flying back to Austin from

9  Las Vegas?

10  A.   No.  We were in Austin, and he was flying to Las Vegas.

11  This was at Austin-Bergstrom International Airport?

12  Q.   He was on an outgoing flight, or he was returning?

13  A.   He was leaving Austin on an outgoing flight to Vegas.

14  Q.   Okay.  And you knew that he had booked that flight?

15  A.   Yes.

16  Q.   You-all knew where he was going to be?

17  A.   Yes.

18  Q.   And you said you previously kind of ran down these rumors

19  that he lived abroad, that he traveled abroad, and none of that

20  proved to be true, right?

21  A.   His biological -- the individuals who claim to be his

22  biological parents had told us he was born in Ohio.

23  Q.   So as far as you've been able to confirm, his wife has

24  been in the United States?

25  A.   Yes.

1   Q.   You said when you arrested him he had $18,000 and some --

2   something more than that --

3   A.   Yes.   Just a little bit more.

4   Q.   -- on his person?

5   A.   Yes.

6   Q.   And he told you he had gotten that money gambling?

7   A.   Yes.

8   Q.   And did he tell you to look at the W-2Gs that he had with

9   him?

10  A.   He stated there was a card -- a laminate card in his

11  wallet that would show that it was earned from gambling.

12  Q.   And did you look at that?

13  A.   Yes.

14  Q.   And what did it show?

15  A.   It did show, basically, that he had won a $300,000

16  jackpot, I believe.

17  Q.   But you didn't actually see the W-2Gs from the casino that

18  he had on him that day?

19  A.   I don't -- I don't recall what type of form it was.   It

20  was a small form that showed a $300,000 ...

21          MS. HERRING:   May I approach, Your Honor?

22          THE COURT:   Sure.

23  Q.   (BY MS. HERRING) I just want to show you.

24  A.   Sure.

25  Q.   Have you seen these forms for Mr. Youngblood?

1  A.   I believe these were from the search of his home.  It was

2  a little bit smaller than this, based on the size of his

3  wallet, the form I had seen.

4  Q.   But you see that each of those shows winnings from

5  July 27th of 2023 from electronic game --

6  A.   I see the reportable winnings, yes.

7  Q.   And each one of them has a different transaction number.

8  Do you see that it's the middle column, the -- I guess it's

9  box 5?

10  A.   Yeah.  Yes.  These look like different transaction numbers

11  to me.

12  Q.   And these add up to $20,840?

13  A.   I don't have a calculator.  But I would assume you've done

14  the math, and there's several thousand in each of these.

15  Q.   But you don't believe that 18,800 and change dollars came

16  from these winnings, the $20,000 on the --

17  A.   Mr. Youngblood mentioned the casinos he went to, and I

18  have not heard him mention Chickasaw Nation Casino.  I'm not

19  sure which casino these would be from or what part of --

20  Q.   The Oklahoma Casino?

21  A.   Or the Oklahoma Casino.  He mentioned that had been a very

22  difficult play and that it would surprise me.  He said he went

23  on one occasion.  Are these all the same dates?  This is all

24  the same dates, so ...

25  Q.   This is three days before he was arrested with $18,800 --

1   A.   Yes.

2   Q.   -- in cash?

3   A.   Yes.

4   Q.   And he has $20,840 of winnings?

5   A.   If that's what you say it calculates to.

6   Q.   To your knowledge, the arrest by the FBI was the first

7   time Mr. Youngblood had been arrested since 2011; is that

8   right?

9   A.   I believe that's right.

10  Q.   And you talked about kind of a scheme potentially spanning

11  all the way back to 2010 through the present day?

12  A.   Yes.

13  Q.   Right.  But, to your knowledge, he's never been arrested

14  during any of that time until now?

15  A.   Not to my knowledge.

16           MS. HERRING:  That's all I have, Your Honor.

17           THE COURT:  Thank you.  Anything, Mr. Harding?

18           MR. HARDING:  One moment, Judge.

19           THE COURT:  And note we've been here for a while.

20           MR. HARDING:  Yes, Your Honor.

21           No, Your Honor.  Thank you.

22           THE COURT:  The PTR reports notes a felony conviction

23  out in California.  Was that a disabling conviction for firearm

24  purposes?

