| | | |
|---|---|---|
| 09:27:52 | 1 | A.   Yeah.  I don't get paid for it.  I lost my pay for |
| 09:27:56 | 2 | that after these first posts came out, but yes, because I |
| 09:28:01 | 3 | care so greatly about it, I still work on it, but I |
| 09:28:05 | 4 | haven't been paid for it over two-and-a-half years. |
| 09:28:09 | 5 | Q.   I'll pass the witness for cross-examination, your |
| 09:28:11 | 6 | Honor. |
| 09:28:22 | 7 | CROSS-EXAMINATION |
| 09:28:22 | 8 | BY MS. HERRING: |
| 09:28:58 | 9 | Q.   Mr. Perardi, I'm going to start, talk a little bit |
| 09:29:01 | 10 | more about the divorce proceedings in this case.  You said |
| 09:29:06 | 11 | that you and Rachel married in -- back in 2015, October |
| 09:29:11 | 12 | 2015? |
| 09:29:12 | 13 | A.   Yes. |
| 09:29:12 | 14 | Q.   And you separated as of September of '21? |
| 09:29:15 | 15 | A.   No.  November of '21. |
| 09:29:18 | 16 | Q.   November '21 was when you actually filed for divorce, |
| 09:29:22 | 17 | right? |
| 09:29:22 | 18 | A.   Yeah, but I was still into the house up until |
| 09:29:26 | 19 | Halloween of that time. |
| 09:29:27 | 20 | Q.   Of '21? |
| 09:29:28 | 21 | A.   Of '21, yes. |
| 09:29:28 | 22 | Q.   And just to be clear, you are the one who initiated |
| 09:29:31 | 23 | the divorce? |
| 09:29:31 | 24 | A.   Yes. |
| 09:29:32 | 25 | Q.   And that was a six-year marriage? |

| | | |
|---|---|---|
| 11:25:24 | 1 | to anybody about it. |
| 11:25:25 | 2 | Q.   So from August of '22 forest of that hockey season, |
| 11:25:31 | 3 | your middle son was not in -- was not living in Texas for |
| 11:25:35 | 4 | that season. |
| 11:25:37 | 5 | A.   Correct. |
| 11:25:43 | 6 | Q.   And he was away from home between the Dallas and the |
| 11:25:46 | 7 | Connecticut for something like was it close to two years |
| 11:25:49 | 8 | total of hockey season time?  I understand summer breaks |
| 11:25:53 | 9 | and things. |
| 11:25:55 | 10 | A.   Yes.  And remember every week I was being told that |
| 11:25:59 | 11 | this was going to end.  Every week from the time I met Mr. |
| 11:26:03 | 12 | Youngblood about it, the money was coming back and this |
| 11:26:06 | 13 | was going to end every week. |
| 11:26:07 | 14 | Q.   But your middle son is away from home for two years |
| 11:26:13 | 15 | playing hockey. |
| 11:26:14 | 16 | A.   Correct. |
| 11:26:21 | 17 | Q.   I want to pull up the $83,000 check that you talked |
| 11:26:26 | 18 | about yesterday.  So like the other checks that we've |
| 11:26:41 | 19 | looked at so far, this is another check you've told us you |
| 11:26:46 | 20 | wrote from T.A.P. Development, right? |
| 11:26:48 | 21 | A.   Yes. |
| 11:26:48 | 22 | Q.   And it's dated July 20th of 2022? |
| 11:26:54 | 23 | A.   Yes. |
| 11:27:42 | 24 | Q.   You see July 20th, I'm just going to use initials |
| 11:27:56 | 25 | that you write this check to, made out to James Holloway, |

11:28:03  1  right?

11:28:05  2  A.   Yes.

11:28:15  3  Q.   $83,000 from T.A.P. Development, right?

11:28:27  4  A.   Yes.

11:28:27  5  Q.   And that's -- we could see a lot of the check that's

11:28:31  6  your Wells Fargo account ending in 7818?

11:28:36  7  A.   Yes.

11:28:39  8  Q.   And yesterday, you told us that you wrote this check

11:28:51  9  because you got a phone call while you were in Miami?

11:28:55  10  A.   Yes, I believe so.

11:28:56  11  Q.   Is that your recollection?

11:28:58  12  A.   Yes.  It's more on the dates that they're cashed that

11:29:03  13  I would know because I was told to write different dates

11:29:05  14  on the checks so can you tell me what date that check was

11:29:10  15  cashed, please?

11:29:11  16  Q.   Check was cashed on July 27th.

11:29:13  17  A.   Yes, then I wrote it from Miami.

11:29:16  18  Q.   When you wrote it, you believed it was needed

11:29:20  19  urgently?

11:29:20  20  A.   Same as every check, yes.

11:29:22  21  Q.   How did this check get from Miami to James Holloway?

11:29:27  22  A.   Fed Ex again.

11:29:32  23  Q.   So your testimony is that July 20th is the date you

11:29:37  24  wrote on the check but it's not the date you check wrote

11:29:39  25  the check.

11:29:40  1   A.   Correct.   I was instructed every time by Mr.

11:29:46  2   Youngblood to put different dates.

11:29:50  3   Q.   You said this one was Fed Exed from Miami?

11:29:56  4   A.   Yes.   Nicole's birthday was the 26th and which were

11:30:00  5   in Miami so that means if it was cashed on the 27th we

11:30:03  6   were still in Miami.

11:30:05  7   Q.   So on Nicole's birthday, you and she went to the Fed

11:30:09  8   Ex in Miami to send this check?

