UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff.<br><br>v.<br><br>SAINT JOVITE YOUNGBLOOD,<br>    Defendant. | CRIMINAL NO. 1:23-CR-135-RP |

**SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE**

The Government respectfully submits this memorandum asking the Court to impose a sentence of **480 months imprisonment** in the above case, based on the factors in 18 U.S.C. § 3553(a). Although the Government's request is significantly higher than the Guidelines range of 168 to 210 months, it is justified by the exceptional facts of this case.

For decades, Youngblood has consistently deceived and victimized people, including family, friends, and strangers. He is a remorseless predator who uses others for his own benefit, regardless of the cost to their physical, mental, or financial well-being. Youngblood has repeatedly blamed others for his own conduct and refused to take responsibility for his actions. A sentence of 480 months is a reasonable and just punishment, amply supported by the 3553(a) factors.

I. **18 U.S.C. § 3553(a)(1)**

    A. **The nature and circumstances of Youngblood's offenses justify a sentence of 480 months.**

Youngblood's conduct in this case is comparable to the most heinous the undersigned have seen in their combined 42 years as prosecutors. What sets this case apart is not Youngblood's unfettered greed and indiscriminate dishonesty—these are common features of fraud cases. Nor is it the over 12 million dollars Youngblood stole from victims or the significant financial hardships he inflicted on them and that they continue to suffer; sadly, these are also hallmarks of many fraud

cases.

Instead, Youngblood's crimes are unique because of the extensive and gratuitous ways he victimized many of his targets. First, unlike many fraudsters, Youngblood routinely targeted people who were well known to him, and with whom he had falsely fostered close relationships. As many victims reported, Youngblood deliberately and methodically infiltrated their lives and the lives of their families, building trust through favors, gifts, and charm. Youngblood established credibility by exploiting his false persona as a decorated military veteran who valued loyalty, honesty, and integrity above all else—and used this fake pedigree as a means of demanding unconditional trust from victims in return. When victims questioned Youngblood's false claims and promises, he responded with anger and feigned shock that someone he considered like family would impugn his impeccable reputation.[1] Of course, only Youngblood knew that these relationships were illusory; his victims believed their friendships with Youngblood were real, meaningful, and based on mutual respect and affection.

Youngblood also increased victims' reliance on him through fear and isolation. Often, Youngblood would tell victims that they were in danger from some fictitious threat, but that they could not seek help from family, friends, or law enforcement—generally because these people were directly associated with the supposed threat. Instead, they had to rely solely on his "protection," not only in relation to the extortion payments he would demand, but often also in the form of firearms he would spontaneously pressure people to take and encourage them to keep readily available. Youngblood's lies, isolation of victims, and use of firearms created an

---

[1] As victims testified, Youngblood commonly referred to them as his best friend or a surrogate brother, father, or grandfather. To maximize the impact on victims, Youngblood typically compounded these false expressions of affection with poignant lies about the deaths of his actual family members.

environment of uncertainty, paranoia, and fear for victims, all so Youngblood could make himself their indispensable savior.

Youngblood's calculated, years-long strategy of befriending, grooming, scaring, isolating, and betraying his victims warrants a significant upward variance from the Guidelines range, not only because it demonstrates the extreme callousness of Youngblood and his scheme, but also because of the increased psychological impact on his victims.

The second highly aggravating feature of Youngblood's scheme was his exploitation of certain victims to further his fraud against others. Two notable examples of this aspect of Youngblood's scheme are his use of James Holloway to cash checks and recruit new victims; and his use of Lane Holloway and his wife to make harassing phone calls and write derogatory emails and social media posts to advance Youngblood's plot. Youngblood's use of victims in this way exacerbates his crime both practically and morally.

