08:15:33

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA ) Docket No. A 23-CR-135(1) RP
                         )
vs.                      ) Austin, Texas
                         )
SAINT JOVITE YOUNGBLOOD  ) April 15, 2024


                    TRANSCRIPT OF TRIAL ON THE MERITS
                BEFORE THE HONORABLE ROBERT L. PITMAN
                         Volume 1 of 7


APPEARANCES:

For the United States:  Mr. Dan Guess
                        Mr. Matt Harding
                        Assistant U.S. Attorneys
                        903 San Jacinto Boulevard,
                        Suite 334
                        Austin, Texas 78701



For the Defendant:      Mr. Jose I. Gonzalez-Falla
                        Ms. Charlotte A. Herring
                        Assistant Federal Public Defenders
                        Lavaca Plaza
                        504 Lavaca Street, Suite 960
                        Austin, Texas 78701


Court Reporter:         Ms. Lily Iva Reznik, CRR, RMR
                        501 West 5th Street, Suite 4153
                        Austin, Texas 78701
                        (512)391-8792




Proceedings reported by computerized stenography,
transcript produced by computer-aided transcription.

**I N D E X**

Page

Jury Voir Dire                                              7

Government's Opening Statements                           153

Defendant's Opening Statements                           164


                              Direct    Cross    Redirect  Recross
Witnesses:

Lindsey Wilkinson        172        214

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| <u>Government's</u> | | |
| #20 | 195 | 195 |
| #22 | 195 | 195 |
| #24 | 195 | 195 |
| #78 | 5 | 6 |
| #84 through 105 | 5 | 6 |
| #116 to 123 | 5 | 6 |
| #138 | 5 | 6 |
| #177 through 182 | 5 | 6 |
| #191 | 5 | 6 |
| #197 through 218 | 5 | 6 |
| #243 through 246 | 5 | 6 |
| #249 through 251 | 5 | 6 |
| #295 | 5 | 6 |
| #306 | 180 | 180 |
| #307 | 177 | 177 |
| #309 | 178 | 179 |
| | | |
| <u>Defendant's</u> | | |
| #1 through 12 | 6 | 6 |
| #15 through 18 | 6 | 6 |
| #20 through 32 | 6 | 6 |
| #34 through 36 | 6 | 6 |

**E X H I B I T S**  (Continued)

|  | Offered | Admitted |
|---|---|---|
| Defendant's | | |
| #39 | 6 | 6 |
| #42 through 57 | 6 | 6 |
| #79 through 88 | 6 | 6 |
| #89 through 90 | 248 | 248 |
| #91 | 249 | 249 |
| #131 | 246 | 246 |

THE CLERK:  The Court calls A-23-CR-135, United States vs. Saint Jovite Youngblood, for jury selection and trial.

MR. GUESS:  Dan Guess and Matt Harding for the government, your Honor.

THE COURT:  Mr. Guess, Mr. Harding.

MR. HARDING:  Good morning.

MS. HERRING:  Charlotte Herring and Mr. Jose Gonzalez-Falla for Mr. Youngblood.

THE COURT:  Good morning.  And good morning, Mr. Youngblood.

Are there any matters we need to take up before we bring the jury panel in?

MR. GUESS:  Your Honor, prior to bringing the jury in, the defense team and the government have agreed to preadmission of certain exhibits numbers.  I'll be letting you know what the Government's Exhibit numbers are.  Ms. Herring will let you know what the preadmission for the defense exhibits are.

THE COURT:  Thank you very much.

MR. GUESS:  For the government, Exhibit No. 78, Exhibits 84 through 105, Exhibits 116 through 123, Exhibit 138, Exhibit 177 through 182, Exhibit 191, Exhibits 197 through Exhibit 218, Exhibits 243 through 246, Exhibit 249 through 251, Exhibit 295.  And those were the agreed

exhibits that we believe should be pre-admitted, your Honor.

THE COURT:  Any objection?

MS. HERRING:  No, your Honor.  That's correct.

THE COURT:  So admitted.  Thank you.

Ms. Herring.

MS. HERRING:  Yes, your Honor.

For the Defendant's Exhibits, we've agreed to pre-admit Exhibits 1 through 12, 15 through 18, 20 through 32, 34, 35, 36, 39, 42 through 57, 79, 80, 81, 82, 83, and 84 through 88.  And those are the agreements we've agreed to -- the exhibits we've agreed to pre-admit, your Honor.

MR. GUESS:  Agreed, your Honor.

THE COURT:  Thank you.  Thank you for your efforts to coming to agreement on those exhibits.

I want to say a word briefly about the panel and the array of the panel today.  It is not as we anticipated.  My apologies for that.  But my understanding is that we will have the first 13 panel members in the jury box.  After that, we will then revert to the back of the courtroom and we will seat -- are we going to use across the aisle?  Seven on one side and six on the...

THE CLERK:  On this side, the first three rows will be used.  Basically everybody will be over here except for the last.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

(Off the record.)

THE COURT:  And just for the record, since we've got a natural break on the jury chart at 37, we'll go ahead and use our questioning on those 37 if that will make sense.  So it will be the first two rows on the right-hand side.

MS. HERRING:  Yes, your Honor.

THE COURT:  Okay.  Are we ready to bring the panel in?

MR. GUESS:  Yes, your Honor.

THE COURT:  Okay.

(Jury venire panel present.)

JURY VOIR DIRE

THE COURT:  Thank you.  You may proceed be seated.

Ladies and gentlemen of the jury panel, thank you so much for your patience this morning and your cooperation and getting to this point in the jury selection process.  Let me introduce myself.  My name is Robert Pitman.  I am the presiding district judge here in the Austin Division of the Western District of Texas.  And I want to thank you again, as I will many times this morning, for taking time out of your busy schedules to comply with the request to be here today.  It wasn't much of a request, I guess.  It was a -- but thank you for

being here nonetheless.

You know, the Austin Division of the Western District of Texas is a significant geographic area. The Western District itself is a huge district. It stretches from a line if you can imagine from Austin -- Waco, Austin, San Antonio, all the way to El Paso. Austin Division is one of the seven divisions in that district and we are comprised of 16 counties surrounding Austin, and that means that several of you had to get up especially early this morning and drive significant distances through Austin traffic, which is probably why you don't live in Austin because you want to avoid that.

And so, I'm sorry that we made you deal with what you probably don't want to deal with or have to deal with in your daily lives, but nonetheless, I want to thank you those of you who came significant distances, in particular, to be here.

I'm sure you already understand the significance and importance of the duty that you are fulfilling today. Just to give you a perspective on this, you know, there are very few opportunities as individual citizens that we have to directly have a say in the running of our government and our society. On the rare occasions, you can vote in a referendum and have a one-person-one-vote say in it, but usually, the say that you have in a

democracy is by electing others who make decisions or who enforce the law on your behalf.

This, however, is one of the few opportunities you have to have a direct say in the lives of members of this community. Both collectively, members of the community as represented by the government here and individually as represented by the defendant here today. I want you to take a minute to appreciate the fact that the service that you are rendering today is of special importance to the people involved in this case. We could not do this without your willingness to fulfill these duties, and I thank you on their behalf as well as on the community's behalf for doing that.

This is a criminal case and the law entitles the defendant in this case to receive the benefit of an impartial jury of his peers. To select such a jury, people are called from the area of 16 counties around Austin and they're selected at random to assure that they represent a cross-section of the community. It was this random selection process that resulted in your being here today.

Now, we are about to select a jury for the case styled, The United States of America vs. Saint Jovite Youngblood. Thirty-seven of you have been randomly selected as our initial questioning panel. Now, by that,

I mean that, as you know, this process is a process of identifying those individuals who ultimately will remain after a session of questioning where I will question you, the lawyers will have an opportunity to question you.  At the conclusion of which, the lawyers for each side will exercise strikes that they have to winnow down this group to a jury that will ultimately serve and hear this case.

Now, we always have to call more than we think we'll need because what we don't want to do is to run out of panel members.  And so, as a reflection of that, those of you who are seated on the back row in this side and the two of you who are seated on this side to my left will not be in the initial group that is questioned.  That is a matter of just efficiency because, at this point, knock on wood, there is some unlikelihood that you will be in the group finally that will remain after this questioning process.

But that is to say that those of you who are in the jury box and on the first two rows here, you will be in the section that will be responding to my questions and the lawyers' questions during this phase of the process.  Now, those of you in the back row and the two of you over here, keep this in mind.  If we reach a certain point where I have cause to excuse certain members of this panel in the initial questioning group, then we may have to call

on those of you in the back row and on this side to fill the spots that are left. In that event, you will not have answered the questions up to that point, but don't worry because, at that point, you will have listened carefully even though you're not responding initially. You will have listened carefully and I will go through the questions to prompt your memory and ask you whether or not had you been in this initial group, you would have responses to any of those questions.

So although you won't be answering questions now, if, in fact, you're called to replace a member in the questioned group, I will prompt you and get you up to speed at that time. The process of jury selection requires that the Court and the attorneys for each party ask potential jurors questions about their background, knowledge, biases and prejudices. The questions may feel intrusive to you, but please understand that that's not -- that's certainly not our intention. We ask questions to ensure that the jury selected for this case has no knowledge of the facts or parties in the case, and holds no biases or prejudices that would prevent you from being a fair and impartial juror in this case.

Now, bias and prejudice are two words that are a bit loaded and they have some negative connotations. However, all of us have certain biases and prejudices. My

predecessor, Judge Sparks, who sat in this courtroom before me, used to give as an example when he selected juries the fact that he was born and raised in Austin, he went to the University of Texas undergrad and law school, and if he were on a panel and one of the defendants was Texas A & M, you see where this is going, he would have to concede that he had certain biases and prejudices that might affect his ability to be fair and impartial.

There's nothing wrong with that.  All of us have by way of our experiences, our connections, we have certain preconceived notions and it doesn't mean that you, on another case and in another situation, couldn't be an appropriate juror.  It just means that based on either the parties or the issues in a case, you might bring to the table something that would make it difficult for you, again, to be fair and impartial and that's what we're trying to get at today.

You will be asked a number of questions and, if at any time, the answer to any of those questions is something that you would prefer to give privately, it won't be privately because it will be with me at the side of the bench and one attorney from each side.  However, you will have the opportunity to do that.  So don't hesitate if in response to a question, you want to give your question up at the bench, you will have an

opportunity to do that.

In addition, when each of you answers a question, I would appreciate it if before answering, you would state your juror number so that the court reporter's record reflects who is answering so that when we're reading it later, we know who is talking.  So if you could take a quick look again at your number and before you respond, say juror number X and then, give your answer.

Again, after I and the parties have finished asking questions, attorneys for each side will exercise the strikes that they have been allotted to exclude certain members of the panel so that we end up in this case with 12 jurors and two alternates who will ultimately remain and hear the evidence in this case.

As I mentioned, this lawsuit is styled, <u>United States vs. Saint Jovite Youngblood</u>.  Mr. Harding, will you please stand.  The person standing is Matt Harding.  Or is it Mr. Guess that will be doing this?

MR. HARDING:  I'll be doing jury selection, your Honor.

THE COURT:  Okay.  Mr. Harding, the person standing is Matt Harding, who represents the government in this case.  Mr. Harding, will you please introduce those who are at the table with you as well as a list of witnesses that the government expects to call in this

case.

MR. HARDING:  Yes, your Honor.

Good morning everyone.  My name is Matt Harding. I work for the Department of Justice, United States Attorney's Office here in Austin.  With me is Dan Guess.

MR. GUESS:  Good morning.

MR. HARDING:  Assistant United States Attorney here in Austin.  Closest to me is Special Agent Justin Noble with the FBI, and next to him is Special Agent Lindsey Wilkinson.  You could expect to hear testimony calling witnesses Agent Noble and Agent Wilkinson.  In addition to those two witnesses, we have a lengthy potential witness list.  We don't intend to call all of these witnesses so don't be frightened, but these are all the folks that we may call.

Joe Fiedler of the FBI, Katie Sloma of the FBI, Eric Perardi from Austin, Texas, James Holloway from Austin Texas, Lane Holloway, Austin, Texas, Danielle Holloway from Austin, Texas, Gary Snider of Austin, Texas, Dale Snider of Austin, Texas, Roseana York of Austin, Texas, Jason York of Austin, Texas, Marvin Knecht of Austin, Texas, Hanfu Lee from San Bernardino, California, Dennis Schuler, Sr. from Ohio, Jason Rzepniewski from Pennsylvania -- excuse me, from Austin, Matthew Vasquez from Las Vegas, Nevada, Luke McEwin from Las Vegas,

Nevada, Scott Levins from St. Louis, Missouri, Darrell Lee from Fort Knox, Kentucky, John Mapes of Austin, Texas, Jeff Bridgman of Pennsylvania, Glen Morehead of Austin, Texas, Karol Devries of Austin, Texas, Adam Pohl of the FBI, Loren Miller of the FBI, Adam Powell of Austin, Texas, Clark Snyder of, Austin, Texas, Jacqueline Cantu of Austin, Texas, Stephen Catoe of Austin, Texas, Rodolfo "Rudy" Conde of Austin, Texas, Judy Edwards, Chantal Evans of Austin, Texas, Nicole Frost of Austin, Texas, Andrea Holloway of Austin, Texas, Jonathan Hanna, Patricia Ann Holloway of Austin, Texas, Seth Holloway of Austin, Texas, Ricky Kumar of Austin, Texas, Rebecca Kumar of Austin, Texas, Ana Lee, Richard Hopson, Bruce Kelley, Prisca Lee of California, Roger Lee of California, Kirk Lohman, James Melton, Carlton Melton, Eric Swanson of Austin, Texas, Zachary Noah, Letha Perardi, Don Schweiters, Lindsay Snider of Austin, Texas, Gary Sertich of Austin, Texas, Jack Rady of Austin, Texas, Jack Taylor, Stephanie Titsworth, and Duane Weber and Chad York. Those are all the government's potential witnesses.

THE COURT: Members of the jury panel, do any of you recognize, or are any of you or any member of your family familiar with, personally acquainted with, related to, had business dealings with, or ever been employed by Mr. Harding, his employer, the Department of Justice, or

any of the persons that Mr. Harding just listed for you? If any of the names of potential witnesses that the government just named sounded familiar to you, if you could please raise your right hand.  Anyone in the jury box recognize any of the names that were read?  Thank you. Anyone on the first row?  And anyone on the second row? Okay.  Thank you very much.

             Ms. Herring.

             MR. GONZALEZ-FALLA:  I'll be doing jury selection, your Honor.

             THE COURT:  Okay.

             MR. GONZALEZ-FALLA:  Good morning.  My name is Jose Gonzalez-Falla and I'm from the Public Defender's Office.  I'm going to be assisting the defense.  Sitting at the table is going to be my co-counsel, which is Charly Herring, Jesus Salinas also from the Federal Public Defender's Office, Amanda Bradley, Rene Maldonado and Dolma Acevedo.  And then, here's our client, Saint Jovite Youngblood, sitting at our table, as well.

             The potential witnesses that may be called in this case are Investigator Brian Oberon from Orange County, California, Officer Corey Harris with the Round Rock Police Department, Rachel Herrera Perardi of Austin, Texas.  And we may have, haven't decided yet, but Mr. Youngblood may be testifying in this case.

THE COURT:  Thank you, Mr. Gonzalez-Falla.

Members of the jury panel, do any of you recognize, or any of you or any member of your family familiar with, personally acquainted with, related to, had business dealings with, or ever been employed by the defendant, Mr. Gonzalez-Falla, the Public Defender's Office, or any of the persons whose name Mr. Gonzalez-Falla just listed for you?  If so, raise your hand.  None in your box.  Any in the back of the room?  And no responses.  Thank you very much.

To the best of your knowledge, have any of the attorneys in this case or members of their offices either acted as your attorney or the attorney for any member of your immediate family or close friends in the past?  And no responses.  Thank you.

Now, you might think that this next question is a bit farfetched and it would be very unlikely for there to be positive responses, but you would be surprised how often, actually, it does yield positive responses, and that is, even though you are from an area of 16 counties around, frequently we experience that people show up here and recognize other members of the jury panel as being neighbors, coworkers.  As you looked around this morning, did any of you recognize as acquaintances or anyone who you have had any business dealings with or otherwise know

each other?  Anyone in the jury box?  Anyone in the back of the room?  All right.  Thank you very much.

Now, let me talk a little bit about the length of this case and potential disabilities that you might have that would affect your ability to serve.  The attorneys in this case have estimated that this case may take around five days to try.  That is the remainder of this week.  That is just an estimate because, as you can imagine, things happen during a trial and sometimes it's shorter, sometimes it's longer than the lawyers anticipate.

The other sort of wildcard in this is that regardless of how long the attorneys say that it's going to last, once the case is submitted to the jury, then the jury will then take some period of time to reach a verdict in the case and to deliberate and that is something that is unknown to us at this time.

So it's usually safe to say that the case will last the period of time that the attorneys estimate, which is the remainder of this week plus two or three days of next week.  It should be safe in terms of looking at your schedule and determining whether or not you have any conflict.  So that being said, is there any one of you and understanding that you all are busy folks and have other places to be, I'll ask whether any of you would suffer any undue hardship or have any special problems serving on a

jury for that length of time.  If anyone would like to bring anything to my attention, anybody in the jury box? Yes, ma'am.  Your juror number?

THE JUROR:  Eight.  I have already spoken about it.  I can't do it that long with childcare.

THE COURT:  Childcare.  What are the limitations there?  Is it -- could you do it for the remainder of the week?

THE JUROR:  No, I couldn't do it for remainder of the week.  No.

THE COURT:  All right.  Thank you.  And anyone else in -- yes, sir.

THE JUROR:  Juror No. 3.

THE COURT:  Yes.

THE JUROR:  I would be clear through the end of this week.  Next week, it's likely that my wife will be out of town so I'll have childcare responsibility and great difficulty to be here next week.

THE COURT:  All right.  Thank you.  Anyone else? Yes, ma'am.

THE JUROR:  Juror No. 5.  I'm having a difficult time.  I have hearing aids.  I'm having a really difficult time hearing some of the people in the courtroom even when it's --

THE COURT:  Okay.  That's helpful.  Let me ask

you this.  You're asking a question that -- you're responding to question I'll have in a minute but let's go ahead and cover this.  One of the questions I will ask in a minute is whether anyone has any difficulty hearing, seeing, or sitting for long periods of time?  Anything that would affect your ability to hear the evidence, to see the evidence, and to be able to sit for some period of time.

One of the followup questions I will ask, and I will ask you now, is whether there are any accommodations that we could make to enable you to hear.  Is there the possibility of perhaps sitting closer to a speaker or making sure that everyone involved speaks loudly so that you can hear?  Is that something that is feasible or possible, do you think?

THE JUROR:  Sometimes, yes, but sometimes, it's not.

THE COURT:  Okay.  And if you did serve on a jury, would you be willing and comfortable to let us know if, at any particular time, you're having difficulty hearing so that we can make sure that you are?

THE JUROR:  I have to because I have to hear.

THE COURT:  Great.  Okay.  Thank you very much.  All right.  Anyone in the first row?  Okay.  Anyone on the first row here?  Yes.  Juror number.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

THE JUROR: Juror No. 19. I am traveling on Wednesday, the 24th out of town, I'm leaving. So if it might push middle of next week.

THE COURT: All right. Thank you very much. Anyone else on the first row? Anyone on the second row? Any? Yes. Your jury number?

THE JUROR: Twenty-seven. So I'm a teacher and my kids are taking the state exam next week and this is the week that we're reviewing and prepping. So technically yes, I can be here, but that will be a full week and it's their first STAAR test that they'll be taking. So just wanted to put that out there.

THE COURT: Okay. Thank you for letting me know that.

THE JUROR: No. 28. I have an appointment of my son for his medical like sleep apnea so I don't have time to.

THE COURT: And when is that?

THE JUROR: For his like sleep.

THE COURT: Yes. When?

THE JUROR: When? On this coming 17th, Wednesday.

THE COURT: All right. Thank you.

THE JUROR: Juror No. 29. I'm okay with everything. Are y'all okay if I wear sunglasses?

THE COURT: Absolutely.

THE JUROR: It's just the lights are super bright.

THE COURT: Absolutely. No. Anything is fine.

THE JUROR: And my husband's having surgery next Wednesday, the 24th, but I understand that we probably -- I think it was said we'd be done by then so I'm not worried about it. And I could get somebody until I get there so I'm happy to serve.

THE COURT: Thank you very much, ma'am. Anyone else on that row? Okay. Thank you very much.

Relatedly, do any of you have any illness in your family, or any business problem, or similar personal concern that while you might be able to be here, would be difficult for you to be attentive? Whatever you have in another area of your life will be distracting to you so that you wouldn't be able to tend to the evidence, you would be distracted from your duties as a juror. Anything that you'd like to bring to my attention in that regard? Yes, ma'am. Your juror number.

THE JUROR: Juror No. 5. I have a memorial service for my sister.

THE COURT: Oh, gosh, I'm sorry. When is that?

THE JUROR: Saturday.

THE COURT: All right. Thank you very much.

Anyone else? Okay. Anyone in the back? All right. Thank you very much.

Also, the question that I referred to a few minutes ago, do any of you have any issue with your eyesight, your hearing, or any other disability that would in any manner prevent you from either seeing or hearing the evidence or presented at trial or would be a distraction to you? I know that there are some people who can't sit for prolonged periods of time. Generally speaking, we try not to go more than two hours at a time without a break. But also, we have had jurors and judges who have stood during the proceedings when you need a break. We can certainly make accommodations for that, as well.

So anything that can't be accommodated that you'd like to bring to my attention regarding any issue that you might have sitting for that period of time and attending to the evidence? Any issues? All right. Thank you very much.

Now I will give you a brief summary of the claims in this case and ask a few questions based on what I'm about to read. The United States alleges that from April 2021 through July 2023, the Defendant Saint Jovite Youngblood devised a scheme to defraud victims and obtain cash and assets from them by means of false

representations and promises.  Specifically, the government alleges that Mr. Youngblood would represent that the funds he obtained from victims would be used to provide them or family members protection from violence by Mexican drug cartel members.  The government alleges that Mr. Youngblood would also represent that any money provided to him would be returned to the investor with a significant return on the investment money.  The government alleges that instead, Mr. Youngblood used the majority of the money provided to him to gamble in Las Vegas for his personal benefit.

The United States has charged Mr. Youngblood in an indictment with four counts of wire fraud in violation of 18, United States Code, Section 1343, and 18, United States Code, Section 2, and one count of engaging in a monetary transaction in criminally derived property in violation of 18 United States Code, Section 1957.  Mr. Youngblood denies these allegations and has pled not guilty.

Later today, the lawyers will give their opening statements, which are a more detailed rendition of their understanding of the facts in this case.  But based upon the short summary which I have just provided to you, I want to ask you a few questions concerning, first, any knowledge that you might already have about this case.

Have any of you read anything about this case in the newspaper, on the internet, or have you heard anything on the radio, in conversations with others, or seen anything on television?  Not to say that anything has been on any of those media outlets, but the purpose of this question is to make sure that you don't think that you have either heard or seen anything related to what I've just described to you.

Have any of you heard, learned, read or seen anything from any -- about what I've just read to you from any source whatsoever other than in this courtroom or in connection with your initial qualification?  If so, if anything that I've read to you sounds familiar to you, if you could please raise your hand.  All right.  No responses.  Thank you.

Now I want to talk a little bit about any prior service that you have had sitting on any type of a jury. Those of you who are -- have lived in a community for some period of time might have had the opportunity to serve on a grand jury.  A grand jury, unlike the jury that's being selected today, is a group of citizens from a community either in a county or in the federal system, a group of individuals who sits usually repeatedly over some period of time to hear allegations of criminal conduct, and at the end of the process, they are asked to consider an

indictment and either deliver a true bill or a no bill resulting in an indictment of someone accused of criminal conduct.

Have any of you, whether in the state system or the federal system, had occasion to serve on a grand jury in the past? Okay. We have some in the back. All right. None on the jury box. Okay. We have front row here. Yes, sir, this gentleman here. Your jury number, please.

THE JUROR: Juror No. 18.

THE COURT: Yes, sir. Let me ask the following questions and those of you who already raised your hands, these are the questions I'll be asking you. If you could state whether it was a state or federal grand jury, how many times you have served, and about when that was.

THE JUROR: State, one time.

THE COURT: And what county was that?

THE JUROR: Gonzales County.

THE COURT: One time back when was that?

THE JUROR: Let me do some addition or subtraction. Forty-six years ago.

THE COURT: Okay. And you are a young grand juror. Were you the foreperson of the grand jury?

THE JUROR: No, sir.

THE COURT: Looking back in the midst of time, is there anything about that experience serving on the grand

jury that you believe would in any way impact your ability to be fair and impartial to each side in this case?

THE JUROR: No, sir.

THE COURT: All right. Thank you very much. Yes. Your juror number, please.

THE JUROR: Juror No. 23. Served on a grand jury in Williamson County approximately 30 years ago.

THE COURT: All right. And were you the foreperson of that grand jury?

THE JUROR: No.

THE COURT: And is there anything about that experience as you recall it that you believe would have any bearing on your ability to be fair and impartial in this case?

THE JUROR: No.

THE COURT: All right. Thank you.

Yes, sir. Your juror number.

THE JUROR: Juror No. 36.

THE COURT: Yes, sir.

THE JUROR: Federal grand jury about 10 or 15 years ago.

THE COURT: And where was that?

THE JUROR: In the Western District of Texas.

THE COURT: Okay. What division?

THE JUROR: Here in the Austin...

THE COURT:  Okay.  And how long did you serve on that grand jury?

THE JUROR:  It was, I believe, a period of six months.

THE COURT:  Okay.  Were you the foreperson of the grand jury?

THE JUROR:  No, sir.

THE COURT:  All right.  As you recall your experience on that grand jury, is there anything about that experience that you believe would affect your ability to be fair and impartial to both sides in this case?

THE JUROR:  No.

THE COURT:  All right.  Thank you very much. Anyone else service on a grand jury?  Okay.  Thank you.

Now, this might yield a few more responses and that is have any of you had the opportunity to serve on a petit jury or a trial jury such as we are selecting today? That could be really anything in municipal, county, state district court, federal court?  Any jury that would be a jury like we're picking today to sit and hear either in a civil case or a criminal case.  Have any of you ever served on a jury?  Not just shown up for selection but actually was selected and served on a jury.  So with that, yes, your juror number.

THE JUROR:  Seven.

THE COURT:  And the questions for you will be was the prior service in federal or state court?

THE JUROR:  State.

THE COURT:  And about how many times?

THE JUROR:  That I actually served, just once.

THE COURT:  Exactly.  And when was that?

THE JUROR:  About 10 years ago.

THE COURT:  Where was it?

THE JUROR:  Hays County.

THE COURT:  And do you remember whether that was a civil or a criminal case?

THE JUROR:  I believe it was civil.

THE COURT:  Okay.  Do you remember generally what it was about?

THE JUROR:  There was a car accident.

THE COURT:  Okay.  Were you the foreperson of that jury?

THE JUROR:  No.

THE COURT:  Did that jury deliberate and reach a verdict?

THE JUROR:  No, because we sat and I don't even know if we listened.  We got chosen and then, the next morning, we came in and were ready and they settled.

THE COURT:  All right.  So you never actually deliberated and reached a verdict?

THE JUROR: Nope.

THE COURT: Okay. Anything about that experience that you believe would have any impact on your ability to be fair and impartial to both sides in this case?

THE JUROR: No.

THE COURT: Thank you. Going down the row, anyone on the first row? No jury. On the back row, yes, ma'am. Juror number.

THE JUROR: Juror No. 13. I think also 46 years ago, if I did my math, I was -- first time I was called, I was selected for a criminal case here in Austin.

THE COURT: Was it in state court? Do you remember where the courthouse was?

THE JUROR: I think it was federal. It was a drug.

THE COURT: Okay. So criminal drug case then.

THE JUROR: Yes.

THE COURT: Were you the foreperson of that jury?

THE JUROR: No.

THE COURT: And did that jury deliberate and reach a verdict?

THE JUROR: Yes.

THE COURT: Is there anything about your recollection of that experience that you believe would in any way have any impact on your ability to be fair and

impartial in this case?

THE JUROR:  No.

THE COURT:  Thank you very much.

THE JUROR:  I also had a civil case.

THE COURT:  Oh, please, go ahead.  Yes.

THE JUROR:  And I can't remember and that was more recently, I think, about 25 years ago.

THE COURT:  Okay.  Where was that?

THE JUROR:  That was here.  It was DUI.

THE COURT:  Okay.  Was that in state court probably?

THE JUROR:  Yes, probably.

THE COURT:  Okay.  And were you the foreperson of that jury?

THE JUROR:  No.

THE COURT:  And did that jury deliberate and reach a verdict?

THE JUROR:  Yes.

THE COURT:  Anything about that experience that would affect your ability to be fair and impartial?

THE JUROR:  No.

THE COURT:  All right.  Thank you very much. Anyone else?  Yes, sir, your juror number.

THE JUROR:  Eleven.  I was in a criminal case here in Travis about seven years ago.

THE COURT:  Okay.  What was the subject matter?  Do you remember?

THE JUROR:  Domestic abuse.

THE COURT:  Okay.  Were you the foreperson of that?

THE JUROR:  No.

THE COURT:  Did that jury deliberate and reach a verdict?

THE JUROR:  Yes.

THE COURT:  Anything about that experience that you think would affect your ability to be fair and impartial in this case?

THE JUROR:  No.

THE COURT:  All right.  Thank you very much.  Anyone else?

