UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA ) Docket No. A 23-CR-135(1) RP
                         )
vs.                      ) Austin, Texas
                         )
SAINT JOVITE YOUNGBLOOD  ) April 16, 2024


TRANSCRIPT OF TRIAL ON THE MERITS
BEFORE THE HONORABLE ROBERT L. PITMAN
Volume 2 of 7


APPEARANCES:

For the United States:   Mr. Dan Guess
                         Mr. Matt Harding
                         Assistant U.S. Attorneys
                         903 San Jacinto Boulevard,
                         Suite 334
                         Austin, Texas 78701



For the Defendant:       Mr. Jose I. Gonzalez-Falla
                         Ms. Charlotte A. Herring
                         Assistant Federal Public Defenders
                         Lavaca Plaza
                         504 Lavaca Street, Suite 960
                         Austin, Texas 78701

Court Reporter:          Ms. Lily Iva Reznik, CRR, RMR
                         501 West 5th Street, Suite 4153
                         Austin, Texas 78701
                         (512)391-8792

Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

**I N D E X**

|                   | Direct | Cross | Redirect | Recross |
|-------------------|--------|-------|----------|---------|
| Witnesses:        |        |       |          |         |
| Scott Levins      | 10     |       |          |         |
| Darrell Lee       | 27     |       |          |         |
| Joseph Fiedler    | 36     | 72    | 107      |         |
| Jeffrey Bridgman  | 114    | 137   | 142      |         |
| Eric Perardi      | 143    |       |          |         |

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's |  |  |
| #1 | 66 | 66 |
| #9 | 121 | 121 |
| #15 | 7 | 7 |
| #31 | 43 | 43 |
| #32 | 44 | 44 |
| #33 through 57 | 43 | 43 |
| #58 through 59 | 65 | 65 |
| #60 through 63 | 43 | 43 |
| #69 | 32 | 32 |
| #72 | 13 | 13 |
| #75 | 134 | 134 |
| #76 | 126 | 126 |
| #77 | 127 | 128 |
| #310 | 70 | 71 |
| Defendant's |  |  |
| #59A through 70A | 90 | 90 |

THE COURT: Good morning.

Is there anything we need to take up before we bring the jury in?

MR. HARDING: There is something, Judge, yes.

THE COURT: All right. Is there anything we need to take up before we bring the jury in?

MS. HERRING: Yes, your Honor, just briefly.

THE COURT: Yes.

MS. HERRING: We wanted to request that the Court issue a proposed limiting instruction to the jury this morning. We had some concerns about Agent Wilkinson's testimony and we did request a transcript last night that the concern being the testimony about a check triggering a wire transaction, which we believe is an inaccurate both factual and legal statement. So we did want to offer a proposed instruction for the Court to consider giving to the jury.

THE COURT: Okay. Have you seen the proposed instruction?

MR. HARDING: I have, your Honor, and we object to it.

MS. HERRING: And the testimony that was given yesterday is on the back of that sheet. We had that pulled last night.

THE COURT: Okay. I'm not sure that a jury

instruction is the correct mode for correcting what you think is non-factual evidence.

MR. HARDING:  They asked the questions knowing she's not a lawyer.  They got the answer they got and I think if you read this in context, what Agent Wilkinson ultimately said was that depositing of a check -- the last thing.  When it's deposited, it initiated a wire transaction, she's talking about a chain of events here. They're asking for an instruction that essentially as a matter of law, depositing a check cannot satisfy this element or go to this element.  I think that's a matter for argument.

MS. HERRING:  We're asking for an instruction that jury be reminded that the Court is going to instruct on the law and the government bears the burden of proving that Mr. Youngblood transmitted or caused to be transmitted a wire communication.  The concern is the testimony yesterday that a check itself, when it is deposited in the bank, triggers a wire transaction.  That is not a correct statement of what a check does or doesn't do.

THE COURT:  The problem is that is factual evidence that needs to come in through either calling her to the stand again to cross-examine her if, at an appropriate time, you want to do that or if you have your

own witnesses who want to contradict that evidence.  But at any rate, I will certainly take up this issue and if there is a need to instruct the jury at the end of the case on anything like this, I think that'd be the more appropriate time to do it.

MS. HERRING:  Yes, your Honor.

THE COURT:  Thank you.

MR. HARDING:  Your Honor, from the government's side, we would ask as the jury's brought in, the first thing we'd like to do is enter the stipulation that the parties entered into and read that to the jury.  And then, we have two witnesses who are out-of-town witnesses that we would like to take out of order if that pleases the Court.

THE COURT:  If there's no objection from the defense.

MS. HERRING:  No objection, your Honor, but we would ask that the Court instruct the government on a going-forward basis that we be given the order that they intend to call the witnesses the night before.

THE COURT:  That would be helpful if you can do that.

MR. HARDING:  We've been giving our best estimate.  We have not been perfect on it, but we have been giving our best efforts.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

THE COURT:  Great.  That's all you can do.

All right.  Very good.

(Jury present.)

THE COURT:  Good morning, ladies and gentlemen of the jury.  This morning, to start off, if you recall during my initial instructions, I indicated to you that one of the types of evidence that you were to consider as evidence was something called a stipulation.  A stipulation is a set of facts to which both parties have agreed and that I will instruct you as a result to find as being true.  The attorney for the government is now going to read into the record what the stipulations in this case have been between the parties.

MR. HARDING:  Thank you, your Honor.  For the record, the government will offer Government's Exhibit 15.

THE COURT:  So admitted.

MR. HARDING:  Stipulation of evidence.  If called by the government, Robert Armenta would testify as follows:  Mr. Armenta is an employee of the Federal Reserve Bank of New York, also referred to as the New York Fed, and is an expert in the operation of the Fedwire Funds Service.  Mr. Armenta reviewed records maintained by the New York Fed related to the Fedwire Funds Service. Since April 27th, 2009, the processing of all Fedwire Funds transfer messages has involved a multistep process

and communication between two data centers in New Jersey and Texas, respectively.  The Fedwire Funds Service initially receives a Fedwire Funds -- excuse me, initially receives Fedwire Funds transfers at the service's primary processing site.  The Fedwire Funds Service application then sends a copy of the message to a secondary processing site and waits for a confirmation from the secondary processing site that the replicated copy also has arrived at that site.  The Fedwire Funds Service then settles the funds transfer by debiting the Fedwire sender's Federal Reserve bank account and crediting the Fedwire receiver's Federal Reserve bank account.

THE COURT:  Mr. Harding, I'm sorry.  I neglected to tell you that you will receive a verbatim copy of this.  Sorry about that.  You will receive verbatim copy of this to review in the juror room so you don't have to take notes.

MR. HARDING:  Actually, if we publish it, would that be all right, your Honor?

THE COURT:  Sure.

MR. HARDING:  Page 2 is where we're at now.  If we go to page 2.  Accordingly, all Fedwire Funds transfers processed through the Fedwire Funds Service after April 27, 2009 involved the transmission of signals by means of a wire in interstate commerce.  Mr. Armenta reviewed the

electric funds transfers alleged in Counts 1 through 4 of the second superseding indictment and concluded that all used the Fedwire Funds Service and, therefore, involved an interstate exchange of electronic communication.

One. As identified in Count 1 of the indictment, the transfer of $36,000 via interstate wire from account ending 6079 of Eric Perardi at Washington Federal to Eric Perardi's Wells Fargo account ending 6673.

Two. As identified in Count 2 of the indictment, the transfer of $50,000 via interstate wire from account ending 6079 of Eric Perardi at Washington Federal to Eric Perardi's Wells Fargo account ending 6673.

Three. As identified in Count 3 of the indictment, the transfer of $235,000 via interstate wire from the Gary Snider Roth IRA account ending 1952 from JP Morgan Chase to Gary Snider's Wells Fargo account ending 2952.

Four, as identified in Count 4 of the indictment, the transfer of $19,800 via interstate wire from account ending 3353 of Hanfu Lee at Bank of America to the Navy Federal Credit Union account ending 7070 of Kota Youngblood.

Each of these four transactions processed through the Fedwire Funds Service and involved an exchange of electronic communications between Federal Reserve

facilities in New York and Texas, signed by the attorneys for the government, attorneys for the defense, and Mr. Youngblood.

With that, your Honor, we would call Scott Levins as our first witness today.

THE COURT:  Good morning.  Take a seat.  If you could raise your right hand to be sworn.

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, I do.

THE COURT:  Please be seated.

SCOTT LEVINS, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. HARDING:

Q.   Mr. Levins, once you get situated, pull that microphone closer to your mouth, please, and then, will you please state your name and spell your last name for the court reporter?

A.   My name is Scott Levins.  The last name is spelled L-E-V-I-N-S.

Q.   And where do you work, sir?

A.   I work for the National Archives and Records Administration.  I'm responsible for an office called the

National Personnel Records Center, which is located in St. Louis, Missouri.

Q.   Can you briefly explain to the jury first what NARA is and, secondly, what that St. Louis facility is for?

A.   The National Archives Records Administration is involved in a lot of programs surrounding the management of the records that are created by the federal government and particularly with regard to those that are scheduled to be retained forever, like the U.S. Constitution.  The office that I work for, the National Personal Records Center, is an office in St. Louis where we store all the personnel records of the federal government, both military and civilian.

Since the 1960s, the government has tried to centralize those so that when you work -- either you serve in the armed services or you serve in a civilian capacity, after you separate, if you ever have a need to get some sort of documentation from your personnel files, you have one-stop shopping.  They're all located in our center in St. Louis.

Q.   And are you familiar -- you mentioned NARA maintains records both there the civilian side and military side. Do you have some experience with the records management of both civilian and military side?

A.   I'm responsible for both facilities.  There's two

different buildings in St. Louis that make up the center. We've got about 700 employees. Most of those employees work at the military facility because we get a lot of reference from military veterans who are seeking benefits. They need documents from their records to apply for federal benefits. We get between 5,000 and 6,000 requests every single day. And then, I'm a federal civilian, I've never served in the military. I can't imagine why I'd need something out of my personnel record when I separate from the National Archives, but sometimes people do. If they leave the job and they later want to apply for another federal job, they might need to get the last personnel action out of their file. So we do get some reference activity on the civilian side, as well, but not the same degree as the military.

Q. May I approach the witness, your Honor?

THE COURT: Yes.

Q. (BY MR. HARDING) Mr. Levins, I'm showing you what's been marked as Government's Exhibit 72 for identification purposes. Do you recognize Government's Exhibit 72?

A. Yes.

Q. What is Government's Exhibit 72?

A. So to prepare for this trial, we were asked to conduct some searches for a military record and civilian record, and I prepared this document so that I could show

exactly what criteria I used for each of the searches and what systems I queried to try to aid in those searches.

Q.    Is this a fair and accurate reflection of not only the databases you searched but, also, the search terms you used and results?

A.    Yes.

Q.    Government will offer Government's Exhibit 72.

MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.    (BY MR. HARDING) And if we could pull up Government's Exhibit 72, please.  You mentioned your involvement in this case sort of stem from our request; is that fair to say?

A.    Yes.

Q.    And we requested, our office or the Department of Justice requested that you search your records, all of your records for certain identifiers, names, dates of birth, Social Security numbers, correct?

A.    Correct.

Q.    And you, in fact, did conduct that search, which we'll discuss, but I do want to talk a little bit before we go into the results about a few of these indexes and databases.  Not all of them in detail.  But can you tell the jury what is contained within the Civilian Personnel Records Registry, or CPR Registry?

A.    It's basically an index that helps us locate physical records, the records are still maintained on paper in boxes on shelves in giant warehouses.  So when the record arrives, the personal information pertaining to the subject of the record is indexed with a location number on the building so that if anybody separates from the civilian service, they later need a record from us, they write to us, they give us their personal information, we query that registry system and it returns a number that corresponds to a location on a shelf in our building so we know where to go to pull the record.

Q.    So when you receive a record and this may be applicable more beyond just a CPR Registry, with all the registries you've got, you'll have both a registry index and then, an underlying document somewhere else.

A.    Exactly.  Just because you query the system and you have a hit for a registry number, that doesn't necessarily mean the record is on the shelf.  It means that at one point, the record was retired and we ingested it into our holdings.

Q.    And is the MPR Registry we see at the bottom of page 1 of Exhibit 72, is that essentially the same thing but for the military?

A.    It is.  Some of the fields that we can query on are a little bit different, but it works the same way.  Over

decades as military records are retired to our facility, we index the personal information of the member of the military with what we call a registry number, which corresponds to a location in our building.

Q.   And that's the sort of second from the bottom, the OPM EHRI, I'm just going to summarize for you and tell me if I'm accurate.  That's a database of current federal employees; is that correct?

A.   Yes.  So in the late 1990s, the military departments began their transition to electronic records and a little bit later, the civilian departments did, as well.  So like my personnel record, I work for the National Archives as a civilian, my record is maintained electronically in that EHRI system.  Our employees have access to that system so that if people who separated from the civilian workforce more recently, we might not have a paper record on our shelf, but there's an electronic record in the system.  So our staff will access it through that EHRI application, download it and send to it the requester.

Q.   And that brings up a good point.  Both the CPR Registry and the MPR Registry, those are analogue files, meaning like hardcopy files, correct?

A.   Yes.

Q.   And so, in general, are those going to be older files?

A.   Generally speaking, yes.  Like I said, the military departments transitioned beginning in the late '90s and wrapping up around 2004, 2005, and then, the civilian government was a little bit later than that.

Q.   So folks who separated from the military or civilian service prior to that date, they're going to have analogue records?

A.   Yes.

Q.   And subsequent to that date, there will be electronic records?

A.   Right.

Q.   And at least in some cases, those electronic records would be in the OPM EHRI?

A.   For civilian agencies, yes.

Q.   So when you're trying to find military records, do you sometimes get requests for folks who are -- you know, they want newer military records not analogue military records?

A.   Yes.

Q.   And what databases or how do you go about querying that?

A.   So when the military departments transitioned to electronic recordkeeping systems for their personnel records, they each developed their own system, but DOD built a web portal, which is not a repository of records,

but it's a tool that we can use -- our employees can be credentialed access in that system and they can query that system to access the electronic record systems used by the military departments.  It's called DPRIS.

Q.   So if I understand right, DPRIS is sort of the middleman between NARA and the actual military branches.

A.    Right.

Q.    Okay.  If we could go to page 2, please, and looking at page 2, the defense DPRIS section, we see for the Army that transition period where files were analogue versus electronic happened on October 1, 2002; is that correct?

A.    Correct.

Q.    So if someone separated from the Army prior to 2002, October 1, 2002, you'd expect to find records in the MPR Registry.

A.    We'd expect to have a paper record in our building and we would use the MPR Registry to locate it.

Q.    For those who separated after October 1, 2002, you would use DPRIS?

A.    Yes.

Q.    And if we could just go then to page 3, there's other databases that you search and we'll talk about these in brief detail, but go to page 4, please.  Let's start if we could highlight the very top portion of page 4 of Exhibit 72.  On the far left column of this page, what are we

looking at?

A.    The far left column is the criteria for the query that I used and each row is a different query.  And the column labels running to your right are the systems or indexes that I queried.

Q.    Okay.  And the things contained within the cells are your results?

A.    Correct.

Q.    So you ran Social Security number 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 through all of the registries at DPRIS, correct?  All the registries and databases except DPRIS.

A.    Correct.

Q.    Why did you not run it through DPRIS?

A.    With DPRIS, you need to enter both a Social Security number and a name.  So later in the document, you'll see a query criteria that includes both and then, you'll have the results from DPRIS.

Q.    You simply couldn't run it using just a social?

A.    Correct.

Q.    With respect to the CPR Registry, did you find any analogue records using that Social Security number?

A.    No.

Q.    Using the MPR Registry of old military records, did you find any responsive documents for that Social Security number?

A.    No.

Q.    For any of the other databases or indexes that you were able to search by Social, did you find any record related to that social?

A.    No.

Q.    Let's talk about the name Dennis Schuler.  What did you find when you ran the name Dennis Schuler through various databases?

A.    So negative in everything except the MPR registry.  When I ran it just on the name, no Social Security number, no middle initial, there were multiple hits.  When I -- when the information's displayed on your screen, it provides the name and then, it provides the service number or Social, which if you served after the 1960s, it's one in the same, and I scrolled through them and none of the Social Security numbers matched the subject.  So there were multiple Dennis Schulers but not matching that Social Security number.

Q.    If we could back out, please.  And let's just highlight sort of the entire bottom portion that we didn't just highlight.  With respect to all the search criteria and all the index or databases you searched, did you find any hits in any of those indexes or databases for any of these names or variations of these names?

A.    No.

Q.   Let's actually focus in on the Dennis J. Schuler line if we could.  What did you find when you searched for Dennis J. Schuler?

A.   So I searched for Dennis Schuler with the middle initial J and then, there were multiple hits.  I think there were three, I believe.  None of them matched the Social Security number that was provided.

Q.   And did any of them match the date of birth?

A.   No.

Q.   In fact, one of the -- you went back and you personally --

A.   Right.  The date of birth is not in the registry. It's a system that requires laying eyes on the record itself.  But for those three subjects, I went into our warehouse and pulled the records and looked at them.

Q.   And of those records, none of them matched the name Dennis Jay Schuler with a J-A-Y, correct?

A.   No.  There were three hits in the system.  The first one, Dennis, the letter J, Schuler turned out to be Dennis and I think the middle name was Joseph.  It wasn't the same one.

Q.   So no match.

A.   There were two hits that did match J-A-Y as the middle name.

Q.   And you did subsequent investigation into those?

A.    Yes.

Q.    And what did you find?

A.    It was not the subject of your inquiry.

Q.    If we could zoom out and go to the next page, please. So it looks like if we can focus, we'll get this whole area here.  Again, you ran those name variations on the top two lines, no results; is that right?

A.    Correct.

Q.    And then, it looks like only CPR Registry could be searched by date of birth and name; is that right?

A.    Right.

Q.    But again, with all the variations and combinations, no results?

A.    Negative.

Q.    What agencies in the civilian side does the CPR Registry cover?  What kind of documents?

A.    They cover any agency that sends us personnel records and pretty much the whole federal government sends us personnel records.

Q.    CIA?  Other intelligence --

A.    Intelligence agencies do send us records.

Q.    If we could back out, please.  And let's talk now at -- we're calling from the earlier pages, these three columns are DPRIS columns.  With respect to DPRIS Air Force, the easy one, you ran all these identifiers to

DPRIS Air Force, you got no results, correct?

A.   For DPRIS and the branch of service Air Force, we got a message back that said that the Social Security number was recognized, but there was no record.

Q.   Oh, I'm sorry, what's the one you got no results on?

A.   Navy.

Q.   DPRIS Navy, no results.  For DPRIS Army and DPRIS Air Force, you got the result you described here.  Positive on the Social Security but no responsive documents?

A.   When I say positive, it just conveyed the message that the Social Security number was recognized.  It doesn't mean that there was a record of service.

Q.   And so, let me ask you that.  DPRIS Army, again, is just a middleman between you guys and the Army?

A.   Right.  It's just a tool that enables our employees to be able to access the electronic records that reside in the Army's system.

Q.   And there are essentially two results you could get: Query with no responsive document or query with responsive document; is that fair to say?

A.   Right.  When you query -- what we're looking for routinely when people come in and they're looking for their military records, they give us their personal information, we query DPRIS, we download whatever documents they need from their electronic file, print them

out, certify them as authentic and mail them to them.

Q.   Based on the results that you found when you queried DPRIS Army and Air Force, did it turn out to be -- were there any responsive documents attached to the queries?

A.   No.

Q.   If we go to the last page.  Same when you searched the Social; is that correct?

A.   I think you need to scroll up to --

Q.   Back to the last page?

A.   I think it spilled over, yeah.

Q.   But again, same results queries but no responsive documents?

A.   Right.

Q.   So obviously, NARA only stores their documents it receives, correct?

A.   Correct.

Q.   So there's always a possibility that some agency never gave you the document.

A.   Correct.

Q.   Well, let me ask you about, say, classified documents.  Let's say somebody had a classified military record.  Would you still expect to see some documents?

A.   Yes.  We would expect to see a record, and if there were classified documents that were part of that record, they would have been removed from that record before it

was retired to us.

Q.   Would there still be an indication in your databases or registries that there were other documents that existed that just had not been transferred to you?

A.   Our registry system would just identify that the record existed and that we make no distinction with regard to the contents of the record.  It's when you the pull record that you would see a reference that there may be some other documents available somewhere else.

Q.   But even if there was a confident -- sort of classified government agent or military officer, you would still have -- you'd expect to see some record?

A.   Yes.  Most of the records are not glamorous. They're, you know, you worked from this date to this date. This is the type of health benefits you chose, life insurance you chose, things like that, things that would not normally be classified.

Q.   What about destruction of records?

A.   So when I speak to veterans group, if you've served in the U.S. military in the sense you've been immortalized because the military personnel record is among the very small percentage of federal records that are scheduled to be retained for the life of the republic so they'll be kept forever.  Military personnel records will never be at least intentionally, deliberately destroyed.

Q.   Have they been inadvertently destroyed?

A.   So we had a fire in 1973 that destroyed between 16 and 18 million Army and Air Force records from the World War II era.

Q.   Have you received requests from veterans from that era to recover their records?

A.   Yeah.  So over the years, we've received millions of them.

Q.   And to your knowledge, have you been able to do that?

A.   Yes.  We can't reconstruct the entire record necessarily, but when we receive a request from a veteran whose record was lost in that fire, what we try to do is look at other record series and we try to find three pieces of information, entry date, separation date and the character of service; and if we find those three pieces of information in official government records, then we can issue a document that can be used in lieu of a separation document and that veteran or their family member can pursue benefits.

Q.   Throughout any of your researches here, did you find any evidence of other documents that may have indicated that the original documents were destroyed?

A.   No.

Q.   So we talked about NARA may not receive the documents.  With the exception of NARA not receiving the

documents in the first place, us giving you incorrect identifiers, or the person named the identifiers not having served in any of these capacities, can you think of any other reason that you would not find results based on the researches you ran?

A.   No.

Q.   We'll pass the witness, Judge.

MS. HERRING:  No questions for this witness.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Thank you.

MR. HARDING:  Government will call Darrell Lee. And may this witnesses be excused, your Honor?

THE COURT:  Any objection to the witness being released?

MS. HERRING:  No, your Honor.

THE COURT:  Okay.  Yes.  Good morning.  Before you take a seat, could you please raise your right hand to be sworn.

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE COURT:  Please be seated.

DARRELL LEE, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. HARDING:

Q.   Mr. Lee, once you have a seat and be comfortable, please pull that microphone close to your mouth and then, will you please say your name and spell your last name for the court reporter?

A.   My name is Darrell Lee.  Last name spelling is L-E-E.

Q.   Where do you work, sir?

A.   I work for the Army Soldier Records Branch, which is part of Army Human Resources Command at Fort Knox, Kentucky.

Q.   How long have you been work in either civilian or military capacity?

A.   Thirty-five years.

Q.   What is your most recent posting and assignment and what do you do in that assignment?

A.   So my most current posting is as the policy proponent for the Army Soldier Records Branch.  So a proponent in the Army means we have the authority to execute and manage a program.  And me being the policy proponent means I write policy, I sustain that policy and interact with other policies throughout the Army that touch the Army soldier record, the human resource record.

Q.   And we're talking about Army records.  Can you tell us a little bit about the iPERMS database?  What that is?

A.   So iPERMS, the Interactive Personnel Electronic Records Management System.  It is the authoritative source for soldier service and for veterans for benefits, for compensation.  It is an electronic system which files documents for the Army and has done since October 2002 in electronic format.  That includes active duty, includes reserve, it includes national guard service, it includes up through separation, whether that's a normal discharge at the end of your contract or whether it's a retirement, or whether it is, unfortunately, some cases for death.  We retain those documents as part of the human resource record.

Q.   And we just heard from somebody from NARA.  They maintain some old analogue Army records; is that correct?

A.   Yes.

Q.   Can you describe kind of how that breaks down between what's an iPERMS and what's a NARA?

A.   So iPERMS as far as the electronic version of the human resource record was 1 October 2002.  So if you were serving on that day or still serving from before that point through that day, or if you've come into the Army and you're serving since then, your records would be stored in iPERMS.  If it was before that day, so 3rd of September 2002 or before, your records remain in hardcopy. So paper documents, microfiche documents would be stored

with NARA, the National Archives and Records Administration.

Q.   And so, just as a hypothetical, if somebody served in the military from 1993 to 2006 in active duty, their records should be in iPERMS?

A.   Yes.

Q.   Can you describe some -- don't go into too much detail.  A summary of some of the types of documents you would find in iPERMS for a typical soldier?

A.   Right.  So the Department of Defense prescribes certain categories of documents that will be stored in iPERMS.  Not every soldier would have all of those categories, but it's a good summation of the types of documents.  So a session document -- and a session is a term that the Army uses to mean onboarding.  So the processing of being from civilian status to military status.  So think of things like your initial contract between you and the Army.  I'm coming in for this many years, I'm serving for this long in this capacity.  You would have identity documents such as your Social Security card, your birth certificate.  You would have if you were an officer, you would have an appointment document and an oath of office document.  Other categories will be training and education.  So anytime you go to a course that the Army provides and you get a certificate, that

certificate should be uploaded into iPERMS because it's reflective of your training and education. Civilian education documents and primary military education documents, those courses that prepare you for promotion and the next level of leadership would be included.

Q. I'm going to stop you. I think that's enough, Mr. Lee, just to get a taste of it. But just to be clear, let me ask you since you are familiar with the military, is captain an officer rank?

A. Yes.

Q. Lieutenant?

A. Yes.

Q. So if somebody were a captain in the Army, you would expect to see promotion documents, officer documents tracking that progression?

A. Yes.

Q. If a person had received a Purple Heart or several Purple Hearts during their time in the military, would you expect to see that record?

A. Yes.

Q. That would be an iPERMS?

A. Yes.

Q. All right. What about classified? You have some folks who operate in a classified capacity, correct?

A. Yes.

Q.   Does that mean there are not going to be any record in iPERMS?

A.   They would still be tracked.

Q.   What would you expect to see in iPERMS under those circumstances?

A.   So for some special populations, you would see documents on the unclassified side that are not classified in and of itself for that document.  So think that initial contract again, at any point where someone goes into a classified category, if that record then goes to the classified side, there would be a placeholder document, which the Department of the Army 1613 is a records locator document that says anyone who has view access of iPERMS -- you're not allowed to see this particular document but it exists and it's a record of where it exists so that would be classified.

Q.   And our office -- the reason you're involved in this case and you got to fly down to Austin is our office asked you to run some queries; is that correct?

A.   Yes.

Q.   May I approach the witness, Judge?

THE COURT:  You may.

Q.   (BY MR. HARDING) Mr. Lee, I'm showing you what's been marked as Government's Exhibit 69 for identification purposes.  Do you recognize Government's Exhibit 69?  It's

kinda small.

A.    Yes.

Q.    What is Government's Exhibit 69?

A.    That is an Excel spreadsheet which I produced in accordance with your request for the search.

Q.    And it reflects not only the search terms and queries but, also, your results?

A.    Yes.

Q.    And you personally conducted this search?

A.    Yes.

Q.    Is it a fair and accurate depiction of results that you received?

A.    Yes.

Q.    Government will offer Government's Exhibit 69.

            MS. HERRING:  No objection.

            THE COURT:  So admitted.

Q.    (BY MR. HARDING) If we could just pull it up and highlight, if we could, just the left side here for now. What are we seeing in the left side of Government's Exhibit 69, the far left column, sir?

A.    Should I utilize this screen or laser pointer?

Q.    You can use the laser pointer, yeah.

A.    So these are the names which were submitted to me by the U.S. Attorney's office.  This is the date of birth that was supplied to me, the Social Security number which

was supplied to me, and then, everything else is a reflection of my search result describing those.

