UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA ) Docket No. A 23-CR-135(1) RP
)
vs.                       ) Austin, Texas
)
SAINT JOVITE YOUNGBLOOD   ) April 17, 2024


TRANSCRIPT OF TRIAL ON THE MERITS
BEFORE THE HONORABLE ROBERT L. PITMAN
Volume 3 of 7


APPEARANCES:

For the United States:  Mr. Dan Guess
Mr. Matt Harding
Assistant U.S. Attorneys
903 San Jacinto Boulevard,
Suite 334
Austin, Texas 78701



For the Defendant:      Mr. Jose I. Gonzalez-Falla
Ms. Charlotte A. Herring
Assistant Federal Public Defenders
Lavaca Plaza
504 Lavaca Street, Suite 960
Austin, Texas 78701

Court Reporter:         Ms. Lily Iva Reznik, CRR, RMR
501 West 5th Street, Suite 4153
Austin, Texas 78701
(512)391-8792




Proceedings reported by computerized stenography,
transcript produced by computer-aided transcription.

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Eric Perardi | 5 | 35 | 192 | |
| Dennis J. Schuler | 203 | | | |
| Roseana York | 209 | 232 | | |
| Jason York | 234 | 263 | | |

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| #10 | 248 | 248 |
| #11 | 207 | 207 |
| #12 | 207 | 207 |
| #106 through 114 | 9 | 9 |
| #107A through 107B | 17 | 18 |
| #108A through 108C | 17 | 18 |
| #109A | 17 | 18 |
| #110A | 17 | 18 |
| #111A | 17 | 18 |
| #112A through 112B | 17 | 18 |
| #113A | 17 | 18 |
| #170 | 224 | 224 |
| #171 | 230 | 230 |
| #166 through 169 | 246 | 246 |
| Defendant's | | |
| #13 | 69 | 69 |
| #14 | 187 | 187 |
| #71 | 165 | 165 |
| #79A | 190 | 190 |
| #101 | 85 | 85 |
| #104 | 87 | 87 |

**E X H I B I T S**  (Continued)

|  | Offered | Admitted |
|---|---|---|
| Defendant's |  |  |
| #107 | 138 | 138 |
| #110 | 125 | 125 |
| #111 | 58 | 59 |
| #112 | 123 | 123 |
| #133 | 72 | 72 |
| #138 | 157 | 157 |

THE COURT: Anything we need to take up before we bring the jury in?

MR. GUESS: Nothing from government, your Honor.

MS. HERRING: Nothing from defense, your Honor.

THE COURT: Very good. Good morning.

(Jury present.)

THE COURT: Good morning, ladies and gentlemen of the jury. And thank you so much for being here and ready to commence our evidence in the case. We will begin and good morning.

Please have a seat and you remain under oath.

THE WITNESS: Yes.

ERIC PERARDI, called by the Government, duly sworn.

### DIRECT EXAMINATION (Resumed)

BY MR. GUESS:

Q.   Thank you, your Honor.

Mr. Perardi, you're the same Eric Perardi who was testifying yesterday; is that correct?

A.   Yes, sir.

Q.   You're still under oath. Do you understand that?

A.   Yes, sir.

Q.   Here to tell the truth and you have to abide by all the promises you made before.

A.   Yes, sir.

Q.   All right. We left off yesterday talking about the

last check that you'd given to Mr. Youngblood, which is dated on January the 1st of 2023. Do you remember that?

A.   Yes, sir.

Q.   I'm going to -- could we have Government's Exhibit 119, which has been pre-admitted? Mr. Perardi, I'm going to hand you what's been marked and admitted as Government's Exhibit No. 119. And I want you to take a quick peek through that. There's several pages; is that correct?

A.   Yes.

Q.   And those are all wires that you're familiar with; is that correct?

A.   Yes.

Q.   As you mentioned yesterday during your testimony, you do a lot of wire transfers in the course of your normal business; is that right?

A.   Yes.

Q.   Could we have page 6 of that document, please. We see page 6, this is the wire transfer of $36,000 on July the 27th, 2022 showing that the bank out of Seattle, Washington the Washington Federal savings bank that was where your HELOC was located; is that right?

A.   Yes, sir.

Q.   In terms of that money, why were you wiring the money to your Wells Fargo account here in Austin, Texas?

A.    So that I could pay Mr. Youngblood.

Q.    Could we have page 8 of that document.  Again so we could see, there's your Wells Fargo -- or your Washington Federal bank account; is that correct?

A.    Yes.

Q.    Located in Seattle, Washington and then, the credit address was to your Austin address for your Wells Fargo account; is that correct?

A.    Yes.

Q.    And this was the $50,000 one on August the 16th; is that right?

A.    Yes.

Q.    When you made that transaction, where were you located at, do you remember?

A.    I was in Austin.

Q.    Were you in Austin or Miami at that time?

A.    This was August 16th, it's in Austin.

Q.    Okay.

A.    Miami was in July.

Q.    Okay.  And this was again the wire transfer that you made for what purpose?

A.    For safety of my child.

Q.    And at whose direction?

A.    At Mr. Youngblood's direction.

Q.    Mr. Perardi, I'm going to hand you a disc, take a

look.  Do you see your initials on that disc?

A.    Yes, sir.

Q.    Are those recorded conversations that you've made at the direction of the FBI and sometimes not at the direction of the FBI involving yourself and Mr. Youngblood?

A.    Yes.

Q.    Before coming to the courtroom you listened to those conversations?

A.    Yes.

Q.    And are they true and accurate in terms of the contents of those conversations?

A.    Yes.

Q.    At this time, your Honor we'd move to admit the disc which contains Government's Exhibits 106, 107, 108, 109, 110, 111, 112, 113 and 114.

        THE COURT:  Any objection?

        MS. HERRING:  No objection.

        THE COURT:  So admitted.

Q.    (BY MR. GUESS) Mr. Perardi, the jury's already heard a little bit about your interactions with the FBI, but before you met with the FBI, did you make contact with a man named Jeff Bridgman?

A.    Yes.

Q.    And who is Jeff Bridgman?

A.    He, from what I was told, is one of the foremost antique dealers in Civil War paraphernalia in the country.

Q.    How did you obtain Mr. Bridgman's name?

A.    A friend of mine who I showed him a picture of that flag to worked for the Secret Service and he gave me Mr. Bridgman's name as somebody who he said would be able to authenticate the flag.

Q.    Why were you looking to get information about that flag?

A.    Well, I had been searching it since I had it in my possession for almost six months and could never really find any accuracy on its authentication, and by this point, I was out several -- you know, $800,000 and was trying to find the -- find out if it was real, if I had to sell it and try to get some of my money back.  I was always told that it could be sold for $2 million and if all things didn't work out, supposedly.

Q.    Who told you it could be sold for $2 million?

A.    Mr. Youngblood.  He actually told me it could be sold for $4 million, but he thought he could at least get 2 million.

Q.    So at this point, you're looking to potentially sell the flag to recoup the losses or the money that you had given to Mr. Youngblood?

A.    Yeah, but I was more -- I was trying to find out what

was real and what wasn't real at that point.

Q.   Do you remember when these contacts with Mr. Bridgman took place?

A.   Yeah.  I don't know the -- it's in April.  I'm not sure of the exact date, but I sent him an e-mail late at night with the picture of the flag and said that this was given to me as collateral and I wanted to authenticate that and then, I woke up to his e-mail the next morning.

Q.   And did Mr. Bridgman tell you something that was interesting to you in terms of the flag itself?

A.   Yeah.  I don't have the exact wording, but in the e-mail, he said that's very interesting because I actually own this flag.

Q.   When he said he owned the flag, did that indicate to you that something was amiss?

A.   Yes, because Mr. Youngblood told me that it had been in his family since the '50s and that his great-grandfather -- or his grandfather, actually, in New York had this flag in his possession and it had been hanging in his grandfather's office in New York, and then, obviously, he retained possession of it as a family heirloom.

Q.   Did you have further conversations or communications with Mr. Bridgman about the flag?

A.   Yes.  I called him on the phone per his direction and

he told me that the flag had been purchased about a year and a half before and that Mr. Youngblood and his wife were at the antique show or Civil War deal, and he actually told me that his name was Saint Jovite Youngblood and I'd never heard that name before.  I'd only heard -- knew him as Kota and he said that, you know, he was kind of a scary dude, ex-military.

Q.   Let me stop you there.  Yeah.  So you had this conversation with him finding out that the flag -- the ownership of the flag was now in doubt.

A.   Yes.  And he told me price of it.

Q.   And what was the price of the flag that he told you it was worth?

A.   He said that he had sold it for 80,000 but it may only be worth about 70 or 75.  He had put it together, 75,000 and he said that Mr. Youngblood through transfers of Marvin and Mr. Youngblood had sent him almost 40,000 but had never fully paid for the flag and that he still technically owned it.

Q.   So it's just happenstance that you reached out to what you assumed was the expert on this flag and he happened to be an owner of that flag; is that right?

A.   Yeah.  I would say God was looking out for me that day, yes.

Q.   After figuring out that the flag had different

ownership than what you had been led to believe and different value, what did you then do?

A.    Well, I also then contacted a friend of mine with the name Saint Jovite Youngblood and I found very different stories online about him.

Q.    Let's not go too much into that other than to say that you began to do a little bit more digging into Mr. Youngblood's past?

A.    Yes, and found out a lot of things were not true.

Q.    All right.  Did you eventually decide that you were going to go to the FBI?

A.    Well, again, ironically, my --

MS. HERRING:  Objection.  Nonresponsive.

A.    I did not.  I went to a lawyer friend of mine.

Q.    (BY MR. GUESS) All right.  And who was that lawyer?

A.    Steve Toland.

Q.    Mr. Toland and you are social friends?

A.    Our children date.

Q.    And you know that he was criminal defense lawyer; is that right?

A.    Yes.

Q.    Did you tell Mr. Toland the story about what was going on with Mr. Youngblood?

A.    Yes.

Q.    And did he eventually advise you and go with you to

meet with FBI agents?

A.   Yes.

Q.   The meeting with the FBI agents, it was with Agent Noble and Agent Wilkinson who are sitting at the table; is that right?

A.   Yes.

Q.   Was Mr. Toland accompanying you also?

A.   Yes.

Q.   Tell me a little bit about that first meeting at the FBI office?

A.   Obviously, it's a pretty crazy story.  So we spent a lot of time going into the details of it.  I had some audiotapes and voice messages left by Mr. Holloway and Mr. Youngblood on my phone.  We played those and then pretty much told them everything that I accounted yesterday in court.

Q.   So they heard your story and this was on April the 27th of 2023; is that right?

A.   Yes.

Q.   Did they talk to you at that point about potentially introducing undercover agent to record what was happening with Mr. Youngblood?

A.   Not initially.  I think they were also finding it a fantastical story but I believe they did some research and then Mr. Toland got back to me and said that they would

like to talk to me about going undercover.

Q. And did you agree that you would help the FBI in their investigation of Mr. Youngblood?

A. Yes.

Q. At this point, Mr. Youngblood was still seeking money from you?

A. Yes. He was demanding -- I mean the money always changed but I think it was down to 77,000 because he had come up with a lot of what he needed of 250.

Q. 250 meaning 250,000?

A. 250,000, yes.

Q. So when you left the FBI office, they asked you to record conversations. Did they give you a tape recorder or some other device to record these or did they ask you to use your cellphone?

A. I said if I had contact with them to use whatever means I could. So I actually had John Mapes, who had given me money, we used his phone and put my phone on speaker phone.

Q. All right. And you recorded a couple of these conversations; is that right?

A. Yes, sir.

Q. You left the office on the 27th. Did you have conversation with Mr. Youngblood on that day?

A. Yes.

Q.   Could we have Government's Exhibit No. 107A, which is a clip from that conversation?  Before we start playing it, you recall this conversation, you've heard it in its entirety obviously, but it was about almost 34 minutes between you and Mr. Youngblood; is that right?

A.   Yes.

Q.   And these were typical of the types of conversations that you would have had with Mr. Youngblood over the course of several months?

A.   For last year.

Q.   So we'll I guess for record purposes, we're going to play clips from the full audio that's been admitted so we'll call this 107A if that's okay with the Court.

          THE COURT:  Yes.

Q.   (BY MR. GUESS) All right.  So 107A, please.

          (Audio file played.)

Q.   So the voice that we just heard, whose voice was that?

A.   My voice and Kota Youngblood's.

Q.   Was anyone else present while you were having this conversation?

A.   John Mapes.

Q.   And again, you're using his phone to record the conversation as you're on speaker phone?

A.   Yes, in his house.

Q.    Mr. Mapes' house?

A.    In Mr. Mapes' house.

Q.    All right.  Go ahead and continue.

(Audio file played.)

Q.    That's a couple of minutes of the conversation again that took almost 34 minutes.  Patio, you heard him talk about patio before?

A.    Yeah.  Yes.

Q.    Are these the type of things he's telling you to convince you that he's being honest with you?

A.    Yes.  My level of paranoia was extraordinary at that point.

Q.    He mentions the cartels, Cardenas again, the postings.  What was going on with the postings at this point?  Because this was April 2023, well past the initial ones of February 2022.

A.    Well, there had been more in October, November, December, January.  Tons of postings about me sex trafficking children, laundering money, being a pedophile. I was getting calls from obviously investors and tons of people but they were -- I mean, there's probably 1,800 posts maybe more that I end up finding later but they were everywhere.

Q.    And again, this name Michael Woo, was that someone you were familiar with?

A.   No.   It's the first time I've ever heard of him.

Q.   But that's the type of individual Mr. Youngblood would weave into his story to convince you of the truth of it; is that right?

A.   Yeah.   There was a lot of those individuals.

Q.   As you sit here today, a fantastical nature of these stories, do you ask yourself why this happened to you?

A.   Yeah.   I've been through a lot of therapy not think I'm an idiot, but yeah, I mean, it's easy now to look back and think how did I fall for all this, but I believed he was a federal agent and I believed that he was a really good friend of mine and I could not imagine anyone doing this to me.

Q.   He mentions in that portion of the call the three-letter agencies.   You thought he was a part of one of those three-letter agencies, didn't you?

A.   Yes.   DOJ and that he special agency group.

Q.   Could we have 107B, please.   We ask that that be admitted for record purposes.   Sorry, your Honor, but I've been told that I need to admit the actual clips that were played, so I'm going to ask that those be admitted.   I'll read those into the record and that way, we can play them easier.   It would be 107A, 107B, 108A, B and C, 109A, 110A, 111A, 112A, B, 113A.

        THE COURT:   Any objection?

MS. HERRING:  No objection.

THE COURT:  So admitted.

MR. GUESS:  You could we have 107B, please.

(Audio file played.)

Q.   (BY MR. GUESS) This part of the conversation, I don't need it until Friday or I'll have it back, something along to that extent; is that right?

A.   Yes.

Q.   Was that consistent with what he would always tell you when you gave him money that it was just around the corner to getting this return?

A.   Yes.  From the first check I wrote.

Q.   The idea that the -- you mentioned Ruth, Musial, Fox, the Gehrig bat, what were these in reference to to your knowledge?

A.   He had these baseball bats that he told me that had been used for historic supporting events, home runs or different games that had the DNA of those specific individuals on the bats and they'd been in his possession and family for a while.

Q.   Were these bats allegedly extremely valuable?

A.   Yes.

Q.   At some point you mentioned in there why don't we just sell this, you know, you only need 77 grand, why don't we just sell it.

A.    I asked that continuously along the way why can't they sell some of these item.

Q.    And what was the reason Mr. Youngblood told you they couldn't sell some of these items?

A.    That bat specifically was in his family and had been given to him by somebody very special to him and he wanted to use it as collateral but did not want to sell it.  He had told me he had sold some of the other ones to Steinbrenners brother, I believe.

Q.    He also mentioned in that that there was a painting that was 500 years old.  Was that something else he had told you about that he had access to or had acquired?

A.    Yeah.  Pizarro, The Conquerer, I believe.

Q.    And what was that about, do you remember?

A.    Well him and James claim that they had very expensive paintings as well as the clocks that they had acquired over their antique career that they could sell and return money to all of us for keeping my children safe.

Q.    Again, a lot more of that call but those are two examples of that conversation from April 27th.  Let's go to next call.  Again this is also on April 27th.  Could I have Government's Exhibit No. 108A, please.  Before we play that, this is a phone conversation lasted about 21 minutes, we're going just going to play a couple of clips for you, okay, Mr. Perardi?

A.    Yeah.

Q.    108, please.

(Audio file played.)

Q.    Couple of names modified there.  The Faberge first, what is he referring in terms of the Faberge?

A.    I believe that's a painting.  I don't know.

Q.    It's something that he considered to be very valuable.

A.    Yes.

Q.    He says he doesn't want Holloway or Marvin to know anything about that though.  Who's Holloway?

A.    James Holloway at antique dealer that I've been writing the checks to.

Q.    And who's Marvin?

A.    Marvin is the supposed ex-LAPD officer that does a lot of his running or helps him out with things.

Q.    In your mind why does he not want James Holloway and Marvin connect to know about this Faberge piece?

A.    Well, along the way, a lot of the excuses that were given for why money wasn't returned would have to do with conversations that either I supposedly had over the phone or Holloway would have with somebody or Marvin.  So he said that he only trusted me.  I obviously thought I had made mistakes I tried to call about things or find out about material.  Every time I asked questions or said

things, it delayed our payments.  So I was very careful to never be on the phone or any of those things but he didn't feel that Marvin and James were -- I don't know if it was smart enough is the right word but did not follow the same protocol that I followed.  So he was asking that I keep it secret from them so that it could not delay him getting all this information out again.

Q.   You mentioned something there, getting the boxes.  Is this in reference to the boxes with the evidence that would be necessary for you to show that your wife had been unfaithful and had put a hit out on you?

A.   Yeah.  It was the audio recording of saying that she had -- was going to have my child kidnapped and text messages and things like that.  Pelican boxes is what they were referred to.

Q.   Could we have 108B played, please.

        (Audio file played.)

Q.   The Feds, he talks about OFAC.  Prior to meeting Mr. Youngblood, had you ever heard of OFAC?

A.   No.

Q.   Do you even know what OFAC is as you sit up there now?

A.   I know it has something to do with paperwork you have to fill out but I don't -- I couldn't explain it, no.

Q.   There's been mention of different ASDAs rather than

AUSAs.  Do you remember some conversation that you had with Mr. Youngblood regarding that?

A.    Yeah.  It was always U.S. Attorneys or assistant attorneys.  I didn't know all the acronyms.  I'm a lot smarter now.  Looked it all up.  But yeah there were always acronyms about federal agents and the three letter agencies and then your office type of individuals.

Q.    In fact, he talked about a Dan; is that right?

A.    He wasn't then.  But yes, Dan Crutchen.

Q.    Okay.  Not Dan Guess.

A.    Yeah.

Q.    Could we have 108C, please.

             (Audio file played.)

Q.    This acid in the face, did you ever see Mr. Youngblood when he had second or third degree burns on his face?

A.    No.

Q.    Why did -- when you saw him, how did he explain the fact that these burns supposedly had disappeared?

A.    By the time I saw him, it had been a couple of weeks and he said that he had been colloidal silver.  His wife is a MD and he said that she'd helped treat it with a dermatologist.  In fact, I texted her and --

Q.    Stop you there.  So he got some treatment to help in terms of that; is that right?

A.   Yes.

Q.   He mentioned there that he had been targeted.  What did that indicate to you?

A.   He said that my ex-wife had someone hired to throw lye in his face.

Q.   So now he's in the midst and has been I guess for a long time?

A.   Well he was beat up at the airport, I mean his kid was killed, he's been in as much of the mix as I have.

Q.   Couple of days later on April the 29th, few more calls with Mr. Youngblood.  Could we have 109A, please.

          (Audio file played.)

Q.   At this point on April the 29th, you've set up the idea that you're going to cooperate and introduce this undercover agent; is that right?

A.   Yes.

Q.   The reference to Rucker Homes in the conversation, who is -- what was that about?

A.   He was the guy who built my house.

Q.   Were you trying to identify or provide information that you were going to have a friend come up with the money at this point?

A.   Yes.

Q.   All right.  Mr. Youngblood says understand the flag, which is that flag in the back of the courtroom and the

Gehrig bat don't get sold.

A.   Yeah.   I was instructed that all the time.

Q.   So holding this collateral but don't actually sell it for cash.

A.   Yeah.

Q.   Could we have Government's Exhibit No. 110A, please.

          (Audio file played.)

Q.   You're talking about his son Kota, Jr. at this point the first part of the conversation; is that right?

A.   Yes.

Q.   Again, still friends at this point or allegedly; is that right?

A.   My best friend.

Q.   All right.   He mentioned the military.   Had seen all the drugs that you could have in the military.   Did he drop these military references often when he had conversations with you?

A.   All the time.

Q.   Could we go ahead to the next exhibit?   Exhibit 111A, please.

          (Audio file played.)

Q.   So this is a conversation between you and Mr. Youngblood; is that right?

A.   Yes.

Q.   This is on April the 29th, which is a Saturday.   When

you're talking about getting the money for Monday or Tuesday again that's coordinated already with the FBI agents; is that right?

A.    Yes.

Q.    And you wanted to give them an opportunity to set everything up so that you could run this ruse on Mr. Youngblood.

A.    Yes.

Q.    All right.  He mentions in there that -- or you mentioned actually you don't want to go through the check bullshit with Holloway.  What did you mean by that?

A.    Just, you know, coordinating with him, having to cash the check or that.  The FBI had instructed me to tell him that this guy had cash and that it would be easier for us to meet him with the cash because I had only been able to write checks because I was transferring money and having to wire transfer from different places or borrow from friends.  I didn't have cash ever except for the time that he gave it to me.

Q.    So he mentions that if he can't get it set up, it's going to cost him more money to change flights.  What did he indicate to you about that at that time?

A.    That happened almost every time.  So almost every incident after the first four or five when I completely ran out of money, it would take me periods of time to get

money, borrow it from friends or wire transfer from other accounts or whatever it needed to be, but every time it cost me or him more money when it was late was usually $5,000 a day or 2,000, whatever the numbers were, always but they were -- the money would always increase which added a lot of pressure obviously.

Q. So May the 1st rolls around and you're actually going to do the undercover meet with the FBI and the undercover agents; is that right?

A. Yes.

Q. And he was introduced to you on that day; is that right?

A. Twenty minute before we met Mr. Youngblood.

Q. All right. Where did the meeting with -- agent Fiedler as we got to know him just a little bit there; is that right?

A. I just knew him as Joe.

Q. As Joe. All right. Where did you and Joe first meat?

A. I met him actually standing in the lobby of the FBI, you have to wait for them to come out and get you and there was this massive dude standing next to me. I did not know he was an undercover agent and just politely said hi and then, when we got upstairs, they introduced him as an agent.

Q.   Was he wearing T-shirt and jeans, something casual so to speak?

A.   Yeah, he looked like a biker.  He was a big military biker guy.

Q.   Tattoos up and down his arms.

A.   Tattoos up and down his arm, yeah.

Q.   So you went up to the offices, Agent Noble, Agent Wilkinson there?

A.   Yes.

Q.   And you sat down and you discussed with Joe what you were going to do with Mr. Youngblood; is that right?

MS. HERRING:  I'm just going to object to the leading.

Q.   (BY MR. GUESS) What did you do when you met with Joe and the agents?

A.   Agent Noble and I had discussed what I had talked to him about and I had played them, obviously, the tape of the you just heard.  So I just wanted to basically tell Joe the story of how we knew each other and how we met and that was all.  We pretty much had time for and then we got in the car and went over to the location.  I think I was telling him about my kids and some details about my life at that point because I was thinking, oh, man, he'd better know my family if he's supposed to be a lifelong friend or a neighbor that knows me well.

Q.   So in the truck on the way to this meeting that's when you kind of talked about your children?

A.   Yes.

Q.   And without going into a lot of the details, you were present during the vast majority of the meeting between yourself, Mr. Youngblood and the undercover agent at the Carrabba's; is that right?

A.   All of the meeting, yes.

Q.   Excused yourself for a period of time to go use the restroom.

A.   Yes.

Q.   But outside of that, you were present?

A.   Yes.

Q.   The jury's already heard the undercover audio and so forth so we won't go into great detail about that, but you were playing a role at that point with the undercover; is that right?

A.   Well I was just being myself, yes.

Q.   He was playing the role.

A.   Yes.

Q.   All right.  Who dominated the conversation in your mind?

A.   Mr. Youngblood.

Q.   Before going to that meeting, did you go into details about why you wanted to get this meeting on tape with Mr.

Youngblood or did you let the agent set the stage?

A.   No.   The agents set the stage.   They had it all arranged.

Q.   On that day May 1st, did you have conversations with James Holloway as well regarding this upcoming meeting or the undercover operation?

A.   Yes, several.

Q.   All right.   I'm going to ask that Government's Exhibit No. 112A be played and could we just play a couple of short clips so we could identify the voices on this telephone call.

          (Audio file played.)

Q.   Whose voice is that?

A.   That's James Holloway.

Q.   And he's the same person that you've been giving these checks to over the several months?

A.   Over the last, yeah, eight or nine months.

Q.   The man who owned the antique or clocks association?

A.   Yes.

Q.   All right.   During that time, how close had you gotten to James Holloway in terms of talking about on a weekly, daily, how were you communicating with him?

A.   I almost talked to him almost every day because Mr. Youngblood didn't have a phone so my only way to actually communicate with Mr. Youngblood was to talk to James and

then Mr. Youngblood would get back to me.

Q. Go ahead and finish playing that clip, please.

(Audio file played.)

Q. So again, confirming what you said, how was Mr. -- how were you going to get a hold of Mr. Youngblood in this situation?

A. I have to reach out to Mr. Holloway.

Q. That's what he said he would need some time in order to?

A. Find Mr. Youngblood.

Q. All right. As you listened to that call, it sound -- tell me a little bit about what Mr. Holloway to your knowledge was discussing with you on this call.

A. I mean he's talking about the posts and how those posts have caused more issues of money that's needed and that Mr. Youngblood's taking care of that, but obviously, all of the money is for getting the information to the government so the government can then arrest my ex-wife and save my children.

Q. Obviously, Mr. Holloway seems to have a great deal of knowledge about the situation going on in your life.

A. Yeah. He was very convincing, over and over again, about what was going on in my life.

Q. As you sit here today, do you believe that Mr. Holloway was in cahoots with Mr. Youngblood throughout

this period of time?

A.    Yes.

Q.    Could we have the second clip played.

        (Audio file played.)

Q.    So he's talking about someone who's more dangerous than Los Zetas; is that right?

A.    Yeah.  There were some names in the posts, there were so many of them but there were names in the posts that I believe were head members of drug cartels' names, but one of the gentlemen in that post was, you know, one of the most vicious killers in the drug cartel.

Q.    You asked specifically how Kota was going to take care of this.  What did Mr. Holloway tell you and did you believe that?

A.    As always that he would be able to pay off these factions that always took money that they only dealt in money but if he did that, then he would be able to get the information to keep me safe.  Once it was released, I would be protected and then, he could pay off these animals or that he referred to them from hurting my children and hurting me.

Q.    Let's go to the Government's Exhibit No. 113, please, play that and again, identify these voices.  Stop for a moment.

        (Audio file played.)

Q.   Whose voice is that?

A.   That's still James Holloway.

(Audio file played.)

Q.   He called me in a panic, who was he referencing?

A.   Mr. Youngblood.

Q.   Both you and Mr. Holloway are talking about your financial situation during the first part of this conversation.

A.   Yeah, that was our everyday conversation.

Q.   Mr. Holloway indicated that he was broke also?

A.   Yeah.  He said he'd given over $3 million to Mr. Youngblood.

Q.   He certainly knew what your financial position was at that point.

A.   Yes.

Q.   Mr. Youngblood, as you've described him, was a close friend at this point of life.

A.   Yeah.  I mean he was one of the only friends I had left because I had obviously alienated myself from everyone except for Nicole and John Mapes and my mom.

Q.   I'm going to ask that Government's Exhibit No. 114 be played.  This is a voicemail that Mr. Youngblood left on your phone; is that correct?

A.   I don't know.  I haven't heard it but yeah, I imagine.

Q.   Just a moment.  For the record, just to be clear, we're only offering Government's Exhibit 114.

MS. HERRING:  No objection.

THE COURT:  So admitted.

(Audio file played.)

Q.   (BY MR. GUESS) This voicemail or message was left about the time that your father was passing or had passed?

A.   No.  He was in the hospital.  He was on hospice.

Q.   Is this typical of the way that Mr. Youngblood would have been conversing with you at this point of your life?

A.   Yes.  It's really hard to listen to, but yes.  I mean, we talked like this all the time.

Q.   Besides the communications that you had with Mr. Holloway, the posts and everything else, would you occasionally receive a phone call from a person that you didn't know whose identity it was?

A.   Yeah.  Towards the end here, I got a bunch of threatening phone calls.

Q.   I'm going to ask that Government's Exhibit 106 be played.

(Audio file played.)

Q.   So this call, did you recognize that voice?

A.   I mean, I don't know who it is, but yes, they called me probably about 20 times over the course of a week and a half.

Q.    The reference to someone having a bad night, what did you take that to be?

A.    Well, he had just told me that he had lye thrown in his face and obviously we had been having that conversation for a week and this is reference to that.

Q.    And the numbers that were referenced in there, were they related to a internet post that you had seen?

A.    Several, yes.  Those numbers were posted as indication that Julie Herrera and my ex-wife were laundering money with the drug cartel in those bank accounts with those exact amounts.

Q.    Mr. Perardi, as you sit here today, what's your financial situation?

A.    I owe about $820,000 to creditors and loans on my business and then to friends and family.

Q.    Since the beginning of February 2022 when this nightmare started for you, has your financial situation deteriorated completely?

