UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA ) Docket No. A 23-CR-135(1) RP
                         )
vs.                      ) Austin, Texas
                         )
SAINT JOVITE YOUNGBLOOD  ) April 18, 2024


TRANSCRIPT OF TRIAL ON THE MERITS
BEFORE THE HONORABLE ROBERT L. PITMAN
Volume 4 of 7


APPEARANCES:

For the United States:   Mr. Dan Guess
                         Mr. Matt Harding
                         Assistant U.S. Attorneys
                         903 San Jacinto Boulevard,
                         Suite 334
                         Austin, Texas 78701



For the Defendant:       Mr. Jose I. Gonzalez-Falla
                         Ms. Charlotte A. Herring
                         Assistant Federal Public Defenders
                         Lavaca Plaza
                         504 Lavaca Street, Suite 960
                         Austin, Texas 78701

Court Reporter:          Ms. Lily Iva Reznik, CRR, RMR
                         501 West 5th Street, Suite 4153
                         Austin, Texas 78701
                         (512)391-8792

Proceedings reported by computerized stenography,
transcript produced by computer-aided transcription.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Hanfu Lee | 7 | 64 | 84 | |
| Matthew Vasquez | 86 | 106 | | |
| Luke McEwin | 108 | | | |
| Brian Oberon | 117 | 126 | | |
| Lane Holloway | 129 | 235 | | |
| Gary L. Snider | 277 | | | |

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| #125 | 183 | 183 |
| #126 | 190 | 190 |
| #127 through 137 | 198 | 198 |
| #139 | 210 | 210 |
| #140 | 210 | 210 |
| #142 | 210 | 210 |
| #143 through 144 | 212 | 212 |
| #145 | 224 | 224 |
| #146 through 158 | 231 | 231 |
| #159 through 160 | 231 | 231 |
| #161 | 160 | 160 |
| #162 | 104 | 205 |
| #163 | 210 | 210 |
| #229 | 88 | 88 |
| #237 through 239 | 110 | 111 |
| #247 | 49 | 49 |
| #248 | 55 | 56 |
| #252 | 55 | 56 |
| #300 | 89 | 89 |
| Defendant's | | |
| #33 | 125 | 125 |

THE COURT:  Good morning.  Is there anything we need to take up before we bring the jury in?

MR. HARDING:  Nothing from government, Judge.

MS. HERRING:  When we left off yesterday, the government has admitted to move the full deposition of Eric Perardi and I did want to re-raise the issue with the Court.  Looking at the rule of completeness, something should be added or included under that rule only where it's necessary to qualify, explain, or place into context the portion already introduced.  I did want to -- the Court had not had a chance to see the deposition but it's a 167-page deposition and our concern -- we're happy to work with government on the sections that they would like included.  We're fine with the majority of it.

There is a section that discusses punishment and what Mr. Perardi believes prosecutors would seek as punishment that we believe should definitely be excluded.  And then, there's another portion that discusses the indictment, the specific charges in the case, and we would argue that that presents the jury something that is layperson opinion on legal issues that should also be redacted.

So we're happy, again, to work with government counsel on that if that's something that they feel strongly they want the full deposition in.

THE COURT: Mr. Harding, is there a more limited portion of the transcript that could accomplish your concerns with regard to completeness?

MR. HARDING: Yes, your Honor. We can work with the defense to get that done.

MS. HERRING: Thank you, your Honor.

THE COURT: I appreciate you raising that. If you have any conflicts, let me know and I'll help you out.

MS. HERRING: And we have nothing further on our end at this point.

THE COURT: Okay. Very good. We're ready for the jury. Bring the jury in.

(Jury present.)

THE COURT: Good morning, ladies and gentlemen. Thank you so much for being prompt this morning and we will pick up where we left off. And the government's next witness?

MR. HARDING: Government would call Dr. Hanfu Lee.

THE COURT: Mr. Lee, come up, please. Before you're seated, can you please raise your right hand to be sworn, please?

THE CLERK: You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing

but the truth?

THE WITNESS:  Yes.

THE COURT:  Please be seated.

MR. HARDING:  Your Honor, may we approach briefly?

THE COURT:  Yes.

(At the bench, on the record.)

MR. HARDING:  Dr. Lee's a dentist and he is concerned that he could be held liable under HIPAA if he reveals the fact that Mr. Youngblood was once his patient. I've looked into it.  I believe if you order him to answer the questions even to the extent that they might go into medical privacy, I think that covers him.  I think he's comfortable with that.  I don't really intend to go any further than just he was a patient, but Dr. Lee had that concern.

THE COURT:  And what will prompt that?  Will he be hesitant to answer a question and that will be my prompt to then?

MR. HARDING:  If could just order him, you know, understand the government's going to ask you some questions related to your dental practice.  I'm going to order that you answer those questions to the best of your ability.  Something along those lines if that's acceptable.

THE COURT:  Just to give context to the jury so they don't think this is in response to his reluctance to answer that --

(Crosstalk.)

MR. HARDING:  Maybe then I will prompt him and say you're concerned about --

THE COURT:  That will be better.

MR. HARDING:  All right.

HANFU LEE, called by the Government, duly sworn.

### DIRECT EXAMINATION

BY MR. HARDING:

Q.   Morning, Dr. Lee.  State your full and last name and spell your last name for the court reporter.

A.   Hanfu Lee, L-E-E.

Q.   Dr. Lee, where are you from you?

A.   I am from California in -- Arcadia in California is where my practice is.

Q.   You mentioned your practice.  What do you do for a living, sir?

A.   I'm a dentist.

Q.   And how long have you been a dentist?

A.   Thirty-three years, sir.

Q.   Okay.

A.   Actually, 30.  Somewhere around 33, 30 years.

Q.   You're familiar with -- well, let me ask you, you're

still actively practicing, correct?

A.    Yes.

Q.    And you and I have had a chance to talk before today; is that right?

A.    Yes.

Q.    You and I have spoken?

A.    Yes.  Uh-huh.

Q.    And you raised a concern with me about some of your testimony regarding your relationship with a person you knew as Jadenne Youngblood?

A.    Yes, correct.

Q.    Your concern had to do with HIPAA law?

A.    Yes.

Q.    Your concern was that essentially, you could potentially be held liable if you were to reveal patient information absent a court order?

A.    Yes.

Q.    Your Honor, I'd ask that you order the witness, for his protection, to answer the questions.  I don't intend to go into any depth but just for his safety and security.

        THE COURT:  Sure.  For the record, Dr. Lee to the extent that you're hesitant to answer any questions because of federal privacy laws, I will order you now on the record to answer those questions.

        MR. HARDING:  Thank you, your Honor.

Q.   (BY MR. HARDING) All right.  Dr. Lee, tell us about your family.

A.   My wife and two grown children.

Q.   And what is your wife's name?

A.   Kriska.

Q.   Okay.  I mentioned earlier you knew of or you were acquainted with a person named Jadenne Youngblood.

A.   Yes.

Q.   Someone known to you as Jadenne Youngblood?

A.   Uh-huh.

Q.   How did you meet Mr. Youngblood?

A.   He came into my practice.

Q.   As a patient?

A.   Yes.

Q.   And you knew him as Jadenne?

A.   Yes.

Q.   Did you know that he has sort of a longer name?

A.   Yes.

Q.   What was that name?

A.   Saint Jovite Kota Jadenne Youngblood.

Q.   Do you see Mr. Youngblood here in the courtroom?

A.   Yes.

Q.   Could you please point him out and describe something he's wearing?

A.   He's wearing black as usual.

Q.   And may the record reflect that not only has the witness identified the defendant but the defendant pointed at himself during that colloquy?

THE COURT:   The record will so reflect.

Q.   (BY MR. HARDING) Did Mr. Youngblood tell you something else about a different name that was associated with him?

A.   Well, yeah.   He said that they associated the name Schuler to him in the past and that it had to do with his guardian after his parents passed away and that that's not really his name and that's -- his name is Youngblood.

Q.   Okay.   Approximately when did you first meet Mr. Youngblood, if you recall?

A.   Was it 2002 -- 2002 or 4, somewhere like that.

Q.   And this is through the practice?

A.   Yes.

Q.   Over time, you got to know Mr. Youngblood a little bit.   Is that fair to say?

A.   Yes.

Q.   Can you tell the jury a little bit about what Mr. Youngblood told you about his military past?

A.   Yeah.   He was like -- said he was in the Army Ranger Special Forces.

Q.   And you mentioned earlier, he said his parents died; is that right?

A.    Yeah.  Well, he had also this tattoo he would show here, green tattoo saying this proves that I was in the Special Forces.

Q.    If you recall, did he ever say what his father did for a living?

A.    He said he was an FBI agent.

Q.    And what did Mr. Youngblood say that he did for a living?

A.    Pardon me?

Q.    What did Mr. Youngblood say that he himself did for a living?

A.    He dealt with precious metals.  He was supposed to be an expert in precious metals and that he bought and sold that antiquities, you know, like collectibles, you know, like whether it's art or any collectibles, even like sports stuff.

Q.    You mentioned the death of his parents.  Do you recall Mr. Youngblood telling you about that?

A.    Yes.

Q.    Can you describe for the jury what Mr. Youngblood told you about the death of his parents?

A.    He said that his parents and his sister were killed in -- at their house because the people that killed them went to the wrong house.  They were supposed to kill people in another house and they went to his house, their

house mistakenly, and then, he wasn't home and they were killed.

Q.   Throughout your relationship with Mr. Youngblood, did he make a note of observing the date of his parent's alleged passing?

A.   Yeah.  He said, you know, I sent flowers to my -- the grave.  Today's the anniversary of their death.

Q.   So for a period of years, I think you said it was 2002, 2004 you first met Mr. Youngblood as a patient.  For a period of time, that's the entirety of the relationship, right?

A.   Yes.

Q.   At some point, some years later, did Mr. Youngblood first ask you for money?

A.   Yes.

Q.   Where were you when he first asked you that money?

A.   I was at a dental conference in Chicago.

Q.   Approximately when was this?

A.   December of 2009.

Q.   Okay.  How does Mr. Youngblood get in touch with you at that time?

A.   Well, my patients have access to my cellphone when they called the answering machine.  So he called me on my cellphone.

Q.   And what did he say or ask you for?

A.    He needed like $80,000 because he was helping his nephew or something that he was in trouble or needed help. He needed, I think -- I'm not sure exactly what it was whether it was protection for him or something had to do with his nephew.

Q.    It was related to his nephew's safety?

A.    Yes.

Q.    Okay.  At some time later, did he tell you sort of a larger story about the background of that?

A.    Yes.

Q.    We'll get there in one second.  Did you give him $80,000?

A.    No.  I gave him only 10,000.

Q.    Why did you only give him 10,000?

A.    Because I didn't have 80,000 to give him at that time and, also, I didn't want to give him that much and I gave him 10,000 because, you know, I got at least that much from the work I did on him.

Q.    Up to this point, you don't have a social relationship; is that correct?

A.    Correct.

Q.    Okay.  What was the story that he told you later about the threat to his nephew, in summary, please?

A.    Pardon me.

Q.    In summary.

A.   Okay.  So he had -- Mr. Youngblood had a collectible store in Crestline in the mountain region in California and he said that there was like drug dealings going on in front of his store and that this guy, which I don't think ended up being his nephew, somehow got involved with it and he needed the money for that.

Q.   And essentially you said there was sort of a drug aspect of -- drug dealing in front of his store.  Did he suggest that the police got involved at some point?

A.   Yes, because he said that the sheriff department in that area, the San Bernardino sheriff department is the one who takes care of the policing and they were crooked and that they knew about the drug deals.  When he went to complain to them about it, they didn't do anything.

Q.   And somehow that corruption in the police department led to this threat against his nephew.

A.   Yeah.  That -- correct.

Q.   So at first, you give him that $10,000.  He's just a patient.  At some point in the future, do you sort of develop a social relationship Mr. Youngblood?

A.   Yes.

Q.   And when approximately, you know, did you start having more of a social relationship versus just a doctor-patient relationship?

A.   So it was 2010 already, about 2012, yeah, two to

three years later.

Q.   And, you know, we'll start there, but you can go forward as I ask you these questions sort of spanning the whole time with Mr. Youngblood.  How would you describe Mr. Youngblood in terms of how he acted towards you and others while you were around?

A.   Well, he was very friendly.  You know, he's tried to charm people, tried to always give compliments to whether the way they dress or something like that.  So he's very good at making people feel better.

Q.   In fairness to Mr. Youngblood, he was cordial.  He was courteous?

A.   Yes.

Q.   How often as your relationship evolves are you seeing Mr. Youngblood on, say, a weekly basis?

A.   Well, the second -- this relationship started because he started asking me for more money, okay?  But he also tried to -- he was trying to be friends with me so that -- well, he used that later on to get more money.

Q.   And how often do you think?

A.   Like he would come sometimes -- later on, he would come to my office almost every day like he would sit there, you know, in my office, private office and then, he would -- you know, he would tell me I need this much money and then, he would wait for me, you know, like sometimes

in between patients on my day off and I would have to call people to borrow money.

Q.   We'll get to that.  But you're seeing him at least sort of as the relationship progresses frequently?

A.   Yes.

Q.   At some point along the way, do you develop a close friendship?

A.   Yes.

Q.   Does Mr. Youngblood say anything about how good of a friend he considers you?

A.   Yeah.  He said, oh, you're my best friend and he's always saying, well, I love you doc, like that.

Q.   Did you develop a friendship and a sort of trust and affection for him?

A.   Yeah.  I developed a friendship with him.

Q.   Was there a particular phrase that Mr. Youngblood would use with you about not disappointing you that he used often?

A.   Yeah.  He said, I'm not going to disappoint you, doc, because after I give him the money and then, he would say, oh, you know, I'm going to give it back to you and I'm not going to disappoint you.

Q.   If we can pull up Exhibit 243, which has been pre-admitted, please.  Can you read that, what's on 243 to the jury, please, Dr. Lee?

A.   Thank you.  I will not let you down.  Jadenne.

Q.   Is that a note that Mr. Youngblood gave to you?

A.   Yes.

Q.   Was this an example of this sort of thing you're talking about in terms of saying he wouldn't let you down?

A.   Yes.  Uh-huh.

Q.   In addition to sort of saying you were his friend, did he ever give you or your wife or your family gifts?

A.   Yes.

Q.   Could you give some examples to the jury about gifts that he gave to you during this period of time?

A.   He gave like iPad, BlackBerry phones.  He gave my wife, you know, like a ring he got from one of his deals, a gold ring with some small diamonds on it.  He gave a cross, a gold cross with some jewelry on it that he said was either blessed by the Pope or belonged to a particular Pope in the past.  And he gave -- I can't remember.

Q.   That's fine.

A.   -- other things, yeah.

Q.   Let's talk about that cross since you just brought it up.  Do you still have that cross?

A.   No.

Q.   What happened with that?

A.   Well, we gave it -- we had -- well, it was like an important cross for Catholic and we're not Catholic, we're

protestant, but that's not the main point.  The main point is we would rather have the money than the cross, you know, because it was supposed to be worth over a hundred thousand or whatever it was and we wanted the money instead of the cross.

Q.   You believed earlier throughout this time in addition to sort of having a friendship with you he's asking you for money?

A.   Yes.

Q.   Did you want the money back?  Essentially like you said, you don't want the cross, you'd rather have money?

A.   Yeah.

Q.   Was that an attempt for you recoup some of your losses?

A.   Yes.  So we gave it back to him to sell so he can get us some money, but we never received the money back.

Q.   Did you ever get the cross back?

A.   No.

Q.   Did Mr. Youngblood and you -- ever take you to Las Vegas?

A.   Well, he didn't take us to Las Vegas.  We went there on our own and one time, he met us there.  I think one time at the Wynn, he arranged rooms for us and also twice with -- one at Aria and one or two times, Bellagio.

Q.   I want to ask you now about your knowledge of Mr.

Youngblood's gambling activities at that time or during that period of time. Did Mr. Youngblood ever tell you he was a professional gambler?

A.   No.

Q.   What did he tell you about his gambling?

A.   He said he didn't like -- he said he was good at playing poker but he didn't like doing it. And that the times he told me he played is like one time when he needed money, he borrowed like $500 from me, or something like that, and he said he was going to go to the local casino and because he needed money, he said he can get it through the poker game. And he ended up, you know, giving me back, you know, like $200 or more than what I gave him. I think that's it. And he knew of a group with supposedly celebrities there that he could play with. But he said he didn't like gambling and that I never thought of him as a -- like a consistent gambler. I never knew that he was, you know, certainly not a professional gambler.

Q.   We went through some of what he asked you money for, but did he ever ask you substantial amounts of money to stake him in gambling?

A.   No.

Q.   Did he ever say, hey, we're partners, we're going to be 50-50 partners, could you give me money and we'll share whatever I win?

A.   No.  Not in gambling.  It's only in his supposed investments.

Q.   Did you ever come to know Mr. Youngblood's children?

A.   Yes.

Q.   What were the circumstances of that?

A.   Well, he brought them to the office for me to meet them and I met them at his house.  We went to -- he invited me to his son's birthday party at the, you know, at the mall.  And so, we met them, you know, my wife and I met both of them.

Q.   As time went on, did Mr. Youngblood reference his children when asking you for money?

A.   Well, yes.  He said, you know, I'm not doing all this, you know, for me.  I'm doing it for my kids, he said, and to get you back the money.  So that's his motivation with doing all these deals that he's supposed to do to get back the money for me and for his children.

Q.   If we could pull up Exhibit 244, please, which has been pre-admitted.  If we'd zoom at top there, please.  Could you read that to the jury, Dr. Lee?

A.   Doc, thank you for everything you have done for our family.  Thank you.  Even and Kota.  We love you, Even and Kota.  Those are his two kids.

Q.   Is that again an example of some time -- some of things that Mr. Youngblood would bring you from his

children?

A.   Yeah.  And then, he would give me like his younger son Kota made something in school and he gave it to me saying, you know, see how they care about you and this is like example of it.  Or like a stuffed animal from the kids or something like that.

Q.   So I think you said it was about March of 2012, the next time Mr. Youngblood asked you for money, going back to sort of our chronology.  I don't want to go into any details about that, but is it fair to say that he asked you for money for sort of attorneys' fees?

A.   Yes.

Q.   And throughout your relationship with him from 2012 to 2017, was a fair amount of the money that you give him related to attorneys' fees of some sort or legal fees of some sort?

A.   Initially, the vastly --

Q.   We don't need the details of that.  Just yes?

A.   Yes.  Uh-huh.

Q.   I want to ask you kind of about how Mr. Youngblood asked you for money.  Would he give you a lot of time to think about your decisions or was there a sense of urgency?

A.   It's always urgent.  That's why he needed cash.  He couldn't even wait for the cash to be deposited in his

account and available the next day.  He always needed it that day and, you know, if I delayed it the next, he -- you know, maybe by the next day.  But he always -- it was always urgent.

Q.    Would he tell you things about what would happen if he didn't get the money on time?

A.    Well, he would make up stories about, you know, that it's, you know, it's critical or else this deal won't go through or we're going to have problems and if I didn't -- sometimes when I didn't give him the money the morning, I would give it to him in the afternoon, he said now because it's latest, now it's going to cost, you know, this much more.  So he would ask more.

Q.    And as time went on, did he ever suggest that failure to pay future money would jeopardize past money?

A.    Oh, yeah, definitely.

Q.    Would Mr. Youngblood ever pay you back, any portion of the money?

A.    Did he pay me back?

Q.    Yeah.

A.    He did give me a small, very small portion back over time.

Q.    And after he would pay you back small portions, what would he do next?

A.    Then he would ask more than what he paid back.  So he

was always negative and always owing me money.

Q.   So he was always paying less than you would give it to him?

A.   Yes.

Q.   Was Mr. Youngblood easy to reach by telephone?

A.   Initially, the first few years, yes.

Q.   Then what happened?

A.   And then, he switched his tactic so that I couldn't reach him and argue with him and ask him, you know, where's the money, why are you asking me more money.  He just would -- it would be difficult to reach him.  He would be changing his phone number.

Q.   And did he give you a reason why he didn't want to particularly carry a phone?

A.   Because he thought -- not thought.  He said that he didn't want people to be able to know where he was so that they wouldn't try to rob him.

Q.   Did Mr. Youngblood ever give you collateral to sort of secure loans -- secure your money?

A.   Well, not really collateral.  He said that, you know, he had property in Arizona and that -- you know, that I could do whatever I wanted with it so that, you know, to kind of like -- I think he had multiple properties in Texas, too, so that, you know, if I -- if something ever happened to him, I still have these -- I still could get

access to his property so that I could get reimbursed.

Q.   So essentially he's securing your investments with property he owns?

A.   Yes.

Q.   Did her give you or your wife a samurai sword?

A.   Yes.

Q.   What was the circumstance there?

A.   It's just one of those items he said was worth money and that he wanted me to help hold onto it.

Q.   And what about a dinosaur head?

A.   Yes, that too.  That was in my office for several months.  It was supposed to be a real dinosaur head and that it was worth, you know, hundreds of thousands of dollars.

Q.   And he kept it at your office?

A.   Yes.

Q.   For a period of time?

A.   Uh-huh.

Q.   Is it fair to say that from 2009, 2010 through 2017, you made a lot payments to Mr. Youngblood?

A.   Yes.

Q.   Could you estimate for the jury approximately how much money you give to Mr. Youngblood over the course of those years?

A.   Till what year?

Q.   2017.

A.   Approximately five million.

Q.   If I may approach the witness, your Honor?

THE COURT:   You may.

Q.   (BY MR. HARDING) Dr. Lee, I'm showing you what's been marked Government's Exhibit 247 for identification purposes.  Do you recognize Government's Exhibit 247?

A.   Yes.

Q.   Leaf through it a little bit, make sure you recognize it.

A.   This is the more recent one.

Q.   What is Government's Exhibit 247?

A.   Okay.  This is the amount for -- that I gave him.

Q.   I'm sorry.  This is the wrong -- I'm showing you the wrong document.

A.   That's later.

Q.   This is later.

A.   The Excel one is the first one.

Q.   Yes.  And that is actually -- can I show you Exhibit 245, please.  If we could zoom in at the top there.  What is Exhibit 245?

A.   This is the Excel spreadsheet that itemizes the payments I -- the money that came out from me because of the money I gave him for these supposed investments starting with the 10,000 on top from that -- that December

meeting that I was in Chicago and then, each year after that.

Q.   The 2010 payment wasn't an investment particularly, was it?

A.   No.  It was for his supposed nephew.

Q.   Okay.  And this -- is the number in this spreadsheet, does it consist of both moneys that you paid to him for investments and for those other purposes like for legal fees, and so on?

A.   Yes.

Q.   Okay.  And if we could -- I don't know if you can read that, Dr. Lee.  Can you read that number to the jury and explain what that number is?

A.   The 4,972,393.

Q.   And 67 cents?

A.   Yes.

Q.   What does that number reflect?

A.   That's the approximate total of money that I expended for him.  That's the money essentially he got more than that actually because I missed in some of these instances, I -- because there were so many and I was busy working, I missed putting it down on the piece of paper.

Q.   What is this breakdown here 2010 through 2017?

A.   That's the total of year how much money was given totaling the 5 million.

Q.   I want to focus only on the investments at this point.  What kind of investments did Mr. Youngblood offer you that led you to pay a portion of this money?

A.   Well, there were like jewelry like he was supposed to buy jewelry from these two older women, whatever, and there was like precious paintings and jewelry and the main part of this initial money was for -- well, the main part of the investments, initial money was for, you know, this supposed painting collection.

Q.   Okay.  But a variety of things, including precious metals, art?

A.   Yes.

Q.   Things of that nature.  Did you ever receive any of the items that you were promised from Mr. Youngblood?

A.   No.

Q.   Actually, I take it back.  You weren't buying the items you were investing, right?

A.   Yeah.  Yeah.

Q.   What kind of return on investment did Mr. Youngblood offer you in return for your investments?

A.   Well, at least half of the money that he was going to get from that.  We were -- like he said, we were like partners.

Q.   So you were -- whatever he got for it, he'd split 50-50?

A.    Uh-huh.

Q.    Did he give you a -- I'm going to make X amount, X times the money that you invest?  Did he ever offer you promise you sort of a guaranteed return?

A.    Yeah.  He would do it at least two times, sometimes ten times.

Q.    Between two and ten times?

A.    Uh-huh.

Q.    Could we pull up Exhibit 246, which is also pre-admitted?  We'll go to this first one on page 1 of 246.  What are we looking at here, Dr. Lee?

A.    That's the summary of the amount that I thought he owed me up to that point, but actually that was wrong.  It was more than that.  It's I didn't have time to go -- I didn't make that spreadsheet yet when I did this.

Q.    And so, just at a basic level, you typed this up; is that correct?

A.    Uh-huh.

Q.    And Mr. Youngblood signed it?

A.    Yes.

Q.    Did Mr. Youngblood -- did either you or Mr. Youngblood prepare sort of receipts for a lot of the transactions that you did, but not all of them?

A.    Yeah.  There were receipts on the items on amounts he borrowed from me and then, if I give him more, he signed

there.  But when I gave him this when I was preparing this document, he shredded a lot of those receipts, the past ones.

Q.   Can you sort of explain that to the jury just a little bit about the shredding of the receipts?

A.   Well, it was in a file and I was, you know, going in my office, he was in my business office, right in front of it.

Q.   Let me stop you really quickly.  Why is Mr. Youngblood in your business office?

A.   Well, because he's just always around there just like he's in my private office.

Q.   So he just came and went as he --

A.   Yeah, there were no patients there.  It was my day off.

Q.   Okay.

A.   Yeah.

Q.   So Mr. Youngblood is in your office and you walk in and what happens?

A.   Well, he was already shredding the old ones that were going to total this amount, but it had more detailed notes and also where the money came from because I wanted to remember where I got the money.  Like which account.  I had different accounts, one for my business, personal. You know, I borrowed from certain people this amounts.  I

wanted to remember where I got the money.

Q.    So Mr. Youngblood destroyed some of your records regarding that?

A.    Yes.

Q.    Is this written by you or Mr. Youngblood?

A.    That's by him.

Q.    And it reflects that he owes you -- or sorry, he will pay you $21,700 in a certain way; is that correct?

A.    Yes.

Q.    And is that signed by Mr. Youngblood?

A.    Yes.

Q.    Fair to say, there's a lot of receipts and IOUs and things of that nature like this that you have?

A.    Uh-huh.

Q.    And that are actually in --

A.    This is the type of receipts that I -- that some of which he shredded already and -- but those that he shredded, many of them, I wrote and he signed.

Q.    Right.

A.    But they were itemized like this.

Q.    And Exhibit 246, we looked at some of those receipts yesterday.  There's a fair number of them but it's not all of them?

A.    Correct.

Q.    Could we go to page 6, please, of this Exhibit 246.

And I don't know if you could rotate or not.  We looked at this yesterday, Mr. Lee, Dr. Lee.  It's hard to read here, but I think it says, I give Hanfu Lee permission to occupy and remodel 405 Shadow Point, San Marcos, Texas.  Signed by Mr. Youngblood, owner of record.

A.    Uh-huh.

Q.    Is that what you were referring to, one of the things you were referring to earlier when you said he would give you some kind of interest in property to secure your investments?

A.    Yes.

Q.    If we could go to page 15, please.  This is lengthy, as well, but if we could zoom.  Can you read that to the jury, Dr. Lee?

A.    I gave Hanfu Lee an interest in the following security.  He said he's making the mortgage payments. This lot in Sierra Montana.  It's in Arizona basically.

Q.    This is an address in Arizona that he's listed as corresponding to that lot, it looks like.  And can you read the last paragraph?

A.    I purchased said property from the Reeves family trust and understand -- I don't know what that word says -- an intention is that once I complete my payments, if I have not satisfied debt to Hanfu Lee, property is his and I will sign over the deed.

Q.   Okay.   Another example of Mr. Youngblood using collateral or security?

A.   I'd like to take that now.

Q.   I want to ask you, sir, how did you pay for these investments that Mr. Youngblood was soliciting you for? And if we can actually pull up 245 again.

A.   Okay.   So initially, it was from my -- you know, whether savings or -- and then, I had to take money from my retirement account that ended up -- like I didn't have any money left in my retirement account by the year 2017 and then, I had to -- you know, in my retirement, it was like only like 600,000 or whatever the maximum at that time and that was all gone.   And then, I had to borrow money from people and, also, you know, take the money I got from my office.

          So it was amazing to me that it ended up being $5 million because I never even had a million dollars and borrowing from all these friends and commercial loans like Loan Me, you know, and Loan Mark and all these different ones that I got loans to give him money, it ended up being that much.

Q.   If we could pull up page 3 of the exhibit, please.   I want to call your attention to the line for August 12, 2014, 22,500 from Schwab, P 401(k) from Scott Trade.   What does that mean, Dr. Lee?   Where did these funds come from?

A.   Deposited to Bank of America that 20,500 from the Schwab account that was -- so I had the 401(k).  I had two 401(k) accounts one in Scott Trade and one in -- the older one was in Charles Schwab.  Scott Trade would not give me the money, have money available that day.  It took a while for them to be able to get me the money.  So I had deposited in Charles Schwab and then, they would give me the money sooner and that's why I did that.

Q.   And so, I think you said earlier, you liquidated a retirement account.  Are these retirement accounts or like investment brokerage accounts?

A.   No.  These are retirement accounts.

Q.   Okay.  Did you also liquidate investment of brokerage accounts to pay for these investments?

A.   Yeah.  Yes.

Q.   Did Mr. Youngblood know that you were doing this?

A.   Yes.

Q.   What did he say about it?

A.   He didn't care.  He just wanted the money.

Q.   If we could pull up page 9, please.  I'll call your attention, sir, to transaction on December 12 of 2015.  What is Cash Call?

A.   It's one of those commercial loan people that I got a loan from there specifically to -- so Mr. Youngblood can get the money he needed.

Q.   Could you describe briefly the process you have to go to get a loan from one of those places?

A.   Yeah, they run your credit and then, they give you certain amount and they give you high interest rate.

Q.   Let me call your attention to December 29, 2015, Loan Me.  What is Loan Me, sir?

A.   Same kind of situation where it's a high interest loan from a commercial company.

Q.   Okay.  And you said earlier that Mr. Youngblood would occasionally pay you back small amounts?

A.   Right.

Q.   If I can call your attention to December 31 of 2015 and there's a negative number here.  What does a negative number in your spreadsheet reflect or mean?

A.   That he paid me that amount.

Q.   And how did he pay you that amount?

A.   Well, he ran his credit cards through my dental office credit card machine.  And that's not necessarily that day.  It was -- I think could have been for the whole year.

Q.   Was that something that Mr. Youngblood did with some frequency was to pay you back with his credit card run through your account?

A.   Yes.  Uh-huh.

Q.   When you are giving money, as you said, Mr.

Youngblood always wants cash?

A.    Uh-huh.

Q.    Are you handling the money -- how are you getting cash from Mr. Youngblood?

A.    Okay.  Initially, I gave him checks and that he deposited it.  He withdrew money from the Bank of America account, but because of the amount of the checks, it was difficult, larger amounts, it was difficult for him to do that or they didn't let him without me being there.  So then, a lot of times, I end up doing that for him, you know, running from my office while seeing patients going in the bank, which was, you know, whether it was a couple of blocks or, later on, Bank of America, which is across the street and then, getting the cash out and then, giving it to him or his person that was helping him get -- deliver cash, his courier.

Q.    You mentioned a courier.  Who is that?

A.    Marvin Knecht.

Q.    And how did you meet Marvin Knecht?

A.    It's just Jadenne just said, you know, this is somebody I know and you give him the money so that he can get it to me or he can deliver it to wherever it's supposed to go.

Q.    Was Mr. Knecht a partner in your investments or just a --

A.    No.  He was just a person who acted like a courier.

Q.    Did he also contact you asking for money?

A.    Yes.  He acted like somebody that is trying to influence me to give money to Mr. Youngblood.

Q.    Did Mr. Knecht ever ask you much for himself or just for Mr. Youngblood?

A.    Only for Mr. Youngblood.

Q.    Okay.  At some point along the way, did a safe wind up in your office?

A.    Yes.

Q.    How'd that come to pass?

A.    Well, he wanted these whether -- it was like large gold coins, for things that were valuable, he wanted a place to put them and so, he said, I bought a safe, they're going to deliver it to your office and -- but he didn't actually buy it.  I had to pay the person for the safe when he got there and then, they screwed the safe into my -- onto the floor and then, that's the initial part of that.

Q.    And what did Mr. Youngblood want a safe in your office for?

A.    So he could get easy access to the valuables he was dealing with.

Q.    At some point along the way, did some valuables allegedly go missing from that safe according to Mr.

Youngblood?

A.   Yes.   Only he and I knew the combination and then, he came one night, he came with a couple of his friends and found out that almost all -- everything was taken from there.

Q.   And what happened as a result of that?

A.   Well, of course, he said that, oh, now I owed -- this gold thing was going to go over here and now you have to give me money so that I could pay them back because that gold thing, that big gold coin or whatever was going to be given to them and now it got stolen.   So now you have to give me more, help me get more money to take care of it.

Q.   If we could go to the last page of this exhibit, please.

A.   Can I speak about that previous page?

Q.   Which page would that be, sir?

A.   The previous one.   It just reminded me about something on there.

Q.   If you know what --

A.   Yes.   Okay.   So one of the people I loaned -- I got money from, I had to put my rental house as collateral and then, when it was due, of course, Mr. Youngblood didn't have the money, so that person did not want to wait and I had to refinance the house.   So it happened a couple of times and then, the second time, I refinanced the house

and then, I couldn't sell it because the person -- it was like not a bank that I refinanced with because by credit rating was lower by then because of all the transactions that went through my credit card from Mr. Youngblood.  And it was private party and so, then, I ended up having to sell my house on auction and I lost that rental house.

