UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA ) Docket No. A 23-CR-135(1) RP
                          )
vs.                       ) Austin, Texas
                          )
SAINT JOVITE YOUNGBLOOD   ) April 19, 2024


TRANSCRIPT OF TRIAL ON THE MERITS
BEFORE THE HONORABLE ROBERT L. PITMAN
Volume 5 of 7


APPEARANCES:

For the United States:    Mr. Dan Guess
                          Mr. Matt Harding
                          Assistant U.S. Attorneys
                          903 San Jacinto Boulevard,
                          Suite 334
                          Austin, Texas 78701


For the Defendant:        Mr. Jose I. Gonzalez-Falla
                          Ms. Charlotte A. Herring
                          Assistant Federal Public Defenders
                          Lavaca Plaza
                          504 Lavaca Street, Suite 960
                          Austin, Texas 78701

Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                          501 West 5th Street, Suite 4153
                          Austin, Texas 78701
                          (512)391-8792

Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Gary L. Snider | 4 | 50 | 81 | |
| Jason Rzepniewski | 82 | 105 | 110 | |
| James Holloway | 111 | 191 | | |
| Katherine Sloma | 259 | 273 | | |

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| #4 through 5 | 189 | 189 |
| #6 | 37 | 37 |
| #16 | 37 | 37 |
| #188 | 48 | 48 |
| #192 through 196 | 43 | 43 |
| #226 through 227 | 92 | 92 |
| #258 | 263 | 263 |
| #286 through 293 | 178 | 179 |
| Defendant's | | |
| (None) | | |

THE COURT:  Is there anything we need to cover today before we bring the jury in?

MR. GUESS:  No, your Honor.

MS. HERRING:  No, your Honor.

THE COURT:  All right.  Want to get the witness?

MR. GUESS:  Mr. Snider, come on back to the stand, please.

(Jury present.)

THE COURT:  You may be seated.  I'll remind you, sir, that you remain under oath.

THE WITNESS:  Yes, your Honor.

GARY L. SNIDER, called by the Government, duly sworn.

DIRECT EXAMINATION (Resumed)

BY MR. GUESS:

Q.   Thank you, your Honor.

Good morning, Mr. Snider.  Glad to have you back.

A.   Glad to be back.

Q.   We left off yesterday, just in a small recap, talking about your relationship to Kota Youngblood and the first time that you made an investment with him.  Do you remember that conversation?

A.   Yes.

Q.   And we were talking about your Fidelity account and how that money had moved; is that right?

A.   Yes.

Q.    I'm going to bring that exhibit back up just so we could have a quick peek at that one more time that was Government's Exhibit No. 200.   And you recognize that document; is that right, Mr. Snider?

A.    Yes.

Q.    This is your document from April the 30th of 2021. You've got these on a monthly basis?

A.    Yes.

Q.    And is this something that you would look at carefully each month, Mr. Snider?   Or is that something you just kind of assumed Fidelity was taking care of for you?

A.    I looked at the information that's on my account on the website every month to monitor the funds whether they go up or go down.

Q.    All right.   And again, we saw here the subtraction of $150,000; is that right?

A.    Yes.

Q.    And to your recollection, that was for the investment in that unique coin that you had seen at Mr. Holloway's house?

A.    Correct.

Q.    Can I have page 17 of that document, please, Ms. Mercado?   I think this is where we left off.   Now, this shows that the distribution made to the Navy Federal

Credit Union account of James Holloway, why did you send it to Mr. Holloway's account?

A. That was the instructions from Kota Youngblood.

Q. Did you ask Mr. Youngblood why you weren't going to send it to his personal account?

A. No.

Q. Why not?

A. It was -- I trusted James Holloway and we proceeded from there.

Q. So at that point, you'd already written those two checks, one for 10 and one for 30,000?

A. Yes.

Q. Plus this 150. So you gave how much money in total for this particular investment?

A. $190,000.

Q. And would you remind the jurors when you were supposed to receive that money back?

A. On the coin investment?

Q. Yes.

A. In November of that year.

Q. So we're talking the end of April here?

A. Yes.

Q. And then, in November, so roughly six, seven months later?

A. Correct.

Q.   And how much money did Mr. Youngblood tell you that you could expect to receive from your portion of the investment?

A.   Approximately, a third of what he anticipated to sell the coin for $10 million.

Q.   So somewhere in the neighborhood of three, three-and-a-half-million dollars?

A.   Yes, depending on what the actual sale was.

Q.   Was that the only time that you had any financial dealings with Mr. Youngblood?

A.   Yes.  The first time.

Q.   The first time.  Not the only time?

A.   Not the only time.

Q.   All right.  I'm going to go forward a little bit. Over the next couple of months, May and June, are you still seeing Mr. Youngblood at Mr. Holloway's house?

A.   Yes.

Q.   Is he starting to come over your house at any point?

A.   Yes.  He would visit us for various reasons.

Q.   And would he come by unannounced or would he call before hand?  How would you know when he was coming by?

A.   Well, he claimed he did not own a cellphone so we usually saw him unannounced, or Jay would call for him.

Q.   Did you find this a little unusual in this day and age that someone wouldn't have a cellphone?

A.    Yes.

Q.    What did you think about that, Mr. Snider?

A.    Well, later, we in other discussions, we determined that he doesn't use a cellphone because he makes arrangements via e-mail to clients that he's meeting.  And the reason he doesn't carry a cellphone is so that the clients can't change the time or the date on his meetings. He did not appreciate when people adjusted his schedule.

Q.    So at some point, you get to know him a little bit better, I take it; is that right?

A.    Over time, yes.

Q.    And is he someone that you become, what you consider, a friend?

A.    Friendly, yes.

Q.    Is he friendly with your wife?

A.    Yes.

Q.    Is he one of the guys that comes over and just in time for dinner or is he one who comes over with flowers and candy in his hands?

A.    From time to time, he would bring flowers, I think candy, but he was very generous.

Q.    I'm going to go forward to September of 2021 and right around the 30th of September, Mr. Youngblood came by your house.  Do you recall that?

A.    Yes.

Q.   Tell the jurors the circumstances of that meeting with Mr. Youngblood, if you could recall.

A.   Well, it started with Mr. Holloway, James Holloway appearing at our door and upon greeting him, he was frantic and in tears and we let him in the house, of course.

Q.   Was that something unusual to see Mr. Holloway in such a state?

A.   Never saw him before in that state.  So we went to our popular favorite place, which is the back porch of our house, and James -- we all sat at the table there and James started to tell us in tears that his granddaughter was being threatened to be kidnapped and harmed, and minutes later, Kota Youngblood set up to confirm the story and give us a few details on what was going on with the cartel and threatening one of Lane's children.

Q.   Let me stop you there.  So first, Mr. Holloway shows up at your house and then, a few minutes later, it's Mr. Youngblood?

A.   Yes.

Q.   Prior to that point, had Mr. Youngblood talked to you about the cartels, about violence, anything along those lines?

A.   No.  I don't recall that.  No.

Q.   So this was kind of shocking to you that the

conversation began this way.

A.    Yes.

Q.    So tell the jurors some of the details that Mr. Youngblood was sharing with you about the threat to Lane Holloway's daughter.

A.    From actions that Lane and his wife, if I recall it, that the two of them had with the cartel that there were some business dealings that did not go well and the repercussions from the cartel was to kidnap and possibly harm one of Lane Holloway's children, which is James Holloway's grandchild.

Q.    Do you remember which child this was?

A.    This was XXXXXX Holloway.

Q.    And that's one of the two daughters at that time that Lane had.

A.    Yes, the youngest of the two.

Q.    How old was XXXXXX at that point if you can remember?

A.    I could only estimate maybe three years old, I'm not sure.  She was very small but she was going to school or kindergarten at that time.

Q.    Mr. Holloway was obviously, as you said, in tears, very upset.

A.    Yes.

Q.    What was Mr. Youngblood's attitude about the situation?

A.    He was pretty frantic, as well, that the short story that he gave us that he needed the money, $235,000 to close the demands from the cartel to ensure that Arella was not kidnapped or harmed.

Q.    Why would you believe this story to be truthful?

A.    Because James Holloway was in the condition he was in.

Q.    And what was your reaction and your wife's reaction when you heard this story?

A.    Disbelief, shock.  We weren't sure how to handle this at all.  We countered with I said, well then, we really need to go to the Feds to get this taken care of and Kota Youngblood convinced us if we went to any of the authorities, the local police or the Feds, as I call them, that the cartel would know and then, Arella would be kidnapped and harmed.  The result would be devastating. So it didn't leave us any choice at that moment.  We felt compelled to help our friend.

Q.    And you discussed this with your wife?

A.    Yes.

Q.    She was on board with giving this money.

A.    Yes.

Q.    So the amount.  235,000, who suggested that as the amount needed?

A.    Kota Youngblood.

Q.   Did you have $235,000 just sitting around in your dresser drawer?

A.   No.

Q.   Did you have a safe in house that had $235,000?

A.   No.

Q.   Did Mr. Youngblood indicate that this was urgent that this get done right away?

A.   Yes.

Q.   So what did you tell him when you didn't have the 235,000 right then?

A.   It would take as it did with the coin investment to transfer money to an account to a bank, it would take three, four days.

Q.   And when you said that you were going to make that happen, what was Mr. Youngblood's reaction?

A.   He was satisfied with the answer and the commitment to do so and he left pretty quickly thereafter.

Q.   Was Mr. Holloway thankful for your contribution?

A.   Yes.

Q.   Did you ask at any point to Mr. Holloway why aren't you giving this money to Mr. Youngblood?

A.   Well, we believed he had already given Kota Youngblood the money himself.

Q.   So this was money that Mr. Holloway wouldn't have had in other words?

A.   Yes.

Q.   Could we have Government's Exhibit No. 202 on the screen, please.  And let's go ahead and highlight the top portion please.

Mr. Snider, this is the same Fidelity account, dated September 30th, 2021, and we see here at top is a transfer of $235,000.  Is that the account that you wired funds from to your Wells Fargo account based on the information provided by Mr. Youngblood?

A.   Yes.

Q.   And again, when we started the year, we were at $607,000 I believe, and now you're down to $321,000 in your account; is that right?

A.   Yes.

Q.   Could we have page 2 of that exhibit.  Again, we see here in the middle, normal distribution partial, Gary Snider, the Dale Snider to Wells Fargo bank and again the $235,000; is that right?

A.   Yes.

Q.   As you sit here today, what was that money paid for?  Why did you give the money away, this 235,000?

A.   To ensure that XXXXXX Holloway was not kidnapped or harmed.

Q.   Now, when you made this transaction, we talked a little bit before about how you would go through it with

Fidelity. Did you follow the same procedure at this time? Did you have to make a telephone call to them?

A.   Yeah, very similar.

Q.   And do you remember talking to a representative?

A.   Yes.

Q.   In fact, you listened to that call today just to refresh your recollection of what was said; is that right?

A.   Yes.

Q.   What were you talking about with that representative?

A.   They wanted to make sure that the transaction -- because it was the second large transaction, they wanted to ensure that the money was safe, it was intended to use for something that I wished it for, that I was not under any distress or being coerced into providing this money or transferring it out of the Wells -- or the Fidelity account to Wells Fargo.

Q.   And you had a pleasant conversation with the individual.

A.   Yes.

Q.   And you told them that it was an investment with your friend.

A.   Yes.

Q.   And which friend were you investing with?

A.   James Holloway and Kota Youngblood.

Q.   That's the first time you had mentioned Kota

Youngblood to them; is that right?

A.    Yes.

Q.    When you told them it was for an investment, that wasn't true, was it?

A.    No, it was not.

Q.    Why did you tell a falsehood to the Fidelity people?

A.    Because I was instructed by Kota Youngblood that if anyone were to find out about the kidnapping and harm that may be done to XXXXXX Holloway, the cartel would be able to find out and they would continue with their action as he described.  So I had to hide the truth in order to obtain the money.

Q.    Did you tell anybody else about the situation other than your wife, Mr. Holloway, and Mr. Youngblood?

A.    No.

Q.    Could we have Government's Exhibit No. 203 on the screen, please?  It's been previously admitted.  So the $235,000 eventually makes it to your Wells Fargo account; is that correct?

A.    Yes.

Q.    Did you go and get a cashier's check or did you write a person check?  How did you get the money, the $235,000 out of your account?

A.    I believe that in this transaction, when it showed up on my account, I contacted James Holloway and the two of

us went to the Wells Fargo branch and obtained that in cash.

Q.   We see Government's Exhibit No. 203 here and is this the slip that you would have filled out?

A.   Yes.

Q.   And it's just you and Mr. Holloway there to pick up this cash?

A.   Yes.

Q.   Had you ever taken out $235,000 in cash before?

A.   Nowhere close.

Q.   Give us an idea what the size -- was it in hundred-dollar bills?  Was it in $20 bills?  What are we talking about?

A.   It was in hundred-dollar bills.

Q.   Bigger than a shoebox?

A.   Bigger than a shoebox.

Q.   Weighed quite a bit?

A.   Yes.

Q.   Is your heart beating a little fast when you were walking out with that cash?

A.   Yes, very fast, it was very stressful.  Still believing that I was doing the right thing.

Q.   And what did you do with the cash?

A.   I handed it to Mr. Holloway.

Q.   And after that, what happened to it?

A.    Well, we went back, he dropped me off and I believe he went directly to wherever Kota Youngblood was to deliver the cash.

Q.    You didn't see Mr. Holloway hand the cash to Mr. Youngblood, did you?

A.    No, I did not.

Q.    Did Mr. Youngblood later confirm with you that he had received that money?

A.    Yes.  In conversations, yes.

Q.    All right.  Could we have Government's Exhibit No. 204, please.  Here's your Wells Fargo statement of September 2021.  Could we go to page 2, please, and let's highlight the bottom portion of that document.  So we see here again part of the -- beginning on 9 -- when we see your Social Security check being distributed on 9-15; is that right?

A.    Yes.

Q.    And again, the top one, those are all deposits related to your 401(k).

A.    Yes.

Q.    All right.  We see that the withdrawal subtractions and again, on 9-30, we see this wire transfer, fed wire 2231 and it shows it's a Roth IRA for $235,000; is that right?

A.    Yes.

Q.   So that's the transaction that you had made with your Fidelity account in other words.

A.   Yes.

Q.   And we see a wire charge of $15 for it and then, withdrawal on that same day.  So same day the money hit your account, you're in the bank withdrawing it.

A.   Yes.  That is correct.

Q.   Why did you have to do it so quickly?

A.   That's what we were told.  As soon as it arrived into my account, which I was checking frequently that day and probably the previous day, as soon as it landed in the account and was accessible, I contacted James Holloway and we got in a car and we drove up to the bank.

Q.   All right.  Again, this is all that sense of urgency that Mr. Youngblood needed that money for.

A.   Yes.  It was life or death.

Q.   Life or death.  Okay.  So this was to protect XXXXXX. To your knowledge, was XXXXXX ever kidnapped?

A.   To my knowledge, no.

Q.   Did you think it was a good investment at that point?

A.   Yes, at that point.

Q.   Was that the last time that you would have had a financial transaction or financial dealing with Mr. Youngblood?

A.   No.

Q.   Would he continue to come by and ask for money?

A.   Yes.

Q.   In fact, there's several occasions when you would use the same process of wiring money out of your Fidelity account to get money to Mr. Youngblood; is that right?

A.   Yes.

Q.   I'm going to go through a few them and we're going to go a little bit quicker on some of these, but anyway, just want to give an idea of what you were doing.  So could I have Government's Exhibit No. 210 on the screen, please.

So this is your statement from October so just a month later, we see a withdrawal of $80,000 from your Fidelity account.  Do you remember why you took $80,000 out of your Fidelity account on that occasion?

A.   I believe that occasion, it was in an attempt to acquire the money that he was trying to transfer from Canada over the border to get access from.

Q.   Tell the jurors a little bit about this scheme.

A.   One of the stories -- and it might be aligned to this one because there are several -- was that he had money coming from Canada trying to make it across the border and there was something that occurred to the gentlemen that were trying to cross the border and they could not get across.  But the $80,000 was used to expedite that transfer of money to pay those individuals to make that

transfer.  He could not because of his restrictions on passport, Kota Youngblood could not make it -- make the trip himself.

Q.   And he needed the $80,000 to make this happen?

A.   Yes.

Q.   Was Mr. Holloway involved with this investment also or was this just between you and Mr. Youngblood?

A.   Myself and Mr. Youngblood.  Mr. Holloway was involved with the acquisition of the money once it was transferred.

Q.   Could I have Government's Exhibit 205, please. Second page.  This is again your Wells Fargo statement from October and one more time, we see the transfer on 10-8, wire transfer again from your custodial IRA account of $80,000; is that right?

A.   Yes.

Q.   We see withdrawal made in a branch store on 10-8. Could we go back to 203 for a second, page 2.  Same process isn't it, Mr. Snider?

A.   Yes, it is.

Q.   Are you watching your account just like you did with the 235,000?

A.   Yes, I'm watching it go down.

Q.   All right.  Was this also an urgent situation?

A.   Yes.

Q.   Why was it urgent?

A.   Because the money was available to transfer at that time and without the $80,000, the transaction was not going to happen so it was used to expedite the money to be transferred and it could not be transferred in any other fashion through a bank or anything else.

Q.   So this all happens in the middle, early part of October.  What's going on in the sale of that gold coin that you had invested in back in April?

A.   I believe at that time, there were delays in trying to sell it because of the cartel or other cartels arguing with themselves and Kota Youngblood was in the middle of all this.  So he had too much exposure to be able to sell the coin to an individual of any type.  So there was one delay after another.

Q.   Are the alarm bells starting to go off in your head at this point, Mr. Snider?

A.   They started to go off.

Q.   Did you think about going to the Feds?

A.   No.  I started asking questions of Kota Youngblood as well as James Holloway.

Q.   What kind of questions were you asking?

A.   Is this for real?  How come this transaction, it didn't happen and there was always a excuse, this one and others, from Kota Youngblood why the transfer did not happen.

Q.   And you believed all those.

A.   As farfetched and elaborate as they were, yes.  I questioned it but not to a point of contacting authorities.

Q.   So November comes and goes and nothing comes from the sale of coins?

A.   No.

Q.   Let's go forward to January.  Could I have Government's Exhibit No. 206 on the screen, please.  Page 2.  See a transfer here.  See the $96,000 there?

A.   Yes.

Q.   Do you remember what the point of that $96,000 was for?

A.   That might have been one of the occasions where Kota Youngblood needed to hire a pilot to fly the money across the border into a remote and secure location, small airport to be able to acquire the cash and then, drive it down to us.

Q.   Still the same Canadian scam or scheme?

A.   Well, it came from -- it was coming from Canada, whether it was Russians or some other cartel or something, there was always different people involved in the transaction.

Q.   At any point in this part of your relationship, does Mr. Youngblood warn you and your wife that you may be in

danger?

A.   Yes.

Q.   What's going on with that part of the story?

A.   Well, he was indicating or telling us that we are being watched.  Our phones were being recorded or listened to and do not use the internet because someone is in your system and we felt like we were basically threatened.

Q.   Did you believe these stories?

A.   Yes, even though we were not able to authenticate any of them with any incident that would occur.  Yes, initially we believed them.

Q.   Could I have Government's Exhibit 212, please.  So this is January 2022 and again, we've got the $96,000 that comes out of your Fidelity account.  Also look at that portfolio value.  What does that say, Mr. Snider?

A.   $98,084.

Q.   So you started with 670-some-odd-thousand and now you're down to 98?

A.   Yes.

Q.   Let's go forward to February of 2022 and Mr. Youngblood comes again asking for money; is that correct?

A.   Yes.

Q.   And could I have Government's Exhibit No. 207 on the screen, please.  Go to page 2 and let's highlight the portion in the middle.  Mr. Youngblood says he needs money

and I see two wire transfers of $37,000 and $59,000.  Do you remember what those wire transactions were for?

A.   They could have possibly been for because some of these are a little out of sequence, one of the reasons money was needed urgently possibly this time was associated to hiring another pilot to fly the money down from across the border from Canada.  Unfortunately, that particular story was not able to do that because the pilot died after receiving a COVID shot and he could not go back to the pilot's wife to ask for the money back.

Q.   How often is Mr. Youngblood coming by your house at this point?

A.   Frequently or occasionally but every time we saw him, it was either -- of course it was money related discussions because we were always looking for when do we see any portion of the money returned to us and it always seemed to be it will be a certain day next week or a certain day two weeks and this is the reason why and, you know, it's basically one delay after another.

Q.   So everything's just right around the corner though and you're going to get made whole?

A.   Oh, yes.  So we were anticipating and excited to see any money returned to us, any portion of the sum.

Q.   Are you starting to feel a little bit desperation, though, too?

A.    Oh, yes.

Q.    I mean we just saw that you're less than a hundred thousand dollars in your IRA account now, right?

A.    Yes.

Q.    At that point in February 2022, do you notice something weird happening around your neighborhood regarding some flyers?

A.    Yes.  For a period of -- can't remember if it was -- probably over a few weeks, we were -- I think it was we were either notified by James Holloway because he received flyers at his -- on his street as well.  But we saw there were papers thrown in the middle of our street, hundreds of papers and they had derogatory comments about people that we knew and did not know that caused us to run out into the street and start collecting them before our neighbors would see any of them.

        But unfortunately because the winds or rains or whatever at that time, some of the neighbors saw it and wondered what was going on with us.

Q.    People you'd been living around for 20-some years?

A.    Yes.

Q.    Could we have Government's Exhibit 125 on the screen, please.  Let's go to page 2.  Mr. Snider, the do you see that document in front of you on the screen?

A.    Yes.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Q.   The writing at the top, 2-25-22 is that your handwriting, Mr. Snider?

A.   Yes.

Q.   And is this something that you would have collected that had been distributed in your neighborhood?

A.   Yes.

Q.   I'm going to have you read the first couple of lines of that.

A.   Warning residents of Mountain Creek.  I'm sorry, I can't read it.

Q.   Needless to say, it's very derogatory towards you. Claims that you're taking advantage of elderly clients who trust them to repair their heirloom clocks and watches.

A.   Yes.

Q.   Had you ever done that?

A.   No.

Q.   Take items of value and replaces it with replicas. Did you do that?

A.   No.

Q.   Did you ever scam someone out of money, Mr. Snider?

A.   No.

Q.   The bottom line, the Sniders and Holloways lie better than honest people tell the truth.  Did that hurt?

A.   Of course.

Q.   Do not trust them about anything they say.  What was

your wife's reaction to all this?

A.    The same.  We were frantic that all of these papers were being thrown in the street by someone who we did not know who was doing it.

Q.    At the same time, is Mr. Youngblood talking to you about maybe some cars or different things that are going on, activities in your neighborhood?

A.    Yes.

Q.    Tell the jurors what Mr. Youngblood's telling you about those cars.

A.    The cars?

Q.    Uh-huh.

A.    Yeah.  That they were -- well, he was protecting us because he hired a couple of people to roam our neighborhood because there were people that were, if I can recall correctly, were driving by our house and looking to see if there was an opportunity to harm us or break in. We did not know.  So he hired two individuals to drive through our neighborhood, protecting us as well as James Holloway's home.

Q.    Did you feel threatened when you heard that story?

A.    Yes.

Q.    How did it change your life?

A.    We thought about everything that we did.  Kota Youngblood for example told us that when you're going to

the store, leaving the house for any reason, make sure no one's following you.  Circle back around to see if there is somebody that's following you and we were just any car that slowed down in front of us house, we were suspect that they might be somebody to do us harm.  We did not know.  So we had to be watchful everything we did.

Q.   So the flyers are coming out, these cars are roaming around, Kota's got security for you.  Do you decide to take some action yourself?

A.   Well, no.  We didn't do anything beyond that that I recall.

Q.   Did you at one point sit in your daughter's car in your driveway to see if you could find the person who was throwing these flyers?

A.   Oh, yes.  Associated to the flyers, yes, we did. James Holloway and I in order to try and find out or get a glimpse of the vehicle that was driving by throwing the papers we sat in my daughter's car one night and watched cars go by for a couple of hours.

Q.   Did you see anyone throwing flyers?

A.   Not that night.

Q.   Okay.  And not to be disrespectful here but you've seen your better athletic days is that right?

A.   By far.

Q.   You're not going to jump out of the car and to try to

track down this person or tackle them or anything, right?

A.   We thought if we could get a closer look even, even starting my daughter's car and driving after these people to try and put this to an end, we were tempted to do that.

Q.   Let me ask, do you keep firearms in your house?

A.   No.

Q.   Did Mr. Youngblood suggest that maybe a firearm would be appropriate for you?

A.   Yes, because we were in danger, he was concerned for us and so he suggested that twice.

Q.   And did he actually try to give you a firearm or offer you one?

A.   Yes.  He said I could have one of James Holloway's guns.

Q.   Did you take one of them?

A.   No.

Q.   Eventually during one of the surveillances of the stakeouts that you, Mr. Holloway, and your wife's participating in some of this and your daughter, also?

A.   One evening, my wife and I decided to sit in her car, which is located in our driveway and it's somewhat of a dark area and it's a dark car that you could not see from the street.  Yes, she and I were watchful for anybody throwing flyers into the street.

Q.   And on that evening, did your wife see someone

throwing flyers?

A.   Yes.   When I went to the house to get a drink and tell my daughter goodnight as she went to bed, I opened the front door back up and noticed that there were flyers in our driveway this time and my wife is up and running down the street -- or down the sidewalk there in front of our house.   So only a few minutes had passed but I missed all the action.

Q.   Did she tell you who she had seen?

A.   Yes.   She identified because of the physical nature Lane Holloway.

Q.   Lane Holloway who is James Holloway's son?

A.   Yes.

Q.   The father of the child who you paid $235,000 to protect.

A.   Yes.

Q.   What was your thought?

A.   Disbelief that Lane Holloway would be involved with throwing the flyers.   We weren't sure he was -- had thrown any of the previous ones but on this occasion, he actually walked up the driveway to throw them in our driveway instead of all over the streets and my wife jumped out of the car as quickly as she could and started running down the driveway and could tell it was the physique or the -- a description of Lane Holloway and recognized the vehicle

as well as his.

Q.   Did you report this to the police?

A.   No.

Q.   Why did you not report it to the police?

A.   We weren't compelled to at that time and we notified Kota Youngblood.

Q.   So instead of calling the police you called Kota and what does he tell you?

A.   I believe at that time, he was going to take care of it.  I'm not sure what his verbal response was.

Q.   Your daughter, she's working in the downtown area at that time; is that right?

A.   She at that time, she was deputy clerk and still is for the city of Pflugerville.

Q.   So she went into work the day after all this took place; is that right?

A.   Yes.  We were not aware that she took one of the sheets from the stack and took it to the police department, which is in the same building.

Q.   And did she make a report about that?

A.   Yes.

Q.   What happened after she made the report?

A.   She told us a day later what she had done and she didn't ask the police or told the police not to take any action.  She just wanted it reported.

Q.   Did officers eventually come to your home?

A.   No.

Q.   Did you report the incident to Mr. Youngblood that your daughter had told someone at the Pflugerville police department about the flyers?

A.   Yes.

Q.   And what was Mr. Youngblood's response when you reported that?

A.   He was upset that now the -- that some of the officers and detectives within the city of Pflugerville, if the wrong ones got a hold of this that they would be communicating this to the cartel.

Q.   So he had you believe that the Pflugerville PD was connected to the drug cartels?

A.   Yes.

Q.   And why was that a problem for you?

A.   We would be threatened all over again from them knowing that we reported it and that we'd be exposed and we would all be in danger if it went any further.

Q.   At this point of your relationship, you don't have much financial resources left.

A.   Not much but that didn't stop Mr. Youngblood from requesting more.

Q.   Were you able to give him more money?

A.   Yes, we did.

Q.   Eventually, in May of 2023, you decide to give him another large amount of money; is that correct?

A.   Yes, I believe so.

Q.   What was the reason that you were going to give him this money?  Why was he asking for it in May of 2023?

A.   I don't recall.  It was one of the other stories that we heard that he needed money urgently to try and expedite the return of our fund.  And I think one story in the sequence of these with large withdrawals was one of the individuals was flying into somewhere in New York at an airport and he was going to meet them there with a large sum of money and he needed to fly up there and get this money and have a pilot hired to fly back but unfortunately, the transaction could not occur because the airport was snowed in so it had to be delayed.

Q.   The last valuable resource that you have is your home at this point.

A.   Yes.

Q.   Had your home been paid off?

A.   Yes.

Q.   Did Mr. Youngblood and Mr. Holloway suggest a way to access the equity of your home?

A.   Yes.

Q.   What was their suggestion?

A.   I went over to the house, I believe I was called over

and I met James Holloway at his home and Kota Youngblood was there, as well. And Kota began to describe that one of his sons and I believe was Seth Holloway was -- had signed for him sale of bitcoin and it was a rather large sale and the IRS found it and started to ask questions about it and in contacting the IRS, somehow contacted Kota Youngblood to tell him, give them the heads up that James Holloway was about to be arrested for this bitcoin sale that was never reported to the IRS.

Q. Is this something that you felt very strongly about that you needed to help Mr. Holloway?

A. Once again, yes.

Q. And what did you then decide to do with your home?

A. Kota Youngblood gave me a contact of a person that buys and sells homes.

Q. And who was that person, do you remember?

A. Jack Rady.

Q. And eventually did you sell your home to Mr. Rady?

A. Yes.

Q. Could we have Government's Exhibit No. 217 on the screen, please. Do you recognize this document?

A. Yes.

Q. This is the sale of your home; is that right?

A. That's correct.

Q. At the top there we see is that your address and your

Q.   information there as the seller?

A.   Yes.

Q.   And then, we see Zit Homes.  Is that Mr. Rady's company?

A.   Yes, it is.

Q.   And sale date of May 19, 2023.  Could we go to page 2 of that document, please?  You sell your home for roughly $300,000; is that right?

A.   Yes.

Q.   Is this a fast sale?

A.   Well, this is -- I believe it was for over a period of time with four transactions to try and get money to Kota for the same kind of reason to expedite money to us that we were looking forward to.  So it took these four transactions to build up to $291,000 and Mr. Rady was able to wait multiple periods.  We signed documents over a dozen times to push out the date of the deliverable of refunding Mr. Rady the money in coordination with Kota Youngblood's ability to acquire the money.

Q.   Eventually, the money from the sale of that house, whose pocket did it end up in?

A.   Kota Youngblood.

Q.   You don't have any of that money left?

A.   No.

Q.   Did you spend your working life making up money to

Q.   pay for that home?

A.   Yes.

Q.   Are you still like in it today?

A.   Yes.

Q.   Are you renting it or how is it working out?

A.   We're paying Mr. Rady rent for that house.  He's allowed us to live in it and not evict us with the condition of paying rent and so, he's been in our minds, he's been very kind to cooperate with us.

Q.   If Mr. Rady were to change his mind, though, you could be moved out of that house very quickly?

A.   We could.  We have an agreement that to stay in the house as long as we would like, presumably paying rent. If we couldn't pay rent, he might still let us live in it but then, it becomes breach of contract and I don't know where we would go.

Q.   At some point, did you take out a loan from Navy Federal Credit Union?

A.   A personal loan, yes.

Q.   And why did you take out that personal loan from Navy Federal?

A.   Another reason to expedite the money, Kota Youngblood needed it.

Q.   That was for $30,000?

A.   Correct, $30,000.

Q.   Are you still paying off on that loan?

A.   No.   We used -- my wife and I used some of the money, sale of stocks to pay it off when the Navy Federal Credit Union could not or would not find a way to give us some relief on that.

Q.   At different times, did Mr. Youngblood sometimes leave you collateral for the money that you were giving to him?

A.   Yes.   So two different occasions, he left us two items.

Q.   May I approach the witness, your Honor?

          THE COURT:   You may.