25           MR. HARDING:  Judge, I don't think the answer is yes.

1   California has some very strange laws about their felonies and

2   things.  The -- the real honest answer is I don't know, but we

3   are not assuming that he's prohibited at this time.

4           THE COURT:  And I'm just curious.  There were five

5   firearms seized at the Youngblood house.  In the PTR report,

6   Ms. Youngblood says the handguns are hers.  Who's claimed

7   ownership of the other three?

8           THE WITNESS:  They weren't seized, to be clear, but

9   they were photographed in place.  So we have not received -- or

10  we're not -- I'm not aware whose ownership they're purported to

11  be.

12          THE COURT:  No -- nobody asked anybody there whose

13  guns they were?

14          THE WITNESS:  I don't know that answer.  I apologize,

15  Your Honor.

16          THE COURT:  All right.  All right.  You can step

17  down.  Thank you, Agent Wilkinson.

18          Any additional evidence?

19          MR. HARDING:  No, Your Honor.

20          THE COURT:  All right.  It's kind of a combo hearing

21  on prelim and detention.  Do you have any evidence you'd like

22  to present?

23          MS. HERRING:  I would just submit to the Court the

24  documents that I've shown the agent.

25          THE COURT:  All right.  We will mark those as Defense

1    Exhibit Number 1, and they will be admitted --

2             MS. HERRING:  That's all I have, Your Honor.

3             THE COURT:  -- I trust without objection?

4             MR. HARDING:  I haven't seen them, Judge, but I won't

5    object.

6             THE COURT:  All right.  They're admitted.

7             MS. HERRING:  Nothing further.

8             THE COURT:  All right.  The close of the evidence, I

9    do find the government has met its burden with regard to

10   preliminary hearing, specifically that they've established that

11   there's probable cause to believe Mr. Youngblood committed wire

12   fraud, in violation of Title 18, United States Code,

13   Section 1343, as well as money laundering offenses under

14   Title 18, Section 1956.

15            That brings us to the issue of detention.  I note,

16   Mr. Harding, this is not a presumption case.  And, again, you

17   both know me.  I get it.  Give me the big-issue argument

18   and ...

19            MR. HARDING:  Yes, Your Honor.  The evidence in this

20   case I think presents three risks, all of which justify the

21   detention of Mr. Youngblood:  First of all, he's a risk of

22   flight; second of all, he's a risk of intimidating or harassing

23   or otherwise obstructing victims or witnesses in this case;

24   and, third, he's a continuing danger to the community.

25            On the issue of flight, normally when we think about

1  a person's ties to the community and reasons they would not

2  flee, it's because they have assets in the community they can't

3  leave behind, they've got friends in the community they can't

4  leave behind, they've developed a reputation in the community

5  they can't leave behind.  And none of those are true in

6  Mr. Youngblood's case.

7           He has no assets or he wouldn't have a public

8  defenders.  He's claimed that, essentially, every asset he has

9  is underwater.  So there's nothing keeping him from walking

10  away from his home tomorrow, because he basically is just

11  walking away from a debt.

12           Secondly, all of these folks sitting here are

13  basically his friend group or friends of friends or other

14  people that he's victimized.  The notion that he is going to

15  stay in the local community to be with them is clearly

16  laughable.

17           I think the evidence has shown in this case that

18  Mr. Youngblood cares about one person and one person only, and

19  that's Mr. Youngblood.  And anything he has to do to further

20  his own needs, he will subordinate anyone's needs to that,

21  including, unfortunately, those of his family and friends.

22           On the issue of continued danger to the community, we

23  have at least two instances after the execution of the search

24  warrant in which Mr. Youngblood has either attempted to or has

25  actually obtained money from victims.