11:30:11  9   A.   Unfortunately, yes, because that was the day I got

11:30:14  10  called.

11:30:16  11  Q.   So you put the date July 20th.   You write the check,

11:30:25  12  you're telling us today, July 26th.   I'm just trying to

11:30:27  13  understand when this check was written --

11:30:28  14  A.   It was over-nighted so if it was cashed on the 27th,

11:30:30  15  then I had to have written it on the 26th.

11:30:32  16  Q.   And you didn't provide the FBI with the Fed Ex

11:30:35  17  showing?

11:30:36  18  A.   I don't know if I had that one or not but Nicole can

11:30:45  19  corroborate that.

11:30:46  20  Q.   I want to talk for a minute about your T.A.P.

11:30:52  21  Development account in July of '22.   In June of '22, you

11:30:57  22  had just received the proceeds from the sale one of your

11:31:01  23  investment properties under BCT, is it MOB Partners,

11:31:08  24  Medical Office Building Partners.   Do you recall that?

11:31:13  25  A.   Yes.

| | | |
|---|---|---|
| 11:31:13 | 1 | Q.   Tell us what BCT MOB Partners is. |
| 11:31:17 | 2 | A.   It's just a medical office building in Bee Cave, |
| 11:31:20 | 3 | Texas. |
| 11:31:21 | 4 | Q.   And you recall selling that property on 6-20 in Bee |
| 11:31:27 | 5 | Caves? |
| 11:31:27 | 6 | A.   My investors sold it, yes. |
| 11:31:29 | 7 | Q.   And that property sold for -- was it about 23 |
| 11:31:32 | 8 | million? |
| 11:31:34 | 9 | A.   I don't know.  I wasn't involved with the sale. |
| 11:31:38 | 10 | Q.   But you got some proceeds from that sale, right? |
| 11:31:41 | 11 | A.   Yeah.  My distributions, yeah. |
| 11:31:44 | 12 | Q.   I want to pull up Exhibit 47.  I'm going to just look |
| 11:32:11 | 13 | on June 23rd of '22.  You got an influx from the MOB |
| 11:32:20 | 14 | Partners $849,962 into your T.A.P. Development account. |
| 11:32:26 | 15 | A.   Yeah.  That's who owned the entity, T.A.P. |
| 11:32:30 | 16 | Development. |
| 11:32:30 | 17 | Q.   This is the same account we're talking about that |
| 11:32:32 | 18 | you're writing the checks from, right? |
| 11:32:34 | 19 | A.   Yes. |
| 11:32:35 | 20 | Q.   And if we go down the bottom by the end of June, it's |
| 11:32:43 | 21 | like you still had a balance in that T.A.P. Development |
| 11:32:45 | 22 | account of over $500,000.  Does that look right? |
| 11:32:49 | 23 | A.   Yes.  I had to write several checks to businesses |
| 11:32:54 | 24 | after that for a product that never went. |
| 11:33:10 | 25 | Q.   I'm going to go forward to the July T.A.P. |

11:33:15  1    Development bank statement which is Defendant's Exhibit 7.

11:33:26  2    So you've told us in July that you wrote this check,

11:33:32  3    you've said today now on the 26th of July, right?

11:33:36  4    A.   Yes.

11:33:38  5    Q.   We saw this bank statement earlier.  Looks like the

11:33:45  6    end of July -- I'm sorry, when your statement closed for

11:33:50  7    this period in July, it's not -- doesn't capture all the

11:33:53  8    days in July, you had $132,000 in that T.A.P. Development

11:33:59  9    account, right?

11:34:01  10   A.   Yes.

11:34:07  11   Q.   I want to just before we move on from this statement,

11:34:12  12   you talked yesterday about some threats that -- actually

11:34:17  13   we heard phone calls about you and Rachel owing some kind

11:34:21  14   of debt collectively to some -- forget if it was the

11:34:27  15   cartel or a bad actor.  Do you recall that?

11:34:29  16   A.   I didn't know the debt.  I was told by Mr. Drum abide

11:34:35  17   that Rachel owed that debt.

11:34:37  18   Q.   There was never a point where you believed that you

11:34:39  19   because of community property concerns also were

11:34:41  20   responsible for her debt?

11:34:42  21   A.   To a cartel?  I don't think the cartel works that

11:34:47  22   way.  I think I would not have owed community property --

11:34:52  23   I don't understand.  No, that -- I don't think they gave

11:34:54  24   me a receipt for the death threats of my child.

11:34:59  25   Q.   You never thought you owed money to the cartel.

11:35:01  1   A.   I gave my money to Mr. Youngblood.  He said that he

11:35:04  2   was handling the other cartel to keep me safe.  But I

11:35:09  3   never met a cartel person.  I only talked to him about the

11:35:13  4   cartel and James Holloway about the cartel and Marvin

11:35:16  5   about the cartel and Gloria about the cartel.

11:35:19  6   Q.   And you were never convinced that you were

11:35:21  7   responsible for Rachel's debt somehow.

11:35:23  8   A.   Well, I was convinced by Mr. Youngblood that I wanted

11:35:26  9   to keep my daughter Mazzlyn safe -- oh sorry.  Didn't want

11:35:30  10  to state my daughter's name.  Yes, he told me that I was

11:35:35  11  -- I would keep her safe at that time.  I believe that's

11:35:37  12  in.

11:35:38  13  Q.   By being responsible for a debt Rachel owed?