From a practical standpoint, Youngblood was able to significantly expand the scope of his fraud by trading on his victims' relationships and reputations for honesty. For instance, Gary Snider testified that he gave money to Youngblood so readily in part because he trusted both Youngblood and James Holloway, the latter of whom he had been friends with for many years. Similarly, Youngblood persuaded Eric Perardi to borrow from his friends, girlfriend, and elderly parents to pay the money he demanded. Youngblood simply would not have been able to defraud as many victims or to steal as much money from them if he had not manipulated them into assisting him.

Morally speaking, Youngblood's use of victims to defraud other victims represents a distinct form of exploitation, on top of lying to them and taking their money. For some victims, the worst consequence of Youngblood's scheme was not the loss of their money, but the alienation

of their friends and family. These victims, some of whom acted as unknowing instruments of Youngblood's scheme, and some of whom were persuaded by a friend or family member to believe Youngblood's lies, must suffer not only the pain of betrayal by their "friend" Youngblood, but also the torment of their perceived betrayal by, or of, actual loved ones.

More egregious still is Youngblood's victimization of Lane Holloway and his family. *See, e.g.*, PSR ¶ 18. Youngblood was not content simply to lie to them and take their money, nor even to use them to defraud Eric Perardi and others. Instead, Youngblood isolated them financially and socially, coercing Lane Holloway to quit his job, "protect" himself by getting an alias name—chosen by Youngblood—tattooed on his hand, and ultimately leave Austin. At Youngblood's instruction, Holloway and his wife also legally changed their names and the names of their children to "protect" them from an imaginary threat. For the same reasons, Lane, his wife, and their three small children spent over a year in a small, extended-stay hotel room in Florida. Youngblood kept them in constant fear of death, and ensured they remained financially dependent on him by saying the cartel would find them if they got jobs. He likewise prohibited them from seeking medical care or enrolling their children in school. Despite Lane's pleas, Youngblood refused to send money for Lane to buy the insulin he desperately needed as a diabetic. What little money Youngblood did send was conditioned on obedience to his demands. Youngblood's domination of and cruelty to Lane Holloway and his family went far beyond what was necessary to perpetrate his fraud—and far beyond what is typical in any criminal case, much less a white collar one. Instead, it speaks to Youngblood's deep and abiding malice.

Youngblood's conduct takes him far outside the mainstream of cases contemplated by the Guidelines. Accordingly, an upward variance to 480 months is warranted in this case to reflect the seriousness of his offense, promote respect for the law, and provide just punishment. *See* 18 U.S.C.

§ 3553(a)(2)(A).

**B. Youngblood's history and characteristics justify a sentence of 480 months.**

Youngblood's history of deception, fraud, and predatory behavior is extensive, spanning many years and targeting many people, including his own family. The following are some notable examples of Youngblood's past actions that illustrate his character.

**1. Youngblood's lies go back decades, and his victims include his own father.**

Youngblood has been lying to and stealing from people since he was a teenager. His fraud goes back to at least his high school days, when he ran up about $20,000 in charges on credit cards he had obtained in his father's name, without his father's knowledge or permission. *See* Attach. A (D. Schuler Interview) at 1. This was also when Youngblood began falsely telling people that his father was in the FBI. *See id.* Youngblood also repeated to his father the familiar lie that Youngblood had served in the military. *See id.* at 2. Youngblood attempted to defraud his father by telling him that Russians were after him and had cut off one of his fingers. *See id.* Meanwhile, Youngblood was lying to his wife Gloria, telling her that his biological father was just a man who had raised him. *See id.*

**2. Youngblood deceived and victimized his wife and sons.**

Youngblood's relationship with his wife Gloria was based on lies. Among other things, Youngblood falsely claimed to have been born in Osaka, Japan, the son of an FBI agent father and nurse mother. *See* Attach. B (G. Youngblood Interview) at 1–2. He fabricated a story about his girlfriend and biological parents being murdered in Ohio when he was 14, after which his "guardians" purportedly stole his inheritance and changed his name to "Dennis Schuler, Jr."[2] *See*

---

[2] In truth, the "guardians" in this story were Youngblood's actual biological parents, and of course "Dennis Schuler, Jr." was Youngblood's birth name.