All right.  Thank you.  On the first row in the back.  Yes.

THE JUROR:  Juror No. 17.

THE COURT:  All right.

THE JUROR:  I served on three juries.  One civil, two criminal cases, all state county courts.  The most recent was probably three years ago, Williamson County.  We didn't deliberate because they reached a plea deal while we were at lunch.

THE COURT:  Okay.

THE JUROR:  Prior to that, it was in Travis County criminal court for domestic violence case that we deliberated on and reached a verdict.  And probably that had to have been about 15 years ago and prior to that, maybe 25 years ago was a civil case.

THE COURT:  And where was that?

THE JUROR:  That was in Denton County and we did deliberate.

THE COURT:  Were you the foreperson of any of those juries?

THE JUROR:  No.

THE COURT:  And is there anything about any of those experiences that you believe would have an impact on your ability to be fair and impartial as a juror in this case?

THE JUROR:  No.

THE COURT:  Thank you very much.  Yes, sir.

THE JUROR:  Juror No. 17.

THE COURT:  Yes.  Eighteen, sorry.

THE JUROR:  One in Gonzales County for murder trial, three in Caldwell County.  One was a murder, child molestation, and the other one's wife, spousal issues.

THE COURT:  All three criminal cases?

THE JUROR:  Yes, sir.

THE COURT:  And about how long ago was the most

recent?

THE JUROR:  Seven years ago, I think.

THE COURT:  Okay.  Were you the foreperson of any of those juries?

THE JUROR:  No, sir.

THE COURT:  Did each of those juries deliberate and reach a verdict?

THE JUROR:  Yes, sir.

THE COURT:  Anything about those experiences that you believe would have any bearing on your ability to be fair and impartial as a juror in this case?

THE DEFENDANT:  No.

THE COURT:  Thank you.  Yes, ma'am.

THE JUROR:  Juror No. 19.  About 12 years ago on a jury in Baltimore City for domestic violence trial and we did deliberate, come to a decision.  I was not the foreperson.

THE COURT:  And is there anything about that experience that would have any bearing on your ability to be fair and impartial in this case?

THE JUROR:  Not at all.

THE COURT:  Thank you.  Anyone else on the front row prior jury experience?  Second row.

THE JUROR:  Juror No. 30.

THE COURT:  Yes, sir.

THE JUROR:  Civil case, Travis County district court, workers' compensation matter.  I was the foreperson.

THE COURT:  And when was that approximately.

THE JUROR:  Twenty-five years ago.

THE COURT:  Did you -- and did you reach a verdict in that case?

THE JUROR:  Yes, we did.

THE COURT:  Anything about that experience that you believe would have any bearing on your ability to be fair and impartial in this case?

THE JUROR:  No, your Honor.

THE COURT:  Thank you very much.  Anyone else on that second row?  Yes.  Your juror number?

THE JUROR:  Juror 35.  In 2007, I served on a criminal state in Williamson County.  It was related to fraud, assault and battery.

THE COURT:  All right.  And were you the foreperson of that jury?

THE JUROR:  No, sir.

THE COURT:  Did that jury deliberate and reach a verdict?

THE JUROR:  It did.

THE COURT:  Looking back at that experience, is there anything about that experience that you believe

would affect in any way your ability to be fair and impartial to each side in this case?

THE JUROR:  Not that I'm aware of.

THE COURT:  Thank you.  Anyone else prior jury experience?  Okay.  Thank you.

Finally, with regard to prior jury experience, some of you might have had experience in the military and had the opportunity to serve on special or general courts-martial.  Anyone have any prior experience on a courts-martial in the military?  No responses.  Thank you.

Let me ask now, switching gears, as to whether any of you or a member of your immediate family, that is, parents, children, siblings, ever participated in a lawsuit as a party or a witness.  A party being one who was either suing or being sued, or a witness, someone who testified in court.  So we have on the front row.  Yes.  Your juror number.

THE JUROR:  Juror No. 4.  My husband has been a witness.  He's deputy fire chief of half of Bastrop County.  So he is a witness quite often in lawsuits.

THE COURT:  Okay.  And have you ever seen him testify?

THE JUROR:  No, sir.

THE COURT:  Have you talked to him about his performance as a witness?

THE JUROR: No, sir. He's not allowed to talk about that.

THE COURT: All right. Do you think that there's anything -- well, I guess since he hadn't talked to you about it, you don't know anything about it, right? All right. Congratulations. Good job. So there's nothing that you think would affect your ability to be fair and impartial in this case?

THE JUROR: No, sir.

THE COURT: Okay. Thank you. Another on the front row here. Yes, ma'am. Your juror number.

THE JUROR: Juror No. 6. I was involved in a civil suit in Travis County that ended two years ago as a result of a car accident. I was the defendant in that case. It settled out of court after depositions.

THE JUROR: And do you think, looking back at that experience, that that would in any way affect your ability to be fair and impartial in this case?

THE JUROR: It would not.

THE COURT: Thank you very much.

THE JUROR: However, in my previous capacity working in county government, I was sued alongside the commissioners court several times for instances that occurred in the county. All of them were civil and nothing would affect my opinion.

THE COURT:  Okay.  What was your position in the county?

THE JUROR:  I was the county judge.

THE COURT:  Okay.  Where?

THE JUROR:  Ector County.

THE COURT:  And you were just a named defendant because you were the county judge at the time.

THE JUROR:  Yes, sir.

THE COURT:  Okay.  Did you ever testify in any of the cases?

THE JUROR:  Yes, sir.

THE COURT:  Okay.  What kinds of cases were they generally?

THE JUROR:  A couple were employment law cases. A couple of them were a result of allegations resulting from contracts disputes.

THE COURT:  Okay.  And about how many lawsuits would you say in all if you had to guess?

THE JUROR:  That I testified in?

THE COURT:  Or that you were a party to.

THE JUROR:  Counties get sued a lot.

THE COURT:  Exactly.

THE JUROR:  Probably, I would say a dozen.

THE COURT:  And how many did you have personal involvement either as a witness or had more involvement?

THE JUROR:  Three.

THE COURT:  And I'm sorry, you said you testified in those?

THE JUROR:  Yes.

THE COURT:  Again, I think you've already answered but I will ask again.  Having been in and around that many lawsuits, is there any experience that you had that you think in any way would affect your ability to be fair and impartial?

THE DEFENDANT:  No, sir.

THE COURT:  All right.  Thank you very much. Yes, sir.  Juror one.

THE JUROR:  Juror 2.  It was probably about 30 years ago, maybe 35 years ago, I was involved in a lawsuit.  I was actually the defendant for an injury and we settled so we didn't go to court.

THE COURT:  Okay.  Did you participate in the lawsuit, though, as a witness and a defendant?

THE JUROR:  No.

THE COURT:  Okay.  Looking back, do you think there's anything about that that would affect your ability for fair and impartial?

THE JUROR:  No.

THE COURT:  All right.  Thank you very much. Anyone on the second row?  All right.  First row of the

back.  Yes, sir.  Your juror number.

THE JUROR:  Juror No. 16.  My brother's a federal agent out of Missouri.  I don't know if he has been sued or not, but I'm kind of assuming he has.

THE COURT:  Okay.  What agency?

THE JUROR:  The FBI.

THE COURT:  All right.  And how long has he been with the FBI?

THE JUROR:  He's been with them for five years now, I believe.

THE COURT:  And is he an agent?

THE JUROR:  Yes, sir.

THE COURT:  Okay.  And do you talk with your brother about his work?

THE JUROR:  No, he's not allowed to.

THE COURT:  All right.  So this will be responsive to the question that I'll ask later on, but since we're talking about it now, I'll go ahead and ask you.  The fact that your brother is an FBI agent, obviously, this case involves the FBI and there will be agents presumably, possibly testifying who are FBI agents. Given the fact that your brother works for the FBI, do you think that you would be more likely than not to believe the testimony of someone who is an FBI agent just because they're an FBI agent?

THE JUROR: I don't believe so, no.

THE COURT: Okay. Would you treat their testimony just as you would any other witness?

THE JUROR: Yes, sir.

THE COURT: And do you believe in any way, your relationship with your brother and his current job would affect your ability to treat both sides equally in this case?

THE JUROR: I don't believe so. I believe I'll be able to treat both sides equally, your Honor.

THE COURT: Thank you very much. Yes, ma'am.

THE JUROR: Nineteen. My older brother was the victim in an assault trial.

THE COURT: All right. Were you involved in the case at all?

THE JUROR: No.

THE COURT: All right. As you recall that -- how long ago was it?

THE JUROR: Thirty-five years.

THE COURT: As you recall it, was there anything about that case that would have an impact on you today in being a juror in this case?

THE JUROR: No, sir.

THE COURT: Thank you. Anyone else on the first row? Anyone in the second row? Yes, sir, your juror

number.

THE JUROR:  Juror 30.  I've been a witness in numerous criminal cases, probably close to a hundred.  I was a Houston police officer detective for 10 years.

THE COURT:  Okay.  When was that?

THE JUROR:  1988 back to 1978.

THE COURT:  All right.  And how were you assigned during your time with Houston Police Department?

THE JUROR:  The only cases that I did not investigate are homicides and sexual assaults.  During that period of time, we had something called neighborhood-oriented policing so we were geographically covering each crime that occurred with the exception of those identified.

THE COURT:  Would that include then any investigations involving any financial --

THE JUROR:  Yes.

THE COURT:  Okay.  Yes?

THE JUROR:  Yes.

THE COURT:  Okay.  Those would be investigating primarily state crimes involving financial misconduct?

THE JUROR:  Correct.

THE COURT:  Okay.  Did you have any prior or later law enforcement experience?

THE JUROR:  No, Judge.

THE COURT:  Okay.  So obviously, it's been a while, but looking back at your experience in law enforcement, I'll ask you the obvious questions and that would be that since that time, can you tell me what you've done for a living?

THE JUROR:  I am a civil attorney.

THE COURT:  A lawyer?

THE JUROR:  Yes, Judge.

THE COURT:  Okay.  And what has your practice been?

THE JUROR:  Primarily E.R.I.S.A., disability law.

THE COURT:  Okay.  We do a fair bit of that here. So looking back then at your time in law enforcement, the obvious question would be whether or not if in a case where law enforcement individuals would be testifying, would you tend to believe their testimony just because they were members of a law enforcement organization?

THE JUROR:  No, Judge.  I think I could evaluate their testimony.

THE COURT:  And do you believe in any respect your background in law enforcement would prevent you from being fair and impartial to both sides?

THE JUROR:  It would not.

THE COURT:  Thank you very much.  Anyone else in that row?  Yes, sir, your juror number.

THE JUROR: Juror 35. I'm not sure that this is germane but it's -- I'm regularly involved in a professional capacity of reviewing requests for evidence related to -- forgot how to communicate -- Office of the Inspector General of the United States Postal Inspection Service and, occasionally, the U.S. Attorney's Office.

THE COURT: And what's your current job?

THE JUROR: I am director of -- senior director of USPS for Octane, Inc. here in town.

THE COURT: So that's a private --

THE JUROR: It is a software company that does logistical integrations for shipping labels.

THE COURT: All right. But you work closely with at least the postal inspector in that capacity.

THE JUROR: I'm responsible for all USPS operations that we have.

THE COURT: Okay. Do you have personal relationships with postal inspectors?

THE JUROR: Yes.

THE COURT: And given the fact that you work regularly with someone who is a law enforcement -- federal law enforcement, I'll ask you the questions that you would anticipate and that is that in the event that someone would testify at trial, would you tend to believe their testimony over someone who is -- has no affiliation with

law enforcement?

THE JUROR:  I believe that I could be fair.

THE COURT:  All right.  Let me ask you again.  Do you think you would tend to believe them over someone who wasn't law enforcement, or would you treat them the same?

THE JUROR:  I believe that I would treat them the same.

THE COURT:  All right.  Gotta follow up because you sound a little hesitant and, you know, the answer may be because of what I do, I would have a hard time doing that and that's perfectly fine.  So am I sensing a little hesitation there.

THE JUROR:  It's not that as much as in lack of context, it's very difficult to answer such a question.

THE COURT:  Absolutely.  And so, I guess I just need a commitment to you that the fact that someone is a federal law enforcement officer that they wouldn't start out ahead of someone who wasn't in terms of who's telling the truth or who's credible.

THE JUROR:  I can be fair and impartial.

THE COURT:  All right.  Thank you very much. Anyone else?  Thank you very much.

Now, we've had a couple of people already respond and if there's nothing else that you need to respond to in this question, feel free to rely on your previous answer.

But the question is have any of you attended law school, taken any law such as business law or criminal justice courses, or received any legal education or training, or worked in a law office or for a court?  Attended law school, taken any law, even business law courses, criminal justice courses, or received any legal training or education, or worked in a legal office.  Yes, ma'am, your juror number.

THE JUROR:  Juror No. 5.  I was a paralegal for 28 years.

THE COURT:  And what kind of work did you do?

THE JUROR:  We did insurance defense and I did real estate wills and trust.

THE COURT:  Were you working directly for a law firm?

THE JUROR:  Yes, I was, several.

THE COURT:  So because of your prior legal instructions -- and that will go with any of you who respond to this question.  At the end of the case, I will give you the law that you are to apply in this case whereas the jury is the factfinder, I am the one who decides the law that is appropriate to apply in this case. And so, I have to ask those of you who have prior legal training for a commitment that regardless of whatever your legal training has been or your belief about what the law

is or should be, that you will follow my instructions and my instructions only at the end of this case.  Will you commit to doing that?

THE JUROR:  Yes.

THE COURT:  All right.  Thank you.  Yes, sir. Your juror number.

THE JUROR:  Juror No. 3.  I took two business law and employment law courses in graduate school.

THE COURT:  All right.  So same question to you is, it's unlikely that those would intersect with what we're doing here, but I just need to tell you because you have had some legal training that you're going to be required to follow the law that I give to you, regardless of your belief about what the law is or should be.  Would you be committed to doing that?

THE JUROR:  Yes, your Honor.

THE COURT:  Thank you.

THE JUROR:  Also, may I revise?  Earlier, I had my weeks mixed up.  I mentioned that my wife may travel next week.  That is two weeks out.  So I actually think I would be clear for this period.

THE COURT:  Oh, great.  Thank you very much.  Or is it that we just -- it's sounding more interesting?

THE JUROR:  Just so fascinating.

THE COURT:  Anyone else?  Yes, ma'am.

THE JUROR:  Hi, Juror No. 10.  Just some special education law in conjunction with admin certification.

THE COURT:  Okay.  So the same question to you is regardless of whatever education you've received of a legal nature, would you commit to following the instructions that I give you, regardless of your belief as to what the law is or should be?

THE JUROR:  Yes, sir.

THE COURT:  Okay.  Thank you very much.

All right.  First row, yes, ma'am.

THE JUROR:  Juror No. 17.  My bachelor's degree is in government so I took quite a few related classes.

THE COURT:  Okay.  Same question to you then is would you commit to following the instructions that I give you, regardless of what you believe the law is or should be?

THE JUROR:  I can follow your instruction.

THE COURT:  Thank you very much.  Yes, ma'am.

THE JUROR:  Juror 23.  I'm an attorney.  I retired three years ago.

THE COURT:  Congratulations.

THE JUROR:  Thank you.

THE COURT:  So you, in particular, I have to ask whether or not because you have extensive legal training and experience, would you resist the urge then to impose

what you think the law should be or what you think the law is if you think I'm wrong?  Do you understand that as an officer of the Court and as a juror, you would be required to follow the law as I give it to you?

THE JUROR:  I do understand.

THE COURT:  And will you commit to doing that?

THE JUROR:  I do commit to doing that.

THE COURT:  Thank you very much.  Anyone else?

And I'll have to ask you, sir, since I don't know that I asked you the specific question.  But the fact that you are a lawyer, as well, you are committed to following the instructions that I give you, regardless of your beliefs about what the law is or should be.

THE JUROR:  Juror 30.  Yes, I would follow the law as you give it.

THE COURT:  Thank you very much. Anyone else, legal training of any sort?  Yes.  Gentleman here.  Juror number?

THE JUROR:  Juror 34.  I took a business law class.

THE COURT:  All right.  In that regard, whatever you might remember about the law then probably won't pertain to what we're doing here.  But in the event that there is some overlap, do you agree that you will commit to following the law that I give you rather than what you

think the law is or should be?

THE JUROR:  I agree.

THE COURT:  Thank you very much.  Anyone else?  Thank you.

Members of the panel who have served on juries before are already aware that once selected as a juror, you will become the judges of the facts in this case, the judge of the credibility of the witnesses and the judge of the weight to be given to the testimony of those witnesses.  It is your prerogative as a juror to believe all of a witness' testimony, only a part of that witness' testimony, or you may totally disbelieve a witness' testimony.  It's completely up to you.

As jurors, you are the exclusive judges of the facts, the credibility of the witness and the weight to be given their testimony.  Whereas the jury is the exclusive judge of the facts, the Court, represented by me, is the sole judge of the law that applies in this case and that's the gist of the questions that I was just asking.

At the conclusion of all of the testimony and after the attorneys for both sides have presented their summary of the case to you in their closing arguments, I will explain the law controlling the issues involved in this case.  You're to be governed by my explanation of the law that applies, which will be set out in what's termed

"the Court's instruction and charge."

If you are selected to sit as a juror in this case, will you be able and willing to render a verdict based solely and on the evidence presented at trial and the law as I give it to you in my instructions, disregarding any other idea, notions, or belief about the law that you may have encountered in reaching your verdict?  If you would be unable or unwilling to render a verdict based solely on the evidence presented at trial and the law as I give it to you in my instruction, please indicate by raising your hand if you would have difficulty doing either of those things.  Thank you.

Now, this is a criminal case.  The indictment or formal charge against a defendant is not evidence of guilt.  Indeed, the defendant is presumed by the law to be innocent.  The defendant begins with a clean slate.  The law does not require a defendant prove his innocence or produce any evidence at all and no inference may be drawn from the election of a defendant not to testify.  The government has the burden of proving the defendant's guilt beyond a reasonable doubt.  If the government fails to do that, you must acquit the defendant.

While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proved beyond all possible doubt.  It

is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in making the most important decisions in your own affairs.

The burden is on the government to prove guilt beyond a reasonable doubt. Is there anyone who would be unable to require the government to prove every element of its case beyond a reasonable doubt as I have just explained that term to you? Anyone unable to do that?

Is there anyone who would have trouble presuming Mr. Youngblood is innocent until the government proves its case beyond a reasonable doubt? And finally, is there anyone who would hold the government to a greater or lesser standard of proof than I have described for you? Anyone who would hold the government to a greater or lesser? Yes, ma'am, your juror number.

THE JUROR: Five. May I talk to you up there?

THE COURT: Yes.

(At the bench, on the record.)

THE COURT: Yes, ma'am.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

THE JUROR:  With everything I'm hearing in the news, I don't trust the government to do it right.

THE COURT:  Okay.  Fair enough.

THE JUROR:  I don't trust the FBI at all.

THE COURT:  Fair enough.  And that's exactly what this process is for.  You want any -- okay.  Great.  Thank you so much.

(End of bench conference.)

COURT SECURITY OFFICER:  Your Honor, we have one more.

THE COURT:  Would you like to come up?  Please.

(At the bench, on the record.)

THE COURT:  For the record, this is Juror No. 7.

THE JUROR:  The guy gives me the creeps.  I don't know if that's something to -- I don't know.  There's something about him that is like offsetting.

THE COURT:  I want to make sure you're talking about the defendant.

THE JUROR:  Yes, I am.

THE COURT:  Okay.

THE JUROR:  I definitely am in the black shirt.

THE COURT:  Yes.

THE JUROR:  I just wanted to throw that out because I don't --

THE COURT:  That's exactly why we're doing this.

Let me ask, does anybody have any questions about that?

MR. HARDING:  Can I ask?

THE COURT:  Please.

MR. HARDING:  So understanding that you sort of get a bad gut feel.

THE JUROR:  Yes.  Yeah.

MR. HARDING:  As the judge explained to you, it's our burden to prove beyond a reasonable doubt every element of the case against him.  And so, the question, I guess, we all want to know is do you think your gut feel would have us -- hold us to a lower burden?  You'd be like you know what, they didn't get quite there but I don't like the feeling of this guy.

THE JUROR:  Honestly, I don't know.  I've never -- it's been -- I don't get bad feelings very often.  I just have it.

THE COURT:  Sounds like Law And Order, it sounds like.

MR. GONZALEZ-FALLA:  She's going to make our job a little harder.

MR. HARDING:  You couldn't commit wholeheartedly to commit us to our burden.

THE JUROR:  It's very hard.  It's --

THE COURT:  Okay.  Thank you.

THE JUROR:  I appreciate it.

(End of bench conference.)

THE COURT:  All right.  Any other responses?  The question being is there anyone who would hold the government to a greater or lesser standard of proof than the one that I have described?  All right.  Thank you.

Mr. Youngblood has been indicted by a grand jury. An indictment is merely the formal method of bringing charges.  It does not create any inference that Mr. Youngblood is guilty.  Is there anyone who believes that just because a defendant has been arrested or indicted, the defendant must be guilty of something?  Again, an indictment is merely the formal method of bringing charges.  It does not create any inference that Mr. Youngblood is guilty.

Is there anyone who believes that just because a defendant has been arrested or indicted, he must be guilty of something?  No positive responses to that.  Thank you.

In the eyes of the law, the government and the defendant are to be treated alike and are entitled to the same honest, fair and impartial treatment.  If selected to serve as the juror in this case, would everyone be willing to accept and apply this principle of law?  Stated differently, if you would have any difficulty treating the government and the defendant alike because they are entitled to the same honest, fair and impartial treatment,

would you bring to our attention the fact that you would have trouble doing that? No responses. Thank you.

It is a juror's duty to base their verdict solely upon the evidence without prejudice or sympathy. If you're chosen for this jury, that is the promise you will make and the oath that you will take before being accepted by the party as jurors and they have a right to expect nothing else. If the government proves its case beyond a reasonable doubt, it would be your duty to convict Mr. Youngblood despite any dislike you may have for the government of its witnesses or any sympathy that you may feel toward Mr. Youngblood.

Is there anyone here who would be reluctant or unwilling to do so? Thank you.

A defendant has a Fifth Amendment right not to testify at a trial and the law states that any juror may not consider a defendant's decision not to testify as any evidence of his guilt. Indeed, a defendant may choose not to testify for any number of reasons, including a belief that the government has not proven its case or a fear of appearing nervous while publicly speaking.

Keeping in mind that Mr. Youngblood's absolute -- excuse me, keeping in mind Mr. Youngblood's absolute constitutional right not to testify, is there anyone here who would hold it against him if he chose not to testify

in this trial or consider it evidence of his guilt? Anyone who would either hold it against him if he chose not to testify or consider it as evidence of guilt? No response. Thank you.

As a juror, one of your jobs will be to assess the credibility of witnesses. After a witness testifies, you may credit all, some, or none of that witness' testimony. However, you may not prejudge the credibility of a witness simply because of their profession, age, appearance, or any other factor.

With that in mind, if someone comes to court and takes an oath, will you automatically believe what that witness testifies is true or is a fact? Is there anyone who just because someone takes an oath, would automatically believe that witness? No responses.

Would it be difficult for you to admit that a witness could testify and be mistaken about things that they testified to? Or that they misremember something? Would it be difficult for you to believe that a witness could testify and be mistaken about things or misremember something?

Would any of you be more or less inclined to believe the testimony of a government agent or employee before hearing that testimony simply because he or she was a government agent or employee? Similar to the questions

I've asked certain of you before and that is, would you tend to believe an agent or employee of the government simply because of their position?  Thank you.

Unless you have otherwise responded to this question, have any of you or has a member of your immediate family -- has a member of your family ever been employed as a law enforcement officer?  Any of you that haven't already made us aware or immediate family members.  Yes, ma'am, your juror number.

THE JUROR:  Seventeen.  My husband was military police probably 30 years ago now.

THE COURT:  Okay.  Now, is there anything about your memory of that service in the military police, whether positive or negative, that you believe would in any way impact your ability to assess the credibility of individual witnesses fairly and impartially?

THE JUROR:  No.

THE COURT:  Thank you.  Anyone else?  Prior law enforcement experience.  Yes, ma'am, juror number.

THE JUROR:  Thirteen.  I have a great nephew that is with the Houston Police Department.  I really don't see him much.  I saw him last week at a memorial service but we didn't discuss his job.

THE COURT:  Okay.  Anything about that relationship, your views of what he does for a living,

anything that he has told you about his job that you think would impact you in any way in being fair and impartial?

THE JUROR:  No, sir.

THE COURT:  All right.  Thank you.  Yes, ma'am.

THE JUROR:  By brother-in-law was with Harris County constable for 20 years and that's with Montgomery County.

THE COURT:  Okay.  Would you be able to be fair and impartial based on that?

THE JUROR:  That'd be fine.

THE COURT:  Okay.  Thank you.

THE JUROR:  I have a cousin who's with Oklahoma Police Department, but we don't ever see each other.

THE COURT:  You're Juror No. 4.  Okay.  Thank you.  Would that in any way affect your ability to be fair and impartial?

THE JUROR:  No, sir.

THE COURT:  Okay.  Thank you.  Anyone else?  Do any of you have any close friends or family members who currently work for the FBI or have worked for the FBI in the past other than those who have already brought that to our attention?  Yes, ma'am.

THE JUROR:  Juror 19.  My cousin is an FBI agent.

THE COURT:  Where?

THE JUROR:  Ohio.

THE COURT:  Okay.  Male or female?

THE JUROR:  Male.

THE COURT:  Has he been with the FBI for quite a while?

THE JUROR:  Yes.

THE COURT:  Do you ever talk to him about his work?

THE JUROR:  Sometimes.  Not often.

THE COURT:  Okay.  Anything about your relationship with him that you believe would affect your ability to be fair and impartial in this case?

THE JUROR:  Not at all, sir.

THE COURT:  Okay.  Thank you.  Anyone else?  The Judge needs a break.  We'll take a brief recess.  Let me tell you something that's very important and those of you who serve on the jury will tire of me saying this and that is, it's very important that you, A, not talk to anyone, including each other, about anything having to do with this case.  Talk about the weather, talk about sports, talk about anything, but do not talk about any person, place, or thing having to do with this case.

Second, in a world where you have at your disposal the ability to look things up on an iPhone or I assume you still -- did they make you give them up?  You have them?  Okay.  So don't look up anything.  Don't look

up any person that we've talked about today, any person that you've seen in the courtroom, as tempting as it is. The reason for that, those two things, not talking to anyone, including each either, and not engaging in any independent research, is because at the end of the day, your verdict in this case, should you serve on this jury, must be based solely on what you see and hear in this courtroom and the instructions I give you at the end of the case.

So please don't consult any source at all about anything having to do with this case and don't talk to anyone, including each other, about anything having to do with this case and that -- with that, let's take a brief break and we'll resume.

MR. HARDING:  Can we approach?

(At the bench, on the record.)

MR. GONZALEZ-FALLA:  Judge, we've agreed on five and seven.

MR. HARDING:  So if you want to release them now.

THE COURT:  Okay.

MR. HARDING:  You want to tell Mr. Hall just not have them come back?

THE COURT:  That would be great.

MR. GONZALEZ-FALLA:  Easiest.

(End of bench conference.)

(Recess.)

(Jury venire panel present.)

THE COURT:  Panel members, I want to go back and cover something that I neglected to mention when I was talking about the trial schedule.  I hope it doesn't change any of your previous responses.  But a few years ago, I started observing a modified trial schedule after our first day.  I don't know if you were made aware of that or not, but let me describe what that is.  Jurors typically do like this.  I've not had a jury yet who complained about it but it is this.

After the first day, that is, tomorrow throughout the remainder of the trial, rather than a normal trial schedule day, we will start a little early at 8:30, which I know is burdensome for those of you who are perhaps coming from greater distances, but the good news is that we will end earlier, too.  We will be going from 8:30 to between 3:30 and looking for a natural break sometime between 3:30 and 4:00.

The catch is that rather than having breaks during the day and an hourlong lunch, we will simply divide that day into three parts of roughly two hours each with two 20-minute breaks rather than little breaks and a lunch.  Jurors find that as long as they're forewarned and they bring sufficient snacks to get them to 3:30, that

they much prefer having two 20-minute breaks and beating Austin traffic and getting home a little earlier.  It gives the lawyers an opportunity to prepare for the next day.  And it gives me an opportunity to have other hearings and other cases in the afternoon so that I can continue to work during the week, in addition to trying a case.

So again, we will do 8:30 to roughly 3:30 and with two 20-minute breaks, spaced as evenly as we can during that period of time.  Is there anything about that that creates a complication that you'd need to revise any previous answer you gave with regard to whether or not there are any complications?  Okay.  Anyone?

We'll pick up where we left off then.  I wanted to talk about this thread of questioning with regard to law enforcement.  Let me ask whether any of you have particularly strong feelings, either positively or negatively, about law enforcement that you think in any way would impact your ability to be fair and impartial to both sides in this case?  That is, any strong feelings whether you have had such good experiences or had any bad experiences that you think you would want to bring to the attention of me or the parties, you think would affect your ability to be fair and impartial?  Has anyone with whom you have a significant relationship, let's say, close

friend or immediate family member, ever had an experience with law enforcement that you believe would affect your ability to be fair and impartial?  If you've had a close friend or family member who's had any experience that you think would impact at all your ability to be fair and impartial, could you let us know about that.

Have any of you, or a member of your family, or close friends ever been employed by any prosecutor's office whether local, state or federal?  Any district attorney's office, U.S. Attorney's office.  Yes, ma'am, your juror number.