Q.   Let's start with the Social Security number because that's sort of the easiest.  When you input that Social Security number into iPERMS, did you receive any results?

A.   No.

Q.   Did you receive any results for any close variations on any of these names?

A.   So not the names themselves.  If you go over to the right, you will see some versions of just the last name to include some variations of the first name.  So no records were found for those particular names.  No record was found for that Social Security number.  We don't search, we don't retrieve records by date of birth alone, but it is a way to verify that record.

So if you just take the name Schuler and I included both common spellings of Schuler, which would be one L and two Ls, I can tell you that there are 783 soldiers who have served in the Army who have records and iPERMS with that spelling.  Of those, if you just truncate the last name to the first name to first three letters D-E-N, there are six of those, but they do not match.  So opening up every one of those records, there's no match.

If you include the last name spelling with two Ls, I can tell you there's 119 soldiers who have served

who have records at iPERMS, but they do not match any other identifiers.  There's no other way to find that record.  And then, the same for Youngblood with an E, there are zero records.  Youngblood without an E, I can tell you that there are 1,318 records in iPERMS with the last name Youngblood.  Again, just going further into the search just to make sure there's no first name, there's no variation of the middle name or first name, still comes back with zero results.

Q.   And cross-referencing any of those names with the Social resulted with no results?

A.   Right.  The Social to include just the first three, the last four, the first three, the last four, the last three, the last four.  Because I have to have three numbers, three characters in order to do the search.

Q.   So even partial Socials didn't match?

A.   Nothing.

Q.   Let's talk about DPRIS.  You know what DPRIS is?

A.   Yes.

Q.   Can you tell the jury briefly what DPRIS is?  We've heard a bit about it already.

A.   So Defense Personnel Records Information System is a conduit between other entities.  So like the VA might use it, NARA might use it.  It's basically a system where they have view access of iPERMS.  They don't store the records,

but it serves as a way for them to view the records that are in iPERMS.

So as a veteran, you might go through a DPRIS request to say, hey, I need a copy of my DD214, which is your statement of service for when you were on -- in the Army. They would be able to go into iPERMS and see that and they could download it and provide it to you because they don't have access to iPERMS as someone who's been separated from the Army. So it's a system to help utilize for veterans' benefits and other entities can use DPRIS, as well, to include law enforcement.

Q.   And is it fair to say that if the Army has no results, then DPRIS Army by definition cannot have any results?

A.   Right.

Q.   Because they're just querying iPERMS.

A.   Yes.

Q.   Aside from us giving you bad identifiers or the individual described in those identifiers having never served in the military, can you think of any other reason why you received the results that you received?

A.   No.

Q.   Pass the witness, Judge.

MS. HERRING:   No questions for this witness.

THE COURT:   Thank you.  You may step down.  Can

this witness be released?

MS. HERRING:  Yes, your Honor.

THE COURT:  You're free to go.

THE WITNESS:  Thank you.

THE COURT:  Next witness.

MR. HARDING:  Government calls Joe Fiedler.

THE COURT:  Before you take a seat, could you please raise your right hand to be sworn.

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE COURT:  Please be seated.

JOSEPH FIEDLER, called by the Government, duly sworn.

#### DIRECT EXAMINATION

BY MR. HARDING:

Q.   TFO Fiedler, once you've settled in, please pull that microphone close to yourself and then, tell -- say your first and last name and spell your last name for the court reporter.

A.   My name is Joseph Fiedler.  Last name is F-I-E-D-L-E-R.

Q.   And, Mr. Fiedler, TFO Fiedler, can you tell the jurors what you do and how long you've done it?

A.    Been a police officer for about 27 years, currently employed by the city of Temple.  I'm assigned to the Federal Bureau of Investigation in Waco where I've been up there for seven years.  Prior to that, I worked for the city of Harker Heights for a couple of years and then, started my law enforcement career in Texas, down here, little community called Mustang Ridge, which is just on the southeast side of Austin.  Prior to that, I was military police officer for four years in the Marine Corps.  So right about 31 years of experience in law enforcement.

Q.    Can you first talk about, briefly, your background in terms of the military?

A.    Yeah.  I joined the Marine Corps. in 1991.  I served four years as a U.S. Marine, stationed in Yuma, Arizona and stationed in Okinawa, Japan, but I got out in 1995.

Q.    And then, the rest of your time has been in law enforcement; is that correct?

A.    Correct.

Q.    Could you tell the -- is it fair to say your role in this case was to serve as an undercover officer?

A.    Yes, it was.

Q.    Undercover agent.  And let me -- can you tell the jurors, what is a TFO?

A.    That's a task force officer.  Local government

agencies such as city of Austin may enter into a memorandum of understanding with the federal agency and assign police officers to those task forces where they'll work with those federal agencies investigating different violations of federal law.

Q.   And so, you are authorized to make both state and federal arrests?

A.   That's correct.

Q.   For the purposes of just keeping this a little easier, I'm just going to call you Agent Fiedler, if that's right.

A.   That's fine.

Q.   Could you tell the jurors a little bit about your training and experience in the area of undercover operations?

A.   Yes.  I went through a very extensive selection process to the Federal Bureau of Investigation to be selected to attend the undercover certification course put on by the FBI.  It's two weeks kind of immersion-type course where you're learning different undercover investigative techniques and learn about legend building and the use of different identities.

Q.   When you say legend building, what do you mean by that?

A.   Depending on the case, you have to create a legend,

essentially what your persona is, who you are, where you come from, what you do for a living, things such as that, whatever you're going portray to the individual that is predicated, that's part of the investigation that you're targeting.

Q.   Is it fair to say that your role in this case was purely as an undercover agent?

A.   Yes.   That was correct.

Q.   Prior to your being reached out to by the FBI here in Austin, you didn't know anything about this case or Mr. Youngblood, or anything, right?

A.   I knew nothing in the case.

Q.   And after the undercover operation, you've had nothing else to do with it either except meeting with us to prepare, correct?

A.   No.   Once I completed my portion, I had no further investigative responsibilities in the case.

Q.   All right.   Well, let's talk about the undercover operation.   How did you get involved in this case?

A.   I was contacted by Special Agent Justin Noble.   He's assigned to the FBI here in Austin.   He requested my assistance with an individual that he had an active investigation on.

Q.   And based on the information that Agent Noble gave you, what did you do?

A.    I came down and I met with Agent Noble, his co-case agent, and they gave me a quick briefing on the case. During that, we set up a time that I would come back and meet with one of the victims in the case and get to know him.  Once I did that, then eventually, I was going to meet with an individual that was identified to me as Saint Jovite Youngblood.

Q.    Do you see Mr. Youngblood here in the courtroom?

A.    Yes, sitting right over there, dark hair and a black shirt.

Q.    May the record reflect the witness has identified the defendant?

        THE COURT:  Record will so reflect.

Q.    (BY MR. HARDING) We're jumping ahead a bit but that's the man you met on May 1st, 2023?

A.    Yes, it is.

Q.    And was Eric Perardi the victim that you met with at first?

A.    It was Mr. Perardi.

Q.    Tell the jury a little bit about how you and -- you talked about building a legend.  You talked about how the things you do.  How did you go about establishing some level of backstory with Mr. Perardi?

A.    So when I met with Mr. Perardi, I tried to get an understanding of what it was that he did for a living and

tried to find a reason that the two of us would have met and become friends. In this instance, I learned that Mr. Perardi was a real estate developer and where he built different commercial buildings, and whatnot, here in Austin area. So we built a legend around our contact being I was a contractor and I had worked on several projects with Mr. Perardi.

Q. And after you and Mr. Perardi came up with that sort of backstory, what did you do?

A. Myself and Mr. Perardi, we went and met with Mr. Youngblood at a restaurant. I believe it was Cabana's.

Q. Let me stop you just real quick. Prior to actually going to that restaurant, did you have a couple of phone calls with Mr. Youngblood to sort of step up query and that sort of thing?

A. Yes, I did. I contacted him via telephone. I had a conversation with him in regards to me wanting to help Mr. Perardi.

Q. And that conversation was recorded, correct?

A. Yes, it was.

Q. Okay. And we're jumping ahead again. May 1st was the sort of day one of the undercover operation, right?

A. Yes, it was.

Q. You also had some phone conversation with Mr. Youngblood on a case?

A.    Yes, I did.

Q.    When you went to the restaurant to meet with Mr. Youngblood, how did you travel there?

A.    Oh, we used a pickup truck that I had obtained from the FBI to use in the undercover operation.  We drove there.

Q.    And you and Mr. Perardi traveled together.

A.    Yes, we did.

Q.    And once you got there, who did you meet and where did you sit?

A.    We got to the restaurant, I was introduced to Mr. Youngblood.  He identified himself to me as Kota.  We were sitting in a little patio area that's just outside the restaurant where -- still got service from inside.

Q.    And were you wearing or did you have on your recording device?

A.    Yes, I did.

Q.    Your Honor, may I approach the witness?

        THE COURT:  You may.

Q.    (BY MR. HARDING) Agent Fiedler, I'm showing you a disc that has been marked with Exhibits 33 through 57 as well as 60 through 63.  Do you recognize that disc, sir?

A.    Yes, I do.

Q.    And what is that disc?

A.    This disc contains the entire recording from my

contact with Mr. Perardi and the other -- No. 33 to 57 and 60 through 63, I believe, were excerpts taken from that recording.

Q.   Sixty through 63 are actually the calls from?

A.   Are the phone calls.

Q.   And you've reviewed all the contents of this disc prior to coming to court today?

A.   Yes, I have.

Q.   And did you verify that both the audio of the undercover operation as well as the audio of the subsequent phone calls is accurately reflected in those exhibits?

A.   Yes, and I initialed the disc.

Q.   Government will offer then at this time, Government's Exhibits 33 through 57.  Excuse me, 31 which is the undercover audio.  That's what we're offering at this time.

MR. GONZALEZ-FALLA:  No objection, your Honor.

THE COURT:  So admitted.

MR. HARDING:  Then 33 through 57, which are excerpts from that audio.

MR. GONZALEZ-FALLA:  And no objection.

MR. HARDING:  And then, finally 60 through 63, which are the May 2nd phone call.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) And, Agent Fiedler, I'm showing you Government's Exhibit 32.  Do you recognize Government's Exhibit 32?

A.   Yes.

Q.   What is Government's Exhibit 32?

A.   This is a transcript of the portion of audio off of that CD.

Q.   And you've reviewed that and prepared it to the audio prior to coming to court today?

A.   Yes, I have.

Q.   With the exception of maybe a typo here and there, is that a fair reflection of the words spoken on the undercover audio?

A.   Best of my knowledge, yes.

Q.   And to the extent that it purports to identify the speakers on that audio, which I should say for the record is Government's Exhibit 31, is it accurate?

A.   Yes, it is.

Q.   Government are offer Government's Exhibit 32 at this time.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

MR. HARDING:  May we approach, your Honor?  I'm sorry.

(At the bench, on the record.)

MR. HARDING:  We expect this witness a little bit later in the morning, but I think it's appropriate to give this limiting instruction about the exhibit and the transcript.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  Okay.  Should we do it now?

MR. HARDING:  Yes, please.

(End of bench conference.)

THE COURT:  Ladies and gentlemen of the jury, an exhibit has just been admitted into evidence that is a transcript of a recorded conversation.  Exhibit 32 has been identified as a typewritten transcript of the oral conversation which can be heard on the tape recording received in evidence as Exhibit 31.  The transcript also purports to identify the speakers engaged in such conversation.

I have admitted the transcript for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the tape recording and, also, to aid you in identifying the speakers.  You're specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine based on your own evaluation

of the testimony you've heard concerning the preparation of the transcript and from your own examination of the transcript in relation to your hearing of the tape recording itself as the primary evidence of its own contents.

And if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.  It is what you hear on the tape that is evidence, not the transcript.

MR. HARDING:  Thank you, your Honor.

Q.   (BY MR. HARDING) So, Agent Fiedler, set the scene for us.  You've arrived at the restaurant.  You meet Mr. Youngblood.  What happens next?

A.   We engage in about an hour-and-a-half-long conversation in which Mr. Youngblood explains to me the situation that he's dealing with with Mr. Perardi and that he needs additional funds to continue helping Mr. Perardi to protect him and his family.

Q.   If you can just give -- again, it's an hour conversation plus.  Can you give maybe the, you know, 10,000-foot view of a summary of that conversation to the jury?

A.   My understanding from the contact I had with Mr. Youngblood, he had reached out to Mr. Perardi in regards to some information he had intercepted as some type of a

ghost agent or something working in Russia, in Ukraine, in which he had some contacts down in South America that had intercepted some communications regarding funds that had been laundered through a car dealership here in the Austin area.  At that car dealership, there was individuals -- I believe it was Julie and Rachel, one of them was the ex-wife of Mr. Perardi.  And money had been siphoned off of that money-laundering scheme by one of the individuals, either Julie or Rachel, and the money belonged to cartel members down in Mexico or somewhere in South America, and Mr. Perardi was responsible for making restitution to the cartels and if not, some type of violence or harm would come to Mr. Perardi and his family.

Q.   And how much at the end of this conversation, how much money did Mr. Youngblood ask you for?

A.   He asked me for $76,000.

Q.   And the purpose of that money was both to protect Mr. Perardi and was there another aspect to this conversation regarding maybe an investment?

A.   Yes.  I would receive for the $76,000, it would be added to funds that Mr. Youngblood had already obtained to make restitution to the cartels for the money that was laundered -- that was siphoned off the laundering operation at the car dealership.  I would receive back the money I invested with a hundred-percent interest.  So I

would receive 76,000 plus an additional 76,000. And then, once he had some type of a prosecutor or prosecutors either the Houston area or down in Mexico that were supposed to take some type of legal action against either the cartels or Julie or Rachel, and in that, there was a sum of gold bullion that was to be recovered or released. From where, I don't know. Approximately 2,000 ounces in which I would receive 25 percent of that that would be split between us roughly 25 percent.

Q. All right. And so, in summary, you were asked for money. It's going to protect Eric Perardi from some kind of cartel threat. It's also going to go towards this gold. Is that a fair summary?

A. Correct.

Q. All right. If we could then just jump right into and play Exhibit 33, which is one of the clips from the audio.

(Audio file played.)

Q. So just to be clear, we're going to play a few clips -- the whole conversation from start to finish, the whole recording is like an hour and a half long, right?

A. Yes.

Q. Fair to say the first portion actually starts when you're still at the FBI office?

A. Correct. Yeah, it's where the recording's actually activated there.

Q.   So the whole drive to the restaurant is recorded?

A.   Yes, it is.

Q.   And then, the conversation at the restaurant is recorded.

A.   Yes, it is.

Q.   And then, the whole drive back -- large part of the drive back is also recorded.

A.   Correct.

Q.   During this hour or so that you're having this conversation, you're also actually ordering food and having a meal, correct?

A.   Yes, we ate dinner there.  Or lunch.  We had lunch there.

Q.   So there's waiters and wait staff coming and going and asking you things of that nature?

A.   Yes.

Q.   But in this particular clip, Mr. Youngblood tells you he doesn't like to carry a phone.

A.   Yes, he did.

Q.   And sort of implied to you that maybe you shouldn't have your phone out either.

A.   Yes.  Yeah.  I had my phone out in the open visible.

Q.   Okay.  If we could move to Exhibit 34, please.

     (Audio file played.)

Q.   Saw the shirt, saw the tats.  What is that in

reference to?

A.    So I have tattoos on both my arms and I was wearing a T-shirt and on the T-shirt said Norse fitness and most of my tattoos are kind of Norse mythology related that he kind of referenced the tattoos and the T-shirt, I assume then to be a little bit more blue-collar type of person I was presenting.

Q.    Was the shirt and the tattoos military or that tattoo's military in nature?

A.    One of them was.  On my left arm up here, I have a very large eagle, globe and anchor which is the Marine Corps. Emblem.

Q.    If we could pull up--  continue, please.

            (Audio file played.)

Q.    Mr. Youngblood says he was Delta for seven years. What is Delta to your understanding?

A.    He pointed to a tattoo he had on his sleeve or on his arm.  I believe it was like kind of a -- maybe a spade or something with a sword through it, I can't really remember, with the Delta Force symbol, looks like, but he referenced Delta Force, which is a specialized operations group within the United States Army.

Q.    Mr. Youngblood says he worked SAG, special Activities Group.  Do you have any idea what that is?

A.    I do not.

Q.   Okay.  Proceed, please.

(Audio file played.)

Q.   Mr. Youngblood claimed to speak Russian, Pashtu, Urdu, Arabic; is that correct?

A.   Yes, he did.

Q.   And he refers to his theaters of operation being Middle East, you know, over there, Ukraine, but not South or Central America?

A.   That's correct.

Q.   If we could move then to Exhibit 35.

(Audio file played.)

Q.   So first of all, Mr. Youngblood told you he was active '93 to 2006; is that correct?

A.   Yes, he did.

Q.   He just asked what was your MOS.  Can you tell the jury what MOS is?

A.   Military occupational specialty.  It's what your job is in the military.

Q.   And what does a 352 MOS mean?

A.   I believe a 352 was a -- like a machine gunner.  I really can't remember exactly which MOS it is.  All the 0300s, 0311 on up is all infantry-based military operational specialty.

Q.   But this is, you know, lingo that a person who was familiar with the military might use?

A.    Yeah.  Marine Corps. uses MOS.  Army uses something a little bit different.  Each branch has a different acronym for their military specialties.

Q.    All right.  Could we please continue?

        (Audio file played.)

Q.    Now we're talking about your tattoos, correct?

A.    Yes.

Q.    Where is your tattoo, sir?

A.    This one.  It goes about halfway down my arm, goes all the way up, you know, across part of my chest and my neck.

Q.    You've reviewed this transcript with me prior to today, correct?

A.    Yes.

Q.    You maintain that you say it goes all way up to your neck.

A.    Yes, see how it...

Q.    Let's listen.

        (Audio file played.)

Q.    Mr. Youngblood claims he was born in Okinawa.  His father worked for the FBI?

A.    Camp Butler is the main headquarters there for the 11 different bases on Okinawa, Marine Corps. bases.

Q.    You have some familiarity with that base, correct?

A.    Yeah, I was stationed at Butler for a while.

Q.   Continue playing.

(Audio file played.)

Q.   During this part of the conversation, are you just trying to establish a rapport with Mr. Youngblood?

A.   Yeah.  We don't even know each other for maybe less than 10 minutes.

Q.   Okay.  And Mr. Youngblood claimed that he is a -- he freelances in some capacity for the Department of Defense?

A.   Yes.

Q.   Okay.  And what is what Lejeune when he mentioned Lejeune?

A.   Camp Lejeune, that's a Marine Corps. base in North Carolina.

Q.   Jumping ahead a little bit, if we could call up Exhibit 36, please.

(Audio file played.)

Q.   Mr. Barajones is one of these cartel figures that is somehow involved in this.  Is that your understanding?

A.   That's what I understood from the conversation.

(Audio file played.)

Q.   So Mr. Youngblood's referred to -- or you actually referred to Yelp, correct?

A.   Yes.

Q.   This conversation that you're having right there is about social media posts.

A.    Yeah, there was some type of posting on -- I don't recall exactly the full content of it on Yelp in regards to the situation that I was shown.

Q.    And Mr. Youngblood is saying that Mr. Barajones is essentially as bad as El Chapo.

A.    That's what I understood, he was cartel leader from Mexico.

Q.    Who's present at this table?  Who's all here during this conversation?

A.    Myself, Mr. Perardi and Mr. Youngblood.

Q.    Okay.  We could continue, please.

          (Audio file played.)

Q.    When Mr. Youngblood says Rachel went after his son, who was he talking about in that conversation?

A.    I believe it was Mr. Barajones' son.

Q.    Not Mr. Perardi's?

          MR. GONZALEZ-FALLA:  Judge, I'd object to the prosecutor leading the witness.

          THE COURT:  Sustained.

A.    Yeah, I don't know.

Q.    (BY MR. HARDING) Fair enough.  Go on.

          (Audio file played.)

Q.    Based on now the conversation about the divorce and custody, does it clarify or refresh your memory about who was potentially being referred to above?

A.    Yes, it does.

Q.    And who was that?

A.    Mr. Perardi.

Q.    Okay.  If we continue, please.

        (Audio file played.)

Q.    Mr. Youngblood's again referring to the social media posts, e-mails, texts, and he is suggesting that he personally knows that these things are accurate, correct?

A.    Yeah.

        MR. GONZALEZ-FALLA:  I object to him leading his witness.

        THE COURT:  Sustained.

Q.    (BY MR. HARDING) Then let me just ask you, sir, to read "the problem with those texts and e-mails is." That's sort of the middle of the page there.

A.    The problem with those texts and these e-mails is the dollar amounts and the banks are specific and they're right.  Now is he involved?  Absolutely not.  Here's where you get into trouble.  Commingling.  OFAC, Office of Foreign Asset Control will be Rachel and Julie's undoing. You do those reports, you could pull out 300 grand, it doesn't matter.  Fill out.  Fill out an 8300 form.

Q.    That's good enough.  Mr. Youngblood's referring, as we'll hear in a second, to the Office of Foreign Asset Control.

A.   Yes, OFAC.

Q.   Some forms you could fill out with OFAC?

A.   Yes.

Q.   Based on this conversation -- and we'll hear more of it in a minute -- does it appear that Mr. Youngblood has a fairly sophisticated knowledge of the financial system and financial regulation?

A.   Yes.  I wasn't familiar with what OFAC was.

Q.   Continue, please.

          (Audio file played.)

Q.   If we could pull up Exhibit 37, please.

          (Audio file played.)

Q.   Is this a reference -- you mentioned before, sort of some information Mr. Youngblood claimed to have and what the money would be used for.  Is this one aspect of that, what Mr. Youngblood's claiming?

A.   Yes.

Q.   Pull up Exhibit 38, please.

          (Audio file played.)

Q.   When he says, I don't care about him, I care about his phone, what was happening then, do you remember?

A.   It was just some random guy walking by.

Q.   Okay.  Continue playing, please.

          (Audio file played.)

Q.   And Exhibit 39, please.

(Audio file played.)

Q.   Who is Mr. Youngblood suggesting Rachel is working with or has some association with here?

A.   Different cartels but Los Zetas cartel, I think specifically, and the Gulf cartel he already mentioned previously.

Q.   At any point in this conversation that you can recall aside from -- there are a few occasions where Mr. Youngblood claims to receive information from other folks; is that correct?

A.   Yes.

Q.   But when he's presenting this information to you, is he suggesting that it's factually true?

A.   Yes.

Q.   Okay.  Exhibit 40, please.

(Audio file played.)

Q.   How much money did Mr. Youngblood claim that he had paid on Mr. Perardi's behalf to help him with his problems?

A.   $4,324,000.

Q.   If we could move then to Exhibit 41, please.

(Audio file played.)

Q.   During this clip we just listened to, Mr. Youngblood said on two occasions something along the lines of this never leaves this table.  Is that something that he said

fairly frequently during this conversation that it was important that you keep this information secret?

A.    Yes.  I took that he didn't want me to speak of it to anybody else.

Q.    And he's told you his eldest son Eventine had been murdered or killed?

A.    Yes, he did.

Q.    Could we move to Exhibit 42, please?

        (Audio file played.)

Q.    Mr. Youngblood told you he was a captain in the Army; is that correct?

A.    Yes.

Q.    Okay.

        (Audio file played.)

Q.    Agent Fiedler, if you'd do me a favor and read back what Mr. Youngblood said starting with "my lawyer once said."

A.    My lawyer once said some people are better at lying than you are telling the truth.  That doesn't mean you're a liar.  It just means that you're really damn good at it.  Or they're really damn good at it.  Excuse me.

Q.    Could we move to Exhibit 43, please?

        (Audio file played.)

Q.    What was the significance of the Gehrig bat and why you'd be holding onto it?

A.    He was offering some type of collateral for the $76,000.  In this instance, he offered a bat that was alleged to have been used by Lou Gehrig and he mentioned it had Lou Gehrig's DNA on it and that it was very valuable and I was to hold it and my money would be returned to me.

            (Audio file played.)

Q.    Go to 44, please.

            (Audio file played.)

Q.    At the outset of this, Mr. Youngblood said that he had friends of his watching over Mr. Perardi; is that correct?

A.    Yes, he did --

            MR. GONZALEZ-FALLA:  I object to the prosecutor leading this witness.  There's no reason to do that. There's a transcript.

Q.    (BY MR. HARDING) Sure.  If we could scroll to the top then.  If you could read lines 2 and 3.

A.    I just -- I'm worried about my kids' safety.  Working on it.  I have friends of mine already watching.

Q.    All right.  Thank you.  If we would pull up Exhibit 45, please.

            (Audio file played.)

Q.    Who is Mr. Youngblood saying "I'd do anything for you, you know that" to?

A.    It was directed to Mr. Perardi.

Q.    Continue, please.

(Audio file played.)

Q.    Mr. Youngblood -- what dollar value did Mr. Youngblood claim that Mr. Perardi's life insurance policy was?

A.    6.5 million.

Q.    Okay.  Can you read lines 10 to 11 starting with she put a -- she put a contract out?

A.    She put a -- she put a contract out because of the 6.5 million that his life insurance is.

Q.    And what do you understand "put a contract out" to mean?

A.    To kill.

Q.    All right.  Thank you.

(Audio file played.)

Q.    If we could pull up Exhibit 46, please.

(Audio file played.)

Q.    These people that are nobody's, who are they?  What is that talking about, do you remember?

A.    I don't remember what he was referring to.

Q.    Okay.

A.    That conversation.

(Audio file played.)

Q.    Can you pull up Exhibit 47, please?

(Audio file played.)

Q. When Mr. Youngblood says the flag's at your house, is he talking to you or is he talking to Mr. Perardi?

A. He's talking to Mr. Perardi.

Q. Exhibit 48, please.

(Audio file played.)

Q. Can you pull up Exhibit 49, please?

(Audio file played.)

Q. Agent Fiedler, can you read lines 3 through 6, the places that Mr. Youngblood lived as a child?

A. Okinawa, then Moscow, then literally, Hong Kong, Johannesburg, Sudan, Morocco, Detroit, Michigan, New York City, Ohio, Raleigh.

Q. And what did Mr. Youngblood say happened to his father -- his parents?

A. He was killed in a car crash. Or I guess both his parents were killed in a car crash.

Q. Exhibit 50, please.

(Audio file played.)

Q. Exhibit 51, please.

(Audio file played.)

Q. This bat Mr. Youngblood's describing, did you ultimately receive that bat?

A. Yes, he gave it to me.

Q. And what is the -- Mr. Youngblood implies it's worth

a certain dollar value.  How much?

A.   Over a million dollars.

Q.   Exhibit 52, please.

(Audio file played.)

Q.   You've said earlier, your involvement in this investigation is very limited.  Do you have really any idea what he's talking about here in terms of specifics?

A.   I had no idea what he was talking about.

Q.   Okay.  Continue.

(Audio file played.)

Q.   So Mr. Youngblood does a lot of talking in this recording; is that right?

A.   Yes, he does.

Q.   You mostly respond very briefly.

A.   Correct.

Q.   Why is that?

A.   Just wanted to encourage him to keep talking.

Q.   Is that something you were trained in?

A.   Yes.  It's called a minimal encourager.  Just to let them know you're listening and paying attention to them.

Q.   Because the point isn't to record you.

A.   I didn't understand what he was talking about at all. I still don't.

Q.   Continue, please.

(Audio file played.)

Q.   Mr. Youngblood's talking about his chain in command and polygraphs.  What did you understand his reference to a chain of command to mean?

A.   Previously, he'd mentioned working for the Department of Defense so some supervisory chain of command he had to report to.