A.    Yeah.  I've lost everything.

Q.    Do you still own your business?

A.    No.  I mean I have T.A.P. Development as a business but I lost all my employees.  They actually started their own business behind my back and I do -- I'm trying to start over and do real estate in a very tough real estate environment, obviously.

Q.   Are you still associated with The Crossover as a manager of the facility?

A.   Yeah.  I don't get paid for it.  I lost my pay for that after these first posts came out, but yes, because I care so greatly about it, I still work on it, but I haven't been paid for it over two-and-a-half years.

Q.   I'll pass the witness for cross-examination, your Honor.

CROSS-EXAMINATION

BY MS. HERRING:

Q.   Mr. Perardi, I'm going to start, talk a little bit more about the divorce proceedings in this case.  You said that you and Rachel married in -- back in 2015, October 2015?

A.   Yes.

Q.   And you separated as of September of '21?

A.   No.  November of '21.

Q.   November '21 was when you actually filed for divorce, right?

A.   Yeah, but I was still into the house up until Halloween of that time.

Q.   Of '21?

A.   Of '21, yes.

Q.   And just to be clear, you are the one who initiated the divorce?

A.    Yes.

Q.    And that was a six-year marriage?

A.    It would have been six years by that point, yes.

Q.    And Rachel was the mother of your youngest child, right?

A.    Yes.

Q.    XXXXX, who you told us about yesterday?

A.    XXXXXXX, yes.

Q.    And when you and Rachel separated in November of 21, XXXXX wasn't even -- was she about three, three years old?

A.    She would have turned three in December.

Q.    It was a contentious separation; is that fair?

A.    Yes.

Q.    Rachel is 15 years younger than you are?

A.    Yes.

Q.    You all met on a party boat, right?

A.    Yes.

Q.    She was in her late 20s, you were in your early mid-40s?

A.    I was early 40, yes.

Q.    You've written before that you were mesmerized by Rachel when you first met her.

A.    Yeah.  She's very pretty.

Q.    She's got striking red hair, right?

A.    Yeah.  She's tall.

Q.   And when you met Rachel, you were still married to your first wife, Natalie, right?

A.   Yes.

Q.   You have three children with Natalie, or your boys?

A.   Yes.

Q.   And you started an affair with Rachel, right?

A.   Yes, we did.

Q.   And that is what led to your divorce with your first wife?

A.   No.   I mean, we -- a lot led to the divorce with my first wife, not because of Rachel.

Q.   You ended up marrying Rachel, though, right?

A.   Yes.   And adopting her daughter.

Q.   In fact, you adopted her daughter a month before you filed for divorce, right?

A.   Well, it takes -- we had the adoption papers in for a very long time.   It was during COVID so it took a long time till she turned 18.

Q.   You had a "under the sea" theme wedding with Rachel, right?

A.   The second wedding, yes.

Q.   You dressed up, you said, Prince Eric, right, and she was Ariel?

A.   That was in the justice of the peace and then, we had a real wedding later.

Q.   At your justice of the peace wedding, that was a very small ceremony, right?

A.   Yes.

Q.   And your -- you've mentioned him several times now, Eric Swanson, one of your good friends, attended, right?

A.   Yes.  And his wife and Parker Dunn.

Q.   So fast forward from, you know, you've had this six-year marriage, 2021 when you all separate, at that time, you were both living in this home in Steiner Ranch, right?

A.   At my home, yes.

Q.   And is that -- is it Terjo Lane?

A.   Terjo.

Q.   Terjo?

A.   Terjo.

Q.   You told us yesterday, you're a former hockey player, right?

A.   Yes.

Q.   And you actually had a -- is it a full-size hockey rink inside the home?

A.   No.  It was like 1,400 square feet of a shooting arena for my children.

Q.   At the time you separated, Rachel, you told us, was working for you at Perardi Development, right?

A.   Yes.

Q.   She was the director of marketing and operations at Perardi Development?

A.   Yes.

Q.   And everything kind of escalated around your 50th birthday party; is that right?

A.   Well after that, yeah.

Q.   That was another boat trip that you had planned, spent a lot of time planning that?

A.   Yeah, Rachel had spent a lot of time planning that, yes.

Q.   And you were convinced that Rachel had actually cheated on you on that trip, right?

A.   No.  I had text messages of her infidelity and she was planning to fly to Granada to meet with the boat captain after the trip.

Q.   You believed that she had cheated on you with the boat captain from the trip.

A.   I didn't know whether she'd done it on the trip or not, but I knew that they were having an internet sexual relations.

Q.   You knew she was unfaithful at the time.  That's what you believed.

A.   That's what I found in the text messages, yes.

Q.   When you filed for divorce, this was not an agreed divorce, right?  It was a contested proceeding.

A.    I don't understand that.  I mean, it was agreed that we both wanted the divorce.

Q.    You all did not file as an agreed divorce with the court, right?

A.    No.  I showed up at my house and there was another man in my home.

Q.    When you filed for divorce, you and Rachel had not already agreed on property division, right?

A.    No.

Q.    You had not agreed on custody, right?

A.    No.

Q.    In fact, your divorce has been highly contested over the last two-and-a-half years, right?

A.    Not by me but yes.

Q.    As you sit here today, your final divorce decree has not yet been entered in Travis County, right?

A.    I'm divorced.

Q.    Your final divorce decree has not been entered in Travis County?  It's set to be entered next week, right?

A.    Yeah.  They never gave back any of the redline since January.  They've had the redline since January.

Q.    As you sit here today, your divorce isn't final.

A.    Well, I'm divorced, yes.

Q.    You had a lot at stake financial as a businessman in this divorce, right?

A.    No.

Q.    You are the high earner, you were the high earner in that relationship.

A.    Yeah.  We spent almost all the money that we were making.

Q.    Rachel depended on you for the job at the time.  She was working for you, right?

A.    Yeah.  That's several other employees, too, yes.

Q.    You were the one that had many different financial interests.  We talked yesterday, variety of different subsidiary companies that you operate under you said T.A.P. Development?

A.    T.A.P. Development, yes.

Q.    Those were your companies, right?

A.    Separate property, yes.

Q.    And you hired a divorce attorney, an expensive divorce attorney, right?

A.    I mean I don't know that there's any inexpensive divorce attorneys.

Q.    Fair.  Divorce attorneys charge by the hour, right?

A.    Yes.

Q.    And you were the one who filed for divorce but the divorce proceedings early on, talking 2021, early '22, cost you a lot money, right?

A.    Well, I had to pay for her lawyers, too.

Q.   You had to pay for quite a few things, right?

A.   I paid for everything.

Q.   So I want the talk about some of the things that you had to pay for.  You recall that when your divorce started, temporary orders were put in place in Travis County.  That's standard, right?

A.   Yes.

Q.   And under those orders those actually set out what you had to continue to pay for.

A.   Yes.

Q.   So you had to continue paying for the mortgage on the Terjo Lane house?

A.   Yes.

Q.   Not a cheap mortgage.

A.   No.

Q.   You actually under those original temporary orders and I heard yesterday you believe that house was your separate property, originally you had to vacate the home and Rachel got to stay there, right?

A.   No.  I didn't have to vacate the home.  I chose to vacate the home because she had a felon living in my house.

Q.   You don't believe that you were ordered to vacate the home in the temporary orders?

A.   No.  I agreed to it.  I was not ordered to.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Q.   You agreed to vacate the home?

A.   Well, she was there with my daughter.

Q.   You agreed to vacate the home?

A.   Yes, I agreed to vacate the home.  I had several other children that I had to -- and obviously to house.

Q.   When you agreed to vacate the home, you then had to pay for your new residence at the Country Trails Lane property, right?

A.   Well, I stayed with friends for the first month and then, yes, I found a home for my children.

Q.   So you were paying the mortgage on your home on Terjo Lane and you were paying rent on a new property, right?

A.   Yes.

Q.   You had to continue to pay all the utilities, insurance, property taxes on your home, right?

A.   Correct.

Q.   You had to continue to pay Rachel's car payments?

A.   Yes.

Q.   You had to pay for auto insurance, for your car and her car?

A.   Yes.  All those were set in place because we we're having mediation in April.

Q.   You had to continue to pay for XXXXXXX preschool?

A.   Yes.

Q.   And you were still paying child support to your first

wife for your three boys?

A.   Yes for two of them now.

Q.   And as you already told us you had to pay for attorneys' fees both for your own attorneys and for Rachel's attorneys, right?

A.   Yes.

Q.   You were also required to continue to pay Rachel the salary even though I imagined you didn't want her working at Perardi Development anymore, right?

A.   Yes.

Q.   And that was $3500 a month?

A.   Yes.

Q.   And you had to continue to do that until she found a new job.

A.   Correct.

Q.   Once she found a new job, that was going to be reduced to just the standard child support amount, right?

A.   Until we had a final decree, yes.

Q.   At the time when your temporary orders were put in place, both of you were ordered not to spend in excess, right?

A.   Yes.

Q.   The temporary orders also required you to inform Rachel if you took out any loan against your separate property, right?

A.   I'm sure it did, yes.

Q.   You had to let her know within 24 hours if you took out a loan against your separate property.

A.   Yes.

Q.   You're familiar with those standing orders that are put in place when someone files for divorce in Travis County, right?

A.   Yes.

Q.   You know that those orders required you, both of you, of course, not to hide property from your spouse, right?

A.   Yes.

Q.   Not to incur any debt other than legal expenses in connection with the case unless the debt was authorized, right?

A.   Yes.  On our personal expenses.  I was running a business.

Q.   The standing order also ordered both parties not to withdraw or transfer money from any account in a financial institution for any purpose unless specifically authorized.  Do you recall that restriction?

A.   Yes.

Q.   You talked yesterday about -- I'm going to jump to these negative posts that started appearing in February and March of '22.  You looked at some of those yesterday that the government showed you.  Show you a few more here

that have already been pre-admitted.  May I approach, your Honor?

THE COURT:  You may.

Q.  (BY MS. HERRING) Show you, this is Defense Exhibit 43.  So these are some of the February-March posts and you've already talked about some of these when you reviewed them with the government attorney yesterday.  So we had looked at the first page.  You told us about the Steiner Ranch Truth account and that you weren't familiar with that account, right?

A.  Correct.

Q.  But does this look like one of the posts that you probably saw at the time?

A.  Yeah.  As long as they're tagged to The Crossover and the Field House.

Q.  Which we see there, right?

A.  Yes.

Q.  The first one at Crossover at the Field House, right?

A.  Yes.

Q.  And this -- just taking that top one, here's a question, why are Joey Pollard and Rachel Perardi together?  Definitely isn't Rachel's looks since Joey's banging a lot of younger woman from his work.  It's the money and the drugs, right?

A.  Yes.

Q.   These posts, they tagged The Crossover but the content on this page is about Rachel and Joey, right?

A.   Yes.

Q.   Here's another that Steiner Ranch Truth account you've talked about.  This is a post, looks like just about Joey Pollard, right?

A.   Yeah, I don't remember seeing that, but yes.

Q.   You don't recall seeing this one before?

A.   I don't think so.

Q.   Here's another one where you had told us at Crossover Texas at the Field House Texas, this is one you would have seen probably before back February-March of '22?

A.   Yes.

Q.   And again, this content Crossover's tag but the content is about Joey Pollard and Rachel, right?

A.   That's what it says, yes.

Q.   This was -- looks like it was posted on the Crossover's Facebook page maybe?  It's hard to tell which social media we're looking at here.

A.   Yeah.  I don't know.

Q.   You don't know this Sal Thomas poster?

A.   I don't know which one -- it could have been Instagram or Facebook.  I'm not sure.

Q.   But this looks like there's a reference to the Crossover in the post, right?

A.   Says here hash tag Cedar Park, I wouldn't have seen. Oh, Crossover at the top.  Yeah, I guess so, yeah.

Q.   And this, again, the content of this is about Joey Pollard and Rachel Perardi, right?

A.   Yes.

Q.   When you filed for divorce in November '21.  You had concerns, you already told us about Rachel's infidelity, right?

A.   Yes.

Q.   You had concerns about her drug use?

A.   Yes.

Q.   About her alcohol use?

A.   Yes.

Q.   You believed she was cheating on you.

A.   Yes.

Q.   And one of the people you actually believed she was cheating on you with was Joey Pollard, right?

A.   I found that out later but yes.

Q.   Now, the divorce court when your temporary orders that you've already discussed were entered, those orders included an order that you not post anything derogatory about Rachel online, right?

A.   I believe after these post, yes, those were in the orders.

Q.   March of '22?

A.    Yes.

Q.    So you would have been in violation of a court order if you had posted something like this about Rachel online?

A.    I never posted these.

Q.    It would have been a violation of a court order to do so?

A.    Yes.

Q.    You testified yesterday that you hired a company to determine that you had nothing to do with the posts.  Do you recall that testimony you gave yesterday?

A.    Yes.

Q.    You mentioned that was through Matt Wood?

A.    Yes.

Q.    Through Matt Wood, you hired a private investigator to follow Joey Pollard around, right?

A.    Yes, because in the post it said he was a pedophile and he was around my daughter.

Q.    And you believed that Joey Pollard was who Rachel was in a relationship with after you all separated, right?

A.    That's what the private investigator told me.

Q.    I want to bring up Defense Exhibit 9, which has been pre-admitted.  May I approach, your Honor?

        THE COURT:  You may.

Q.    (BY MS. HERRING) Do you recognize that as an e-mail exchange that you've had with Matt Wood that we've been

talking about?

A.   Yes.

Q.   So if you go to the last page of that e-mail, this is a report that you received from Matt Wood, right?

A.   Yes.

Q.   And we can see he tells you on the investigative front, She Spies followed Joey to work today.  They continued to the Night Office Solutions.  The next step is to decide whether to authorize She Spies to do the deep dive internet research on Joey.  I'm told that the evidence generally comes back in admissible form and can probably be used in court.

You recall that you were looking to compile evidence about Joey Pollard to be used in your divorce proceedings?

A.   Yeah, on the direction of Mr. Youngblood.

Q.   Mr. Youngblood wanted you to compile evidence on Joey Pollard from Matt Wood?

A.   He was telling me that all of the things in those posts were true and that he had evidence that Joey Pollard was trying to extort money from me.

Q.   Mr. Youngblood didn't talk to Matt Wood.

A.   No.  I had to talk to my attorneys about it, yes. That's my way to also try to verify what Mr. Youngblood was telling me.

Q.   It's your testimony that you talked with Matt Wood about what Mr. Youngblood was telling you and told him about Mr. Youngblood?

A.   No.  I did not.  I was authorized to not talk to anybody about that.

Q.   At some point, presumably on your communication with Matt Wood, She Spies proceeds forward with this deep dive. This is going to be internet research into Joey Pollard, right?

A.   Again, yes, because I was told that he was a pedophile.

Q.   And you do receive a report after this deep dive that they did not find any blatant footprint on the dark web for sex sites, porn sites, or CP, child pornography, right?

A.   Correct.

Q.   And this -- the group doing the deep dive said -- the other option was they could actually start a dialogue via chat with him through some websites to see if they could net any true intel, right?

A.   Yes.

Q.   And you through Matt Wood, you paid for this search. This was part of your legal fee, right?

A.   Actually, my mom paid for it.

Q.   The social media post that you just reviewed with us

reference exactly these types of things that you're looking for, right?

A.   Yes.   This is in April so this was -- I would never have done any of this had there not been those posts.

Q.   You believed that Rachel was cheating on you with Joey Pollard?

MR. GUESS:  Your Honor, I'm going to -- asked and answered.  He answered the questions many times that he believed Mr. Pollard was having an affair with his soon-to-be-ex-wife at this point.

THE COURT:  Okay.

MS. HERRING:  I could move on, your Honor.

Q.   (BY MS. HERRING) You also testified, you called it C4.   I think it might have been R3?

A.   Yeah, sorry, R3.

Q.   You hired R3 to prove that you didn't make these posts, right?

A.   Well, these were all recommendations of my divorce attorney.

Q.   So you hired R3 to prove that you didn't make the posts?

A.   Yes.

Q.   And R3 is a digital forensics firm?

A.   That's what Matt Wood told me, yes.

Q.   And we see that Matt Wood spoke with R3 about

protecting the raw data from your phone and laptop.  There was a concern that Rachel or her attorneys might get access to all of the data imaged from Eric's phone and laptop.

A.    Yeah, they were concerned about messages with me and my attorneys.

Q.    You wanted to make sure that Rachel and her attorneys did not get a full image of your phone?

A.    I have nothing to hide on my phone.  It's just communication between my lawyers.  That was what my lawyers suggested.

Q.    So it was only your lawyers's concern about turning over your full phone?

A.    Yeah.

Q.    Not yours?

A.    No.  I have nothing to hide on my phone.

Q.    At one point after several months after you started -- you had gone to the FBI and already started working with them in the undercover operation, they did call you and ask you if you had been responsible for the February-March posts.  Do you recall that?

A.    Yes.

Q.    And you told them no, that you had not.

A.    Correct.

Q.    And you told them that a report had been done on your

phone.

A.   Yes.

Q.   And you never provided them a copy of that report.

A.   I have it.  They didn't ask me for it.

Q.   They didn't ask you for it?

A.   Correct but I did provide them with this information.

Q.   With this e-mail, yes?

A.   Yes.

Q.   Do you believe that there were earlier e-mails between you and Matt Wood maybe in February when the posts started discussing this?

A.   No.  I mean, as I testified yesterday, Mr. Pollard had sent a threatening letter to me after this came out.

Q.   He sent you a cease and desist letter, right?

A.   Correct.  And that's when Judith, my attorney, put me in touch with Matt Wood to then respond to that letter.

Q.   Did you also have conversations about these posts with a man named Lane Holloway?

A.   I've never spoken to Lane Holloway.

Q.   Jumping forward to June of 2022.

A.   Yes.

Q.   You requested some amendments to the temporary orders in your divorce.  Do you recall that?

A.   Yes.

Q.   Through your attorneys obviously.

A.    Yes.

Q.    You at this point wanted Rachel to move out of the Steiner Ranch home, right?

A.    Yeah.  I could not afford both homes.

Q.    You're seven months into the divorce proceedings at that point, right?

A.    Yes.

Q.    She's still living in the home.

A.    With no job.

Q.    With no job.

A.    Correct.

Q.    And you referred yesterday to that home in Steiner Ranch as your house.  That's what you called --

A.    Well, I was on the deed and the mortgage and I built the home prior to marriage.

Q.    That was initially in your divorce disputed, know, right?  Rachel didn't immediately agree that she had no right to the home.

A.    Her and her lawyers disputed it, yes.

Q.    You had bought the land for that property prior to marriage?

A.    Correct.

Q.    Right?  The house, the physical house itself was built after the marriage.

A.    No.  It was built during our engagement, I guess.  We

weren't married.

Q.   It was built during your engagement.

A.   Well we got engaged in May, the house started in January.

Q.   Were the property taxes in both of your names?

A.   I don't know that.  No, I don't believe so.  I mean I was responsible for paying everything.

Q.   Because Rachel wasn't working.

A.   No.  Because she wasn't on the mortgage or the homestead.

Q.   You asked the Court to order her to vacate the home by I think you wanted July 15th of '22.  Do you recall that?

A.   Yes.

Q.   And you also moved to -- asked the court to order her to go and find another job, right?

A.   Yeah.  Been almost a year at that point.

Q.   Up to that point, T.A.P. Development was still paying her this monthly $3500?

A.   Per the requirement, yes.

Q.   You also in June of '22 wanted a court order that she submit to drug testing, right?

A.   Well, she had tested positive for meth.

Q.   And you asked that she be ordered to submit to drug testing?

A.    Yeah.  I was concerned for the safety of my daughter.

Q.    You filed that request for an amendment to the temporary orders, I believe it was, June 9 and then, two weeks later, Rachel filed a counterpetition in the divorce.  Do you recall that?

A.    If you say so, yes.

Q.    Do you recall that she did file counterpetition in the divorce?

A.    Yes.

Q.    Do you recall that in her counterpetition, she asked the Court to award her a disproportionate share of the community property?

A.    She'd been asking that all the way through.

Q.    He asked that, she alleged that that was due to your fault in the breakup of the marriage, right?

A.    Yes.

Q.    She claimed you breached fiduciary duties owed to her, right?

A.    Yes.

Q.    She alleged in that petition that there had been fraud and waste committed by you.

A.    That was what she alleged.

Q.    She alleged that you breached your fiduciary duty by using community property to benefit your separate property without her knowledge, right?

A.   Yes.

Q.   Do you recall that there was a whole section titled fraud and waste in that counter petition?

A.   I believe so, yes.

Q.   And as a remedy for the again just alleged fraud, she requested that the Court order that you reimburse the community estate for funds or assets expended by the community's estate for your benefit.

A.   Yes.

Q.   Do you recall that ask?

A.   Yes.

Q.   I imagine you did not enjoy being accused of fraud, right?

A.   I mean no, but it was part of the divorce apparently.

Q.   It's pretty contentious at that point.

A.   Yes.

Q.   You knew at least at that point that your assets were being scrutinized by Rachel and her attorneys.

A.   Yes.

Q.   And as the divorce goes on as is standard in divorces or contested divorces, you were asked to provide a lot of financial records to her attorneys and vice versa.

A.   Yes and I did every time.

Q.   You were also ordered to prepare an asset inventory, do you recall that?

A.   Yes.  Several of them.

Q.   May I approach, your Honor?

THE COURT:  You may.

Q.   (BY MS. HERRING) I'm going to show you what's been marked as Defendant's Exhibit 111.  Do you recognize this document?

A.   Yeah, it's dated April 5th.  This is -- we were supposed to have our first mediation.

Q.   Does this look like the asset inventory that you and probably your attorneys would have prepared in April of 2022?

A.   Yes.

Q.   Does it look to be an accurate copy in your recollection of that inventory at that time?

A.   Yes.

Q.   We'd move to admit Defendant's 111.

MR. GUESS:  Could we ask it be kept off the screen?  It was just on my screen.  I'm going to object based on relevance.  I don't understand how it's relevant to the facts in this case, your Honor.

MS. HERRING:  Your Honor, it includes references to several of the bank accounts that we are -- had been discussing all day yesterday in this case, as well as the life insurance policy that was discussed, as well as the home equity line of credit, and those are the four line

items I want to discuss with the witness.

THE COURT:  Objection overruled and admitted.

Q.   (BY MS. HERRING) I just want to go through a couple of these line items with you, Mr. Perardi.  You told us that this is the home, I've been calling it the Steiner Ranch home because it's hard to pronounce this.

A.   Yes.

Q.   But this as you have told us you believe and was ultimately decided your separate property, right?

A.   Yes.

Q.   The debt, the home equity line of credit was a community debt; is that right?

A.   I believe that I was the only one that could access the home equity line of credit.

Q.   And we'll talk about this later you were the only one that could access the home equity line of credit but you and Rachel took out the home equity line of credit?

A.   Well, I took out the home equity line of credit.  I think she had to sign on some documents for it, yes.

Q.   You listed it in your asset inventory in April of '22 as a community debt.

A.   Yeah.  My attorneys did that.  Yes.

Q.   You disagree with that today?

A.   No.  No, because it was a debt against property that I owned.

Q.   I want to go down.   We talked about this bank account a lot yesterday, 6673.   This is your Wells Fargo checking account?

A.   Yes.

Q.   At the time?

A.   Yes.

Q.   And this is a -- at the time community asset?

A.   Yes.

Q.   Wells Fargo checking 7818, this was the T.A.P. Development bank account, right?

A.   Yes.

Q.   And that is a separate property bank account?

A.   Yes.

Q.   Your company's account?

A.   Correct.

Q.   And just this last line item under life insurance, Prudential life insurance company term policy on Eric's life in the face amount of $5 million, right?

A.   Yes.

Q.   Rachel files the counterpetition toward the latter part of June of 2022 and you told us yesterday that it was late June when you got this call from Vegas, right?

A.   Well, we had a mediation before then.

Q.   She files a counterpetition, you have a mediation and then you get the call?

A.    We had a mediation for final divorce.  Yeah so there were counter petitions filed but we actually went with Jonathan Friday and had a full mediation.

Q.    And the mediation didn't resolve your divorce in June of '22?

A.    It ended in about 20 minutes.

Q.    Contentious experience?

A.    I mean, the ask was I don't even know if I -- am I allowed to say what the ask is in federal court?

Q.    If you'd like to share that with.

A.    Yeah.  She asked for $3 million and full custody of my child.

Q.    And that occurred sometime late June?

A.    Yes.

Q.    And then, I'm just -- we're going to jump to this call you got from Vegas that you told us about from Eric Swanson and Adam Powell?

A.    Yes.

Q.    Which was also in late June?

A.    Yes.

Q.    And you told us yesterday that you had not been able to attend this hockey showcase in Vegas, right?

A.    Yes.

Q.    But your friend's business partners Adam and Eric were there.

A.    They're not business partners.  No.  Just friends.

Q.    Adam Powell didn't work for you?

A.    He worked for The Crossover but he's not a business partner.  He was an employee.

Q.    Your testimony yesterday was that Adam and Eric told you that Mr. Youngblood needed to speak with you urgently; is that right?

A.    Yes.

Q.    And he needed to meet with you as soon as he returns to Austin.

A.    Yes.

Q.    And that meeting occurred when he returned to Austin.

A.    Yes.

Q.    He came to the new home you were living in, the country?

A.    Country Trails.

Q.    Country Trails?

A.    Yes.

Q.    This was the early morning meeting?

A.    Yes.

Q.    And he told you Rachel had been using and dealing drugs; is that right?

A.    No.  He told me that way earlier than that.  He told me that my life was in danger and my son was going to be kidnapped.

Q.   And that she was trying to have you killed to cash in on the $6.5 million life insurance policy?

A.   Yes.  And he knew all the details about my divorce, all these bank accounts and all the details of my life insurance policy.

Q.   You testified yesterday he quoted your life insurance policy the number that you had, the amount you had and who the policy was with.

A.   Yes.

Q.   And you testified that this meeting occurred after Mr. Youngblood returned from the Vegas hockey event.

A.   Yes.  But I had been talking with him for months at that point.

Q.   Eric Swanson, you told us was one of your -- is one of your very good friends long time friend?

A.   Yes.

Q.   And Eric Swanson and his wife Sara, I don't know if they still do but worked for Prudential?

A.   Eric did not.  No.

Q.   Sara Swanson did?

A.   Yes.

Q.   And Sara Swanson had helped you and Rachel set up the life insurance policy?

A.   Yes.

Q.   You think Eric would have been aware of your life

insurance policy?

A.   No.  He would lose his license if him and his wife discussed that.

Q.   At the meeting that occurred at your home when Mr. Youngblood came early that morning, it was only you and Mr. Youngblood?

A.   Yes.

Q.   No other witnesses to that meeting.

A.   No, my daughter was asleep in the other room.

Q.   I want to talk for a minute about who you believed Mr. Youngblood was at that time, okay?  June of '22.  You told us he was the father of two teenage boys that you coached in hockey.

A.   Yes.

Q.   That you had known him for some number of years at that point, maybe five, four or five years?

A.   Four or five years, yes.

Q.   And you believed he was a government agent?

A.   Well he told me that.  Yes.

Q.   You believed that at the time?

A.   Oh yeah.  Absolutely.

Q.   And when he came to your house that morning, you told us it was early in the morning.

A.   7:30.  I'm a father of five, 7:30 is not early in the morning.

Q.   He didn't show you any kind of badge, right?

A.   I mean, I'd known him for four years.  I didn't ask him for a badge.

Q.   In four years, he'd never shown you any kind of credential.

A.   No.  Should I have asked him for one?

Q.   Like the agents who you see walk around with their badge on their hips every day, Mr. Youngblood, you witnessed him --

A.   He told me he was undercover all the time.

Q.   You never saw him with a badge anywhere?

A.   No.

Q.   You said he shows up at your house in dark-color clothing, right?

A.   Similar to what he's wearing now, yes.

Q.   No uniform, no insignia of any type, right?

A.   Always undercover.

Q.   That's what you believed?

A.   That's what he told me, yes.

Q.   And he told you at that meeting that he needed you to get him $70,000 to protect you from this imminent threat, right?

A.   Yes.

Q.   And that you should write a check to someone named James Holloway?

A.    Yes.

Q.    You told us yesterday you didn't know who James Holloway was at the time.

A.    No.  I'd never met him.

Q.    You never heard the name before.

A.    No.

Q.    He told you at that meeting that your money -- that you'd also get your money back; is that right?

A.    He said he would do anything to make sure that I got my money back.

Q.    And that you would also get a return on that $70,000?

A.    Not in that meeting, no.

Q.    Not in that meeting.

A.    No.

Q.    And you said you wrote the check that day.

A.    Yes.  Out of my T.A.P. Development account.

Q.    And Mr. Youngblood I think you said yesterday, you gave it to him, right?

A.    Yes.

Q.    He didn't give you any receipt for that check.

A.    No.

Q.    Didn't ask you to sign anything related to any of the contract you'd been talking about?

A.    Well, there was no contract.  It was the safety of my child's life.

Q.    But you believe he's a federal agent?

A.    Yes.

Q.    And there's no co agent, right?  It's just Mr. Youngblood.

A.    I have not met any of his other associates.

Q.    So you give him this check, you don't get anything in writing in return.

A.    He was my friend.  No, I did not.

Q.    We're just going to pull up the check.  So I want to just understand, make sure I understand from your testimony yesterday the dating on this check.  So you have always, I think in all of your statements, the FBI, the newspaper, all the time, said that $70,000 was the first amount of money Mr. Youngblood ever asked you for; is that right?

A.    Yes.

Q.    You recall that when you went to the FBI much later in April of '23, they asked you to prepare a list of all the checks that you had given to Mr. Youngblood, right?