Q.   I think that's sufficient.  You mentioned you had bad sort of credit on your credit cards.

A.   Yes.

Q.   Were you paying for some of these things on your credit card, as well?

A.   Yes.  So --

Q.   I think that's sufficient.  If we could just sort of zoom in just this particular part right here just the dates.  The last dates.  So it looks like the last date that's reflected here is November of 2017.  Is the --

A.   Yes.

Q.   Is that approximately the last -- assuming the last record you have of payment to Mr. Youngblood up to that date?

A.   Yes.

Q.   What happened around that time with you and Mr. Youngblood?

A.   Well then, he asked me again for more money soon after that for, supposedly, he was in Mexico that he had

this money available to him, but he needed me to give him money so he can get that money, which didn't make sense to me, okay? And so, I didn't believe him. I just didn't give him any more money.

Q. And at that point, when's the next time you saw Mr. Youngblood?

A. I came to Austin in 2023, '23 -- '22.

Q. We'll get there in a second. So for five years approximately, you didn't see Mr. Youngblood.

A. Yes.

Q. During that time, do you make attempts to communicate with him or get in touch with him either directly or through Mr. Knecht?

A. Yes. So his numbers, of course, didn't work anymore by then and his e-mail, he didn't respond. In fact, one of them was blocking my e-mail and then, he didn't respond to any of those, me asking for repayment. And then, I contacted Mr. Knecht and told him when he contacts him to have him call me, but he never called me back.

Q. And so, for, again, five years or so, no communication with Mr. Youngblood?

A. Yes.

Q. Mr. Youngblood owes you by your estimation about $5 million at this point and then, he stops talking to you. Why do you not go to the police right then?

A.   Because I thought he would, you know, get done with his deals and start paying me.

Q.   So you thought, in fact, behind the scenes, things were still happening?

A.   Yeah.  I was hoping that was happening.

Q.   Did Mr. Youngblood ever give you any warnings about speaking to the police?  Did Mr. Youngblood suggest that you shouldn't trust the police?

A.   Well, yeah.  He didn't trust the law enforcement saying that a lot of them were corrupt.  That's what a lot of times he would say.

Q.   Did he ever give you an indication that interference by third parties might jeopardize these deals?

A.   Yes.

Q.   Why would that be the case?

A.   I don't know.  He just said that.  He just was trying to be secretive and, I guess, to keep me from talking to the correct people so that I would keep giving him money.

Q.   Did Mr. Youngblood ever tell you that you were being watched?

A.   Yes, at a time, he said that.

Q.   By whom were you supposedly being watched?

A.   Supposedly, the Russian mob took pictures of me and talking to my friend at the back of my office.  You know, he -- I don't remember if he even showed me the pictures

but that's what he said.  They took -- see here, they're watching you and things like that.

Q.   How did Mr. Youngblood have any idea what the Russian mob is doing?

A.   Because he said he spoke Russian and he knew what they were doing.

Q.   He had connections to the mob in some fashion?

A.   He knew them.

Q.   Knew them.

A.   Yeah.

Q.   So at some point, you do go to the police, correct?

A.   Yes.

Q.   When is that approximately?

A.   What was it, about three years later or so from this date.

Q.   So quite a bit after this date, you're going to the police department.  Do you remember which police department you went to?

A.   Yeah, the local Arcadia Police Department.

Q.   You go in one day and you make a report; is that right?

A.   Yes.

Q.   At some later time, you speak to a detective?

A.   Yes.

Q.   What does that detective tell you about what has

happened to you -- first of all, what do you tell the detective -- you told the detective more or less the same thing you just told the jury today in summary?

A.   Yeah.   That I was scammed out of all this money and my wife is the one that encouraged me to do that.   Because I was just hoping all this time that he would somehow come up with the money.   But then, since I never could get contact with him, she said I should go there.

Q.   And you speak to a Detective Oberon; is that right?

A.   Yes.

Q.   He tells you straight out you've been scammed.   You shouldn't believe a word this dude says, right?

A.   Uh-huh.

Q.   You give your report to Detective Oberon.   What's the next thing that happens in terms of law enforcement contact?

A.   He forwarded to it the FBI because it was such a large amount and then, I spoke to the FBI agents interviewed me.

Q.   You told them more or less the same story we've talked about this morning?

A.   Yes.

Q.   Did they also advise you they believed you've been defrauded?

A.   Yes.

Q.   After that, did you speak to another member of law enforcement?

A.   Secret Service.

Q.   And that was at the -- did you initiate that?

A.   No.  They called me.

Q.   And you described in summary what the agent talked to you about, same sort of thing we talked about.

A.   Well, he told me others were being defrauded.

Q.   I'm going to stop you there.

A.   Okay.

Q.   With respect to your case, what did he say about -- did he say anything about your case?  Or did you ask any questions about your case, or anything like that?

A.   Yeah.  That I was scammed.

Q.   Okay.  Now, let's jump ahead to October of 2022, you said that's the next time you saw Mr. Youngblood.

A.   Uh-huh.

Q.   Can you describe the circumstances there?  How did you find Mr. Youngblood?

A.   My wife did a property search of his and where he -- well, I guess a people search of him and his wife and then, the Manor, Texas property kept coming up.  So we went over there and just dropped in and he was there.

Q.   Believe it or not, here in Texas, we pronounce it Manor.  So you and your wife went out to the Manor house

Mr. Youngblood lives at?

A.   Uh-huh.

Q.   Was that on Runnel Ridge?

A.   Yes.

Q.   What happens when you get there?

A.   Well, he was having a garage sale and we went in there and he was surprised to see us and that's when we -- he didn't want his friends that were helping there to know what we were talking about.  We went to his bedroom and thens he showed me those items over there, the flag and the headdress and he said -- and then, see, I finally got the flag that I was talking about, you know, but I have to have it appraised for auction it off at Sotheby's, whatever the auction is, and then, my wife is getting upset, you know, Jadenne, you --

Q.   Let me stop you really quickly.  He said, I finally got the flag.  Was he suggesting to you that this flag was somehow the result of money you gave him long ago?

A.   Yes, because one of the items I was -- that he was supposed to get for the money I gave him was this flag.

Q.   And what was Mr. Youngblood's purpose in showing you this flag that apparently your money had paid for and this -- what did he say this other thing was?

A.   Indian headdress.

Q.   What was the purpose of him showing you that?  What

was the point?

A.   Well, because he said we can get money for these items and then, you know, I would be able to repay you but, you know, I can't do it right now because it has to be appraised first and all that.

Q.   More security for your investments.

A.   Uh-huh.

Q.   Prior investments.  How does your wife feel at this point?

A.   She's very upset that that's what she told him when she was -- you know, you owe us money and you haven't paid us, you know.  It's a lot of money that you owe us and, you know, we suffered because of you and basically that's what she said.

Q.   Did he acknowledge that he owed you that money?

A.   Yes.

Q.   And what did he say he was going to do to make it right?

A.   Well, first, he got mad at her because she was shouting at him and he was afraid his friends from the neighborhood would hear.  He said, oh, this is my house, you can't talk to me like that and I had to calm her down. And he said he was working on -- see, look, I got the flag, I'm working on it, you know, I'm going to get you back your money.

Q.   Did he suggest that he had a large deal in the works that was going to repay everything he owed you?

A.   Yes.

Q.   What did he tell you about what that deal was related to?

A.   Well, I'm not sure if he told me at that point.

Q.   Okay.

A.   Yes, the bigger deal.

Q.   We'll get there in a minute.  You and your wife confront him in his bedroom after he's taken you there.  Hey, you owe me all this money.  He says, don't worry, I've got this stuff, I've just gotta get it appraised and I've got this other big deal.  How does the encounter conclude?

A.   He wanted to -- well, we were leaving -- at that point, we were leaving with nothing, okay?  And when we go in our car, he goes, oh, you know, give me a hug so that my friends think we're friends, you know.  I don't want to leave like that like in a bad way and then, so he, you know, made my wife and I -- especially my wife like give him a hug.  And then, we went to back to the hotel and the next morning is when he called me and gave me money.

Q.   Tell us about that.  He gave you some money?

A.   Gave me $500 cash and then, he gave me his debit card, he said I could start withdrawing his debit card

every week.

Q.   That happened here in Austin?

A.   Yes.

Q.   In the Austin area?

A.   Yeah.

Q.   So what do you do?

A.   Okay.  So I took it and I started to take the amount.

Q.   Let me stop you.  Do you go back to California?

A.   Yes.

Q.   Okay.  You go back to California, then what?

A.   And on -- it was supposed to be Friday or whatever, I started taking money with his debit card, but I couldn't do it every week.  Sometimes he didn't have enough.  He would tell me just wait and then, so it wasn't consistent even with the debit card.

Q.   How much money approximately did you get off that debit card?

A.   I guess the total over several weeks was -- I think it's 4,000 or something.

Q.   Plus whatever cash he gave you on the day --

A.   Yeah.  Uh-huh.

Q.   After the debit card stops paying out, do you have another conversation with Mr. Youngblood?

A.   Yes.

Q.   And describe that conversation, please.

A.   Well, basically he needed money again from me.  It's not even before the debit card transactions finish, even during that time, I have it recorded later, that previous exhibit, and he started I wanted more money because this big deal is imminent.  You know, now it's gold, gold bars, eventually.

Q.   Describe for the jury what you understood the investment in gold bars to be.

A.   It was -- it was going to be gold bars that total between 50 and 75 million, something like that.

Q.   So he suggested to you that if you gave him more money, he could get those gold bars?

A.   Yeah, he could complete this transaction and this was like the culmination of all the work that he started from when he first borrowed money.  This is the big deal that was going to come through finally.

Q.   So again, he's suggesting to you that money you paid between 2012 and 2017 was actually connected to this deal.

A.   Yes, because he said, I've worked on this ten years, you know, if I don't get this done and you don't give me more money as he kept asking for money, it's going to be all for nothing.

Q.   Let me now approach you with the correct Exhibit 247 and ask you, you've already said you recognize it.  Can you tell the jury what it is?

A.    Okay.  This is from my QuickBooks ledger and it takes -- records all the money I gave him in 2023.

Q.    Now, was all of this money reflected on Government's Exhibit 247 some way related to this gold deal?

A.    Yes.  It's all for the gold deal.

Q.    And is it fair and accurate summary of the money that you paid to Mr. Youngblood for that gold deal or aspect of that gold deal?

A.    Yes.

Q.    Government will offer 247.

MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.    (BY MR. HARDING) If we could pull up 247, page 2, please.  Let me just zoom in sort of on this part.  So what's the first date you have reflected as money that you gave to Mr. Youngblood between -- on this document?

A.    January 10, 2023.

Q.    And when is the last payments, I guess?

A.    July 31, 2023.

Q.    What is reflected here when you say check?

A.    I think that's the way -- I think it's the way the QuickBooks records.  I think it's either because it's a checking account or it's because it's not checks.

Q.    Yeah.  So let's talk --

A.    It's a checking account.

Q.   Let's talk about that.  How are you paying Mr. Youngblood during this period of time?

A.   Okay.  So Zelle -- as you see, Zelle there is the most common, towards the end, he figured out that I gave Zelle money to his account directly.  There were some wire transfers.  Initially, he thought that was the only way I could get money to his account, but then, he figured out later that we could do it with Zelle.  And then, I also deposit money, cash that I withdrew from my -- this is my business account and put it into his Navy Federal account.

Q.   I want to call your attention in particular to this line here, July 3rd, 2023, a wire transfer of $19,800 to Mr. Youngblood.  Do you remember paying that?

A.   Yes.

Q.   Again, this is money related to this gold deal?

A.   Uh-huh, yes.

Q.   I gotta ask you, Dr. Lee.  Am I right in saying between January and July of 2023, you paid Mr. Youngblood over $150,000?

A.   Yes.

Q.   And that's just as an aside.  You've provided to us and we've provided to defense several versions of this spreadsheet, correct?

A.   Uh-huh.

Q.   This is the latest revised version that you have.

Can you explain to the jury why there were multiple versions?

A.   Because I didn't have the final version till I did my taxes and I went through every transaction and figured out that they belong to this -- the money that I gave him.  So I didn't think it was that much initially but, you know, little by little, it ends up to be so much.

Q.   So let me ask you the question I was about to ask you.  You give Mr. Youngblood $5 million between 2010 and 2017.  He disappears for five years.  In the meantime, you're told by the Arcadia Police Department you've been scammed.  You're told by the FBI that you've been scammed. You're told by the Secret Service you've been scammed. And yet, in 2023, you give Mr. Youngblood over $150,000. Why?

A.   Because he's a good con artist.  Because he convinced me and -- he did it slowly so you can see from the beginning as a small amount and it progressively got more, okay?  Because he convinced me that this gold deal was imminent, you know, he's got different aspects of it, it's going to go this way, it's going to come this way from different--  out of the country and it has to be brought here and then, it's going to be -- I'm going to get this much per ounce for it.  You know, we're going to lose a little money in that transaction, but we're going to end

up getting all these millions.

Q.   Not to pry, sir, but this is an embarrassing thing to look back on, isn't it, sir?

A.   Yes.  I didn't even realize -- I didn't -- because it kept going on, I didn't add it each time.  I didn't know it was going to be this much.  You know, it's like I was not only embarrassed, I was like sad I gave him that much money.  I was like so stupid.

Q.   You are concerned -- I mean, you were very reluctant to share this information with anyone, correct?

A.   Yes.

Q.   And in particular, your wife?

A.   Yes.

Q.   Have you told your wife about this?

A.   No.

Q.   Are you concerned how she'll react when she does find out?

A.   Yeah.  She'll be very upset, but she also realizes what a good con artist he is and how smooth and how he talks.  She knows that he can convince people to do things that they don't want to do and that they don't realize what's happening until the total becomes so much.

Q.   So you said that all of this money is in some way related to this gold investment?

A.   Yes.

Q.    But it's not like every transaction is, for instance, $1,700 for one bar of gold, right?

A.    Right.

Q.    Can you describe for the jury some of the aspects of the scheme that you're paying -- excuse me, some of the aspects of the investment that you're paying for with some of these payments?

A.    There are many aspects of it because I couldn't -- I didn't understand the picture.  Of course, that's the intention so I don't understand, okay?  But I had to pay -- he had to pay this much to get this part of the investment so he can get this whole deal done, okay?  So he would have to either buy something and sell something, and so, he can get the money so that it would be able to fund this big project.  But all of it went to this gold project to facilitate this gold project.

Q.    In some cases, it was acquiring things to sell to then use for larger projects?

A.    Yes.

Q.    Were there other things that Mr. Youngblood needed to facilitate it, including things like travel?

A.    Yeah, like his travel expenses, permits to bring the -- supposedly the gold is supposed to come in a ship and he needed the permit and all that and he needs security for the gold.

Q.   Was there an aspect of this in relation to the gold scheme that involved Rolex watches?

A.   Yes.

Q.   Can you describe for the jury -- well, according to the defendant, what relationship did the Rolex transactions have with the larger gold deal?

A.   Well, that was to like pay me back for some of this money I gave toward the gold deal.  So, you know, he was supposed to send three Rolex watches to me so that I could sell them so that I can recoup some of the money that I gave him.

Q.   So this is a repayment of money you paid for the --

A.   I never got it, of course.

Q.   Was Mr. Knecht going to get a share of the Rolex money?

A.   No.  He was just the deliverer.  He's the one that picked up the Rolex watches and he was at one time going to deliver it to me.  And then, Mr. Youngblood said, oh, I'm going to go meet you in LA, I'm going to deliver it, but none of that ever happened.

Q.   But the Rolexes were for you to have?

A.   Yes.

Q.   And sell as you saw fit?

A.   Yes.

Q.   Mr. Knecht wasn't going to have a piece of that deal.

A.    No.    No.    That had to do with money I already gave him.    Mr. Knecht was going to get some money from the gold deal but nothing to do with Rolex.

Q.    Mr. Youngblood wasn't going to get anything from the Rolexes, was he?    These were for you.

A.    Supposedly.

Q.    Was Mr. Youngblood going to profit from the larger gold deal allegedly?

A.    Yeah, of course.

Q.    May I approach the witness, your Honor?

THE COURT:    You may.

Q.    (BY MR. HARDING) Dr. Lee, I'm showing you two discs. The first of which is marked Government's Exhibits 248 and 252.    Do you recognize that disc, sir?

A.    Yes.

Q.    Have you had a chance to review it before coming to court here today?

A.    Yes, I initialed it and dated today.

Q.    And does it contain both a June 29th, 2023 voicemail from Mr. Youngblood as well as a July 3rd, 2023 voicemail from Mr. Knecht?

A.    Yes.

Q.    Is that a fair and accurate representations of those voicemails?

A.    Yes.

Q.    Government will offer Exhibits 248 and 252.

MS. HERRING:  Your Honor, we were advised of this on our way over to court this morning so I'm not sure which voicemails.

MR. HARDING:  These are the ones that have already been in.

MS. HERRING:  Aren't they already admitted?

MR. HARDING:  Oh, 248 and 252 are already admitted?  No, they're not.  These are on your list, as well.  Sorry.  One second, your Honor.

THE COURT:  Sure.

MR. HARDING:  We'll offer them.

MS. HERRING:  No objection.

THE COURT:  So admitted.

MR. HARDING:  And for the record, I will offer Government's 253, which is a July 7, 2023 voicemail from Mr. Knecht.

THE COURT:  Any objection?

MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.    (BY MR. HARDING) June 29, 2023, what day was that, sir?

A.    Thursday.

Q.    You and I checked that this morning, right?

A.    Yes.

Q.    Okay.  If we could pull up Exhibit 252, please.

(Audio file played.)

Q.    He said and he's on the way to pick up the box and the warranty card, correct?

A.    Yes.

Q.    Who is that?

A.    Marvin Knecht picked up the Rolex watches.

Q.    He was going to pick up the Rolex watches?

A.    Uh-huh.

Q.    Please continue.

(Audio file played.)

Q.    Mr. Youngblood said first he's northeast, then he's southeast.  Now, on Monday, he meets up with the rest of them.  During this entire investment in 2023, did he talk about meeting with various people related to this gold deal?

A.    Yes.

Q.    Could you describe some of those for the jury?

A.    Well, like the security people, friends of his that were supposed to be ex-military and that were going to help him secure and transport the gold.

Q.    So Mr. Youngblood had multiple meetings with folks to sort of facilitate this gold?

A.    Yes, and whoever else.  I don't know what else he was involved in.

Q.   Just to be clear.  Counsel said I may have misspoken. This voicemail is left by Mr. Youngblood, correct?

A.   Yes.

Q.   When he mentions M, he's talking about Marvin?

A.   Yes.

Q.   But when he says, I'm going to meet with these people on Monday, he's saying himself.

A.   Yes.

Q.   What date was Monday?

A.   July 3rd.

Q.   Okay.  The date of the $19,800 transaction?

A.   Yes.

Q.   We can continue, please.

        (Audio file played.)

Q.   He closed back with love you, doc.  Was that common for him?

A.   Yeah.

Q.   Mr. Youngblood says he's at the mercy of some overnights and he has these confirmations.  Do you remember what those are?

A.   I don't know what those are.

Q.   Okay.

A.   What he was expecting -- supposedly expecting overnight or whatever.

Q.   Okay.  Can we play Exhibit -- so Exhibit 248, which

is a July 3, 2023 voicemail from Mr. Knecht.

(Audio file played.)

Q.    So Mr. Youngblood says -- sorry, Mr. Knecht says he's on his way again to pick up boxes and warranty cards for the watches, right?

A.    Uh-huh.

Q.    He says -- then he says, Mr. Youngblood told me I need -- you need to send $19,300 to him immediately because he is stuck where he is.

A.    Uh-huh.

Q.    Based on the last conversation in which he said, I'm going to be meeting with them on Monday, this being the voicemail on Monday, what did you understand?

A.    No.  I think this was the voicemail on Thursday, also.

Q.    No.  This is July 3rd.

A.    Okay.

Q.    So this is a Monday voicemail.  He's stuck where he is.  Did you understand that to mean that he was in some way having a hard time concluding the gold deal?

A.    Yes.  He was stuck wherever he was that he couldn't -- whether he couldn't get -- he needed the money for whatever it is in the gold deal to facilitate getting it here.

Q.    And was this a common sort of ask for Mr. Youngblood

in like sort of, oh, there's a sudden obstacle, I need more money?

A.    Yes.

Q.    He said the Holloways have fucked it.  Do you know who the Holloways are?

A.    No.

Q.    We can continue, please.

            (Audio file played.)

Q.    He said we need to put that money in immediately so we can get paid, correct?

A.    Yes.

Q.    Was the only investment -- what investment would Mr. Knecht be paid on related to the gold?

A.    It's just the gold.  Only the gold investment.

Q.    Okay.  So no other investment that we would get paid on other than that gold.

A.    Yes.

Q.    Okay.  We could continue, please.

            (Audio file played.)

Q.    According to Mr. Knecht, he is conveying a message from Mr. Youngblood?

A.    Yes.

Q.    If we could pull up Exhibit 253, which is a voicemail for four days later, July 7, 2023.

            (Audio file played.)

Q.    So you said some of this money was you were supposed to get three Rolex watches.  Mr. Knecht just says he picked them up and gave them to Mr. Youngblood.  Did you ever see any of those Rolex watches?

A.    No.  When I asked for it, he said it was being sent to Florida because they had microchips in them that had to be removed.  The tracking chips supposedly.

Q.    Can we please pull up Exhibit 249, which has been pre-admitted.  And let me just ask you, sir, what are we looking at here on the first page of Government's Exhibit 249?

A.    It's my checking account.  Business checking account.

Q.    And that covers the dates of July 1 through July 31, 2023?

A.    Yes.  Uh-huh.

Q.    If we could go to page 5 of that, please.  If we could zoom in down here.  What are we looking at here in the second lane, sir?

A.    This is the wire that I sent to Mr. Youngblood's Federal Credit Union account.  The money that Marvin Knecht said that he wanted to -- he needed the $19,800.

Q.    And it reflects account number for Mr. Youngblood ending in 7087 for an ID number; is that correct?

A.    Yes.

Q.    Also has Mr. Youngblood's name as you know it or some

version of his name?

A.    Yes.

Q.    If we could look at Exhibit 250, which has been pre-admitted.  And if we could zoom in on this top part, which is really the only part of it.  Do you recognize this as a document that also reflects that wire transfer?

A.    Yes.

Q.    And it shows the date of July 3rd, the amount of $19,800.  Your account number; is that correct?

A.    Yes.

Q.    And it was drawn on -- is this your business account, I guess?

A.    Yes.  Uh-huh.

Q.    And then, Arcadia, California?

A.    Yes.

Q.    If we you could go to the next half.  This reflects it was received by Navy Federal again in Virginia, account ending 7070, similar information to what we just looked at before.  And do you recognize that as Mr. Youngblood's address that you went to in October '22?

A.    Yes.

Q.    Let me ask you this, Dr. Lee.  Where were you when you sent this wire transfer?  Were you in Texas or out of Texas?

A.    No.  I was in Arcadia.

Q.    If we could pull up Exhibit 251, please, it's also pre-admitted.  I know you don't know this document particularly but it appears to be -- at least it reads that it's Saint Jovite Youngblood, a Navy Federal Credit Union account of some variety.  If we could go to page 2.  That's a checking account.  At least it reads that it's a checking account ending in 7070.  Do you see that, sir?

A.    Yes.

Q.    And if we go to page 4, please.  We see reflected here in the middle, a bank wire deposit on July 3rd, $19,800; is that correct?

A.    Yes.

Q.    Which brings his account from a balance of $983 to a balance of 20,000 and change.

A.    Yes.

Q.    Did you ever see any of these gold bars?

A.    No.

Q.    Did you ever get any return with the exception of the cash that Mr. Youngblood gave you when you confronted him in October of 2022?  With the exception of the debit transactions where you withdrew money from his account in that month and year, did you ever receive any money back from Mr. Youngblood?

A.    No.  There's a possibility that he did another different credit card transaction, but I don't remember if

it's --

Q.   That would have been back in October?

A.   Yeah.  In the previous year, 2022.

Q.   And would that have been nearly $150,000?

A.   No.  It's part of that 4,000 I told you about.

Q.   Okay.  So he gave you back about 4,000?

A.   Yeah.

Q.   Possibly between the debit card and the credit card. Beyond that, no other returns?

A.   Right.

Q.   One moment, please.  We'll pass the witness, Judge.

                    CROSS-EXAMINATION

BY MS. HERRING:

Q.   Good morning, Mr. Lee, Dr. Lee.

A.   Good morning.

Q.   Let me go back to your early money that you told us about in California about 2010, 2012 through 2017.

A.   Yes.

Q.   Now I want to talk again a little bit about why you gave Mr. Youngblood most of that money.  He when he lived in California and you knew him in California, he would ask you for money to borrow money to invest it, right?

A.   Part of it, yes.

Q.   You knew he talked to you about the objects, the types of items he intended to purchase with the money.

A.   Yes.

Q.   You knew that they weren't traditional investment objects.

A.   Right.

Q.   You weren't investing in houses or flipping houses or real estate?

A.   Correct.

Q.   You gave us a short list but it was things like coins, right?

A.   Yes.

Q.   Comic books?

A.   Yes.

Q.   Star Wars memorabilia?

A.   Yes.

Q.   Jewelry, I think you said?

A.   Yes.

Q.   Sculptures at one time?

A.   Yes.

Q.   Rembrandts maybe, paintings?

A.   Uh-huh.  Yes.

Q.   And he would ask you for money to purchase these items, right?

A.   Right.

Q.   And you believed that you would get a return on your money at some point.

A.    Right.

Q.    And you believed that when that art or that comic book or the coins sold, it would sell at a markup or for a premium and you would get money back as a result of that increase in the price, right?

A.    Supposedly, yes.

Q.    But at the time, you believed it was an investment.

A.    Yes.

Q.    You considered yourself to be a partner in an investment deal.

A.    Yes.

Q.    And I think you just told us as a partner in an investment deal you were expecting a return on your investment.

A.    Yes.

Q.    You had no intention of gifting him free money, right?

A.    Of course not, no.

Q.    You expected to make a profit as well.

A.    Yes.

Q.    I think you said at least double was what he would typically promise you?

A.    Yes.

Q.    And sometimes up to ten times.

A.    Yes.

Q.    You also knew at the time or it sounds like you believed that this was Mr. Youngblood's business, right?

A.    Yes.

Q.    You thought he had a reputation for doing this type of deal in California.

A.    Nationwide.

Q.    Nationwide.  You saw him as someone who was -- had some kind of expertise in valuing collectable items.

A.    Yes.

Q.    I want to pull up Exhibit 31, which has been pre-admitted.  In addition to the items we just listed, the coins, the jewelry, the sculptures, comic books, there was a component of that investment deal in California that involved Rolex watches, right?

A.    Yes.

Q.    So I'm pulling up here defense Exhibit 31, which are some of your receipts that you provided tow Arcadia police department back in 2019.  Not sure if you can see on your screen but do you see the handwritten notations below those receipts?

A.    Yes.

Q.    Is that your handwriting?

A.    Yes.

Q.    And were you noting there that these were receipts for Rolex watches?

A.   Yes.   These were receipts for Rolex watches for that time period.   Different than what we talked about before.

Q.   Yes.   But in California this time period, you would go to jewelry stores sometimes with Mr. Youngblood?

A.   Yes.

Q.   The two of you would go together?

A.   Uh-huh.

Q.   And he would select the Rolexes, I think you have said you weren't an expert at selecting which ones would be most valuable, right?

A.   Uh-huh.   Yes.

Q.   And then he would want you to put your credit card down to make the purchase.

A.   Right.

Q.   And you believed because he told you that the watches were going to be sent off to be modified to enhance their value?

A.   Yes.

Q.   Right for particular types of buyers, I think military buyers?

A.   Or hunter, yeah.

Q.   Hunters.   And you believed that that modification was going to increase the value of the Rolex, right?

A.   Yes.

Q.   And then in theory, you were hoping that you would

make a return once he was able to sell these kind of marked up Rolexes, right?

A.   Yes.

Q.   I think you expected you were going to make at least 20 percent more than what you put in on the Rolex investment?

A.   Yes.

Q.   Deal.  And just like with those other objects, at one time in California, you considered yourself a partner in this investment.

A.   Yes.

Q.   Now I want to talk to you a little bit about how you gave Mr. Youngblood the money in California from that 2010 to 2017 period.  It was your understanding that most of those types of transactions for objects, nontraditional investment objects needed to be or were done in cash, right?

A.   Yes.

Q.   Mr. Youngblood wanted cash.

A.   Yes.

Q.   That type of business was a cash business.

A.   Yes.

Q.   Pull up here on the screen defense Exhibit 29 but these are some of the receipts that you turned into the, again, the Arcadia police department back in 2019.  Do you

recognize some of these -- does this look like copies of what you had given to Arcadia?

A.    Yes.

Q.    And I'll just note here, this is 125-page document with looks like we've got -- multiple receipts on each page.  This is a lot of receipts that you collected.

A.    Yes.

Q.    And they're kind of faded in the copy isn't great but it looks like they are receipts showing cash deposits into the Navy Federal Credit Union account; is that right?

A.    Correct.

Q.    So can you -- you remember these are the receipts that you would get when you would go deposit cash.

A.    For him, yes.

Q.    For him, right, into his account at Navy Federal Credit Union?

A.    Yes.

Q.    If we can zoom in on one of them that looks clear, back then in, California, this was the same account, the account ending in 7070, right?

A.    Yes.

Q.    It's always been that account for Mr. Youngblood.

A.    Yes.

Q.    You told us earlier, you banked primarily at Bank of America?

A.   Yes.

Q.   So you would have to withdraw the cash from your bank and then go to deposit it at a Navy Federal Credit Union branch?

A.   Yes.

Q.   And sometimes I think you said you did that even multiple times in a day.

A.   Yes.

Q.   This would show us you were doing that quite frequently?

A.   Yes.

Q.   You mentioned that you sometimes borrowed money from friends, right?

A.   Yes.

Q.   I believe you had talked about a specific friend with Arcadia, the Arcadia police officer that you borrowed a lot of money from.  I will probably mispronounce his name but someone Handojo?

A.   Yes.  Uh-huh.

Q.   Do you remember borrowing $135,000?

A.   Yes.

Q.   And in that instance was -- Handojo wrote a check, was it, to you and then, you then cashed the check and gave it to Mr. Youngblood, if you can recall?

A.   No.  I couldn't cash -- it was such a large amount,

of course, they don't have $137,000 cash at the bank if you don't -- if you just come in with a check.  So I endorsed it because we tried to do that at the bank.  I endorsed it and then, gave it to Mr. Youngblood and he somehow got it cashed.

Q.   But it was your understanding he wanted it in cash form as soon as he could --

A.   Yes.

Q.   -- find a way to do that?

A.   Yes.

Q.   I want to bring up Defense Exhibit 30.  You talked about this briefly.  The prosecutor showed you these handwritten IOUs, I'll call them.

A.   Uh-huh.

Q.   And again, we've got 25 pages of them.  You accumulated a bunch of these promises over that seven-year period, right?

A.   Yeah, false promises.  Yeah.

Q.   And these, again, are documents that you collected and took in and turned into the Arcadia Police Department, right?

A.   Yes.  Uh-huh.

Q.   In theory, these handwritten documents from Mr. Youngblood were supposed to act as receipts showing you what he promised to pay back, right, what he owed you?

A.   Yes.

Q.   I want to just look through a few of them.  If we can go to page 2.  So on here, on looks like August 1st of 2012, you gave him $26,000, right?

A.   Yes.

Q.   And moneys are to be returned on or before August 8th, right?

A.   Yes.

Q.   So he gave himself a week to repay you, right?

A.   Yes.

Q.   If we scroll to the next page.  And then here is another one, $37,500 on August 6, 2012.

A.   Yes.

Q.   So by this point, he hasn't even repaid you the 26,000 that we just saw on the other one.

A.   Correct.

Q.   But you gave him another 37,000 in that same week it looks like?

A.   Yes.

Q.   So these IOUs would just pile one on top of the other?

A.   Uh-huh.

Q.   You weren't getting money back between them.

A.   No.

Q.   He just would write you a new I O U?

A.    Yes.

Q.    Sometimes he'd rip up the old one, write brand-new one, right?

A.    Yes.

Q.    He often gave himself pretty short turn around times?

A.    Yes.

Q.    And you never saw a turn around and that kind of a timeframe?

A.    Correct.

Q.    I want to bring up Exhibit 32.  Bring up a copy of the letter that you took with you to the Arcadia Police Department in 2019.  Do you recognize this letter?

A.    Yes.

Q.    If we look at the bottom, I believe it shows that you -- this is a letter you prepared with the hundred of your wife, it looks like?

A.    Yes.

Q.    She's listed as the contact person.  You told us this was one of the reasons that you ended up going to the police in 2019.

A.    Yes.

Q.    At her prompting.  Did she help you draft this do you recall?

A.    Yes.

Q.    So in this letter, you see that Mr. Youngblood

promised to return Dr. Hanfu Lee's money plus the profit for the investments, right?

A.   Yes.

Q.   And now you can't locate him, right?

A.   Yes.

Q.   And some point in there, it says that he's a liar, right?  It's covered by the stamp but Mr. Youngblood was such a liar he was a smooth talker, right?

A.   Yeah.  Right.

Q.   And in the end, you realized the money was always going out and never coming back, right?

A.   Yes.

Q.   He told you many different stories?

A.   Yes.

Q.   When you went to Arcadia Police Department with this letter, with your IOUs, with your receipts, with your spreadsheet that you've talked about, you knew you had been scammed.

A.   Yes.

Q.   In fact, in 2019, you had already stopped giving him money, at least a year and a half earlier, I think the end of 2017, right?

A.   Yes.  Correct.

Q.   Do you recall telling the police officer that though you stopped giving money in November of 2017 he did ask

you for more a few times and you turned him down?