Q.   (BY MR. GUESS) Mr. Snider, I'm handing you what's been marked for identification purposes Government's Exhibit 6, which is two items.   Prior to coming to the courtroom, you are familiar with these items; is that correct?

A.   Yes.

Q.   First, let's talk about the one in the small -- may I move for admission of Government's Exhibit 6?

          MR. GONZALEZ-FALLA:   No objection, your Honor.

          THE COURT:   It's admitted.

          MR. GUESS:   Oh, 6 and 16, I'm sorry, your Honor.

          MR. GONZALEZ-FALLA:   No objection.

          THE COURT:   So admitted.

Q.   (BY MR. GUESS) So let's talk about Government's Exhibit 6.  First off, you see this envelope.  Can you read?

A.   Snider collateral.

Q.   And this was the item that was inside that envelope; is that correct?

A.   Yes.

Q.   May I publish to the jury, your Honor?

          THE COURT:  You may.

Q.   (BY MR. GUESS) So this was the item that Mr. Youngblood delivered to you and your wife?

A.   Yes.  Early one morning.

Q.   And let's go ahead and unwrap that.

A.   And it was wrapped in tin foil so that nobody that's staying in our home could identify it so it was protected in the aluminum foil as we were told and instructed.

Q.   So we're looking at here and, again, what I see here is a little pin or something like that; is that correct?

A.   Yes.

Q.   May I publish to the jury?

          THE COURT:  You may.

Q.   (BY MR. GUESS) What is this item?  What did Mr. Youngblood tell you this item was?

A.   I recall it was in possession of one of Navalny's crosses.

Q.   Who is Navalny?

A.   He's -- I believe the term may be dissident in Russia.

Q.   And did Mr. Youngblood explain to you how he came in possession of this that Navy Cross?

A.   I don't recall if he did and what he said if he did explain how he came across it.

Q.   Was it valuable?

A.   According to Mr. Youngblood, yes.

Q.   How valuable was it according to Mr. Youngblood?

A.   He didn't provide if I recall, he did not provide a specific number but he said that it was very valuable and to hold on to it.

Q.   And did you do so?

A.   Yes.

Q.   Until eventually, the FBI came by and you provided it to them.

A.   Yes.

Q.   Mr. Youngblood also dropped off a second package for you; is that right?

A.   Yes.

Q.   And what was to be contained in that second package?

A.   Very valuable Faberge, something that I believe Mr. Putin had and so, it was one of his, if I recall correctly.

Q.   So piece of Faberge, what is that?  I'm not familiar.

A.   It's a valuable egg.  I don't know how valuable it is and there was not a -- to my recollection, not a specific number.  Only that it had great value to it and hold on to this collateral until the money came in.

Q.   And Mr. Youngblood told you it was special to Vladimir Putin, the president of Russia?

A.   Yes.

Q.   How was it wrapped or how was it packaged?

A.   It was wrapped in bubble wrap so that large at one end and narrow at another and I'm not certain of the size of the egg.  I think it's fairly small but you could not determine what was inside of the package because it was wrapped several times in bubble wrap.

Q.   Were you instructed not to open it?

A.   No.  We felt that let's keep it as is so that if there's any questions that we opened it and switched it or something that we just decided not to open it.  We trusted Kota Youngblood for his word.

Q.   Eventually you and your wife did open it up, though, didn't you?

A.   Yeah, on a special occasion we had James Holloway happened to be coming over for a visit and we continued to question what is in this package that we were hiding in our closet.  So we became frustrated enough to take it on

back porch and in front of James Holloway, open up, unpeel the bubble wrap.

Q.   Do you remember when this was?

A.   No, I don't recall exactly when it was.

Q.   When you opened up the bubble wrap, what did you find inside it?

A.   A large book.

Q.   May I approach the witness?

THE COURT:  Yes.

Q.   (BY MR. GUESS) Government's Exhibit No. 16, is this the book that you found inside the package that was supposedly the Faberge egg?

A.   Yes.

Q.   And it looks to be a Russian book; is that right?

A.   Yes.

Q.   Certainly not a Faberge egg, though, is it?

A.   No.

Q.   Anything special about this book that you can see, Mr. Snider?

A.   Not to me but according to Kota Youngblood, it was one of Vladimir Putin's possessions all over again.

Q.   At that time, what gave it value?  The fact that it once belonged to Putin?

A.   Yes.

Q.   Eventually, the FBI came out to talk to you and your

wife in June of 2022; is that right?

A.   Yes.

Q.   And let me go back for just a moment.  I'm looking at the Government's Exhibit 217.  We have the date there.  I just want to make sure we've got the dates right here.  This is the date that you recall selling your home?

A.   Yes.

Q.   Okay.  Just wanted to double check that.  I meant June of 2023 when the FBI came out to visit you.

A.   Ah, yes.  Yeah.

Q.   Not June 2022.  My mistake there.

A.   Okay.

Q.   So they come out to visit you; is that correct?

A.   Yes.

Q.   And do you remember who came out to visit with you and your wife?

A.   Mr. Noble and Ms. Wilkinson.

Q.   And you told them that you had many meetings out in your back porch?

A.   Yes.

Q.   Did you also have security cameras in your home at that time?

A.   Yes, we do.

Q.   All right.  Did they ask you or did you offer to give them some examples of Kota Youngblood out on the back

porch with you and your wife?

A.   Yes.  Upon a future visit.  Every time Kota Youngblood did visit, it was pretty consistent and became normal business, no matter what the discussion was, to shut the cameras off, take our tablets and cellphones and hide them in a back room so that none of our conversations could be heard.

Q.   I'm going to hand you what's been marked for identification purposes as Government's Exhibits 192, 193, 194, 195 and 196 and it's a disc with your initials on it; is that correct?

A.   Yes.

Q.   And those contain short snippets from your security video camera of you, yourself, your wife, Mr. Youngblood and Mr. Holloway on your back porch?

A.   Yes.

Q.   You reviewed them prior to coming into the courtroom and they are true and accurate of what occurred on that day.

A.   Yes, I have.

Q.   Offer Government's Exhibits 192 through 196 inclusive.

        MR. GONZALEZ-FALLA:  No objection.

        THE COURT:  So admitted.

Q.   (BY MR. GUESS) So this is after the visit with the

FBI officers and you allowed your security camera to run this time instead of turning it off?

A.   Yes.  It's a motion camera so it picks up when there's movement and fortunately, Mr. Youngblood was standing and walking around so it caught different portions of his visit.

Q.   All right.  Let's go ahead and start, Ms. Mercado, if we can, with Government's Exhibit 192.

(Audio and video file played.)

Q.   Who are the two people entering -- that's your home; is that correct?

A.   That is correct.

Q.   Who are two people entering into your home?

A.   First Kota Youngblood, the second person is James Holloway.

Q.   And Mr. Youngblood was dressed in black, was that his normal attire?

A.   Always.

Q.   Let's go to Government's Exhibit No. 193.

(Audio and video file played.)

Q.   All right.  Describe what's going on here and where we're at?

A.   This is our back porch and my wife and I were sitting in the chairs, James Holloway was in one of the chairs where Kota's standing but got up and walked behind and

stood there in this particular clip and Kota Youngblood is telling us a story.

Q.   Is it early in the morning, late in the day, when is this?

A.   It's early in the morning.  The visit was a complete surprise.  I think I was one part of the house and my wife was on the back porch so it took a while for me to get to the front door after hearing the doorbell ring.  But yes it was early in the morning.

Q.   All right.  Go ahead and play the clip, please.

          (Audio and video file played.)

Q.   And then, the video stopped there for -- it kind of cuts back and forth; is that right?

A.   Yes.

Q.   Is this something normal that would happen with you and Mr. Youngblood when you're having these conversations where he's kind of sitting up there almost in a lecture type mode?

A.   Yes.  He had a story to tell and he told a full length version of it.  They were very elaborate, detailed and to people that can't verify.  We took him for his word.

Q.   He's very passionate in front of you there, right?

A.   Yes.

Q.   All the time?

A.    All the time.

Q.    Let's go ahead and play the next clip, please, 194.

(Audio and video file played.)

Q.    So what was this part of the story about if you can recall?

A.    I can't recall beyond this, but it was one of the stories about young girls being naked.  This one, I think, is something in a bathtub and we've heard similar stories before.

Q.    Next clip, please.

(Audio and video file played.)

Q.    I don't need 70 grand from you, just need 30.  Sound familiar?

A.    Yes.

Q.    This happened a lot of times to you and your wife?

A.    Yes.

Q.    Did you come up with the 30 grand on this occasion?

A.    Not on this occasion since we already had visits from special agents.  So we left the camera on and there was no question about the camera on this particular visit as in the past.  So we were happy to accommodate this visit.

Q.    Next clip, please.  This is the last one, correct?

(Audio and video file played.)

Q.    And Mr. Youngblood indicated to you that he considered you and your wife family?

A.    Yes.  We were the aunt and uncle to him.

Q.    The hugs good-bye very common?

A.    All the time.  Every time.

Q.    Must be kind of hard on this occasion though to get a hug, wasn't it?

A.    It was different but as time went on, we trusted him less but knew giving him money even small amounts, hanging on to the possibility of getting some money back.  But yes, this was different because we knew that it was over.

Q.    Could we have Government's Exhibit No. 216 on the screen.  Mr. Snider, these have been pre-admitted, 216, I see a check here from James Holloway dated August 23rd, 2022 for $4,000.  Do you remember what that check was for?

A.    I have to believe it was a payment that he was giving us money back.

Q.    Mr. Holloway?

A.    There was a few of those transactions.

Q.    Okay.  Overall, if you have an idea how much money were you ever given back from either Mr. Holloway or Mr. Youngblood as part of your investments?

A.    Probably around 30 to $40,000.  It would be increments of, say, a check or cash of $5,000 or something.  But then a short time later, Kota Youngblood would need that money back so James Holloway would be coming back to get the similar or same amount back from

us.  So every time we did receive any amount of money, it didn't last long.

Q.    At some point, did you prepare for yourself a summary of what happened to you and your wife over the course of your relationship with Mr. Youngblood?

A.    Yes.  I tried to keep some level detail of the money received and the money given.

Q.    And that's contained in Government's Exhibit 188.  Do you recognize the exhibit?

A.    Yes, it is main.

Q.    Three-page document, again, you tried to list out all the times that you would give money to either Mr. Holloway, Mr. Youngblood, but it's all part of that scheme; is that right?

A.    Yes.  The dollar amounts, the dates should be accurate, the check numbers.  I'm a little vague on the comments that I wrote later to try and understand or determine each of the transactions.

Q.    Move for admission of Government's Exhibit 188.

        MR. GONZALEZ-FALLA:  No objection.

        THE COURT:  So admitted.

Q.    (BY MR. GUESS) Could we have 188, Ms. Mercado?  This basically sets out what happened to you and your wife beginning from that first investment until May of 2023 when you sold your house; is that right?

A.   Yes.

Q.   The total amount of money that you are personally out for is almost $1.3 million?

A.   Yes, approximately.

Q.   And then you add in the interest you paid or due?

A.   Best estimate from loans that we took out including my daughter's.

Q.   And your daughter was also victimized by Mr. Youngblood?

A.   Yes.

Q.   As you sit here today, tell the jurors what your financial situation is like, Mr. Snider.

A.   We still have some amount of money in the Fidelity accounts because we had several accounts to begin with and over a period of time with these withdrawals, we were beginning to close some of the accounts.  So we have a small amount of money left that is supporting our monthly payments from Fidelity and the pension from when I received a pension and Social Security.  So we're living off of that basically.

Q.   Has your life changed considerably from that first investment?

A.   Yes.

Q.   Much worse position.

A.   Yes.  Much worse.

Q.    I'll pass the witness for cross-examination.

                    CROSS-EXAMINATION

BY MR. GONZALEZ-FALLA:

Q.    Good morning, Mr. Snider.

A.    Good morning.

Q.    So your relationship with Mr. Youngblood was something that really grew from your relationship with Jay Holloway.

A.    Yes.  That is correct.

Q.    And you had known Jay Holloway for many years?

A.    Yes, approximately 2003, 2004.

Q.    You said he just lives down the street?

A.    Yes.  He was about twelve houses away down two streets but five-minute walk.

Q.    And you knew not only him but his wife?

A.    Yes.

Q.    And his children, as well.

A.    Yes.

Q.    That's Seth and Lane?

A.    Yes, and Allison.

Q.    And Allison.  And you said that you would go over there and you would work with Jay repairing clocks?

A.    Yes.

Q.    You considered him -- I mean, you were his apprentice?

A.    Yes.

Q.    I mean, because he was the one who was familiar with this and you were learning from him on how to repair these old clocks.

A.    That is correct.

Q.    I guess you probably saw Mr. Holloway as kind of a brother.

A.    He was definitely part of the family.  He was beyond a friendship.

Q.    And before you met Mr. Youngblood, had you done any business deals with Jay Holloway?

A.    No.  I bought a few clocks from him, maybe a half a dozen over the years.  But no, no business with him.  I would travel with him when he would go to different clients and do basically house calls.  I would travel with him and assist him where I could, you know, where it takes two people to get parts or get tools or something.  So I helped him.

Q.    It seems like Jay Holloway in the lifestyle that he led when you knew him for those many years was one that was relatively undramatic.

A.    Correct.

Q.    I mean, working with clocks and then, he's got his family there.  Did you know when, how long he had known Mr. Youngblood before you first met Mr. Youngblood?

A.   Not sure, but I believe that I knew of Kota Youngblood about the time that he met him because I was over Jay Holloway's house typically twice a week all day and so I would be -- I was introduced to Kota Youngblood probably at the beginning when Kota started coming over.

Q.   And what year believe that was?

A.   I think it was 2020.

Q.   2020?

A.   I think so.

Q.   You know, so, you know, Mr. Holloway, I mean -- if we go back to maybe 2018, 2019, would that surprise you if Jay Holloway had known Mr. Youngblood going back that far?

A.   No, it wouldn't surprise me.  I'm not real accurate on any dates at that time when Jay Holloway met Kota Youngblood as well as when I was introduced to him so there could be a span there.

Q.   You had talked about having lunch with Mr. Youngblood and Jay Holloway and how Mr. Youngblood would buy lunch?

A.   Yes.

Q.   And this was before you made the initial -- that first $150,000 investment.  That was the first investment that you made?

A.   Yes.  It was before.

Q.   So how much time before that, before that first transaction occurred in April of, I think it was, 2021?

A.    I think so.

Q.    How much time before that had you known Mr. Youngblood?

A.    I would estimate about a year.

Q.    About a year?

A.    Somewhere in there.

Q.    Were you aware or did Mr. Holloway tell you of any previous business deals or investments with Mr. Youngblood?

A.    I knew that they had business dealings between the two of them, yes.

Q.    Did you know of any of the details of those business dealings?

A.    No.   When I was upstairs working on the clocks left alone, the two of them when Mr. Youngblood would arrive, they would be discussing something downstairs.

Q.    Would Jay Holloway tell you any of the specifics of the business deals that he had with Mr. Youngblood?

A.    No.

Q.    Would he tell you whether he had made money or lost money with Mr. Youngblood?

A.    Not until later when I became involved.

Q.    And when was that?

A.    That was about the time of the coin.

Q.    About the coin?

A.    Yes.

Q.    And what did Mr. Holloway tell you about his history of dealings with Mr. Youngblood?

A.    That they were both working on large investments and he did see some money coming in from those.

Q.    Did Mr. Holloway lead you believe that his relationship with Mr. Youngblood had been a successful one?

A.    Yes.

Q.    Did he ever tell you that he had lost money with Mr. Youngblood?

A.    Eventually, he did, yes.

Q.    Eventually.  And when was it that he told you that?

A.    It was probably after the coin.

Q.    After the coin.

A.    Yes.

Q.    How much time after coin, do you know?

A.    No, I cannot recall.

Q.    Did Jay Holloway ever let you know that he was chasing money that he'd given to Mr. Youngblood?

A.    Chasing money, I'm sorry.

Q.    Like he had lost money and was trying to recoup just as you found yourself in a situation where you were trying to recoup funds, did Jay Holloway ever tell you that he was in a similar position?

A.    No.

Q.    So the first major investment which involved $150,000, you said that there were a couple of previous payments.  I think it was $30,000 and then, $10,000?

A.    That is correct.

Q.    Now and those were to facilitate the transaction.

A.    That was to help to facilitate the transaction of the coin, yes.

Q.    And were any details provided about how this money would facilitate the coin transaction?

A.    It would show that with the cash that waiting for the $150,000 would provide good faith.

Q.    So Jay Holloway was also a partner in this deal; is that correct?

A.    Yes.

Q.    Because you were going to split the proceeds three ways?

A.    Yes.

Q.    And Jay Holloway then had also made an investment, correct?

A.    Yes, as I believed.

Q.    As you believed.  And what did Jay Holloway, Mr. Youngblood tell you about Jay Holloway's commitment to this coin investment?

A.    They did not provide any details about his portion.

Q.   Now you were contributing $190,000.

A.   Yes.

Q.   And so you never learned any specifics about how much money Jay Holloway, himself, had committed to this?

A.   No.

Q.   Did you ask?

A.   No.

Q.   Did Mr. Youngblood tell you how much money he had contributed --

A.   No.

Q.   To this investment?  And did you ask Mr. Youngblood how much he had contributed?

A.   No, I did not.

Q.   What was your belief about how much money they had contributed?

A.   I believed that they contributed the same similar portion to be able to profit from the $10 million, potential $10 million sale.

Q.   And I expected the reason you believe that is because you trusted them.

A.   Yes.

Q.   And you believed that if they were asking you for that amount of money that they probably had made the same stake in this potential $10 million investment.

A.   Yes.  The request was made by Kota Youngblood for

that and so, I assumed that they both had made contributions to the purchase of that.

Q.    And did Jay Holloway do anything to indicate to you otherwise?

A.    No.

Q.    Did the way that he act in your presence, did it make you believe that he had a similar commitment just because of what he said and did?

A.    Yes.

Q.    And I guess it was both you and your wife who were relying on Jay Holloway and his relationship, I guess his history with Mr. Youngblood, as well, as being one that would prove profitable in the future.

A.    Well, both of them, Mr. Youngblood and Mr. Holloway.

Q.    And you and your wife because you'd gone to your wife and gotten her to approve of this deal because if your wife had said no, we're not going to do it, you wouldn't have done it.

A.    Probably not.  She had more sense than I did.  If one of us said no, then yeah, we would have stepped back from it.

Q.    So over the years that you had known Jay Holloway, was there anything about his lifestyle that would have caused you to believe that he was somehow connected to cartels?

A.    No.

Q.    When you think of cartels, what is it that you think about?

A.    When I hear that, I think of people from Mexico taking money, hurting people, everything you hear about cartels.

Q.    Right.  So does Jay Holloway speak Spanish?

A.    No.

Q.    Do any of his family members speak Spanish?  Lane? Or...

A.    Lane's wife.

Q.    Okay.  Lane's wife.  That's Danielle?

A.    Danielle.

Q.    Now, had you gotten to know not only Jay Holloway but also his children relatively well over the years?

A.    Allison lived in California so we met -- we have spoken to her a few times when she came to visit.  Seth Holloway even though he lives in Austin, we did not run into him very often.  So we've met with them, we've had a few visits with him at the Holloway house.

Q.    So Lane would probably be one that you would know best.

A.    Yes.

Q.    Because he just lived down the street from you?

A.    Yes.  He had moved in down the street in between our

houses.

Q.   And how long had he been -- had he lived down the street from you?  How many years?

A.   I cannot recall.

Q.   Was it more than a couple of years?

A.   Yes.  It was several years.

Q.   And was there anything about Lane that you knew that would have caused you believe that he was associated with cartels?

A.   No.

Q.   Were you aware of any problems between Jay and Lane around the time that you had made this coin investment?

A.   Not at that time but I knew that they had had discussions.  Their relationship wasn't exactly the best but nothing that would cause concern or red flag.

Q.   What was it that you understood about -- what had strained the relationship, do you know?

A.   Between the children Seth, Allison, primarily Seth and Lane having disagreements.

Q.   So Seth and Lane are having disagreements but what about Jay and Seth?

A.   They had disagreements as well, I believe, but they were still baby-sitting their -- Seth's son so they did not have a broken relationship.  They just had strains on how the kids were acting to the parents.

Q.   Well, I'm thinking about Lane.

A.   Okay.

Q.   And Jay.

A.   Yes.

Q.   Were you aware of them having any problems in their relationship?

A.   I think yes, they were a little discouraged about how the -- they were being used as baby-sitters and Jay was taking care of some of the household things.  I would say that they were not appreciated enough.

Q.   I see.  Kind of grandparents that are kind of taken advantage of?

A.   Yes.

Q.   Where the son is putting a lot of responsibility to care for their kids and they're not --

A.   Well, they're doing date nights and those kind of things and using the grandparents where they needed them so they were not appreciative, I'd say.  But not where there was a broken relationship.  They were still visiting each other constantly since they only lived a few houses from each other.

Q.   Had Jay said anything to you that he was concerned about Lane's lifestyle or his associates or business dealings?

A.   No.

Q.   So when Jay came to your home in September and you described him as being very emotional and distraught and he told you that he feared that Lane's -- that his granddaughter was kidnapped or was going to be kidnapped, that just came out of nowhere?

A.   Yes.

Q.   And previous to that, Jay had not suggested to you in any way that Lane was in any way connected to the cartel, right?

A.   Correct.

Q.   And when you said that this visit, was it one that occurred at nighttime?

A.   Yes.

Q.   I can't imagine that this is something that you'd ever experienced before in your entire life.

A.   No.  Never.

Q.   And when he came and he told you tearfully that he had this fear and then, Kota supported him in this, you know, as he was talking to you, did you ask him about how this could happen?  Did you kind of inquire about the details of how is this even possible?

A.   We had questions.  We were pretty much in shock of the whole situation so we did not know what to do.  Again, recommended to go to the Feds to have this entire situation exposed but Kota Youngblood said that would only

make things worse.

Q.   Right.  But I mean in terms of why it would happen, how it happened why they believed this to be the case, those kinds of details, those kinds of specifics.  Did you make any kind of, you know, inquiries about that?

A.   No.  To build up to this point, no.  We did not at that moment.

Q.   So you didn't question the facts that they were presenting to you.  That wasn't something that you were skeptical of.

A.   No.  We did not ask detailed questions.

Q.   And is that just because you trusted Jay and you couldn't believe he would do something to deceive you?

A.   We trusted both of them, yes.  Both of them.

Q.   Now, had you prior to that, had you had any information that Mr. Youngblood was somehow connected to cartels or had intelligence about cartels or could --

A.   I don't think so, no.

Q.   You had just learned that he had some military background?

A.   Uh-huh.

Q.   Did you ask Mr. Youngblood about why he believed this to be true, just that kind of a general question?

A.   Only that he had information from the cartel that built up and I think it was related to a dealing that Lane

had with the cartel that didn't work out and that was the first I heard of the cartel associated to anybody.

Q.   So that night then, you decided you were going to go ahead and give them $235,000.

A.   Yes.

Q.   Now that's a very specific number, $235,000.

A.   Yes, it is.

Q.   And did that cause you any kind of -- I mean, curiosity about how, why $235,000?

A.   No.

Q.   Why was that a magic number?

A.   No.  It was a lot of money.

Q.   And did Mr. Youngblood tell you why $235,000, why that was the amount of money that would be necessary to solve this problem?

A.   That would be the amount of money necessary to solve the problem.

Q.   Did Mr. Youngblood tell you why, though?  Did he tell you this is the number and I know this because this is what this is going to accomplish, this is how much we have to pay this or whatever, any --

A.   Well, yes.  He had other moneys but he needed the $235,000 to be able to pay off the cartel to satisfy the deals that Lane went through.

Q.   Okay.  To satisfy the deals that Lane went through.

So Lane had some kind of debt is that what happened?

A.   Some transaction or some business dealings of some nature.  We didn't ask what the details of that were.

Q.   So the 235,000 was to fill a gap?

A.   Yes.

Q.   And Mr. Youngblood was telling you that he had -- that's all he was missing was the 235.  Did he tell you what the debt was, what the total debt was?

A.   No.

Q.   Did he tell you why or how Lane had incurred this debt to the cartels?

A.   I don't recall that he did.

Q.   And I guess you didn't ask either.

A.   No, we did not.

Q.   Now, Jay, who is Lane's father?

A.   Yes.

Q.   Did he tell you or share with you what his belief was about how Lane had incurred debt to the cartel?

        MR. GUESS:  Object as to hearsay, your Honor.

        MR. GONZALEZ-FALLA:  It goes to the state of mind of what's happening.

        THE COURT:  Overruled.  You can answer.

A.   Can you repeat the question?

Q.   (BY MR. GONZALEZ-FALLA) Yes.  Did Jay share with you what he believed or what he believed Lane had done to

incur this cartel debt?

A.   No.

Q.   Did Jay -- so correct me if I'm wrong, but it seems that Jay believes that Lane, his daughter's going to be kidnapped or does he even talk about that?  Does Jay even mention whether Lane's aware of this or what Lane has done to protect his granddaughter or anything like that?

A.   I don't believe any details at that time.

Q.   So other than you being told that Lane's daughter is going to be kidnapped or has been -- is going to be kidnapped?

A.   Correct.

Q.   You have no other information about Lane's knowledge or awareness of this?

A.   No.

Q.   This is Lane's debt.  It's not anybody else's debt.

A.   As we understood.

Q.   And so, you don't know how he's incurred it, you don't know the full amount of it.  But you believe that your money will pay off the debt.

A.   Yes.

Q.   And so you give -- you arrange for these wire transfers to happen.

A.   Yes.

Q.   Now this is happening at night.  What time at night

did it occur?

A.   I only estimate about 8:00 or 9:00 at night.

Q.   Do you remember the day of the week?

A.   No, I do not.

Q.   And so, I guess then, immediately, you called Fidelity that evening?

A.   Next day, business day.

Q.   Then you have a conversation with your Fidelity agent there?

A.   Yes.

Q.   All right.  This is in September, is it, 30th when you called Fidelity?

A.   Approximately.

Q.   Okay.  So when you call Fidelity on September 30th, you had already spoken to them in April, right?

A.   Yes.

Q.   In April to arrange for the $150,000 wire transfer, right?

A.   Yes.

Q.   And when you made -- when you arrange for a wire transfer, you have to speak with a Fidelity agent?

A.   Yes.

Q.   And when you're speaking to that agent, they will refer you to other agents in the course of this transaction to make sure that what you're doing is not

going to be a scam, right?

A. I don't believe they did the first time on the $150,000. There was usually two agents, one where you contact, I believe, the toll-free number and then, they get a hold of somebody to get on the phone to get the information on the transaction.

Q. So when you were preparing to testify here, you told -- you answered questions saying that you had actually listened to an audio recording of what occurred when you were arranging for the wire transfer that occurred on September 30th.

A. Yes. On the occasion of the $235,000, yes.

Q. Okay. Did you also have an opportunity to hear what happened in audio recordings when you did the April $150,000 wire transfer?

A. No.

Q. Transaction. Do you recall or would it be consistent with your experience that when you do this-because you did several wire transfer transaction, right? The first one that you did in April was one where the money went directly into Jay Holloway's bank account.

A. Yes.

Q. Right? And do you recall talking to Fidelity about why you were transferring money to Jay Holloway's bank account?

A.   No.  I don't recall.  That was a discussion.  It may have been but.

Q.   Do you recall any concerns about Jay Holloway being just an individual and having just, you know, not -- this not being a commercial transaction, you know, with a business or, you know, there not being any kind of a contract?  Do you recall anything like that happening with Fidelity?

A.   No, I don't.

Q.   During the April 30th transaction?

A.   No, I do not recall.

Q.   Do you recall telling Fidelity that you expected to receive the money -- when you take money out of an IRA like a Roth IRA which you have, that's not that taxable event unless you return it within 60 days.

A.   Correct.

Q.   Is that right?

A.   Yes.

Q.   And so all that money that you've got in that IRA is growing tax-free but the minute you take it out, you're going to get taxed on it unless you put it back in within 60 days?

A.   Yes.

Q.   Do you remember having a conversation with people at Fidelity about whether you were going to get that money

back in your April transaction?

A.   I believe on that occasion, it was I expect to see funds being returned to us so that we could put the money back in.

Q.   In April.

A.   From the April transaction, yes.

Q.   The April transaction?

A.   Yes.

Q.   When you did the April transaction, the wire transfer, you believed that you would get those funds back, returned to you within the 60-day window that was necessary so that it would not be a taxable event.

A.   Yes.   We were hoping for the sale of the coin that Kota Youngblood indicated that would happen by November but sooner, as well.

Q.   Okay.   So when you're talking to Fidelity, though, do you remember telling them you expected to get it back within the 60-day period?

A.   Anticipated that we would get that money back to put it back in.

Q.   And do you recall if they were asking you about the specifics of the coin and you were reluctant to talk about the specifics of what you were doing about the details, you'd rather not share that information?   Do you recall?

A.   No, I don't believe they asked.

Case 1:23-cr-00135-RP   Document 187   Filed 04/08/25   Page 70 of 281

70

Q.   Okay.   In any event, on that occasion in April of 2021, you transferred $150,000 into Jay Holloway's bank account at Navy Federal Credit Union.

A.   Correct.

Q.   And now we go to September 30th when you're transferring the $235,000 and this time, you don't transfer it directly into Jay Holloway's Navy Federal Credit Union account.

A.   Correct.

Q.   Now do you recall having a conversation with a Fidelity representative during that wire transfer about what had happened before in April?

A.   Not about what happened before.  I don't recall that being part of the conversation.  Only specific to why -- verify why the $235,000 was being withdrawn.

Q.   Which you say was an investment.

A.   Yes, I did.

Q.   Well, do you recall if they asked you well, what about -- what happened last time in April, did you get your money back on that occasion?  Do you recall them asking you about that?

A.   I don't think they did.

Q.   Do you recall if you told the Fidelity representative that you expected that you would be making a return on that investment within the 60 day window when you paid,

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

when you were going to transfer the $235,000?

A.   I'm not sure that I did but I may have.

Q.   Okay.  Now, that time, you transferred the money to yourself.

A.   Yes.

Q.   To your own Wells Fargo bank account?

A.   Yes.

Q.   And do you recall the reason that that happened was because Fidelity was not comfortable with you transferring funds again to Jay Holloway?

A.   No.  That did not come up.  We just thought it would be a smoother transaction if it went to Wells Fargo believing that at that time, they may or would have the cash available to complete the transaction.

Q.   So you said that we believed it would be a smoother transaction.  When you say we, is that you and Jay Holloway?

A.   Yes.

Q.   So if you're going to transfer money to any account, it's still going to take time, it's a wire transfer, correct because you have to settle the funds?

A.   Yes.

Q.   And the thing that delays the transfer is the fact that you have to convert stocks into cash and then, that allows the funds to be taken out of the account.

A.   Yes.

Q.   So if you're going to be liquidating the stock and then it's cash, won't it be just as fast to go into your account versus to go into Jay Holloway's account in terms of the speed that that money leaves the Fidelity account once it's been liquidated?

A.   Could be.

Q.   But nonetheless, what you're telling us -- do you recall or you're just not sure whether Fidelity said, look, we're just not comfortable with you sending Mr. Holloway $235,000 after you've already sent him $150,000 and you still haven't made that money back and, you know, there's a lot of scams going on and, you know, it's your money but, you know, we're concerned about maybe heirs or somebody complaining down the future.  We have some responsibility to you to warn you about the stuff but it's your money and if you want to do it that way, why don't you go ahead and send it to yourself and that's fine.  You don't recall anything like that?

A.   No.  We covered those areas you have mentioned that they had concerns because it was the second transaction and they wanted to make sure I was not in any danger or being scammed or anything and I gave them the impression that no.  This is a transaction that I wasn't worried about because I had a lot of faith in the individuals

behind it.