1              In the first case it was the night of the search

2    warrant execution, when one of the individuals with

3    Mr. Youngblood said, Hey, we're going to this lady's house,

4    spoke to that lady, and she was going to give him 20 grand-plus

5    that night in relation to the scheme.  $1,000 from another

6    individual in relation to Mr. Youngblood getting money out of

7    Montreal.

8              Even though he knows law enforcement is looking at

9    him, he continues to victimize.  And he has no legitimate

10   source of income.  And so, essentially, he has no choice but to

11   victimize people to continue his lifestyle.

12             Any argument about him winning money in gambling,

13   first of all, as Agent Wilkinson testified, he has hundreds of

14   thousands of dollars in net losses at gambling -- over gambling

15   for the past couple of years.

16             And, secondly, as the Court is well aware, bad money

17   in means bad money out.  That is money laundering.  The fact

18   that he's using fraud money to try and win more money doesn't

19   make that clean money.  And so whether he's using current fraud

20   money or old fraud money to make more, that's just a continuing

21   threat to the community.

22             On the issue of witness intimidation, witness

23   concerns, you've heard he went to Mr. Holloway's house the day

24   of the search warrant with two large individuals, one of whom

25   was armed, and all three of them had different stories about

1  why they were there.  Mr. Youngblood -- the common link being

2  Mr. Youngblood wanted them there.  One of the gentlemen is very

3  large and I would suggest to the Court would be intimidating to

4  an older gentleman, or really anyone.  Another person was

5  armed.

6          And so I think all three of those things are present

7  in this case.  I'll just close by saying, when the Court is

8  deciding whether it can craft conditions, as this Court is well

9  aware, the crafting of conditions depends on the compliance and

10 the trust on the defendant.  And the evidence in this case

11 shows Mr. Youngblood lies to everyone he meets at all times to

12 further his aims.  The Court cannot trust he will comply with

13 any conditions this Court would set.

14         MS. HERRING:  Your Honor, the government has moved

15 for detention in this case on serious risk of flight, and they

16 have not met their burden to show that Mr. Youngblood is a

17 serious risk of flight.  And until that burden is met, the

18 Court is not supposed to look at the dangerousness factor in

19 the case.

20         I think what the government is really arguing is that

21 Mr. Youngblood is a risk of flight because of the crimes he's

22 charged with, because they believe he's a serial fraudster, but

23 there is no evidence that they have put on that he is a serious

24 risk of flight beyond the fraud scheme itself.

25         That argument bypasses the analysis that the Court

1    has to follow under the Bail Reform Act and requires a finding

2    that he first pose a serious risk of flight.  And that risk

3    just isn't present in this case on the testimony that the Court

4    has heard today.

5         The FBI has said they've known where he's been the

6    whole time.  He's been in this community for nine years.  He's

7    been at the same residence for nine years.  Pretrial Services,

8    I will just point out -- I'm not going to go into detail in

9    that report -- but Pretrial is recommending release in this

10   case under a series of conditions.

11        All of the individuals who are now in the

12   government's victim bucket are individuals he's known for a

13   long time, as the AUSA just pointed out.  This is a fraud

14   scheme that involves a -- it's not a nationwide risk for

15   victims.  It's this small circle, all of whom have now been in

16   contact with the FBI, who know how to contact the FBI, who have

17   been told that they're victims, and who have coordinated and

18   can continue to coordinate with the victim coordinator.  And,

19   you know, I think there's a lot of evidence of that today.

20        The FBI left Mr. Youngblood out for three weeks after

21   executing the search warrant after -- on his home, finding

22   firearms at the home.  No reason to believe that there was

23   going to be danger posed by those firearms.  No reason to

24   believe he was going to flee.  Saw him again a second time with

25   the large individuals.  Didn't take off.  They told him to wait

1    in the car; he waited in the car.

2            There's been no evidence presented to the Court that

3    he's ever failed to appear for a court setting.  He's never --

4    he has not been arrested since 2011.  My understanding is that

5    in California he showed up for his cases, and that's why those

6    cases were resolved.  And the Court is asked to consider today

7    whether it can set conditions that reasonably assure his

8    appearance in court, and this Court can set those conditions.