11:35:42  14  A.   He said he was paying most of it to keep her safe and

11:35:47  15  that that's all I could come up with at the time.

11:35:59  16  Q.   So I just want to point out before we move on that

11:36:04  17  looks like on the 27th of June, you made your annual tax

11:36:13  18  payment $170,000 for you and Rachel.  That was your

11:36:17  19  payment to the IRS, right?

11:36:19  20  A.   Yeah, but that's actually -- so when I got that

11:36:24  21  $840,000, it's a payment for the proceeds of that sale.

11:36:27  22  So it's a prepayment tax of the future years.  Not that

11:36:32  23  year.  I still owed money to the IRS for this year.

11:36:34  24  Q.   Exactly but this was -- this 1 $70,000 payment is a

11:36:39  25  payment to the IRS?

11:36:39 1  A.   Yes, for real estate you have to make your payment as

11:36:43 2  soon as you get a distribution for capital gains.

11:36:47 3  Q.   So going back to this $83,000 check, we see on July

11:37:02 4  27th, right, that this check was cashed, right?

11:37:06 5  A.   Yes.

11:37:08 6  Q.   It's your understanding that James Holloway cashed

11:37:10 7  that check?

11:37:12 8  A.   That's who I wrote it to.  And Kota called me to

11:37:26 9  confirm that he cashed it.

11:37:28 10  Q.   On the 27th.

11:37:30 11  A.   I mean.

11:37:31 12  Q.   That's what your bank records show, right?

11:37:33 13  A.   Oh, yeah.  I don't know if he called that day or not.

11:37:54 14  Q.   So I want to talk now a little bit about your

11:37:58 15  Washington Federal bank account and the home equity line

11:38:04 16  of credit that we've already heard about yesterday and

11:38:07 17  today and why you opened that account.

11:38:10 18       Did you ever tell Agent Wilkinson that you opened

11:38:14 19  the home equity line of credit because of Mr. Youngblood?

11:38:18 20  A.   No.

11:38:22 21  Q.   Before you and Rachel separated, you applied for that

11:38:27 22  home equity line of credit.

11:38:27 23  A.   Yes.

11:38:29 24  Q.   The lender was Washington Federal.

11:38:31 25  A.   Correct.

| | | |
|---|---|---|
| 11:38:32 | 1 | Q.   And that was done in September of 2021. |
| 11:38:36 | 2 | A.   Yes. |
| 11:38:37 | 3 | Q.   I'm going to pull up Exhibit 48.  This is a copy of |
| 11:38:54 | 4 | the security instrument for that -- |
| 11:38:58 | 5 | A.   Can we go back up to the top, please?  Says borrower |
| 11:39:03 | 6 | Eric J. Perardi. |
| 11:39:05 | 7 | Q.   And wife, Rachel Marie Perardi, right? |
| 11:39:08 | 8 | A.   But not at the top of that loan. |
| 11:39:12 | 9 | Q.   Reading here, borrower is Eric J Perardi and wife |
| 11:39:18 | 10 | Rachel Marie Perardi, right? |
| 11:39:20 | 11 | A.   Yep. |
| 11:39:21 | 12 | Q.   The lender is Washington Federal, right? |
| 11:39:26 | 13 | A.   Yes. |
| 11:39:27 | 14 | Q.   And if we look down here, the credit limit this was a |
| 11:39:32 | 15 | home equity line of credit for $461,322, right? |
| 11:39:36 | 16 | A.   Yes. |
| 11:39:37 | 17 | Q.   If we go to the last page of it, we can see that |
| 11:39:46 | 18 | Rachel actually had to sign off on this as well a |
| 11:39:52 | 19 | borrower, right? |
| 11:39:52 | 20 | A.   Yeah apparently. |
| 11:39:53 | 21 | Q.   That was done September 13 of '21. |
| 11:39:56 | 22 | A.   Yes. |
| 11:39:56 | 23 | Q.   The first -- once this was set up, you could draw on |
| 11:40:18 | 24 | that line of credit over time as needed, right? |
| 11:40:23 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:40:25 | 1 | Q.   And when you requested disbursements on that line of |
| 11:40:30 | 2 | credit, you had it set up to get deposited into an account |
| 11:40:34 | 3 | that you've set up also at Washington Federal, right? |
| 11:40:38 | 4 | A.   I believe that's the only way I could have the |
| 11:40:41 | 5 | disbursements. |
| 11:40:44 | 6 | Q.   So if we look at defendant's 56, you opened an |
| 11:40:52 | 7 | individual account at Washington Federal to receive those |
| 11:40:57 | 8 | disbursements.  Does that look right?  I believe that's |
| 11:41:00 | 9 | what your telling us.  I'm just trying to show you the |
| 11:41:02 | 10 | documents that? |
| 11:41:04 | 11 | A.   Yes. |
| 11:41:04 | 12 | Q.   Confirm that.  And you opened that account, we can |
| 11:41:09 | 13 | sea it here, you talked about this banker yesterday, |
| 11:41:12 | 14 | Tandrea Stenline, you opened this account in March of '22, |
| 11:41:16 | 15 | right? |
| 11:41:16 | 16 | A.   Yes. |
| 11:41:18 | 17 | Q.   And you opened it as an individual account as you've |
| 11:41:21 | 18 | said, you were the only one that had access to request |
| 11:41:23 | 19 | disbursements on the home equity line of credit? |
| 11:41:25 | 20 | A.   That was per the temporary orders. |
| 11:41:32 | 21 | Q.   And you testified yesterday that in July of '22, the |
| 11:41:38 | 22 | only available funds that you had to wire transfer were |
| 11:41:44 | 23 | funds that you would have had to wire transfer from the |
| 11:41:48 | 24 | home equity line of credit to your Wells Fargo account, |
| 11:41:51 | 25 | right? |

11:41:53  1   A.   I was trying to get money back into my accounts as

11:41:56  2   fast as I could so yes.