*id.* at 2. As he did with many others, Youngblood falsely told his wife and children he was a military veteran. *See id.* at 3; Attach. C (E. Youngblood Interview) at 2. Youngblood kept his wife and children constantly in fear of harm, including harm from corrupt police, drug cartels, and the Russian mafia. *See* Attach. B (G. Youngblood Interview) at 2–3; Attach. C (E. Youngblood Interview) at 1. As he did with many other victims, Youngblood isolated and alienated Gloria from her biological family and told her that she could only trust and rely on him. *See* Attach. B (G. Youngblood Interview) at 2–3. Youngblood instructed his wife and sons to pretend that his eldest son Eventine was dead, supposedly to keep Eventine safe from a cartel threat. *See id.* at 3; Attach. C (E. Youngblood Interview) at 1. In reality, the story of Eventine's alleged death was simply another deception by Youngblood, calculated to promote his fraud scheme.

**3. Youngblood stole from and lied to the mother of his daughter.**

In the mid-90's, Youngblood sold a car to a woman while working at a dealership in California. *See* Attach. D (KS Interview) at 1. The two began dating shortly thereafter. *See id.* When the woman received a $3,000 inheritance, Youngblood told her he could double her money in a week. *See id.* The woman agreed and gave Youngblood the money; he promptly disappeared. *See id.* Shortly thereafter, the woman learned she was pregnant. *See id.* Four years after her daughter was born, the woman hired a private investigator who located Youngblood. *See id.* Youngblood paid child support for approximately four months, after which he came up with excuses for why he could not pay, including the lie that he needed the money to support his "adopted" son Eventine. *See id.* at 1–2. Youngblood also told the woman other lies, including that he was a military sniper and helicopter pilot. *See id.* at 2.

Youngblood maintained an intermittent relationship with his daughter over the years. *See* Attach. E (EM Interview) at 1. As he did with other people, Youngblood structured his relationship

with his daughter around his own self-interest: When she was a child, Youngblood used her as a "prop" during his "business trips." *See id.* At various times, Youngblood gave her jewelry and other expensive items, only to take them back and never return them—a pattern of behavior described by many of the victims in this case. *See id.*

Youngblood's treatment of his daughter and her mother echoes his manipulation and abuse of other victims in this case. His longstanding pattern of self-serving behavior reinforces the fact that his actions in this case were established habit, not an anomaly. Youngblood's sentence should reflect his career of deception.

**4. Youngblood lied to and tried to defraud complete strangers.**

Although Youngblood typically stole from his purported "friends," he was also willing to deceive complete strangers. Shortly before his arrest, Youngblood attempted to defraud a person who sat next to him on an airplane during one of his frequent trips to Las Vegas. *See* Attach. F (John Interview) at 1. Contrary to his testimony at trial, Youngblood told this person that he did not gamble in Las Vegas; instead, he claimed he was there to conduct military training. *See id.* at 1–2. Youngblood attempted to get $80,000 from this man by inventing an imaginary drug debt owed by his son. *See id.* Youngblood later tried to sell his house to the man for $300,000 in cash, falsely claiming that such a sale would circumvent an $80,000 lien on the property. *See id.* In fact, Youngblood's house had a $750,000 IRS lien on it. *See* Attach. G (Rady Interview) at 2. After his first gambits failed, Youngblood asked the man for an $80,000 loan. *See* Attach. F (John Interview) at 2. This and similar incidents show Youngblood's willingness to victimize anybody at any time if he thinks it will benefit him. Such indiscriminate malice deserves an extraordinary upward variance.