THE JUROR:  Juror No. 6.  I was an assistant district attorney in Ector County for eight-and-a-half years and an assistant county attorney for three years before that.

THE COURT:  So you, yourself, then have been a prosecutor.

THE JUROR:  Yes, sir.

THE COURT:  So you understand that you would have an obligation as a juror in this case to be fully fair and impartial to both sides.  Do you believe given the fact that you for some period of your career appeared on behalf of the government in these kinds of cases, that would in any way affect your ability to be fair and impartial?

THE JUROR:  It would not, your Honor.

THE COURT:  All right.  Thank you very much. Juror number, please.

THE JUROR:  Twenty-three.  I have a good friend who worked at the Travis County District Attorney's Office.

THE COURT:  Okay.  Now or in the past?

THE JUROR:  In the past.

THE COURT:  Okay.  So you both as a lawyer and having a friend now who was a prosecutor, do you believe that in any way, that would affect your ability to be fair and impartial in this case?

THE JUROR:  No.

THE COURT:  Okay.  Thank you.  Anyone else?

Let me ask now whether you or any member of your immediate family, again, parents, siblings, or children, ever had a legal dispute with the federal government.  A legal dispute with the federal government.  That could be in the context of perhaps the IRS is the most frequently mentioned.  But any other dispute that you might have had with the federal government.  All right.

Do you have any feelings or beliefs about the federal government that since they are a party here might affect the way that you'd think about this case and your ability to be fair and impartial?  Do you hold any beliefs or feelings about the federal government and their

participation in this case that you would like to bring to our attention that would affect your ability to be fair and impartial to both sides?  Thank you.

Has anyone ever been personally affected by a fraud or believed or perceived fraud, or had a close friend or family member who has?  Anyone been personally affected whether you were -- whether or not you were the target?  Yes.  Your --

THE JUROR:  Juror No. 37.  And my stepdad was recently defrauded about $14,000 just in a phone scam.  Weird text.

THE COURT:  And that was fairly recently?

THE JUROR:  Like in the last two months, yes.

THE COURT:  Since that's fresh on your mind, do you think that having gone through that and perhaps heard from your stepfather about that, do you believe that that would affect how you would approach this case and whether or not you could be fair and impartial?

THE JUROR:  I believe I can be fair and impartial.

THE COURT:  Okay.  And I want to make sure I'm not sensing when you say "I believe I could."

THE JUROR:  Just thinking through it before I answered, I could be fair and impartial.

THE COURT:  I appreciate that very much.  Thank

you.  Yes, sir, juror number.

THE JUROR:  Juror No. 21.  I had a parent that was -- got one of those phone calls saying you had an Amazon purchase, blah, blah, blah, and we need you to buy gift cards to get a refund and they were -- I think, spent about two grand on gift cards that were merely stolen.

THE COURT:  Was that fairly recently?

THE JUROR:  Last year, I believe.

THE COURT:  Okay.  So as you saw your parents being the object of that fraud, do you believe in any way that that would prevent you from being fair or affect in any way your ability to be fair and impartial in this case?

THE JUROR:  I do not believe so, your Honor.

THE COURT:  Thank you.  Anyone else?  Yes.

THE JUROR:  Juror 25.  Before retiring a few years ago from H.E.B., I worked approximately 40 years and as a store leader, we were obviously responsible for everything.  We pretty much had continuous fraudulent activity going on.  Most stores do in some form or fashion whether it's shoplifting, the phone call scams, et cetera, et cetera.

THE COURT:  No.  I appreciate you bringing that to our attention.  So having been -- experienced that through your employer for all those years, do you believe

you've developed any feelings or beliefs or attitude that would bleed over into this case and prevent you from being fair to both parties in the case?

THE JUROR:  Probably, frankly.

THE COURT:  Okay.

THE JUROR:  I mean, the local law enforcement and, occasionally, FBI would be involved with solving some of these things and that was how, you know, you got -- we got to the end result.  In most cases, we needed that help.  So my tendency is probably leaning towards law enforcement, you know, if it's sort of a 50-50 type of a situation.

THE COURT:  Sure.  I appreciate that candor.  So let me ask it this way.  In this case, would you be able to suspend your judgment until you heard the evidence from both sides before you reached a conclusion about what you're asked to decide in this case?  Would you be a little bit --

THE JUROR:  I would certainly try.  Yes.

THE COURT:  All right.  Thank you very much.

THE JUROR:  I don't know if that's a...

THE COURT:  Yes.  Thank you.  Those are exactly what we're looking for.

COURT SECURITY OFFICER:  Your Honor, one more in the box.

THE COURT:  Yes, please.  We've got a couple.

THE JUROR:  No. 11.  Yes, one of my uncles was a victim of fraud last year.  One of my uncles.

THE COURT:  And what sort of fraud was that?

THE JUROR:  It was phone fraud.  They called asking for my name so he wire-transferred money, about $3,000 worth.

THE COURT:  Okay.  So having gone through that with your uncle, do you believe that you would be able to set that aside and be fair and impartial in this case?

THE JUROR:  I think so after hearing the evidence, yeah.

THE COURT:  So you would wait to decide the issues in this case until you heard all the evidence in the case.

THE JUROR:  Yes.

THE COURT:  And you would be fair and impartial to both sides in doing so?

THE JUROR:  Yes.

THE COURT:  Okay.  Thank you.  Anyone else?  Yes.

THE JUROR:  Juror 24.  I have a coworker whose brother started a Go Fund Me for supporting things ongoing in East Palestine and took that money for himself.

THE COURT:  Okay.  Were you a victim of that by any chance?

THE JUROR: Yes.

THE COURT: Okay. So that was fairly recently, I assume.

THE JUROR: I think the investigation is ongoing. I think it's been over -- I think it's been like three years. Two or three years.

THE COURT: And has that resolved yet, the investigation?

THE JUROR: I believe it's ongoing.

THE COURT: All right. So having been that close to a recent fraud, do you believe that that would affect your ability to sit in this jury as a fair and impartial juror?

THE JUROR: I believe I would have some bias.

THE COURT: All right. Thank you very much. Yes, ma'am. Your juror number?

THE JUROR: I'm Juror No. 29. This past December, I was kind of the victim of a Craigslist fraud. I don't know if that counts or not.

THE COURT: Sure. Can you tell me generally kind of what happened?

THE JUROR: I was looking for a Shih Tzu and they said send money, and anyway, I Googled the address and I had another friend ask for it and they changed it every time. But I never lost money, but it just makes my blood

boil that people do this to other people. I'll be honest about that. And I have a lot of older clients in my business and several of them have been victims. I can't say they're family but I think we're all entitled to a fair trial. So I would do my best, but I just think people that take advantage of other people are lowest of low. So I would not be being honest if I didn't say that but I will do my best to be partial -- I mean, I will listen because we all need to have a fair trial as citizens.

THE COURT: Thank you so much. Well said. I appreciate it. Anyone else? Yes, sir. Juror number?

THE JUROR: Juror No. 2. My father was fraud, I don't know, a few hundred thousand dollars about 10 years ago. It was about getting him to send money that he can get gold for chemicals. It was something that we tried again to stop, but it didn't stop.

THE COURT: All right. And did that result in an investigation or prosecution by any chance?

THE JUROR: No.

THE COURT: Okay. So having been so close to someone who was defrauded, do you think that that would affect your ability to be fair and impartial to both sides in this case?

THE JUROR: Well, one thing, I wasn't close to my

dad, but I just saw it happening. But no, it would not affect me.

THE COURT: Thank you very much. Anyone else? Thank you. And here, if you want to give your response in person at the bench, feel free. The question is has anyone here or a close family -- friend or immediate family member ever been arrested for, accused of, or convicted of a crime other than a minor traffic offense but including a DWI or DUI? Anyone here close friend or immediate family member arrested or accused of and/or convicted of a crime other than a minor traffic offense? Anyone here? Yes, sir. Juror No. 2.

THE JUROR: Juror No. 2. My son, I would say 15 years ago, he was convicted of stealing alcohol.

THE COURT: Stealing.

THE JUROR: Stealing out of cars.

THE COURT: Where was that?

THE JUROR: Smith County.

THE COURT: Okay. How did that result? Was there a prosecution?

THE JUROR: Yes. It was 10 years adjudication.

THE COURT: Okay. So did you believe that your son was treated fairly by the police, the prosecutor, or the court?

THE JUROR: Yes.

THE COURT: Okay. Do you think that there's anything about that experience that would make it difficult for you to render a verdict based solely on the evidence that you see in the courtroom, see here in the courtroom and the law that I give you?

THE JUROR: No.

THE COURT: Thank you very much. Anyone else in the jury box? First row. In the back? Second row. Yes, sir. Juror No?

THE JUROR: Juror No. 30. My brother was arrested for white-collar fraud.

THE COURT: Okay. Where was that?

THE JUROR: Houston, Texas.

THE COURT: About how long ago?

THE JUROR: Same time I was a police officer.

THE COURT: So it's been a while.

THE JUROR: Yes.

THE COURT: Was that in state or federal court?

THE JUROR: State.

THE COURT: Okay. And how did that resolve?

THE JUROR: Prison sentence.

THE COURT: Okay. And were you involved with him during that time going through this?

THE JUROR: Yes.

THE COURT: All right. Do you feel that he was

treated fairly by everyone in the process?

THE JUROR:  Yes, I do.

THE COURT:  And is there anything about that experience that would make it difficult for you to participate in this trial as a juror and be fair and impartial?

THE JUROR:  There's nothing that would affect me.

THE COURT:  Thank you.  Anyone else?  Yes.  Yes, ma'am.

THE JUROR:  No. 23.  I had a son who was arrested for DWI.

THE COURT:  Okay.  And how did that resolve?

THE JUROR:  Deferred adjudication and the charges were dismissed.

THE COURT:  Did you feel like he was treated fairly by everyone in the process?

THE JUROR:  Yeah, he was.

THE COURT:  And do you believe that that would in any way affect your ability to be fair and impartial?

THE JUROR:  No.

THE COURT:  Thank you.  Anyone else?

COURT SECURITY OFFICER:  No. 4.

THE JUROR:  Juror No. 4.  My ex-husband for nonpayment of child support and he was treated very fairly.

THE COURT:  Too fairly.

THE JUROR:  Very fairly.

THE COURT:  All right.  So do you think in any way that would affect your ability to be fair and impartial?

THE JUROR:  Not at all.

THE COURT:  Thank you.  For this next question, if you have not already responded by means of another question, has anyone here or a member of your immediate family or close friend ever been a victim of a crime that you have not previously answered?  Any close friend, immediate family or yourself been a victim of a crime?  Yes, sir.

THE JUROR:  Seven.  One of my aunts was kidnapped for ransom.

THE COURT:  And where was that?

THE JUROR:  In Mexico.

THE COURT:  All right.  When was that?

THE JUROR:  About 10 years ago.

THE COURT:  Okay.  Do you have any reason to -- well, let me ask whether or not you know or did anyone involved have any idea of how that happened or why?

THE JUROR:  Basically, somebody overheard her talk about her retirement money and I guess they were part of a gang that took advantage of that.

THE COURT: All right. And was she --

THE JUROR: Yeah, she -- after they gave -- you know, they got the money, the ransom money, she was let go.

THE COURT: Good. So is there anything about that experience that your aunt had in Mexico that you would -- that would affect you in any way and prevent you from being fair and impartial juror in this case?

THE JUROR: No.

THE COURT: Okay. All right. Anyone else? Anyone in the back of the room? Thank you.

Next question. Have any of you, or your immediate family member, or close friend ever worked for a bank? Bank or savings and loan or credit union? Yes, ma'am.

THE JUROR: My very first job for six months out of college, I worked for a savings and loan as a teller.

THE COURT: All right. And if there is testimony about banks and individuals, transactions with banks, do you think that your experience as a teller would in any way impact your ability to be fair and impartial to both sides in this case?

THE JUROR: No, sir.

THE COURT: Thank you. Anyone else back of the room? Couple of people. Yes, sir.

THE JUROR:  Juror No. 21.  As a real estate appraiser, I've worked on appraisals for -- I don't know if this is you're talking about but fee appraisals for bank clients.

THE COURT:  Okay.  So to the extent that there's mention of -- or a bank or banking or testimony about banks, do you believe that that experience or association would in any way affect your ability to be fair or impartial?

THE JUROR:  No, your Honor.

THE COURT:  Thank you.  Yes, sir.

THE JUROR:  Juror 35, your Honor.  I was a associate vice-president for JP Morgan Chase in the management information systems data science division.

THE COURT:  Okay.  Same question then.  Based on that association with the bank, if there is testimony about a bank or banking issues, would that experience and those associations have any impact on your ability to be fair and impartial?

THE JUROR:  No, sir.

THE COURT:  Thank you.  Anyone else?

Now, a word about the potential for punishment in the event of a conviction.  If Mr. Youngblood is convicted of any count, it will be the Court's job to decide what the punishment will be.  The law does not allow jurors to

consider or discuss sentencing or punishment when reaching a verdict. The first question is whether or not there's anyone here who would find it difficult or impossible to reach a decision about Mr. Youngblood's guilt without considering punishment. Would you be able to set aside the issue of any potential punishment in determining his guilt or innocence? Is there anyone who would have difficulty doing that? Thank you.

Next question, is there anyone here who would find it difficult or impossible to find Mr. Youngblood guilty even if you were convinced of his guilt beyond a reasonable doubt simply because you would not be allowed to decide his punishment? Is there anyone that would have difficulty finding him guilty in the event that you were convinced of his guilt beyond a reasonable doubt simply because you would be unable to decide the punishment? Anyone have any difficulty with that? Thank you.

Finally, do any of you have any strongly held personal beliefs either of a religious, ethical, philosophical, or other basis that prevents you generally from sitting in judgment of another person and voting on their guilt? Anything about any personally -- closely held personal belief that makes it difficult or impossible for you to sit in judgment of another person and voting on their guilt?

All right.  Thank you.  Now, before I allow the attorneys to spend some time with you asking questions, I want to ask two questions that are meant to reach those of you who are sitting back thinking he's just not asking the right question.  If only he would ask -- he got close but he didn't quite ask the right question or ask it in a right way.  So these two questions are designed to elicit from you any information that you have if you've been sitting there thinking, if only they would ask me this, I would be able to divulge information about potential bias or that would be of interest to the parties.

And the two questions are this.  If you or a family member were the defendant, would you in any sense be dissatisfied to have a person with your frame of mind serve as a juror?  If you knowing all that you know about this case, is there anything that would prevent you if you were a defendant or a family member from thinking that you would be an appropriate juror?  Anything that you've been thinking as we've been sitting here today?

And do you know of any reason that you could not sit in this case with complete fairness and impartiality and decide the case based only on the evidence presented in court and the law given at the conclusion of the trial or for any other reason that we've not discussed?  Is there anything that we haven't discussed that would impact

your ability to be fair and impartial?  All right.  Thank you very much.

Now, ladies and gentlemen of the jury panel, I'm going to give an attorney for each side to have the opportunity to ask you questions.  I've limited them to 20 minutes per side.  And remember as I stated earlier that the nature of some of their questions may seem to be intrusive, but I assure you that neither they nor I have a desire to pry into your backgrounds unnecessarily, but we're asking questions so that we are confident that you can act independently in serving as a juror in this case.

Again, please remember if at any time, you don't want to discuss publicly your response, feel free to request a bench conference for that purpose.  Mr. Harding.

MR. HARDING:  Thank you, your Honor.  Ms. Golden if I could ask for the presentation.

Good morning again.  Everyone.  I've seen a lot of smiling happy faces and why not?  You've got the joy of jury selection, possibly jury service combined.  As the Judge said, we're going to be asking some questions. Again, it's not our intention to pry into your life for no reason, but it may be intrusive, embarrassing questions. So I'd like to go ahead and go first.  I'll tell you something embarrassing about myself.  After you hear it, you'll feel a lot better about yourselves.

My wife and I have eight cats.  I know.  This guy seems normal.  There's kind of a story there, but at the end of the day, we still have eight cats.  So now you can be satisfied and confident that no matter what you have to say, my story's more embarrassing.  And secondly, if you are lucky enough to get chosen for this jury, you can -- at least the slow times in the trial, you can count the cat hair on my suit.  So think that.

I wanted to just cover a few things really quickly here because -- and this -- I'm going to pick on Juror No. 24 and 25, if I might.  The Judge said at the beginning of his questioning, the reason we're doing this is because, ultimately, those of you who are chosen for the jury are going to have to take an oath and it's going to be an oath to follow the law as given to you by the Court, and an oath to base your verdict solely on the evidence you hear in the courtroom, see in the courtroom, and not bias and prejudice or sympathy.

So Juror No. 24 and 25, I recall during questioning, essentially both of you said like I'll try.  I'll do my best.  And so, what we don't want is a situation where we ask you to take that oath and you can't take that oath wholeheartedly without reservation and that's why we're asking all these questions.  And so, Juror No. 25, I think you said essentially, hey, I might

be biased in favor of.  Is that fair to say?

THE JUROR:  Yeah, it is.

MR. HARDING:  I mean, it's a case with Mr. Youngblood.  Do you agree with that?

THE JUROR:  Yes.

MR. HARDING:  If you were Mr. Youngblood, you probably wouldn't want you sitting on that jury, right?

THE JUROR:  Probably not.

MR. HARDING:  Because you might give cops a little more credibility or you might feel it's a 50-50 choice and you weren't quite sure, you'd go with the cops.

THE JUROR:  That's fair.

MR. HARDING:  This might not be the best case for you.  Is that fair to say?

THE JUROR:  Probably.  Yeah.

MR. HARDING:  Same question for the flip side, No. 24.  I think you said you might tend the opposite direction; is that correct?

THE JUROR:  Yeah.  I think it's hard without the evidence.  Like there's a lot of unknowns here.  But yes, I think it would be -- I mean, if I were sitting in Mr. Youngblood's place, I'm not sure if I'm the best juror for this case to be completely biased.

MR. HARDING:  And potentially, the government as well, depending on how you --

THE JUROR:  Correct.

MR. HARDING:  Okay.  So that's sort of what we're trying to get to.  We're not going to try to change your mind.  We're not going to try to argue with you. Ultimately, let me ask, your Honor, if I may, what's the duty of a prosecutor?

THE JUROR:  To uphold justice.

MR. HARDING:  And part of justice is Mr. Youngblood's constitutional rights, including his right to a fair trial.  So if you were sitting on this jury, it will be your job to make sure Mr. Youngblood gets a fair trial and understand that the government does a good job. Anybody have a problem or think they could not do that? Okay.

I'm going to skip that question because the Judge -- shocking nobody did my job better for me than I.  Let me start with an easy one.  I want just a number from every one of you.  I'm just going to go through the first two rows and the jury box.  What is your opinion of law enforcement in your neighborhood?  Just zero through 10 but you can't pick 5.  Exactly that.  To make it a slightly harder question and community can mean whatever you want it to mean.  It's your neighborhood.  It's your city.  It's your state.  Whatever you feel that to mean. Juror No. 1, what's your number?

THE JUROR:  Seven.

THE JUROR:  Eight.

THE JUROR:  Seven.

THE JUROR:  Seven.

THE JUROR:  Eight.

THE JUROR:  Seven.

THE JUROR:  Seven.

THE JUROR:  Eight.

THE JUROR:  Seven.

THE JUROR:  Nine.

THE JUROR:  Thirteen.

THE JUROR:  Nine.

THE JUROR:  Nine.

THE JUROR:  Eight.

THE JUROR:  Nine.

THE JUROR:  Eight.

THE JUROR:  Seven.

THE JUROR:  Seven.

THE JUROR:  Six.

THE JUROR:  Eight.

THE JUROR:  Seven.

THE JUROR:  Six.

THE JUROR:  Seven.

THE JUROR:  Nine.

THE JUROR:  Eight.

THE JUROR: Seven.

THE JUROR: Nine.

THE JUROR: Six.

THE JUROR: Seven.

MR. HARDING: Only a seven from a former PD detective. Juror 31.

THE JUROR: Nine.

THE JUROR: Six.

THE JUROR: Seven.

THE JUROR: Eight.

THE JUROR: Nine.

THE JUROR: Ten.

THE JUROR: Four.

MR. HARDING: Well, let me ask you. Just go ahead, No. 36, you've answered 10. It's your opinion of law enforcement so, I mean, naturally, I'm going to have to ask the followup question. I know the Judge already asked it, but if a police officer takes the stand, are you going to wait till after they testify to assess their credibility, or are you just going to believe what they say?

THE JUROR: I'll listen to what they say.

MR. HARDING: I think that, No. 35, I believe you mentioned it's kind of hard to answer this question without context and you said same as the Judge said.

After a witness testifies, you can give whatever credibility they deserve. You can consider their training, their experience, what they had to say, all of that. What the law prohibits is for you to prejudge how credible they are. And so, just because they're a police officer, just because they're whatever, you can't give them better or worse treatment.

I think the Judge may have already asked this, but just to be safe, if I change this question to say FBI rather than law enforcement, does anybody have strong positive or negative opinions about FBI?

THE JUROR: Mine would go up.

MR. HARDING: All right. Would anybody else like Juror No.

THE JUROR: Thirty-seven.

MR. HARDING: Go up in your estimation, raise your hand. Eleven would go up. No. 29 would go up. Would anybody's go down? I'm not seeing anyone so I'll move on. So I anticipate the Judge will give you an instruction like this. I think he actually even said it during his questioning. If you are picked as a jury on this case, it will be your duty to base your verdict solely upon the evidence without prejudice or sympathy.

And so, ultimately, it comes down to if we prove our case beyond a reasonable doubt, it's fair that we

should have to prove it, right?  We made an accusation, we should prove it.  That's fair.  If we prove it, your duty is to convict Mr. Youngblood.  And by the same token, if we fail to prove it, your duty is to acquit.  Sound easy, right?

It's not quite so easy as we'll see.  Robin Hood.  Naturally, you all thought we would talk about Robin Hood.  Who here thinks of Robin Hood as a hero?  Show of hands.  Thank you.  Juror No. 9.  I'll pick on you.  Actually, did you raise your hand up a lot?  No. 1, you shouldn't have done that.  You're No. 1.  I gotta ask you, why is Robin Hood a heroic figure?

THE JUROR:  Because he offered money to poor people.  I mean, the story stealing from the rich and giving to the poor.

MR. HARDING:  Right.  Exactly.  Stealing from the rich and giving to the poor.  We all feel especially the story of Robin Hood where the rich people are kind of terrible, that's kind of a sense of justice by itself, right?  We all like that idea.  Sort of intuitive, right?  Well, what if Robin Hood didn't only steal from the rich?  I'll go to No. 9, what if Robin Hood stole from everyone, still a hero?

THE JUROR:  Not in my opinion.

MR. HARDING:  Is Robin Hood a hero if he steals

from everybody and he gives to the poor?  What about if he steals from the rich and keeps it?  Juror No. 3, how about that?  A hero?

THE JUROR:  No.

MR. HARDING:  Why not?

THE JUROR:  That is theft.

MR. HARDING:  I'm glad you said that, actually. So people have very strong opinions, some people do, about wealth inequality, right?  It's a problem in our society. It's unquestionably true.  But are there folks here who believe that the status of a victim as either rich, or old, young, whatever it is, you would have a harder time convicting a defendant if you found out that the victim had that kind of attribute?

So let's say all of our victims are rich people. Could you -- assumingly, we prove our case beyond a reasonable doubt, is there anybody who's going to have a hard time convicting on that basis just because the victims are rich?  How about somebody else?  What if they were all young?  Is there any characteristic?  Anybody here raise their hand, is there any characteristic about a victim that would make you change your mind, assuming we proved our case beyond a reasonable doubt?  All right.

Here's the really hard part.  Every single version of Robin Hood that we just discussed, legally

speaking, you would have to convict whether it is the one who's stealing from the rich and giving to the poor and you're all happy about it or the one who's stealing from the rich and keeping it for himself. And so, this is the hard part. I'm going to give a hypothetical to you and I'm going to ask anybody that has a hard time with this.

Assume the government, us, we prove our case to you beyond a reasonable doubt, but the defendant stole from only rich, greedy, cruel victims. The defendant gave every cent to charity, a charity that you love. You hate our witnesses. We got the sheriff of Nottingham on the witness stand, you hate him but you believe him and beyond a reasonable doubt. And probably the most likely one, you can't stand the prosecutor. Under those circumstances, who here could not convict? The law says you would have to, but that's a pretty tough scenario. Who here would not be able to convict under those circumstances? Show of hands. Front row? Back row? How about my two rows over here? Any reason to think that? Who would have a hard time convicting? Convicting, we're talking about convicting Robin Hood here, the good version.

Anybody have a hard time, have a hesitation on that? No. 11, you're kind of nodding your head.

THE JUROR: Probably but you have to go by what...

MR. HARDING: So you're saying you sort of want to, but ultimately, you would obey your oath. Is that how folks feel like you might feel sympathy for? You might want to cut him some slack? But the law says that it's gotta happen. And I will say as the Judge pointed out earlier, that's an issue that we take up at sentencing time: Tell the Judge why you did. Tell the judge all these factors. But that's not an issue you guys get to decide. Is there anybody who has a hard time thinking that? All right.

Here's a hypothetical. I get drunk on 6th Street and, I mean, like falling down. You're smiling because you're like, you're too old. No. I get that. But I am really, really drunk on 6th Street on my way walking back to my ride share because I'm still responsible, sort of, I take a shortcut down a dark, secluded alley all by myself. My head's on my phone trying to figure out how to use it because I'm old, I get it, and I get mugged. Who here thinks that's at least partly my fault? Is there anybody here who thinks it is partly my fault that I got mugged? Anybody here in the front row? Juror No. 37.

THE JUROR: Thirty-seven, yes. Well, I mean, it's just bad choices.

MR. HARDING: Absolutely bad choices and so, you think I bear some of the blame.

THE JUROR:  Nobody deserves to get mugged.  I think you're putting yourself in that situation.

MR. HARDING:  Talk to me about that.  Why am I getting myself in the situation?  What am I doing that is making me a more attractive target?

THE JUROR:  You're vulnerable.

MR. HARDING:  Sort of a vulnerable situation, does anybody here think it's at least partly my fault that I got mugged?  Is 37 the only one?  Well, this question's meaningless.  Who thinks it's mostly my fault?  No one.  And then, the last question which I was going to ask is who thinks I'm so much at fault that the person should be prosecuted?  Juror No. 37.

THE JUROR:  It's absolutely prosecuted, yeah.

MR. HARDING:  Let me ask another hypothetical before I get to this so I'll just go back one so it's not too confusing.  Who here, anybody here have minor children, say 10 or under?  Juror No. 3.  I want to have a hypothetical with you if that's all right.  Do you have a car?  Do you drive a car?  What's the make and model?

THE JUROR:  Honda truck.

MR. HARDING:  If I am a representative from Honda, all right, this is your lucky day, Juror No. 3, because I have an exciting opportunity for you.  We are rolling out a new child restraint device.  How old are

your kids?

THE JUROR:  They are young, six and four.

MR. HARDING:  Six and four, perfect, because this is exactly the age that we're targeting with our restraint system.  We're going to pay you a million dollars if you will let us use your children in a crash test.  Don't worry, the restraint system has been tested and tested, it is 75 percent effective.  You're going to take that deal?

THE JUROR:  No.

MR. HARDING:  Why not?

THE JUROR:  No price on my children.

MR. HARDING:  So even if I offered you $10 million for a one percent chance, is there any amount of money I could offer you to make you take that risk for your children?

THE JUROR:  (Moves head side to side.)

MR. HARDING:  Who here feels like Juror No. 3? He wants to throw away easy money.  Who here agrees with Juror No. 3, there is no amount of money you would take for a risk to your children?  We can go No. 1, 2, 4 6, No. 13, 11, 10, No. 8, No. 9, No. 14.  Basically everyone and 22 in the front row, no children.  And in the back row? Everybody except 27, who has no children.  Okay.  I think that's right.

So as I said, it's going to be our job to prove

to you the elements of wire fraud.  As the Judge told you, four on the five things against Mr. Youngblood are wire fraud counts.  So in legal terms, we talk about elements of the offense, which is to say.  There are certain things that we have to prove to you beyond a reasonable doubt and if we prove them to you, then we've proven our case and you have to convict; and if we don't, then you acquit.

There's a lot of other things out there that aren't elements so you might -- I mean, inevitably, at the end of this trial, if you're a juror, you will have questions.  You will not need to answer every question, but as long as we have proving these elements beyond a reasonable doubt, that's what matters in terms of a verdict.

And so, the elements of wire fraud, sort of the legal kernel of wire fraud is that the defendant knowingly devised a scheme to defraud.  And the Judge will define all of these things for you by the end of trial.  The scheme to defraud has to employ false material representations, pretenses or promises.  I've highlighted material.  I think that's going to be an issue the defense will discuss with you and may be an issue in the trial.

He has to use wire communications in interstate commerce because that's how the federal government gets any kind of jurisdiction over the case.  And finally, he

has to act with intent to defraud.  You can't defraud someone by accident.  So what is materiality?  Materiality is a representation -- or sorry.  It is a representation, pretense or promise that has a natural tendency to influence or is capable of influencing the decision of the decisionmaker, of a person.

And so, let me pick on you Juror No. 12.  Sorry, I know it's out of nowhere.  Let's say you're in the market for a new car and I'm selling a car and you and I get together and you say, hey, it's a great day.  I say, yeah, it's a great day.  We go about our business and you buy a car.  Now, let's assume that really in my heart of hearts, I don't think it's a great day.  I think it's just an okay day.  Does that matter to you in terms of whether you buy the car from me or not?  So that would be a lie or representation on my view, I don't think it's a great day, but it's not a material lie.