Q.   He's having to justify himself somehow with them?

A.   Yeah.

(Audio file played.)

Q.   Pull up Exhibit 53, please.

(Audio file played.)

Q.   Is this your reference back to the debt that's supposedly owed?

A.   Yeah.  I was just adding it up in my head and seemed to be short.

Q.   Okay.

(Audio file played.)

Q.   At the earlier part in your testimony, you said there's sort of a gold component to this story.  Is this what you're referring to?

A.   Yes, it was.

Q.   If we could pull up Exhibit 54, please.

(Audio file played.)

Q.   Was this the 76,000 you referred to at the beginning?

A.   Yes, it is.

Q.   Exhibit 55, please.

        (Audio file played.)

Q.   And then, Exhibit 56, please.

        (Audio file played.)

Q.   Did you wind up going with them to go get the bat?

A.   No.

Q.   What happened next then after -- well, what happened next?

A.   He brought the bat to us.

Q.   So Mr. Youngblood, Mr. Perardi left together?

A.   Yes.

Q.   And then, returned together with the bat?

A.   With the bat, yes.

Q.   May I approach the witness, Judge?

        THE COURT:   You may.

Q.   (BY MR. HARDING) Agent Fiedler, I'm showing you Government's Exhibit 358 and 59 for identification purposes.  Do you recognize Government's Exhibit 58 and 59?

A.   Yes, I do.

Q.   What is depicted in Government's 58 and 59?

A.   It's a photograph of the bat wrapped in plastic as it was when I received it.

Q.   On the May 1st, 2023?

A.   Yes.

Q.   Is it a fair and accurate depiction of how the bat looked on that date?

A.   Yes, it is.

MR. HARDING:  Government will offer Government's Exhibit 58 and 59.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) Before you take a look at those, if we could pull up Exhibit 57, please.

(Audio file played.)

Q.   And if we could now then pull up Exhibit 58.  Zoom in, please, the middle here.  In Exhibit 57, you could be heard saying not for sale?

A.   That's correct.

Q.   What is the significance of that with respect to Government's Exhibit 58?

A.   The sticky note's actually taped on there, I believe, or somehow in the plastic.  I saw that and I just read it out loud.

Q.   That was on there when you first saw the bat?

A.   Yes.

Q.   Is this the same condition as when you saw it?

A.   Yes.

Q.   You didn't have the word "Gehrig" on it?

A.   I did not.

Q.   And Exhibit 59, please.  Just a closer look at that same bat?

A.   Yes.

Q.   One moment, your Honor.  Agent Fiedler, could you please open up this box, which is marked as Exhibit 1 for identification purposes?  What is Government's Exhibit 1?

A.   It's a baseball bat.

Q.   Is it the baseball bat that you received from Mr. Youngblood and Perardi on May 1st, 2023?

A.   It was wrapped in the plastic so I never saw the actual bat, but yes, it's marked -- it was marked into evidence once I turned it over to the agents.

Q.   With the exception of -- the jury can't see this but the bat has been removed from the tape since the pictures in Exhibit 58?

A.   That's correct.

Q.   Is that correct?

A.   That's correct.

Q.   With the exception of that, focusing on the taped portion if you can, sir, is that in the same condition as when you first saw it?

A.   Yes.  Just with the bat.

Q.   The government will offer Government's Exhibit 1.

          MR. GONZALEZ-FALLA:  No objection.

          THE COURT:  So admitted.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

MR. HARDING: We'd ask that the witness be allowed to show Government's Exhibit 1, both pieces to the jury.

THE COURT: Yes.

Q. (BY MR. HARDING) Could you step down, Agent Fiedler, and show Exhibit 1 to the jury, please. If you could move down to the left a little bit, Agent Fiedler, show the folks on the left side of the jury. Thank you very much.

Just while I'm up here with you, there's a chain of custody sort of log on this bat; is that correct? Or on this box, I should say.

A. Yes.

Q. And what date is reflected?

A. 5-21-23.

Q. Could you read that again?

A. Oh, I'm sorry 5-1-23.

Q. May 1st of '23?

A. Yes.

Q. And who first seized it first on chain of custody?

A. Special Agent Justin Noble.

Q. And when you received the bat, you brought it back to the office. Who did you give it to?

A. Justin Noble.

Q. After you received the bat, brought it back to FBI, gave it to Agent Noble, was your sort of role for May 1st

done?  Did you do anything else on that day?

A.   On that day, no.

Q.   Did you arrange -- sounds like we have some clips of this.  Did you arrange at some point to meet with Mr. Youngblood the following day to give him the money?

A.   Yes.  I was supposed to meet him the following day to deliver cash.

Q.   Did you have any actual intention of delivering that cash?

A.   I did not.

Q.   Did you even come to Austin on May 2nd?

A.   Did not.

Q.   But did you have several phone calls with Mr. Youngblood about that topic?

A.   Yes, I did.

Q.   And these have already been admitted as Government's Exhibit 60 through 63 so I'll ask if we could pull up Exhibit 60, please.

          (Audio file played.)

Q.   That was your first call with Mr. Youngblood.  Was there a subsequent -- there's several subsequent calls after that, correct?

A.   Yes, there was.

Q.   And again, although you've told him you're on your way, you're good to get the money in a couple of hours,

that's just a lie.

A.    Yeah, I was not going to meet him.

Q.    If we could call up Exhibit 61, please.

           (Audio file played.)

Q.    Are you familiar with Austin landmarks particularly?

A.    No.

Q.    Is that why you're kind of showing --

A.    I don't know where that is.

Q.    Okay.  Continue, please.

           (Audio file played.)

Q.    So during this time, are you in contact with Agent Wilkinson and Agent Noble?

A.    Yes, I am.

Q.    And since you're not in Austin, are they giving you sort of updates on what's happening in Austin?

A.    Yes, they are.

Q.    Before the next call comes, does Agent Wilkinson tell you something about Mr. Youngblood being with another person?

A.    Yeah.  They were sitting outside the restaurant and he had somebody with him.

Q.    And that's going to play a part in this next call?

A.    It is.

Q.    Pull up Exhibit 62, please.

           (Audio file played.)

Q.   And of course, you say you're about 10 minutes out, but that's not correct?

A.   No.

Q.   Play Exhibit 63, please.

          (Audio file played.)

Q.   You didn't actually go.

A.   No, I did not.

Q.   And may I approach the witness for the last time, Judge?

          THE COURT:  You may.

Q.   (BY MR. HARDING) Agent Fiedler, I'm showing you what's been marked as Government's Exhibit 310 for identification purposes.  Is Government's Exhibit 310 a summary of -- an accurate summary of some of the things that Mr. Youngblood said during the recordings that we just listened to?

A.   Yes, it is.

Q.   And do you think it would help the jury to understand your testimony if they were able to see Government's Exhibit 310?

A.   I believe it would.

          MR. GONZALEZ-FALLA:  Your Honor, we've never seen 310.

          MR. GONZALEZ-FALLA:  I'd tender to counsel now.

          THE COURT:  Yeah.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) If we'd just publish 310, please. Again, just a summary of some of the things we covered today here during this conversation.

A.   That's correct.

Q.   I think as you testified at the beginning, after this undercover operation ended, you had no further involvement in this case until we contacted you to testify here in court?

A.   That's correct.  I did not.

Q.   Pass the witness, Judge.

THE COURT:  Ladies and gentlemen of the jury, this is a good time for us to take our first of two 20-minute breaks.  Let's call it 10:55, give you another couple of minutes.  And so, if you can be assembled in the jury room and ready to go, come back into the courtroom at 11:15, we will commence testimony at that time.  In the meantime, please don't talk to anyone, including each other, about this case.  And please don't engage in any independent investigation.  We'll see you back here at 11:15.

(Jury not present.)

THE COURT:  We'll be in recess until 11:15.

(Recess.)

(Jury present.)

THE COURT:  Mr. Gonzalez-Falla.

MR. GONZALEZ-FALLA:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. GONZALEZ-FALLA:

Q.   Good afternoon, Officer Fiedler.  My name is Jose Gonzalez-Falla.  I'm representing Mr. Youngblood.  We haven't had a chance to talk, have we?

A.   No, sir, we haven't.

Q.   So, Officer Fiedler, you were saying your role in this was as an undercover officer.  You came into this case kind of late while things were already underway and you were just going to go in there and participate in this meeting?

A.   That's correct.

Q.   But nonetheless, you had prepared for this meeting by developing what you'd characterize as a legend?

A.   That's correct.

Q.   Which is a role?

A.   Yes.

Q.   And the role you were going to play was a friend or loyal friend of Mr. Perardi's who you had met through construction?

A.   That's correct.

Q.   Business; is that right?

A.    Correct.

Q.    And you met with Mr. Perardi in order to prepare for this role.

A.    I did.

Q.    Because you were going to be a close friend of Mr. Perardi, you'd have to know background about Mr. Perardi.

A.    I'd have to know some, yes.

Q.    You'd have to know and you were kind of a working-class guy.

A.    Correct.

Q.    You poured concrete, steel in construction.

A.    Correct.

Q.    And you were going to give up a significant amount of money.

A.    I was.

Q.    $76,000?

A.    Yes, that was the plan.

Q.    $76,000 that you had earned through your hard work.

A.    Correct.

Q.    You toil, you use your back when you work.  You're not somebody who's just sitting in an office like I do all day, right?

A.    That's correct.

Q.    Okay.  So to give up $76,000 would be a large sum of money for you.

A.   True.

Q.   In the legend that you had assumed.  In the role that you were playing.

A.   Yes.

Q.   Because when you came to this meeting, you weren't a business associate of Mr. Perardi's.  You were somebody that had met him through the construction business?

A.   That's correct.

Q.   And so, you wanted to portray yourself credibly as not only somebody who was working class but somebody who cared about the money that you were going to be giving to this man, Mr. Youngblood.

A.   That's correct.

Q.   Now, in preparing for the meeting, you met with Mr. Perardi how many times?

A.   I believe just once.

Q.   And you did not make any report about this meeting with Mr. Perardi where you developed this legend, right?

A.   I did not.

Q.   And when you met with him that one time, how long did that meeting last?

A.   I don't recall.

Q.   Was it a long meeting?  A brief meeting?

A.   It was probably an hour or so.

Q.   And who was present during that meeting?

A.   Myself, Mr. Perardi, Special Agent Noble, and I believe there may have been -- I think Special Agent Wilkinson was there, as well.

Q.   And where did the meeting take place?

A.   At the FBI office here in Austin.

Q.   Now, I know you're looking at the jury but I'm the one who's talking to you.

A.   Yes, sir.

Q.   Would you mind --

A.   Yes, sir.

Q.   -- looking at me when I talk to you?

THE COURT:  Counsel, he can look wherever he wants.

MR. GONZALEZ-FALLA:  I'm sorry?

THE COURT:  You're asking him to look at you instead of the jury?

MR. GONZALEZ-FALLA:  I'm trying to make eye contact with him, Judge.  Yeah.

THE COURT:  Okay.  Well, you can look wherever you want.

MR. GONZALEZ-FALLA:  I mean, maybe I don't know that's inappropriate, Judge.

THE COURT:  Okay.  Yeah.

Q.   (BY MR. GONZALEZ-FALLA) Anyway, so the two FBI agents were present, you were there with Mr. Perardi.  Were you

aware how long Mr. Perardi had been making payments to Mr. Youngblood?

A.   I did not.

Q.   Was that discussed at all during the meeting?

A.   I don't recall.  I don't recall that.

Q.   When did the meeting take place?

A.   It was a day or two prior, I believe, to the 1st of May.  I don't remember the exact date.

Q.   So it was May 1st is when the undercover meeting took place; is that right?  May 1st is when the undercover meeting took place?

A.   Yes.

Q.   You met two days after the undercover meeting with the FBI and Mr. Perardi?

A.   It was sometime before that.  I don't recall the exact day that we met.

Q.   So right now, we're in the middle of April so it was about a year ago?

A.   Yes.  Almost to a year.  Almost a year.

Q.   And this meeting that you had with Mr. Perardi, did Mr. Perardi tell you about the problems that he had had that led up to this payment being made?

A.   We discussed some of them, yes.

Q.   Did he tell you that he -- did he tell you a specific reason why he needed the money?

A.   Why Mr. Perardi needed the money?

Q.   Did Mr. Perardi give you a specific reason why he needed the money?

A.   I believe Agent Noble and Agent Wilkinson had given me that information.

Q.   So Mr. Perardi did not give you a specific reason?

A.   Well, I think by that -- point of that meeting, he had already been to the FBI.  There was no money to change place -- to change hands.

Q.   Did he tell you, Mr. Fiedler, I need $76,000 for this specific purpose at that meeting where you're going to assume the role that you're going to play?

A.   No.  I don't think we even -- we had an amount at that time.  The amount I don't think came until Mr. Youngblood mentioned it in the meeting on the 1st.

Q.   So there was not a --

A.   When the specific amount --

Q.   -- there was not a specific amount?

A.   Not at the meeting at that time, no.  I don't recall.

Q.   So when you were taking -- when you were going to assume the role that you were going to play, you did not have a specific amount?

A.   I don't believe we did at that point.

Q.   You didn't.

A.   I don't believe we did at that point.

Q.   Okay.   And you did have a specific purpose for the money.

A.   If there was money to be paid, yeah, there would be a specific purpose for it.

Q.   No.   But I mean, Mr. Perardi didn't tell you a specific purpose, did he?

A.   On the pre-meet?

Q.   When you're getting your role when you're establishing your --

A.   The legend?

Q.   The role you were going to play, yeah.

A.   The money wasn't part of establishing the legend. That was just us getting to know a little bit about Mr. Perardi so we could make the meeting seem normal as if we had known each for a period of time.   As far as --

Q.   So knowing the reason that you were going to be paying this money would not help you fulfill your role in this meeting?

A.   An undetermined amount of money, yes, not 76,000.   I didn't know at the time what the amount of money was going to be.

Q.   Oh, did you have a general idea?

A.   No, I did not.   I know he had close to 800,000 what I understood at the time so I knew it would be significant.

Q.   Was part of your role you were going to have to

credibly be able to come up with the money, right?

A.   That's correct.

Q.   And so, as part of your role, how were you going to come up with the money?  What was your story?

A.   Well, I was in the construction business.  It was very lucrative after working under Mr. Perardi on several projects and I poured concrete.  Not physically.  I didn't pour the concrete myself, but I had people pour for me.  I had the companies that contracted these with Mr. Perardi.

Q.   You were going to have cash, right?

A.   I probably would have had cash, yes.

Q.   Well, this was about cash.  It was about you bringing cash to Mr. Youngblood, right?

A.   That's correct.

Q.   That was part of the role you were taking.  So when you were preparing for the role then, you didn't know how many payments Mr. Perardi had met.

A.   I did not.

Q.   You didn't know the specifics of what these payments were for.

A.   No, I did not.

Q.   You did not know how long Mr. Perardi had been making payments to Mr. Youngblood.

A.   No, I did not know the total duration.

Q.   You did not know the amounts of the payments that Mr.

Perardi had been making to Mr. Youngblood.

A.   I did not.

Q.   And you didn't know when the last payment was made by Mr. Perardi to Mr. Youngblood.

A.   I did not.

Q.   Or who Mr. Perardi had been making these payments to.

A.   I believe he was making them to Mr. Youngblood is what I was --

Q.   Did you know, in fact, he had made them to another person?

A.   A physical transfer of the money, no.

Q.   Had you heard of a person named Jay Holloway?

A.   I had been mentioned at that point.

Q.   Was that the individual at the meeting?

A.   I believe so, yes.

Q.   Jay Holloway?

A.   I believe so.

Q.   And his name came up because he was an intermediary or how did his name come up?

A.   There were some intermediaries that he had been dealing with.  I couldn't remember exactly who they were at the time.

Q.   "He" being Mr. Perardi?

A.   Mr. Perardi.

Q.   Now, did Mr. Perardi tell you that he had been going

through a divorce?

A.   Yes.

Q.   And did he tell you that his soon-to-be-ex-wife, or at some point would be his ex-wife, was Rachel Perardi?

A.   Yes.

Q.   And did he tell you that he had believed that Ms. Perardi was a user of cocaine?

A.   I don't recall that.

Q.   You don't recall him saying that?

A.   No.

Q.   Did you recall him saying that he believed that Rachel Perardi had been promiscuous?

A.   That I believe, yes.

Q.   And when Mr. Perardi told you he believed his, at some point, ex-wife had been promiscuous, did he state this to you as a fact?

A.   I don't know.

Q.   Do you know whether he stated it was something that I believe or something that I know to be true?  Do you know the difference?

A.   I do know the difference, yes?

Q.   And did he make a distinction to you when he told you about Rachel Perardi being promiscuous?

A.   I don't know.

Q.   You don't know?

A.   I don't know.

Q.   So when you went to that meeting with this role that you had assumed, was part of that role that you were helping a friend who had been cuckolded by his wife, is that part of your role?

A.   I was helping a friend that had fear for his family they would come to harm.  As far as the involvement between him and his wife and the promiscuity of his wife was not something that I needed much information on or even planned to delve into.

Q.   But it's still an important fact, isn't it?

A.   Just the knowledge of it, yes, but I didn't need all the details of that.

Q.   And that came up during the meeting?

A.   Mr. Youngblood mentioned it, yes, but we can't discuss it.

Q.   Mr. Perardi had also mentioned it during the meeting that you had before going to the undercover meeting?

A.   Right.  We didn't discuss it in the meeting.  Mr. Youngblood mentioned it and then he --

Q.   No.  I'm saying that during the meeting when you're setting up your role so that you can be credible, Mr. Perardi mentioned that Rachel Perardi had been unfaithful.

A.   He did, yes.

Q.   Did he tell you how many times?

A.    No.

Q.    Mr. Perardi had been -- did he tell you why he believed she had been unfaithful?

A.    No.

Q.    Did you ask him?

A.    I did not.

Q.    Did he tell you that he had been led to believe that she was connected to a cartel?

A.    Yes.

Q.    At that point, did he no longer believe that she was connected to a cartel or do you know?

A.    I don't know.

Q.    And she had -- did he tell you that he had acquired a flag from Mr. Youngblood?

A.    Yes, he did.

Q.    Did he tell you -- did you ever see the flag?

A.    I did not.

Q.    But you did tell Mr. Youngblood that you had seen the flag during that meeting, did you not?

A.    I Googled it.  I wasn't familiar with the battle flag.

Q.    Did you tell Mr. Youngblood that you had seen the flag?

A.    I don't recall telling him that, no.

Q.    During the meeting?

A.   No.

Q.   Did you tell him during a phone call that you had liked the flag, that you were impressed by it, one of the recorded calls?

A.   It's possible, yeah.  I knew the flag was in the custody of Mr. Perardi so I may have said I had seen it. He didn't believe that I had been to Mr. Perardi's house.

Q.   Did Mr. Perardi tell you that what had caused him to go to the FBI was his learning that Mr. Youngblood was not the true owner of the flag?

A.   I seem -- I recall something about that, yes.

Q.   That Mr. Perardi told you that or that the FBI told you that?

A.   FBI, I believe, told me that.

Q.   That the reason Mr. Perardi had come to them was because he had learned that this flag was a fake -- not the flag was a fake but Mr. Youngblood didn't own it?

A.   I recall something to that effect.

Q.   Did Mr. Perardi tell you that he had invested much with Mr. Youngblood?

A.   Agent Noble had told me that prior to.  But yes, he concurred with what Agent Noble had told me.

Q.   That there was an investment?

A.   I don't know if he called it an investment.  I think the funds were to pay back an alleged debt to a cartel for

money laundering from an --

Q.   Well, hadn't Mr. Perardi told you that he wanted to get his money back?

A.   Of course.

Q.   In your experience, is it common for somebody who makes an extortion payment to have their money returned to them?

A.   Well, they find out it's a fraud, yeah, absolutely.

Q.   Well, this is -- I'm talking about when Mr. Perardi's making these payments to Mr. Youngblood, he was doing that with the belief that he was investing in something.  Did you know that?  Were you told that in your preparations to assume your role?

A.   From what I understood, the payments were made for protection of his family for the payback of a debt to a cartel.  If that's investment for the sake of his family, then if he referred to it as that, I don't know.

Q.   When you were preparing for this meeting, you were not told by Mr. Perardi or by the FBI that these payments were serving as an investment with an expected return on the investment.  Is that news to you now?

A.   I believe he was promised a return on his funds.  But when I think of investments in stocks and in real estate, I wouldn't consider this an investment.  Whether he used that or not, I couldn't tell you.

Q.   Now, Mr. Perardi said he wanted his money back that he expected to get his money back, right?

A.   I would think so, yeah.

Q.   He had been told he would get his money back?

A.   By Mr. Youngblood?  I believe so.

Q.   Well, by Mr. Youngblood.  And that the flag was a way of securing the money that he had been paying; is that true?

A.   I believe that was part of the money that he had given, that was given as collateral in some aspect.

Q.   And so, now when the flag apparently not even owned by Mr. Youngblood, that collateral is put at risk, isn't it?

A.   I would believe so, yes.

Q.   So his return is put at risk.  Whether he's going to get his money back is put at risk, right?

A.   My knowledge of this case is after he had gone to the FBI.

Q.   Yeah.

A.   What his mindset was prior to, I have no idea.

Q.   Well, I mean, you go to this meeting because Mr. Perardi wants to get his money back.

A.   After the FBI had established that the story that he had been fed was false, that information was given to me by the agents.

Q.   Okay.  Well, let's go back to --

A.   What his mindset was prior to, I cannot tell you.  I don't know.

Q.   So when you go to this meeting then, Mr. Perardi at that point certainly no longer believed that his life was in danger.

A.   I don't know whether he was convinced or not.

Q.   Okay.  He knew that he'd been deceived.

A.   I believe he did.

Q.   He knew that he'd been scammed, right?

A.   I believe he did.

Q.   And this meeting, you're going to make an offer of payment.  You're going to see if you're going to pay cash, but no amount has been determined but we can say reasonably that it was a significant amount of money that you were going to pay in cash, right?

A.   Yes.

Q.   So before you went to the meeting, did you listen to a recorded phone call or did you overhear a recorded phone call between Mr. Perardi and Mr. Youngblood?

A.   Before the 1st?

Q.   Yes.

A.   I did.

Q.   And that's Government's Exhibit No. 20.  Would you play 20?  Let me just say before she plays this recording,

you and Mr. Perardi were together, I suppose, you were overhearing the conversation?

A.    I don't believe it was played for me.  What I meant was Agent Noble, Agent Wilkinson and Mr. Perardi, I believe all --

Q.    Okay.  So they just replayed it for you to hear?

A.    From what I recall, it was recorded.

Q.    This is in evidence as Government's Exhibit No. 20.

(Audio file played.)

Q.    Okay.  So now, this recording, did you hear any other recordings besides this one?

A.    I don't recall.  I remember hearing this one but it's probably --

Q.    You don't remember hearing any other recordings?

A.    No.

Q.    Okay.  Now, when you go to the meeting, then there was going to be money that was going to be -- that you were going to probably provide.  Now, when you're in there in your undercover capacity, are you there to help develop information?

A.    I'm there to elicit, yeah, to obtain information from Mr. Youngblood.

Q.    As long as it's appropriate with your role?

A.    Correct.

Q.    Right.  You don't want to act inconsistent with your

role.

A.   Correct.

Q.   You don't want to alert yourself maybe you're not who you say you are.

A.   Correct.

Q.   So you could steer the conversation, right?

A.   Sure.

Q.   You could seek clarifications?

A.   Uh-huh.

Q.   You could try to understand the specifics of what people are talking about?

A.   Yeah, to the best you can, yeah.

Q.   As long as you stay consistent with the role that you're playing.

A.   Sure.

Q.   Okay.  So we heard a lot of the clips.  The jury hasn't heard the entire, you know, recording because it's rather lengthy.  But from that recording, I've made some clips, as well.  Probably put some emphasis on some aspects of what was going on there because one of the things that, you know -- well, let's just start playing through here and I'll take these in order.  Now, they are in chronological order with when they occurred during the meeting.

          And so, the first clip is Defendant's Exhibit No.

59 and in this clip, this is where Mr. Youngblood begins to talk about what -- I thought these had been pre-admitted, your Honor, and these have not. Okay. So, Judge, I thought these had been pre-admitted, but these are Exhibits No. 59, 59A. And actually, they're 59 -- go all the way, 59 through 70A and those Exhibits 59 through 70A are all taken from the Government's Exhibit of the recording of the undercover meeting. And A is a transcript that was taken from those portions that have been excerpted and those transcripts were also taken from the government's transcript. So it's all the same.

THE COURT: Okay. Any objection?

MR. HARDING: Just need to clarify, does each one have 59, 59A and then, 60 and 60A?

MR. GONZALEZ-FALLA: Yes, each clip.

MR. HARDING: We don't have any objection.

THE COURT: Okay. So admitted.

Q. (BY MR. GONZALEZ-FALLA) Okay. So we'll play 59.

(Audio file played.)

Q. Okay. Let's stop there. So this is Mr. Youngblood explaining what he's going to do; is that correct? I mean, he's telling you what he's going to do and what he has and how he can help your friend; is that fair?

A. I'd have to hear the clip again.

Q. Okay. Let's play it again.

(Audio file played.)

Q.   Did you hear it that time?

A.   Yeah.

Q.   Do you know what he's talking about when he says the tape?

A.   I do not.

Q.   The recorded calls, the cellphone records?

A.   I don't.  I do not.

Q.   You did know about what he was talking about there. You weren't prepared for that in your role-playing meeting?

A.   Took it at face value what he was saying.  May be some recorded phone calls and documents, but I didn't have any knowledge of or heard anything about these recorded calls or documents she left in a rental car.

Q.   Mr. Perardi had not told you about Rachel maybe having or what this might -- recorded phone calls or cellphone records, what that might mean.  Mr. Perardi had not told you anything about that?

A.   No.  I learned that Mr. Youngblood.

Q.   Okay. Now, we're going to go to -- now, during the meeting, there were some discussion about bringing federal charges against Rachel.  Do you recall that?

A.   I do.

Q.   And had Mr. Perardi in this role-playing meeting

mentioned the names Daniel or Akiko, Kiko --

A.    No.

Q.    -- had he mentioned any of those people?

A.    No.  I don't know those people.

Q.    Now, again, we're going to play a clip from this meeting where Mr. Youngblood again is pitching the services that he can provide to your friend who you've come to this meeting with money.  This is Defendant's Exhibit No. 60.

        (Audio file played.)

Q.    Okay.  There he talks about OFAC, Office Of Foreign Asset Control, that being her undoing.  You do these reports, you fill out an 8300 form.  Do you know what he's talking about there?

A.    At the time, I had no idea what he was talking about.

Q.    Okay.  Or what he means by their undoing.  What he's talking about is being their undoing, do you know what he meant by that?

A.    About Rachel's undoing?

Q.    Yeah, about how this failure to comply with those rules would be her undoing he was just talking about.

A.    Well, when I listened to what he said then that there was some type of a federal charge from an organization or a group called OFAC in which she would be charged federally for doing something.  I didn't know what

something was.

Q.   All right.  We'll continue with the recording.

(Audio file played.)

Q.   Okay.  So now, he's specifically describing seven different cases where she didn't do these forms, and again, is it your understanding that he was talking about federal prosecution seven different federal cases?

A.   I understood at the time of that, yes.

Q.   Okay.  Now we're going to go to the next clip, which is Defendant's Exhibit No. 61.

(Audio file played.)

Q.   At this point, we're talking about the number that you've come to provide, right?  You're going to come to a decision about what the amount is that Mr. Perardi needs in order to make the problem go away.

A.   That's correct.

Q.   So Mr. Youngblood says he has $20,000 in his wallet.  He's already put up 234,000 and it's exactly 96,000 short, right, to get everything released for him, right?