A.    Yeah -- yes.

Q.    From all the checks you'd written from T.A.P. Development, right?

A.    Yes.

Q.    Do you recall that you list this check as the first payment you ever made in this case?

A.   Yes.

Q.   May I approach, your Honor?

        THE COURT:   You may.

Q.   (BY MS. HERRING) I'll show you Defendant's Exhibit 13.   Do you recognize this e-mail exchange with your attorney Judith Bryant who you've been talking about?

A.   Yes.

Q.   Does this look like a copy of the e-mail exchange that you later provided to the FBI?

A.   Yes.

Q.   We'd move to admit Defendant's 13.

        THE COURT:   Any objection?

        MR. GUESS:   No objection, your Honor.

        THE COURT:   So admitted.

Q.   (BY MS. HERRING) You see on the bottom of the second page of this e-mail and the top of the third page, your attorney, you've told us Judith Bryant was one of your divorce attorneys, right?

A.   Yes.

Q.   She lists out all of these same checks that we went through in detail yesterday, right?

A.   Yes.

Q.   And she also lists this $70,000 in her list as the first check, right?

A.   Yes.

Q.   And both you and the list you prepared for the FBI and your attorney in this list here, y'all are going by the date that these checks are cashed, right?

A.   Yeah.  I believe I searched up all the checks that had been written to James Holloway when I was providing the list.

Q.   And so if we go back to that $70,000 check, that was the first check that was ever cashed in this series of checks that you wrote over time from T.A.P. Development, right?

A.   First one, I believe so, yes, unless I missed one.

Q.   Do you think that you missed one?

A.   I mean, the way you're talking, I must have.

Q.   I'm just asking you about why you list the $70,000 check first.  You list -- you've always said $70,000 was the first check you wrote, the first payment you needed to make to Mr. Youngblood, right?

A.   That's what I believed, yes.

Q.   And that check indeed was the first check that was cashed.

A.   I think that's when I looked up the records, I mean, this is a year later and I'm looking up through the FBI. So if there was another check before then, then I obviously missed it.  That means he owes me more money.

Q.   Well, this check is dated the 8th of July of '22,

right?

A.    Yep.

Q.    $70,000 check.

A.    Yes.

Q.    The first amount of money you say Mr. Youngblood ever asked you for.

A.    I believe so.

Q.    May I approach, your Honor?

        THE COURT:    You may.

Q.    (BY MS. HERRING) Have you seen this document before in preparing to testify?

A.    I don't know.  I don't know that I've seen it before.

Q.    Does this look like a representation of all the checks that were written from --

        MR. GUESS:    Judge, we can't hear any of the conversations taking place here.

Q.    (BY MS. HERRING) Does this look like a representation of the 17 checks that you have wrote from your T.A.P. Development account in connection with this case?

A.    Yeah, but it looks like they're out of order unless I wrote the 86,000 before the 70,000, which I didn't think so.  But I don't know.  But yes, those are all the amounts.

        MR. GUESS:    Your Honor, may I take the witness on voir dire?

THE COURT: Let's wait till she -- are you going to offer this?

MS. HERRING: Yes.

THE COURT: Let's wait till you're finished with your predicate.

Q. (BY MS. HERRING) Is this in fact the number of checks you recall written in this case?

A. I would have to look at all the checks that we went through yesterday but that I recall, I guess, yes.

MS. HERRING: I'm just going to move to admit 133 as a demonstrative only.

MR. GUESS: No objection as to a demonstrative, your Honor.

THE WITNESS: What does that mean?

THE COURT: Admitted for that purpose.

THE WITNESS: What does demonstrative mean?

THE COURT: It will not be part of the evidence. It will just be used by the attorneys.

THE WITNESS: Okay. Just sounds like a very scary word.

Q. (BY MS. HERRING) So just for demonstrative purposes, this is a list of all the checks that you talked about yesterday. We're talking about the order of these checks, okay? So $70,000 you've said is the first amount of money Mr. Youngblood asked you for, correct?

A.    Yes.

Q.    And you wrote that check, we were just looking at that check, it's dated the 8th of July.

A.    I did not date the checks properly per Mr. Youngblood's order.

Q.    The check is dated the 8th of July, right?

A.    Correct.

Q.    And as we just talked about that check was cashed on the 8th of July.

A.    Correct.

Q.    There is another check that is dated the 7th of July. You recall that check?

A.    Do you have a copy of the check.

Q.    Yeah, we're going to look at it in a minute.  But do you recall writing an $86,000 check?

A.    I mean, if I wrote it -- I mean, there's a lot of checks.

Q.    We'll bring it up.

A.    Okay.

Q.    Do you recall this check that's dated July 7th of '22, right?

A.    Yes.

Q.    You talked about this check extensively yesterday. Do you recall that?  You spent a lot of time talking about the $86,000?

A.    Is this the one from New Orleans that was Fed Ex-ed.

Q.    What you testified yesterday?

A.    It was Fed Ex-ed from New Orleans, yes.

Q.    That check is date July 7th?

A.    Correct.

Q.    Which is before July 8th, right?

A.    That's what I was instructed to write on it, yes.

Q.    It's also an earlier check number in your checkbook, right?

A.    Well, I was in New Orleans and I had a different checkbook in my backpack.  I had several checkbooks for that account.  So that was the checkbook that I had when I was in New Orleans.

Q.    So it's your testimony that check No. 2085 and check No. 2110 weren't in the same checkbook for T.A.P. Development?

A.    No.  They are not.

Q.    Flipping back to the demonstrative for a minute.  The check that we were just looking at, the $86,000 check that's dated July 7th wasn't cashed until July 21st.  You recall that?

A.    Yes, but I wrote it on the 20th or -- yeah, because I Fed Ex-ed it out that day.

Q.    You never told us yesterday what date Mr. Youngblood came and asked you for the $70,000.  Do you recall when

Mr. Youngblood asked you for the first payment you ever made to him $70,000?

A.    If I have my phone, I could find out the date of the showcase and I would know.  But I know it was before the 4th of July because my son was in that showcase in June.  I just need to look at the exact date.

Q.    Was it the Vegas summer showdown?

A.    Yes.

Q.    May I approach, your Honor?

        THE COURT:  You may.

Q.    (BY MS. HERRING) Was that the event that your son played in in Vegas in 2022?

A.    No.  That's not it.

Q.    It's not the Vegas summer show down.

A.    Apparently not, no.  It's a showcase --no.  This is an actual tournament.  It's not the Vegas show down.  I can't remember the name of the exact tournament but that is not it and it was before.  It was the end of June.  It was before the 4th of July weekend.

Q.    But you can't remember the name of the hockey tournament in Vegas that your son played?

A.    It was not a tournament, it was a showcase.  I don't have it with me right now, no.

Q.    You can't recall the name.

A.    I can't recall it currently.  Yes.

Q.   Was it the Vegas summer showdown that occurred in Vegas July 8th through 10th?

A.   No.

MR. GUESS:  I'm going to object as to statement of evidence without having it properly admitted.  That the attorney put in a date there that she knows wasn't accurate as to what the defendant just answered -- or the witness just answered.

MS. HERRING:  I'm not seeking to admit that document, your Honor.

MR. GUESS:  May we approach?

THE COURT:  Yes.

(At the bench, on the record.)

THE COURT:  Ms. Herring, did you know that hadn't been admitted into evidence?  You put that date on the record knowing that it had not been admitted into evidence, but you asked that question and that's improper questioning and I'm going to ask --

MS. HERRING:  I asked.

MR. GUESS:  It hadn't been admitted into evidence and you put it on the record.  I'm going to ask that, again, that be stricken from -- well, not -- I'm not asking it be stricken from the record but just note my objection and ask that you please refrain from talking about the documents that haven't been admitted into

evidence as a question.

MS. HERRING:  I'm asking him to clarify that it was not a particular tournament in Vegas.

MR. GUESS:  He answered that question and you specifically asked July 7th in order to try to get in the jurors' minds that Mr. Perardi could not have met with Mr. Youngblood.  I'll object to that, your Honor.

THE COURT:  Okay.  Be careful with that.

MS. HERRING:  Yes, your Honor.

THE COURT:  Thank you.

(End of bench conference.)

Q.   (BY MS. HERRING) I believe you just told us that you don't recall the date that Mr. Youngblood came and asked you for the $70,000; is that right?

A.   I would have to look at my notes.

Q.   Do you recall that you have -- you wrote that date down somewhere for the FBI?

A.   I don't know if I wrote that down for the FBI.  I referenced it but I don't know if I wrote it down or not.

Q.   You've never said that you wrote that date down for the FBI?

A.   I wrote a letter to my mom that day stating that Mr. Youngblood had come to me and said that I was going to be killed and my son was going to be kidnapped.  I would need to find that letter and see the date on it.

Q.   You've never said that you wrote that date down for the FBI?

A.   I don't recall.

Q.   You recall that you gave sworn testimony on January 9th of 2024 in connection with your divorce deposition this year?

A.   Yes.

Q.   You recall that you went to a law office and were sworn in just as though you were in a courtroom to tell the truth the whole truth and nothing but the truth?

A.   Yes.

Q.   And you were deposed by one of Rachel's divorce attorneys?

A.   Yes, and my attorney Steve was there.

Q.   And you knew at that proceeding, like today, you have to tell the truth.

A.   Yes.

Q.   May I approach, your Honor?

        THE COURT:   You may.

        MR. GUESS:   Do we have a copy of this?

Q.   (BY MS. HERRING) I'm showing you, Mr. Perardi, transcript from the deposition testimony you gave on January 9th of this year.

A.   January 9th.

Q.   Page 129.   You recall that at that deposition you

were asked the date that Mr. Youngblood met with you?  Do you recall being asked that question?

A.   Yes.

Q.   Do you remember what date he shows up at your door at 7:00 in the morning, that was the question.  This is the bottom of 129, line 22.

A.   I said I don't.  I have it written down somewhere for the FBI.

Q.   And what else do you say?

A.   So my trial, which is -- because my divorce was supposed to go to a trial, a jury trial.

Q.   Can you please read the rest of that line?

A.   So by trial, I can definitely give you all of those dates.

Q.   So on January 9th of this year, you said that you had written down that date for the FBI.

A.   Yes.

Q.   Your Honor, we can provide this to the Court later?  But I would under Rule 801(d)(1)(A) move to admit just the page 129 and 130 of that deposition, prior inconsistent statements made under oath in a deposition are admissible as not hearsay.

        THE COURT:  Okay.  I'll take a look at it.  That will give you the opportunity to respond.

Q.   (BY MS. HERRING) Going back to this $70,000 check, do

you recall that you wrote that check as you've told us now multiple times because Mr. Youngblood came to your house, told you your son was in danger being kidnapped and killed, right?

A.   Yes.

Q.   And he also told you this is your description that you provided to the FBI, he has proof with his friends at the NSA of audio conversations between Joey Pollard and Rachel Perardi?

A.   And several other people.

Q.   He gave a list of names?

A.   Yes.

Q.   He told you he had proof?

A.   Yes.

Q.   You didn't ask to see that proof?

A.   Oh, yeah.  I did.

Q.   You didn't see the proof?

A.   No, he said he was going to bring it to me.

Q.   And you didn't ask to see it before you wrote the $70,000 check.

A.   No.  I was instructed by a federal officer to write the check.

Q.   This is the same proof against Joey Pollard, the same Joey Pollard that you, through Matt Wood, and your attorneys had had investigated essentially, right?

A.   No.   It was Aaron before and Joey Pollard and Julie Herrera and Rachel.   I mean, there were so many names involved in that.

Q.   We're talking about the same Joey Pollard, though, that you, through Matt Wood, had had investigated through She Spies in February and March --

A.   Actually, she was --

THE COURT:   Let's let her finish the question before you --

THE WITNESS:   Yeah.

THE COURT:   Go ahead.

Q.   (BY MS. HERRING) Yes or no to that question?

A.   Yes.

Q.   Same Joey Pollard.

A.   Yes.

Q.   We already saw that e-mail exchange earlier that they had not found any proof that Joey Pollard was involved in child pornography, X-rated websites, had any kind of nefarious online presence, right?

A.   Yes.

Q.   You didn't follow up with your contacts through your attorneys to ask them at this point to go back and investigate Joey Pollard to see if there was some cartel connection with Rachel?

A.   That was not the accusation.   That was through Aaron

Dufour.

Q.   You did not go back to your attorneys and ask them to restart that online --

A.   I told my attorney --

THE COURT:   Let her finish the question before you answer it, please.   Go ahead.

Q.   (BY MS. HERRING) You didn't go back to your attorneys and ask them to reinitiate their online deep dive into Joey Pollard after Mr. Youngblood came and told you that there was this proof of these audio conversations?

A.   The accusation was about Rachel.

Q.   You didn't go back to your attorneys and ask them to reinitiate their investigation into Joey Pollard?

A.   No.

Q.   You didn't let your lawyers know at the time that you thought your ex-wife who you're in a divorce proceeding with, was going to put a hit on you?

A.   I did.

Q.   You didn't provide the FBI with any of those conversations where you notified your lawyers in that?

A.   No.   That was all over phone calls or in person.   I was instructed to stay off of all text messages or putting any of that in writing.

Q.   You only spoke about this matter with your lawyers on phone calls.

A.   Yes.

Q.   Your lawyers didn't feel the need to file anything in your divorce proceeding letting the Court know that you were -- you believed that your life was in danger?

A.   She recommended that I change my will, which I did.

Q.   Didn't file anything in court to your knowledge?

A.   No.  I did not file anything in court.

Q.   I want to talk just for a minute about the life insurance policy because that's come up several times.  You told the FBI that Mr. Youngblood told you that Rachel was trying to have you killed or put a hit on you so that she could cash in on your $6.5 million life insurance policy, right?

A.   Yes.

Q.   And you told the FBI that you at that time believed that.

A.   Yes.

Q.   You knew though that you did not have a $6.5 million life insurance policy, right?

A.   It was $5 million and there's another -- I didn't know the exact amounts but there was another $2 million of a Key Man Life Insurance and then, a half-a-million dollars from Lincoln Financial that was from before I got married.  So maybe I misquoted the amount.

Q.   You testified though that it was -- it mattered to

you that Mr. Youngblood was able to tell you the exact amount of your life insurance policy.  That was convincing to you, right?

A.   Yes, he talked about the $5 million life insurance policy.

Q.   He talked about a $5 million life insurance policy.

A.   Yes, and then, I think he referenced 1.5 after that but the $5 million life insurance policy.

Q.   Not a $6.5 million life insurance policy right now.

A.   Well, the two added together, yes.

Q.   You recall you told the FBI that Mr. Youngblood told you that Rachel Perardi is going to put a hit on you for your $6.5 million life insurance policy, right?

A.   That's what I told them, yes.

Q.   That's what you told the FBI.

A.   Yes.

Q.   May I approach, your Honor?

        THE COURT:  You may.

Q.   (BY MS. HERRING) Mr. Perardi, do you recall inquiring with Prudential about your life insurance policy in February of '22?

A.   Yeah, I had to provide that for court.

Q.   Does this look like a copy of the letter you received from Prudential when you made that inquiry?

A.   Yeah.

Q.   Does it appear to be a accurate copy of the letter that you would have received in February to the best of your recollection?

A.   I believe so.

Q.   We'd move to admit Defendant's 101.

THE COURT:   Objection?

MR. GUESS:   Could I have a moment?   We're just receiving this for the first time.

No objection, your Honor.

THE COURT:   So admitted.

Q.   (BY MS. HERRING) So it looks like in February of '22, you had made a request for information from Prudential concerning your life insurance policy, right?

A.   At request of the lawyers.

Q.   Sorry, I didn't hear you.

A.   At the request of lawyers, yes.

Q.   In connection with your divorce proceedings, you reached out to Prudential to figure out the amount of your life insurance policy?

A.   Yes.

Q.   And you told me when I walked up to the stand, you recalled receiving this response from Prudential?

A.   Yes.

Q.   And we see that your life insurance policy was $5 million policy, right?

A.   Yes.

Q.   And we see on the second page -- or excuse me, the third page that Rachel Perardi your spouse at the time was the class is beneficiary of the $5 million and your mother was the second beneficiary, right?

A.   Yes.

Q.   This was the only life insurance policy that Rachel Perardi was a beneficiary of?

A.   No.  She's on a Key Man Life Insurance policy, too, I believe.

Q.   Well, a key man life insurance policy is a policy that a business person would take out so that the principal of a business dies, a company could keep operating, right?  It's why it's called Key Man.

A.   Yes.

Q.   May I approach, your Honor?

        THE COURT:  You may.

        MR. GUESS:  Could I have a copy of this one?

Q.   (BY MS. HERRING) Do you recognize this as a copy of your key man policy?

A.   Yes.

Q.   Does that look like an accurate representation of that?

A.   Yeah, I haven't seen that in a long time, but yes.

Q.   We move to admit 104.

THE COURT:  Objection?

MR. GUESS:  Just a moment, your Honor.  I've just been handed this one, as well.  The document from August 12, 2019 is no objection, your Honor.

THE COURT:  So admitted.  Ms. Herring, at a convenient time, if you could let me know when we could take a break.

MS. HERRING:  Yes, your Honor, we'll just get through this document, that'd be great.

THE COURT:  Okay.

Q.   (BY MS. HERRING) So you've told us this appears to be a copy of your Key Man Life Insurance policy for $2 million, right?

A.   Yes.

Q.   If we go to the last page again where we can see the beneficiary proceeds that arise from the insured's death will be payable in one sum to Perardi Development in Austin, Texas as the beneficiary, right?

A.   Yes.

Q.   Rachel was not the beneficiary of the Key Man policy, right?

A.   I think there are documents that state how it's in the will, how it's distributed.

Q.   She's not listed as the beneficiary of the Key Man policy --

A.    No.   It has to be the business.

Q.    We can break, your Honor, at this point.

THE COURT:  Okay.  Ladies and gentlemen of the jury, we've reached a good breaking point for our first of two 20-minute breaks.  Let's call it 10:45 and if you could be back in the jury room, ready to go, at five after 11:00, we'll resume testimony at the time.  You know the instructions so I won't repeat them this time.

(Jury not present.)

THE COURT:  We'll be in recess.

(Recess.)

THE COURT:  We have a quick sidebar.

(At the bench, on the record.)

THE COURT:  Just wanted to let you know that Juror No. 8 informed the courtroom security that she knows the witness' lawyer.  That's all we know.  I just wanted to pass that along just in case you need to think about it to make any further inquiry.  That's the only information we got.

MR. GUESS:  Okay.

THE COURT:  Okay?

MR. GUESS:  Thank you, your Honor.

(End of bench conference.)

THE COURT:  Ready to bring in the jury.

(Jury present.)

THE COURT: Ms. Herring.

Q. (BY MS. HERRING) Mr. Perardi, I want to talk briefly. You've mentioned you had a concern about Rachel using drugs, right?

A. Yes.

Q. And as part of your divorce proceeding that was ongoing at this time, Rachel was being drug tested, right?

A. I could request it, yes.

Q. You could request it?

A. Yes.

Q. And you were given access to her drug test results, right?

A. Correct.

Q. She had to report them to the Court and to you?

A. Correct.

Q. You mentioned that she had tested positive at one point.

A. Yes.

Q. Do you recall that being in January, January 6th of '22?

A. Yeah, I believe so.

Q. And after that positive test in January of '22, do you recall that she did not test positive again?

A. Yes.

Q. But you were still having her tested periodically?

A.   We both got tested one other time after that, I believe.

Q.   You both got drug tested?

A.   Yes.  I drug tested as well.

Q.   And you wanted both of you also on the Soberlink Breathalyzer program, right?

A.   Yes.

Q.   And you had access to her results on that and likewise, she had access to yours.

A.   Correct.

Q.   And that affected your ability.  You had that in place because you were exchanging XXXXX during this time, right?

A.   Correct.

Q.   You had shared -- was it a two two three or a 50/50?

A.   Two two three.  It's a 50/50 but it's two two three.

Q.   It was two two three at the time?

A.   That was 50-50.  I have joint custody.  It's the same schedule I have with my other children.

Q.   And so what that meant while your divorce was pending in 2022 was that one parent would get first two days of the week, Monday, Tuesday, exchange Wednesday, right, Wednesday, Thursday, exchange Friday, someone would get the weekend, the three.

A.   Correct.

Q.   So older in 2022 while your divorce is pending, that is the custody schedule you have with your young daughter?

A.   And my sons, yes.

Q.   During this time, you're meeting twice a week to exchange your daughter.  You and Rachel.

A.   No.  I would pick her up from school.

Q.   You picked her up from school?

A.   Yes.

Q.   This is the same time that you write that first $70,000 check you told us about because your concerned that Rachel has a hit on you.

A.   Based on the information I was given by Mr. Youngblood.

Q.   During that time when you go to do the exchange of your daughter when you go to pick up your daughter Mr. Youngblood isn't going with you to protect you, right?

A.   He said that he had someone watching me.

Q.   Mr. Holloway wasn't going with you to protect you right?

A.   No.  They said they had someone watching every time that I exchanged.

Q.   You never were aware of who that was.

A.   He told me it would be better if I didn't know.

Q.   During this time when you got this custody arrangement in place, you don't make a report to the

police about concern that you're going to be killed.

A.   I was talking to a law enforcement agency.

Q.   So you didn't make a report to any police organization?

A.   No, because I had a federal officer watching my back.

Q.   You didn't make a report to any police?

A.   No.

Q.   You didn't make a report to XXXXXXXX preschool, right?

A.   No.  I had a federal officer.

Q.   You didn't make a report with the Travis County divorce court, right?

A.   No.

Q.   I want to bring up the $86,000 check again that we talked about yesterday, talked about a little bit already today.  You testified yesterday that you wrote this check after you received a phone call while you were in New Orleans claiming that XXXX was in danger that someone was going to kidnap him.  Do you recall that?

A.   Yes.

Q.   You told us yesterday that at the time you were moving around, sleeping in friends's homes, right?

A.   Yes, Nicole's as well.

Q.   Nicole being your -- your girlfriend?

A.   Yes.

Q.   And my recollection is that you sort of implied that this multi-city trip you took with Nicole to New Orleans, Miami and Nashville was because you needed to be safe.  Is that what you were trying to convey?

A.   No.   That's what I was told, yes.

Q.   This is your -- Nicole is a four or five-month relationship at that point, six months?

A.   No.   We started dating in March, February, March so four months, yeah I guess.   Yeah.

Q.   And you said that she volunteered to put this trip on her credit card.

A.   Yeah, she paid for everything.

Q.   And you and she spent two weeks traveling to New Orleans, Miami and Nashville?

A.   Correct.

Q.   And it's your testimony that you did that because you felt unsafe in Austin?

A.   That's what I was told, yes.

Q.   You testified yesterday that this check, you dated it July 7th but it wasn't written on July 7th.  Is that your testimony?

A.   Yes.

Q.   You said it was Fed Ex-ed from New Orleans to James Holloway.

A.   Yes.

Q.   You recall when you actually wrote this check?

A.   If it was cashed on the 21st then I wrote it on the 20th.

Q.   I want to show you if we can bring up, it's been pre-admitted, defendant's 16.  You recall providing a copy of the Fed Ex receipt to the FBI?

A.   Yes.

Q.   Is there a reason that when you provided this copy, you didn't include the information about where the Fed Ex had been sent from?

A.   This was all I had, I believe.

Q.   Is it a screen shot that you took, a photo you took?

A.   Nicole put this on her credit card.  I got the receipt from her.

Q.   Right.  And this is a copy of what you provided to the FBI.

A.   Yeah, I took a screen shot of it, yes at the time.

Q.   Is there a reason you took a screen shot that didn't include the location, the Fed Ex was sent from?

A.   No.  I didn't mean to do that.

Q.   You didn't provide the FBI with your travel records showing that you were in New Orleans at this time?

A.   No.  Nicole testified to them that I was.

Q.   Did they ask you for your travel records?

A.   No.

Q.   You testified yesterday that you had a phone conversation with Mr. Youngblood in which you specifically discussed how you were going to have to come up with money because the only available funds you had were from a home equity line of credit.  Do you recall testifying to that yesterday?

A.   Yes.

Q.   To be clear, you had never before mentioned the FBI having that phone call, right?

A.   No.  I talked to them about that.

Q.   You had told the FBI about that specific conversation with Mr. Youngblood where you discussed in detail a wire transfer?

A.   Yeah.  I asked him -- it was very specific because of the -- having it be -- the fact there was no Wells Fargo in New Orleans.  So I had to get the money, like I said, from -- transferred from that funds over.  I had that conversation with them several times afterwards.

Q.   Back in April and May when you first went to the FBI?

A.   I don't recall.

Q.   Do you recall if it was more recent that you shared that in preparation for your testimony hear?

A.   No.  It was summer maybe, as well, of 2023, before Mr. Youngblood was detained, I believe.

Q.   And you had this phone conversation while you were in

New Orleans. You don't recall the phone number that Mr. Youngblood called from?

A.    He only calls from unknown numbers. Always blocked number.

Q.    So going back to that $86,000 check, your testimony is that this check dated July 7th was written July 20th.

A.    Yes.

Q.    And it was cashed on the 21st?

A.    Correct.

Q.    And you had to request a disbursement from your home equity line of credit to get funds into your T.A.P. Development account in order to cover this check?

A.    Yes. But I also had to write a check for Rachel's apartment and all of her moving expenses, as well, and lawyer fees.

Q.    I'm just trying to understand. Your testimony is that you had to disburse the home equity line of credit and wire money to Wells Fargo and move it into your T.A.P. Development account because of this check.

A.    Yes.

Q.    This check was cashed July 21st of '22. Do you recall that?

A.    That's what you say it is.

Q.    When is it you believe that you wired money between July 20th and July 21st that originated in a draw from

your home equity line of credit?

A.   I don't have that record in front of me.

Q.   This is Defendant's Exhibit 7.  It's your T.A.P. Development bank statement from July of '22.  And we can see here on the 21st, you said you weren't sure if you could remember that the check was cashed, the $86,000 check is cashed, right?

A.   Yes.

Q.   Before this check is cashed, the ending balance, ending daily balance in your T.A.P. Development account on the 20th is $218,218.  Do you see that?

A.   Yes.

Q.   This is sufficient funds to cover an $86,000 check, right?

A.   My business has a $50,000 burn rate and I have a $30,000 financial burn rate to Rachel and our home expenses.  So I was going to be out of money pretty quickly.

Q.   I've heard you say that but I'm just asking about July 20th and July 21st.  On July 20th when you say you Fed Ex-ed this check to James Holloway, we saw the Fed Ex receipt you had a balance in your T.A.P. Development account of $218,218.  Do you see that?

A.   Yes.

Q.   That is a sufficient balance to cover an $86,000

check, right?

A.   Yeah.   There's a lot that come out after that I believe.   But.

Q.   So between the 20th and the 21st, there's no addition of a wire, funds from a wire here.   Is it your testimony that you wired money between the 20th and the 21st of July to cover the $86,000 check?

A.   I believe that was the case, but I must have been wrong in my recollection of the dates.

Q.   I want to talk a little bit about you mentioned XXXX several times, your middle son, right?

A.   I thought we weren't going to use their names in court.

THE COURT:   We had talked about.

MS. HERRING:   I thought it was going to be redacted afterward.   No?

THE COURT:   It'd be preferable if you could just refer to him by maybe birth order or something rather than name.

MS. HERRING:   I'm sorry, your Honor.

THE COURT:   By birth order, second son or whatever.

Q.   (BY MS. HERRING) Your middle son is the son who is the kind of star hockey player, is that fair?

A.   Yeah, my younger son as well, yes.

Q.   Your middle son is competitive youth hockey player now.

A.   Yes.

Q.   You've traveled all around even internationally to China with him, to play hockey over the course of his youth hockey career, right?

A.   Yes.

Q.   And you told us earlier that you shared custody of your three sons with your first wife Natalie Moses, right?

A.   Yes.

Q.   And at this time, you've had a 50/50 arrangement with their mother, with Natalie?

A.   I still have that, yes.

Q.   So did that mean the boys were going back and forth between --

A.   Two two three, the same.

Q.   And during this time, you told us you're also paying child support, correct?

A.   I'm currently still doing that, yes.

Q.   And you believed after speaking to Mr. Youngblood that the cartel was going to kidnap your middle son. That's what you told us, right?

A.   Yes.

Q.   Not the older son not youngest son, just they were going after the middle son.

A.    That's what Mr. Youngblood told me.

Q.    You didn't feel the need to tell his mother that you thought your child was in danger when you were going back and forth between --

A.    I talked to XXXX about it extensively.

Q.    You didn't feel the need to tell your son's mother that you believed that your middle child was going to be kidnapped any day by the cartel.

A.    I believed that a federal agent was watching my child.

Q.    So you didn't feel the need to tell your son's mother that you believed he was going to be kidnapped by the cartel?

A.    No.

Q.    You didn't make a police report to any local law enforcement about that.

A.    I've already stated that.

Q.    At this time in 2022, was XXXX -- excuse me.  Was your middle son playing for the Dallas Hockey Club already?

A.    No.

Q.    When did he begin doing that?

A.    He didn't go in until September.

Q.    September of '22?

A.    Yes.

Q.    In August of '22 didn't he move up to Connecticut to play hockey?

A.    Yeah, the season doesn't start till September, but yes, he moved up in August.

Q.    In August of '22 your middle son moved to Connecticut?

A.    Yes.  Connecticut, sorry, the year before he was with Dallas and he moved to Connecticut in August that year.

Q.    So part of '21 into '22, he was in Dallas?

A.    He was in Dallas from 2021 to 2022 season and then he -- he got cut from the team and then, he played in Connecticut the '22-'23 season.