A.   Just once.

Q.   Just one time?

A.   As I recall, yes.

Q.   That was the 90,000 that he asked you for and you said no, not anymore?

A.   It wasn't that much.  It was less than 5,000, less than 10,000 for sure.  The last time I spoke to him about when he asked me, I don't think it was that much.  I can't recall.  No.  The 90,000 is what -- okay.  So he said he was in Arizona and he had 90,000.  Then he went to Mexico and that 90,000 was in front of him and now he needed money to get that 90,000 back, which is like stupid.  Why would he go to Mexico and then have to get money to get money that was already in the United States.  That's why I didn't give him any more money.

Q.   You heard it, you said that's stupid I'm not giving you more money?

A.   Yeah.

Q.   In addition to Arcadia Police Department, you did speak to the FBI in 2019.

A.   Yes.

Q.   And you told us you told them the same thing you had told Arcadia, right?

A.   Yes.

Q.    I believe you followed up with those agents, you and your wife followed up several times trying to send them more information that might help in an investigation, do you recall that?

A.    Yes.

Q.    But nothing happened at that time.

A.    Correct.

Q.    So you've told us five years pass, right?

A.    Yes.

Q.    And you hadn't gotten your money back?

A.    Uh-huh.

Q.    You hadn't gotten any help from the FBI or Arcadia PD, right?

A.    Yes.

Q.    And you made the decision to fly to Texas.

A.    Yes.

Q.    To be clear, you have never been afraid for your physical safety with Mr. Youngblood, right?

A.    Correct.

Q.    You weren't afraid of going to meet with him.

A.    No.

Q.    By the time you came to Texas, you knew he had scammed you.

A.    Uh-huh.

Q.    You knew all his IOUs were worthless.

A.    Yes.

Q.    You hadn't gotten any money back.

A.    Yes.

Q.    Your wife had told you not to believe him.

A.    Uh-huh.

Q.    She helped you write a letter saying he's a liar. The officer at Arcadia PD told you outright.  I wouldn't believe a word he says, right?

A.    Yes.

Q.    You told us today that the Secret Service person you met with also said you'd been scammed.  Don't believe him?

A.    Yeah, by phone.

Q.    By phone?

A.    Yeah.

Q.    And the FBI told you that.  As well.

A.    Yes.

Q.    Bring up Defense 35.  We've already heard you started giving him more money and we looked at the wire.  I want to talk about these receipts which if you can see the dates are from 2023.  Does that look?

A.    Yes.

Q.    Right?  These are nor receipts of you depositing cash again into the Navy Federal Credit Union account.

A.    Yes.

Q.    And this was something you did once you had returned

to California?

A.   Yes.

Q.   So you went back to California and again with your cash from your Bank of America, went to Navy Federal credit union and would make those deposits?

A.   Yes.

Q.   To the same account you had deposited to five years before?

A.   Yes.

Q.   Right?  May I approach, your Honor?

THE COURT:  You may.

Q.   (BY MS. HERRING) Dr. Lee, I'm showing you two e-mails.  Do you recognize these as e-mails that you sent to one of the FBI agents, Agent Noble?

A.   Yes.

Q.   This one, as well.

A.   Yes.

Q.   Do these look like accurate copies of the e-mails that you sent?

A.   Yes.

Q.   I would move to admit Defendant's 37, 38.

MR. HARDING:  Object to hearsay.  It's an out-of-court statement, presumably offered for its truth.

MS. HERRING:  Your Honor, these are e-mails that Mr. Lee wrote.  They are his statements.

MR. HARDING:  Out-of-court statements, yes.

MS. HERRING:  May we approach, your Honor.

THE COURT:  Yes.

(At the bench, on the record.)

MS. HERRING:  I'd just like clarification since we've admitted e-mails the last four days of trial.

MR. HARDING:  Which has made it to be a four-day trial.

THE COURT:  I mean, it's hearsay, right?

MS. HERRING:  That's fine.  I'll just question him on it.

THE COURT:  Okay.

(End of bench conference.)

Q.   (BY MS. HERRING) Dr. Lee, do you recall sending FBI Agent Noble e-mails describing to him why you started sending money in 2023?

A.   Yes.

Q.   You recall that there were many different reasons that he gave for needing money?

A.   Yes.

Q.   One of those reasons was getting gold --

MS. HERRING:  Your Honor, I object.  This is again offering out-of-court statements, offered for their truth.  This is hearsay.

Q.   (BY MS. HERRING) Dr. Lee, can you tell us some of the

reasons that you told Agent Noble you started to send money again in 2023?

MR. HARDING:  Same objection.  Asking him to repeat a prior statement is still hearsay.

THE COURT:  I'll allow the question.  If you can answer the question.

A.   Okay.  The reasons why -- okay.  So for the transportation of the gold shipment for, like, I guess, paperwork to get out of port, for security for the gold, security people later for the gold, and all the things related to the gold basically.

Q.   (BY MS. HERRING) Did you ever tell Agent Noble that you were expecting Rolex watches again?

A.   Yes.

Q.   Did Mr. Youngblood also ask you to kind of front him or cover his personal transportation costs, gas, flights, that type of thing?

A.   Yes.

Q.   I want to play again the call you listened to it but it's Defendant's 81.  Is this the voicemail that you had from Mr. Youngblood on June 29th of 2023?  So we heard it earlier, we're just going to play it again briefly.  I have a few questions about it.

A.   Okay.

(Audio file played.)

Q.   You told us M is Marvin Knecht, right?

A.   Yes.

Q.   And Marvin was going to pick up three Rolex watches that were supposed to be given to you as part of the payment for money that you had begun to resend, right?

A.   Yes.

Q.   Now we're going to the voicemail that Marvin left you on July 3rd.

(Audio file played.)

Q.   So you got this voicemail, right?

A.   Yes.

Q.   And you wired that 19,800?

A.   Yes.

Q.   To the same account, that Navy Federal Credit Union that you've always used, right?  And Marvin had told you that he had picked up the watches, right?

A.   Yes.

Q.   You still haven't seen any watches at this point, right?

A.   Right.

Q.   This is another voicemail from Marvin four days later on the 7th.

(Audio file played.)

Q.   Again, you received this voicemail from Marvin Knecht, right?

A.   Yes.

Q.   This led you to believe that he'd gone and picked up three of these watches?

A.   Yes.

Q.   You would have liked to received the watches, I imagine, right?

A.   Yes.

Q.   Watches would have been partial repayment on the money that you had sent, right?

A.   Yes.

Q.   You were asked by the FBI to review your voicemails and provide anything that you thought was important in this case, right?

A.   Yes.

Q.   You did that at their request?

A.   No.  I told them about it.

Q.   You did it to try to be helpful, right?

A.   Yeah.

Q.   Because like you did with Arcadia PD, you wanted to provide anything that might help you recover your money, right?

A.   Yes.

Q.   You didn't provide any voicemails from July of 2023 related to gold?

A.   No.  I didn't, but I found something else when I was

going over them again.

Q.   About gold?

A.   About the millions he was going to give me from the gold.

Q.   Do the voicemails talk about gold?

A.   Not specifically but the amount -- whatever it's called million that he was going to get me as part of that gold deal.

Q.   No further questions.

          MR. HARDING:  One moment, your Honor.

                    RE-DIRECT EXAMINATION

BY MR. HARDING:

Q.   Dr. Lee, do you have that voicemail with you right now?

A.   Yes.

Q.   Do you think if you put it on speaker mode, you could just play it for the jury?

          MS. HERRING:  I'm going to object, your Honor. This has not been provided to defense counsel.

          MR. HARWOOD:  We don't have it.  This is the -- I mean, we're limited together.

          THE COURT:  All right.

A.   Wait, I found it when I was going over all the voicemails again.  It was July 8th, 2023.

Q.   (BY MR. HARDING) Hold it to the microphone and play

it.  It's on speaker mode, your Honor.

A.  I have to go find it.  I did a picture of the narrative of that but let me go find that was 15 seconds.  Okay.

(Audio file played.)

Q.  Can you replay that, Dr. Lee?

A.  Okay.  Do it again.

(Audio file played.)

Q.  Is that Mr. Youngblood's voice, sir?

A.  Yes.

Q.  Is that 14 million and change related to the gold deal that Mr. Youngblood promised --

A.  Yeah.  I was incorrect when I said 12 million.  Yeah.

Q.  Pass the witness.

MS. HERRING:  No further questions.

THE COURT:  May this witness be released?

MS. HERRING:  Yes, your Honor.

THE COURT:  Thank you, Doctor.  You're free to go.

We could take our break now.  What do you think?  About a little longer?  All right.  I haven't seen anybody clamoring for a break so let's power through for a few minutes.  Your next witness.

MR. GUESS:  Matthew Vasquez, please.

THE COURT:  Walk toward the far corner of the

courtroom and then, walk back towards me, please.  Good morning, sir.

THE WITNESS:  Good morning.

THE COURT:  Before you take a seat, could you raise your right hand to be sworn, please?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

MATTHEW VASQUEZ, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. GUESS:

Q.   Good morning, Mr. Vasquez.  I'd like you to introduce yourself to the jurors and spell your last name for the court reporter.

A.   Yes.  My name is Matthew Vasquez.  That's V-A-S-Q-U-E-Z.

Q.   Mr. Vasquez, you are coming in from out of town; is that correct?

A.   That is correct.

Q.   Where do you live?

A.   I live in Las Vegas, Nevada.

Q.   How long have you been in Vegas?

A.   A little over 20 years.

Q.   What do you do in Vegas?

A.   I'm currently the director of financial investigations for RJ Corporate Compliance.

Q.   And the director of financial investigations for corporate compliance, that's a mouthful.

A.   It is.

Q.   What does that entail?  What do you do on a daily basis?

A.   I oversee a team of individuals responsible for reviewing customer activity for suspicious activity.

Q.   And what -- so suspicious activity, what are you talking about?

A.   Related to anti-money laundering, terrorist financing, other financial crimes.

Q.   So it's a pseudo law enforcement type of job?

A.   Correct.

Q.   But you're not a law enforcement officer.

A.   No, I'm not.

Q.   Do you work with law enforcement?

A.   Randomly, yes.

Q.   Tell me a little bit about the casinos that you oversee in Vegas and elsewhere.

A.   MGM resorts oversees or runs all the -- most of the Las Vegas properties, about 12 properties in Las Vegas.

We also have some properties in various regional areas. One in Mississippi, Maryland, Massachusetts, Michigan and then, also, New Jersey.

Q.   Is your department responsible for all those casinos or just a specific casino?

A.   We're responsible for all of the casinos with the exception of Borgata in New Jersey.

Q.   And out of the casinos in Vega, what are some of the more larger ones and more well-known ones?

A.   Aria, Bellagio, MGM Grand.  There is also Park MGM. There's many others but those are the largest.

Q.   All right.  May I approach the witness, your Honor?

          THE COURT:  You may.

Q.   (BY MR. GUESS) Mr. Vasquez, I'm handing you what's been marked for identification purposes as Government's Exhibit No. 229.  Do you recognize what that is?

A.   Yes, I do.

Q.   And is that a screen shot of a document that's maintained by MGM and your department?

A.   It is, yes.

Q.   All right.  Is it related to Saint Jovite Youngblood?

A.   Yes.

Q.   Move for admission of Government's Exhibit No. 229.

          THE COURT:  Any objection?

          MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. GUESS) I'm also going to hand you a disc here and on it is Government's Exhibit 300.  Actually, 297 through 301, but 300 is the one that you looked at yesterday; is that correct?

A.   That's correct.

Q.   And you initialed this disc from looking at it yesterday?

A.   Correct.

Q.   And is that a video from one of your casinos?

A.   Yes.

Q.   Move for admission of Government's Exhibit No. 300.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. GUESS) Tell the jurors a little bit about the type of records or the type of activity that you track with your casinos.

A.   The casinos use multiple systems, software programs that are used to track players' gaming activity.  Our main program is one that looks at or tracks all the gaming activity for patrons in order for them to accrue complimentaries that are earned through their activity, both gaming and non-gaming activity throughout the casinos.

Q.   Could I have just a moment, your Honor?

THE COURT:  Yes.

MR. GUESS:  Your Honor, I'm sorry, the document here, the one we had talked about last night has been misidentified here.  Could we take the -- a short break so that I could get the proper document?

THE COURT:  Yes.

MR. GUESS:  I apologize.

THE COURT:  Actually, it's -- time for our long break is about now so we'll go ahead and do that.

MR. GUESS:  Thank you, your Honor.

THE COURT:  Ladies and gentlemen, we'll take our first 20-minute break of the day.  Let's call it at 10:30.  If you could be back in the jury room ready to go at 10:50, we will resume testimony at that time.  You know the instructions.

(Jury not present.)

(Recess.)

THE COURT:  Ready to proceed?

MR. GUESS:  Yes, your Honor.

(Jury present.)

Q.   (BY MR. GUESS) Mr. Vasquez, you're the same person who was on the stand when we took this quick break; is that right?

A.   Correct.

Q.   I appreciate the Court's indulgence allowing us to

fix the exhibit.  But would you please take a look at what's in front of you there, No. 229, and pull the document out of the sleeve and rather than one page, it's two pages; is that correct?

A.   That's correct.

Q.   All right.  Let me grab that from you.  At this time, we'd readmit 229.

MR. GONZALEZ-FALLA:  No objection, your Honor.

THE COURT:  So admitted.

MR. GUESS:  Could I have 229 on the screen, please, Ms. Mercado.  Thank you.

Q.   (BY MR. GUESS) Could we go ahead and let's focus in on the left-hand side of the document.  All right.  Mr. Vasquez, you were telling the jurors that MGM, your department keep a lot of information about certain people that come into the casinos; is that correct?

A.   Correct.

Q.   And you refer to them as patrons?

A.   Correct.

Q.   Government's Exhibit 229, is that one of the documents or some of the information that you are able to pull up on individuals who come to your casinos?

A.   Yes.

Q.   All right.  At the top, we see Mr. Saint Youngblood.  Do you recognize that name?

A.    Yes, sir.

Q.    You've never met Mr. Youngblood in person, have you?

A.    No, I have not.

Q.    No reason to, correct?

A.    Correct.

Q.    Are you on the casino floors on a daily basis?  Or where do you work at?

A.    I work, actually, in a building housed on MGM Grand property, but it is back of house or it is a private building that where our offices are based.

Q.    And the way that you kind of monitor or track information about your patrons is through what's called a players club account?

A.    Correct.

Q.    Explain to the jury what the players club account is.

A.    A players club account is our loyalty program for our various casinos where someone has the ability to go to one of our players club representatives, sign up for an account with us and that will track their gaming activity and other resort-related offerings in order to earn complimentaries to be used for things around the casinos such as free meals, free hotel rooms.

Q.    Do you have different levels within your players club?

A.    I do.

Q.   Talk to the jurors a little bit about the levels in the players club.

A.   We have the entry level, which is referred to as a sapphire-level player.  It's a very low-end player that goes all the way up to platinum and a noir-level player, which is an invite-only level player.

Q.   And looking at the document there in front of you, Government's Exhibit 229, are you able to identify what level Mr. Youngblood would have been at in the players club?

A.   He would have been either a platinum or a noir-level player at that level.

Q.   So to get that invitation, what does it require from MGM from the players club to reach that level of platinum or noir?

A.   It requires a certain dollar level of spend for the customer to bring into the casinos and spend in various areas either through gaming or through other expenditures throughout the casinos to be able to be invited into that club.

Q.   Your records go back quite a ways on each player; is that right?

A.   Digitally, yes.

Q.   All right.  In front of us right now highlighted, we have 2011 through 2016; is that correct?

A.   Yes, sir.

Q.   All right.  And again, I want you to kind of explain -- so let's start with the first group there, site group begin date and trip, can you tell me what that is in reference to?

A.   Yes.  Those headers actually explain the years that are being represented in this particular information, group of information.  The beginning date shows the earliest day that that data is listed.  There is other information there like slot statistics showing various things such as the coin in.

Q.   I'm going to stop you there.  The first column that we see here, 1998 through 2023, is that a compilation of all the columns that we have in front of us?

A.   That's correct.  There's only so much real estate that can be or screen space that could be displayed on this, but that particular blue column does show the aggregate of all the activity from 1998 through 2023.

Q.   Could we go to page 2 of that exhibit, please, Ms. Mercado?  This is just, again, looking at 2023, back to 2016; is that right?  The yearly?

A.   Correct.

Q.   And the blue column hasn't changed from the first page of that document?

A.   Correct.

Q.    So let's talk about slot statistics.  Coin in, explain to the jurors what coin in means.

A.    Coin in represents the amount of money that was wagered on slot machines for that specific time period.

Q.    So for this period from 1998 through 2023, we see coin in of $140,553,420; is that right?

A.    Correct.

Q.    And then, for 2021, I'm highlighting on the big screen there, 22 million plus some?

A.    Correct.

Q.    2022, relatively low, 5.8 million?

A.    Correct.

Q.    And then, 2023, 21.5 million; is that right?

A.    Yes.

Q.    So how do you get these numbers in terms of coin in? Is this someone actually dropping quarters into a machine or is this something different?

A.    It's something different.  Patrons have the ability to insert cash directly into the machine in the form of U.S. currency bills.  They can insert those into the machine.  They do also have the ability to purchase what's known as a slot gaming voucher either from one of our casino cashiers or they could purchase it at one of the automated kiosks on the casino floor.  They would still insert cash to purchase that particular ticket and that

ticket can then be used and inserted into a slot machine.

Q.   For coin out, tell us what that means.

A.   Coin out represents the amount of coin that left those specific machines during those -- that particular period.

Q.   So I'm looking at 2023, I see coin in of 21.5 million, coin out of 19.6 million; is that right?

A.   That is correct.

Q.   And is that based on, again, actual money going in and out?  Or is this based on a computer slip that you get when you leave your machine?

A.   It's based on the amount of credits that are actually in any particular slot machine whether that was funded through the use of a slot gaming voucher or through cash inserted directly into the machine.

Q.   And again, our recollection is the pull the slot, the quarters come falling out, you got your big bucket there.  That doesn't happen anymore, does it?

A.   No.  No, sir.

Q.   Where do you pick up your winnings if you happen to win at the machine?

A.   You would actually cash out any credits from the machine by pressing a cash out button and what will happen is it will dispense a gaming voucher, a non-cash gaming voucher for the amount of credits that were in that

machine, which you then can take and redeem for cash at an automated kiosk or one of the casino cashiers.

Q.   And if someone wins a big jackpot or if they have a winning hand, do they have to fill out any type of tax forms or government forms?

A.   Specifically for a slot jackpot, yes, they do.  They have to fill out a W-2 form.

Q.   And explain to the jurors what that means.

A.   A W-2 form is a taxable form that has to be filled out for any slot jackpot or winnings in excess of $1,600 or greater.

Q.   And does the casino keep records of all that?

A.   Correct.  Yes, we do.

Q.   Jackpots we see here, 1.2 million for 2023, what does that indicate?

A.   That is how much in just slot jackpots that were won.  It varies slot machines for that particular framework.

Q.   So a jackpot is considered a low level of money or high level of money?

A.   It's considered a higher level of money.

Q.   Is there a minimum amount that's considered a jackpot?

A.   $1,600 is taxable, but there are lower-limit jackpots that are also hit.

Q.   And what would be the maximum jackpot?

A.    It can range all the way up into the millions.

Q.    Off of a machine.

A.    Off of a machine such as megabucks machine has million-dollar jackpots.

Q.    And we see here again in 2023, 1.2 million in jackpots; is that right?

A.    That is correct.

Q.    And again, over the course of Mr. Youngblood's patronage of the MGM, 7.7 million in jackpots?

A.    Correct.

Q.    The next line, ACT win, what does that stand for?

A.    That stands for actual win and that number represents -- if it's in black, it represents the amount of money that the customer lost or the patron lost.  If is in red, it represents an amount that was won by the customer or the patron.

Q.    So again, 2023, the black number of 696,365, that would be winnings for the casino, losses for Mr. Youngblood.

A.    That's correct.

Q.    And the totality in terms of 1998 through 2023, we show a black number of $2.225 million.

A.    Correct.

Q.    Again, that's winnings for the casino.

A.    Winnings for the casino, yes.

Q.   So the old adage the house always wins proves true here; is that right?

A.   Yes, it is.

Q.   At some point, we do see back in 2020, a red number of $136,000; is that right?

A.   That is correct.

Q.   So some years, Mr. Youngblood would actually come out on top?

A.   Correct.

Q.   But overall, the house never loses.

A.   Correct.

Q.   Theoretical win, that next column, what does that mean?

A.   That is actually a number that is used by marketing personnel at our various casinos to help determine how much profit the customer -- the potential profit that could be earned off of that customer.

Q.   And is that actual money or is that --

A.   It's not actual money.  It's comprised of bunch of various formulas just calculating the amount of time that's played and the type of machine that is being played on the dollar value for that machine.

Q.   All right.  So those are the slot statistics?

A.   That's correct.

Q.   The slot statistics would show that Mr. Youngblood

almost exclusively was there to play slot games?

A.   Correct.

Q.   And you don't know what kind of slot games he's playing, you just know it's some type of slot?

A.   Correct.

Q.   Below that, it says table statistics.  What are table statistics?

A.   Table statistics are the actual physical table games such as blackjack, roulette, other types of card-style games such as Casino War, Pile Gal Poker.

Q.   We see, again, totality over 1998 to 2023, he spent on time played six hours and 27 minutes?

A.   Correct.

Q.   So not very long at the tables then for that period of time?

A.   Not at all, no.

Q.   Net buy-in, what does that mean?

A.   Net buy-in is the aggregate total of all the casino chips that were used as well as any cash and any markers that were used to fund that player's activity at the table games.

Q.   So these are all really small numbers relative to what we saw on the slots?

A.   Absolutely.

Q.   Would that indicate to you that Mr. Youngblood was

basically a slot player at your casinos?

A.    Yes.

Q.    You identified Government's Exhibit 300.  I'm going to ask that that be played now.  That's been admitted.  Do you recognize which of the casinos at MGM this is?

A.    Yes.  That's the Aria Casino.

Q.    All right.  So you were noting that the carpet was unique to Aria?

A.    That's correct.

Q.    Is there any other casino that has that style of carpet?

A.    Not that I'm aware of.

Q.    We see here, Five Star Poker, the machine; is that right?

A.    Correct.

Q.    Is this something that you're familiar with?

A.    Relatively, yes.

Q.    All right.  Is that one of the machines that would be there at the Aria?

A.    Yes.

Q.    And on this machine, is there a maximum amount of bets, or anything like that, that you could tell, or is this just unknown based on the picture?

A.    Not that I could actually visually see from the surveillance footage that we're viewing there.  I can't

exactly tell the denomination that he's wagering on that machine.

Q.   And we see two machines next to each other; is that right?

A.   Correct.

Q.   And this is dated 6-13 of 2023.  Is this -- again, you mentioned surveillance cameras.  Is this from the Aria's video surveillance?

A.   Yes.

Q.   Do you have cameras throughout the casino?

A.   We do.

Q.   Why do you have the cameras there?

A.   It is part of both state regulation and other various regulations where slot machines in any gaming area as well as table games have to be monitored by surveillance for purposes of fraud prevention, other types of activities, suspicious activity that may happen on the casino floor.

Q.   Let's go ahead and continue playing the video, please.

        (Video file played).

Q.   And we see your patron there feeding in bills to the machine that he's not sitting at.  Why would he be doing that?

A.   One example of someone doing that is in order to avoid losing that specific machine where they like to

play, they will insert cash into a near by machine and then, press the cash out button to receive a voucher and then, take that voucher from the machine that they inserted the cash in and put it into the game of the other machine that they're actually playing to kind of keep from having to go visit one of the casino cashiers and happen to lose that specific machine to another player.

Q.    Do patrons generally have favorite machines that they like to go to?

A.    Typically, yes.

Q.    Let me pause it there again, please.  In this, you saw the patron obviously filling a number of bills, and so forth.  It looks like in front of him there, there's some type of card.  Do you see that?

A.    Yes.

Q.    Is that what you're talking about, one of the cards that you get from the machine?

A.    It's -- slot game voucher, yes.  It's just a paper voucher, yes.

Q.    Let's go ahead and continue playing the video.

        (Video file played.)

Q.    What did your patron do?

A.    He removed the slot gaming voucher from the machine to his left and then, inserted it into the machine that he's -- where he is actually sitting and playing.

Q.   So the amount of cash that he put in comes back out on that slip and then, it goes into this other machine?

A.   Correct.

Q.   All right.  The video shows that this is 8:28 -- you're on a 24-hour military clock; is that correct?

A.   Is that correct.

Q.   So this is 8:30 in morning when this is happening?

A.   Approximately, yes.

Q.   Go ahead and finish the video, please.

        (Video file played.)

Q.   So is there an amount of money that you could only put in at one time?  Because he's obviously putting more money in.  Why would he be doing that?

A.   It's based on how much he's wagering.  So if he wagers the maximum amount or whatever amount he's wagering, he may need to insert more credits into the machine or more funds into the machine in order to continue his gaming on that machine.

Q.   And as he's putting money in, he's obviously playing on the machine to the right; is that right?

A.   That's correct.

Q.   Are these machines set up to play quickly or to -- do you have time to consider your cards?

A.   For the type of game that he's playing, yes, it's a poker-style game so he has time between when the machine

displays the particular cards and him choosing when to hold a specific card or when to not hold a card.  So yes, he has plenty of time to.

Q.   We saw him do something to the right-hand side of the screen there.  Could you pause it for just a quick second again, Ms. Mercado?  When that portion of the screen went to the smaller, what was going on there, do you remember?

A.   I would have to look at that again.  I'm sorry.

Q.   Could you just review that or maybe like 30 seconds?

(Video file played. )

Q.   What's going on there?

A.   What's happening is he is actually inserting a pin number that he has created for his players account to be able to access any free play that's been generated through his gaming activity.

Q.   Okay. All right.  Thank you.  Go ahead and finish playing.

(Video file played.)

Q.   Are you able to tell what denomination those bills are or is that too blurry?

A.   They appear to be hundred-dollar bills.

Q.   I think that's enough for now.  Thank you, Ms. Mercado.

So the video -- obviously, you have videos.  How long do you keep your videos generally?

A.   Standard procedure is to keep them for a period of 10 business days unless through a request by law enforcement or some other regulatory body wants that footage saved for longer, in which case, standard records retention period is five years.

Q.   I have nothing else for this witness, your Honor. I'll pass for cross-examination.

CROSS-EXAMINATION

BY MR. GONZALEZ-FALLA:

Q.   Good morning, Mr. Vasquez.

A.   Good morning.

Q.   So you were referring to these figures using dollar amounts?

A.   Correct.

Q.   Do they correspond directly to dollars?

A.   Yes, as far as dollars that were wagered in those slot machines.

Q.   Because you also referred to credits?

A.   Correct.

Q.   Do they also reflect credits?

A.   Yes, it does.

Q.   So it's a combination of dollars and credits?

A.   Yes.

Q.   So it's not all dollars.

A.   No.  It's not all dollars.

Q.   Okay.  And you said that this is based on a -- Mr. Youngblood's players number?

A.   Correct.

Q.   Is that right?  So he has to use a specific identification number when he's playing this game?

A.   It's printed on the card or it's encoded in the information on the card so whenever they insert a card, it recognizes that that's the individual and that's their account number.

Q.   So whoever inserts the card is the one that's going to be producing the statistics here?

A.   Correct.

Q.   And what kind of card is this?  Is it a photo card or is it just a black card?

A.   It's just a plastic card that's usually colored based on what level they are, what level of player they are like sapphire, gold, platinum, noir.

Q.   Does the card have the person's photograph on it?

A.   It does not.

Q.   So anybody can use the card.

A.   Technically, yes.

Q.   I have no further question, your Honor.

        MR. GUESS:  Nothing else, your Honor.  May the witness be excused?

        THE COURT:  Any objection?

MS. HERRING:  No objection.

THE COURT:  Yes.  Thank you very much.  Free to go.

THE WITNESS:  Thank you.

THE COURT:  Next witness.

MR. GUESS:  Government would call Luke McEwin.

THE COURT:  Morning, sir.  Before you're seated, could you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

LUKE MCEWIN, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. GUESS:

Q.   Good morning, Mr. McEwin.  I'd like you to introduce yourself to the ladies and gentlemen of the jury and spell your last name for the court reporter.

A.   Sure.  My name is Luke McEwin.  I'm the executive director of the Resorts World Cage Credit Casino Collections Department.  My last name is M-C-E-W-I-N.

Q.   And you did a good job of telling us where you're employed.  Where do you live, sir?

A.   In Las Vegas, Nevada.

Q.   And that's where the casino's located at?

A.   Yes, sir.

Q.   How long have you been in Resorts World?

A.   A year.

Q.   And prior to that, were you working in the casino industry?

A.   Yes, sir.

Q.   What did you do in the casino industry before that?

A.   Same position.  I was at the M Resort for 11 years before that and other properties earlier.

Q.   Resorts World, would you describe for the jurors what Resorts World is and a little bit about what the casino is like?

A.   Sure.  It's a property built a couple of years, two-and-a-half years ago on the strip there, in the north end of the strip where the Stardust used to be.  They imploded that and then, built Resorts World there.

Q.   Is it a big hotel casino complex?

A.   Yes, it is.

Q.   One of the bigger ones in Vegas?

A.   Yes, sir.

Q.   And you said you started there about a year ago. Exactly -- you said you're the executive director of cage operations?

A.   Cage collections credit and loyalty services.

Q.   All right.  Explain to the jurors what that means.

A.   Okay.  Sure.  So I oversee the floor departments, take care of the standard operating procedures, handle anything where a situation may arise and they may need a decision on any situations that arise that are outside of the standard operating procedures and the management team isn't comfortable with it, they'll come to me for some decisions.

Q.   All right.  And do you have people who work underneath you?

A.   Yes, sir.

Q.   How many?

A.   About 80.

Q.   I'm going to hand you what's been marked for identification purposes in which you've previously seen, Exhibits 237, 238 and 239.  Do you recognize these documents?

A.   Yes, I do.

Q.   And what are they?

A.   They are win-loss statements.

Q.   And they're produced by Resorts World; is that correct?

A.   That's correct.

Q.   Move for admission of Government's Exhibit 237, 238, 239.

MR. GONZALEZ-FALLA:  No objection, your Honor.

THE COURT:  So admitted.

Q.  (BY MR. GUESS) You passed one of your counterparts as you were entering the courtroom today in a different casino.  Does Resorts World have a loyalty program or identification for certain patrons at the casino?

A.  We do.

Q.  Tell the jurors a little bit about what that is like or what the program is.

A.  Sure.  So rewards program, the guest would fill out an application with their basic information to get a rewards card and then, from that rewards card, they would place it on -- inside a slot machine to track their play and then, based on their play, they're given certain complimentaries or points back that they earn for free slot play, which you can download that back onto the machine to play again.  And also, on the table game side, they're able to show their card to the table games team and get tracked for their play and they track their average bet, the time played, how much they won or they lost, and they enter that into the computer system.

Q.  What are the levels of patrons that you have within this system?

A.  We have numerous levels.  Basically we have our VIP level, the upper end where play is at a higher level, and

then, below that are pretty much the standard players that come in and on vacation and playing at a lower level financially.

Q.   You've had opportunity to look at Government's Exhibits 237, 238 and 239.  Can you tell the jurors what level Mr. Youngblood would have been at at Resorts World?

A.   I would say he'd be VIP.

Q.   The highest level?

A.   Yes, sir.

Q.   And could we have Government's Exhibit No. 237 on the screen, please.  This is the statement of 2021 win-loss for Mr. Youngblood; is that correct?

A.   Yes, sir.

Q.   Tell us what the table win column stands for.

A.   Table win, again, would be the net at the end of the year what he won or lost on tables.

Q.   And what are tables?

A.   Tables are blackjack, dice, roulette, any of those type of games.

Q.   And it shows zero so he didn't do anything at the tables at Resorts World that year?

A.   Correct.

Q.   We see slot coin in.  What does that mean?

A.   Slot coin in is, as I mentioned earlier, when you put your player card into the machine, the machine tracks how

much they call coin in or cash that you're putting into the machine to play.

Q.   Can you actually put cash into a machine or do you have to have one of these cards?

A.   Well, the card just tracks the play.  You could put cash in there and play without a card or with a card.

Q.   So the only way you track it, though, is through the card.

A.   Yes, sir.

Q.   And the card itself, is that shared among patrons or does the patron guard that card closely?

A.   The card is pin-protected so it's that patron's specific card.

Q.   In 2021, we see slot coin in of $10.8 million; is that right?

A.   Yes, sir.

Q.   And we see coin out of 5.3 million.  What does coin out mean?

A.   Coin out is what the machine pays you back as you're playing throughout the timeframe.  And again, if you put $10 in and a machine gives you $5 back, coin out is that $5.

Q.   Slot jackpot, what does that refer to?

A.   Slot jackpots are what he would win that are taxable on a W-2 G and those are accumulated for the year and

that's what he won for the year.

Q.   And then, the next column, slot win/loss, what does that indicate?

A.   That is the net of his play for that year of whether he won or if he lost.  In this particular case, that's what he won for the year.

Q.   So in 2021, Mr. Youngblood's card, Mr. Youngblood won $131,000 from Resorts World?

A.   Correct.

Q.   Go to Government's Exhibit No. 238, please.  So in the next year, we see a dramatic increase in coin in; is that right?

A.   Yes.

Q.   See a little bit there on the table win; is that right?

A.   Yes.  Just a little.

Q.   How much win or loss does he have for the table games that year?

A.   He lost $1,200.

Q.   So we show 70 million of coin in, 33 million of coin out.  And let's just go to that column where we talk about the slot win-loss, it's in parentheses.  What does that indicate?