Q.   And when you were talking about having faith -- well, that you were concerned about what you're telling Fidelity this to assure them that it's going to be okay, you also told them you believed you would get some money become and you'll be able to put it back into your account, right?

A.   Yes.

Q.   Within the 60-day period.  Now we know that what was really going on from what you've told us is this money was really being paid to protect Jay's granddaughter, right, the $235,000?

A.   Yes.

Q.   Was there also about investment component to this?

A.   No.

Q.   There was no investment component to it.

A.   No.

Q.   So $235,000 in cash and because you need cash because of the nature of what's going on here, right?  And so you go with Jay Holloway to a Wells Fargo.

A.   Yes.

Q.   Had you been to that Wells Fargo before with Jay Holloway?

A.   For different reasons maybe in the past but not to...

Q.   Withdraw $235,000 --

A.   Yeah.  This would be a first, yes.

Q.   So when you went to the Wells Fargo branch, which one was it, by the way, do you remember?

A.   Hesters Crossing and I-35.

Q.   Is that the same one you'd been with him before?

A.   Yes.  We both did business in that particular branch.

Q.   And when you went in there and Jay was asking -- so you have a Wells Fargo account so you withdrew $235,000 cash and then, you gave it to Jay?

A.   I believe it was in the form of a check, a transfer to him.

Q.   Okay.  So you gave him a check?

A.   I think so.

Q.   And then, he gave the check to the teller?

A.   Yes.  And then, went in the back and they were able to come up with the money.

Q.   So they went back to the safe?

A.   Yes.

Q.   Now that's a pretty unusual transaction, isn't it?

A.   Yes.  Well, for me, it is.

Q.   Well, what about for Jay?  Did it appear to be unusual at that bank for Jay to get that much money out of an account?  Did they say anything to Jay like, Mr. Holloway, this is a very large amount of money, are you sure what you're doing?

A.   They weren't overly concerned with it.  They were

just simply filling the transaction.

Q.   Did anybody comment like this is normal for Jay or --

A.   No.  We probably made -- the only comments we probably made was this was a lot of money and -- but they did not hesitate in fulfilling the transaction.

Q.   So Jay takes the money and then, he leaves and we don't know what he did with it, although later, you received word that it had been delivered and the granddaughter was fine.

A.   The granddaughter was safe.

Q.   Did you ever talk to Lane after this?

A.   No, not about this.

Q.   Did you ever -- so you never let Lane know that you had helped save his daughter?

A.   No.  I don't believe so.

Q.   So did you see Lane apart from the time that he was spreading leaflets in your neighborhood or I guess your wife saw him on that occasion?

A.   On that particular night.

Q.   Yeah.

A.   But no.  We didn't associate with Lane very often. It was typically we would see Lane and Danielle occasionally at James Holloway's house.  We never -- the only time I would go over is if Danielle needed something done in the house and James and if I was over James

Holloway's house, working on clocks, for example, then he would just invite me to come along and go into the house and he would take care of or fix whatever was broken. That's when I would see Danielle so we did not associate with Lane and Danielle.

Q.   So Lane -- that this paying of the debt that Lane had to the cartel, did you believe that Lane had continued his involvement with the cartel?  Had you known anything about that?

A.   I was not aware of it.  I can't remember that there were other actions that Lane continued to work with the cartel.

Q.   What did you think about that?  I mean, the fact that, you know, he had somehow incurred a debt that was greater than $235,000 because you were just filling a gap and now it's been paid off, daughter hadn't been kidnapped, you lived just a few -- I guess it's a few -- just down the street, huh, from you?

A.   Yes.

Q.   I mean, what did you think about that?

A.   Well, Kota Youngblood would reference that there was still some activity between Lane and the cartel or some ongoings with Danielle, different stories at different times.  But again, we didn't really associate with Lane or Danielle in those conversations.

Q.   So these flyers that you later found Lane to be responsible for, I mean it must have been pretty shocking to see that.

A.   Yes.  It was a shock to us that somebody would throw disparaging sheets of paper on our street for us to discover and to collect.  Yeah, it was.

Q.   I mean, but even today, you and your wife of all things and for it to be Lane, you know, I mean, here, you've had this role that's helped him with his daughter and now this is happening.  What was -- could you put together what would motivate Lane to do that?

A.   Other than being threatened by the cartel or something, this information coming from Kota Youngblood.

Q.   So the cartel -- so Lane was doing this because the cartels wanted him to do it?

A.   Yeah.  His family by this time, his family was being threatened once again.

Q.   Lane's family was being threatened?

A.   Lane's family was, yes.

Q.   And so, how was it that you believed or were led to believe that these flyers would further some cartel interest?

A.   Not sure.  It was just instructions that somebody was throwing these papers out.  We thought since Lane was and Danielle were not mentioned in any of the flyers, if I

recall correctly, then my wife and I deduced that, well, if anybody's throwing papers in our street, the only person missing from the information on those sheets of papers is Lane and Danielle.  They're capturing the rest of the family and other folks we did not know.

Q.    Right.  But how did that -- how did you believe or how were you led to believe or what were you told that this information, these disparaging remarks would further the interests of the cartel?  How was it going to help the cartel?

A.    We just got information from Kota Youngblood once we exposed that it was Lane Holloway that was delivering these papers.  Up until then, we did not know who and why.

Q.    Right.  So you knew that Lane was connected to the cartel because his granddaughter was going to be kidnapped as a result of a debt so you put Lane and the cartel together and then, you put flyers and Lane together so that means that the flyers are connected to the cartel.

A.    As we were told.

Q.    Okay.

A.    Lane was being told to put those papers --

Q.    That's right.  So that's what I was trying to understand and maybe there's no answer to this.  I don't know.  That how would it help the cartel for these flyers to be distributed in your neighborhood?  Mountain View, is

that the --

A.    Mountain Creek is the subdivision.

Q.    Mountain Creek.  In the Mountain Creek subdivision.
Right.

A.    We had no information on how they tied together.

Q.    Right.  Now, later, these other -- I guess, is there
still -- so the $235,000 then was just gone.  I mean, that
wasn't something that you expected to recoup.

A.    Well, we expected to recoup the sale of the coin,
which would give us our money back and then some.

Q.    Okay.  So the coin was the -- maybe the $11
million --

A.    Approximately $10 million sale if that was the amount
Kota Youngblood was able to acquire.  So we knew that the
money would be replaced with the sale of the coins so this
was not contingent upon any other investment.  This was
just something to save the child.

Q.    Right.  So now, so the other payments that you're
making to recoup funds is really to recoup the 150,000
that you put in for the coin.

A.    Yes.  To recoup the funds and to open up
opportunities to get the sale of the coin accomplished.
Yes.

Q.    And so, when we were talking about hiring pilots and
moving money, that's all tied to the coin?

A.    There were other opportunities that Kota was able to -- he said he was able to accomplish that would bring in large sums of money for us.  Whether it was related or unrelated to the coin.  So not all of the funds that were being retrieved or associated to the coin, but it was another way to pay us some of the money back before the coin could be sold.

Q.    Okay.  Now, Jay was the one who would pay you whatever small returns you ever received; is that right?

A.    I believe on most, if not all, occasions, it was Jay, yes.

Q.    And did he pay you in checks?

A.    I think there was one or two occasions of receiving checks and most of the time, he would bring us an envelope with cash in it.

Q.    And this would be Jay, as well.

A.    This is Jay, yes.

Q.    And when Jay would do this, he wouldn't be with Mr. Youngblood.

A.    I would say no.

Q.    And Jay would be drawing these payments out of his own personal account, the account that he had with his wife?

A.    The cash that he would bring over to us?

Q.    Or the checks.  When the checks would be from James

and Patricia Holloway --

A.   From their account, yes.  Those few occasions, yes.

Q.   And then, the video clip that we watched, we saw Jay there with Mr. Youngblood.

A.   Yes.

Q.   Is that kind of the way it would happen would be Jay would come with Mr. Youngblood to your home?

A.   Most of the time, yes.

Q.   Sometimes Mr. Youngblood would come alone?

A.   Sometimes he would.

Q.   But generally it would be with Jay?

A.   Yes.

Q.   If I could have a moment, your Honor.  I'll pass the witness, your Honor.

                    RE-DIRECT EXAMINATION

BY MR. GUESS:

Q.   Mr. Snider, do you believe that your friend Jay Holloway scammed you out of money?

A.   Do I believe he scammed me out of money?

Q.   Yes.

A.   No.

Q.   You believe that he profited from anything that you gave to Kota Youngblood?

A.   No.

Q.   No further questions, your Honor.

MR. GONZALEZ-FALLA:  Nothing further, your Honor.

THE COURT:  Thank you, sir.  You may step down.
Is this witness released?

MR. GONZALEZ-FALLA:  Yes, your Honor.

THE COURT:  And you're free to go.  Thank you
very much.  Your next witness.

MR. HARDING:  Government calls Jason Rzepniewski.

THE COURT:  Good morning, sir.  Before you take a
seat, could you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that
the testimony which you may give in the case now before
the Court shall be the truth, the whole truth, and nothing
but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

JASON RZEPNIEWSKI, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. HARDING:

Q.   Mr. Rzepniewski, once you get settled, please pull
that microphone close to you and then -- probably most
important of any witness in this case, could you please
state your name and spell your last name for the court
reporter?

A.   My name is Jason Rzepniewski.  My last name is
spelled R-Z-E-P-N-I-E-W-S-K-I.

Q.   And, Mr. Rzepniewski, could you tell the ladies and gentlemen of the jury what you do for a living?

A.   I am an appraiser and up here by trade, I'm an accredited member of the National Society of Appraisers, graduate personal property appraiser with National Auctioneers Association.  I also am employed by Gaston & Sheehan who holds the United States Marshal Service contract.  It's the national jewelry, art, antiques and collectibles contract.  For that contract, my duties are as the lead appraiser and I'm charged with inventory management and inventory and disposal of all assets that are served under that contract.

Q.   Sorry.  When you're answering questions, can you just pull that microphone closer to you or ease further into it, please?

How long have you been doing this type of work in terms appraisals and that sort of thing.

A.   I've been project manager for the national jewelry contract for the last 15 years in pretty much the same kind of capacity for appraisal work.

Q.   And you mentioned a variety of accreditations and education you had.  Can you -- not in great detail but can you tell the jurors what the graduate personal property appraiser education entails?

A.   So the bigger of the two would be the accredited

member with the International Society of Appraisal.  That kind of binds you to a code of ethics.  You go through an educational portion with the society and you also have to have a log number of hours that are peer-reviewed for your appraisal work that you submit.

And then, the personal property appraisal side of the National Auctioneers Association is a little bit lighter, but it backs in more towards, you know, reviewing your hours and what you've done as your body of work as an appraiser.  And in addition, I'm also a graduate gemologist with the Gemological Institute of America and accredited jewelry professional, which I failed to mention, too.

Q.   You mentioned you worked on a contract with the United States Marshal Service.  Can you describe for the jury kind of what that entails on sort of a daily, weekly, monthly basis?

A.   So my role is it's a national contract so I serve -- the Marshal Service serves all of the agencies under the DOJ umbrella, which the FBI, ATF and those assets -- jewelry, art, antiques and collectible assets are seized as part of the cases -- ongoing cases.  So those are sent to our company and it's up to us to have their proper care and custody.  I have them appraised, inventoried and dispose of them when the time comes.

Q.    And as part of that job when the marshals are, say, executing a search warrant or seizing assets, something of that nature, do they rely on you to kind of tell them what is worth seizing and not seizing?

A.    That happens from time to time either on the marshals level or on the agency side, we're tasked to come in and identify potential assets of value and, you know, kind of make sure that the assets that are being taken have equity merit.

Q.    In terms of your work as an appraiser generally, I mean, can you approximate even in the hundreds how many -- or thousands, how many times you've done appraisals professionally for the jury?

A.    You know, on an ongoing basis, I appraise approximately thousands of items in a given year.  Most of them fall under the gems and jewelry side of things, but there is also some other general stuff.  But, you know, thousands of items appraised.  You know, in terms of general project assignments, hundreds, you know.

Q.    And you said -- is it fair to say since you are accredited by GIA, the Gemological Institute of America, is jewelry and gems more your particular specialty?

A.    That's my day-to-day, correct.

Q.    But do you have sort of a broad range of knowledge, as well?

A.   I do because of just my relationship as the project manager for the jewelry, art, antiques and collectibles contract, it lends me to -- I have oversight over appraisals that are other asset type.  So art that comes in, collectibles, sports collectibles, those type of things, I see them, I see the appraisal work.  I look at the -- not appraisal and review directly but I do take part of in the appraisal process.  If not executing the appraisal, backing it up.

Q.   And have you authored any publications or articles or anything regarding appraisal or any kind of work like that?

A.   No, I have not.

Q.   At this time, the government would offer Mr. Rzepniewski as an expert in the area of appraisal and the proximate valuation of various items.

        MS. HERRING:  No objection.

        THE COURT:  He's so recognized.

Q.   (BY MR. HARDING) Mr. Rzepniewski, can you walk us through not necessarily in this case what you did, but how you approach appraisal and valuation as a general matter.

A.   So in general, it begins with readily apparent identity of the asset that you're handling or you're reviewing so the -- in the case of art, it would be, you know, what medium is it.  And if it's jewelry, it would --

precious metal or stone?  Or are you dealing with coins?  Are you dealing with bullion?  Are you dealing with something that has numismatic value?  And then, sports collectibles, you know, what are you dealing with, sports cards?

So you're looking at what you have and then, you're kind of looking at the value characteristics of it, what makes it valuable.  In most cases with collectibles and artwork, it's going to be -- somewhat lends itself the value standpoint is going to be to the provenance of the asset itself.  And the provenance kind of in the context of a collectible is kind of a more complete and detailed history of ownership, custody and where the item's been since its origin.  So you kind of -- be able to look at that subset of factors and be able to assign value and from there, you would directly work into --

Q.   Let me stop you real quick just so I can make sure I'm tracking.  At the outset, you said you were sort of looking a readily identifiable surface characteristics.  I mean, that's kind of you using your knowledge of things you've seen in the past, the markets and things of that, and just saying, what does this appear to be.

A.   Correct.

Q.   What the condition -- what's its condition?  How old is it?  You know, what does it sort of purport to be on

its surface?  And then, the provenance side is like okay, so maybe it's a gold coin, but is it a particular kind of gold coin that has a story behind it.  Is that a fair summary?

A.   Correct.

Q.   So once you kind of go to that body of knowledge, then how do you make your evaluation or appraisal?

A.   And then, from that point, we look at comparables. So if you're looking at artwork, you're going to look at other sales comparables that are by -- you know, if it's a blue-chip artist, you know, somebody that everybody's heard of, we're looking at other sales comparables.  If it's collectibles, you're looking at other market -- you're going to look in the same market that you're drawing your comparisons from to be able to establish an opinion of value that you can provide in your report for the client.

Q.   And is that also going to be based not only on kind of your knowledge of the markets but, also, just some sort of research into recently sold comparables?

A.   Right.  When we develop a complete report, the client and whoever's reading the report, the intended user of the report should be able to read through and understand where the value basis came from and it's generally derived from the market comparables.

Q.   And so, we'll talk about this in some detail -- a little bit of detail as we go forward, but did you use that general method you've just described for the jury in this case when we asked you to evaluate certain items?

A.   Not exactly.  In some part, yes, it's my experience in researching that but not exactly.  So the scope of the work for this assignment was to review the assets and kind of make an assessment on the spot more so to if it had potentially high value.  So something that would have equity beyond -- obviously, there's expense to relocating an asset, appraising the asset, storing the asset.  So that equity would be, you know, at a certain level.

Q.   That's probably a good distinction to make.  The process you described earlier is sort of a formal appraisal process, right?

A.   Right.

Q.   When we asked you to do some work, it was, I guess, a spot check or a valuation or estimate; is that right?

A.   That's correct.

Q.   A less rigorous research path than you've described before.

A.   Correct.

Q.   And in the course of -- how did you get involved in this case?

A.   I was contacted by my client, the FBI Austin, to meet

them at a seizure warrant location on a given day.

Q. And that was in July 13th of 2023?

A. Correct.

Q. And did you go to one location that day or two?

A. I went to two.

Q. First one was on Runnel Ridge?

A. Correct, in Manor.

Q. Second one was at West Point Way in Elgin?

A. Yes.

Q. So that was on July 13th of '23. Did you ultimately, in the course of the entire contract with the FBI, go to seven different locations?

A. Yeah. Over the evolution of the project, yes.

Q. And I don't want to talk about all of them necessarily, but on March 6th of 2024, did you go to a place on County Road 118 in Giddings, Texas?

A. I did.

Q. And then, another location, did you go to the FBI office itself to examine some items?

A. Yes, I did.

Q. May I approach the witness, your Honor?

THE COURT: You may.

Q. (BY MR. HARDING) Mr. Rzepniewski, I'm going to show you what's been marked Government's Exhibit 226 and 227 for identification purposes. Do you recognize

Government's Exhibit 226 first?

A.    Yes, I do.

Q.    And what is Government's 226?

A.    That's a statement recap of the valuation -- walkthrough valuation services I provided at the different locations.

Q.    And it contains not only the locations that you went to and the dates but, also, sort of your methodology and overall conclusion?

A.    Correct.

Q.    Is it a fair and accurate copy of the report that you made in this case?

A.    Yes, it is.

Q.    Turning to 227, if you could flip through and make sure you recognize those photographs, sir.

A.    Yes, I do.  I recognize all of them.

Q.    What are they in general?

A.    Just general photos of the assets that I encountered or was presented.

Q.    Not all of the assets; is that fair to say?

A.    Yes.

Q.    Just certain ones you took photographs of?

A.    Correct.

Q.    Are these photographs that you gave and provided to us?

A.    Correct.  Yes, they were.

Q.    Are they fair and accurate depictions of the -- some of the items that you saw them on the date you saw them?

A.    Yes.

Q.    Government will offer 226 and 227.

        MS. HERRING:  No objection.

        THE COURT:  So admitted.

Q.    (BY MR. HARDING) I want to start -- I only want to talk about four of the locations, the two search warrant locations, County Road 118 and the FBI.  Let's start with the Runnel Ridge search warrant location, did you at the time or now, did you know whose house that was?

A.    No, did not.

Q.    Can you tell the jury, was there anything notable to you about that location, items you found there or anything like that?

A.    No, there was not.  In general, it would be what would you expect if you walked into any -- every average house, you know, art, decorative art hanging on the wall, you know, knickknacks, decorative items on the shelves, but nothing that I would consider, you know, of exceptional value.

Q.    Let me ask you because you did mention it but I want to emphasize.  The mission or sort of brief you were given by the FBI was to locate what exactly or to identify what

exactly?

A.    So the scope of work laid out was to identify assets of, you know, exceptional value.  So, you know, I think more or less the threshold would have been around $10,000 or more, somewhere in that neighborhood.

Q.    And you explained that was because or the rationale was that it has to be worth seizing, storing, appraising, selling, and if it's not clearly going to cover the cost of that with some return, then that's sort of your threshold.

A.    Correct.

Q.    Do you recall at the Runnel Ridge house, there was like a pretty fancy aquarium set up, things like that?

A.    There was.

Q.    You weren't there to evaluate stuff like that.

A.    No.  We didn't offer an opinion on that at all.

Q.    You were there to look at sort of antiques, collectibles, things of that nature?

A.    Correct.

Q.    And again, your conclusion regarding the entirety of the Runnel Ridge house?

A.    That it was just basically everything was -- falls in the category -- most of the items I saw were a hundred dollars or less, some were 500.  I believe there was a -- there might have been a floor clock or a case clock that,

you know, could have been a few thousand dollars.  But again, by the time you moved it and resold it, the secondary market values would have eaten all the equity out of that asset.  So there was -- everything pretty much fell in that range, that hundred to $500, you know, liquidation.

Q.   And in fairness, you did not examine every single item and every single box in every single drawer like -- is that fair to say?

A.   No, I did not.

Q.   Did you examine the items that were called to your attention by FBI as well as items that caught your own eye?

A.   Yes, both.

Q.   Okay.  Let's go then to the West Point Way house. Was there something notable about some of the things you found in that house?

A.   There was a particularly large inventory or grouping of clocks, you know, and they were in various stages of -- you know, when I say clocks, like wall clocks, cuckoo clocks, whatever I can draw the mental picture of that that was the most notable.

Q.   And did it appear to you that it was maybe like a workshop for fixing clocks or anything like that?

A.   It did.  There was a bench set up -- bench tools for

repairing clocks, clock parts, clock inventory of parts, that type of thing.

Q.   Now, you and I discussed this before.  Can you explain to the jury whether or not you made an evaluation or estimate of those clocks, and if not, why not?

A.   We discounted the clocks, you know, and basically grouped them into the subset of a value grouping that would be -- that would fall below the scope of work threshold because of the unknown nature of the repairs that would have to be made and the fact that several of them appeared to be missing parts or in various stages of repair.

Q.   And so, if some of them had been repairable or repaired, had all their parts, possibly, they could have been of some higher degree of value.

A.   Correct.  Yes.

Q.   But you felt -- you didn't feel it was appropriate to make that determination based on the fact that they were disassembled.

A.   Correct.

Q.   With respect to the rest of the house, in summary, can you tell the jury sort of what you looked at and what you concluded?

A.   There was an area where there was a large number of frame prints that were wrapped.  They were being

unwrapped. And there was a sampling reviewed by myself and one of my other associates was with me and they were all found to be prints. There was some other --

Q. Can I stop you and just ask you to explain what it means by a print versus something else.

A. A print is not -- it's a reproduction. It's not -- you can't really attribute it to being like a poster, but it would be something that would be a reproduction of famous piece of art or something that is mass produced just for the purpose of being decorative, something you hang in your office or at your house, something along those lines.

Q. And so, you looked at some of this artwork. You looked at some other items. Aside from the disassembled clocks, did you find anything that you determined to be of exceptional or high value?

A. No, I did not.

Q. Was it consistent more or less with the Runnel Ridge house in terms of approximate value of the things that you didn't uncover?

A. There's probably a little bit more potential value there, but that's unknown because of the condition of the clocks. But, you know, more or less yes, yeah, there was more assets, but they all more or less fell in the same category in my opinion.

Q.   And let me ask you -- I probably should have asked you with the Runnel Ridge house so I'll ask you for both search warrant locations, did you find any evidence of provenance or anything sort of identifying these particular items as having any particular history?

A.   No, we did not.

Q.   Let's talk about County Road 118 and if we could pull up Government's Exhibit 171, please.  Do you recognize that photo, sir?

A.   Yes, I do.  That was -- it's a snapshot of the group of assets that were presented at that location.

Q.   To the extent you remember looking at some of these items, with the exception of this item, which we'll talk about in a moment, can you just give two or three examples of things you recall looking at and some of the conclusions you drew about their value?

A.   So the rug on the bottom laying here rolled up on the ground was definitely just your common, you know, machine-made area rug.  You know, for most part, it's something that you would find at, you know, your home goods store, your local home goods store.  You had some framed photos of Marlon Brando and some other things, they're decorative.  There's nothing of, you know, significant value there.  They're just something you would hang in a room for -- a movie room or something, something

along those lines.

Q.   Let me ask you, also, while you're at these search warrant -- while you're at these locations, are you by yourself or are you with other folks and consulting with other people?

A.   I had another -- two other people that have experienced, you know, an appraisal with me.  One that had over 20 years of experience as a generalist and is also an accredited appraiser and another one that, actually, the owner-operator of Gaston & Sheehan that's been in the business for 40 years that has experience with a wide range of antiques and collectibles, too.

Q.   So while you were doing this estimate or valuation, did you consult with them as necessary in their areas of expertise or to get second opinions?

A.   I did.  And that's pretty standard within the appraisal field to bring in people that can substantiate competency with a report.

Q.   Is there anything in Government's Exhibit 171, aside from the thing on the far left now, that catches your eye?

A.   There were some swords over here that were behind this frame Dream Catcher that we looked at.

Q.   We'll talk about those in just one second.  If we could pull up 227, page 1, please.  Were those coins that you found at the County Road 118 location?

A.   Yes, they were.  Yes, it was.

Q.   Could you talk us through what these coins are and your opinion of their estimated value?

A.   There was two bags of them that were coin bags, canvas bags that were completely full of those coins and I just pulled out two subject -- I kind of perused through but I pulled out two that kind of represent more or less what was in the bag.  The Elizabeth II penny, I believe, 1961 to 1967, these pennies or these coins retail at $2 if they're uncirculated condition.  Somewhere in the condition they're in is probably going to be around a nickel to 20 cents each.

Q.   And that's because of the wear on them?

A.   Correct.  That's just -- yes, correct.

Q.   If we could go to pages -- if we could just scroll slowly through pages 2, 3 and 4.  You saw the second page. You mentioned swords earlier.  Were those swords that you examined at the County Road 118 location?

A.   Yes, they were.

Q.   And if we could go to page -- which page would be the easiest one to look at in terms of explaining to the jury the value, the over-view shots or close-up shots?

A.   Probably, if we kind of go to the group overview shot, I think that probably would give a very --

Q.   Page 2.  If you'd walk us through how you determine

the proximate value of these swords and what you think their proximate value might be.

A.    So with the Katanas-type sword or the samurai, the Japanese swords, we examined the blades and found most of them, they all appeared to be machine-made.  And what we're looking for is, you know, some of the clear evidence of a hand-made samurai would have certain characteristics on the blade.  They would have -- it would have below what they call the hamon line or the tempering line when -- a handmade sword is quenched.  It actually leaves kind of unpolished lines below towards from the midpoint of the blade down.  So we can't see that in this picture but that's what we were looking for.

There was also there, there's kind of a naval ceremonial sword there and without any type of provenance to substantiate that -- they're so populated in the market and so readily available that, you know, they fall into that -- all these swords would fall into the price category of, you know, the 200 to $500 range, somewhere in that neighborhood.

Q.    Do you remember from Government's Exhibit 171, the Dream Catcher and you've had a chance to look at Government's Exhibit 10 over there, the Dream Catcher, correct?

A.    Correct.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Q.    May the witness step down, your Honor?

THE COURT:   Yes.

Q.    (BY MR. HARDING) If you want to come over to the Dream Catcher.  If you could just walk us through, Mr. Rzepniewski.  Just sort of walk through things that catch your eye about it and what you believe the approximate value.  Please keep your voice up for the court reporter.

A.    Okay.  So again, I had another appraiser with me at that time that has experience as a generalist, but what we observed and what we discussed was that this appeared to be more of a modern piece with the bead work, the pelt and everything, the way it was arranged, this is something that you would typically see more so in a souvenir shop in New Mexico as opposed to something that had -- you know, may have been used in a ceremony or maybe has some tribal reference to it.  But that would have to -- there was no other provenance that was supported, provided at that time, so that's the assessment we made based on the characteristics of how it was made.

Q.    Looking at some of the aspects of Government's Exhibit 9, I think so -- I mean 10.

A.    It's 10.

Q.    Do you believe there's any chance that's a hundred-plus years old?

A.    No.

Q.    And actually, it's perfect that you're right there. Can you take a look and you saw them at the FBI office, also -- I'm sorry.  You saw that at County Road 118.  You also saw some items at the FBI office and can you open up Government's Exhibit 6 and tell us if you recognize it?

A.    I do.

Q.    Can you show that to the jury and sort of walk them through the same way how you determined the proximate value for that?

A.    So I was presented this and, again, working down working down the list, what I'm looking for is precious metal content.  Was it signed by anybody?  Was it Cartier or somebody along those lines.  And then, if there's not anything that distinctly calls it out or ties it back to anything, it's really just an everyday average brass pin that could be purchased for $50 or less.

Q.    If you could just replace that.  With Government's Exhibit 16, if you could stay at the microphone, show it to the jury.  It's going to be hard for you to do because you have to face one way or the other.  To the best of your ability, if you could show Government's Exhibit 16 for the jury.  Maybe show it to them first.

A.    This book was presented to me at the FBI location and my general assessment of it with books, everything comes down to the condition.  So looking at the dust cover and

then, some of the interior pages, which I can't really open right now and show you, but there was tears. There was no significant artwork within, you know, comparison with some of the historical books, you see some of the etched images and some of the better artwork. Just didn't present any of that so I didn't find any significant value with this item, as well.

Q. And so, let me ask you. I've got one more thing to show you while you're still there. Let's say somebody claimed that was a book owned by Vladimir Putin. Even if that were true, if there's no provenance, how is that going to affect the value?

A. Without anything to tie it back, you would be -- you'd be on two different market comparisons. You'd be looking at, you know, general publications of this book and poor condition. Or maybe even if it was collectible, you'd have to -- the condition. If you introduced the provenance side of things with the history of ownership or whoever, you know, had custody of the item, then, you know, that puts it on a whole different level. But we didn't have that evidence when we made our assessment.

Q. And did you give an estimate of the approximate value that you believe for that book?

A. I didn't. It just -- it didn't meet the threshold. No.

Q.   Finally, let me show you what's been marked Government's Exhibit 1.  Did you examine Government's Exhibit 1 during your evaluation at the FBI office?

A.   Yes, I did.

Q.   I'm going to ask you to do the same thing.  Show the jury Government's Exhibit 1, any distinguishing characteristics you noted, approximate valuation.

A.   So when I examined the bat, the first thing that -- I'll see if I can find it here with the light.  So here on the -- in between the two and it's really hard to see without raking light.  It says official softball bat so given the condition of the bat, it's stamped official softball bat there and, again, it's also written on in black marker with the initials GMD.  There is without any other, you know, provenance or history on this, this is just your -- you know, an old wooden softball bat.

Q.   Thank you.  That's all I need to ask you about that. I'll pass the witness, Judge.  Thank you, Mr. Rzepniewski.

THE COURT:  Ladies and gentlemen, it comes to a good opportunity for us to take our first 20-minute break for the day.  Let's call it 10:55.  If I could ask you to be back in the jury room ready to go at 11:15, we'll take our break now.  You'll recall the previous instructions that I've given you and I would ask you to observe those during the break.

(Jury not present.)

THE COURT:  We'll be in recess.

(Recess.)

THE COURT:  Is there anything we need to take up before we bring in the jury?

MR. HARDING:  No, your Honor.

MS. HERRING:  No, your Honor.

(Jury present.)

THE COURT:  Thank you for your patience, ladies and gentlemen of the jury.  Sorry for the delay and we'll pick up where we left off.  Ms. Herring.

MS. HERRING:  Thank you, your Honor.

CROSS-EXAMINATION

BY MS. HERRING:

Q.   I'm not going to try to pronounce your last name.

A.   I understand.

Q.   Good morning.  Just a few questions for you, sir. You told us that you were called out, knowing that search warrants were going to be executed at two homes, correct?

A.   I was called out to one, to the initial residence.  I didn't know at that time whether there would be a second one.

Q.   But you attended both search warrant executions ultimately.  You went to both homes that day?

A.   I went to both, correct, on the same day.

Q.   And you told us the first house was the house in Manor?

A.   Correct.

Q.   And I think you said your conclusion was after you reviewed everything in the home that was of possible interest to you, everything was about a hundred dollars or less of value?

A.   Based on the items that I saw when I was in there, yes, that was the range, somewhere between 100 and $500, in that neighborhood.  Not a blanket assessment but just an in general, yes, because I didn't see everything.

Q.   And about how quickly were you able to make that determination?

A.   Probably took around an hour or more at each location.  I can't recall the exact time, but I know I was there at least an hour or more.

Q.   And you didn't have to take items offsite for further examination?

A.   That wasn't part of the scope.  That wasn't my call either.  I gave the verbal, you know, satisfaction of the scope of what we were looking for:  Was there anything of significant value?  But it wasn't my judgment that, say, let's take this somewhere else.  I just basically reviewed the items.