9            Fraud cases always involve allegations of deception,

10   of con, of dishonesty, and Congress in fashioning the Bail

11   Reform Act has said that's not the type of case where the Court

12   is to apply a presumption.  Those are drug trafficking cases.

13   Those are crimes of violence.  Those are cases where -- that

14   carry life sentences or the death penalty.  Fraud is not that,

15   and it is specifically, I think, carved out of that.  This is a

16   case where the Court is to assume that conditions can be set.

17           Secondarily, in this division, in the Western

18   District of Texas, the Court knows conditions are frequently

19   set in fraud cases.  That is the common practice.  I think it's

20   fair to say it's the most common practice when an individual is

21   charged with fraud.

22           These are charges, he's not even been indicted yet,

23   and this court can set conditions.  The individuals who are

24   detained for fraud in this division are detained on fraud

25   schemes that involve transferring money out of the country,

where it becomes untraceable in Nigeria, or they're non-U.S. citizens.

I think to the concern about obstruction or witness intimidation, this Court has many examples, "go bys."  I would remind the Court of the Kurt Barton prosecution by Your Honor some years ago in which the CEO of Triton Financial was indicted for an elaborate Ponzi scheme, involved 300 people, 300 victims, $50 million.

That's not the type of scheme we're talking about in this case.  I think even the agent testified that the -- that the threats that were made were sort of bizarre, absurd, I think facially absurd.  And the Court can consider that when it thinks about a risk to the community going forward.

In the *Barton* case conditions were set.  Mr. Barton eventually received a very lengthy, I think, 17-year prison sentence.

THE COURT:  He was detained.

MS. HERRING:  Originally he had conditions set.

THE COURT:  Yeah.  But he violated them.

MS. HERRING:  He had them set.  He was given the benefit initially on that size of a fraud scheme.

THE COURT:  He violated them.  That goes into the computation on just how likely is it for a liar and a thief to comply with conditions that are set.  So I -- *Barton* is not a good argument.

1          MS. HERRING:  I think recently in this courthouse, in

2    the *Nate Paul* case conditions were set, and the conditions have

3    been amended with the government's participation and agreement,

4    because there has been concern about going after witnesses in

5    that case.  And, in fact, the government agreed to provide a

6    list of every individual that the defendant was not to contact.

7    And conditions have been updated in that case that, without

8    leave of court, Mr. Paul, who is on bond, may not have contact

9    with any victims without prior permission from the government.

10          I think in a case we're all familiar with now where

11   there is a great fear, at least DOJ has expressed of

12   obstruction and intimidation, former President Trump's case,

13   conditions have been set.  And that -- those conditions

14   specifically state Defendant shall not communicate about the

15   facts of the case with any individual known to be a defendant,

16   except through counsel or in the presence of counsel.

17          The fear is that the government -- I'm not attempting

18   to undermine those being concerns, legitimate concerns, by the

19   government.  But what I am saying is that the Court has the

20   ability to fashion conditions to address those concerns.  And

21   today, on a complaint, Mr. Youngblood is to be presumed

22   innocent in the court, and he is to be given the benefits of a

23   presumption of release.

24          THE COURT:  That's not in 3142.  Where is that?  They

25   filed a motion to detain.  They now have a burden of proving --

```
1              MS. HERRING:  -- a serious risk of flight.
2              THE COURT:  Yeah.  I mean, I've read 3142.  It
3    doesn't say there's a presumption of innocence in 3142.
4              MS. HERRING:  Well, there's a presumption of
5    innocence in the --
6              THE COURT:  No.  I understand it's in the ether --
7              MS. HERRING:  Not in 3142.
8              THE COURT:  -- it's in the ether here.
9              MS. HERRING:  In the Constitution, yes.
10             THE COURT:  Can I tell you something?  I respect you
11   too much.  I'm not going to engage with you on the proprietary
12   of throwing other court decisions at me and other cases.  Not a
13   great tactic.  Let's talk about this case.
14             MS. HERRING:  Your Honor, I -- the reason I reference
15   those cases is because there are very specific conditions that
16   have been set in those cases that I think can serve as go bys,
17   where there are equally strong concerns about obstruction and
18   about nonappearance.
19             And this Court can set very detailed conditions.  You
20   can put him on home detention.  You can put him on a monitor.
21   You can order he have no access to electronic devices.  There
22   hasn't been a suggestion he uses a telephone.  But, you know,
23   the Court can craft a very stringent set of conditions that
24   allow Mr. Youngblood to work with counsel on this case, which
25   is a complex case, and to be at home.
```