11:41:57  3   Q.   Do you recall testifying about that yesterday?

11:41:59  4   A.   Yes.

11:41:59  5   Q.   And that is what you said, right?

11:42:01  6   A.   Yes.

11:42:01  7   Q.   And you said you told us that Mr. Youngblood had that

11:42:05  8   conversation with you in that specific --

11:42:08  9   A.   Yes, he told me that every time I -- that next week

11:42:11  10  the money would be back so don't worry about it, don't

11:42:14  11  worry it, the money's coming back, the money's coming

11:42:17  12  back.  That was always --

11:42:17  13  Q.   You testified yesterday that you had a specific phone

11:42:21  14  call with Mr. Youngblood while you were in New Orleans

11:42:24  15  discussing that you would have to wire transfer funds

11:42:29  16  pulled from your home equity line of credit.

11:42:30  17  A.   I talked to him about having to borrow from my

11:42:34  18  businesses, borrow from lines of credit, all of those

11:42:37  19  things, yes.

11:42:37  20  Q.   So you did specifically discuss --

11:42:47  21  A.   Yes, I did.

11:42:49  22  Q.   I want to talk about your disbursements from your

11:42:52  23  home equity line of credit and how you use them, okay?  So

11:42:54  24  once your divorce proceedings began, you could only

11:42:57  25  request disbursements from the line of credit if they were

| | | |
|---|---|---|
| 11:43:01 | 1 | going to be used for authorized expenses, right? |
| 11:43:04 | 2 | A.   For lawyers. |
| 11:43:06 | 3 | Q.   For lawyers.   Authorized expenses? |
| 11:43:08 | 4 | A.   Correct. |
| 11:43:09 | 5 | Q.   And this was at some point in the divorce, there was |
| 11:43:13 | 6 | a dispute, right, between you and Rachel about whether she |
| 11:43:18 | 7 | wanted access to half the line of credit because she had |
| 11:43:21 | 8 | signed for it as well, right?  You recall that being a |
| 11:43:24 | 9 | dispute in your divorce? |
| 11:43:26 | 10 | A.   I think on her third lawyers, yes. |
| 11:43:34 | 11 | Q.   So I want to just talk briefly, make sure we |
| 11:43:38 | 12 | understand how this money from the home equity line of |
| 11:43:45 | 13 | credit moved, okay?  So we have the home equity line of |
| 11:44:13 | 14 | credit and you have just told us that money would get |
| 11:44:15 | 15 | disbursed to this Washington Federal account that was in |
| 11:44:21 | 16 | your name, right? |
| 11:44:21 | 17 | A.   Right but I had no checks to that account. |
| 11:44:23 | 18 | Q.   I'm just asking you? |
| 11:44:24 | 19 | A.   Yes. |
| 11:44:25 | 20 | Q.   Where this money went when it was disbursed so it |
| 11:44:28 | 21 | goes to a Washington Federal account and that account |
| 11:44:32 | 22 | number we see at the top ends in 6079, right? |
| 11:44:36 | 23 | A.   Yes. |
| 11:44:37 | 24 | Q.   So you could request the disbursement, that's where |
| 11:44:40 | 25 | the money would go. |

| | | |
|---|---|---|
| 11:44:42 | 1 | A.   Yes. |
| 11:44:45 | 2 | Q.   And then as you told us, you would have money wired |
| 11:44:53 | 3 | from Washington Federal to Wells Fargo, right? |
| 11:44:57 | 4 | A.   Yes. |
| 11:44:58 | 5 | Q.   And when you would do that, you would have it wired |
| 11:45:01 | 6 | into your Wells Fargo personal account.  That account |
| 11:45:05 | 7 | number that ends in 6673. |
| 11:45:07 | 8 | A.   Yeah, it couldn't be wired to T.A.P. Development. |
| 11:45:09 | 9 | Q.   So it was wired to your personal account? |
| 11:45:11 | 10 | A.   Yes. |
| 11:45:11 | 11 | Q.   In Wells Fargo 6673.  And then once it reached this |
| 11:45:24 | 12 | account, you could transfer it to another Wells Fargo |
| 11:45:28 | 13 | account, the T.A.P. Development account, right? |
| 11:45:31 | 14 | A.   Yes. |
| 11:45:31 | 15 | Q.   That's the account that ends in 7818. |
| 11:45:37 | 16 | A.   Yes. |
| 11:45:37 | 17 | Q.   When you would do that movement between your two |
| 11:45:43 | 18 | Wells Fargo accounts, you had many bank accounts in Wells |
| 11:45:46 | 19 | Fargo, right? |
| 11:45:46 | 20 | A.   Yes. |
| 11:45:47 | 21 | Q.   That's something you could do probably on an app even |
| 11:45:56 | 22 | but just through Wells Fargo? |
| 11:45:57 | 23 | A.   Yes. |
| 11:45:57 | 24 | Q.   That's just a bank transfer. |
| 11:45:59 | 25 | A.   Correct. |

11:46:10  1    Q.   And you told us earlier if you remember when we

11:46:12  2    looked at your asset sheet that 6673 at some point in 2022

11:46:19  3    considered a community asset and 7818, separate property

11:46:24  4    asset.  Do you recall that earlier?