**C. <u>A sentence of 480 months will help protect the public from future crimes by Youngblood.</u>**

As the United States Sentencing Guidelines acknowledge, crafting a sentence sufficient to protect the public from a defendant's further crimes requires courts to assess the likelihood of that defendant's recidivism and future criminal behavior. *See* U.S.S.G. Ch. FOUR, Pt. A, Refs & Annos. A sentence above the Guidelines range may be warranted where a defendant's criminal history category substantially under-represents the likelihood that they will reoffend. *See* U.S.S.G. § 4A1.3. Such a determination may be made on the basis of prior similar adult criminal conduct, even if such conduct does not result in a criminal conviction. *See id.* § 4A1.3(a)(2)(E).[3] Similarly, the degree to which a defendant depends upon criminal activity for a livelihood is relevant in determining the appropriate sentence. *See id.* § 5H1.9; *see also* 28 U.S.C. § 994(i)(2) (directing the United State Sentencing Commission to assure that the Guidelines "specify a sentence to a substantial term of imprisonment" for defendants who "committed the offense as part of a pattern of criminal conduct from which the defendant derived a substantial portion of the defendant's income").

Youngblood is almost certain to reoffend upon release: he is a lifelong predator with no legitimate employment who has consistently refused to take responsibility for his criminal actions, much less express remorse for the harm he has caused. As the record shows, he has lied to his family and purported friends for decades about virtually every aspect of his life, from his birth to his childhood to his invented military career to his false government service to the fictitious death of his son, all as a means of controlling others and profiting himself. Youngblood has offered this Court no evidence to suggest that he intends to alter his consistent pattern of deception and fraud. Indeed, even direct law enforcement intervention failed to change Youngblood's ways. As the trial

---

[3] Although Section 4A1.3 speaks to *departures* based on under-represented criminal history category, the same concerns can also be the basis of non-Guidelines *variances*. *See, e.g.*, *United States v. Mejia-Huerta*, 480 F.3d 713, 723 (5th Cir. 2007).

evidence showed, Youngblood continued to defraud victims even after the FBI executed a search warrant at his home on July 13, 2023—including receiving thousands of dollars from Dr. Hanfu Lee in the following weeks, concluding with two Zelle payments from Dr. Lee on the day of Youngblood's arrest at the Austin airport while waiting to board his flight to Las Vegas. *See* Gov. Tr. Exh. 247 at 2. Nor did the experience of trial open Youngblood's eyes; notwithstanding the overwhelming evidence of his fraud, he vociferously (and frivolously) maintains that he has never defrauded anybody—indeed, in his view, he is the true victim in this case. *See*, e.g., Youngblood Letter [ECF No. 128] at 2–5 (suggesting Eric Perardi's lawyer solicited inmates to hurt or kill Youngblood, accusing the lawyer of conspiring with Special Agent Noble and others to improperly influence Youngblood's case, and falsely attributing statements to Judge Lane at the detention hearing).

As many courts have held, a defendant's past conduct is often indicative of his probable future behavior. *See, e.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *United States v. Hebert*, 574 F. Supp. 3d 416, 427 (E.D. Tex. 2021) ("The best predictor of future behavior is past behavior."). Here, Youngblood's past conduct all but ensures he will reoffend upon release. A sentence of 480 months will help protect the public from Youngblood's predations for many years.[4]

The Government recognizes that the farther a sentence varies from the applicable Guideline sentence, the more compelling the justification based on the 3553(a) factors must be. *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006). However, while an appellate court may take the degree of variance into account and consider the extent of a deviation from the Guidelines, it may not

---

[4] But probably not forty years: given Youngblood's potential eligibility to earn time credits while incarcerated, it is plausible he will serve less than two-thirds of his sentence in a custodial setting. *See* 18 U.S.C. § 3632(d); 18 U.S.C. § 3624(g).

require extraordinary circumstances or employ a rigid mathematical formula using a departure's percentage as the standard for determining the strength of the justification required for a specific sentence. *See Gall v. United States*, 552 U.S. 38, 47 (2007). Even a significant variance from the Guidelines does not constitute an abuse of discretion if it is commensurate with individualized, case-specific reasons, as found by the district court. *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015). A non-Guideline sentence unreasonably fails to reflect the statutory sentencing factors where it (1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors. *Smith*, 440 F.3d at 708. Appellate review for substantive reasonableness is highly deferential, because the sentencing court is in a better position to find facts and judge their import under the § 3553(a) factors with respect to a particular defendant. *United States v. Hernandez*, 633 F.3d 370, 375 (5th Cir. 2011).