Now, maybe if I happen to know so there's the -- that is the main definition of materiality.  I think the Judge will also instruct you that there's two ways we could prove it.  A representation is material if a reasonable person were to rely on it.  And a representation is material even if an unreasonable person would rely on it if the person making the representation knows, or has reason to know, that the person's going to

rely on it, anyway.

So it's either reasonable and then, any reasonable one is -- counts for unreasonable plus knowledge. So let's say, Juror No. 12, I happen to know that you only do business with people who share your exact same opinion about the day. Well then, when I lied to you, that might be material, right? Because if I had told you the truth and I think it's kind of an okay day, you would be like, oh, that's my rule. I'm not going to deal with you anymore. Does that make sense? Then we get a question about materiality.

There's also a very important subset of this definition or to this definition in determining materiality. You should consider that naivete, carelessness, negligence or stupidity of a victim does not excuse criminal conduct. Who here thinks that fraudsters target only extremely sophisticated people who have done a ton of due diligence and never get anything? Nobody, right? That it how fraudsters work. The law takes that into account. It takes into account if you pick a vulnerable victim and you know they're vulnerable and we prove our case, then that's material.

Okay. So I need to ask this other last one, probably. Assume we prove our case beyond a reasonable doubt, all those elements I just said about wire fraud,

but you also think the victim or victims were naive, careless, negligent, stupid, or should have known better. Who here could not convict under those circumstances? Is there anybody in either any of the jury box or the front two rows? Who here would have a hard time convicting if you know, hey, these victims are -- frankly, they're kind of idiots for falling for this? Anybody have a hard time with that? Juror No. 10? You okay with that? Juror No. 8?

THE JUROR: Uh-huh.

MR. HARDING: All right.

THE COURT: You have one minute, Mr. Harding.

MR. HARDING: Thank you, your Honor.

I think I'll just close by asking the same question the Judge did, which is in light of this conversation we've had just now and you've had time to think about it and the fact you know I'm a crazy cat person, is there anything about anything we've discussed that makes you think, hey, I didn't say before but now upon reflection, I wouldn't be the best juror for either Mr. Youngblood or for the government? Is there anything that's sort of rattling around in the back of your mind to that effect? Anybody? Well seeing none, thank you all for your time. We look forward to putting our case on and seeing some of you for about a week.

THE COURT: Mr. Gonzalez-Falla.

MR. GONZALEZ-FALLA: Good morning, folks. My name is Jose Gonzalez-Falla. I said here earlier, I'm here with Charly Herring, with my co-counsel, we are here representing Mr. Youngblood. Of course, our role's a little different than the prosecutor's role because we're defending our clients. We're advocates on behalf of our client.

And so, what we're doing right now is we're doing a deselection process. It's not like I'm picking you, you and you to be on a jury. I'm actually removing people from the jury. In order to do that, I want to know as much as I can about you in as brief a time as possible. You know, this is a very important case because it involves the life and liberty of Mr. Youngblood, and so, I don't want to waste your time and so, I want to be as efficient as I can.

Now, one of the things that's important as we go here today is that you are in federal court and the reason you're in federal court is because Mr. Youngblood is charged with a federal crime. And you've heard about the presumption of innocence and he's still presumed innocent even though he's in a federal courtroom. But the difference between a state court and a federal court for this specific charge is the wire fraud element. That's

what makes this case different.  So it's not necessarily disputing whether there's a fraud act, but the issue in dispute might be whether there's a wire fraud because as the government told you, they have to prove beyond a reasonable doubt that Mr. Youngblood caused the use of the wires, which means that they have to prove that he acted with knowledge that the wires would be used in the ordinary course of business, or that their use would be reasonably foreseeable to him.  Okay.

Now, that's kind of some of you might think that's a technical defense, but it is an element of the crime and you have heard the Judge instruct you about the elements of the crime.  All of these elements are equally important or equally necessary.  They're elements.

Okay.  So what we'd be asking you to do will be making decisions that are based on reason, not emotion.  So one of the first questions that I want to ask and we're going to scale these just like the government did, although I'm not going to have ten numbers.  We're going to have five.  And so, I'm going to ask you -- all of us are different, right?  I think I'm more of an emotional kind of a person.  I think I make decisions more based on emotions than logic and I don't know what number I would put on it, but I want you to think about this and just give us a number out loud so we could write it down and we

could scale your answer.  No. 1, what would you put yourself?  Are you a logic person or more of an emotion?

THE JUROR:  I would put myself in a four.

MR. GONZALEZ-FALLA:  Okay.  Juror No. 2?

THE JUROR:  I would say four.

THE JUROR:  Three.

THE JUROR:  I'm a four and a half.

THE JUROR:  Four.

THE JUROR:  Three.

THE JUROR:  Four.

THE JUROR:  Three.

THE JUROR:  Three.

THE JUROR:  Three.

THE JUROR:  Three.

THE JUROR:  Four.

THE JUROR:  Four.

THE JUROR:  Four.

THE JUROR:  Three.

THE JUROR:  Three.

THE JUROR:  Three.

THE JUROR:  Four.

THE JUROR:  Four.

THE JUROR:  Four.

THE JUROR:  Four and three quarters.

MR. GONZALEZ-FALLA:  And Juror No. 26?

THE JUROR: Four and a half, five.

THE JUROR: Four.

THE JUROR: Four.

THE JUROR: Three.

THE JUROR: Three.

THE JUROR: Three.

THE JUROR: Two.

THE JUROR: Four.

THE JUROR: Five.

THE JUROR: Five.

THE JUROR: Five.

THE JUROR: Four.

MR. GONZALEZ-FALLA: And Juror No. 38?

THE JUROR: Four.

MR. GONZALEZ-FALLA: Thirty-nine. The next question has to do with how you're going to follow the law. How you feel about following the law and how do you feel about these principles that we've been discussing that the defendant should have the right to have jurors follow the law and not their own values. And this is a question about do I even agree with that or not so much.

Juror No. 1, where do you fall on that line between one to five? Do you strongly agree with that?

THE JUROR: Quite honestly, say four again.

THE JUROR: I would say five.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

MR. GONZALEZ-FALLA:  If you personally disagree

with the outcome that might occur, you would use your own values, but just how do you feel along that spectrum?

THE JUROR:  Four.

MR. GONZALEZ-FALLA:  Juror No. 30?

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

MR. GONZALEZ-FALLA:  Now, this next question relates to the government having to prove every element of the crime beyond a reasonable doubt.  Whether you strongly agree or not so much.  And here, I want to talk about, you know, here we talked about these elements and I mentioned one element about causing the wire.  That's one element.

So in an example, you had a reasonable doubt as to one element such as that, would you still be able to -- would you agree that they still had to prove that element? You know, would you still agree that the verdict that you would have to -- you would need to reach not guilty would be a reasonable doubt about that one missing element, do you strongly agree with that or disagree with that? Strongly disagree with that.  Do you follow me?  Do you follow that question?  That relates to this about one

element missing, will you agree or strongly disagree with that, you know, appropriate?  Juror No. 1?

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Four.

THE JUROR:  Four and a half.

THE JUROR:  Four.

THE JUROR:  Three.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Three.

THE JUROR:  Three and a half.

MR. GONZALEZ-FALLA:  Okay.  Thank y'all very much.  Here's another question.  It's kind of a variation of that.  If someone is guilty of fraud, they must be guilty of wire fraud.  I think we've got -- does everybody feel like those previous answers covered this?  I think it pretty much does so I'm not going to go through that slide.

Or how about a fraudster should go to prison even if the government fails to prove the type of fraud he's charged with committing?  That's a variation of that.  So conceding fraud but not the type of fraud that's charged, how do you feel about that, Juror No. 1?  Do you strongly disagree with that idea?  Or you agree that a person

oughta go to prison even if they failed to prove the type of fraud because the guy committed a crime.

THE JUROR:  I mean, lack of context, but I would say three.

MR. GONZALEZ-FALLA:  Okay.  But the context is yeah, I guess, you know, if the idea is the type of fraud is charged, not proven, I mean you have a reasonable doubt as to the type of fraud that's charged, that's the context.  But you believe there's a complete fraud happening, you believe that harm has resulted, and that's the part of that can be difficult when you take an oath as a juror where you have these issues come up.  Those are not easy cases this question's trying to bring out.  And so, we're asking about feelings or whether you agree because some people agree.  Some people don't disagree. So we're just trying to find out where you are on this line.  There's no right or wrong answers.  It's just how you feel about it.  Juror No. 1.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Three.

THE JUROR:  Five.

THE JUROR:  Three.

THE JUROR:  Four.

THE JUROR: No disrespect intended, but I think it's an irrelevant question because we don't have anything to do with the sentencing.

MR. GONZALEZ-FALLA: It's about how you agree -- it may be irrelevant but it's just trying to find out how you feel.

THE JUROR: Four.

THE JUROR: I was going to say the same thing as 10, but I'll say three. It makes no sense.

MR. GONZALEZ-FALLA: You know, we could change it to say a fraudster should be convicted instead of go to prison.

THE JUROR: It's hard to answer when you don't have context.

MR. GONZALEZ-FALLA: Well, these are all -- it's hard to put into context in the abstract. Juror No. 14.

THE JUROR: Five.

THE JUROR: Four.

THE JUROR: Three.

THE JUROR: Five.

THE JUROR: Three.

THE JUROR: Four.

THE JUROR: Four.

THE JUROR: Four.

THE JUROR: Two.

THE JUROR:  Three and a half.

THE JUROR:  Four.

THE JUROR:  Three.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Three.

THE JUROR:  Three.

THE JUROR:  Five.

THE JUROR:  Four.

THE JUROR:  Four.

THE JUROR:  Five.

THE JUROR:  Five.

THE JUROR:  Three.

THE JUROR:  Two.

THE JUROR:  Two.

MR. GONZALEZ-FALLA:  All right.  I think Judge Pitman covered this, right?  People who have been victims of a scam.  We talked about that.  And this is kind of a delicate one because I think there's going to be testimony about a divorce as part of this case and this experience. Affects people differently.

And I want to get a sense if you've been through a divorce, if you have, how long ago it was and whether it was a hard-fought divorce, your feelings about it. Because if you hear the evidence in this case, it may

bring back some memories and I'd like to get an idea if it would and how you think it might affect you.  So if -- anybody who has been -- Juror No. 4, how long ago was that?

THE JUROR:  Twenty years ago.

MR. GONZALEZ-FALLA:  Is there anything about that experience you think --

THE JUROR:  Best thing that ever happened to me.

MR. GONZALEZ-FALLA:  Child support?

Juror No. 11.

THE JUROR:  Just like two weeks ago.

MR. GONZALEZ-FALLA:  And no -- nothing about that?

THE JUROR:  Fairly amicable.

MR. GONZALEZ-FALLA:  Juror No. 21, how long ago?

THE JUROR:  2013, '14.

MR. GONZALEZ-FALLA:  Was it an amicable thing?  Was it hard fought?

COURT REPORTER:  I can't hear.

THE JUROR:  I wouldn't say it was amicable but no hard feelings.

MR. GONZALEZ-FALLA:  You don't think there was anything about that that would be unfair in this case?

THE JUROR:  No, sir.

MR. GONZALEZ-FALLA:  Anybody else?  Juror 25?

THE JUROR:  Thirty-five years ago, it was pretty tough, custody.

MR. GONZALEZ-FALLA:  Okay.  Anything about that experience you think it affects your -- the way you make sense today or how --

THE JUROR:  No, not really.

MR. GONZALEZ-FALLA:  Okay.

THE JUROR:  Still haunts me to some degree.

MR. GONZALEZ-FALLA:  Okay.  Anybody in the next row?  No.  Juror No. 30.

THE JUROR:  About 30 years ago.  Juror 30.  It was amicable.

MR. GONZALEZ-FALLA:  Okay.  So nothing about that experience.

Juror No. 2.

THE JUROR:  About six years ago.

MR. GONZALEZ-FALLA:  Was there anything about that experience?

THE JUROR:  No.

MR. GONZALEZ-FALLA:  Now, Judge Pitman asked you about that question at the very end, kind of catch-all question.  If you hadn't asked this question, did it capture a reservation that you might have?  Once you take that oath and you sit in that jury box, there's no going back.  And you might have some feelings now that you want

to express or you just haven't come out.  You've heard me speak.  You've heard the government speak.  Anybody here who has some concerns about sitting in this case if they want to bring to our attention they think we should know about so that we can intelligently make decisions about whether, you know, you should serve or not serve on this case?

Anybody?  Juror No. 22.

THE JUROR:  I believe everything started there was a cartel element to it.  I do have some bias towards that.

MR. GONZALEZ-FALLA:  You believe that -- I'm sorry.

THE JUROR:  I do have some bias towards that.

MR. GONZALEZ-FALLA:  The cartels?

THE JUROR:  Cartel element.

MR. GONZALEZ-FALLA:  Cartel elements?

THE JUROR:  If that is part of if I remember correctly.

MR. GONZALEZ-FALLA:  It is about cartel.

THE JUROR:  So I just feel strongly that anybody who would use, I guess, cartels to kind of influence a decision would be something I'd be biased towards.

MR. GONZALEZ-FALLA:  You would be biased against that.  Yeah.  I could understand that.  I mean, it's a

very powerful diminished use. Do you think it would have -- I mean, would it -- how do you think it would affect your judgment?

THE JUROR: I would probably go against the person who's being charged.

MR. GONZALEZ-FALLA: Do you think that if the use of that kind of influence, would that interfere with your ability to judge the other elements of the crime?

THE JUROR: Yes.

MR. GONZALEZ-FALLA: Juror No. 22, that the presence of the cartel as a way to influence behavior would affect their ability to fairly judge the other elements of the crime. Juror No. 29, you're nodding your head.

THE JUROR: Yes, I agree.

MR. GONZALEZ-FALLA: Okay. Anybody else agree with Juror No. 22 or 29? Yes, Juror No. 31.

THE JUROR: Yeah, I agree. I deal with that all the time.

MR. GONZALEZ-FALLA: You deal with that.

THE JUROR: Just having to deal with cartels from work perspective.

MR. GONZALEZ-FALLA: How do you deal with it?

THE JUROR: I manage a business in south Texas, deep south Texas. I've had to deal with it multiple

times, yes.

MR. GONZALEZ-FALLA:  So would that fact affect your ability to judge the other elements of the crime?  Or would it --

THE JUROR:  It will definitely have -- it weighs heavy on every decision for all of us at the end of the day so yeah.

MR. GONZALEZ-FALLA:  Okay.  Thank you very much. Anybody else besides -- yes.  Juror No. 15.

THE JUROR:  I can decide if somebody's trying to convince me.  I get convinced so fast.

MR. GONZALEZ-FALLA:  I couldn't hear you.  If somebody's trying to convince.

THE JUROR:  If you're talking, you say something, I listen to you and I might go to you.  Next, he comes and he talks, then I might believe him.  I can't decide.

MR. GONZALEZ-FALLA:  You can't decide?

THE JUROR:  Maybe I might be wrong, also, so I can't.

MR. GONZALEZ-FALLA:  You think it would be hard for you to make decisions?

THE JUROR:  It is hard for me to.

MR. GONZALEZ-FALLA:  Would be hard for you to sit on a case like this and make decisions?

THE JUROR:  Yes.

MR. GONZALEZ-FALLA:  That's what I'm hearing you say.  Is that fair?

THE JUROR:  Yes.  Yeah.

MR. GONZALEZ-FALLA:  And is it because of the cartel aspect or just in general because --

THE JUROR:  In general.

MR. GONZALEZ-FALLA:  Okay.  Thank you very much, Juror No. 15.  Okay.  Thank you very much for your time and for your answers.

THE COURT:  Can I see counsel at the bench.

(At the bench, on the record.)

THE COURT:  We did okay till that last part.  So I guess I'll ask for -- first for challenges for cause.  Mr. Guess.

MR. GUESS:  Just a moment, your Honor.

MR. HARDING:  I think Juror No. 15, it wasn't so much the cartel aspect.  I just think she essentially said she wouldn't be able reach a decision.  I think sort of disregard anything else.  Yeah, language barrier, also.

THE COURT:  She expressed that she's slightly impressionable but she believed --

MR. HARDING:  Uh-huh, impressionable.  We agree on her, cause or...

MR. GONZALEZ-FALLA:  We agree on cause, Judge.

MR. GUESS:  You visited with Juror No. 8 on

childcare issue.  I don't know if we really explored that too much more but...

MR. HARDING:  That's true.

THE COURT:  Problem is that we told them that they shouldn't come here if they had a conflict through next Wednesday and so, I don't --

MR. GUESS:  That's fine by me.  Put that down as a possible issue.

THE COURT:  He'll have to work that out.

MR. GUESS:  In terms of other causes, I mean, we go to 24 and 25, bias towards fraudsters.  I don't know if you felt like they were sufficiently --

THE COURT:  What's your position with regard to 24 and 25?

MS. HERRING:  Twenty-five, he said he didn't think that he could be fair.

MR. HARDING:  Twenty-four said that she might be unfair to both sides.

THE COURT:  So they cancel each other out.

MR. GUESS:  We'll agree to 24 and 25 then.

MR. HARDING:  And then, 22, I think, is the one that started off with the cartel stuff.

THE COURT:  When we're talking about cartel, I want to make sure they understand that we're talking about this is not somebody who is alleged to be involved with

the cartel unless I'm wrong.

MR. GONZALEZ-FALLA:  Well, I was talking about abuse of the cartels.

MS. HERRING:  Cartels just scare people.

THE COURT:  Right.  But I want to make sure that's what they're understanding because like the guy in south Texas, once he understands that we're not talking about actual cartel involvement, we're talking about someone who simply uses that as a part of whether that influences the decision.  I want to followup on anybody who says the cartel is the reason, I want them to come up let's clarify what that is.

MR. HARDING:  Twenty-two, 29 and 31.  That's actually the ones I have left, personally, except for No. 28.

MS. HERRING:  There was 11 that had a family kidnapped by.

MR. HARDING:  Twenty-eight, early on, said that she had a son with medical appointment.

MR. GUESS:  Again, it's the same issue.

MR. HARDING:  That was April 17 which is going to be two days from now.  No. 28.

THE COURT:  Yeah.

MR. GONZALEZ-FALLA:  Same issue we had with Juror 8, Judge.

MR. HARDING:  That's true.

MR. GUESS:  We're going to go deep into that panel, which I know you don't want to do, Judge.

THE COURT:  What is your thought on 29?

MR. HARDING:  Twenty-nine just said, I feel the same way as 22, but I think that could be explored.

MS. HERRING:  She said fraudsters make her blood boil.

THE COURT:  But then she said we all need to be fair and she resolved that to my satisfaction.  If you want to bring her up, that's --

MS. HERRING:  Yes.

MR. HARDING:  My notes said she would do her best.

MS. HERRING:  There was also just factually, No. 2 described having his father defrauded almost identically sounding.

THE COURT:  But he wrapped it up by giving assurances.  So other challenges for cause?

MS. HERRING:  Individual who had -- works very closely with the U.S. Postal Service and he expressed that his initial position would be to trust law enforcement.  I know the Court tried to follow up with him and he didn't fully commit.

THE COURT:  Would you like to bring him up then?

MS. HERRING:  Yes.

THE COURT:  Okay.  Any others?

MS. HERRING:  So we'll have 15, 25 and --

THE COURT:  So let's be clear.  So far, there's an agreement with regard to challenges for cause for 5, 7, 15 and 24 and 25; is that correct?

MR. GONZALEZ-FALLA:  That's correct, your Honor.

THE COURT:  Then the ones that I am going to bring up to the bench for further questioning will be 22, 28, 29, 31 and 35.  Are there any others?

MR. GONZALEZ-FALLA:  Does that include the guy from south Texas?

MS. HERRING:  Yeah, 31.

THE COURT:  The question is whether or not we want to take this as an opportunity to give them a lunch break because that's going to take a while to bring all of those up.  So this might be a natural break for us to take lunch and then, resume at 1:00 unless somebody has a better idea.

MR. HARDING:  You mean call them up while we're doing lunch or --

THE COURT:  No.  Go to lunch and start back up again.

MR. GONZALEZ-FALLA:  That's fine, your Honor.

THE COURT:  All right.

(End of bench conference.)

THE COURT:  Thank you for your patience, ladies and gentlemen of the jury panel.  After consulting with the lawyers, it has become clear that we are going to have to do considerable followup questioning with a few of you to clarify some answers that you previously gave and since that's going to take a bit of time and it's just now a little after noon, I thought that this might be a good opportunity for us to take our lunch break and resume at 1:00 to continue our jury selection.

So we'll give you a one-hour -- just shy of a one-hour break.  If you could remember the instructions I previously gave you and this is how important it is.  If any of you violate this instruction, we've got to start over and bring in a new group of people on a new day and so, that's what's the risk here.

And so, I would respectfully ask you, please don't talk to each other or anyone else about this case.  And don't engage in any independent investigation by any means of anything that you've heard, any person, place, thing, or issue, or law, again, for the reason that in the end, your verdict must be based solely on the evidence that you hear and see in this courtroom and the law that I give you.

I will, however, excuse at this time for purposes

of this proceeding the following jurors who are free to leave and the remainder of you will be coming back after lunch.  Juror Nos. 15, 24 and 25, you are free to go now. The remainder of you, have a nice lunch and we will see you back at 1:00 to continue our jury selection.

COURT SECURITY OFFICER:  Juror No. 50 has asked to speak to you.

(At the bench, on the record.)

THE JUROR:  Hi.  I just have a number of things so I thought I should talk before the break.

THE COURT:  Absolutely.

THE JUROR:  Like schedule-wise, I have basically two full-time jobs because I'm writing a book that is due in the next couple of weeks on top of my full-time job. I'm also in the training, frankly, at work that goes through June that I can't miss.  And then, aside from that, I also have a bit of a bias because my best friend was involved in a fraud case where a lot of money was taken from her by her ex-husband and he gambled it.  So I kind of have personal feelings about that whole thing but just wanted to let you know that.

THE COURT:  No.  I appreciate that.  I think we're probably in good shape.

MR. GUESS:  I agree.

THE COURT:  We'll dismiss you at this time.

THE JUROR:  Thank you.

THE COURT:  Okay.  Be in recess.

(Lunch recess.)

(Jury venire panel present.)

THE COURT:  Thank you, ladies and gentlemen of the jury panel.  We're now going to call just a few of you up to the bench for some followup questioning.  So I appreciate your patience as we conduct the remainder of our bench conferences.  First, could I ask Juror No. 22 to approach the bench, please.

(At the bench, on the record.)

THE COURT:  Good afternoon.  I have some followup questions because a few responses about your cartel-related so I wanted to follow up with you and make sure you understand that if, I'm not mistaken, that the allegations in this case do not necessarily have to do with the actual cartel or the involvement of a cartel.  But I think the allegation relates to the fact that the defendant may have used the existence or threat of the cartel in a manner that was actually not true, that nobody thinks was true.  Is that accurate or --

MR. GONZALEZ-FALLA:  It was used as an influence.

THE COURT:  As an influence.  Right.  So it's not the real cartel issues invoking their name sort of.  Does that make a difference to you in terms of --

THE JUROR: Not really. Mainly because, I guess, given my culture that's a little bit of if you want to really influence people, you will kind of threaten them with that. So just that kind of coming into play.

THE COURT: Yeah. Okay. Any followup?

MR. HARDING: And just to be clear, I mean, it sounded like when Mr. Gonzalez-Falla was questioning you, the fact that the defendant may have used the cartel as a threat is something you consider outside its appropriate scope. Because like you could consider the fact that he tried to defraud someone, but you couldn't use it, for instance, like Mr. Gonzalez-Falla said, if we didn't prove, you know, intent to defraud or something like that, or we didn't prove wires or whatever.

THE JUROR: I just want to remain unbiased.

THE COURT: Okay. Any other questions?

MR. GONZALEZ-FALLA: You would be unbiased because of that.

THE JUROR: Yes.

THE COURT: Thank you very much. Juror No. 29, please. If you could approach.

(At the bench, on the record.)

THE COURT: You know the drill. So just wanted to follow up because in the context of talking about the -- I think it was the Craigslist scam, you made some

pretty strong statements about people who defraud others and then -- but you sort of ended on a note of but I understand I have to be fair.  So I just wanted to explore that a bit with you because what we're looking for is people who haven't had those kinds of experiences but ones that could sort of separate that and make sure that in this case, you would require that the government prove all of the elements that they have to prove in order to obtain a conviction and that that wouldn't be colored by your personal experience.  You know what I'm getting at so can you tell us a little bit about where you are on that?

THE JUROR:  I think they're scum of the earth.  I mean, I think there are people that take advantage of people that are vulnerable.  I have a lot of clients that have had this happen to them.  I do not have a high opinion of them, but I'm not going to say that he is so, I mean, if you prove it.  But I can't say that I'm not biased.

THE COURT:  Okay.  Would you then say, though, that you would still, even though you have those feelings, require the government prove everything that they're required to prove and according to the instructions I give you before you find this individual guilty of anything?

THE JUROR:  Yes.

THE COURT:  Okay.

THE JUROR:  I mean, I'll do due diligence but y'all keep looking for bias and I'm just saying, it feels very biased.  I mean, it feels very --

MR. GONZALEZ-FALLA:  Strong.

THE JUROR:  Strong and so, I don't want -- you may like me, but you may be like -- you know, because I'm being honest.  And same with the cartel.  The mention of that, anybody who's associated with that, it shows me bad judgment.

THE COURT:  On that note, in this case, I think the allegation is not going to be any actual association with the cartel.  Rather, it's going to be that he used that as a threat.

THE JUROR:  Oh, well, same thing.  I mean, it plays on the vulnerability of people and I just -- there's a lot of crimes out there.  That's just one of the ones like child molestation.  Sorry.

THE COURT:  No.  That's what we're here about.

THE JUROR:  I believe in a fair trial so I'm just saying.

MR. GONZALEZ-FALLA:  Seems like my job's going to be a lot harder.

THE JUROR:  It might be.

MR. GONZALEZ-FALLA:  Because of how strong you feel about it.

THE JUROR:  I do.

THE COURT:  And that's the candor we appreciate.

THE JUROR:  Thank y'all for being here.

THE COURT:  I appreciate it.

Juror No. 31, if you could approach, please.

(At the bench, on the record.)

THE COURT:  Thank you so much for coming up.  I just wanted to follow up about the cartel issue raised. So we just wanted to make sure that you understand that there is not, to my understanding, going to be an allegation of an actual involvement in the cartel or connection to the cartel.  I think the evidence that the government anticipates it might show is that it was the untrue -- how would you characterize it?

MR. HARDING:  The defendant used the threat of the cartel to get money from people would be the --

THE JUROR:  He was the cartel?

MR. HARDING:  No.

THE JUROR:  Or he was using it as defending from the cartel?  Okay.  The second one.

THE COURT:  But there's not going to be any evidence, I believe, that the cartel was actually involved.

THE JUROR:  Right.  Okay.

THE COURT:  With that, is that something that you

think would taint your views?  Or would you be able to take that for what it is and listen to the evidence and base your verdict on the evidence and require that the government prove all the things that they have to prove?

THE JUROR:  I would say I can be impartial, but I would say that it's difficult just with -- dealing with every day right now.  So...

MR. GONZALEZ-FALLA:  Why don't you tell me about that.

THE JUROR:  I run an energy company in south Texas along the border and so, we have all sorts of tracking issues running through our assets every day, all day.

MR. GONZALEZ-FALLA:  Oil and gas production?

THE JUROR:  Oil and gas production.  I have to deal with that in the oil theft department in the Permian Basin and we've got, you know, hundred-thousand dollars stolen by trucking companies that are managed by the cartel.

MR. GONZALEZ-FALLA:  I see.

THE JUROR:  So I've had to deal just with the interaction and down there.  Just interaction with -- I mean, they're smuggling people so it's pretty scary.

MR. GONZALEZ-FALLA:  Sure.  Yeah.  So as the Judge was saying, what this case involves the use of them.

THE JUROR:  As threats.

MR. GONZALEZ-FALLA:  It's like, you know, cartels out there and pay some money, maybe you can be safe, that kind of thing.  So the question --

THE JUROR:  It would be hard for me to separate my day-in-and-day-out dealings with that from in life.

MR. GUESS:  If it was a mafia case, for example.

THE JUROR:  It's the same thing.

MR. GUESS:  So any type of organized crime, you're going to have a visceral reaction against.  Most people would --

THE JUROR:  Should be, yeah.  Well, for us, living in the state of Texas.

MR. GUESS:  Right.

THE JUROR:  So this is what we got.

MR. GUESS:  Again, the real question is can you set that aside and just base your decision on this case just from the facts and the evidence that you hear from the witness stand?

THE JUROR:  I believe that I can.  Yes.  Yes.

MR. GUESS:  All right.

THE JUROR:  To the best of my ability for sure. I mean, with the facts and strong support and all that, I'll do my best.  Well, I don't understand the pieces of the puzzle.  I would have to listen to what I think the

issues are.

MR. GONZALEZ-FALLA:  So basically the factfinding issues the Judge was talking about applying.

THE JUROR:  Right.

MR. HARDING:  Do you think you could wait and listen to the law the Judge gives you?

THE JUROR:  I think I could and to the best of my ability since it's his actual right.

THE COURT:  Thank you so much.

MR. HARDING:  Thanks, Judge.

THE COURT:  No. 35, you may approach the bench, please.

(At the bench, on the record.)

MR. GONZALEZ-FALLA:  Mr. Varner, when we were asking questions, you were talking about your experience working with the postal service.  Or I guess your company also works with the inspector general's office.