A.   Correct.

Q.   To get everything released.  Do you know what he meant by what needed to get released?

A.   I do not.

Q.   Okay.  Well, now we're going to listen to more of this where this is discussed.  Go ahead.

(Audio file played.)

Q.   Okay.  So when we look at that clip there, Mr. Youngblood is recording that if he's able to get the money, they're going to be history, Julie and Rachel, right?

A.   That's what I understood, yes.

Q.   And the way they're going to be history is through this prosecution that's going to result.

A.   I understood that, yes.

Q.   Okay.  So now we're going to go to the next clip, which is Defendant's Exhibit No. 62.  This clip, Defendant's Exhibit No. 62, occurs after several of the government clips that you've heard because I know it's a long meeting, I know it's kind of hard to keep track of all these clips.  But what will have already occurred is government's clip No. -- Exhibit 38, Government's Exhibit No. 39, No. 40, No. 41 and No. 42.  And in government's clip No. -- all right.  Let's go ahead and play it.

(Audio file played.)

Q.   In that clip, you hear him say that it's just a matter of money, returning property and handing over paperwork that puts an end to these people, right?  What we heard on the clip.

A.   Correct.

Q.   Again, he's referring to paperwork, right?

Paperwork.

A.   Yeah.   That's what he said.

Q.   So you give him money and then, he's going to be able to get paperwork, right?

A.   Correct.

Q.   Now, the next clip that we're going to hear is Defendant's Exhibit No. 63.  Now, Defendant's Exhibit No. 63 is also after a series of clips that the government played, which were clip No. 63 is after clip No. 43, clip No. 44, clip No. 45, clip No. 46, clip No. 47, and clip No. 46.  All right.  Go ahead and play No. 63.

          (Audio file played.)

Q.   There, we heard Mr. Perardi say, how do we get them to move on it, right?  Now, you were there at that meeting.  When he said, how do we get them to move on it, he follows Mr. Youngblood's statement about proceeding with the prosecution, right?

A.   At the time of the recording, that's what I understood, yes.

Q.   So Mr. Perardi's asking how do we get these prosecutions going, right?

A.   Correct.

Q.   Okay.  Let's continue the recording.

          (Audio file played.)

Q.   Now let's go to Defendant's Exhibit No. 64.  Okay.

Now, this also is a recording that followed Government's Exhibit No. 49, which was a clip. Let's go ahead and play this clip, 64.

(Audio file played.)

Q. So there, Mr. Youngblood is telling you that a fact is that she's been cheating since day one, referring to Rachel Perardi, right?

A. That's what he said.

Q. And that's consistent with what Mr. Perardi told you that Rachel had been unfaithful to him, correct?

A. That's what I understood.

Q. And that he was going through a divorce, right?

A. That's correct.

Q. And in this clip, Mr. Youngblood seems to be telling you and Mr. Perardi that his loyalty is with Mr. Perardi and that Rachel has just been out to get his money from day one, right?

A. That's what I understood.

Q. Okay. Now, Mr. Perardi, had he told you that he believed Rachel had been trying to get his money from day one since they were married? Had he told you that?

A. I don't recall that specifically him saying that.

Q. So the first time you heard this was at this undercover meeting where Mr. Youngblood says she's been trying to get his money from day one?

A.   That's what Mr. Perardi said, yes.

Q.   So maybe Mr. Perardi believed that even though you didn't know it.

A.   I meant Mr. Youngblood.  That's what he said in the clip there.

Q.   He said it in Mr. Perardi's presence.

A.   He did.

Q.   And Mr. Perardi did not disagree with him.

A.   Didn't appear to.

Q.   So the next clip is going to be Defendant's Exhibit 65 and this also follows the government's clips which -- this clip is actually within Government's Exhibit No. 52, which is their 20th clip.

          (Audio file played.)

Q.   Okay.  So that clip, Defendant's Exhibit No. 65, Mr. Youngblood again is referring to the divorce, is he not?

A.   Yes.

Q.   He's referring to Mr. Perardi being used by Rachel as a piece on a chessboard, right?

A.   That's what he said.

Q.   And again, and then he refers to, oh, I want my daughter.  That's a reference to the custody dispute that was going on; is that correct?

A.   It mentioned something about custody dispute, yes.

Q.   Had Mr. Perardi told you during your role-playing

meeting that he was involved not only in a divorce but also a custody dispute?

A.   I believe so.

Q.   And so, when Mr. Youngblood says, oh, I want my daughter, it's all bullshit, he again is referring to Rachel saying I want my daughter sort of making it appear that what Rachel is saying is really just all a lie, just a way to get money from Mr. Perardi, right?  It's all bullshit.

A.   Can you repeat the question, please.

Q.   Sure.  He says the kids, she doesn't care, don't confuse this.  Oh, I want my daughter.  It's all bullshit. It's a piece on a chessboard and she's using as leverage and it's disgusting.

A.   Yes, that's what he said.

Q.   Now, Defendant's Exhibit No. 66.  So let's go ahead and play Defendant's Exhibit No. 66.

         (Audio file played.)

Q.   Okay.  So in this clip, he kind of brings around, once again, the idea that Mr. Youngblood has the capacity to be able to let the Feds do our work for us, right? He's telling you and telling Mr. Perardi, let's let the Feds do our work.

A.   That's what he said, yes.

Q.   And is he again referring to these references to

these federal agencies, OFAC and not filing a form 8300. That's the reference to the Feds.

A.   Yeah.  I don't -- yeah, I still don't -- I didn't understand at the time who has the forms, who has the information, who "they" is.  I would assume that the federal agencies had these documents in their custody. That didn't make any sense to me why we were there discussing it.  I don't know.

Q.   And you weren't prepared for that?

A.   I had no idea what he was talking about.  I didn't know who "they" was.  I didn't know who had the documents. I didn't know why if this was a potential federal charge why the documents would be in anybody's custody other than the federal government.  I didn't know.  I don't know.

Q.   Do you know what Form 8300 is?

A.   I have no idea.

Q.   But Mr. Youngblood had referred to these forms as being necessary to make certain financial transactions, right?

A.   Yes.

Q.   And he was saying that Rachel had not done these with these bank accounts that she had in Mexico.

A.   Correct.  I have researched it since that point.

Q.   This is what he said at the meeting.

A.   At the time, I had no clue.

Q.   But certainly Mr. Perardi hasn't expressed any confusion about what he was saying.

A.   No.

Q.   Mr. Perardi didn't, say, what's a Form 8300?  That didn't happen during the meeting.

A.   No, he did not.

Q.   And Mr. Perardi didn't say, oh, she's violating the law.  He didn't say anything like that either.

A.   No.

Q.   He didn't act like he was surprised that Rachel could be maybe prosecuted federally.

A.   No, not at all.

Q.   Okay.  So now we're going to go to number -- Defense Exhibit No. 67 and when you listen to this one, we've already heard these names but there's the name of Akiko and Daniel that's going to come up here.  Okay.  Go ahead.

          (Audio file played.)

Q.   Okay.  Now, this clip kind of sums it all up, right?  I mean, what Mr. Perardi's problems are and how the payment is going to solve those problems, doesn't it?  I mean he says --

A.   From that clip, I didn't gather that.

Q.   Well, he says, here's everything you're owed, our business is concluded.  I have Akiko take everything.  Daniel needs to bury Rachel.  Your divorce is handled

Mazzy's yours.  Your money's restored.  Your debts are paid.  Kind of sums it up?

A.   At the time that recording was made, I was confused as to who he was talking about.  I had no idea who Akiko or Daniel was.  I was under the impression of money was to be paid to the cartel for money laundered that was siphoned off.  I didn't know who Akiko or who Daniel was or how that would solve the problems for him.

Q.   You went in that meeting with a certain understanding of what to expect?

A.   A minimal understanding, yes.

Q.   Your understanding of what to expect was that there was this cartel debt because of some money that had been siphoned off, right?  That's what you believed.  That's what you --

A.   That's what I understood, yes.

Q.   And you go in the meeting and something different happens.

A.   Mr. Youngblood was -- he was all over the place.  It was hard to follow that.  When he brought up Akiko and Daniel, I had no reference as to who those people were.

Q.   And you didn't ask him?

A.   No.

Q.   You didn't say or you didn't look at Perardi and say, Akiko?  Daniel?

A.    No.  I had no idea.

Q.    OFAC?  What are they talking about.

A.    I wasn't going to interrupt Mr. Youngblood.  I was just going to let him keep talking.  I had no idea who they were.

Q.    Another thing you didn't want to do, you didn't want to alert Mr. Youngblood that you weren't in on this.  You didn't want --

A.    Even if I had asked who they were that the ruse was literally understanding my friend was in trouble and I want to help him.  As far as the intimate details, I had no idea --

Q.    I'm saying that's the ruse --

A.    -- I had no idea who they were.

Q.    That's the way you went in there but that's not the way the meeting came out.  You go into that meeting and then now they're talking about money laundering.  They're talking about OFAC --

A.    Well, I didn't anticipate Mr. Youngblood talking as much as he did --

          THE COURT:  Just a minute.  You're starting to step on each other and the court reporter, for her sake, if you could kind of slow it down, ask your question, answer, wait for each other to finish before you continue.

          THE WITNESS:  Yes, your Honor.

THE COURT:  Thank you.

Q.   (BY MR. GONZALEZ-FALLA) Right.  I mean, the meeting went in a very different direction than what you expected.

A.   Yeah.  I didn't anticipate Mr. Youngblood talking as much as he did.  I just let him talk.

Q.   You didn't expect Akiko's name coming up.

A.   I didn't expect 90 percent of what he said.  It was hard to follow and I wasn't going to interrupt him.  I just let him keep talking.

Q.   Well, it wasn't hard for Mr. Perardi to follow, was it?

A.   I don't -- you'd have to ask Mr. Perardi that.  I don't know.

Q.   Well, he didn't stop the meeting.  He didn't ask for clarifications from Mr. Youngblood, did he?

A.   I don't believe so, no.

Q.   Okay.  Defendant's Exhibit No. 68.  Now, this one is one where -- I believe it's in Government's No. 53.  This entire clip is included within Government's No. 53.  Let's go ahead and play it.

        (Audio file played.)

Q.   There, Mr. Perardi chimes in on Dan, right?  He says why isn't Dan moving on her.  Did you understand Dan to be a federal prosecutor?

A.   No, I did not.

Q.   Did you know what Dan was?

A.   I had no idea what Dan was -- who Dan was.

Q.   But before that Mr. Youngblood was talking about these guys, who -- one's a U.S. prosecutor, an ASDA, federal agents that work at central, serious people trying to help Mr. Perardi, right?

A.   He said that.

Q.   These were all -- continue to play.

(Audio file played.)

Q.   Now here, we have this sort of point of confusion or lack of an opinion about what this is about, right, because Mr. Youngblood says that it's about custody and then, Mr. Perardi goes back to saying, well, it was all about her wanting me dead.

So were you prepared for all this discussion about divorce and custody and Mr. Youngblood talking about how he could help Mr. Perardi resolve these personal issues as it relates to divorce?

A.   Somewhat but not the details that Mr. Youngblood was providing, I was just learning those at that particular moment.

Q.   Now, I think that this next clip is clip No. 11 where I think you express -- clip No. 11, which is my Defense Exhibit No. 69.  This is a kind of a clip and at the end, you sort of express your confusion about what's going on

*105*

here.  This is something that you really didn't expect. But we'll go ahead and hear the clip 11, which is Defendant's Exhibit No. 69.

(Audio file played.)

Q.  After this long talk by Mr. Youngblood, Mr. Perardi says, I don't know about any of that except for what you told me, about what Mr. Youngblood had told him, right?

A.  He said that.

Q.  So Mr. Perardi at least is saying he's aware of this but he didn't know anything more than what Mr. Youngblood has already told him, right?

A.  That's what I understood --

Q.  So that would tell us Mr. Perardi, before going into this meeting, was aware of this information, right?

A.  I understood that from his statement, yes.

Q.  But it's not something that he shared with you before you went to the meeting.

A.  No.

Q.  Okay.  We'll go on.

(Audio file played.)

Q.  And that kind of what sums up where you were like what are we even talking about here.

A.  I still have no idea what we're talking about.  I've read the transcript, but I'm still confused with all the information he provided.  I was confused then.  I had no

idea who these people are.

Q.   You didn't have to be confused.  You could have been prepared, right?  But you weren't prepared.

A.   I was prepared for what I was going to provide.  As far as the details, that was -- I don't know how long he had been dealing with Mr. Perardi, but to funnel it down to one hour over a lunch was -- it was too confusing to understand.

Q.   But Mr. Perardi knew about it.

A.   How much he knew of what was said during that meeting, I don't know.  I don't know.

Q.   Okay.  So we get to the last clip here that I've pointed, we're going to go ahead and this is where you talk about the money.

          (Audio file played.)

Q.   Okay.  So there, you're talking about the click, click, click is the safe, right?

A.   Correct.

Q.   That's just making it very clear what we're talking about in this case is a cash transaction, the way you're going to pay Mr. Youngblood is with cash?

A.   That is correct.

Q.   Okay.  So then, the meeting's over with.  You get the bat that you didn't really want and there's the next meeting that's supposed to take place the next day where

Mr. Youngblood then is making his final pitch because you're not wanting to meet him, but he's trying to impress upon you why it's important that you give him the money that Mr. Perardi needs, right?

A.   That's correct.

Q.   And in that -- and we've heard I'm not going to replay it for the jury but -- and you heard.  You heard this recording earlier today what Mr. Youngblood says is that Eric needs the information, right?  He needs the information.

A.   Yes, he said that.

Q.   He doesn't say that Eric needs the money.  He needs the information that Mr. Youngblood has, right?

A.   He said that.

Q.   And from the context of what was discussed at the meeting, isn't it clear to you that the information that Eric Perardi needed was the information that would put Julie in prison?  That would prosecute her, that would enable her to get locked up and for Mr. Perardi to achieve all of his objectives?

A.   That's what I understood, yes.

Q.   I'll pass the witness, your Honor.

                    RE-DIRECT EXAMINATION

BY MR. HARDING:

Q.   Agent Fiedler, I'm going to go over just a few

things.  I know it's a little unfair to put you in this position since you were just there in the recorded conversation.  But since you were there, Mr. Gonzalez-Falla sort of suggested -- I'm going to characterize it this way.  You tell me if you agree.

Essentially, this meeting is about Eric Perardi getting revenge on Rachel because of a bad divorce.  Is that -- do you understand the question to be somewhere along those lines?

A.   The questions I've answered over the last?

Q.   From Mr. Gonzalez-Falla in particular.

A.   Oh, yes.  That's what I think appear to me the direction we were going.

Q.   This isn't about protecting kids.  This isn't about any kind of danger.  This is about Eric Perardi and Rachel Perardi having some kind of fight over custody and their kids and their divorce.

A.   Yes.

Q.   So let's talk a little bit about the conversation you had that day.  Mr. Gonzalez-Falla said that essentially, all this money was just going to get some documents, but that's not actually true when we go back and review the --

MR. GONZALEZ-FALLA:  Judge, I object to him leading the witness.

MR. HARDING:  I'm actually commenting on the

evidence that's already in the record.

THE COURT:   I'll allow the question.

Q.   (BY MR. HARDING) Based on the conversations that are recorded, there's also reference to a $6.1 million debt that Rachel owes to the cartel, correct?

A.   That's correct.

Q.   And when Mr. Gonzalez-Falla says your debts are going to get paid off, you recall earlier in the -- another clip we listened to from the defense where Mr. Youngblood is explaining Eric Perardi bears this debt because Rachel incurred it through the cartel, correct?

A.   That's correct.

Q.   They both bear the debt and that's the debt that's being referred to about being paid off, correct?

A.   That's the way I understood my money that I was going to provide would be there to help pay back the $6.1 million.

Q.   During this entire conversation, I think it's pretty evident, but just who's driving the conversation?  Is Eric Perardi saying, hey, let's get Rachel, let's get Julie? Who's driving the entire conversation?

A.   Mr. Youngblood.

Q.   And it's Mr. Youngblood who said that Rachel Perardi put a hit on Eric Perardi.

A.   He said that.

Q.   So the fact that Eric Perardi might want Julie or Rachel in jail, does that strike you as surprising?

A.   Not at all.

Q.   When we were talking about -- you listened to some calls, you listened to a lot of things, and so has the jury so I'll try to keep it reasonably brief.  But Mr. Gonzalez-Falla pointed out, hey, when Mr. Youngblood says these certain things, Mr. Perardi's not contradicting him. He's going along with it, right?

A.   Yes, he is.

Q.   The same is true in the other direction.  When you were talking about meeting with Mr. Youngblood, you said how much danger is he in?  Do I need to arm up or what?

A.   Yes, I do.

Q.   And Mr. Youngblood didn't say to you "what are you talking about, what danger," did he?

A.   No.

Q.   He said to you, "I've got it taken care of, I have people watching Eric"?

A.   He said that, yes.

Q.   Based on that, do you believe that Mr. Youngblood was trying to give the impression to you and to Mr. Perardi that Mr. Perardi was in danger?

A.   Yes.

Q.   Can we play Defense 66, please?  I'm showing you the

transcript that's in evidence as Exhibit 32, I believe. If you could follow along.

        (Audio file played.)

Q.   Do you remember that line of questioning that Mr. Gonzalez-Falla -- and the clip he played for you?

A.   Yes.

Q.   I'm going to show you -- I paginated this, it's page 45 on the version I'm showing you, correct?

A.   That's correct.

        You'd agree with me, Agent Fiedler, make sure it's done the legal way and let the Feds do our -- their work for us is where that clip stops.  That's what -- the clip that we just listened to?

A.   Yes.

Q.   However, the conversation goes on, doesn't it?

A.   It does.

Q.   Mr. Perardi says, what I told you before, if she's guilty, then that's -- this was never -- this was always about protecting my children.  And what is Mr. Youngblood's response?

A.   I understand that.

Q.   And I didn't -- like you said she's guilty.  You said she's guilty, Eric Perardi says.  All these things, Mr.

Perardi says, but that's not what it's about for me. Mr. Youngblood says, Eric, it's not about the money. Mr. Perardi says, it was about protecting my kids. And what is the last thing that Mr. Youngblood says right after that? Can you read it?

A.   The paragraph there?

Q.   Just right here.

A.   I agree with you.

Q.   Mr. Youngblood isn't saying, what are you talking about danger of your kids, is he?

A.   No, he's not.

Q.   He's not talking about, hey, let's talk about your divorce, that's what we're here about, is he?

A.   No.

Q.   He's saying yes, Eric, this has always been about protecting your children?

A.   Yes, that's what he's saying.

Q.   Based on that and the other aspects of this conversation, do you believe this conversation was about a bad divorce only?

A.   No.

Q.   Certainly, there was a component of it that was about a bad divorce, correct?

A.   That's correct.

Q.   But not all of it.

A.   No.

Q.   Pass the witness, Judge.

          MR. GONZALEZ-FALLA:  I have no questions, your Honor.

          THE COURT:  Thank you.  You may step down.  Your next witness.

          MR. HARDING:  Government would call Jeff Bridgman.  May this witness be excused, your Honor?

          MR. GONZALEZ-FALLA:  Yes, your Honor.

          THE COURT:  You're free to go.  Thank you.

          Before we take this witness, we're going to take a five-minute comfort break.  Take five minutes.

          (Jury not present.)

          (Jury present.)

          MR. HARDING:  May I have a moment to confer with counsel?

          THE COURT:  Of course.

          MR. HARDING:  May we approach?

          THE COURT:  Yes.

          (At the bench, on the record.)

          MR. HARDING:  I think Mr. Bridgman has some items with him that he brought that we, the government, have never seen.  I think I know what they are to some extent.  Could we just have five minutes for Charly to go through those so that she isn't surprised and we aren't surprised

by what he has?

THE COURT:  Sure.  Of course.

MS. HERRING:  I didn't know.

(End of bench conference.)

THE COURT:  Ladies and gentlemen of the jury, this is one of those times that we're going to have to do a little consulting.  I think it's going to be brief and so, I'm not going to excuse you from the courtroom.

MR. HARDING:  I think we're good, Judge.  Thank you and I apologize.

THE COURT:  Not at all.  Can you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

JEFFREY BRIDGMAN, called by the Government, duly sworn.

                    DIRECT EXAMINATION

BY MR. HARDING:

Q.  Thank you, your Honor.

        Mr. Bridgman, can you please state your first and last name and then, spell your last name?

A.  Sure.  Jeffrey Bridgman, B-R-I-D-G-M-A-N.

Q.  Could you introduce yourself to the jury?  Tell them

what you do and how long you've done it?

A.   Sure.  I go by Jeff, Jeff Bridgman.  I'm an antiques dealer.  I've been in the business since June of 1991.  I specialize in antique American flags and we stock about 3,000 of them, mostly 19th Century.  My focus is 19th Century.  Do large-scale museum exhibitions.  A little unusual as a dealer because we do that.  We do all of our own textile conservation.  I've mounted thousands of flags.  We do antique shows, not so many today.

Q.   I'm being told some folks in the back can't hear you too well.  Can you speak up a little bit?

A.   I'm sorry.

Q.   So you specialize in early American flags; is that right?

A.   That's correct.

Q.   Your business also includes other things; is that fair?

A.   I'm a folk art dealer.  American folk art dealer.

Q.   In terms of your experience with flags, can you just describe for the jury some of your expertise in the area of appraising flags and that sort of thing?

A.   Sure.  I mean, in my world, there's sort of no substitute for handling thousands of examples so my --that's what I've had the great privilege to do because my ex-business partner had thousands of them before I got

into it and learned from him.  I appraise flags for museums, including George Washington's headquarters flag at Valley Forge now at the Museum of the American Revolution in Philly.  Only known flag thought to have been made by Betsy Ross went from one museum to another. That sort of thing.

Q.   So let me just jump ahead a little bit.  You know, you've been a flag dealer, an antiques dealer since 1991, I think you said.  At some point, did you meet a person that you learned to be Kota?

A.   Yes.

Q.   Do you see Mr. Youngblood here in the courtroom?

A.   Yes.

Q.   Could you please point him out and describe something he's wearing?

A.   Yes, at the table behind you.

Q.   May the record reflect the witness has identified the defendant?

        THE COURT:  I believe he -- is that sufficient for identification?

        MS. HERRING:  I don't think so, your Honor.

Q.   (BY MR. HARDING) Can you describe what he's wearing?

A.   Yes.  Dark-blue shirt, black hair.

        THE COURT:  The record will so reflect.  Thank you.

MR. HARDING:  No.  Thank you.

Q.   (BY MR. HARDING) When approximately did you meet Mr. Youngblood?

A.    At the spring Round Top antique show.  Round Top or Carmine, technically, Texas in 2022.

Q.    Okay.  Without going into tremendous detail, what is that antique show?

A.    Round Top is an enormous market with 67 different shows that open and close at different times.

Q.    And what is the purpose of the show?  I mean, what's being transacted there?

A.    Selling antiques.

Q.    Of all types?

A.    Yes.

Q.    Okay.  What was the context?  When did you first -- I mean, you were at the show.  How do you meet Mr. Youngblood?

A.    He came into my booth at the show.  I had not met him before then.

Q.    Did he want to transact some sort of business?

A.    He was interested in flags.  He said he'd been on my website many times and I was impressed with that and very interested and in antique flags.

Q.    Okay.  Did Mr. Youngblood tell you a little bit about himself?

A.    Yes.

Q.    Could you tell the jury?

A.    Some.  I think I may have asked him if he had been in the military and he said that he had been a Navy Seal. And I think he said he'd been 82nd Airborne cross-service.

Q.    What did he tell you that he did for a living, if you recall?

A.    He didn't really say until he said he had been hired by Exxon -- recently hired by Exxon.

Q.    Do you remember for what purpose?

A.    No.

Q.    Okay.

A.    Didn't say.

Q.    So did you transact business with Mr. Youngblood that day?

A.    Yes.

Q.    And this is going to be April of '22; is that right?

A.    Yes.

Q.    Okay.  What was the first transaction that you had with Mr. Youngblood that day?

A.    He bought a 1940 to '50 copy of the Gadsden flag, small flag.

Q.    If you could just describe with your hand approximately how big the flag is.

A.    A flag about this size and a framework about this

size.

Q.   So maybe a couple of feet by three feet, something like that?

A.   Two feet, two to three feet, yeah, and overall.

Q.   If you recall, approximately how much did you sell that for?

A.   $1,800, I think.

Q.   And how did Mr. Youngblood pay for that if you recall?

A.   With a credit card.

Q.   Okay.  Did Mr. Youngblood at some point ask you to sort of help him buy something else?

A.   Yes.  He was interested in a medallion of some sort. I didn't see it that another dealer had.  That dealer didn't take credit cards.  A lot of dealers are -- I mean, I'm almost 57, I'm a young guy in the field.  Some were just old school.  Some of them were just plain old and they don't take credit cards so it's not an unusual thing. Done it before.  I've taken them 30 years.  So...

Q.   If you described this already, I'm sorry, I missed it.  What exactly did Mr. Youngblood want you to do for him?

A.   He wanted to buy the medallion from that didn't take credit cards and he wondered if I would pay for it and then, he could pay me with his credit card.  I've done

that before so I said sure and that's what happened.

Q.   At some point during this conversation, or during the day, or during this fair, the show, did you talk to some folks who kind of knew Mr. Youngblood or one person in particular?

A.   Yes.   There was one person I spoke with that a neighbor at the show that I'd actually done the same thing with a credit card before, she was about 80 years old who had said he had been coming to the show for years and she knew him, had met his wife and, I think, their son, I believe she said, and he had bought something from her. He talked to her a lot.  She thought well of him.

Q.   Sort of vouched for him; is that fair to say?

A.   Yeah.

Q.   At some point later that weekend or that day, do you start talking about a larger possible purchase?

A.   He was interested in the flag that's in the back of the courtroom here.

Q.   Let me go ahead and ask you if I could ask the witness to step down, your Honor.

        THE COURT:  Yes.

Q.   (BY MR. HARDING) If you could come and examine Government's Exhibit No. 9 over here, Mr. Bridgman. You've had a chance to look at this before coming to court today; is that correct?

A.    Yes.

Q.    Could you tell the jury, what is Government's Exhibit No. 9 with respect to this case?

A.    This is the flag that Mr. Youngblood was interested in.  It's a Confederate First National flag.  Many people don't realize that the flag of the Confederacy officially like akin to the stars and the stripes, it was this flag which looks too much like the stars and stripes on the battlefield and this was changed.

Q.    I know we could probably talk for a very long time and we will.  Is this, in fact, the flag that you and Mr. Youngblood were discussing --

A.    Yes.

Q.    -- purchase of and you ultimately transferred to him; is that correct?

A.    That's correct.

Q.    Is it in substantially the same condition as the last time you saw it?

A.    It is.

Q.    Government will offer Government's Exhibit No. 9. You can take your seat.

        MS. HERRING:  No objection.

        THE COURT:  So admitted.

Q.    (BY MR. HARDING) So you and Mr. Youngblood, does he instantly agree to purchase that flag?  Or how does the

transaction or the bartering go?

A.  No, he didn't instantly purchase it.  He was not really sure whether if it was something he wanted to do or could pull off, but he really wanted it.

Q.  Let me stop you.  What was the first price that you said for the flag?

A.  The price on the flag, I don't think it was written on the wall, but it was 85,000 retail, and at some point, I told him that I could do 75,000 on it.

Q.  But even still, he's kind of hemming and hawing a little bit; is that fair?

A.  Yes.

Q.  So how does -- what happens next?

A.  I said that, you know, if you wanted, you could pay me over time that I regularly did that and, you know, I would just ship it to him when he had it paid for and take it back to Pennsylvania.