Q.    Which would have started in August of '22?

A.    Yes.

Q.    So when your son, who you believe is facing active kidnapping threat from the cartel, moves to Connecticut to play for a hockey team, you don't inform the host family that he's living with that he may be in danger?

A.    I don't know how you have that conversation with somebody but no.  I did talk to her about keeping XXXXXX whereabouts known at all time and that he was in danger. Q. You talked to who?

A.    To Laura, his host mom.

Q.    And you talked to -- did you talk to his hockey coach or the team, the program he was in?

A.   No.   I was instructed by Mr. Youngblood to not speak to anybody about it.

Q.   So from August of '22 for the rest of that hockey season, your middle son was not in -- was not living in Texas for that season.

A.   Correct.

Q.   And he was away from home between the Dallas and the Connecticut for something like -- was it close to two years total of hockey season time?  I understand summer breaks and things.

A.   Yes.  And remember every week I was being told that this was going to end.  Every week from the time I met Mr. Youngblood about it, the money was coming back and this was going to end every week.

Q.   But your middle son is away from home for two years playing hockey.

A.   Correct.

Q.   I want to pull up the $83,000 check that you talked about yesterday.  So like the other checks that we've looked at so far, this is another check you've told us you wrote from T.A.P. Development, right?

A.   Yes.

Q.   And it's dated July 20th of 2022?

A.   Yes.

Q.   You see July 20th, I'm just going to use initials

that you write this check to, made out to James Holloway, right?

A.    Yes.

Q.    $83,000 from T.A.P. Development, right?

A.    Yes.

Q.    And that's -- we could see a lot of the check that's your Wells Fargo account ending in 7818?

A.    Yes.

Q.    And yesterday, you told us that you wrote this check because you got a phone call while you were in Miami?

A.    Yes, I believe so.

Q.    Is that your recollection?

A.    Yes.  It's more on the dates that they're cashed that I would know because I was told to write different dates on the checks so can you tell me what date that check was cashed, please?

Q.    Check was cashed on July 27th.

A.    Yes, then I wrote it from Miami.

Q.    When you wrote it, you believed it was needed urgently?

A.    Same as every check, yes.

Q.    How did this check get from Miami to James Holloway?

A.    Fed Ex again.

Q.    So your testimony is that July 20th is the date you wrote on the check, but it's not the date you wrote the

check.

A.   Correct.   I was instructed every time by Mr. Youngblood to put different dates.

Q.   You said this one was Fed Ex-ed from Miami?

A.   Yes.   Nicole's birthday was the 26th and we were in Miami so that means if it was cashed on the 27th, we were still in Miami.

Q.   So on Nicole's birthday, you and she went to the Fed Ex in Miami to send this check?

A.   Unfortunately, yes, because that was the day I got called.

Q.   So you put the date July 20th.   You write the check, you're telling us today, July 26th.   I'm just trying to understand when this check was written --

A.   It was over-nighted so if it was cashed on the 27th, then I had to have written it on the 26th.

Q.   And you didn't provide the FBI with the Fed Ex showing?

A.   I don't know if I had that one or not but Nicole can corroborate that.

Q.   I want to talk for a minute about your T.A.P. Development account in July of '22.   In June of '22, you had just received the proceeds from the sale one of your investment properties under BCT, is it MOB Partners, Medical Office Building Partners.   Do you recall that?

A.   Yes.

Q.   Tell us what BCT MOB Partners is.

A.   It's just a medical office building in Bee Cave, Texas.

Q.   And you recall selling that property on 6-20 in Bee Caves?

A.   My investors sold it, yes.

Q.   And that property sold for -- was it about 23 million?

A.   I don't know.  I wasn't involved with the sale.

Q.   But you got some proceeds from that sale, right?

A.   Yeah.  My distributions, yeah.

Q.   I want to pull up Exhibit 47.  I'm going to just look on June 23rd of '22.  You got an influx from the MOB Partners $849,962 into your T.A.P. Development account.

A.   Yeah.  That's who owned the entity, T.A.P. Development.

Q.   This is the same account we're talking about that you're writing the checks from, right?

A.   Yes.

Q.   And if we go down the bottom by the end of June, it's like you still had a balance in that T.A.P. Development account of over $500,000.  Does that look right?

A.   Yes.  I had to write several checks to businesses after that for a product that never went.

Q.    I'm going to go forward to the July T.A.P. Development bank statement which is Defendant's Exhibit 7. So you've told us in July that you wrote this check, you've said today now on the 26th of July, right?

A.    Yes.

Q.    We saw this bank statement earlier.  Looks like the end of July -- I'm sorry, when your statement closed for this period in July, it's not -- doesn't capture all the days in July, you had $132,000 in that T.A.P. Development account, right?

A.    Yes.

Q.    I want to just before we move on from this statement, you talked yesterday about some threats that -- actually we heard phone calls about you and Rachel owing some kind of debt collectively to some -- forget if it was the cartel or a bad actor.  Do you recall that?

A.    I didn't know the debt.  I was told by Mr. Youngblood that Rachel owed that debt.

Q.    There was never a point where you believed that you because of community property concerns also were responsible for her debt?

A.    To a cartel?  I don't think the cartel works that way.  I think I would not have owed community property -- I don't understand.  No, that -- I don't think they gave me a receipt for the death threats of my child.

Q.   You never thought you owed money to the cartel.

A.   I gave my money to Mr. Youngblood.  He said that he was handling the other cartel to keep me safe.  But I never met a cartel person.  I only talked to him about the cartel and James Holloway about the cartel and Marvin about the cartel and Gloria about the cartel.

Q.   And you were never convinced that you were responsible for Rachel's debt somehow.

A.   Well, I was convinced by Mr. Youngblood that I wanted to keep my daughter XXXXXXX safe -- oh sorry.  Didn't want to state my daughter's name.  Yes, he told me that I was -- I would keep her safe at that time.  I believe that's in.

Q.   By being responsible for a debt Rachel owed?

A.   He said he was paying most of it to keep her safe and that that's all I could come up with at the time.

Q.   So I just want to point out before we move on that looks like on the 27th of June, you made your annual tax payment $170,000 for you and Rachel.  That was your payment to the IRS, right?

A.   Yeah, but that's actually -- so when I got that $840,000, it's a payment for the proceeds of that sale. So it's a prepayment tax of the future years.  Not that year. I still owed money to the IRS for this year.

Q.   Exactly but this was -- this 1 $70,000 payment is a

payment to the IRS?

A.   Yes, for real estate you have to make your payment as soon as you get a distribution for capital gains.

Q.   So going back to this $83,000 check, we see on July 27th, right, that this check was cashed, right?

A.   Yes.

Q.   It's your understanding that James Holloway cashed that check?

A.   That's who I wrote it to.  And Kota called me to confirm that he cashed it.

Q.   On the 27th.

A.   I mean.

Q.   That's what your bank records show, right?

A.   Oh, yeah.  I don't know if he called that day or not.

Q.   So I want to talk now a little bit about your Washington Federal bank account and the home equity line of credit that we've already heard about yesterday and today and why you opened that account.

     Did you ever tell Agent Wilkinson that you opened the home equity line of credit because of Mr. Youngblood?

A.   No.

Q.   Before you and Rachel separated, you applied for that home equity line of credit.

A.   Yes.

Q.   The lender was Washington Federal.

A.   Correct.

Q.   And that was done in September of 2021.

A.   Yes.

Q.   I'm going to pull up Exhibit 48.  This is a copy of the security instrument for that --

A.   Can we go back up to the top, please?  Says borrower Eric J. Perardi.

Q.   And wife, Rachel Marie Perardi, right?

A.   But not at the top of that loan.

Q.   Reading here, borrower is Eric J. Perardi and wife Rachel Marie Perardi, right?

A.   Yep.

Q.   The lender is Washington Federal, right?

A.   Yes.

Q.   And if we look down here, the credit limit this was a home equity line of credit for $461,322, right?

A.   Yes.

Q.   If we go to the last page of it, we can see that Rachel actually had to sign off on this as well a borrower, right?

A.   Yeah apparently.

Q.   That was done September 13th of '21.

A.   Yes.

Q.   The first -- once this was set up, you could draw on that line of credit over time as needed, right?

A.    Yes.

Q.    And when you requested disbursements on that line of credit, you had it set up to get deposited into an account that you've set up also at Washington Federal, right?

A.    I believe that's the only way I could have the disbursements.

Q.    So if we look at Defendant's 56, you opened an individual account at Washington Federal to receive those disbursements.  Does that look right?  I believe that's what you're telling us.  I'm just trying to show you the documents that --

A.    Yes.

Q.    -- confirm that.  And you opened that account, we can see it here, you talked about this banker yesterday, Tandrea Stenline, you opened this account in March of '22, right?

A.    Yes.

Q.    And you opened it as an individual account as you've said, you were the only one that had access to request disbursements on the home equity line of credit?

A.    That was per the temporary orders.

Q.    And you testified yesterday that in July of '22, the only available funds that you had to wire transfer were funds that you would have had to wire transfer from the home equity line of credit to your Wells Fargo account,

right?

A.   I was trying to get money back into my accounts as fast as I could so yes.

Q.   Do you recall testifying about that yesterday?

A.   Yes.

Q.   And that is what you said, right?

A.   Yes.

Q.   And you said you told us that Mr. Youngblood had that conversation with you in that specific --

A.   Yes, he told me that every time I -- that next week the money would be back so don't worry about it, don't worry it, the money's coming back, the money's coming back.  That was always --

Q.   You testified yesterday that you had a specific phone call with Mr. Youngblood while you were in New Orleans discussing that you would have to wire transfer funds pulled from your home equity line of credit.

A.   I talked to him about having to borrow from my businesses, borrow from lines of credit, all of those things, yes.

Q.   So you did specifically discuss --

A.   Yes, I did.

Q.   I want to talk about your disbursements from your home equity line of credit and how you use them, okay?  So once your divorce proceedings began, you could only

request disbursements from the line of credit if they were going to be used for authorized expenses, right?

A.    For lawyers.

Q.    For lawyers.  Authorized expenses?

A.    Correct.

Q.    And this was at some point in the divorce, there was a dispute, right, between you and Rachel about whether she wanted access to half the line of credit because she had signed for it as well, right?  You recall that being a dispute in your divorce?

A.    I think on her third lawyers, yes.

Q.    So I want to just talk briefly, make sure we understand how this money from the home equity line of credit moved, okay?  So we have the home equity line of credit and you have just told us that money would get disbursed to this Washington Federal account that was in your name, right?

A.    Right but I had no checks to that account.

Q.    I'm just asking you?

A.    Yes.

Q.    Where this money went when it was disbursed so it goes to a Washington Federal account and that account number we see at the top ends in 6079, right?

A.    Yes.

Q.    So you could request the disbursement, that's where

the money would go.

A.    Yes.

Q.    And then as you told us, you would have money wired from Washington Federal to Wells Fargo, right?

A.    Yes.

Q.    And when you would do that, you would have it wired into your Wells Fargo personal account.  That account number that ends in 6673.

A.    Yeah, it couldn't be wired to T.A.P. Development.

Q.    So it was wired to your personal account?

A.    Yes.

Q.    In Wells Fargo 6673.  And then, once it reached this account, you could transfer it to another Wells Fargo account, the T.A.P. Development account, right?

A.    Yes.

Q.    That's the account that ends in 7818.

A.    Yes.

Q.    When you would do that movement between your two Wells Fargo accounts, you had many bank accounts in Wells Fargo, right?

A.    Yes.

Q.    That's something you could do probably on an app even but just through Wells Fargo?

A.    Yes.

Q.    That's just a bank transfer.

A.    Correct.

Q.    And you told us earlier, if you remember when we looked at your asset sheet that 6673 at some point in 2022 considered a community asset and 7818, separate property asset.  Do you recall that earlier?

A.    That's what they put on the sheet.  I think we were assigned accounts separately at the temporary orders.

Q.    The home equity line of credit was a -- on that sheet, you worked on that with your attorneys in April of '22 -- was a community debt.

A.    Yes.

Q.    I want to talk about all the disbursements that you made from that home equity line of credit.  I'm going to pull up Defendant's 50.  You recollect if you go to the next page, that the first disbursement from that home equity line of credit was actually the day you opened that account March 22nd of '22.  We see that here?

A.    Yes.

Q.    That was a $43,000 draw from that line of credit, right?

A.    Yes.

Q.    Then you make if we pull up Exhibit 57.  We see here not disbursement May 12 of 2022.  Do you see that?

A.    Yes.

Q.    Shows us here, it's money moved from one of your

accounts to another of your accounts, right?

A.    Yes.

Q.    I believe at the top shows us it's a $48,000 disbursement, right?

A.    Yes.

Q.    Then if we keep scrolling down to June.  Do you see this next disbursement on June 6th for another 48,000?

A.    Yes.

Q.    To be clear at this point, none of this?

A.    Do you have my Am Ex statement?

Q.    You didn't provide your credit card statements.  I don't have your credit card statements?

A.    So the only way I could pay for.

Q.    But I didn't ask you a question about that.  We're going to get to that.  I'm just going to ask you about this disbursement.  At this point, March, May, June, Mr. Youngblood has not asked you for any money, right?

A.    No.  This is for lawyer fees in my divorce.

Q.    We see this next disbursement, another one in June 2022, another 52,000, right?

A.    Yes.

Q.    Next one, July 11th, right?

A.    Yes.

Q.    84,000, do you see that?

A.    Yes.

Q.   You told us earlier these are for legal fees that you're making these disbursement?

A.   84,000 was after I'd written a check to Mr. Youngblood.  So the ones before that, yes, for sure.

Q.   It's your testimony that this wire on July 11th is because of Mr. Youngblood?

A.   I mean, money had been written out of my account for lawyer fees for the safety of my children.  I honestly at that time was just trying to do anything I could to pay all these bills and give him the money that he's requesting to keep my child safe.

Q.   Is it your testimony that the disbursement on July 11th was related to Mr. Youngblood?

A.   Well, I had just given him a $70,000 check that I believed he cashed.

Q.   Is it your testimony that this disbursement is related to Mr. Youngblood?

A.   Yes.  I believe so.  I don't know.

Q.   Yes I believe so, I don't know.  Which of those is the answer?

A.   I was just transferring money from that HELOC to pay my bills for lawyers to pay for money that was requested by him, to pay for moving expenses for Rachel.  I mean, if we go back to --

Q.   No, I don't want to go back.

A.   Okay.

Q.   I want you to answer the question.  Was this money -- is it your testimony today that the disbursement was because of Mr. Youngblood?  Yes, no, or you don't know?

A.   I think he had a part to do with that check, yes. It's not specifically just for that check but to cover expenses that I was going through, yes.

Q.   Not for -- not specifically for that check.

A.   I don't know.

Q.   Let's go to the next page.  We get to this July 27th wire which we're going to come back to.  Do you see this one is for the $36,000?  You testified about this one a little bit yesterday, right?

A.   Yes.

Q.   And there's another one in August.  So we see August 10th, the 48,000, right, that's coming from the home equity line of credit?

A.   Yes.

Q.   And we see right here there's another one August 16th, right?

A.   Yes.

Q.   I think that's the 50,000.  And then, I believe the last one is defense Exhibit 51, 9-12, September 12, right, 25,000, right?

A.   Yes.

Q.   And at that point, the home equity line of credit is I believe pretty close to tapped out, right?

A.   Yes.

Q.   It was as you've said an incredibly expensive divorce, right?

A.   Yes, it keeps going after this.

Q.   As of January 2023, so yes, it's kept going, you'd spent over $200,000 on your divorce attorneys.  Does that sound about right?

A.   Yes and probably another 200 on hers.

Q.   Probably another 200 on hers.  You'd spent almost half a million dollars on just attorneys' fees, right?

A.   Unfortunately, yes.

Q.   And you used the home equity line of credit to pay a lot of these attorneys' fees?

A.   Yes.

Q.   So I want to go back to this July 27th wire transfer, the one that you talked about yesterday.  If we pull up Defense 52.  We can see that you -- this is the Washington Federal record that shows when you requested that disbursement, right, so you did it on July 27th.  Looks like the 11:00 in morning; is that right?

A.   Yes.

Q.   And when you make this disbursement, it goes -- this is just the record it shows, it's landed in the Washington

Federal account, right?

A.   Yes.

Q.   If you'll pull up Exhibit 2.  So going back to your Washington Federal statement, here, we can then see that there was a wire, right, on the same day, domestic wire withdraw out 7-27, $36,000, right?

A.   Yes.

Q.   And you showed us -- you talked about having to work with your banker, having to actually make the request for a wire to occur, right?

A.   Yes.

Q.   That's not something you do on an app on your phone?

A.   No.  I can't do that at that bank.

Q.   And there is a lag time between when you request a wire and when a wire is completed, right?

A.   Yeah.  They have to get it in by a certain time but yes.

Q.   You looked at this document yesterday.  This is a Government's Exhibit.  It's also one of our exhibits, Exhibit 3, and we see here, talked about the banker that you frequently worked with, Tandrea Stenline, looks like the wire was initiated at 1:28 p.m. and was finally completed, took about an hour, 2:30 p.m.  do you see that?

A.   Yeah, they're on the west coast so they're three hour -- two hours ahead of us.

Q.   Two hours behind us.

A.   Or behind us, sorry, yeah.

Q.   And this again is that wire into Wells Fargo personal checking 6673, right?

A.   Yes.

Q.   And it says here so it's 1:28 p.m., initiated which you're saying is 3:28 p.m., our time?

A.   Well, Tandrea is in Dallas so the other one is the -- the 2:29, I imagine, is the one on the west coast of when they actually sent it.  I don't know.  I wasn't -- I don't work at that bank but I know that it comes out of Washington state.

Q.   But it looks like by the afternoon of the 27th, that money has been wired into your Wells Fargo account.

A.   Yes.

Q.   And this again, this is moving money from your account in Washington Federal to your account at Wells Fargo.

A.   Yes.

Q.   Just to look at the July statement we can see that that wire reaches -- this is 6673 account, the 36,000 comes in, right?

A.   Yes.

Q.   And we even see here, we talked about this yesterday you've gotta pay a fee to do a wire transfer.  There's a

$15 charge for that wire.

A.    Yes.

Q.    Now, the following day, the 28th, you make a transfer to T.A.P. Development, right, of $29,000?

A.    Yes.

Q.    And that's just a transfer to another Wells Fargo account, right?  That's not a wire.

A.    Correct.

Q.    You call that for lawyers -- I believe it's for lawyer fees, right?

A.    That's what I put on the check -- or on that wire, yeah, or transfer, sorry.

Q.    On the transfer.  You're the one who puts a notation in when you --

A.    Yes.

Q.    When you move it between your Wells Fargo accounts?

A.    Yes.

Q.    I want to show you Defendant's Exhibit 20 already admitted.  You told us yesterday, you have experience as a sophisticated businessman with bank record so this is not your record but I want to show you this.  Wells Fargo bank account James Holloway, person you wrote the check to 7-27, cashes that check, right?

A.    Yes.

Q.    He cashed it at 9:32 a.m. central time?

A.    Yes.  I believe he got the Fed Ex that morning.

Q.    Went right to cash it.

A.    That was every time I gave him a check, they usually went right to cash them.

Q.    So I just want to -- making this as you've explained it to us James Holloway cashes your check before you even disburse from your home equity line of credit and before you initiate the wire and before the wire's completed and before you move the money to T.A.P. Development.

A.    Yes.

Q.    And the check you wrote to James Holloway was drawn from T.A.P. Development?

A.    Yes.

Q.    Money from this wire didn't reach T.A.P. Development until the 28th of July, right?

A.    Correct.

Q.    You recall that month, July, you did -- wrote a almost $36,000 legal bill to your divorce attorneys?

A.    If you say so, yes.

Q.    Your attorney worked for -- I can't say the name NMSB was the short version of the law firm?

A.    Yeah, Judith Bryant.

Q.    May I approach, your Honor?

          THE COURT:  You may.

Q.    (BY MS. HERRING) Do you recognize this legal bill?

A.   Yeah, looks like all of them.  Yes.  There's a lot of them.

Q.   Does it look like an accurate copy of your July 2022 legal bill?

A.   Yes.

Q.   I would move to admit Defendant's 112.

MR. GUESS:  No objection, your Honor.

THE COURT:  So admitted.

Q.   (BY MS. HERRING) We can see on the last page of this bill you did owe -- the bill was for total amount $35,235, right?

A.   To replenish the trust, yes.  The bill is 23, it looks like, and then, you've gotta put 10 back.  They always want to put 10 in there.

Q.   So the July bill was $35,235.

A.   Okay.  Yeah.

Q.   Do you see that?

A.   Yes.

Q.   I want to talk about another $36,000 expense that you owed your divorce in July of '22.  You told us earlier, you and your attorneys had filed the motion to amend the temporary orders to get Rachel to move out of your house, right?

A.   Yes.

Q.   You were hoping to sell the house because you had a

lot of debt, a lot of bills at this point.

A.   Well, I couldn't afford the other house either.  So I can't want to sell the house at the time.  I just wanted to move back into it with my children.

Q.   And in fact, you got the temporary orders amended in July of '22 so that Rachel was ordered to vacate the home by August 1st?

A.   Yes.  That was the judge's order.

Q.   But in exchange for her agreeing to vacate the home, you were ordered to prepay twelve months of rent on a new place for Rachel, right?

A.   Yeah.  I don't think she agreed to it.  The judge ruled that but yes.  And then, I was asked to pay for an apartment -- or for a house for her.

Q.   And she found a place out in Spicewood, right?

A.   Yeah.  Yes.

Q.   And you were in fact ordered to pay exactly $36,000, right?

A.   Well, I was ordered to pay for furniture, moving expenses and whatever her bill would be for her apartment. I think it had a certain cap, I'm sure I had to pay first and last month's rent, deposit, I mean, I agreed to whatever it took to help her out.

Q.   May I approach, your Honor?

        THE COURT:  You may.

Q.   (BY MS. HERRING) I'll show you a copy of the temporary orders.  Do you recognize this as the amended temporary orders entered in July 28th of 2022?

A.   Yes.

Q.   Does that look to be the signatures, the accurate copy of your temporary orders from that date?

A.   Yes.

Q.   We move to admit Defendant's 110.

        MR. GUESS:  No objection.

        THE COURT:  So admitted.

Q.   (BY MS. HERRING) So if we go to the second page. When we look at this top section, further ordered that Eric Perardi is authorized to draw against the HELOC and shall prepay 12 months of rent for Rachel Perardi's new residence up to the amount of $36,000.  The parties acknowledge by their signatures below her new residence is located, she said it's in Spicewood, and that Eric Perardi has delivered payment of 36,000 to the landlord as of the date of entry of this order.  Do you see that?

A.   Yes.

Q.   You were authorized by the court to draw $36,000 against the home equity line of credit for this specific purpose.

A.   Yes.

Q.   And you drew $36,000 on July 27th.

A.    Yeah.  This all happened at the same time.  Yes.

Q.    The wire of $36,000 matches exactly the amount you were authorized to have wired out of that account by the divorce court.

A.    Yes.

Q.    Bring up Defendant's Exhibit 42.  This next paragraph, the parties have agreed and acknowledged that Eric Perardi has delivered payment of -- you mentioned this, the security deposit, 3,650, $800 pet deposit as well to that same -- to the landlord of --

A.    Yeah, if you scroll down, there's also a $5,000 insurance -- I mean, furniture, as well, I believe, in that same order.  No?

Q.    And you did indeed write a check from T.A.P. Development for a total amount of $40,450, which we can do on a calculator together or agree is 36,000 plus the security deposit plus the pet deposit to Fort Pedernales, which is the landlord or the property management company of Rachel's new address, right?

A.    Yes.

Q.    You also dated this check July 20th of 2022.

A.    Well, the order, that's when I actually had to send it.  The orders were -- yeah, I mean, had to mail it because I was away, I guess.

Q.    You mailed this check also.

A.    I believe so.  Yes.  I was in -- away at that time.

Q.    And we went through, I know you went through with the government's attorney all of the checks that followed after these early ones.

A.    Yeah.

Q.    So you said you told us that the threats of kidnapping continued and that's why you wrote checks in August of '22, right?

A.    Yeah, and then, for his son, as well.

Q.    And on August 15th, you wrote a $54,000 check and said you also gave $40,000 in cash, right, you recall that?

A.    Yes.

Q.    I want do bring up Exhibit 1B.  I want to look at that check from the 15th of August.  This is the $54,000 check to James Holloway, right?

A.    Yes.

Q.    Also written from the T.A.P. Development account?

A.    Yes.

Q.    We looked at this earlier but you took a disbursement from the home equity line of credit on August 16th of '22, right?

A.    Yeah, if you wrote it down there, then yes, we had at it.

Q.    This check is written on the 15th, $54,000, you take

Q.   the disbursement on the 16th, 50,000, right?

A.   Apparently to replace it.

Q.   The 16th of August, there's a wire of the $50,000 I believe here we're into -- this is the 6673 so from Washington Federal to the personal Wells Fargo checking, right?

A.   Yes.

Q.   And then, you transferred 58,000 to T.A.P. Development, right?

A.   Yes.

Q.   You include because you've told us you're the one including the notations for the transfers, legal fee, divorce, HELOC.

A.   Yes.

Q.   And the reason you write here legal fees is what you told us earlier that your disbursements from the home equity line of credit were being used to cover legal fees.

A.   I mean, they weren't obviously being used for legal fees, they were being used for extortion, too.

Q.   Do you remember testifying in January of this year in your deposition that all of the remainder of the funds were drawn out over time for legal fees?

A.   I don't remember that but if you say it's in there, then it's in there.

Q.   No.  I want to show you to make sure you remember

what you said.  May I approach, your Honor?

THE COURT:  You may.

Q.   (BY MS. HERRING) In January of this year, when you were being questioned under oath, Rachel's attorney asked you, can you tell me a little bit about what was borrowed, when and what the funds were used for.  Do you see that?

A.   Yes.  You just told me there was 200,000 for each attorney so --

Q.   Can you read your answer, please, Mr. Perardi?

A.   I was ordered to pay for Rachel's home for a year --

Q.   No.  Starting at line 13.

A.   It was done in September.  There was a line of credit for 450.  I believe we were required to take 25 or 30 out immediately, I'm sure, was spent on personal expenses and the remainder of the funds drawn out over time for the lawyer fees, for her lawyers, my lawyers, living experiences.

Q.   So when you testified, you were asked what the funds from the home equity line of credit were used for, you said the remainder of the funds were drawn out over time for lawyers fees for her lawyers my lawyers, living expenses.

A.   I'm sure that's what they -- that's all blended together but yes.  I said that in the -- I ran out of money pretty fast.

Q.   Now I want to talk a little bit, shifting gears, to how you typically got money to Mr. Youngblood.  You never -- we've just gone through all out wires, all of the disbursements.  You never wired my money directly to Mr. Youngblood, right?

A.   No.

Q.   You never wired any money directly to James Holloway.

A.   No.

Q.   You always either wrote checks or gave cash, right?

A.   Correct.

Q.   And every check you wrote was made out to James Holloway aside from the one you wrote to yourself to cash and one to Marvin Knecht.  Do you recall that?

A.   Yes per Mr. Youngblood's instructions.

Q.   And you were aware that James Holloway was trying to cash these checks as quickly as he got them from you, right?

A.   That's what Mr. Youngblood told me.  Yes.

Q.   But that was your impression from your interactions with Mr. Holloway once you did start interacting with him?

A.   Yes.

Q.   He was trying to cash the checks.

A.   Well, he did cash the checks.

Q.   He did cash the checks.

A.   Yes.

Q.   It was your understanding that Mr. Youngblood wanted cash, right?

A.   He said he needed cash.

Q.   In fact, you learned that kind of the benefit that Jay Holloway, James Holloway brought to this arrangement was he was able to quickly cash high-dollar amount checks at his particular Wells Fargo branch, right?

A.   Yes.   That's what he and Mr. Youngblood told me.

Q.   You learned he had some kind of connection at the bank where they would process those things without waiting for the check to clear the payer's bank?

A.   Yes.

Q.   You learned over time about Brian, the bank manager, right?

A.   I didn't know him.   No.   I don't think I ever knew his name.   But he cashed several at Wells Fargo, not just the one that he was at.

Q.   You don't remember ever having Brian, the bank manager's information in your cellphone?

A.   I called him after my car got broken into, yes.

Q.   You did have Brian's contact info in your cellphone?

A.   After my car got broken into, yeah.   I'd never met him before then because James gave it to me to ask him if there were security tapes at Wells Fargo.

Q.   So at some point Brian, the Wells Fargo bank

manager's number gets into your phone.

A.   I guess, yeah.

Q.   You would sometimes actually meet Jay Holloway at the bank to give him your checks, right?

A.   I met him at several different banks.

Q.   But you would drive to the bank, he would drive to the bank, you'd meet at the bank, exchange --

A.   Sometimes parking lots, sometime banks.  All different locations.

Q.   A lot of times, that one on I-35 North up in Round Rock?

A.   Only once there.

Q.   At the time when this was going on in your mind, you thought it made sense that Mr. Youngblood wanted cash, right?

A.   He said my children's life depended on it.

Q.   He needed cash because he was making some kind of off the books payments?  Was that your impression, your understanding at the time?

A.   That's what I was being told, yes.

Q.   So he wasn't dealing with checks once the money got to him, he needed cash.

A.   No.  He told me the type of people that were going to protect my child needed cash.

Q.   The type of people who were going to protect your

child needed cash?

A.   Yes.

Q.   Going to briefly just your communication with Jay Holloway, you would text with Jay Holloway, right?

A.   Yes.

Q.   You would also talk to him on the phone?

A.   Yes.

Q.   It was often frustrating for you that you had to go through Jay Holloway to reach Mr. Youngblood, right?

A.   Yeah.  I was told that Mr. Youngblood had no cellphone or he would have burner phones.  But he would call me sometimes and talk to me extensively.