A.   That he lost that much.

Q.   So that's about 1.165 million?

A.    Correct.

Q.    When gamblers have losses, do they also get these W-2 Gs for those or do they just get them for winnings?

A.    Just the winnings, the slot jackpots.

Q.    Government's Exhibit 239 and this is for 2023; is that correct?

A.    Yes, sir.

Q.    Again, same type of process and there's a little bit of a table loss there?

A.    Yes.  13,480.

Q.    We see again, a large amount in terms of slot in, slot out and a good size jackpot; is that right?

A.    Yes.

Q.    Is that one jackpot or probably multiple jackpots?

A.    Probably multiple jackpots through the year.

Q.    And the total is that Mr. Youngblood ends up winning $300,000 at your casino that year.

A.    For the slot win, yes --

Q.    For the slots.  The total is a little bit less because he lost those table games.

A.    Correct.

Q.    But again, he comes out a winner that year.

A.    He did.

Q.    So unlike the other one, sometimes the house loses, right?

A.   Yes.

Q.   All right.  No further questions of this witness, your Honor.  I'll pass him for cross-examine.

MR. GONZALEZ-FALLA:  No questions, your Honor.

THE COURT:  May this witness be excused?  Thank you, sir.  You're free to go.

THE WITNESS:  Thank you.

THE COURT:  Next witness.

MR. HARDING:  Your Honor, at this time, we've discussed with defense about them calling a witness out of theirs out of order.

THE COURT:  Okay.

MS. HERRING:  Yes, your Honor.  May I just step outside?

THE COURT:  Sure.

MS. HERRING:  Your Honor, the defense would call Officer Brian Oberon.

THE COURT:  Before you take a seat, could you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

BRIAN OBERON, called by the Defendant, duly sworn.

DIRECT EXAMINATION

BY MS. HERRING:

Q.   Mr. Oberon, can you please state and spell your name for the court reporter?

A.   Sure.  It's Brian, B-R-I-A-N, Oberon, O-B-E-R-O-N.

Q.   And can you tell us where you're currently employed?

A.   The Orange County District Attorney's Office as an investigator.

Q.   And how long have you been with the Orange County District Attorney's Office?

A.   Four years.

Q.   And what is your role there currently?

A.   Currently, I'm assigned to the game unit where I assist the district attorney and the prosecution of game-related cases.

Q.   And prior to joining the Orange County DA's Office, where were you employed?

A.   I worked for the Arcadia Police Department for 17 years.

Q.   And what positions did you hold at the Arcadia Police Department?

A.   I spent seven years as a patrol officer, three of which I was an FTO, field training officer, and then, I became a detective and I worked financial crimes cases, anything that had to do with money or being scammed and I

was a detective for 10 years.

Q.   And what kinds of financial crimes cases did you see at the Arcadia Police Department?

A.   So cases that I received training in and that I personally investigated dealt with identity theft, credit card fraud, forgery, check fraud, money, counterfeiting, the production of fraudulent identifications and various documents, embezzlement, theft, financial elder abuse, internet fraud, wire fraud, real estate fraud, investment scams.  I think that about covers it.

Q.   Thank you.  Do you recall an investigation into an investment scam case you handled in June of 2019?

A.   Yes.

Q.   And how did that case -- did that case involve a victim named Hanfu Lee?

A.   Yes, it did.

Q.   Can you tell us how that case came to the Arcadia Police Department?

A.   It was initially -- well, Mr. Lee came to the police department and an initial police report was taken by Officer Whiter, Gaddy Whiter.  From there, then the case was assigned to me in the detective bureau to look into further, so that's when I reviewed the case and investigated it further.

Q.   And as the detective assigned to that case, how did

you proceed with it?

A.   I read through it.  There were some documents that were provided to Officer Whiter that I looked through and then, I contacted Mr. Hanfu Lee and had him come to the police department so I could interview him further, and he provided through e-mail a spreadsheet that had the times when he gave money to Mr. Youngblood and where that money came from.

Q.   And I want to ask you, do you recall if you recorded your interview with Hanfu Lee?

A.   Yes, I recorded it.

Q.   And why do you as an investigator, as a financial crimes detective decide to record an interview?

A.   To make an accurate account of what's being said and it was -- I'm pretty sure it was our policy at that time. I don't remember what the policy exactly said, but anytime I interviewed a witness, victim or suspect, it was recorded.

Q.   And is that something -- I know you're no longer with Arcadia PD, but is that something that would be retained by the Arcadia Police Department even if the detective moves on to another position?

A.   Yes.  It was booked -- I booked it into evidence.

Q.   And after meeting with Mr. Lee, what was the nature of the scam?

A.   It boiled down to Mr. Youngblood was a -- first was a patient, then became a friend and it boiled down to from 2010 to 2017, so seven-year period, Mr. Youngblood would ask to borrow money and in that seven-year time span, it was just over $5 million.  So in his investment endeavors where Mr. Youngblood would purchase comic books, coins, jewelry, paintings, sculptures, Star Wars memorabilia, sports memorabilia and Rolex watches, and in return, give some of the profit to Mr. Lee.

Q.   So it was an investment scam.

A.   Yes.  That's what I understood it to be.

Q.   Was there a Rolex watch component to it?

A.   Yes.

Q.   Can you talk about that?

A.   So I -- what I recall is I think there were four Rolex watches that were purchased.  Mr. Hanfu Lee purchased those with his credit card.  Mr. Youngblood accompanying him to wherever these watches were purchased. I don't recall where they were purchased.  And Mr. Youngblood picked out the watches and then, from there, Hanfu Lee was told that Mr. Youngblood was going to send those watches out of state to a friend of his.  So the face of the watch could be altered to look like a military-style face, and in turn, the watches would be more valuable, approximately 20 percent more valuable.  He

could sell them for a profit.  Therefore, Mr. Hanfu Lee could get -- it was either half, double or ten times the amount -- half, double and ten times the amount was a consistent thing that Mr. Hanfu Lee was telling me throughout all these investment scams or opportunities. It ranged from getting half, double or ten times the amount back of what Mr. Youngblood was borrowing or being loaned.

Q.   What was your impression of the investment scam as it was structured that it was item after item was going to be purchased, Mr. Lee expected returns for each item?

A.   Yes.

Q.   When Mr. Lee explained this investment plan or scheme to you, did it make sense or was it pretty obviously a scam in your opinion as a law enforcement officer?

A.   My opinion, I realized immediately it was -- he got scammed out of money.

Q.   And to the best of your recollection, how had Mr. Lee given most of that money to Mr. Youngblood?

A.   So Mr. Hanfu Lee would take money out of his personal business accounts and give it to Mr. Youngblood.  He would --

Q.   Sorry to stop you but cash or --

A.   Cash, yes.  Mr. Hanfu Lee would borrow money from friends of his, then give the cash.

MR. HARDING:  Your Honor, I don't mind the fact that he's going to talk a little bit about the investigation or the report.  We just heard this from Dr. Lee.  It is hearsay.  I'm going to object at this point to the hearsay.

Q.   (BY MS. HERRING) Did your investigation uncover any other ways that Mr. Youngblood was provided funds?

MR. HARDING:  If the answer's going to be what Mr. Lee, Dr. Lee told him, then I'd object to hearsay.

MS. HERRING:  It's about his investigation into this scam, your Honor.

THE COURT:  You can ask but not in a way that's soliciting hearsay.

Q.   (BY MS. HERRING) Did you have a chance to review the documentation that Mr. Lee had brought in?

A.   Yes.

Q.   Can you summarize what kinds of things he brought to you or brought to Arcadia?

A.   Receipts from the credit card purchases from the Rolex watches, receipts for deposits into Mr. Youngblood's bank, accounts, and then, a spreadsheet that listed who Mr. Hanfu Lee got money -- borrowed money from to give to Mr. Youngblood.  I remember there being check numbers on that spreadsheet.

Q.   In your recollection or in your impression, was there

any concern that Mr. Lee was making the investments out of fear?

A.   No.

Q.   When Mr. Lee -- I think his wife came with him; is that right?

A.   Correct.

Q.   When they came to interview with you, had Mr. Lee already stopped giving money to Mr. Youngblood?

A.   Yes.

Q.   What is your understanding of why there was a delay in his report to Arcadia?

MR. HARDING:  Your Honor, this is again asking for Detective Oberon or, excuse me, Investigator Oberon to say what Dr. Lee said.

THE COURT:  Sidebar.

(At the bench, on the record.)

THE COURT:  So I don't have an understanding what's going on here.  It seems to me he's recounting his experience of the investigation which I would think that you're eliciting the testimony talking about why he did what he did as an investigator.

MS. HERRING:  Yes, and I have about five questions left.

MR. HARDING:  And if it was not offered for the truth and an instruction to that effect, I have no

problem.  It's just I don't want to go through this story a second time through this detective.

THE COURT:  I get it.

MS. HERRING:  All of your law enforcement officers get to discuss their investigation.

THE COURT:  Yeah, I mean.

MR. HARDING:  When you object, we say it's not offered for the truth, it's offered -- you, I think, are offering for its truth.

MS. HERRING:  I'm offering for the jury to hear about his investigation into this scam and his understanding of the scam.

THE COURT:  I'll allow that.

(End of bench conference.)

Q.   (BY MS. HERRING) Had Mr. Lee come to Arcadia immediately after he had stopped giving money to Mr. Youngblood?  Or was there a delay?

A.   There was approximately one-year-and-four-month delay.

Q.   And what did your investigation reveal as to why there was that lag time in making the police report?

A.   Mr. Hanfu Lee told me that Youngblood told him that if other people were aware of what was going on, they'd try to stop Mr. Hanfu Lee giving the money to him.  He wanted to give Mr. Youngblood an opportunity to pay him

back, but ultimately, his wife pushed him to file the police report.

Q.   After you met with Mr. Lee, what did you decide to do with the case?  How did you decide to handle it?

A.   I decided to contact the FBI because I knew that they had more resources and it was a large dollar amount, so I provided them with a summary of the case and they decided to take the case.  So at that point, I turned the case over to them and I didn't do any further investigation.

Q.   Do you recall preparing a transmittal letter that you sent along with all of the documents that you provided to the FBI?

A.   Yes.

Q.   May I approach, your Honor?

          THE COURT:  You may.

Q.   (BY MS. HERRING) Investigator Oberon, does that appear to be a copy of your transmittal letter?

A.   Yes, it does.

Q.   Does that look like an accurate copy of it?

A.   Yes.

Q.   I would move to admit Defendant's 33.

          MR. HARDING:  No objection.

          THE COURT:  So admitted.

Q.   (BY MS. HERRING) You told us you referred the case to the FBI because of the dollar amount and the resources

that the FBI had at its disposal.  Did you actually speak to anyone at the FBI about the case?

A.   I did.

Q.   Who did you speak with?

A.   It was a supervisor, Stephanie Orrick.

Q.   And what did you learn from that conversation?

A.   That they were going to investigate the case.

Q.   Did you ever hear back from the FBI about the results of that investigation?

A.   No, I did not.

Q.   Did you do any further work on the case?

A.   No, I did not.

Q.   Have you had any communication with Hanfu Lee since 2019?

A.   No.

Q.   No further questions.

                    CROSS-EXAMINATION

BY MR. HARDING:

Q.   Investigator Oberon, how are you?  I'm Matt Harding, one of the prosecutors on this case.

          In response to questioning from Ms. Herring, you said this seems pretty obviously a scam to you.

A.   Yes.

Q.   You're a trained investigator?

A.   Yes.

Q.   And you'd agree with me that in fraud cases, it is often very easy for someone on the outside to see what isn't so obvious to the person on the inside.

A.   Yes.

Q.   You see this all the time in your fraud investigations?

A.   Correct.

Q.   The tactics that Dr. Lee described Mr. Youngblood is using, high-pressure tactics, need a decision immediately, the risk of losing prior money, are those all extremely common tactics used by fraudsters and con men?

A.   Yeah, they use -- get on their emotional side.

Q.   And based on what Dr. Lee told you, that's exactly what Mr. Youngblood did.

A.   Correct.

Q.   Would you agree with me, sir, that con men and fraudsters typically target vulnerable people?

A.   Yes.

Q.   People who are more gullible?

A.   Yes.

Q.   People who are older?

A.   Yes.

Q.   People with whom they may have a personal relationship of trust?

A.   Correct.

Q.   Did Mr. Youngblood display all those qualities according to Dr. Lee?

A.   Yes.

Q.   Based on all things that we've just discussed, do you believe that Mr. Youngblood is, in fact, an accomplished con man?

A.   Yes.

Q.   Pass the witness.

MS. HERRING:  No further questions.

THE COURT:  May this witness be excused?  Yes. Thank you.

MR. HARDING:  Yes, your Honor.

THE COURT:  You can go.  Your next witness.

MR. HARDING:  The government will call Lane Holloway.

THE COURT:  Morning, sir.  Before you take a seat, could you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

LANE HOLLOWAY, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. HARDING:

Q.   Mr. Holloway, please have a seat.  Get yourself close to that microphone and then, state your first and last name and spell your last name for the court reporter, please.

A.   Lane Holloway, H-O-L-L-O-W-A-Y.

Q.   Mr. Holloway, where are you from, sir?

A.   Pflugerville, Texas.

Q.   Lived there most of your life?  All your life?

A.   No.  Just initially Austin for college and then, to Pflugerville.  I've lived there since 2015.

Q.   Okay.  And you mentioned college.  Can you tell us where you went to undergrad?

A.   University of Texas.

Q.   Here in Austin?

A.   Yes.

Q.   And what was your degree?

A.   Electrical engineering.

Q.   Did you get any advanced degrees?

A.   Yes, I did.

Q.   Can you tell the jury what those were?

A.   Master's in Electrical Engineering from University of Texas San Antonio and a Ph.D. in Electrical Engineering and Computer Science from University of Texas, Austin.

Q.   Can you tell the jury a little bit about your family, starting with your parents.

A.   My parents are Jay and Pat Holloway, they live in Pflugerville.  I have a brother Seth, my younger brother, and my younger sister Allison.  They all went to University of Texas.  Allison now lives in Washington and my brother lives here in Austin.

Q.   Okay.  Are you married, sir?

A.   Yes, I am.

Q.   What is your wife's name?

A.   Danielle Holloway.

Q.   And do you have kids?

A.   Yes, I have three.

Q.   Would you mind telling us their names and ages?

A.   Sure.  I have XXXXX, who is 10, XXXXXX, who is seven, and XXXXXX, who is two and a half.

Q.   Let's talk a little bit about your work history.  Sounds like you're an engineer by trade?

A.   Yes.

Q.   Or computer engineer, electrical engineer?

A.   Yes.

Q.   You and I have met before today several times; is that correct?

A.   Correct.

Q.   And during that conversation, we learned that you and

I both were at IBM at the same time in 2008.

A.   Yes, we were.

Q.   We didn't know each other; is that correct?

A.   Correct.  Did not know you.

Q.   I also didn't know you.  Can you tell the jurors what you did for IBM between 2000 and 2010?

A.   Okay.  I worked in a software group and I wrote software that would analyze people's code bases to see how -- how many bugs were in the codes and could make estimations on if the code could be improved or not.

Q.   And when you say code, you're talking about computer programs?

A.   Yes, computer programs.

Q.   After you left or after you left IBM, where did you go?

A.   I went to a company called Potomac Fusion, which is a government contractor.

Q.   After that where, did you go?

A.   Went to a startup that was called Home Away, now it's called Vrbo.

Q.   And you left there some point along the way?

A.   Yes, I did.

Q.   And where did you go after that?

A.   I went to a computer security company called Rapid7.

Q.   All of the jobs you're describing now, essentially

coding jobs, development -- web development or software development?

A.    Correct.

Q.    You left Rapid7 under not the best circumstances, correct?

A.    Correct.

Q.    Tell the jury just very briefly, not the whole story, just what happened in sort of one sentence.

A.    Okay.  Disagreement on the path forward.

Q.    That's not even one sentence probably.  Were you fired?  Did you quit how?  Did that go?

A.    It was a mutual parting of ways is the best way to put it.  We both agreed that what I wanted to do and they wanted to do was different so they gave me a payment and said go ahead and leave and I left.

Q.    There were no allegations of dishonesty or fraud or anything?

A.    No.  Just disagreement on path forward.

Q.    After that, where did you go to work?

A.    I went to work for Amazon.

Q.    And again, in brief summary, what did you do for Amazon?

A.    For Amazon for three years, I worked on building software for fulfillment centers.  And then after that, I worked in AWS, building Open Search and Elastic Search

clusters that they have.

Q.   More computer coding-type stuff?

A.   More computer coding, things like that.

Q.   That was a good job?

A.   Yes, it was.

Q.   Could you tell the jurors your approximate salary or, let's just say, compensation at that time?

A.   Compensation, at least 400,000, maybe 600,000, somewhere in there.

Q.   Some of that's salary, some of that's stock?

A.   Yes, salary and stock.

Q.   Financially, how were you doing at that time?

A.   Doing very well.

Q.   And what years did you work for Amazon?

A.   2015 through October of 2021.

Q.   Okay.  Do you know a person named Kota Youngblood?

A.   Yes, I do.

Q.   Do you see Mr. Youngblood here in the courtroom?

A.   Yes, I do.

Q.   Could you please point him out and identify him by something he's wearing?

A.   Black sweater right over there.

Q.   May the record reflect the witness has identified the defendant?

        THE COURT:  Record will so reflect.

Q.   (BY MR. HARDING) Could you tell the jury approximately when you first met Mr. Youngblood?

A.   I believe I met him maybe 2018 when he was at my father's house.

Q.   Tell us about that.  How did that come to pass?

A.   He was -- I had gone over there to check on my parents to see how they were doing and he was there and introduced himself.

Q.   You and your folks live really close together?

A.   Yes, we live basically three doors way.

Q.   So you go to your parent's house and he's there.  You just have a casual encounter.

A.   Yes.

Q.   Did he appear to have some greater degree of relationship with your father?

A.   It was like they were kind of like associates doing work together.

Q.   Your dad knew him?

A.   Yes.

Q.   Let's jump ahead a little bit to at some point, does your father ask you for money related to some kind of art investment?

A.   Yes.

Q.   Is that also in 2018, approximately?

A.   It would probably be 2018.

Q.   Okay.  What was the sort of pitch to you from your father?

A.   My dad was like they needed some cash to buy some artwork.

Q.   Who's "they"?

A.   My dad and Kota.

Q.   Okay.  So your father approaches you saying, hey, could you lend us some cash so we could buy some art?

A.   Yes.

Q.   What did you think?  What did you say?

A.   I was kind of like how much do you need and why and, you know, kind of what happens.

Q.   How much were they asking for approximately?

A.   So maybe 15, 16, maybe 17,000.

Q.   That's a fair amount of money, obviously.

A.   Yes.

Q.   Did you do some research into the artwork and see if it seemed like a reasonable investment?

A.   I did a little bit of research, it looked okay.  It was real and seemed to be there.  I couldn't get too much on it, but it appeared to be like real artwork so...

Q.   You're no art expert; is that fair?

A.   Correct.

Q.   So what do you do?

A.   I said, well, if I wanted to, will you pay me back?

Q.   What did your dad say?

A.   Dad said yes.

Q.   So did you give him the money?

A.   I gave him the money.

Q.   Let's jump ahead a little ways.  Did you get paid back?

A.   Yes, I did.

Q.   Okay.  Let's jump ahead a little bit further.  Is there another time when your father comes to you and asks for a similar kind of loan to invest in artwork or other investments?

A.   Yes.

Q.   What do you say?  Do you lend him on that occasion?

A.   Said the same thing.  I said as long as you pay me back.  It's my father so...

Q.   Were you offered some collateral on that occasion?

A.   One of them, yes, I was.

Q.   What was the collateral you were offered?

A.   It was supposedly some weird coins, some full set of coins.

Q.   Up until now, we've been talking about you having discussions with your father, correct?

A.   Yes.

Q.   Who offers you the collateral?

A.   Kota offers me the collateral.

Q.   Supposedly some valuable coins?

A.   Yes.

Q.   What do you say when he offers you the collateral?

A.   I say, well, sure.  I figured I was going to get paid back.

Q.   Did you take the collateral into your own custody?

A.   I did not.  I left it with my father.

Q.   At some point along the way, is it fair to say there's a few deals like this of a similar nature to what you just described?

A.   Yes.

Q.   And you get paid back every time?

A.   Yes.

Q.   Could you estimate for the jury about how many times you're loaning money to your father for some kind of joint project between him and Kota Youngblood?

A.   Three, four, maybe five times.

Q.   Okay.  At some point along the way, does your father suggest that you open a Navy Federal Credit account?

A.   Yes, he does.

Q.   What does your father say the reason that might be a good idea is?

A.   Because it's usually pretty easy to get loans from Navy Federal.

Q.   When you're loaning him money, sometimes you were

actually taking out a bank loan to give him.

A.    Yes.

Q.    You're not going to your checking account and withdrawing 16 grand in cash or whatever.

A.    Not initially.

Q.    When you went to Navy Federal, did they seem to know Mr. Youngblood?

A.    Yes, they did.

Q.    Can you tell the jury about that?

A.    One of the people there had known him in California and said he was a great standup guy and they said he's a great person to talk to and was a standup person.

Q.    They vouched for him?

A.    They vouched for him.  Yes.

Q.    So four to five deals of that nature; is that right?

A.    Somewhere like that.

Q.    In that neighborhood.  Again, you're paid back every time?

A.    Yes.

Q.    At some point in your relationship with Mr. Youngblood, at this point, is sort of purely a business sort of transactional relationship?

A.    Yes.  It's more with my father.  Not really with him.

Q.    At some point, do you actually develop a more personal relationship with Mr. Youngblood?

A.    Yes.

Q.    And that started in 2018, give or take, or is it after that?

A.    After that.

Q.    Is it 2019, 2020?  When would you say?

A.    I'd say 2019, right really before COVID.

Q.    Okay.  Let's talk about the progression of your relationship.  At some point, I mean, do you become pretty close friends with Mr. Youngblood?

A.    Yes.

Q.    Let's talk about that progression of the relationship.  In the beginning, as you said, he seems more sort of a friend of your father and you just kind of ran into him.

A.    Yes.

Q.    At some point, does he start coming to your house, as well?

A.    Yes, he does.

Q.    Tell the jury about that a little bit.

A.    Well, he would basically visit my parents, then come over and visit with my wife and I for a few minutes, then take off.

Q.    And did those visits become more frequent over time?

A.    Yes, they did.

Q.    He'd sit down and chat with you and your family?

MR. GONZALEZ-FALLA: Object to leading.

Q. (BY MR. HARDING) I'll rephrase. Describe to how the relationship progressed.

A. Okay. So first, it started out as he'd come by and just chat, see how we're doing. And then, he'd come by and talk a little bit more and we'd talk more often and he stayed for longer.

Q. Did he ever -- the relationship ever reach a point where you felt comfortable letting him watch your kids?

A. Yes.

Q. And did he, in fact, watch your kids on at least one occasion?

A. Yes, he did.

Q. Did he ever say anything to you about how he felt about you in terms of your relationship with him?

A. He said he felt like we were brothers.

Q. Did you feel similarly toward him at some point as the relationship progressed?

A. Yeah, I felt very close to him like we were brothers. Yes.

Q. Did Mr. Youngblood indicate to you at any point that he had some kind of connections in the computer security world?

A. Yes, he did.

Q. And how did that sort of come to your attention?

A.    When he kind of said he knew kind of what happened at Rapid7.

Q.    So describe that conversation for the jury, please.

A.    Okay.  So he had said, I know how you loved Rapid7 because he always -- that's what happens when people just don't understand or don't like what you're doing because they feel threatened by you.  He said, I know that I had people there who told me what happened and how they -- how the process happened that they were sad to see you go but they knew that this happened.  He was like I knew people there and knew how it was to have the same connections you have, but I said, who are they?  And he said, I can't tell you that.

Q.    What impact did that have on you that he seemed to know details about your personal life?

A.    It was a little surprising that he seemed to know that much about me but...

Q.    Did it lend credence in your mind to the notion that he might have these contacts?

A.    Yes, it did.

Q.    Did Mr. Youngblood tell you anything about his military background?

A.    Just that he was a member of Delta Force, had gone up through the Rangers and initially started out as a marine.

Q.    Marine, Rangers, Delta Force?

A.    Yes.

Q.    Did he tell you some interesting stories about his time in Delta Force?

A.    Told a few stories but never a ton of them.

Q.    Did he tell you about receiving a Purple Heart?

A.    Yes.

Q.    Could you tell the jury about the story that Mr. Youngblood told you about when he received the Purple Heart?

A.    So he said he received his first Purple Heart when he was a marine translator and that he was taken to, I believe, Africa with a Delta Force operative who used him to get into the building to save somebody and that the Delta Force operative took out everybody in the building, and then, when they were leaving, somebody came and slashed him with a machete.

Q.    When you say slashed him with a machete, who do you mean?

A.    Kota.

Q.    Continue.

A.    With a machete and they rolled down the stairs and broke the bad guy's neck and Kota was back out of the building.

Q.    So you alluded into this earlier, but does Mr. Youngblood brag about the military or just mention it in

passing?

A.   For me, he just kind of mentioned it in passing.

Q.   Let's talk about the jobs that Kota told you he had. What did he say?

A.   First, he said he did -- you know, sold antiques and dealt with antique coins, toys, trains.  Then he also said that he did close-quarter combat training for the Army.

Q.   Did he suggest to you that he also as an employment or as part of a job, he had connection to organized crime?

A.   Yes.

Q.   Could you tell the jury about that a little bit?

A.   So he said that he worked with people from the mobs, from the Russian mob and the mafia crime families in a purely legal sense of only, you know, helping them buy and sell antiques and coins.

Q.   So if I understand, you're saying he helped these organizations but what he did was legal?

A.   Yes.

Q.   Did he ever tell you he was a professional gambler?

A.   He never did.  He told me he hated gambling.

Q.   Why did he tell you that he hated gambling?

A.   He said he hated gambling because it was never a sure thing and you should only go with sure things.

Q.   Jumping ahead to the latter part of your sort of developing relationship is from a time when he started

coming around daily?

A.   Never daily but many times, during the week.   He always said he worked Friday, Saturday, Sunday.

Q.   Would he ever bring gifts for you or your family?

A.   Yes.

Q.   Would you describe some of those to the jury?

A.   Let's see, he'd bring flowers for my wife.   He would bring toy for my kids.

Q.   You said you were at Amazon from 2015 to 2021, October of '21?

A.   Yes, sir.

Q.   Your relationship with Mr. Youngblood, did they extend past October of '21?

A.   Yes, they did.

Q.   After you quit or after you left Amazon, did Mr. Youngblood even give you some money?

A.   Yes, he did.

Q.   To pay for bills and whatnot?

A.   Yes.

Q.   After -- leading up through this, this whole progression, what's your feelings about Kota Youngblood, you know, at this time?

A.   That he like, cared for my family and cared for us wanted to make sure that we were safe and provided for.

Q.   At some point, did your brother Seth call you

regarding some kind of potential danger to your children?

A.   Yes.

Q.   Can you tell the jury about that, please?

A.   Well, by brother had called me saying that my father was asking for $500,000 for some reason and he goes, do you know anything about this?  And I said, I do not know anything about this.

Q.   Obviously, probably a pretty surprising call to get.

A.   A very surprising call.

Q.   What do you do next?

A.   I go over to my father's house and said Seth just called me, what's going on.

Q.   When you get to your father's house who all's there?

A.   Kota, my father and my mother.

Q.   May we approach?

THE COURT:  Yes.

(At the bench, on the record.)

MR. HARDING:  The coming testimony is going to be about cartel threats, and so on, and pursuant to the motion in limine, Mr. Holloway would testify that Mr. Youngblood claimed to know this information about the threats from the cartel because he was incarcerated with a cartel leader.  And so, we've talked about -- I don't know if there's an objection but that's the only -- we're not going to suggest that he was guilty of anything but just

mention that.

THE COURT:  Okay.

MS. HERRING:  If you say it in that way. Youngblood told him he had been incarcerated.

MR. HARDING:  If you don't mind me leading him, I will.

MR. GONZALEZ-FALL:  In a county jail.

MR. HARDING:  Oh, yeah, that's fine.  I have told him not to say anything about any jail stuff except to the extent that I ask him.

(End of bench conference.)

Q.   (BY MR. HARDING) It's your mom and your dad and Mr. Youngblood?

A.   Yes, sir.

Q.   And what are you told by -- you know, you go to your house, your dad's house, having received this alarming phone call, what's next?

A.   That's what I was told that my two kids at the time, my oldest daughter and youngest daughter were going to be kidnapped.

Q.   And who was going to be doing the kidnapping?

A.   The cartels.

Q.   Who's telling you this?

A.   Kota is telling me that.

Q.   Why would your children, according to Mr. Youngblood,

be kidnapped by a cartel?

A.   Because my father-in-law, who was a customs official, was actually involved with the cartels.

Q.   And somehow that involvement led to something against your children?

A.   Yes.

Q.   Could you describe your understanding, your recollection of what exactly the connection there was?

A.   So apparently my father-in-law was helping the cartels to bring drugs and money and human trafficking across the border down south.

Q.   And something went wrong or how does that turn into a threat to your children?

A.   Something went wrong and my father-in-law said you're not going to get it so you can get it from my son-in-law.

Q.   You said get it.  Is there a suggestion he owes some sort of debt?

A.   Some sort of debt or something to that effect.

Q.   And I want you to listen to my question very carefully.  Just answer the question I ask you.  Did Mr. Youngblood say that he knew this information because he, himself, met a cartel associate named Elvis in jail?

A.   Yes.

Q.   Okay.  What did Mr. Youngblood claim Elvis -- did he claim that Elvis was related to a famous cartel leader?

A.   Yes, he did.

Q.   And who was that?

A.   El Chapo.

Q.   What was the relationship of Elvis to El Chapo, according to Mr. Youngblood?

A.   They were uncle and nephew.

Q.   So having been told by, I guess, Mr. Youngblood that your children are potentially going to get kidnapped, what -- and that he could potentially stop this, what do you do?  I mean what?

A.   Well, we called my brother, talked to him and he agreed to give the money and that as long as he gets paid back.

Q.   Did you ever bring up the idea of going to the police?

A.   Yes, I did.

Q.   And why did you not go to the police?

A.   So I was told that many of the people in the police are on the payroll for cartels and they knew about this happening.

Q.   Who told you that?

A.   Kota Youngblood.

Q.   So if you know, did Seth end up paying that money?

A.   As far as I know, yes.

Q.   Okay.  How did Mr. Youngblood feel about Seth?

A.    Did not like him at all.

Q.    Did you notice any change in how much he liked or disliked your brother after this date?

A.    Definitely disliked him.

Q.    More, less or the same?

A.    More.

Q.    Okay.  At some time in the future, do you receive another indication that there's more threat to your family?

A.    Yes, I do.

Q.    Can you tell us approximately when that happened and what happened?

A.    Which time?

Q.    Let's talk about the first time after what we just discussed.

A.    Okay.  I want to say shortly after that, there was another one saying that --

Q.    Is this 2019-ish, 2020?

A.    2019-ish.

Q.    I'm sorry, I didn't hear the last part of your answer.

A.    I said which one?  You said the closest one after that?

Q.    Right.  So what was the next supposed threat to your children after that?

A.   Again, it was kidnapping.  Then there was one for killing them multiple times.

Q.   Let's talk about that a little bit.  Is this -- now we're talking 2019 and so.  Is this a time when you and Mr. Youngblood have become close enough that he's at your house on a somewhat frequent basis?

A.   Yes.

Q.   And so, it's just during one of these visits he tells you this or is there like a special meeting set up?

A.   No.  This one's when the kids are at school and it's just my wife and I in the house.

Q.   So Mr. Youngblood comes over?

A.   Yes.

Q.   And tells you what?

A.   Tells us that our kids are in danger and we need to get some amount of money very quickly like in a few hours, maybe like a day, at most.

Q.   Can you approximate for the jury we're talking about, $500, 20 grand, $500,000?

A.   I think it was 40,000.

Q.   So tens of thousands.

A.   Yes.

Q.   And what is Mr. Youngblood claiming this money is going to do?

A.   He claims that he can make it go away if we give him

the $40,000, he can go talk to people and they will -- it will smooth over whatever happened.

Q.   Did Mr. Youngblood ever describe himself to you as a fixer?

A.   Yes.

Q.   What did you understand that to mean during your relationship?

A.   As someone who goes into tense situations and fixes problems.

Q.   Did he ever suggest to you, or imply to you, or state to you he was part of the government or was this just sort of a freelance thing?

A.   Sometimes part of the government and sometimes freelance.

Q.   Okay.  So he asked you for about $40,000.  If you give it to him, he says he could protect your children, what do you do?

A.   Go give him money because I love my children.  I want to make sure I'm doing the right thing to keep them safe.

Q.   40,000 and is a situation like this, is he saying, you know, take your time in payment or is he giving you a timeframe?

A.   Timeframe, very short.

Q.   What are you doing then to get your hands on 40 grand in the short-term?

A.   Oh, taking out loans usually from a Navy Federal, collateralizing with my vehicles.

Q.   Okay.  Did you end up borrowing money from some other folks, as well?

A.   Another time, yes.

Q.   So this, we're still talking about the first time so you give him the 40 grand.  What happens?

A.   He leaves and comes back later and says it's all been taken care of.  Everything's okay.

Q.   So was everything okay at that point?

A.   Everything seemed to be okay.

Q.   Then what happened?

A.   Well, we started having cars show up and kind of watching my house.  So if I'd walk outside, I'd see vehicles that don't belong in our neighborhood.

Q.   Did Mr. Youngblood tell you a story or tell you why that was happening?

A.   Yes.  He said it was because our families were getting involved in like the cartels with them to buy things for them and run things for them and that we needed to be very careful to make sure that everyone sees that we're not talking to our families because they are doing very bad things and...

Q.   So let me stop you there really quickly.  If I recall right, you said that Mr. Youngblood's story was that your

father-in-law was really the connection that caused all this to begin with, right?