Q.   You didn't feel you needed to do further research

before you could offer that opinion to the FBI, right?

A.    Not based on what I had at that time, no.

Q.    Now, you said you looked at an assortment of different types of objects, paintings, we saw the swords, all kinds of different objects, right?

A.    Yes.

Q.    And you noted in your report that when you comment on the market, the market that most of these items looked to be acquired through and could be commonly found at thrift shops, Goodwill, garage sales, estate sales?

A.    Correct.

Q.    That was your conclusion about the likely --

A.    A majority of the items.

Q.    And when you used that term, "looked to be acquired through," is that -- you could figure that out by eyeballing it or how do you make that?

A.    So that's not really a report.  That's more of a statement of what I did.  That's just a recap of what I did.  A report would be an actual, you know, appraisal report.  So what I gave at that time was not even a verbal appraisal.  It was based on my history and my experience as an appraiser looking at the items in my position of what I do daily.

Q.    And you were asked to prepare this knowing this case was going to trial.  You prepared it March 11th of this

year.

A.    Correct.

Q.    About a month ago?

A.    Yeah.  Correct.

Q.    So I'm just asking about the sentence here.  The market that most of these items looked to be acquired through was thrift shop, garage sale, Goodwill.  How did you make that determination or that conclusion?

A.    It was based on my -- just my physical review of the evidences in the time that I had it.

Q.    And you also noted here that many of the pieces you observed still had Goodwill stickers on them, right?

A.    There was a few, yes.

Q.    Some of the paintings that had the orange 999 stickers on the back?

A.    Yes, they did.

Q.    You talked about one baseball bat or softball bat that you examined.  Were you asked to examine multiple bats?

A.    There were a few that were presented to me at the FBI location.

Q.    When those were presented to you, were they still wrapped up in some fashion or had they already been unwrapped?

A.    They were wrapped.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Q.   Did you participate in unwrapping the one that you've showed us?

A.   I can't recall that if I unwrapped that one, but I did unwrap at least one of the bats, but I don't recall if it was that one.

Q.   Do you recall having any concern or conveying any concern to the FBI that unwrapping them might allow DNA to escape from the bats?

A.   That wouldn't be a consideration of mine, you know, because DNA while volatile is not really a valuation standpoint that I would, you know, kind of lean on in terms of considering something of value.  So preservation of condition, yes, if we were, you know, taking, you know, a piece of art out or, you know, in the case of the bat, I would think just generally taking it out would not harm the bat for what is typically considered a value standpoint.  You know, we're not taking it out and playing a game with it.  We're just taking it out to take a look at it.  So...

Q.   And you didn't advise the FBI that there was any need to store anything in any particularly controlled environment, anything like that, right?

A.   No.

Q.   No further questions.

RE-DIRECT EXAMINATION

BY MR. HARDING:

Q.   Just one quick followup area.  You said sort of DNA's volatile, but it wouldn't really influence your valuation judgment a ton.  Could you explain that to the jury?

A.   So when it comes to sports collectibles and bats, in my experience, what is attributable to the value of it is was a game used, was it used by, you know, a player or a person of notoriety.  And then, there's the provenance that I mentioned before, the documentation that backs that up.  DNA being something that's volatile, you know, something that's game used lasts forever, but DNA could possibly be destroyed or, you know, it could be lost in a collectible -- in the sense of a collectible item if that's the way we're looking at it.  But that's not typically how things are valued and sold when it comes to sports collectibles.

Q.   The provenance of sort of what you can prove it was used for is kind of more important than does it have someone's DNA?

A.   Correct.

Q.   I'll pass the witness, Judge.

        MS. HERRING:  Nothing further.

        THE COURT:  May this witness be released?

        MS. HERRING:  Yes, your Honor.

THE COURT:  Thank you.  You're free to go.  Next witness.

MR. GUESS:  Call James Holloway.

THE COURT:  Morning, sir.  Before you take a seat, could you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

JAMES HOLLOWAY, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. GUESS:

Q.   Good morning, Mr. Holloway.  Make yourself comfortable and once you're comfortable, speak into the microphone and introduce yourself to the ladies and gentlemen of the jury.  Spell your last name for the court reporter.

A.   Okay.  My name is James Holloway.  Holloway is H-O-L-L-O-W-A-Y.

Q.   And, Mr. Holloway, prior to coming to testify today, you and I met on a couple of occasions to talk about the facts of this case?

A.   Yes, sir.

Q.   Tell the jury, how old a man are you?

A.   I'm 72.

Q.   And tell me a little bit about your background. Where did you grow up?

A.   A native Texan, grew up in east Texas and went to college, you know, in Texas, and initially, I went into the sales business.  I was a agricultural background, grew up in a small ranch.  And when I came out of college, I was hired by an agricultural company and worked in the ag business for many, many years, at which time, I did a lot of traveling, wanted to be home with my family a little bit more, and I went to work more in a different area in the office supply business company called Pitney Bowes.

Q.   Let me stop you there for a second and the reason I do that is that when an answer goes on a little bit, we'd like to give the opportunity to have question and answer.

A.   Yes.

Q.   So you were in sales?

A.   Yes.

Q.   You mentioned that you got married.  That you had a family?

A.   Yes.

Q.   Who are you married to?

A.   My wife is Patricia Wilkinson Holloway.

Q.   And how long have you and Pat been married?

A.   Forty-four years.

Q.   And you go by Jay; is that correct?

A.   Uh-huh.

Q.   And you have children?

A.   Yes, three children.

Q.   Tell us their names and a little bit about them.

A.   The oldest one is Lane Holloway, lives here in the Austin area.  I have a daughter, Allison Holloway.  She lives up in the Seattle area.  And my youngest is Seth Holloway, he lives in Austin area.

Q.   And there's something unique about all three of your children.  What was their academic achievement?

A.   They all have Ph.D.s.

Q.   And in what fields do they have Ph.D.s?

A.   Electrical engineering, or, I guess, computers.

Q.   Did they get their intelligence from you or your wife?

A.   From her.

Q.   So you're talking about your sales business.  Tell the jurors a little bit about the companies that you've worked for just -- and bring us how you arrived in Austin, Texas.

A.   Okay.  I was the sales manager for an instrument company out of New York and that's how they wanted me in the Austin area.  I was in Houston and they gave me a

choice to where I wanted to live because we had a little office here, so I came to this office, but our main office is up in New York.  And that company, thank goodness, I was doing a lot of work with a company called 3M and I was doing a presentation up in Canada with their vice-president, which point he said, we want to buy your company.  So I went back to our president and said, do we want to be sold, here it is.  And 3M bought our company and I became sales manager for that division, same division for three -- actually, I retired back in 2009.

Q.   And that's what brought you to Austin?

A.   Yes.

Q.   So you said you retired in 2009.  Was your wife still working?

A.   Yes.  She was a manager with Ernst & Young, the accounting firm.

Q.   And where were you living?

A.   In Pflugerville.

Q.   How long have you lived or how long did you live in Pflugerville?

A.   We moved from Houston to Pflugerville in 2001.

Q.   And did you move into the Mountain Creek subdivision in Pflugerville?

A.   Yes.

Q.   At some point, did you become a member of the

homeowners association?

A.    Yes, sir.

Q.    And did you meet a friend Gary Snider as part of that homeowners association?

A.    Correct, yes.

Q.    You and Mr. Snider have been friends for many years now?

A.    Many years.

Q.    Families and friends, you know about his kids, your kids, all that kind of stuff?

A.    Yes.

Q.    You also have or you started a sideline business based on an interest in clocks; is that right?

A.    Yes.

Q.    Talk to the jurors about your clocks.

A.    Well, the first thing my wife ever bought when we got married was a clock.  My parents thought we were crazy.  They wanted us to buy a washer or dryer.  Didn't happen.  But we always enjoyed clocks.  We both grew up really very meager lives and it was kind of neat and whenever we had extra money, we'd buy a clock or two.  So we started to have a nice collection.

        As I moved up and become high-level manager and traveled, I was able to afford many nicer clocks and that's when one of the people we've been buying things

from said you need to learn how to repair clocks. And it became a hobby while I was working and when I had a chance to retire in 2009, I thought, well, I could retire or take a different transfer, do something else with 3M, I'm going to retire and start a clock shop. I'd already been doing repair work for people for fun. So that's how I got started in the clock business.

Q. And did you start your own company?

A. Yes. We had our own company called Holloway Trading.

Q. Was it a separate shop or did you just work out of your home?

A. I had a large house so we worked out of the house.

Q. And did you advertise that business on the internet?

A. Yes.

Q. Jump forward to 2018, you'd been retired for eight or nine years at that point?

A. Correct.

Q. Is your clock business going very well?

A. Very well.

Q. Are you repairing as well as buying and selling clocks?

A. Yes.

Q. At some point in 2018, do you remember being called for a repair at a residence in Manor, Texas?

A. Yes.

Q.   Who was the person who asked you to come to Manor?

A.   I believe it was Mrs. Youngblood.

Q.   And did you agree to go to the house?

A.   Yes.

Q.   What happened when you got to the house in Manor?

A.   Mr. Youngblood was there and he told me that he had a clock there.  It was what we call a four-glass clock.  He said it belonged to his grandfather and had sentimental value and he wanted it to run.  So I started to try to get it to run.  It was, in essence, what we'd say was out of beat.  I put it in beat and finished the house call and left.

Q.   Did you send him the bill?

A.   He paid me there.  Yes.

Q.   Do you remember if it was cash or a check?

A.   Cash.

Q.   Do you see Mr. Youngblood in the courtroom with us today?

A.   Yes.

Q.   I want you to point him out, describe an article of clothing he's wearing.

A.   Right over there, he's wearing, it looks like, black.

Q.   May the record reflect that Mr. Holloway identified the Defendant Kota Youngblood?

     THE COURT:  Record will so reflect.

Q.   (BY MR. GUESS) So pretty uneventful repair job?

A.   Yes, sir.  Just a standard call.

Q.   Was that the last time that you would have interactions with Mr. Youngblood?

A.   No.

Q.   What happened next in terms of your relationship?

A.   I did receive a call from Mr. Youngblood, week, two weeks later, something like that, saying that the clock had stopped running and I need to come back, at which point he asked me to look at it and I told him it needed to be repaired.  It needed to be restored.  It was dirty, needed cleaning.  He also had another clock that he said belonged to his grandfather that had sentimental value and wanted me to take that and clean that.  So I took both those back to the shop and we did a restoration.

Q.   And when you say "we," who are you talking about?

A.   A lot of the times, it was me.  I grew up, like I said, in sales and in sales, you tend not to say "I did this."  I feel better saying "we."

Q.   At that point, in 2018, was Gary Snider learning the clock repair business with you?

A.   Yes.  I had couple other people learning the business with me.

Q.   All right.  So you took these clocks back to your home to be repaired and did Mr. Youngblood eventually come

over to your house to pick those clocks up?

A.    No.    I returned them to Mr. Youngblood.

Q.    During the time that you're in Mr. Youngblood's house, are you guys having general conversation?  What's happening?

A.    Well, general conversations.  I like to visit with the customer, make them comfortable with me and be comfortable with them.

Q.    You're a salesman, right?

A.    He asked background what did I do, how I become working in clocks and things of that nature.  And I asked, what do you do and try to find out what they do.

Q.    Again, you're a salesman.  You've been in sales for all your life; is that right?

A.    Correct.

Q.    Right around August the 13th of 2018, did you receive or have a conversation with Mr. Youngblood regarding the need for money?

A.    Yes.

Q.    Tell the jurors about that conversation.

A.    Well, he -- actually, Mr. Snider and I were coming back from a house call and he'd called me and he told me that his sister had been -- had died in a car wreck and he needed $20,000 to offer her a proper funeral.  They were Catholics and this is what they needed to do.

Q.   Now, you'd only met Mr. Youngblood on two occasions at that point; is that right?

A.   No.

Q.   You met with him more than that?

A.   After I returned the clocks to him, he had told me that he had interest in a grandfather clock and I was an officer in a couple of clock clubs in the area, and one of our good dear friends that we had vacationed with before had passed away and his wife had called me saying would you please help us, you know, sell his collection.  And Mr. Youngblood said he was looking for a grandfather clock and I showed him some of the things in the collection and he bought that.  So I had a little more business relationship.

Q.   Anything personal going on between the two of you at that point, though?

A.   No.  Just a business relationship which you would have with standard clock customer.

Q.   So you get this call about him needing $20,000 to help with funeral expenses for his deceased sister?

A.   Yes, sir.

Q.   What did you decide to do, Mr. Holloway?

A.   We decided to help him based on the fact that he had always paid very well.  He lived in a very nice house.  They drove two BMW X6s, looked like they were very

successful and had the ability to make payment back.  And he promised to do a promissory note along with interest.

Q.   Could we have Government's Exhibit No. 180 on the screen that had been previously admitted.  And you recognize that check, Mr. Holloway?

A.   I do not have a picture of the check.

Q.   Oh, sorry.

A.   Yes, I recognize that.

Q.   On the screen in front of you, do you see that check?

A.   Yes, sir.

Q.   Is that your Wells Fargo account?

A.   Yes, sir.

Q.   And we see a check written on August the 13th, 2018, SK Youngblood.  Who is SK Youngblood?

A.   Saint Jovite Kota Youngblood.

Q.   And is that how he introduced himself to you or did he go by another name?

A.   Kota.

Q.   Kota.

A.   Yes.

Q.   For $20,000 and on the memo line, it says for money. You felt confident about giving this check to someone you had only recently met?

A.   Traditionally, people in the clock clubs have always been very, very honest so yes, I mean, he looked

successful. I did meet him at his bank, which was Navy Federal, and he went in there and he did a promissory note, which he gave them what to write. They wrote it up for him. Everybody at Navy Federal recognized him, spoke highly of him, so I felt very comfortable that we have something that was okay.

Q. When you say everyone at Navy Federal seemed to know him or talk about him, describe for the jurors what it was like going into the bank with him.

A. Well, when I went in there, they have a front reception and it happened to be the assistant manager of the bank. I think he'd indicated that he had known her from being in California. She recognized him. Certainly vouched that he was a nice customer of theirs.

Q. Did that give you confidence that you were going to get this money back?

A. Absolutely.

Q. And did Mr. Youngblood tell you how long he would need that money or would he be able to repay you?

A. Initially, it would be like a couple of weeks, I think.

Q. And you say that a promissory note was given to you.

A. Yes.

Q. Describe -- do you have a copy of that promissory note still?

A.    Yes.

Q.    All right.  Describe what it said inside the promissory note.

A.    It said that I loaned him $20,000 and he was going to repay.  I forgot the exact amount, like 24, $26,000 in two weeks or something of that nature.

Q.    So you go to the Navy Federal Credit Union.  You give him the check; is that correct?

A.    Yes.

Q.    And does he cash it there at the teller station?

A.    No, he does not.  We go clearly across the street almost to a Wells Fargo where I banked and he went into Wells Fargo and he asked me to follow him there and to wait out in the lobby in case he had any problems cashing a $20,000 check, which he did not.

Q.    So you go to his bank with a check for $20,000 to him, but yet, he has to go to your bank to cash it?

A.    Correct.

Q.    Why is that?

A.    Well, first off, Navy Federal may not have $20,000 at that point in time and, secondly, you're talking about a credit union cashed a check off of a bank.  They are going to hold that check for at least one day and might hold it up to three days being a larger amount over 10,000.

Q.    So that's why you went to Wells Fargo?

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

A.   Yes.  And he needed the money immediately to bury his sister.

Q.   Which Wells Fargo branch did you go to if you can recall?

A.   It's closed now.

Q.   That's all right then.  Had you been to that Wells Fargo before where you cash checks of that nature?

A.   Yes.  That was the bank I always went to.

Q.   You were a well-known customer to them at that point?

A.   Yes.

Q.   So $20,000 out the door and you continued to have some conversation with Mr. Youngblood over the next few days; is that right?

A.   Yes, about a week later.

Q.   What happened about a week later, right around August the 20th?

A.   Well, he'd come back and said he needed additional funds for his sister that maybe part of it just took care of the funeral home.  The other needed to be additional funds, if I remember somewhat, for maybe the cemetery, perpetual care or something of that nature had to be paid.

Q.   And how much did he ask for this time?

A.   Again, I think 18 or $20,000.

Q.   Could we go to page 2 of Exhibit 106.  180, excuse me.  And we'll expand that.  So this time, we have the

second check written a week later for $18,000.  This time, the memo line says loan.  Again, the purpose of this check?

A.   I believe it was to -- I guess for the cemetery plot of his sister for her to be buried properly.

Q.   Did Mr. Youngblood also execute another promissory note for you?

A.   Yes, he did.

Q.   Did you do the same procedure where you went to Navy Federal Credit Union or did you just go straight to your bank this time?

A.   On the promissory note he -- actually, I had asked for additional funds.  Some of it was cash that I had given.  He had given me some items, I guess, to hold as some of a guarantee that I'd have payment.

Q.   Collateral?

A.   Collateral.  And he brought a promissory note to me.

Q.   So what kind of items did he give you to hold as collateral, if you can recall?

A.   Well, there was a broach, there were some rings, there was a painting.  There was an item, he called it a sailor's mirror.  He said that his grandfather had been on it back in the 1880s.  It was sold on Sotheby's and his grandfather dropped out of 120, it went for like 140 and it had come back up, and he had acquired it and supposedly

had the provenance that came across with Columbus on the Santa Maria or one of those.

Q.   So he seemed to be very knowledgeable to you about antiques and unique items.

A.   Very.  His house was full of antiques.

Q.   That was the first visit you'd gone over there and you'd seen some of those?

A.   Oh, yes.  And I was working on the second visit looking at one of the -- maybe first or second, I actually sat on a chair and he's like, ooh, that's an antique chair.  No one sits in that chair.  Apologize but I needed to sit down to check something.

Q.   Do you have any specialties in terms of knowledge about antiques or precious metals, anything like that?

A.   I at one time had my appraiser's certificate but it was a specialty of clocks.

Q.   And that's your primary level of expertise; is that right?

A.   Yes.

Q.   All right.  You don't look at furniture, paintings or --

A.   Well, I like furniture and I like paintings but I don't have great knowledge on any of that.

Q.   You mentioned that he had the provenance on the items that he was giving to you that took it all the way back to

the Mayflower?

A.   He said -- he didn't say he had the prov -- he said this is what it came from.  He said that Sotheby's had the provenance and he had spoken to his contact at Sotheby's who looked it up and confirmed that it was the same item that his grandfather had tried to purchase.

Q.   Was that something that was important to you?

A.   Yes.

Q.   Why?

A.   It's history.  I mean, how many times do you have a chance to maybe own something that's from the 1400s from someone that landed and helped found our country.

Q.   The provenance itself, though, did you care about that or was that just something that came up during the course of the conversation?

A.   No.  It was part of what he gave for the value.

Q.   So you've given now $38,000?

A.   More than that.

Q.   Oh, what was more?  Did you give him some cash, as well?

A.   Yes.  There was several times, I gave him some cash over this period.

Q.   How much cash, if you can recall?

A.   Probably maybe 20, 30,000.  I don't know.

Q.   All right.  Could we go to page 3 of that exhibit.

We see here, another check written just another week later, basically on 8-28-18, this time to Mr. Youngblood for $2,300. That seems like you're getting in the habit now of writing Mr. Youngblood checks on a fairly frequent basis, Mr. Holloway?

A.   Yes, it was.

Q.   Do you remember what the purpose of this check was for?

A.   I really don't.

Q.   Just says loan; is that right?

A.   Yes.

Q.   Certainly a lot less than what had been previously given to him.

A.   Yes.

Q.   Let's expand out again. And the middle portion there. Picture of the back of the check, it's been signed, and obviously it looks like it was deposited in Navy Federal Credit Union. So on this check, you didn't have to cash it at your bank to give him the cash; is that right?

A.   Correct. At this point, I hadn't cashed any cash at my bank on checks. Everything else was cash I had either on hand or something.

Q.   All right. If we could go to the next page of that exhibit. So again, we have another check, legal fee, $5,

700.  Again, why are you writing two checks to Mr. Youngblood on the same day?

A.   I don't recall exactly other than it had something to do that he claimed he needed to pay a legal fee.

Q.   Okay.  And that's why you wrote that in the memo line?

A.   Yes, sir.

Q.   So these checks would start to multiply over the next several months; is that right?

A.   Yes, sir.

Q.   At this point, do you discuss with Mr. Youngblood about potentially entering into like a partnership to buy interest in antiquities or antiques, anything like that?

A.   Well, he had brought his collateral, several antique items, and then, he started contacting me and saying, hey, we have an opportunity -- or back up.  He had said he had contacts to find antiques and he had found something that thought if I was interested in, he would go 50-50 with me, and he had places he thought he could sell the item and turn it for a profit fairly quickly.  So I said yes.  It sounded like something that was good.

Q.   Did you believe him when he was telling you all these things?

A.   Absolutely.

Q.   The collateral that he had given to you, did you have

it independently appraised?

A.   No, I did not.

Q.   Did you take a good look at it, though, to determine whether or not you felt it was a genuine article?

A.   Yes, I did.

Q.   And what was your conclusion?

A.   I felt that it was.  Some of the jewelry and things and my wife looked at it and she likes jewelry and she collects jewelry.  Nothing like the expense of what we had there, but she had looked at it and she felt yes, the diamonds were real.  He claimed some of it was Tiffany's, some of it was Faberge.  My wife didn't buy that.  She didn't think it was quite that high of quality, but certainly it had value.  It had enough stones, karats that it would be valuable.

Q.   So between this first check, which you wrote for the funeral expenses for his sister on August the 13th, up until April of 2019, would it surprise you that you wrote 55 checks to Mr. Youngblood over the course of those next several months?

A.   No.

Q.   The totals came out to almost $250,000 is your recollection?

A.   Yes, sir.

Q.   All those checks that you wrote to him, they were

generally for, again, memo line for loans or different investments that you were making with Mr. Youngblood.

A.   At that point, I think more were, you know, dual investments.  He was bringing things.

Q.   So you become partners in some of these opportunities to make money down the road.

A.   Yes, sir.

Q.   Let's talk a little bit about what's happening with your relationship with Mr. Youngblood.  It's more than just a professional relationship; isn't that right?

A.   Yes.  He probably after the first check that I wrote him, he became -- he worked very hard to establish a relationship with us, one of trust that he was an honest person.  He always talked that he had never told -- he told one lie that he -- to his family when he was six years old and his dad told him how disappointed he was in him and he never lied again.  So he just harped on that he didn't lie, he worked hard, no one could work harder than he worked.  And he was at our house, he would bring things to my wife, flowers.  If he was there around lunchtime: Let me buy lunch.  Other things that trying very hard to show himself and he would say, you know --

        MR. GONZALEZ-FALLA:  Judge, I object to the narrative response.

        MR. GUESS:  That's fine.

A.    Oh.

Q.    (BY MR. GUESS) That's okay.  So let's talk about him coming to visit you at the house.  After this initial period of August-September of 2018, was Mr. Youngblood starting to come over to your house frequently?

A.    Yes, sir.

Q.    How frequently would he come over to the house?

A.    If he, quote, wasn't working, he was there every day.

Q.    And at some point, he became more than a business partner; is that right?

A.    Yes.

Q.    How would you describe his relationship with you and your wife?

A.    Well, he came to us and said that we were the best people he had known next to his grandfather, who was the superstar, and he said, you know, the histories that his parents had been murdered and he could now change -- he could select his family and he wanted us to be a family and he wanted to be like our son.

Q.    He knew that you had children, though; is that right?

A.    Yes.  He had met a couple of them.

Q.    Let me ask you.  Your oldest son Lane, he lived close to you in Pflugerville?

A.    Yes.  There was two houses between us.

Q.    Did you have a good solid relationship with Lane at

that point?

A.   Yes.  We normally walked about two miles every morning and two miles every night.

Q.   Visit about what was going on in your lives during these walks?

A.   Yes.  Mostly with his life and his work.

Q.   All right.  And obviously, he was married?

A.   Yes.

Q.   How many children did he have back in 2020, let's just say?

A.   Two.

Q.   All right.  And what were the names of his daughters?

A.   XXXXX and XXXXXX.

Q.   Were these your first two grandchildren?

A.   No.  Well, XXXXX was and then, my younger son had a son.

Q.   All right.  And would you sometimes baby-sit for Lane and his wife when they'd go out?

A.   Yes.

Q.   Tell me a little bit about what Mr. Youngblood would tell you about his background.  So first off, let's talk about did he say whether or not he was a veteran, a military man?

A.   Yes.

Q.   Tell me about that.

A.   Well, he claims that he joined the marines and he was going to an interpreter because he spoke seven different languages and that they found that he -- because he spoke that, some guy from the military, only gave his first name, said you're going to join a different branch and he moved him to the Army where he did some sort of special ops, and in time, he worked his way into being a Delta Force and a Delta Force commander, position of captain.

Q.   All right.  So position of captain?

A.   Yes, sir.

Q.   What was the Delta Force?  Did he explain to you what that was?

A.   Yes.  They're a special military unit that does, as he would call it, surgical operations.  He would say seals do broad, you know, delta does special.

Q.   Now, you don't have any prior military experience; is that correct?

A.   No.

Q.   Were you impressed by these stories?

A.   Oh, very good stories, yes.

Q.   The languages, did you ever hear him speaking a foreign language?

A.   If it was a -- it would be a phrase.

Q.   Did he tell you about any type of medals or awards that he had won while serving in the military?

A.   Yes.

Q.   What did he tell you?

A.   I think he had like seven different medals from Purple Heart, couple of those, all sorts of different medals.  He claimed at Fort Bragg, he was the third most decorated soldier.

Q.   You were impressed?

A.   Oh, yes.  Who wouldn't.  I love my country.

Q.   Did you notice the tattoos on his arms?

A.   Yes.

Q.   Did any of those have significance for his military service?

A.   Yes.  He said when he retired, his Delta Force team paid for the tattoos to be put on his arm because it was a real privilege and honor to have that.

Q.   Besides the business that he had in terms of locating unique objects, did Mr. Youngblood tell you that he had other jobs that he worked on?

A.   Well, when I met him the first time, I asked what he did, he said he worked for ExxonMobil.

Q.   All right.  Did he have other jobs that you knew about?

A.   At that time or later?

Q.   Well, a little bit later on as you develop the relationship.

A.    Well, he also claimed that he did special reviews on military.  He paid, got a check monthly.  If the military had a bad operation, they hired him to look at it and tell them what went wrong because he was very good at figuring out how to get out of bad situations and that's why the multiple tours that he had with his team, Delta team, no one was ever hurt, or shot, or killed.

Q.    Sounds like he's almost a James Bond type of character at this point?

A.    Bigger than life, yes.

Q.    You said something about the fact that he told you that his parents had been killed.

A.    Yes, sir.

Q.    Did he tell you the circumstances behind their killing?

A.    Yes, he did.

Q.    Explain to the jurors what Mr. Youngblood told you about his parents.

A.    Well, he said his parents had a house and they also had an apartment and they rented the apartment and they had gone over to the apartment, which happened to be also the apartment that -- oh, trying to think of the guy.  The guy that did the silver, solid stainless steel car, a John.

Q.    DeLorean?

A.    John DeLorean, who was a, you know, drugee and he lived in an apartment next to theirs and that John evidently had owed money and the drug people came to take him out and mistakenly opened his parents' door, at which point, they had, I believe, stabbed his mom and killed her, they had stabbed or done something to his dad, and that he had returned, was going to meet them there. Coming up the stairs, he said one of the people that had been involved tried to stab him, he got away and went up the stairs.  Another guy was attacking him.  He claimed his father on his dying breath shot the guy but didn't kill him and a neighbor came out of the door.  There was an ironworker or something and shot the guy dead.

Q.    And how old was Mr. Youngblood when all this took place?

A.    Thirteen.

Q.    And you believed the story?

A.    Good story.  So yes.

Q.    What was his father's employment?

A.    He was an FBI agent.

Q.    And after his father had been murdered, did he tell you who took care of him as a 13-year-old?

A.    He said that his father had left -- that one of his military buddies, Mr. Dennis Schuler, was going to take care of him, and he said he stayed with him for maybe a

day or two days, but Dennis Schuler was a drunk who beat his wife and he was trying to protect the wife and he got in an argument out on the balcony.  Mr. Schuler hit him with a two-by-four and he was about to throw him over the ledge --

Q.   I'm going to stop you.

A.   -- when some friends pulled him off and he left he said he walked out and never went back.

Q.   All right.  And eventually, where did Mr. Youngblood end up?

A.   He said that he had been working and he took funds that he had.  He said he had made thousands of dollars and he knew someone and they gave him -- had a fake passport made, making him legal age to fly, and he flew overseas and ended up, I believe, in Morocco.

Q.   You're a salesman?

A.   Yes.

Q.   You know a good sales pitch when you hear one, right?

A.   Yes.

Q.   Did you believe all this stuff or did you try to corroborate anything that Mr. Youngblood was telling you at that time?

A.   I had no way of really corroborating.  I have dealt with people that are perpetual liars.  Traditionally, they won't look at you in the eye when they talk to you but

their stories change.  His stories never changed.  He told it multiple times to multiple people that I heard, never changed.

Q.  So that gave you confidence that he was being honest with you.

A.  Yes.  Along with the time that, I mean, he was showing us things, things we had and I was keeping at our house all looked real.  I felt we were working with someone that was honest.

Q.  Did he tell you that he was a descendant of some --

A.  Red Cloud.

Q.  Pardon me?

A.  Red Cloud.

Q.  All right.  So Native American chief?

A.  Yes, Lakota Sioux or something in South Dakota.

Q.  And is that where his name Lakota came --

A.  Yes.

Q.  Okay.  At some point, in August of -- we're going to jump forward a little bit here, did he talk to you about having some knowledge about drug cartels, Mexican drug cartels?

A.  Yes.  He talked about that much earlier.

Q.  Okay.  So what was he telling you about the drug cartels?

A.  One of the reasons -- it's a little longer but I

believe him was right off the bat of starting to give him some money, he gave me the story that he had had some legal trouble in California and he spent time incarcerated there --

Q.   Let me stop you.  May we approach at sidebar?

THE COURT:  Yes.

(At the bench, on the record.)

MR. GUESS:  So he's obviously a very talkative witness.  So this is the point where he's going to say that he fought with El Chapo's nephew Elvis in the prison and that's how they got to know each --

MR. GONZALEZ-FALL:  Jail.

MR. GUESS:  Or in jail, excuse me.

MR. GONZALEZ-FALLA:  We've talked about this many times.  I would expect you would have prepared him to --

MR. GUESS:  I've tried.  So anyway.

MR. GONZALEZ-FALLA:  So what do you suggest we do now?

MR. GUESS:  If you'll let me just say at some point, he introduced you -- or he told you he knew someone by the name of Elvis who was connected to the drug cartels.

MR. GONZALEZ-FALLA:  He had previously said that he met Elvis in jail.

MR. GUESS:  Yeah.  So I'd just ask that if that's

okay then.

MR. GONZALEZ-FALLA:  Just to show the context of how he met him.  Not for any other purpose.

THE COURT:  You don't mind a little leading to control the...

MR. GONZALEZ-FALLA:  That's fine.  I have no problem with him leading to control the story.

THE COURT:  Okay.  Yeah.

(End of bench conference.)

Q.  (BY MR. GUESS) I'm going to ask you a particular question.  Listen carefully to the question and then, just answer the question, okay?

So in terms of the drug cartels, did Mr. Youngblood indicate that he had knowledge of a person named Elvis, who was related somehow to El Chapo Guzman?

A.  Yes.  He said it was his nephew.

Q.  Okay.  All right.  Did he also talk about having connections to other mobsters?

A.  Yes.

Q.  And were they the Russian, Italian mobs?

A.  Initially, the Russian, later the Italian.

Q.  And he had connection to them in New York.

A.  Russians was New York and Los Angeles.

Q.  In terms of the type of work he did for the Russian mob, can you describe what Mr. Youngblood said he did for

them.