1          He does have ties to the community.  He has a wife

2     and two children here.  He has a son in high school.  He does

3     have a home.  He presumably would be incentivized to keep his

4     home and find a way to pay -- pay for it so that his family has

5     a place to live.

6          But my argument is that I think, with carefully

7     crafted conditions, not just the standard -- I recognize the

8     standard, check-the-box conditions won't cover it in this case.

9     But I think if the Court sets a list of all of the individuals

10    he can't contact -- he now has a lawyer.  I mean, I've been on

11    the case a few days at this point.  But conditions can be set

12    that reasonably assure his appearance in court and that protect

13    the community.  And so I would ask that the Court work to

14    fashion those.

15         I think they would require something beyond what's

16    been proposed in the Pretrial Services report, and I'm happy to

17    give specific suggestions.  But I would ask the Court to do

18    that in this case.

19         THE COURT:  Thank you, Ms. Herring.

20         Based on the evidence that I've heard,

21    Mr. Youngblood, you have an elaborate history of not telling

22    the truth.  After hearing the testimony, all I can say is wow.

23    The number of lies, the depth of those lies, is beyond anything

24    I've ever heard.  And I've been around a long time.  Absolutely

25    incredible.

1              I'm a little confused on how much money nets out here
2    in the end.  I've heard things like there was over 20 victims
3    since 2010, and there's millions of dollars.  But then I heard
4    some iteration that some of the money has gone back, begging
5    the question, how did it go back?  I'm not going to get into
6    all that.  That's something these lawyers are going to spend a
7    lot of time with over the coming months figuring that out.

8              But the reality is there are a number of victims, and
9    there's a lot of money, in the millions of dollars.  And there
10   may be a net, but the reality is that the money seems to flow
11   one way primarily: to Mr. Youngblood.

12             The victims in this case are typical of the victims
13   that we have in fraud cases.  If you think about it, the people
14   that really have their dukes up and don't fall for these kind
15   of lies, they don't get victimized, so they don't make federal
16   cases.  But how many of us back in the day received the
17   Nigerian prince letters, where now we get the Netflix text,
18   you're -- my subscription is being discontinued.

19             And you may be wondering, Why would somebody send a
20   Nigerian prince letter or send a Netflix text?  The answer is
21   you've just got to find one.  You've just got to find one
22   person, whether you want to use the word foolish, ignorant,
23   greedy, naive, whatever word you want to use and apply to that
24   victim, the reason we all keep getting those letters and those
25   texts is because there's always somebody out there who falls

1    for it.

2            And you found a number of people who were either

3    foolish, ignorant, afraid, greedy, whatever it may be, whatever

4    their motivation.  The bottom line is it was incumbent upon

5    you, Mr. Youngblood, to do what you said you were going to do

6    by and through yourself or your intermediaries before you were

7    entitled to any money that you got from those victims, no

8    matter what character trait you want to attribute to them.

9            And I'll tell you this:  The law is designed to

10   protect rich people just as much as it's designed to protect

11   poor people.  That's a bad argument.  And, frankly, fraudsters

12   don't go after poor people.  They go after people with money.

13   That's the nature of the fraud cases that permeate this

14   courthouse.

15           The money always seemed to go one way.  It went to a

16   guy who doesn't work.  There's nothing here that indicates any

17   work whatsoever.  If you had a work history, Ms. Herring would

18   have shared it with me.  You're a poor gambler.  Frankly,

19   you're like every gambler I've ever made -- I've ever known.

20   They have a great month, and the other eleven they get

21   hammered.  It's just over and over.  There's no such thing as a

22   good gambler.  They're all losing.