11:46:26  5    A.   That's what they put on the sheet.  I think we were

11:46:29  6    assigned accounts separately at the temporary orders.

11:46:35  7    Q.   The home equity line of credit was a -- on that

11:46:40  8    sheet, you worked on that with your attorneys in April of

11:46:43  9    '22 -- was a community debt.

11:46:44  10   A.   Yes.

11:46:45  11   Q.   I want to talk about all the disbursements that you

11:46:54  12   made from that home equity line of credit.  I'm going to

11:47:03  13   pull up Defendant's 50.  You recollect if you go to the

11:47:28  14   next page, that the first disbursement from that home

11:47:32  15   equity line of credit was actually the day you opened that

11:47:34  16   account March 22nd of '22.  We see that here?

11:47:39  17   A.   Yes.

11:47:51  18   Q.   That was a $43,000 draw from that line of credit,

11:48:00  19   right?

11:48:01  20   A.   Yes.

11:48:01  21   Q.   Then you make if we pull up Exhibit 57.  We see here

11:48:17  22   not disbursement May 12 of 2022.  Do you see that?

11:48:22  23   A.   Yes.

11:48:23  24   Q.   Shows us here it's money moved from one of your

11:48:32  25   accounts to another of your accounts, right?

11:48:34  1   A.   Yes.

11:48:35  2   Q.   I believe at the top shows us it's a $48,000

11:48:46  3   disbursement, right?

11:48:47  4   A.   Yes.

11:49:01  5   Q.   Then if we keep scrolling down to June.  Do you see

11:49:16  6   this next disbursement on June 6th for another 48,000?

11:49:21  7   A.   Yes.

11:49:31  8   Q.   To be clear at this point, none of this?

11:49:35  9   A.   Do you have my Am Ex statement?

11:49:37 10   Q.   You didn't provide your credit card statements.  I

11:49:40 11   don't have your credit card statements?

11:49:41 12   A.   So the only way I could pay for.

11:49:42 13   Q.   But I didn't ask you a question about that.  We're

11:49:44 14   going to get to that.  I'm just going to ask you about

11:49:46 15   this disbursement.  At this point, March, May, June, Mr.

11:49:51 16   Youngblood has not asked you for any money, right?

11:49:53 17   A.   No.   This is for lawyer fees in my divorce.

11:50:12 18   Q.   We see this next disbursement, another one if June

11:50:20 19   2022, another 52,000, right?

11:50:24 20   A.   Yes.

11:50:25 21   Q.   Next one, July 11th, right?

11:50:39 22   A.   Yes.

11:50:45 23   Q.   84,000, do you see that?

11:50:49 24   A.   Yes.

11:50:49 25   Q.   You told us earlier these are for legal fees that

11:50:56  1  you're making these disbursement?

11:50:57  2  A.   84,000 was after I'd written a check to Mr.

11:51:02  3  Youngblood.  So the ones before that, yes, for sure.

11:51:07  4  Q.   It's your testimony that this wire on July 11th is

11:51:10  5  because of Mr. Youngblood?

11:51:11  6  A.   I mean, money had been written out of my account for

11:51:14  7  lawyer fees for the safety of my children.  I honestly at

11:51:20  8  that time was just trying to do anything I could to pay

11:51:24  9  all these bills and give him the money that he's

11:51:26  10  requesting to keep my child safe.

11:51:28  11  Q.   Is it your testimony that the disbursement on July

11:51:33  12  11th was related to Mr. Youngblood?

11:51:37  13  A.   Well, I had just given him a $70,000 check that I

11:51:40  14  believed he cashed.

11:51:41  15  Q.   Is it your testimony that this disbursement is

11:51:43  16  related to Mr. Youngblood?

11:51:44  17  A.   Yes.  I believe so.  I don't know.

11:51:51  18  Q.   Yes I believe so, I don't know.  Which of those is

11:51:54  19  the answer?

11:52:04  20  A.   I was just transferring money from that HELOC to pay

11:52:08  21  my bills for lawyers to pay for money that was requested

11:52:13  22  by him, to pay for moving expenses for Rachel.  I mean if

11:52:17  23  we go back to --

11:52:18  24  Q.   No, I don't want to go back?

11:52:20  25  A.   Okay.

113

11:52:20  1   Q.   I want you the answer the question.  Was this money

11:52:23  2   -- is it your testimony today that the disbursement was

11:52:25  3   because of Mr. Youngblood?  Yes, no or you don't know?

11:52:29  4   A.   I think he had a part to do with that check, yes.

11:52:36  5   It's not specifically just for that check but to cover

11:52:40  6   expenses that I was going through, yes.

11:52:43  7   Q.   Not for -- not specifically for that check.

11:52:47  8   A.   I don't know.

11:52:52  9   Q.   Let's go to the next page.  We get to this July 27th

11:52:59  10  wire which we're going to come back to.  Do you see there

11:53:03  11  one is for the $36,000 you testified about this one a

11:53:07  12  little bit yesterday, right?

11:53:08  13  A.   Yes.

11:53:09  14  Q.   And there's another one in August.  So we see August

11:53:49  15  10th, the 48,000, right, that's coming from the home

11:53:53  16  equity line of credit?

11:53:53  17  A.   Yes.

11:53:54  18  Q.   And we see right here there's another one August

11:54:01  19  16th, right?

11:54:02  20  A.   Yes.