Courts impose sentences far above the advisory Guidelines range when necessary to ensure that the sentence reflects the severity of the offense and protects the public from further crimes. For instance, the defendant in *United States v. Rosogie*, 21 F.3d 632, 633 (5th Cir. 1994), was sentenced to an above-Guidelines sentence of 150 months of imprisonment after pleading guilty to possession of stolen mail, illegal reentry, and making a false statement on a passport application. In finding that this was a reasonable departure from the Guidelines range of 30 to 37 months, the Fifth Circuit emphasized the defendant's "deceptive, fraudulent offenses" as well as his "high risk of recidivism." *See id.* at 634. Similarly, in *United States v. Rhine*, the district court imposed an above-Guidelines sentence of 180 months after the defendant's guilty plea in a drug and firearm case, approximately six times the Guidelines range of 30-37 months; this sentence was affirmed as reasonable on appeal, based on the § 3553(a) factors, including conduct outside the scope of the

indictment. 637 F.3d 525, 526, 528–30 (5th Cir. 2011). So too was the 210-month sentence imposed for intoxication manslaughter in *United States v. Key*, 599 F.3d 469, 471–72 (5th Cir. 2010)—a sentence more than 13 years longer than the low-end of the advisory Guidelines range of 46 to 57 months. In part, the Fifth Circuit found that the variance was justified by the "extreme nature and circumstances of the offense" and the fact that the defendant's conduct reflected wanton carelessness for others. *See id.* at 475. And in *United States v. Daughenbaugh*, a mail threat case, the defendant was sentenced to 240 months of imprisonment—183 months above the low end of his Guidelines range of 57 to 71 months. 49 F.3d 171, 174–75 (5th Cir. 1995). The district court justified this departure in part because the defendant "seem[ed] to have a propensity to engage in criminal conduct at all times and perpetuate criminal acts." *Id.* at 175. The Fifth Circuit found this was a reasonable sentence. *Id.*

Substantial variances are also upheld in fraud cases where aggravating factors are present. In *United States v. Brantley*, 537 F.3d 347, 348 (5th Cir. 2008), the defendant pled guilty to bank fraud and passing counterfeit checks and was sentenced to 180 months of imprisonment, despite his Guidelines range being only 41 to 51 months. In upholding the upward variance, the Fifth Circuit emphasized the extended nature of Brantley's crimes, calling him "practically a one-man crime wave for 30 years," and observing that a long period of incarceration was necessary to protect the public and ensure adequate deterrence. *See id.* at 350. Similarly, in *United States v. Randall*, 440 Fed. App'x 283, 284–85 (5th Cir. 2011) (unpublished), the defendant pled guilty to mail and bank fraud and was sentenced to 180 months, almost twice the low-end Guidelines recommendation of 97 months. In affirming the district court, the Fifth Circuit found that several factors justified the upward variance, including the defendant's likelihood of committing future fraud and the reprehensibility of his conduct in targeting people in his Alcoholics Anonymous

group. *See id.* at 289–290. The Fifth Circuit also affirmed a 120-month sentence (an 87-month upward variance) in a wire fraud case with a single victim and a loss amount of approximately $500,000. *See United States v. Navarro-Jusino*, 993 F.3d 360, 361 (5th Cir. 2021). Among other reasons, the Fifth Circuit found that a large upward variance was justified by the impact to the victim and the defendant's apparent lack of acceptance of responsibility during his colloquy. *See id.* at 362 (finding that each of these factors warranted a "large" variance). Other Circuits have imposed similar sentences where the defendant's conduct or history were particularly egregious. *See, e.g.*, *United States v. Bartoli*, 728 Fed. App'x 424, 425–26, 429–30 (6th Cir. 2018) (unpublished) (affirming sentence 12 years and almost 250% higher than low end of recommended Guidelines sentence); *United States v. Mitchell*, 617 Fed. App'x 976, 980 (11th Cir. 2015) (unpublished) (affirming 15-year sentence, almost 260% above low end of Guidelines).