THE JUROR:  Office of the Inspector General, U.S. Attorney's Office and other investigating authorities.

MR. GONZALEZ-FALLA:  How long did you work with them every day kind of?

THE JUROR:  A little bit of context would be helpful here.  Stamps.com is owned by Octane.  Octane is headquartered here in town.  I run that postal service business for billing labels, 7 billion dollars last year.

It's -- so a variety of transactions and situations will come up from counterfeit, financial fraud, Hazmat, illicit or dangerous drugs.  We are dealing some extent of those every week.

MR. GONZALEZ-FALLA:  Those types of law violations that require investigation?

THE JUROR:  I would say the actual investigations are probably once a month.

MR. GONZALEZ-FALLA:  And you're the person who helps with coordination?

THE JUROR:  I am not the person who holds data, but I am the person who represents Octane at a relationship level to the Postal Service.  And I provide consultation to investigating authorities who are looking for context on transactions.

MR. GONZALEZ-FALLA:  Federal crimes being investigated?

THE JUROR:  Yes, sir.

MR. GONZALEZ-FALLA:  So you were also in talking, you were saying something about doing your best, you know, to, I guess, assess the credibility of federal agents.

THE JUROR:  It's very difficult to -- I wouldn't say federal agents.  When asking if I can guarantee that I will be unbiased tomorrow, depending on what was in my ice tea or the circumstances of the day, I will do my best to

commit to that.  But to say for sure is like saying for sure I know that the sky will not be orange next Wednesday.  Fires in Mexico, you've lived in Austin for a while, can turn the sky orange whenever.  I will promise to do my best for what happens for tomorrow.

MR. GONZALEZ-FALLA:  I guess what I hear you saying is you don't know you'll be successful.  At least whether your best would result in --

THE JUROR:  I'm saying, I cannot foresee all sets of circumstances.

MR. GONZALEZ-FALLA:  Okay.

THE COURT:  Anybody else?

MR. HARDING:  No, I don't believe so.

THE COURT:  Thank you.

THE JUROR:  Thank you.

MR. GONZALEZ-FALLA:  Move to strike.

THE COURT:  So let's talk about 22.

MR. HARDING:  I think we're all agreed on 22.

THE COURT:  Twenty-nine?

MR. GUESS:  I don't believe -- I think that she held strong feelings but I don't think that she can't be fair.  So I don't think there's a witness or potential juror who has strong feelings about crime, most of us do.  As in a murder case, everyone's going to say, you know, murderers should never obviously receive...

MR. GONZALEZ-FALLA:  Well, this is a fraud case and she used some very strong language to describe fraudsters.  She called them scum bags, lowest of the low.

MR. HARDING:  She also said -- I think from my perspective -- obviously, different perspective, the most important thing she said was, but I don't know if he is one of them.  If you prove that he is one of them, then I'm going to.  But she did say she would make us prove it.

MR. GONZALEZ-FALLA:  I got a very strong sense from her that she was going to make our job a lot harder and I think she said that, too.

THE COURT:  I can understand --

MS. HERRING:  She referenced bias.  She used the word "bias."  She's identifying with the feeling of bias.  She proffered that word.

THE COURT:  I think, instructively, she also said like child abuse cases, of course anyone is going to have instinctive biases about that.  But she kept coming around to but we've gotta do it, but gotta be fair and we've got to do the right thing.  So I think that there's not a doubt that she expressed significant biases, but I think she understands the importance of setting that aside and I think she gave me the requisite assurance that she could do it.  So I will overrule that objection.

Thirty-five, I don't even know what to do with

that.

MR. GONZALEZ-FALLA:  I think he's biased.  I don't think he could set it aside.  I think he tried to communicate that through what he was saying.

MR. HARDING:  My feeling was that he is the kind of guy who wouldn't give an assurance about anything.  You asked him about are you biased about what you're going to have for dinner tomorrow.  You know, I think he's sort of very logically minded to the Nth degree where he isn't even willing to speculate about tomorrow.

THE COURT:  Or try to be too clever for his own good.  Unless you object, I'm going to strike him.  Is that okay?

MR. GONZALEZ-FALLA:  Yes, Judge.

THE COURT:  All right.  Any other strikes for cause?

MR. GONZALEZ-FALLA:  Those are all the ones.

THE COURT:  For the record, make sure we're on the same pages.  The panelists who have been struck for cause are 5, 7, 8, 15, 22, 24, 25, 28, 35.

MR. GONZALEZ-FALLA:  That's what I have, Judge.

THE COURT:  How many is that?

THE CLERK:  Nine.

THE COURT:  Nine.  We had a five margin so that means we need to pull four.  I'm going to question six to

allow for another cushion in case we lose two on this next question. Does that sound reasonable?

MR. HARDING: Yes.

THE COURT: So I'll question 38 through 43. No, I'm sorry -- is that okay?

MR. GONZALEZ-FALLA: Uh-huh.

MR. HARDING: Alternate 12.

THE COURT: Takes into account alternates. Is that right? Okay.

MR. GONZALEZ-FALLA: Yes, Judge.

THE COURT: Is that good?

MR. HARDING: Yes.

(End of bench conference.)

THE COURT: Thank you again for your patience, ladies and gentlemen of the jury. We have, in fact, moved into the circumstance that I had anticipated earlier and that is that those of you who have been passive listeners throughout this proceeding are now going to move -- several of you are going to move into the group of folks who we do need to follow up with and ask questions of.

So at this time, I'm going to ask that panel members 38 through 43 -- so that would be from that end through six persons into the jury panel -- that you now help us by going through and I won't ask whether or not you would have answered any of those questions. What I

will do is go slowly through in outline form to prompt you with the areas of questions that I was asking about, and if at any time, you determine that you would have, had you been in this initial group, had a responsive -- had a response to any of these questions, then I will ask you to raise your hand and we'll do the same as we have been doing early on.

First of all, any of you who recognized either any of the lawyers, the folks associated with the lawyers, or any of the witnesses that were named at the beginning. Any familiarity with any of those individuals? Okay. Thank you, or the defendant himself. No response. Thank you. Any knowledge of other panel members before today? No response. Any issues with regard to the length of the case? Any hardships, undue hardships? Any illnesses, other issues such as any hearing or eyesight issues that you need to make us aware of? Okay.

Any of you heard through any means anything about this case before today? All right. Any prior service on a grand jury? Any prior service on a trial jury? Any service on a prior courts-martial? Okay. Any of you or immediate family member participated in a lawsuit as a party or a witness? Yes. Your jury number, please.

THE JUROR: Forty-three.

THE COURT: Yes. Could you tell me about in what

capacity?

THE JUROR:  I was in two different civil lawsuits that were settled at mediation.

THE COURT:  Okay.  And what was your role?

THE JUROR:  I was in a car accident in one of them and one of them was just a financial disagreement, I guess.

THE COURT:  You were a party in the lawsuit?

THE JUROR:  Yes.

THE COURT:  And neither of those went to trial.

THE JUROR:  No.

THE COURT:  Okay.  And is there anything about those experiences that you think would have any bearing on your ability to be fair and impartial in this case?

THE JUROR:  No.

THE COURT:  Okay.  Thank you very much.  Anyone else?  Okay.

Have any of you attended law school, taken any law courses such as business law or criminal justice?  Received any legal training or education?  Or worked in a law office or for a court?  Okay.  No responses.  All right.

Now, as I talked to you about your role as jurors in this case that your obligation would be to apply the law as I give it to you, regardless of any notions or

belief that you may have about what the law should be in encountering your verdict. And I'll ask now if any of you would be unable or unwilling to render a verdict based solely on the evidence presented at trial and the law as I give it to you in my instructions, if you could raise your right hand if you would have difficulty doing that. Thank you.

Now, with regard to burden of proof, the burden is on the government to prove guilt beyond a reasonable doubt. Is there anyone who would be unable to require the government to prove every element of its case beyond a reasonable doubt as I have explained that term to you? Anybody unable to do that? Is there anyone who would have trouble presuming Mr. Youngblood is innocent until the government proves its case beyond a reasonable doubt? Is there anyone who would hold the government to a higher or lesser standard of proof? Thank you.

In the eyes of the law -- excuse me. First, Mr. Youngblood has been indicted by a grand jury. However, an indictment is merely a formal method of bringing charges. It does not create any inference of guilt. Does anyone believe that just because a defendant has been arrested or indicted that he must be guilty of something? Does anyone believe that? All right.

In the eyes of the law, the government and the

defendant are to be treated alike and are entitled to the same honest, fair and impartial treatment. Is everyone willing to accept and apply that principle? And no response. If it's a juror's duty to base your verdict solely upon the evidence without prejudice or sympathy so if you're chosen, is that the promise you will make and the oath you will take before being accepted, and that they have a right to expect nothing less that you will base your verdict solely on the evidence without prejudice or sympathy? If you would be unable to do that, please raise your hand.

If the government proves its case beyond a reasonable doubt, it will be your duty to convict Mr. Youngblood despite any dislike you may have for the government or its witnesses, or any sympathy you may feel toward Mr. Youngblood. Is there anyone here who you would be reluctant to do that? All right.

A defendant has the right under the Fifth Amendment of the Constitution not to testify. And the law states that a juror may not consider a defendant's decision not to testify as any evidence of guilt. Is there anyone who would have any trouble accepting that proposition that you cannot hold it against the defendant if he chooses not to testify? Is that a problem for anyone? All right.

One of your jobs will be assessing the credibility of the witness. You may credit all, some, or none of any witness' testimony. Will you automatically believe a witness if he or she takes an oath? Or will you listen to the testimony and determine credibility after the testimony? Is there anyone who would have trouble doing that?

Is there anyone who has trouble with the concept that a witness could testify and be mistaken about some things or may misremember something? Does anyone have trouble understanding and appreciating that? Would any of you be more or less inclined to believe the testimony of a government agent or employee before hearing that testimony simply because he or she was a government agent or employee? Would you be inclined to view testimony given by a federal agent as being more credible than other witnesses just because of their position or employment? Is there anyone who would answer yes to that question?

Have any of you or a member of your immediate family ever been employed as a law enforcement officer? Any of you or immediate family members? Do any of you have close friends or family members work or have worked for the FBI? Does anyone have any strong feelings about law enforcement, positive or negative, that would affect your ability to be fair and impartial to both sides in

this case?  Any strong feelings about law enforcement?

Have you or anyone with whom you've had a significant relationship ever had an experience with law enforcement either so negative or so positive that you feared that it might affect your ability to be fair and impartial in this case?  Have you or any member of your immediate family ever have a legal dispute with the federal government?  Do you think that the fact that the federal government is a party here might affect the way you would think about this case and your ability to be fair and impartial?  Does anyone think that that would be a problem?

Has anyone here ever been personally affected by fraud, or had a close friend or family member who has been affected by a fraud?  Does anyone here or do you have a close friend or family member who has ever been arrested for, accused of, or convicted of a crime other than a minor traffic offense, but including DWIs?  Any of you, a close family member, or a close friend been arrested for, accused of, or convicted of a crime?

Has anyone here, a member of your immediate family or close friend ever been a victim of a crime?  Any of you or your immediate family members ever worked for a bank?  There were questions about the fact that in the event that Mr. Youngblood is convicted that the Court will

be the one to impose any appropriate punishment.  So is there anyone here who would find it difficult or impossible to reach a decision about Mr. Youngblood's guilt without considering punishment?

Is there anyone here who would find it difficult or impossible to find Mr. Youngblood guilty even if you were convinced of his guilt beyond a reasonable doubt simply because you would not be able to decide his punishment?  Finally, if you were -- these are the catch-all questions in the end.  If you or a family member were the defendant, would you be dissatisfied in any respect to have a person in your frame of mind serving as a juror in that case?

Do you know of any reason that you cannot sit in this case without complete fairness and impartiality and decide the case based solely on the evidence presented in court and the law given at the conclusion of the trial or for any other reason we've not discussed?  And here, if there is something that I have not gone over just now that during the previous questioning, you have had in the back of your mind, yeah, I think I would have spoken up had I been in that initial group?  Is there anything that any of you would like to bring to my attention in that regard at this time?  Okay.

Can I see counsel at the bench, please.

(At the bench, on the record.)

THE COURT:  Do you have any followup questions?

MR. GUESS:  No questions from the government.

THE COURT:  Is there -- so I think we have arrived then at the jurors who have been struck for cause. Do you have additional number of jurors who remain -- so I think we have sufficient number of jurors for you to now exercise your peremptory strikes.  Are you prepared to do that?

MR. GUESS:  Could we have just a few minutes to --

THE COURT:  Yeah.  I'll excuse them for 15 minutes.

MR. GUESS:  Yeah, that's fine.  We're ready to go to discuss that.

THE COURT:  Any issues we need?

MS. HERRING:  (Moves head side to side.)

MR. GONZALEZ-FALLA:  No, Judge.  We're good.

THE COURT:  We'll take a 15-minute break, bring them all back in, seat the jury and go from there.

MR. GUESS:  All right.  That sounds good.

MR. HARDING:  Is there any anticipation that we would proceed straight to opening statements --

THE COURT:  Yes.

MR. HARDING:  -- and then testimony?  So should

we bring our exhibits with us?

THE COURT:  Yes.

MR. GONZALEZ-FALLA:  Take the last that we're striking from?  What's the last number?

MR. GUESS:  Thirty-nine.

(End of bench conference.)

THE COURT:  Ladies and gentlemen of the jury panel, we are one step closer to our objective.  Now, we have completed the process of questioning the panel and we're going to take a 15-minute break, during which time, the lawyers are going to process the information to confer among themselves to exercise the strikes that they've been given.  We will then call you back here into the courtroom.  And I would ask that you not be present in the courtroom even during the break because they will be able to talk more freely when you're not here.

We will then bring you all back in.  Having exercised their strikes, we will then have the clerk call the names of the jury that will then -- when you come back, you can stay in the back and you don't have to be in any particular order when you come back to be seated.  But when you come back, if you could sit out there, then the clerk will call your names one-by-one, you'll come, be seated in the jury box, we'll swear you in.  At that time, I will excuse the remainder of you.  You're free to stay,

obviously, but I will excuse you for the day once we have seated and sworn the jury and we will proceed then to the opening statement.

So with that, we'll take a 15-minute break. Again, remember the instructions: Don't talk to anyone, including each other. Don't engage in any independent investigation. Thank you.

(Jury venire panel not present.)

(Recess.)

THE COURT: Have the parties had an opportunity to review the jury panel?

MR. HARDING: We have, your Honor.

THE COURT: Any objections to the jury?

MR. HARDING: We have no objections, Judge.

MR. GONZALEZ-FALLA: No, your Honor.

MS. HERRING: No, your Honor.

THE COURT: All right. I will now ask the courtroom security officer to bring in the panel members. We will seat the jury. I will then excuse the panel and start instructing the jury.

MS. HERRING: And, your Honor, if I may, I don't know if now is the appropriate time, but we are going to invoke the rule in this case. We'd ask that anyone potentially testifying to be excluded from the duration of the trial.

THE COURT: Okay. The rule has been invoked. Do you have any witnesses that are -- we'll cover that in a minute.

(Jury venire panel present.)

THE COURT: Thank you. You may be seated.

Members of the panel, thank you again for your patience. The lawyers have now exercised their peremptory strikes and we have identified those among you who will be seated as the jury in this case. I'll ask the clerk now call your names. As your name is called, if you could please come forward and the courtroom security officer will direct you to your seat.

THE CLERK: Juror No. 1 will be John Wooderson, Juror No. 2, Alyssa Dadoly, Juror No. 3 will be Angela King, Juror 4, James Hearn, Juror 5, Elizabeth Henry, Juror 6, Jennifer Keate, Juror 7, Kathleen Willse, Juror 8 will be Lillian Phillips, Juror 9, Gregory Reed, Juror 10, Charles Welch, Juror 11 will be Aaron Gaus, Juror 12, Chelsea Windlinger, Juror 13, Lawrence Collie, and Juror 14, Cott Strzinkek.

THE COURT: Now, to those of you who were not selected today, I want to on behalf of the parties in this case, as well as this community, express to you again my appreciation for your taking time out of your busy schedule to come here and engage in this really important

civic process.  Although you were not chosen today, hope springs eternal, you will still be on our list, I think, and another day, another time.

With no further adieu, I will release you and you're free to go.  You're also free to stay.  We will be -- I'll be instructing the jury briefly and then, the lawyers will make their opening statements in the case. You're free to sit in for any part of that and as much of this trial as you would like, but you're not required to, obviously.  And I will add that your leaving -- I'm releasing you at 2:00 but we do not follow up with your employer to let them know that we released you at 2:00. That's between you and your conscience.

But thank you again.  I'll release you now if you would like to go, you can excuse yourself now.  But if you'd like to stay, you're welcome to, as well.  Thank you so much.

(Jury venire panel exits.)

THE COURT:  Now, ladies and gentlemen of the jury, I will ask that you each stand and raise your right hand to be sworn.

THE CLERK:  Each of you do solemnly swear or affirm that in the case of The United States of America vs. Saint Jovite Youngblood, the defendant now before the Court, you will render a true verdict according to the law

and evidence?

(Affirmative responses given.)

THE COURT:  Thank you.  Please be seated.

Ladies and gentlemen of the jury, now that you have been sworn in, I will give you some preliminary instructions that will guide you in your participation in this case.  As the judge, I will decide all questions of law and procedure.  As the jury, you and you alone are the judges of the facts.  Your duty is to judge the facts based on the evidence.  You'll then apply the law as I give it to you to those facts.  You must follow the law whether you agree with it or not.

Nothing that I may say or do during the course of this trial is intended to indicate nor should it be taken by you to indicate what your verdict should be.  I have designated 12 of you to be jurors and two of you to be alternate jurors.  Alternate jurors shall hear the case in the same capacity as regular jurors.  Alternate jurors may be called upon to replace one of the other jurors if he or she becomes unable to perform their duties as a juror.  However, an alternate juror that does not replace another juror will not be made a part of the jury that ultimately renders a verdict in this case.

The evidence in this case will consist of testimony from the witnesses, the documents, and other

things received into the record as exhibits and any facts that the lawyers agree or stipulate to or that the Court may instruct you find.  There are two kinds of evidence, direct and circumstantial.  Direct evidence is direct proof of a fact such as the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  I'll give you further instructions about direct and circumstantial evidence at the conclusion of the case, but have in mind that you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses to disbelieve, and how much of any witness' testimony to accept or reject.  I'll give you some guidelines for determining the credibility of witnesses at the end of the case.

Certain things, however, are not evidence and must not be considered by you to be evidence.  The four types of things not to be considered evidence are:

One, statements, arguments and questions by lawyers are not evidence.

Two, objections to questions are not evidence. Lawyers have an obligation to their client to make an objection when they believe evidence is being offered improperly under the rules of evidence.  You should not be influenced by the objection or by my ruling on it.

If in response to an objection, I sustain the objection, then ignore the question that was asked. If in response to the objection, I overrule it, then treat the witness' answer like any other answer. If in response to an objection, I instruct you that some item of evidence is to be received by you only for a limited purpose, then you must follow that instruction.

Three, testimony that I exclude or tell you to disregard is not evidence and must not be considered.

And four, anything you see or hear outside this courtroom is not evidence and must be disregarded. You're to decide the case solely on the evidence presented here in the courtroom.

The indictment or formal charge against a defendant is not evidence of guilt. Indeed, the defendant is presumed by the law to be innocent. The defendant begins with a clean slate. The law does not require the defendant prove his innocence or produce any evidence at all, and no inference may be drawn from the election of a defendant not to testify. The government has the burden of proving the defendant's guilt beyond a reasonable doubt. If the government fails to do that, then you must acquit the defendant. While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proved beyond any possible

doubt.  It's only required that the government's proof exclude any reasonable doubt concerning his guilt.

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.  Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you'd be willing to rely on it and act upon it without hesitation in making the most important decisions of your own affairs.

Now, a few words about your conduct as jurors. You should give careful attention to the testimony and evidence presented for your consideration during the trial.  But do not form or express any opinion about the case one way or another until you've heard all the evidence and have had the benefit of the closing arguments of the lawyers and my instructions on the law that will apply in the case.

Once you commence your deliberations on your verdict, you will have access to the exhibits that I admit into evidence during trial.  Under normal circumstances, however, you will not have a written transcript of the testimony of the witnesses during your deliberations and we will not be able to read to you any significant portion of a witness' testimony ; therefore, please pay careful attention to the testimony given by each witness during

the trial in this case.

Until this trial is over, do not discuss this case with anyone, including each other, and do not permit anyone to discuss this case in your presence. This includes your spouse, children, relatives, friends, coworkers, people with whom you may commute to court each day. During your jury service, you must not communicate any information about this case by any means, including face-to-face conversations, phone calls, text messages, internet posts, social media app posts, and do not do so until I accept your verdict and excuse you as a juror.

Again, do not even discuss this case with your fellow jurors until the end of the case when you retire to deliberate. It's unfair to discuss this case before all the evidence is in because you may become an advocate for one side. The parties, the witnesses, and the attorneys are not allowed to communicate with you and you may not speak with anyone else in or around the courthouse other than your fellow jurors or court personnel.

Do not independently investigate this case. You must rely solely on what you see and hear in this courtroom. Do not try to learn anything about the case from any other source like using your computer, tablet, phone. Do not read any media accounts should there be any. And if you do encounter any media accounts, whether

on the radio, the internet, television, as soon as you become aware that it might relate to this case, please turn off your device, leave the room, do whatever is necessary to prevent from hearing anything about the broadcast. Do not visit or view any place discussed in the case and do not look up or view any place discussed in the testimony.

In summary, you may not research any information about the case, the law, the people involved, including the parties, witnesses, the lawyers, until after you've been excused as jurors. The reason for these cautions lies in the fact, again, that it is your duty to decide the case based solely on the testimony and evidence presented during the trial without consideration of any other matter.

You've been provided with notebooks and pens so that you may take notes during the trial if you choose. If you choose to take notes, please keep in mind the following instructions. First, whether you take notes at all is entirely up to you. Second, if you choose to take notes, the notes that you take are only aids to your memory.

If you do not take notes, in deliberating in this case, you should rely on your independent recollection of the evidence and you should not be unduly influenced by

other jurors' notes. Finally, please remember that notes themselves are not evidence and should not be given any more weight in your deliberations than the recollection or impression of any juror about the testimony that you will hear. From time to time, I may rule on motions or objections made by the lawyers. You should not infer or conclude from any ruling that I make that I have any opinions on the merits of this case favoring one side or the other.

If I sustain an objection to a question that goes unanswered by a witness, you should not speculate on what that answer might have been nor should you draw any inference or conclusion from the question itself. During the trial, I may have the need to confer with lawyers out of your hearing, from time to time, concerning questions of law or procedure that require consideration by me alone.

On some occasions, you may be excused from the courtroom as a convenience to you while I discuss these matters with the lawyers. So we'll try to limit those interruptions as much as possible, but please remember that we're doing our best to be efficient with your time and try to be patient even when the case, at times, may appear to be moving a little slowly.

The trial will now begin and the lawyers for each

side will be given an opportunity to make opening statements during which they may explain the issues in this case and summarize the facts that they expect the evidence will show.  First, the government will make an opening statement, which, again, is simply an outline to help you understand the evidence that the government's attorney expects to introduce.

Next, the defendant's attorney may, if they choose, make an opening statement.  The government will then present its witnesses and counsel for the defendant may cross-examine them.  Following the government's case, the defendant, if he chooses, may present witnesses and the government will have the opportunity to cross-examine them.  The government may then decide to present rebuttal witnesses.  After all the testimony and evidence has been presented, the lawyers will then be given a final opportunity to address you and make their closing arguments in the case.

The statements that the lawyers make now as well as the arguments they present at the end of the case are not to be considered by you as either evidence in the case, which comes only from the evidence and -- that comes in through the witnesses, and exhibits or your instructions as to what the law is in this case, which will only come from me.  These statements and arguments

are intended only to give you an overview of the case and help you understand the issues and the evidence as it comes in as well as the position taken by both sides.

Now, the rule has been invoked in this case and so, I will ask whether or not either party has any witnesses present in the courtroom that need to be excluded at this time.

MR. GUESS:  None from the government, your Honor.

MS. HERRING:  No, your Honor.

THE COURT:  All right.  I will place you under a continuing obligation to ensure that your witnesses are aware that the rule has been invoked and the consequences of the invocation of the rule.  All right.  Government.

MR. GUESS:  Thank you, your Honor.

GOVERNMENT'S OPENING STATEMENTS

MR. GUESS:  Just so you'll know, this is Rachel Mercado from our office.  She's the one that runs all the technology.

May I proceed, your Honor?

THE COURT:  You may.

MR. GUESS:  Good afternoon.  Again, my name is Dan Guess.  I'm an AUSA here with the Austin office and together, with Matt Harding, we're going to be talking to you about this case.  We'll be presenting evidence.  As the Judge explained to you, Mr. Youngblood has been

indicted on four counts of wire fraud and one count of money laundering.  The purpose of my statement here today is to kind of preview the evidence for you.  What I say up here is not evidence.  The only evidence that you're going to hear comes from that witness stand over there.

Now, some of you have watched television, you've watched movies.  You see a lot, you know, great things that happen on the witness stand, and so forth.  Well, the purpose of the witness stand is simply to tell the truth about what happened, tell the facts.  Because the Judge said, you're going to be the judges of the facts.  So they're going to get up there and they're going to tell you what their recollections are.  They'll talk about physical exhibits.  They'll talk about financial documents.  They'll talk about a lot of stuff that went on during the course of this case.

And let's get right to the beginning of it.  In April 2023, you're going to hear from the FBI agents that they were contacted by an individual who had said that he felt like he had been defrauded by Kota Youngblood, the man sitting right over there.  And what they're going to tell you is also an unbelievable story.

Agent Wilkinson, Agent Noble from the FBI were in their office, they met with Mr. Eric Perardi, a local businessman.  You're going to find out about Mr. Perardi

that he was a successful businessman here in the local area and he came in and he talked to them in late April of 2023. And the evidence is going to show that Mr. Perardi told the agents that Mr. Youngblood had been extorting money from him to protect Mr. Youngblood -- or, excuse me, Mr. Perardi from death threats from his soon-to-be ex-wife. Not only that, Mr. Youngblood told Mr. Perardi, now, if he didn't pay money, Mr. Perardi's children were potentially threatened by the Mexican drug cartels.

Upon hearing the evidence, upon hearing those statements from Mr. Perardi, Agents Youngblood (sic) and Wilkinson then decided that they would try to do an uncover operation and what they did -- and you're going to hear the testimony from Task Force Officer Joe Fiedler. Officer Fiedler is a Temple Police Department officer and he's going to come up here and he's going to tell you from that witness stand that on May the 1st, just a few days after meeting with Mr. Perardi, that he pretended to be Mr. Perardi's friend.

The reason Joe Fiedler had to be called into this case, the evidence will show, is that Mr. Perardi was broke. Mr. Perardi had already spent over $700,000 given to Mr. Youngblood through an individual known as James Holloway. We'll hear a lot about the details from Mr. Perardi. You're also going to hear straight from that

man's mouth because Joe Fiedler, as the uncover agent, had a little recorder in his pocket.

These agents went out there to observe the meeting between Mr. Fiedler, Mr. Perardi and Mr. Youngblood.  Took place at a restaurant.  In over an hour's worth of conversation, you're going to hear the exact same story that every witness in this case is going to probably tell you about.  Mr. Youngblood as a former military man, as someone who had connections with the cartels who could make things happen, whose theater of operations were primarily Afghanistan and the Middle East, but he had connections into the cartels and he could protect people.

And what he wanted from the undercover agent was money.  Money to protect Mr. Perardi's family and to gather evidence necessary to put Mr. Perardi's soon-to-be-ex-wife in jail, put her in danger because she was the one, according to Mr. Youngblood, who was connected in the cartels and why Mr. Perardi and his kids were in danger.

So you'll hear about that whole episode.  You're also going to hear some telephone conversations that followed up.  What you're going to find out is that Mr. Youngblood told Agent Fiedler in the undercover capacity that he was good for the money and he was going to give

him something as collateral.  Something that will make sure he's going to get this money back and what was it?  A bat that was used by Lou Gehrig, a famous Yankee baseball player, the iron man who in the 1930s had set the record for the most consecutive games played.  And Mr. Youngblood had in his possession a bat that had the DNA of Lou Gehrig on it.

He's also going to tell you about a flag, supposedly million-dollar flag that the Smithsonian wanted that Mr. Youngblood was going to give as collateral so that the money could come back to him.  You're going to find through the course of the testimony that that conversation encapsulates what Mr. Youngblood had been doing for years.

So the agents upon hearing this story and using their undercover agent began further investigation and what they found, lo and behold, was that Mr. Perardi wasn't the only victim here.  What Mr. Youngblood was doing, the evidence will show, was defrauding multiple people.

Here on the screen, I think it's in front of your screens, you see Kota Youngblood and then, we're going to talk about the Hockey Association.  You'll see Eric Perardi's picture there.  You're going to see these other people and their names are going to come up during the

course of this case.  These are people that Kota Youngblood had befriended over the course of years because all their sons were engaged in hockey together.

You're going to find out from Mr. Perardi that he was himself a hockey player and hockey coach for Mr. Youngblood's sons and he's developed a hockey rink or hockey area called The Crossover.  You'll hear about everything that Mr. Perardi had straight from Mr. Perardi.