Q.  Still yet, let me ask you.  This show that you described where you met Mr. Youngblood, that's here in Texas?

A.  Yes, it is.

Q.  Where are you from?

A.  Pennsylvania.

Q.  And that's where you do all your work?

A.  Yes.

Q.   So if I understand correctly, you told him -- or he told you, I might have to pay over time, and you essentially said, look, I'll take this back to Pennsylvania with me.  Once you've paid enough, then I'll ship you the flag.  Is that the kind of deal?

A.   Yeah.  I mean, I think I probably brought up to pay over time than --

Q.   Okay.  But that was sort of the general understanding?

A.   I'm not a hundred percent sure but yes.

Q.   Was you'd take it back with you?

A.   That was the initial -- it was my initial thought what I told him.

Q.   It evolved from there, correct?

A.   It did.

Q.   And how did -- what happened next?

A.   I was really the catalyst for that in the end because I talked to him a lot.  I liked him, you know, and, you know, these other two transactions went through with a credit card and I just said, you know what, I was having a bad show.  I said I'm going to give it to him.

Q.   So you're going to give him the flag up front for no money?

A.   That's correct.

Q.   Payment on the back end?

A.   Yeah.

Q.   Is that sort of common or not common in your business?

A.   From dealer to dealer, it varies but it's not uncommon.

Q.   For you?

A.   Yeah.  Little uncommon for somebody I completely don't know for that dollar amount but...

Q.   So why did you feel comfortable --

A.   I'm in a risk business.

Q.   What made you comfortable doing that, making that deal with Mr. Youngblood?

A.   I just -- I liked him and I believed what he was telling me.

Q.   And also, I think you mentioned earlier sort of a friend at the show had done some business with him in the past.

A.   Yes.  I think if I didn't know that, I wouldn't have proceeded.

Q.   Okay.  Did you ultimately arrive at a different price than 75,000?

A.   He at some point -- and I don't know exactly when that occurred but it was either that -- I think it was that day.  Could have been -- it could have been immediately after, he said, listen, because I'm going to

pay you over time, I'll pay you the face price of the flag. And so -- and I said that's great and I changed the receipt to 85,000.

Q. Okay. So the ultimate deal you sort of arrived as was I'll leave the flag with you and you'll pay me $85,000 over time.

A. Yes. I think. I think that was -- I think the $85,000 part was done before we delivered it, although it's been a while. I'm not a hundred percent sure. Happened that week.

Q. But the broad strokes are you're going to leave the flag with him. He's going to pay you 85,000?

A. Yes.

Q. May I approach the witness, Judge?

THE COURT: You may.

Q. (BY MR. HARDING) Mr. Bridgman, I'm going to show you what's been marked as Government's Exhibit 76 for identification purposes. Do you recognize Government's Exhibit 76?

A. I do.

Q. And you had a chance to look at it before today?

A. Yes.

Q. What is Government's Exhibit 76?

A. This is a copy of the invoice and notated -- we just do these in Microsoft Word so my assistant has entered

payments here.

Q.   These were payments that were made.

A.   Yeah.

Q.   So this is not the original document you would have sent to Mr. Youngblood.  This is something that's been appended with the information on page 3?

A.   Yes.

Q.   But otherwise, is it a fair and accurate depiction, not counting these additions here?

A.   Yes.

Q.   A fair and accurate depiction of your contract with Mr. Youngblood?

A.   Yes, it is.

Q.   Now, I note it's not signed by Mr. Youngblood.

A.   Never was.  I'm quite certain -- I think he made a -- there would have been a delivery receipt that he signed. I know that exists somewhere in my records, but I didn't make him sign.  It's not unusual either for something like this.

Q.   Government's Exhibit 76 is a accurate version of your contract; is that correct?

A.   That's correct.

Q.   We'll offer Government's 76.

          MS. HERRING:  No objection.

          THE COURT:  So admitted.

Q.   (BY MR. HARDING) And I'll show you Government's Exhibit 77.  Do you see Government's Exhibit 77, sir?

A.   Yes.

Q.   And what is Government's Exhibit 77?

A.   This was when the agent from the FBI asked me for payment receipts and that I sent them a -- all of the wire transfer records and then, this was a summary that I put together of that.

Q.   You and I actually had a chance to talk about this document, as well; is that correct?

A.   That's correct.

Q.   And compared them to Government's Exhibit 78, which is actually already in evidence, various wire transfer documents.  You'd agree with me there's a thousand dollars missing that Mr. Youngblood actually paid?

A.   Yes.  Yeah, I missed one.  There was a thousand dollars payment on the 17th of March of 2023 and the date that this is missing here is 3-30.  On the 30th, he made this $500.

Q.   With those exceptions, is this a fair and accurate summary of the payments that were paid on behalf of Mr. Youngblood for Government's Exhibit 9?

A.   Yes.

Q.   We'll offer Government's 77.

        MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) If we could pull up Government's Exhibit 76, please, page 1, and if we could zoom in just the top here.  We have a date.  So as you said, this transaction occurred in April of '22.  And is this the information that you received from Mr. Youngblood regarding where to send payment or deliver the flag, or whatnot?

A.   Yes.

Q.   If we could zoom back out, please.  And then, there's a lot of information.  The first two pages, you'd agree with, we are kind of -- well, what you actually did over there, described a lot of things about this flag, right?

A.   Correct.

Q.   Could we zoom in just the very bottom line?  What does it mean when you write in here it has no specific history, the flag?

A.   It just means that the flag is of the period but we don't know where exactly it was carried or used.  No specific known history of use.

Q.   Why is that important in your business?

A.   Most of the time, flags don't have any known history of use, but when they do, that raises the value and interest theoretically, depending on how interesting that is.  Sometimes it doesn't make any difference.

Q.   Well, like you mentioned before, Betsy Ross' flag, if you could prove that, that might improve its value substantially?

A.   Absolutely.

Q.   Have you heard the term "provenance"?  Can you describe for the jury what does provenance mean in the areas of antiques dealing?

A.   Provenance is that plus a chain of ownership.

Q.   Okay.  And so, this flag, although I think we'd all agree pretty stunning, it doesn't trace back to any particular battle that you could say or any sort of -- you know, anything like that?

A.   Correct.  No known history of use.

Q.   And then, if we could move to Government's Exhibit 77, please.  Let's talk about after you give the flag to Mr. Youngblood, it looks like starting shortly thereafter -- you know, you sold it on April 6, we start seeing payments via wires; is that right?

A.   Yeah.  Sold it on the 2nd, I think.

Q.   Okay.  So this date's off by a little bit?

A.   The date on the receipt is off.

Q.   Okay.  So a couple of days before.

A.   Yeah.

Q.   These wire payments that you're receiving, are these wires from Mr. Youngblood himself?

A.    They were transacted, I think, by the gentleman I was speaking with on the phone, an intermediary.

Q.    And do you remember what this person's name was?

A.    Martin, I believe.

Q.    Okay.  If we could pull up Government's Exhibit 78, which is pre-admitted, and if we could focus on down here, please.

A.    Marvin.

Q.    Does that refresh your memory about who accepted this money?

A.    Yeah.

Q.    So according to this document, Marvin Knecht is sending you money on various dates.

A.    Yes.

Q.    And so, who was your understanding who Marvin Knecht was?

A.    What Kota said that he was ex-law enforcement and someone who helped him.

Q.    To be clear, Mr. Youngblood said that Marvin is ex-law enforcement.

A.    That's correct.

Q.    Not he, himself.  Okay.

A.    Although I think in a text, Marvin identified himself as --

Q.    As ex-law enforcement.

A.    LA it says in the text.

Q.    If we could go back to Government's Exhibit 77, please.  So we have some notes here.  So the payments start off being pretty frequent and then, there's sort of -- seems like there's a bit of a gap and that become a little bit less frequent over time.  Is that fair to say?

A.    Yes.

Q.    This note I'm highlighting here on January 31 of 2023, can you describe for the jury what this signifies?

A.    I guess I must have recorded -- at certain times, including that instance, Mr. Youngblood either -- I don't know if he ever said this himself because I did talk to him a few times.  Usually I spoke with Marvin -- he would pay additional amounts because he felt bad that he wasn't keeping up with the payments as agreed.  Because it was supposed to initially be paid off in a month and he added several amounts at times.

Q.    And when --

A.    In lieu of that.

Q.    When Mr. Knecht would send you money and you would later speak to Mr. Youngblood, was it clear to you that Mr. Youngblood knew that Marvin was sending that money for him?  You know, this was not a surprise to him.

A.    It seemed clear to me.

Q.    But if we can just go back out to the full document.

Starting, it looks like, maybe March-ish of '23 minus that wire transfer that you mentioned earlier, the money kind of stops.

A.   Yes.

Q.   And there were missed payments kind of the interim. Did Mr. Youngblood explain to you why he couldn't make these payments?

A.   Yes.  He and Marvin both explained that he was having some trouble with his son who had been at University in California, southern California.  He said that he had been in -- one of the two said that he had been in a fraternity, had gotten involved with selling drugs with some other members of the fraternity and had not made some sort of payment and so, the cartels were after him.

Q.   And did he ultimately tell you the fate of his son?

A.   Yes.  He said he'd moved him out of that school into another school in the northern part of the state where he began doing the same thing, went back to his old habits. And then, at some point, I think Marvin told me that -- I'm sure it was -- that his son was found dead in a ditch in Mexico.

Q.   So the money dries up.  You're talking to Mr. Youngblood and Marvin during this time to try to figure out what's going on.  At any point, are you considering suing him or anything along those lines?

A.   No.

Q.   Why?

A.   You know, I knew when I was going into this that he might not keep with payments just based upon other clients I've had.  I know how these are.  I was just trying to let it roll.

Q.   Okay.

A.   He had made significant effort and Marvin was a really good communicator.

Q.   It looks like from Government's Exhibit 77 that we account for the extra thousand dollars you didn't credit him with, he owes maybe $21,000 on that flag or 38,000, depending on how you handle those sort of --

A.   Extra payments, right.  Exactly.

Q.   At some point in April of 2023, do you get sort of an interesting e-mail that brings you here to court today?

A.   Yes.

Q.   And what was that e-mail in summary?

A.   I got an e-mail from a guy Eric Perardi that with a picture of the flag stating, can you tell me, you know, how much is this worth?  I took it in as collateral on a loan.  I was like yep, there it is.

Q.   May I approach, Judge?

THE COURT:  Yes.

Q.   (BY MR. HARDING) Mr. Bridgman, I'm showing you what's

been marked Government's Exhibit 75 for identification purposes.  Do you recognize Government's Exhibit 75?

A.   Yes.

Q.   What is Government's Exhibit 75?

A.   It is my reply to Eric by e-mail.

Q.   If we look through --

A.   E-mail chain.

Q.   And is it a fair -- having reviewed it, is it a fair and accurate depiction of the e-mail chain between you and Mr. Perardi?

A.   Yes.

Q.   We'll offer Government's Exhibit 75.

        MS. HERRING:  No objection.

        THE COURT:  Admitted.

Q.   (BY MR. HARDING) If we could pull up 75, please.  We don't need to look at the very first part of the e-mail, but if we could just focus in on maybe the first three paragraphs.  You said, you know, Mr. Perardi's like, hey, can I get this appraised, it's collateral for me, you said -- and he sent you a picture of the flag and you were like something's up.  What's your response to Mr. Perardi and what was your plan to do at that point?

A.   Well, I was surprised because I was trying to on a couple of occasions maybe get the flag back to sell it to get him out of his -- Lakota out of his predicament.  And

so, I thought, well, you know, now I realized why he didn't want to do that.  And I was trying to just figure out what was going on.  I don't know.  Could you restate?

Q.    No, no.  That was perfect.  I was just thinking, which takes me a while sometimes.

How much did you pay when setting up that flag -- actually, briefly, can you describe what you had to do to get this flag into sort of this condition from what you found it as?

A.    Sure.  I had forgotten that.  I looked it up yesterday.  I paid $13,500 for it at auction plus the premium.  So I had 16,200 in it and then, we conserved and framed it.  If someone brings me a flag like this extraordinary amount of work, it's about 10,000 or so to get -- we do do framing for others.

Q.    You said earlier, this flag has no specific history; is that right?

A.    Correct.

Q.    So if someone would have claimed it was the oldest existing Civil War flag, that would be false, correct?

A.    That would be false.

Q.    Is this flag, beautiful though it is, worth $900,000?

A.    No.

Q.    What do you think the maximum you could possibly sell a flag like this for would be?

A.   I might be able to price it as high as $125,000.

Q.   I think when we talked earlier, you said you were kind of in a position where you get to price flags because you're the authority.  Is that kind of true?

A.   For a long time, I was the only guy.  I make up the prices largely.

Q.   So if somebody said that they had received an offer from the Smithsonian for $900,000 for this flag, do you believe that's credible?

A.   No.  The Smithsonian largely doesn't buy things. They do refer people to me.  But occasionally, they do but no, that wouldn't be.  Occasionally, they buy things but not often and they -- that would not be something they would do.

Q.   Your transaction with Mr. Youngblood occurred in April of 2022, correct?

A.   Yes.

Q.   So if someone on May 1st, 2023 said that the Smithsonian offered them that much money two years ago for the flag, meaning May 1st of 2021, would that person even have had that flag at that point?

A.   No.

Q.   Where would that flag have been at that point?

A.   Two years ago from 2023 would have still been -- well, it was pretty close to by the time I bought it at

auction.

Q.   Okay.   Pass the witness, Judge.

CROSS-EXAMINATION

BY MS. HERRING:

Q.   Good afternoon, Mr. Bridgman.

You, I think, mentioned or told us that you in this case came up with this proposed payment plan; is that right?

A.   With extended payment, yeah.

Q.   That was an arrangement that you offered to Mr. Youngblood when he showed interest in the flag?

A.   Yes.

Q.   You did -- I think you told us this earlier, but when you were looking at the receipt that you had prepared that Mr. Youngblood hadn't signed this receipt; is that correct?

A.   Correct.

Q.   Do you recall if you sent this receipt to him or gave this receipt to him, or was this prepared after he had already left the Round Top show?

A.   It was prepared after he left the Round Top show.  I e-mailed him at least the receipt for 75,000.

Q.   Do you believe just -- may I approach, your Honor?

THE COURT:  Yes.

Q.   (BY MS. HERRING) This document you talked about

earlier, do you recall if you conveyed this document to him? You e-mailed it or provided it to him?

A. Not with the payments on it for sure but without those, I think so. I'm not a hundred percent sure. I know I'm sending him the 75,000. I think I followed up with that one afterwards.

Q. Would that have been something you would have done by e-mail, you think?

A. Yes.

Q. Or did you mail it to this address?

A. Might have done both. I don't know. E-mail for sure if I did it. Because I sent the other one e-mail.

Q. When you had -- when you first met Mr. Youngblood at Round Top, you told us that he did -- at least made one smaller purchase from you by credit card?

A. Yes.

Q. And that transaction went through that day?

A. It did.

Q. And you processed another transaction for him, as well, to help him out purchasing from a different vendor who didn't take credit cards, right?

A. That's correct.

Q. And that transaction went through, as well?

A. It did.

Q. And you say that's one of the reasons, in fact, you

felt like you give this payment plan deal a go, right?

A.   Yeah.   That was one of the reasons.

Q.   You said you liked him, as well.

A.   Yeah.   And my neighbor had known him and she's kind of a tough cookie.

Q.   When you talked about the document that you drew up with the payments that you received, this shows you did receive payments over time toward the balance due on the flag, right?

A.   Correct.   Yes.

Q.   And you obviously tracked the payments you received because you were able to prepare this document.

A.   Yes.

Q.   And from your perspective as a vendor dealer in these kinds of antiquities artifacts, you just wanted to be paid, right?   It didn't matter to you who was sending you payments?

A.   That's correct.   It was unusual but I try to roll with it.

Q.   And you felt that Mr. Youngblood was trying to pay for the flag, right?

A.   I did.

Q.   You recall in that e-mail that you just looked at, you said he's not dodging so much as he just can't do it, right?   And that was your impression.

A.   It was, yes.

Q.   It sounds like you do business all over the country. You travel to different shows; is that right?

A.   Yes.

Q.   So you regularly are accepting payments from out-of-state customers; is that fair?

A.   All the time.

Q.   You're based in Pennsylvania?

A.   Yes.

Q.   Right?  And, so, if you were at a show in California, you sell to someone in California, they're going to have to get you payment in Pennsylvania.

A.   Yes.

Q.   Do you also sell online?

A.   Yes.  Bulk of my business is online.

Q.   So when you -- do you regularly accept payment by wire?

A.   Yes.

Q.   And to accept as a businessowner, to accept a payment by wire, you are required to provide the information that the customer needs to set up the wire transaction; is that right?

A.   Usually, yes.  Usually, a receipt, yeah.

Q.   You have to give your customer the account information needed for them to make the wire.

A.   Yes.

Q.   So in this instance, you would have provided that information at some point.

A.   Yeah.  Don't remember how, but I did.

Q.   You just told us one of the last things you talked about was that you also -- you are an appraiser of flags in your line of work, right?

A.   Yes.

Q.   People reach out to you for appraisals?

A.   Yes.

Q.   I think you said -- I didn't hear you clearly but that you're one of few or maybe even the only person with this kind of expertise; is that right?

A.   Yeah, one of few.

Q.   One of few.  The day of the Round Top show, Mr. Youngblood actually left with the flag that day or was it --

A.   No.  Two of my guys who help me set up and do my deliveries delivered the flag.

Q.   After that flag left your possession, you didn't see it again until you, I guess, started getting ready for this to come here now.

A.   Yeah.  Well, other than the photograph, I didn't see it until I was here.

Q.   So after Mr. Youngblood took possession of the flag,

you don't know if he had it appraised by anyone else, right?

A.   No.

Q.   Thank you.  I have no further questions.

RE-DIRECT EXAMINATION

BY MR. HARDING:

Q.   Just one clarification.  I think you said you're not sure which -- or which of the invoices or both you sent to Mr. Youngblood; is that right?

A.   I know I sent the $75,000 invoice because I found the e-mail where I attached it with it attached.  I didn't have a chance to look to see if I sent the other.  I think I -- I would have e-mailed it but I don't --

Q.   Let's just talk about the $75,000 one that you definitely sent.  It had all the same information that's on the one that's in evidence now, it just had a price and it didn't have the record of payments; is that right?

A.   Yes.  It was sent on April 2nd.  I have it written in the top of my stack --

Q.   It contained the same history of the -- the same description of the flag and that sort of thing?

A.   That's correct.

Q.   Okay.

A.   Yes.

Q.   I'll pass the witness, Judge?

A.   Same receipt, really.  Just changed them.

Q.   Thank you, sir.

        MS. HERRING:  No further questions.  Thank you.

        THE COURT:  May this witness be excused?

        MS. HERRING:  Yes, your Honor.

        THE COURT:  Thank you very much.  You're free to go.

        THE WITNESS:  Okay.

        THE COURT:  Next witness.

        MR. GUESS:  Government would call Eric Perardi, your Honor.

        THE COURT:  Before you take your seat, could I get you, please, to raise your right hand to be sworn.

        THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

        THE WITNESS:  I do.

    ERIC PERARDI, called by the Government, duly sworn.

                    DIRECT EXAMINATION

BY MR. GUESS:

Q.   Mr. Perardi, good morning.  Or afternoon, I guess, now.

A.   Yeah.

Q.   I want you to introduce yourself to the ladies and

gentlemen of the jury and spell your last name for the court reporter.

A.   My name is Eric Perardi, P-E-R-A-R-D-I.

Q.   And, Mr. Perardi, how old a man are you?

A.   I am 52.

Q.   Do you have family?

A.   Yes.

Q.   Tell me a little bit about your family.

A.   I have five children.  So I have an adopted daughter Riley, who's 20 years old.  I have a son Matteo, who's 20 years old.  I have a son XXXX, who's 17 years old, a son XXXX, who's 14 years old, and a daughter XXXXXXXX, who's five years old.

Q.   And tell me a little bit about your background. Where did you grow up, did you go to college, few things like that.

A.   Yeah.  I grew up in the midwest in Pekin, Illinois. My dad worked for Caterpillar and I ended up going to college in upstate New York to play division one hockey at Rensselaer Polytechnic Institute, RPI.

Q.   If I asked you to spell Rensselaer, would that be a pretty tough thing to do or not?

A.   I don't know if I can spell it or not.

Q.   What did you study at RPI?

A.   I studied industrial engineering.

Q.   And you said that you played hockey there?

A.   Yes.

Q.   Tell me a little about that.

A.   I started playing hockey when I was very young at four or five years old and kind of my goal in life was to be a division one hockey player.  So I left home at like 15 years old to go into school and make that a reality and I was fortunate enough to get that scholarship and had four really exciting years.  And we ended up winning an ECAC Championship my senior year and hockey was a big part of my life.

Q.   RPI was a hockey powerhouse.  Still is to this day, right?

A.   Yes.  They're in the ECAC with the ivy-league schools so it was one of those schools where I could go and get an unbelievable education for free, which was fantastic.

Q.   After graduating from RPI, did you continue in the hockey world?

A.   Yes.  I went out to Los Angeles and I played professional roller hockey and something that was called pro beach hockey.  It was on the beaches of Huntington Beach.  It was pretty fun, exciting.  And then, I was a bartender in Los Angeles after I retired.

Q.   Would some of those hockey matches get aired on ESPN or maybe Ocho?

A.    Yeah.  We actually have a documentary coming out which I'm pretty excited about.  Unfortunately, I wasn't able to go to the reunion, but they did come out here and I was able to be in the documentary.  But yes, it was on ESPN 2 and it was pretty exciting.  My friend thought that was pretty amazing.

Q.    All right.  Eventually, you left California, came here to Texas; is that right?

A.    Yes.  I moved here in '06.

Q.    Tell me when you came to Texas, what was your career goal?  What were you doing at that time?

A.    Well, I had -- I was about to have my second son XXXX and he was born in November 14th and we moved here in December 6th of that year.  I was ready to get out of the bartending business and kind of hustle and bustle of LA, I didn't want to raise my children.  I had some friends that had been involved in real estate and they suggested that I talk with this company out of North Carolina who was looking for someone to come to Austin at the time and start a medical office division.  So they had moved one of their partners out here to do that and I came out here to work with him and learn about the real estate business.

Q.    Prior to that, had you had any experience in developing properties, real estate transactions, anything like that?

A.   No.   I had purchased a home in California with my ex-wife and we had had like some toxic mold in the house and things had happened to it, but that was pretty much my only real estate experience.

Q.   So when you came here in 2006 to take on this new job, this new career, did you find it was something that you were good at?

A.   Yes.   Ironically, having kind of a mixed background of engineering degree and bartending and I had done, you know, some theater stuff in the past and been a salesperson.   In that capacity of being a bartender, it was pretty interesting that developing buildings was a lot similar to some of those careers and putting it all together, it made for a pretty interesting life.

Q.   Is there a lot of human interaction, a lot of sales calls or, you know, client calls, a lot of client contact with that type of career?

A.   Yeah.   I was very specific into medical office building so I spent a lot of time with doctors and then, obviously, real estate investors and banks.   But as a developer, you kind of put together the whole project so you take a piece of land and see that opportunity and take the risk up front and then, hopefully it pays off with a reward down the plan.   But we have to essentially spend a lot of time -- you know, some projects can take two or

three years before they go.

Q.   I'm not getting into the details here but at some point, you and your first wife divorced; is that right?

A.   Yes, in 2013.

Q.   And at a later point, you then remarried.

A.   Yes.  I got married in 2015.

Q.   And who was the woman that you married in 2015?

A.   Rachel Herrera.

Q.   Could I have the opening exhibit, the flowchart on the screen for a second?  We'll come back to that.  Never mind.

        Before getting into this part of it, let's talk a little bit about Kota Youngblood.  First off, do you see him in the courtroom with us today?

A.   Yes.

Q.   I want you to point him out and tell the jury what article of clothing that he's wearing.

A.   He's wearing a black sweater, it looks like.

Q.   And he pointed there at himself just to confirm; is that right?

A.   Yes.

Q.   To your recollection, how did you meet Mr. Youngblood?

A.   I met him through hockey.  So when I moved to Austin, I had been involved in the hockey organization in Los

Angeles and when I moved to Austin and my now-17-year-old son started playing hockey in 2010. When he was four years old, I started coaching hockey in Austin and I had coached a group of kids. So in hockey, we use birth years, so I coached a group of kids who were 2006s and I really started coaching them when they were four. They ended up being a pretty talented team that ended up being the first double A hockey team. Most of the really good hockey teams are out of Dallas. Austin, they had a lot of trouble breaking into that. We had some good coaches. So a double A team in Dallas and we'd won some championships and had a really good run.

So Kota and Gloria Youngblood's son, Kota, Jr., started to do -- learned to play, learned to skate hockey and it was phenomenal because he was about 11 years old, I believe at the time, maybe 12, but usually in hockey, it's a difficult sport because you have to learn how to skate first before you do anything else and he exuded enormous talent for a kid who had not really played very long. And he was playing in our Reckley program, but there was a lot of talk about his talent and how talented he was for only being in hockey for a few years.

Q.   You got to know Mr. Youngblood through his son primarily then, I take it; is that right?

A.   Yes. And then, his son ended up making our team and

knocking off some of those kids who'd been on the league team for a while and it was awesome because he got --

MS. HERRING:  I just object to the narrative.

THE COURT:  You want to break it up?

Q.  (BY MR. GUESS) So we talked a little bit about -- just to be clear, you and I have met a couple of times during the course of your preparation for coming in here today; is that right?

A.  Yes.

Q.  And we talked about some of the items you're discussing and testifying to today; is that right?

A.  Yes.

Q.  What's the one thing I always told you about Mr. Perardi, in terms of your testimony today?

A.  Keep it short.  You know, I don't have to go into excessive details.

Q.  All right.  You have to be honest, don't you?

A.  Yes, to be honest.

Q.  So first off, let's talk a little bit about hockey association.  We see your picture there at the corner; is that right?

A.  Yes.

Q.  The people that are pictured here, first off, Nicole Frost, who is she?

A.  She's my current girlfriend.

Q.   All right.  We see here picture of Rachel Herrera, that's the woman you married 2015?

A.   That's my ex-wife.

Q.   Adam Powell, who's that?

A.   He's the head of our hockey association and he worked for me at The Crossover.

Q.   All right.  Eric Swanson?

A.   Swanson's one of my best friends.  Their son and my son have been playing together since they were six.

Q.   And Rickie and Rebecca Kumar at the bottom.

A.   I coached their child, as well, along with Kota Youngblood.

Q.   So all these people eventually came to know Kota Youngblood, is that right, through the hockey association?

A.   Yes.

Q.   And at the very top, John Mapes, he's not really part of the hockey association, he's a friend of yours?

A.   No.  His son played hockey with Eventine, their older son.

Q.   Which brings us to the question, how many children did Mr. Youngblood have to your knowledge?

A.   To my knowledge, he had two children.

Q.   And what were their names?

A.   Eventine Youngblood and Kota Youngblood.

Q.   When you first met Mr. Youngblood, what was your

impression of him?  What did he do for a living?

A.   Well, I heard a lot from other people about him but my impression of him was that he was a very, you know, strong kind of alpha male, kept very quiet to himself, but was very complimentary to the coaches, would always thank us for working with his son.  He had military tattoos and talked about his military background and then, stated that he had a job in the government.

Q.   To your knowledge, at that point, do you know what kind of job he had for the government?

A.   At that time, I did not know.  I just knew that he worked for the federal government.

Q.   Did he talk about having been deployed during his military career?

A.   Yes, he'd gone on several tours and over in Afghanistan and he had two of his fingers had been bandaged up all the time and he claimed that those -- that was accidents from IED when he was over in the war.

Q.   Did he tell you about winning the Purple Heart?

A.   Yes.  Said that he won a Purple Heart and that he was in the Rangers.  My ex-father-in-law was also an Army Ranger so they had had a discussion about that at one time.