Q.   You didn't ever see Jay Holloway physically hand cash to Mr. Youngblood?

A.   No.

Q.   But you learned how -- you learned that he was from Jay Holloway?

A.   No.  From Mr. Youngblood saying that he received it.

Q.   So after the two wires that we talked about, you're not wiring more money at this point.  You're continuing to yes a bunch of checks.

A.   Yes.  They came very fast.

Q.   You mentioned that yesterday that in September, you wrote this check because you believed -- I think Gloria had called you told you something about their son, Mr.

Youngblood now needed help for?

A.    This is August.

Q.    Do you recall the check you wrote in September what it was for?

A.    Yeah.  If it's -- again, it's all a lot but Mr. Youngblood called me and said that his son needed fees and that they had spent all their money protecting my child as well and then his wife confirmed that.  You know very upset on the phone telling me that they needed money for their son Eventine.

Q.    And I am going to go through quickly the rest of these checks.  Would it help you to have a copy of the Excel you provided to the FBI?

A.    Yes, please.

Q.    So you just told us about the check on the 14th going to the 21st.  That was another check to James Holloway, $47,000, right?

A.    Yes.

Q.    And that was you were told you had to get payment to secure funds to get information and coins over the border and clocks sold?

A.    Yeah, right at that time is when I was then told about my -- the cartel man being murdered.

Q.    It says that the reason you gave for that check was you had to secure funds to get information and coins over

the border.

A.    Yeah but this is shortened version of what was going on because I needed to give this to the FBI.  But at the same time as that as going on is when the cartel member was intercepted on the border with my son's picture and his address that I was told by Mr. Youngblood that had happened.

Q.    So when the FBI asked you to write out why you had written all these checks, you wanted to give them a shortened version?

A.    Well, I mean, I'm just telling you that same time that happened, that may not have been what that exact check was for, but I know that that exact same time is when -- again, phone calls after e-mails after -- I mean, after text messages that my son was in danger.

Q.    You mentioned yesterday, you talked about this notation on the check line, the Kyle project?

A.    Yes.

Q.    So the first seven checks you write I'm just going to go through them quickly you write Kyle project rendered, changes a little bit on each one.  This next one Kyle project services rendered, Kyle project rendered again.  I think that's the next two.  Kyle project rendered.  We're up to August now.  Kyle project received, I think that says.  Do you see that?

A.    Yes.

Q.    Then Kyle investment land.

A.    Yes.

Q.    I think the next one is Kyle investment.  You told us yesterday there was a Kyle project that was another cross over-style development that you through your companies were planning to build out in Kyle, right, Hays County?

A.    Not at this time but yes, it was earlier in the year that failed.

Q.    Earlier in the year of 2022?

A.    Yes.

Q.    And that was a large joint development plan, there was going to be a stadium where the Spurs were going to come up and play, right?

A.    That was the plan, yes.

Q.    You'd acquired land for it, right?

A.    No.  One of my business partners put down earnest money to acquire land.  I did not acquire any land.

Q.    I'm going to show you Defendant's Exhibit 84 and 85.  E-mails that you had at the time, you mentioned your friend, your architect, John Mapes?

A.    Yes.

Q.    And actually, if we scroll to the last page.  John Mapes actually went out -- he had drawn out a whole architectural plan for the plan development, right?

A.   Yes.

Q.   And Rachel, who was the director of marketing at Perardi Development at the time also --

A.   That's 2021, by the way.

Q.   Yeah.  It's when you started this planning for the Kyle project, right?

A.   Yes.

Q.   Rachel was director of marketing at Perardi Development at that time, wasn't she?

A.   Yes.

Q.   And she was also working on the Kyle project, right?

A.   Yeah.  As was everyone at our office.

Q.   Rachel was already even sounds like pre purchase of land trying to start coordinate being the Spurs, work out a deal with them?

A.   Yeah, it's not really how real estate goes in my business.  You have to do a lot of preplanning well before you can purchase the land and, obviously, this was a -- the only way this works is if the Spurs actually agree to go to the site.

Q.   And Rachel was working on that, right?

A.   I believe she thought she was.  I found out later that she was not working on it as much as she should have been.

Q.   Do you recognize this e-mail exchange about?

A.   Yeah, she's on -- she's copied on all the e-mails because she was part of our team.  So is Parker Dunn, John Trube, Rachel --

Q.   Does this look like an actual copy of the e-mails that were sent at that time about the Spurs?

A.   Yes.

Q.   I would move to admit Defendant's 107.

MR. GUESS:  No objection.

THE COURT:  So admitted.

Q.   (BY MS. HERRING) So you said Rachel was copied on all the e-mails at the time and was aware that this development was in the works?

A.   Yes.

Q.   So if she saw checks with Kyle project memo line --

A.   Those checks were written in 2022.

Q.   Please stop interrupting me.  She would have seen a check memo line, Kyle project.  In her mind, she would think the check related to the Kyle project that she had worked on when she worked for Perardi Development?

MR. GUESS:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q.   (BY MS. HERRING) Rachel knew about the Kyle project.

A.   Yes.

Q.   A check written with Kyle project in the memo line would appear to be a legitimate business expense, right?

A.    Yeah.  I was asked by Mr. Youngblood to put that on the checks.

Q.    In September, we saw the first seven checks.  The notations start to change.  If we go down to the next check.  Start adding the word "clocks" to the memo line.  Clocks Kyle final?

A.    Yeah.

Q.    Kyle clocks investment, November of '22?

A.    I had been presented with an e-mail from James Holloway at that time about this clock investment.

Q.    So you switch and this time and you add it's no longer Kyle project, it's Kyle clocks, right?

A.    Correct.

Q.    I want to show you Exhibit 12, defense Exhibit 12 which has been pre-admitted.  Talked about these a little bit yesterday.  This letter discussing this arrangement between Holloway trading and T.A.P. Development for this clock investment.  Right?

A.    Yes.

Q.    I want to make sure I understand your position on this letter.  You believed this was a real investment at the time or this was a cover letter that you and James Holloway did?

A.    No.  James Holloway did it.  I was demanding that they give me my money back or I was going to go to the

government.  At this time I told them that they needed -- they kept talking about these clocks they needed to be sold it's like well, I need to have some sort of proof of these clocks and some sort of receipt as you claimed before, I had written a bunch of checks with no receipts at that point.

Q.   So at this point, Holloway trading and Eric Perardi under T.A.P. Development enter into an agreement for antiquities, list each specific clocks, call yourselves equal partners.

A.   I did not write this e-mail.

Q.   I'm sorry, what was --

A.   I did not write the e-mail.  James Holloway sent it to me is how I got it.

Q.   My question is, did you believe at this time that you were investing in clocks?

A.   No.

Q.   What was the purpose of this letter?

A.   At that time to have some kind of collateral that those clocks were going to be given to me to sell if they couldn't get my money back, whatever was going on.

Q.   Did you believe that these clocks existed?

A.   Yeah, they sent pictures of the clocks in this e-mail.

Q.   In your mind at this time, you thought you had clocks

as collateral somehow.

A.   That's what they told me they were going to use to get my money back to me.

Q.   And here, you're expecting a $2 million sale price?

A.   I'm not.  No.  That's what they told me.

Q.   But at the time putting yourself back at that time, did you believe that you were going -- that there was going to be a $2 million return from the sale of clocks?

A.   I believed what they told me, yes.

Q.   I'm going to show you Exhibit 10.  This has been pre-admitted.  This is an e-mail exchange between you and Jay Holloway where you and he go back and forth on this. He's attached the letter to the e-mail and you tell him September 30, thank you, can you change to T.A.P. Development, LLC.  Just want proper entity.  Responds, LLC, copy.

A.   Yeah.  It's because I'd written all the checks from T.A.P. Development, so obviously, he was going to pay me back.  I wanted him to pay me back to T.A.P. Development.

Q.   You wanted to make sure that that letter is accurate as to the name of your company.

A.   I mean that's the only collateral I have, yes, at that point.

Q.   Eventually, you recall, you made another followup letter in April of '23, right?

A.    I didn't make the letter.  They gave it to me.

Q.    So you signed this letter, right?

A.    Yes.  I was asked to sign it.

Q.    But you decided to sign it.

A.    Yeah.  I was out a lot of money by that point and they were claiming that they were going to give me back $67,000 a week.

Q.    At this point in April, you haven't gotten back anything, right?

A.    Except for the $40,000 and a golf sleeve.

Q.    And in this letter, you discussed specific investment amount, very detailed descriptions of the items, right, and then you again provide exact dollar amounts of what you expect the sale to be, the profit and how much is going to go to T.A.P. or --

A.    I did not create this letter.  It was handed to me in the parking lot.

Q.    And you signed it in the parking lot?

A.    Yes.

Q.    And you told us yesterday that you thought that $806,000 added up to about what you had put into this at this point with all these checks; is that right?

A.    That and, well, with John Mapes', yeah, somewhere in that vicinity with John Mapes' money, as well, and the cash that had been given over.

Q.   This amount would then explain the checks that you'd written, the money that you were out including your friend's money?

A.   Yes, it would get me back close to or exactly what they were promising was coming back.

Q.   So October 7, 2022 we're back to the checks from T.A.P. Development you write check to yourself, memo line salary, right?

A.   Yeah.   That was the only way I could get cash quickly.

Q.   So the point of this check was for you to get cash for Mr. Youngblood.

A.   Yes.

Q.   And at this time again, by October, you've still never seen any credential from Mr. Youngblood, no badge, no government ID of any type, right?

A.   No.

Q.   And at this point, he's still supposed to be the one protecting you from the cartel threat.

A.   Yes.

Q.   And he's asking you to get him cash.

A.   Yes.

        THE COURT:   Counsel, we need to take a five-minute break, please.   Members of the jury, take a five-minute break, as well.   Remember the instructions

I've previously given you.

(Jury not present.)

THE COURT:  We'll be in recess for five minutes.

(Recess.)

MS. HERRING:  I think we're going to substitute in a new Exhibit 41 that included the texts.  The government is not opposed to that.

MR. GUESS:  Agreed.

MS. HERRING:  I did want to move to have the three pages admitted as demonstratives.

MR. GUESS:  As demonstratives, no objection.

THE COURT:  Is that it?

MS. HERRING:  Yes, your Honor.

(Jury present.)

THE COURT:  You may proceed.

MS. HERRING:  Thank you, your Honor.

Q.   (BY MS. HERRING) If you can bring up Defense Exhibit 87.  You recall, Mr. Perardi, at some point, you had discussions with your friend Eric Swanson about what was going on at this time?

A.   Yes.

Q.   Show you a text conversation.  This is you with Eric Swanson?

A.   Yes.

Q.   You recall providing some copies of texts that you

selected to the FBI?

A.   Yes.

Q.   So in this text, you ask Eric, I don't know where to go from here.  I have to reveal it to my lawyer, something, because I have no money to move on.  Just have no way of knowing what to talk about with the clocks. This is in October, right?

A.   Yeah.  This is in reference to the death of his son.

Q.   And Eric tells you that his inclination would be full disclosure, that he doesn't really know how to advise you, right?

A.   Yes.

Q.   And this is again I believe October 18th.  He said full disclosure, does he mean discussing this with your attorneys?

A.   Yes.

Q.   And you, after this text exchange with your friend Eric, actually went to not your attorneys but to John Mapes, your friend, right?

A.   I went to John Mapes?

Q.   Yeah, you reached out to John Mapes.  You started reaching out to John Mapes to get his?

A.   No.  I was with John Mapes when Kota reached out to me and I talked to John Mapes about meeting with Kota.

Q.   So at certain points you didn't have any more funds,

right?

A.   Right.   Correct.

Q.   And when you didn't have money, you've told us Mr. Youngblood told you, figure out how to come up with it, right?

A.   Or my son was going to be killed next.

Q.   You had to figure out where to get money from.

A.   Yes.

Q.   And you did find other, you said, your mother, girlfriend, friends, right?

A.   Yes.

Q.   And you asked those people for money.

A.   Yes.   Well, Mr. Youngblood asked John Mapes for money.   I asked him to help with my bills because I was out of money.

Q.   You asked them to give you money to help you with your bills.

A.   Yeah because all this money had gone to him.   John Mapes specifically gave money to James Holloway.

Q.   On October 7th, you did ask your friend John Mapes for money, right?

A.   Kota did.   Or it is that the $15,000?   Yes, I needed -- he told me -- yes, he needed the cash immediately that day.

Q.   On that day, Mr. Youngblood hadn't told you to ask

John Mapes. You needed the cash for Mr. Youngblood, you went to John Mapes.

A.    I did not tell him what the $15,000 was for.

Q.    Right. And you did not tell him anything about that being needed for Mr. Youngblood. You asked John Mapes essentially for a loan, right?

A.    Yes. That's before his son was killed or allegedly.

Q.    I'm going to ask the witness to stop talking if no question has been asked, your Honor.

A.    Sorry.

Q.    If you could give him that instruction.

THE COURT:    If you'll just listen to the questions and limit your answers to directly respond.

THE WITNESS:    Yes.

Q.    (BY MS. HERRING) Bring up Defendant's Exhibit 86. This is essentially a handwritten I owe you to John Mapes, right?

A.    Yes.

Q.    Is this something that you recall writing?

A.    John wrote it, I signed it.

Q.    Acknowledging that you owe John Mapes $15,000?

A.    Yes.

Q.    And believe if we scroll to the bottom, there is a notation need one week. Is that his writing or your writing?

A.    That's his.

Q.    So he's thinking he's going to get the 15,000 back in a week?

A.    That's what I was told by Mr. Youngblood.

Q.    At this point when you signed this I owe you with John Mapes you haven't gotten any money back from Mr. Youngblood, right?

A.    I'd gotten $40,000 in cash back, yes?

Q.    And you were out almost $500,000 by this point.

A.    Yes.

Q.    You did not tell John Mapes that you hadn't gotten your money back when you asked to borrow money from him on October 7th.

A.    No.

Q.    I want to show you defense Exhibit 41.  By this point, October '22 you're starting to get frustrated with Mr. Holloway and Mr. Youngblood, right?

A.    Yes.

Q.    Because the money -- you're not getting your money back, right?  Instead, you're being asked for more money.

A.    I'm being told that my children are still alive so it's working.

Q.    And you're frustrated at this point.

A.    Yes.

Q.    So you provided to the FBI a copy of this text

between you and Jay -- James is Jay Holloway, right?

A.   Yes.

Q.   When you sent this to the FBI -- may I approach briefly, your Honor?

THE COURT:   You may.

Q.   (BY MS. HERRING) Just want you to see the notation that you put on it.  You sent this to the FBI and you said this is a -- you called it an October 21 James threat, right?

A.   Yes.

Q.   And in this exchange, this is you're in green, right, and James is in gray?

A.   Yes.

Q.   So James says a messenger came to his house asking him to contact you.  Our friend was still needing the help, right?

A.   Yes.

Q.   And you say at the bottom, I have my kids at my house.  If someone shows up, I'm calling the police, right?

A.   Yes.

Q.   And you do not end up calling the police in October of '22, right?

A.   No.  No one showed up at my house.  I did not call the police.

Q.   After this, you set up a meeting with John Mapes and Mr. Youngblood, you talked about going to the Grove yesterday, right?  Cedar Park?

A.   That was after Mr. Youngblood said his son was killed.

Q.   You set up that meeting?

A.   Yes.  I was with Mr. Mapes, Mr. Youngblood called me and I was very distraught so I came back in and I disclosed to Mr. Mapes what was going on.

Q.   But you met at the Grove?

A.   At the Grove, yes.

Q.   You didn't tell John Mapes going into that meeting that you hadn't gotten any money become other than the $40,000 that you --

A.   Yes, I did.

Q.   Given as a carveout.

A.   Yes, I did.

Q.   You told him --

A.   Yes, I told him everything --

Q.   -- about the money, I've gotten none back.

A.   Yes, I did.

Q.   And at that lunch, I believe it went on two hours, hour and a half, it was pretty long?

A.   We went outside and talked.  Mr. Youngblood did not eat with us.

Q.   You listened to Mr. Youngblood tell John Mapes that you needed $65,000, right?

A.   Yes.

Q.   And you needed that money to win custody of your daughter from Rachel?

A.   No.  To protect my children because his son had just been killed.

Q.   You don't believe Mr. Mapes thought that you needed the money for custody?

A.   He knew what was going on based on what Mr. Youngblood told him what was going on in the conversation.

Q.   That conversation wasn't recorded, right?

A.   No.  Nothing with Mr. Youngblood at that time had been recorded.

Q.   And in your recollection of that meeting, you don't believe Mr. Youngblood told Mr. Mapes that it was -- the money was needed to help you win custody of your daughter?

A.   I don't recollect that, no.  I know there was a lot said about cryptocurrency.  I mean, it was as always a lot said.

Q.   After that meeting, John Mapes went and got a cashier's check for $65,000.  Was that your understanding?

A.   Yes.

Q.   He did that because it was for you for his friend.

A.   Correct.  Yes.

Q.   And just a few days later in early November, I think it was November 3rd, you asked John Mapes for another $37,000, right?

A.   We took possession of that flag right after that first meeting as collateral.  I did not ask John, James Holloway asked him for it.

Q.   You did not tell John that you'd run into unforeseen circumstances and you needed more money from them?

A.   I told him that that's what they were saying.  I didn't ask John to give the money in the first place.  I asked him to listen to them and make the decision himself and he made the decision on both counts based on what he was told by Mr. Youngblood and Mr. Holloway and we had that flag at my house.

Q.   You were the one who brought John Mapes into this situation, right?

A.   Yes.

Q.   I want to go to November, early November of 2022. You told us yesterday you wrote -- it's on your -- do you still have the sheet that you prepared for the FBI.  You wrote three checks in the span of two days, November 1st, November 1st, November 2nd?

A.   Yes.

Q.   All that combined, that's over $72,000 of checks, right?

A.   Correct.

Q.   And you explain yesterday that at this point, you felt the threat had morphed from your middle son to focused on your daughter; is that right?

A.   That's what I was told, yes.

Q.   You're still exchanging your daughter with Rachel back and forth in the custody arrangement you have, right?

A.   Once a week.

Q.   And you still at this point have not filed anything in the divorce suggesting that there is a threat or that your daughter who's the subject of a custody dispute is at risk, right?

A.   No.  I was advised by Mr. Youngblood not to.

Q.   And you didn't seek counsel of your divorce lawyers on that point.

A.   I just had a gun put in my face by his wife and his son was killed so I was kind of in fear of my life at that point.

Q.   So you did not seek the counsel of your divorce lawyers on whether you should raise this issue with the Court.

A.   I talked to them.  They didn't raise it.

Q.   You talked to them about your belief that your daughter the subject of the custody dispute was -- that her life was at risk?

A.    Yes.

Q.    They didn't file anything with the Court about that.

A.    No.  I had told them that Mr. Youngblood was a federal agent.  They didn't know what to do with the story.

Q.    November 1st was another day where you went to meet Jay Holloway in person to give him a check, right?

A.    Yes.

Q.    You said these three -- these first checks early November, one was -- so this $20,800 check at this point, this is deposit money to help out with getting safety for my child, Rachel's in the paid her bills and the cartel is coming after your daughter, right?

A.    That's what I was told, yes.

Q.    And then if we go to the $48,000, this one was has to get money to stop Rachel from her next attempt at a hit, right?

A.    Yeah, I believe those are out of order on the days they're deposited but yes.

Q.    Yeah I'm just going this is the order we have.  I'm not talking about the dates.  Just these are the reasons at the time that you were writing the checks.

A.    Yes.  It's what I was being told.

Q.    So on November 1st, you said you went to meet Jay Holloway, was it to give him one of these checks, two of

these checks?  Do you remember?

A.   I can't remember which one I gave him that day.

Q.   After you met with Jay Holloway, you took your daughter to this trampoline park, right?

A.   Yes.

Q.   And your car was broken into.

A.   Yes.

Q.   And your gun was stolen from your truck.

A.   Yes and Nicole's ID.

Q.   And both her wallet and a firearm had been in a safe?

A.   Yes.

Q.   You testified yesterday, I had a locked safe inside my vehicle.  I have a gun safe that no one has the combination to and obviously keep it there locked, especially with my children.  Do you recall your testimony yesterday?

A.   Yes.

Q.   You said yesterday you did that, you started taking precautions?

A.   Yes.

Q.   You actually had a safe with the factory code setting still on it, right?

A.   I believe so, yes.

Q.   000?

A.   0.

Q.   And when the officer arrived, you told him, ah, it wasn't very hard to get into, I never change the code?

A.   Yes.

Q.   You told the FBI when you went to meet with them in April that you believe this vehicle break-in was evidence that the cartel was coming after you, right?

A.   That's what I was told by James and Mr. Youngblood.

Q.   You did call the police when that break-in occurred at the trampoline park, right?

A.   Yes.

Q.   And a Round Rock police officer did come and meet with you, right?

A.   Yes.

Q.   Took fingerprints?

A.   Yes.

Q.   Took your -- all your personal information?

A.   Yes.

Q.   Went inside and viewed the security footage in the trampoline park?

A.   Yes.

Q.   And at some point, Nicole also arrived while you were still meeting with that officer, didn't she?

A.   Yes.

Q.   And she came in already having learned that her credit cards had -- someone had just tried to use them at

a Target nearby.

A.   Yeah, and then, I called her and said her wallet was missing.

Q.   Someone had tried to buy $500 worth of stuff from the Target.

A.   I don't know.  That's what -- but yes.

Q.   You don't recall being there when Nicole explained that to you and the officer?

A.   Yeah.  It's kind of a blur but if you say it was in the transcripts, then yes.

          MS. HERRING:  Your Honor, I'm going to move to admit a clip from a portion of a body camera just addressing this conversation between Mr. Perardi and Ms. Frost.

          THE COURT:  Okay.

          MS. HERRING:  It's Defense 138.

          MR. GUESS:  No objection, your Honor.

          MS. HERRING:  I'll offer Defense 138.  And for the record, this is Nicole?

          THE WITNESS:  Yes, and her children.  Two of them.

          (Audio and video file played.)

Q.   (BY MS. HERRING) To this point, you learned your girlfriend's credit cards had been taken and someone's already started trying to use her debit card somewhere

near by?

A. Yes. Well, she had told me that before she got there.

Q. And you don't believe then that the cartel is the one that has broken in, stolen the wallet?

A. I was told by James and Mr. Youngblood that that's what they did to distract the fact that they broke into the car. They went and tried to use the cards to make it look like it was another break-in.

Q. The cartel would go take the credit cards and use them at the Target across the street.

A. Whoever had targeted my daughter, yes. And it wasn't across the street, it was down the way. It was in Lakeline, I believe, Cedar Park.

Q. So you told us earlier that you weren't sure you had Brian, the bank manager, you weren't sure when you got his number in your phone. Do you recall having it by this point?

A. I believe that I'm on the phone with either him or James Holloway at that point or both back and forth.

Q. You recall telling the officer that you had just come from the bank -- or so you'd been playing there for a while with your daughter but prior to that, you had come from the Wells Fargo branch, right?

A. Yes.

Q.   It was the branch nearby?

A.   It's around the corner, yes.

Q.   And you told the officer that you had gone there to give your friend a check for a real estate deal?

A.   Yes.  That's what I was told to tell them.

Q.   That was James Holloway you were talking about when you said friend, right?

A.   Yes.

Q.   And you believed at this point on this day, that your youngest daughter who's there is in danger from the cartel, right?

A.   That's what I was told that night.  They told me that before this, that yes, that would be blow back and then again, her -- it was odd because the window that was broken into was her car seat window.  But yeah, they went into the front of the car and took only.

Q.   Only what was in the safe?

A.   Yes.

Q.   They didn't take laptops, iPad, I think a backpack --

A.   Checks, money, passports, anything.

Q.   None of that?

A.   None of it.

Q.   You believed at this time when you talked to this officer that your daughter was in danger or you didn't believe that until later when you talked to Jay Holloway

and Mr. Youngblood, no.

A.   They told me that the officer was working with the people that broke into my car.

Q.   When you're talking to this officer you don't think you're in danger from the cartel?

A.   Oh, I definitely do, but I think that he's part of it.

Q.   At this time when you're talking to this officer.

A.   That's what they.

Q.   You think the Round Rock PD?

A.   They told me not to talk to anybody, that they said that the Round Rock PD -- I got very specific later when I actually met with him but at the time they're like just be vague about everything.  So they were mad that I'd actually called the police officers.  I didn't know what else to do.

Q.   May we approach briefly, your Honor?

THE COURT:  Yes.

(At the bench, on the record.)

MS. HERRING:  I'm going to move to admit the body camera as a -- either under the present-sense impression exception or as an excited utterance.  He's testified about his feelings at the time and the body camera shows how he acted in response to the break-in on the day of, immediately after it occurred.

MR. GUESS:  I believe it's still a hearsay statement.  I don't think there's a present sense impression.  He had the opportunity at that point that -- he has already testified officer arrived 45 minutes later and this is something he mentioned to the officer.  It's already been testified to.  We don't need to see the video coming in, as well, and they don't have a basis to introduce it other than through him, which he's never seen at this point.  So there's no basis for admission.

THE COURT:  Sustain the objection.

(End of bench conference.)

Q.   (BY MS. HERRING) You didn't tell the Round Rock police officer that you were in danger, right?

A.   I don't believe so.

Q.   And you told them that you'd come from giving a check to a friend because you owed him money for a real estate deal?

A.   Yes.

Q.   You testified yesterday that you could not get a hold of Mr. Youngblood after this.  He was on a plane but Mr. Holloway said he was texting with him.  Do you remember saying that yesterday?

A.   Yes.

Q.   You told us earlier that Mr. Youngblood doesn't really carry a phone, right?

A.   That's -- I didn't have his number but apparently James did.  He would have burner phones and his number changed all the time.

Q.   When you were asked by the FBI to provide all text messages that you thought were important for this case, you never provided any text messages with Mr. Youngblood, right?

A.   I don't know that I had any.

Q.   You didn't have any text messages with Mr. Youngblood?

A.   No.  I didn't text with him, no.

Q.   And you don't know whether James Holloway provided any messages, texts --

A.   I've not spoken to James Holloway in a long time.

Q.   You don't know there was a text exchange or not?

A.   I don't know, no.

Q.   Do you recall that on this same day or same time, early November of '22 was when the online harassment posts restarted?

A.   Yeah, after we got back from Dallas, yes.

Q.   That was November of '22?

A.   Yes.

Q.   I don't need a specific day just that was when they restarted the?

A.   Yes.

Q.    Harassment?

A.    Yes.

Q.    Shortly after you'd given the on the -- I think over $70,000 to Mr. Holloway, right?

A.    Yes.  Well, Mr. Youngblood.

Q.    At this period in November of '22, you recall that the online social media stuff started including Toyota Cedar Park, right?

A.    I guess, yes.  I mean there are so many social media posts but yes.

Q.    Well, you remember we looked at the February and March ones earlier?

A.    Yes.

Q.    And those were about Rachel and Joey Pollard, right?

A.    Yes.

Q.    And you went through a lot of them yesterday with the government.  I can show you them again.

A.    No.  I've seen those, yes.

Q.    The November ones all the way through toward till when you went to the FBI included Crossover, you, Rachel, many names, and Toyota of Cedar Park.

A.    Yes.

Q.    Including Rachel's Aunt Julie Herrera?

A.    Yes.

Q.    At this point, Rachel had just started working at

Q.   Toyota of Cedar Park, right?

A.   I think so, yes.

Q.   You had tried -- you'd been asking the Court for months to make her get a job?

A.   Correct.

Q.   And she started working at the Toyota dealership in Cedar Park in October of '22.  That's when T.A.P. stopped paying her salary finally.

A.   Correct.

Q.   When the posts started and involved Toyota Cedar Park, you got a phone call from Julie Herrera?

A.   Yes.

Q.   Right?  She called you and asked you to stop making those posts, right?

A.   Yes.  And her -- Rachel's dad texted me the same.

Q.   Do you recall receiving that voicemail and providing it to the FBI?

A.   Yes.

            (At the bench, on the record.)

            MS. HERRING:  Move to admit a voicemail that we received from the government in discovery that was provided to them by Mr. Perardi that he received and will testify that he received -- just testified he received from Julie Herrera.  The government is objecting --

            MR. GUESS:  It's a hearsay statement.

THE COURT:  What's the substance of the call?

MS. HERRING:  The posts, the online posts.  It's offered to -- for the fact that he received the voicemail from Julie Herrera.  Not for the substantive for the truth of the call.

MR. GUESS:  Which he just testified to so it's cumulative at that point then.

THE COURT:  I think it's probably admissible.  I'll let you get it in and we'll see whether it is.

(End of bench conference.)

MS. HERRING:  Move to admit Defense 71, your Honor.

MR. GUESS:  No other objection, your Honor.

THE COURT:  Overrule the objection.

Q.   (BY MS. HERRING) I'm going to play this voicemail that you just talked about receiving from Julie Herrera.

A.   Yes.

(Audio file played.)

Q.   You testified yesterday that you responded to Julie by e-mail.

A.   Yes, my lawyer said that I should send her an e-mail.

Q.   And you didn't provide a copy of that e-mail to the FBI?

A.   I don't know if I did if they don't have it, then I must not have.  But Julie received it and said thank you

when she received it.

Q.   I want to go to the check you wrote on November 5th. We can just talk about it because you have your sheet about what you said it was for.  At this point, I think you say Mr. Youngblood claimed he needed money to get -- can you read that is it Costello wife out of country?

A.   What November -- what?

Q.   November 5th.  That's what you have as?

A.   No.  I don't have the November -- well, maybe it's on the check but on my -- oh, it's listed as the 8th on here. Sorry, yes.