A.    Yes.

Q.    At some point during this time period, does your father-in-law pass away?

A.    Yes, he does pass away.

Q.    Do you go to that funeral?

A.    No.

Q.    Why not?

A.    We were told not to go because if we went, we would be surrounded by every horrible, you know, cartel person and every single like government agency would be there. There was a chance we'd be killed.

Q.    Who told you that?

A.    Kota Youngblood.

Q.    Why'd you believe him?

A.    I believed him because the things that were happening to us, we had the cars showing up and watching our house. We would see them park, you know, a few houses away and there would be someone in there watching our house, watching us sometimes, if we left, would follow us.  We had things that looked to be like break-in attempts to our house.  We had things moved in our backyard when no one should have been able to get into our backyard.

Q.    Did you tell Mr. Youngblood about these things?

A.    Yes, I did.

Q.    And what was his response to you?

A.    His response was that it was the cartels, mafia, mob looking at us because they believed we had associations with various family members that were supposedly doing these things.

Q.    So as you've said, it started off with Danielle's father being the problem.  Did that sort of eventually change?

A.    Yes, it did.

Q.    Tell the jury about that.

A.    So it grew into that my father was involved with them and then, as was my brother.

Q.    So Jay Holloway, your father, and Seth Holloway, your brother.

A.    Correct.

Q.    And what time period are we talking about here?  Are we talking about still 2019 or 2020?

A.    End of 2019, 2020 through 2021.

Q.    What does Mr. Youngblood tell you about your father?

A.    He was saying my father was involved and he was buying guns for the cartels and then, also doing diamond trades with them.

Q.    So prior to this, you're pretty close with your father, right?

A.    Yes, I am.

Q.    Live a couple of doors down?

A.    Yes.

Q.    When Mr. Youngblood tells you your father is getting involved in the cartel, surely you must have had some doubt.

A.    I did have doubts but...

Q.    What convinced you that it's plausible?

A.    Well, as we had, again, more cars following us and we also had a situation where there was -- my kids were in gymnastics and they were at this gymnastics place called Platinum Gymnastics in Pflugerville.  Kota came to us and said take your kids out of the Platinum Gymnastics right now because the owner of Platinum Gymnastics is having parties at his house and he is, you know, having sexual relationships with them.

Q.    With them?

A.    With the kids.  So at first, we were like okay, we'll take them out.  And then, you know, two days later on the news, the owner of Platinum Gymnastics is arrested for, you know, sexual indecency with a child that even played on the news.  The news here in Austin.

Q.    And once you saw that happened after Kota had predicted it, what impact did that have on you?

A.    That he obviously had connections that he said he had

because he knew about it beforehand. So lend more credence to the fact that, yes, these cars that are showing up are -- probably are what he said he's doing and that he has the connections.

Q. Did he suggest to you anything about like something you said, the cars are cartel related, your dad is now cartel related? Did he say that the two relate or was it just sort of like these are two separate things?

A. They were kind of linked. We were told if they saw us talking like with my father, my brother, that we could die.

Q. And who told you that?

A. Kota told us that.

Q. Prior to this period of time, sort of early 2020, did you and your father spend a lot of -- spend some time together on a daily basis?

A. Yes. We still walk every morning.

Q. Did Mr. Youngblood at some point tell you anything about that?

A. Yes. He said to slowly not start walking with my father because of all this.

Q. And what was the purpose of you sort of separating yourself from your father?

A. So that the cartels would see that we're not connected to my father.

Q.   And as time went on, how much contact did you have with your father?

A.   Zero.  I wouldn't even leave my house if I saw my father outside.

Q.   Speaking of which, during this period of time and subsequent, how did you feel in terms of safety at your house?

A.   Very unsafe.  We bought blinds to cover every one of our windows.  We bought curtains, pulled them tight.  We even moved furniture in front of windows so that, therefore, someone had to break in through a window, we'd be able to have a little bit of time to protect ourselves. As part of this, Kota also given us weapons.

Q.   We'll get to that in a minute.

A.   Okay.

Q.   I want to talk --  now, we've got Danielle's father cartel, your father cartel, you said Seth got brought into it.

A.   Yes, he did.

Q.   Describe that for the jury, please.

A.   So my brother first started saying that I had stolen a big client from him and that big client being stolen initially started out as like, say, $40,000.

Q.   Sorry, let me clarify.  Did Seth call you and said you're stealing bitcoin from me?

A.    No.

Q.    How did you learn this information?

A.    Kota told me that Seth is going around telling everybody that I stole bitcoin.  And then, he said don't say anything because your brother is involved with the cartels and he's the one telling the cartels that he was holding some of their money that was bitcoin.

Q.    And bitcoin for the members of the jury who may not know what it is, a cryptocurrency?

A.    Yes, it is.

Q.    Again, same question.  Were you close with your brother?

A.    Not really close with him.

Q.    Was it sort of made that easier to believe this about Seth?

A.    Yes.

Q.    Over time, how much communication do you have with Seth?

A.    None.

Q.    So you're completely cut off from your father and your brother at this point?

A.    Correct.

Q.    At some point, does Mr. Youngblood tell you something about cartel folks watching your kids at school?

A.    Yes.

Q.   Tell the jury about that.

A.   He said that the cartels were watching my kids and that they were going to kidnap them if we didn't come up with enough money and we had four hours to get the money.

Q.   And do you remember approximately how much that was?

A.   He said he had a lot of it but we needed to get the last like $60,000.

Q.   And we're still in the 2020-ish timeframe thereabouts?

A.   Yes.

Q.   Did he tell you at any point about whether you were being watched?

A.   Yes, he said that we were being watched, as well.

Q.   May I approach the witness, Judge?

          Mr. Holloway, I'm showing you what has been marked Government's Exhibit 161 for identification purposes.  Do you recognize that document, sir?

A.   Yes, I do.

Q.   What is -- in general terms, what is that document?

A.   This was phone numbers that I had written down of numbers to block on my phone and it was in one of my notebooks where I keep all my notes.

Q.   And you wrote this?

A.   Yes, I did.

Q.   Is it a fair and accurate reflection of what you

wrote down?

A.   Yes, it is.

Q.   Government will offer Government's 161.

MR. GONZALEZ-FALLA:   No objection.

THE COURT:   So admitted.

Q.   (BY MS. HERRING) Who told you to block these numbers?

A.   Kota Youngblood.

Q.   And what reason or reasons did he give you to block these numbers?

A.   Because they were family members involved with the cartels.

Q.   Who is this person here at the top?

A.   Andrea is my brother's wife.

Q.   I think you already said this is your father and your mother, right?

A.   Yes.

Q.   Your brother.  Who are the Salcedas?

A.   Those are my wife's family.  That's the mother and father and that was their cellphone numbers and home phone number.

Q.   Are these the folks Mr. Youngblood is saying originally was the cartel?

A.   Yes.

Q.   Who --

A.   That's my sister Allison.

Q.   Who are these folks down here?

A.   So Joey Dennis and Maggie Dennis are -- Maggie is my wife's sister, Joey is her husband.  And John Wolfe was a friend.

Q.   And Mr. Youngblood instructed you to stop talking with these folks?

A.   Yes.

Q.   Did you?

A.   Yes, I did.  We feared for our lives so he said he could keep us safe if we did what he did -- what he told us to do so we did.

Q.   Let's talk about the money you gave to Kota Youngblood to protect yourself and your concern from these threats.  Between 2018, 2019 and 2021, can you estimate for the jury approximately how much money you gave to Kota Youngblood for the purpose of protecting yourself and your family?

A.   500 to 600,000, somewhere in there.

Q.   Where did this money come from?

A.   Came from my savings, came from refinancing my house for the cashout loan, came from my bank accounts.

Q.   Did you have stock?

A.   I did.

Q.   Did you liquidate that?

A.   Yes, I did.

Q.   How about -- are there investment or retirement 401(k) type?

A.   Yes, everything.

Q.   Did Mr. Youngblood know that you were liquidating these sources of money to pay him?

A.   Yes.

Q.   What did he say?

A.   He said do it because your family's life is in danger and I can't tell people if we don't have this money.

Q.   Could we pull up Government's Exhibit 121, which has already been admitted.  What is shown on Government's Exhibit 121, the part that we're looking at here in the top right?

A.   The amount that I borrowed, 30,000.

Q.   If we zoom back out.  What's the date of that loan?

A.   June 25th, 2019.

Q.   Was this an example of money you gave to Mr. Youngblood?

A.   Yes.

Q.   And then, 122, please.  Look at page 1, do you see the loan amount there at the top?

A.   18,000.

Q.   And if we go to page 2, please.  Page 3, actually. You can see first payment due when?

A.   2020.

Q.   Okay.  So 18 grand borrowed in 2020, again, is this an example of some of the money you gave to Mr. --

A.   Yes.

Q.   I want to ask you how Mr. Youngblood would ask you for money or demand money from you.  We already talked it being on a tight schedule.  Did you try to verify and corroborate some of the things he told you?

A.   Yes, I did.

Q.   You've already mentioned the gymnastics situation were from other occasions where he would tell you something, you would research it and you'd find out that it was true?

A.   Yes.

Q.   What impact did that have on you in terms of believing him, trusting him, that sort of thing?

A.   It definitely raised it because he would say something, I'd be able to look it up and verify that it was true.

Q.   Were there times when you couldn't verify the information and you would sometimes ask him about it?

A.   Yes.

Q.   How would he react if you sort of questioned him?

A.   Reacted like why are you telling me because I verify all these things.  And it was also I'm trying to protect your family here, why would you doubt me.

Q.    Throughout this time period, does he make comments to you about the police?

A.    Yes.

Q.    And again, what sort of comments is he making about the police?

A.    Again, that the police are taking money from the cartels.  And same thing with the FBI, that the FBI is getting tons of evidence against me because of all the false claims that my brother and family are saying about me and my wife.

Q.    What sort of false claims is Mr. Youngblood saying that your brother and your other panel members are making about you and your wife?

A.    That we were the ones behind everything going bad and that they were doing all they could to blame my wife and I as to what the problems were.

Q.    Did Mr. Youngblood ever bring up CPS as a possibility?

A.    Yes, he said they would take our kids from us.  That he had the power to keep everybody away and once -- that he could work with his people and get it all fixed and we'd be safe.

Q.    And this is -- who is he saying is going to be the person to keep you safe?  Is this cartels?  Is this the mob people?

A.    It was him by working with all his connections that he had across, all the government agencies, the mobs the cartels, everything.

Q.    What government contacts did Mr. Youngblood claim to have?

A.    He said he had someone who worked for NSA, someone named Demarcus Bell, who was a computer hacker, various people inside the FBI.

Q.    He claimed -- did he claim he personally knew these people?

A.    Yes.

Q.    Okay.  You mentioned earlier, weapons that Mr. Youngblood give you.

A.    Yes.

Q.    Talk about that.  What was the first weapon that Mr. Youngblood gave to you?

A.    The first one was a Kimber 1911.

Q.    Do you remember approximately when that was?

A.    It was when I was still talking with my father.

Q.    So that would have been before the early part of 2020?

A.    Yes.

Q.    If I said late 2019, does that sound about right?

A.    Sounds about right.

Q.    What was the purpose of Mr. Youngblood giving you

this pistol?

A.   Because he said there could be people coming for us at that time.

Q.   And he's wanting you to protect yourself?

A.   Yes.

Q.   Is that the implication?  Was that the only weapon that Mr. Youngblood gave you?

A.   No.  I was also given a Smith & Wesson handgun that was former FBI carried weapon.

Q.   And --

A.   It was given to my wife for her safety.

Q.   Did Mr. Youngblood said it was for her safety?

A.   Yes.

Q.   That was the only weapons that Mr. Youngblood gave to you.

A.   No.  We were given two others.

Q.   Please tell the jury.

A.   I was also given an AR-15 and an AK-47.

Q.   And those were somewhat later?

A.   Yes.

Q.   Did you have ammunition for those weapons?

A.   Yes.

Q.   Again, what is the reason that Mr. Youngblood is giving for why he's giving you these weapons?

A.   In case someone breaks into our house, we's be able

to protect ourselves.

Q.   I mean, plenty of folks have, you know, firearms for home protection.  Is he just suggesting everyone should have one or is he suggesting something different?

A.   Suggesting everyone should have one but, number two, people coming could be very, very mean wanting to, you know, take our children, take us.

Q.   Did he provide you any other weapons besides firearms?

A.   Sometimes, yes.

Q.   When Mr. Youngblood is telling you that there's this sort of danger that you need to be aware of, why does it seem plausible to you at this time?

A.   Again, the same reasons.  The vehicles coming past our house slowly, the vehicles stopping and watching our front door, watching us.  He would come and say, hey, we know -- I know that people that you talk to, these people on your phone or that you have various letters coming to you and then, describing these letters to us like the envelopes they were in before they showed up.

Q.   Were those accurate predictions?

A.   Yes, they were.

Q.   Again, what impact did that have on you in terms of your trust and belief for Mr. Youngblood?

A.   Again, he somehow had the connections to know what

was coming and what was in them.

Q.   Could you tell the jury at some point, did Mr. Youngblood say something to you about a Gulf cartel emblem?

A.   Yes.

Q.   Can you tell the jury about that?

A.   So we had a time when he came over and said, did you see what happened to your window?  I said no, I haven't. So he pointed to it and said, look, someone actually tried to break into your house and they broke away the screen, they couldn't get it out all the way.  So we had a screen that was very buckled in the front and then, he said below it was actually I think like a medallion that hung on a necklace.

Q.   And what did Mr. Youngblood say was the significance of that?

A.   He said that this was like a emblem of the Gulf cartel and that someone was trying to break into our house and he'd known about it, but here was the emblem they must have left because they were in a hurry to get out.

Q.   I want to jump ahead to sort of later in 2021.  So this has been going, I think you said, sort of alienation from your father and brother from 2020.  Are you paying money to Mr. Youngblood sort of throughout this entire period?

A.   Yes.

Q.   And it's for what reason?

A.   Protecting my family, protecting me.

Q.   At some point, does Mr. Youngblood suggest to you that you need to take kind of drastic action to change your identity?

A.   Yes.

Q.   What does he tell you?

A.   He says that the cartels had requested that we change our name in order to prove that we have no connection to our family.

Q.   And why would that matter to anyone as far as you knew?

A.   As far as I knew, he said that they wanted proof that we weren't doing anything and only way to do that was to truly change our name.  And I said the fact that I'm not talking to them, the fact that I'm not communicating with them, it's not enough, and he said no, you need to change your name.

Q.   And what name did Mr. Youngblood want you to change your name to?

A.   Change it to Will Elessedil.

Q.   Is that the name that you picked or he picked?

A.   He picked.

Q.   Do you know where that name came from, Elessedil?

A.    Yes.    It comes from a series of fantasy novels by Terry Brooks the Sword of Shannara.

Q.    Do you know whether or not the defendant, Mr. Youngblood, is a fan of those books?

A.    Yes, he is.    His oldest child is named after one of the characters.

Q.    If we could please pull up Government's Exhibit 123, which has been previously admitted.    What are we looking at here, sir, in Government's Exhibit 123?

A.    This is the order of name change that we did for my wife, my family and my kids, to change our names.

Q.    So this is obviously you, correct, Lane Thomas Holloway?

A.    Correct.

Q.    Who's this?

A.    My wife.

Q.    If we got the next page.    This is just the full corporate filing for your name change?

A.    Correct.

Q.    Next page, please.    What name, if you don't mind just you and your wife, what names did you guys change from and to?

A.    So Lane Thomas Holloway to William Lane Elessedil. My wife, Danielle Holloway, to Eretria Lorilai Elessedil.

Q.    Is Eretria another name you recognize?

A.   Yes, it.

Q.   What's that name?

A.   Same book, Will and Eretria were husband and wife in the books.

Q.   Did Mr. Youngblood pick all of these names?

A.   He picked the first name and last name, yes.

Q.   So this looks like it takes effect December 22 of '21.

A.   Yes.

Q.   You've changed your name to show that you're not connected to your family and, therefore, the cartels.  Is that kind of --

A.   Yes.

Q.   Does that stop the problem, according to Mr. Youngblood?

A.   No.

Q.   What do you gotta do now?

A.   So while there was happening, he said we need to have something done to you that shows that this is you because they apparently had a -- they were hiring someone who looked like me to go do things.

Q.   Mr. Youngblood's telling you this.

A.   Yes.

Q.   Do what kind of things?

A.   Purchase -- someone that looked like my wife and

myself apparently purchased a book from somebody, then stiffed them on it -- would go and attack people in some way and use me as the scapegoat and he said there were things of you being seen places where you couldn't have been.

Q.   Is this cartel related or just something separate?

A.   Usually related to the cartels or one of the various, you know, mob or mafia.

Q.   So you need to show that this look alike isn't you?

A.   Correct.

Q.   What does Mr. Youngblood say you gotta do?

A.   He says you need to get a tattoo on a place that can always be seen so, therefore, they will know it's not you.

Q.   And did you, in fact, do that?

A.   Yes.

Q.   Your Honor, may I ask the witness to step down and show the jury his tattoo?

        THE COURT:  Yes, you may.

        (Witness complies.)

Q.   (BY MR. HARDING) Thank you, Mr. Holloway.  The jury's just seen it but could you state for the record what your tattoo says?

A.   It says Elessedil.

Q.   Same name that Mr. Youngblood wanted you to change?

A.    Correct.

Q.    Where is this tattoo on you for record purposes?

A.    It is on my right, I guess, top of my hand, right below the wrist.

Q.    Is that the original boldness or darkness of that tattoo?

A.    No.  I'm currently having it removed with a laser.

Q.    Sorry.  How many sessions have you gone to thus far?

A.    Four.  About four right now.

Q.    You mentioned earlier that you stopped working at Amazon October of 2021, correct?

A.    Correct.

Q.    Why did you stop working at Amazon?

A.    I stopped working from because I was told that my brother and his friends were trying to get me fired and that they had been able to take -- I've had a video meeting with a company through Zoom and at this video meeting, it happened.  Kota came to the house the next day and said, I just saw a picture of you on a Zoom meeting wearing your Guns N' Roses T-shirt and you were there talking to three other cartel members through a Zoom call.

Q.    And why was he telling you this?

A.    Because --

Q.    According to him.

A.    According to him, this was them trying to set me up

with someone who was working with the cartels. One was supposed to be my brother and his friends, they're using me as the scapegoat.

Q. And what impact did this have on you when he told you the story?

A. Again, very surprised because when that happened, I hadn't seen him that day, but he knew that I was wearing a Guns N' Roses T-shirt and that I was on a video -- on a Zoom meeting, which there was a Zoom meeting but it was not with the cartels. It was with a financial firm where I was helping them.

Q. Did Mr. Youngblood tell you anything about what your brother intended to do to you in relation to your job?

A. To have me fired by placing child pornography on my computer.

Q. And did he explain to you sort of the rationale behind why your brother would do this?

A. Because they were trying to ruin me and my family while also, again, using me as the scapegoat for everything they do.

Q. So do you ultimately wind up leaving Amazon?

A. I do.

Q. At this point, you've mentioned this is late 2021, how much money do you have left?

A. Basically nothing.

Q.   Where has it all gone?

A.   It's gone to him to protect my family.

Q.   That being the case, how are you going to live with no job?

A.   He said I'll take care of you for a while till I can get you out of here and get you safe.

Q.   What is Mr. Youngblood's plan as he's explaining it to you for how he's going to get you out of here and get you safe?

A.   So he tells us that we will basically lay low while he cleans everything up and then, we'll meet him in Florida, and then, we'll take a boat from Florida to -- I think he said he had a house for us in the Bahamas.

Q.   Mr. Youngblood claimed he had a house for you in the Bahamas?

A.   Yes.

Q.   And so, you were just -- what are you supposed to do in the meantime?

A.   We were supposed to just keep our heads low.  Don't do anything.  To just stay safe.

Q.   Okay.  And how long does this state of affairs last in terms of you guys sitting at home with nothing happening?

A.   It goes October, November, December, January, maybe like February is when things change.

Q.   Okay.  During this period of time, how are you paying your bills?

A.   He just drops off enough cash for us to pay the bills and buy groceries and whatnot and gas and everything.

Q.   Are you leaving the house at this time?

A.   Only to basically drop the kids off at school and go get groceries and even then, sometimes we have the groceries just delivered to our house.

Q.   Is Mr. Youngblood suggesting that this is going to blow over at some point or is this an ongoing thing for a long time?

A.   He says it's going to blow over and he just has to, you know, tie up loose ends.

Q.   So in February '22, you said things changed.  Do you remember some events that occurred in the time period of the Superbowl weekend in February of '22?

A.   Yes.

Q.   Describe what happens in terms of Mr. Youngblood and you in that time period.

A.   Okay.  So right before that, he tells us that we need to leave our house because people are coming after us.  He says I've got money for you.  Go stay in an extended-stay hotel in Austin just away from your house for two weeks.

Q.   And what's the purpose, according to Mr. Youngblood,

of this trip?

A.    Was to keep us safe because people were going to come to our house looking to kill us.  He basically tells us he told people that we went to Oklahoma and he just told us, stay here, stay in Austin, so we did.

Q.    So you go to an extended stay.  How long did you stay there?

A.    One week at that one and then, a week at another one.

Q.    Start with that first week.  Does Mr. Youngblood ask you to do anything while you're there?

A.    Yes.  We get a call -- I did not get a call.  He had his helper Marvin show up at the hotel.

Q.    Let me stop you there.  Who's Marvin?

A.    Marvin, to me, seemed to be the person who Kota relied on to do everything for him when he wasn't around.

Q.    Did you know Marvin only through Mr. Youngblood?

A.    Yes.

Q.    What did Mr. Youngblood tell you about Marvin?

A.    He told me that Marvin was a former LAPD cop on the SWAT team.

Q.    Did it seem to you that Mr. Youngblood and Marvin were sort of equal partners or that one of them was -- one was subordinate to the other?

A.    One was subordinate to the other.

Q.    Who was subordinate?

A.    Marvin was subordinate to Kota.

Q.    Okay.  So Marvin shows up.

A.    Yes.

Q.    And what happens?

A.    He calls Kota, Kota gets on the phone and tells me that I need to start making some posts about Eric Perardi's ex-wife and her boyfriend at the time.

Q.    So Marvin is with you in the hotel room?

A.    Yes.

Q.    Mr. Youngblood is on the phone?

A.    Yes.

Q.    At this point, did you know Eric Perardi?

A.    I do not.

Q.    Had you ever met him?

A.    Never met him.

Q.    What does Mr. Youngblood tell you about who he's with and why you're making these posts?

A.    He tells me he's with Eric Perardi and I'm making this because Eric Perardi needs to have something -- some help to keep his kids safe.

Q.    You heard -- did you believe that Mr. Perardi may have been with Mr. Youngblood?

A.    I did.

Q.    Why?

A.    Because Kota told me he was.

Q.    But you never spoke to him?

A.    No, I never did.

Q.    So Mr. Youngblood is saying, hey, I'm here with Eric Perardi, you gotta make these posts?

A.    Yes.

Q.    You may have answered already; if so, I missed it. Did he explain why you were supposed to make these posts?

A.    He told me I had to make them because they needed to like discredit his ex-wife or soon-to-be ex-wife so Eric could have custody of his child.

Q.    Was there a cartel connection there, as well?

A.    No.

Q.    This is Superbowl Sunday?

A.    Yes.

Q.    Who tells you what to write?

A.    Kota tells me what to write.

Q.    Word for word?

A.    Basically like here's what it should say but don't make it sound like me.

Q.    And this is according to Mr. Youngblood, this is at the direction of Eric Perardi?

A.    Yes.

Q.    Could we pull up Exhibit 115, please, it's already been admitted.  We've seen this before.  If we could zoom in at the very top.  This is a slightly later post, this

is February 16th.  Is this a post that you made at the direction of Kota Youngblood?

A.   Yes.

Q.   If we could scroll down a few pages.  Here's a question.  Why are Joey Pollard and Rachel Perardi together.  It definitely isn't Rachel's looks since Joey's banging a long younger women from his work.  It's the money and drugs.  Is that something you posted at Mr. Youngblood's direction?

A.   Yes.

Q.   You never spoke to Eric Perardi or whoever was supposed to be with --

A.   Never did.

Q.   You have no idea who was with Mr. Youngblood?

A.   Correct.

Q.   After you were done making these posts, what does Mr. Youngblood tell you?

A.   He told me to stop that because Eric Perardi wanted him to stop it.

Q.   Any explanation for why the sudden change?

A.   No.

Q.   Does Mr. Youngblood give you instructions to make any other kind of posts or attacks against anyone else?

A.   Eventually, yes.

Q.   How much later?

A.   When we were at the second extended stay.

Q.   Does he -- at some point, does he ask you to do anything with regard to your brother?

A.   Yes.

Q.   Is that during the second extended stay?

A.   Yes.

Q.   I guess, let's get to that one.  After you get done with that first extended stay, what happens?

A.   We go to another extended stay and we also --

Q.   Do you go straight from one to the other or do you go home first?

A.   No.  Straight from one to the other.

Q.   And this is paid for by who?

A.   By Kota.

Q.   When you're at the second one, what does Mr. Youngblood ask you to do?

A.   He tells me that I have to send out flyers because our family is doing more to like harass us and he could only help me if we send out the flyers and if I can't help him, then he can't help us and he could walk away and let us just die.

Q.   Does he give -- so what is the importance, according to Mr. Youngblood, of discrediting your family?

A.   Because if he can get them discredited, it gives him space to be able to, you know, work with his people to

clean everything out and show that these people are the bad people they are.

Q. And these flyers, how do you get them printed?

A. From a Fed Ex Kinko's.

Q. Who pays for that?

A. He does through Marvin.

Q. So when you say "he does"?

A. Kota.

Q. And is Marvin with you when the flyers are printed?

A. No.

Q. How do you -- is it that he just gives you money?

A. Yes, he gives me the money.

Q. How do you know what to put in these flyers?

A. He told me things to say.

Q. Again, was this sort of word-for-word or I'll tell you the basic gist but don't sound --

A. Yes.

Q. May I approach the witness, Judge?

THE COURT: Yes.

Q. (BY MR. HARDING) Showing you what's been marked Government's Exhibit 125 for identification purposes. Do you recognize Government's 125?

A. Yes.

Q. What are Government's Exhibits 125?

A. Those are flyers that I was told to print and

distribute.

Q.   And looks like there's in this particular exhibit, there's five of them.  Does that look correct to you?

A.   Yes.

Q.   Are these fair and accurate copies of the flyers that you distributed at Mr. Youngblood's direction?

A.   Yes.

Q.   Government will offer Government's 125.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) If you could pull up 125, please. If we look at the first paragraph here, zoom in.  Who are Eddie and Ritamay Mire?

A.   Those are the parents of Andrea, my brother's wife.

Q.   Okay.  And I think we all know Jay, Seth, Andrea, Pat Holloway.  These are family members of yours?

A.   Yes.

Q.   Zoom out.  Derogatory information about a lot of these people, true?

A.   Yes.

Q.   Can you read the first sentence of that, sir?

A.   Seth, Jay, Eddie, Pat and Ritamay tell lies better than an honest person tells the truth.

Q.   This is something in that Mr. Youngblood told you to write?

A.    Yes.

Q.    And if we go to page 2, last paragraph.  Do you agree with me sort of a repeated phrase?

A.    Yes.

Q.    Mr. Youngblood told you to write that?

A.    Yes.

Q.    Where are you distributing these flyers, Mr. Holloway?

A.    At their neighborhoods.

Q.    How are you doing it?

A.    Just I was told to drive through the neighborhoods at night and throw the flyers out.

Q.    At some point, do you get caught?

A.    Yes.

Q.    Who catches you?

A.    One of the Sniders.

Q.    Who are the Sniders?

A.    They are friends of my parents.

Q.    What do you do -- describe for the jury panel how it goes when you get caught.

A.    Hop in my car and drive off.

Q.    So you get caught in the act but not physically detained?

A.    Yes.  And that was the last day of February.

Q.    Okay.  I want to talk about -- were you ever

instructed by Mr. Youngblood to say anything about your brother?

A.   Yes.

Q.   Aside from what we've just seen in the flyers?

A.   Yes.

Q.   What kind of things were you instructed to say about your brother in addition to what we've already seen?

A.   I was told to say that if they come asking why -- this happens after I think what you want to talk about on the 1st.  I was told later.

Q.   Well, let me ask you about your brother and bitcoin.

A.   Yes.

Q.   What is Mr. Youngblood telling you that your brother's doing with bitcoin?

A.   He says he's taking bitcoin, stealing it from the cartels and then, going through like bitcoin mixers, which is basically like money laundering for bitcoin.

Q.   And then, how are you involved?  Do you get involved somehow, according to Mr. Youngblood?  Not actually involved but --

A.   They're using my e-mail and my name and they probably have bitcoin wallet set up in my name.

Q.   The suggestion being that you're involved somehow.

A.   Yes.  I'm the one being the ringleader.

Q.   And again, this gets confusing but this is just

information you're getting from Mr. Youngblood?

A.   Yes.

Q.   At some point, do you have a meeting at a restaurant about stealing bitcoin from the cartel?

A.   Yes.

Q.   What restaurant is that?

A.   It was the Salt Grass on 183.

Q.   Let's talk about how that meeting came to be.  How did you end up at the Salt Grass restaurant?

A.   Okay.  So Kota told me that I needed to talk with people who could help sort this out.

Q.   And who did he describe these people as?

A.   He described them as -- the person is a former DEA who could help us and he could help make my case to the DEA that I was not the person who was doing this.

Q.   When you go to the meeting, do you, in fact, meet this person?

A.   Yes, I do.

Q.   Who all's there at that meeting?

A.   Me, my wife, my baby at the time, just a few months old.  That's because XXXXXX had just been born so she was three months old, this gentleman and his wife.

Q.   And what does this man tell you?

A.   He basically accused me of stealing from cartels and that I'm going to die because I'm doing this and that

they're going to take my kids, rape my kids in front of me, kill my wife, cut off my balls, shove the balls down my mouth and then, kill me.

Q.   He's telling you that this is a danger that you're facing?

A.   Yes.

Q.   After that meeting ends, does Mr. Youngblood say anything to you about how it went?

A.   Went horribly and then, he cut the relationship off with those people because he knew I was honest and this guy just was not listening to me.

Q.   Did you know at the time who those people were?

A.   I did not.

Q.   Do you know now who they are?

A.   Yes, I do.

Q.   Who are they?

A.   They were the Yorks, Jason and Roseana.

Q.   Let's talk about March 1st, 2022.  What happens, if anything, on that day?

A.   On this day, we have a call from Marvin and Marvin tells us you're done with Texas.  You have three hours to get your kids and get ready to get out and he would meet us at the Fry's parking lot in three hours.

Q.   What's the sudden urgent threat, according to Mr. Knecht?

A.    That my brother had put a hit out on me and that there were people actively coming to look for us and Kota had bought us a few hours of time.

Q.    Do you go to the meeting?

A.    Yes.

Q.    With your family?

A.    Yes.  After we ran through the house grabbing what we could, throwing it all into the car, grabbing our kids from their school and packing up.

Q.    And do you meet at that parking lot?

A.    Yes, we do.

Q.    Who all's there?

A.    Me, my wife, my three children and Kota.  Marvin stays away.

Q.    How old is your youngest at this point?

A.    Just a few months old.

Q.    In addition to your family and Kota, did you say Marvin, as well?

A.    Marvin was -- stayed away.

Q.    Okay.  He was present but not sort of --

A.    Yes.

Q.    Were there anyone else in that parking lot that you saw?

A.    There were cars circling the parking lot.

Q.    Did Mr. Youngblood say anything about what the

purpose of those was?

A.    To look for possibly trying to kill us.

Q.    Who did those people work for according to him?

A.    According to him, to the cartels.

Q.    The folks who were doing the circling, who did they work for?

A.    For him.

Q.    "Him" being?

A.    Kota.

Q.    Okay.  So you go to this meeting, Mr. Youngblood is there, what happens?

A.    He tells me I need to call my father and he gives me a script of what to say so I wrote what down so I could say it.

Q.    May I approach, your Honor?

        THE COURT:  You may.

Q.    (BY MR. HARDING) I'm showing you what's been marked Government's Exhibit 126 for identification purposes.  Do you recognize that document, sir?

A.    Yes.

Q.    What is that document?

A.    That is what I told my dad on March 1st when Kota called him and handed the phone to me.

Q.    Is this a fair and accurate copy of what Mr. Youngblood told you to say to your father?

A.    Yes.

Q.    Government will offer Government's 126.

        MR. GONZALEZ-FALLA:  No objection.

        THE COURT:  So admitted.

Q.    (BY MR. HARDING) If you could, I think your handwriting might even be worse than mine, although it's hard to say.  Could you read this to the jury, please?

A.    Yes.  It says, dad, I am getting on a plane in ten minutes with my family and not coming back.  I am in grave danger and being looked for.  Seth, Boatright and his fucking friends paid some bad people to find me and the kids.  Kota borrowed money to get me out.  Everything I said in those letters came from Petz and Evan after Seth fucked all of them over with Eddie for 20 million. Good-bye and fuck off, dad.

Q.    Mr. Youngblood told you to say this?

A.    Yes.

Q.    And then, I think you were saying -- did you, in fact, narrate this to your father?

A.    Yes, I did.

Q.    And what were the circumstances there?

A.    Because he said say this to them so I could get you out and keep you safe.

Q.    Sorry.  I meant more the nuts and bolts, who made the call and that kind of thing?

A.   Kota made the call, handed the phone to me, I made it and handed it back to him.

Q.   Who's Boatright?

A.   Boatright is one of my brother's friends who is a CPA.

Q.   This story that you're reading to your father, is this essentially what Mr. Youngblood has been telling you this whole time?

A.   Yes.

Q.   So what is the story of why Boatright's involved, according to Mr. Youngblood?

A.   So Boatright's involved because he's a CPA and he's helped me and my brother clean all the money.

Q.   And who are Petz and Evan?

A.   So Petz was one of my brother's friends who works with him at the company.  And Evan was my brother's boss, who is also his friend.