A.   Initially, he said he handled financial arrangements or investment arrangements that they did not necessarily invest money in banks.  They liked to invest in metal and things of that nature, which was his specialty, and he was able to help them acquire metal when it was going up and acquire it when it was down and then, watch it go up again.

Q.   Did he seem to have a pretty sophisticated knowledge of financial institutions and ways of transacting businesses?

A.   Yes.  Very much.

Q.   Did the Russian connection also give him access to some of these unique items?

A.   Yes.

Q.   What did he tell you about that?

A.   Well, he brought one for us to keep, which was a platinum skull, claimed it once belonged to the -- one of the palaces for Katherine The Great that it was a gift to her and during the breakup the U.S.S.R., it kind of got lost.

Q.   All right.  Did you do a little bit of research into that platinum skull?

A.   I did look.  I couldn't find it, but again, there's not a lot knowledge on the Russian museums that I could

find.  But I certainly believed it was platinum.  I don't have great knowledge on metal, but it had the characteristics of platinum, heavy, it's not silvery or shiny.

Q.   And you kept that in your home.

A.   Yes, sir.

Q.   At some point, did you end up returning it back to Mr. Youngblood?

A.   Yes.

Q.   Going to go forward a little bit to April of 2020 and could we have Government's Exhibit No. 182, which has been previously admitted.  Your Wells Fargo bank account; is that correct?

A.   Correct.

Q.   All right.  And below that on the active summary, we see a balance of roughly $8,000; is that right?

A.   Yes.

Q.   Would that have been fairly normal for you?  This is in 2019 in terms of what your balance would have been kept?

A.   Yes.

Q.   And in this timeframe of May 2019, this is before you're really heavily invested in terms of financial investments with Mr. Youngblood; is that right?

A.   What date did you say?

Q.   This is May of 2019.  I'm sorry.

A.   I was pretty heavily invested already at that point.

Q.   All right.  We see here on page 2, look at that and expand the middle portion there.  Just a little bit more up above that, please.  That full section.

          We see on 5-15, is that your wife's paycheck that's coming into your account?

A.   Yes, sir.

Q.   And then, we see here, Social Security check for you; is that right?

A.   Correct.

Q.   And then, there were a few more additions but pretty much, it was your wife's salary plus your Social Security and whatever you made from the clock that you were living on?

A.   Yes, sir.

Q.   Did you also have a good bit of savings involved or bit of savings at that point?

A.   Yes.

Q.   All right.  So let's go then to page 5 of that exhibit, please.  Going to go forward to April of 2020.  And we're going to see at the bottom here, the same account; is that correct?

A.   Yes.

Q.   And I see a deposit here of $230,625.  By this point

in 2020, had your wife retired from E & Y?

A.    Yes, sir.

Q.    And so, you're not getting a big bonus from her from work or anything like that; is that right?

A.    No.  No.

Q.    Do you remember what this $230,000 was about?

A.    It was part of her, I guess, IRA or whatever.

Q.    All right.  This is during the pandemic, 2020?

A.    Yes.

Q.    April?

A.    Yes.

Q.    All right.  Could we go to the next page of that exhibit.  So 4-6, we see a deposit of $206,2050 wire transfer from the Patricia Holloway rollover IRA.  Do you see that there?

A.    Yes.

Q.    And Patricia Holloway being your wife, were you aware of this transaction?

A.    Yes.

Q.    And what was the purpose of this transaction of putting the $200,000 into your Wells Fargo account?

A.    Mr. Youngblood, because we trust him, had become our financial advisor and he was helping my wife to invest in things that would do better than what she had done with the stock market.

Q.   This particular amount of money, was this something that needed to be done right away in order to take advantage of some these opportunities?

A.   Yes.  He -- do you want me to expand or --

Q.   Yes, please.

A.   He'd explained that there was an individual who was a collector of stamps and of gold coins that had passed away and his brothers wanted to use the money.  They wanted to sell these investments and buy land and that they really didn't understand the value of the stock -- of the stamp collection or the total value of the coins, which he did, and that would be an opportunity for us to buy things, I won't say for pennies on the dollar but for a discount, and we could make some good money and he felt it would only do nothing but go up as we held it.

Q.   So you got this money out, goes into your -- to your bank account; is that correct?

A.   Yes, sir.

Q.   Are you just going to write Mr. Youngblood another check now to cover the expenses for this?

A.   No.  He had quit wanting checks.  He had been wanting cash.

Q.   And so, what did you have to do then to convert this $200,000 into cash?

A.   A lot of work.

Q.   All right.

A.   It was the pandemic.  You could not go into a bank, you had to go drivethrough.  Most banks, if they would give you anything more than 10,000, 20,000 was the max that anyone would go.  So I had to go to like six Wells Fargos across Austin to come up with this money and it did require a couple of days and it was critical that we have the money to him or these people were going to do business and sell the items to someone else.

Q.   Could we have Government's Exhibit No. 181, please.  So these, again, are going to be some of those checks that we're talking about.  So this was a few days before the transfer on 4-6, there's a $9,000 check there.  To your recollection, was what given to Mr. Youngblood for this investment?

A.   It's just given for an investment.  I can't say which one.

Q.   All right.  It says pay to the order of James Holloway.  Were you always writing these checks to yourself, Mr. Holloway?

A.   Yes.

Q.   Why were you writing them to yourself?

A.   Because Mr. Youngblood said he had had a bad relationship with Wells Fargo in California.  And even though when I first met him, he had a bank account with

Wells Fargo, he said he had dropped or they cancelled him for some reason and he needed cash, but they wouldn't cash it for him because he didn't have an account with them.

Q.   Let's go to page 3 of that exhibit.  So there we see the first check written on 4-6, the date that the 200,000 hits your bank account, and again, I see a check there written to yourself for $10,000.

A.   Correct.

Q.   Part of the reason that, again, the 10,000, was that the limit that was going on?

A.   That was the limit.

Q.   All right.  Next page of that exhibit, another check written 4-6-20, again, for $10,000.  That's check No. 5793.  Did you go to a different Wells Fargo to --

A.   Yes.

Q.   -- cash this check?

A.   Yes, sir.

Q.   So it's the second Wells Fargo you'd gone to on this date already.  Go to page 3.  I'm sorry, next page is 5. We see here, a withdrawal slip from your checking account. Explain what this was on 4-6.

A.   Again, this was pulling money out.  This was probably done from one of the banks, my normal bank.  I might have been able to go in there or I may not have had a check, but this is what they call a counter check.

Q.   All right.  And again, this would have entitled you to take the $20,000 in cash.

A.   Yes.

Q.   The next one, please.  Check 5788, $20,000, this time, again, written on 4-6, did you go to another bank?

A.   Yes.

Q.   This is the fourth bank you'd gone to that morning or the afternoon?

A.   That day, yes.

Q.   Next check 5789, again, $20,000.  And this is all to get the money to Mr. Youngblood.

A.   Yes, sir.

Q.   Another bank you had to make a stop at --

A.   Another Wells Fargo, yes.

Q.   Is anyone at Wells Fargo stopping you, one of the tellers, saying, Mr. Holloway, this is like the fifth or sixth check you've cashed, why are you doing this?

A.   No.

Q.   No one thinks that this is anything out of the ordinary for you.

A.   No one questioned it.

Q.   When you and your wife took out the $200,000 from the IRA, did the people at TD Ameritrade talk to you about are you sure you want to do this?

A.   Yes.

Q.   Tell us about that.  What were they advising you?

A.   Well, initially, they were are you -- you know, is this a con job?  Our concern was I kept records of the growth of Dow, Russell, whatever, 2000, all of the different NASDAQ and all of those, and I had been complaining to the people that was holding our money that they were underperforming.  So they were a little concerned that we were taking all of our money out because of their lack of performance to what we thought the standard should be when other people I knew that had accounts were doing over standard.

Q.   But they were just advising you to be careful about what you were doing?

A.   Yes.

Q.   And you did tell them that you felt confident about what you were doing with the money?

A.   Yes, sir.

Q.   All right.  Without going into all of them but there was another, looks like, one, two, three, four -- or three more checks written on 4-6 ranging from 20,000, 20,000, 28,000, three more bank trips that day?

A.   Yes.

Q.   And then, on the last page of that exhibit, could we have that one please, Ms. Mercado.  5795.  There we go. This is the next day, 4-7-2020, and that's a check for

$20,000; is that right?

A.   Yes.

Q.   Had you just gotten tired or ran out of banks on 4-6 to go to?

A.   Ran out of banks.

Q.   So eventually end up getting the full amount of money from that liquidation of the 401(k) to give to Mr. Youngblood.

A.   Correct.

Q.   Tell me how you got that cash to Mr. Youngblood.  How did that work?

A.   I collect the cash, come home and give it to him.  He was sitting at the breakfast table with my wife.

Q.   At certain points would you collect cash from other people to give to Mr. Youngblood?

A.   At different times, yes.

Q.   These deals that you're doing with Mr. Youngblood, this is just an example of one particular deal in April of 2020; is that right?

A.   Yes, sir.

Q.   Over the course of your relationship, it starts 2018 when you pay the first check for the funeral for his sister up until the end of the situation in July of 2023, do you have any idea of how many deals you invested in with Mr. Youngblood?

A.   Several.

Q.   Did you also identify people who you knew in the Clock Association to invest with Mr. Youngblood and yourself?

A.   I did not identify people.

Q.   Okay.

A.   He knew people that I was working with.  My clock shop was doing quite well.  I had three people working with me and he knew them because he would come over and spend the day or lunch.  So he knew them and he suggested some investments that would they be interested.

Q.   And were some of your friends interested in dealing with Mr. Youngblood?

A.   Yes.

Q.   Including the Sniders; is that right?

A.   Yes.

Q.   Mr. Snider came in earlier and testified about a deal on a gold coin that happened in April of '21.  Do you remember that incident with Mr. Snider?

A.   Yes.  It was a gold medallion.

Q.   All right.  The gold medallion.  Tell the jurors how you first came to know about this gold medallion.

A.   He brought it to our house.

Q.   When you say "he."

A.   Mr. Youngblood.

Q.    All right.

A.    He showed it to us and said this was just kind of one of the things of what we had done.  The money we had given him, part of it, we should have a third of this or we should have part of the ownership.  And that the medallion supposedly commemorated when the transcontinental railroads met.

Q.    You actually saw the medallion itself?

A.    Yes.  I kept it for long time.

Q.    Describe for the jurors what it looked like and why you felt it was authentic.

A.    Well, it -- I guess it was about, well, about that big around and it was gold and it had things on it, you know, looked like commemorating the railroad so it looked like very authentic and it definitely looked to be gold.

Q.    Did Mr. Youngblood tell you what that medallion was worth?

A.    He said there was a smaller medallion that was damaged that had been sold by Sotheby's for a little under $10 million and he thought this one being larger and better condition would sell easily for 14, 15, maybe 20 million.

Q.    So he's telling you this.  Does he need money at this point to try to facilitate the sale of this medallion?

A.    I would say yes.

Q.   And was he asking you for money to assist in the sale of this medallion?

A.   At this point, we had already probably contributed a million dollars of different things and he said this is just part of what we had contributed, but he thought, do you have friends that would be interested in being partners with this.

Q.   And did you tell him that Gary Snider was potentially somebody who would be interested?

A.   He suggested if the Sniders would be interested, I said yes, I will call Mr. Snider and see if he is.

Q.   Did you do so?

A.   I did.

Q.   Eventually, Mr. Snider and then, later, his wife came over to your home; is that right?

A.   Correct.

Q.   Describe the meeting that took place at your kitchen table, I guess, regarding the medallion.

A.   Yes.  They looked at it.  He gave them explanation of what it was, told them if they would invest, I want to say like $196,000, he would give them one-third of the profit or the profit off the medallion.

Q.   And was Mr. Snider interested in doing that investment?

A.   Yes, after he spoke with his wife.

Q.   And to your knowledge, did he eventually do that?

A.   Yes.

Q.   At the table during this discussion, did Mr. Snider indicate that he was going to have to go into his IRA to get this money?

A.   Yes.  He wrote an initial check that was so many thousand out of his check currently, but then, he had to take money out of his IRA or something to make the rest.

         MR. GONZALEZ-FALLA:  Your Honor, I'm going to object to leading to be careful in this area.

         THE COURT:  Okay.

Q.   (BY MR. GUESS) Eventually, where did Mr. Snider deposit the funds from that IRA account?

A.   I believe he wrote me a check and I cashed it at the Wells Fargo Bank that I did business with.

Q.   And what did you do with that $150,000?

A.   I gave it to Mr. Youngblood.

Q.   At that point, had you become aware from Mr. Youngblood that your son Lane was potentially in some danger?

A.   Yes.

Q.   Describe for the jurors what Mr. Youngblood told you about your son Lane.

A.   He explained that my son had become involved in the drug business.  That he had been making very good money

but seemed to be not interested in his job at Amazon, even though he was making a lot money, because he was making so much more money in the drug business.

Q.   Did you believe him?

A.   Yes.

Q.   Why would you believe him?  This is your son, the one you're walking with every day.  Why would you believe that?

A.   My son and I walked every morning, every night into the end of June.  At the first of July, I would call my -- I'd text him and say what time are you coming down to walk?  Well, I'm busy.  In the evening, I text are you coming, want to walk?  I'm busy.  And after three or four days of this, I went ahead and walked, I thought, well, I guess he doesn't want to meet with me -- walk anymore.

Q.   Is this during the pandemic in 2020?

A.   This was -- yes, because this was in 2020.  He came down once -- well, Mr. Youngblood was telling me that Lane with his father-in-law, who was in the drug business, was trying to help him, help my son sell some fake Mexican coins, gold coins, and that Lane was wanting him to verify whether they were true, real coins or not with value, and he said he really didn't want to do that.

Well, my son came down once and said, you know -- and he told him, he said he wanted Lane to get my

permission. My son came down, asked permission, I told him I do not want Mr. Youngblood involved in this. The next day, my son came down and he says, I'm going to have him do it, anyway. The next time I spoke to him was on July 21st, his birthday, he came down, I think, for his birthday card with his younger daughter XXXXX, and that was the last time I spoke to him until '23.

Q. So July of '20, you believe at this point that your son is now working with the drug cartels?

A. Absolutely.

Q. And that came from Mr. Youngblood.

A. Yes. May I expand?

Q. No. Just do question and answer here.

Your son who had the Ph.D. in electrical engineering working for Amazon, making good money, had all of a sudden turned to the drug world, according to Mr. Youngblood.

A. Yes.

Q. Why did you believe this, Mr. Holloway?

A. I was up there earlier in the year. I have a key to their house. They had, you know, a key to mine. And I was up there one day and his wife said, we're going to be rich, really rich. Okay. Maybe I knew that Mr. Youngblood was working some deals with them. I thought okay, maybe that's it. And then, all of a sudden, then

they changed the lock to their house and we were not getting together weekly like we used to and we were just simply talking maybe on the phone and, at that time, doing some walking.  And so, at that point, I thought, well, maybe this is true that when he said he was in the drug business, that's what was happening.

Q.   So the last time that you spoke to your son before very recently was on his birthday in 2020.

A.   Yes, sir.

Q.   Did you see the grandkids?

A.   The youngest daughter XXXXXX came down with him for -- they stayed about 15 minutes.

Q.   After that, though, no contact with Lane or his family.

A.   No, sir.

Q.   What was Mr. Youngblood telling you over these next several months regarding what was happening to your son?

A.   Well, he would come almost every day and when he did, he always went to my son first and he would come and tell us what they were doing, or the drug business, or what was happening.  Different stories that he was transporting stuff, transporting money, all different things.  And he was telling how his son was afraid of me.  Also, that I have a neighbor that moved in and they were putting solar on their house and they were putting a security system and

he was telling me that my son thought that I was putting in security so I could beam and get us into his house.

Q.    So Mr. Youngblood's working to undermine the relationship between you and your son.

A.    Yes.

Q.    At some point in September, do you remember going over to Mr. Snider's house with Mr. Youngblood a little bit later regarding a threat to Lane's child?

A.    Yes.

Q.    All right.  Do you remember how much money was asked of Mr. Snider?

A.    I want to say it was 100,000 or more.

Q.    Don't recall, though, specifically?

A.    Sometimes he would call me.  There was times when I was taking his youngest son to his hockey game and he would call me at the hockey and say there's a threat against Lane or his kids and we need money, and it's like I don't have that kind of funds anymore.  And he would say, well, will the Sniders help?  And I would three-way call into Sniders and let him talk to them and he would tell them what he needed and basically if they agreed that Gary would write me a check the next day.

Q.    Do you remember Mr. Snider specifically giving you or talking with Mr. Youngblood $235,000 in September of --

        MR. GONZALEZ-FALLA:  Object.  Leading, your

Honor.

THE COURT:  Overruled.  You can answer the question.

A.   Yes.  I would say yes.

Q.   (BY MR. GUESS) As time went on, did you have better relations or worse relations with your children as your relationship with Mr. Youngblood grew?

A.   Virtually had no relationships.

Q.   And become estranged from your son Seth?

A.   Yes.

Q.   Were you aware when your son Lane left Pflugerville and went someplace else?

A.   Yes.

Q.   How did you become aware of that?

A.   Mr. Youngblood told me that he helped Lane leave the country, that the cartel was after him and that he and his friend Marvin had driven their cars while my son drove his minivan to the private airport or corporate airport there in Pflugerville where he had hired a private jet to fly him to a Caribbean island and they had criss-crossed, keeping the cartel cars from coming up and shooting Lane and his family in their car.

Q.   So Mr. Youngblood was the saviour in this case?

A.   Absolutely.

Q.   Did you feel grateful to him at that point?

A.   Absolutely.

Q.   Did he tell you some more stories about what had happened to Lane at a later point in the story?

A.   Yes.  He normally, about once a week, would bring us an update on their life on the Caribbean island where I would ask, because he was a type I diabetic, is he getting insulin?  And he said no, he doesn't want it.  He's drinking but the people -- I've got people watching him, taking care of him.  All he wants is for them to buy him a bottle of liquor every day and he goes out, sits on the beach and drinks liquor.

Q.   Stop you there.  Did you know your son to be a big drinker?

A.   I did know he likes alcohol.

Q.   Okay.  Was he abusive with it?

A.   No, not when I was talking with him.

Q.   So now, your son's in the Caribbean island pursuant to the arrangements of Mr. Youngblood.  At some point, does that change?

A.   Yes.  First off, when he took -- the kids were taken away from them and put into a wealthy family who was going to raise them.  And he said sometime after a year there, he would get us together to meet and see the kids so they wouldn't lose knowledge of their grandparents.

Q.   All right.  Did you ever see your grandkids?

A.   No.

Q.   Did you at some point find out that something happened to your son?

A.   Yes.  He claimed that he and his wife were having arguments and she stabbed him.  One night when they were being staked, she stabbed him with a steak knife and spent several days in the hospital but it didn't kill him.

Q.   And this is all coming from Mr. Youngblood?

A.   Yes.

Q.   Did something even worse happen to your son, according to Mr. Youngblood?

A.   Well, yes.  He told me that my daughter-in-law, Lane's wife, had escaped the island somehow and that Lane eventually escaped the island, also.

Q.   And what happened after Lane escaped from the island?

A.   Well, because the cartel was still after him, he was going to get them to a safe place far away from the cartel in Australia and in multiple trips, trying to get the two of them to safety.  That he claimed that Lane was into kiddie porn and doing things like that, and the people who were trying to get them safely there were Russians, they hated that and they saw what he was doing and that they ended up shooting him twice in the chest and throwing him in a lake and he was dead.

And he did call me one morning at 5:30 in the

morning to let me know that the bad news that my son was deceased.

Q.   Do you remember when that was?

A.   I don't know.  May maybe.

Q.   Were you distraught?

A.   Yes, to a degree.  If my son was that bad of a porn person and a pedophile, I could only have some grief because that's not how he was raised.

Q.   Prior to the story that Kota Youngblood told you, none of that had been true about your son, right?

A.   Absolutely nothing.

Q.   As he's telling you these stories, is he asking you for money to help sustain Lane's lifestyle?

A.   He's asking me to find people that I know that would loan money.

Q.   And are you doing that?

A.   I am getting him in contact with people and then -- letting him ask -- tell them what he needed.

Q.   But you would be there to vouch for him to some extent; is that correct?

A.   Yes.

Q.   These people knew and trusted you for a long time?

A.   Correct.

Q.   And eventually, they ended up giving him money; is that correct?

A.   Yes.

Q.   Could we have the organizational chart, 306.  I'm going to focus here on the right.  We see the part of your family up here at the top of the chart; is that correct?

A.   Correct.

Q.   Sniders, we've already talked about them, the second line there.  Who is Glen Morehead?

A.   He was a friend, a clock friend.

Q.   And at some point, did Mr. Youngblood ask you to vouch for him with Mr. Morehead as far as investment?

A.   Yes.

Q.   Leslie Morehead, is that Mr. Morehead's wife?

A.   Yes.

Q.   Gary Sertich, who's that?

A.   He's a clock friend.

Q.   And you still have some relationship with these people; is that right?

A.   Maybe.

Q.   Did Mr. Sertich eventually meet with Mr. Youngblood and you?

A.   Several times.  At least twice in person.

Q.   Are you aware whether or not Mr. Sertich gave money to Mr. Youngblood?

A.   Yes.

Q.   The Devrieses, Karol and Jacob.

A.   He met with them both.

Q.   And again, did they give money to Mr. Youngblood?

A.   Yes.

Q.   Did you voucher for Mr. Youngblood?

A.   Yes, but Mr. Devries also knew Kota, vouched for him.

Q.   And then, last, Rudy Conde.

A.   Yes.

Q.   Another Clock Association member?

A.   Yes.

Q.   Same story?

A.   Same story.

Q.   All right.  In hindsight, you're looking at all this information, so forth, and to some extent, you're helping Kota Youngblood with this scheme, aren't you?

A.   Yes.

Q.   You're accepting checks on his behalf?

         MR. GONZALEZ-FALLA:  Object to leading, your Honor.

         MR. GUESS:  I'll rephrase the question.

Q.   (BY MR. GUESS) What is Mr. Youngblood asking you to do to help him?

A.   To find someone that would loan money to help in various instances.  Some of it was to help him.  He claimed that his -- he claimed his older son had been murdered and he -- because he got involved in drugs, the

drug cartels, and he was coming and claiming that his younger son was getting involved with drugs and he was valedictorian at that point, literally, number one in his class.  He was a great hockey player.  This would ruin his career.  He wouldn't be able to go to college.  No scholarship --

Q.   Okay.  Let me stop you there.  So what else is he asking you to do as you'd been doing for him?

A.    Basically that was it.  Just, you know, he had some people he would suggest some he knew, I would go with him.  I refused to talk to them about it.  I had him go and talk.  Many times, he would talk -- a couple, he would talk to them individually and he'd say they're going to give you money, pick up a check.

Q.   A lot of the checks were made out to you.

A.    Most all were.

Q.    Why is that?

A.    The Wells Fargo Bank I did business with, one of the times I was picking up money, they had counted the money three times through their counter with two people and gave me $5,000 too much.  One I got home and looked at it, it's like this is $5,000 too much.  I was on my way back to the bank to return the money when they called me and say, do you have too much money?  I said yeah, it's not my money, it's yours, I'm returning it, and they were like we can't

believe you're returning this money.  I said it's not mine.  I don't steal.

So after that, anytime I went in with a check for high dollars, they were like, Mr. Holloway, here it is.

Q.   You're a trustworthy individual.

A.   They trusted me completely.  I trusted Mr. Youngblood.

Q.   So why is Mr. Youngblood asking you to accept these checks for him other than that reason?

A.   Well, they were either to help -- he was handling things for other people that I maybe knew or didn't know such as Mr. Perardi.

Q.   All right.  Let's go on to Mr. Perardi.  At some point in 2022, you have a conversation with Mr. Youngblood; is that right?

A.   Correct.

Q.   And does Mr. Youngblood tell you to expect something in the mail?

A.   Yes.  He calls me, I want to say, one evening, said you need to be up early because there's going to be a Fed Ex delivery that Mr. Perardi is writing a check to you for me for services I'm rendering, and you'll be there by 5:00.  I need you to run to the bank, cash it, and when I come back in town, I will come get it from you.

Q.   Was this something different or was this something

new to you in your relationship with Mr. Youngblood?

A.   Asking for money when he's out of town so he'll be available when he's in town, pretty standard.

Q.   Was this the first time that you've had someone Fed Ex a check to you?

A.   No.  I had a cousin that Fed Ex-ed some money to me. No.  I take that back.  She wired it.  So no.  This was the first Fed Ex.

Q.   Did you know who Eric Perardi was?

A.   I had casually met him once out at the -- his skating rink or whatever, Crossover, whatever.

Q.   And that's because Mr. Youngblood and you had developed such a close relationship that you would sometimes help out with his children?

A.   Well, during the COVID, his wife supposedly took the vaccine and she came down with, was it Gray -- some disease so that she couldn't see to drive.  So because he said you're family, you're like the kids' grandfather, will you take care of little Kota, I got up every morning early, drove from Pflugerville to Manor, picked up little Kota, took him to school in the evening.  I went over and picked him up from school, took him home many times, take him to get something to eat.  When he had hockey practice, I picked him up and took him to Cedar Park for his hockey practice where I stay and took him home.

Q.   All right.

A.   And this was for a good while.

Q.   All right.  So you're doing a lot of stuff for Mr. Youngblood at that point?

A.   Yes.

Q.   And so, when he told you that the check was coming, did it come as he told you?

A.   Exactly as stated.

Q.   Did he tell you what those services that he's providing to Mr. Perardi were for?

A.   No.

Q.   And what did you do with the check?

A.   I cashed it and held it for him to come pick it up.

Q.   At that point, were you aware, was Mr. Perardi in town or out of town?

A.   The first one, this was two times, he called one week apart, I think.  The first one, he said he was either in New Orleans or Florida.  I don't believe which one of the two.

Q.   You're talking about "he," you're talking about Mr. Youngblood?

A.   Yes.

Q.   So he was out of town.  Mr. Perardi was out of town. That's why he Fed Ex-ed the checks to you?

A.   Yes.

Q.   Later on, during the course of this event, you got to know Eric Perardi a little bit better?

A.   Very well.

Q.   Spent a lot of time on the phone with him?

A.   As well as in person.

Q.   Would you meet him at banks occasionally?

A.   I met him at a couple of banks, yes.

Q.   Do you remember one occasion at the Wells Fargo in which you met Mr. Perardi in the parking lot and went in?

A.   Yes.

Q.   I want you to describe a little bit about what caused you to be at that Wells Fargo and what happened.

A.   Mr. Youngblood had called me and told me that Mr. Perardi would be calling me, that he was going to write me a check and we needed the funds immediately.  So Mr. Perardi called me and he also at that point started -- not Perardi.  Mr. Youngblood's explaining some of the issues that Mr. Perardi was involved with that was in danger of his life, and things like that, and his family's life. And --

Q.   Let me stop you there and ask you what kind of threats was Mr. Perardi and his family facing?  What was happening?

A.   They were to be assassinated.

Q.   By who?

A.   By a Mexican cartel.

Q.   All right.  You go to the Wells Fargo and meet Mr. Perardi?

A.   Yes.

Q.   And are you on high alert that day?

A.   Once I started handling funds, I always was on high alert.  Mr. Youngblood was very good at look at your surroundings, if you have any questions, take your car keys out of your pocket, drop them, you look around while you're picking them up.  When you leave with money, go a different direction so you could circle around and see if someone's following you.  I also at that point, even though before him, I always carried, I have a CCW and I carried.  So I had, you know, protection if someone was to try to attack me.

So when I arrived at the bank, I noticed a white 4Runner with two men in it parked near the front door.

Q.   Was that unusual?

A.   Yes.

Q.   Why?

A.   Well, people park and go in.  They don't park and stay in the car.

Q.   Did Mr. Perardi arrive at the parking lot?

A.   He was there when I arrived.  We visited four, five minutes.  He was explaining more of his situation.  He

stayed outside, wrote me a check with his little girl who was in the back seat. I went in, cashed the check, came back. He asked if I had any issues, no issues with the bank, and he said he was off. And I took off myself with the money to go back to the house waiting for Mr. --

Q. Did you notice something different about the 4Runner that you first saw?

A. Yes. I noticed that it had moved and it was now parked backwards where they could see us in the parking lot.

Q. Did that cause you concern?

A. Yes, it did. It made me concerned so that I was very careful when I left, watched what they were doing.

Q. Later, did you get a call from Mr. Perardi that his car had been broken into?

A. Yes. He'd called me in a panic a few hours later, said he had taken his daughter to a play scape place and while they were there, his car had been broken into. It was the rear window where his daughter had been sitting in the back seat.

Q. Not getting into the details because that's what Mr. Perardi would have told you, but at some point later, did you and Mr. Youngblood meet with Mr. Perardi?

A. Yes. Mr. Youngblood asked me to meet him with Mr. Perardi and his friend at the Crossover.

Q.   And did Mr. Youngblood explain why this had taken place, according to Mr. Youngblood?  Why the break-in of the car happened?

A.   It dealt with the divorce Mr. Perardi was going through that was causing the issues of them being -- potential of being assassinated.

Q.   And that was coming from Mr. Youngblood.

A.   Yes.

Q.   Could we have Government's Exhibit No. 105, please. Let's go to page 3 of that exhibit, I believe.  Mr. Holloway, this has already been admitted into evidence, Government's Exhibit 105.  You recognize that letter; is that correct?

A.   Yes, sir.

Q.   Is that a letter that you had written to -- well, just your letter; is that correct?

A.   Correct.

Q.   Who is this letter supposed to go to?

A.   Mr. Perardi.

Q.   It says Holloway Trading and T.A.P. Development are equal partners.  Were you a partner with Mr. Perardi and T.A.P. Development?

A.   No.

Q.   It says for $585,000 each invested.  Had you invested $585,000 with T.A.P. Development in anything?

A.   Part of the items were things I did on some of those items.

Q.   Did Mr. Perardi ever ask you about helping him out with his new planned development, the Kyle project?

A.   No.

Q.   Did you know anything about the Kyle project?

A.   No.

Q.   Would the Kyle project be something that, you know, could use your expertise as a clock person?

A.   Not that I know of.

Q.   Several of the checks that Mr. Perardi wrote to you had Kyle project in the memo line.  Do you know why that was put there?

A.   Yes.  He was in the middle of a divorce and Mr. Youngblood was asking him for funds to keep him supposedly from not being murdered and he -- because of the divorce, he couldn't make certain investments or he couldn't hide money, and this was a way of showing that the money was going to some sort of investment and didn't look like he was breaking the requirements of his divorce.

Q.   And that's what Mr. Youngblood was telling you.

A.   Yes.  And Mr. Perardi indicated the same.

Q.   And we see here, a signed document on April 1st, 2023.  The items had sold for $2 million at the bottom of that.  Do you see that?

A.    Yes.

Q.    That wasn't quite accurate, was it?

A.    That was not accurate.

Q.    They were supposed to be sold but --

A.    Yes.  Mr. Youngblood said he would have -- he had them sold, he just hadn't received the money.

Q.    Okay.  And you gave this to Mr. Perardi; is that right?

A.    Yes.  This is what Mr. Youngblood had asked me to provide.

Q.    At this time, you knew that Mr. Perardi was in financial distress?

A.    Very much so, yes.

Q.    You were in financial distress?

A.    Totally.

Q.    Could we have Government's Exhibit 177.  Do you recognize this document?

A.    Yes, sir.

Q.    It's dated January of 2022.  What's this document in reference to, Mr. Holloway?

A.    The sale of our home.

Q.    Tell me a little bit about what happened with the sale of your home.

A.    Mr. Youngblood came and said that the investment of the painting that had been sold, or whatever, we needed

this money to receive money back and he had to have the money. This was like a Wednesday, I believe, or something, and he had to have the money by Friday or we were going to lose the payment that we needed.