23           And the PTR report, I guess I'm -- I'm beating this

24   to death.  You can ask any United States pretrial services

25   officer, and they will tell you they do not consider weight of

1 the evidence and they do not consider nature and circumstance

2 of the offense in making their recommendations to the judges in

3 this courthouse as to whether or not somebody should be

4 released or not.

5        Those are two really important conditions which, by

6 the way, the congress and a past president put in Section 3142

7 and said that I have to consider those things in making a

8 release decision.  I'm really to the point with Pretrial where

9 I don't want the recommendations anymore, because they're not

10 based on everything I'm required to consider.

11        And let's be real clear.  The weight of the

12 evidence -- I don't know what's going to happen, but I know

13 where this is going to end up one day.  The weight of the

14 evidence is overwhelming against you, Mr. Youngblood.  And, in

15 addition to that, the nature and circumstances of this

16 offense: your lies, your intimidation, references to cartel,

17 over and over again -- cartel, the reason that word gets

18 bandied about is they're violent, they're dangerous, and they

19 scare people.

20        This has got to be the most massive pattern of

21 intimidation, threats of violence, and death I've ever seen.

22 The ability to get on the Internet and disparage other people

23 and blossom up your reputation and take away the bad things,

24 it's just -- the fraud is pervasive.  It's everywhere.

25        I'm going to find that the government has proven by a

1  preponderance of the evidence that you're a serious risk of

2  flight.  I'm also going to find that the government has

3  established by clear and convincing evidence that -- let me say

4  this right -- there is a serious risk that you will obstruct or

5  attempt to obstruct justice or threaten or injure or

6  intimidate, or attempt to injure, threaten, and intimidate,

7  prospective witnesses and even jurors in this eventual case, if

8  it goes to trial.  That's a -- that's an easy one.

9          I'll also find by clear and convincing evidence -- I

10  always go round and round on these fraud cases on whether or

11  not danger to the community is an actual prong, but I'm going

12  to find that one as well.

13          And the primary reason is -- and I have it up here; I

14  highlighted it during the discussion -- if you were to reach --

15  if I were to set conditions in this case, I would have gone

16  through them all with you, told you what they are, and at the

17  very bottom I would have said you would have had to sign.  And

18  you would have signed right above an attestation that said, "I

19  promise to obey all conditions of release, to appear as

20  directed, and surrender to serve any sentence imposed."

21          Mr. Youngblood, I wouldn't trust you with 10 bucks.

22  I wouldn't trust you with any important decision in my life,

23  and I trust that most of the people in this courtroom wouldn't

24  either.  Your -- your word is incapable of belief or value as

25  it relates to a promise to abide by conditions.  There are no

1  conditions that I can set that provide for the safety of the

2  community, prevent you from potentially obstructing or

3  attempting to obstruct justice, or fleeing, going somewhere

4  else.

5          So I've already reached that conclusion, but I'll

6  tell you this lastly:  I always hope there's a special place

7  for thieves one day.  But for me, as the son of a career

8  military officer, one who survived Vietnam, who raised a

9  family, and we were never rich, I have particular disdain for

10  anybody who steals the valor of the men and women who really

11  earned it, earned it on a battlefield or earned it in uniform.

12          And so good luck to you, sir.  I'm going to order

13  your detention.  I'll put together a short written order that

14  memorializes the findings that we've had today.  I'm going to

15  take a five-minute break, and then we're going to start with

16  the next case.

17          (Proceedings concluded at 11:59 a.m.)

18

19

20

21

22

23

24

25

1      **REPORTER'S CERTIFICATE**

2   I, Arlinda Rodriguez, do hereby certify that the foregoing

3 was transcribed from an electronic recording made at the time

4 of the aforesaid proceedings and is a correct transcript, to

5 the best of my ability, made from the proceedings in the

6 above-entitled matter, and that the transcript fees and format

7 comply with those prescribed by the Court and Judicial

8 Conference of the United States.

9

10 /S/ Arlinda Rodriguez     August 16, 2023

11 ARLINDA RODRIGUEZ      DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)