11:54:04  21  Q.   I think that's the 50,000.  And then, I believe the

11:54:14  22  last one is defense Exhibit 51, 9-12, September 12, right,

11:54:47  23  25,000, right?

11:54:48  24  A.   Yes.

11:54:49  25  Q.   And at that point, the home equity line of credit is

| 11:54:57 | 1 | I believe pretty close to tapped out, right? |

11:54:57    1   I believe pretty close to tapped out, right?

11:54:59    2   A.   Yes.

11:55:00    3   Q.   It was as you've said an incredibly expensive

11:55:08    4   divorce, right?

11:55:11    5   A.   Yes, it keeps going after this.

11:55:15    6   Q.   As of January 2023, so yes, it's kept going, you'd

11:55:19    7   spent over $200,000 on your divorce attorneys.  Does that

11:55:24    8   sound about right?

11:55:25    9   A.   Yes and probably another 200 on hers.

11:55:28   10   Q.   Probably another 200 on hers.  You'd spent almost

11:55:31   11   half a million dollars on just attorneys' fees, right?

11:55:34   12   A.   Unfortunately, yes.

11:55:40   13   Q.   And you used the home equity line of credit to pay a

11:55:45   14   lot of these attorneys' fees?

11:55:46   15   A.   Yes.

11:55:56   16   Q.   So I want to go back to this July 27th wire transfer,

11:56:03   17   the one that you talked about yesterday.  If we pull up

11:56:13   18   defense 52.  We can see that you -- this is the Washington

11:56:29   19   Federal record that shows when you requested that

11:56:34   20   disbursement, right, so you did it on July 27th.  Looks

11:56:39   21   like the 11:00 in morning; is that right?

11:56:45   22   A.   Yes.

11:57:09   23   Q.   And when you make this disbursement, it goes -- this

11:57:16   24   is just the record it shows it's landed in the Washington

11:57:20   25   Federal account, right?

| | | |
|---|---|---|
| 11:57:21 | 1 | A.   Yes. |
| 11:57:38 | 2 | Q.   If you'll pull up Exhibit 2.  So going back to your |
| 11:57:43 | 3 | Washington Federal statement, here, we can then see that |
| 11:57:47 | 4 | there was a wire, right, on the same day, domestic wire |
| 11:57:51 | 5 | withdrawal out 7-27, $36,000, right? |
| 11:57:58 | 6 | A.   Yes. |
| 11:58:04 | 7 | Q.   And you showed us -- you talked about having to work |
| 11:58:12 | 8 | with your banker, having to actually make the request for |
| 11:58:15 | 9 | a wire to occur, right? |
| 11:58:17 | 10 | A.   Yes. |
| 11:58:18 | 11 | Q.   That's not something you do on an app on your phone? |
| 11:58:22 | 12 | A.   No.  I can't do that at that bank. |
| 11:58:37 | 13 | Q.   And there is a lag time between when you request a |
| 11:58:42 | 14 | wire and when a wire is completed, right? |
| 11:58:45 | 15 | A.   Yeah.  They have to get it in by a certain time but |
| 11:58:48 | 16 | yes. |
| 11:59:04 | 17 | Q.   You looked at this document yesterday.  This is a |
| 11:59:07 | 18 | Government's Exhibit.  It's also one of our exhibits, |
| 11:59:09 | 19 | Exhibit 3, and we see here, talked about the banker that |
| 11:59:17 | 20 | you frequently worked with, Tandrea Stenline, looks like |
| 11:59:20 | 21 | the wire was initiated at 1:28 p.m. and was finally |
| 11:59:24 | 22 | completed, took about an hour, 2:30 p.m.  do you see that? |
| 11:59:29 | 23 | A.   Yeah, they're on the west coast so they're three hour |
| 11:59:33 | 24 | -- two hours ahead of us. |
| 11:59:36 | 25 | Q.   Two hours behind us. |

| | | |
|---|---|---|
| 11:59:38 | 1 | A.   Or behind us, sorry, yeah. |
| 11:59:56 | 2 | Q.   And this again is that wire into Wells Fargo personal |
| 12:00:03 | 3 | checking 6673, right? |
| 12:00:06 | 4 | A.   Yes. |
| 12:00:19 | 5 | Q.   And it says here so it's 1:28 p.m., initiated which |
| 12:00:27 | 6 | you're saying is 3:28 p.m., our time? |
| 12:00:31 | 7 | A.   Well, Tandrea is in Dallas so the other one is the -- |
| 12:00:34 | 8 | the 2:29, I imagine, is the one on the west coast of when |
| 12:00:38 | 9 | they actually sent it.  I don't know.  I wasn't -- I don't |
| 12:00:40 | 10 | work at that bank but I know that it comes out of |
| 12:00:43 | 11 | Washington state. |
| 12:00:48 | 12 | Q.   But it looks like by the afternoon of the 27th, that |
| 12:00:52 | 13 | money has been wired into your Wells Fargo account. |
| 12:00:56 | 14 | A.   Yes. |
| 12:00:56 | 15 | Q.   And this again, this is moving money from your |
| 12:01:04 | 16 | account in Washington Federal to your account at Wells |
| 12:01:10 | 17 | Fargo. |
| 12:01:10 | 18 | A.   Yes. |
| 12:01:11 | 19 | Q.   Just to look at the July statement we can see that |
| 12:01:34 | 20 | that wire reaches -- this is 6673 account, the 36,000 |
| 12:01:39 | 21 | comes in, right? |
| 12:01:40 | 22 | A.   Yes. |
| 12:01:41 | 23 | Q.   And we even see here, we talked about this yesterday |
| 12:01:46 | 24 | you've gotta pay a fee to do a wire transfer.  There's a |
| 12:01:49 | 25 | $15 charge for that wire. |