Although case comparisons are of limited use in the context of the fact-based, individualized assessments that must be made at sentencing, *see Key*, 599 F.3d at 475–76, this Court may find helpful the Fourth Circuit's opinion in *United States v. Robertson*, 856 Fed. App'x 432 (4th Cir. 2021) (unpublished). In *Robertson*, the defendant was found guilty after a jury trial of 15 counts of wire fraud related to his operation of an eight-year, $10-million Ponzi scheme that victimized, among other people, his family friends. *Id.* at 433–34. The district court sentenced Robertson to 480 months of imprisonment, over twice the low-end Guideline recommendation of 235 months. *Id.* at 435. Robertson appealed, claiming his sentence was unreasonable. *Id.* In rejecting Robertson's argument and affirming the district court, the Fourth Circuit noted several aggravating factors that justified the substantial upward variance: Robertson's targeting of vulnerable victims and people close to him, his misuse of financial savvy and other expertise to prey upon less sophisticated victims, his callousness and lack of remorse, the seriousness of his

offense, and the need for deterrence. *See id.* at 437–39.

Youngblood's conduct shares many features with Robertson's: both misused personal relationships to perpetrate their fraud, claimed expertise over their victims,[5] and evinced a total disregard for the well-being of their victims. However, Youngblood's acts were even more reprehensible: unlike Robertson, Youngblood put many of his victims in fear of physical harm to themselves or their families; deliberately destroyed relationships between family members and friends; coerced Lane Holloway and his wife to abandon their home and prior life and reside in a small hotel room with three small children for over a year; and recklessly endangered the life of Lane Holloway by denying him needed medication. Also, unlike Robertson, who ultimately apologized to victims for his conduct, Youngblood evidently believes he has done nothing wrong. *See id.* at 438.

For the foregoing reasons, the Government respectfully submits that a sentence **of 480 months** is sufficient, but not greater than necessary, to effectuate the goals listed in 18 U.S.C. § 3553(a). To achieve this total sentence, the Government respectfully suggests that the Court sentence Youngblood to 240 months of imprisonment for each Counts One through Four, with Counts 1 and 2 running concurrent to each other but consecutive to Counts 3 and 4; and Counts 3 and 4 running concurrent to each other, but consecutive to Counts 1 and 2, for an overall sentence of 480 months. The Government further suggests that the Court sentence Youngblood to 120 months of imprisonment on Count Five, to run concurrent to all other counts.

If the Court were to accept the Government's recommendation, Youngblood's sentence would be structured as follows:

---

[5] In fact, Youngblood claimed to have two sorts of specialized knowledge: expertise in investments and elite military training and contacts.

| Count | Sentence | Consecutive or Concurrent |
|---|---|---|
| 1 | 240 months | Concurrent to Counts 2 and 5; Consecutive to Counts 3 and 4 |
| 2 | 240 months | Concurrent to Counts 1 and 5; Consecutive to Counts 3 and 4 |
| 3 | 240 months | Concurrent to Counts 4 and 5; Consecutive to Counts 1 and 2 |
| 4 | 240 months | Concurrent to Counts 3 and 5; Consecutive to Counts 1 and 2 |
| 5 | 120 months | Concurrent to all other counts |

Respectfully submitted,

Jaime Esparza
United States Attorney

*/s/Matt Harding*
By:   MATT HARDING
DANIEL D. GUESS
Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2024, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System, which provided notice to:

Jeff Senter
Attorney for Defendant Saint Jovite Youngblood

<u>/s/Matt Harding</u>
MATT HARDING
DANIEL D. GUESS
Assistant United States Attorneys