But again, the investigation that the agents did also showed that there was a clock association.  The first person up there, I'm going to circle him up here is James Holloway.  You're going to find out that James Holloway was the first Texas victim.  The first one that we know about, anyway, and that Mr. Youngblood used him.  Mr. Youngblood had a lot of the victims in this case write checks to James Holloway.  James Holloway then would take those checks, go cash them at the Wells Fargo Bank and then, give the cash straight to Kota Youngblood.

There are elements in there in terms of protecting James Holloway's grandchildren and family.  You're going to find, as you could see, that a number of the people here, Gary Snider, lost over a million dollars to Mr. Youngblood's scheme, depleted $235,000 out of his IRA to protect Jay Holloway's grandchildren, Danielle Holloway's daughter, Lane Holloway's daughter, all based

on lies, a scheme to defraud. Mr. Youngblood is really convincing.

The evidence is going to show that he used this same scheme on a number of these individuals. Mr. Holloway's going to tell you that he's lost millions of dollars. Mr. Snider will tell you that I lost over a million dollars to the scheme and it wasn't just for protection. Some of it was based on the fact that Mr. Youngblood claimed to be an expert in antiquities that had access to gold, to precious jewels, that had access to items that only he could obtain. Baseball bats used by Babe Ruth, Lou Gehrig, Jimmie Foxx. A cross worn by Alexei Navalny, recently murdered or deceased Russian prisoner. Somehow, Mr. Youngblood had gotten in possession of those. You invest in these, we're going to make a lot of money. You'll hear that from several of the victims.

You're also going to find out that there was a third group, the California group we call it. You'll hear from Dr. Hanfu Lee, a dentist in California. You're going to find out that over a number of years, he was defrauded by Kota Youngblood. You're going to find out that he came to Texas in 2023 despite having given millions of dollars with the hope, just the hope that maybe he'd get some of that money back by investing Mr. Youngblood.

The evidence is going to be corroborated by financial records. You'll see the wire transfers that occurred. You'll see, again, Mr. Snider, for example, taking his IRA out of his Fidelity account. The money moving from New York here to, Texas, Texas at the Wells Fargo bank. $235,000 in cash taken out of a branch in Wells Fargo Bank that ended up with Mr. Youngblood.

How did he do this? I think that's the first question everyone asks is how could I fall for something like this? The agents were asking themselves that and that's what the evidence is going to show is that Mr. Youngblood used a variety of techniques and methods to pry money out of his victims. The evidence will show that he used high pressure tactics such as urgency. I don't get this money now, your child will be killed. You gotta do it now.

You're going to find out from Eric Perardi that Mr. Youngblood talks a lot about his military career and about the fact that he still works for the government. Mr. Perardi believed that he was a government agent, and so, rather than going to the FBI, Mr. Perardi thought he was working with a government agency. A lot of these people are going to tell you that Mr. Youngblood convinced them that all police, all law enforcement is corrupt. They're all infiltrated by the cartel and only he, only

Kota Youngblood could stand in the way of these people being kidnapped, murdered, and otherwise harmed.

The old adage is right from Watergate, right? Follow the money and we're going to do that for you. We're going to follow the money and we're going to show you where a lot of it went. The checks were sent to James Holloway, checks were cashed, the cash went to Kota Youngblood. What did Kota Youngblood do with money? Well, he went to Vegas, played video poker. You're going to hear from casino witnesses, you're going to see casino records showing that in 2021, 2022 and part of 2023, that Kota Youngblood lost over $2 million playing video poker. That's where the money went.

You're going to hear evidence from a financial analyst with the FBI that he was using this money also to support a lifestyle. He had a wife, he had children that he was using that money to support them. The financial agent is going to tell you, I looked at the bank account and you know what, I didn't see anything that would indicate that he was working. There's no direct deposits. There's no payments to an auction house, to obtain an item, then to sell it later on for a big profit. Nothing like that.

You're going to find out that Kota Youngblood traveled to Vegas a lot. Subpoenaed records are going to

show on Southwest Airlines all the trips he took to Vegas. So you're going to hear from the undercover agent and you're going to hear from the witnesses, you're going to see some of the physical items that he claimed were exceptionally valuable that serve as collateral.

And again, what you're going to see at the end when you follow the money is that Kota Youngblood was no Robin Hood. Kota Youngblood took from people who desperately needed that money, people who are now in their 70s, the evidence will show, who lost everything. There's going to be evidence that you're going to hear that James Holloway and his wife Patricia, Gary Snider and his wife Dale Snider both believed so much in what Kota Youngblood was telling them that they both sold their houses that had been paid off to an individual that Kota Youngblood suggested they talk to, and that he took $700,000 on houses that they owned and used that for his own benefit. People that worked their entire lives to buy their own homes, poof, gone. That's what the evidence is going to show.

A lot of the information that you're going to find out is that Kota Youngblood is not a stupid man and he used James Holloway to hide some of that activity. James Holloway is going to be the conduit to getting the cash. Remember when we're talking about the use of wires,

is it reasonably foreseeable?  Is it reasonably foreseeable that somebody's going to have $235,000 in cash just sitting in their house?  No.  They're going to have to get that from someplace.  They're going to have to get that from a retirement account.

Eric Perardi will tell you that he had to take a home equity line of credit on a house in order to get the cash necessary to save his children, to save himself. You're going to hear what the FBI did in terms of this investigation and they put together a very fast-paced investigation, relatively speaking, for a fraud case.  But they're going to tell you about subpoenaing records, bank records that they analyzed, the undercover operation.

You're going to hear recorded telephone calls between Mr. Perardi, some involving Mr. Holloway, but again, what you're going to find out is that the story is always the same.  You're going to hear from Kota Youngblood, himself, talking about how he was scamming these people.  The financial analysis will confirm that the only person who wasn't devastated from this relationship is Kota Youngblood.

The evidence will show that every other individual suffered great financial consequences as a result of his fraud.  That's going to be the evidence in a nutshell.  Again, you're going to have the opportunity

when you hear those witnesses, see that evidence to know exactly why Mr. Youngblood was going to be guilty of these crimes of wire fraud and money laundering. I look forward to working with you for the next several days. Thank you.

DEFENDANT'S OPENING STATEMENTS

MS. HERRING: Saint Jovite Kota Jadenne Youngblood is not on trial for being a liar. You're going to hear that over the course of years decades, Mr. Youngblood is someone who invented and adopted a persona for himself that he maybe, at one time, actively fabricated, but now, even to this day, it's who he is. He's a man that he has created and the government is going to call him a liar.

You're going to get to hear Mr. Youngblood talk. You just heard references to audios, voicemails and undercover recording. You're going to hear him speak and you're going to hear how he speaks in pressured diatribes that advance minute details of this reality that he lives in. When you hear Mr. Youngblood speak, it is possible that you might feel like some people did at certain times and he's a charismatic person, a magnetic personality. It's also possible that you're going to find him frightening when you hear him speak. That you're going the find him bizarre, eccentric, offensive.

When you hear Mr. Youngblood speak, you're going

to have strong reactions to him and it's very probable that you will not like him. You're going to hear that Mr. Youngblood, depending on his audience, presented himself as the son of an FBI agent, former Army Ranger, former Special Forces, someone who worked in a pseudo mercenary capacity with sometimes the Department of Defense, sometimes the NSA, sometimes the Department of Justice, depended on his audience, depended on the day.

And you're going to hear that many people after they spent time with Mr. Youngblood, after they listened to Mr. Youngblood, became convinced that they or their children or the children of their good friends were at risk from unidentified Mexican cartels. Again, which cartel? Why? That depended on the day of the audience.

You're going to hear that these people believed after meeting Mr. Youngblood, after hearing from him that the only way to stave off a threat from the cartels was to pay money, to get money, to get cash to Mr. Youngblood to use to protect them. And people didn't just think that they were going to be protected from the cartels with these extortion payments, they also thought after meeting with Mr. Youngblood that they were somehow going to make money on these payments. That they were going to get returns on investment on protection payments because somehow, the money that was staving off the cartel threat

was also going to lead to investments in things like gold that was going to come in suitcases over the border or cargo ships with valuable gold pinball machines that just needed to reach the port.  Or a Faberge egg that was stolen by a Russian oligarch and just needed to be found. Paintings, Rembrandts, Picasos, Pissarros.  And as you could probably guess, the evidence will show none of these existed.  None of these things had value.  The ship never arrived.  The suitcases never crossed the border.  There was no return on investment that ever materialized.

But you're going to hear that many people believed these stories and many people gave money as a result of Mr. Youngblood's stories to this man named Jay Holloway.  And Jay Holloway is an important person in this saga that went on for quite a while.  Jay Holloway, on the one hand, is someone who lost his entire life savings because he, too, believed Mr. Youngblood.  He had stars in his eyes for the wealth that was going to arrive.

But Jay Holloway had another purpose, as well. You're going to hear that Jay Holloway was someone with a special connection at a particular branch of Wells Fargo and Jay Holloway, because he went to this branch so frequently because of his business, had developed a relationship where the bank would cash high-dollar checks, 60, 70, $80,000 checks without actually waiting for the

check to clear.  So Jay Holloway could get cash quickly if you put a check in his hand and Jay Holloway was the way Mr. Youngblood got money from all these people in the form he wanted it in, which was cash.

We believe, we expect the government is going to bring you evidence to show that Mr. Youngblood got cash and used it, used it to live and frequently travel to Vegas to gamble with it.  You're going to hear that the government has spent a lot of time, even agents all over the country have spent time trying to track down who Mr. Youngblood is and who he isn't, what has he said that's real, what has he said that's not.  Did he serve in the military?  We've gotta get that record.  Who is he?  What's his name even?  You're going to hear that was a question.

I gave you all those names in the beginning.  Is his name Saint?  Is it Jovite?  Is it Kota?  Is it Jadenne?  Is his last name even Youngblood or is he just a man named Dennis who was born in Ohio?  The stories are confusing, they don't make sense and it's very easy to get caught up in them.  But Mr. Youngblood is not on trial this week for being a liar.  The only reason we're all here in federal court together is because the federal prosecutors have charged Mr. Youngblood with a federal offense, the offense of wire fraud.  That is a specific

crime.

And you've already heard and the Judge is going to instruct you later in the week that wire fraud requires that the government prove that Mr. Youngblood knowingly came up with a scheme to defraud, that his scheme involved material misrepresentations, false representations, that he had a mental state, an intent to defraud, and that he caused wire transactions to be sent to further his scheme for the elements of wire fraud.

And your job this week is really very narrow. It's only to look at whether that particular crime has been committed. Mr. Youngblood is not on trial for being a liar. You're going to hear about four wire transactions. There are three men and four transactions. Eric Perardi did the wires that are in Counts 1 and 2 of the indictment. A man named Gary Snider is in Count 3 of the indictment. And a man named Hanfu Lee is in Count 4 of the indictment. And the details of those wires are very important.

The good news for you in your job is that unlike the stories, which are muddled and confused, confusing and hard to sort out, wires are banking transactions. You're going to get to see them in bank records, reliable sources, the records themselves. And you're going to hear from each of these witnesses. We expect Mr. Perardi, Mr.

Snider, Mr. Lee that they're going to tell you why they wired money. You're going to hear from Mr. Perardi. Mr. Perardi promotes himself as a successful businessman. Mr. Perardi did not wire any money to Mr. Youngblood. You're going to hear that Mr. Perardi had many different companies, different subentities of his companies and he had many bank accounts, over 20 bank accounts. That Mr. Perardi frequently moved money between his various accounts.

You're also going to hear that Mr. Perardi was going through an incredibly contentious divorce and that his assets were being scrutinized by his ex-wife and her divorce attorneys, and that there were restrictions placed on what he was supposed to be doing with his money while the divorce was pending, while the asset division had not been decided. And we believe the evidence will show that Mr. Perardi did not wire money because of Mr. Youngblood. Mr. Perardi wired money to move it away from his ex-wife and to use it to try to destroy her, bury her. You're going to hear other words in the divorce to try to win his divorce.

Mr. Perardi did not wire money to Mr. Youngblood. Gary Snider also did not wire money to Mr. Youngblood. Gary Snider, different situation. He was longtime friends with Jay Holloway during the clock group together. They

go back 10, maybe even 20 years. And you're going to hear from Gary Snider that his transactions and his money were related to his relationship with Jay Holloway. He trusted Jay Holloway. The evidence is not going to show you that he wired money to Mr. Youngblood because he didn't.

And finally, you're going to hear from Hanfu Lee. Hanfu Lee is a very, again, different set of circumstances. Hanfu Lee has a relationship with Mr. Youngblood that goes back over a decade to California. Hanfu Lee, I believe, still leaves in California. He's a dentist there. He was Mr. Youngblood's dentist, the dentist for Mr. Youngblood's children.

And back in 2010, Hanfu Lee started giving Mr. Youngblood money, cash, all cash for years for investment deals. And incredibly, over time, over seven years, he gave $5 million in cash to Mr. Youngblood, didn't get the return on investment he thought he was going to make, only got $50,000 back. And Hanfu Lee actually went to law enforcement, went to the police in California and said Mr. Youngblood's scamming me, help, I want my money back. You're going to hear that he interviewed with officers and that the local law enforcement even elevated it to the FBI in California in 2019 and nothing happened.

Mr. Youngblood moved to Texas. I believe the evidence will show there wasn't any contact, and then, for

some reason that we'll all hear this week, five years later, almost five years later, Hanfu Lee flies from California to Texas, tracks Mr. Youngblood down, they have a closed-door meeting with no witnesses.  Hanfu Lee comes out of the meeting, returns to California and starts sending Mr. Youngblood more money.  We believe the evidence will show that Hanfu Lee's case is very, very different from the other charges that are brought and it really doesn't belong in this indictment in Texas.

We ask you this week that you don't get distracted by the stories because it's very tempting.  The stories are much more entertaining than bank records, than wire transactions.  The stories that you're going to hear, government lie, stories, whatever word you want to use, are incredible.  They're absurd, they're ridiculous.  They're often horrible.  But your job, again, is very narrow.  It is only to determine whether a particular federal offense has been committed.

Don't get distracted by the stories.  Mr. Youngblood is not on trial for being a liar and we're not asking you to like him.  Your job is to determine whether the government can prove beyond a reasonable doubt that he committed a federal offense of wire fraud.  The wires are critical to that.  And because the evidence will show that Mr. Youngblood did not cause the wires, we will get back

up before you at the end of this trial and ask you to return a verdict of not guilty.  Thank you.

THE COURT:  Your first witness.

MR. HARDING:  Yes, your Honor.  Government calls Agent Lindsey Wilkinson.

THE COURT:  Before you take a seat, could you please raise your right hand and be sworn.

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

LINDSEY WILKINSON, called by the Government, duly sworn.

### DIRECT EXAMINATION

BY MR. HARDING:

Q.   Agent Wilkinson, once you get situated, have some water, get comfortable, if you could then state your name and spell your last name for the court reporter, please.

A.   My name is Lindsey Wilkinson, W-I-L-K-I-N-S-O-N.

Q.   Agent Wilkinson, if you could just please introduce yourself to the jury, tell them what you do, how long you've done it.

A.   Good afternoon.  I'm Special Agent Lindsey Wilkinson. I work for the Austin resident agency of the FBI and I have been an FBI agent since 2020.

Q.   Is that 2020, is that when you became a special agent with the FBI?

A.   That's correct.

Q.   Could you tell the jury what you did before that?

A.   Yes.  Before that, in 2012, I joined the FBI, I worked primarily at our headquarters in another field office where I served as a management and program analyst inside the FBI.  So I've been with the FBI for -- since 2012.

Q.   What sort of stuff did you do in that capacity?

A.   In that capacity, I was primarily a speech writer for some of the executives at the FBI.  I also served as a chief of staff for one of our field offices, our Chicago offices, and some other internal matters like our leadership programs and kind of other human resources functions.

Q.   I'm going to give you a laser pointer to assist with your testimony as we go forward here today.

     Let me ask you with respect to this case, could you tell the jury what was your role in this case?

A.   I was the case agent in this case alongside my partner, Agent Noble.

Q.   Then let's just get right into it.  How did you even get involved in this case and how did you become aware of Mr. Youngblood?

A.   We became aware of Mr. Youngblood because a victim, Eric Perardi, contacted a local defense attorney and that was Steve Toland and Mr. Toland reached out to the FBI, and ultimately, my partner, Agent Noble, was contacted by Mr. Toland and we set up a meeting between Eric Perardi and Steve Toland to discuss what was going on with Mr. Perardi.

Q.   And this was approximately when?

A.   The end of April of 2022 -- or, I'm sorry, excuse me, 2023.

Q.   Okay.  Could you give -- now again, at the outset of this, you're meeting with Mr. Toland, an attorney, and Mr. Perardi, who claims he's been defrauded.  Do you know anything about the case particularly up until before the --

A.   No.

Q.   Understanding that this is simply what Mr. Perardi is telling you, can you describe at a high level what it is that Mr. Perardi told you that led you to investigate?

A.    Mr. Perardi reported to the FBI that he had been the victim of an extortion and fraud scheme, generally that he believed he was in danger -- that Mr. Youngblood had told him that he was in danger of the cartels and that he had continued to pay Mr. Youngblood over $700,000 over time to protect his family from the cartels.  And there was a

second component that he was assured throughout the process that they would receive this money back because there was an investment scheme to the side of it.  But primarily, he was concerned for the safety of his family and had realized at that point that he believed it to be a fraud, the risk and extortion of his family.

Q.   Jumping ahead a little bit, well, quite a bit probably, at any point during the course of your investigation, over the next months and years, did you ever corroborate any aspect of the cartel threat against Mr. Perardi?

A.   We never found any evidence of a true cartel threat of danger against Mr. Perardi or any other victim.

Q.   Again, according to Mr. Perardi, where is this cartel threat coming from?  Where does it stem from?

A.   It stems from Mr. Perardi had been going through a pretty contentious divorce and Mr. Youngblood had claimed that Mr. Perardi's wife at the time had taken out a hit on him and was trying to become or to receive the -- she was the beneficiary listed for his 6.5, I believe it was, million-dollar insurance policy.  So she had orchestrated a hit with the cartel so that she could receive the money.

Q.   And approximately how long, according to Mr. Perardi, had this been going on at that time?

A.   Almost a year.  It started this kind of mid-June

2022, and as I mentioned, he came to us in about April 2022, approximately.

Q.   Again, this is based on what Mr. Perardi told you. Who was telling him all this information about this cartel threat, about his ex-wife's involvement, about these investments?

A.   Mr. Youngblood.

Q.   And do you see Mr. Youngblood here in the courtroom?

A.   I do.

Q.   Could you please point him on it and identify him by something he's wearing?

A.   He's the gentlemen over there in the black, sir.

Q.   May the record reflect, your Honor, that the witness has identified the defendant?

        THE COURT:  The record will so reflect.

Q.   (BY MR. HARDING) If we could please pull up for the witness only Exhibit 307.  Agent Wilkinson, during the course of your investigation, did you have an opportunity to run -- after this report was given to you, run Mr. Youngblood through various law enforcement databases and verify certain identifiers related to who he was?

A.   Yes.

Q.   In the course of your investigation, have you also had an opportunity to examine certain personal documents of Mr. Youngblood's, including his driver's license,

passport, things of that nature?

A.    Yes.

Q.    And have you also examined other financial documents and other documents that would contain his Social Security number?

A.    Yes.

Q.    Are some various names that Mr. Youngblood has used as well as his date of birth and his Social Security number, are those accurately reflected on Government's Exhibit 307?

A.    They are.

Q.    And do you think it would help the jury understand your testimony if they were able to see Government's Exhibit 307?

A.    Yes.

        MR. HARDING:  At this time, your Honor, the government will offer 307 as a demonstrative.

        THE COURT:  Any objection?

        MS. HERRING:  No, your Honor.

        THE COURT:  So admitted.

        MR. HARDING:  If we could publish to the jury, your Honor.

Q.    (BY MR. HARDING) And so, just to be clear, this top set of six names, is this the only set of names you learned Mr. Youngblood went by?

A.    No, it's not.

Q.    Could you give a few other examples?

A.    We also discovered Dennis J. Schuler, Jr., Denny Schuler, Jadenne Youngblood, Kota Youngblood.  A couple of variations within these names, Jadenne Youngblood.

Q.    Fair to say throughout your investigation, you encountered various names used by Mr. Youngblood?

A.    Yes.

Q.    However, during your investigation, did his date of birth and Social Security number, to the extent that you saw it, did that remain constant?  Did those remain constant?

A.    That did remain constant.

Q.    If we could please pull up Exhibit 309 for the witness only, please.  I want to talk now, Agent Wilkinson, about sort of some of the players that Mr. Guess just referred to starting with Mr. Youngblood's family.  Before we show this to the jury, is Government's Exhibit 309 an accurate reflection of Mr. Youngblood's immediately family?

A.    It is.

Q.    Do you think it would help the jury to understand the testimony if they could see Government's Exhibit 309?

A.    I do.

Q.    We'll offer Government's Exhibit 309 as a Department

of Labor exhibit.

MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) While we're waiting for the images to show up, I can ask you, what was the name or is the name of Mr. Youngblood's wife?

A.   Gloria Youngblood.

Q.   And does -- to your knowledge, based on your investigation, does Mr. Youngblood have children?

A.   He does.

Q.   Who are they?

A.   His eldest son is Eventine Youngblood and his younger son is typically referred to as baby Kota Youngblood or little Kota, Kota Youngblood.

Q.   And these were folks that, throughout the course of your investigation, you've had a chance to speak to and interview, things of that nature, except for Mr. Youngblood?

A.   Yes.

Q.   And if we could then for the witness only, I'm sorry to say, pull up Exhibit 306, page 6 only.  Could you tell the jury -- can you describe for the jury what Exhibit 306 is?

A.   This is an overview of some of the witnesses and victims that we spoke to in the case and that had

involvement with Mr. Youngblood that he either attempted to seek money from or ask money from.  And in fact, it's the same chart that Mr. Guess just showed to the jury during opening statement.  It is the same chart.

Q.   And it's an accurate chart based on the folks you identified as victims?

A.   It is.

Q.   We offer Government's Exhibit 306, page 6, as demonstrative.

          MS. HERRING:  No objection to page 6.

          THE COURT:  So admitted.

          MS. HERRING:  Of 306.

Q.   (BY MR. HARDING) If we could publish page 6, please. Agent Wilkinson, if you could use your laser pointer, help us out here.  Let's start with the Hockey Association. You said Eric Perardi was the person who came in to make the initial complaint; is that correct?

A.   That's correct.

Q.   I don't want to go over all of these names right now, but I do want to talk about a few significant ones.  Who is Rachel Herrera?

A.   Rachel Herrera was Mr. Perardi's wife at the time. Ex-wife that we discussed.

Q.   And this was the person that, according to Mr. Youngblood and according to Mr. Perardi, was putting Mr.

Perardi in danger?

A.   Yes, due to her cartel connections.

Q.   And who is Nicole Frost?

A.   Nicole Frost is a current girlfriend of Mr. Perardi.

Q.   The other folks involved here, we can talk about, but is it fair to say these are, again victims, or potential -- attempted victims?

A.   Yes.

Q.   Let's turn to the Clock Association.  And in particular let's start with James Holloway.  At the time that Mr. Youngblood -- excuse me, Mr. Perardi's making this report to you, you're aware of James Holloway, correct?

A.   Yes.

Q.   Based on Mr. Perardi's statements to you, what was James Holloway's role in what he believed to be the fraud against him?

A.   He believed he was also a part of the fraud as a coconspirator to the fraud.

Q.   And on what basis, again, in summary, on what basis did Mr. Perardi believe that?

A.   Mr. Perardi believed that Mr. Holloway was receiving the money, giving it to Mr. Youngblood, and was operating with Mr. Youngblood.

Q.   And based on initial evidence that you received, was

James Holloway considered by you a suspect alongside Mr. Youngblood?

A.   He was.

Q.   Is he still an active suspect?

A.   He's not an active suspect.

Q.   Let me ask about the other folks here.  So first of all, who is Patricia Holloway?

A.   That is James Holloway's wife.

Q.   Who is Lane Holloway?

A.   Lane Holloway is the son of James and Patricia Holloway.

Q.   He plays a significant role later in this investigation; is that fair to say?

A.   Yes, he does.

Q.   Alongside his wife, Danielle?

A.   Yes.

Q.   Who are Gary and Dale Snider?

A.   Gary and Dale Snider are close friends of James and Patricia Holloway.  They are also members of the Clock Association.

Q.   And without going into detail about the rest of these folks, in summary, who are they in relation to this case?

A.   Lindsey Snider is the daughter of Dale and Gary Snider.  And the other individuals are close friends or friends of Mr. Holloway's or members of the Clock

Association that they were a part of.

Q.   Finally, with respect to our -- so actually, let me ask this.  At the time that you're speaking to Mr. Perardi, do you know anything about the California connection?

A.   We do not.

Q.   But there is another individual, not pictured here, who you had some information about; is that correct?

A.   That's correct.

Q.   Who was that?

A.   That was Marvin Knecht and he was someone that Mr. Perardi said was also coconspirator with Mr. Youngblood.

Q.   And so, what's depicted here of Government's Exhibit 306, page 6, is more than you knew in late April when Mr. Perardi walked in.

A.   Yes.

Q.   When Mr. Perardi walked in, you're essentially -- you know, of course, Eric Perardi, Nicole Frost, Rachel Herrera.

A.   Yes.

Q.   James Holloway.

A.   Yes.

Q.   Marvin Knecht.

A.   Yes.

Q.   And then, Kota Youngblood.

A.    Yes.   I believe Adam Powell and Eric Swanson from Mr. Perardi, as well.

Q.    Okay.   But a lot of this information actually comes from subsequent investigation; is that correct?

A.    Yes.

Q.    Okay.   So you meet with Mr. Perardi in your office, he tells you this story.   What do you and Agent Noble do at that point?

A.    At that point, we run just basic record checks.   That includes just different databases the FBI has.   And we discuss inserting an undercover to hear some of this information.

Q.    With respect to the basic information you're able to run sort of instantly, or very soon thereafter, does it appear to either corroborate Mr. Perardi's story or, at a minimum, make you want to investigate further?

A.    It does.

Q.    What instructions did you give to Mr. Perardi after that first meeting?

A.    After that first meeting, we told him to make sure he maintained any records he has, any text messages, and, also, to attempt to record any conversations he could, if it was possible, with Mr. Knecht, with Mr. Holloway, and with Mr. Youngblood.

Q.    Jumping ahead slightly, did Mr. Perardi later come

forward and give you a variety of evidence in the form of recorded calls, social media posts, things of that nature?

A.    He did.

Q.    But going back to late April of 2023, you said you were investigating or sort of considering the idea of using an undercover; is that correct?

A.    Yes.

Q.    Based on what Mr. Perardi had told you, did you come up with kind of -- you and Agent Noble come up with a cover story what might be plausible for an undercover to be introduced?

A.    Yes.  So at this point, Mr. Perardi had said to Mr. Youngblood that he had run out of money.  And so, you'll see that several of these people involved were asked by Mr. Perardi to help him and give him money so that he could pay off this extortion attempt.  And so, it was a natural part of the case that Mr. Perardi needed to kind of recruit other people in his life to help pay these funds, so we thought it would be a natural part of the case to introduce an undercover as, yet, someone else in Mr. Perardi's life that could give him some funds to help pay this.

Q.    And so, who did you -- I say "you" collectively as you and Agent Noble.  Who did you reach out to to serve in an undercover capacity?

A.   We reached out to a task force officer with the FBI named Joe Fiedler.

Q.   Agent Fiedler will testify -- or TFO will testify about all those details, but you could give a brief summary to the jury about kind of the steps you took leading up to the undercover operation in terms of setting agent Fiedler up with Mr. Perardi and getting things in place?

A.   Essentially we needed to create a couple of things, a backstory of how they would have known each other, get a couple of relevant details within each other.  They should know each other's kids' names, they should know a couple details about them.  We gave the undercover a backstory that he was someone that worked in steel and in concrete and lived nearby Mr. Perardi.  Since Mr. Perardi was a developer of many buildings, it seemed natural that the undercover could work in steel and building materials and be a part of that.

We also got a burner phone for the undercover to use specifically for this operation and acquired some of our recording devices to use for the operation.

Q.   And is all that standard operating procedure with undercover operation of this sort?

A.   It is.

Q.   So you said you guys sort of came up -- you

brainstorm, hey, maybe Agent Fiedler can be a guy who has some money and could help Mr. Perardi out. Did you then tell Mr. Perardi to distribute that story to Mr. Youngblood?

A.   We did. We told him to kind of lay the groundwork for introducing him. He described him, as I mentioned, as someone in steel and concrete and someone who operated in cash, didn't like the government, so it would lay more foundation of why he would be willing to help and have money on hand.

Q.   And at some point, did Mr. Perardi come back with some results about whether or not Mr. Youngblood was interested?

A.   He did. He came back with some recorded conversations.

Q.   And was the indication that Mr. Youngblood was, in fact, interested in meeting Agent Fiedler?

A.   Yes.

Q.   Let's go to the undercover operation itself now, day one, we'll say, of the undercover operation. What date was that?

A.   That was May 1, 2023.

Q.   Leading up to the undercover operation and as part of Mr. Perardi's complaint to you and reports to you, did you examine various social media posts related to this case?

A.    We did.

Q.    Your Honor, may I approach the witness?

        THE COURT:    You may.

Q.    (BY MR. HARDING) Agent Wilkinson, I'm showing you what's been marked Government's Exhibits 18 and 19 for identification purposes.  Do you recognize Government's Exhibits 18 and 19?

A.    I do.

Q.    Can you describe at a high level what they are?

A.    These are two of the posts that Mr. Perardi would have presented to us of one of the victims and it just is basically slandering himself and a couple of other individuals and explains a connection between him and a cartel.