Q.   Did Mr. Youngblood appear to actually have some personal knowledge about rangers and military?  Was it

something that appeared to be fake or real to you?

A.   No.   He was an expert at it.   I mean, I felt like he was in the military.   He knew everything about the military and strategic military involvement.

Q.   This would have been about 2018, 2019 maybe when you first got to know Mr. Youngblood?

A.   Yes.   Right into 2020 when COVID started.

Q.   So you're coaching his sons, little Kota, who they're calling baby Kota --   what do they refer to him as?

A.   We called him Kota, but baby Kota was what big Kota referred to him as.

Q.   He was known as big Kota?

A.   Yes.

Q.   And then, Eventine?

A.   Correct.

Q.   Who's the older of the two boys?

A.   Eventine.

Q.   Were you doing any business with Mr. Youngblood at this point?

A.   No.

Q.   Were you going out to dinners with him, having any type of social interaction?

A.   Not initially.   As a coach of the team, we try to keep our social interactions kind of away from the parents because obviously, parents want to talk to you about why

their kids weren't playing or are they playing, so we try to not do that.  But I was at some team dinners or road trips where we all went out to eat as a team.

Q.   It's fair to say that parents become friends through the association of their kids being on the team, and so forth; is that right?

A.   Yeah.  Hockey is one of those things, I think it's pretty amazing you spend a lot of time in hotels with your children and I used to say that --

MS. HERRING:  Again, I'm just going to object to this narrative testimony.

THE COURT:  Break it up a little bit.

Q.   (BY MR. GUESS) All right.  So you're traveling?

A.   Yes.

Q.   With the hockey and everyone's becoming friends?

A.   Yeah.  They spent a lot of time together.

Q.   Mr. Youngblood included?

A.   Yes.

Q.   What about his wife?  Did you ever meet her?

A.   Yes, Gloria Youngblood.

Q.   Would she do some of the traveling also?

A.   She did a lot of it because Kota said that his job took him away a lot.

Q.   He didn't give any details about his job at this point, did he?

A.    No.

Q.    Let's go forward.  In early part of 2020, you mentioned The Crossover.  Tell the juries what The Crossover is and what your role was at The Crossover.

A.    The so Crossover is a sports wellness and entertainment center up in Cedar Park.  I and some other people, it's kind of been a lifelong dream of ours to build this complex, started in about 2015 and we were able to open it in the fall of 2020.  We began construction in 2019, but it has two ice rinks, soccer fields, bars, restaurants, physical therapy, gym, some medical tenants, e-games, just all kinds of things for families and community.

Q.    Were you the primary developer for that project?

A.    Yes, me and John Trube.

Q.    Were you the total owner of it?

A.    No.  In real estate, especially buildings like that, I'm just a small owner and I'm the manager partner.  John and I made decisions but we've got, I think, 26 investors and, obviously, a bank that is the majority owner.

Q.    Owned a lot debt on the projects, in other words, right?

A.    Yeah.  Currently, we have $24 million of debt and we have $21 million on investors.

Q.    We're into 2020, the pandemic hits, you're opening up

this Crossover.  Is there concern about whether or not it's going to be a success?

A.    Yes.  All of my buildings, medical office building in The Crossover suffered from tenants not wanting to pay rent, the banks, we had to go and work and negotiate with all the banks to get some forbearance on the loans.  I mean, there was a time where we weren't sure if people could even come into a retail center that big. Fortunately, we were in Williamson County so the rules were a little different than Travis.  But yes, everyone was six feet apart with masks.  Most of the other tenants were not able to open for six to twelve month delay.

Q.    Okay.  At this time, you're worried about your business.  You've made this huge investment taking up most of your professional time; is that right?

A.    Yes.

Q.    What's going on with your marriage to Rachel?

A.    Well, we had just had a child.  We'd gone through in vitro in 2018 and had a child who was born in -- XXXXXXX in December of 2018.  So it was a lot strain, I guess, on, you know, everyone on COVID and having a newborn baby and older blended family, children, but for the most part, we were working through it.  She worked for me.  She was marketing director of the Crossover.  So we obviously spent a lot of time at work and at home.

Q.    The new baby, you called her XXXXX; is that right?

A.    Yeah, XXXXX.

Q.    Okay.  Things start to happen, though, in terms of your marriage; is that right?

A.    Yeah.  Not to my knowledge but yes.  We had gone on a trip that summer with some friends down to the Caribbean.

Q.    I'm going to stop you there because I'm not going to get into details, but I'm just going to ask you, did you start to wonder or did you foresee that your marriage was going to begin to end?

A.    Yeah.  There was infidelity and drug use and some things that I didn't know about.

Q.    All right.  Move forward a little bit to February of 2022.  At this point, you and your wife have filed for divorce.

A.    Yes, in November of 2021.

Q.    And it's not an easy divorce, is it?

A.    No.  There's a custody battle going on and she had just tested positive for meth.  So there were some very -- concerns about my children's safety.

Q.    So in February 2022, do you host a Superbowl party or some type of event at The Crossover?

A.    Yeah.  The bar that is at The Crossover is called the Field House and they had a big Superbowl party.

Q.    And do you remember Mr. Youngblood was there at that

party or not?

A.    No, he was not.

Q.    May I approach the witness, your Honor?

        THE COURT:    You may.

Q.    (BY MR. GUESS) Mr. Perardi, I'm going to hand you what's been marked for identification purposes as Government's Exhibit No. 115.  Do you recognize Government's Exhibit 115?

A.    Yes.

Q.    And it's a series of posts on Twitter, I believe; is that right?

A.    Yes.  There were several.  I believe this is Twitter, yes.

Q.    All right.  This came to your attention during that Superbowl event; is that right?

A.    Yeah, that was a post on Twitter, Facebook and Instagram.  These are the Twitter ones.

Q.    All right.  Move for admission of Government's Exhibit No. 115.

        MS. HERRING:    Your Honor, Mr. Perardi's just saying that's something that he saw.  If it's not -- I'm not sure what the basis for admission is here.

Q.    (BY MR. GUESS) Did you create the post in this?

A.    I did not.

Q.    You saw them, though.

A.    Yes, I was shown them by my marketing director.

Q.    To your knowledge, are they true as far as what was appearing on the web at that time?

A.    No.  They all had my businesses tagged in them.

Q.    But again, the information may not be true but it was what was posted; is that right?

A.    Correct.

Q.    Move again for admission of Exhibit 115.

        MS. HERRING:  I think it would have to be limited --- entered for the limited purpose of what Mr. Perardi saw and not for the contents.

        THE COURT:  Okay.  I'll admit it with that limitation.

Q.    (BY MR. GUESS) Okay.  Then may I publish to the jury, your Honor?

        THE COURT:  You may.

Q.    (BY MR. GUESS) All right.  So we see here the first page of what was handed to you; is that right?

A.    Yes.

Q.    Steiner Ranch Truth, are you familiar with that particular social media group or I don't know how you --

A.    No, I've never heard of that.

Q.    Up until that time; is that right?

A.    Correct.

Q.    Were you living in Steiner Ranch at that time?

A.   Yes.

Q.   Let's go to page 2 of that document.  And top, we see -- I'm going to read it and ask you if you recognize any of these names.  Shady underhanded stuff going on with the night office solutions sales team led by Joey Pollard.  You don't say.  It isn't just me who speaks the truth.  Do you know who Joey Pollard is?

A.   Yes.

Q.   Did you know who he was at that time?

A.   Yes.

Q.   And who is Joey Pollard?

A.   He was a gentleman that was dating my wife or friends with my ex-wife.

Q.   Rachel Perardi?

A.   Correct.

Q.   Could I have the next page, please.  Actually, go to the next page, page 4.  The very top post there, dated February the 15th, this is again right around that Superbowl weekend; is that right?

A.   Yes.

Q.   Could we go ahead and highlight that first -- thank you.  Could you go ahead and read that first post?

A.   It got worse when they were leaving the ice and he started to hit on them.  These weren't grown women.  They were young girls 12 to 15 years old.  Just sick and don't

worry.  It gets worse or better, depending on your point of view.

Q.   What was this referencing when young girls are leaving the ice?

A.   I had not seen these in particular until later but the original ones that were tagged to The Crossover and Chapparal Ice were in reference to, I guess, him.  They would be referring to Joey in this case being a pedophile and spending time or being allowed to spend time at my Crossover to groom young girls.

Q.   Okay.  Let's go to the next page, please, and these are reverse date order.  So on February the 13th, we see the top post the -- why don't you go ahead and read that one, please.

A.   Here's a question.  Why are Joey Pollard and Rachel Perardi together?  It definitely isn't Rachel's looks since Joey's banging a lot younger women from his work.  It's the money and drugs.

Q.   When you see something like that as a businessman as someone who's invested in The Crossover, what are you thinking?

A.   Well, it was awful.  A lot of investors and people contacting me after this post but, you know, most importantly, I had my five-year-old daughter with me and my 20-year-old daughter with me, which is Rachel's

daughter that I adopted, and I was hoping that they did not -- obviously my 20-year-old did not see this post about their mother.

Q.    Read the next post, please.

A.    Hey, folks, that goes to The Crossover in Cedar Park. Want to swing in real life?  Talk to Rachel Perardi and Joey Pollard to get you into their rotation.

Q.    There's a bunch of hash tags there regarding swingers, sex Steiner, Ranch, Eric Swanson 1981.  Are you familiar with Eric Swanson 1981?

A.    No.  I'm not on Twitter, but obviously as to, I guess, an "at" would mean it attaches to some account that he must own.

Q.    Let's go to the bottom one there if you would on February 13th.

A.    Yeah, at Crossover, Texas.

Q.    It says -- I'm sorry, on the very bottom of that page where it says starts with guess who knows, would you highlight that one, Ms. Mercado, please.  Go ahead and read that one, Mr. Perardi.

A.    Guess who knows what this is?  Rachel Perardi can tell you.  She and her boyfriend Joey Pollard have been arrested multiple times for drug possession and usage. Would you let your kids around them?

Q.    First off, this is the first time that you're hearing

anything about this kind of stuff; is that right?

A.   Yes.   To my knowledge, my wife at the time or ex-wife now was not ever arrested for drugs.

Q.   Based upon these posts, did you feel it's going to have an impact on your business?

A.   Yes.   Following these posts, I actually had a lawyer letter sent to me from Joey Pollard and a lawyer and I had to retain a civil lawyer, Matt Wood, who then reached back out to them and they found out there were hundreds of other posts that I didn't know about.

Q.   Did you feel like The Crossover was being attacked?

A.   Yeah.   There were posts about the Field House, about Chapparal Ice, The Crossover.   Obviously building a community center and having five children, myself, having talk of pedophilia, swinging, drugs, those type of things are pretty damaging to a business.

Q.   Did you hire a company at some point to try to determine who was making these posts?

A.   Yes.   Through Matt Wood there was a company called C4, I forget the name exactly.   They searched into the post.   We hired a private investigators to follow some of the information about the post and then, they took my computer and cellphones and did excessive research of that to determine that I had nothing to do with those posts.

Q.   At some point as these posts are coming to your

knowledge, seeing what's going on, and so forth, does Mr. Youngblood approach you to talk about what's happening at The Crossover?

A.    Yes.

Q.    When did that happen and what was your recollection of that conversation, if you can recall?

A.    Well, after these posts, several days later, he told me that all of the posts were true and that through his government contacts at the NSA, that he had looked into this and that he had proof that my ex-wife had multiple juvenile charges and that they had been expunged because her dad was Army Ranger in the military and he was able to expunge those and that Joey Pollard and her had, in fact, been having an affair earlier in my marriage and that they were plotting together to --

Q.    Let me stop you there again.  Keep it so -- question and answer so that defense has -- so basically what we saw on those posts Kota confirms is actually happening and he knows it.

A.    Yes.

Q.    Does he ask you for -- to hire him to try to help you out of this jam?

A.    No.  He's my friend.

Q.    That's how he's approaching you?

A.    Well, he was my friend so yeah.  He came, you know,

he was talking to me about how he could help me.

Q.   At this point, is he telling you what he does for a living, what his job is?

A.   Yes.   We had extensive conversations about his government work working for the DOJ and under the special activation group and that his job involved being able to be a liaison between the government and some of the underbelly people in society.

Q.   So these conversations take place over a few months; is that right?

A.   Yes.

Q.   How often are you talking with Mr. Youngblood at this point?

A.   I mean, obviously seeing him at the rink sometimes but a lot of time conversations would go through Eric Swanson.   Kota did not carry a cellphone or have any way to communicate with me.   So I would get on a call with Eric and him, or I would talk to him at Eric's house or in other locations that were set up by Eric.

Q.   Now, you said it was common knowledge that you were going through a tough divorce within this group.   Was Mr. Youngblood also aware of your divorce situation?

A.   Yes.   His wife was -- had been friends with my wife, as well, and obviously our kids were all friends.

Q.   I'm going to go forward to June of '22.   And in June

of '22, your son XXXX, where is he at?

A.   For the second year in a row, he had gone to Las Vegas for a showcase for hockey.

Q.   What's a showcase?

A.   Adam Powell, who you had referenced earlier, would take a group of older kids with their parents or sometimes without and these kids would then go and play some practices and scrimmages in front of division one hockey coaches, junior A coaches, and it would give them that chance to be able to perform in front of coaches that they may end up being able to try out for teams one day.

Q.   Was Kota Youngblood's son also a part of that in Vegas?

A.   For both years, yes.

Q.   You got a call -- first off, did you travel to Vegas with the team?

A.   No.  I was unable to attend.  I had XXXXXXX.

Q.   You got a call from Adam Powell, who was coaching the team, kind of shepherding them or supervising them at that time; is that right?

A.   Yes.

Q.   Eric Swanson was also on that call?

A.   Yes.  Well, he called me, as well.

Q.   Tell me what Adam Powell and Eric Swanson tell you on the telephone.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

A.   So they both said that it was really important that I meet with Kota, that Kota was out in Las Vegas and that he'd had some extensive conversations with them about the safety of a child and that he was going to be flying back to Austin the next day and that I would be receiving a phone call from an unknown caller that morning and I would want to pick that up and make sure that I met with him.

Q.   What was your reaction to this call?

A.   I mean, I was terrified.  I immediately called my son XXXX and I talked to him and he said that he had just gotten back from talking with Kota in a parking lot and Kota had given him a big hug and then, lectured him about his surroundings and being aware of his surroundings and to make sure that he knew where he was at all times and to make sure that he was with other kids on this trip and not to ever be alone in Vegas.

Q.   The next day, does Kota Youngblood arrive back in Austin?

A.   Yes.

Q.   Does he contact you?

A.   Yeah.  I received a phone call approximately 6:30 in the morning.

Q.   And what happened after you received that telephone call?

A.   I gave him the address of the house that I was

leasing and he said he was driving over to the house to meet me in person.

Q.   You were leasing the house because your soon-to-be ex-wife Rachel was living in the house in Steiner Ranch.

A.   Yes.  She remained in my home in Steiner Ranch.

Q.   And just to be clear, there was separate property that you had bought prior to the marriage with Rachel; is that right?

A.   Yes.

Q.   When Kota arrived at the rental that you were staying at, describe the meeting and what he told you.

A.   Well, my daughter was still asleep.  She still sleeps with me after all this.  So she was in my bed.  So he and I went outside on the back patio.  Whenever you talked with Kota, he asked that you leave your cellphone and any sort of recording devices obviously inside.  So we both went outside, shut the doors and began a conversation on the patio at about 7:30 in the morning.

Q.   And what was the content of that conversation?  What was Kota telling you at that time?

A.   He told me that he knew all about my life insurance policy.  He quoted my life insurance policy, the number that I had, the amount that I had, who the policy was with.  He talked about some of my real estate holdings and said that through the research of trying to help me figure

out these posts and this information of her having these past charges that he had come up with a lot of information and had been listening to them and that my life was in danger. That he knew that I had just had mediation, which I had not told him or anyone else about. He knew the amount that was asked at that mediation by my ex. He knew the circumstances that were asked. And then, he proceeded to go into extensive details about his monitoring her and Joey and this other boyfriend of hers Aaron, who had had felony charges, and how they had convinced her or she had been in a decision that said the cartel were going to kidnap my son XXXX, hold him for ransom and then, I would be expected to find or gain access to money, which I explained to him I did not have.

Q. Let me stop you there. So he's telling you things about your life that you don't believe he would have any access to other than through some secret meetings or some government agency meetings?

A. There's no way. I mean, this was very detailed information about my personal life and finances and business dealings.

Q. So he's telling you that there's going to be a hit or a contract out for your murder?

A. Yes. He says that my son is going to be kidnapped and that when I go to make the ransom that I'm going to be

killed by the drug cartel by Zetas for my life insurance policy.

Q.   You're an educated man, you're a successful businessman at this point.  Did you try to corroborate some of the stuff that he was talking to you about?

A.   I mean, not at that moment.  He's a federal agent and I'm his friend and he has, to this moment, loved my son like -- yeah, like he's a son to him.

Q.   And again, before we go on, in preparation pursuant to FBI instructions, you went ahead and created an Excel spreadsheet for yourself to kind of help you remember some of the events that occurred during this timeframe; is that right?

A.   Yeah.  I had been doing journaling.  Obviously a lot of things were going on and I kept --

MS. HERRING:  Object to the answer.  He said yes. I object to the continued narration.  We're past the answer.

THE COURT:  All right.  If you could just try to limit your answers to the question.

THE WITNESS:  Sorry.

THE COURT:  Would this be a good time for us to take a break?

MR. GUESS:  Sure.  This is fine.

THE COURT:  Ladies and gentlemen of the jury,

we're going to take our second 20-minute break of the day. It's 1:45 so if you could be back in the jury room, ready to go at five after the hour and we will finish off the rest of the day.

(Jury not present.)

THE COURT:  We'll be in recess.

(Recess.)

MR. GUESS:  We'd agreed that the names of minor children that were mentioned by Mr. Perardi should be redacted from the transcript and we ask that that be ordered for the court reporter.

THE COURT:  I will so order.

MR. GUESS:  Thank you.

(Jury present.)

MR. GUESS:  May I proceed, your Honor?

THE COURT:  You may.

Q.   (BY MR. GUESS) Mr. Perardi, before we took a break, we were talking about June of '22 when Kota came to your house sitting on the back porch.  You recall that?

A.   Yes.

Q.   And at that time, did Mr. Youngblood tell you that he could help you with this problem?

A.   Yes.

Q.   And what was the problem that you thought he was going to help you with?

A.    Protect my children from the drug cartel, specifically, my 17-year-old son.

Q.    Was it also to help protect yourself?

A.    Yes, and to keep me safe from being killed for my life insurance policy.

Q.    How much money, if you recall, did Mr. Youngblood tell you he would need to provide that protection for you?

A.    He said that he needed $70,000.  Some of it would go towards protection but some of it was to get the information of phone calls and text messages.  He said that he had audio recordings of my ex-wife ordering this hit on me and the kidnapping of my child.

Q.    Based on what he'd already told you about some of those specific details, did you believe him at that point?

A.    Yes.  Absolutely.

Q.    Let's take a look at what's been already admitted as Government's Exhibit No. 84.  Could you put that up on the screen, Ms. Mercado.

      Mr. Perardi can you see that check there?

A.    Yes.

Q.    And is that a check from your company T.A.P. Development?

A.    Yes.

Q.    Tell me what is T.A.P. Development?

A.    T.A.P. Development is the real estate entity holdings

that I do all of my projects with.

Q.   And this check is written on July the 8th of 2022. Is that the date that you recall Mr. Youngblood coming to your rental home?

A.   No.  That's the date I was told to provide the check.

Q.   Who told you to write that date on the check?

A.   Mr. Youngblood.

Q.   That's your signature there at the bottom?

A.   Yes.

Q.   And it's paid to the order of James Holloway.  Who is James Holloway at that time, do you know?

A.   I did not know and had never met James Holloway, but Mr. Youngblood told me that James was a antique dealer that worked with antique clocks and different items and that he used to work at 3M and that Mr. Holloway was able to cash checks at the Wells Fargo near him and be able to take that money because he needed cash immediately. Because I was confused at how if I give him a check, I'm used to checks being held and he said that the check could be cashed and he could immediately have cash.

Q.   At the time he told you about this threat, did you ask Mr. Youngblood, shouldn't we go to the cops, shouldn't we go to the FBI?

A.   Well, he was the federal government so I, of course, trusted him and thought that he was working in the best

interest of my children and me.

Q.   I see on the memo line there, it says Kyle project services rendered.  What was the Kyle project?

A.   So I was working with my development partner and architects to do a second Crossover project and the project did not happen.  Interest rates changed dramatically.  So I had just -- had to write a bunch of checks to different vendors who I actually worked on the project and were unable to go forward so I did not know what to write on the memo check.  I mean, I couldn't put down that I'm going to be killed or that my son's safety was in danger.  So Mr. Youngblood suggested that I put down the Kyle project and to say that James Holloway was a potential vendor or investor.

Q.   Was this an attempt to hide money from Rachel Perardi, who you were involved with a divorce at that time?

A.   No.  I owned T.A.P. Development outright and had owned it since 2007 and was given it in my first divorce and obviously everything that I did was discoverable during the divorce.  So I mean, they were going to -- her and her lawyers were going to see all of these checks.

Q.   Could we go to page 3 of that exhibit, please, Ms. Mercado.  And would you please highlight about midway down, you'll see check No. 2110 at the bottom third.

This is your Wells Fargo statement for the month of July 2022; is that correct?

A.    Yes.

Q.    And we see there the cashed check of $70,000?

A.    Yes.

Q.    Was this the check that you had written on that day?

A.    Yes.

Q.    Or written previous to that day; is that right?

A.    Correct.  Yes, previous to that.

Q.    All right.  So, Mr. Perardi, $70,000, is that a lot of money to you at that time?

A.    Yes.  My business only had that amount that you see in it, which is 279.  And the divorce and the burn rate of my company was about $50,000 a month and my personal burn rate with my ex-wife was probably about $30,000 a month. So I had no other income that was coming in except for the money that was in this business.

Q.    So this would have been the first time that you wrote a check that was to benefit Kota Youngblood.

A.    Yes.

Q.    And what was that money going to do for Mr. Youngblood, did he tell you?

A.    It was to be helping the transportation of the documents from the NSA agent and to make sure that those documents were delivered safely and the audio tapes, and

then, to provide supervised protection of me and any children.

Q.   Was this going to help you in terms of your desire to have full custody of your daughter?

A.   I mean, it was going to help me to keep my children alive.  If he gave me the documents that said that my ex was charged with meth previously and that she was going to have me murdered, I would imagine a court would have given me custody of my child.

Q.   So is that the only payment that you made to Mr. Youngblood over the time that you and he became friends or partners or did you --

A.   No.  And I was told that this payment would be returned to me within weeks.

Q.   So he was just using this money but you were going to get it back.

A.   Yes.  He told me that he is a very simple man and the safety of my children and me as his friend are the most important thing that he was using this money to protect my children.  But had personal items of his own that he would sell in his own money invested to make sure that my children were safe and that he could give that money back to me immediately.

Q.   He was doing that because he considered you one of his very good friends?

A.    One of his best friends.

Q.    And you considered him a very good friend at this point, too?

A.    Yeah, I mean, he was protecting me from drug cartels and was very involved with wanting to protect my children.

Q.    That same month -- could we have Government's Exhibit No. 85 on the screen, please.  Another check written from your T.A.P. Development account.  This has been previously admitted, dated July the 7th of 2023, written to James Holloway, again, for the Kyle project rendered.  What was this $86,000 for?

A.    So this is the first summer that I was going to not have my daughter for two weeks because the divorce, obviously you got a shared custody in the summer and I was told that I would be killed those two-week period if I was in -- stayed in Austin, Texas.

Q.    Let me stop you there for a quick second.  Why did Mr. Youngblood tell you that you were extremely vulnerable at that point to being assassinated or killed?

A.    He told me that it was under strict orders from Rachel that when I had my daughter XXXXXXX, the five-year-old, which I was sharing 50-50 custody under the temporary orders, that I was safe, but if she was not in my custody, that I was in danger.  So every time that I did not have her, I slept at more people's houses or other

friends' or Nicole's home and mention of my whereabouts were unknown.

Q.   This check for $86,000, did you write this when you were in Austin, Texas?

A.   No.

Q.   Where did you write this check from?

A.   I wrote it from New Orleans.

Q.   Tell the ladies and gentlemen of the jury how you came to write this check for $86,000 while you were in New Orleans.

A.   So obviously, Nicole knew about what was going on and she volunteered to put travel on her credit cards and we planned a trip where we would go to multiple cities over that two-week period, New Orleans, then Nashville and Miami, and we stayed in one hotel and then, some friends in the other places.  But it was in New Orleans where I got a phone call.

Q.   Who made this phone call to you?

A.   The original phone call was a text from Eric Swanson saying that he needed to talk to me immediately and that Kota needed to talk to me immediately and then, I talked to Kota on the phone.

Q.   Was that off of Eric Swanson's telephone or do you remember which phone it came from?

A.   I can't remember if it was an unknown number or if he

called me on a three-way call.

Q.   And what did Mr. Youngblood tell you on that telephone call?

A.   That my son, my 17-year-old who I won't use his name, was in danger, that he was at the Canyon Ridge Middle School track wearing a blue elite hockey sweat shirt and he was with Eric Swanson's son XXXX and the drug cartel were watching them and that the guys that he had paid were also watching and that he needed more money to keep him safe.  Since I was out of town, they were going to try to kidnap XXXX.

Q.   Did you call your son?

A.   Yes.

Q.   And what did you learn about where your son was at and what he was wearing?

A.   Arys said I'm at the Canyon Ridge Middle School track, I'm wearing an elite hockey sweat shirt.  I'm with XXXX and XXXXXXX and another kid that he ran track with and we're running track at the school, and I said you need to go home, you need to turn on your Life 360 notification immediately and you need to make sure I know where you are at all times.

Q.   The information that Mr. Youngblood just told you about on the telephone, you corroborated, you confirmed?

A.   Yes.  And Eric said that he just talked to Alex and

Alex was with XXXX, or my son, as well.  Sorry.

Q.   So this check that's dated July 7, 2022, did you and Mr. Youngblood talk about how you were going to get this money to him to help protect your child?

A.   Yes.  I told him the only available funds that I had because this is obviously written after July 7th -- were I would have to wire transfer money from a HELOC on my home to a Wells Fargo account, transfer that from my Wells Fargo account to my business account, and there were no Wells Fargos in the state of Louisiana and I did not know that until I had gone to Louisiana, so I was unable to do any of that in real time so I had to get a hold of bankers.

Q.   Let me stop you there.  So you're having this discussion with Mr. Youngblood about how you're going to have to use this interstate wire to get that money to him.

A.   Yeah.  He told me that it was of the utmost importance and I did not have time to waste.

Q.   Under normal circumstances, would you have just waited till you go to back to Texas to write a check?

A.   Yes, of course.

Q.   So this check is dated July 7, 2022, again, to James Holloway.  At this point, had you looked up James Holloway on the internet to see who he was or anything like that?

A.   Absolutely.  He had an antique clock company that

seemed to have suffered during COVID and that he had worked for 3M for years prior to that.

Q.   Did you see a picture of him online, as well?

A.   I didn't see a picture of him but it said that his age was in his late 70s.

Q.   So you wrote this check -- could we go back to Government's Exhibit No. 84 for a moment, please, page 3. Actually, page 4.  Check No. 2085, highlight that, please.

So this is a check that's again dated on 7-8; is that correct?

A.   Yes.

Q.   Or 7-7.  Excuse me.

A.   7-7.

Q.   But it's not cashed until 7-21.

A.   Yes, because I Fed Ex-ed it overnight on 7-20, I believe.

Q.   So you're in New Orleans?

A.   Yes.

Q.   You're explaining to him how you're going to get this money together and you happened to have a checkbook with you; is that right?