Q.   What did you write that check for?

A.   He said it was -- he needed to -- so again, it's going to sound stupid as I say it out loud but this was the story that I was told.  He said that Mr. Costello had been picked up obviously at this point and he said that he'd cut a deal that he had proof that how they had hired the second hit was through cryptocurrency and that Mr. Costello was willing to give over that information if his wife was taken out of the country.  So the 67,000 was to fly a private jet and her and another, I guess, member of the Russian mob.

Q.   So this check --

A.   Out of the country.

Q.   This is we've moved to the Russian mob at this point?

A.    They've always been the ones who helped him with the other cartel.

Q.    The Russian mob was helping Mr. Youngblood with the Mexican cartel?

A.    Yes.  So according to him and Mr. Holloway that the mob backs a certain cartel, not Los Zetas, the other one, and they do not think kindly of kids being killed and the threats that had been made against me.  So the entire time this was going on, he always discussed -- he would call it going to New York.  I mean, I learned later all -- more details about this that he bragged about playing hockey, friend with some high level --

Q.    Just staying on what this check is about, though.

A.    Yeah.  This check was about him getting a private jet to fly that -- wife out of the country.

Q.    And is this still related to gathering evidence about Rachel or --

A.    I mean, this is now a new threat of, you know, the first one didn't happen because he prevented it and now his son's been killed.  This is a new threat.

Q.    Did you ever tell James Holloway that you wanted Rachel in jail?

A.    I said if she was guilty of the crime, absolutely.

Q.    Did you tell him you needed evidence to win your divorce?

A.    Yeah.  To protect my child, yeah, if this was what was going on.

Q.    You think you used the words in your divorce?

A.    I may have in the text message.  My dad was dying at this time.  It's pretty emotional for me.

Q.    We're going to look at some of the text messages between you and James Holloway.  These are messages that start about this time November of 2022.  Hard to read, they're a little blurry, but these are text messages that you provided to the FBI, you recall that?

A.    Yes.

Q.    You sent them three e-mails and you included a bunch of text messages.

A.    Yes.

Q.    So November 6 and 7 on the page we're looking at now, you tell Jay that you need money back from clocks, right?

A.    That's what I was.

Q.    See that at the very top?

A.    Yeah, I was told to never text about what the real reason for money was for.

Q.    So I need to get money back from clocks.  You were saying does not refer to clocks?

A.    Well, they said they're selling the clocks is how I'm going to get my money back but, I mean, all the money was not given to them for clocks.

Q.   You just said you were told never to text about what the money was really for.

A.   Yeah.  This caused a lot of problem and more delays I'm sure.

Q.   So clock, does the word "clocks" here refer to physical real clocks or does it -- is it a code word for something else?

A.   He's saying he's going to sell the clocks to get me my money back.

Q.   Does it refer to a physical clock?

A.   I've never seen the clocks, no.  That's what I'm being told.

Q.   And when you use that word I need to get money back from clocks, you mean you're expecting money back from physical time ticking the clocks or from something else?

A.   That's what they're telling me.  I've testified how they were going to get me the money back.

Q.   You say I can't do any real estate deals, right?

A.   I have no money.

Q.   And Jay essentially on this date tells you be patient, right, says don't stir the pot.

A.   Yeah.

Q.   You see that?

A.   Yes.

Q.   And then he tells you he thinks that Rachel, your ex,

Q.   he's referring to Rachel, right, the bottom?

A.   Yes.

Q.   He thinks Rachel is able to see his messages, right?

A.   Apparently through Michael Woo, yes.

Q.   You don't believe that Rachel can see your text messages with James Holloway, right?

A.   I don't believe Rachel can but they're telling me that they're being monitored by the people that she's working with.

Q.   This is still November 7th and the top part of this message is -- if there's anything before it, we don't know exactly what it says, but, we see it's all money I owe that she can't get in the divorce but I need the clocks sold, obviously.  Nothing to hide there.  What are you referring to with clocks here?

A.   He's telling me that's how I'm going to get my money back.  I'm out all of this money.  I can't pay any bills.

Q.   And --

A.   I can't do any more deals and I've got no money coming in.

Q.   And you're sharing with Jay Holloway that you're talking about money that Rachel can't get in the divorce.

A.   Well, it was all separate property.  This was never about hiding money.

Q.   Why do you need to tell, specify that for Jay

Holloway that antique clock dealer who's Mr. Youngblood's associate?

A.    Well, because he's been telling me and Mr. Holloway has been telling me that my life is in danger and he just told me not to text message us about anything that they're monitoring his phone.  So I texted him that I need this money back.

Q.    But why does Jay Holloway care that the money that you're giving him is separate property or community property?

A.    I don't know.  I can't answer why I put that in this text.  I'm pretty desperate at this point.

Q.    We jump down November 27th at the very bottom.  You say in green, I have to have something back in next two days.  What's the status on the clocks.

A.    Et cetera.

Q.    What about what is the clocks referring to on November 27th?

A.    If you remember, they said that they would be selling those in three months time and this is now the three month time and there's been no money returned, no sale of clocks, nothing.

Q.    Friday, December 2nd, the larger section there.  You tell James Holloway, I need to ask you about something else.  Do you see that?

A.    Yes.

Q.    What's the something else that you need to ask James Holloway about that you don't want to text about?

A.    I can't remember based on this.  Can I see the rest of the texts?

Q.    Well, this is all that you provided.

A.    I don't recall at that point.  There was so much that was being discussed.

Q.    Going into January now.  So January of '23, you're talking about what's the timeline, Jay tells you Thursday.  Then you say keep me posted on both.  Obviously, they have different challenges and preparations.  What is "both" are you talking about here?

A.    About getting the information, the pelican boxes and the money back.

Q.    This message is about your divorce or no?

A.    No.

Q.    Go down the next one.  You say keep me posted on both and then you say, I have to talk with my attorneys next week so I need sooner than later held off as soon as I could.  Do you see that?

A.    Yes.  I'm being asked to pay more of Rachel's attorneys' fees and I don't have any money.

Q.    If we go down the next set of them, this is January 6, so the next day, you say, hey, things heating up for

me.  Just -- hard to read.  Can you read that what you wrote there?

A.    Heating up for me.  Just keep me posted on any problems or changes.  A lot moving at me right now.  My dad was in the hospital at this time, too.  And I'm still waiting for the money, still waiting for the pelican box --

Q.    Thank you.  You've answered.  I'm going to go forward to February 11, Saturday.  You text, tell K, K's Mr. Youngblood, right?  When you say K in your text messages, that refers to Mr. Youngblood?

A.    Yes.

Q.    Tell K thank you for updating me.  I would like to meet in person if we can, the three of us, to discuss next steps and how to paper the deal.  What is that referring to?

A.    To what they end up giving me in March, which is that -- they keep telling me that they're going to start paying me become over a weekly period of time and I said I need some sort of proof of that, that this money's coming back.

Q.    This is the same day, this is a continuation, you say tell him, telling Jay to tell him.  So you're talking about tell Mr. Youngblood, right?

A.    Yes.

Q.    That I want to discuss real estate investments,

right?

A.    Yes.

Q.    And you have not done any real estate investments with Mr. Youngblood, right?

A.    No.  I wanted to discuss with him why I can't do any real estate investments because I have no money.  Again, my dad passed away on January 31st.

Q.    On March -- we're going to move down to March 1st. You asked for an update on the timeline, right, and you tell Jay that you just lost your shares in The Crossover and lawyers have filed a motion for money in the divorce, right?

A.    Yes.

Q.    And then, you on March 6 say, thank you for today. Please let friends know about my divorce lawyer orders. Thank you.  Who are the friends?

A.    I meant to say friend.  I think I put an extra S in, there, but it's about Kota and that I was ordered to pay her lawyer fees.

Q.    We're going to go forward to March 13th.  You say good morning.  This is to Jay.  I need to speak with K about my capital D and lawyers ASAP.  Thank you.

A.    My divorce.

Q.    You want Jay to get you in touch with Mr. Youngblood because you need to update Mr. Youngblood on your divorce?

A.   I need money back immediately and he's obviously telling me constantly, the divorce isn't going to matter because your wife is guilty of trying to have you killed and your son to be kidnapped.  So none of it's going to matter because you're going to get your money back and all this information.

Q.   Mr. Youngblood is concerned about your -- the outcome of your divorce?

A.   No.  He's concerned about the safety of my children. He doesn't care about my divorce.

Q.   But you want to speak to Mr. Youngblood about your divorce?

A.   Yes how I'm supposed to talk to all these people about it.

Q.   This is a continuation, we're still on March 13th. You say I need some answers for my decisions this week, right?  Mr. Holloway tells you he doesn't know where Mr. Youngblood is, right?

A.   Yes.

Q.   And then he suggests that you delay anything involving X, X, what is that referring to, Rachel?

A.   Yes.  Anything involving my divorce.

Q.   You tell him that's almost impossible.  He tells you take the fifth, right?

A.   Yeah.  I don't think James Holloway's a lawyer.

Q.   And you tell him, well, can't do that in my divorce, right?

A.   I mean, no.

Q.   That's your response?

A.   Yes.

Q.   Not in my divorce.  So this is the same week, March 15th, the bottom half.  You let Jay know that Rachel's lawyers are demanding money, right?

A.   Yes.

Q.   And then he says if you don't have money, you don't have funds, right?

A.   Yes.

Q.   You say well it's not what the court order says. That is the problem, investment was not allowed, right?

A.   Yeah, because they keep telling me to refer to it as an investment.

Q.   But you could tell your divorce lawyers that you've been?

A.   It's not my divorce lawyers her divorce lawyers.  I can't tell her divorce lawyers that Rachel's been trying to have me killed.  That's the hardest part about this whole thing.

Q.   In March you still believe that Rachel is trying to have you killed when you've been in a divorce proceeding for a year and a half.

A.   I believe that Mr. Youngblood has kept me safe this entire time.  Yes.

Q.   You believed that Rachel is actively trying to have you killed in March of 2023?

A.   Yes.  Right up until I went to the FBI.

Q.   You believe that whole time?

A.   The whole time.

Q.   That the woman that you were in divorce proceedings with that you were exchanging a child with, every week was trying to have you killed.

A.   Yes, I did.

Q.   The top you told us before the plural friends was a mistake.  Here you say again, just Jay says just say you have friends who are helping you financially.  Who are the plural friends that keep appearing in your texts?

A.   No.  He says just say you have friends.  That's him talking about himself and Kota apparently.

Q.   We move forward to April now.  You're still texting with Jay.  To be clear, you did not provide every text message you had with Jay Holloway, right?

A.   I provided all the ones that I had up to this date -- Mr. Youngblood took my phone.

Q.   I'm just asking did you provide all the text messages you had with Jay Holloway?

A.   I provided all the ones that I had with Jay Holloway,

yes, on my phone.

Q.   You did that, the FBI asked you to do that.  They let you take the screen shots and send it to them.

A.   Yes.

Q.   So when we see breaks in these dates, it's because you didn't have any texts with Jay Holloway during those periods.

A.   I don't know.  I think I just gave them things that were relevant to this.  I don't know that I -- they asked me for everything with him.

Q.   So you decided what was relevant for the FBI?

A.   At this time, I was trying to put it all together for them.  I don't remember.

Q.   Monday, April 10th, the bottom, you're informing Jay that Rachel's lawyers are going to have to be told about all debts this week.  Do you see that?

A.   Yes.

Q.   Wednesday, April 12th -- Tuesday and Wednesday, April 11th to 12th, you let Jay know that there's been more lawyer filings and then, you say today is D day for me.  See that?  Is there some setting in your divorce on that day?

A.   I don't remember that exactly.  I just know that I have not been paying on my house or any other -- I couldn't pay anything at that point.  So I think that they

were demanding that we go to court.

Q. I want to go down to Sunday April 16th. This is when you have already gotten upset with Jay and you've said, I'm going to take the flag to court, right?

A. Yes.

Q. Then you tell him, at the end, lawyers will be calling this week like I said, right?

A. Yes.

Q. And he says, Mr. Youngblood called this morning and has an update on your number one issue. I can meet this afternoon, right?

A. Yes.

Q. Is there further discussion about what your number one issue was?

A. Yeah.

Q. These are the last texts you provided --

A. How could --

Q. -- were there further messaging?

A. I don't think so because I find out about the flag shortly thereafter this with Mr. Bridgman. I don't know.

Q. So your divorce as you've expressed in these texts to Mr. Holloway was in fact escalating in April of '23, right? Rachel's lawyers filed a motion to enforce the temporary orders in March, right?

A. Yeah, for me to pay her lawyer fees.

Q.   They allege that you weren't complying with the requirement that you pay those fees?

A.   Correct.

Q.   She had switched divorce attorneys at one point, right, to a different firm?

A.   Yes.  This is her third one, yes.

Q.   They sent you invoices starting back in December of '22, right?

A.   They sent them to my lawyers and then I've actually got them but yes.

Q.   But you didn't pay them.

A.   No.  I paid what I could at the time.

Q.   And there was actually a court hearing set on this motion to enforce on April 21 of 2023, do you recall that? It got moved but the original setting was April 21st of 2023?

A.   Yeah.  I think my mom paid the lawyer fee for me.

Q.   That's what your -- when you're talking about all these filings, your lawyers are filing things you're talking about this motion to enforce with the lawyer seeking payment of the attorney's fees?

A.   Yes.

Q.   And you were going to have to go to court to explain why you couldn't pay.

A.   Yes.  But I was being told that information was

coming and money at any day now.

Q.   You referenced in your messaging with Mr. Holloway at one point that we saw that you lost your shares in the Crossover, right?

A.   Yeah.  My partners were going to take them away because I couldn't make a capital call.

Q.   You also had a litigation, you were in litigation at the time with Chapparal Ice, Ice Sports --

A.   I was not.  The company that owns The Crossover was.

Q.   The company that owns The Crossover and you worked for Ice Sports?

A.   No.  I was the developer of Ice Sports and the managing partner, but it's an investment that's owned by a lot of people.

Q.   You owned a part of it.

A.   Yes.

Q.   And you were the, you said, the managing partner of Ice Sports?

A.   Yes, me and Adrian Lufschanowski.

Q.   When The Crossover opened, Chapparal Ice was the anchor tenant, right?

A.   Well, they signed a lease in the building, yes.

Q.   They were -- you had contemplated that they were going to be the ones that operated the ice rink, right?

A.   They operated their space in the building, yes.

Q.   Do you dispute that they were anchor tenant?  Is anchor tenant the wrong business term?

A.   It's a very large complex but they had the certain amount of the building, yes.

Q.   And there was a lease agreement, right, between Chapparal Ice and Ice Sports?

A.   Yes.

Q.   And Chapparal had also invested quite a bit of money into finishing out The Crossover.  Weren't they like nine million in?

A.   They invested in their finish-out of their space tenants do in a real estate deal.

Q.   $9 million?

A.   If you say so, yes.  We invested three or four million as well.

Q.   And at some point, Chapparal fell behind on the rent payments that they were supposed to be making to Ice Sports for that lease, right?

A.   They stopped paying for six months.

Q.   Leading up to those missed rent payments, Chaparral had been asking Ice Sports for statements about operating expenses, breakdown of what they were being asked to pay, right?

A.   Yeah, they were asking my -- I'm not the asset manager so they were asking the asset managers of the

entity.

Q.   You said you were a managing partner of Ice --

A.   I'm not the asset manager.  I was doing property management and I was the developer but there's a whole group of investors that are in charge of exactly what you just asked me that I'm not in charge of.

Q.   And Chapparal specifically wanted to know why the asset management fees were being charged to them when those weren't operating costs.  Do you recall that?  That was one of the things Chapparal was asking for information on?

A.   Yeah.  It's in their lease but I don't know if it was passed through or not but that's again, I did not set those documents up, the lawyers set those up and the asset management group is?  Charge of that.

Q.   At some point Ice Sports just locked Chaparral Ice out of the Crossover, right?

A.   Yeah.  That was a decision made by their lawyers. Yeah, I was asked to enforce it.

Q.   When this tenant was locked out, they couldn't even come in and get their equipment, right there was a big dispute about whether The Crossover was unlawfully retaining their equipment?

A.   Yeah.  With lawyers that was their dispute.  I was an investor in Chapparal Ice, as well, by the way, so it was

hard for me, it was on both sides of the equation.

Q.   This was escalating in this February, March, April of 2022, right?

A.   Yes.

Q.   Chapparal filed for bankruptcy in May of '22?

A.   Yes.

Q.   Do you recall that Chapparal in their bankruptcy filing in this Western District of Texas claimed that you Eric Perardi had made representations to them about what would happen if they'd been unable to make rent payments?

         MR. GUESS:  Your Honor, I'm going to object to the relevance at this point.  I don't see where we're going with the -- a lot of bankruptcy discussions on Chapparal Ice.

         MS. HERRING:  I could move on, your Honor.

         THE COURT:  Okay.

Q.   (BY MS. HERRING) When you just made that one, statement, I lost my shares in Crossover, is that something that came out of the valuation of the shares following Chapparal's bankruptcy?  Basically your shares weren't worth anything more and Chapparal went bankrupt?

A.   No.  I was required to make a capital call as all the investors were and I had no money at this point, all my money's gone.  So I owed $44,000 and I was told that I was going to lose my shares.  Luckily --

Q.   In April -- we'll move on.  In April 2023, you told us you decided to hire an attorney, right, criminal defense attorney Steve Toland?

A.   Yeah.  Yes.

Q.   You hired him to help you go to the real FBI?

A.   Well, I went to Steve and asked him to help me go to the real FBI.

Q.   You said that your attorney's daughter dates your middle son.

A.   Yes.

Q.   This is the middle son who's been at risk much of this time in the cartel in your mind?

A.   Yes.

Q.   Did you let Steve Toland know that his daughter's hanging out with your son who might be kidnapped?

A.   I'd only met Steve Toland one other time in my life.

Q.   You hired Mr. Toland to facilitate communications with the FBI?

A.   I asked him to.  Yes.  I didn't have any money.

Q.   May I approach, your Honor?

        THE COURT:  Yes.

        MR. GUESS:  May we approach the bench first?

        (At the bench, on the record.)

        MR. GUESS:  I want to object to the relevance and to the -- this is simply to say that he has a contract

with Mr. Toland to pay money.  I don't understand what the relevance of this is going to be.

MS. HERRING:  He has testified he didn't have any more money to pay and he hires Mr. Toland for $500 an hour to help him communicate with the FBI.

THE COURT:  We're going to need to take a break pretty soon so what's your thought?

MS. HERRING:  I have a couple of calls.  So...

THE COURT:  We'll go ahead and take it then. We're running a little overdue, anyway.

(End of bench conference.)

THE COURT:  Ladies and gentlemen of the jury, it's time for the second of our two 20-minute breaks. Let's call it 1:50.  If you could be back in the jury room at 2:10 and we will resume evidence at that time.  You'll recall, you're not supposed to talk to anyone, including each other, about this case and don't engage in any independent investigation and we will see you back in 20 minutes.

(Jury not present.)

(Recess.)

(Jury present.)

THE COURT:  Thank you.  You may proceed.

MS. HERRING:  May I approach, your Honor?

THE COURT:  You may.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Q.    (BY MS. HERRING) Mr. Perardi, this is what we started to talk about when we broke.  Do you recognize this as a copy of the contract that you signed with the attorney you were telling us about?

A.    Yes.

Q.    Is that an accurate copy of that contract?

A.    Yes.

Q.    We move to admit Defendant's 14.

        MR. GUESS:  Noting our prior objection, your Honor.

        THE COURT:  Objection is overruled and the exhibit is admitted.

Q.    (BY MS. HERRING) You have told us that you chose to engage your -- you called him a friend but Steve Toland is your attorney at this point, right?

A.    Yes.

Q.    And this engagement with Mr. Toland was -- you agreed to pay him to represent you, right?

A.    Yes.

Q.    Can't remember if it was 500 an hour, does that sound -- I believe it's down a little bit.

A.    500 and the paralegal is 235, yes.

Q.    Going back to the top, this part in bold, you had engaged him to facilitate communication with the FBI, right?

A.   Yes.

Q.   And advocate for you for any financial compensation that you might be eligible for, right?

A.   Yes.

Q.   So after you retained Mr. Toland, you go for a meeting with him at the FBI office, right?

A.   Yes.

Q.   You were not under the impression you were going to have to pay the FBI agents any money at that time, right?

A.   No.

Q.   That meeting to your knowledge was not recorded; is that right?

A.   With the FBI or with Steve Toland.

Q.   Well either but --

A.   I would imagine with the FBI was recorded.  I don't know that they told me that but I would imagine that they do record those conversations.

Q.   And following that meeting, they talked to you, you told us about going undercover helping with this undercover operation.

A.   Yes.  They called Steve and then Steve spoke to me about it.  Yes.

Q.   And you knew that those -- that meeting that was arranged with your participation that that was going to be recorded?

A.    Yes.

Q.    And by the time we get to those recordings -- well, I should step back.  You also after you retained Mr. Toland, you started recording any communication you had that you could record with Mr. Youngblood, right?

A.    Yes, per Mr. Toland told me to, yes.

Q.    And at that point, when you began making an effort to make those recordings you've already gone to the FBI, you already know that this was a scam.

A.    Yes.

Q.    So when you were speaking on all those recordings, you no longer believe Mr. Youngblood.

A.    No.

Q.    And you're trying to assist in kind of drawing Mr. Youngblood out to capture recordings of the things he's been telling you all this time, right?

A.    He does most of the talking but yes.

Q.    You've heard over the last day, day and a half some of these calls that you've listened to where he talks about needing to get again more and more and more funds to bury Rachel, right?

A.    That's what he used, yes.

Q.    Jay Holloway also uses -- used that term with you, right?  Do you recall a call that you had with Jay Holloway about?

A.    Yes.

Q.    Voicemail that he left you?

A.    That's what they both said all the time.

Q.    I'm going to ask to play Defendant's 79.  This is a voicemail that you received and provided to the FBI that Jay Holloway left.  I would also move to admit the transcript 79A.  We had not moved for that before.

MR. GUESS:  No objection.

THE COURT:  So admitted.

MS. HERRING:  Thank you.

Q.    (BY MS. HERRING) This is the call leading up to that meeting with the undercover?

A.    Yes.

Q.    And you hear Jay say we'll get more money, we're going to be able to bury and everything -- take care of everything with your ex?

A.    Right.

Q.    Go back to Defendant's 88.  Just going back to one text that which were talking about earlier, November 7th so we've talked about this one at the top.  Earlier when I'd asked you about it.  You text Jay, it's all money that I owe.  She can't get them in divorce but I need the clocks sold.  Obviously.  You are wanting, expecting at this point hoping for a return on the money that you've given Jay Holloway and Mr. Youngblood.

A.    Not a return, just any of it back.  I can't pay my bills and I owe lots to my parents.

Q.    You talked to us about those promissory notes, right?

A.    Yes.

Q.    And the $2 million expected return from the sale of the clocks.

A.    That James said, yes.  Not 2 million to me.

Q.    Not 2 million to you but a return on your 800 and something thousand investment as listed in that promissory note.  You told us that when you got that, you were hopeful that that would be something that was going to happen at that time?

A.    Yes.  That's what they kept telling me.

Q.    And all of those checks that you wrote, every check you wrote involved in this case came out of your T.A.P. Development account, right?

A.    Yes.

Q.    Mr. Youngblood, you've told us, Mr. Holloway kept telling you these paintings, gold, clocks, some point, we're going to arrive, be sold, had changed, some point it's going to happen, right?  That's the story that you now feel was used to lead you on.

A.    Yes.

Q.    And you tell Jay Holloway here, this is all about the money -- what you're referring to with the money, it's

money that you owe she can't get in the divorce.  That's your text to him.

A.    Yeah.

Q.    That you need the clocks sold?

A.    Yeah, I need the money back so I can pay my bills.

Q.    And if this money comes back, it's going to come back to T.A.P. Development?

A.    T.A.P. Development, correct.  That's where it was written out of.

MR. GUESS:  Your Honor, I object these have been asked and answered multiple times.

MS. HERRING:  I have one more question.

THE COURT:  Okay.  One more question.

Q.    (BY MS. HERRING) T.A.P. Development, that money comes back to it, that will be your separate property, right?

A.    If that's the decision made in the divorce, yes.

Q.    Now I have one more if it's okay.  You've told us earlier, the asset sheet all along, you have been very confident T.A.P. Development is your separate property. It's your company.

A.    I've owned it since 2007.  Yes.

Q.    No further questions.

                    RE-DIRECT EXAMINATION

BY MR. GUESS:

Q.    Good afternoon, Mr. Perardi.

A.    We're not done yet, Dan?

Q.    I know it's been a long day.  Long day yesterday.  I have just a few questions to follow up on with you.

A.    Okay.

Q.    You recall when Ms. Herring was talking to you about that first meeting you had with Mr. Youngblood at your rental property?

A.    Yes.

Q.    You said that you could go back to your telephone and identify the day as to when that meeting took place.  Do you remember that?

A.    Yes.

Q.    During the break, have you had an opportunity to go back to your phone and take a look at it?

A.    Yes.

Q.    Your son who was in the hockey showcase, when did he leave Austin, Texas?

A.    He left on Father's Day, June 19th.

Q.    Of 2022?

A.    Of 2022, yes.

Q.    And when did he return to Austin, Texas?

A.    On I believe June 24th, 2022.

Q.    And at some point around June 24, maybe June 25th, is that when you would have had your meeting with Mr. Youngblood at the rental property?

A.   Yes.  My son was not back then.  So it would have had to be before my son arrived.

Q.   Let's talk a little bit about postdating the checks.

A.   Yes.

Q.   When you're writing the checks, are you writing the exact date that you're writing the check?  Are you putting different dates occasionally?

A.   I was asked to put different dates.

Q.   And who asked you put those different dates?

A.   Mr. Youngblood.

Q.   Did he explain why he needed them dated differently?

A.   He just felt that the money would come back quickly and to have those different dates on them would show that he could get it back to me fast.  He didn't really explain it.  I mean, I trusted that he knew what he was talking about.

Q.   Can you remember when the defense attorney showed you the sale of the medical office building in the 800-and-some-odd-thousand dollars deposit coming into your T.A.P. account?

A.   Yes.

Q.   Could we have government No. 86 on the screen, please, Ms. Mercado?  And let's go to the next page and the next page.  Well, that's good.  So this is the T.A.P. Development account; is that correct?  7818 right there?

A.   Yes.

Q.   And this is at the end of July, I believe.  Is that right?

A.   Yes.

Q.   So you started on your balance based on that big deposit from the sale of the office complex of $563,000. By July 26 your balance is down to $132,000.

A.   Yes.

Q.   Is that something unusual for your T.A.P. Development account?

A.   No.

Q.   Now, this is the time that you're writing these checks to Mr. Holloway and Mr. Youngblood, right?

A.   Yes.  Hard to look at, but yes.

Q.   In fact she showed you the check that was dated on 7-27, cashed on that same day.  Do you remember going through that with the defense lawyer?

A.   Yes.

Q.   And we've already been through.  I'm not going to go through it again but you had moved money from your Washington Federal HELOC account to your personal account then transferred that money to the T.A.P. account?

A.   Yes.

Q.   You remember the lawyer asking you a bunch of questions from your deposition, right?

A.   Yes.

Q.   That was only to be used for your divorce payments. Can't use it for anything else, right?

A.   Yes.

Q.   All right.  May I approach the witness, your Honor?

THE COURT:  You may.

Q.   (BY MR. GUESS) Mr. Perardi, I'm going to show you that same deposition.  See you've got a copy there but I'll show you mine.  Just take a look at page 145 of that exhibit or that deposition.  Take a look and starting at line 15 or line 16, excuse me.

MS. HERRING:  Your Honor, I'm going to object. Unless this is a prior inconsistent statement that's being pointed out, this is not admissible.

MR. GUESS:  I'm not offering it for admission. I'm asking him to take a look at it so he could correct his prior testimony before the defense attorney.

THE COURT:  I'll allow.  Go ahead.

Q.   (BY MR. GUESS) Do you see that beginning at line 16?

A.   Yes.

Q.   First off, what are you being questioned about there?

A.   Ask if I wired some money or did your bank account receive money at first.

Q.   All right.  And then again this is the same accounts that we're talking about, right?

A.    Yes.

Q.    Dates of July 27 and August 16, 2022?

A.    Yes.

Q.    And do you remember those?  It was a question; is that correct?

A.    Yes.

Q.    And what did you respond?

MS. HERRING:  Objection to him reading from the prior deposition.  He has not said anything inconsistent.

THE COURT:  You can go ahead.

Q.    (BY MR. GUESS) Thank you.

A.    It says a wire transaction in the amount of $36,000 drawn from Washington Federal bank account in Seattle was deposited into EP's Wells Fargo account 6673.

Q.    And then, they asked you whether or not that money -- did you wire some of that money out of Washington into your Wells Fargo account and what was your answer?

A.    Correct.  And then, from the Wells Fargo account into T.A.P. Development and then, wrote the check to him out of T.A.P. Development.

Q.    Who's him?

A.    It says who's JH and I said James Holloway.

Q.    So during the deposition, you told the lawyers that you had written this check that the deposit of 36,000 had gone to Jay Holloway; is that right?

A.    Yes.

Q.    Over the course of all the stuff that's happening to you, Mr. Perardi, you're in financial distress at this point.

A.    Yes.

Q.    Starting to feel the pressures of financial, correct?

A.    During that deposition or when I wrote those checks?

Q.    When you wrote those checks.

A.    Yeah, very much so.

Q.    The extortion payment or the payment that was being given to Kota Youngblood to protect your family, was that all related to you having to move this money around from the HELOC to the T.A.P. Development account?