Q.   How were they tied into all this, according to Mr. Youngblood?

A.   So Petz and Evan were ones who had connections into various, I would say, dark web, black things like they would -- they were doing illegal things for money on the side pertaining to computer security.

Q.   And who's Ed?

A.   Ed was Eddie Mire.  Eddie Mire's also a CPA.  He's an

actuary, sorry.

Q.   After you read this to your father, Kota hangs up the phone.  What happens next?

A.   Hands us 1,600 bucks and tells us to go hide for a week because he's going to go fight for us and keep us safe.  He said, I'll see you on the other side in a week or two.

Q.   And what did you understand that to mean, he's going to fight for you?

A.   He's going to clean up whatever needs to be cleaned up and we're done and we'll be okay.  We'll be safe, we'll be finished.

Q.   When you read what's in Government's Exhibit 126 to your father, did you believe these things?

A.   Yes, I did.

Q.   So what do you do?  You've got 1,600 bucks and then what?

A.   We hopped in our car and started driving out of Texas.  We drove towards Louisiana looking for a hotel.  So we called ahead, found a hotel.  Then I stopped at Houston, deposited the money into our account so we could pay for the hotel and drove all night to New Orleans.

Q.   And what did you do once you got to New Orleans?

A.   Got in the hotel and physically holed ourself in the hotel, put everything in front of the door so we could

stay safe because we weren't sure what's happening.  So we just in complete fear, slept with a gun underneath my pillow.

Q.   Since you bring that up, you mentioned earlier that Mr. Youngblood gave you four different firearms.  Are the guns you have now the same or different?  Or...

A.   We had the Kimber 1911 and the Smith & Wesson.  We left the other two guns at our house and whenever we left.  He asked for the keys to our house and one of the keys for our van so we gave them to him.

Q.   And when you say "him."

A.   Kota.

Q.   So you got two of the guns, you give your keys to him.

A.   Yes.

Q.   And those are the guns you're sleeping with.

A.   Yes.

Q.   During your travel, is Mr. Youngblood or Mr. Knecht calling you to sort of give you updates on the situation?

A.   Yes.

Q.   Could you describe what he's telling you if you recall?

A.   Initially, it's like getting through things just, you know, get it done for you.

Q.   Is he making any comments about your father or Seth,

or anything else, about continuing threats?

A.    There's always continued threats.

Q.    How long did you stay in New Orleans, give or take?

A.    About five days.

Q.    And then?

A.    And then, went to another place because New Orleans was getting expensive and we didn't have that much money left.  So we went to some cabins in Bogalusa, which is basically an hour and a half, two hours away.

Q.    Still Louisiana?

A.    Still in Louisiana.

Q.    Do you communicate with Mr. Youngblood at that point about you said you were running out of money?

A.    Yes.  We called Marvin, who occasionally could get in touch with Kota.

Q.    What are you being told by Mr. Youngblood and/or Marvin?

A.    To hang tight, stay down, don't go anywhere but just stay safe like keep your head down.

Q.    How long do you stay there in Bogalusa?

A.    Stayed there about five days and he called up and he said it's taking longer, you guys need to move further out.  He goes you need to start moving towards Florida.

Q.    Why was he saying that?  What is the explanation he's giving you for that?

A.   He's telling us to move towards Florida because that is where he'll meet up with us and get us out of all the danger.

Q.   So during this time, you're with your three kids?

A.   Yes, and my wife.

Q.   How are they taking all this?

A.   My wife is taking it really rough.  The kids just think we're on vacation.

Q.   When you say your wife's taking it really rough, what do you mean?

A.   Well, she -- obviously we're both very scared because we still -- like they're still after us so we're still again, scared to kind of go outside, scared to do anything, but we're also trying to make sure that our kids don't realize how scared we are for them and for us, for our lives.

Q.   After Mr. Youngblood tells you to move further out, what do you do?

A.   We go to Biloxi and stay there for a few weeks. Kota's sending us money through Marvin.

Q.   How is that happening?

A.   So initially, Marvin goes to our bank and just deposits the money into our account.

Q.   And then, you withdraw it as you need it?

A.   Yes.

Q.   So you stay in Boloxie for how long?

A.   Maybe two-and-a-half, three weeks maybe.

Q.   And then, what happens after that?

A.   He calls us and says, you guys can get to Florida and start getting to Florida.  So we find a hotel in Jacksonville and take a eight-hour drive to that hotel.

Q.   Do you remember what that hotel was?

A.   The first hotel was on the A1A freeway.  We stayed there for just a night because they said they had a full kitchen, but they did not.  So we stayed there one night and left and we worked really hard to find an extended stay in Jacksonville.  We found one but then, they called us and said we don't actually have any rooms yet.  So we did go find another hotel for like three days.  And then, we ended up moving into -- it was basically a Whispering Suites hotel.

Q.   May I approach the witness, Judge this?

        THE COURT:  Yes.

Q.   (BY MR. HARDING) Mr. Holloway, I'm going to show you a variety of documents.  Let's start with Government's Exhibit 127.  Do you recognize Government's Exhibit 127?

A.   Yes.

Q.   What is Government's Exhibit 127?

A.   It is all the charges for me to stay in one of the rooms I stayed in till we were found by the FBI.

Q.   This is not the -- you just said --

A.   This was the second time we were there.

Q.   Okay.  And so, just to get the timeline right, I think you said it was March 1st when you left.  Could you estimate for the jury about how long the entire trip to Florida took?

A.   You mean like a day?  Or...

Q.   From Texas to Florida.

A.   From Texas to Florida, we were talking -- so we left March 1st, got into Florida March or end of March, beginning of April, somewhere in there.

Q.   So you estimate it took about a month to get there?

A.   Yes.

Q.   Take a look at Government's Exhibits 128 through 137, please, and see if you recognize those.

A.   Yes, this is the place where we stayed.  This was the room.

Q.   You don't have to describe -- are they all photographs of the hotel room, the hotel itself?

A.   Yes, they are.

Q.   Are they fair and accurate depictions of the style and layout of the hotel room you stayed in, although not necessarily the same hotel room you stayed in both times?

A.   Yes, they are.

Q.   Government will offer Government's Exhibits 127 and

then, 128 through 137.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) If we could pull up Government's Exhibit 129, please.  Can you tell the jury what we're looking at here in Government's Exhibit 129?

A.   This is the extended stay hotel where we stayed, the parking lot.

Q.   And if we could go to Government's Exhibit 131, please.  What are we looking at in Government's Exhibit 131?

A.   This is the room that we stayed -- equivalent room to what we stayed in.

Q.   In fact, I think when we met to prepare, you said this actually was one of the rooms you stayed in but maybe the second time?

A.   Yes.

Q.   Okay.

A.   This would have been the second time.

Q.   And where -- orient the jury sort where is the photo being taken from and where are we looking?

A.   This is from the door when you enter, looking into the room.

Q.   If we could pull up 132, please.  Obviously, bathroom but where in relation to what we just looked at is this?

A.   That would have been just off to the right when you walked into the door, you had the refrigerator, the sink, kind of the kichenette area, and on the right, you had the bathroom.

Q.   Let's look at 134, please.  Can you describe the view we're seeing here?

A.   This is from the window just in front of the AC, looking back to the front.

Q.   Kind of the mirror image from the front door?

A.   Yes.

Q.   And then, finally, 136, please.  What are we looking at here, Mr. Holloway?

A.   It's basically like the closet area with the TV off to the side.

Q.   If you could estimate for the jury, how big is this hotel room?

A.   Maybe 200 square feet.

Q.   You could use -- well, how big you could compare this to any part of this courtroom, or the jury box, or something like that.

A.   It's maybe a little bit smaller than the jury box total.

Q.   Who all's staying here?

A.   Me, my wife, my three children, and one dog.

Q.   And how long do you end up staying at one or another

room like this in Florida?

A.    From basically April of '22 through July of '23.

Q.    Over a year?

A.    Over a year, yes.  Close to two.

Q.    You said in the beginning, Mr. Knecht is sending you money via to your Amplify Credit Union account; is that correct?

A.    Yes.

Q.    Does that change at some point along the way?

A.    Yes, because we had a loan from Amplify and we weren't being given enough money to be able to pay for the loan from Amplify so we -- they froze the funds in the account, took all money from the account, and we could no longer use it.

Q.    Once you lose access to your Amplify account, what source of cash do you have?

A.    We were told not to work because if we worked, we had our Social Security numbers show up, they would find us and kill us.  "They" being cartels.

Q.    And who's telling you this?

A.    Mr. Youngblood.  I was also told not to work because of that reason and we were told to not go to the doctor because if we went to a doctor, they could use our Social Security numbers and, again, they were looking for our Social Security numbers to pop up on their radar so we

couldn't do that either.

Q.   You can't work, can't go to the doctor?

A.   Correct.

Q.   Did you mention about a school?

A.   They couldn't go to school.

Q.   How did were you handling your kids at this point?

A.   I end up home-schooling our children.

Q.   In terms of money, you can't get a sort of official job.  Are you doing anything to get money on your own?

A.   I tried to basically be an Uber for some of the people who are at the hotel.

Q.   And how about your wife?

A.   My wife does nails for some of the people in the hotel and does a little bit of knitting for them.

Q.   Once you lose access to your Amplify account, how are you getting money at all at this point besides the things you just described?

A.   It was being sent to us by Western Union by Marvin and we were picking up at a Wal-Mart.

Q.   Do you have any ability to support yourself at this point, not really?

A.   Zero.

Q.   May we approach, Judge?

        THE COURT:  You may.

        (At the bench, on the record.)

MR. HARDING:  Another motion in limine was regarding no testimony that Mr. Youngblood was trying to kill Lane Holloway by depriving him of insulin.  I do want to go into the facts that he is a diabetic, he does need insulin, he wasn't getting it.  I've instructed him not to imply overrule suggest that Mr. Youngblood was trying to kill him, but I think it's relevant to the jury in his state of mind.

MR. GONZALEZ-FALLA:  I have a 403 objection to that, your Honor.  I think it's highly prejudicial for the jury to hear that he was in fear for his own life because we've heard a lot of very dramatic testimony about his flight across the country and the circumstances that surrounded all of his experience, I just think that additional is unnecessary.

MR. HARDING:  Only thing I would add is you're about to hear that Mr. Youngblood asks Mr. Holloway to do a variety of things for him and he threatens, I will stop giving you money and I will cut you off.

THE COURT:  This all part of the narrative but it's inextricably intertwined with the whole story and highly relevant and probative and tieing it to whatever significant prejudice there is is appropriate and integral to the case.  So I'll overrule the objection.

Is this a good time for us to take --

MR. HARDING:  It would be a great time.  Yes.

(End of bench conference.)

THE COURT:  Ladies and gentlemen of the jury, we've reached a good time to take our second 20-minute break of the day.  It's 1:10, if you could be back in the jury room, ready to file back in the courtroom at 1:30, or a little after, and we will assume testimony at that time.

(Jury not present.)

THE COURT:  Take a recess.

(Recess.)

THE COURT:  Do we need to take up anything before we bring the jury in?

MR. HARDING:  No, your Honor.

(Jury present.)

MR. HARDING:  May I proceed, your Honor?

THE COURT:  You may.

Q.   (BY MR. HARDING) So when we left off, Mr. Holloway, we were talking about kind of your situation when you find yourself in Florida at Wood Springs hotel, I think you said you were sort of unable to work except on sort of odd jobs, unable to take the kids to school, unable to go to the doctor per Mr. Youngblood.

A.   Correct.

Q.   Let me ask you, sir, do you have any health conditions?

A.    Yes.  I'm a type I diabetic.

Q.    During this period of time, are you running low --
what are your supply of insulin and other diabetic
supplies?

A.    I ran out of insulin after about the first month and
was asking Kota Youngblood if there's a way for me to get
supplies and get supplies to us because I was out of
insulin.

Q.    May I approach the witness, Judge?

        THE COURT:  Yes.

Q.    (BY MR. HARDING) I'm showing you what's been marked
as Government's Exhibit 162 for identification purposes.
Do you recognize that document, sir?

A.    Yes.

Q.    What is that?

A.    This was a list of things that we wanted to tell Kota
that we had issues with we needed kind of money-wise to be
able to pay for everything.

Q.    Is it something you wrote?

A.    Yes, it is.

Q.    And is it a fair and accurate depiction of what you
wrote down?

A.    Yes, it is.

Q.    Government will offer Government's Exhibit 162.

        MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. HARDING) Pull up 162, please.  Let's start with this top part where there's sort of two numbered paragraphs.  What is the significance of that?  What do you write down there?  Why were you writing it?

A.   Okay.  So we asked if we should stop using Navy Fed.  Again, we had two loans out at Navy Fed and we figured that the same thing that was going to happen to us with Amplify where they would, you know, freeze the account and take the money was going to happen.  So we're like what do we need to do?  This happened much earlier than everything written in pencil.

Q.   Okay.  Let's look at the pencil part then.  If we could zoom in down here, Ms. Mercado.  What are we looking at here in the numbered list of one through eight?

A.   These were the sort of bills that we had coming so first was the 400 for the Amplify loan.  Second was a little bit of loan so we could take XXXXXX and XXXXXX somewhere for their birthday.  Or actually, that's XXXXXX and my wife for their birthdays in September.  Next one was we needed money for prescriptions for my wife's medication.  In addition, medication online and then, some money to buy some skates for the girls.  And again, the kids are okay but, again, they're crying.  They're feeling like the stress of being on what we're trying was a

vacation for so long.  Like we had no money, very little money because most of the money went to paying to the hotel.  And then, finally, money for car insurance because we weren't able to pay for this.  And again, I needed my diabetic and medical supplies.

Q.   And did you indicate these needs to Mr. Youngblood?

A.   Yes, multiple times.

Q.   How did he react?

A.   He said that he'd work on it.

Q.   Did the money increase?

A.   No.  The money actually got to be less.

Q.   It got less?

A.   Yes.

Q.   Let's take a look.  You've mentioned Mr. Knecht was sending you money via wire transfer; is that correct?

A.   Correct.

Q.   Pull up Government's Exhibit 138, please.  What are we looking at in Government's 138, Mr. Holloway?

A.   These are the money that was sent to us by Marvin. Ignore the very top one, obviously.

Q.   So according to this, starting in January '23 is when the transition from the Amplify deposits switched over to --

A.   Yes.

Q.   -- wire transfers from Mr. Knecht.

A.   Correct.

Q.   And we see a certain dollar value being transferred on a semiregular basis?

A.   Uh-huh.

Q.   Looks maybe five, six, $700 for the most part?

A.   Correct.

Q.   How much -- if you recall, how much did the hotel itself cost?

A.   Before we got the discounted rate for being more than six months, we were looking at close to 700 a week.

Q.   Did you have much cash left over to live on and do other things with?

A.   No.

Q.   Around this time, say, later 2022, did Mr. Youngblood ask you to do something with respect to Mr. Perardi?

A.   Yes.

Q.   What did he ask you to do?

A.   He had told us that Eric Perardi was now working with the cartels to help him get some money so he could expand what he was doing with buildings and that he got the money through his ex-wife Rachel and her aunt.

Q.   Did Mr. Youngblood ask you to do any kind of research into Mr. Perardi?

A.   Yes.

Q.   Describe that for the jury.

A.    He asked me to look into everybody that he had been dealing with and then, tell them that Perardi was a bad person.

Q.    Was that the only person that Mr. Youngblood asked you to do similar things towards?

A.    No.  It started out with initially, it was Perardi, Rachel, her aunt, and then, a few people that he worked with and it slowly expanded into adding my father to it, and then, occasionally, Seth.  Then he added two other people at the very end.

Q.    Who are they if you remember?

A.    It was Chad and Katherine York who are supposed to be -- who supposedly knew my brother.

Q.    And so, what does Mr. Youngblood want you to do with these people or to these people?

A.    He gives me a list of things that they're doing and says, make sure everyone knows about it.

Q.    And what did he mean by that or what did you understand?

A.    He said you'd better post it on social media and you should tell everyone through social media what was happening, and if I don't see enough posts, you need to do more, and we would do it and I was told, are you doing it more?  You need to do it more.  If you don't do it, I can't help you.  I'll stop sending you money and I'll let

the cartels kill you and I'll just walk away.

Q.   In addition to just saying, if you don't help me, I won't help you, did he offer a rationale behind how it could potentially help you protect yourself?

A.   He said if people see it, again, it was like tell everybody this was happening so that way, they'll get people to look into them because I can't be the person who points out that.  You need to look into them because it will blow up the cover that I know all these things.

Q.   You said that he gave you sort of a list of things to say; is that right?

A.   Correct.

Q.   Did you write those down?

A.   Yes, I did.

Q.   May I approach the witness, Judge?

         THE COURT:  You may.

Q.   (BY MR. HARDING) Mr. Holloway, I'm showing you what's been marked as Government's Exhibit is 39 for identification purposes.  Could you flip through that for a minute and let me know when you're done.  What are we looking at or what are you looking at in Government's 139?

A.   These were all notes that I took from whenever Kota spoke to us.

Q.   Is it a fair and accurate depiction of the notes that you wrote based on the things Mr. Youngblood told you?

A.    Correct, yes.

Q.    Government will offer Government's Exhibit 139.

            MR. GONZALEZ-FALLA:  No objection.

            THE COURT:  So admitted.

Q.    (BY MR. HARDING) And then, Exhibits 140, 142 and 163, which are subsets of 139.

            MR. GONZALEZ-FALLA:  And no objection, your Honor.

            THE COURT:  So admitted.

Q.    (BY MR. HARDING) So Mr. Youngblood is telling you what to say.

A.    Correct.

Q.    And you're writing it down.

A.    Correct.

Q.    And then, posting.

A.    Correct.

Q.    Could we please pull up Government's Exhibit 140, please.  What are we looking at on this Government's Exhibit 140?  Not in detail but in general.

A.    These are notes he told us about payments that Perardi made with money from the cartels.

Q.    Could we please side-by-side have 140 and Exhibit 106 already in evidence, which is audio.

            (Audio file played.)

Q.    Do you know that phone call, Mr. Holloway?

A.   Yes.

Q.   Who made that call?

A.   My wife.

Q.   You'd agree with me -- or I'm not going to ask you that.  What's the relationship between what's written here and here and that phone call?

A.   That's what she was told to say.

Q.   And what she did say?

A.   Yes.

Q.   May I approach the witness, Judge?

THE COURT:  You may.

Q.   (BY MR. HARDING) Mr. Holloway, I'm going to show you what's been marked as Government's Exhibit 141 for identification purposes.  Do you recognize what that is, sir?

A.   Yes.

Q.   In general, what is Government's Exhibit 141?

A.   It is some of the posts that I was directed to make.

Q.   By whom?

A.   By Mr. Youngblood.

Q.   And is it a post that, in fact, you did make?

A.   It is.

Q.   Let me show you Government's Exhibit 143.  Can you tell the jury, what is Government's Exhibit 143?

A.   This again was an article I was told to write and put

it on the line.  So same thing along the lines with the post on Yelp.

Q.   And Government's Exhibit 144.

A.   The same thing about Cedar Park Toyota.

Q.   Are these all either social media posts or documents that you created, sir?

A.   Yes.

Q.   Offer 140, 143 and 144.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

MR. HARDING:  Oh, excuse me, 141, 143 and 144.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

MR. HARDING:  Could we have 140 and 141 side-by-side, please.

Q.   (BY MR. HARDING) This is a post I think you've just said that you made at Mr. Youngblood's direction?

A.   Correct.

Q.   We don't need to go into it, but I do want to call your attention to sort of this middle paragraph here and these dollar amounts and dates.  Are you familiar with those dollar amounts and dates?

A.   Yes.

Q.   How are you familiar with them?

A.   Because they're from what he told us and they're from

that note.

Q. Did you use these notes to post that post?

A. Yes.

Q. And many other similar posts like it?

A. Correct.

Q. Could we please call up 142 already in evidence. Let's just focus on the bottom half of this page, please. What are we looking at here, Mr. Holloway?

A. This was kind of the first draft of everything that we were told.

Q. By whom?

A. By Kota Youngblood.

Q. I have been provided well researched information on Cedar Park Toyota, its leadership and their ties with the Los Zetas and Gulf cartels. Cedar Park Toyota.

A. Operates.

Q. Operates as nothing more than a front for the cartels to launder money, sell narcotics, and perhaps even human trafficking, and so on, correct?

A. Correct.

Q. If we could then pull up Government's Exhibit 143. What is this document?

A. It was what was posted.

Q. So you took handwritten notes. Did you convert it to some other form?

A.   Yes.

Q.   What form did you convert it to?

A.   To this text document.

Q.   And this is a accurate copy of that text document?

A.   Yes.

Q.   And it reads, in part, I have been thoroughly researched and vetted information on Cedar Park Toyota, its leadership, Julie Herrera and the Cavender Auto group and their ties to Los Zetas, the Gulf cartel, and so on.

A.   Correct.

Q.   Would you pull up 144, please.  This is a post in February of '23; is that right?

A.   Yes.

Q.   It reads, in part, I was given vetted information that Cedar Park Toyota, its leadership, Julie Herrera and the Cavender Auto group and their ties to Los Zetas, the Gulf cartel, and so on, this is a post that you made?

A.   Yes.

Q.   Why did you make it?

A.   Because I was told if I don't make it, we will die, he'll leave us, and the cartels will come kill us.

Q.   You'd agree with me -- we've seen two examples now. Are those the only examples of things that Mr. Youngblood told you write, you took notes about, you convert to some other form and posted online?

A.    Correct.  Yes.

Q.    There are others or this is the only ones?

A.    These are -- there are multiple posts made but they obviously said the same things.

Q.    But in term of number of posts, the quantity of posts, the frequency of posts, how often was it?

A.    Very often.  We were often told keep doing it and you'd better keep doing it and I'll call back and check. And he would call back and be like have me post more.  You need to post more.

Q.    And this particular set of things we just talked about with respect to Cedar Park Toyota, and so on, that's not the only example of things that Mr. Youngblood was telling you to write.

A.    Correct.

Q.    You mentioned before that he asked you to attack Eric Perardi and Julie Herrera, which is here, but, also, your father and your brother as well as Chad York?

A.    Yes.  There's two other people I worked with, Eric Perardi, and similar things that somebody -- a John Francis and a Mr. Mapes.

Q.    At some point, does Mr. Youngblood ask you to do something for him about his own social media presence?

A.    Yes.

Q.    What does he ask you to do?

A.   He asked me to basically make as hard as possible to find information about him and to have things removed, negative things removed about him.

Q.   What sort of -- when you say make it as hard as possible to find information about him, what do you mean by that?

A.   Basically, obfuscate everything, write articles using his name or other names and have them not be with what he does.

Q.   Like make up fake stories?

A.   Yes.

Q.   Did he also ask you to do something for a company called Athabasca Holdings?

A.   Yes.

Q.   And do you know what Athabasca Holdings was?

A.   It was a company he had made.

Q.   What did Mr. Youngblood want you to do with Athabasca Holdings?

A.   He said make it a software company and make it look like a startup and tie it to my address at -- in Manor.

Q.   In terms of the fake stories he asked you to post, did he tell you what to write?  Did you pick what to write?  How did that work?

A.   On Athabasca, I just came up with a software idea and wrote it up.

Q.   How about information about Mr. Youngblood, himself?

A.   Generally just make something up.

Q.   Did he have a particular request that you post something about him being married?

A.   Yes.  He wanted me to say that he had two other marriages that happened on, I guess, two multiple years so he said it would make him look like a really bad person who didn't love his wife and had two marriages with two other people and apparently two other women were already dead.

Q.   Do you recall any other notable stories that you made up about Mr. Youngblood on his request?

A.   Yeah.  One, he requested -- he said you should make something about me being a -- he said, I dont' know, a dildo salesman.

Q.   A dildo salesman?

A.   Yes.

Q.   Did Mr. Youngblood explain to you why he wanted this done?

A.   Just to keep people from saying other articles about him, I guess, really to drive the negative -- or the articles about his -- about him previously further down the ranks.

Q.   So let's jump to October 2022.

A.   Okay.

Q.   Does Mr. Youngblood tell you something about his eldest son?

A.   Yeah.  He calls my wife and I and says that his eldest son has been killed by the cartels and that on his arm, one arm has the initials of my -- of Lane Holloway and Danielle Holloway on one.  But the other arm is our names, we had changed our names to on the other arm.  And that his son was found off the coast of San Diego.

Q.   What was -- why was Mr. Youngblood telling you this?

A.   To scare us more.

Q.   Sorry.  What I mean to say is he says his son was found dead with your initials --

A.   Yes.

Q.   -- your wife's initials on one arm, old name, new name.

A.   Yes.

Q.   Does he imply anything about your involvement or, you know, does he explain why that might have happened?

A.   He explained it happened because they were -- because they were looking for us and they found his son and they found his son because his younger son called his older brother, and they triangulated him through that phone call.

Q.   At some point along the way, sort of end of 2022, maybe into 2023, did Mr. Youngblood broach the subject of

your daughter XXXXX?

A.   He -- that was broached near the end of when the FBI found us.  So we'll say the FBI found us in July 10th of '23, this was maybe a week before then.

Q.   What did Mr. Youngblood say he wanted to do?

A.   He said he was going to bring us a new vehicle so he could get rid of the mini-van and that on the way back, he wanted to take XXXXX with him.

Q.   And did he explain why?

A.   No.

Q.   Did Mr. Youngblood ever come out to Florida?

A.   No.

Q.   You've alluded to this.  FBI, at some point, I guess you said, July 10, 2023, makes contact with you.  How did that go?

A.   I was out in the parking lot changing the tires.  The van had a flat and the FBI comes and asked us if I know somebody named Saint Jovite Kota Youngblood.

Q.   So let me just take one step back.  You've just described that over a period of months, you're posting these extremely negative social media posts about a wide variety of people.  At this time, what are you feeling, how are you feeling about Kota Youngblood?  Do you still believe he's your benefactor?

A.   Yes, because we still were like -- we still believed

we're in great danger so we're still -- again, we barricaded our door to our hotel room every night.  We asked to not be on the first floor, we wanted to be up on a floor or two so we could stay safe so we only had, you know, one way into our room.

Q.   Did Mr. Youngblood ever tell you what to say about him if law enforcement came to contact you?

A.   Yes.

Q.   Could you please bring up Government's Exhibit 163. Could you tell the jury essentially what Government's Exhibit 163 reflects?

MR. GONZALEZ-FALLA:  I don't believe this is in evidence.

MR. HARDING:  I apologize.  Oh, it is a subset of 139, I believe.

MR. GONZALEZ-FALLA:  Okay.

MR. HARDING:  For record purpose, I'll go off of 163, which is a subset of an exhibit already in evidence.

MR. GONZALEZ-FALLA:  I have no objection.

THE COURT:  Admitted.

Q.   (BY MR. HARDING) Apologies.  If we could pull back up, please, Ms. Mercado.  Can you see that okay, Mr. Holloway?

A.   I have it right here.

Q.   Okay.  Could you tell the jurors what -- let me ask

you this.  Who wrote this?

A.    I wrote it.

Q.    And who told you to write it?

A.    Mr. Youngblood.

Q.    And what is the significance or substance of it?

A.    These are generally what people are -- he said this is what your family's doing to you.  Here's what you want to tell people -- you want to tell the FBI about what's going on with your family.

Q.    Do you know who Mark Chavez is?

A.    On attorney on West 12th Street.  That's all I knew.

Q.    Mr. Youngblood told you?

A.    Yes.  He said that was his lawyer that he had on retainer.

Q.    Okay.  So up here, I changed my name because of what my family was involved in.  I know they were in business with them.  What is that -- I mean, what is the story there?

A.    The story like we've covered it before, but yes, the thing that I changed my name because my family was supposedly involved in that business and I was told to change it to keep my family safe -- to keep my wife and my kids and myself safe.

Q.    How about this not going to discuss in street but come here asking about Saint Jovite?

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

A.   Saying we can discuss some someplace but don't like talk about it just in the open.

Q.   What does this mean at the bottom here of 163?  What does it say?

A.   All Saint Jovite Youngblood is being is candid, he's being honest.

Q.   So you were instructed to repeat that to people who asked?

A.   Yes.  Uh-huh.

Q.   So did you -- when FBI first made contact with you on July 10, 2023, did you tell them essentially this story and largely the story you just told the jury?

A.   What I first told them was that I know he's an honest, upstanding person and that I don't know why you'd come asking me about someone like this.

Q.   So fair to say you weren't tremendously cooperative?

A.   No, not tremendously cooperative.

Q.   What happens after you talked to the FBI for the first time?

A.   So he told us we should get out of Florida.

Q.   Who's "he"?

A.   Kota.

Q.   And how did you get in touch with him?

A.   He was calling us through Marvin's phone.

Q.   And did you tell him about what had just happened?

A.   Yes.

Q.   And then, what did he tell you to do?

A.   He told us we should go meet with the FBI and tell them what's happening with us, which is all this right here.

Q.   Oh, so this 163 was --

A.   Yes.

Q.   -- a result of that phone call?

A.   Correct.

Q.   Okay.  Did you ultimately go meet with the FBI?

A.   Yes, I did.

Q.   Did you tell them this story?

A.   I did.

Q.   Was that on the 10th, 11th, do you recall?

A.   That was on the 11th.

Q.   Okay.  On the 10th, did Mr. Youngblood ever instruct you that you should leave town?

A.   Yes, but we had told him they found us so finding us again probably would be easy.

Q.   May I approach the Judge?

          THE COURT:  You may.

Q.   (BY MR. HARDING) Government's Exhibit 145 for identification purposes.  Do you recognize 145?

A.   Yes.

Q.   It's two pages.  What's Government's Exhibit 145?

A.    This was the receipt from the Wal-Mart where we would pick up money for $600.

Q.    This is the receipt that you saved?

A.    Yes.

Q.    Is it a fair and accurate depiction of the receipt that you had at that time?

A.    Yes, it is.

Q.    Government would offer Government's 145.

        MR. GONZALEZ-FALLA:  No objection.

        THE COURT:  So admitted.

Q.    (BY MR. HARDING) At the very bottom here, can you tell the date and time that this receipt reflects?

A.    July 10, 2023 at basically 6:10 in evening.

Q.    Is that before or after you'd spoken to the FBI the first time?

A.    That was before I spoke to the FBI.  The FBI had left a business card in our door.

Q.    So I think I missed a step.  July 10, did you get a business card?

A.    We got the business card and we called him and he said, you guys gotta leave.  We said we had no money so he sent us money.  We went and got it and when I got back, we had gotten a flat tire so I was fixing the flat tire, and that's when the FBI showed up.

Q.    Okay.  If we could go to page 2 of this document,

please.  Who's sending you this money?

A.    Marvin.

Q.    And what is your understanding of the purpose for this money?

A.    Was for us to be able to leave Jacksonville so we were -- I was fixing the tire.  My wife and kids were packing up the room.

Q.    Do you wind up leaving Jacksonville and running off?

A.    No.

Q.    What do you do instead?

A.    We stay and talk to the FBI on the next day.

Q.    Describe for the jury how that goes.

A.    Well, before that, we drop our kids off with some people that we knew because we were still believing in that if we went and spoke with the FBI, there was a good chance that we would still never see our kids again.

Q.    Why did you believe that?

A.    Because we had the belief that everything that -- there was tons of people saying things against us that were already there and that we really had to protect our children because we would never see them again if we went and talked.

Q.    So you drop your kids off somewhere, do you go to the FBI?

A.    Yes.

Q.    What happens?

A.    We wait for a few hours, they grab us and then, we go in and we speak with Justin and Lindsey.  Should I actually point them out?

Q.    Let me stop you really quick.  When you say they grabbed you, do you mean violently?

A.    No.  They lead us in.

Q.    And this is happening in Florida, right?

A.    Yes.  This is in Jacksonville.

Q.    Justin and Lindsey, Agent Noble, Agent Wilkinson, they're not in Jacksonville, correct?

A.    Correct.

Q.    Who do you talk to in Jacksonville, if you recall?

A.    It was Byron, I forgot his last name.  I have his card.

Q.    That's fine.  So you're dealing with a local agent, though.

A.    Correct.

Q.    And I'm guessing the local agent on the phone?

A.    We spoke to them on the 10th and we saw them again on the 11th.

Q.    So Byron's the guy who came out to the hotel?

A.    Correct.

Q.    And then, at some point, you have conversation that includes Byron and these two agents?

A.   Correct.

Q.   How does that conversation go?

A.   At first, they basically were like do you believe we're the FBI?  And I said yes, I do, because we're in an FBI building.

Q.   And were you prepared to tell the package story about Kota Youngblood?

A.   Yes.

Q.   Did you tell that story?

A.   A little bit.

Q.   Then what happened?

A.   Then they said -- that's when they were like do you believe we're with the FBI?  Do you believe we're in an FBI office?  And they went through like do you believe everything that we just told you?  And I said yes and that's when they said Kota Youngblood is a con man and he has conned you for all this time.  They take my wife out of the room and told me directly.

Q.   How did that make you feel?

A.   Like an idiot.

Q.   Did it take you by surprise?

A.   Yes, it did.

Q.   When you looked -- I guess, why did you believe the agents when they told you that?

A.   Because near the end, Kota did things or said things

that, to me, did not match with what he said he was.

Q.    Can you think of an example?

A.    Yes.  He called us one night and said, I'm gambling on a Dodgers game and you better hope that these things happen so I'll have money to send you.

Q.    Why was that surprising to you?

A.    Because he told me he never gambled because he only believed in sure things and gambling's not a sure thing.

Q.    After these agents tell you you've been conned, what do you do then?

A.    Major rush of emotions.

Q.    In terms of the story you tell them, do you stick to the script or do you --

A.    No.  I tell them kind of what's happened through everything from like when it started to what's happened. Then they bring my wife in and tell her and she breaks down crying.  And then, we talk with -- is it okay for, you know, your brother to call and talk to your brother? I said yes.