Q. And did he identify a way for you to get this money?

A. Yes. Suggested that we sell our house.

Q. Is this the house that had been paid off?

A. Yes, sir.

Q. You worked your entire life to buy?

A. Yes, sir, along with my wife.

Q. And did you know who Jack Rady was?

A. I did not. Mr. Youngblood came to the house and he was on my computer trying to find people that the type that buy homes that can give you the money right away. And we made a couple of calls. I called one person who said he wanted to come at lunch to look, but Mr. Rady, I called him, he said he would come right away and he came and looked.

Q. All right. And how much did he offer you for that house?

A. Initially, he offered me, I think, 375. I told him 400, he took 400. The house should have been around 6 to 650.

Q. So you took a significant loss.

A. Absolutely.

Q.   And what happened to that 400,000?

A.   Mr. Youngblood took it to hopefully secure the payments so we would eventually have our money returned to us and all that we had invested.

Q.   Are you still in that house?

A.   No.

Q.   What happened after you sold it?

A.   Mr. Rady was very kind.  I had a couple of very large safes that we originally had kept a lot of the valuables in, and Mr. Rady had given us part of the sale that I could stay in the house to March, I believe, and he wanted the safes.  And in talking to him, he let me stay in the house to end of June because I needed to have an estate sale to clear out and I gave him both safes, which he did want.

Q.   And where did you end up moving to?

A.   I rented a house in Elgin.

Q.   Are you still in that house?

A.   No.

Q.   To this day?

A.   No.

Q.   Different one now?

A.   Yes.  I live with my son in Pflugerville.

Q.   So all this is going on and you're still believing in Mr. Youngblood.

A.    Yes.  You could say that.  There's questions.

Q.    What kind of questions?

A.    You wonder if he's real or not, but at this point, you're hanging on to a thread.

Q.    It's been five, six years at this point?

A.    Yes.

Q.    How much money do you think that you're out of at this point?

A.    A little over 3.3 million.

Q.    And anything been returned to you by Mr. Youngblood in terms of anything significant?

A.    No.

Q.    In July of 2023, the FBI comes to your rental home; is that correct?

A.    Correct.

Q.    May I approach the witness, your Honor?

        THE COURT:  You may.

Q.    (BY MR. GUESS) Take a look for identification purposes at Government's Exhibits 286 through 293.  Just take a look and see if you recognize this, Mr. Holloway.

A.    Yes.

Q.    All right.  And those are the photographs from that day at your rental home; is that right?

A.    Correct.

Q.    Mover for admission of Government's Exhibits 286

through 293 inclusive.

MR. GONZALEZ-FALLA:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. GUESS) Could we have 286 on the screen, Ms. Mercado?  And this is your home that you're renting?

A.   Yes, sir.

Q.   What street is that on?

A.   It's, I want to say, 100 West Point Way.

Q.   All right.  And was that your van parked out in front?

A.   Correct.  Yes.

Q.   Could we go to the next slide, please?  Just the entryway to the home?

A.   Correct.  Yes.

Q.   We see at the top, right above the credenza, is that some of the clocks that you have?

A.   Yes.

Q.   Next slide, 288, and we see a picture here of the garage area?

A.   Yes.

Q.   The clock in the background there, is that the kind of clock that you would be working on?

A.   Yes.  That's a rare Ansonia.

Q.   You have a lot expertise regarding those types of clocks?

A.    Yes, sir.

Q.    Next slide, 289, what are we looking at there?

A.    That was my clock shop there at the house.

Q.    And do you still have people working with you on the clocks?

A.    No.

Q.    Just yourself?

A.    Just myself.

Q.    290, see a picture of the closet with a painting. Was that your painting?

A.    Yes.

Q.    And the wrapped paintings next to that, those were your paintings, also?

A.    The one you see is the one we had purchased many years ago and the others were things that he had brought because he would bring paintings -- if you saw them, it was almost like here it is, this is beautiful, let's wrap it, or it could come wrapped.

Q.    So this is collateral that you were holding?

A.    Yes.  It was ours basically what we had given him money for.

Q.    Did you believe it had great value?

A.    Yes for value.

Q.    All right.  Next slide.  First off, do you recognize who this letter is from?

A.    Yes.   This is my cousin.

Q.    All right.   Did she become an investor with Mr. Youngblood?

A.    She had loaned us money to help, you know, bring back the funds that he said we have.   Things that he said he sold.

Q.    This is dated May 14, 2023, signed disappointed Judy. What's the context of this letter?

A.    Well, she had loaned us money because Kota had said -- he asked me if I could get X dollars.   I could -- he says we you could pay them back in like two weeks and he never was able to come up with the funds.   So we would talk and she was just very disappointed that she hadn't been able to be repaid.

Q.    She says here, I was scammed by my first cousin.   Who is that?

A.    Me.

Q.    Did you feel like you scammed her?

A.    At that point, yes, I felt that something was wrong. She probably would never get the money back.   Although I was able to pay her some money back but not everything.

Q.    Next slide.   Are these some of the firearms that you kept in your house?

A.    Yes.

Q.    Now, you've always had firearms; is that right?

A.    I've had rifles, yes.

Q.    Did Mr. Youngblood suggest that you needed to have additional --

A.    Yes.

Q.    -- weapons?

A.    Yes, he did.

Q.    Why was that?

A.    Well, for our protection that we were always -- probably from around the time of COVID on, we were under the threat that the cartel was going to potentially attack or murder us and so, I had a gun, we blocked the doors. My wife never left the house to speak of.

Q.    Did your wife also carry a firearm pursuant to instructions from Mr. Youngblood?

A.    My wife never left the house.

Q.    All right.  Government's Exhibit 293.  And we see here, photograph, this is your wife's bag, a purse?

A.    Yes.

Q.    And it's several documents underneath that?

A.    Correct.

Q.    During this time that you're communicating with Mr. Youngblood, is he giving you instructions in case police officers come up to talk to you?

A.    Yes.

Q.    What's he telling you to do?

A.    Little background, he was telling us that my youngest son was involved with the cartel, that he was wanting us to be murdered.  Same way with the cartel with my older son that we were in danger all the time because of their drug dealings.  And he said that the various three-letter agencies of the federal government were coming in on them and they would be talking to us and you needed to make sure that your wording was very careful that you had no relationship with my kids or their in-law families, otherwise, we could be blamed because they'll be blaming us, them being drug dealers and things of that nature, and we needed to stay clear of that.

Q.    And in fact, did your wife write down a note so she could remember what to say about that?

A.    That is my handwriting and Mr. Kota was -- Mr. Youngblood was giving me and I had him repeat it multiple times so I could write it down word-for-word.  She wanted it so she would have it if she was asked.

Q.    This is what you're talking about right here?

A.    Yes, sir.

Q.    That's your handwriting then?

A.    Yes.

Q.    All right.  And that was kept inside your wife's purse?

A.    Yeah, she kept it.

Q.   Who told you to write that down, specifically?

A.   Mr. Youngblood did and he told my -- told us that the Feds could come into the house with a warrant, but they could not look at her purse and she should keep it in her purse.  So she felt it was secured there.

Q.   On July the 13th of 2023, were you at home or were you outside the home when the FBI executed a search warrant?

A.   I was outside the home.

Q.   Where were you at?

A.   I was at 3709 Rams Horn Way in Round Rock.

Q.   Whose house was that?

A.   It was Mr. Kota's, Mr. Youngblood's.

Q.   Had you been to that house before?

A.   Oh, yes.

Q.   And what were you doing there at the house?

A.   He had asked me to reach out to Chantal Evans, who does estate sells, and he was trying to get her to loan another $27,000 and he was going to give her title to the house as well as title to a white 4Runner that was parked in the garage that had 16 miles on it, and he wanted me to meet her over there that morning.

Q.   So you're supposed to meet someone pursuant to Mr. Youngblood.  Are you with him at that point or just by yourself?

A.    No.  I was by myself.

Q.    So did you get a call from the FBI?

A.    Yes.  Lindsey Wilkinson called and asked me to return home.

Q.    And what did you do when she asked you to come back to your home?

A.    I told her I would be there.  It would take about an hour.

Q.    And did it take you about an hour to get back there?

A.    Yes.

Q.    In that hour.  Did you reach out to Mr. Youngblood?

A.    I did not.

Q.    What did you do?

A.    I was driving and the best way to come back to Elgin from Round Rock is take 79 to Taylor and from Taylor, 95 into Elgin.  And when I was about to get onto 95, I got a call from Mr. Youngblood and he said that the FBI had been at his house and they were on the way to mine, which when Lindsey had called me, asked me to come back, I tried calling my wife and no one ever answered, so I assumed that they were already at my house.

Q.    Was Mr. Youngblood agitated, nervous?  What was his reaction when he told you the FBI was on the way to your house?

A.    No, no.  He was like, you know, everything's fine.

Just, you know, they're calling you for drugs or whatever, just -- and you're not involved in that so just...

Q.   Did you feel comfortable?

A.   Yes.

Q.   All right.  So did you go to your house?

A.   Yes.

Q.   And when you got there, what did you see?

A.   A lot of police cars.  A lot of black cars.

Q.   Eventually, did you find Agent Wilkinson, Lindsey, and talk to her?

A.   Yes.

Q.   Were you cooperative with her?

A.   I tried to be.

Q.   Were you telling her the whole story at that time in terms of what you knew about everything?

A.   No.

Q.   And at a certain point, you asked to have legal counsel; is that right?

A.   Correct.

Q.   At some point, Agent Noble arrived; is that correct?

A.   Yes.

Q.   And did he approach you?

A.   Yes.

Q.   And he didn't want to talk to you but he wanted to do something for you, didn't he?

A.   He wanted me to listen.  He said, I knew you have -- you know, want to have a lawyer with you.  Just listen.

Q.   And what did he do?

A.   He said, I want to tell you first that, you know, I could arrest you on multiple things, but everything Mr. Youngblood has ever told you is a lie.

Q.   And what did he then -- or what was your response to that, I guess?

A.   I said prove it.

Q.   And what happened?

A.   He said your son is alive along with his -- your kid -- your grandkids and his wife and I said prove it.

Q.   What happened?

A.   He opened up his cellphone and he called my son.

Q.   Which son?

A.   Lane.

Q.   The one who had been killed, according to Mr. Youngblood?

A.   Yes, the one who had been murdered and been dead for a month or two.

Q.   And what happened then?

A.   I heard the voice of him talking to Mr. Noble along with his wife, at which point, I knew Mr. Youngblood was a total fake and he was a liar and he had deceived us all along.  At which point, then I told him I revoke any need

for an attorney, I will talk to you about anything you want.  And prior --

Q.   Let me stop you there.

A.   Okay.

Q.   And since that point, you've been cooperating with the FBI?

A.   Absolutely.

Q.   You've gone back over your finances.  Prior to August of 2018, when you wrote that first check to Mr. Youngblood, what's happened to your financial situation?

A.   Disaster.  I have nothing.  I live on -- my wife and I live on our Social Security and have debts out the ear because we had taken out -- Mr. Youngblood would want us to buy things he would sell.  Or there was times he said, I need cash.  You can buy gold from -- a gold company up in Oklahoma and I could -- get to it me and I could convert to it cash.  I've gotta have the cash.  You could buy it on your credit cards.

Q.   Okay.  Definitely financial situation.  How do you relate to people in the Clock Association and these friends that you and Mr. Youngblood approached together?

A.   Very tenuous.  Some really don't even talk.  There's no relationship, should I say.

Q.   Your cousin, disappointed Judy, do you have a relationship with her?

A.    Yes, I do.  Once Justin Noble called and explained everything to her, she said, I know you owe me money, don't worry about it, you don't owe me.  I love you, you're my cousin.

Q.    Mr. Holloway, I'm handing you two items here.  It's a letter dated February 6, 2023.  Do you recognize what that is?

A.    Yes.

Q.    And is that a handwritten will that you wrote for yourself on February the 6th, 2023?

A.    Yes.

Q.    All right.  Government's Exhibit No. 5, do you recognize these two documents?

A.    Yes.

Q.    All right.  And those are the notes that --

A.    I transcribed.

Q.    Okay.  Found in your wife's purse.

A.    Yes.

Q.    Move for admission of Government's Exhibits 4 and 5.

        MR. GONZALEZ-FALLA:  No objection.

        THE COURT:  So admitted.

Q.    (BY MR. GUESS) On Exhibit No. 4, could we have that on the screen.  Do you recognize this as what you considered a will?

A.    Yes.

Q.   Read that second paragraph for us, would you please, Mr. Holloway.

A.   In case of my death, I leave all of my possessions to my wife, Patricia W. Holloway, with the stipulation that she will take care of and support as she sees fit the son of SK Youngblood, currently of Manor, Texas.  Little Kota is 16 years old currently.

Q.   Read the next paragraph.

A.   I note that I leave nothing to my natural-born children.  Lane Thomas Holloway has changed his name.  Allison Leigh Holloway and Seth Michael Holloway.  They know why they are being written off in this will.  If my wife is unable to be the executor of my estate, my first option is SK Youngblood of Manor, Texas.  My second option is Glen Morehead of Round Rock.  By my own hand, James Holloway.

Q.   Even as recently as February of 2023, you still believed in this man, don't you?

A.   Yes.  I could not believe my kids because of the things he was telling me they were doing.  He was constantly telling us -- my wife didn't go to her dad's funeral.  She didn't go to her mother's funeral of fear.  We went to the memorial where the family gathered.  He told us that my youngest son had hired a cartel to shoot our car, things of this nature.

Case 1:23-cr-00135-RP    Document 187    Filed 04/08/25    Page 191 of 281

191

Q.   Okay.  I'm going to stop you there.  I think I'll pass the witness for cross-examination.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. GONZALEZ-FALLA:

Q.   Good afternoon, Mr. Holloway.

A.   Yes.

Q.   Prove it, that's what you told FBI Agent Noble?

A.   Correct.

Q.   When he told you that Mr. Youngblood was lying.

A.   Yes, sir.

Q.   Prove it.  But you never told Mr. Youngblood to prove what he was telling you.

A.   No, sir.  I believed he was -- he had established a relationship of trust.

Q.   So he never proved any of his lies to you?

A.   You can't really prove a lie, sir.

Q.   That's right.  So he never did, did he?

A.   There were things he said, though, that were things you could back up.

Q.   So you've been in sales all your life.

A.   Yes, sir.

Q.   You still were in sales when you were in the clock business?

A.   Yes, sir.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Q.   Right?  And when you're selling something, do you believe in full disclosure?

A.   As much as possible, yes.

Q.   As much as possible.  So there's some things you shouldn't disclose?

A.   No.

Q.   I mean, don't you agree that it's appropriate to disclose things when it's going to affect the decision that somebody's going to make?

A.   Yes.

Q.   And if that disclosure's going to reflect that somebody's been lying before somebody invests money, is that something you should disclose?

A.   Yes.

Q.   Now, you know that going back to 2019, your son Seth had told you that Mr. Youngblood was lying.  Going back, didn't your son show you proof of that?

A.   No, he did not.

Q.   What did he show you?  Didn't he show you what he had found out about Mr. Youngblood?  Did he confront you with some lies that Mr. Youngblood had told you?

A.   He told me what he saw on the internet.

Q.   Uh-huh.

A.   And Mr. Youngblood very early in our relationship had explained that this was stuff that was put on there

falsely.

Q.   Did he prove it?

A.   Well, there was documents on some of the things, but no, I guess the answer's no.

Q.   Seth was able to document, wasn't he, falsehoods that Mr. Youngblood had told you, you just chose not to believe your son?  I mean, you made choices here, Mr. Holloway, right?

A.   Yes, I did.

Q.   I mean, you made a decision to believe that your son, Seth, who is a Ph.D. in electrical engineering.

A.   Correct.

Q.   And you made a choice to believe that he was a member of the drug cartels?

A.   Yes, I did.

Q.   Was there anything about Seth's raising that would have caused you believe that he would join a Mexican drug cartel?

A.   When he quit speaking to me and I did go to his house and when you go to a person's house and there's three cameras parked out front looking at you.

Q.   That wasn't my question.

A.   You asked me why I believe.

Q.   No.  My question was, was there anything about Seth's upbringing that would cause you believe that he would

become a Mexican -- join a Mexican drug cartel?

A.   Seth was known at our house to be an excellent liar.

Q.   So that would make him likely to join a Mexican drug cartel?

A.   For money, yes.

Q.   Was he a criminal?

A.   Not to my knowledge.

Q.   Was he a thief?

A.   Not to my knowledge.

Q.   Was he a drug trafficker?

A.   I couldn't prove it.

Q.   Did he extort people?

A.   Mr. Youngblood said he did.

Q.   No.  Did Seth do that?

A.   I don't know.

Q.   Before you met Mr. Youngblood?

A.   I don't know.

Q.   And then, Lane, what about the way that you raised him would cause you to believe that he would become a member of a Mexican drug cartel?

A.   Money changes people.

Q.   Well, what did Lane ever do to exhibit that he had money that would have changed him?

A.   As I noted, his wife said that they were going to be very, very wealthy.

Q.   But did you ever see him exhibit signs of wealth?

A.   He quit speaking to me, sir.  I have no idea.

Q.   Was that exhibiting signs of wealth him not speaking to you?

A.   Well, I don't know.  I haven't been in his house.

Q.   Did he ever exhibit signs of wealth?

A.   Yes, driving a Porsche, driving a Cadillac, things of that nature.

Q.   And how much was he earning when he was working at Amazon?

A.   I don't know.

Q.   Did you ever know Lane to be a drug user?

A.   No.

Q.   A drug trafficker?

A.   No.

Q.   Somebody who would extort people?

A.   No.

Q.   Did you ever know him to be somebody who would cause injures to somebody, kill somebody, kidnap somebody?  Did you ever know that about Lane?

A.   No.

Q.   And he was also a Ph.D. in electrical engineering; is that correct?

A.   Yes.

Q.   Now, you -- your son Seth had actually reported your

relationship with Mr. Youngblood to Adult Protective Services, hadn't he?

A.    I do not know who did it.

Q.    But you were reported?

A.    Correct.

Q.    And you were visited by people who worked for the state of Texas to investigate this relationship; is that correct?

A.    No.

Q.    You weren't?  You weren't interviewed?

A.    I was interviewed.  They wanted to know if I was safe, if I had money to eat, food, or if I had other problems for financial need.

Q.    But weren't they, in fact, concerned about the large sums of money that you were withdrawing from Wells Fargo?

A.    No, sir.

Q.    They weren't concerned about that?

A.    They did not bring it up, sir.

Q.    They didn't.  They just worried about whether you were eating or whether you had food on the table?  That's what they were worried about?

A.    That's what they asked.

Q.    They didn't ask you about your financial judgment?

A.    No, sir.

Q.    Did Seth raise concerns about your financial

judgment?

A.   Not to me.

Q.   Not to you.  Did he raise concerns about your relationship with Mr. Youngblood?

A.   Yes.

Q.   He was concerned that you were getting conned?  Is that right that, you were being taken?

A.   He did not say that.

Q.   What words did he use then?

A.   He said that Mr. Youngblood was slimy.

Q.   Slimy.  In what way?

A.   I don't know.

Q.   Well, what did you interpret it to mean?

A.   I didn't.

Q.   You didn't?

A.   I didn't put any...

Q.   Well, when Seth said he was slimy, what provoked him to tell you that?

A.   I think he would say that he was slippery or someone that maybe you need to check out to be trusted.

Q.   Okay.  And what about that?  Why?  What did he tell you about him that -- what caused him to do this?  Did he tell you?

A.   You'd have to ask him, sir.

Q.   You didn't ask him?

A.   No.  I didn't.  He told me and that was it.

Q.   So among the things that Mr. Youngblood had told you -- you had given large sums of money and we saw that displayed over here on the screen, you know, when your wife -- when her TD Ameritrade account was drained of the $230,000 and you spent, was it, April 6 going from bank to bank to bank withdrawing large sums of money.  Recall that?

A.   Yes, sir.

Q.   And you give all that cash to Mr. Youngblood, right?

A.   Correct.

Q.   And all that cash that you gave him, did you see any return on those funds that you gave Mr. Youngblood?

A.   Yes, I did.  We received gold coins and things of that nature of value.

Q.   The gold coins and did you have those gold coins appraised?

A.   I did not.

Q.   You said there were things of value.  How did you know there were things of value?

A.   We looked them up.

Q.   Online?

A.   Online.

Q.   And how did you know that they were worth what was online?

A.   Well, if you don't believe everything -- you look up something that says this is what it is.

Q.   So when Seth had shown you things that were online about Mr. Youngblood, you didn't believe it, but when you looked up coins online, you chose to believe that; is that correct?

A.   I questioned Mr. Youngblood, he had an answer.  He had a quick answer for what had happened and why this was going on.

Q.   Why this was going on, why you weren't getting money back, why you weren't getting an actual return?

A.   Why his name was being put out the way it was.

Q.   No.  I'm talking about you not getting anything back for money that you're investing.

A.   We had things that we thought were of equal or greater value.

Q.   What things were those?

A.   Paintings.

Q.   What paintings?

A.   Diamonds, things of that nature.

Q.   What paintings?

A.   There are probably pictures and things.

Q.   Well, tell me about a painting that you had that was of great value.

A.   Well, there were things that he thought was or he

told us were like a Monet.

Q.   Like a Monet?

A.   It was a Monet.

Q.   It was a Monet.  How do you know it was a Monet?

A.   Because it had the Monet name on it.

Q.   Where?  On the painting?

A.   On the painting.

Q.   So that made it a Monet because it had Monet written on it?

A.   He represented himself as being very good in art, represented that his contact with Sotheby's had authorized and told him what this was.

Q.   This is what Mr. Youngblood is telling you?

A.   Correct, your client.

Q.   I'm talking about you getting it authenticated, the painting authenticated.

A.   I don't know where I would go to get it authenticated --

Q.   So was this an actual painting or was it a print?

A.   Today, there were some that were prints.  Some are actual paintings.

Q.   Today, there are some that were prints?

A.   Yes.

Q.   Back then, they weren't prints?

A.   They were.

Q.   So they were prints.

A.   I did not know the difference.  I never claimed to be an art expert, sir.

Q.   Well, I mean, a print is not a painting because there's no paint on a print.

A.   This had a lot of texture.

Q.   The print had texture on it?

A.   Yes, sir.

Q.   So this wasn't something that was wrapped in plastic then?

A.   Some came and he --

Q.   But you unwrapped it.

A.   Some I did unwrap, some I didn't.  Some we wrapped there.  He would bring it in and we would wrap it.

Q.   So would you decide which one to wrap and which one to --

A.   Everything was wrapped, sir.

Q.   Okay.  Well, how did you decide which one to unwrap?

A.   If it came in wrapped, I didn't unwrap it.  I accepted it for what it was.

Q.   Wrapped?

A.   Yes.

Q.   And so, somebody would wrap an oil painting in plastic?  Does that make sense to you?

A.   Yes.  That's how he brought it to me.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Q.    But does that make sense to you that you were doing any research on how you preserve something like a Monet, an oil painting that's a Monet?

A.    He said to wrap it and keep it in a dry environment.

Q.    He said for you wrap it or to keep it wrapped?

A.    To keep it wrapped in a dry environment.

Q.    Any other famous paintings that you had that you collected to secure?

A.    He claimed there was a Rembrandt, which I think is actually a print that has some sort of texture to it that's been put on.

Q.    A Rembrandt?

A.    Yes.

Q.    So he had a Rembrandt, as well?

A.    Yes.

Q.    And where did Mr. Youngblood acquire this Rembrandt?

A.    He said that it came out of someone who had it in a safe for 60 years down in the valley.

Q.    So there was a Rembrandt in a safe down in the valley for 60 years and you believe that?

A.    I did at the time.

Q.    Did you ever look at this Rembrandt?

A.    Yes.

Q.    At your home?

A.    Yes.

Q.   And so, when you acquired this Rembrandt, was it like in security for some of the payments that you had made?

A.   It was an item that I invested a few thousand dollars with him supposedly 50-50 on.

Q.   Okay.  So these items which you had invested in, when did you uncover them and discover that they were prints and not paintings?

A.   When the FBI unwrapped them.

Q.   Oh, so it wasn't until you had had these paintings for years then.

A.   Yes, sir.

Q.   Without checking them out.

A.   Yes, sir.  Mr. Youngblood requested that we seal them up in our house and that's where they were all sealed. Wrapped and sealed.

Q.   Okay.  When you were talking to your friends with the Clock Association, the people that you had gone to to get them to invest, right, because you went to some of your close friends?

A.   I did not go to them to invest, sir.

Q.   You didn't go to them?

A.   No.

Q.   You went with Mr. Youngblood to them.

A.   I took Mr. Youngblood and he talked to them his needs and he talked to them about investment.

Q.   Okay.  So you went with Mr. Youngblood to see your friends.

A.   Yes.

Q.   These were your friends.

A.   Yes.

Q.   These were people who trusted you.

A.   We had a business relationship.

Q.   Your friends at the Clock Association?

A.   We did not go out and eat together, sir, or anything like that --

Q.   But they trusted you.

A.   I trusted them.  They trust -- I mean --

Q.   Well, that's why you went.

A.   Yes.

Q.   That's why Mr. Youngblood took you.

A.   Absolutely.  I'll say, yes.

Q.   So you were there to vouch for Mr. Youngblood, right?  You were there listening to what Mr. Youngblood was telling the people?

A.   Yes.

Q.   The people who were in your Clock Association.  How big is your Clock Association?

A.   Probably regular meetings 12, 15 people.

Q.   How old are those folks?

A.   They're like me, most are retired, retirement age.

Q.   And how often do y'all meet?

A.   Only once a month.

Q.   And where do you meet?

A.   Different places.  Typically one of the meetings was a barbecue joint in Austin.

Q.   And how long have you been a member of this Clock Association and meeting with these folks?

A.   Joined in 2006.

Q.   In 2006.  Were you the president of the Clock Association?

A.   I am of one.

Q.   Was Mr. Devries involved with the Clock Association?

A.   He came to some meetings.  He was a member of the national program.

Q.   And what about Mr. Snider?

A.   He was, too.

Q.   So these are relationships that you formed over time and people would talk about different aspects of clocks at these meetings?

A.   You do programs.

Q.   And you said that when you're associated with clocks, it tends to mean that you're somebody what's honest, right?  Somebody who's reliable?

A.   Yes.

Q.   So you would accompany Mr. Youngblood to meet with

these folks and then, Mr. Youngblood would make his pitch. So what would Mr. Youngblood be pitching when he went to go see members of this Clock Association?

A.    The first member I guess he pitched was to Mr. Snider and to Mr. Devries and that was on the gold medallion, which they physically held in their hand.  Then he went to Mr. Sertich.

Q.    This is like the $10 million coin?

A.    Yes.

Q.    And did it ever sell for $10 million?  Did it ever sell at all?

A.    He took it and he said he -- I had it for probably a year or so, at which point, he said he needed to have it appraised so we could sell it because we had promised to get it sold.

Q.    So the $10 million coin had never been appraised?

A.    It needed to be reappraised because it had been opened.  He said on appraisals, they need to be appraised and put in a sealed container with the correct markings.

Q.    Well, appraisals are in writing, are they not?

A.    Correct.

Q.    Did you see one in writing?

A.    Not on that point.  I never -- he never said it never finished appraise --

Q.    Did you ever ask to see one in writing?

A.   Of that, no.

Q.   When Mr. Youngblood went to these members of the Clock Association about this gold medallion, did you say it had been appraised or did you represent it had value?

A.   I never give my information about it.  Mr. Youngblood represented it to the people.

Q.   So you just stood there and listened to it?

A.   Yes, sir.

Q.   And did you watch your friends pay money?

A.   They gave me money, yes, to give to him.

Q.   What else?  What were the other investments that your friends were making with you present and Mr. Youngblood?

A.   Well, he had a stamp collection that some of them invested.

Q.   What kind of stamp collection?

A.   Very rare stamp collection.

Q.   What made it so rare?

A.   I do not know stamps, sir.

Q.   I know, but what made it rare?  How was it described as being a rare and valuable stamp collection?

A.   Whatever makes stamps value.

Q.   There was no specifics that were discussed?

A.   He gave some specifics.  I saw the collection.  He give some specifics but I don't remember.

Q.   So you saw the collection?

A.   Yes, sir.

Q.   Where did you see the collection?

A.   In my house.  I had the collection for a while.

Q.   Where is it now?

A.   I don't know.

Q.   So --

A.   Mr. Youngblood took it because he said he thought they were not dry enough and the stamps would be sticky and they'd lose their value.

Q.   Were these stamps wrapped in plastic?

A.   They were in some sort of container, yes.

Q.   Did you ever open the container to look at the stamps?

A.   Yes.

Q.   And what kind of stamps were they?

A.   American stamps, I think.  Some of them -- I don't remember, sir.

Q.   You don't know.  Did they have an appraisal along with the stamps?

A.   No --

Q.   To see what the value was?

A.   No.

Q.   What other investments were -- was Mr. Youngblood seeking your friends at the Clock Association to invest in?

A.   Another one that he wanted was a broach that was given to the Apollo astronauts.  Then another one that he used with Mr. Sertich was a manuscript of the Empire Strikes Back signed by all of the key members of the movie.

Q.   So several of the members of the Clock Association did give money, did they not, to Mr. Youngblood?

A.   They did.

Q.   And that money would be given to you, in fact?

A.   Yes, to give to him.

Q.   So when you're accompanying Mr. Youngblood to these places, eventually you're the one who gets the money.

A.   Yes.

Q.   And you're the one who cashes the money.

A.   Yes.

Q.   And you cash the money at the Wells Fargo where people know you and they trust you?

A.   Yes.

Q.   And the amount of money that you're cashing are very large sums of money.

A.   Yes, sir.

Q.   That's kind of the way this worked, right?  You would get a check or cashier's check, go to the Wells Fargo, cash the money and then, give the money to Mr. Youngblood.  That's the way you did it.

A.    He would contact the people, say what he needed, say write the check to Mr. Holloway, he will get the funds when I'm back in town, he'll give it to me.

Q.    What about Pizarro, The Conquerer?  Remember talking about that painting?

A.    Yes.

Q.    Did you ever see that painting?

A.    Yes.

Q.    And who had that painting?

A.    I did.

Q.    Do you still have it?

A.    Yes.

Q.    You still have it?

A.    Uh-huh.

Q.    Is it a real painting?

A.    It's a real painting.

Q.    Is it a print ir a painting?

A.    It's painting.

Q.    What's it worth?

A.    I do not appraise paintings, sir.

Q.    What were you telling your friends it was worth?

A.    Mr. Youngblood said it was worth maybe 75 to a hundred-million dollars.

Q.    Seventy-five to a hundred-million dollars?

A.    Yes.

Q.   You still have it?

A.   I still have it.

Q.   You haven't tried to sell it to make restitution to all these victims?

A.   No.  FBI says it's all fake so it doesn't matter.

Q.   Did you show them this painting, the FBI?

A.   I don't think -- know if they saw it or not.  It was at the house.

Q.   What about the gold?  Wasn't there a big gold shipment that was going to be...

A.   Yes.  He claimed he had 20, $30 million of gold coins.

Q.   Was it gold coins or gold bars?

A.   Initially, it was -- forgot the exact term for gold dollar -- $20 gold pieces or neodynium or something -- that's a magnet.  Some sort of gold coin.

Q.   So initially, it was gold coins and then, it became gold bars?

A.   He claims that the gold coins were stolen by the cartel and through his friendship with the cartel, they were able to get the money returned, but it was going to be in gold bars.  No.  The gold bars was selling another painting that he had sold.  A Rembrandt painting he had sold.