| | | |
|---|---|---|
| 12:01:51 | 1 | A.   Yes. |
| 12:01:57 | 2 | Q.   Now, the following day, the 28th, you make a transfer |
| 12:02:03 | 3 | to T.A.P. Development, right, of $29,000? |
| 12:02:13 | 4 | A.   Yes. |
| 12:02:13 | 5 | Q.   And that's just a transfer to another Wells Fargo |
| 12:02:27 | 6 | account, right?  That's not a wire. |
| 12:02:31 | 7 | A.   Correct. |
| 12:02:31 | 8 | Q.   You call that for lawyers -- I believe it's for |
| 12:02:51 | 9 | lawyer fees, right? |
| 12:02:53 | 10 | A.   That's what I put on the check -- or on that wire, |
| 12:02:57 | 11 | yeah, or transfer, sorry. |
| 12:02:59 | 12 | Q.   On the transfer.  You're the one who puts a notation |
| 12:03:02 | 13 | in when you? |
| 12:03:03 | 14 | A.   Yes. |
| 12:03:04 | 15 | Q.   When you move it between your Wells Fargo accounts? |
| 12:03:07 | 16 | A.   Yes. |
| 12:03:07 | 17 | Q.   I want to show you Defendant's Exhibit 20 already |
| 12:03:18 | 18 | admitted.  You told us yesterday, you have experience as a |
| 12:03:24 | 19 | sophisticated businessman with bank record so this is not |
| 12:03:27 | 20 | your record but I want to show you this.  Wells Fargo bank |
| 12:03:32 | 21 | account James Holloway, person you wrote the check to |
| 12:03:39 | 22 | 7-27, cashes that check, right? |
| 12:03:41 | 23 | A.   Yes. |
| 12:03:42 | 24 | Q.   He cashed it at 9:32 a.m. central time? |
| 12:03:51 | 25 | A.   Yes.  I believe he got the Fed Ex that morning. |

| | | |
|---|---|---|
| 12:03:55 | 1 | Q.   Went right to cash it. |
| 12:03:57 | 2 | A.   That was every time I gave him a check, they usually |
| 12:03:59 | 3 | went right to cash them. |
| 12:04:02 | 4 | Q.   So I just want to -- making this as you've explained |
| 12:04:10 | 5 | it to us James Holloway cashes your check before you even |
| 12:04:17 | 6 | disburse from your home equity line of credit and before |
| 12:04:22 | 7 | you initiate the wire and before the wire's completed and |
| 12:04:26 | 8 | before you move the money to T.A.P. Development. |
| 12:04:32 | 9 | A.   Yes. |
| 12:04:33 | 10 | Q.   And the check you wrote to James Holloway was drawn |
| 12:04:36 | 11 | from T.A.P. Development? |
| 12:04:38 | 12 | A.   Yes. |
| 12:04:39 | 13 | Q.   Money from this wire didn't reach T.A.P. Development |
| 12:04:44 | 14 | until the 28th of July, right? |
| 12:04:46 | 15 | A.   Correct. |
| 12:04:54 | 16 | Q.   You recall that month, July, you did wrote a almost |
| 12:05:00 | 17 | $36,000 legal bill to your divorce attorneys? |
| 12:05:07 | 18 | A.   If you say so, yes. |
| 12:05:21 | 19 | Q.   Your attorney worked for -- I can't say the name NMSB |
| 12:05:27 | 20 | was the short version of the law firm? |
| 12:05:30 | 21 | A.   Yeah, Judith Bryant. |
| 12:05:34 | 22 | Q.   May I approach, your Honor? |
| 12:05:38 | 23 | THE COURT:  You may. |
| 12:05:40 | 24 | Q.   (BY MS. HERRING) Do you recognize this legal bill? |
| 12:05:45 | 25 | A.   Yeah, looks like all of them.  Yes.  There's a lot of |

| | | |
|---|---|---|
| 12:05:48 | 1 | them. |
| 12:05:48 | 2 | Q.   Does it look like an accurate copy of your July 2022 |
| 12:05:54 | 3 | legal bill? |
| 12:05:54 | 4 | A.   Yes. |
| 12:05:54 | 5 | Q.   I would move to admit Defendant's 112. |
| 12:05:58 | 6 | MR. GUESS:   No objection, your Honor. |
| 12:05:59 | 7 | THE COURT:   So admitted. |
| 12:06:06 | 8 | Q.   (BY MS. HERRING) We can see on the last page of this |
| 12:06:12 | 9 | bill you did owe -- the bill was for total amount $35,235, |
| 12:06:22 | 10 | right? |
| 12:06:22 | 11 | A.   To replenish the trust, yes.   The bill is 23 it looks |
| 12:06:29 | 12 | like and then you've gotta put 10 back.   They always want |
| 12:06:32 | 13 | to put 10 in there. |
| 12:06:33 | 14 | Q.   So the July bill was $35,235. |
| 12:06:36 | 15 | A.   Okay.   Yeah. |
| 12:06:39 | 16 | Q.   Do you see that? |
| 12:06:40 | 17 | A.   Yes. |
| 12:06:43 | 18 | Q.   I want to talk about another $36,000 expense that you |
| 12:06:48 | 19 | owed your divorce in July of '22.   You told us earlier, |
| 12:06:54 | 20 | you and your attorneys had filed the motion to amend the |
| 12:06:56 | 21 | temporary orders to get Rachel to move out of your house, |
| 12:06:59 | 22 | right? |
| 12:07:00 | 23 | A.   Yes. |
| 12:07:02 | 24 | Q.   You were hoping to sell the house because you had a |
| 12:07:06 | 25 | lot of debt, a lot of bills at this point. |

12:07:08  1   A.   Well, I couldn't afford the other house either.  So I

12:07:12  2   can't want to sell the house at the time.  I just wanted

12:07:15  3   to move back into it with my children.