Q.    Now, again, jumping ahead, is it fair to say throughout this investigation, you have seen a huge number of social media posts?

A.    Yes.  These are two examples on them.

Q.    Are they fair and accurate depictions of some social media posts that you looked at during the course of this investigation?

A.    Yes.

Q.    Government will offer Government's Exhibits 18 and 19.

        MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) And these were -- well, tell us. What was the significance of these social media posts in the grand scheme of what was happening to Mr. Perardi as he explained it to you?

A.   Mr. Perardi explained that Mr. Youngblood would say that the cartels were posting this information because they were aware of Mr. Perardi and that they knew of the activity and that's why Mr. Perardi was in trouble, and for Mr. Perardi's perspective as a business professional in the Austin community, he felt great pressure and reputational damage when he saw these posts.  He also was getting a lot of pushback because of his contentious divorce.  You'll see his ex-wife named here.  So it was causing him a lot of emotional and reputational distress.

Q.   And was this distress that Mr. Youngblood offered to solve for a price?

A.   Yes.

Q.   If we could zoom in on that top paragraph, please. And starting with the owner of the Crossover, could you read that to the jury?

A.   The owners of the Crossover, Eric Perardi, is in bed with Los Zetas CDN and JNGC.  He launders money for them. His ex-wife Rachel has financial and sexual relations with Maxiley Barahona and Nemesio Cervantes.  And Julie Herrera

Rachel's aunt uses their money to launch Toyotas of Cedar Park and City Limits Subaru.

Q.   So let's just break this down because there's a lot of names and there's a lot of sort of allegations here. We know who Eric Perardi is.  He is, in fact, the owner of the Crossover or developer of the Crossover, correct?

A.   Yes.

Q.   Do you know who Los Zetas CDN and JNGC at a general level --

A.   These are cartels.

Q.   Mexican cartels?

A.   Yes.

Q.   The next allegation is that Mr. Perardi launders money for those cartels and that his ex-wife Rachel has financial and sexual relations with a certain individual named Barahona; is that correct?

A.   Yes.

Q.   And Cervantes.

A.   Yes.

Q.   This ex-wife Rachel is, at least as far as you know at this time, Rachel Herrera?

A.   Yes.

Q.   Have you in the meantime -- I know at the time, you may not have known this but now, do you know who Julie Herrera is?

A.   Yes.

Q.   Who is?

A.   That is Rachel's aunt and she is owner of Toyota Cedar Park.

Q.   This last portion, to the extent it describes who Julie Herrera, is it accurate?

A.   Yes.

Q.   And if we could now zoom out and go to paragraph 2. And if you could just go ahead and read up until why would you want to give?

A.   Nemesio Cervantes has a $10 million reward on his head and these three people know where he is and don't turn him in.  Just how deep are they in with him?  Maxiley Barahona is the head of Los Zetas and this isn't even touching on Z40 Miguel Morales, who orchestrates everything while being safe behind bars.

Q.   And then, this last line, last sentence.

A.   Do yourself a favor and stay away from any business associated with these three dirt bags.

Q.   So Eric Perardi is concerned about this because, as you said, it's naming him directly.

A.   Yes.

Q.   And according to this post, there's a man named Cervantes who has a $10 million reward on his head and is also a leader of a drug cartel.

A.   Yes.

Q.   And the allegation is that not only Mr. Perardi but also Julie Herrera and Rachel Herrera are associated with this individual.

A.   Yes.

Q.   If we could then turn to Government's Exhibit 19, and again, we don't need to go into the same great detail but if we could just focus on maybe the first -- sorry, the second and third paragraph.

Is it fair to say that these are very similar allegations about money laundering and relationships between -- supposed relationships between Eric Perardi, Julie Herrera, Rachel Herrera and these drug cartels?

A.   Yes.

Q.   And it also brings in the Toyota Cedar Park again as sort facilitator of this illegal activity?

A.   Yes.

Q.   It also alleges, unlike the last one, directly that Rachel sells drugs directly for the cartel.  Rachel Herrera.

A.   Yes.

Q.   If we could zoom back out.  So these two texts are just emblematic or sort of illustrative of a variety of social media posts that were being made at the same time; is that right?

A.    Yes.

Q.    And were the other posts of a similar nature calling out Mr. Perardi, his business, and his soon-to-be ex-wife and aunt, her aunt, I should say, as involved in this kind of illegal activity?

A.    Yes.

Q.    Did these social media posts corroborate the things that Mr. Perardi was telling you about what Mr. Youngblood was saying to them?

A.    They did.

Q.    So on May 1st of 2023, the day one of the undercover operation, what's the -- one of the first things that happens in terms of the setting it up and the lea-up?  Let me rephrase the question.  That was a bad question.

      Did you jump straight to introducing Agent Fiedler to Mr. Youngblood or was there some kind of lead-up conversation?

A.    No.  Mr. Youngblood had purposely not carried a phone and has told most of our victims and witnesses that he didn't carry a phone.  So Mr. Perardi contacted Mr. Holloway to contact Mr. Youngblood.

Q.    And so, did you, you, FBI, and you personally, facilitate these phone calls between Mr. Perardi and Mr. Youngblood and then, later, Mr. Perardi, TFO Fiedler and Mr. Youngblood?

A.    Yes, we did.

Q.    Did those occur at the FBI office?

A.    Yes.

Q.    Using a FBI recorder?

A.    Yes.

Q.    And you were present for some or all of those recordings?

A.    Yes.

Q.    Your Honor, may I approach the witness again?

        THE COURT:   You may.

Q.    (BY MR. HARDING) Agent Wilkinson, I'm showing you what's been marked -- it's a disc that's been marked with Government's Exhibits 20 through 22 inclusive, and 24.  Do you recognize that disc?

A.    Yes, I do.

Q.    How do you recognize it?

A.    I have signed it with my initials and dated it after reviewing the material on there.

Q.    And does this disc contain accurate recordings of those lead-up phone calls as well as some subsequent videos that you took?

A.    Yes.

Q.    Are they fair and accurate depictions of those phone calls and videos you took?

A.    Yes, they are.

Q.   Government will offer at this time Government's Exhibit 20 and 22 inclusive, as well as 24.

THE COURT:  Objection?

MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) If we could please -- if it please the Court, I have a demonstrative I would like to use with the easel over there.  Would it be all right if I questioned the witness with a microphone in back of the courtroom?

THE COURT:  Yes.

MR. HARDING:  Thank you, your Honor.

Q.   (BY MR. HARDING) So the first call that we're discussing, Agent Wilkinson, this is a call between Eric Perardi and Mr. Youngblood, correct?

A.   Yes.

Q.   This occurred in the early afternoon hours of May 1st of '23?

A.   Yes.

Q.   And you were present for this call.

A.   Yes.

Q.   If we could play, then, Government's Exhibit 1, please.

(Audio file played.)

Q.   So who is speaking just now?

A.   The last voice you heard was Mr. Youngblood and the one who said "hey" is going to be Mr. Perardi's voice.

Q.   And Mr. Youngblood just made a reference to Mr. Barahona's brother, correct, the wife's brother?

A.   Wife's brother.

Q.   If we could just keep playing then.

(Audio file played.)

Q.   So the message that Mr. Youngblood has just conveyed is, I just got off the phone with Terrence.  Terrence is going to speak to someone who knows Barahona about this issue.

A.   Yes.

Q.   Okay.  And then, the second voice we just heard, that's was Mr. Perardi's voice?

A.   Yes.

Q.   All right.  If we could play it again.

(Audio file played.)

Q.   So Mr. Youngblood -- or, excuse me -- yeah, Mr. Youngblood said -- or, excuse me, Mr. Perardi said that James has the bat.

A.   Yes.

Q.   Who is the James in question here?

A.   This is James Holloway.

Q.   And at some point in this undercover operation, that will come out?

A.   It will.

Q.   Okay.

(Audio file played.)

Q.   So Mr. Youngblood says this changed dramatically when these new things were posted.  What was that a description, as far as you can tell, based on the context of that call?

A.   It appears because they referenced these high-level cartel leaders and now that they're online, it is increasing the risk to Mr. Perardi.

Q.   And also, Mr. Youngblood also said, you noticed they didn't include Julie's name.  So the post we did actually did have Julie's name in them, so this appears to be reference to some other similar post that didn't have Julie's name?

A.   There were tens of posts the weekend before even.

Q.   Okay.

(Audio file played.)

Q.   Does that appear to be references to those social media posts?

A.   Yes.

Q.   Rachel's sleeping with these two cartel leaders, $10 million reward.  Is it corroborating, again, this phone call -- is this corroborating for you Mr. Perardi's telling you the truth about what Mr. Youngblood told him

all this time?

A.   Yes.   Now I can hear it live time.

Q.   Play it again.

(Audio file played.)

Q.   So when Mr. Perardi asked what needs to be done, Mr. Youngblood says, we need to bury Rachel?

A.   Yes.

Q.   There's no suggestion about Mr. Perardi.

A.   Correct.

Q.   In fairness to Mr. Youngblood, did you understand that to mean literally kill Rachel?

A.   No, I did not.

Q.   Based on your knowledge of the case, what did that actually mean?

A.   I believed it meant that he wanted to put Rachel in prison and/or judicially act on Julie's business and Rachel.

(Audio file played.)

Q.   So Mr. Youngblood has just laid out what in terms of what he's going to tell Joe Fiedler?

A.   He's telling him in exchange for the money that Joe Fiedler will bring him as the undercover, he will, in exchange, double his money in a week and give him two valuable pieces of collateral.

Q.   And those two valuables were?

A.   One was a baseball bat and one was a flag.

(Audio file played.)

Q.   References to Akiko and Daniel.  Mr. Youngblood is going to pay these people so that Akiko and Daniel could bring something somewhere.  What was that?  What did that mean to you?

A.   He's making claims that he has connections to people who can help protect Mr. Perardi and his family because they have connections to the cartels.

Q.   Are the name Akiko and Daniel ones that come up many times in Mr. Youngblood's stories?

A.   They do.  Yes, the context that he has.

Q.   Have you ever identified an actual person named Akiko associated with Mr. Youngblood?

A.   We have not.

(Audio file played.)

Q.   Mr. Youngblood says his theater is in the Middle East, Afghanistan, that sort of thing.  Is that consistent with what Mr. Perardi told you about the claims that Mr. Youngblood was making about his supposed government connections?

A.   Yes.  Mr. Perardi had said he believed -- or Mr. Youngblood had said that he worked as a government agent with connections to many government agencies as well in the theater of Ukraine, Russia and Middle East.

Q.   And again, is this what you're hearing on the tape or, excuse me, the recorded call, is it again confirming what Mr. Perardi told you?

A.   It is.

          (Audio file played.)

Q.   So where is Joe Fiedler during this conversation?

A.   He's in the room with us.

Q.   This is obviously a ruse of some variety.  You're pretending as though they were somewhere else and trying to coordinate a meeting; is that correct?

A.   Yes.

Q.   And so, the next question that's meant to be asked by Mr. Perardi kind of flummoxed.

A.   Yes.  Since we're all in the room together, it makes it an uncomfortable moment.

          (Audio file played.)

Q.   Could you pull up 21 now?

          THE COURT:  Mr. Harding is that going to be a demonstrative?

          MR. HARDING:  It is, Judge.  I realize now that I came here way too early but now I'm stuck.  I'm overcommitted.

          THE COURT:  You're not.

          MR. HARDING:  I promise you, I'm going to write something there.

THE COURT:  Okay.

(Audio file played.)

Q.  (BY MR. HARDING) Mr. Youngblood said that outside of that call earlier, one of my sons is no longer with us. He said that Mr. Perardi was active in his one son's life and used to coach the son who was no longer with us?

A.  Yes.

Q.  Who -- you mentioned Mr. Mr. Youngblood has two sons; is that correct?

A.  Yes.

Q.  Who is the older son between the two?

A.  It's Eventine Youngblood.

Q.  And who is the person, which son does Mr. Perardi still have a relationship?

A.  With baby Kota Youngblood.

Q.  So when Mr. Youngblood says my son who's no longer with us who used to be associated with Mr. Perardi, he's talking about Eventine Youngblood?

A.  Yes.

Q.  Is Eventine Youngblood dead?

A.  He is not.

Q.  How do you know that?

A.  I have spoken with him many times since this recording.

(Audio file played.)

Q.   Again, Mr. Youngblood is offering to use these connections to somehow exonerate Mr. Perardi from something and also to take action against Julie and Rachel; is that correct?

A.   Yes.

Q.   Okay.

(Audio file played.)

Q.   Mr. Youngblood, what did he say he wants to have happen?

A.   He wants Julie to be picked up, Rachel destroyed, and Mr. Perardi exonerated.

Q.   Again, this is Mr. Youngblood saying these are things he wants to have happen?

A.   Yes.

Q.   Okay.  Go on, please.  Thank you.

(Audio file played.)

Q.   Who's XXXX?

A.   XXXX is Mr. Perardi's son.

Q.   And did Mr. Perardi tell you something that Mr. Youngblood claimed almost happened to his son?

A.   Yeah.  Mr. Youngblood had claimed that his son XXXX was going to be kidnapped, was almost kidnapped, and that he specifically was in danger from the cartels.

Q.   And asked for money to prevent that.

A.   Yes.

Q.    And does this appear to be a reference to that situation?

A.    Yes.

Q.    Okay.  Please proceed.

(Audio file played.)

Q.    Seven deployments later, Mr. Youngblood said.  Did Mr. Perardi tell you what Mr. Youngblood had said about his military experience?

A.    Yes.  He said he had been in the military and served as a special -- as a Delta operator.

Q.    Again, is this statement by Mr. Youngblood that you're hearing that's being recorded consistent with what Mr. Perardi was telling you?

A.    Yes, it was.

Q.    All right.  Carry on, please.

(Audio file played.)

Q.    Those are all Mr. Perardi's children?

A.    Mr. Perardi's children.

Q.    All right.  Thank you.

(Audio file played.)

Q.    Mr. Youngblood's talking about wanting to control the environment.  Was a fre -- did Mr. Perardi say sort of frequently suggested by Mr. Youngblood that there's always sort of surveillance and danger and it was important that he pick locations where they could have secure meeting,

that sort of thing?

A.    Yes.

Q.    And is this another -- was this consistent with what Mr. Perardi told you about that?

A.    It is.

Q.    Go on further, please.

(Audio file played.)

Q.    So Mr. Youngblood says he is going to tell James where to bring the bat; is that right?

A.    Yes.

Q.    Okay.  Continue, please.

(Audio file played.)

Q.    Again, what is Mr. Youngblood claiming he's going to do to help Mr. Perardi on?

A.    That he's going to make contact with his connections who can help put a stop to the threats against Mr. Perardi.

Q.    Because he knows someone who knows Mr. Barahona?

A.    Yes.

Q.    A Mexican drug cartel leader?

A.    Yes.

THE COURT:  Mr. Harding, would this be a good time for us to take a break?

MR. HARDING:  It would be perfect, Judge.

THE COURT:  Ladies and gentlemen of the jury,

we're going to take just a ten-minute comfort break.  So it being 3:46, if you could be back in the jury room, which you will see for the first time in a few minutes, and ready to be brought back in in ten minutes.

(Jury not present.)

(Recess.)

(Jury present.)

THE COURT:  Mr. Harding.

MR. HARDING:  Yes, your Honor.

Q.   (BY MR. HARDING) We ended before the break on that second call, three-way call between Mr. Perardi, Mr. Youngblood and Agent Fiedler; is that correct?

A.   Yes.

Q.   And at the end of that call, they were trying to figure outer where to meet.

A.   Yes.

Q.   Ultimately, did you all come up with a location to meet?

A.   We did.  After a couple other calls to figure out the location, they selected Carrabba's right on the same area.

Q.   How close is that to the FBI office?

A.   It is right down the road from the FBI.

Q.   Mighty convenient for you, right?

A.   Yes.

Q.   Did you give -- you, law enforcement, give TFO

Fiedler a recording device to take to the meeting?

A.   Yes, we did.

Q.   And what did you do once that location had been selected?

A.   Once that location was selected, myself and two other agents went to conduct surveillance at that location.  I was inside with another agent at a table.

Q.   What did you do once you got there?

A.   I had dinner and watched Mr. Youngblood and Mr. Perardi and our undercover meet.

Q.   So your role during this is just to watch the meet; is that fair to say?

A.   Yes.

Q.   And do you, in fact, see TFO Fiedler, Mr. Perardi and Mr. Youngblood meet at that restaurant?

A.   Yes.

Q.   You can't hear what they're saying?

A.   No.  I'm inside the restaurant and they chose to sit outside at a table.

Q.   Okay.  May I approach the witness, your Honor?

          THE COURT:  You may.

Q.   (BY MR. HARDING) I'm showing you, Agent Wilkinson, what's been marked Government's Exhibit 23 and 25 for identification purposes.  Do you recognize Government's Exhibits 23 and 25?

A.    Yes.    These are photos that I took on surveillance.

Q.    Twenty-three, what date was 23 taken?

A.    Twenty-three was on May 1, 2023.

Q.    The first day of the undercover operation?

A.    Yes.

Q.    And what about Government's Exhibit 25?

A.    That was the next day of the operation.

Q.    So this is sometime down the road?

A.    Yes.

Q.    And then, earlier, we admitted Government's Exhibits 24, which was a short video clip that you took; is that right?

A.    Yes.

Q.    Could you describe for the jury what Government's Exhibit 24 is?

A.    It's the -- it's Mr. Youngblood and Mr. Perardi walking up into the restaurant with Task Force Officer Fiedler.

Q.    And in fact, we admitted Government's Exhibit 24, as well, which was the video.  What's Government's Exhibit 24 -- I think I tricked you.  Twenty-two is the video and 24 is also a video.  Twenty-two is which video?  The arrival video?

A.    The arrival video.

Q.    Twenty-four would be the departure video?

A.    The departure video.

Q.    Very confusing.  I'm sorry for my mistake.  Hopefully be clear in a second.  Can we pull up Government's Exhibit 22, please, previously admitted.

            (Audio and video file played.)

Q.    Who was walking up in the red?

A.    In the red shirt was our victim, Eric Perardi.

Q.    And who is he hugging right now?

A.    He's hugging Mr. Youngblood.

Q.    Okay.  And who are we about to see follow right behind?

A.    We're about to see the Task Force Officer Joey Fiedler.

Q.    That's a video you took from inside the restaurant?

A.    Yes.

Q.    I forgot to ask you, but are Government's Exhibits 23 and 25 the photos you took, are they fair and accurate depictions of the things you saw on May 1st and May 2nd, respectively?

A.    Yes.

Q.    Government will offer Government's Exhibits 23 and 25.

            THE COURT:  Any objection?

            MS. HERRING:  No objection.

            THE COURT:  So admitted.

Q.    (BY MR. HARDING) So you arrive, you take that video of Mr. Youngblood, Mr. Perardi and Agent Fiedler arriving. And then, you conduct surveillance from inside the restaurant?

A.    Yes.

Q.    If we could pull up Exhibit 23, please.  What are we seeing in Government's Exhibit 23?

A.    This is Mr. Youngblood outside at the Carrabba's restaurant table talking.

Q.    At some point during the meeting.

A.    Yes.

Q.    And then.  If we could pull up Government's Exhibit 24.

            (Audio and video file played.)

Q.    What is in Government's Exhibit 24?

A.    That is Mr. Youngblood and Mr. Perardi and Officer Fiedler leaving the meeting.

Q.    Now, obviously this meeting took a period of time.

A.    Yes.

Q.    Approximately, maybe 45 minutes to an hour?

A.    An hour and a half maybe.

Q.    Okay.  And during that whole time, you're just watching.

A.    Yes, they had appetizers and a meal.

Q.    After those three leave, what did you do?

A.   After those three leave, we continued to have our meal at the restaurant, close out and then, go back to the FBI office.

Q.   Once back at FBI, do you have a conversation with Mr. Perardi?

A.   Yes.

Q.   And in summary, what was the substance of that conversation?

A.   He told about the conversation and it basically mirrored everything he had told us previously that he now told our undercover, that there were threats to the cartel -- that Mr. Youngblood had told the undercover there were threats.

Q.   Did you have sort of a debrief session with TFO Fiedler?

A.   Yes, we did.

Q.   Based on that conversation with TFO Fiedler, did you understand that the sort of arrangement was that TFO Fiedler was supposed to give Mr. Youngblood the money the following day on May 2nd?

A.   Yes.  And we had this conversation with Mr. -- or with the officer separately than Mr. Perardi.

Q.   Did you ever have any intention of giving money to Mr. Youngblood?

A.   No, we did not.

Q.   And so, where is TFO Fieldler from?

A.   He's from the Waco, Texas area.

Q.   Did you just send him back to Waco?

A.   We did.

Q.   May 2nd rolls around, what happens?

A.   So this is the following day when they arranged to meet.  I go and set up surveillance with several other agents in our office at the location where they agreed to meet to exchange the money and Officer Fiedler had been conducting phone calls with them.  He was calling me to relay what their conversation was, where they said they would be, and what the arrangements would be.  So I was stationed outside -- again, they agreed to meet at the Carrabba's, same location, the next day.  So I was stationed, parked in my car, and I think that was the photo we just saw from my car watching the meeting.

Q.   Actually, if we could pull up Government's Exhibit 25.  And zoom in, if we could, sort of in the middle.  This is a photograph you took on May 2nd?

A.   Yes.

Q.   And who's depicted in this photograph?

A.   This is Mr. Youngblood on the left and Mr. Marvin Knecht on the right.

Q.   And again, Mr. Knecht's role in this that you knew at this time was what?

A.   We believed him to be a coconspirator at the time.

Q.   So you're in touch with TFO Fiedler?

A.   Yes.

Q.   Based on your understanding, what is the arrangement supposed to be with Mr. Youngblood on May 2nd between him and TFO Fiedler?

A.   That TFO Fiedler would bring cash to Mr. Youngblood.

Q.   Does TFO Fiedler ever show up?

A.   He does not.

Q.   What happens -- well, what do you instruct TFO Fiedler to do?

A.   We tell him to essentially at some point turn off your phone, stop answering, you're not going to show up, end of your role in this.

Q.   You are aware he had been having conversations throughout that day with Mr. Youngblood?

A.   Yes, and they were all recorded.

Q.   After you tell TFO Fiedler, hey, turn off your phone and stop answering, what happens here at the restaurant?

A.   I watch as they sit at the table for some time, seemed to be waiting, and eventually, both -- Mr. Knecht leaves first.  Mr. Youngblood sits at the table a while longer, goes inside, comes back out, and then, he eventually leaves, as well.

Q.   And do you stay or do you follow?

A.    I follow them.

Q.    And where does Mr. Youngblood go?

A.    Mr. Youngblood goes to the Chevron.  There was a Chevron gas station right around the corner and parks his car at one of the pumps and Mr. Knecht joins him.

Q.    And what happens then?

A.    I see Mr. Youngblood very angry, yelling and seems to be very frustrated, talking to Marvin, Mr. Knecht.

Q.    After that happened, what did you do?

A.    I concluded the surveillance.

Q.    And is that essentially the ending of the -- the end of the undercover operation on May 1st and 2nd?

A.    Yes, it was.

Q.    That wasn't the end of your role in this investigation or the investigation as a whole, was it?

A.    No, it was not.

Q.    As a co-case agent, could you describe for the jury, again, in brief summary, some of the investigative techniques that you all used during this case?

A.    So we reviewed financial records.  We interviewed numerous witnesses and victims.  We also requested grand jury subpoenas for some of these records.  We executed numerous search warrants and a couple of other law enforcement activities.

Q.    In terms of the very beginning of this investigation,

is what you've testified to a fair summary of the investigation to this point?

A.   Yes.

Q.   We'll pass the witness, Judge.

CROSS-EXAMINATION

BY MS. HERRING:

Q.   Good afternoon, Agent Wilkinson.  You just got done telling us that Perardi, Eric Perardi was the FBI's -- I think you called him your initial victim; is that right?

A.   Yes.

Q.   And you and Agent Noble were both present at that first interview with Mr. Perardi?

A.   Yes.

Q.   I know you do it occasionally, but it's not very common to have kind of a walk-in to the FBI, right?

A.   Actually, it's extremely common.

Q.   Someone hires an attorney and schedules a meeting?

A.   We take walk-ins every day, actually.

Q.   And that's why Mr. Perardi got the meeting with you because you mentioned his connection with his defense attorney that he'd hired?

A.   Well, in his case, that's how we were connected, but it was not uncommon for someone to bring in an attorney, as well.

Q.   He came to you with his defense attorney present at

that first meeting with Agent Noble?

A.   Yes.

Q.   And as you understood it, just from your initial meeting with Mr. Perardi, he told you he had been convinced by Mr. Youngblood that he had to pay for protection from the cartels, right?

A.   Yes.

Q.   And he'd been making payments to James Holloway via check, right?

A.   That he had been giving Mr. Holloway checks that then he believed were being cashed and given directly to Mr. Youngblood.

Q.   And by the time he came to the FBI, this had been going on in Mr. Perardi's case about 10 months?

A.   I believe that's accurate.

Q.   And Mr. Perardi, you mentioned, was out a lot of money at that point.

A.   Yes.

Q.   Over $700,000.

A.   Somewhere over 700,000.

Q.   And he was making payments to Mr. Youngblood because he believed Mr. Youngblood was able to provide this protection that he had been convinced he needed, right?

A.   Yes.  He was paying it to protect his children and stop the threats to him.

Q.   And when Mr. Perardi came and explained to you why he'd been making these payments, he gave you details that Mr. Youngblood, he said, had told him, right?

A.   Yes.

Q.   He told you that Mr. Youngblood had said his family, particularly one son, was a target of the cartel, right?

A.   Mr. Youngblood's family, you're saying --

Q.   No.  Mr. Perardi's family.

A.   Oh, yes, XXXX Perardi.

Q.   He was concerned about XXXX Perardi --

A.   Yes.

Q.   Is one of his sons, right?

A.   Yes.

Q.   He told you that Mr. Youngblood had told him he was in great danger, right?

A.   Yes.

Q.   He told you that he believed his ex-wife was using -- I think using drugs and maybe dealing drugs?

A.   Yes.

Q.   There was a concern about his ex-wife's drug use?

A.   Yes.

Q.   And he believed that his ex-wife was going to place a hit on him because she was the beneficiary of a $6.5 million life insurance policy.

A.   At the time he came to us, he believed these

statements were now fraudulent and that's why he came to us.  But why he gave the money initially was because he believed his wife had taken out a hit on him because of this insurance policy.

Q.   But when he came to see you, you believed that he believed these things, right?

A.   I believe he believed them at the time and he came to us, he said he had evidence that these must be false statements because he was -- the piece of collateral, he was given the flag that was mentioned, he found out that it was misrepresented in both value and ownership.  So because he found out about this flag, it started unraveling some of the lies for him and he realized that these had to be fraudulent statements over time and it was at that time that he decided to contact the FBI.

Q.   He explained or recounted to you, I guess, his very first meeting with Mr. Youngblood, which, like you said, was 10 months prior to him coming to the FBI, right?

A.   Yes.

Q.   And he described Mr. Youngblood coming to him, asking for, I think it was, $70,000, right, was the first?

A.   I'm not sure the first amount, but it was a large amount.

Q.   Do you not recall that $70,000 was the first check that Mr. Perardi told you that he had --

A.   He wrote at least -- I believe it was somewhere over 15 checks of large sums, but it was definitely in the neighborhood of around $70,000.

Q.   It was or it wasn't your understanding that the first payment was $70,000 beginning July 8th of 2022?

A.   I just don't recall the numbers, but he gave us a number of the transactions and said.

Q.   Would it help you to see -- well, you recall.  You testified previously at a hearing in this case?

A.   Yes, I did.

Q.   Right?  At that time, you were also sworn in as a witness?

A.   Yes, ma'am.

Q.   You gave truthful and accurate testimony at the time?

A.   Yes, I did.

Q.   Would it help you to see your transcript from that testimony?

A.   Yes.  I said in that day, it was approximately $70,000 beginning July 8, 2022, followed by an $86,000 payment July 21st, 2022, and $83,000 payment on July 27th, 2022, and I noted that I had a couple of notes in front of me at the time.  So I would say that's accurate.

Q.   And you still -- now that you've had a chance to refresh your memory, you recall that that's still your recollection today that that is how Mr. Perardi's payments

started?

A.   Yes, based on my notes.

Q.   And you learned and I believe Mr. Perardi told you that he wrote checks -- his checks were made out to a man named James Holloway.

A.   Yes.

Q.   Is that right?  You had three meetings with Mr. Perardi in close proximity, right?

A.   Yes.

Q.   There was April 27th, May 1st and May, I believe, 2nd or 3rd, right?

A.   Yes.

Q.   And at some point after the first meeting, you asked Mr. Perardi to bring in prepared materials for you, right?

A.   Yes.

Q.   You asked him to bring you copies of the checks, right?

A.   Yes.

Q.   You asked him to bring you printouts from his bank records?

A.   Yes.

Q.   And you asked him to prepare you the summary of why he had written each check that he could remember.

A.   Any information he believed would support what he was saying to us.

Q.   And he prepared, I think it was, an Excel sheet and brought you all of those materials?

A.   Yes, he did.

Q.   And that's how you referenced a number of checks. Does it sound right there was something like 16 or 17 total checks?

A.   Yes.

Q.   That he wrote.

A.   Approximately.

Q.   You learned from your review of the checks in your investigation, Mr. Perardi did not write those checks to Mr. Youngblood, right?