A.   Yeah, I always had my business checkbook with me at all times.

Q.   So you wrote this check for $86,000 and how did it -- how was it sent or who was it sent to?

A.    He gave me James Holloway's home address over the phone and I went to the Fed Ex with Nicole and her and I Fed Ex-ed the check to James Holloway.

Q.    Still haven't met James Holloway at this point, though, have you?

A.    No.   But I confirmed with Kota, the next day, that he had received the check.

Q.    So after you leave New Orleans, you end up in Miami or eventually in Miami; is that right?

A.    Yes.

Q.    Let's go forward to that date in Miami and did you receive communication from Mr. Youngblood that he needed to talk to you?

A.    Yes, that it was desperately urgent.

Q.    Were all these contacts with Mr. Youngblood always urgent of you had to do it right away type deal?

A.    Yeah.   I mean, looking back, the tightrope and pressure was unbelievable.

Q.    So he contacts you while you're in Miami and what does he tell you that's going on?

A.    He tells me that XXXXX safety is -- or my son's safety is still very much in danger and that that money was not enough and that he's put in his own funds, as well, and that I need to immediately get him another check.

Q. So at this point, then, Mr. Youngblood's telling you that he's helping fund the precautions for your son's safety?

A. He's always helped fund it. He's put in far more than I had.

Q. So your son's in danger again and this time, how much money, if you can recall, does Mr. Youngblood need from you?

A. I'm not sure. I mean, there have been so many checks but maybe 56,000. I can't remember the exact amount.

Q. Let's take a look at Government's No. 86 and see if that refreshes your memory how much money he needed this time.

A. Far more than that.

Q. So this check is dated July 20. So now this is a third check within a two, three-week period. How much is it for?

A. $83,000.

Q. Memo line, Kyle project rendered?

A. Yeah. I was instructed to keep them all the same.

Q. Did you again reference the fact that you were going to have to move money out of your HELOC account?

A. Yeah. My business owed a lot of money in that previous slide. I just paid for my ex-wife to a year's worth of an apartment for her and my daughter when she had

her.  I had mounting lawyer bills and money that was to go back to my business employees so the only way I could access funds was to wire transfer money from my HELOC account.

Q.    And just to make sure we all understand, would you explain to the jury what a HELOC is and how you obtained that line of credit?

A.    Yeah.  It's a home equity line of credit and I had obtained it in September of 2021.  My home had increased quite a bit in value at that time so I was able to take out a second mortgage and I was using that as protection for stuff at the house, businesses in case -- I didn't obviously anticipate interest rates to go where they did. It was a safety net not to be used until it was.

Q.    We're going to kind of bounce back and forth just a little bit here but I want to have you explain the details.  So in order to access the funds from the HELOC, what did you have to do, Mr. Perardi?

A.    I had to reach a banker in Dallas named Tandrea and Tandrea worked for Washington Federal.  She would then contact a banker in Seattle where Washington Federal was based and they would then wire transfer that money into my Wells Fargo account, and then, I would move that money from my Wells Fargo account into my business account and then, write the check out of my T.A.P. Development

business account.

Q.   Could we have Government's Exhibit No. 101 on the screen, please.  Do you recognize this document, Mr. Perardi?

A.   Yeah.  This is my wire authorization by Tandrea.

Q.   And this is something that, again, you are familiar with through your business as well as through the HELOC; is that correct?

A.   Yes.  In my business, I have to wire transfer money a lot.

Q.   So we see wire transfer amount of $36,000; is that right?

A.   Yes.

Q.   And this went from Washington Federal Bank, which was based in Seattle, as you said, to your Wells Fargo account; is that right?

A.   Yes.

Q.   Which Wells Fargo account did it go to?

A.   My personal Wells Fargo.

Q.   Could we have page 2 of that particular document, please.  Is this the page, the first page of your personal account?

A.   Yes.

Q.   The account No. 6673, that's different than your T.A.P. Development account; is that right?

A.   Yes.

Q.   The next page of that document, Ms. Mercado.   Please highlight on 7-27.   Again, we're going to see the wire transfer from Washington Federal, Perardi $36,000 and that's the deposit; is that right?

A.   Yes.

Q.   So that's where the wire transfer came in?

A.   Yes.

Q.   Obviously, that doesn't add up to the amount of the check that you had to write on that occasion, though, does it?

A.   No.

Q.   What did you do with that $36,000?

A.   I transferred it into my business so that I could write the, I believe, $86,000 check.

Q.   And again, the check we've already looked at, that was part of the payment that you made to Mr. Youngblood at that time?

A.   Yes.

Q.   The telephone calls, and so forth, that you'd had with Mr. Youngblood, were you always out of state at this point in these two that we talked about in New Orleans and Miami?

A.   Yes.

Q.   And he was back here in Texas to your knowledge?

A.    Correct.  Nicole was with me so she heard every call.

Q.    After this payment of $83,000, did Mr. Youngblood indicate to you that that would be it, that he'd put this all to bed?

A.    After every payment, I was told that would be -- it was just weeks away from having the information, having my ex arrested or detained and then, he would be working on giving me back my money.

Q.    You said weeks away from having your ex arrested. Was that important to you?

A.    No.  Only if she was guilty, I guess.

Q.    What was your primary concern?

A.    My primary concern was the safety of my children.

Q.    After this third payment -- and let me step back a second.  How did you transfer that check for $86,000 to Mr. Youngblood since you were in Miami at that time?

A.    Miami has Wells Fargos, I was able to do it online and transfer it over in real time.

Q.    So you transferred that money from Miami office to the Texas account?

A.    Yes.

Q.    Let's move forward to August the 10th, about two weeks later, you were back in Texas; is that right?

A.    Yes.

Q.    Tell me what happened with Mr. Youngblood and a

meeting at Starbucks.

A.   So I got a call from Mr. Swanson again saying that Mr. Youngblood was going to meet me and he had some money to return to me.  So I went to the Starbucks on 2222, which is close to Steiner Ranch, before I was going to pick up my daughter and met him and he said that he had gotten some money from New York from the mob friend of his that he deals with for the government and that they were concerned about the safety of my children, as well, and he handed me a golf sleeve like a driver sleep cover for a driver with hundred-dollar bills in it and told me that it was $44,000.

Q.   Were you surprised?

A.   No.  I mean, Mr. Youngblood always had cash on him. I mean, I'm surprised I guess that I was getting it back and that was a good thing.  He said the information and, you know, the safety of my children was working through the payments and he wanted to make sure that he got me some money back.

Q.   So again, this is corroborating the story that he's telling you that eventually you're going to get this money back but he is working hard to make sure your children are safe?

A.   Yes.  And he's put in a lot of his own money, as well.

Q.   Did you walk out of there with that 40,000 or $44,000 in cash?

A.   Yes.

Q.   And what did you then do with it?

A.   I had moved my safe over to Nicole's residence. Obviously my house was not safe and I'd put cameras and things in my house, so I brought it over there and I put it in my safe at her house.

Q.   Was it on this occasion that you met James Holloway, finally?

A.   No.  A few days later, I was asked to come up with a much larger payment and the urgency was massive that --

Q.   When you say you were asked, who asked you to make another payment?

A.   Kota.

Q.   And how did he communicate that to you, in person or on the telephone?

A.   On the telephone.

Q.   What did he tell you was happening?

A.   He told me that I needed to get more money that my ex had taken a trip down to Brownsville -- her family was from south Texas -- with a very dangerous man from Los Zetas drug cartel named Juan Guzman and that she had left a sweater and a credit card in the car, but there was money being transferred across the border and that a hit

man had been identified that was going to cross the border and kill my child or kidnap my child.

Q.   Was there something about that incident that Kota said stood out to him in terms of why you were going to be further threatened?

A.   Yeah.  The fact that they had been able to actually deliver the money in person.  It ramped up the circumstances.

Q.   So he needs more money now to provide for the protection and what did you do at that point?

A.   He told me to meet James Holloway.  I was over in Circle C area and I met -- the only way that I could get any more money was to -- I had a business line of credit with Frost Bank under my T.A.P. Development and it was a line of credit for $40,000.  So I went to Frost Bank and got a cashier's check for $40,000 and then, I went to Wells Fargo to cash that cashier's check.  I got the money out of the safe that he had given me, I took around 31,000 of that, I think some other cash that was in there, and then, I tried to cash the check at Wells Fargo.  Wells Fargo said that they would hold a cashier's check.  So I went back to Frost Bank and I begged the cashier, who was very nice, to give me $40,000 in $100 bills.  And this whole time, James Holloway was outside talking to Nicole and corroborating all of the story saying his family was

also in danger.

Q.   Let me stop you there.  So Mr. Holloway and you had met.  Had Kota arranged for you to two to meet?

A.   He said you're -- you know, this is who you had been writing the checks to and you need to go and meet him.

Q.   And again, this is around Circle C area.  Where did you meet him, if you can recall?

A.   In front of the Frost Bank building on William Cannon.

Q.   Tell the jurors what Mr. Holloway looked like.  What was your impression of him?

A.   I mean, he looked like anyone's grandfather.  He's very -- maybe about five-ten, kind of a thin man, wears a baseball cap, has kind of crooked teeth but glasses.  Looks like your grandfather, anyone's grandfather.

Q.   Seemed to be a reliable and credible person?

A.   I mean, he spoke extremely highly of Kota and his relationship with him, confirmed everything that was going on with my ex and what he had said was happening and, I mean, just 3M businessman who was into antiques and clocks.

Q.   Could we have Government's Exhibit No. 87 on the screen, please.  This check's dated August the 10th of 2022.  Is this the check that you would have given to James Holloway around that timeframe?

A.   Yes.  I believe so.

Q.   All right.  And it's for $21,000; is that right?

A.   Yes.

Q.   Kyle project rendered one more time; is that right?

A.   Yes.

Q.   So did Mr. Holloway other than tell you what a great guy Kota was give you any additional information about how long he'd known Kota, what kind of business Kota was in, anything like that?

A.   Yeah.  He stated that everything Kota said about being his military service, the death of his parents, his government involvement, him working with antiques and different things as part of his other job were all true and that he very much worked and knew the drug cartels intimately through his SAG job with the government.

Q.   So the first time, you meet this man but he seems to be a credible person in your mind?

A.   Yeah.  It stands out that he said to me, over and over again, if I'm wrong about this and my child's dead, then what would I do?

Q.   Your child.

A.   Yes.

Q.   Let's go forward to the 16th of August.  Right around that date.  Was there another contact with Mr. Youngblood?

A.   Yes.  I believe I may have talked to his wife first.

Q.   On this occasion, does he need more money in order to get the evidence about Rachel's plot?

A.   Yes, but he had been talking to me about his son Eventine and he said that his son, who I'd known and had coached before that had gotten involved with drugs in California in school and he was very concerned about his son and he said his son was -- his wife called me and said that I believe this time that his son had been picked up in a sting operation in San Diego for fentanyl and drug related and that they needed money for a lawyer and that he had given so much money to help my son that I needed to help him with some money to try to help get his son a good attorney.

Q.   So at this point, you're going to give additional money to Mr. Youngblood; is that right?

A.   Yes.  Him and his wife both corroborated that story.

Q.   And in order to do so, you were going to have to tap into that HELOC account one more time; is that right?

A.   Yes.

Q.   Could we have Government's Exhibit No. 102 on the screen, please.  Again, this is the wire detail from the Washington Federal Bank.  Tell me how you arranged for the wire transfer to occur.

A.   I called and e-mailed Tandrea again, who then verified it looks like from a different person this time.

But Tandrea was always my contact at Washington Federal.

Q.   And how much money were you wiring?

A.   $50,000.

Q.   That's indicated where I'm using the pointer; is that right?

A.   Yes.

Q.   And again, going from your Washington Federal HELOC in Washington state to your Wells Fargo account in Texas; is that right?

A.   Yes.

Q.   Which account was it going to go to?

A.   My personal account.

Q.   Could we have page 3 of that document, please, Ms. Mercado.  And let's highlight the 8-16 lines.  So we see here, top line 8-16, there's the wire of $50,000; is that right?

A.   Yes.

Q.   And then, actually charged you a wire fee.

A.   Yes.

Q.   $15 and then, you transfer that money to your T.A.P. account; is that right?

A.   Yes, plus an additional 8,000 it looks like.

Q.   The line says there commercial basic checking loan for legal fee divorce HELOC.  What was that in reference to?

A.   I mean, I was transferring it into my business account for this but obviously not going to put on my memo line or here that I was transferring it for the reasons of safety of my child or protection of myself.

Q.   You would have been the person, though, to indicate that it would have been for the divorce; is that right?

A.   Yes.  I did have -- obviously, I was paying both lawyers at the same time.

Q.   Could we have Government's Exhibit No. 88 on the screen, please.  Same time you're transferring this money around, we see the T.A.P. Development check fore $54,000 on August the 15th.  Is that what that date is?

A.   It looks like that's the date on the check, yes.

Q.   That's your handwriting, right?

A.   Yes.

Q.   And again, Kyle project received, James Holloway. Same pattern we've received previously; is that right?

A.   Yes.

Q.   And the reason for this money is again to protect your children, protect Kota's son.

A.   Yes.

Q.   So let me ask you, but for the fact that Kota was asking you for this money, would you have been wire transferring this money between Washington state and Texas?

A.    No, because it was a loan against my house that I had to pay off, so I was actually borrowing money to make any of these payments at this time.

Q.    Could we have page 3 of that document, please. Excuse me, page 4.  We see is that 58,000 from the HELOC. And then, there's that cashed check for $54,000 on 8-16. So all this stuff's happening very rapidly, right?

A.    Yeah.  I mean, by this time, I've lost several hundred-thousand dollars, but obviously, my children are still alive so that was the most important thing.

Q.    At this point, are you trying to do a little bit of research to make sure that some of what Mr. Youngblood's telling you is true?

A.    Yeah.  I mean, I've become an expert at this point on Los Zetas drug cartel and their brutality of murdering children and hanging people from bridges and obviously had done research on James Holloway and looked up Kota Youngblood extensively and found nothing but positive things about him being an antique dealer and working gold and mines and different things and having a master's degree from Case Western.  All the things that he had told me were true.

Q.    And you'd seen those things online, you said?

A.    Yes.

Q.    You said that Kota and Gloria asked for some money to

help Eventine, as well?

A.    Yes.

Q.    Take a look if we could have Government No. 89.  Why did the Youngbloods need money to help protect Eventine if they were pouring money to protect your son?

A.    Because they didn't have any money left because they were trying to help me save my child.

Q.    So when they told you that they needed money to protect their oldest Eventine, did you agree to help them out?

A.    Yeah.  He said that he was having to do an auction on his house and sell several antique items, but he could not get the money quick enough of any of these antique items so if I could give him some more money, he would sell everything he had and then some to get me back my original money, but obviously, money to help him with his child.

Q.    That's something that you had known about from other parents that Mr. Youngblood's house was filled with supposedly valuable antiques; is that right?

A.    Yeah.  I mean, every person that had been over to his house -- and I had not been at that time -- corroborated that he had just elaborate items, that flag hanging in his house that was worth millions of dollars and --

Q.    Is this Mr. Youngblood telling you that he possesses a lot of very valuable items?

A.    Yes.  He said his grandfather was an antiques dealer and that he has been passed down a lot of valuable items and then, through his business was paid or given a lot of valuable items because of his knowledge in the different fields that he was involved in.

Q.    So again, I think you probably know the answer to this but why not just sell some of the stuff to pay for these expenses?

A.    Well, that's what I asked James over and over again. By this time, now that I had met him, I was having conversations with him, as well, and they explained to me that antique items like that take a longer timeframe to sell obviously and the cash was the only way that these people would deal in any of this was through cash.  So none of these items could be sold quick enough to eliminate the threats.

Q.    The urgency again?

A.    Always the urgency.  I mean, phone calls, text messages at all hours of the night.  I carried a gun with me everywhere I went.

Q.    Was that something you had done before meeting Mr. Youngblood?

A.    Never.

Q.    Why were you carrying a firearm?

A.    I was instructed by him that my safety and that I

should have a firearm on myself at all time. James also carried a firearm on him all the time and Kota said that he was well protected but that I should always be ready because, at any time, someone could drive up to my car or children and I needed to be able to protect myself.

Q. This check for 66,000 written on September the 14th, 2022, your recollection is that went to Mr. Holloway, eventually cashed it to Mr. Youngblood to help protect Eventine.

A. Yes.

Q. We have page -- besides protection of your family, was Mr. Youngblood telling you something else regarding valuable items that he was trying to bring back into the country?

A. Yeah. He had talked to Eric Swanson extensively about it and James obviously confirmed it that his grandfather had left him these gold coins from the '20s. Apparently there was a certain amount of them that were minted dollar bills from the 1920s and Eric Swanson talked about them all the time. But that was one of the items that he claimed, though he had given up everything of his own personal financial wealth and items that he had that he knew that those could be sold and he would be able to pay back Mr. Holloway, myself, himself any of the money that had been paid for the protection of our families.

Q.   Do you recall a conversation in which you and Mr. Youngblood talked about if you could only give some money, he'd be able to get some of these clocks or this gold across the border and everyone would be made whole in terms of their investment?

A.   Yeah.   This was a little even scarier if that's even possible under the circumstances.   So James claimed that he had these antique clocks, which I was demanding to see and, you know, again, I said, sell your flag, sell your clocks.   I don't care what you have to do.   I'm borrowing money from friends, family, myself, whatever at this point.   But under these circumstances, he said that some of the money had been used in order to protect my child. And I met him in person and he didn't want to go into great detail over the phone, but in person, he basically alluded to Juan Guzman, who supposedly had been with my ex-wife, his brother was part of Los Zetas cartel and that he was intercepted at a hotel south of the border and his throat was slit and was killed by a -- someone who Youngblood knew in the cartel and on his possession were pictures of my son, pictures of Eventine and young Kota and pictures of Eric Swanson's son, and the address of my son's house where his mom was and my address.

Q.   This obviously caused you a great deal of concern.

A.   I mean, I don't know -- I've never experienced

anything like that. So yeah. I wasn't sleeping a lot before, but it was worse and pretty hard nights.

Q. Could we have Government's Exhibit No. 90 on screen, please. This check's written on September the 21st, 2022, same format as the others that we've seen, $47,000, was this given to Mr. Holloway to benefit Mr. Youngblood to put to bed some of these issues that were taking place?

A. Yeah. And this is the first time I actually saw James go in and come back out with cash. So this was told to me before but I actually met him and he was able to cash a check and then, came out with cash. So everything that they were telling me was real.

Q. Okay. For this $47,000, did you have that money in your account, or did you end up borrowing some money to help fund this particular check?

A. No. I had -- when the first threats happened, I wrote a letter to my mom about if I was to end up dead or something happened to XXXX, this is what I was told was going on. So by this time, my mom had known about this. My dad was sick, but my mom knew about what was going on. So I actually borrowed money and my parents were over seeing doctors in Austin and I begged my mom to give me some money because I didn't have anymore access to much money.

Q. How much money did she loan you?

A.    I think at that time, maybe 16,000.  She's loaned me over 130,000 by the end of this.

Q.    Something else that was kind of happening around the same time is that you'd see Mr. Youngblood at Pappadeaux's every now and then?

A.    Yeah.  There was a meeting place where he would ask me and Mr. Swanson to come and talk with him.

Q.    On one occasion, or at least on one occasion, did someone drop off something of value in which you perceived to be value to Mr. Youngblood while you were there with him?

A.    Yeah.  I think it was also important that everyone in the restaurant knew him and bus boys and waiters and cooks would come out and say --

        MS. HERRING:  Objection.  Nonresponsive.

A.    Yes.

Q.    (BY MR. GUESS) Tell me a little bit about, again, what was dropped off and what impact that it had on you.

A.    It was a bag of gold coins.

Q.    And what impact did that have on you?

A.    Well, he showed me one of the coins and they were minted in 1920 gold coins that he was claiming that he had access to much more of those and those were what he was going to use to sell to pay back himself, Mr. Holloway and me, and to keep our families safe.

Q.   Did that tend to corroborate your trust in Mr. Youngblood that you were going to get this money back at some point?

A.   Yeah.   I mean, I believed everything he said to me.

Q.   And you said he's kind of a superstar in this restaurant?

A.   Yes.

Q.   Tell me how he was treated inside the restaurant.

A.   I mean, it was the same he was everywhere.   We went where people knew him.   He's very engaging, says hello to everyone, everyone will come out and talk to him.   He's very particular the way he orders food.   But they thank him for things he'd done for them and he told me that he had used his connections to help several of them with different things that had happened to them and they all -- I mean, they came out and treated him like the way we all treated him that he was your best friend and somebody who could really help you if you had a problem.

Q.   You mentioned that at this point, you wanted some proof that these clocks or other things existed; is that right?

A.   Yeah.   I mean, I was out enormous amount of money.

Q.   So what had you been discussing with Mr. Youngblood and Mr. Holloway regarding these clocks, if you can recall?

A.   They claimed that they were going to go to Sotheby's and auction these.  He said he had three antique clocks and a candlestick, I believe, from the Notre Dame cathedral in Paris that was recovered from a fire and that that was actually blessed by a Pope.  And Mr. Holloway confirmed that he did have all of those items and I said, well, I need to possess those items or have some sort of collateral of those items, keep them safe while you guys do whatever it takes to get them on the item block or auction block.

Q.   Let's take a look, if we could, at what's been pre-admitted as Government's Exhibit 105.  This is an e-mail that you sent back to the -- or gave to the FBI at some point; is that right?

A.   Yes.

Q.   So page 3 of that, do you recognize this document?

A.   Yes.  It was put together by James Holloway.

Q.   All right.  Kota Youngblood's name doesn't appear anywhere on here, does it?

A.   No.

Q.   Why -- was this something that Mr. Holloway gave to you?

A.   Yeah.  He told me under the direction of Mr. Youngblood.

Q.   All right.  And in it, it talks about the lamp for

the Notre Dame cathedral in Paris, a tall case clock, a couple of those, a jeweller, regulator, what was the point of this document that you remember?

A.   This is what they said would be a way to show that they were going to sell these clocks and I could get my money back.

Q.   The bottom line, the second paragraph, estimate auction value of expected sale is estimated at 2 million U.S. dollars.  Did you believe that?

A.   I did a lot of research on antique clocks.  This e-mail actually came with pictures, as well, and I did a lot of research on the antique clocks and the three of them obviously added up to close to a million, million-one.  I can't remember the number.  But I guess it was the Tiffany lamp that had an unknown value because it had been from Notre Dame cathedral, the age of it and being blessed by a Pope.

Q.   The top line of that second paragraph talks about Holloway Trading and T.A.P. Development are equal partners for $585,000 each invested.  Was this whole connection between James Holloway, Kota Youngblood and yourself just an investment, Mr. Perardi, or was it for protection?

A.   Absolutely not.  It was for protection and that's how much I'd given them at this point was 585,000.  If I was going to do an investment document, I would have done an

investment document.  This is far later after I'd already given them a ton of money.

Q.    Again, you're a business person who deals with contracts quite a bit?

A.    Yes.

Q.    This is not something that you would have relied upon to make an investment in a particular item or deal; is that right?

A.    No.  I was desperate for some kind of proof that they were going to give me my money back and my children were going to be safe.

Q.    I'm going to go forward again.  Could I have Government's Exhibit 91 on the screen, please.  Again, contacted by Mr. Youngblood about the need for money.

A.    Yeah.  I had told him that if I didn't get some proof that I was going to have to go to the authorities by this point, and Mr. Youngblood contacts me and says that he's been beaten up at the LAX airport and that his passport -- I did not know anything about government passports at the time.  I was not very familiar with that but his red government passport had been taken away from him and that he would potentially be put on the no fly list and he was -- had gone to LA to have a meeting to protect obviously my child but then, Eventine, as well, and he believed that somebody from Los Zetas cartel, the same ones that were

targeting me, ordered by my ex-wife, had jumped him and beat him up at the LA airport.

Q.   He's back in Texas in terms of October --

A.   He was at my house.

Q.   So he was telling you this story at the house?

A.   Yes.

Q.   And does he ask you for a large amount of money?

A.   It's about maybe 21,000 at this time.  He said that someone tried to break into his house or they showed up to his door, as well, and they'd broken the window at his house and that my house was going to be next.  Obviously they had my address.  The body was found with it.

Q.   So you wrote a check for $6,000.  It's Government's Exhibit No. 91; is that right?

A.   I wrote it to myself, yes.

Q.   For salary is what it says?

A.   Yeah.  I needed to get cash and that was my only way to get cash quickly out of that business account.

Q.   Did you actually hand the 6,000 -- or the check or the $6,000 to Mr. Youngblood?

A.   Yes.  And I borrowed an additional $15,000 from my friend John Mapes who lived in the neighborhood because he needed the money immediately and he was standing at my house.

Q.   Did you go and cash that check for 6,000 and then

come back with the money or did you give him the check?

A.    No.    I gave him the cash and he had a bunch of cash on him that he claimed was his amount.    I didn't count it, but it looked like well over $50,000 or more based on when he'd given me that golf sleeve.

Q.    Could we have page 3 of that exhibit, please, Ms. Mercado.    Go down to check No. 2098.    Again, we're just looking at that particular transaction, the $6,000 check that went through your T.A.P. Development account; is that right?

A.    Yes.

Q.    At this point, what's your financial situation like, Mr. Perardi?

A.    You see it right there at the end that month, my business has only $28,000 in it and I had a burn rate of close to $50,000 a month.

Q.    When you say burn rate, that's how much it's costing you to keep up with bill and expenses?

A.    I had employees, bills, et cetera, that I had to pay for and then, obviously, personal expenses.

Q.    So this is a desperate financial time for you then.

A.    Yeah.    I was not able to pay a lot of bills.    I stopped paying my life insurance policy at this point.

Q.    Government's Exhibit No. 92 on the screen, please. So this event, this time he comes over to your house is

Q. right around October the 7th because that's the date that the check was cashed; is that right?

A. Yes.

Q. Couple of weeks later, he comes or you have contact with Mr. Youngblood again; is that right?

A. Yes.

Q. And on this occasion, something's happened to his oldest son. Is that what he tells you?

A. Yeah.

Q. What happened to his oldest son, according to Mr. Youngblood?

A. He was killed.

Q. Killed in what way? An accident?

A. No. He said that his son after getting out with some friends in Mexico in Baja, California with some fraternity brothers and that his youngest son Kota had called his brother when he told him not to do this and they had triangulated the call and that his son was found dead, dismembered and his throat cut on a beach in Mexico by the drug cartel.

Q. This is his oldest son Eventine?

A. Yeah, and he was very distraught.

Q. Who was distraught?

A. Kota.

Q. Were you aware that Eventine had been a college

Q.   student at University of California San Diego about this time?

A.   That's what I was told, yes, that he was in San Diego University and I saw online that he'd published a paper that said he was going to school out there.  So I tried to look him up, as well.

Q.   This is a kid that you had coached as a youngster for hockey?

A.   Yeah.  He, like I said, played with John Mapes' son and knew he was older than little Kota and my son.  But yes, being in the hockey organization, I knew him.

Q.   Where did Mr. Youngblood tell you this devastating news?

A.   He told me in person and then, I collaborated the story.  I believe we were in a parking lot and I collaborated the story with Eric Swanson, who had just gotten a call from him, as well, and from James Holloway, who both said that Eventine had been murdered.

Q.   Did Mr. Youngblood ask you to do something for him?

A.   Yeah.  He knew that, like I said, our families were all close and he said Gloria was obviously really upset, his wife and he knew that I was in the Manor area where they lived because I had that medical office building over there.  So he asked me to go to his house and try to talk to Gloria.