A.    Yes.

Q.    You used that money for other things, too, obviously?

A.    Yeah.  I mean, there were, like I said, bills everywhere.

Q.    You're not denying the fact that you were paying defense lawyers?

A.    True.

Q.    You were paying for your own expenses?

A.    Yes.

Q.    Your ex-wife's or soon-to-be ex-wife's expenses?

A.    Yes.  Salary for my employees, business expenses.

Q.    So you had a lot expenses that were going on and

you're using some of those wires to help cover those, expenses, including the payments to Mr. Youngblood?

A.   Yes.

Q.   Could we have Government's Exhibit No. 88, please. Next page.  The T.A.P. Development account one month later, August 23rd.  So at the end of June, you had $563,000 in that account.  On August 23rd, how much did you have left in that account?

A.   $40,794.07.

Q.   But for the fact that you were making these payments to Kota Youngblood as well as the other, would you have had to move that money from the HELOC to that account?

A.   Not if I didn't have to make those payments, no.

Q.   You're not trying to tell the jury that the $36,000 wire was specifically only for Mr. Youngblood, are you?

A.   No.

Q.   You're saying that you needed to move that money for what purpose?

A.   To cover all expenses in my life including the payments that I was giving to Mr. Youngblood to protect my children.

Q.   If you had been making those large payments to Mr. Youngblood, would the T.A.P. account have had enough money to pay those other expenses?

A.   Yes.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Q.   When we looked at that video of you at the Altitude, was that you in the background with your daughter?

A.   Yeah, with XXXX -- oh, sorry.  Yes.

Q.   Remember --

A.   It's hard not to say my kids' names.

Q.   I know.  The capital call of $44,000 for the real estate investment at The Crossover, do you remember approximately when that was?

A.   I believe it's January of 2023.

Q.   But for the fact that you'd been extorted by Mr. Youngblood over all these months, would you have had the money to pay for that capital call?

A.   I would hope so, yes.

Q.   When the message with Mr. Holloway was done and they talk about burying Rachel, do you remember that?

A.   Yes.

Q.   That was a word that they used often, isn't it?

A.   All the time.

Q.   And when they talked about the box, what did you understand that to mean?

A.   The pelican box that contained the tape of her saying that she wanted to have my child killed or kidnapped, sorry.

Q.   And that was point for you because you were concerned about your child's safety?

A.    That and obviously that's -- if that's the truth, then it's a criminal act.

Q.    I think it was a little bit confusing when defense counsel used the term return on the clock money and so forth.  At this point in the spring of 2023, were you hoping just to get back some of the principal that you had given to Mr. Youngblood and Mr. Holloway?

A.    Yeah.  I couldn't pay for anything.  All my bills had doubled.  The interest rates had changed on the HELOC and everything was twice as much as it was before and I had no money.

Q.    You were interested in getting that information about the threats to your life and the cartel primarily for what purpose, Mr. Perardi?

A.    I just wanted it all to end.  He promised me that he would be able to make sure that I was safe after that and I just wanted it all to end.

Q.    Last thing I wanted to visit with you about to clear up a little bit, clearly you had a $5 million life insurance policy that your former wife Rachel Perardi was a beneficiary of?

A.    Yes.

Q.    Your recollection regarding the conversation with Keith on that back porch in June of 2022 was how much money did he tell you that that life insurance policy was

for?

A.    I think I stated that he said six-and-a-half million.

Q.    At that time, you knew but was it clear to you that your life insurance policy was 5 million instead of six-and-a-half million?

A.    Well, I was counting the key man.  I thought actually the key man was 1.5 million.  I learned something today.

Q.    In terms of any details about that policy, were you surprised to learn that Mr. Youngblood had any information about your insurance status?

A.    Yes.  And it happened so fast, I mean rapid-fire conversations.

Q.    The mere fact that he had that, would you consider confidential information, again, something that would give him some credibility in your eyes?

A.    Yes, and he was my friend.

Q.    Nothing else, your Honor.

        MS. HERRING:  No further questions.

        THE COURT:  Thank you.  You could step down.

        Your next witness.

        MR. HARDING:  May this witness be excused, your Honor?

        MS. HERRING:  He can be excused but not released from the --

        THE COURT:  Okay.  You're excused for the day.

MR. HARDING:  Government calls Dennis Schuler, Sr.

THE COURT:  Before you take a seat, if you could please raise your right hand to be sworn.

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

DENNIS J. SCHULER, called by the Government, duly sworn.

<u>DIRECT EXAMINATION</u>

BY MR. HARDING:

Q.   Mr. Schuler, once you get situated, could you please state your name for the court reporter and then, spell your last name?

A.   My name is Dennis J. Schuler, S-C-H-U-L-E-R.

Q.   And where are you from, sir?

A.   I'm from Ohio.  I was born in Cleveland, Ohio.

Q.   I just want to start off by making it clear you are not here by choice, are you?

A.   No.  I did everything I could do not to be here.

Q.   You are here because we, the government, have subpoenaed you to appear.

A.   Yes.

Q.   And the Court.

A.   My attorney advised me I have to be here.

Q.   And the Court has ordered you to appear.

A.   Yes.

Q.   I'll try to make this as brief as possible.  I appreciate you coming down from Ohio.  Let me ask you, sir.  Do you know Mr. Youngblood?

A.   Mr. Youngblood is my natural son.

Q.   Your biological son?

A.   Yes, biological.

Q.   May I approach the witness, your Honor?

THE COURT:   You may.

Q.   (BY MR. HARDING) Mr. Schuler, you and I had a chance to meet yesterday, correct?

A.   Correct.

Q.   And I'm showing you now and I showed you yesterday what's been marked as Government's Exhibit 11.  Do you recognize that document, sir?

A.   Yes.  It's my son's birth certificate.

Q.   And how do you recognize it?

A.   I recognize it because I had received it from the city of Cleveland after his birth.

Q.   It contains personal information?

A.   Yes, and it's accurate.

Q.   Government will offer Government's Exhibit 11.

MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) What was Mr. Youngblood's birth name?

A.   Dennis J., J-A-Y, Schuler, Jr.

Q.   And about what age was Mr. Youngblood when he left home?

A.   Somewhere between 18 and 19.

Q.   For the entire time from the time he was born until the time he left home, where did you all live?

A.   We lived in Cleveland and then, we lived in North Olmsted, Ohio and then, Westlake.  Those two are suburbs of Cleveland.

Q.   So Ohio always?

A.   Always Ohio.

Q.   Never lived abroad?

A.   No.  No.

Q.   And Mr. Youngblood was born where?

A.   He was born at Fairview Hospital, which is in Cleveland, Ohio.

Q.   Had you ever lived in New York City, or Raleigh, North Carolina?

A.   No.

Q.   Have you ever worked for the FBI?

A.   No.

Q.   Were you aware at some point along the way, Mr. Youngblood changed his name?

A.   I was aware that he was going by a different name. Did not know he did it legally.

Q.   May I approach the witness, Judge?

THE COURT:   You may.

Q.   (BY MR. HARDING) I'm going to show you what has been marked Government's Exhibit 12 for identification purposes.  We've gone over this set of documents, as well, yesterday, correct, sir?

A.   Correct.

Q.   I want to focus your attention on page 4.  Could you describe for -- what is this document to the best of your knowledge?  Or let me ask you this.  What is the title of this document?

A.   A Petition For Change of Name.

Q.   And the petitioner is named?

A.   Dennis J. Schuler.

Q.   The date of birth for Mr. Schuler on this document?A. XX-XX-71.  That's correct.

Q.   That's your son's birthday?

A.   Yes.

Q.   Has some more information.  The name that he's asking to have his name changed to, I won't ask you to read.  But I will ask you, part 7 here, there's a name listed,

Gretchen Schuler.  Who's Gretchen Schuler --

MS. HERRING:  Your Honor, this has not been admitted and we object to the hearsay.  He did not prepare this document, so we'd ask that it be excluded and that he not be continued to be questioned on it.

MR. HARDING:  We'll offer it as a certified public document.

THE COURT:  Any objection?

MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) Let me make it a lot easier.  Let's pull up Government's 12, please.  If we'd go to page 4, please.  So as you said this is your son's date of birth XX-XX-71?

A.   Yes.

Q.   He was born -- well, actually, was he born in Fairview Park, Ohio?

A.   No.  The hospital's name was Fairview.  It was still in Cleveland, Ohio, but that was the name of the hospital.

Q.   And who is Gretchen Schuler, sir?

A.   Gretchen Schuler is my daughter, his full sister.

Q.   His only sister?

A.   Only sister.

Q.   Is she still alive, sir?

A.   Yes, she is.

Q.   No. 6, reason for proposed change of name, foster father changed my name when I was a minor to take his name.  Is that accurate, sir?

A.   No, that's not.

Q.   You're not his foster father?

A.   No.  I'm his biological father.

Q.   Thank you, sir.  We'll pass the witness.

MS. HERRING:  No questions for this witness.

THE COURT:  May this witness be excused?

MS. HERRING:  Yes, your Honor.

MR. HARDING:  Yes, your Honor.  Thank you.

THE COURT:  You're free to go, sir.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Next witness?

MR. GUESS:  The government would call Roseana York.

THE COURT:  Before you take a seat, could you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, I do.

THE COURT:  Please be seated.

ROSEANA YORK, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. GUESS:

Q.   Good morning, Ms. York.

A.   Good morning.  Or good afternoon.

Q.   Or afternoon.  Exactly.  I want you to introduce yourself for the ladies and gentlemen of the jury and spell your last name for the court reporter.

A.   Roseana York, Y-O-R-K.

Q.   And do you live here in the local area?

A.   Yes, I do.

Q.   Where do you live at?

A.   Giddings.

Q.   How long have you been in Giddings?

A.   Little over eight years.

Q.   Before that, where were you living?

A.   California.

Q.   And in California, did you work for a while?

A.   I sure did.

Q.   Tell the jurors what you did for a living.

A.   For 26-and-a-half years, I was a correction officer with California Department of Corrections.

Q.   You worked in the jail system?

A.   In the prison system.

Q.   Prison system.  And what's the difference between

jails and prisons?

A.    Well, right now, I'm working with Lee County Sheriff's in the jail system.  There's a big difference.

Q.    All right.  Twenty-six-and-a-half years, you said?

A.    Twenty-six-and-a-half years.

Q.    In California, is a corrections officer considered a law enforcement officer?

A.    Yes.

Q.    You have a badge, you have identification, you have to go through some training; is that right?

A.    Yes.

Q.    And tell me a little bit about what you did within the prison system.

A.    Worked the dorms where the prisoners would walk around and we'd have to inspect their areas constantly. And then, I transferred to Patton State Hospital, which was a state hospital for the criminally insane, and I worked transportation, the visiting, the watch office and the gates.

Q.    So you've done a lot things in the prison system. And currently, you said you're with Lee County?

A.    Lee County Sheriff's.

Q.    Had you been retired for quite a number of years before you went back to Lee County?

A.    Ten-and-a-half years retired.

Q.   You ended up going back to work and we'll get to that in a little bit, okay?

A.   Okay.

Q.   Just to be clear, you've met with me on a couple of occasions, right?

A.   Yes.

Q.   I actually brought you into the courtroom so you could have familiarity before you testified today; is that right?

A.   Correct.

Q.   During our meetings, what have I always told you that you have to do?

A.   Tell the truth.

Q.   So let's jump right into it.  Do you know a person by the name of Saint Jovite Youngblood?

A.   Yes.

Q.   And what did you know him -- what was his name that you knew him by?

A.   We would call him Jadenne Youngblood.

Q.   Jadenne.  And do you see Mr. Youngblood in the courtroom with us today?

A.   Yes, I do.

Q.   Why don't you point him out and describe an article of clothing?

A.   He's right over there.

Q.   May the record reflect Ms. York identified Mr. Youngblood?

MS. HERRING:   She just pointed.   An article of clothing --

Q.   (BY MR. GUESS) Describe an article of clothing that he's wearing.

A.   He's wearing a black sweater.

THE COURT:   Record will so reflect.

Q.   (BY MR. GUESS) When, to your recollection, did you meet Mr. Youngblood?

A.   2012.

Q.   2012, you're still back in California?

A.   Yes.

Q.   And how did you meet him?

A.   My husband did some security work for him.

Q.   Was your husband also a law enforcement officer?

A.   My husband was a correction officer.

Q.   Correction officer.   Kind of like worked in the prison system like yourself?

A.   Yes.

Q.   What's his name?

A.   Jason.

Q.   Jason York?

A.   Jason York.

Q.   All right.   So you met Mr. Youngblood through your

husband and you said he was doing some security work for Mr. Youngblood?

A.   Yes.

Q.   Was your husband retired from the prison system at that point?

A.   Yes, he was.

Q.   And do you remember where you met Mr. Youngblood for the first time?

A.   We were in, I want to say, Pasadena at a -- like a little cafe.

Q.   And why were you getting to know Mr. Youngblood at that time?

A.   Oh, I wanted to sell some jewelry that I had from my ex-husband.

Q.   So Mr. York is your second husband?

A.   Yes.

Q.   All right.  And why would you think that Mr. Youngblood was a good person to transact this type of deal with?

A.   Because he told me that -- my husband told me that he was a authenticator, fine arts and precious metals, and that he had connections.

Q.   Tell me what your first impression of Mr. Youngblood was at that meeting in Pasadena.

A.   I thought he was very nice, very, you know, smooth

talker, very well-mannered.

Q. Did you bring some of the jewelry with you to have him look at?

A. Yes.

Q. Did he seem knowledgeable about looking at the jewelry and knowing what its value was, anything like that?

A. He didn't give us a price. He said he was going to take it elsewhere and sell it and then, bring us the money back.

Q. Now, at some point during your divorce from your first husband, you received a settlement of approximately $60,000?

A. Sixty-three now.

Q. Do you remember when that was, Mrs. York?

A. I believe I got it around 2012, I believe. It took a while to get it.

Q. And with some of that money, did you decide to invest it?

A. Yes. Well, not invest it. It was more like get silver and gold to put away.

Q. Okay. So you were going to buy actual gold and silver?

A. Yes.

Q. Okay. And who do you decide to buy this gold and

silver from?

A.   Through Mr. Youngblood.

Q.   How did you know that he was in the business of buying gold and silver?  Did he advertise business someplace or what was going on?

A.   He had cards that said that he was into precious metals.

Q.   Did he have a store or did he have a website? Anything like that?

A.   We never went to the store, but he did have like a business card with an address on it and a phone number.

Q.   But to your knowledge, you don't know whether or not he had a physical location?

A.   I do not know.

Q.   And did you eventually buy gold and silver from Mr. Youngblood?

A.   Yes.

Q.   And what did you do with the gold and silver that you received -- well, let me back up.  What kind of gold and silver was it?  Was it coin form?  Was it a --

A.   There was coins and there was like little silver like old antique medicine boxes and some necklaces and stuff.

Q.   And what did you do with the gold and silver that you bought from Mr. Youngblood?

A.   We just placed it in our safe.

Q.   At the house?

A.   At the house, yeah.

Q.   All right.  At some point after that, did Mr. Youngblood approach you about needing money?

A.   Yes.

Q.   Tell me a little bit about that.

A.   He was arrested in 2013.

Q.   Let me stop you there.

MS. HERRING:  May we approach?

THE COURT:  Yes.

(At the bench, on the record.)

MR. GUESS:  We tried to tell her to be careful about that, obviously, regarding the motion in limine so that's why I stopped her.  If you want to give a limiting instruction, that's fine.

MS. HERRING:  I also just want to object that it's information outside the scope of the indictment, his charge starting in 2021 forward, and this is go going back to 2016.

THE COURT:  Okay.  Would it be sufficient for limiting -- do you want me to ask them to disregard that statement?  Or what would be the requested instruction at this point, if any?

MS. HERRING:  Are you even going to 2016 --

MR. GUESS:  No, no.  I just want to -- he asked

her for money.  He needed the money was because he got arrested.  But I just want to say that she gave him money.

MS. HERRING:  Yeah, maybe just --

MR. GUESS:  Or not 2021 but within the -- after moving here to Texas.  Yeah.

MS. HERRING:  Maybe just still limiting instruction on the last line and --

THE COURT:  To disregard.  Just disregard.

MR. HARDING:  Obviously, that's fine with us, but Hanfu Lee is going to talk about some of that, too.  We've already discussed that, right, in terms of like his claims about how he knows certain cartel people and so on.

THE COURT:  We'll just take it one step at a time.

(Crosstalk.)

MS. HERRING:  -- for other witnesses.

THE COURT:  I'll tell the jury to disregard the last statement.

MR. GUESS:  Yes, that's fine.

(End of bench conference.)

THE COURT:  Ladies and gentlemen, I'll simply ask you to disregard the last response that was given by the witness.

Q.   (BY MR. GUESS) So, Ms. York, let me be very specific and listen to the question carefully.  Did Mr. Youngblood

at some point ask you -- ask to borrow money from you?

A.   Yes.

Q.   All right.  And you gave him some money; is that right?

A.   Yes.

Q.   In 2016, you and your husband decided to come to the great state of Texas; is that right?

A.   That's correct.

Q.   All right.  Left California and where did you move to?

A.   Giddings, Texas.

Q.   At that point, had you become friends with Mr. Youngblood?

A.   It was prior to that.

Q.   Right.

A.   Yes.

Q.   So when you moved to Texas, was he already here in Texas or is he following you?  Do you remember?

A.   He was already here in Texas.

Q.   Do you know where he was living at in Texas?

A.   Manor.

Q.   And did you know about his family at that point?

A.   Yes.

Q.   Who was his family?  Was he married?

A.   Yes.

Q.   Who was he married to?

A.   Gloria.

Q.   And did he have children?

A.   Two boys.

Q.   What were their names?

A.   Even and Kota.

Q.   And in 2016, approximately, were they middle school, elementary school?  Do you remember what age roughly they were?

A.   I believe one was, I would say, middle school.

Q.   May I have a moment with defense counsel?

          MR. GUESS:  May we approach?

          (At the bench, on the record.)

          THE COURT:  Just to make sure that we're clear, I'm going to ask this witness.  She gave four loans to Mr. Youngblood in 2016 based on his first request to refinance his home, a $20,000 loan.  Then he needed $26,000 to protect his sons from the cartel.  Then he borrowed another 10,000, he gave collateral as silver.  And then, in that same month of August, he borrowed another $18,000 to protect from the cartel again.

          MS. HERRING:  I'd like to have a running 404(b) objection.  Or if the Court wants me to approach with each question.  But this goes directly to the 404(b) argument the Court heard at pretrial.  This is improper and,

additionally, outside the scope of this indictment.  My concern is that putting on a witness like this going back to 2016 is before what's been charged, which was a scheme from 2021.

THE COURT:  Okay.  So I already ruled that as a pretrial matter and I'll give you a running objection. Thank you.

MS. HERRING:  Sure.

(End of bench conference.)

Q.   (BY MR. GUESS) Mrs. York, in 2016, when you moved here to Texas, did you have an opportunity to reconnect or to see Mr. Youngblood in that -- in 2016?

A.   Yes.

Q.   In May of 2016, do you remember Mr. Youngblood asking for a loan from you?

A.   Yes.

Q.   Why did you have money at that time, Mrs. York?

A.   Because we made a profit on our house in California.

Q.   Do you remember how much that loan was for?

A.   The first one was for $20,000.

Q.   And what was the purpose of Mr. Youngblood asking for that money?

A.   He said that he needed the money to refinance his house to show that the company that he had the money in the bank.

Q.   A few months later, in August of 2016, does he come and ask again for more money?

A.   Yes.

Q.   Do you remember how much money he asked for in August of 2016?

A.   I have my list.  Can I use my list?

Q.   You may use that to refresh your recollection.

A.   In August, it was $26,000.

Q.   Let me ask you, what was the reason that Mr. Youngblood told you he needed that $26,000 for?

A.   That the Russians were after him and the family and he needed cash right away.

Q.   Had he talked to you about the Russians before?

A.   Oh, yes.

Q.   And in what capacity he talked about the Russians?

A.   That he did business with them.  That he was a -- got them items that they needed, antiques, different things like that.  He also stated that his wife had borrowed money from them and never paid it back while he was incarcerated the first time.

Q.   All right.  So he needed this money for the Russians. Did you give another loan in August of 2016?

A.   We got an $18,000 loan for him and, also, my husband sold his --

Q.   Let me stop you there for a second.  You said you got

a loan for him?

A.   Yes.

Q.   Why did you that?

A.   Because he said nobody would give him a loan.

Q.   And where did you get the money from?

A.   Navy Federal.

Q.   So you took out a loan, gave the proceeds to Mr. Youngblood?

A.   Yes.

Q.   Did you give him checks or did you pay him in cash?

A.   I believe it was -- yeah.  I do not remember.

Q.   That's fine.  Let's move forward to 2021.  And first off, what was your father's name?

A.   Alfonso Valdez.

Q.   And he lived in California?

A.   Correct.

Q.   Did he know Mr. Youngblood?

A.   Yes.

Q.   Through you?

A.   Through us.

Q.   In May of 2021, your father passed away; is that correct?

A.   That is correct.

Q.   Did you receive an inheritance from your father?

A.   I did.

Q.   How much money did you receive from your father's estate?

A.   I received $150,000 plus a life insurance of 18.

Q.   And did you also collect some coins from your father?

A.   Yes.  There were two gold coins.

Q.   And describe for the jury, if you remember, what those gold coins looked like, approximately how big they were.

A.   They're about this big.

Q.   You're holding your hand up there.  So little bit bigger than a silver dollar-type deal?

A.   Oh, yes.

Q.   Much bigger than that.  Did you ask Mr. Youngblood to give you a valuation of those coins?

A.   Yes.

Q.   And did he do so?

A.   Well, he told me that they were worth 35,000 each. Total of $70,000.

Q.   So you maintained a good relationship with Mr. Youngblood to this point; is that correct?

A.   Correct.

Q.   Are you seeing his family at any point while you're here in Texas?

A.   We ran into his -- we went to his son's hockey game once and that was the first time in many years that we've

seen his son Kota.

Q.    Do you remember when that was?

A.    I do not.

Q.    Sometime last three or four years maybe, though?

A.    It was probably a year prior to -- it was probably in 2022.

Q.    All right.  May I approach the witness, your Honor?

THE COURT:    You may.

Q.    (BY MR. GUESS) Ms. York, I'm going to hand you what's been marked for identification purposes as Government's Exhibit No. 170.  Recognize what's contained in Government's Exhibit 170?

A.    Yes, I do.

Q.    And you're familiar with those two cashier's checks; is that correct?

A.    Yes.

Q.    All right.  Move for admittance of Government's Exhibit 170.

MS. HERRING:    No objection.

THE COURT:    So admitted.

Q.    (BY MR. GUESS) And let's take a look at the top check, please.  Do you recognize this cashier's check, Mrs. York?

A.    Yes, I do.

Q.    And how do you recognize it?  What was it for?

A.    Mr. Youngblood stated that this was to pay the banker to get our bank accounts set up.

Q.    And why did you need bank accounts set up?

A.    Because apparently, there was a lot of money coming to him.

Q.    So you were going to invest with Mr. Youngblood in terms of maybe getting more than 60,000?

A.    Well, all of the money was supposed to be like an investment so that we -- he said that whatever was his because we helped him so much, that half of what he gets belongs to us.

Q.    Was he talking to you about specifically about how much money he was anticipating receiving?

A.    To tell you the truth, he kept on changing.

Q.    What did it start off with, if you can recall?

A.    Around 10 million.

Q.    And did he tell you what was the source of this $10 million?  Was it going to be cash?  Was it going to be gold?

A.    It is rare coins, bonds that his grandfather left him.

Q.    And his grandfather had lived where?

A.    He stated that he lived in New York.

Q.    Take a look at the bottom of that exhibit, please, second check, and that one for 60,000 that was written

about 9-13, September 13th of 2021; is that correct?

A.    Yes.

Q.    This is a check for $57,225 written on September the 1st.

A.    Yes.

Q.    So this is preceding the other check that we looked at.  Again, this was given to Mr. Youngblood?

A.    Yes.

Q.    And why did you give this check to Mr. Youngblood?

A.    For the same reason he stated.

Q.    Did you have a strong belief that Mr. Youngblood actually was going to be able to get this large sum of gold and other valuables across to you?

A.    We did.

Q.    All right.  Did you discuss this with your husband?

A.    Yes.

Q.    Now, also, in terms of the investment that you got -- or, excuse me, the inheritance from your father, did Mr. Youngblood talk to you about buying a Rolex watch?

A.    Yes.

Q.    Tell the jurors a little bit about that.  And this occurred sometime in 2021, after you received the money from inheritance; is that right?

A.    Correct.

Q.    Tell the jurors a little bit about that Rolex watch.

A.   He called me up and stated that he found a rare watch, it was a Paul Newman -- I can't remember exactly what it -- Rolex watch that he wanted me to buy for $40,000 that he would put in 20 and if I put in the other 20,000, and I was like, you know, my husband's not -- oh, come on, it's a bargain.  I really want to get this for him.  So I said okay.

Q.   And how did you pay for that watch?

A.   Cash.

Q.   Did you personally give the cash to Mr. Youngblood?

A.   Yes.

Q.   And how did you get the cash?

A.   From my bank account.

Q.   You walked in and just took out 20,000?

A.   Yes.

Q.   All right.  And did you receive the watch?

A.   Yes.

Q.   There were other valuable items that Mr. Youngblood told you that he had access to; is that right?

A.   Yes.

Q.   At some point, did he talk to you about a Swiss bank account that he had access to?

A.   Yes.

Q.   Tell the jurors a little bit about that story from 2021.

A.    That was supposed to be the grandfather's, what they call the boxes.

Q.    Safety deposit box?

A.    Safe deposit box with the coins and the bonds. That's what account that was.

Q.    So that was part of what these checks, Government's 170, were supposed to help to get across --

A.    No.

Q.    No?

A.    No.

Q.    Is this something different?

A.    Yes.

Q.    Based on your interactions with Mr. Youngblood over a long period of time, did he appear to be a successful person?

A.    I thought so.

Q.    Had the trappings of wealth?

A.    Somewhat, yes.

Q.    Lived in a nice home to your knowledge?

A.    It was nice.  It was all right.  Yeah.

Q.    Had you ever been over to his home?

A.    Yes.

Q.    Did you notice that there was always a Christmas tree up in his home?

A.    Yes.

Q.   At some point, did Mr. Youngblood offer to you and your husband some collateral for the money that you had provided to him?

A.   Yes.

Q.   And what happened to that collateral if you can remember?

A.   At some point, he would give us something, then he would take it back.  That happened a few times.

Q.   Why would he take it back?

A.   He said that he had somebody interested in these items that they wanted to see and that he would bring it back to us.

Q.   And did he ever bring those items back with him?

A.   No.

Q.   Did he ever bring you money back for the sale of those items?

A.   No.

Q.   May I approach the witness again, your Honor?

     THE COURT:  You may.

Q.   (BY MR. GUESS) I'm going to show you what's been marked for identification purposes as Government's Exhibit 171.  Do you recognize that?

A.   Yes.

Q.   And what's depicted in Government's Exhibit 171, are these items that Mr. Youngblood --

A.    Yes.   That whole room.

Q.    So they were given to you by Mr. Youngblood?

A.    Yes.

Q.    Move to admit Government's Exhibit 171.

          MS. HERRING:   No objection.

          THE COURT:   So admitted.

Q.    (BY MR. GUESS) So we see here, photograph of a room filled with items, large number of items; is that right?

A.    Yes.

Q.    Do you remember where this photograph was taken?

A.    At my house.

Q.    And the items that are pictured there, until very recently, they were sitting in your house; is that right?

A.    Yes.

Q.    Did Mr. Youngblood give you all these items?

A.    He gave them to us to hold onto them.

Q.    Did he tell you that you could sell them?

A.    He stated if anything was to happen to him that we can call like the auction houses and they'll come in and they'll look at everything and give us a price for everything.

Q.    And did he estimate how much these items would be worth?

A.    He stated that the items at our house was worth $12 million.

Q.   I'm going to use a laser pointer here.  You could see this item right there.  Thank you, Ms. Mercado.  Do you see that item there?

A.   Yes.

Q.   What was that item?

A.   He stated that was the headdress of his great-grandfather Sitting Bull.

Q.   And did he tell you that he had a family connection to Sitting Bull?

A.   Yes.

Q.   Did he tell you how much that particular item was worth?

A.   He told us that if anything was to happen to him, to notify the tribe in North Dakota.  I guess -- I think it was called the Lakota tribe in North -- no, South Dakota and I could probably get about a million dollars for it.

Q.   Did you ever notify that tribe about it?

A.   No.

Q.   I'm sorry, I forgot to ask.  What street do you live on in Giddings?  Don't have to give the street address.

A.   It's County Road 118.

Q.   May I have a moment, your Honor?

        THE COURT:  Yes.

        MR. GUESS:  I'll pass the witness for cross-examination, your Honor.

CROSS-EXAMINATION

BY MS. HERRING:

Q.    Good afternoon, Ms. York.

A.    Hello.

Q.    You talked -- I believe, the first money you talked about giving Mr. Youngblood was back in -- you said $20,000 cash, 2016.  Does that sound right?

A.    That's not the first time we gave him money.  We gave him an item in 2013.

Q.    You gave him a physical item?

A.    A physical item.

Q.    And then, in 2016, you gave him $20,000?

A.    Yes.

Q.    Cash?

A.    Yes.

Q.    You talked about another $20,000 cash and then, another $26,000 cash?

A.    Yes.

Q.    Is that right?  Looks like a few more cash -- more cash you gave him later in 2016?

A.    There was more cash.

Q.    And then, moving forward to 2021, which I think is where you went, you said you gave a cashier's check that's what we saw on the screen, right?