Q.    Up until then, what did you think about your brother?

A.    I was afraid and angry because I'm like why would you do this to me?  But at the same time, I was like, I couldn't believe you would do something like that.

Q.    Did you speak to him that day or the next day?

A.    Yes.

Q.   And without going into substance of the conversation, how does it go?   Okay?

A.   Okay.

Q.   Do you end up asking him for some money?

A.   Yes.  I didn't want to, but they were like we have no way to get you back and I had no money to basically make it back to Texas.

Q.   And you recall looking back at the wire transfers?

A.   Yes.

Q.   He did send you that money.

A.   Yes, he did.

Q.   Let's talk about getting back to Texas.  How did you get back to Texas?

A.   I drove.  So I drove, we pack up the car as much as we can.  We ended up giving away a bunch of things, everybody at the hotel, we couldn't bring with us.  So we gave away food, gave away toys, gave away appliances, plates, dishes, everything like that.  We just gave it away to everybody at the hotel.  Then we -- again, we packed up all we could.  We went to the friends' house and picked up our daughters and then, we drove to a small town outside Tallahassee where we stayed with some friends for about a day and then, I -- we stayed there for a day and I slept and then, I left that town on -- at 7:00 p.m. and drove all the way through the night to meet with the FBI

on Friday at 10:30 a.m. in Austin.

Q.    That's where you met these agents for the first time?

A.    Correct.

Q.    Did you wind up going to seek medical treatment?

A.    Yes.  We were taken to the hospital.

Q.    If you don't mind my asking, sir, how much do you weigh now?

A.    I weigh about 180 pounds.

Q.    How much did you weigh when you got back from Florida?

A.    I weighed about 125 pounds.

Q.    Did you wind up going back to your house?

A.    After the FBI had replaced the locks for us and done a cursory walk through the house to make sure it was livable.

Q.    May I approach the witness, Judge?

        THE COURT:  You may.

Q.    (BY MR. HARDING) I'm going to show you what's been marked Government's Exhibit 146 through 158 inclusive and take a minute to sift through those and see if you recognize them, sir.

A.    It's my house that hasn't been lived in for like two years.

Q.    Is this substantially the same condition you found your house is when you came back from Austin?

A.   It is.

Q.   Government will offer Government's Exhibits 146 through 158 inclusive.

        MR. GONZALEZ-FALLA:   No objection.

        THE COURT:   So admitted.

Q.   (BY MR. HARDING) If we could please pull up Government's Exhibit 146.  What are we looking at here, Mr. Holloway?

A.   My overgrown backyard.

Q.   148, please.

A.   Still more of it.

Q.   152, please.

A.   The back patio.

Q.   154, please.

A.   Patio.

Q.   155.

A.   The front of the house.

Q.   And 158.

A.   Again, the backyard.

Q.   When you got back to your house and went inside, what did you find?

A.   That it had been trashed.

Q.   Was everything that you had left there still there when you returned?

A.   No.  Jewelry had been stolen.  My office had been

tossed inside out like a lot of the drawers were thrown on the ground like somebody had gone there looking for anything of value.

Q.   May I approach the witness again?

THE COURT:   You may.

Q.   (BY MR. HARDING) Mr. Holloway, I'm showing you what's been marked as Government's Exhibit 159 and 160 for identification purposes.  Do you recognize those?

A.   Those are me.

Q.   Are those accurate photos of how you appeared when you returned from Florida?

A.   They are.

Q.   Government will offer 159 and 160.

MR. GONZALEZ-FALLA:   No objection.

THE COURT:   So admitted.

Q.   (BY MR. HARDING) Can we please pull up 159?  And 160, please.  Where was this photograph taken, sir?

A.   That was taken at our house on my birthday.

Q.   I think I accidently called it a photograph.  This is actually a still image from a video; is that right?

A.   Yes, it is.

Q.   After you got back, did you work with the FBI to do something related to the social media posts that you had posted?

A.   Yes.  They asked me to -- I offered to remove them so

I did.

Q.   When approximately was that?

A.   End of July, beginning of August.

Q.   What's your relationship like with your father now?

A.   It's very good.

Q.   Has he tried to harm you in any way?

A.   No.

Q.   Have you seen any indication he's associated with any sort of cartel?

A.   No.

Q.   After you got back to Texas, did you wind up making a trip down to the border?

A.   Yes, we did.

Q.   Where'd you go?

A.   We went to Brownsville.

Q.   What's significant about Brownsville?

A.   Brownsville, that's where my mother-in-law lives who is supposedly trying to have us killed.

Q.   Did anything bad happen to you while you were down there?

A.   I got sick, but not from food and not from them.

Q.   Any threats to you while you were down there?

A.   None.

Q.   Let's talk about some other things that may or may not have happened since you came back.  Have you had any

issues with CPS since you came back you?

A.    None.

Q.    Any issues with child pornography appearing on your computer?

A.    None.

Q.    No mysterious cars hanging around?

A.    No, none.

Q.    Any break-ins or break-in attempts?

A.    None.

Q.    Any cartel emblems or medallions left at your house?

A.    None.

Q.    Has any harm come to you?

A.    No.

Q.    Any harm come to your wife?

A.    No.

Q.    Any harm come to your kids?

A.    None.

Q.    Have any of Mr. Youngblood's alleged dangers to you come true since you've been back in Texas?

A.    They have not.

Q.    Tell the jury the emotional and physical aftermath and financial Mr. Youngblood's scheme has had on you.

A.    Okay.  So financially, mountains of debt.  From the time I've gotten a job, I basically paid almost all of my salary to get our house out of foreclosure.  I've had to

sell my vehicles to pay off the loans that they had associated with them.  I have no savings.  Still IRS debt that has to be paid off so been working to pay off the IRS, which I believe when I total up how much I owe from all of this, I was looking at about $300,000 in just financial debt and everything and I've managed to work my way out of most -- a lot of it but there's still -- I paid off about half.

Q.    How about you and your family emotionally?

A.    Emotionally, my wife is in counseling.  My kids still occasionally cry at night what happened to them.  I still have medical issues trying to get my blood sugar under control from all the stress of everything, trying to correct it.  I did have an injury while I was in Florida that I cannot get surgery on because my blood sugar's not under control.  So I have to get healthy enough to have surgery.

Q.    Do you still think Kota Youngblood's your friend, sir?

A.    No.

Q.    Pass the witness.

                    CROSS-EXAMINATION

BY MR. GONZALEZ-FALLA:

Q.    Good afternoon, Mr. Holloway.

          So you told us about your education.  What are

your degrees?

A.   They are a Bachelor's in Electrical Engineering and Master's in Electrical Engineering and a Ph.D. in --I guess it's marked as electrical engineering from the University of Texas, but the dissertation when across both electrical engineering and computer science.

Q.   And what kind of work are you doing now?

A.   I am a software -- I'd say, a principal software developer.

Q.   And so, you develop software?

A.   Correct.

Q.   You're probably one of the most intelligent people probably in this courtroom, I would think.  How would you describe your childhood?

A.   It was a very normal childhood.

Q.   Where'd you grow up?

A.   I grew up in Oklahoma.  I grew up in Texas, multiple towns in Texas, and basically settled in Houston.  And then, I was in Houston until I moved to Austin for college.

Q.   And you said you have a brother named Seth?

A.   Correct.

Q.   And is he a younger brother?

A.   He is a younger brother by four years.

Q.   And then, you've got a sister.

A.    Correct.

Q.    All of y'all grew up together in a home together?

A.    Correct.

Q.    And you described your childhood as normal.

A.    Yeah, as normal as it can be.

Q.    And your father, what kind of work did he do?

A.    He was a sales manager for 3M.  He was always a salesperson or a sales manager.

Q.    And you described your relationship with your father as being pretty close?

A.    Yes.

Q.    Up until you grew apart.  And your father at the time that you met Mr. Youngblood, at that time, he was retired; is that correct?

A.    He was working on clocks and refinishing clocks and antiques.

Q.    And was that something that he did with other folks?  Did he belong to a clock group?

A.    Yes, they had a clock group and he repaired clocks for them and for other people.  He repaired clocks for the state of Texas.

Q.    Now, you, your wife -- how long had you been married before you met Mr. Youngblood?

A.    I married my wife about twelve years ago.  I have known my wife -- we've been married for about seven years

before I met Mr. Youngblood.

Q.   And you have three children together now?

A.   Yes.  We had two at the time.

Q.   Did you know your -- I'm sure you knew your wife's father when you got married.

A.   Yes.

Q.   And what kind of a person was he?

A.   He was a very -- like very nice person.  He was a very just kind of normal dad from what I could tell.

Q.   Did your wife -- did she tell you anything about him, about her father that would cause you to believe that he was involved in illegal activity?

A.   Well, he was a customs official from Mexico.

Q.   In Mexico?

A.   In Mexico, yes, and that apparently whenever the -- at some point, they killed his boss and he quit being a customs official.

Q.   At the time that you were married, had he already quit being a customs official?

A.   Yes, he was retired at that point.

Q.   Was he living in Mexico or was he living in the United States?

A.   Living in the United States.

Q.   With his wife, I suppose?

A.   Yes, with his wife.

Q.   And is that where he had raised the woman who you had married, Danielle?

A.   Yes.

Q.   At the time that you married your wife, was there any inkling of any kind of organized crime connection or any kind of --

A.   Not at all.

Q.   How would you describe her family in terms of, you know, being religious or abiding -- law-abiding?

A.   Hundred percent law-abiding, very deeply religious Catholics.

Q.   Would you go visit them?  Were they living in Brownsville?

A.   Yes, they were.

Q.   And would you also visit them often?

A.   Yeah, we visited them probably once every two or three months.

Q.   Did you ever -- I don't mean to pry here.  It's just a question.  Did you ever -- question that I'm wondering about, had you experienced any kind of mental illness before you met Mr. Youngblood or had any kind of mental health diagnosis before you met Mr. Youngblood?

A.   Never.

Q.   And your brother Seth, you said that y'all weren't really close.  Did you consider yourselves as rivals or

you just didn't grow up very close because of the age difference?

A.   Age difference.

Q.   Was Seth -- were you ever cruel to Seth?

A.   Never.

Q.   Or was he ever cruel to you in any way?

A.   He was cruel to me.

Q.   How was he cruel to you?

A.   He would often -- he'd occasionally try to attack us with a baseball bat.  I think it was just more maybe a misunderstanding.  That was it but it was only once.

Q.   Only once.

A.   And he was very, very young at the time and we were in grade school.

Q.   When Mr. Youngblood came into -- you know, got to know your dad and then, you met Mr. Youngblood, had Seth met Mr. Youngblood?

A.   That I do not know.

Q.   Were you ever -- did Seth ever tell you about any concerns that he had about Mr. Youngblood?

A.   He did and I asked my father about it and got a response.

Q.   And what did Seth tell you about his concerns?

A.   He told me that.

        MR. HARDING:  May we approach?

THE COURT: Yes.

(At the bench, on the record.)

MR. HARDING: I've told this witness not to say anything Mr. Youngblood's past and I think Seth might have said something about him being arrested in the past and stuff like that.

MR. GONZALEZ-FALLA: No. It was only --

MR. HARDING: So I need to tell him that he's allowed to talk about it because --

MR. GONZALEZ-FALLA: Yeah, okay. That's fine.

THE COURT: Okay.

(End of bench conference.)

Q. (BY MR. GONZALEZ-FALLA) So put this in a time perspective about when Seth told you about his concerns about Mr. Youngblood.

A. It was very early on.

Q. 2019?

A. 2019.

Q. And what Seth told you was that he was concerned that Mr. Youngblood might be taking advantage of your father. Is that what he told you?

A. Yes.

Q. That he might be getting your father to engage in some financial transactions that weren't very prudent?

A. I wasn't told that.

Q.    Just that he was what?

A.    He was concerned with Mr. Youngblood.

Q.    Did he tell you that he had learned things about Mr. Youngblood that were concerning?  I mean, that he did some research, some internet research about him?

A.    He had done some internet research about him and found some things.

Q.    That reflected he might be a con man?

A.    Yes.

Q.    And so, in 2019, you're becoming aware that your brother -- your younger brother has discovered information about Mr. Youngblood --

A.    Uh-huh.

Q.    -- that indicate to you he's a con man and this was information that dated back some time; is that right?

A.    Yes, it dated back multiple years.

Q.    And did you know that Seth had actually reported to Adult Protective Services his concerns about Mr. Youngblood's relationship with your father?  Were you ever aware of that?

A.    No.

Q.    Did your father tell you about being interviewed by Adult Protective Services about his relationship with Mr. Youngblood?  Did your father ever tell you that, that people had talked to him?

A.    I think my dad had told me and he told me that it wasn't their business.

Q.    It wasn't their business?

A.    He didn't tell me who did it but he said that they had done that.

Q.    Did your father tell you why Adult Protective Services had come to speak with him?

A.    He did not.

Q.    Now, your father, you know, is somebody -- where did he grow up?  Where's his background?

A.    He grew up in a small town, went to college, became a sales person, rose up through the ranks as a salesperson, tried to provide us with everything he could.  Then he retired when he got into clocks, he kind of retired and...

Q.    What kind of education did he have?

A.    He has a degree and was working for his MBA at some point when we were still children but ended up not finishing it because he needed to work.  He changed jobs.

Q.    Did your father speak Spanish?

A.    No, he does not.

Q.    You eventually believed that he was somehow connected to the cartel.  Was there anything about his background that would have caused you believe that he might become involved with the cartel?

A.    Nothing.

Q.    What about your brother Seth?  Was there anything about your brother's background that would cause you to believe that he would get mixed up with a Mexican cartel apart from him chasing you with a bat once?

A.    Just perhaps like his sense of jealousy.

Q.    Sense of jealousy?

A.    Yeah.  Again, look, I think he viewed us as more like I gotta do better than my brother.  I just viewed him as my brother.

Q.    That's kind of the rivalry?

A.    He had rivalry.  I didn't have a rivalry.  It was like he's by brother.

Q.    So what did he do to compete with you as you became adults?

A.    He would often like to compare like what we were doing.  Everything was -- for him, it was like, well, if you're making this much, I need to make that much.  Or if you're doing this, I need to be doing better than you and I was like you just need to have your own path, Seth.

Q.    You need to have your own what?

A.    Own path.  You don't need to see what I'm doing.  I'm doing what I want to do.

Q.    Did he seem to be chasing you then, it seems like?

A.    I can't make a statement for what he was doing.

Q.    Just objectively, what did he do with his career that

sort of matches what you're describing?

A.   He went into technology like me.  He worked in startups like I did.  He kind of followed the same things I went but different companies, but we're both in technology.

Q.   What kind of degrees did he get?

A.   He has a Ph.D., as well.

Q.   A Ph.D.?

A.   Yes.

Q.   In what?

A.   Electrical engineering.

Q.   Like you?

A.   Like me.  However, he beat me to it.

Q.   Oh, he got the Ph.D. first?

A.   Yes.

Q.   And then, you followed and got your Ph.D.?

A.   I started the party and I cleaned up the party.

Q.   And what kind of work does he do now?

A.   He is a manager.  Last I knew, he worked for Salesforce.

Q.   Okay.  So your wife's family and your own family, your brother, Seth, and your sister, what does she do?

A.   She's also in tech.  She has a Ph.D. as well.

Q.   She has a Ph.D.  It's like really hard to imagine that your father or your brother would get mixed up with a

cartel. What would cause you to believe that that would happen apart from Mr. Youngblood telling you that? Is it just his ability to persuade you that's the case?

A. It wasn't just a conversation. As we alluded to before, the cars in front of our hours.

Q. Tell me about the cars in front of your house. What was it about those cars that stood out as being connected to the cartel?

A. They were vehicles that, number one, did not -- were not associated with anybody around us in the neighborhood. I knew all my neighbors. I knew the friends. You'd see their friends, you'd see vehicles.

Q. What kind of vehicles were they?

A. They were usually Tahoes or Yukons, blacked-out windows all the way around. They would often maybe sit there for 15, 20 minutes.

Q. When you say "they," where would "they" sit?

A. That would be parked a few doors away from our street. When I walked out of the house, you could turn to the right and see them.

Q. You walk out your front door?

A. Yes, sir.

Q. And it's to the right?

A. Yes.

Q. On your side of the street?

A.    On the opposite side of the street with a direct view into our front -- kind of to our front door.

Q.    One car, one Tahoe?

A.    It might be one car, but it would show up multiple times and it would not be -- again, this is not a car that was not -- that I had never seen before, but it would show up and there would be someone sitting in it.  They might sit there 15, 20 minutes and then, they just drive off.

Q.    And how often would this happen?

A.    Fairly often.  We were told that these are people looking at us to see if we're going to talk to my father.

Q.    This is what Mr. Youngblood told you?

A.    Yes, it is.

Q.    And did he describe the vehicles that -- was he there when he saw a vehicle and said, that's one of the vehicles?

A.    He would say, it's a black Tahoe, right?  And I would say yes.

Q.    And how often did that happen?

A.    It was fairly regular.

Q.    For how long?

A.    Until everybody left.

Q.    So how long was that?

A.    2020, 2021, basically two years.

Q.    So for two years, there was a black Tahoe that would

park across the street from your house for about 15 minutes?

A.   Fifteen, 20 minutes, would look, drive off.

Q.   And your father lived on the same street?

A.   No.  He lived kind of -- his street T-ed into ours.

Q.   So if you were to walk out of your house and go down.

A.   You had to walk street across.

Q.   Straight down that way?

A.   Yes.  Straight out my front door would get us onto the house up the street my father lived on.

Q.   And then, how far would you have to walk to get to your father's house?

A.   Three houses.

Q.   Three houses and so, these people were going to see if you went to go see your dad?

A.   Yes.

Q.   And so, why was that important to the people who were in the black car -- in the Tahoe?

A.   Because we were told that they saw me talking with my father or else, they could kill us and my family.

Q.   Okay.  So why would they kill you and your family if you talked to your father?

A.   Because they want proof that we were not associated with them at all.

Q.   But why would talking to your father, why would that

be bad?

A.   Because we were told that they believed that my father was -- they're looking to see what we were doing that my father was the one who was involved in and if we showed up, we were involved.

Q.   Your father was involved with what?

A.   Was involved with cartels.

Q.   In what way?

A.   Again, we were told that it was dealing with buying them, armament, like basically buying them weapons or giving them weapons.

Q.   Had you ever known your father to buy arms?

A.   No.

Q.   He fixed clocks, right?

A.   He fixed clocks.

Q.   Had you ever known him to buy the kind of weapons that the cartel would want like machine guns or assault rifles?  Do you have any familiarity with that, your father?

A.   I found -- I do not have familiarity with that, but at the time, I was believing Kota.  And given that Kota had given me weapons, I gave my father weapons.

Q.   My question was did your father have any familiarity with assault rifles or weapons before, I guess, he'd received some from Kota?

A.    He had friends who were into weapons and he would -- so they thought his friends were gun nuts, so to speak.

Q.    But your father wasn't.

A.    No.

Q.    And so, you were told that your father was like a gun runner or a gun seller to the cartel.  Did you ever talk to your father about that?

A.    Again, I did not because anytime I even got like, you know, like with Kota telling us if they saw us doing that, we were -- that I was putting my family in danger, putting myself in danger.

Q.    So at what point did you decide that you weren't going to talk to your father about his potential involvement with a drug cartel?  When did you decide I can't talk to him?  Wasn't there a moment where you thought maybe I oughta talk to him?  Wasn't there at least just a moment where you thought you could have that conversation?

A.    There were multiple times, but every time I looked at it and I wanted to go across, I would see this vehicle there and I was so scared based on what Kota had told me that everything that was happening to our house, happening to me.

Q.    Everything that happened to your house, happened to you?

A.    No.   Things like we have these -- again, like we were -- everything that was happening to us like having the cars, having -- looking at our houses, being broken into, be safe.

Q.    So you talked about your house being broken into. What we're talking about is the way the medallion was left?

A.    Well, it's the medallion and there's like -- it was Kota was telling us all these things were happening and the only way to stay safe was to do what he told us.   He said, I am doing this because I'm keeping you safe.   You need to follow what I tell you to stay safe.   So we were scared so we did what he said.

Q.    You were saying the stuff that was happening and then, to your house, right, and then you described this cartel medallion being left.

A.    That was one.   Again, sometimes we'd -- if we all left, we'd come back to our house, we might see things like tables moved in our backyard or...

Q.    How would they be moved?   How would the table be moved?

A.    Like someone had moved it.   There would be things.

Q.    How would it be, like on its side?   Would it be moved to one side or how would it be moved?

A.    It was kind of like tilted like kind of adjusted like

someone tried to get into the window and then, left very quickly. So I had the things --

Q. But nobody had gone into your home. Just the table had been moved askew somehow.

A. Things had been moved askew, things like that.

Q. And how often did that happen?

A. That felt like something that happened maybe monthly, it felt like, but the thing was we had locks on our gate so someone would had to have hopped the fence.

Q. To move a piece of furniture?

A. Yes.

Q. But not go into your house.

A. Yes.

Q. And so, you perceive the idea that they were just moving a little bit as a sign.

A. Perhaps there was a sign that things were being moved and we began to actually buy stronger locks on everything.

Q. Was it always the same table or was it a different table or -- -

A. Different table, different things we had multiple tables. But at this point, we were also so scared because we were told they're coming for you, they're going to -- there's a chance that they're going to do something. Anytime we began to question, it was like, I'm trying to keep you safe, follow what I tell you. So we were

literally like if he told us to do something and we did it because we were completely scared because of all these things.

Q.   When you said every time we began to question, what does that mean, every time -- was that just telling Mr. Youngblood, I don't believe you --

A.   Yeah, we --

Q.   -- or maybe there's some other explanation?

A.   Yeah.  We'd say isn't there an explanation?  Is there something else and he would say no, it's not.  He's like why don't you believe me?  I've been right on these things and he mentioned the things that I had --

Q.   What had he been right about?

A.   So he had been right about -- the big one was he knew the one about the Platinum Gymnastics he had told us and said, look, you're going to receive a letter.

Q.   So the first thing was about the person who had this gymnastics place being charged with sexual assault of a child?

A.   Yes.

Q.   That made the news?

A.   That made the news.

Q.   And it made the news after he told you about it.

A.   No.  Yes, after he told us about it, yes.

Q.   So he told you about it and then, it made the news a

couple of days later?

A.   Correct.

Q.   But you weren't aware that anybody else might have told him or might have been on some other news source?

A.   There was -- I didn't see any news source for it.  I actually checked when he told me it was going to happen, I Googled and saw nothing on it.

Q.   So how would he know that this person was going to get charged with being a pedophile or with sexual assault of a child?  Did he tell you?

A.   He said that he had connections that knew about this.

Q.   So what kind of connections?

A.   He said he knew cops and...

Q.   So why would they tell him about this person being a pedophile or having, you know, sexual relations with children that would go into -- why would they tell him about it?  What was he going to do about it?

A.   I don't know.

Q.   Did you ask him?  I mean, it seems kind of a random thing to have inside information about whether somebody who's operating a, you know, a children's play center is going to get arrested.

A.   It did, but he seemed to know what was going on in most places.  I don't know how.

Q.   Okay.  So we talked about that one instance there and

you said something about letters?

A.    So one point, he said, you're going to receive a letter from your mother-in-law.  It's going to be in a pink envelope and it's going to have a piece of tape on the back.  You shouldn't open it.

Q.    This is your wife's mother?

A.    Yes.

Q.    And the one who's living in Brownsville?

A.    Correct.

Q.    So you got an envelope from her?

A.    Yeah, pink letter with a piece of tape on the back like he told us.

Q.    And did you open it?

A.    No.

Q.    You didn't.

A.    No.  He told us don't open it.

Q.    Why not?

A.    Because he said it had information that could get us killed if we looked at it.

Q.    What kind of information could get you killed?

A.    He told us that it had bank account numbers for money that was stolen from the cartels.

Q.    So why would your mother-in-law send you an envelope that contained bank account numbers of money that had been stolen from the cartel?  Why would your wife's mother do

that?

A.   Because, at this point, he had told us that they were involved with the cartels and...

Q.   But why would she send you account numbers?  Either she's involved with the cartel, if she's a member of the cartel, or whatever, why would she send you this information?

A.   I do not know.

Q.   Can you think of a reason?  I mean, how would it help her?  What would she want you to do with that kind of information?

A.   I do not know.

Q.   So do you even know what was inside this -- you never found out what was inside the envelope.

A.   I never found out what was in the envelope.

Q.   And when did you get this envelope, this pink envelope?

A.   I don't recall.  It's been too long.

Q.   We're not trying to get too specific, was it early on or sort of later in your experience before you left?

A.   It was before we left.  Maybe a month or two before we left.

Q.   And so, we're talking about when you left is when you left for your trip to Florida?

A.   Yes.

Q.   And so, this would have been a month or two before you left.  Were you already going in the extended stay places?

A.   No.  It was before that.

Q.   It was before the extended stay places?

A.   Correct.

Q.   This pink envelope that you got, did it have -- was it your mother in-law's handwriting?

A.   It was definitely my mother in-law's handwriting.

Q.   And had Mr. Youngblood ever seen correspondence from your mother-in-law?

A.   Never.

Q.   Had she ever written you before?

A.   She would call us on the phone.

Q.   So she had never written before?

A.   Nah.  She rarely writes.

Q.   Uh-huh.  And what else besides the pink envelope and the dark car, the dark Tahoes, and then, the tables that were moved, what else?

A.   He also had said, again, I know what happened to your Rapid7.

Q.   What happened to Rapid7?

A.   We already talked about that but it was about me leaving Rapid7.

Q.   And was that a secret?

A.   It was not known by many people.  No one.

Q.   Did your father know about it?

A.   Nope.  He never knew.  Never told him.

Q.   You never told him?

A.   No.  I just said I left Rapid7.  We parted ways.

Q.   Did you tell your wife?

A.   She knew we left.  I said I left Rapid7.

Q.   But you didn't tell her why?

A.   Nope.

Q.   You didn't tell Seth?

A.   Nope.

Q.   And so, you said that you had just parted ways.  Why was that such a secret?  I mean, why was that so hard to tell anybody about?

A.   It was my -- I don't need to tell everybody everything about my life so I said, hey, we had a disagreement and we agreed to part ways.

Q.   Okay.  So he tells you that he knows why you left Rapid7 and then, he tells you why, right?

A.   Yeah.

Q.   And then, you're surprised that he knew this, right?

A.   Yeah so --

Q.   What did that tell you about him?

A.   He had said that he had, you know, connections in multiple place, that he had connection with multiple

people.  And when he goes like, oh, yes, when you left Rapid7 and then, he had mentioned, you know, that they fired you because they had a disagreement with how we wanted to move forward.  Like how I wanted to move the company one way and they didn't want to go that way.

Q.   What is Rapid7?

A.   Rapid7 is a computer security firm.

Q.   Computer security firm?

A.   Correct.

Q.   And what direction did you want Rapid7 to go?

A.   I wanted Rapid7 to go more in the direction of being able to connect their on-premises software to the cloud devices they had.

Q.   And what did they -- which direction did they want to go?

A.   They wanted to focus more on premises software.

Q.   And not use the cloud?

A.   And not use the cloud as much.

Q.   And that was the biggest disagreement?

A.   That was really the disagreement with how to do it and I said we should go to the cloud and I had written all the software that did this.  I had POC -- POC is a proof of concept so I had a proof of concept that worked that showed how it could interact with the cloud.  So I had shown how we could simplify all the work we were doing by

combining, but they have things called data models.  Data models are how you represent perhaps physical or object of things --

MR. HARDING:  Your Honor, I'm going to object not so much to the narrative but the relevance at this point.

Q.   (BY MR. GONZALEZ-FALLA) Okay.  So apart from Rapid7, what else did he do that caused you to believe he had these special skills?

A.   He seemed to know many people.  He proved to speak in languages that lined up to what he said he could speak.

Q.   What languages did he appear to speak?

A.   Chinese.

Q.   Did you ever hear him speak Chinese?

A.   Yes, I did.

Q.   Do you know Chinese?

A.   I know a few words yes but...

Q.   So when did he speak Chinese?

A.   He spoke Chinese, he spoke to a shop keeper or a person who was running one of the massage -- the foot massages in the mall at Lakeline.

Q.   So he was getting a foot massage?

A.   No.  He just walked up to the person who was there and said hi, how are you doing, how's business.

Q.   And that's what he said in Chinese?

A.   I'm making an assumption that appeared to be.

Q.   It was a short -- it was just a --

A.   Short conversation, yeah.

Q.   Nothing extensive?

A.   Nothing extensive.

Q.   And it's not like you ever saw him reading Chinese calligraphy out loud.

A.   No.

Q.   Reading Chinese books?

A.   No.

Q.   Any other special language skill?

A.   French.

Q.   Did you hear him speak French?

A.   Yes, I did.

Q.   In what context?

A.   He spoke it to my wife.

Q.   What did he say?

A.   I don't know.  I don't speak French.  My wife speaks French.

Q.   How often were they speaking French?

A.   Once -- just once or twice.

Q.   For how long?

A.   Like a few minutes.

Q.   Anything else?  He speaks a little Chinese, some French, and what else?

A.   Well, those are the ones I heard.  He said he spoke

multiple other ones but at no point could I --

Q.   He said he spoke multiple languages.

A.   Yes.

Q.   So Chinese, French.  What other languages?

A.   He said he spoke Japanese and Russian.

Q.   But you never heard him speak those.

A.   No, I did not.

Q.   And you never tested his ability to speak any of those languages?

A.   No, I did not.

Q.   I mean, you didn't, for example, give him a book in Surelac text and say, Kota, why don't you read this to me.

A.   No.

Q.   Or translate the Russian.

A.   No.

Q.   So at what point -- did you never feel that you could ask your father -- you never felt safe enough to ask your father about what he was doing?

A.   I never felt safe enough.

Q.   And you never felt safe enough to talk to your younger brother about what Kota was saying.

A.   Correct.

Q.   You never were able to do that.  And you never wanted to talk to your mother-in-law about what you were listening -- about what you were hearing about her

activity. You didn't feel that you could do that either?

A. Didn't feel we could do that. He would sometimes when we had phone calls, he would come back the next day and say, why did you talk to and he'd say the number of the person that we had talked to. Why did you talk to them?

Q. Who'd you talk to?

A. It could have been just like sometimes it was Danielle's sister Maggie and he would know that we spoke to Maggie.

Q. On a cellphone?

A. On a cellphone.

Q. And whose cellphone?

A. My wife's cellphone.

Q. And when would he tell you that he had known you had spoken to Maggie?

A. He'd show up the next day and be like you spoke to Maggie for 15 minutes and we'd look on our phone, sure enough, it was a 15-minute phone call, my wife spoke to Maggie.

Q. And why did your wife speak to Maggie?

A. They're sisters, they just chat all the time.

Q. So what would be wrong with her speaking to Maggie?

A. I don't know. Like he'd eventually said that Maggie was doing things with the cartel with her father and we

shouldn't talk to them.  But he seemed to know when we made phone calls and who we made them to.  He knew the phone numbers.

Q.   So the cartel -- why was the cartel after you?  Was it because of this pink envelope that you received?

A.   No.

Q.   It was just because Mr. Youngblood told you that?

A.   It was because Mr. Youngblood told us that we were being the scapegoats for what they were doing.

Q.   For what the cartel was doing?

A.   For what our family around us was doing.

Q.   For what your dad was doing.

A.   Not my dad -- not just my dad but my brother.

Q.   This is your dad's gun running?

A.   Gun running, the stuff from...

Q.   So why would you have to be a scapegoat for something that your father was doing?

A.   Because they were trying to pin it all on me when something went wrong.  It was like you're the one who they're blaming it on.

Q.   When what went wrong?

A.   Like they didn't pay the money or they lost some sort of cash and they're saying you're the ones.

Q.   So if your father didn't pay the cartel the money, then you would be the scapegoat?

A.    They were saying that you're the one -- they're setting you up as the responsible one.

Q.    Then you would be the one that's responsible?

A.    Yes.

Q.    Not your father.

A.    Not my father.

Q.    So why wouldn't a cartel go after your father who was the one that was responsible for messing things up?  Why wouldn't they, you know --

            MR. HARDING:  Your Honor, I guess I object to speculation.

            THE COURT:  Sustained.

Q.    (BY MR. GONZALEZ-FALLA) I mean, just can you make sense of that for me?

A.    It's all speculation.  I couldn't tell you why.

Q.    But you connect the dots.  Just connect the dots how that works.

            MR. HARDING:  Same objection, Judge.

            THE COURT:  I think you've explored this enough.

Q.    (BY MR. GONZALEZ-FALLA) Are you familiar with how cartels operate?

A.    I am not.

Q.    Did you do any research how cartels operate?

A.    I try not to do that.

Q.    You didn't want to learn?

A.   Well, I figure they operate -- I don't know how they operate.

Q.   I mean, there's lots of books about cartels.  There's lots of shows about, you know, documentaries.

A.   I've watched them, yes.

Q.   News reports where, you know, if -- and it seems that one consistent theme is that when somebody steals drugs from the cartel, for example, the person who stole the drugs is the one who's going to pay, right?  Make sense?

A.   Sure.

Q.   And if a person is running guns for the cartel and they mess the cartel up with their gun contract, then they're going to pay for it.  I mean, that seems to be the way cartels work.  The person who messes up is the person who pays the price, right?

A.   Okay.  Yes.

MR. HARDING:  Your Honor, I'm going to object. If he wants to ask what Mr. Youngblood told him or what his understanding was, I have no objection.  But this is asking him to sort of talk about cartels and this is both speculative and irrelevant.

THE COURT:  Sustained.

Q.   (BY MR. GONZALEZ-FALLA) Now, you have -- I think you would agree that you have a lot of expertise when it comes to computers.