Q.   The gold bars, were, what, a Rembrandt painting that

he sold?

A.   Yes.

Q.   So the gold bars were going to pay for the Rembrandt painting?

A.   No.  He claimed that while he was in California.

Q.   This is going years back.

A.   Yes.  That he had a person who came in that wanted money occasionally.  A man came in and said he needed a couple thousand dollars for some education to pay for some schooling for his son --

Q.   Okay.  So this is when Mr. Youngblood had a store, right, a shop in California?

A.   Yes, sir, that's what he said.

Q.   He came in.  You're talking about him coming to Mr. Youngblood's shop?

A.   Yes.  This person, yes.

Q.   So this person comes into Mr. Youngblood's shop and what does he say?

A.   He said he had some paintings that he wanted some money for.

Q.   Some paintings?

A.   Yes.

Q.   And Mr. Youngblood was interested in acquiring the paintings?

A.   Mr. Youngblood said that he had sold paintings in the

past.  He looked down and they were wrapped and rolled and he saw -- felt that they were old, figured he could get a couple thousand dollars.  If not, the karma of helping somebody was worthwhile so he gave him the money.  He said he put the painting someplace and didn't look at them for several months.

Q.    These are the rolled canvasses?

A.    Yes.

Q.    And then, Mr. Youngblood unrolled the canvasses.

A.    Yes.

Q.    And what did he find?  What did he discover?

A.    He discovered that there were two Rembrandts and another painting for someone else.

Q.    Was that Pizarro, the conquerer?

A.    No.

Q.    Okay.  So two Rembrandts, though, that's pretty good.

A.    Yes.

Q.    And what did he do with the --

A.    Go ahead.

Q.    Yes.  What does he do with these Rembrandts?

A.    He said that when he realized they were valuable, he went to the FBI office, showed it to them and said, here they are and they said, well, they were from the Boston art heist back in the '80s.  They said that time had run out.  They had already been paid for in insurance.  If

they were real, keep them.  It was up to him.

Q.   Okay.  So this is a very famous robbery of an art museum in Boston, right?

A.   Yes.

Q.   So we're talking about two Rembrandts that are really priceless, right?

A.   Yes.

Q.   And so, you're telling us that Mr. Youngblood told you he went to the FBI and they said, ah, the insurance has paid it, you could keep those Rembrandts?

A.   Yes.

Q.   And what's that -- so that's how he acquired title to these Rembrandts?

A.   Correct.

Q.   Did you ever tell your friends this story?

A.   Yeah.  I think I did on one, yeah.

Q.   You're not sure, though?

A.   On the Rembrandt, I think it was mentioned to Mr. Morehead.

Q.   Mr. Morehead.  And why did you only mention it to Mr. Morehead?

A.   Because he came to us -- initially, some of the money that he received from Mr. Devries was to -- he said he had sold this painting.

Q.   Okay.  So we're talking about Mr. Devries giving

money to Mr. Youngblood.

A.   Give it to me to give to Mr. Youngblood, yes.

Q.   Gave it to you to Mr. Youngblood.

A.   To expedite the shipment of this painting to a Russian oligarch that he had sold it to and the Russian oligarch was giving him back gold.

Q.   So we're talking about the Rembrandt.

A.   Yes.

Q.   And Mr. Youngblood has sold the Rembrandt to a Russian oligarch.

A.   Through his Russian connections.

Q.   Through his Russian connections which he had made in California?

A.   Yes, and New York.

Q.   And so-- but he has to get paid for the painting, Mr. Youngblood does.

A.   Yes.

Q.   And he's going to be paid in gold bars.

A.   No.  Gold coins.

Q.   Gold coins.  Okay.  But Mr. Youngblood has to get those gold coins.

A.   Yes.

Q.   And that's a problem, right?

A.   That becomes a problem.

Q.   And so, that's why Mr. Devries is going to give money

so that Mr. Youngblood can get the gold coins that are going to pay for the Rembrandt?

A.   Yes.

Q.   And is that what Mr. Devries gave money to you for?

A.   Yes.

Q.   And how much money did Mr. Devries give to you in order to help Mr. Youngblood get the gold coins for the Rembrandt?

A.   Initially, part was for the stamp collection, part was for the painting, and part was for the whatever -- the thing -- the astronaut.

Q.   The broach?

A.   Broach.

        THE COURT:  Mr. Gonzalez-Falla, it's time for us to break.  Ladies and gentlemen of the jury, we're going to take our second 20-minute break of the day.  Let's call it 1:45, if you could be back in the jury room and ready to be assembled and come back in at five after 2:00.  And if you could follow the instructions previously given, please.

        (Jury not present.)

        (Recess.)

        (Jury present.)

        THE COURT:  Mr. Gonzalez-Falla.

        MR. GONZALEZ-FALLA:  Thank you.

Q.   (BY MR. GONZALEZ-FALLA) So Government's Exhibit No. 306, you've seen this before, Mr. Holloway?

A.   Yes, sir.

Q.   And going to the Clock Association, I was asking you questions about the Devries, which are on the lower corner.  How long had you known the Devries when you and Kota went to talk to them?

A.   Probably 2006, 2007.

Q.   And was Jacob Devries someone who worked with you repairing clocks?

A.   He did probably starting in the later teens of 2000s.

Q.   And his wife so y'all knew each other socially?

A.   Yes.

Q.   And also with the clock connection.  And so, when you accompanied Mr. Youngblood to visit with them, the investment that you were pitching had to do with this painting, or was it the broach, or was it all of these things?

A.   At different times, different items.

Q.   So how many times did you -- what was the series -- what did you start with?

A.   He started with the medallion.  The gold medallion.

Q.   But he started and you were there with him, right?

A.   Yes.

Q.   Okay.  And --

A.   No.   Actually was at our house, I believe, or I don't remember exactly.   It was either at their house or my house.

Q.   Now, this is the same gold medallion that the Sniders had invested in.

A.   Yes.

Q.   Did y'all show him the gold medallion?

A.   Yes.

Q.   And so -- and then they agreed to do what?

A.   They funded -- he needed, I think, like $135,000 and -- but it was just a loan.   It was a loan initially, a very fast turnaround loan and they gave us the money, I'll say, on Wednesday or Thursday.   And I wrote him a check for the $135,000 either a Monday or Tuesday to pay him back.

Q.   Okay.   What was the next investment after that one?

A.   The next investment was the stamp collection.

Q.   That's the stamp collection you talked about.   How much did they invest in the stamp collection?

A.   It was a hundred thousand.

Q.   And so, that was the expectation the stamp collection would be sold down the line?

A.   Correct.

Q.   It was represented that there was a buyer already that was probably going to buy these stamps, right?

A.   He had a buyer in mind is what he understood.

Q.   Okay.  And then, the next -- that didn't go through, did it, the stamps?

A.   Never saw any money.

Q.   What was the next one?  The broach?  Was that the --

A.   I think it's the broach.

Q.   How much was that broach worth?

A.   He represented potentially several hundred-thousand dollars.

Q.   Okay.  And what made that brooch so special?

A.   It belonged, I believe, to Mr. Armstrong.

Q.   Neil Armstrong?

A.   Yes.

Q.   The astronaut the first to land on the moon?

A.   Yes.

Q.   Was that, in fact, the brooch that you had?

A.   I can't appraise that.  You go online, it looked like something that they were given.

Q.   Something that they were given?

A.   The astronauts were given.

Q.   Well, there's several brooches, weren't three?  There's one Neil Armstrong had and there was another brooch.  Did Ms. Devries later raise questions whether this was the brooch that was the Neil Armstrong brooch?

A.   Yes.

Q.   And she raised concerns about this?

A.   Yes, she did.

Q.   He had done some internet research?

A.   Yes.

Q.   And it showed that this wasn't, in fact, the Neil Armstrong brooch.

A.   There were two brooches what Mr. Armstrong -- Youngblood said and this was -- he said it was one that he had, but it wasn't the one she was looking for.

Q.   After the Armstrong brooch, is that when they got involved in the gold or the painting investment?

A.   No.   That was already -- well, that's when she wanted something else and he had me give her a bat that he had. That we had.

Q.   A bat?

A.   Yes.

Q.   Okay.  What was the bat that you gave to the Devrieses?

A.   It was supposed to be a bat used by Babe Ruth.

Q.   And was this bat wrapped in plastic?

A.   Yes.

Q.   Was it wrapped in plastic to preserve the DNA on the bat?

A.   That's what he said to keep that.

Q.   And when Ms. Devries was given the bat, was Mr.

Youngblood there or did you give her the bat without Mr. Youngblood?

A.   I give it without Mr. Youngblood.  He had been at our place, I told him and he said, take the bat.

Q.   So she took the bat and then, when you gave her the bat, then she understood that bat to be the same one that Babe Ruth had used, right?

A.   That's what I've been told.  That's what I related.

Q.   Ms. Devries was getting concerned about the fact that she hadn't seen any money, right?  She hadn't seen returns on her investment.  She was getting concerned that she was going to lose all this money.

A.   They had loaned over $700,000 and we had paid back over 400,000 to her.

Q.   So there was still $300,000 was owed?

A.   Correct.

Q.   And so, you had to take some steps to assure her that she would see her money?

A.   That's why we gave her the bat.

Q.   Did later, she ask for you to sign a loan agreement?

A.   Yes.

Q.   And did you sign the loan agreement?

A.   She asked for Mr. Youngblood and I to sign the loan agreement.

Q.   Did you sign the loan disagreement?

A.    I did because he refused to sign it.

Q.    So you were the only one who signed the loan agreement.

A.    Yes.

Q.    Again, you were representing to your friend, Ms. Devries, that she would receive her money.

A.    Yes.

Q.    She did not receive her money.

A.    Not all of it.

Q.    Not what you agreed to pay in that loan agreement.

A.    We paid -- he paid me, provided money for, I believe, three or four payments.

Q.    But you didn't pay what was owed?

A.    We did not finish the payment.  He did not have the money after that.

Q.    Okay.  So now, what about Mr. Glen Morehead?  Mr. Glen Morehead, who's over here, and Leslie Morehead, they're a couple?

A.    Correct.

Q.    Correct?  And you went to Mr. Morehead, as well, did you not, to pitch an investment to them?

A.    No.

Q.    No?

A.    No.

Q.    What did you do?  Did you get money from Mr.

Morehead?

A.    I took Mr. Youngblood there, who asked Mr. Morehead

for $5,000 to bury his dead son who was murdered in

Mexico.

Q.    Okay.  Mr. Youngblood's son?

A.    Yes.

Q.    And so, why were -- so you brought Mr. Youngblood to

Mr. Morehead so he could borrow $5,000 to bury Mr.

Youngblood's son?

A.    Yes.

Q.    And is that what happened?

A.    He loaned him the money.

Q.    Did he loan him more money?

A.    Yes.

Q.    How much more money?

A.    Probably close to a million dollars or over.

Q.    And so, when he loaned him this money, did he also

give it to him in cash?

A.    He gave it to me in cash.

Q.    And so, he wrote -- how many checks did he write to

you in cash?

A.    I couldn't say.

Q.    You couldn't say?  You don't remember?

A.    I don't keep records of that, sir.  Mr. Youngblood

called and said to Mr. Morehead, I need money, this is how

much I need.  And Mr. Morehead talked to his wife and they would come up with the money.  They had to move it out of retirements or different funds or...

Q.   So how many checks do you think -- how many, just the number of checks do you think Mr. Morehead wrote in your name for you to cash?

A.   Six, seven, I don't -- I'd say something like that --

Q.   And the amounts that these checks totaled was in excess of a million dollars?

A.   I would say yes.

Q.   And so, in all this cash, did you always go to that Wells Fargo Bank and cash the checks there?

A.   On those, yes.

Q.   And none of these involved any kind of a wire transaction.  These are just --

A.   Not to me.

Q.   Not to anybody.

A.   Well, there may have been a wire transaction from Mr. Morehead's wherever the security of the money was at to his bank account.

Q.   You just don't know because you just received a check and then, you went to your bank and you cashed the check.

A.   No, sir.  I met Mr. Morehead at the Wells Fargo Bank where he wrote a check at the bank and he either cashed it and gave it to me or he -- in his name or he wrote it out

to me and cashed it with us together.

Q.   Okay.  So these items that Mr. Morehead was giving you cash for on six different occasions in denominations that had to exceed probably 20, $30,000, correct?  $30,000 --

A.   Yes.  I'd say, yes --

Q.   -- $50,000?

A.   Probably 70, 80,000.

Q.   And this was occurring during what period of time, do you recall?

A.   It was in '23.

Q.   In 2023.

A.   Yes, sir.

Q.   Was that February of 2023 around the same time that y'all are -- that you're visiting Mr. Perardi?

A.   Mr. Perardi, I believe, started in '22.

Q.   Right.  So they overlap?

A.   Yes.

Q.   This overlaps.  And so, the specific things that Mr. Morehead was giving y'all money for, did it involve gold?

A.   He -- good question.  Okay.  It was supposedly he had sold again this Rembrandt painting.

Q.   Okay.  We're talking about Mr. Youngblood?

A.   Yes.  And he was going to be paid -- initially, he came to Mr. Morehead, myself and said, okay, I can be paid

in cryptocurrency but I don't think that's wise, and we all agreed because none of us think crypto is the way to go financially, and then, he said, well, I can get it in gold so that's like okay.  So that's what Mr. Morehead was helping with the gold.  So we were expecting gold and that's where gold bars came in.

Q.    So these gold bars were where?

A.    They were being brought into Cayman Virgin Islands.

Q.    Is this the Russian who's paying for the Rembrandt? He's having the gold being brought in --

A.    This is a different Russian.

Q.    It's a different Russian.

A.    Yes.

Q.    So do we have two different Russians and two different Rembrandts?

A.    Same Rembrandts.  The first Russian couldn't make the agreed payment.  The painting came back, according to Mr. Youngblood.

Q.    It was returned to Mr. Youngblood?

A.    It was returned.  He said he did not have possession of it.  He had a friend who had possession of it.

Q.    Of the Rembrandt?

A.    Yes.

Q.    Okay.  So now, this other Russian is going to be making a payment to Mr. Youngblood in gold bars?

A.    Yes.  Uh-huh.

Q.    And how many gold -- how much gold?

A.    Supposedly, couple hundred million.

Q.    Couple of hundred-million dollars worth of gold.

A.    Yes.

Q.    And so, that has to be shipped; is that right?

A.    That's what he said.

Q.    Then it's going to be shipped through, what, the British Virgin Islands?

A.    It was coming through the British Virgin Islands. Claimed it was there.

Q.    Okay.  So the gold is there at the British Virgin Islands.  It's just a matter of getting this payment so that the harbor master can free the ship?

A.    He has the details.  It was various items of how initially, he came through with some cash and showed a gold bar, you know, to us and had some cash, but he started saying some of it he had to pay off so many people to get the gold bars into the U.S.

Q.    So now he's having trouble getting the -- so the money is going to free the ship up?  Is that what's going to happen?  It's going to release the gold?

A.    Yes, to release the gold.  Initially, he claimed that he had a very good friend who was an attorney.  Or I forgot what the British term is for an attorney.

Q.   Like a barrister?

A.   A barrister, that's right.

Q.   Solicitor?

A.   And a solicitor.  And he was one of the main solicitors, had one of the big firms.  He was an older guy but he was great friends them, that he had made friends with them years ago and that he was helping him to secure all this and to get the gold.

Q.   So you received the money.

A.   He received the money.  Or he received the gold.

Q.   You received it first, right?

A.   What?

Q.   The money from Mr. Morehead.

A.   Yes.

Q.   And then, this money is given to Mr. Youngblood.

A.   Yes.

Q.   And then, the gold doesn't get free.

A.   Yes.

Q.   The gold still was held, right?

A.   Still there, yes.

Q.   Is it still there now?

A.   I have no idea.  At this point, I'd have to say there was never ever any gold.

Q.   So that was Mr. Morehead.  Now, what about Mr. Sertich?

A.   Yes.

Q.   You went to Mr. Sertich, as well, right?

A.   Yes, twice.

Q.   And the investment that Mr. Sertich made had to do with, is it, Star Wars?

A.   Yes.  The Star Wars, the manuscript.

Q.   And did you ever acquire the manuscript that Mr. Sertich --

A.   Mr. Sertich held it in his hand and Mr. Youngblood, he told him he could keep it if he wanted until he could secure the deal and he was going to sell it back to the producer of the movie.

Q.   The producer of?

A.   Producer or director, someone.

Q.   Of Star Wars?

A.   It was like Skywalker Enterprises.

Q.   So Mr. Sertich paid money, then he was going to profit from this when that manuscript was resold?

A.   He promised him that it would be sold and he would get his money.

Q.   And that didn't happen.

A.   It did not happen.

Q.   And again, you received the money?

A.   Yes.  He gave me a check for that, yes.

Q.   And how much money was that?

A.    A hundred thousand.

Q.    A hundred-thousand dollars in cash?

A.    Yes.

Q.    And when did that happen?

A.    Probably January of -- I don't know, I'd have to look.  You probably have the information.

Q.    January of?

A.    Might have been '22.

Q.    '22?

A.    Probably, yeah.  I think it'd be '22 now.  Yes.  It might have actually been before January.  Might have been in '21.

Q.    So did you ever make any payments to Mr. Sertich?

A.    Yes.

Q.    How much?

A.    15,000 to 20, something like that.

Q.    Okay.  And so, what was the amount that was remaining to be paid to Mr. Sertich that wasn't given to him?

A.    Frankly, it would have been about 200,000.

Q.    Did you also sign a note to Mr. Sertich?

A.    I did.

Q.    And was that your name on that note?

A.    Yes, it was.

Q.    And so, of course, you're giving your word then. That's not Mr. Youngblood --

A.   I believed Mr. Youngblood was going to come through with his promise, yes.

Q.   Now, we know that we were talking about Mr. Perardi and how you began to -- you met Mr. Perardi.  Was it the first time that you met him that involved the money transfer?  When you actually met with Mr. Perardi, was this when the vehicle was broken into?

A.   The first time I shook his hand was at the Crossover whatever.

Q.   Okay.  That's when you met him but that didn't --

A.   First time, it was just a casual one person, Eric Swanson, said Jay, meet Mr. Perardi.  He was doing something, some paperwork or something on a computer and he stood up we shook hands and that was it.  The second time I met him would have been at the money transfer of the bank where his truck was broken into.

Q.   Okay.  So before that, though, you had received some Fed Ex packages that contained --

A.   A check, two.

Q.   The check.  And do you recall when you received those Fed Ex packages, there were two, right?

A.   I think one each week.  One one week and one the following week.

Q.   And that was it.  There were to more Fed Ex packages apart from --

A.   To my knowledge, no.

Q.   When you received the first Fed Ex package, did you open it up to see what was inside?

A.   Yes.  I was instructed to open it and take the check as soon as I could when the bank opened at 9:00.

Q.   Was the check made out to you?

A.   Yes.

Q.   And so, the date on the check, was it the same day more or less that you received?

A.   I would assume when he wrote the check.

Q.   Okay.  So you get a Fed Ex package, you open it up, you examine the check, it appeared that that check -- the date on the check matches more or less the date that you received the package.  Do you follow me?  So if you open up that package on July 7 and the check is written for July 6, it's the next day.

A.   Yes.

Q.   And did you check the dates on those checks and compare them?

A.   Yes.

Q.   You received the Fed Ex package.  So both checks that you received in a Fed Ex package arrived about the same date that they had been written?

A.   Yes.

Q.   And then, when did you take the checks to be cashed?

A.   The day the Fed Ex package arrived, I took it at 9:00, I was at the bank.

Q.   And then, you went to the bank, then you cashed -- I think one was 80 -- do you remember the amounts?

A.   Those records were taken by the FBI, but yes, they were like 80 or 78,000, something like that.

Q.   And so, you went to your Wells Fargo Bank that same morning, cashed the check, and then, took the cash with you?

A.   Yes.

Q.   Is that right?

A.   Correct.

Q.   With both checks?

A.   Correct.

Q.   Okay.  Now, you knew that Mr. Perardi apart from having the -- you know, believing and being told that his life was in danger, you knew that he was also going through a divorce, right?

A.   No.

Q.   You didn't?

A.   With these checks, I knew nothing about it.

Q.   But later on, you did?

A.   Yes.

Q.   I mean, later on, you learned that he was going through a divorce?

A.   Yes.  Mr. Youngblood gave me great detail of what he was going through with his wife and her connections and things of that nature.

Q.   If we could have Defendant's Exhibit No. 10. Investment -- this is a forwarded message from Jay Holloway, dated September 30, 2022.  You see this e-mail?

A.   Yes.

Q.   It's Defendant's Exhibit No. 10.  Do you recognize this?  It's a forwarded message, Jay Holloway.

A.   Yeah.

Q.   Please check to make sure it's correct, thanks.

A.   Okay.

Q.   And then, he says thank you, can you change to T.A.P. Development, LLC.  Just one proper entity.

A.   Yes.  I had received money from Mr. Youngblood to pay Mr. Perardi back and I wrote the check out to the wrong name.

Q.   Okay.  Let's go up a page.  Page 2.  So let's go to Defendant's Exhibit 11.  This is a letter T.A.P. Development, LLC, Eric Perardi owner, and it's signed by you and Mr. Perardi, right?

A.   Correct.

Q.   Now, there you describe this business agreement to acquire unique items to resale for a profit.  Then you write that you agree to a 50-50 split of the items sold.

Now there you list these clocks.  Are those real clocks?

A.    Yes.

Q.    And do you own these clocks?

A.    I did at one time.  A couple, yes.

Q.    This is the American tall case clock, English tall case clock, American wall clock by E. Howard 1870s, a Tiffany standing lamp made for and dedicated to Notre Dame cathedral 1900, is that something that you owned?

A.    Yes.

Q.    And then, you say the items were assembled with a broker outside the United States for his client.

A.    That's what we were told to put down.  This is what Mr. Perardi -- I mean, Mr. Youngblood specifically said to note on this.

Q.    This is what he told you to put down?

A.    Yes.

Q.    And you wrote this.

A.    Yes.

Q.    So were the items assembled with a broker outside the United States?

A.    You would have to get that from Mr. Youngblood.

Q.    You were the one -- you owned the clock, right?

A.    Mr. Youngblood was the mediator putting this together.  He's the broker.

Q.    Okay.  The clocks, though, are items that you own,

right?

A.    Not all of them.  Mr. Youngblood said just list them. People are stupid, they don't know the difference of the value or whatever.  But because I did have a couple of these items, I listed them.

Q.    Okay.  So then, you say the payments -- the buyer required special considerations which we have accommodated to maximize our profit and delayed payment through the broker.  The payments are scheduled over 12 weeks due to the foreign currency exchange.  And then, you have the items sold for 2 million less broker fees putting all this stuff in there.  Now is this --

A.    This was directed to me by Mr. Youngblood.

Q.    Okay.  And so, is this something that's supposed to characterize an investment from Mr. Perardi?

A.    Yes.

Q.    Is it something that Mr. Perardi can then later receive a return on this investment?

A.    That was what we were anticipating that he'd receive money and I would also receive something back.

Q.    And the amount you expected to receive would be the two million?

A.    Yes.

Q.    Less broker fees?

A.    Yes.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Q.   And so, how were you and Mr. Perardi and Mr. Youngblood, was he also going to receive this money?

A.   The money would go to Mr. Youngblood, who was going to be providing the money to us.

Q.   Okay.  So Mr. Youngblood, you and Mr. Perardi would be equal partners?

A.   Yes.  I guess you would say that, yes.

Q.   And so, you would then split up this $2 million among yourselves?

A.   Yes.

Q.   Now, this was something --

A.   Let me back up.  This was not money that probably would -- well, the money was to come from sale of the painting.

Q.   Okay.  So what we have is money that you would expect to receive but it may not be for clocks?

A.   Yes.

Q.   So the clocks are just there as a cover for the real source of the money, which is going to be the paintings?

A.   This was a cover so that Mr. Perardi would not be violating the issues of his divorce.

Q.   Okay.  So while it is covering the issues for his divorce, it's not covering the expectation that he's going to receive money.

A.   It was recovering the money that he had been giving

Mr. Youngblood for protection. Paying him back for that money.

Q.   And plus some? Was there going to be more?

A.   I believe that's about what Mr. Perardi had invested with Mr. Youngblood.

Q.   Okay. So you used the word "investment." Was there anything else --

A.   What he had given -- invested to Mr. Youngblood for his protection.

Q.   Okay. Could we go see No. 12, Defendant's Exhibit No. 12. So do you see this letter, September 30th of 2022? Now, that's sometime before that it says Holloway Trading and Eric Perardi entered an agreement for antiquities for investment and resale purposes. Here again, there's a reference to clocks.

A.   Yes.

Q.   Is that also tied into that other?

A.   This was the first letter, I believe, that Mr. Youngblood had asked me to put together for Mr. Perardi.

Q.   And again, this is another cover letter for purposes of the divorce. It's a way to cover the expenses, what he's investing so that --

A.   Yes. He did not feel that it was good to go and say to the divorce attorney, my wife's trying to murder me, I need to pay this. So that's why this was put together

because this was what Mr. Youngblood had told him was happening, according to Mr. Perardi to me.

Q.   Well, there was also -- wasn't there also some other aspect of the money being put toward gold?

A.   No.

Q.   Did you ever learn about any of that?

A.   This had nothing to do with Mr. Perardi, the gold.

Q.   Now, let's go to Defendant's Exhibit No. 88.  Now, there was a series of text exchanges between you and Mr. Perardi and I just wanted to see if we can cover some of these.  Now, this is the first page.  The bottom of that previous page, page 1.

Now, in green is Mr. Perardi, right?  He says, I need to get money back from clocks.  Is that a reference to this agreement about the clocks?

A.   Yes.

Q.   Do you know?

A.   We were anticipating Mr. Youngblood would fulfill the deal and he was saying every week, I've got money coming, I have money coming.

Q.   Okay.  So we go to the next page and there, again, you see that Mr. Perardi saying, I need to get money back from clocks.  My credit score is down.  And then, you say hang in there, right?

A.   Yes.

Q.   That's what you say?

A.   That's what Mr. Youngblood kept telling me, you tell him to hang in there.

Q.   And then, you write, I deleted the e-mail.  Your ex is seeing my phone texts, et cetera, right, at the very -- see at the very bottom?  I deleted the e-mail.  Your ex is seeing my phone?  That's your text?

A.   If it is, it was because yes, Mr. Youngblood was telling me everyone was monitoring my phone, my texts and my e-mails and everything.

Q.   All right.  Now, let's got the next page.  Mr. Perardi writes, it's all money I owe that she can't get in divorce but I need clocks sold obviously.  Do you know what he's talking about there, it's all money I owe that she can't get in the divorce?  You don't know?  And then, you say steady forward.  Just kind of keep keeping him in good spirits?

A.   That's what Mr. Youngblood kept telling me.  You've got to handle Mr. Perardi.  He's, you know, getting freaky and shaky.  You've got to keep him because we're going to get all this money and he's going to be taken care of along with myself.

Q.   And then, the next page, he says, any new number to text for update.  You say no.  This is towards the bottom.  I have to have something back next two days.  What is the

status of the clocks.  This is, again, referencing to when he's going to --

A.    Supposed to have money to settle the clock to make this look --

Q.    So down how Kota was going to settle these clocks? Do you know where he was going to get the money or how much money he was going to get?  Did Mr. Youngblood ever talk to you about that?

A.    He claimed he was getting money from different sources.

Q.    And then, the next page, you say, but you have the clocks, correct?  Mr. Perardi asked you, you have the clocks, correct?  What is that a reference to?

A.    To a couple of clocks, yes.  I did have a couple.

Q.    So these are the clocks that were going to be sold for the $2 million?

A.    Theoretically, yes.

Q.    So did Mr. Perardi believe that these clocks were worth that much?

A.    I have no idea.  I cannot speak for what he believed.

Q.    Did you ever talk to him about the clocks?

A.    No.

Q.    Did he know that you were the one who had the clocks?

A.    Yes, he knew I had some of them, some of the stuff.

Q.    But he didn't talk to you about it.

A.   No.  His focus was on the fact that he was afraid for his life and the lives of his children.

Q.   So he writes later down there on -- the next page. Keep me posted on both.  Obviously they have different challenges and preparations and then, you say, will do. Do you know what Perardi means when he's asking you about both?

A.   Not at this date.

Q.   Back then, you would have?

A.   I would have.

Q.   But you don't recall?

A.   I do not.

Q.   That was a reference to -- do you know what it could have been a reference to when we're talking about two items in this text message?

A.   I would think one of them -- there was a couple of things.  Mr. Youngblood had said that part of money that he needed from Perardi was the information showing that his wife that he was divorcing was filmed and had information that she had made with the Mexican cartel to murder Mr. Perardi and his kids, and supposedly, it was being kept in some sort of pelican case and Mr. Youngblood was telling him, I'm getting that pelican case and Mr. Perardi kept saying, I need it to take, you know, for proof.  And Mr. Youngblood was saying, I'm going to get

it.  I suspect this is what one of them was.  And the other was about getting the gold to pay off on the clock deal so he could be repaid for the money he invested with Mr. Youngblood.

Q.    Okay.  So you just made a reference to gold.

A.    Yes.

Q.    You said to get the gold to pay off on the clock deal.

A.    I took it Mr. Youngblood was getting gold.  That's what he --

Q.    So the gold is sort of looming in the background of all of this --

A.    Yes.

Q.    That's what's going to fund all of this.

A.    He liked to use gold as a monetary thing because he said it was harder to trace.

Q.    He says, I have to talk with my attorneys next week so need sooner than later.  Held off as long as I could.  You say yes, items being released but delivered end of week.  Okay.  Now, those items what your referring to, is this what's in th pelican case?

A.    Yes.

Q.    And then, the next page, Mr. Perardi writes here, hey, things are heating up for me.  Just keep me posted of any problems or changes.  A lot moving at me right now,

right?

A.    Yes.

Q.    Then you write, will keep you in the loop as I know any updates.

A.    Yes.

Q.    He refers to John Mapes as freaking out, as well. That's somebody who you met, right, John Mapes?  Did you ever meet John Mapes?

A.    Yes, I met John.

Q.    Next Thursday.  I know everyone's freaking out and then, you ask him to take a deep breath.  And then, the next page, you say -- he writes, please, I need help and answer, and then, you write he is working on help now a little later today.  Mr. Perardi writes, my whole world is gone, money, businesses, home.  Now my father this much -- it's just too much.  And then, you say you're strong, you will win.

       When you say you will win, are you referring to hi divorce?

A.    To the fact that Mr. Youngblood, I believed, was going to come through with what he had promised, at which point, he would win.  He would get all his money back as well as Mr. Youngblood promised that he'd give him some more money so he would be able to financially restart his business career.

Q. So Mr. Youngblood, you said, had promised to give him more money.

A. Yes.

Q. That's more money than he had received for this --

A. Yes.

Q. -- protection, right? And the amount of money he had promised to give him was a lot more, wasn't it?

A. I don't know exactly how much. He just said more.

Q. But it was more. And that money would be channeled through the sort of clock investment somehow?

A. That was my understanding.

Q. It somehow would be done off the books, so to speak, or in a legitimate way, papered in such a way that he would get it.

A. Yes.

Q. And part of him winning, too, would involve him winning his divorce.

A. Correct.

Q. Winning custody of his daughter.

A. Correct.

Q. And then, the next page, now there Mr. Perardi appears to have forwarded you a text that shows he's having problems with the money and how pathetic and humbling it is. And then, you write, I will show him this text when I see him. You're referring to showing Mr.

Youngblood the text about how much money problems he's having, right?

A.    Yes.  Mr. Youngblood's not wanting to talk with Mr. Perardi.

Q.    You're the screen, you're kind of the shield?

A.    I'm kind of the shield.

Q.    Okay.  So the next page, you write, maybe later today or tomorrow.  And then, he says, also tell him I want to discuss real estate investments.  Okay.  Do you know what Mr. Perardi meant by that?