12:07:17  4   Q.   And in fact, you got the temporary orders amended in

12:07:20  5   July of '22 so that Rachel was ordered to vacate the home

12:07:24  6   by August 1st?

12:07:25  7   A.   Yes.  That was the judge's order.

12:07:28  8   Q.   But in exchange for her agreeing to vacate the home,

12:07:33  9   you were ordered to prepay twelve months of rent on a new

12:07:38  10  place for Rachel, right?

12:07:39  11  A.   Yeah.  I don't think she agreed to it.  The judge

12:07:42  12  ruled that but yes.  And then, I was asked to pay for an

12:07:46  13  apartment -- or for a house for her.

12:07:49  14  Q.   And she found a place out in Spicewood, right?

12:07:52  15  A.   Yeah.  Yes.

12:07:55  16  Q.   And you were in fact ordered to pay exactly $36,000,

12:08:02  17  right?

12:08:03  18  A.   Well, I was ordered to pay for furniture, moving

12:08:07  19  expenses and whatever her bill would be for her apartment.

12:08:14  20  I think it had a certain cap, I'm sure I had to pay first

12:08:19  21  and last month's rent, deposit, I mean, I agreed to

12:08:22  22  whatever it took to help her out.

12:08:30  23  Q.   May I approach, your Honor?

12:08:31  24       THE COURT:  You may.

12:08:33  25  Q.   (BY MS. HERRING) I'll show you a copy of the

12:08:35  1  temporary orders.  Do you recognize this as the amended

12:08:39  2  temporary orders entered in July 28th of 2022?

12:08:43  3  A.   Yes.

12:08:43  4  Q.   Does that look to be the signatures, the accurate

12:08:49  5  copy of your temporary orders from that date?

12:08:55  6  A.   Yes.

12:08:56  7  Q.   We move to admit Defendant's 110.

12:08:59  8         MR. GUESS:   No objection.

12:09:00  9         THE COURT:   So admitted.

12:09:02  10  Q.   (BY MS. HERRING) So if we go to the second page.

12:09:13  11  When we look at this top section, further ordered that

12:09:19  12  Eric Perardi is authorized to draw against the HELOC and

12:09:22  13  shall prepay 12 months of rent for Rachel Perardi's new

12:09:26  14  residence up to the amount of $36,000.  The parties

12:09:28  15  acknowledge by their signatures below her new residence is

12:09:31  16  located, she said it's in Spicewood, and that Eric Perardi

12:09:35  17  has delivered payment of 36,000 to the landlord as of the

12:09:40  18  date of entry of this order.  Do you see that?

12:09:42  19  A.   Yes.

12:09:43  20  Q.   You were authorized by the court to draw $36,000

12:09:48  21  against the home equity line of credit for this specific

12:09:51  22  purpose.

12:09:52  23  A.   Yes.

12:09:52  24  Q.   And you drew $36,000 on July 27th.

12:10:01  25  A.   Yeah.  This all happened at the same time.  Yes.

| | | |
|---|---|---|
| 12:10:06 | 1 | Q.  The wire of $36,000 matches exactly the amount you |
| 12:10:12 | 2 | were authorized to have wired out of that account by the |
| 12:10:16 | 3 | divorce court. |
| 12:10:17 | 4 | A.  Yes. |
| 12:10:31 | 5 | Q.  Bring up Defendant's Exhibit 42.  This next |
| 12:10:47 | 6 | paragraph, the parties have agreed and acknowledged that |
| 12:10:50 | 7 | Eric Perardi has delivered payment of -- you mentioned |
| 12:10:53 | 8 | this, the security deposit, 3,650, $800 pet deposit as |
| 12:10:59 | 9 | well to that same -- to the landlord of -- |
| 12:11:03 | 10 | A.  Yeah, if you scroll down, there's also a $5,000 |
| 12:11:05 | 11 | insurance -- I mean, furniture, as well, I believe, in |
| 12:11:09 | 12 | that same order.  No? |
| 12:11:20 | 13 | Q.  And you did indeed write a check from T.A.P. |
| 12:11:24 | 14 | Development for a total amount of $40,450, which we can do |
| 12:11:34 | 15 | on a calculator together or agree is 36,000 plus the |
| 12:11:37 | 16 | security deposit plus the pet deposit to Fort Pedernales, |
| 12:11:43 | 17 | which is the landlord or the property management company |
| 12:11:47 | 18 | of Rachel's new address, right? |
| 12:11:48 | 19 | A.  Yes. |
| 12:11:51 | 20 | Q.  You also dated this check July 20th of 2022. |
| 12:11:56 | 21 | A.  Well, the order, that's when I actually had to send |
| 12:11:58 | 22 | it.  The orders were -- yeah, I mean, had to mail it |
| 12:12:03 | 23 | because I was away, I guess. |
| 12:12:05 | 24 | Q.  You mailed this check also. |
| 12:12:06 | 25 | A.  I believe so.  Yes.  I was in -- away at that time. |