A.   Yes.

Q.   And the checks were made out to James Holloway.  Your investigation showed cash by James Holloway --

A.   Yes.

Q.   -- right?  You learned that Mr. Perardi even knew when he was writing the checks to James Holloway, James Holloway's intention was to cash those checks, usually as quickly as possible.

A.   Yes.

Q.   From the beginning of your investigation, has it been your finding that Mr. Youngblood wanted to get his hands on cash as quickly as possible?

A.   Yes.

Q.   You mentioned this in your testimony earlier, but you said when you first started this and you had only heard from Mr. Perardi, you did believe that Jay Holloway was potentially a coconspirator in the case; is that right?

A.   Yes.  That's correct.

Q.   And he did -- he took acts that furthered or facilitated what you believe now are Mr. Youngblood's actions, right?

A.   Yes.

Q.   Mr. Holloway, in your estimation, accepted dozens, you think over a hundred checks from -- if you include everything that you've reviewed?

A.   I couldn't make a guess, but he accepted a large number of checks from our victims.

Q.   And some of the people you learned were like Mr. Perardi, who had been introduced through James Holloway or through Mr. Perardi, right?

A.   I'm sorry.  Can you ask that again?

Q.   Yeah.  I can do a better question than that.

        Mr. Perardi, at some point, brought in friends when he ran out of money to continue writing checks to James Holloway, right?

A.   Yes, but some of those friends gave money directly to Mr. Youngblood.

Q.   Your investigation showed that James Holloway would

actually go around Austin sometimes to meet people to pick up the checks from them in parking lots, different locations?

A.   Yes.

Q.   Sometimes he'd meet them at the bank where he was going to walk in and cash it as soon as he got the check in his hand, right?

A.   Yes.

Q.   And your investigation, is it fair to say, showed that James Holloway's role was to collect money and convert it to cash to get it to Mr. Youngblood?

A.   Yes, and it showed that he did this at Mr. Youngblood's direction.

Q.   In your initial meeting with Mr. Perardi, you didn't -- there was not a focus on wire transactions, right?

A.   We listened to what he had to say primarily and he focused on the extortion and what he believed had been the risk to his family and a great loss of money, as well as possibly an investment fraud going on.

Q.   And when he followed up pretty rapidly and brought you the Excel sheet and the bank records, those, too -- the focus of that were these checks that he had written, right?

A.   Yes.  The checks and which would constitute a wire transaction.

Q.    In your mind, a check is a wire transaction?

A.    When the money moves from a bank account in one state to another state, we typically look at wire fraud generally as a federal nexus.

Q.    It's your understanding that a -- writing a check is a wire transaction?

A.    The check itself when it is deposited in the bank then triggers the wire transaction.

Q.    That's what you had been taught in your training and experience?

A.    In my experience, the check then issues, yes, but I think what you're asking is did we consider wire fraud initially.  We considered a number of federal offenses and which one would be -- was taking place here, if any.

Q.    I'm asking you whether you think a check is a wire transaction.

A.    I think when it's deposited, it initiated a wire transaction.

Q.    When you first started working on this case and you interacted with Mr. Perardi, it seemed unusual that he wouldn't have come to not necessarily the FBI but law enforcement, right, if he thought he was at risk of being murdered by the cartel?

A.    Well, if he thought he was working with a government agent and that he was concerned about involving someone

who -- the FBI or other entities, that could further endanger his children.

Q.    Did you find his story -- or I think you did find his story hard to believe when he first told it, right, when you had only talked to Eric Perardi?

A.    Yes.  It was confusing and there was a lot of elements and it sounded pretty fantastical.

Q.    Eric Perardi came to you and said that his ex-wife was using drugs, was connected to the cartel, and the cartel was going to go after him because she ordered a hit on him for a $6.5 million life insurance policy, right?

A.    He told us that he had given money to someone who had said that and he had believed those statements at the time and continued to give money under that premise.

Q.    And when he came to speak to you in April of 2023, you felt it was clear that he had believed that story.

A.    Yes.

Q.    You weren't sure at the time, though, why he would have believed that story, right?

A.    I think combined with the posts, the social media posts, it seemed that there were online elements that would make it believable.  It just -- the story itself was hard to follow and there were a lot of entities and elements.

Q.    It wasn't clear to you, though, why Mr. Perardi would

think his ex-wife wanted him killed, right?

A.   It was clear because he had said that he had a $6.5 million life insurance policy that she was at the time a beneficiary of.

Q.   He referenced the $6.5 million life insurance policy, specifically?

A.   I can't remember if it was that very first day, but in the very beginning of our conversation, the life insurance policy was referenced as well as the contentious divorce.

Q.   And he gave you the amount of life insurance policy, right, 6.5 million?

A.   That's my recollection.

Q.   You need to review your notes?  Do you remember?

A.   If you have my 302 of the first meeting.

Q.   May I approach, your Honor?

THE COURT:  You may.

Q.   (BY MS. HERRING) I believe that's from your second meeting on the 1st of May.

A.   Yes, these are my notes and I did write $6.5 million life insurance policy.

Q.   You even wrote the company it was with, right, Prudential?

A.   Yes.

Q.   When you were doing an interview of someone, you

strive to take accurate notes, right?

A.   Yes, I do.

Q.   You want to get all the details correct.

A.   These are from the May 1st meeting.  I see it wasn't at that first -- the initial meeting was April 27th.  These are my notes from May 1st --

Q.   That's right --

A.   -- that's listed --

Q.   -- May 1st, you believe Mr. Perardi told you that he had a $6.5 million life insurance policy with Prudential, right?

A.   Yes.

Q.   And he told you his wife was a beneficiary of that policy?

A.   Yes, at the time.

Q.   She was a beneficiary at the time or --

A.   She had been the beneficiary of the policy at the time.  I believe when he was speaking to us, he had changed her from the beneficiary since this was many months later.

Q.   One of the other things you talked about that Mr. Perardi mentioned was these negative online reviews, right?

A.   Yes.

Q.   And he told you about the reviews and then, you saw a

lot of examples for yourself.

A.   Yes.   Some of them were still active online so we could pull some of them up.

Q.   Those two when you first read them are kind of bizarre posts.

A.   There were a lot of players and a lot of references to cartels and they were posted on restaurant websites and Yelp reviews for different Austin entities, which was kind of bizarre.

Q.   And your understanding from Mr. Perardi was these started up in November of '22?

A.   I believe the first -- I know there was significant posts that happened around Superbowl of 2023.   But I believe the November 22 posts targeted his ex-wife directly.   They were pertaining to her sexual relations and infidelities in the community and that Crossover and Mr. Perardi weren't named yet.

Q.   The February-March ones --

A.   The February-March ones --

Q.   -- his wife, specifically --

A.   No, I'm sorry.

Q.   -- not the Crossover?

A.   The earlier ones referred to Rachel Herrera, the ex-wife, and her kind of proclivity to sleep around as well as some of her boyfriends.   But then, the later posts

are when Mr. Perardi and his business, the Crossover, were introduced.

Q.   That would be -- when you say later, that's November --

A.   February --

Q.   -- later on --

A.   -- 2023.

THE COURT:  You're talking over each other a lot. If you could wait till she answers the question and then, wait till she responds.

MS. HERRING:  Yes, your Honor.

THE COURT:  Thank you.

Q.   (BY MS. HERRING) So there was an early set of posts in February and March of 2022 and then, posts restarted November 2022 on.  Mr. Perardi came to you in 2023. Superbowl was February of '22.

A.   I just have to look at some of the dates.  But yes, I write Facebook and Instagram posts beginning in February 2022.

Q.   And those were the posts that you understood to be about Mr. Perardi's ex-wife, right, and her -- Joey Pollard, a man that she was referenced with in the post and their, as you said, sexual conduct and drug use.

A.   And drug use, yeah.  Wife cheated and his wife did drugs is what I wrote.

Q.   And the posts that you just referred to that when the government showed you that exhibit, those were part of the later group because they included the Crossover, Toyota, and all these other names?

A.   Yes, that's correct, from my recollection.

Q.   And you talked about this the last time.  You testified in this case, but in your experience, at least at that time, you as an FBI agent had not heard of a case before where the cartel was posting on Yelp.

A.   Yeah, and I believe I said I didn't work cartel. However, it was new to me that they would be posting on Yelp.

Q.   Since beginning this investigation or since your work started on this in April of 2023, have you heard of a case where the cartel is actually posting on Yelp?

A.   No, but I still have not worked the cartel.  I primarily work complex financial crimes.

Q.   So the post -- I just want to clarify before I move on from this point.  But the posts that you talked about earlier, the Government's Exhibits 18 and 19, those are from November.  They don't have a date on them.

A.   No.  I believe they're from around the week before our undercover operation.  They were much later so closer to April 2023.

Q.   April 2023?

A.    Yes.

Q.    So you would put those in that second round of posts?

A.    Yes.

Q.    You brought this up a few minutes ago, but you mentioned that Mr. Perardi told you that the reason, the thing that prompted him to come to the FBI in April of '23 was this incident with the flag?

A.    Yes.

Q.    Right.  He'd been interacting -- paying, writing checks for 10 months at that point, right?

A.    Yes.

Q.    And you're talking -- you're referring to this flag from Jeff Bridgman?

A.    Yes.

Q.    Mr. Perardi actually had possession of this confederate flag?

A.    Yeah.  It was a Civil War-era flag.

Q.    And when he received it -- he received it from Mr. Youngblood, he told you?

A.    He told us that, yes.

Q.    And his belief, based on what Mr. Youngblood had told him, was that it was worth -- forget if it was one million or two million but...

A.    There'd been a number of --

Q.    Millions -- in the millions of dollars --

A.    -- how many millions it was worth but he said it was an extra --

THE COURT:  Again, you're talking over each other.  If I could ask you, let her answer the question. Stop, count to three and then, respond.  And then, count to three before you ask the next question.

Q.    (BY MS. HERRING) Do you remember how much Mr. Perardi thought that flag was worth?  Just ballpark is fine.

A.    Over a million dollars.

Q.    Over a million dollars.  And he was upset when he learned, right, that the flag was worth, I think it was, $85,000, not a million dollars, right?

A.    Yes.  And he felt that that supported that he was being defrauded.

Q.    When he learned that fact, that was what -- the light bulb went off for him and he went to the FBI.

A.    That's what he told us.

Q.    When Mr. Perardi came into your office with an attorney saying, I've been told I have a hit on me from my ex-wife, she wants me killed for my life insurance policy, when he walked in, you believed he believed that?

A.    I believe that that's why he gave -- he believed it enough to give Mr. Youngblood money but that he thought it was no longer true and that he had been defrauded by Mr. Youngblood and extorted by Mr. Youngblood.

Q.   So you did not feel the need at that time to go out and investigate whether Rachel Herrera was actively putting a hit on Mr. Perardi when he came to see you.

A.   Correct.

Q.   And in fact, you waited several weeks to talk to Rachel Herrera, right?

A.   Yes.

Q.   I think it was two weeks.  Do you recall talking to her on May 12th?

A.   Yes.  We just took other law enforcement steps before that, but we intended to talk to her pretty soon after.

Q.   So there was no urgency at the time, no concern on your part that she was actually involved in illegal activity?

A.   We weren't concerned that Mr. Perardi's life was in danger.

Q.   Were you concerned that Rachel Herrera was connected to the cartel and going to place hits on people?

A.   No.

Q.   When you talked to Rachel Herrera, you actually went to meet her in person, right?

A.   Yes.

Q.   And you learned from her that she, too, had been the target of online harassment, right?

A.   Yes.

Q.   And hers started earlier, back in February-March of '22, right?

A.   Yes.

Q.   And they weren't on Yelp, they were on -- you had just looked at your notes, Facebook, the Instagram.

A.   Yeah, I believe hers were on Instagram and Facebook primarily.  Twitter maybe, as well, but social media.

Q.   And you learned in speaking to her that she actually thought Eric Perardi was responsible for those posts?

A.   Yeah, she told us she believed it was her ex-husband.

Q.   You learned from her, too, that they were going through a very heated divorce, right?

A.   Yes.

Q.   And you learned that the -- those posts from that early group, February-March, tracked topics that were coming up in the heated divorce, right?

A.   Yes, the drug use.

Q.   Things that she felt Mr. Perardi was accusing her of in the custody battle that was going on?

A.   Yes.

Q.   She also -- I think you learned from her that one of the reasons she thought Mr. Perardi was responsible was because the posts contained very personal information that only he would be aware of.

A.   Yes.

Q.   When you met with her again, it was clear to you she had no connection to a cartel, right?

A.   Yes.  We didn't believe that she was a member of the cartel.

Q.   And you had her send you copies of the posts that she independently had gathered when this harassment against her started in February and March.

A.   Yes.  She sent me a large number of posts, as well.

Q.   Was it a large number you recall when you wrote up your report from your meeting with her -- I think there were of 66 attachments.  She forwarded you everything she could find.

A.   Yes.  There was a large number of posts involving her and the personal relationships of hers.

Q.   And after you interviewed Ms. Herrera on May 12th of 2023, you didn't interview her again; is that right?

A.   That's correct.

Q.   By the time you talked to Ms. Herrera, to Rachel Herrera, you had already done this undercover meeting, right?

A.   Yes.

Q.   You'd already gotten recordings of a variety of calls at that point, right?

A.   Yes.

Q.   You said you had Eric Perardi immediately start

recording all those calls and send them to you anytime Mr. Youngblood called him?

A.   Yes.

Q.   You started -- I think you mentioned the other steps you took.  You started sending out subpoenas for records?

A.   Yes.

Q.   And Mr. Youngblood was arrested in July of '23, right?

A.   I believe it was July 30th of 2023.

Q.   And I believe it was four months from April to August of 2023, after the undercover meeting, after you, well, even arrest Mr. Youngblood, you do call -- you did call Mr. Perardi and asked him if he had been responsible for those posts against Rachel Herrera, right?

A.   Yes.

Q.   And he told you no.

A.   He told us he was never responsible and, in fact, that he had hired someone to look at all his devices in his computers to help, you know, give a forensic -- or a computer analysis to show in the divorce proceedings that he had not been responsible.

Q.   And you did not get a copy of that forensic analysis that showed that.

A.   I don't believe we received a full -- or we requested a full copy of the analysis, no.

Q.   I want to talk a little bit more about how you went about gathering evidence in this case.  You as an FBI agent have a lot of tools you can use to gather evidence, right?

A.   Yes.

Q.   You sometimes get search warrants?

A.   Yes.

Q.   Subpoenas, you've already mentioned?

A.   Yes.

Q.   You do surveillance.  You've talked about surveillance.

A.   Yes.

Q.   And you do interviews.  You talked about that.

A.   Yes.

Q.   So when you get a search warrant, that's a formal application from a court, right?

A.   Yes.

Q.   And you, in fact, authored many of the search warrant applications in this case.

A.   Yes, I did.

Q.   And if you are approved for a search warrant, that means the FBI gets to conduct the search, right?

A.   Yes.

Q.   That would involve a team of people typically?

A.   Typically, yes.

Q.   In this case, I don't know when the search warrant was executed at Mr. Youngblood's house, there were probably 20, 25 agents involved.  Does that sound right?

A.   I wasn't at that location, but I believe it was over 15 agents and task force officers.

Q.   And when you execute a search warrant, you have people trained to search for evidence that are there executing the warrant?

A.   Yes.

Q.   They're trained in what to look for, right?

A.   And how to mark it and handle it appropriately as well as bag it and secure it until it gets to our office and placed into our evidence holdings.

Q.   And the same is true, I think you did several search warrants for phones in this case, right?

A.   Yes.

Q.   If you get a search warrant for a phone, you're going to have an agent with technological expertise conduct the search of that phone?

A.   Yes.

Q.   You use special computer programs that the FBI has to pull the contents of a phone, right?

A.   Yes, I do.

Q.   And then, you get agents who oftentimes very specialized in that area to review phone search records,

right?

A.    Typically, they pull it and then, the case agents or others can review the information.

Q.    And it's a pretty common thing nowadays with everyone has a phone that the FBI does, right?

A.    Yes, it is.

Q.    You've talked about subpoenas.  You've got subpoenas, grand jury subpoenas in this case and that's just another tool you have for gathering evidence, right?

A.    Yes.

Q.    When you issue a subpoena, that's something you send to an organization and they're responsible for conducting the search and sending you back the record you've asked for; is that right?

A.    Yes.

Q.    And typically, you use those with institutions like financial institutions, organizations that have processes in place to accurately pull records and send them to you?

A.    Yes.

Q.    And I think you and Agent Noble collectively issued 50, maybe a few more than that, subpoenas in this case?

A.    I looked at the list recently.  I believe it was around 50.

Q.    And in this case, most of those were for bank records, right?

A.    Majority of them were for financial institutions.

Q.    And that's important in a case like this because even though Eric Perardi walks in with checks, you want to get the actual records from the bank and verify transactions, right?

A.    Yes, ma'am.

Q.    Another way you can gather evidence is you can just as an FBI agent sometimes ask people to give it to you, right?

A.    Yes.  They can consensually agree to it.

Q.    And you might do that when you have decided you trust the person?

A.    Sometimes we'll obtain the record from them personally.  They'll hand us copies of bank records and then, we can go back and get subpoenas to get their legitimate -- you know, or the records from the bank itself, as well.

Q.    Even beyond bank records, text messages, e-mails, phone recordings?

A.    Yes.

Q.    Sometimes you just ask people to send those to you.

A.    Yes.  If it's relevant to the investigation, yes.

Q.    When you ask someone to give you something even though you're a federal agent, and that carries weight with lay people, you're relying on that person to follow

through, right?

A.   Yes.

Q.   If you don't use a search warrant and conduct the search yourself, if you don't issue a subpoena, if you just ask someone to give you information, you leave it up to them to determine what they're going to provide, right?

A.   Yes.  If I don't have a court order, then I can't compel someone to give me information.  But if I have reason to get a court order, I could request one from the Court through an application.

Q.   So in this case, you got text messages from Eric Perardi, right?

A.   Yes.

Q.   And you asked him to send you text messages that he thought were relevant to your investigation.

A.   We asked him to send anything that he thought would be -- that we should know in the investigation to support the statements that he had made.

Q.   You did not, no one in the FBI went through Mr. Perardi's phone to see what was in there, right?

A.   We did not obtain a search warrant for Mr. Perardi's phone, no.

Q.   You didn't apply for one.

A.   We did not apply for one, no.

Q.   So the text messages you got from Mr. Perardi were

texts that he selected to send you.

A.   Yes.

Q.   He sent you e-mails, as well, right?

A.   Yes.

Q.   And those, too, were e-mails he decided to forward to share with you.

A.   They were the ones he provided to us, yes.

Q.   You did not go through his e-mail with him.

A.   I did not get a search warrant for his e-mail account.

Q.   You didn't sit down with him and look through his e-mail?

A.   No, I did not.

Q.   Then you've talked about the recordings and the fact you were even on some of the recordings that he made.  The recordings we heard just now were recordings that the FBI directed Mr. Perardi to make, right?

A.   Yes.  We were present and were recording on our devices and we said this is our strategy to record these conversations.

Q.   You don't have recorded calls every time Mr. Perardi spoke to Mr. Youngblood.

A.   Correct.

Q.   And you don't have any kind of recording of the -- even the initial meeting between Mr. Youngblood and Mr.

Perardi, right?

A.   That's correct.

Q.   You also asked Mr. Perardi who else he thought you should talk to in your investigation, right?

A.   Yes, we did.  That's standard practice for us.

Q.   And he put you in touch with quite a number of people, right?

A.   Yes, he did.

Q.   And many of those people were people who worked at The Crossover, right, and the hockey group you talked about?

A.   I believe it was friends of his from the hockey community, Adam Powell, Eric Swanson, some of the names I touched on earlier.

Q.   You talked to his girlfriend.

A.   Nicole Frost, yes.

Q.   And many of these people that even the names you just named gave money to Eric Perardi or at Eric Perardi's request when he needed money, right?

A.   Nicole Frost did.

Q.   And John Mapes did?

A.   John Mapes, did, as well.  John Mapes was the architect for Mr. Perardi and helped him on -- he worked with him in Mr. Perardi's capacity as a developer so they had a longstanding relationship.

Q.   You interviewed John Mapes at some point?

A.   Yes.

Q.   Early on in this investigation, you decided to rely on Eric Perardi for a lot of this texts, e-mails, recordings, right?

A.   He provided us a large number of e-mails, texts and postings, yes.

Q.   You never collected a copy of the life insurance policy, right?

A.   I don't recall if we did by the end of the investigation, but I don't believe that we did.  I just don't recall.

Q.   You didn't collect any proof that Rachel Herrera had ever been using drugs.

A.   I did not.

Q.   Mr. Perardi told you he was convinced that his son XXXX was potentially one of the targets of this threat, right?

A.   Yes.

Q.   You didn't interview XXXX mother to see if Mr. Perardi had ever conveyed his concern about his son's safety to her?

A.   No, I did not.

Q.   And XXXX, XXXX is a minor, right?  A child?

A.   I believe he was 17 at the time.

Q.    He was -- Mr. Perardi shared custody of his son with his -- the first ex-wife?

A.    Yes.

Q.    Mr. Perardi told you he was in the middle of a heated divorce, right?

A.    Yes.

Q.    And Rachel Herrera told you they were in the middle of a heated divorce, right?

A.    Yes.

Q.    You did not collect the records from that divorce proceeding?

A.    No.

Q.    Did you learn that it was sealed?

A.    I believe he told us that the divorce proceeding was sealed.

Q.    Did you learn that he had requested it be sealed?

A.    I did not know who requested it.

Q.    So you didn't get any records from the divorce about what Mr. Perardi was and wasn't supposed to be doing with his assets at the time, right?

A.    No.  I was not aware of their divorce agreements.

Q.    You corrected -- requested, subpoenaed bank records for Mr. Perardi, right?

A.    Yes, his businesses and his personal bank account.

Q.    And he has a lot of businesses, right?

A.    I believe he has a business and subsidiary companies underneath it.

Q.    You've got a large number of bank records back from Wells Fargo for Mr. Perardi's different bank accounts, right?

A.    Yes.

Q.    He has numerous bank accounts?

A.    Yes.

Q.    Upwards of 20 sound correct?

A.    I don't recall.

Q.    And you didn't look into Mr. Perardi's financials beyond your investigation into Mr. Youngblood?

A.    That's correct.  I was not investigating Mr. Perardi's financial or business dealings.

Q.    When you issue a subpoena for bank records, you -- maybe you and your team, Agent Noble together, decide how far back you want those records to go, right?  You set the date range that you're asking for.

A.    Yes.  Typically, we try to balance that it pertains to the investigation but isn't unduly burdensome on the institution.  And because we have to review it, we don't want so many years that it would be difficult to review.

Q.    And in this case, do you recall that from Mr. Perardi's banks records, you started your request at April of 2022 through the end of your investigation here?

A.    I don't recall the specific dates.  I would have to look at the record.  But I do believe we would have done from roughly the time that he had said he had been defrauded, a little before that to the date that he came to the office.  You can't future-date a subpoena.

Q.    May I approach, your Honor?

THE COURT:  You may.

Q.    (BY MS. HERRING) Do you recognize this as a copy of the subpoena that the -- was issued to Wells Fargo for Eric Perardi and T.A.P. Development, one of these companies?

A.    Yes, I do.

Q.    Does this appear to be a accurate copy of that subpoena?

A.    Yes, it does.

Q.    We'd move to admit this, your Honor.  I don't have it marked as an exhibit number but we'll add one.

THE COURT:  What number will it be?

MS. HERRING:  131.

THE COURT:  Any objection?

MR. HARDING:  I don't know what it is.  We have no objection.

THE COURT:  So admitted.

Q.    (BY MS. HERRING) Do you see now, getting a chance to review that subpoena, that the date range was April 1st,

2022 to August 18th of '23?

A.   I do, but since this includes to August 18th, 2023, that means I would have probably issued this around 18th of August in 2023.  And I believe there's a subpoena before this that would have also included Mr. Perardi's Wells Fargo records, and I don't have dates of that subpoena.

Q.   This subpoena starts, though, April 1st of '22.

A.   Yes, it does.

Q.   So this would not include Mr. Perardi's bank records from the time of those early Yelp posts in February and March.

A.   This subpoena does not.

Q.   Since coming to the FBI for assistance, Mr. Perardi has repeatedly reached out to you to intervene in his divorce proceedings.  Do you recall that?

A.   He's reached out to me because he -- I recall one occasion where he was trying to pay for his son's hockey expenses and he was asking for a letter from the FBI saying that he'd been the victim of fraud and that was why he wasn't able to have money to pay this.  So there were instances like that.  But specifically for the divorce proceedings, I don't -- I'd have to --

Q.   May I approach?

     THE COURT:  You may.

Q.    (BY MS. HERRING) Show you what's been marked as Defendant's Exhibit 89 and 90.  Do those appear to be the e-mails you were just discussing to the hockey academy?

A.    Yes.  This one is the e-mail I described about the hockey academy payments and this one appears to be to Elite Hockey Association, as well.

Q.    And those appear to be accurate representations of the e-mails that you were CC-ed on?

A.    Yes.

Q.    We'd move to admit Defense 89 and 90.

        MR. HARDING:  No objections.

        THE COURT:  So admitted.

Q.    (BY MS. HERRING) So looking at 89, you've already explained, this was an e-mail to the hockey academy about his inability or the fact that he hasn't paid for his son's fees, right?

A.    Yes.

Q.    In this e-mail, this is kind of, I guess, the fourth line, it says to the billing department, please feel free to call the agents listed below, right, and he CC's you and Agent Noble on this e-mail, right?

A.    Yes.

Q.    And Defense Exhibit 90 is a similar e-mail, I believe it's about the same fee and he says, please speak with the FBI, right?

A.    Yes.

Q.    Mr. Perardi has also sent you at least one text message about his divorce, right?

A.    Yes.

Q.    May I approach, your Honor?

        THE COURT:    Yeah.

Q.    (BY MS. HERRING) Does that look like this is taken from a spreadsheet you prepared of all your texts with Mr. Perardi?  This is one selection.  Does that appear to be an accurate representation of the text you received from Mr. Perardi?

A.    Yes.

Q.    I would move to admit page 1 of Defendant's 91.

        MR. HARDING:    No objection.

        THE COURT:    So admitted.

Q.    (BY MS. HERRING) So in this text message, Mr. Perardi is explaining to you that Rachel and her lawyers are going to try and drag me into court so that I have to pay them more money I don't have.  I do not want to be put up on the stand and have public testimony about all this.  Just letting you know my time is running out on this ridiculous divorce, right?

A.    Yes, I believe it says about all this, if it's still under wraps, and I believe he included that because Agent Noble and I had instructed Mr. Perardi that it was

important as we conduct our investigation, we typically ask that people don't speak to other witnesses, don't speak to other victims so that when we interview them, we get the authentic story from them rather than from someone else.  So we had been instructing him for -- it looks like at this point, this is on May 26, so it would have been a couple of weeks to, you know, more or less keep the information to himself and I think he had continued to ask us when he would be -- when this would be made public and when this could be disclosed more publicly.

Q.   This is a text you received on May 26th of 2023?

A.   Yes.

Q.   And his divorce was still ongoing after he came to the FBI in April.

A.   Yes.

Q.   It's your understanding it's still ongoing now?

A.   I believe that the divorce was finalized pretty recently.

Q.   Like today?

A.   Like last week.

Q.   So you've said you didn't conduct any full review of Mr. Perardi's financial situation, right?

A.   That's correct.

Q.   Your investigation has been focused solely on Mr. Youngblood and whether Mr. Youngblood committed the

offense of wire fraud, right?

A.   And at the time the coconspirators, Mr. Knecht and Mr. Holloway and anyone else at the time that we believed to be involved.

Q.   So you cannot speak to any financial problems Mr. Perardi might have had outside the scope of your investigation?

A.   That's correct.

Q.   Pass the witness.

MR. HARDING:   We have no questions, Judge.

THE COURT:   Thank you.   You may step down.   Would this be a good time to break for the day?

MR. HARDING:   I think we're not going to get through another witness, most likely.

THE COURT:   Ladies and gentlemen, it's a long day.   It's close enough to 5:00 to call, so I'm going to excuse you for the day.   If you'll recall, from now on, our plan will be to be in the jury room, ready to go by 8:30 in the morning.   The deal being if we do that, I will get you out of here by 4:00 to beat the traffic.

You'll get tired of me giving you these instructions, but please don't talk to anyone, including each other, about this case.   And don't engage in any independent investigation of any person, place, thing, or law because, in the end, you must base your verdict solely

on what you hear and see from the witness stand and the instructions that I'll give you at the end of the case.

With that, thank you for your attention and patience throughout the day and we will look forward to seeing you, ready to go tomorrow morning at 8:30 in the morning.

(Jury not present.)

THE COURT:  All right.  Is there anything we need to take up before we break for the day?  Anything from the government?

MR. GUESS:  No, your Honor.

THE COURT:  Defense?

MS. HERRING:  No, your Honor.

THE COURT:  Okay.  Very good.  We will see you tomorrow morning at 8:30.

(Proceedings adjourned.)

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

* * * * * *


UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS     )


   I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

   I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

   WITNESS MY OFFICIAL HAND this the 8th day of March, 2025.


                        ~~~~~~~~~~~~~~~~~~~~~~~~~
                        LILY I. REZNIK, CRR, RMR
                        Official Court Reporter
                        United States District Court
                        Austin Division
                        501 West 5th Street,
                        Suite 4153
                        Austin, Texas 78701
                        (512)391-8792
                        SOT Certification No. 4481
                        Expires:  1-31-27


        LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
          U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)