Q.   Did you do so?

A.   Yeah.  Well, yes.  I went to the door and knocked on the door and the window at his front door glass pane was broken as he had stated and the house kind of looked -- lawn hadn't been mowed but it just -- and I knocked on the door several times and she didn't answer.  I went back out to the car, called him -- or called Marvin or Mr. Holloway's phone, I can't remember, one of the two.  The way that I got in touch with him, he ended up calling me back and saying, hey, I just spoke to her, she's going to answer the door.

Q.   Okay.  So you're knocking on the door.  Does she eventually answer the knock?

A.   Yeah.  She answers the door with a gun in my face.

Q.   Why would she have a gun pointed you at that point to your knowledge?

A.   She's shaking.  Gloria's not a very big woman and she's got the gun pointed at my head and she clocks it and says that my ex is responsible for the death of our son.  She looks like she hasn't eaten in days.  She's extremely thin and distraught and has been crying and she said that if her husband had not been helping me and all of their money had not gone to this that they could have saved their own son; and that it was my fault and my ex-wife ordering all of this and have our son killed because Kota

was trying to protect me.

Q.   At this point, when was the last time that you can recall seeing Eventine?  He'd been away at college for a year or so?

A.   Yeah.  I hadn't seen him in a year.

Q.   All right.  Not to disappoint from the storytelling standpoint, but eventually, you did see Eventine Youngblood here in Austin in August of 2023, didn't you?

A.   Yeah, I saw him at -- Mr. Youngblood --

Q.   You saw him here in Austin, right?

A.   Yeah, I saw him here.

Q.   He wasn't actually murdered, was he?

A.   No.  But I didn't know that till --

Q.   Around that time of the 21st of October, could we have Government's Exhibit No. 92, another check from T.A.P. Development to James Holloway for $10,000.  This is about the time that you're interacting with Gloria Holloway, Kota Holloway -- excuse me, Gloria Youngblood and Kota Youngblood as far as the death of their son; is that right?

A.   Yes.

Q.   And this $10,000 check that we see at Government's Exhibit No. 92, why did you write that check?

A.   I mean, it was another, you know, hey, we're going to get these funds across the border, we need help.  I'd also

seen his younger son at that point at the hockey rink, who was crying in my arms, and other people involved in the organization had confirmed that Eventine was dead.

Q.   This was a little bit different on the memo line where it says clocks Kyle finally.  So it's not just the Kyle project.  Why did you change that around if you can recall?

A.   Yeah.  They told me that I should put the clocks on there now that they'd sent me that e-mail that they were going to sell the clocks.

Q.   Couple after weeks later, November the 1st, is there still a threat out there, according to Mr. Youngblood, to you and your family?

A.   The threats changed considerably at this time now that this gentleman had been found killed, the cartel and that his son was dead.  He said that my ex was unable to pay her debts to the cartel of all this promise that she was going to get from life insurance policy and what he had prevented.  So the threat now was against my five-year-old daughter -- well, she was three at the time, I guess.  But the threat was against my youngest daughter that the cartel was going to take action on her since my other son was away in Connecticut and no one knew where he was.

Q.   Did you have to borrow money from your friend John

Mapes to help fund some of this protection?

A.   Yeah.  We met at the Grove in Cedar Park.  John and I were working on The Crossover project, some stuff going on with that, and Kota was asking me for a considerable amount of money that I obviously did not have anymore.  So I told John some of what had been going on obviously to get the 15,000 and then, I just said, hey, I don't know if you have it or don't have it, but can you meet with Mr. Youngblood, who you've met before, and let him talk to you about what's going on and if at the end that you decide that you want to help, great, I'm going to leave that up to you.

Q.   Did you facilitate the meeting between Mr. Mapes and Mr. Youngblood?

A.   Yes.  We met in that parking lot.

Q.   Were you present during that meeting?

A.   Yes.

Q.   And eventually, your friend John Mapes gave $65,000 to Mr. Youngblood on your behalf; is that right?

A.   Yes.  Mr. Youngblood told him that he could have that flag as collateral and that that flag was worth $2 million.  And he asked me if I would go and pick the flag up from his house because Gloria and him would be there.  And then, he asked John to go and take out money and give it to James Holloway.

Q.   Let me ask you.  This flag, which has been admitted as Government's Exhibit No. 9, had you seen what before in Mr. Youngblood's house?

A.   No.  I'd only heard about it from him and James and then, all of our friends that talked about it hanging.  He had it hanging in his bedroom so I had no reason to be in his bedroom.

Q.   You said the flag was valued at $2 million.  Who told you it was valued at $2 million?

A.   Mr. Youngblood and Mr. Holloway.

Q.   Did you take the flag as collateral?

A.   Yeah.  It was not easy.  Had to go to the Wal-Mart up the street and get tie-downs and bungee cords and try to fit that in the back of my truck bed, which was a pretty scary ride from Manor to Steiner Ranch with a $2 million item in back of your car.

Q.   On November 1, could we have Government's Exhibit No. 93.  I'm going to go a little bit faster pace with some of these because there's still a couple more.  But bottom line is this check for 48,800 written to James Holloway on November 1st, 2022, you wrote that out of your T.A.P. account for what reason?

A.   I mean, they're always the same reason, but obviously, the threat against my daughter now was imminent and to move this along to try to get all of this stopped.

Q.   Was there mention of the fact that the person who had murdered Eventine was now working with Rachel?

A.   Yeah.  That was the narrative.  I mean, as hard as it seems to believe at that -- you know, you're in the middle of this chaotic, you know, Gloria's confirming it, James Holloway's confirming it, Marvin's confirming it, Youngblood's confirming it, and obviously, I'm concerned for the safety of my children.

Q.   You mentioned the name Marvin.  Who's Marvin?

A.   Marvin was, what I was told, an ex-LAPD officer that I had met that time, one time here that worked with Mr. Youngblood, and I believe he used to live with him, as well, and now lived with Mr. Holloway.

Q.   Besides Rachel, the name Julie Herrera comes up in terms of Mr. Youngblood's scam; is that right?

A.   Yeah.  Julie's Rachel's aunt.

Q.   And you had met her through the marriage and...

A.   Yeah, I knew Julie very well.  She's a businessowner in Cedar Park.  Her and I had known each other for a long time.  She was building the Toyota dealership at Cedar Park and I was building The Crossover.  Obviously we were about a block away from each other.

Q.   Mr. Youngblood is telling you all kinds of terrible things about Julie Herrera; is that right?

A.   Yeah.  He had very detailed information about her and

her family as he would have about Rachel and her family about them laundering money through the car dealership and working with Los Zetas in the south Texas Toyota cartel.

Q.   And you've seen several posts online regarding that particular issue; is that right?

A.   Yeah.  There were some posts that came out again about Rachel, about Julie.  And then, this time, there were posts about Nicole and I at The Crossover.  So there was a series of posts that came out in a flurry that I had no idea about until Julie called me up and left a threatening message with me, and then, my ex father-in-law texted me with the message that I needed to stop these posts.

Q.   So they blamed you for making these posts about your ex-wife.

A.   Yeah, Rachel had been blaming me from the beginning about all of this.

Q.   Let's go forward again.  Another check, Government's Exhibit No. 94, please.  Same date of November the 1st, check for $20,800, Kyle clocks investment.  This is a check that you wrote to James Holloway.  Did you meet James Holloway at the Wells Fargo on that day to give him this check?

A.   Yes.  And I had to sell a business interest to get this money.  But yes, I met him at the Wells Fargo in

Round Rock.

Q.   Tell me a little bit about what took place there at the Wells Fargo in Round Rock when you met with Mr. Holloway that day.  Who was with you and what were some of the circumstances?

A.   Well, I got a call that I needed to meet him immediately and get him more money and I believe he was talking with John Mapes, as well, about getting him more money.  There was a certain amount and this is all I could come up with.  But I had my daughter, my three-year-old with me, and we had planned on going to Altitude, which is a jumpy place off of 45 and I-35.  So I met him there at like 1:30 or 1:00 in the afternoon.

Q.   So you're there in the parking lot of the Wells Fargo, you meet Mr. Holloway.  Then obviously you know Mr. Holloway by this point.

A.   Yes.

Q.   Anything unusual in terms of what's going on there at the bank that day?

A.   I mean, there were people in the parking lot that just seemed to be in their cars.  I mean, look, I was so paranoid at this point, everywhere I turned, somebody was following me.  Somebody had broken into my house.  You know, at every turn, you're just -- I'm always off my cellphone watching in the rear-view mirror.  So there

seemed to be some people hanging around outside but I wasn't -- I had a gun with me so I wasn't concerned.

Q.   The gun was inside your vehicle?

A.   Yeah.   I had a locked safe inside my vehicle.   I have a gun safe that no one has the combination to and obviously keep it in there locked, especially with my children, but inside my vehicle.

Q.   You're taking precautions.   Was Mr. Holloway also very observant or talking about the need to be careful?

A.   Yeah.   He had a gun with him, as well.   I mean, obviously, Eventine had just been killed and we were all on high alert.

Q.   So you gave Mr. Holloway this check for $20,800.   And then, once you gave him the check, what did you do?

A.   I watched him go inside, cash the check.   As before, he came back out, said we were good, he has the cash and that he was going to go meet the runner, I believe, because Mr. Youngblood was traveling, working on these problems.   I then got in the car with my daughter and we went over to Altitude to have a daddy-daughter day and jump on the trampolines.

Q.   When you finished your time at Altitude, did you go back out to your car?

A.   Yeah.   We were in there for maybe an hour.   I don't know.   I mean, three-year-old can jump pretty good.   She

had a great time. I went back out to my car and found that the rear passenger window, which is where my daughter's car seat was, was completely shattered and glass was everywhere inside my car.

Q. What did you do?

A. I mean, my daughter's crying. I immediately went inside the car. I had my laptop and checkbooks for my businesses in my backpack in the car in the front seat and those were not taken. My daughter's iPad and some other items in the car not taken. And then, I went and used the combination to unlock my gun safe and my gun was gone. And Nicole and I had gone to the Elton John concert that she had --

Q. Let me stop you there. So you find several items including your firearm stolen, from your car?

A. Yes.

Q. You go back into Altitude at that point to make a police report?

A. Well, I called 911. And the other item was Nicole's wallet was in the safe with my gun. Those are the only two items taken. I actually had my passports and all my kids' passports in the car, those were not taken either. But yes, I called 911.

Q. And were you waiting then for a police officer to show up?

A.   Yes.  And then, I called James Holloway.

Q.   Why did you call James Holloway?

A.   Because I asked him if he had seen suspicious characters that were outside the bank and he said yes and he said do not call the police and I said, well, I've already called the police.

Q.   Did you reach out to Mr. Youngblood after that?

A.   I could not get a hold of him.  He was on a plane but Mr. Holloway said he was texting with him.

Q.   And what was the information that Mr. Holloway was transmitting to you regarding instructions from Mr. Youngblood?

A.   They reported that the police would take a while to get there and that I was to not tell them anything about what was going on and that I should just state that I was doing a real estate investment with Mr. Holloway.

Q.   Why did they not want you to talk to the police?

A.   He said that the Round Rock Police were involved and he felt that whoever was going to show up was involved with people that had broken into my car.

Q.   How long did you have to wait before the Round Rock officer showed up?

A.   I mean, it was 30 or 40 minutes and Nicole arrived, as well, because her credit card got triggered.  Somebody took the -- her credit cards and started trying to spend

them at a Target and a gas station up the street so she got an alert to cancel all her cards.

Q.    So eventually, the officer shows up at the Altitude jumpy place and do you meet with him?

A.    Yes.  I sit and talk to him, Nicole and I both do, and I offer to find out the serial number of my gun so he has that.  Didn't seem very interested.  Nicole, the same. Obviously we were worried about her safety, her children and all that, her address.  She had her driver's license in that wallet, as well.

Q.    Let me stop you there.  Did you ask the Altitude people to look at the security cameras for the parking lot?

A.    Yeah.  Right after it happened and I called 911, I went in and asked them, they said yes, we have cameras that faces that area and they said they would show it to me after the police approved, but they had no problem giving it to me.

Q.    Did Mr. Holloway explain to you that's what happened when you asked to view that video?

A.    He said that he didn't believe that they would give me the -- let me actually view it and he said he would try to work on his Wells Fargo Bank manager to see if they could see anything in the parking lot of the Wells Fargo.

Q.    At some point, the officer is there and are you aware

that he's wearing a body camera so he's recording interaction with you?

A.    I was not aware of that.  No.

Q.    And subsequent to that time, you've never looked at that time video since then, have you?

A.    I've never seen it.

Q.    All right.  Would it surprise you that the officer says to you that you were the victim of what's called jugging?

A.    No.  It's what he said that people follow people from a bank or wait for them to come out.

Q.    And that's what he suspected had happened in your case?

A.    Right.  And I said, well, I wasn't the one that came out with money.  I gave someone money in a real estate deal, they're the ones that came out with the money, they should have followed them.

Q.    Was that true?  Had you given the money to someone for a real estate deal?

A.    No.

Q.    Why didn't you tell him about that money?

A.    I had given it for protection of my children under the guidance of what I believed are federal agents' guidance to say that to the officer.

Q.    After that incident occurred, did you then eventually

meet with James Holloway and Kota Youngblood at the Crossover or near The Crossover?

A.   I was denied access to that videotape.  The police officer did not let me see it.

Q.   And what happened when you met with Mr. Youngblood regarding this incident?

A.   So obviously, I couldn't drive with my child because there was glass everywhere in her car seat, so I had a girl that watched my daughter come and bring a car seat to me and take my other son to hockey practice.  And then, Nicole and all of her children and my youngest daughter were summoned to The Crossover parking lot by Mr. Youngblood to meet to discuss the details of what had happened.

Q.   I thought Mr. Youngblood was out of town, though. Hadn't Mr. Holloway said --

A.   Mr. Holloway said that he was on a plane and that he arrived home and that he would meet me there at 6:00 or 7:00 at night.

Q.   And what did Mr. Youngblood tell you?

A.   I mean, he was obviously distraught over what happened.  He said it was a direct intention to show that they could get to my daughter that they'd broken the window out in her car seat to make a statement.  And you can see the Toyota dealership from the parking lot and he

went into an extensive story to me and Nicole together and separately that Julie Herrera and Rachel were behind this and that Julie had the factory code and Rachel obviously knew the code to my safe and they had -- that's why it had not been broken into and somebody had used the combination to open it.

Q.   Let me go forward just a little bit, looks like another day.  November the 2nd.  Could we have Government's Exhibit No. 95 on the screen, please.

So November the 1st, we saw that the 20,800 and now this check for $3,000.  Do you remember writing this check out to James Holloway for $3,000.

A.   Yeah.  I was set to leave the next day to go to Dallas with my middle son for a hockey game.  Obviously taking my daughter with me.  My oldest son is away at college at this time and my second oldest son is away playing hockey so I just had the two.  Nicole was terrified about her house so she was going to go up to Dallas, as well, and get a separate hotel room with her kids.

Q.   So you're going --

A.   I was paying for protection of us while we were in Dallas.

Q.   So you get a call while you're in Dallas; is that right?

A.    No.  He says that night that I gotta come up with this money immediately and he's going to protect me against them knowing where I'm at, going to Nicole -- you know, Nicole should not go home.  She should come with me and that he needs money to keep us safe to get people to follow us to Dallas to make sure we're okay.

Q.    That's the purpose this $3,000 was for?

A.    Yes.

Q.    Government's Exhibit No. 96, could we have that on the screen, please.  Few days later, November 5, 2022, check for $67,000.  At this point, something's going on with your father, too; is that right, Mr. Perardi?

A.    Yeah.  My dad, who is kind of my hero, has got early dementia and he's lost the ability to swallow late October.  So my parents are coming over on a regular basis going to doctors and they can't figure out what's causing him -- he's lost the ability to talk and swallow so it's not looking good.

Q.    As you're struggling with your father's illness, and so forth.  Does Mr. Youngblood tell you about his parents and how he sympathized with your situation?

A.    Yeah.  He had told me several times that his parents were killed.  That his dad was an FBI agent and that his dad was wrongly targeted and blown up and Mr. Youngblood -- it happened right before Christmas and when I went into

his house with his wife, there was a Christmas tree there and he said he kept a Christmas tree up all times to remember that death of his parents. And that he had a framed, I believe, a $20 bill that was his dad had given him to go to dinner that night that his dad was killed. But it was a very tragic moment in his life when he was younger and he could really sympathize with, obviously, my son who may be killed and then, now my dad is dying. So we bonded on several levels.

Q. This Christmas tree, had you seen it in his home before this November of 2022?

A. I had not ever been to his house, but everyone else talked about it being there and he always talked about it being there and his wife and kid talked about it being there.

Q. The check for $67,000 that you wrote to him on this occasion, how did you come up with this money, Mr. Perardi?

A. I'd borrowed more money from my parents and I believe I had to pay the IRS, as well, so I borrowed -- I borrowed interest against one of my buildings, $150,000 to a partner who basically I'd been paying interest back to but will take the interest in that medical office building if I don't get the money back to him.

Q. So the $67,000 you obtained and is it consistent with

why you'd been paying Kota Youngblood since July of 2022 to protect your family, to potentially get assets back to repay everyone?  What's the story this time?

A.    Yeah.  I mean, he believed that he obviously -- I feel stupid saying it now out loud, but they had obtained that information on the body of the guy that was there and he had used help from obviously the legal people to do that.  So between the tapes, the gold coins and now the proof of her wanting to have my child killed, I believed this payment was to try to help get it across the border so that he could have that pelican box -- he talked about -- a lot about a pelican box and James would say the same thing, that there was this -- all of this income was in a pelican box.  Obviously he didn't want anyone at the border to know what the pelican box was in it, but he'd have to pay off several items or government people at the border to get it across.  But all of that had the information and that some of the payments would continue to be protecting my child -- childs now, obviously, and then, this information to come to fruition.  I just want it to stop at this point.  I'd spent so much money, I just didn't know what else to do.

Q.    You're out several hundred-thousand dollars at this point at a very short period of time.

A.    600 or more thousand dollars.

Q.   That check was dated November the 5th.  Could we have Government's Exhibit No. 97 up, please.  Remember writing this check for $10,000 based on additional threats to Eventine?

A.   No.  Eventine had been dead.  Additional threats to my child.

Q.   All right.  And this check's dated November the 7th was cashed, according to the document there, on November the 14th or posted November the 14th?

A.   Yeah.  That's my son's birthday, the one who was originally targeted.  So I remember it very much because it -- I didn't want to put that date on the check.

Q.   At this point, are you asking your friend John Mapes for additional money?

A.   Yeah.  And he denied me the money.

Q.   What did he tell you?

A.   I mean, he said he didn't have anymore money but that obviously, the flag, we had to figure out how to sell that or get value for it.  But, you know, he had been promised by James and by Kota and I had been promised, as well, that it was just every week was weeks away, it's coming this week, I'm selling an item, money's coming, you're going to get money back, and I'd not obviously gotten money back.

Q.   Were you desperate to get this money back, Mr.

Perardi?

A.   Yeah.  I'd taken money from my dying father and my mom, money from my girlfriend, money from John Mapes, money from business partners, and money from all of my businesses and loans and credit cards, desperate to get it back.

Q.   Let's go forward to Government's Exhibit No. 98. This check for $15,000 on November the 10th, posted on November the 21st.  Did Mr. Youngblood tell you about how he was going to need to fly to Egypt?

A.   Yea.  The story that he told about how Rachel was funding the second attempt was that she had gotten into cryptocurrency with a guy named Justin Costello and Justin Costello was laundering money for the mob.  He told John Mapes and I this.  I obviously looked that up afterward and Justin Costello was a wanted fugitive with his wife, Isabella Rosini, who was in the hemp business, and they by this time got picked up and were in federal custody in San Diego trying to cross the border.  So the story obviously checked out.

Q.   You were trying to corroborate more of this income because these stories are getting more and more fantastical, aren't they?

A.   Yeah.  And I would write down or text myself or pay attention to everything, every detail, and then, keep

track of it and go home and try to -- we were even trying to reach out to San Diego University to find out if Eventine still went to school there or had been killed, or reached out to his fraternity house. I was doing everything I could, John and I and Nicole, to find out anything.

Q. Are you getting suspicious at this point that maybe none of this is true and that you're being scammed?

A. Yeah, I mean, it's more than I just can't believe that somebody would say their son was dead if it wasn't true and I obviously was -- believed Mr. Youngblood. But yeah, it's -- I mean, there were many nights that I was having conversations with God and friends and I actually even reached out to a Secret Service agent that was a friend of mine who was in the hockey community, but he didn't call me back, unfortunately. I wish he would have.

Q. So this check for $15,000, again, same process as before, right?

A. Yeah. It was urgent.

Q. Next payment, let's go forward to December the 27th, 2022, Government's Exhibit No. 99. And you've identified earlier, the individual Marvin, who was the LAPD officer. Is this Marvin connected to the person on this check?

A. Yes.

Q. Tell me a little bit about why this went out to James

Holloway and what it was for.

A.    So there was a particularly bad ice storm in the northeast in Buffalo and all of the flights were cancelled.  So Mr. Youngblood was supposed to be back with a large amount of money at this point.  My dad was really sick and we just spent what I knew was going to be my last Christmas with him.  And I got an urgent call from Mr. Youngblood saying he was stuck in Buffalo, New York where they just cancelled, actually, an NFL game, I believe, and that Gloria had exhausted all of their credit cards, maxed out everything they had and he had no way to get home and he needed $4,000 for a private flight because none of the airlines were leaving.  And James was preoccupied, I don't know, but Marvin agreed to meet me and they asked me to write the check to Marvin and then, Marvin went in and I believe -- I don't know.  Maybe he was able to cash --

Q.    You have the check to Marvin.

A.    Yeah.  I met him at the Wells Fargo at Four Points.

Q.    How did you know that Mr. Youngblood had been stranded in Buffalo?  Was it a call from him or from somebody else?

A.    Originally from James, then from Marvin and then, from Mr. Youngblood.

Q.    Few days later, on January the 1st, 2023, check posted on January the 4th.  Could we have Government's

Exhibit 100 up, please.  This is the last check that you're going to write to Mr. Holloway; is that right?

A.    Yeah.   This one was pretty absurd.

Q.    So it's $9,000.   Tell us the circumstances behind this particular check.

A.    At this point, they claim that they had the codes, they moved the money or funds across the border and they had cashed it with the Russian mob or someone that he was working with that could sell these items quickly.  And that they had crypto codes that Mr. Youngblood was able to obtain but the Russian lawyer that -- or Russian mobster, I believe, I can't remember, I think that had these codes was detained for passport issue and a visa violation and he needed money desperately, quickly to get him out of custody in Los Angeles so he could get these codes, and then, he would be bringing me back some of the funds or any of the money.

Q.    You're reaching for last straw obviously in terms of hopeful that you'll get some of this money back, is that right?

A.    Yeah.   I'd just driven across the country to take my son back to Connecticut and I returned to desperate phone calls again.

Q.    All right.   That was the last check that you wrote to Mr. Holloway.  The last time that you would have given

funds to Mr. Youngblood; is that right?

A.   Yeah.  I stopped paying my mortgage and all my bills at this point.

Q.   At some point, did you start to receive a little bit of money back from Mr. Holloway?

A.   Yeah.  My father, unfortunately, passed away January 31st and they were still asking me for money then trying to --

Q.   Did you have money to give to them anymore?

A.   I didn't have anything left.

Q.   All right.  Take a look at Government's Exhibit No. 103, please.  See a check from James and Patricia Holloway to T.A.P. Development for $10,000.  Would you explain to the jury what this check was for and how you came to possess it?

A.   Yeah.  In March, I believe that I had gone to them and told them that they needed to get my money back.  My father's gone and I was without any funds to even pay for my house or any bills, and they agreed to start giving me a portion of this money that they claimed had been given to Mr. Youngblood from a cryptocurrency so this was -- this and some cash was given to me by Mr. Holloway.  The cash was for Nicole and for John Mapes, a little bit for me and then, this was written to my business as a return.

Q.   How much cash was given to you, if you can recall?

A.   I don't know, maybe 22,000.  I don't know, actually.
I'd have to look at it.

Q.   Could we have Government's Exhibit 104.  Roughly a
week later, we see a $4,000 check to T.A.P. Development
from James Holloway, again, same type of situation as what
we had the week before?

A.   Yeah.  They were supposed to come weekly and they
were supposed to be for far more amounts because at this
time, I was out $650,000 and I said that I needed to start
receiving it back in equal payments, and they told me it
would be over six to eight-week period.  The first check
at 10 was the largest and then, this one at four was what
I got after that.

Q.   To your recollection, did you receive any more checks
from James Holloway on a return from that crypto money
that had come back?

A.   No.

Q.   At some point, can we have Government's Exhibit 105
back on the screen, please.  So this is happening in March
2023.  Could we go to the last page of that exhibit,
please.  See here, another document that you'd received,
it's got Mr. Holloway's signature and your signature, Mr.
Perardi.  What was this document about?

A.   This was given to me by Mr. Holloway and he put his
signature on it and asked me to sign it and it was to

basically say that they had sold these clocks, they had the money and that I would be receiving weekly payments back in that amount.

Q.   Okay.  So let's go ahead and focus in, if we could, Ms. Mercado, top paragraph there, the 620,000.  We see there 620,600, is that the amount of money that you had provided to Mr. Holloway and Mr. Youngblood over the course of the seven or eight months?

A.   Yes, plus the cash that John Mapes -- that does not include John Mapes' money as well as the cash that was given.  So they had well over 800-some-thousand dollars at that point.

Q.   The reference to the clocks, that's what you believed that Mr. Holloway had sold or had possessed because he had told you that back on -- in September of 2022; is that right?

A.   Yeah.  That's what they had actually received.

Q.   Could we blow up the last paragraph, please?  All right.  Then we see here how much money you're going to get back; is that right?

A.   Yeah, $67,231.67 over a 12-week period.

Q.   Mr. Holloway is telling you in this document that the items had already been sold for little over $2 million as broker fees.  Did Mr. Youngblood ever tell you about the sales of these items and having received this money?

A.    Yes.    He said they had been sold and brokered and that the coins were also being used to put -- if you look at this, it says that 806,000, that's about close to what the cash and money that we had given.    So it was basically call it a return on investment, it was basically getting all of our money back.

Q.    And outside of the two checks plus the bit of cash that you discussed, did you receive any other resources, funds from Mr. Holloway or Mr. Youngblood?

A.    No, I did not.

Q.    Judge, may we approach?

THE COURT:    Yes.

(At the bench, on the record.)

MR. GUESS:    We're towards the end of the day. I've got some calls I'm going to play for him tomorrow, but I think we could start off with that if that's good with you, and then, allow them to go into cross-examination.

THE COURT:    It's a good time to break?

MR. GUESS:    I think so.

(End of bench conference.)

THE COURT:    Ladies and gentlemen of the jury, we've come to a natural break in the evidence and so, I'm going to send you home for the day.    You know the typical instructions:    Don't talk to anyone, including each other,

about this case.  And don't engage in any independent investigation of any matter because, at the end of the day, your verdict must be based solely on the evidence that you hear and see in this courtroom and the law that I give you at the end of the case.

We will assemble and be ready to start at 8:30 sharp tomorrow morning and we will pick up where we left off.  Thank you very much and we'll see you in the morning.

(Proceedings adjourned.)

* * * * * *

UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS     )

I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 8th day of March, 2025.

~~~~~~~~~~~~~~~~~~~~~~~~
*LILY I. REZNIK, CRR, RMR*
*Official Court Reporter*
*United States District Court*
*Austin Division*
*501 West 5th Street,*
*Suite 4153*
*Austin, Texas 78701*
*(512)391-8792*
*SOT Certification No. 4481*
*Expires:  1-31-27*

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*