A.    Yes.

Q.    2021, that was to open the -- some bank account?

A.    Yes.

Q.    And then, there was another cashier's check, as well?

A.    Yes.

Q.    You said all of the money, you understood it was supposed to be for investments, right?

A.    It was to open bank accounts.  That's what he told us to pay the banker to open bank accounts.

Q.    To get valuable something deposited so that you would get an investment return?

A.    Yes.

Q.    In your mind, all of this money that you've given to Mr. Youngblood over time, was this supposed to result in a return on investment?

A.    Yes.

Q.    From the very beginning when you first gave Mr. Youngblood money up through when you moved to Texas and continued to do so, you have never wired him any money, right?

A.    No.

Q.    It's been cash and cashier's checks and physical objects with value.

A.    Correct.

Q.    He's never asked you to wire him money?

A.    No.

Q.    No further questions.

MR. GUESS:  No further questions.  May this witness be excused, your Honor?

THE COURT:  Any objection?

MS. HERRING:  No objection.

THE COURT:  Thank you, ma'am.  You're free to go.

Your next witness?

MR. GUESS:  Government would call Jason York.

THE COURT:  Good afternoon, sir.  Before you take a seat, could you raise your right hand to be sworn, please?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

JASON YORK, called by the Government, duly sworn.

## DIRECT EXAMINATION

BY MR. GUESS:

Q.    Good afternoon, Mr. York.  Thank you for your patience today and yesterday.  Introduce yourself to the ladies and gentlemen of the jury and spell your last name for the court reporter.

A.    My name is Jason York, Y-O-R-K.

Q.    And, Mr. York, do you live here in Giddings, Texas?

A.    I do.

Q.    What street address -- or what is the street name that you live on?

A.    I live off of County Road 118.

Q.    And obviously, you passed your wife as she was walking up.  You're married to Roseana for how long now?

A.    Oh, we've been married -- see, you're going to get me in trouble -- 16.  Sixteen years.

Q.    You two met in California; is that right?

A.    Yes.

Q.    And met as part of the corrections system; is that right?

A.    Yes, sir.

Q.    But in the good way.

A.    In a good way.

Q.    All right.  Tell me a little bit about your career with the California Department of Corrections.

A.    I started corrections.  My first institution was Donovan, California, which is down towards the border.  And then, I transferred to Ironwood, which is in Blythe, California.  It's a level 3.  At that institution, that's where I got involved in gang units and different things like that.  Then I transferred to Chino Norco, which is a

rehab facility. And then, on to Patton, which is the criminal -- hospital for the criminally insane. That's where I met my wife.

Q. We've already covered that area. As a corrections officer, you're considered a law enforcement officer; is that right?

A. Yes, sir. We're a sworn peace officer.

Q. Having a lot of training then in terms of law enforcement?

A. Yes, sir.

Q. All right. When did you leave your job with the California Department of Corrections?

A. 2010.

Q. Why did you leave that job?

A. I was medically retired. I was involved in a riot and I was injured.

Q. You were a young man at that point?

A. I was.

Q. Did you look for other employment after you left that job?

A. I did actually start my own business working with a friend, doing events for cage fighting.

Q. Interesting careers, Mr. York. At some point in California, did you meet Mr. Youngblood?

A. I did.

Q.   And how did you know him or how was he introduced to you?

A.   I met him through another friend that I had sold insurance with on the side and he called me and said that they needed somebody that had a truck, and apparently, I was the only guy he knew that had a truck and they needed to move some stuff.  So I showed up and that's when I met Mr. Youngblood.

Q.   What year was that, if you could recall?

A.   2012.

Q.   And do you see Mr. Youngblood in the courtroom with us today?

A.   I do.

Q.   I want you to point him out and describe an article of clothing that he's wearing.

A.   He's wearing a blue sweater.

Q.   May the record reflect the witness has identified Mr. Youngblood in open court?

        THE COURT:   Record will so reflect.

Q.   (BY MR. GUESS) So they asked you for the truck.  What was the purpose for the truck?  Did you find out?

A.   Yeah.  Mr. Youngblood, I guess, dealt in at the time -- I didn't know but dealt in antiques and things like that and there was a individual selling a bunch of stuff out of a garage and he was purchasing a whole a lot of it,

so they needed to move it.

Q.   Was that something that you got interested in?

A.   I do.  I'm kind of a history buff and I enjoy old things like that so I did pique the curiosity, yes.

Q.   Did you develop a little bit of a friendship with Mr. Youngblood based on that mutual shared interest?

A.   I did.  I wanted to learn what he knew.

Q.   And did he start asking you questions or asking you to help him out on different things?

A.   Yes.

Q.   Describe the type of things that you were doing with Mr. Youngblood at that point.

A.   I did security for him.  He was also a gambler.  So I would go to casinos with him and watch his back.  And then, when he'd leave the casinos, I'd tail him for a while, make sure that nobody was following him.

Q.   Did Mr. Youngblood have a serious part in terms of his fear for his own safety?  Or why were you doing the security for him?

A.   He said there were people following him and he would win money and people would follow him through the casinos and things like that.

Q.   Did that make sense to you?

A.   Yeah.

Q.   How many times did you do security for Mr.

Youngblood, if you could recall?

A.   At least five.

Q.   And were you paid for these security measures that you were taking?

A.   I was paid for most of them.

Q.   And was it for Mr. Youngblood or for somebody else?

A.   No.  It was through somebody else.

Q.   At some point during your early relationship with Mr. Youngblood, did you meet an individual known as Dr. Hanfu Lee?

A.   I did.

Q.   All right.  Could we have the court chart up on the -- there it is.  Mr. York, could you see the screen in front of you there?

A.   Yes, sir.

Q.   Underneath Mr. Youngblood, there's a pic of you, your wife and Dr. Lee.  Is that the person you knew from Mr. Youngblood?

A.   Yes, sir.

Q.   Okay.  That's good.  So how did you meet Dr. Lee with Mr. Youngblood?

A.   I was told that Dr. Lee and Mr. Youngblood had a business association with Mr. Lee would fund his gambling and then, they would split the profits.

Q.   All right.  And did that come from Dr. Lee or from

Mr. Youngblood?

A.   Mr. Youngblood.

Q.   Did you make visits to Dr. Lee's office to pick up cash or whatever?

A.   We did.

Q.   All right.  And at some point, did you overhear a heated discussion between the two of them?

A.   I did.

Q.   The casinos that you went to, were they primarily in -- local in terms of around the California area?

A.   Yeah, Indian casinos and then, we also went to Vegas.

Q.   So you accompanied Mr. Youngblood to Vegas?

A.   Yes.

Q.   Tell me what it was like to go to Vegas with Mr. Youngblood.

A.   Like nothing I've ever experienced.  He had a huge following.  Everybody knew him from the valet all the way to the front desk, people would just really say welcome back, Mr. Youngblood, welcome back, how are you today.  And I do remember one time, we ordered a cab from the Wynn Hotel and a Rolls Royce pulled up to give us a lift.

Q.   You're still impressed to this day, aren't you?

A.   I've never experienced anything like that before.  So...

Q.   Based on this trip to Vegas and going to these

casinos, what was your impression of Mr. Youngblood?

A.   He knew exactly what he was doing.  I knew -- he seemed to be extremely knowledgeable in all the facts so I found him very trustworthy.

Q.   In 2016, you decide to move to Texas?

A.   Yes.

Q.   When you came to Texas, had Mr. Youngblood already relocated?

A.   Yes.

Q.   Let me take it a step back.  Mr. Youngblood, did he have a wife?

A.   Yes.

Q.   And who is his wife?

A.   Gloria.  Gloria Yi.

Q.   And how did you meet her, in California?

A.   I did.

Q.   Mr. Youngblood introduced her and so forth?

A.   Yes.

Q.   How about children?  Does he have children?

A.   He has two children.

Q.   What are their names if you can recall?

A.   Even and Kota.

Q.   Did you meet them when they were pretty small in California?

A.   I did.

Q.   Did you and Roseana spend time with the family?

A.   Yes.

Q.   What would you do with the Youngblood family as a group?

A.   We went to Disney, Disneyland.  We also went to Vegas one time with them.

Q.   So they became good friends?

A.   Yeah.

Q.   Now, you said that you'd had the shared interest in antiques and old items.  Were you and Mr. Youngblood engaged in a business in California at this time?

A.   Not at this time, no.  We had talked about it.

Q.   But you never got involved in the business at that time?

A.   No.

Q.   So you come to Texas in 2016 and do you run into Mr. Youngblood when you come here to Giddings?

A.   We both knew that we were coming.  Originally, I had come out from California with Mr. Youngblood to his house in Manor.  He had told us that there were some squatters there and he wanted some people to come out and help him get them out, but there wasn't any when we got here.  He knew that my wife and I would move into Giddings.

Q.   So to some extent, I don't know if this is the right term, but Mr. Youngblood was -- based on your law

enforcement experience, you're a big man, maybe could use you for muscle at times?

A.   Yeah.   That's what -- at that time, yes.

Q.   All right.   So we've been over a little bit of this, but at some point in 2016, does Mr. Youngblood ask you and Roseana to borrow money for himself?

A.   Yes.

Q.   And one of the reasons was for some protection; is that correct?

A.   Yes.

Q.   Do you remember what Mr. Youngblood told you about why he needed to borrow that money in August of 2016?

A.   He had problems with the cartels that he needed payment for.  I tried to keep myself out of that.  My wife was more involved on the money side.  I would get very frustrated about it.

Q.   Were you giving or was your wife giving him large amounts of money?

A.   Yes.

Q.   Money that was needed by you and your wife.

A.   Yeah.  Money we borrowed from other people, money we borrowed from banks in order to help him.  I sold my Jeep to give him money.

Q.   How much did you sell your Jeep for, do you remember?

A.   I believe it was $16,000.

Q.   And this money was primarily to protect him and his family from the cartels?

A.   Yes.

Q.   What kind of cartels were looking at Mr. Youngblood?

A.   He said the Sinaloa cartel.

Q.   So you're familiar with the Sinaloa cartel from your time in California?

A.   More so with the Mexican mafia, but yes.

Q.   And obviously, a very violent group?

A.   Very much so.

Q.   You had no reason to doubt Mr. Youngblood at that point, though, did you?

A.   No.  We had a friendship.  He was at that time former military.  We had brotherhood.  We had formulated a relationship, I had thought.

Q.   You said you're former military.  What branch did you serve in?

A.   I was in the Navy.

Q.   And you said that you and Mr. Youngblood talked about your shared service.  Where did he serve?

A.   He said he served in Langley.  He started out as a Marine, then he was recruited by the Army, went to the 82nd Airborne; then from there, he went to Delta.

Q.   Did you believe him?

A.   I did.  He knew everything.  He was very

knowledgeable of the military and different things and inner workings and things that most people that never served wouldn't know.

Q.   And as a former military man yourself, it all rang true?

A.   Yeah.  I mean, once you're in the military, there was always that brotherhood.

Q.   I want to approach witness for a moment.

THE COURT:  Yes.

Q.   (BY MR. GUESS) Mr. York, I'm going to hand you a few photographs here.  I'm going to ask you just to -- without telling us exactly what they are just ask, do you recognize what's contained in Government's Exhibit 166?

A.   Yes.

Q.   And is that something that was relevant to your relationship with Mr. Youngblood?

A.   Yes.  That was in my possession.

Q.   All right.  Government's Exhibit 167, do you recognize that photograph?

A.   Yes.

Q.   And again, something that's familiar to you from your association with Mr. Youngblood?

A.   Yes.

Q.   Government No. 168, do you recognize that?

A.   Yes.

Q. And again, association with Mr. Youngblood?

A. Yes.

Q. Government's Exhibit 169, do you recognize those?

A. Yes.

Q. Again, association with Mr. Youngblood?

A. Yes.

Q. At this time, your Honor, we'd move to admit Government's Exhibits 166, 167, 68, 69.

MS. HERRING: No objection.

THE COURT: So admitted.

Q. (BY MR. GUESS) So we're talking about his military service. At some point when you're moving some stuff from Mr. Youngblood, does something come into your view that convinces you this is really the truth?

A. Yes.

Q. Let's have Government's Exhibit 167 on the screen. And, Mr. York, do you recognize what this is?

A. I do.

Q. And what is it?

A. Those are his dog tags.

Q. This is a picture of his dog tags, though; is that right?

A. Correct.

Q. Did you actually see the real dog tags?

A. I did.

Q.   And were you the one that took this picture?

A.   I did.

Q.   Why did you take the picture of Mr. Youngblood's dog tags?

A.   I needed proof.  So much money had gone out of our accounts that my wife and I were really questioning everything.

Q.   Did you talk to Mr. Youngblood about these dog tags at all?

A.   No.

Q.   Kept that a secret?

A.   Yes.

Q.   Let's take a look at Government's Exhibit No. 166. Describe for the jurors what they're looking at in Government's Exhibit No. 166.

A.   This was a gold coin that was given to me to hold by Mr. Youngblood.  He had told me that it was a old, old coin worth a lot of money.

Q.   Did he state specifically how much money?

A.   Millions.

Q.   Did he say he had access to this coin whenever he needed it?

A.   I had it in my possession.

Q.   You had it in your possession?

A.   Yes.

Q.   Do you still have it in your possession to this day?

A.   No.  He came and took it back.  Said he had a wealthy friend that was having a party and wanted to display it and show it off and that it never came back.

Q.   And when was that if you can recall?

A.   I would be guessing, sir.  I'm sorry.

Q.   No problem.  One of the other items that he provided to you, I'm going to -- do you recognize that item?

A.   Yes, sir.

Q.   What is that?

A.   That was a -- he gave that to me.  He said that that was Sitting Bull's.

Q.   And that's Government's Exhibit No. 10; is that correct?

A.   Yes.

Q.   Move for admission of Government's Exhibit 10.

         MS. HERRING:  No objection.

         THE COURT:  So admitted.

Q.   (BY MR. GUESS) This is the piece that Sitting Bull owned?

A.   That's what he said.  It was his because he had told me that he was Native American and he had history, heritage, so this was part of his heritage.

Q.   All right.  Could we display that to the jurors, your Honor?

THE COURT:  Yes.

Q.   (BY MR. GUESS) Now, until very recently, that was in your possession, right?

A.   Yes.

Q.   Who did you give it to eventually?

A.   I gave it to the FBI agents that came to the house.

Q.   And that would be Agent Noble and Agent Wilkinson?

A.   Yes.

Q.   And you've had opportunities to discuss this case with them on several occasions; is that right?

A.   Yes.

Q.   Could we have Government's Exhibit 169 on the screen, please?  Obviously, on 169, we see the Sitting Bull item on the left-hand side.  On the right-hand side, what are we looking at there, Mr. York?

A.   That was a flag he says is incredibly valuable and it was going to be given to us to hold for our financial that we paid to hold onto.

Q.   So there was often collateral at different times to --

A.   Lots of collateral.

Q.   Lots of collateral.  Okay.  This flag, in particular, do you remember what he said it was worth or what its background was?

A.   He said it was millions.  It's like one of a kind.

Obviously, the flag, the stars, you can see it's older, but to be honest with you, that's the first time I've ever really laid eyes on it.

Q.   That's the same flag, you think?

A.   Well, that's -- it looks like the same exact flag.

Q.   Did you ever possess that flag?

A.   I did not.

Q.   And obviously, sitting in the back of the courtroom there, that's not something that was ever in your house or your possession.

A.   No, sir.

Q.   Did he talk to you about valuable paintings?

A.   All kinds.  I had supposedly bunches at the house that I brought to the FBI.  They all said they're not worth anything.

Q.   That was contained -- bring up Government's Exhibit 171, which has already been admitted.  And you recognize that room from your home?

A.   Yes.

Q.   Could we blow up the middle portion right there?  We see in front of the table a painting, we see some type of iconograph on the back.  We see lots of porcelain.  Did all this come from Mr. Youngblood?

A.   Yes.

Q.   And did he tell you that it was all exceptionally

valuable?

A.   Yes.

Q.   And why was he letting you hold onto it, Mr. York?

A.   He told me that we could hold onto it because if something had happened to him, we could sell this and that would be our repayment.

Q.   What was he telling you that he was worried about if something happened?  What did he mean by that?

A.   He was always talking about working with the cartels or the Russian mob, or there was always somebody after him.

Q.   When he would give you these items, would some of them be wrapped up very tightly with plastic bubble wrap?

A.   Basically all and he would say don't open these, don't unwrap it.

Q.   Why?

A.   My own personal opinion, because I would find out that they weren't worth anything.

Q.   What was he telling you why you couldn't unwrap them?

A.   Because they're precious, they're worth a lot of money, you don't want to mess it up.

Q.   At some point in your relationship, did Mr. Youngblood -- and what was his first name that he used around you?

A.   Jadenne.

Q.   Jadenne.  Did he ask you to meet with someone named Lane?

A.   Yes.

Q.   Did you know who Lane was?

A.   No.

Q.   And did Mr. Youngblood explain to you what was -- why you needed to meet with this Lane?

A.   Yes.

Q.   What did he tell you?

A.   He told me that he had -- Lane is a computer guy and he had taken bitcoin from the drug cartels and the drug cartels were after him, and he wanted me to express to Lane how dangerous the cartels were to him and his family.

Q.   Was this something that you had some knowledge about based on your prior career as a corrections officer?

A.   Yeah, I know exactly what they're capable of.

Q.   So did you agree to this meeting that Mr. Youngblood had set up?

A.   I did.

Q.   Where did you meet Lane?

A.   We had met at a restaurant.

Q.   And who was there?

A.   My wife and I, Lane, Jadenne and Lane's wife and little baby.

Q.   How old was the baby if you can remember?

A.    A small -- in a stroller still.

Q.    Tell me what happened at that Salt Grass.

A.    We sat down and I explained to him the dangers that he was putting his family in and more so his wife and his little baby, and I couldn't understand how somebody would be so stupid of playing with the cartels in that aspect.

Q.    Lane, did he introduce himself by his last name or not?

A.    No.

Q.    What was this man's reaction to your --

A.    He said he understood.  He knew.  His wife said the same thing.  So it gave credence to the whole thing that he really did.  I assumed that he really did.

Q.    Was that the only time that you would have met with this person?

A.    Yes.

Q.    Some other people that Mr. Youngblood introduced you to or hung out with.  There was a man named Clark Snyder?

A.    Yes.

Q.    What did you know him as?

A.    Igor.

Q.    And what, according to Mr. Youngblood, was Clark Snyder's line of business?

A.    He worked with the cartel -- with the Russian mob. One of his relatives is high up in the Russian mob and

like when Jadenne and I and my wife would go to restaurants, he would show up and he'd bring like a satchel and give it to Jadenne and Jadenne said that's the books for the Russian mob.

Q.   Was Mr. Snyder a big man?

A.   Yeah, he's a big man.

Q.   Scary-looking almost?

A.   He could be, yes.

Q.   All right.  There was a person named Demarcus that he talked about.  Who was Demarcus?

A.   Demarcus was his computer guy.  He was a computer whiz that would, you know, fix things internet-wise or online, or anything like that.

Q.   Did Mr. Youngblood tell you or imply that he was working as a government agent?

A.   No.  He said he worked with -- he taught, where was it, with -- I want to say it was ExxonMobil because he was a -- what is it called with the rocks and stuff like that, gems and --

Q.   Geology?

A.   Thank you.  Geology.  He was in that.  So never did he tell me he worked for the...

Q.   Did he ever talk about his parents?

A.   Yes.

Q.   What did he tell you about his parents?

A.    He said his father was a CIA and his mother and him, they got killed and his -- that's his parents.  He said that the man that took over was his father's best friend or good friend, or something.

Q.    Do you remember that person's name?

A.    No.

Q.    Pardon me?

A.    No, I don't remember his name.

Q.    Did he have a cartel contact that he told you about?

A.    Yes.

Q.    What was the name of that cartel contact?

A.    Elvis.

Q.    So all of this is taking place in terms of meeting with Lane, 2022 maybe, 2023, do you remember?

A.    Uh-huh.

Q.    All right.  So fairly recently, right?

A.    Yes.

Q.    Government's Exhibit 168, I meant to ask you about that.  Could we have that on the screen, please?  Do you recognize that?

A.    I do.

Q.    What is it?

A.    That is my Rolex watch.

Q.    And who owned it before you?

A.    I have no idea.

Q.   Who supposedly owned it before you?

A.   Paul Newman.

Q.   And where did you obtain this watch?

A.   Well, Jadenne came to my wife and for my birthday, they decided that they were going to buy this together, so my wife gave him $20,000 for our part.

Q.   And did you receive the watch?

A.   I did.

Q.   Do you still have that watch?

A.   I don't.

Q.   What happened to the watch?

A.   He took it to get fixed and it never came back.

Q.   Did he explain to you when it was going to come back?

A.   Well, every time, the individual that was fixing it was out of the country or there was something going on, he wasn't able to get it.  It was supposedly a guy in Dallas.

Q.   In July of 2023, did you receive a telephone call from Mr. Youngblood?

A.   Yes.

Q.   Let me ask you, did you have Mr. Youngblood's telephone number saved in your phone?

A.   No.  Which is -- I know people think that that -- he never like had anybody call him or at least us.  We'd have to send him e-mail and say, hey, call and then, he would call us.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Q.   When the call would come in, would it be from an unknown number, a blocked number?

A.   It would always be private.

Q.   Private.  Did he carry a cellphone with him when you would be with him?

A.   Sometimes when we'd go to the restaurants, he'd have a phone with him, but he'd always say that it was ultra protected and, you know.  So...

Q.   But never gave you the number to call him?

A.   No.

Q.   So you get this call in July, correct?

A.   Uh-huh.

Q.   And what did Mr. Youngblood ask of you at that time?

A.   He always asked for money.

Q.   Was there a time when he asked you to come to his home because agents had come there?

A.   Yeah.  So first, we met for -- was supposed to meet for lunch.  He didn't say anything about the FBI raiding his house at that time.  We went and we ended up not eating because he had said that they raided his house and he asked me if I would be, you know, willing to come and take a look at the paperwork that the FBI left because he said there were things left off it that they took.  So I obliged.  I said yeah, sure.

Q.   And you went to his home, right?

A.   Yeah, my wife and I both.

Q.   Who else was there besides Mr. Youngblood?

A.   Gloria.

Q.   And did you see the search warrant?

A.   I did.

Q.   And did you take a look at it?

A.   I did.

Q.   And what did you think about it?

A.   Everything looked up and up.

Q.   Did you tell that to Mr. Youngblood?

A.   I did and he said that there were gold coins that were missing and things like that.  I told him, well, you could always file a grievance if that's, you know, what he wanted to do.

Q.   So you looked at the paperwork, told him everything looked on the up and up?

A.   Yep.

Q.   Was that the end of your day with Mr. Youngblood?

A.   No.

Q.   What happened after that?

A.   He told me that one of his friends' house had gotten raided also and would I be interested and willing to go and look at his paperwork.

Q.   What did you tell him?

A.   I told him sure.

Q.   Did he tell you who the friend was?

A.   No.

Q.   And you're with your wife?

A.   Yeah.

Q.   So how are you going to get over to your friend's house?

A.   I had my wife -- I said, honey, you go home, I'll ride with Jay and that -- that's what I called him sometimes, Jay -- and I'll ride with him and then, I'll get a ride home later on.

Q.   And let me ask you, at this point, Mr. York, are you carrying a firearm?

A.   I am.

Q.   Is that usual for you?

A.   Yes.

Q.   Does Mr. Youngblood know that you're carrying a firearm?

A.   Yes.

Q.   So you get in the car with Mr. Youngblood.

A.   Uh-huh.

Q.   And what happens next?

A.   We pick up Igor at a -- it was like an aquarium.  He met us in a parking lot so he got in the car and we drove over to this individual's house.

Q.   The house that you went to, had you been there

before?

A.    No.

Q.    And when you got there, what did you do?

A.    Jadenne told me, go up and knock on the door.  So I got out of the car, started walking up there.

Q.    What happened?

A.    The agents stopped me.  They came up in their vehicles and asked me what I was doing.

Q.    One of those was Agent Noble right there?

A.    Yes.

Q.    Now, he was moving a little bit better back in July; is that right?

A.    Yeah, he was.

Q.    When he approached you, did he have his badge out?

A.    He told me exactly who he was.

Q.    And what happened?

A.    He brought me over to his car and questioned me what I was doing there.  I explained to him that I was coming over to take a look at paperwork and he asked me if I knew what was going on.  Told him I don't have any clue what's going on.  I don't know this individual.  And then, he told me that the guy I'm hanging out with is not a good guy.

Q.    Stop you there.  The person who was residing in that home, did he ever come out to meet you?

A.    Yes, he came out.  He didn't meet me, though.  Mr. Noble told him to go back into the house.

Q.    Did you recognize who that person was?

A.    No.

Q.    Never seen him before in your life?

A.    No.

Q.    Did you ever look at the paperwork?

A.    No.  I never made it into the house.

Q.    So did you go back to the car at some point?

A.    I did.

Q.    And was Mr. Youngblood upset?  Was he calm?  What was his reaction?

A.    He was extremely upset.

Q.    When he got upset, what was he doing?

A.    He was in the car questioning us what we said.

Q.    Did you go up to the house by yourself or did Igor go with you?

A.    No.  I was going by myself.  Igor was walking behind -- walking behind.  He was trailing behind me.

Q.    Okay.  So two people were approaching the house, though?

A.    Yes.

Q.    All right.  So you get back in the car, he's angry and what's he talking about inside the car with you?

A.    He asked me what did I say.  I told him.  I told him

what I was doing here.  And then, Igor got in the car and Igor said something to Jadenne but I didn't hear it and Jadenne got really upset, and then, he said, all right, we gotta go.  So we left.

Q.   And where did you go after that?

A.   Well, I got out.

Q.   Tell me what happened.

A.   Well, I guess I finally woke up at that time and I was thinking about what he had said and all the things in the past and all the stuff that spun in my head and I just -- I told him, I said you're toxic, I can't, let me out. So he let me out at McDonald's and I called my wife to come pick me up.

Q.   At some point during your relationship with Mr. Youngblood while you're here in Texas, did he report that something tragic had happened to his oldest son?

A.   Yes.

Q.   What did he tell you happened to his oldest son?

A.   He said his son was killed by the cartels.

Q.   And was this one of those occasions where he asked you for cash?

A.   Yes.

Q.   Did you provide him that cash?

A.   Yes.

Q.   No further questions, your Honor.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

THE COURT: All right. We do have less than 10 minutes of questioning.

MS. HERRING: Just I'll be very brief.

THE COURT: All right.

CROSS-EXAMINATION

BY MS. HERRING:

Q. Mr. York, I think you said that your wife is the one who handled any financial transactions with Mr. Youngblood?

A. Most of them, yes.

Q. You mentioned selling your Jeep at one point?

A. Yes.

Q. Do you recall if when you sold your Jeep, you gave Mr. Youngblood cash?

A. We always gave him -- I can't say we always gave him cash because she gave him cashier's check.

Q. To the best of your recollection, you always gave him cash or cashier's checks?

A. Yes.

Q. He never asked you to wire him any money?

A. Not that I recall.

Q. No further questions.

THE COURT: Anything further?

MR. GUESS: May the witness be excused?

THE COURT: Any objection?

MS. HERRING:  No objection.

THE COURT:  Thank you, sir.  You're free to go.

THE WITNESS:  Thank you, sir.

THE COURT:  Ladies and gentlemen of the jury, we've reached another end of another day of testimony. I'm now going to release you for the day.  If you will recall my previous instructions, please do not talk to anyone, including each other, about this case.  Do not communicate with anyone by any means about this case.  And do not engage in any independent investigation of any person, place, thing, or law involved in the case.  And with that, we will see you and pick this up tomorrow morning at 8:30.

(Jury not present.)

THE COURT:  All right.  Anything we need to take up before we break for the day?

MR. GUESS:  No, your Honor.

MR. HERRING:  Yes, just briefly.  We had moved to admit just the two pages of deposition that were presented as inconsistent statements and the Court reserved ruling on that.

THE COURT:  What's the government's position?

MR. GUESS:  I don't believe that they're admissible in terms of inconsistent statements.  They're useful for impeachment purposes, but I would object to

them actually being entered into this.

MS. HERRING: And I believe under -- there's a special exception to hearsay under 801(d)(1)(A), prior inconsistent statements that were made under oath in a deposition are -- have full substantive admissibility. So that's the ground specifically that we're --

MR. GUESS: We'll ask for the optional completeness rule so that the entire deposition be put in.

THE COURT: Any objection to that?

MS. HERRING: At this time, we would just ask for those excerpts, your Honor. We can review it ourself, but my co-counsel and I haven't discussed having a full deposition go in.

THE COURT: Okay. I'll admit the deposition in its entirety and pursuant to the government's request. And we will be adjourned for the day.

MS. HERRING: Thank you, your Honor.

THE COURT: We'll take a five-minute break before our 4:00 hearing.

(Proceedings adjourned.)

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

* * * * * *


UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS      )


   I, LILY I. REZNIK, Certified Realtime Reporter,

Registered Merit Reporter, in my capacity as Official

Court Reporter of the United States District Court,

Western District of Texas, do certify that the foregoing

is a correct transcript from the record of proceedings in

the above-entitled matter.

   I certify that the transcript fees and format comply

with those prescribed by the Court and Judicial Conference

of the United States.

   WITNESS MY OFFICIAL HAND this the 8th day of March,

2025.


                                   *Lily Iva Reznik*

                                   ~~~~~~~~~~~~~~~~~~~~~~~~~
                                   *LILY I. REZNIK, CRR, RMR*
                                   *Official Court Reporter*
                                   *United States District Court*
                                   *Austin Division*
                                   *501 West 5th Street,*
                                   *Suite 4153*
                                   *Austin, Texas 78701*
                                   *(512)391-8792*
                                   *SOT Certification No. 4481*
                                   *Expires:  1-31-27*