A.    Yes.

Q.    And you have a lot of expertise when it comes to computer security.

A.    Yes.

Q.    And you were talking about working at the company where you had left because y'all were going -- you had a different vision for the future of the company.  That was a security-based company; was that right?

A.    Yes, that was.

Q.    And so, is that the type of company that makes sure you know that malware doesn't come into a computer and take it over?  Is that what y'all do?

A.    It depends.  A wide suite but generally, what it is is it looked for user spoofing.  It would do scanning of software ports looking for that.  But it wasn't like a McAfee.

Q.    Okay.  What is user spoofing?

A.    User spoofing, that's whenever you would have someone who gets into the software and then says -- and then, uses that as a way to get further into your network.  So basically get your password or someone did figure out how to crack someone's password, there's something like what we would call a phishing attack and they would get your password and get into the system and try and use that to get further into the system in various ways.

Q.   So that's like a hacking into a person's computer to extract information from you?

A.   Yes.  The general idea being able to exfiltrate data.

Q.   You were talking about one of the things that really was disturbing when Mr. Youngblood had told you that he had seen you on this -- he told you that Seth was going to hack into your computer and plant child pornography, right?

A.   Yes.

Q.   Now, did you have software in your computer to identify viruses or malware?

A.   Yes.

Q.   What kind of protective software did you have in your computer?

A.   That would be what was installed by the company, which everything that's installed is being done through a backdoor in the Apple software.

Q.   This is what Mr. Youngblood told you?

A.   Yes, it was.

Q.   And so, there was a way to protect against that?

A.   No, there's not.

Q.   There's no way that you could prevent your younger brother from installing child pornography in your computer?

A.   Correct.  If there's a backdoor, it could be open.

Q.   And so, did you talk to Seth about why he would want to put child pornography in your computer?

A.   No, because I was terrified of everything that was happening.  I was scared.  I was just trying to maintain the safety of me and my family.

Q.   When you say everything that was happening, are we going back to --

A.   Everything we talked about before.

Q.   So getting a new computer wasn't going to work.

A.   Correct.

Q.   Getting a computer that didn't have Apple wasn't going to work.

A.   No, because they're on -- every piece of software is vulnerable at some point.  They have a whole section of vulnerabilities cold zero days which is a term that are not known to users or not known to the general public.

Q.   So everybody here is vulnerable to having somebody put child pornography in their computer?

A.   Theoretically, yes.

Q.   Theoretically?

A.   Yeah.

Q.   Did it ever happen?

A.   It did not.  We already went through that, but it did not happen.

Q.   Why would Seth have access to child pornography?

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

A.    I do not know.

Q.    Does Seth have any interest in child pornography?

MR. HARDING:  Your Honor, objection.

MR. GONZALEZ-FALLA:  This is exploring the basis --

THE COURT:  Sidebar.

(At the bench, on the record.)

THE COURT:  So I get that you're trying to ask questions to portray this witness believes as being real but there has gotta be some limits to that.

MR. GONZALEZ-FALLA:  Some what, Judge?

THE COURT:  Some limits to that.  You're making the point but you're just --

MR. GONZALEZ-FALLA:  All right.  I'll move on.

THE COURT:  Okay.

(End of bench conference.)

Q.    (BY MR. GONZALEZ-FALLA) When you began moving around, you went to -- I guess, you first went to these extended stay hotels, right?  The Extended Stay America hotels, that was the first place that you went when you left your home?

A.    Uh-huh.

Q.    And you said that you had been -- you were at extended stay, I guess it would have been in February.  We saw the government showed these displays of the postings

that you made in February that were in the direction of Mr. Youngblood that were targeting Rachel Perardi and her boyfriend, Joey Pollard?

A.   Uh-huh.

Q.   And you said you believed that Mr. Youngblood was working with Eric Perardi at the time; is that correct?

A.   Correct.  That's what he -- that's what Kota told me.

Q.   So you were in a hotel room?

A.   Yes, I was.

Q.   And Martin was in the hotel room with you.

A.   Yes, he was.

Q.   And then, Mr. Youngblood's on the phone.

A.   Yes, he was.

Q.   And Mr. Youngblood is talking to you on the phone.

A.   It was on speaker, but he was talking to me on the phone and Marvin was listening in.

Q.   Okay.  And so, you were led to believe that Eric Perardi was there?

A.   Correct.

Q.   And you told the FBI that you believed Eric Perardi was there.

A.   Correct.

Q.   And the reason you believed that Eric Perardi was there is because that's because Mr. Youngblood told you that.

A.   Correct.

Q.   And you never heard Mr. Perardi say anything.

A.   I heard someone say something, but I did not know who that person was; but I was led to believe that that was Eric Perardi.

Q.   What did the person say?

A.   I heard something on the lines of stop doing that.

Q.   I'm sorry?

A.   I heard something along the lines of please tell him to stop doing that.

Q.   Please tell him to stop doing that.

A.   Yes.

Q.   This was the other voice.

A.   Yes.  At least that's what it sounded like.

Q.   Please tell him to stop doing that.  To stop doing what?  Why did the voice say please tell him to stop doing that?

A.   I do not know.

Q.   Were you doing -- was that person being told about something that you were doing and so, that statement would have reflected a desire that you stop doing something?

A.   That's what I took it to believe.

Q.   And what were you doing that this person wanted you to stop doing?

A.   Those posts on the direction of Kota.

Q.    So Kota is telling you to -- he's telling you what to put?

A.    Correct.

Q.    He's verbalizing this?

A.    Yes.

Q.    And then, another voice says tell him to stop doing that?

A.    Yes.

Q.    Okay.  So that voice would be contradicting Mr. Youngblood, right?  It would be telling him, you know, tell him to stop doing that.  Stop telling him to do those things, right?

A.    Correct.

Q.    And this was a male voice?

A.    It sounded to be male, yes.

Q.    And do you specifically recall what it was that you were -- what you were posting or what information you were putting up there that this voice wanted you to stop doing?

A.    I had stopped posting at that point.

Q.    You had told the FBI that you were doing this while Marvin watched you to make sure you did it and that Kota and Eric were given updates on the phone by Marvin?

A.    Yes, correct.

Q.    Okay.  So you said that Kota and Eric were getting updates.

A.    Who I believed was Eric, yes, because I was told by Kota.

Q.    Well, was Marvin talking to somebody named Eric?

A.    Marvin was talking to Kota.

Q.    Did he ever use the name Eric when he was speaking on the phone?

A.    He only spoke with Kota because Kota was the person holding the phone from what I was able to perceive.

Q.    You never heard Marvin say Eric when he was speaking on the phone.

A.    Never.

Q.    And you never heard -- you just told the FBI this because this is what Kota told you at that time.

A.    Correct.

Q.    Or later?

A.    At that time.

Q.    At that time.  You said that you did this for about an hour and then, you were told that it was enough and you needed to destroy the electronics that you used; is that right?

A.    Yes.

Q.    Did you destroy the electronics that you used?

A.    Yes, I did.

Q.    What did you destroy?

A.    Destroyed the laptop.

Q.   What kind of a laptop?

A.   It was like a $200 laptop.

Q.   There was a period of time that you were describing to the jury where you were liquidating, you were taking out loans and you were just borrowing money and giving all this cash to Mr. Youngblood and you were doing that for protection.

A.   Yes.

Q.   There was no aspect -- everything that you were paying him was just for that purpose, right?

A.   Correct.

Q.   And all these payments were in cash, right?

A.   Cash or cashier's checks.

Q.   But in a way, they would be readily negotiable, controverted to cash immediately.

A.   Yes.

Q.   And that's pretty much the way you would give cash to Mr. Youngblood.

A.   Correct.

Q.   Never any other way that you would receive cash?

A.   No.

Q.   One of the things that you -- when you went to the FBI, that letter you wrote to them where you kind of summed everything that had happened what you'd been through, you mentioned in that letter that you could have

easily made simple -- let me tell you exactly what it is that you told them. As you were writing it, you said, I'm sorry, I'm getting really pissed off and really sad writing this. Seeing how I could have easily made simple checks to realize he was full of shit.

A. Uh-huh.

Q. And is this makes me angry.

A. Yes.

Q. What were the simple checks that you could have made?

A. Visible checks I could have made with talking to my brother, talking to my father, but again, I was looking back and realizing that was all a lie, but at the time, I believed it to be the truth that they were trying to actually kill me. So yes, I --

Q. What about online checks?

A. I had done some online checks and I had run across previous court cases, but I could never actually get to see what the court cases were about. I could actually get into like the dialogue of the case but I couldn't get the court transcript. It would have required me to travel.

Q. I'll pass the witness, your Honor.

MR. HARDING: Nothing, your Honor. Thank you.

THE COURT: Thank you. You may step down.

Your next witness.

MR. HARDING: May the witness be excused, your

Honor?

MR. GONZALEZ-FALLA:  Yes.

THE COURT:  Yes.  You're free to go.  Thank you.

MR. GUESS:  Call Gary Snider.

THE COURT:  Good afternoon, sir.  Before you take a seat, could you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

GARY L. SNIDER, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. GUESS:

Q.   Good afternoon, sir.  How are you today?

A.   Nervous.

Q.   I want you to introduce yourself to the ladies and gentlemen of the jury and spell your last name for the court reporter.

A.   My name is Gary Lee Snider.  Last name spelled S-N-I-D-E-R.

Q.   And, Mr. Snider, prior to coming in the courtroom, you and I have had a couple of chances to talk about this case; is that right?

A.    Yes.  The process, the procedure, yes.

Q.    And you also recognize the two agents at the table with me today, don't you?

A.    Yes, I do.

Q.    And who are they?  Justin Noble and?

A.    Justin Noble and my daughter's name, Lindsey.

Q.    Wilkinson?

A.    Wilkinson.

Q.    You worked with them on this case that time; is that right?

A.    Yes, I did.

Q.    Tell me a little bit about your family, Mr. Snider.

A.    Married to my wife about 47 years.  We both met in the Air Force at Dyess Air Force Base in Abilene, Texas and we have one daughter.

Q.    And the daughter's name?

A.    Lindsey.

Q.    All right.  What did you do in the Air Force?

A.    Aircraft mechanic on the C130 Hercules airplane.

Q.    And how long were you on active duty?

A.    Four years.

Q.    Did you continue in the reserves?

A.    No, I did not.

Q.    But you do have a military background.

A.    Yes, I do.

Q.   All right.   Where do you live, sir?

A.   In Pflugerville, Texas.

Q.   Have you lived there for a long time?

A.   Since 2000.

Q.   And tell me what you did as a -- when you were working.

A.   I came to Texas to work for Dell Computer and retired from there in 2017.   I was in a procurement organization for the entire time.

Q.   Did your wife work?

A.   On and off, she did.

Q.   And I can't remember, did I ask your wife's name?

A.   Dale Snider.

Q.   Dale Snider.   You retired in 2017 and at that time, you had a friend named Jay Holloway?

A.   That's correct.

Q.   Tell the jurors a little bit about your friendship with Mr. Holloway.

A.   I first met Jay Holloway is in the one of the meetings with the homeowners association in our Mountain Creek subdivision and I did not know him before until that meeting because two of the officers decided they wanted to leave the organization.   And so, I was basically left alone at that moment and Jay Holloway raised his hand and volunteered to join the officers.

Q.   So you guys are neighbors in the same area.

A.   Yes.  In the same subdivision, about twelve houses apart.

Q.   And the homeowners association meeting, this is the early 2000s?

A.   No.  This was probably 2023, but by the time I was on the committee and then, James Holloway joined.

Q.   Did you become more than just HOA board members together?

A.   Yes.  We became very close.  His wife and my wife.

Q.   And did you become familiar with his family?

A.   Yes, I did.

Q.   Did he have children?

A.   They had three children, yes.

Q.   What were the names of the Holloway's children?

A.   Lane Holloway, Seth Holloway and Allison Holloway.

Q.   And is that the order of their ages?

A.   I believe so.

Q.   You said you became personal friends, social friends with Jay and his wife.  Tell the jurors what some of the things that you would do in terms of social activities.

A.   We would visit each other's homes, have dinners quite often.  We would go up approximately once a week to a restaurant and we -- eventually, as I retired, I started working in his home on repairing clocks as an apprentice

because he had the experience and the knowledge as well as the tools to do the proper work on antique clocks.

Q.   Tell us a little bit about Mr. Holloway's interest in antique clocks and how he shared that with you.

A.   He had a lot of insight on and was schooled by another individual as far as trained on what the history of clocks were that go back to the 1700s, a lot of history and mechanics of them as you do the teardown to clean them and repair them, there are a lot of parts associated with them.  So the more I worked on antique clocks, the more I understood what I did not know.

Q.   Which is quite a bit, obviously.

A.   Still don't know.

Q.   Are you still doing that?

A.   No longer.

Q.   Are you still neighbors with Mr. Holloway?

A.   Yes.

Q.   When you were working on these clocks, where would the activity take place?

A.   In Mr. Holloway's home.

Q.   And do you remember approximately when you started getting involved with the clock repair and looking at the clocks?

A.   Pretty quickly after I retired in 2017.

Q.   How often would you go over to Mr. Holloway's house

to work on clocks?

A.    Typically, twice a week.

Q.    Did he have a special room set up for the clocks?

A.    Yes.  Upstairs he had a specific room to do the work and have the tools in that same room.

Q.    Besides clocks, did Mr. Holloway have any other specialization in valuation of antiques or other types of valuables?

A.    He had knowledge of antiques, primarily furniture. But most of his interaction with clients was to try and value if they requested to try and evaluate the price or the value of clock that the client may have.

Q.    Did he advertise his business on the internet?  Or did he have a shop that he could, you know, come meet me here?  How did he do that business to your knowledge?

A.    He had advertisement on the internet that he worked with individuals, most of them seem to be through word of mouth because there aren't that many antique clock repair people out there anymore and basically word of mouth.

Q.    Did you also belong to a clock guild or organization?

A.    Yes, the Chapter 15 for the -- for one of the national organizations.

Q.    Was Mr. Holloway also involved in that organization?

A.    Yes, he was.

Q.    Tell the jurors what this association is about and

what you guys do in terms of the clock association.

A.   It's a national organization is the National Association of Watch and Clock Collectors, based out of Pennsylvania.   There are chapters throughout the country and Mr. Holloway is and was the president of Chapter 15, which is the southwestern chapter, located generally in central Texas.

Q.   Is he generally regarded as probably one of the premier clock repairmen/evaluators in the southwest?

A.   He was highly regarded as an expert and value person in that community.   He was also at one time on national committee.

Q.   At some point, as you're going over to Mr. Holloway's house to work on the clocks and visit with Jay, do you happen to meet an individual named Kota Youngblood?

A.   Yes.

Q.   Do you see Kota Youngblood in the courtroom with us today?

A.   Yes, I do.

Q.   I'd like you to point him out and describe an article of clothing that he's wearing for the record.

A.   He's the gentleman in the black clothing.

Q.   Is that something that you would typically see Mr. Youngblood dressed in?

A.   Always.

Q.    So tell the jurors when you first met or your recollection, your first encounter with Mr. Youngblood.

A.    I typically -- the initial meeting was ran into him downstairs, was invited to go to lunch with Jay and himself and that's the time I met him, and that became a repeated event because he was over his house constantly.

Q.    Is it something that happened in 2019, you believe? Or do you have any recollection of the timeframes of this?

A.    Probably 2019, 2020, around that time, yeah.

Q.    And before meeting Mr. Youngblood at the house, you had never heard of him or never seen him before.

A.    No, I had not.

Q.    So you said that you guys went to lunch, that Mr. Youngblood was often at Mr. Youngblood's house when you would go over to help with clock repairs.  Did this continue for many months?

A.    Many months, yes.

Q.    Into 2020; is that correct?

A.    Yes.

Q.    You and Mr. Holloway are friends.  Were you also aware that his son Lane lived in the same subdivision?

A.    Yes.

Q.    Did you know Lane and his wife?

A.    Yes.  I had met them.

Q.    How many children did they have, to your knowledge?

A.   Well, they currently have three.

Q.   At the time when you were first going over to Mr. Holloway's house, how many children did they have?

A.   They did not have any and then, they started coming.

Q.   When you went to his lunches, what would you and Mr. Holloway and Mr. Youngblood talk about?

A.   It was various topics between the weather, political, and it was anything and everything we would cover.

Q.   Did you learn a little bit about Mr. Youngblood's background at some of these lunches?

A.   Yes.

Q.   Tell the jurors what you learned about Mr. Youngblood's background from him.

A.   He had a colorful and honorable period with the military and he in general between all the stories that we heard of him that I became familiar with him, he did a lot of saving lives and individuals and activities.

Q.   As a former Air Force member, did you find out which branch he served in?

A.   Yes, he was in the Delta Force.

Q.   What did you know Delta Force to be?

A.   An elite group, I believe, in the Army.

Q.   Did he share with you some of the stories regarding his time in Delta Force?

A.   Yes, that he was fighting individuals he would not

name who they were and his fingers were damaged in one of the battles that he was in. I remember a story that he said that when he went to sit at a table for a meal, nobody would sit with him because that's what they do in the military when somebody is so elite and has done what he's done, they are not allowed to sit with somebody so highly regarded. So he always sat alone.

Q. Were you impressed by these stories?

A. Yes. I'm familiar with them, but yeah, some insight on the stories, I didn't put a whole lot of weight into them. But yeah, it sounded impressive.

Q. Did you notice some of the tattoos that Mr. Youngblood had on his arms?

A. Yes, I noticed them. I don't recall what they were.

Q. None of them stuck out to you as being associated with the military in any way?

A. Not that I recall but didn't focus on them.

Q. One of the things that would happen at lunch was regarding the payment of the bill. Who paid for the lunches?

A. Mr. Youngblood.

Q. Always?

A. Always.

Q. Why was that? Were you not willing to pay for your own lunch, Mr. Snider?

A.   I attempted many times and was successful once only by tricking him, yes.

Q.   What was his personality like?  What did you think of him as you're getting to know him a little bit?

A.   He was very warm, asked a lot of personal questions, just generally a great guy.

Q.   Did Mr. Holloway seem to have a really good relationship with him?

A.   Yes.

Q.   Tell me a little bit about their relationship in terms of did you find out that they were going into business together?

A.   Yes.  I understood they were -- they had investments that they were working on.  As I was upstairs working on clocks the days that I did go over to Mr. Holloway's house, they were downstairs working on deals, investments, and I wasn't privy to those conversations.

Q.   At this point, were you interested in doing any of these deals with them?

A.   No.

Q.   Mr. Snider, at some point, though, you do become involved in a financial situation with Mr. Youngblood and Mr. Holloway; is that right?

A.   Yes.

Q.   I'm going to move forward a little bit regarding

what's been admitted as Government's Exhibit 191.  I'm going to ask that that be played -- placed on the screen, please.  I'm going to go up to the end of 2020.  This is your Wells Fargo account.  Do you recognize that?

A.   Yes.

Q.   I'm just going to expand that please, Ms. Mercado. So at this point, at the end of 2020, have you had any financial dealings with Mr. Youngblood?

A.   No.

Q.   Have you ever done anything with Mr. Holloway as far as an investment goes?

A.   No.

Q.   So as of December 31st, 2020, this is you and your wife, this is your Wells Fargo banking account; is that right?

A.   That's correct.

Q.   At that time, looks like you had assets of $51,126; is that right?

A.   Yes.

Q.   And go to page 2, please.  We see that prime checking, you've got about 33,000.  You've got another preferred checking was 6,000, high yield savings of 10,000, and money market of 1,000, add up to the 51,000. Was that a pretty normal for you to keep a balance of 50,000 more or less in your checking account at that time?

A.   Yes.

Q.   And you were not working now; is that right?

A.   I was not working.

Q.   Could we go to page 4, please.  So I want to look at the deposits here.  I see we have $6,400 and change in terms of deposits.  Was that pretty normal again for what you were depositing monthly into your account?

A.   Yes.

Q.   See a Social Security check there for $2,500.  Was that your Social Security check?

A.   Yes, and the one above is my wife's.

Q.   All right.  So you both have Social Security and I see a couple other deposits.  What's this $960?  Do you remember what that money was for?

A.   It was one of the Fidelity investments.

Q.   So you have an IRA account, as well.

A.   Yes.

Q.   So you're getting that, the 685, do you remember what that was for?

A.   Yes, that's a separate investment from Fidelity that was distributed from another organization.

Q.   All right.  So we've got several, looks like, Fidelity distributions up there; is that right?

A.   Yes.  The others are related to a pension from NCR, AT & T.

Q.   And then, we see the withdrawals, the subtractions. For that month, you're positive about almost $3,000; is that right?

A.   Approximately, yes.

Q.   Living well within your means, in other words, right?

A.   Yes.

Q.   Do you consider yourself to be a rich person at this time, Mr. Snider?

A.   At this time?

Q.   No.  Back in 2020.

A.   I didn't think I was rich but I was comfortable.

Q.   All right.  Let's take a look at Government's Exhibit No. 197.  This has been previously admitted.  Do you recognize Government's Exhibit No. 197?

A.   Yes.

Q.   And let's expand that, please, just the top portion. Mr. Snider, this is the Fidelity portfolio investment report for the end of December 2020, the same area when we looked at the bank account; is that right?

A.   Yes.

Q.   And is this the information that was known to you in terms of what you held with Fidelity?

A.   Yes.

Q.   Besides yourself, did your wife also have access to this account?

A.   Yes.

Q.   So I'm going to go ahead and highlight the top portion.  As of the end of December 2020, you had $667,000 in your Fidelity account total; is that right?

A.   Yes.

Q.   How long had it taken you to build up that amount of money, Mr. Snider?

A.   My whole working life.

Q.   So you'd been contributing off and on just like everyone else does who was working out there, looking forward to a nice retirement; is that right?

A.   Yes.

Q.   Could we have No. 2, please.  And I see here, we've got two different IRA accounts.  We have the rollover IRA and then, a Roth IRA; is that right?

A.   Yes.

Q.   And they increased in value little bit over the course of that time period; is that right?

A.   Yes.

Q.   Were you working with Fidelity in terms of giving you advice as to, you know, how to invest your money and what to do with it?

A.   Yes.

Q.   And you've been working with them for a long time?

A.   Yes, several years.

Q.   Were you satisfied with their advice?

A.   Yes.   They had done very well even through the 2008 through 2010, we lost money, but they gain it back pretty quickly.

Q.   At any point during these lunches or when you're over at the house and Mr. Youngblood is there, did your financial status ever come up?

A.   No.

Q.   Never talked money with him?

A.   Not my money.

Q.   Did he talk about his money?

A.   He may have.   I don't recall.

Q.   Besides his military career, what was Mr. Youngblood doing for a living at that point, do you know?

A.   He said he was constantly working with individuals and organizations to trade toys, coins, stones, all kinds of materials.

Q.   Did he have a store or did he have some type of website where he was doing this business on?

A.   I think it was neither, but I think it was word of mouth and connections that he had.   That he said he had.

Q.   Did Mr. Holloway confirm that there were some truth to this story?

A.   Yes.

Q.   So these collectibles or antiques that he had access

to, what would he tell you about them?

A.   Just stories about having scripts from movies that he was trading stones.  He had coin transactions, a lot of different things that he was into.  Not antique clocks, no.

Q.   About at some point in April of 2021, are you over at Mr. Holloway's house when Mr. Youngblood starts talking about something of particular value?

A.   Yes.  Mr. Holloway called me at home and said, I've got something you should see.

Q.   And what happened then?

A.   I went over to his home and found him and his wife and sitting at the center of the table was Kota Youngblood.

Q.   And what happened when you got to the house?

A.   I was shown a coin in a velvet-looking pouch that Mr. Youngblood identified that is a very rare coin in better condition than the one he has seen in the past that garnered $10 million.

Q.   So he's gotta coin there that he says was in better condition than the one he just sold for $10 million?

A.   That he has seen that is in worse condition.

Q.   So what was your reaction when you saw this?

A.   I was invited to -- at the last minute because somebody dropped -- an investor dropped out of the

investment of the coin, I was asked if I would be willing to contribute the money to be able to close the deal.

Q.   What do you mean close the deal?  Can you explain that, please?

A.   He needed a certain amount of money to give to this individual who actually owned the coin, even though he had it in his possession, and he needed $150,000 to close that deal immediately because any amount of money less than that would not close the deal.  So since the other person dropped out, I was to help out and back then, with the money they needed.

Q.   Was Mr. Holloway going to participate in this deal?

A.   Yes.

Q.   How much was he going to contribute?

A.   I'm not sure.  Probably the same amount but I'm not sure.

Q.   Was Mr. Youngblood contributing cash to this deal?

A.   As I understand it, yes.

Q.   More or less than 150,000, do you know?

A.   I'm not sure.

Q.   The coin itself, you had an opportunity to look at it, hold it in your hand?

A.   Yes.

Q.   Describe for the jurors.  What are you looking at that at that house?

A.   It was a medium-sized gold coin.  I don't remember what was on either side of it, but it looked like very unique and as Kota Youngblood described it as extremely unique, maybe the only one in the world.

Q.   Was he convincing in his sales pitch?

A.   Yes.

Q.   Did you decide right then and there, I'm in for $150,000?

A.   No.

Q.   What did you do?

A.   I went and got my wife.

Q.   All right.  So you had your wife come over to house then, too?

A.   Yeah.  She listened to the same story and as an opportunity not only to possibly gain some money but primarily to help out in the time of need for them to be able to close the deal.

Q.   Why was it so urgent that they have this money quickly?

A.   That was the statement from Kota Youngblood if he can't close it immediately, he will lose the opportunity to gain millions of dollars.

Q.   Before we go on could I have the organizational chart on the screen, please.  And just so the jury knows, picture of you; is that correct, Mr. Snider?

A.   I'm sorry.  That's my picture, yes.

Q.   That's you; is that right?

A.   Yes, sir.

Q.   And that's your wife next to you?

A.   Yes.

Q.   And your daughter next to her; is that right?

A.   Yes.

Q.   See James Holloway there.  Is that a picture of Jay?

A.   Sorry, I don't see -- oh, up in the corner, yes, without his glasses, yes.

Q.   He usually wears glasses?

A.   Yes.

Q.   And Patricia, do you know her?

A.   Yes.

Q.   Who is that?

A.   Pat Holloway, yes and Lane Holloway, yes.

Q.   All right.  And what about the last one there?

A.   Danielle Holloway.

Q.   They're all related, correct?

A.   Yes.

Q.   So you went and retrieved Dale so she could hear the pitch and what happened when she heard the pitch?

A.   Surprisingly, she believed it, as well.  So both of us conceded, agreed to provide the money to close the deal.

Q.   How much was that going to be?

A.   $150,000.

Q.   So did you just walk over to your house and grab $150,000 out of the kitchen cabinet and bring it back to the Holloways?

A.   No.  I had to contact Fidelity Investment the next day.

Q.   Did you explain that to Mr. Youngblood that you were going to have to reach into your IRA?

A.   Yes.

Q.   Take a look at Government's Exhibit 198 on the screen, please.  So this check's dated April 23rd, 2021. That's from your Wells Fargo account; is that correct?

A.   Yes.

Q.   And it's for $10,000.  Why is it written to James Holloway?

A.   That was the instructions that I received from both of them to make it to James Holloway so he could go to the bank the next day and cash the check.

Q.   Why did he need to cash the check?  Why couldn't you just have written a check for $150,000 to Mr. Youngblood?

A.   Because that was the process that they needed to follow.  Mr. Youngblood was busy at the time so James was going to go to the bank, retrieve the money, and then, later on, give it to Kota.

Q.   Was that the method in terms of he had to have cash? Or could he not work through normal checks or cashier's checks?

A.   He always worked in his dealings with cash.

Q.   Can we have page 2 of that.  And here, we have on April 22nd, another check for $30,000, again, to James Holloway.  Is this all in reference to the investment that you're making on this gold coin?

A.   Yes.

Q.   Why did you write these two checks?

A.   For money to be provided in the meantime because the Fidelity transaction wasn't going to happen to three, four days, and this was cash initiated for good faith.

Q.   And you explained that to Mr. Youngblood as you're sitting there in Mr. Holloway's home?

A.   Yes.  And to James Holloway, yes.

Q.   So let's go next to Government's Exhibit No. 199.  So this is your first page of your portfolio, Fidelity account; is that right?

A.   Yes.

Q.   And last day of March 2021, right before you're making this investment with Mr. Youngblood and Mr. Holloway.  Your account has grown from 667 to 681,000; is that right?

A.   Yes.

Q. So you knew that you had the money to give to Mr. Youngblood at that time.

A. Yes.

Q. Why were you interested in doing this investment, Mr. Snider?

A. Primarily not so much to make a few million dollars, it was primarily to help out my friend and Kota Youngblood in closing this transaction.

Q. And what were you going to get out of the deal once he had manipulated whatever he needed to manipulate?

A. Approximately a third of the sale of the coin.

Q. Did Mr. Youngblood explain to you how that sale would take place and when you would actually see a return on that investment?

A. He knew of several individuals that he could probably sell this coin to. He referenced any billionaire would want to have this in their possession and brag about it. But he said we would have our investment into this coin back by November of that same year.

Q. So April to November, you're going to get the whatever he sells it for, you're going to get one-third of that profit?

A. Yes.

Q. And this was going to be a private transaction rather than selling it through an auction house or anything like

that?

A.    Yes.

Q.    Did Mr. Youngblood indicate that any of the people that he was going to be dealing with were on the shady side of things, or is this just I've got people that I know would be interested in buying it?

A.    People that he knew or connections that he had. Nothing about shady people.

Q.    At this point in time from 2021, you've known Mr. Youngblood for a period of time, at this point, right, maybe a year or so?

A.    Yes.

Q.    First time that you've done an investment with him. Had you had any conversations regarding Mexican drug cartels with Mr. Youngblood at that point?

A.    No.

Q.    Had Mr. Holloway told you anything about Mexican drug cartels?

A.    No.

Q.    Were you aware that Mr. Holloway had had a falling-out with his son Lane at that point?

A.    Yes.

Q.    What did you know about that?

A.    Only that they had some arguments that they had entered into, disagreements, and it became somehow

elevated and I think about that time was they weren't seeing each other.

Q.   Let's go back to our deal for the gold coin.  Could I have Government's Exhibit No. 200, please.  So the first check was April 22nd.  The second check was April 23rd, that's $40,000.  And we see here, a subtraction of $150,000 at the top of your Fidelity statement.  What was that $150,000 for?

A.   That was withdrawal from that account to come up with the cash for this transaction.

Q.   And came out of your Fidelity Roth; is that correct?

A.   Yes.

Q.   To make this transaction, what did you have to do, Mr. Snider?

A.   I made a phone call to my -- to the number that was given to me with Fidelity to -- like an 800 number to contact them and start the transfer of the money.

Q.   Was this the first time that you had made such a large transfer or distribution from your IRA?

A.   Yes.

Q.   So tell me about the process in terms of did you make a telephone call?  How did you get the instructions over then to get you the money into your Wells Fargo account?

A.   Yes.  Once I understood the correct number to call, I made the call and they took the information from me and it

was -- went fairly smooth except it took a few days, maybe four or five days to actually get the funds transferred.

Q.   And actually, you had that money transferred directly to Jay Holloway's account rather than your own account; isn't that right?

A.   That's correct.

Q.   Did you have to get him the wiring instructions on how to do that?

A.   Not necessarily.  It basically went from the Fidelity account into the Navy Federal Credit Union, to his account.

Q.   Mr. Holloway's account.

A.   Mr. Holloway's account so he was waiting for it to arrive.

Q.   And then, you said that happened four or five days after you'd had a meeting in Holloway's house?

A.   Yeah, over a weekend, I believe, but yes, about that.

Q.   Could I get page 11 of that same Exhibit No. 200, Ms. Mercado.  So again, this is the Roth portion of your IRA; is that right?

A.   Yes.

Q.   So we see again, there's that $150,000 distribution and shows that your account value went down from 404 to 267; is that right?

A.   Yes.

Q.   You actually made a little bit of money in terms of the investment but you again took out that big distribution.

A.   Yes.

Q.   All right.  Mr. Guess, we're going to have to call it a day soon.

MR. GUESS:  Could I just finish up with this last -- this count?  I'm sorry, your Honor, I wasn't paying attention to the clock.

THE COURT:  Oh, no, no.

Q.   (BY MR. GUESS) Let's go to page 17 of that document, please, Ms. Mercado.  And the top portion of it again.

So here, we see the normal distribution says partial because you're not taking out all the money from that account, is that right?

A.   Yes.

Q.   Dated 4-27, so four or five days later just like you talked about earlier, and where does it show that that money's going to?  See?

A.   James Holloway.

Q.   And which account did it go to?

A.   His account.

Q.   The Navy Federal Credit Union?

A.   Yes.

Q.   Did you know Mr. Holloway to bank at Navy Federal?

A.    Did I know of it?

Q.    Yeah.

A.    I knew he had an account there, yes.

Q.    Okay.  Did you know that Mr. Youngblood had an account there?

A.    Yes.  I was told he did.

Q.    Well, why didn't you just wire money into Mr. Youngblood's account?

A.    That was the instructions that they gave me.

Q.    Would you have transferred in this money but for the need for that cash immediately?

A.    Yes, I would not have.

Q.    All right.  Your Honor, I'll stop at this point then.

            THE COURT:  Ladies and gentlemen of the jury, we've reached the end of another day.  I'm going to release you for the afternoon under the same instructions I've given you throughout the trial, and that is, please don't talk to anyone, including each other, about this case or engage in any independent investigations.  We'll start up again tomorrow morning at 8:30 sharp and we are looking forward to seeing you then.

            (Proceedings adjourned.)

* * * * * *

UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS      )

I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 8th day of March, 2025.

~~~~~~~~~~~~~~~~~~~~~~~~~
LILY I. REZNIK, CRR, RMR
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street,
Suite 4153
Austin, Texas 78701
(512)391-8792
SOT Certification No. 4481
Expires:  1-31-27