A.    No, I really do not.  I would assume it was maybe Mr. Youngblood had been speaking with him and told him that he had funds or would want to invest in other real estate investments with him.

Q.    But you don't really know --

A.    I have no idea.  I'm just speculating.

Q.    Then the next page, you tell him, when K returns, referring to Mr. Youngblood, right?

A.    Yes.

Q.    Because he's asking you when do you expect him back.  And he's asking about an update on the timeline because he just lost shares in Crossover.  Now, that's dated March 1st of 2023.  Next page, he writes thank you for today.  Please let friends know about my divorce lawyer order.  Thank you.  Now, he's asking you let your friends know

that.  Do you know who he's referring to?

A.    Just, I guess, Mr. Youngblood.

Q.    Okay.  And then, you said will do.  When he says my divorce lawyer orders, do you know what he's referring to about divorce lawyer orders?

A.    No, sir.

Q.    He says, talk with John today.  He said his investment can be cash or check returned excellent figure cash.  Now, is this about Mr. Mapes?

A.    If it was John, it would be Mr. Mapes, I would believe.

Q.    And so, there he's talking about Mr. Mapes making a cash payment in support of Mr. Perardi.  You say excellent figure cash.  You were talking about getting money back?

A.    This was talking about getting money back, yes, that Kota said that he would pay.

Q.    Okay.  The next page, he says -- okay.  I can deposit directly into your account for Wells Fargo.  Who are you referring to there?  Is that Mr. Perardi?  Mr. Perardi writes, no.  Just wanted you all to know that I have Mazzy quite a bit.

A.    Yes.  That's his daughter.

Q.    That's his daughter?

A.    Yes.

Q.    And so, he's letting you know that she's going to be

with him and then, you say okay?

A.   Yes.   Mr. Youngblood was saying he would have funds and you can deposit money into someone's account as long as you have their account number if you're in the same bank.

Q.   Okay.   And then, he says let me know when, you know, it's Thursday or Friday, will do, figure Friday at this point.   Do you know if funds were ever deposited?   Would you have been the one to do that?

A.   I don't think I would deposit any money.   I think at this time, so many contacts, it could have been something I gave him a check.

Q.   Okay.   The next page.   We see he writes good morning -- this is March 13 at 11:10.   Mr. Perardi writes, good morning.   I need to speak with K about my D and lawyers ASAP.   Do you know what he's referring to there?  Does D mean divorce?

A.   I can't say.

Q.   Do you know what else it could be besides that in the context of what Mr. Perardi --

A.   I'm not sure.   I have no idea in that context.   If you want to assume --

Q.   Which is dangerous --

        MR. GUESS:   I object.   Speculation --

        MR. GONZALEZ-FALL:   Well, that's fine --

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

MR. GUESS:  -- it's been asked and answered.

Q.    (BY MR. GONZALEZ-FALLA) Later, he says will meet you in a few hours.  Need to do three things first.  Are you at Nicole's.  Did you meet with Mr. Harwood?

A.    I'm sure I did.

Q.    Do you know what y'all discussed?

A.    No, I don't remember, but it had to do with something, I'm sure, the debt being paid that we were looking for Mr. Youngblood to come through with the money that he promised he would come through with.

Q.    Okay.  So the next page, Mr. Perardi writes, I need some answers for my decisions this week.  Do you know what he's referring to there, the decisions?

A.    I don't know.

Q.    He writes, I just need a direction to start again.  Do you know what he's referring to there?

A.    No.

Q.    You say, I gave what I know.  What are you talking about when you say, I gave what I know?

A.    I'm sure he is asking me to relay this information to Mr. Youngblood.  I gave what I know to Mr. Youngblood.  Mr. Youngblood, many times, was telling me, I just can't deal with him.  You gotta deal with him.  But it's like you've got --  I would talk to Mr. Youngblood and say you really need to talk to Eric.

Q.   Okay.  You say, delay anything involving X is my suggestion.  So now when you say X, are you referring to Mr. Perardi's ex-wife or soon-to-be ex-wife?  Earlier, you had said in a text that you believe the X was able to see your texts.  You used the letter X.

A.   Probably had something to do with that.  I don't want to speculate.

Q.   So you're telling Mr. Perardi, delay anything involving the X.

A.   I think it was he was -- his attorney, his divorce attorney was pushing him to let's close this divorce out and he was trying to delay it.

Q.   So he could get the money?

A.   Yes.

Q.   And then, almost impossible, unfortunately, that's Mr. Perardi saying that.  And then, you say take the fifth.  That protects what is working.

A.   He was like okay.  If I go to the divorce and say my ex-wife is trying to have me murdered along with my kids, how is this going to look?  He said that's not going to look.  He's like can't say that because I don't want -- he didn't want to bring that up.

Q.   So you're advising Mr. Perardi to take the fifth so he doesn't have to disclose that his wife is maybe having him killed --

A.   Yes.

Q.   -- like that's somehow incriminating to Mr. Perardi?

A.   To him, it was.

Q.   It was incriminating to him that his wife would want him killed?  That's --

A.   Whatever reason he wanted, he didn't want to bring it up to them.

Q.   He writes, the fifth will be used against me in a divorce court, all lawyers say so.  And then, you say, stay cool and remember what was discussed.

A.   Yes.

Q.   So when you say, remember what was discussed, do you remember what was discussed?

A.   I do not at this time.  It probably had to do with things Mr. Youngblood was --

MR. GUESS:  I object.  He's speculating now.  He says he doesn't know.

THE COURT:  I'll allow the answer.

Q.   (BY MR. GONZALEZ-FALLA) Go ahead.

A.   It was things that Mr. Youngblood had discussed with him.

Q.   So remember what was discussed.  Were you present during the discussion?

A.   No.

Q.   Because it seems when you read that, that it's

suggesting that I remember what was discussed.

A.   I normally was not present with a lot of -- any discussions that Mr. Youngblood had with Mr. Perardi.

Q.   Okay.

A.   I would get the answer.  He would talk and then, Mr. Youngblood would call me and say this was what I discussed.

Q.   Okay.  Then further down, he says, if don't have money, you don't have funds.  That's you telling Mr. Perardi, you don't have it, you don't have it, right?

A.   Yeah.

Q.   And yet, Mr. Perardi says, that is not what court order says.  That is problem investment was not allowed. That's why I have been so stressed about getting it back. So do you know what he's talking about there?

A.   Yes.  That was the investment -- the information, the clocks where he was trying to hide the fact that he was spending money to try to keep the cartel from murdering him and his kids.

Q.   Okay.  And also, the investment that was papered with that clock arrangement and where Mr. Youngblood had promised that he would get more money.

A.   Yes, sir.

Q.   In addition to what was paid for the protection payments.  March 31, the bottom.  Okay.  There, Mr.

Perardi writes at the very bottom, please send the e-mail describing the investment timeline.  I sent you an e-mail yesterday.  Do you know what he's referring to there, describing the investment timeline?

A.   That would probably be one of the letters that you already had on the screen on the payment schedule.  It would be paid in six months or whatever.  This was per what Mr. Youngblood had instructed me to put down.

Q.   And so, this was also something that would be helpful for him to use during his divorce?

A.   Absolutely, yes.

Q.   To describe the investment.  Now, you actually had conversations with -- or at least you left him a voicemail, did you not, Mr. Perardi on his phone about what was going on?  Do you recall doing that?

A.   I tried to respond to him on anything that he requested.

Q.   In your dealings with Mr. Perardi, did he have -- I mean, clearly he believed that his wife wanted to kill him?

A.   Yes.

Q.   Or he had a belief at one point that his wife wanted to or was going to kidnap his son, as well, right?

A.   Yes.

Q.   But had those things been resolved at some point?

Like the whole idea that he was going to be killed by his wife, was it your understanding that Mr. Youngblood had actually intercepted the assassins?

A.    Yes.   He said that he'd used his contacts with the Sinaloa cartel who had stopped the attacks.   Didn't mean that there would not be more.

Q.    But that attack that initially led to the first payment had been resolved.

A.    I guess.   Again, the first couple of payments, I had no idea what they were involved.

Q.    I think you in an e-mail that you had sent to the FBI, I think you had written that the funds were for the help from Elvis.   He was told there were three men involved and two were taken out.

A.    Yes.

Q.    And so, that's --

A.    That's what Mr. Youngblood told me and the other one went into hiding, I was told.

Q.    Okay.   Then the next series of payments had to do with the stuff that was in a pelican case that related to the retrieving of the video of his wife making a video with the cartel.

A.    That's my understanding.

Q.    And then, that was going to be a clear way for Mr. Perardi to win his divorce.

A.   That's my understanding.

Q.   And is that when you met Mr. Perardi at the Wells Fargo is for the first time in connection with that payment that was going to be used to acquire the pelican case with the recordings?

A.   I don't know what the funds were to be used for.  I simply acquired the funds.  If it coordinates with the bank in that, then yes, that.

Q.   Now, Mr. Perardi had -- believed that and had been led to believe that he had collateral that far exceeded -- I mean, it was worth -- maybe like the flag was worth between one and a half to $4 million; is that correct?

A.   That is what Mr. Youngblood kept telling everybody.

Q.   Kept telling you and Mr. Perardi?

A.   Yes.

Q.   And that flag was something that Mr. Perardi would then be able to keep for himself if things didn't work out?

A.   Yes.

Q.   And that's something that he would keep outside of the divorce, as well, right?  You don't know?

A.   I'm speculating.  I don't know.

Q.   I'm going to play what's Defendant's Exhibit No. 79. This is on May 1st.  Do you remember a meeting that took place between Mr. Perardi, a friend of Mr. Perardi's and

Mr. Youngblood?  Mr. Perardi had a friend who was going to supply some funds that would help him complete a payment that Mr. Youngblood needed?

A.   Mr. Youngblood was working with Mr. Perardi and Mr. Youngblood told me that Mr. Perardi had a friend or someone, a neighbor in the neighborhood that hated his wife and would help with the funds.  And then, Mr. Youngblood was like, you know, just stay in touch with Mr. Perardi because I don't carry a phone.

Q.   Okay.  So before that, that meeting took place on May 1st.  This is a voicemail and I want you to hear it.  It's in evidence as Defendant's Exhibit No. 79.  And then, I'm going to ask you some questions after you hear it.

A.   Okay.

          (Audio file played.)

Q.   Did you know what you were talking about there that Gloria has all the e-mails, text messages?  Do you know what you're talking about there?

A.   I did at that time.  I suspect it had something to do with some of the negative texts and e-mails or things against him, and maybe John Mapes.

Q.   Okay.  Go ahead.

          (Audio file played.)

Q.   So there, you use the word "they are going to bury." Is that a reference to burying the ex-wife?

A.    That is a reference to Kota used.  He said he had connections with the U.S. Treasury or different three-letter U.S. agencies that were following on this supposedly tape that would be able to put his ex-wife in jail along with her aunt.

Q.    And so, when you say bury, that's referring to burying Rachel?

A.    Not physically.

Q.    Well, I know --

A.    Put her in jail, yes --

Q.    -- put her in jail, burying her.

A.    That's what Mr. Perardi had said several times to me. He would like her, you know...

Q.    So then, you say if your friend hates her that much, let him know this is going to put her away.  Again, you're referring to Rachel.

A.    Yes, put her away in jail.

Q.    And the friend hating her, where did you get the belief that this friend that Mr. Perardi --

A.    Mr. Perardi told me that this person disliked his wife more than he did.

Q.    Now, you said that this person hated his ex-wife as much as Mr. Perardi did?

A.    Yes.  That's his words to me, my understanding.

Q.    In the times that you met with Mr. Perardi, did you

get a sense that he hated his ex-wife?

A.   He disliked her immensely.

Q.   Would he call her names?

A.   No.

Q.   So he just disliked her immensely?

A.   Well, if someone told me you wanted me murdered, I would probably dislike them immensely, also.

Q.   Did he also believe that she had been unfaithful to him?

A.   He never talked about that that I know of.

Q.   I'll pass the witness, your Honor.

        MR. GUESS:  No redirect, your Honor.

        THE COURT:  All right.  May this witness be excused?

        MR. GONZALEZ-FALLA:  Yes, your Honor.

        THE COURT:  You're free to go.

        THE WITNESS:  Thank you, sir.  Appreciate it.

        THE COURT:  Next witness.

        MR. GUESS:  Call Katie Sloma.

        THE COURT:  Come forward and walk toward that corner of the courtroom and then, back to me.  Good afternoon.  Before you sit down, I'll ask you to raise your right hand to be sworn, please.

        THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before

the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

KATHERINE SLOMA, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. GUESS:

Q.   Good afternoon, Ms. Sloma.  Please introduce yourself to the ladies and gentlemen of the jury and spell your last name for the court reporter.

A.   Good afternoon.  My name is Katherine Sloma.  My last name is spelled S-L-O-M-A.

Q.   Ms. Sloma, where do you work?

A.   I work for the FBI.

Q.   And is this the first time you've actually testified in a courtroom?

A.   This is the second time.

Q.   Second time.  You're a little nervous today?

A.   A lot nervous.

Q.   Okay.  You know these two people here; is that right?

A.   I do.

Q.   Work with them?

A.   I do.

Q.   You feel a little more comfortable now that you see someone in here that you know?

A.    A little bit.

Q.    All right.  Tell me about what you do for the FBI.

A.    I'm a forensic accountant.

Q.    And a forensic accountant sounds like a fancy title.
What is that?

A.    Formal definition of it would be I apply accounting
skills to provide quantitative financial information for
criminal matters before the Court.

Q.    Very good.  Tell me about your educational background
that enables you to hold that position.

A.    I have a bachelor's degree from Texas A & M
University with a major in economics and minor in finance,
and then, I have supplemental accounting hours.

Q.    And I can't remember if I asked you, how long have
you been with the FBI?

A.    Thirty-two years.

Q.    Always here in the Austin office?

A.    Always here in Austin.

Q.    And besides your formal education and the 32 years of
work experience, do you have any certifications or
additional training that helps you in your position?

A.    I'm a Certified Fraud Examiner.  I took an exam to do
that and you have to have work experience to be qualified
to take that exam.

Q.    And they call it a CFE for short is that, right?

A.    CFE, yes.

Q.    Is that something that's unusual or do a lot of people have these CFEs?

A.    A lot of people with my job have that designation.

Q.    All right.  And how long have you had that certification if you can recall?

A.    Since approximately 2009.

Q.    You're not a special agent.  You don't have law enforcement credentials; is that correct?

A.    That's correct.

Q.    You don't go and arrest people.

A.    No.

Q.    You don't go out and execute search warrants.

A.    No.

Q.    You don't carry a firearm.

A.    No.

Q.    You carry a pen and a calculator.

A.    Most of the time, yes.

Q.    All right.  Were you asked to assist in the investigation of Agents Noble and Wilkinson on Kota Youngblood?

A.    Yes.

Q.    In fact, you don't know who Kota Youngblood is in terms of individual other than what you've seen on financial records.

A.    Correct.

Q.    All right.  Did you receive help in the sense of doing your financial analysis through grand jury subpoenas and other official documents?

A.    Yes.

Q.    Primarily looked at Navy Federal Credit Union banking accounts associated with Kota Youngblood; is that correct?

A.    That's correct.

Q.    And tell the jurors how you went about analyzing those records.  What was contained within those records?

A.    There's checks, debits, withdrawals, bank statements. It's a lot -- it comes in a PDF usually when the bank returns the subpoena, the information that was subpoenaed and -- I'm sorry.  What else?

Q.    So you get the records.  Did you ask for a specific period of time or were you looking just generally in terms of whatever records you have?

A.    My analysis focused on the period of January 1st of 2021 through August of 2023.

Q.    And you said that you received from the bank a full accounting of his credit union accounts.

A.    Yes.  The accounts that were related to him that he was a signator authority on at Navy Federal Credit Union.

Q.    Is that hundreds of pages?  Thousands of pages?

A.    Probably thousands of pages.  I know it's thousands

of transactions.

Q.   May I approach the witness, your Honor?

        THE COURT:   You may.

Q.   (BY MR. GUESS) Ms. Sloma, in preparation for your testimony today as well as through your analysis, did you prepare the following Exhibit No. 258?

A.   I did.

Q.   All right.  And it's about five pages; is that right?

A.   That's correct.

Q.   Information came from the subpoenaed bank records as well as casino records that you received; is that right?

A.   That's correct.

Q.   At this time, your Honor, we'd move to admission of Government's Exhibit No. 258.

        MS. HERRING:   No objection.

        THE COURT:   So admitted.

Q.   (BY MR. GUESS) Ms. Sloma, you took all these records, the bank accounts, the casino records, everything you could get your hands on; is that right?

A.   Yes.

Q.   And what did you then do with all of that information that you got?

A.   I take it from a PDF and utilizing software, I convert it to an Excel spreadsheet so that I can analyze it easier.

Q.    And did you do that in this case?

A.    I did.

Q.    And you found through the subpoenas that there were four Navy Federal Credit Union accounts that Mr. Youngblood was a signatory to?

A.    Yes.

Q.    All right.  Those would be the accounts ending in Nos. 7070, 6330, 1564 and 1431?

A.    That sounds correct, yes.

Q.    All right.  Could we go ahead and have Government's Exhibit 258, please.  First off, let me ask, we see the name Saint Jovite Jadenne Youngblood.  Were there other people with access to these accounts?

A.    Yes.

Q.    Who else had access to the accounts?

A.    The spouse, Gloria Yi or Gloria Youngblood.

Q.    And did this account include checks?

A.    It did.

Q.    Credit card statements, that kind of stuff?

A.    The bank statements are bank statements, credit card -- there was also credit card -- there were also credit card statements provided in the subpoena in the subpoena return.

Q.    And did you use those credit card statements in building this model?

A.    Not this particular one.  This is strictly the bank accounts.  I reviewed the credit card transactions because they were -- payments were made to the credit card from these checking and savings accounts.

Q.    So we see a number of general categories.  Is this something you created or is this something that the bank gave you?

A.    This is something I created to make it easier for me to summarize and view the data.

Q.    So the general categories, how did you determine that these were going to be the categories you used?

A.    From experience, this is kind of what we -- what I look at what people spend money on.

Q.    So it's telling you both how money comes in and money goes out towards in other words.

A.    Correct.

Q.    All right.  Let's take a look at a few of those.  Again, this is a composite of roughly two-and-a-half years?

A.    Yes.

Q.    So we're looking here, let me point out first, this cash category, what does cash mean to you?

A.    Cash to me is currency or and/or cash advances that were taken on a credit card and deposited to this account.

Q.    So can you give us an example of how that would have

happened based on your analysis?

A.   You deposit the funds through an ATM like cash through an ATM deposit, you could take it to the bank and deposit it in person to the teller and deposit it that way.   And cash advances are done a lot of times like I think Navy Federal has an app, most banks do these days, and you can request a transfer from a credit card to be deposited to the checking account.

Q.   We see over a million dollars in cash deposits into those four accounts in that time period.   Is there any way to attribute where that cash came from?

A.   No.

Q.   You don't know if it's the sale of a car or anything like that?

A.   No.

Q.   The withdrawals, 258,976, what does that reflect?

A.   Those are ATM.   Again, ATM withdrawals like you go to the machine and put your card in and you withdraw cash or a less cash transaction from a deposit of a check or something of that nature, you can sign and get cash back.

Q.   All right.   Credit card loans on the debit side, you see $934,155.   What does that reflect?

A.   The majority of that total was credit card payments and loan payments.   Majority of the credit card payments were to the Navy Federal credit card.

Q.   What loans, if you could recall, did Mr. Youngblood have out?

A.   Car loans.

Q.   All right.  How many car loans if you can remember?

A.   I can recall at least two.

Q.   Category on individual, I see a number of 133,731.  What is that referencing?

A.   That is moneys that came from individuals that were deposited by checks.

Q.   So if someone writes him a check, then that gets deposited?

A.   Correct.

Q.   All right.  The gambling winnings, $20,000, what did you find out about that?

A.   That was a check from Aria Resort and Casinos for $20,000.  That was deposited into the account.

Q.   So that'd be like an individual but, again, just from a casino?

A.   Correct.

Q.   Just single that one out?

A.   Correct.  In this case, Mr. Youngblood gambled and so, I wanted to try and track the amount of money, to the extent possible, that was from that activity.

Q.   Let's go ahead and highlight the bottom portion of the document now.  Next big figure there, we see retail of

25,000.  What would retail have included?

A.   Amazon purchases, Target, Home Depot, Best Buy.

Q.   Taxes, I see 23,000.  Were those all to the IRS or local tax authorities?

A.   Yes.

Q.   And then, travel, what was included within the travel category?

A.   Hotels and airfare.

Q.   And then, finally, you see wire deposits of 65,200. What was that in reference to?

A.   Those are wire transfers into the Navy Federal accounts.

Q.   Do you recall where these wire transfers came from?

A.   Mr. Hanfu Lee.

Q.   That's just the general analysis of what you saw by analyzing the Navy Federal Credit Union accounts?

A.   Correct.  That's the way I summarized it.

Q.   Again, that included both Mr. Youngblood and his wife.

A.   Correct.

Q.   Let's go to page 2.  What am I looking at here, Ms. Sloma?

A.   It's the same information, it's just broken down into deposits and expenditures.  So the totals across from '21 to '23 would equal the 1.3 in the deposits on the previous

slide and the same for the bottom.

Q.   All right.  So, for example, yeah.  So that top line right there on cash deposits, again, just broke it down.

A.   Broke it down by year.

Q.   All right.  Anything that's jumped out at you as you did this analysis?

A.   There was a significant number of cash transactions, seemed to be, and credit card payments.

Q.   As you were looking at the bank accounts, did you see any deposits from an employer?

A.   No, I did not.

Q.   Any type of statement from a one-off Uber saying, hey, here's some money for you?  Anything like that?

A.   No.

Q.   Was there any indication that he had written a check to Sotheby's or some other auction house for a large purchase?

A.   No.

Q.   Anything at all to indicate that Mr. Youngblood had employment income coming into these bank accounts?

A.   No.

Q.   We do see on that expenditure side, the credit card loan payments, 2021, 410,000, 2022, 373,000 that -- put you on the spot here.  Quick math, how much per month is that going out the door?

A.   It's about 27,000 -- 27, $28,000 a month in credit card and loan payments.

Q.   Did that include what he was paying for his home?

A.   No.

Q.   Why not?

A.   I wasn't able to track rent or mortgage payments. This must have been made with cash.

Q.   You didn't see anything to indicate that he owned the home, did you?

A.   There was one $5,000 check, I believe, to a title company that indicated he owned the home.

Q.   And then, the cash withdrawals, you see that on the bottom there, again, those would be from the ATMs?

A.   Or the counter at the bank.

Q.   All right.  Let's go to page 3 of the document.  You said you also had the opportunity to look at the casino records.

A.   That's correct.

Q.   Which casinos did you look at?

A.   MGM, Aria and Resorts World.

Q.   And the top portion of this is just a repeat of the previous slide; is that right?

A.   That's correct.

Q.   Let's go ahead and focus on that bottom, the net gambling activity and total deposits, please.  All right.

So we see the net gambling activity totals. How did you arrive at these numbers, Ms. Sloma?

A. I took the information that was subpoenaed from MGM, Aria and Resorts World and added them together to arrive at the total win or loss that he had had for the year. So the 434,140 is a combination of $565,000 loss and a $131,000 win at Resorts World, I believe, for that year, for 2021, for example.

Q. And then, the bottom line, the total deposit spending and losses, what does that indicate?

A. That is the total of the deposits that were made to the account, and subtracted from that were the expenditures that he made and then, on top of that, would have been the losses that he incurred.

Q. Is it safe to say that the gambling losses were the primary driver for the overall losses?

A. Yes.

Q. Did you put that into a chart form to help the jurors visually see what was going on?

A. I did.

Q. Let's got the next slide, please. This is a bar graph, right?

A. Correct.

Q. Explain to the jurors what they're looking at here.

A. So on the blue is the deposits to the account. The

green are the expenditures would have been withdrawals, debit card transactions, and the red are the gambling losses.  The net gambling losses for the year.

Q.   So this is just a visual representation of what the previous slides had showed.

A.    Correct.

Q.    And then, could we go to the last slide, please? What are we looking at here?

A.    This is the same information from the previous slides with the addition of the totals for victim funds.

Q.    Let's look at the bottom for the net gambling to the bottom of that document.  Expand that please, Ms. Mercado. So again, we see these overall loss amounts from the accounts and then, the funds received from victims.  How did you come up with those numbers?

A.    Based off of information that Agents Wilkinson and Noble provided to me through their interviews with victims.

Q.    Did you talk to any of the victims about how much money they had lost?

A.    I personally didn't speak with any of the victims.

Q.    Was the information contained in there independently derived for the victim funds?  Independently by did you require subpoenas to banks or anything like that?

A.    That information, they did subpoena some banking

information for some of the victims.

Q.   All right.  But that was the special agents who gave you that information.

A.   Correct.

Q.   You weren't looking at the records yourself in other words.

A.   No.

Q.   All right.  I'll pass the witness for cross-examination, your Honor.

THE COURT:  Ms. Herring.

CROSS-EXAMINATION

BY MS. HERRING:

Q.   So you talked about this large cash number here that you identified in going through Mr. Youngblood's bank statement, right?

A.   Yes.

Q.   And to do that, you go line item by line item through each statement and you put any number you see that goes in or out into one of these general categories, right?

A.   Any number on the statement?

Q.   Well, you've said that you receive bank statements from subpoenas, right, and to come up with this chart, you are going -- you are reviewing each bank statement item by item.

A.   This is done through Excel but...

Q.   But you making sure that you classify each item correctly in each bank statement.  I mean.  This takes a lot of time.

A.   Yes, it does.

Q.   So this is a high -- would you say high-volume cash deposit in comparison to the total here, which is one-million-three-hundred-something?

A.   Yes.

Q.   So a little over a million of that is cash.

A.   Yes.

Q.   That's the bulk of what's going through this?

A.   Yes.

Q.   This bank account, right?

A.   Yes.

Q.   And then, you talked about this wire line item down here, the 65,200, right?

A.   Correct.

Q.   And you said that that came from wires from one individual.  Do you recall doing that?

A.   I believe those were all from the same individual. Yes.

Q.   And that was Mr. Hanfu Lee?

A.   Hanfu Lee.

Q.   I'd like to bring up Government 251.  I may ask you to do brief math with us here.  If we go to page 2 of

this, Ms. Mercado, please.

So this, we see here -- so to do your analysis, you would go down and look for a wire, right?  And we see bank wire deposit of 5,900 year, right, on 6-16?

A.   Yes.

Q.   And if you're able to just glance at this first part quickly, that's the first wire that comes in on this bank statement.

A.   Assuming this is the -- is this the second page of the bank statement or --

Q.   Yes.

A.   I believe so.

Q.   That's a copy of the full bank statement, it looks like, from June 11 of '23 through 7-10-23, right?

A.   Yes.

Q.   So if we can -- can you just confirm that the first wire that you can identify in that bank statement is the 6-16, 5,900?

A.   Yes.  That looks to be the first wire.

Q.   And then, can you find the next wire that comes in which, I think, is on the next page?  I believe it's at 6-20 is the date but you can check me, please.  This 29,7 bank wire deposit?

A.   Yes, I see it.

Q.   So we've got 5,900, 29,700.  Then we go, there's

Q.   another one that comes in at 6-21 for -- it's 4,600, right, is the next wire?  Should just be six lines down.

A.   Bank wire on 6-21.

Q.   Yes.

A.   Yes, ma'am.

Q.   And then, onto the next page of that statement, see another one come in on 7-3, right, the 19,800?

A.   That's correct.

Q.   19,800, right?

A.   Yes.

Q.   And then, there's a fifth one that comes in which we can pull up in -- well, I guess I should say that's the last wire you can find in this statement, period, right, 6-11-23 to 7-10-23?

A.   It's last -- which is the last wire --

Q.   The last wire, the 19,800, the one that you just pointed out to us is the last wire in that month by the time that statement closed for that month.  Does that look right to you?

A.   That looks to be the last one, yes.

Q.   And so, there's one more wire later in July but that doesn't -- 7-14 doesn't make it onto this month's statement by the time it closes, right?  But you in your review would have gone through the next month, the next month, the next month to the end of your -- the period

that you were asked to view.

A.   Yes.

Q.   And so you would have added all of those wires up and that's how you would have reached your 65,200 total.

A.   Yes.

Q.   And you saw those just from June 16th to the middle of July of '23, right?  That statement period that we just --

A.   Yes.

Q.   -- walked through.  And your review covered a much bigger period.  You started in January of 2021, right, and you went all the way through August 16th of 2023.  And so, in all of your period that you were asked to review for the FBI, those were the only five wires that you identified.

A.   They were the only ones that I categoried as a wire.  Those in that category.

Q.   Yes, ma'am.  Thank you.  I have no further questions.

         MR. GUESS:  Nothing else, your Honor.

         THE COURT:  All right.  May this witness be released?

         MS. HERRING:  Yes.

         THE COURT:  All right.  Thank you.  You're free to go.

         Ladies and gentlemen of the jury, we are three

minutes shy of our quitting time and so, I'm going to give that back to you. It's been a long week. You have been very attentive and I appreciate your attention throughout the week. I'm now going to release you for the weekend to return on Monday morning at 8:30.

I'm going to take a few minutes with you to review the instructions I've given you throughout the trial; and the reason I'm going to review them is because it's particularly important now that you're going to have a few days off to remember those instructions. You're going to be around people who are aware of your jury service. So I'm going to have to remind you that you're going to have to exercise restraint and to tell them you can certainly confirm that you're serving on a jury, but that's all you should tell them. They may ask you what it's about. They may be inquiring because of something they've heard. Please resist the temptation. It's very important that you simply say that the very intimidating judge told you not to talk to them at great risk, at your peril.

Also, you're going to have access potentially to media reports, if there are any, and so, I would urge you to avoid the media this weekend to the extent if you have someone who can perhaps filter it for you. But if you do encounter any information about this case or any of the

individuals involved, I instruct you to immediately avoid exposure to any of that. Certainly do not seek any information by means of the internet or any other source about any person, place, or thing involved in this case, anything involving, the people involved, the law that may pertain to this case, and the reason being, at the end of the day, you are going to be asked to base your verdict solely on the evidence that you hear in the courtroom and the law that I give you at the end of the case.

As I told you at the beginning of the case, the importance of this is extreme. In the event that you violate any of these orders, it could not only result in consequences for you but, more importantly, we would have to start over. All of the resources, time and effort that's going into this trial would be for naught. And so, I urge you, please, to follow the instructions I have given you.

With that, we will see you back on Monday morning at 8:30 in the morning. I wish you a great weekend and I thank you again for your service.

(Jury not present.)

THE COURT: All right. Is there anything we need to take up before we recess for the weekend? Anything from the government?

MR. GUESS: Nothing from the government, your

Honor.

THE COURT:  All right.

MS. HERRING:  Nothing from defense, your Honor.

THE COURT:  All right.  Very good.  Thank you very much.  Have a nice weekend.  We'll see you bright and early on Monday morning.

MR. GUESS:  Thank you, Judge.

THE COURT:  And we are now adjourned.

(Proceedings adjourned.)

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

* * * * * *

UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS     )

    I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

    I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

    WITNESS MY OFFICIAL HAND this the 8th day of March, 2025.

                        ~~~~~~~~~~~~~~~~~~~~~~~~~
                        LILY I. REZNIK, CRR, RMR
                        Official Court Reporter
                        United States District Court
                        Austin Division
                        501 West 5th Street,
                        Suite 4153
                        Austin, Texas 78701
                        (512)391-8792
                        SOT Certification No. 4481
                        Expires:  1-31-27

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
   U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)