UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA ) Docket No. A 23-CR-135(1) RP
)
vs. ) Austin, Texas
)
SAINT JOVITE YOUNGBLOOD ) April 22, 2024

TRANSCRIPT OF TRIAL ON THE MERITS
BEFORE THE HONORABLE ROBERT L. PITMAN
Volume 6 of 7

APPEARANCES:

For the United States:   Mr. Dan Guess
Mr. Matt Harding
Assistant U.S. Attorneys
903 San Jacinto Boulevard,
Suite 334
Austin, Texas 78701

For the Defendant:   Mr. Jose I. Gonzalez-Falla
Ms. Charlotte A. Herring
Assistant Federal Public Defenders
Lavaca Plaza
504 Lavaca Street, Suite 960
Austin, Texas 78701

Court Reporter:   Ms. Lily Iva Reznik, CRR, RMR
501 West 5th Street, Suite 4153
Austin, Texas 78701
(512)391-8792

Proceedings reported by computerized stenography,
transcript produced by computer-aided transcription.

**I N D E X**

|                     | Direct | Cross | Redirect | Recross |
|---------------------|--------|-------|----------|---------|
| Witnesses:          |        |       |          |         |
| Justin Noble        | 5      | 59    | 84       |         |
| Rachel H. Perardi   | 100    | 115   |          |         |
| Saint Jovite        |        |       |          |         |
| Kota Youngblood     | 129    | 169   |          |         |

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| | | |
| #2 | 32 | 32 |
| #13 | 45 | 45 |
| #263 through 264 | 13 | 13 |
| #265 through 285 | 21 | 22 |
| #296 | 52 | 53 |
| #297 through 301 | 50 | 52 |
| | | |
| Defendant's | | |
| #149 | 78 | 78 |
| #44 through 146 | 98 | 99 |

THE COURT: Is there anything we need to take up before we bring the jury in?

MR. HARDING: Your Honor, I just e-mailed to Julie and tendered to counsel some of our proposed amended jury instructions, some of which we've conferred with defense about, some of which we have not. But I just wanted the Court to be aware that we will be making some requests beyond the pattern during the charge conference and so, I just wanted to make the Court aware of that.

THE COURT: Okay. Thank you very much.

MS. HERRING: And we have not had a chance to review this filing. We will be filing something shortly, as well, with the proposed amended instructions, as well, but we would just request, at some point, we get to look at this and then offer --

THE COURT: Absolutely.

MS. HERRING: -- argument to the Court.

THE COURT: Okay. Very good. We'll bring the jury in. Thank you.

(Jury present.)

THE COURT: And good morning, members of the jury. Thank you so much for being here, ready to go. I hope you had a nice, restful weekend. We will pick up now where we left off with the evidence in the case and with that, Mr. Guess.

MR. GUESS:  Government would call Justin Noble.

THE COURT:  Before you take a seat, could you raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

JUSTIN NOBLE, called by the Government, duly sworn.

<u>DIRECT EXAMINATION</u>

BY MR. GUESS:

Q.   Good morning, Agent.

A.   Good morning.

Q.   Although it's well-known who you are, please introduce yourself to the ladies and gentlemen of the jury and tell us how you're employed.

A.   My name is Justin Noble, N-O-B-L-E.  I'm a special agent with the FBI.

Q.   Tell me a little bit about your FBI career.  When did you start and what do you do?

A.   Joined the FBI in 2007.  Out of the academy, I was assigned to a small two-man office in Havre, Montana.  I investigated violent crimes on two remote Indian reservations.  In 2011, I was moved here to Austin.  From 2011 to 2022, I invested violent crimes, gangs and drugs.

2022, I was transferred to the white-collar squad.

Q.   And prior to that, what did you do for a living?

A.   I was a United States Marine.  From 2000 to 2007, I was on active duty.  Left active duty and served in a reserve status concurrent with my FBI service.

Q.   In the Marine Corps, were you ever deployed?

A.   I've deployed multiple times.  My last deployment was in 2018, I mobilized and deployed to Afghanistan for the entire year.

Q.   Very familiar with military culture, military -- particularly as it pertains to the Marines.

A.   I am.

Q.   You said that you moved into white-collar squad fairly recently; is that right?

A.   2022, yes, sir.

Q.   All right.  Did you get a little bit of training before you went into the white-collar squad?

A.   The training was limited.

Q.   Okay.  Let's talk a little bit about this investigation.  When did you first begin your investigation?  Or when did you first hear about Saint Jovite Youngblood?

A.   Some time in April, I received a phone call from an attorney here in Austin.  His name is Steve Toland.  I had worked with Mr. Toland on a gang case, drug case sometime

a few years back so he had my phone number.  He described a potential investigation and I agreed to meet with him and his client few days later.

Q.   When did you meet with him and his client, if you can recall?

A.   On April 27th, 2023.

Q.   And who is the client that you met with?

A.   Mr. Eric Perardi.

Q.   Tell the jurors a little bit about what that meeting was like.

A.   It was a four-hour meeting.  Mr. Perardi described the nature of the crimes that had been committed against him.  It was pretty clear that Mr. Perardi wasn't just a fraud victim, that he had actually been terrorized for months by Mr. Youngblood.

Q.   Were you the only agent in the room at that time?

A.   No.  It was Agent Wilkinson was with me.

Q.   And was that conversation recorded?

A.   No, it was not.

Q.   Is that unusual?

A.   No.  We typically don't record statements.  Policy is that we have to record statements if it's a custodial, interrogation, but other than that, we don't have to record statements.

Q.   And this was not a person of interest or a subject.

This was just a victim reporting a crime.

A.   That's correct.  It was just a victim interview.

Q.   So you got the details and a little bit of the information about what Mr. Perardi had been going through. What did you then do?

A.   We then got approval to open an investigation.  I think we analyzed his statement and determined that there's an opportunity for us to introduce a undercover employee to Mr. Youngblood.

Q.   Prior to that, did you ask him to record any of the conversations that he had?  Or did you ask him if he had recorded conversations with Mr. Youngblood?

A.   He did.  During the phone call I had with Mr. Toland, I suggested that it be a good idea for Mr. Perardi to record any interactions he had with Mr. Youngblood before a meeting on the 27th.  Mr. Perardi actually showed up to his meeting with a few recorded conversations that we were able to listen to at that meeting.  We also instructed him to record any further conversations he had with Mr. Youngblood until we met again.

Q.   So you talked about the undercover operation.  Tell the jurors a little bit about what goes into planning an undercover operation.

A.   There's an approval process to introduce an undercover employee, can be dangerous, and so, there's a

threat assessment on whether or not it's feasible and safe to do so. I think we kind of expedited the approval process and got approval pretty quick to introduce the undercover the following week.

Q. And were you the agent who decided or was able to pick which undercover officer you wanted to use?

A. I did. I had worked with TFO Joe Fiedler in the past. I knew he was an undercover. I had used him as an undercover in the past and I thought that -- or we thought that it was a perfect fit that he could actually fill the character of Joe the concrete man, which he did.

Q. And tell me what you discussed or how you approached Officer Fiedler about working as the undercover.

A. I called him the day after I met with, which I believe was a Thursday, with Mr. Perardi. I called and talked to TFO Fiedler on Friday, asked what his availability was, and he said he was available on Monday, May 1st to come to Austin, Texas to meet with Mr. Perardi.

Q. Did you give him some of the background as to what he was going to be doing?

A. Very limited. Just said it was a fraud case and I thought he'd be perfect as an undercover in the case.

Q. So let's go to May 1st then. On that day, did Officer Fiedler arrive at your office?

A. He did.

Q.    And how about Mr. Perardi?

A.    He did.

Q.    Did you arrange a meeting between the two of them so they could get their stories together?

A.    He did.  They briefly met, met each other and they just discussed the different aspects that might -- might come up during a meeting with Mr. Youngblood.  It was a brief interaction.

Q.    And were you present during that interaction?

A.    I was.

Q.    What was the next step in the undercover operation?

A.    We set up a surveillance team at a restaurant nearby the office and we observed the undercover employee, Mr. Perardi and Mr. Youngblood meet.  Prior to that, we also outfitted the undercover with a recording device so he could record the conversation.

Q.    Were you also in a position to videotape some of the meeting between Mr. Perardi, Mr. Youngblood and the undercover officer?

A.    I did.  I was able to walk by and capture a video of the meeting on my cellphone at one point during the operation.

Q.    Tell the jurors a little bit about what goes into the surveillance portion of an undercover operation.

A.    Well, the safety of the undercover employee is

paramount in a undercover operation. We had agents inside the restaurant. We had agents outside the restaurant just to make sure that if anything happened, there'd be somebody there to respond immediately.

Q. You said that you were actually able to get a little of the meeting on videotape?

A. I did.

Q. During the -- you were present, obviously, when the undercover video was -- or recording was being played for the jurors. Were you the person who was -- that Mr. Youngblood was talking about was walking by on the telephone?

A. Yeah. If you recall during the undercover, there was a comment made by Mr. Youngblood about somebody walking by with a cellphone and he doesn't always carry a cellphone, that was actually me walking by recording Mr. Youngblood when that happened.

Q. So the recording takes place. What happens after that?

A. After the undercover meet, I think it lasted approximately an hour, between an hour, hour and a half, I observed Mr. Youngblood and Mr. Perardi depart the location. The undercover stayed for a period of time. Mr. Youngblood and Mr. Perardi returned. I observed Mr. Youngblood present a plastic -- what appeared to be a

baseball bat wrapped in plastic, he presented it to the undercover and he stepped back and he gave him a solute as he departed.

Q.    Who gave who the solute?

A.    Mr. Youngblood gave the undercover a solute.

Q.    May I approach the witness, your Honor?

        THE COURT:  You may.

Q.    (BY MR. GUESS) Agent Noble, I'm handing you what's been previously admitted as Government's Exhibit No. 1. Do you recognize that exhibit?

A.    I do.  This is evidence out in 1B6, which is the baseball bat I'm talking about.

Q.    And go ahead and take that out of the box.  Hold that up for the jurors, please.  So that's the wrapping that the bat was in, correct?

A.    It is.  This is what -- this is how I observed Mr. Youngblood hand this to the undercover.  He handed it to him, stepped back and gave him a solute.

Q.    And what happened with the bat after that?

A.    Brought it back to the -- I collected it from the undercover, I brought it back to the FBI office and I booked it into FBI evidence and it remained sealed the way we received it for a period of time.

Q.    I'm going to ask you to take a look at Government's Exhibits 263 and 264 and ask, do you recognize those two

photographs?

A.   These are two pictures of that exact baseball bat.   I say baseball.   It's actually a softball bat.

Q.   So when you got back to the office -- move for admission of Government's Exhibit 263 and 264.

MS. HERRING:   No objection.

THE COURT:   So admitted.

Q.   (BY MR. GUESS) So you got back to the office, checked it into evidence.   At a later point, you actually unwrapped that bat.

A.   I did in preparation for Mr. Youngblood's detention hearing, we actually opened the bat to determine what it was.

Q.   And what was the purpose of unwrapping the bat?

A.   I had arranged to send pictures of the bat to a authenticator to see the value or if the bat was authentic.   And so, I opened the bat and began to take pictures of the bat but then, quickly realized that it wasn't a baseball bat, it was a softball bat.   There was no need to send to it an authenticator.   I can authenticate it myself as a fake.

Q.   Can we go ahead and have Government's Exhibit 236 on the screen, please?   We have a piece of cellophane tape over that bat; is that right?

A.   That's right.

Q.   And can you read the word on that?

A.   "Official softball."

Q.   And this was the bat that Lou Gehrig supposedly used?

A.   Supposedly, yes.

Q.   264, another piece of tape there and what does that say?

A.   Says "All star."

Q.   So the recording had been completed and at that point, did your investigation end?  Were you ready to arrest Mr. Youngblood at that point?

A.   No.  We began interviewing witnesses associated with Mr. Perardi's original complaint, John Mapes, Eric Swanson, eventually, Rachel Perardi.

Q.   So the people that you initially identified were members of that Hockey Association that we've seen?

A.   Yeah -- yes.  Individuals that were in the Hockey Association category, yes.

Q.   And based on those interviews, did you decide at that point that it was time to arrest Mr. Youngblood?

A.   No.  Our investigation continued.  We turned to our intel team to start doing a deep dive into Mr. Youngblood's background.  That's when we learned of a bunch of casino losses, travel to Las Vegas, bunch of suspicious activity in and out of his Navy Federal bank account, among other things.

Q.    You said that you at some point early on in your investigation interviewed Rachel Perardi?

A.    We did.

Q.    What was the purpose of the interview of Ms. Perardi?

A.    I think we wanted to assess whether or not she could have possibly been involved.  There were these posts that were out there and at the time, we just didn't know where the posts were coming from, and so, I think we wanted to talk to her to get her side of the story.

Q.    Mr. Perardi had indicated to you some of these negative posts had come on Yelp and other social media sites?

A.    Yes.  And he provided those to us and, also, they were still available openly online.

Q.    Were you starting to look then closely at the postings to see whether or not they were going to continue, or is it an ongoing situation?

A.    It was actually ongoing.  They were continually kind of popping up randomly.  We also -- back up.  We also interviewed somebody from Cedar Park Toyota because they were mentioned in these posts.  And so, we learned then that Cedar Park Toyota had actually hired a law firm to try to find who was doing these posts, as well.  And so, we sent court orders out and some various other things to try to identify who was actually making these posts.

Q.   Had Cedar Park Toyota through their efforts been able to identify the source of the posts?

A.   No.  Whoever was making these posts seemed to have a lot of knowledge of computer programming as if they possibly had a Ph.D. in computer programming.

Q.   Who else -- you said that you attempted to use some type of legal process to identify the poster; is that right?

A.   We did.  We sent court orders to various social media sites to try to identify various aspects of whoever the user was, IP address, geographical locations.  All of them had been anonymized.

Q.   You're unable at that point early in the investigation in 2023 to figure out who was making these social media posts?

A.   No.  We did not figure out.

Q.   You talked a little bit about going into the financial side of the investigation.  Tell the jurors what goes into the financial investigation of a case like this.

A.   Well, there's various databases that we use to look for suspicious activity in and out of certain accounts, cash transactions over 10,000.  And obviously, in this case, one of the big ones were the casinos.  Casinos do a good job of reporting cash transactions over 10,000 so we identified a lot of that type information.

Q.   You're able to identify some bank accounts by individuals; is that right?

A.   We did.

Q.   Did you look at Mr. Perardi's bank accounts?

A.   We did.  We actually sent subpoenas for Mr. Perardi's bank accounts in an effort to verify the story that he told us and the money that he said he had lost and gave. We used those accounts to verify that.

Q.   How about Mr. Youngblood's bank accounts?

A.   We did.  We sent subpoenas for Mr. Youngblood's various bank accounts.  Navy Federal Credit Union being the largest one.

Q.   Let's move to the investigation a little further along.  Certainly, Mr. Jay Holloway became someone of interest to you?

A.   He did.  Mr. Holloway also had suspicious activity reported on his bank accounts.  The one thing different about Mr. Holloway's accounts to Mr. Youngblood's accounts is the money seemed to only be going one way.  It wasn't going in.  It was only being used to cash checks.

Q.   And based on the identification of Jay Holloway, did you focus part of your investigation on activities involving him?

A.   We did.  We interviewed his son, Seth Holloway.  We also interviewed probably his best friend Gary -- best

friends Gary and Dale Snider.  So we learned quite a bit of information about Mr. Holloway and how he was involved in this scheme.

Q.   And is this activity happening roughly June of 2023?

A.   Yes.

Q.   So you get the information from the undercover on May the 1st and now you're about maybe six weeks into the investigation?

A.   That's correct.

Q.   Based on what you were trying to discover about Mr. Jay Holloway, were you able to identify several members of a Clock Association?

A.   We did.  That really -- that information came from Gary and Dale Snider.  And we also interviewed Jim Devries, the other member of the Clock Association, as well, and we learned that they both thought that other members of the clock organization had been scammed or involved in this scheme, as well.

Q.   Could we have Government's Exhibit 306 on the screen? And we see there in front of you, the Clock Association. Is that all of the members of the Clock Association that you would have interviewed or talked to?

A.   No.  No, sir.  We interviewed probably 15 members of the Clock Association.

Q.   And based on that information that they'd given to

you, did that assist you in your investigation?

A.   It did.  It did.  The picture became clear of what we were dealing with.

Q.   Were all of them familiar with Saint Jovite Youngblood?

A.   They were.

Q.   And based on that, did you then issue additional grand jury subpoenas for additional financial information?

A.   We did.  I think in total, we issued over 50 grand jury subpoenas or trial subpoenas for bank records related to victim accounts and Mr. Youngblood's accounts.

Q.   At some point again during the course of your investigation in, say, June, July of 2023, did you identify the California connection or parts of the California connection?

A.   We did.  We found a complaint that Mr. Hanfu Lee made to the Arcadia Police Department and that was forwarded in 2019, 2020 to the FBI here in Austin.  So we knew about Mr. Hanfu Lee's complaint.  And then, eventually, we did meet Jason York and Roseana York and learned about Alfonso Valdez, which is Roseana York's father.

Q.   Let's talk a little bit about that.  The Arcadia Police Department, we've heard from the former officers down with the Orange County DA's office.  When did you get the information about Mr. Lee about a complaint or some

type of paperwork coming here to the Austin, Texas area?

A.   We learned about that complaint after we opened our investigation sometime in early May of 2023.  The FBI actually received that complaint in early 2020.

Q.   Were you working financial crimes at that point?

A.   I was not.  I was on the gang drug squad.

Q.   Any idea why that wasn't taken up in 2020?

A.   I have no idea.

Q.   Would it be unusual in your experience for the FBI not to do something with a complaint similar to the one that you saw from 2020?

A.   The FBI receives a lot of complaints.  There's a lot of variables that go into supervisor making a decision whether it should be worked or not worked.  It could be various things from manpower to the timing of the complaint.

Q.   The search warrants, let's go forward to that then. So you've got all of this information, it's coming in.  Do you feel at that point that your investigation is focused as to Saint Jovite Youngblood?

A.   Yes.

Q.   And you decided along with Agent Wilkinson to apply for search warrants; is that right?

A.   We did.

Q.   And which two locations did you feel were appropriate

to conduct a search at?

A.    Mr. Youngblood's primary house located in Manor, Texas on Runnel Ridge and Mr. Holloway's rental house, which was located on West Point Way in Elgin, Texas.

Q.    Why those two locations?

A.    We were looking for evidence of the crime but we were also looking for valuable items.  We had talked to many victims that had lost a large sum of money and so, the purpose of the search warrants was to collect evidence of the crime and, also, to possibly seize valuable items so we could get some sort of restitution back to our victims.

Q.    Why did you think that there were going to be valuable items at Mr. Youngblood's home?

A.    Well, there was always stories of gold and various valuable items and so, just in the abundance of caution, if we found that, we wanted to seize it.

Q.    Agent, I'm going to hand you what's been marked for identification purposes as Government's Exhibits 265 through 285.  If you'll flip through those quickly, please.

A.    These are photographs from Mr. Youngblood's primary residence on Runnel Ridge in Manor, Texas.

Q.    Move for admission of Government's Exhibits 265 through 285 inclusive.

          MS. HERRING:  No objection.

THE COURT:  So admitted.

Q.   (BY MR. GUESS) So when you get ready to execute a search warrant, tell the jurors a little bit again about the preparation that goes into that.

A.    There's a threat assessment involved.  We have to have a tactical trained agent do a threat assessment.  The plan for the search warrants was actually planned by one of our tactically trained agents, our SWAT agent, and so, they determine exactly how to execute those search warrants.

Q.    Again, is that common procedure for the FBI?

A.    Yes.

Q.    So the threat assessment was done and was it just a couple of agents?  You and Wilkinson are going out there? Or did you decide that you needed more than just two?

A.    No.  We decided these two cases that we were going to use a surrounding callout method to execute these search warrants, which is a team of 12 to 15 agents that surround the location and then, somebody in a loudspeaker actually calls the occupants of that location outside.  We thought because we knew there were guns involved at both locations that that was the safest method to use.

Q.    And was the warrant executed on what day?

A.    July 13, 2023.

Q.    Were you there at the location at Runnel Ridge?

A.    I was.

Q.    And were you lead agent at that location?

A.    I was.

Q.    Tell the jurors what the lead agent is responsible for doing.

A.    The lead agent's responsible for all aspects of the execution of the warrant.  So I was primarily there to make sure that the search team collected the appropriate items and the appropriate actions were taken during the search.

Q.    In anticipation of finding some of these valuable items, did you ask an appraiser to come along with the FBI team to see whether or not there were things of value?

A.    We did.  We actually had an appraiser there with us. He testified earlier last week.  Jason Rzepniewski is his name.

Q.    Had you met Jason Rzepniewski prior to this date?

A.    I had talked to him on the phone, yes.

Q.    Tell the jurors what happened when you and the FBI team arrived at Runnel Ridge.

A.    Again, we did a surrounding callout.  We called Mr. Youngblood out of the residence.  We called his wife out of the residence.  We called his son out of the residence and then, we cleared the residence.  Mr. Youngblood left as soon as we cleared the residence.  He left.  His wife

and son remained behind.

Q.   When you say he left the residence, what do you mean?

A.   Well, he was initially detained while we cleared the residence.  And then, after the residence was cleared, he was released and he actually left.

Q.   So he wasn't arrested?

A.   No.

Q.   Wasn't detained in any manner?

A.   No, he was not other than the initial detainment while we cleared the residence.

Q.   Were there any other individual besides Mr. Youngblood, his wife Gloria, and his son Kota in the residence?

A.   No, there was not.

Q.   And tell the jurors a little bit about the search procedure.  How does that happen?

A.   So you go into a house, initially, the first thing you do once it's been tactically cleared is to take photographs the way the FBI found the house, and then, once that's done, each room is marked with a specific letter, and then, search team comes in and starts looking for items that are authorized for the FBI to take in the search warrant.

Q.   Go to Government's Exhibit No. 266 on the screen, please.  Describe for the jurors what we're looking at

here, Agent Noble.

A.   This is Mr. Youngblood's primary residence on Runnel Ridge and his two vehicles.

Q.   265, please.   What are we looking at there?

A.   This is inside Mr. Youngblood's vehicle.   This is actually the vehicle that Mr. Youngblood left in.

Q.   Could we go ahead and expand around the book in the backseat there.   And can you tell us what that book is?

A.   That is a book from a series called the book of Shannara.

Q.   And later on, you determined that had some significance to Mr. Lane Holloway as well as to Mr. Youngblood.

A.   It did.   The characters in this series were Lane Holloway and his wife, Danielle Holloway's names that they had changed their names to.

Q.   Could we have 267?   Explain what we're looking at here.

A.   This is looking in the entryway of Mr. Youngblood's house.

Q.   We see a large Christmas tree.   What date was this warrant executed on?

A.   July 13, 2023.

Q.   Any reason why the Christmas tree would have been there in your opinion?

A.   We'd heard from numerous victims at this time that Mr. Youngblood's parents had been -- he had told victims that his parents had been killed on or around Christmas and so, he always kept a Christmas tree in his house to signify that event.

Q.   268.   What are we looking at there?

A.   This is the room to the left as you walk in and a large grandfather clock is seen there.  I mean, it's a large clock.  I don't know if it's a grandfather clock but it's a large clock.

Q.   Did Mr. Rzepniewski take a look at that clock to value it?

A.   He did.  He said it was valued at -- this was the most valuable thing we found in the house.  He said it was valued at a couple thousand dollars, but after moving and shipping costs, it wouldn't have enough equity for the FBI to seize.

Q.   Could we have 269, please?  And again, let's focus a little bit on the cabinet there, that China cabinet. Appears to be filled with a lot of books and old items; is that right?

A.   It is.  His house was filled with a bunch of knickknacks and I don't know, junk, I guess you would say.

Q.   See the painting there on the floor.  Did that have any significant value according to Mr. Rzepniewski?

A.    No.    I walked through the house during the warrant. I walked through the house with Mr. Rzepniewski and we looked at everything we could find.    I asked him to look at everything as best he could to find anything of value and he didn't except for that large clock.

Q.    Exhibit No. 270, please.    Describe what we're looking at there.

A.    This is inside Mr. Youngblood's kitchen.

Q.    The flag at the top, was that the flag that you had been told about from Mr. Perardi or some similar flag?

A.    It is not but it is an unusual item.

Q.    Could we have Government's Exhibit No. 271, please? What are we looking at there, Agent Noble?

A.    This is his laundry room, Mr. Youngblood's laundry room, and a safe that was closed in the laundry room.

Q.    Did you ask Mr. Youngblood or Mrs. Youngblood to open that safe for you?

A.    We did and we actually did enter the safe.

Q.    Could we have Government's Exhibit 272, please?    We see here the contents of that safe.    Was there anything of value in that safe?

A.    There's nothing of exceptional value.    There were some firearms in the safe.

Q.    And we see an ammo can that's familiar to you from your military background?

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

A.    Yes.   That is an ammo can.

Q.    Was there ammunition contained in that can?

A.    There was some ammo, ammunition inside the safe.

Q.    Could we go to Government 274, please?   What are we looking at here, Agent Noble?

A.    This is -- I believe this is one of the rooms upstairs and, again, it's filled with junk.

Q.    See there on the right-hand corner, a few items; is that right?

A.    I do.   It appears that there is --

Q.    Let's go to 275, please.   It will be a better photograph.   That's the same room; is that right?

A.    That is the same room.

Q.    Looks to be some older items in the box as well as a lot of paintings on the floor; is that right?

A.    Yes.

Q.    Could we go to Government's Exhibit No. 276?   What are we looking at here, Agent Noble?

A.    This is a storage space in Mr. Youngblood's attic. We actually -- I actually went in the space with Mr. Rzepniewski as he looked at the various paintings.   One comment he made that if anything was of value in this space, it would be ruined by the way it was being stored in this hot attic space.   But he did look at everything and didn't find anything of value.

Q.   Exhibit 277, just a different angle to give you a wider version of what you're looking at?

A.   Yes.  Again, this is significant because a lot of our victims had been given items just like this for collateral and told that they were of exceptional value.

Q.   Did you find a Rembrandt in there while you were looking around?

A.   No, we did not.

Q.   Not from the Boston Archives from the 1980s.

A.   Absolutely not.

Q.   Exhibit No. 278, what are we looking at there?

A.   Again, just stuff stacked up, again, items similar to items that are -- some of our victims had been given over time.

Q.   Was that a Chippendale table from the 1700s or anything like that?

A.   It was not.

Q.   Government's Exhibit 279.  What are we looking at there?

A.   This is a large book that appears to have Russian text on it.  I asked the photographer to take a picture of this because this is very similar to the book that was given to Gary and Dale Snider as collateral.

Q.   Was there any indication that this book had any provenance as Mr. Rzepniewski had talked about?

A.    Mr. Rzepniewski actually looked at the specific book at my request and said it was not worth anything.

Q.    Government's Exhibit No. 280.  What are we looking at there?

A.    This is one of the firearms that we found in the house.

Q.    What kind of firearm is this?

A.    It appears to be a handgun with a -- some sort of addition so you can use it as a kind of a rifle.

Q.    Do you recall where that firearm was found?

A.    I don't specifically recall where that was.

Q.    Government's Exhibit 281 and what are we looking at there?

A.    Another semiautomatic handgun that was found in the residence.

Q.    Exhibit 282.

A.    Again, another semiautomatic gun that was found in the residence.

Q.    And finally, 283.

A.    This is the fourth gun that we found in the residence.

Q.    Could we go to Government's Exhibit No. 285, please.  Describe what the jurors are looking at there.

A.    I think the most remarkable thing is the large painting over the mantle.  And then, the fish tank, he did

have some exotic fish in that tank.

Q.   During the course of the financial investigation, did you look at some of the expenditures of Mr. Youngblood?

A.   He did.  He spent quite a bit of money obtaining his fish tank.  We actually talked to the owner of a store here in Austin that Mr. Youngblood frequented to buy fish food and buy fish.  After that interview, we also determined that that particular person had been victimized by Mr. Youngblood, as well.

Q.   Government's Exhibit 284, please.  What are we looking at there?

A.   These are photographs of credit cards that we found at Mr. Youngblood's house.  The bottom one, the Greater Texas Credit Union, we sent a subpoena for bank records related to that account.

Q.   The top one is MGM reward card?

A.   It is.

Q.   And did you also seek the records from that particular credit card?

A.   I can't say if we took -- we sent a subpoena for that particular credit card.  I believe -- I just can't say for sure.

Q.   Bottom line is that the financial analysis conducted by Katie Sloma, the NFCU account would have paid for those credit cards; is that right?

A.    Yes.

Q.    Agent Noble, take a look at what's been marked for identification purposes as Government's Exhibit 2.   Do you recognize that?

A.    Yes.   This is Mr. Youngblood's passport and passport card.

Q.    And where were those recovered from?

A.    From his residence.   I believe this was in his safe.

Q.    During the execution of the search warrant on July 13th?

A.    Yes.

Q.    Move for admission of Government's Exhibit 2.

          MS. HERRING:   No objection.

          THE COURT:   So admitted.

Q.    (BY MR. GUESS) Did you have an opportunity to look through the passport prior to coming to the courtroom today?

A.    I did.   I looked at it the day of the search warrant and I've reviewed it since.

Q.    Did you find lots of trips to Egypt or other exotic locations in that passport book?

A.    We did not.   There was actually only two stamps in here and they're related to a cruise in 2017.

Q.    So once the search of Mr. Youngblood's residence was complete, what did you then do in terms of July 31st?

A.    July 13th.

Q.    13th, excuse me.

A.    I cleared Mr. Youngblood's residence and then, myself and the appraiser, Mr. Rzepniewski, traveled to West Point Way.  That search was still ongoing.

Q.    Did you then decide to go out to the second search location?

A.    I did.  We went to West Point Way.

Q.    On the way, did you have telephone contact with Agent Wilkinson?

A.    I did.  I spoke with Agent Wilkinson to get an update on how that search was going.  She was the lead agent at that location.

Q.    And based on that information that you received, what happened when you arrived at the West Point address?

A.    The first thing I did was talk to Mr. James Holloway.

Q.    Mr. Holloway, to your knowledge, had already requested counsel at that point?

A.    He did.  I knew that.

Q.    Did you ask him questions or did you just approach him?

A.    I did not.  I told him that I just needed to talk to him and have him listen.  He pretty well described that interaction the other day.

Q.    Prior to executing these warrants on July the 13th,

you had become aware that Lane Holloway was in Florida?

A.   We did.  We located Lane Holloway on or about July 10th or July 11th.

Q.   How did you identify where Lane Holloway was?

A.   Our intel team actually found him through analysis of license plate readers.

Q.   And when you identified where Lane Holloway was, what did you do?

A.   Well, we sent the agent in Florida to make contact with him prior to the execution of the search warrants. We were concerned that after the search warrants were executed that Mr. Holloway would leave that location.

Q.   Prior to that, were you aware that there had been a missing persons report on Lane Holloway?

A.   Yes.  Several of Lane and Danielle Holloway's friends reported them missing to the Pflugerville Police Department.  I spoke with the detective about that particular investigation and they determined that they moved on their own free will, and so, that investigation really didn't go very far.

Q.   So you got to the house on West Point and it was then that you -- or you had the phone call with Lane Holloway on speaker in front of Jay Holloway?

A.   That's correct.

Q.   You're also aware, obviously, that there was an item

seized from the home of Mr. Jay Holloway at West Point; is that right?

A.   There were several items seized.  But yes, I did review the items that were going to be seized.

Q.   I'm handing you two pieces of paper here that's been previously admitted as Government's Exhibit 5, I believe. Do you recognize Government's Exhibit 5?

A.   This was a handwritten note that was found in Patricia Holloway's purse.  Patricia Holloway is James Holloway's wife.

Q.   And we're looking at the screen.  You can see the evidence on the envelope there; is that right?

A.   Yes.

Q.   Let's go ahead and blow up the first note there. First off, where is this note located at when you seized it?

A.   It was located in Patricia Holloway's purse.

Q.   And did you talk to Mrs. Holloway about why this note was in her purse?

A.   After we tried to interview her and we located this, yes, we did discuss this with her.

Q.   Why don't you go ahead and read that, if you can, on the note.

A.   We do not condone what Lane or Seth and their wives and families' behavior are into.  They are not welcome

here.  We have had people and following the people down to the arrow, not respectful looking people of nonwhite descent, back up, including law enforcement come to our door.  Here as well as on prior address looking for them.

Q.   Let's go down to the second part of the note.  Go ahead and read that.

A.   Yes.  If Kota's name comes up, he has nothing to do with them.  No one has come to us asking about him or about money -- money about Lane and his family's -- Lane and his family's activities.

Q.   Was that note significant to you in your investigation?

A.   It is.  These are instructions from Kota Youngblood that was written down by James Holloway and then, given to Patricia Holloway and instructions of what she should say to law enforcement when questioned.  It's significant because the interviewing agent that interviewed Patricia Holloway that day was unaware of this note and this is almost exactly what she told that agent.

Q.   During the course of your investigation, did you find out that Patricia Holloway had since become shut in during the previous two or three years?

A.   Yeah.  So Gayle and -- Dale and Gary Snider were essentially the Holloways' best friends so when we interviewed them, we learned that Patricia Holloway would

rarely leave the house and had been isolated from everybody except for James Holloway and Kota Youngblood.

Q. So the search at West Point is starting to wind down; is that right?

A. Yes.

Q. Does Jay Holloway agree to cooperate with you after learning that his son was still alive?

A. He does.

Q. And once you finished the search and interviewed everyone that needed to be interviewed there, what are you going to do at that point, Agent Noble?

A. So the search team had finished and they had cleared the residence. Agents were departing. I was the last one to depart the residence. I believe I was on the phone speaking with the prosecutors about how the search warrants went and what we had discovered. So I had sat in front of the house for a period of time while the other agents had already departed.

Q. Tell the jurors what happened as you were out there. Are you by yourself or with another agent?

A. At this point, I'm by myself in my FBI-assigned vehicle. I leave the residence. As I'm leaving the neighborhood, I see Mr. Youngblood's residence -- pull into the neighborhood with two individuals in it. So I call my supervisor, who was the last person to leave

before me, and tell him that he needed to return to the address because I thought Mr. Youngblood was returning -- was going to Mr. Holloway's house.  And so, we returned to the residence and we set up down the street and wasn't just a few seconds before Mr. Youngblood arrived at the location.

Q.   Was that the same car that had been parked at Mr. Youngblood's residence?

A.   It was.

Q.   Was Mr. Youngblood by himself or did he have other people with him?

A.   You know, he had two individuals with him.  At the time, we didn't know who they were but their names -- we did learn their names were Clark Snyder and Jason York.

Q.   Clark Snyder, you figured out later, had a nickname among the group?

A.   That was Igor the Russian.  That was what Mr. Youngblood had referred to him as one of the victims.

Q.   What happened as you're watching the car approach Mr. Holloway's home?

A.   He pulls up to the house and very similar to the way Mr. York described it last week, Mr. York was walking up to the front door, Mr. Snyder was falling behind and Mr. Youngblood was in trace behind them.  Myself and my supervisor pulled up and we intercepted that before they

got to the door. We sent Mr. Youngblood back to his car and then, we did a kind of a field interview of Mr. York and Mr. Snyder.

Q. As Mr. York and Mr. Snyder approach the door, how were they dressed and what was their demeanor from your perspective?

A. Well, from my perspective, it was very clear what was going on. The three of them were going there to do some sort of intimidation tactic on Mr. Holloway.

Q. Once you had opportunity to talk to York and Snyder, what happened?

A. They left. They left and then later that night, I was able to find a phone number for Mr. Jason York and I contacted him by phone and I set up an official interview a couple of days later.

Q. And Mr. York came in to talk to you?

A. He did.

Q. And later, you figured out from him, his knowledge about Mr. Youngblood, and so forth, as he testified to earlier.

A. Yes.

Q. All right. Did you also talk to Clark at some point?

A. We did. We located Mr. Clark and attempted to talk to him several times and then, eventually, he came in for an interview, as well.

Q.   Execution of search warrants is complete.  Are you ready to arrest Mr. Youngblood now?

A.   No.  Investigation is continuing.  We're still identifying victims and doing victim interviews and also waiting for bank records to come back.

Q.   You're looking to gather all the financial information that you can so that you can be sure of what was going on and the totality of the financial scheme?

A.   That's correct.

Q.   Did you have a pretty good idea of what the scheme was about at this point?

A.   We did.  It was pretty clear that from all the victim interviews we had done to that point that Mr. Youngblood was conning these individuals so he could go to Las Vegas and gamble.

Q.   You said that you identified trips to Vegas; is that right?

A.   We did.

Q.   How did you come about that information?

A.   We sent a grand jury subpoena to the two casinos in Las Vegas that Mr. Youngblood most frequented.

Q.   What were those casinos?

A.   Aria and Resorts World.

Q.   And at some point after the execution of the search warrants, did you receive information from one or both of

those casinos?

A.   We did.  We found out that from the Aria casino that Mr. Youngblood had made a hotel reservation and was planning on coming to Las Vegas on or about the end of July -- on or about July 30th.

Q.   Did you also seek to confirm that through airline records?

A.   We did.  We spoke with Southwest Airlines and we learned of the exact flight Mr. Youngblood planned on taking.

Q.   Was that a concern to you, Agent Noble?

A.   It was because on July 13th, it didn't appear as though Mr. Youngblood had any money.  There was a small amount of cash in his residence and we seized that and so, we felt that if he was going to Las Vegas to gamble that he was continuing to victimize somebody.

Q.   Based on that information, were you then ready to make your arrest of Mr. Youngblood?

A.   We did.  We filed a complaint and got an arrest warrant.

Q.   And that came from a federal judge?

A.   It did.

Q.   What happened once you got that complaint and arrest warrant?

A.   We had an arresting set up at the Austin airport and

when Mr. Youngblood showed up to check into his Southwest flight, he was arrested.

Q.    Were you part of the arrest team?

A.    I was, but I did not arrest Mr. Youngblood.  Agent Wilkinson did.

Q.    Once he was arrested, was he searched?

A.    He was.

Q.    And what did you find on Mr. Youngblood's person?

A.    Approximately $20,000 in cash and another Shannara book.

Q.    Besides the $20,000 in cash and the book, was there anything else of note about Mr. Youngblood at that time?

A.    There was also -- he also had in his possession a WG, a winning certificate of jackpot that he had won in Las Vegas and he had claimed that that money that he had was from that jackpot.  I guess the only other unusual thing is that he was dressed all in black.

Q.    The proof of jackpot winning, was that something that was significant to you when you're making this arrest?

A.    No.  We knew that he had gambled a lot and that he had won jackpots and then, he lost that money back or spent it in other ways: but it was significant because that was how he justified his cash.

Q.    Once he was arrested, was the money seized and placed into evidence?

A.   It was.  We moved to administratively seize that money.

Q.   And once the handcuffs were placed on him, was he transported to a jail?

A.   He was.  He was transported to Williamson County jail for an overnight hold.

Q.   Who did the transport?

A.   Myself and Agent Wilkinson.

Q.   Was Mr. Youngblood cooperative or was he being rude to you in any way during this time?

A.   No.

Q.   At the same point in your investigation, you'd become aware that there supposedly had been a murder of Mr. Youngblood's oldest son?

A.   That's right.  Numerous victims spoke of Mr. Youngblood telling a story about how his oldest son, Eventine Youngblood, had been murdered by the cartel even in Mexico or in southern California.

Q.   Did you do something to determine whether that was accurate or false?

A.   We did.  We sent an agent to a known location in southern California and that agent actually located Eventine Youngblood on or about August 2nd and completed an interview of him.

Q.   So you knew that that was not something that was

accurate or true.

A.   Completely false.

Q.   Was that the end of your investigation or did you continue to look up financial records?

A.   No.   We continued to send out subpoenas and review financial records as they came in.   And also, it seemed like every victim interview led to another victim interview.   It just -- we kept completing interviews.

Q.   Based on your investigation, how many victims, approximately, were you able to identify?

A.   At least 25 victims.   At least.

Q.   And the amounts of money that they were defrauded out of?

A.   The most conservative estimate would be $5 million. That's not counting Mr. Hanfu Lee's $5 million that you heard about from 2011 and 2017.   Many of our victims are still paying -- they're convinced to get signature loans with high interest rates.   Many of our victims are still paying those loans.   Many of those victims are still paying IRS payments from money they withdrew from retirement accounts.   At least five million.

Q.   And that five million would just be the Texas victims?

A.   Yes.

Q.   Again, you said they don't include Dr. Lee.   If you

do include Dr. Lee, what's the loss amount?

A.    More than 10 million.

Q.    At that point during the process, were you convinced that Mr. Youngblood was working alone or was there possibility that some other people were working with him?

A.    There's an obvious person, again, an individual named Marvin Knecht.  Many victims described him as a runner.  Somebody that helped Mr. Youngblood that was generally how he was described.  We interviewed Marvin Knecht multiple times.  I can't say whether or not he was a coconspirator, but he was definitely a victim.  He had lost money to Mr. Youngblood over the years.

Q.    As part of the investigation, did you also look to see Mr. Youngblood's personal tax records?

A.    We did.

Q.    Hand you what's been marked for identification as Government's Exhibit 13.  Are those the official tax records that you received from the IRS?

A.    Yes.

Q.    Move for admission of Government's Exhibit 13.

        MS. HERRING:  Your Honor, I would re-urge the objection that the Court heard earlier to the relevance of this.

        THE COURT:  I'll acknowledge the objection, overrule it and admit the evidence.

Q.   (BY MR. GUESS) Could we have Government's Exhibit 13 on the screen, please?  These are tax records from 2018 to 2021; is that correct?

A.   Yes.

Q.   Could we go to page 13 of that exhibit, please, Ms. Mercado?  And we see here, page 13 of the 2018 tax return. Can you go ahead and blow that up for us, please?  Can you read that for us, Agent Noble?

A.   Yes.  Net gambling income that taxpayer is a professional game player.  The income from self-employment is estimated by the taxpayer.

Q.   Could we go to the next page of that document and let's highlight the income portion there.  Thank you.

We see here, gross receipts or sales of over $17 million.  Do you know where that income would have come from?

A.   That would have been his gambling winnings.

Q.   And the expenses?

A.   His gambling losses.

Q.   And then, the total profit from gambling in 2018 pursuant to the tax records?

A.   $88,651.

Q.   Could we go to page 19 of that exhibit?  See there the combined wages and self-employment earnings.  How much did that result in terms of income?

A.    $128,400.

Q.    Did you see during the course of your investigation any indication that Mr. Youngblood had ever received income from an employer?

A.    No.    That's one of the most significant things that came out from our intel analysis of Mr. Youngblood.    He never had a regular job that we could find.

Q.    And how did you confirm that information?

A.    Texas Workforce history.

Q.    So he'd been living here since 2016; is that right?

A.    Yes.

Q.    And Texas Workforce does what?

A.    They report earnings of people employed in Texas. And so, you have a regular job, your job reports to Texas Workforce Commission quarterly.

Q.    If we go to page 21 of that exhibit, please.    And this is 2019 taxable income records; is that right?

A.    Yes.

Q.    We see here at the bottom that the income is $122,500 with a taxable income of $62,820; is that right?

A.    Yes.

Q.    Page 21 of the exhibit.    Or 35, excuse me.    And there, we have a line that says gambling losses.    How much was the gambling losses in 2019?

A.    Reported by Mr. Youngblood was 11,427,913.

Q.   Could we go to page 41 of the exhibit?  Again, we're looking now at 2020, U.S. Tax Form; is that right, Agent Noble?

A.   Yes.

Q.   And the total taxable income for that year at line 15 on the IRS form?

A.   40,262.

Q.   And on line 9, which is the income, how much was his income that year?

A.   $93,040.

Q.   Could we go to page 57 of the exhibit, please.  And for 2020, we have gambling losses of how much?

A.   $12,853,639.

Q.   Could we go to page 64?  This is the 2021 tax return and our income on line 9 is how much?

A.   $92,312.

Q.   And the taxable income for that year for him?

A.   73,550.

Q.   Could we go to page 64?  I'm sorry, 73.  And again, in 2021, what's he reporting as his source of income?

A.   Professional gambler.

Q.   And income for that year for his gambling?

A.   $73,550.

Q.   Finally, page 87.  Gambling losses for 2021?

A.   $21,645,722.

Q.   Now, as you're going through your investigation, are the media posts, the social media information, are they still happening in June and July of 2023?

A.   They are.

Q.   At some point during your investigation, did you figure out who was responsible for making those derogatory posts about Mr. Perardi and others?

A.   We did.  The FBI, like I said, made contact with Lane Holloway in Florida.  We asked Mr. Holloway to come back to Texas and on July 14th, we interviewed him and then, we learned that he was the one actually making all the posts, including the early posts and the later posts.  He admitted to doing all the posts.

Q.   And did you then ask Mr. Holloway at a certain point to come into your office to show you how that worked and to try to remove some of those posts?

A.   He did.  There was a lot of posts that were still out there, and so, we asked him to come in and in front of us log into a computer, log into the accounts and remove what was still remaining.

Q.   When do you recall that happening?

A.   Late July, early August.

Q.   Of 2023?

A.   Yes.

Q.   Was Mr. Holloway able to remove some of the negative

posts about Mr. Perardi and others?

A.   He did.  And also, he removed some of the erroneous information that he had posted about Mr. Youngblood.

Q.   Did you alert the people at Cedar Park Toyota that those posts had been removed?

A.   We did.

Q.   And did you explain to them who is responsible for those posts?

A.   We didn't give them a name, but we told them we knew who it was and Cedar Park Toyota had hired a security company to have security onsite because employees were scared from these posts.  And so, we wanted to let them know that there really wasn't an actual threat so they didn't need to continue with the security.

Q.   Your Honor, may we approach?

        (At the bench, on the record.)

        THE COURT:  You may.

        MR. GUESS:  So, your Honor, at this time, I'm going to move for admission of Government's Exhibits 297 through 299 and 301.  Those are snippets from the casinos where we likely saw 300.  I'm going to have those played to the jury, but Mr. Gonzalez-Falla had indicated that he'd have an objection as to one of the videos.

        MR. GONZALEZ-FALLA:  Ms. Herring.

        MR. GUESS:  I'm sorry.

MS. HERRING:  Yes.  I have an objection to 297 and 298.  299 and 301 show his -- show him sitting at machines gambling as we already saw the other day.  We have no problem with that.  297 and 298 shows Mr. Youngblood receiving a neck massage.  It's the corner of the screen, we cannot see him gambling.  The purpose of the video is to prejudice the jury by showing the touch -- I'm not even sure it's a female.  We'd move for the exclusion of those two.

THE COURT:  What's the relevance of those two?

MR. GUESS:  The relevance is it shows the date that he gets in there.  The timestamp on there showing he was in there as early as 5:57 a.m. in the morning, and so forth.  And it's indicative of what Mr. Youngblood was doing in the casinos during the timeframe of this conspiracy -- or not conspiracy but the criminal activity.

MS. HERRING:  The government can establish that point in time at the casinos of the other videos which show him directly playing and have the focus on his play. He first two videos of him in the corner on the screen is purely prejudicial.

THE COURT:  Just because he's getting a neck massage?

MS. HERRING:  Yes, your Honor.  It's not relevant --

MR. GUESS:  He's sitting at the machine playing video poker and one of the employees of the casino comes up to again help him continue his gambling activity.  This is very early in the morning.

THE COURT:  I don't think that's particularly prejudicial and so, I'll overrule the objection.

MR. GUESS:  Thank you, your Honor.

(End of bench conference.)

Q.   (BY MR. GUESS) Agent Noble, you said you had communicated with Southwest Airlines at certain points; is that correct?

A.   We did.

Q.   Did you then subpoena travel records from Mr. Youngblood at Southwest Airlines?

A.   We did.

Q.   I'm going to hand you what's marked for identification purposes as Government's Exhibit No. 296. Do you recognize that exhibit?

A.   I do.

Q.   And the highlighted portion would be the times when Mr. Youngblood had traveled to Las Vegas, Nevada; is that correct?

A.   That's correct.

Q.   We'll move for admission of Government's Exhibit 296.

MS. HERRING:  If the government could ask more

questions to establish a predicate that Agent Noble has knowledge of how this was prepared.

Q.   (BY MR. GUESS) Agent Noble, based on 296, the information underlying this come from subpoenaed airline records; is that correct?

A.   That is correct.

Q.   And those records were pursuant to a grand jury subpoena?

A.   That is correct.

Q.   You've reviewed those records to establish what's contained in Government's Exhibit No. 296?

A.   I have.

Q.   Those are calendar of 2021, 2022 and 2023; is that correct?

A.   Yes.

Q.   The yellow highlighted portions would indicate those dates that Mr. Youngblood was in Las Vegas, Nevada based on the Southwest Airlines travel records?

A.   That's correct.

Q.   And those would be voluminous records in terms of looking at the underlying records?

A.   Yes.

Q.   Move for admission of 296.

        MS. HERRING:  No objection.

        THE COURT:  So admitted.

Q.    (BY MR. GUESS) Could we have 296 on the screen, please, Ms. Mercado?  We see here, Government's Exhibit 296, 2021, again, these are based only on the airline records; is that right?

A.    Yes.

Q.    If Mr. Youngblood had decided to drive out to Las Vegas, it wouldn't be reflected in this.

A.    No.

Q.    If he had flown a different airline, wouldn't be reflected on this exhibit.

A.    No.

Q.    Do you have an indication he flew anything other than Southwest, though?

A.    We do not.  Seemed to fly Southwest most frequently.

Q.    The highlighted portions for 2021, those are dates when, again, you see travel to Las Vegas and back to Austin.

A.    That's correct.

Q.    Could we go to the next page?  Again, a number of dates in 2022; is that right?

A.    Yes, approximately 125 days.  120 days, approximately.

Q.    And 2023?

A.    Yes.

Q.    All right.  He was arrested by FBI on what date?

A.    July 30th.

Q.    And that's that Sunday; is that right?

A.    Yes.

Q.    Overall, approximately how many days did Mr. Youngblood spend in Las Vegas during this two-and-a-half-year period?

A.    Approximately 300 days.

Q.    You also requested and received videos from the Aria Casino to help you establish when or where Mr. Youngblood was at the casino; is that right?

A.    That's correct.

Q.    Your Honor, we'll move for admission of Government's Exhibits 297 through 299 and 301.

        MS. HERRING:   Maintain the objection to 297 and 298, your Honor.   No objection to 299 to 301.

        THE COURT:   Overrule those objections and all the exhibits are admitted.

        MR. GUESS:   May we publish to the jury, your Honor?

        THE COURT:   Yes.

Q.    (BY MR. GUESS) First, let's stop there.   All right. What are we looking at here, Agent Noble, based on your investigation?

A.    This is the lobby of the Aria Casino.

Q.    All right.   And we're looking at the timestamp there

in the bottom left-hand corner.  Do you see that?

A.    Yes.

Q.    And it reads July the 8th, 2023 at 05:08.  What time is that?

A.    It's June the 8th, 2023 and it's 05 in the morning, 5:00 a.m.

Q.    And we could see some activity in the casino.  Looking here at the bottom left, is that where Mr. Youngblood is located?

A.    Mr. Youngblood's at the terminal with the slot machine down at the bottom left, yes.

Q.    That's the video poker machine?

A.    Yes.

Q.    Could we go ahead and play that.

        (Video file played.)

Q.    We see a little bit of activity at the casino as this video is playing; is that right?

A.    Yes.

        (Video file played.)

Q.    Let's go ahead and stop that one.  Could we go to 298, please?  So now, the same location; is that right?  Same surveillance camera?

A.    Yes.

Q.    Now, the time has changed.  It's the same date, though; is that right?

A.    Same date, June 8, 2023, this is a few hours later, 08:49.

Q.    Okay.  So almost four hours later.  He started at 5:08, now it's 8:49 a.m.?

A.    Approximately, yes.

Q.    All right.  Go ahead and play that a little bit more, Ms. Mercado.

          (Video file played.)

Q.    And the blinking light on top of Mr. Youngblood's machine, you can see him there clearly at the corner; is that right?

A.    Yes.

Q.    And that's a casino employee there who's giving him a neck massage.

A.    Yes.

Q.    And that was another casino employee who came over to do something with the machine; is that right?

A.    Yes.

Q.    All right.  We'll stop that.  Let's go forward then to Exhibit 299.  Now, this is going to be on 6-13.  We see Mr. Youngblood there.  Do you know what's happening there?

A.    He is receiving a jackpot winnings from a casino employee.

Q.    All right.  We see him hand a little bit of money to someone; is that right?

A.   He did.  He gave that employee a tip.

Q.   The denominations of the bills there, do you know what denominations those are?

A.   Those are hundred-dollar bills.

Q.   And he's putting some of them into a bag.  What else is he doing with that money?

A.   Appears to be putting into his wallet, as well, and he's organizing some in front of him.

Q.   What time of morning is this occurring at?

A.   Approximately 6:00 a.m.

Q.   All right.  Could we go to -- we've already seen 300. Let's go to 301.  And again, what are we looking at here?

A.   This is him receiving another jackpot winning, tipping a casino employee.

Q.   What time was the video taken at?

A.   This was on June 13th, 2023 at approximately 2:00 p.m.  1:40 p.m. in the afternoon.

Q.   The previous one, he was there early in the morning again?

A.   Yes.

Q.   Same machine he's at all this time; is that right?

A.   In these last two videos, yes.

Q.   And we see there another person to the right hand, looks like they have a pretty big stack of cash; is that right?

A.    Yes.

Q.    Looks to me like that person's verifying that the jackpot win was correct.

A.    That is correct.

Q.    All right.  Go ahead and stop that.  Pass the witness for cross-examination.

CROSS-EXAMINATION

BY MS. HERRING:

Q.    Good morning, Agent Noble.

A.    Good morning, Ms. Herring.

Q.    I want to go back and talk a little bit about how this case started with Eric Perardi.  You've heard your co-Agent Wilkinson tell us that Eric Perardi was the initial victim, right?

A.    Yes.

Q.    You also heard Agent Wilkinson tell us that walk-ins are extremely common at the FBI.  You recall that from last Monday?

A.    Yes.

Q.    And that y'all take them every day.

A.    Yes.

Q.    And we learned you don't actually need an attorney to walk into the FBI, right?

A.    You do not.

Q.    Any one of us in this room could walk into the FBI if

we believed we were a victim of a financial crime, right?

A.    Yes.

Q.    And if we did that, we might even be able to meet with you or Agent Wilkinson.

A.    You would most likely meet with the duty agent.

Q.    Now, when you take a walk-in to the FBI, you as an agent know nothing about that person, right?

A.    Potentially.

Q.    Well, you haven't had time to prepare for a walk-in meeting, right?

A.    When someone walks into the FBI, they meet with somebody at the front door.  They provide an ID.  Somebody at the front door will run a criminal history or kind of a pseudo background check on the person to determine who they are and if their ID is valid.

Q.    Well, when someone walks in, you don't actually know even what type of crime necessarily they're seeking to report, right?

A.    No.

Q.    And you just said a background check is done on the spot, that there's no pre-check done on a walk-in, right?

A.    A criminal history is run before they meet with an agent.

Q.    So you'd run someone through the NCIC system and your other FBI databases before sitting down with them?

A.   Yes.

Q.   When someone walks into the FBI as a walk-in, you as an agent have no reason at that moment to believe or disbelieve a person, right?

A.   That's correct.

Q.   You wouldn't have preformed some opinion about the information they're going to bring you at that point, right?

A.   That's correct.

Q.   Your job is to listen to what they have to say, right?

A.   Yes.

Q.   Try to ask questions, right?

A.   Yes.

Q.   Try to ask questions to see if there are something that you think is worth investigating further, right?

A.   Yes.

Q.   You would try to ask questions to identify what independent information might exist that you could go get to corroborate the information they're bringing you, right?

A.   Yes.

Q.   Try to ask questions to figure out if you find someone who walks in to be credible, right?

A.   Yes.

Q.   Eric Perardi, you've told us, was also a walk-in, right?

A.   Yes.

Q.   So you would have no reason to treat Eric Perardi any differently than you would treat anyone else who walked into the FBI?

A.   Correct.

Q.   Now, you've told us earlier that you made a decision not to record -- to visually record or audio record your meeting with Eric Perardi, right?

A.   That's correct.

Q.   You do have rooms at the FBI equipped with audiovisual recording equipment, right?

A.   We do.

Q.   You also have -- you take a work cellphone into your meeting that you can use as a recording device, right?

A.   I guess we could, but we wouldn't.

Q.   Well, you heard Mr. Perardi testify last week that he actually thought you would have recorded him, right?  You heard that testimony?

A.   I heard that.

Q.   But you did not record your initial meeting with Mr. Perardi?

A.   No.

Q.   The FBI does have access as of fairly recently to

body-worn camera devices, right?

A.    Yes.

Q.    You didn't use one of those when you interviewed Mr. Perardi for the first time.

A.    No.

Q.    You did in this case record -- audio and video record the interviews of two individuals in the FBI office you brought in to speak with, right?

A.    I mean, specifically, who?

Q.    Well, when you asked Mr. Youngblood's wife to come meet with you at the FBI office, you audio-video recorded your interview of her.

A.    We did.

Q.    And you also audio-video recorded the portion of that interview that included Mr. Youngblood's son.

A.    Yes.

Q.    Eventine, right?

A.    Yes.

Q.    And both of those interviews were conducted at the same FBI building where Eric Perardi walked in, right?

A.    Yes.

Q.    So I want to talk a little bit about how you document your investigation when you don't record -- audio-video record a witness interview.  It's correct, isn't it, that when you interview witnesses, you always as an agent try

to interview with a partner, with a co-agent, right?

A.    Yes.

Q.    You don't conduct interviews alone.  That's not FBI policy or best practice, right?

A.    I would say it's not a best practice.

Q.    And when two agents go to interview a witness, is it typically one agent is sort of lead note taker and one is lead questioner?  Is that fair?

A.    Yes.

Q.    And the note taker's -- agent's job is to capture as much as possible of the interview of the conversation, right?

A.    Yes.

Q.    They don't typically capture the questions that are being asked.  It's more the information gleaned from the answers; is that fair?

A.    Yes.

Q.    And you keep copies of all notes that yourself, co-agents take when you conduct witness interviews, right?

A.    Yes.

Q.    And then, at some point, one or both agents write what's called a 302, right?

A.    Yes.

Q.    And a 302 is just the number of the form that the FBI uses to document a witness interview, right?

A.    Correct.

Q.    And when you prepare a 302, sometimes you as an agent would prepare the same day you did the interviews, sometimes within a few days but pretty close in time to the interview, right?

A.    Yes.

Q.    And when you draft a 302, that's going to be based on both notes that were taken and your memory from having conducted the interview.

A.    Yes.

Q.    And a 302 is what you're going to use down the line to remember what you as the agent learned in that interview, right?

A.    Yes.

Q.    You work multiple cases at a time typically?

A.    Yes.

Q.    You interviewed in this case dozens of people.  You talked about 50 people over the course of this investigation, right?

A.    Yes.

Q.    Perhaps more?

A.    Perhaps.

Q.    So when Eric Perardi came to the FBI as a walk-in with his attorney, he told you about the checks he'd written to James Holloway and his belief that he had been

scammed by Mr. Youngblood, right?

A.   Yes.

Q.   He told you it started with this incident when Mr. Youngblood came to his house early one morning and asked him for $70,000 and he believed there was a threat from his ex-wife, Rachel Herrera, on his life, right?

A.   Yes.

Q.   And we believe -- heard this from Agent Wilkinson but the exact date when this started didn't make it into your 302.  You recall that?

A.   Yes.

Q.   But the rest of the details of Mr. Perardi's concern, a $6.5 million life insurance policy, the company where that insurance policy was held, Prudential, that didn't make it into your notes and your 302, right?

A.   Yes.

Q.   Those are very specific details, right?

A.   Yes.

Q.   And when Eric Perardi came in and told you the story about what Mr. Youngblood had told him, you never learned why Perardi would have believed that story, right?

A.   What do you mean?

Q.   Over the course of your investigation, you didn't learn why Mr. Perardi believed his ex-wife would have had a hit on him for his life insurance policy.

A.   Mr. Perardi told us why he believed that.

Q.   He believed it because he thought Mr. Youngblood was a federal agent, right?

A.   Yes.

Q.   And he believed that he told you about these online postings?

A.   Yes.

Q.   That made him afraid, right?

A.   Yes.

Q.   But you didn't get an answer to why Mr. Perardi would think his wife was capable of such a thing, right?

A.   Mr. Perardi had said that -- said that he was told by Mr. Youngblood that his wife was in some sort of drug business, tied to her Aunt Julie Herrera and Cedar Park Toyota, and I think, therefore, he believed that there was some sort of drug debt that was owed.

Q.   And your investigation from that point forward never revealed how Mr. Youngblood would have known about Rachel Herrera, right?

A.   What about her?

Q.   You didn't identify some source of information that Mr. Youngblood had about Rachel Herrera Perardi.

A.   Like a secret source of information?

Q.   Correct.

A.   No.

Q.   You did learn Mr. Youngblood was friends with Eric
Perardi, that Eric Perardi considered him to have been a
friend at one time, right?

A.   Yes.

Q.   You learned that Mr. Perardi was the hockey coach and
Mr. Youngblood was one of the hockey dads, right?

A.   Yes.

Q.   They had several years of an acquaintance of perhaps
friendship?

A.   Yes.

Q.   That wasn't true for Mr. Youngblood and Rachel
Herrera, right?

A.   When we interviewed Rachel Herrera, I think she told
us that she had met Mr. Youngblood on two occasions.

Q.   Over the course of your investigation, you never
discovered how Mr. Youngblood would have known the name
Joey Pollard, right, independently?

A.   No.

Q.   And though it came up repeatedly, this life insurance
policy, you didn't discover how Mr. Youngblood would have
known about Mr. Perardi's policy or the amount of it,
right?

A.   No.

Q.   And we heard earlier this week that if Mr. Youngblood
had come talking about a threat based on a $6.5 million

life insurance policy, he would have been wrong because Mr. Perardi didn't have a $6.5 million life insurance policy with his ex-wife named as the beneficiary, right?

A. Specific to the 6.5 million number, yes.

Q. And you never asked Eric Perardi for a copy of his life insurance policy at that time.

A. We did not.

Q. Your investigation didn't uncover any source of information that Mr. Youngblood had about Mr. Perardi's divorce, right?

A. No.

Q. And in fact, Mr. Perardi's divorce, you did learn, had been sealed, right?

A. Yes.

Q. And you, the FBI didn't get copies of that divorce proceeding either, right?

A. No.

Q. Over the course of your multiple interviews with Perardi, he gave you the names of other people that he thought you should talk to to corroborate the information he was bringing you, right?

A. Yes.

Q. He gave you quite a few different names; is that fair?

A. Yes.

Q.   And all of the people that Eric Perardi gave you to talk to were either friends, employees, or business acquaintances of Mr. Perardi, right?

A.   Yes.

Q.   You spoke with Nicole Frost, Mr. Perardi's girlfriend, right?

A.   Yes.

Q.   He gave you the name of Eric Swanson, one of his longtime friends, right?

A.   Yes.

Q.   He give you the name of Adam Powell, one of the hockey coaches at the Crossover, right?

A.   Yes.

Q.   Gave you the name of John Mapes, who we heard about last week, an architect, business relationship and friend, right?

A.   Yes.

Q.   I want to talk just a little bit about other ways you gathered information from Mr. Perardi.  You recall when Agent Wilkinson testified last week that she told us -- that I asked her if you'd asked Mr. Perardi to send you text messages that he thought were relevant and she said no, we asked him to send us anything he thought would support the statements he had made.  Do you recall that testimony?

A.   Yes.

Q.   You didn't ask Eric Perardi to send you everything he had so that you could evaluate the credibility of the statements he had made.

A.   When Mr. Perardi was in our office and we were doing his interview, he had told us about these text messages that he had with James Holloway.  As he told us the story, we manually reviewed those messages in the office before we left.

Q.   And you asked him to send you later by e-mail, right, the text messages that he thought supported what he'd been telling you?

A.   Those text messages among other things.

Q.   Well, you didn't ask him to send you things he thought would undermine his statements, right?

A.   No.

Q.   And Eric Perardi got to curate what he provided to the FBI, right?

A.   Yes.

Q.   We heard from Agent Wilkinson last week that I think about two weeks passed before you interviewed Rachel Herrera, the ex-wife, right?

A.   Yes.

Q.   And you learned, in fact, in that interview, maybe you'd learned it from Perardi, as well, that the divorce

was actually ongoing.  It wasn't finalized at that point, right?

A.   Yes.

Q.   You also learned that divorce was very contentious. It was heated.

A.   Yes.

Q.   You learned there was lots of animosity between the two of them in that relationship.

A.   It was very contentious.

Q.   It was pretty clear to you when you did meet with Rachel Herrera that she did not have any connection to the cartel, right?

A.   Yes.

Q.   You also didn't gather any evidence to suggest that she actually had some kind of serious drug problem, right?

A.   No.

Q.   When you met her, you could just tell that that story had been made up, right?

A.   Yes.

Q.   As an FBI agent conducting investigations generally, you frequently pull call logs, cellphone records, telephone records, right?

A.   If needed, yes.

Q.   It's a pretty common piece of evidence to gather, though, right?

A.   Yes.

Q.   And when you get call logs, you can describe them, but you get large Excel sheets that show each time a call is received by a cellphone, each time a call is outgoing from a cellphone, and which numbers the calls come from and go to, right?

A.   That's accurate.

Q.   And we've heard many witnesses, almost every witness tell us that Mr. Youngblood didn't carry a phone on a regular basis, right?

A.   Yes.

Q.   He was hard to reach.

A.   Yes.

Q.   In fact, many people were frustrated by that, right, because they had to go through James Holloway or Marvin Knecht, right?

A.   Yes.

Q.   Perardi said that, too, that Kota didn't carry a phone, right?

A.   Yes.

Q.   We also heard Mr. Perardi tell us last week that calls were coming in very frequently, every day, right? Do you recall that testimony?

A.   Yes.

Q.   And we heard him testify that Mr. Youngblood

specifically called him while he was in New Orleans to have a detailed conversation about wiring money, right?

A.    Yes.

Q.    He gave pretty specific details about that call, right?

A.    Yes.

Q.    You'll recall from your notes from your 302, you had not written down a single note about a telephone call like that, right?

A.    Yes.

Q.    Nothing in your prior investigation record, in your notes, or your report suggesting that Eric Perardi had ever told you about such a call.

A.    That's correct.

Q.    You also heard last week Mr. Perardi talk about various text messages between James Holloway and Mr. Youngblood.  Do you recall that?

A.    I don't.

Q.    Do you recall hearing him say that when his car was broken into that November 1st date that he tried to reach out to Mr. Youngblood, couldn't get a hold of him but thought James, Jay was texting with him while he was traveling.  Do you recall that?

A.    I think James Holloway said that Mr. Youngblood was in the air and could only be reached by text.

Q.   You did seize Jay Holloway's phone, right?

A.   Yes.

Q.   And his computer, right?

A.   Yes.

Q.   You didn't find any record of such a text exchange.

A.   No.

Q.   You did not seize Mr. Perardi's phone, right?

A.   No.

Q.   You didn't ask him if you could just borrow it to image it, give it back to him?

A.   No.

Q.   We saw some of the e-mails last week between Mr. Perardi and his divorce attorney, his various creditors, and we saw he started CC-ing you and Agent Wilkinson on some of those e-mails.  You recall that?

A.   Yes.

Q.   Now, as an FBI agent, it's not part of your job to get involved with someone's personal divorce proceeding, right?

A.   Yes.

Q.   Have you appeared in divorce court on behalf of Mr. Perardi?

A.   No.

Q.   Have you made representations to the Travis County court about Mr. Perardi's financial situation?

A.   No.

Q.   I want to talk now a little bit about the Sniders, about Dale and Gary Snider.  We heard from Gary last week, right?

A.   Yes.

Q.   You actually first interviewed Dale Snider, Gary's wife; is that right?

A.   Yes.

Q.   And you had her, I believe, come into the FBI office in person so you could meet her, right?

A.   Yes.

Q.   And Gary didn't come to that first meeting.

A.   He did.

Q.   He did come to the first meeting?

A.   He did.

Q.   You learned that meeting that the Sniders, as you've told us earlier this morning, are very close friends with the Holloways, right?

A.   Yes.

Q.   Go back something like 20 years?

A.   Yes.

Q.   Celebrate holidays, travel together, eat together regularly, right?

A.   That's accurate.

Q.   Both Gary Snider and Jay Holloway are in the same

clock group, Clock Association.

A.    Yes.

Q.    Do you recall in your 302, the 302 that you drafted from that first interview with Dale Snider that the Sniders had made a $260,000 investment in a gold coin?

A.    I don't recall the specific numbers but that sounds right.

Q.    After your first meeting with the Sniders at the FBI office, you remained in contact with them?

A.    Yes.

Q.    At some point, you gave Gary Snider, maybe Dale Snider, too, your work cell number?

A.    Of course.

Q.    And do you remember that several months into this investigation, four or five months later, I think in October of '23, you did receive a text message from Mr. Snider, from Gary Snider.

A.    Yes.

Q.    You recall that Mr. Snider sent you more details about that night of September 30th than what had transpired when Jay Holloway came to his home in tears?

A.    Yes.

Q.    Was that text a followup to a conversation, a telephone conversation you'd had with Mr. Snider, or was it just out of the blue four or five months later?

A.   You'd have to show me the specific text, I could tell you.

Q.   May I approach, your Honor?

THE COURT:   You may.

Q.   (BY MS. HERRING) Do you recall receiving that text message from Mr. Snider on October 5th?

A.   Yes.

Q.   Does that look like an accurate copy of the text you received from him?

A.   Yes.

Q.   I would move to admit 149.

THE COURT:   Any objection?

MR. GUESS:   No objection.

THE COURT:   So admitted.

Q.   (BY MS. HERRING) So upon seeing that text, do you recall was that sent in response to a conversation you had with Mr. Snider, or was that sent unprompted?

A.   This is in response to a conversation I had had with him.

Q.   You see at the bottom where he says, I hope this helps to clarify and does not confuse what we told you yesterday.  Do you see that line?

A.   Yes.

Q.   You didn't write any notes or report about what he had told you the day before?

A.    No.

Q.    But he felt the need to send something to you clarifying that?

A.    I'm not sure why he wrote those specific words.

Q.    And you didn't write down any notes about your call with him that you could refresh yourself with now.

A.    No.

Q.    You didn't think it was important to document a call you had with a witness discussing this fateful night of September 30th?

A.    This particular conversation was related to us preparing for grand jury and which specific wire counts we were going to use in a superseding grand jury indictment and so, the conversation I had with him was related to that.

Q.    Your conversation with him was specifically related to a wire transaction.

A.    Yes.

Q.    You heard Mr. Snider testify last week that it was his belief that when he withdrew that $235,000 in cash, gave it to Jay Holloway, that that money went directly to Mr. Youngblood, right?

A.    Yes.

Q.    And that is your understanding of what happened to that money.

A.    Yes.

Q.    I want to move forward and talk just briefly about Hanfu Lee.  You interviewed Dr. Lee, was it, telephonically for the first time because he's in California?

A.    Yes.

Q.    And that was in August of '23 that you first made contact with Dr. Lee?  Does that sound right?

A.    Sounds right.

Q.    And you did write a 302 about that phone interview, right?

A.    Yes.

Q.    And at some point after your initial interview, you requested he send you some documents, right?

A.    Yes.

Q.    I think he sent you receipts, ledgers, some account information, right?

A.    Yes.

Q.    Provided those to you by e-mail?

A.    Yes.

Q.    Do you recall that Dr. Lee also provided you with a list of all the reasons Mr. Youngblood had told him he needed to send money?  Do you recall that?

A.    Yes.

Q.    Do you recall some of the many reasons Mr. Youngblood

gave for wanting money from Hanfu Lee in 2023?

A.   The primary reason was for some large gold transaction.

Q.   Recall any of the other reasons that Dr. Lee told you Mr. Youngblood had asked him for money?

A.   There was a mention of Rolex watches.  There's also money that was given for airline pilots, fuel for the transfer of the gold.  There was several reasons.

Q.   I want to talk a little bit more about your collection and assessment of all of these objects that you've -- that the FBI has accumulated over the course of this case.  Fair to say, you've collected a lot of unusual objects in your investigation?

A.   Yes.

Q.   You've told us about, shown us baseball bats, the headdress Dream Catcher, flags, books, crosses, all kinds of things.

A.   Yes.

Q.   And all of the people you collected those objects from said Mr. Youngblood told me this was really valuable and they believed it, right?

A.   Yes.

Q.   And at this time, the FBI is storing, what is it, four or six baseball bats, something lake that?

A.   Four bats.

Q.   And 30-plus paintings, right?

A.   Or canvass.

Q.   Canvas, prints, right?

A.   Yes.

Q.   Objects that you pretty quickly and easily determined were not valuable objects, right?

A.   Yes.

Q.   You told us earlier the bat that says softball on it, you were able to figure that out yourself just by eyeballing the wood on the bat, right?

A.   Yes.

Q.   And many of the paintings at the FBI office have these Goodwill stickers on the back of them, right?

A.   Yes.

Q.   You recall, I can't recall when it was, but when Mr. Gonzalez-Falla and myself went to the FBI office to review those objects with you sometime earlier this year -- last year?

A.   Yes.

Q.   Several of the bats you hadn't even had to open because you knew there was no chance they belonged to Babe Ruth or Lou Gehrig, right?

A.   I believe we opened them that day.

Q.   Correct.  We opened them together.  You hadn't been worried that the FBI had been sitting on some valuable

Babe Ruth bat for months, right?

A.    No.

Q.    We heard last week from Agent Wilkinson and, also, she's an agent or analyst, Katie Sloma, that this case involved a lot of cash, right?

A.    Yes.

Q.    And your investigation showed that Mr. Youngblood's goal, intent was to get his hands on cash as frequently and as quickly as possible; is that fair?

A.    Yes.

Q.    You also reviewed numerous financial documents, bank records in this case that show that Jay Holloway had cashed a lot of checks, high volume number of checks cashed.

A.    Yes.

Q.    And many of them, if not most of them, were cashed at the same Wells Fargo branch up in North I-35, right?

A.    Yes.

Q.    You recall some mention of the bank manager there, Brian, I think that name came up last week with Mr. Perardi and Mr. Holloway?

A.    I don't recall that name.

Q.    You never interviewed Brian Martinez, the bank manager at that particular Wells Fargo branch?

A.    No.

Q.   You never interviewed anyone at that Wells Fargo branch?

A.   That's correct.

Q.   Banks typically keep pretty good surveillance footage records, right?

A.   For a short period of time.

Q.   And Wells Fargo would have presumably given you those, had you asked, with either a subpoena or maybe even if you'd just gone and asked as an FBI agent?

A.   If they had it.

Q.   You didn't request footage from the Wells Fargo branch that Jay Holloway frequented?

A.   No.

Q.   No further questions.  Thank you.

                    RE-DIRECT EXAMINATION

BY MR. GUESS:

Q.   Agent Noble, Ms. Herring asked you a few questions. We'll try to clarify some of this stuff.  In terms of how Kota Youngblood figured out these details about Eric Perardi, do you have some idea that Kota Youngblood had ingrained himself in that hockey community for a number of years?

A.   Yes.

Q.   What was his relationship to the hockey community, the group of people that we'd seen on that chart as well

as others not seen on that chart?

A.    The best way I can describe Kota Youngblood on how he was able to do this is he is a wolf in sheep's clothing. He operating much like a storyteller where he listens to what people tell him and then, he uses that against them.

Q.    Is it possible based on what you know about the community that there was a little bit of gossip that was going around?

A.    There was.

Q.    Mr. Perardi talks about the fact that he wouldn't go to drink beers or have dinner with people because he was coaching.  But the other group of people, what did you find out about them?

A.    It was a close-knit community.  Yes.

Q.    Mr. Youngblood's wife Gloria, was she friends with Rachel Perardi, did you find out?

A.    She knew her, yes.

Q.    And did they sometimes talk and discuss things?

A.    Probably on occasion.

Q.    John Mapes, he wasn't part of that community, or was he?

A.    He was not.

Q.    But Eric Swanson and Adam Powell were?

A.    Eric Swanson was Mr. Perardi's best friend.  Adam Powell was his son's -- Eric Perardi's son's hockey coach.

Q.    Did Mr. Perardi tell you that he confided in Swanson a lot of problems in his marriage?

A.    He did.  He talked to Mr. Swanson a lot about his marriage.  Mr. Swanson was also present during a lot of the conversations and meetings between Mr. Youngblood and Mr. Perardi.

Q.    And it was Eric Swanson and Adam Powell who had telephoned Mr. Perardi about the hockey showcase in Las Vegas; is that right?

A.    That's correct.  They were the ones that reported that Mr. Youngblood had been saying that Mr. Perardi and his family were in danger.

Q.    And this was after several months in which Mr. Perardi and Mr. Youngblood become closer because of the posts?

A.    Yes.

Q.    The fact that Rachel Perardi, Rachel Herrera was having an affair, Mr. Perardi knew about that.

A.    Yes.

Q.    And he talked about it with other people; is that right?

A.    He did.

Q.    The fact that Joey's name would come up during that, would that surprise you?

A.    No.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Q.   The amount of money and the insurance policy Ms. Herring asked you about that.  Again, based on your investigation, how much was his personal life insurance policy for?

A.   $5 million.

Q.   But you only found that out later?

A.   Yes.

Q.   And then, he also had a business policy of approximately how much money?

A.   Two million.

Q.   So that's roughly six-and-a-half-million dollars?

A.   It's seven million but...

Q.   When Mr. Perardi came into the office with Mr. Toland on the 27th, did he allow you to have his phone, free access to his telephone?

A.   Yes.

Q.   Is that unusual that a victim would offer you his telephone?

A.   No.

Q.   And what was the point of you looking through his telephone?

A.   As he was telling us the story, we were confirming what he was saying but based on these text messages that he said he had had.

Q.   Ms. Herring used the word "curate."  Do you believe

that Mr. Perardi curated the messages, or was he simply providing you information that was necessary for you in your investigation?

A.   I believe he just provided what's necessary for our investigation.

Q.   Did you believe he was hiding stuff from you?

A.   No.

Q.   Is it normal for you to seize a victim's telephone during the course of an investigation?

A.   Only when necessary.  I don't believe it was necessary in this case.

Q.   She asked you about why you did the video interviews or videotaping of the interviews of Gloria Youngblood and Eventine Youngblood.  Why did you decide to go ahead and record those interviews and not other victims' interviews?

A.   Well, Eventine Youngblood came into the office with his mom Gloria.  Small portion of the first audio recording is with Eventine.  The main purpose of that recording was to interview and capture the words spoken by Ms. Youngblood.  At that time, we weren't sure if she was a coconspirator or not.

Q.   So she was a potential subject of your investigation at that point?

A.   Yes.

Q.   Is it normal for you to go ahead and do videos of

subjects at that point?

A.   Yes.

Q.   Why is that?

A.   Just to capture the words spoken.  Just in case there's something revealed in the interview that's of importance.

Q.   You mentioned a wolf in sheep's clothing.  Who was fanning the flames of discord between Eric Perardi and Rachel Perardi?

A.   Kota Youngblood.

Q.   And how was he doing that?

A.   He was doing it through conversations with Mr. Perardi and these online posts.

Q.   Ms. Herring asked you why you didn't put the fact that Mr. Perardi had been on the telephone with Kota Youngblood while he was in New Orleans in the first part of the investigation.  Do you remember that question?

A.   Yes.

Q.   Was the fact that the call took place that was a telephone call, was that important to you?

A.   Not the most important thing, no.

Q.   What was the most important thing?

A.   The check was sent and the check was cashed.

Q.   Did Mr. Perardi ever tell you a story other than the fact that he moved that money in order to pay off Kota

Youngblood?

A.   He was steadfast in that.

Q.   Did you also learn during the course of your investigation that Mr. Youngblood would sometimes use third parties like Lane Holloway to identify information about potential victims?

A.   Yes.

Q.   What did you learn during the course of your investigation about that?

A.   Mr. Holloway, Lane Holloway had a Ph.D. in computer programming.  He would oftentimes be asked by Mr. Youngblood to do online research, kind of internet deep dives of individuals.

Q.   So, for example, you would be able to potentially find out that Rachel Herrera and Julie Herrera has some type of a relationship?

A.   Yes.

Q.   In regards to the Sniders, Ms. Herring asked you a couple of questions, in fact, and we've admitted a defense exhibit there.  You said that the purpose of your conversation with Gary Snider was to talk about the count on the grand jury for the $235,000.  What was Mr. Snider's story about that $235,000?

A.   He had provided --

        MS. HERRING:  Object to the hearsay.

THE COURT: Any response to that?

MR. GUESS: It's in response to her question, she opened the door as to why this was important so just filling in the gaps, your Honor.

THE COURT: Sustain the objection.

Q.   (BY MR. GUESS) All right.  Did Dale Snider's story ever differ from Gary Snider's?

A.   Never.

Q.   When you identified Dr. Lee or Dr. Lee came on the scope of your investigation, was that a surprise to you?

A.   Yes.

Q.   Why?

A.   Dr. Lee had been -- had lost $5 million from 2011, roughly, 2017.  He came to Texas to try to retrieve some of that money, confronted Mr. Youngblood.  So yes, it was a surprise that that victimization started over again.

Q.   And again, you would have probably looked into Dr. Lee but for the fact that he came to Texas in 2023; is that right?

A.   That's correct.  And that we saw that there were some wire transfers and Zelle payments in 2023 from Hanfu Lee to Mr. Youngblood.

Q.   Did Dr. Lee ever vary from the fact that the money in 2023 was to make the big deal, the gold deal come through?

A.   Never.

Q.   Ms. Herring asked you about the old bats, the paintings, everything else.  Let me ask you, Agent Noble, based on your interview of many of these witnesses, and so forth, do you consider them to be stupid people?

A.   No.

Q.   Were they so gullible that they would have bought the beans from Jack and the beanstalk?

A.   No.

Q.   Why were they so interested in investing or believing Kota Youngblood?

A.   Kota Youngblood is a one-in-a-million con man.  He says what he has to say to get what he wants.  He developed relationships and used the information that he gathered from the victims against them.  He isolated families from each other.  He used every tactic that I could think of that a con man would use to get anything he wanted.

Q.   No further questions, your Honor.

        MS. HERRING:  Nothing further for this witness.

        THE COURT:  Thank you.  You may step down.  Could you approach?

        (At the bench, on the record.)

        THE COURT:  Where are we in your evidence?

        MR. GUESS:  We're going to rest.

        THE COURT:  Then what's your intention?  Are you

going to rest?

MS. HERRING:  Move for judgment on Counts 1 and 5.

THE COURT:  Okay.  And then, after that?

MR. GUESS:  We will call a witness.

THE COURT:  Okay.

MS. HERRING:  Yes, your Honor.

THE COURT:  Shall we take our break?  That will give you --

MS. HERRING:  Yes, your Honor.

(End of bench conference.)

THE COURT:  All right.  Any further witnesses, Mr. Guess?

MR. GUESS:  Your Honor, ladies and gentlemen of the jury, the government would rest its case-in-chief at this point.

THE COURT:  Ladies and gentlemen of the jury, the government has rested.  We'll take this as an opportunity to take our first 20-minute break of the day.  Although I'm going to make that a 25-minute break this time.  We're going to have a couple of things that we're going to need to deal with in your absence.  And so, it's 10:30 now.  If you could take your break, be back in the jury room, ready to go at 10:55.

And you'll recall the instructions that I've

given you throughout this trial:  Please don't talk to anyone, including each other, about this case and don't engage in any independent investigation.  And we'll see you back here in 25 minutes.

(Jury not present.)

THE COURT:  Let's take our break and then, convene a few minutes before for any motions that you think would be appropriate at the time.  So we'll take -- let's take a 20-minute break now.

(Recess.)

THE COURT:  All right.  Do we need to take up anything before the jury comes in?

MR. GONZALEZ-FALLA:  There's a Rule 29 motion Ms. Herring's going to --

THE COURT:  Okay.  Ms. Herring.

MS. HERRING:  Yes, your Honor.  Should we approach about a Rule 29?

THE COURT:  Before we bring the jury in, yeah.

MS. HERRING:  Yes, your Honor.

At this time, I would move for a judgment of acquittal on Counts 1 and 5 of the indictment.  As the Court knows, under Supreme Court case Schmuck v. United States, which is 489 U.S. 705, 1989, in order to prove that the wires in furtherance of the scheme as contemplated by the perpetrator at the time, the

government -- that is the requirement, that is the government's burden on that point. The government must establish that Mr. Youngblood intentionally participated in a scheme to defraud and used the wire to further that scheme.

There's a Fifth Circuit cite, as well, United States vs. Ingles, I-N-G-L-E-S, 445 F. 3d, 830, Fifth Circuit, 2006. And finally, under Kann v. United States, the Supreme Court case, 323 U.S. 88, 1944, a wire cannot be for the purpose of furthering the scheme to defraud if the wire is sent after the scheme has reached its fruition.

In this case, on Count 1, in particular, the Court has heard testimony directly from Eric Perardi that he wrote the check on July 26, 2022. Bank records establish that James Holloway cashed that check on July 27th at 9:32 a.m. Mr. Perardi did not request disbursement from his home equity line of credit until that same date. And then, the wire, once the money moved from the home equity line of credit to the Washington Federal account, was not initiated until 1:28 p.m. and completed approximately an hour later at 2:30. That movement of money is -- has been put on by the government both through bank records and through Mr. Perardi's direct testimony. And then, finally, we saw records that Mr.

Perardi did not move the money that had been wired from his personal account into the account from which the check was cashed until the following day.

So if I may provide this to the Court.

THE COURT:  Sure.

MS. HERRING:  Illustrative of the issue but essentially, the check was cashed and the fraud as to that account was complete before the wire was ever initiated; and therefore, there is insufficient to show that that particular wire furthered the scheme to defraud.  Because Count 5 rests on Count 1, specifically charges the unlawful activity that is the basis for the Count 5 money laundering count, I would move for a judgment of acquittal on both Counts 1 and 5.

THE COURT:  Thank you.

Mr. Harding.

MR. HARDING:  Your Honor, Ms. Herring's argument relies on the mistaken assumption that the scheme had reached its fruition.  That the scheme that is alleged in this indictment continued from 2021 through 2023, it included Mr. Youngblood's expenditure of that money at casinos and on this personal benefit.  Because the scheme was ongoing, the fact that the wire transfer was made prior to -- excuse me, after the check written by Eric Perardi is irrelevant, it was still in furtherance of the

scheme in the sense that it resulted in money in Mr. Youngblood's pocket that he'd then spent on gambling and his personal expenses.

MS. HERRING:  Your Honor, my response to that is just that the government has to meet each element as to each specifically charged wire transaction.  So the Court has to analyze Count 1 separately from Count 2, 3 or 4. Just because they have alleged a continuing scheme doesn't relieve the government of its burden on that point.  And on Count 1, specifically, this wire was not even initiated until after the check had been cashed.  For that reason, the Court should grant motion under Rule 29.

THE COURT:  Thank you.  I agree with the government's assessment of the evidence in the case and will deny your motions at this time without prejudice for you to re-urge them in the future.

Any other matters or issues you'd like to raise?

MS. HERRING:  Yes, your Honor.  For the record, I would move just generally on all counts arguing that the government has not put on sufficient evidence as to Counts 1 through 5.

THE COURT:  Any brief response?

MR. HARDING:  No, your Honor.  I think we've established enough evidence that at least the jury can make that decision.

THE COURT:  Yes.  I believe that to be the case so I'll deny that motion, as well.  All right.

Are we ready to bring the jury in?

MS. HERRING:  Your Honor, may I address one other evidentiary issue?

THE COURT:  Of course.

MS. HERRING:  On our exhibit list, we had designated, previously, Defense Exhibits 133, 144, 145 and 146 as demonstratives.  The Court will recall those are demonstrative exhibits that I prepared as Mr. Perardi was testifying and I would ask that those be allowed in as summary exhibits at this point so that those can go back to the jury.

MR. GUESS:  I'd object to that, your Honor.  I don't believe that the predicate was set for summary evidence as I went through it with Agent Noble up there on the stand.  Demonstratives have always been presented for educational purposes as a means to help the jurors understand the point that the lawyer is trying to make, not as full evidence.  Based on that, the government would object to any demonstratives going back to the jury room.

THE COURT:  I don't recall you having set the predicate for them as being summary evidence unless I'm misremembering.

MS. HERRING:  I did, your Honor, walk through on

144, 145 and 146, showing Mr. Perardi the records that had been pre-admitted as we went, getting him to confirm what I was writing down as we went through the records, essentially made the summary together. I agree on 133 that that was not the case. But 144, 145 and 146, I would argue that I did conduct that predicate with Mr. Perardi in the courtroom.

THE COURT: Then I will allow those to go to the jury. Those three.

MS. HERRING: Thank you.

THE COURT: Those three.

MS. HERRING: Thank you, your Honor.

THE COURT: All right. Anything else before we bring the jury in? Okay.

MS. HERRING: No, your Honor.

(Jury present.)

THE COURT: Does the defense wish to call any witnesses?

MS. HERRING: Yes, your Honor. The defense would call Rachel Herrera Perardi.

THE COURT: Before you take a seat, could you raise your right hand to be sworn, please.

THE CLERK: You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing

but the truth?

THE WITNESS:  Yes, I do.

THE COURT:  Please be seated.

RACHEL H. PERARDI, called by the Defendant, duly sworn.

DIRECT EXAMINATION

BY MS. HERRING:

Q.   Good morning, Ms. Herrera.  Could you please state and spell your full name for the court reporter?

A.   Yes.  It's Rachel R-A-C-H-E-L, Herrera, H-E-R-R-E-R-A, Perardi, P-E-R-A-R-D-I.

Q.   Is this your first time testifying in federal court, Ms. Herrera?

A.   It is.

Q.   Are you a bit nervous this morning?

A.   I am.

Q.   And you are here under a subpoena, right?

A.   That's correct.

Q.   And just to be clear for the jury, you don't have any personal interest in the outcome of my client, Mr. Youngblood's case, right?

A.   I do not.

Q.   Can you tell the jury a little bit about your background, where you grew up?

A.   Sure.  I am daughter to someone that was in the military so my brother is three years older than I.  I was

born in San Antonio.  We moved around a little bit growing up.  My dad eventually was stationed at Fort Hood where he retired.  And so, I finished out my schooling there, worked for a military contractor for a few years and then, landed in Austin around 2008.

Q.   And what brought you to Austin, specifically?

A.   Just opportunity looking for long-term professional sort of development that I couldn't really get in a smaller town.

Q.   And can you tell us about your schooling, where you went to school and what you studied?

A.   I did a couple of years at Austin Community College and just with a focus on general business admin.

Q.   And do you have children, Ms. Herrera?

A.   I do.  I have two girls.  One is 20 and one is five.

Q.   And how do you know Eric Perardi?

A.   We are still legally married.

Q.   And how long were you -- how long have you been married to Mr. Perardi?

A.   Since October of 2015.

Q.   And when did the two of you separate?

A.   In October of 2021.

Q.   And who filed for divorce?

A.   He filed.

Q.   Do you know why he filed for divorce?

A.   We had had --

MR. GUESS:  I'll object as to speculation and as to hearsay.

MS. HERRING:  Just her knowledge of the divorce proceeding if she can answer to her knowledge of it.

THE COURT:  I'll allow her to answer.

A.   Of why he filed?  We had had problems in our marriage since probably 2020.  We had been going through couples therapy and in one of those sessions, I expressed that I was done in the relationship, and shortly thereafter, he filed.

Q.   (BY MS. HERRING) And was that a contested divorce proceeding or was it an agreed divorce?

A.   It's been very contentious.

Q.   You said it's, in fact, still not finalized?

A.   Correct.  We were supposed to have a setting on 15th of this month but he moved to the 25th of this month.

Q.   And you are aware that Eric Perardi has accused you of infidelity?

A.   Yes.

Q.   You're aware that he has accused you of drug use?

MR. GUESS:  I'll object as to leading.

THE COURT:  I'll allow it.  Go ahead.

Q.   (BY MS. HERRING) Are you aware, Ms. Herrera, that Eric Perardi has stated that he believed that you at one

point placed a hit on his life for his $6.5 million life insurance policy?

A.   His lawyer stated that to my lawyer in an e-mail, yes.

Q.   Is that how you learned about it?

A.   Yes.

Q.   And to be very clear for the jury, did you ever place a hit on Eric Perardi for his life over his life insurance policy or for any other reason?

A.   I did not.

Q.   What about your marriage or your behavior in the course of your marriage?  Do you believe you would have given your ex-husband a reason to believe that you were capable of doing something like that?

A.   I have no idea.  It's very outlandish.

Q.   Were you ever violent toward him in marriage?

A.   No.

Q.   Did you have or do you have any kind of personal or family connection to a Mexican cartel organization or organized crime in any way?

A.   I do not.

Q.   Do you personally know anyone in a Mexican cartel?

A.   I do not.

Q.   Have you ever had romantic relationships with anyone that you believe is a drug lord or cartel affiliated?

A.    No.

Q.    Do you speak Spanish, Ms. Herrera?

A.    I know a couple of words enough to find a restroom, order a drink, but I do not speak fluent Spanish, no.

Q.    You didn't grow up speaking Spanish at home?

A.    No.

Q.    Do you have family that lives in Mexico?

A.    I do not.

Q.    Have you traveled to Mexico since you and Mr. Perardi separated?

A.    I have not.

Q.    To your knowledge, would there have been any reason to believe through the course of your marriage that you owed some sort of financial debt to a Mexican cartel?

A.    No.

Q.    When your ex-husband initiated divorce proceedings, where were you working at the time?

A.    We owned a commercial real estate company and I worked for the company.

Q.    And what was name of that company?

A.    Perardi Development.

Q.    And what was your role there?

A.    I was the director of marketing.

Q.    Did Mr. Perardi own other companies, as well?

A.    Yes, but typically, everything sort of kind of rolled

under Perardi Development.

Q.   And are you familiar with T.A.P. or T.A.P. Development?

A.   Yes.   T.A.P. was -- I believed to be sort of the holding company for the business.

Q.   And was T.A.P. Development a disputed asset in your divorce or was it always separate property?

A.   It was separate property.   He created that LLC in, I believe, 2008 so that was separate property before --

Q.   It predated your relationship --

A.   Yes.

Q.   Who is Joey Pollard?

A.   He was a former coworker of mine.   Before I started with Perardi Development, I worked for Xerox in 2012 to '15.   We worked together at Xerox.

Q.   And did your ex-husband have a reason to believe that you were cheating on him with Joey Pollard?

A.   He came to -- I was hosting a trade show for Xerox. I sold 3D printers for them so I was hosting a trade show. Eric showed up to that trade show unannounced and uninvited and said that he didn't like the way that Joey looked at me, and it sort of became this thing for him that he thought that there was flirtation there that he did not approve of.

Q.   And this was -- the event you're referring to, was

this before early on in the marriage or pre?

A.   Pre-marriage.

Q.   Pre-marriage?

A.   Uh-huh.

Q.   Do you recall being a subject of harassing or negative social media posts in February-March of 2022?

A.   Yes.  So it was Superbowl weekend, I was leaving an event and was -- I received a notification that I had been tagged in multiple posts from Facebook to Instagram and then, LinkedIn, as well, all claiming that I was on drugs or doing drugs with Joey, that I was involved in swinging groups in Steiner Ranch, that I was not to be trusted around someone's daughter.

Q.   And what did you think when those posts started to appear?

A.   I immediately sent them to my attorneys.  I reported the posts.  Everything that was being said in those posts were things that were being said about me by my ex, and so, I took that to my lawyers and just said, what can we do to have these removed.

Q.   Do you know what steps your attorneys took at that time, if any?

A.   I know they were able to pull IP addresses but they didn't lead anywhere.

Q.   Had you ever been the subject of either social media

harassment or any other kind of electronic harassment before that February-March date?

A.    No.

Q.    When you and Mr. Perardi separated, did he take any action with the -- through messaging related to kind of his opinion about why the divorce was going to happen or why the separation had occurred?

A.    Pretty early on, he -- right around the time that that interaction happened with the therapist, he began to make calls, e-mails, texts to pretty much everyone in my life, my parents, my brother, my aunts and uncle, my cousins, anyone who was involved in our professional circle, all of our neighbors.  We lived in a pretty tight-knit community and so, went through -- and this was actually something that I had addressed with the therapist in a therapy session.

        MR. GUESS:  Your Honor, I'll object to the narrative response at this point.

Q.    (BY MS. HERRING) What was the content of that communication?

        MR. GUESS:  And I'll object as to hearsay.

        MS. HERRING:  Your Honor, it's not for truth of the matter.  It's just I'm asking her for a summary of the types of content included at the time.

        THE COURT:  I'll allow it.

A.    It was just that I was a drug addict, that I was suicidal, that I was a drunk, that I was a cheater, very disparaging comments.

Q.    Was it similar content to what then showed up in February-March?

A.    It was almost exact verbatim.

Q.    And why did your ex-husband believe that you were using drugs, if you know?

A.    I don't believe that he did.  I think it was a way for him to create a narrative.

Q.    Were you required to drug test during the divorce proceedings that had been going on for two-plus years?

A.    Yes.  I've had urinalysis, hair and nail testing.

Q.    And why has that been a part of the divorce?

A.    Because of his allegations.  My lawyers basically said if you don't have anything to hide, then we don't need to fight it.  It's better to just go along with it than have to go in front of a judge and he would order it, anyway.

Q.    And you have gone along with it, right?  You've engaged with the drug testing?

A.    I think there's been at least a dozen.

Q.    And do you recall one positive drug test, I believe it was January of '23?

A.    Yes.

Q.   Is that the only positive result that's ever come during all the --

A.   Yes.

Q.   -- Dozen tests you've mentioned?

A.   Yes.

Q.   And what happened with that drug test?

A.   I had not disclosed a diet prescription medication that I was taking and so, they didn't have that on so the medical review was taken.  I then took a test three weeks later and it was negative.

Q.   Did you have a concern during your divorce that your ex-husband was misusing community assets?

A.   Not necessarily while we were married.  I was sort of left out of a lot of the financials.  I was not made aware of how things were structured with our finances until we separated.

Q.   And once you separated and the divorce proceeding began, did you have a concern about your ex-husband's use of community property?

A.   Very much so.

Q.   And what gave rise to that concern for you?

A.   Moving large amounts of money, you know, six-figure amounts of money from accounts, using community money for business and business money for community.  It was all sort of intertwined.  There was sort of a very meticulous

structure to all these different bank accounts that I did not have view into.

Q.    Did you have any particular concern about Mr. Perardi's use of the home equity line of credit?

A.    I was very concerned about that.

Q.    So what can you tell us about the home equity line of credit, why you all applied for it?

A.    So in May of 2021, his friend, who is the banker or was for Washington Federal, suggested that we take out this home equity line of credit because of where the market was sort of as a security blanket because we were expanding the business at that time, and so, he said, you know, we have close to $500,000 in equity in the home, we can use that as sort of a rainy day or emergency fund and to help fund these new larger projects that we were involved with.

Q.    And did you also -- do you recall, you also signed for that line of credit?

A.    I did, yes.

Q.    And that money, that line of credit was approved shortly before you and Mr. Perardi separated; is that right?

A.    September, right around the time that we split but before he filed.

Q.    And after you separated and divorce proceedings

began, did you have access to the HELOC, the line of credit?

A.   I have never had access to it.  No.  I never had view or any level of access.

Q.   And once Mr. Perardi initiated divorce proceedings, what did you understand that money, that line of credit was going to be used for?  How was it going to be used?

A.   I knew that he was granted use of 36,000 of it for my rental accommodations.  Beyond that, I did not know that he was allowed to spend it.

Q.   Was the access to the HELOC something that you and your attorneys were disputing in the divorce?  Were you trying to get access to some of that community debt?

A.   Yes.  Well, it was my understanding that, you know, we both signed it that half of it should be available for my use.

Q.   And that was disputed in the divorce; was that right?

A.   Correct.

Q.   At some point, did you start to work at Toyota Cedar Park?

A.   I did in October of '23.

Q.   Tell us a little bit about that, how you found that job and...

A.   Or '22, I'm sorry.  So my aunt actually owns that dealership and I was looking for employment and she had

offered a position for me there.

Q.   After you started to work at Toyota Cedar Park, did you suffer more social media online harassment?

A.   Almost -- probably about two weeks after my employment started there, very similar posts were being made to Yelp, DealerRater, which is sort of a car sales website, Google, anonymous e-mails were sent to Toyota, anonymous e-mails were sent to our home office, Gulf States Toyota, a lot of sort of similar narrative that I was doing drugs on the sales floor, that I was having relations with customers, that I was being rude, drinking.

Q.   Did those posts affect your ability to start that job off and continue to do that job?

A.   I wasn't even fully through the sales training process when all of that started.  You know, obviously, that being my aunt's dealership, she knew what had been going on with my divorce, but it certainly affected because those were something that every single person in that dealership saw and they employ 500 people.

Q.   Do you know over the course of your six-plus-year marriage, did you have a relationship with Mr. Perardi's children, his sons from his first marriage?

A.   Yes.  I met them when they were three, six and nine.

Q.   And what kind of role did you play in their lives over the course of that marriage?

A.    I was very heavily invested.  Very hands on, you know, attended school field trips and I planned all of the birthday parties.  You know, I would drive them here and there.  I treated them as my own sons.

Q.    And you were their stepmother?

A.    Yes.

Q.    Can you describe your relationship with the middle son, XXXX Perardi?

A.    Uh-huh.  He and I were probably the closest.  He's a really, really good kid.  We spent a lot of sort of quality one-on-one time together.  You know, I took him to a lot of practices and that sort of thing.  We were very close.

Q.    And you traveled with the boys?

A.    Uh-huh.

Q.    And your husband at the time, as well, for hockey tournaments, right?

A.    Very often, yes.

Q.    Have you heard that at some point, Eric Perardi has alleged or said that he believed that you were going to have XXXX killed through your cartel connections?

A.    I was made aware of that allegation at some point in the course of this.

Q.    And what did you think when you heard that?

A.    I was shocked to hear that.  It's beyond anything

that I can comprehend.

Q.   Did you maintain any relationship for any period of time with XXXX after you and Eric separated?

A.   Yes.  So he had moved to Dallas for hockey in August of '21, so just before Eric and I separated, so he was living with a host family.  We maintained a relationship via phone, social media, texting, until he returned from that host family for the summer after the school year had completed and then, it was radio silence.

Q.   And you also have a young daughter with Mr. Perardi, right?

A.   Yes.  She's five.

Q.   And what has your custody arrangement been over the course of these years of divorce proceedings?

A.   We are on a 50-50 schedule.  Originally, we were doing a two-two-three schedule because that's what the sons were on.  In January of this year, we moved to a two-two-five.

Q.   Does that mean -- can you tell the jury what that means?  Are you exchanging your daughter on a weekly basis?

A.   Yes.  So when it was two-two-three, it was a Monday, Tuesday and then, Wednesday, Thursday and then, the weekend.  So it was multiple times per week, we would exchange.  Now he has her every Monday, Tuesday.  I have

her every Wednesday, Thursday and then, we switch weekends.

Q.   Have you ever done anything to place your daughter in danger?  Place her life in danger?

A.   Absolutely not.

Q.   Would you ever do anything to place your daughter's life in danger?

A.   No.

Q.   Do you know my client, Mr. Youngblood?

A.   Just sort of in passing.  His son played on a hockey team with XXXX so just, you know, being at games or the rink.  That's about it.

Q.   Do you consider yourself friends with him?

A.   No.

Q.   And are you here today in support of him in any way?

A.   No.

Q.   And you're not familiar with the facts of this case or the charges here, right?

A.   Just from what I've been sort of made aware of through Eric's deposition and his media.

Q.   You haven't reviewed evidence or seen discovery in the case.

A.   No.

Q.   Pass the witness.

CROSS-EXAMINATION

BY MR. GUESS:

Q.   Good morning.  Do you go by Herrera or Perardi?

A.   Herrera is fine.

Q.   I figured.  I'm Dan Guess.  I'm the prosecutor in the case, Assistant U.S. Attorney.  Understand what my role is in this case, right?

A.   Yes.

Q.   We've never met, have we?

A.   We have not.

Q.   First time ever seeing one another and talking?

A.   Yes.

Q.   All right.  You said you're a little nervous.  Are you feeling a little bit better now?

A.   I'm okay.

Q.   Prior to coming in here, you've -- obviously, you've spoken with defense counsel, though; is that right?

A.   Correct.

Q.   How many times have you met with defense counsel?

A.   We met in person once.

Q.   Okay.  And talked on the telephone?

A.   Yes.

Q.   How many times?

A.   I would say maybe a handful.

Q.   And discussions about Mr. Youngblood during the

course of those conversations?

A.   More so about what sort of documents that I may have from my divorce proceedings that would relate to this case.

Q.   And I'm sorry you're going through a very contentious divorce, but it was highly contested, right?

A.   Yes.

Q.   And you and Mr. Perardi -- do you still speak or are you on nonspeaking terms at this point?

A.   It sort of ebbs and flows but I'd say we are more on the nonspeaking term.

Q.   When the divorce was first initiated by Mr. Perardi in October-November, '21, were you two at each other's throats at that point?

A.   I would say yes.

Q.   Did it help in February of '22 when the postings started about you and Mr. Pollard?

A.   It certainly made things a lot worse, I would say.

Q.   And as they continued, it just continued to get worse and worse, right?

A.   The stories sort of grew more and more.  My reaction to him grew less and less.

Q.   Would you consider Mr. Perardi to be a bit of a jealous husband?

A.   Yes, very much so.

Q.   And people in the hockey community, your friends,
they knew Mr. Perardi was jealous; is that right?

A.   I don't know.

Q.   Did you hang out with the hockey crew at all?

A.   Yes, we did.

Q.   And you're close to his son.  Hockey was a big part
of his life, wasn't it?

A.   Uh-huh.  Yes.

Q.   You met Mr. Youngblood's son, Kota, little Kota or
baby Kota, right?

A.   Yes.

Q.   He'd come over to your house?

A.   I don't recall him ever being at our home.

Q.   Okay.  And the hockey parents, having had children of
my own, I know that, you know, you kind of sit around at
practice or games and you have conversations; is that
right?

A.   Sure.

Q.   And you get to know each other?

A.   Yes.

Q.   Go out to dinner sometimes?

A.   Yes.

Q.   Maybe have a beer or something like that, right?

A.   Yes.

Q.   And you participated in those along with Mr. Perardi

and several of the other families?

A.    Yes.

Q.    Was Mr. Youngblood ever at those?

A.    I can't recall ever having a meal together with him, no.

Q.    How about his wife Gloria?

A.    I do remember having a dinner with her before, yes.

Q.    You believed in February of 2022 that Eric Perardi was the source of the information on those posts; is that right?

A.    I did.

Q.    Do you still believe that today?

A.    I do.

Q.    You don't think that anyone else was responsible other than Eric.

A.    If he didn't specifically type it himself, I believe that he instructed someone to.

Q.    Was Eric a really technical person?  Did he know computers very well?

A.    Relatively, I would say.

Q.    Did he have a degree in computer technology?

A.    No.

Q.    Did you ever see him using Facebook and other social media for The Crossover?

A.    Yes.

Q.   And did you use social media for The Crossover?

A.   Yes.

Q.   Part of the job in terms of trying to promote the facility; is that right?

A.   Correct.

Q.   And it's safe to say that when The Crossover opened with the pandemic approaching, it was a stressful time in both your lives.

A.   Sure.

Q.   You'd invested a lot of money.

A.   Yes.

Q.   A lot of time and effort into making this a success; is that right?

A.   That's correct.

Q.   Just out of -- make sure we're clear, Mr. Pollard, he'd been a coworker.  Did you maintain a friendship with him after you married Mr. Perardi?

A.   Yes.

Q.   Does he have a criminal background?

A.   Not that I'm aware of.  I haven't done a background check on him.

Q.   All those allegations that were contained in the posts all wrong?

A.   Correct.

Q.   At some point, you became aware that Mr. Perardi was

also the subject of several of those posts; is that right?

A.   I was not made aware of that until the FBI contacted me.

Q.   So you didn't listen to him when he was talking about him being attacked in terms of these social posts?

A.   Never told me that.

Q.   To your knowledge, did The Crossover ever become a source of these posts?

A.   The very first post tagged The Crossover as well as myself.

Q.   Would that be something that would harm Mr. Perardi?

A.   I don't know.

Q.   You don't think it was important to Mr. Perardi to maintain the integrity and the safe place that The Crossover would become?  You didn't think that was important to him?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.  Mr. Perardi had a very strong interest in making The Crossover a success, right?

A.   Yes.

Q.   Any negative posts about The Crossover would directly impact Mr. Perardi's ability to make money?

A.   I guess you could say yes.

Q.   It would, wouldn't it?  No one wants to take their kids to a place where it's dangerous, do they?

A.    No.

Q.    Would it surprise you that Mr. Perardi thought that you were the source of a lot of the negative posts about him?

A.    Would that surprise me?

Q.    Yeah.

A.    No.

Q.    Do you know a man by the named of Lane Holloway?

A.    I do not.

Q.    Have you heard about him since your divorce proceedings started during the deposition?

A.    During the -- yes.

Q.    Were you aware that Mr. Perardi had paid for an investigator to identify where the source of the negative post was coming from?

A.    I was aware that Mr. Perardi was paying a private investigator.  I don't know what for.

Q.    Would it surprise you that he was paying an investigator to determine who was the source of those negative posts?

A.    That would surprise me, yes.

Q.    Would it surprise you that that investigator was able to determine that Eric Perardi had nothing to do with those posts?

A.    That would surprise me.

Q.   Is Mr. Perardi a good father?

A.   He does the best he can.

Q.   Does he love his children?

A.   He does.

Q.   Has he spent thousands of dollars on his boys for hockey?

A.   He spends a lot of money on hockey, yes.

Q.   During the course of the divorce proceedings, did he pay for your rent?

A.   That was court ordered.

Q.   Did he also provide income for you until you got the job at Toyota -- or, excuse me, at -- yeah, Cedar Park Toyota?

A.   No.   There was a specific date that that was ordered to end on.   That was long before Toyota.

Q.   You said that things between you and his son went radio silent, I believe, after he came back from Dallas. That would have been in May of '22?

A.   Correct.

Q.   Do you know when the first threat was made to Mr. Perardi regarding the allegation that you were going to have his son kidnapped?

A.   I don't believe that to be true so I don't know.

Q.   You don't know when that threat came to Mr. Perardi, though.

A.   No.

Q.   How much money would you pay to protect your daughter from death or kidnapping?

A.   I think I would probably go to the police first.

Q.   How much would you pay?  Would there be any amount that you wouldn't pay?

A.   I don't know how to answer that.  I mean, obviously, as a mother, I'll do whatever it takes to protect my child.

Q.   Thank you.  Nothing else, your Honor.

MS. HERRING:  No further questions.  May this witness be excused?

MR. GUESS:  No objection, your Honor.

THE COURT:  Thank you.  You're free to go.

THE WITNESS:  Thank you.

THE COURT:  Do you have any other witnesses?

MS. HERRING:  May we have a moment with my client, your Honor?

THE COURT:  Of course.

MS. HERRING:  Your Honor, could we request a five-minute recess with our client?

THE COURT:  Yes.  Ladies and gentlemen of the jury, we're going to take a five-minute recess.  If you could remember the instructions I've previously given you.  Take a five-minute recess and we'll call for you in just a

few minutes.

(Jury not present.)

THE COURT:  And we'll be in recess.

(Recess.)

THE COURT:  Ready for the jury?

MR. GONZALEZ-FALLA:  No, we're not.

MS. HERRING:  We're not ready, your Honor.

THE COURT:  Okay.

MS. HERRING:  Your Honor, Mr. Youngblood's intention is to testify.

THE DEFENDANT:  I want to defend myself, your Honor.

THE COURT:  Okay.  Thank you.  You could have a seat and let's have a bench conference, please.

(At the bench, on the record.)

THE COURT:  All right.  So it's your client's intention to testify.

MS. HERRING:  Yes, your Honor.

THE COURT:  Anything you need to put on the record before he takes the stand?

MS. HERRING:  It would be my preference to put it on the record.  I think the Court has reviewed his right to testify and not testify that it's his decision to take the stand.

THE COURT:  Would that be a sufficient --

MS. HERRING: I believe so, your Honor, unless the Court thinks there are other warnings that are --

THE COURT: Anything else that you'd like for me to advise the client of other than his Fifth Amendment right?

MR. GONZALEZ-FALLA: No, your Honor.

MS. HERRING: We also have the issue of getting him to the stand in shackles.

THE COURT: We'll get him there before the jury comes in.

MS. HERRING: Yes, your Honor.

THE COURT: It's going to be a couple of minutes.

(End of bench discussion.)

THE COURT: Mr. Youngblood, your attorneys informed me of your intention to take the stand to testify in your own defense. Before you make that decision final, I want to make sure that you understand that you do have the right not to testify, that it's the government's burden to prove your guilt, and you have no burden of putting on any evidence at all much less testifying yourself. If you chose not to testify, the jury will be instructed that they're not to hold that against you. You do have a right not to testify.

Do you understand that you have those rights?

THE DEFENDANT: May I ask a question, your Honor?

THE COURT: Of course.

THE DEFENDANT: The last two days, I was anticipating conference with my attorneys. That never happened for various reasons. I have told them since day one, I had every intention to testify and I have a right to defend myself. I understand that I can hide behind the shield that is the Fifth Amendment. I chose not to do that, I have never hidden anything about my past from anyone and these people are lying. They've dragged my children into it. They've dragged my wife into it. They have dragged me into it.

It is my opinion that I could not live with myself. If I'm going to go to prison for something I did not do, then I want these 12 people to judge me for my actions, judge my past, understand my past, understand me. I did not steal, I do not need to steal, and I feel the need to get that out publicly. And if I lose, then I lose. But I cannot look myself in the eye, question my son's decisionmaking, question my wife's decisionmaking and then, say, well, your dad had the chance to stand up there and defend himself. No one ever asked me what happened. When I did try to speak to them, they never listened.

So I am of the opinion I am right. I understand what I'm risking. I mean no disrespect to you. You've

been nothing but respectful to me since day one. I've made that clear. But the jury does not understand what I've gone through and to paint me in the light with the cartel is a joke. With what I've been through and what they've done to my family and my home and my best friend's mother is a joke. It is disgusting and if I don't stop it and I didn't bring it up, who's going to?

THE COURT: And it is your right to do so and we'll give you that right. So at this time, if you'd like to take the stand before we bring the jury in.

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Are we ready?

MS. HERRING: Yes, your Honor.

MR. GONZALEZ-FALLA: Yes, sir.

(Jury present.)

THE COURT: Ms. Herring, your next witness.

MS. HERRING: Yes, your Honor. The defense calls Saint Jovite Kota Youngblood.

THE COURT: All right. Mr. Youngblood, if you could please raise your right hand to be sworn.

THE CLERK: You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE DEFENDANT: I do.

THE COURT:  Please be seated.

SAINT JOVITE KOTA YOUNGBLOOD, called by the Defendant, duly sworn.

## DIRECT EXAMINATION

BY MS. HERRING:

Q.   Mr. Youngblood, could you please state your full name for the court reporter?

A.   Yes.  Thank you for your time, by the way.  I was born Dennis J. Schuler, Jr.  I changed my name the first time it was possible legally to Saint Jovite Kota Jadenne Youngblood.

Q.   Do you want to tell the jury why you selected that name?

A.   Yes.  Roman Catholic.  My confirmation name was Saint Jovite Kota Jadenne Stephen.  Youngblood was a nickname that my uncle -- I grew up predominantly with my uncle. Spent every spring break with my uncle, every vacation with my uncle, every holiday with my uncle.  He and his husband Larry were role models to me.  Pretty much everything I learned about life, how to deal with people and how to handle things, I learned from my uncle.

Unfortunately, my uncle passed away in 1984 from HIV/AIDS.  That was the end of that.  Shortly after that, my mother decided to move on from my father.  My father was abusive.  You saw him.  There's a reason we haven't

spoken in 37 years.

Q.   And where did you grow up, Mr. Youngblood?

A.   I grew up in Cleveland, Ohio.  My uncles were both travel stewards, I believe is the right word, for United Airlines.  They were senior stewards.  They took the international routes that included Heathrow, Cairo, Morocco, Berlin.  I believe he had Osaka and Okinawa from there and Incheon, Korea.  So I would spend my summers -- for example, we would go 30 days to Osaka, Okinawa.  Then we spent 30 days in Morocco, spent one year, 30 days in Paris.  Spent the majority of time in London.  They had friends in east London.

Q.   You've heard over the last week, many people state that you've claimed your father was an FBI agent.  Is that something you've said and can you explain that?

A.   Yes.  I have said it.

Q.   Why?

A.   My father and my brother broke up several times.  The police were involved in North Olmsted, Ohio.  They took my father out of the house in handcuffs four different occasions that I remember.  My mother was school board president North Olmsted School District.  My father was vice-president of United Transportation Union.  Both of them had reputations.  My mother did not file on my father until I believe I was 14; but before then, when I was six,

seven, eight, there had been incidents he had drawn blood. I remembered one of the arresting officer's last name was Flint, he had drawn blood on me.  He had cut my head open a couple of times and there had been multiple incidents. My mother eventually had him arrested.  He was taken out of the house and that was the end of it.

Down the street, there was family named Gregory Kerr.  We went to the same high school.  Steven Harpol (phonetic) went to the same high school.  Both of their fathers, I spent all my entire school year from 11, 12, 12 to 13, 13-14 so it would have been sixth grade, seventh grade and eighth grade living in the Greg Kerr household, he was a federal agent with the FBI.  Steven Harpol was an FBI agent, also, out of the Cleveland office.  They were like fathers to me.  They coached our baseball teams, they coached our soccer teams, and I lived in their homes.

Q.   Do you today -- I think you told us you've been estranged from your father for some time.  Do you have any relationship with your mother?

A.   I talked to my mother once in 37 years and my argument was she knew what was going on with my sister, myself and my father, and did nothing to stop it.  I've seen my father twice, like I said, since I was -- 1989 would be the last time I could legally move.  I was 18.  I changed my name at 17 after going through the emancipation

process.  The lawyer's name was Bruce Tyler Wick.  I did it again at 18 and I reconfirmed it with the paper you saw in 1997 shortly before I met Mrs. Youngblood.  So three different times, I went through it.

Q.    And when did you leave Ohio?

A.    I left Ohio permanently September 3rd, I believe, 1990.  Got my heart broken.

Q.    Was that after you had finished high school?

A.    I had finished.

Q.    And where did you go when you left Ohio?

A.    The plan was to go to the United States Marine Corps. I had taken the MEPS testing.  I had taken the ASVAB.  I had all the qualifications.  I was medically disqualified simply because you could see my feet without chains, I have no arch.  So without the arch, they were concerned about the physical wear and tear that I would take.  I was offered other employment from various other people that I drew interest from and I declined that opportunity at the time.

Q.    So just to be clear for the jury, you did not join the Marines at that point.

A.    I did not join the Marines.  Later, I did the same process in 2010.  I took MEPS again for the United States Army.  They wanted a six-year commitment for 18 Alpha, which would be a Special Forces designation, and once

again, it had to go through battalion because of everything I'd been through in my life and the other verifications.  It was approved by battalion.  I was interviewed.  I did retake the ASVAB.  My score in 1989 was 99.  My score in 2010 was 95.  I did pass all the qualifications, including mental background, physical background.  They did not care at that point about the arch for whatever reason, but I decided that a six-year commitment on my part at 38, I would have been older than anyone that had ever qualified.  Physically, I was capable, but it was six years and if I did not qualify, I would have been stuck with the designation 11 Bravo, which is basically infantry and I had no interest.  So it was either that or transition into something in the sciences and I didn't want to do that.

Q.   So when you left Ohio, you moved the California; is that right?

A.   I did.

Q.   And what did you do in California?

A.   I worked for as a financial analyst and a financial officer for a couple of different auto groups.  And I did some work for Merrill Lynch for a man named Ken Hageman, who I had worked for at the Great Northern Corporate Center when I was in high school doing the same thing, cold calling, sales, those kind of things.

Q.   At some point in your youth, did you learn to speak languages other than English?

A.   On different languages, I have some skills.  There's nothing special about me.  But the languages discussed here with the so-called allegations and relationships I have, I do not speak these languages.  I do not speak Russian fluently.  I do not speak Spanish fluently.  I do not have anything to do with these kind of people and I do not want anything to do with those kind of people, and I find it disgusting and despicable, the tactics.

Q.   What languages do you speak other than English?

A.   I took French in school for a considerable amount of time.  I took German in school for a decent amount of time.

Q.   Do you speak any Chinese?

A.   I speak Chinese.  My wife speaks Cantonese.  I do not.  My Mandarin is passable.  I've been to China 17 times.  The passport that they showed you was renewed in 2017, I believe.  The one before that would show shows trips.  The one before that would show significant activity in 2001 to 2015.

Q.   We've heard your wife's name Gloria mentioned.

A.   Yes.

Q.   Can you tell the jury how you met your wife?

A.   My wife walked in on 3-15-1997 to Santa Monica Acura,

I was a senior financial officer for them.  My ex was walking out at the same moment that just got done telling me everything that was wrong with me as a human being and literally ran in at the door with my wife.  The next day, my wife was a graduate resident physician that had studied surgery and family practice at UCLA.  She graduated University of Illinois, University of Chicago Medical School, and she was maybe six months from graduating from the residency program at UCLA Olive View.

That day, the guy came and told me the next morning, said that crazy lady's here to see you again, the one that was yelling at everybody.  I said, you gotta be kidding.  Once wasn't enough?  He said no.  It's the doctor.  I had no idea who they were talking about.  She came up and said, are you single?  I am.  Do you want to have dinner?  I did.  We moved in the next day and I've been with my wife for 27 years.  The person that they're attacking, 27 years.  My children and my wife, 27 years, and I have to listen to this when I get up here.

Q.   Did you and your wife reside in California for a brief --

A.   We did.  We lived at 1550 Amherst, No. 305, Santa Monica/West LA, and we purchased a host in Arcadia, California in 2000.  I believe it was March 10th.

Q.   And how long did you stay in that home?

A.   In California, the residence in Florinda, six years.

Q.   Were your children born in that home?

A.   My children were born in that home, yes.  Right. Kota was born right at the end of it.  We were purchasing a house in the mountains, Crestline, you know, Lake Arrowhead had big bear, that's where we were moving to. But the house was going up considerable amount.

Q.   Tell us about your two boys, when were they born, how old are they now?

A.   Eventine Youngblood was born X-XX-2002.  Kota was born X-XX-2006.  My oldest son, we've had some problems recently with him.  I won't go into the details until the attorney tells me to, but I had to pull him out of school and move him a couple of times because of some of the people he got involved with.  He was a -- no one doubts his intelligence.  He's a 4. student premed.  My youngest son may be smarter than he is now.  Both were fantastic hockey players.  Baby Kota, as you heard him referred to by the United States Attorney here, if he had played with the passion that his brother had, he probably would be playing in NHL next year.  He was that good.  He started late, which was the only reason I think that cost him an opportunity to go to another level.  He probably is.  I've been, unfortunately, unavailable the last nine months and I've lost all contact with everyone.  My house is gone.

My dogs have been euthanized.  And my children, I have no idea what's going on, but he was still playing when I was arrested.

Q.   Mr. Youngblood, we've heard some stories about the source of your oldest son's name Eventine.  Can you talk about where that name comes from, how you chose that name?

A.    Absolutely.  It had nothing to do with the Sword of Shannara.  I read those books after the fact.  Someone gave them to me because I read Lord of the Rings cover to cover several times.

Q.   And you do like those books?

A.    I do.

Q.    Sword of Shannara is one of your favorite series --

A.    It is very much so, but it wasn't until about five years ago, my son was born in 2002.  My uncle Dale's -- one of his best friends, he was also a steward, they lived on the north side of Chicago.  There was a group of them that all flew out of O'Hare and his name was Eventine and I always liked the name.  So people always said how did you get Saint Jovite, Kota Jadenne and Stefan.  My uncle's middle name was Stefan, Dale Stefan Schuler.

        And as far as the Youngblood, ever since I was a kid, my uncle's nickname for me was where's the Youngblood, where's the Youngblood, because I had a ton of energy all the time.

Q.   Have you ever claimed to have Native American heritage in your background?

A.   Supposedly, according to my father, if you can believe him, five percent, something like that.  Majority of my family is German, French, English and, I believe, Bulgarian, Romanian.

Q.   Going back to your time in California, you mentioned that you and your wife purchased a home.

A.   Yes.

Q.   Did that home at some point burn down?

A.   The home had burned down was in Crestline, 24567 San Moritz.

Q.   Can you explain to the jury what happened --

A.   Am I allowed to speak about what happened?

Q.   If you would like to tell the jury what happened to your home in California, you can do so.

A.   People have said a lot things about me and you should hear it from me and you should hear my version of what happened and my version is the truth.  I moved up there in 2006.  My wife made the decision, because of some family members, that she didn't want to make the drive to and from the mountain.  If you look at it, that's one of these and the weather can get very, very nasty.  After three days of making that drive, my wife decided she could not do it.  She was terrified.  So she decided to move back

down the mountain to 11131 Malone Street. I had just put my life savings -- and we don't have traditional investments. Our house had gone up considerably in Arcadia, if you know Arcadia, it's a predominantly Chinese neighborhood. So California might have gone up, I don't know, 50 percent. Arcadia went up 300 percent. So instead of buying stock or bonds that I know nothing about, I bought gold and I bought gold we got married till 2006 at 300 to 500 an ounce and it's at almost, when I was arrested, 2,000 an ounce. We had up until recently, the majority of that still.

So I used a chunk of that to make the down payment for the mountain house and my wife picked the color. She picked the furniture. She picked the floors the carpets, everything. I lived there three days and then, moved back down, bought a property with my brother-in-law and sister-in-law. And we were still married and then, it was a hard thing for me to accept. My oldest son was going to stay with me and then, he decided that he would have a better life with his doctor mother who made considerably more than I did and he moved back down the mountain with her.

I opened a business -- it's okay to explain?

Q.   You can explain your business to the jury, yes.

A.   I opened a business Youngblood Alta Bravo Toys and

Games.  My business did well.  It was reflected on my federal tax returns for those two years.  The problem became small town, I was unaware of some of the environment and with the drugs in town was like nothing I'd ever seen.  I had problems instantly with some of the people ranging from cartel members to Aryan Brotherhood to a group called PENI Skins to a problem with a couple of off-duty San Bernardino sheriffs that is well documented including physical altercations and me ended up going after one of them who had threatened me with a firearm.

To make a long story short, September 2011, my primary residence with my best friend's mother, God strike me dead if I'm, lying, her name is Fay Mann was burnt to the ground with her in the house.  So to tell me I have any ties to the cartel is a joke.  To tell me I have any ties to the Russian mob is a joke.  And to tell me that I associate with any of the kind of things that these people may or may not be telling you is sickening.

Q.   Can you talk a little bit about the shop you mentioned, what kind of things you sold there?

A.   Predominantly, I have no expertise in art.  I have no expertise in pottery, Faberge.  My expertise was in vintage Star Wars, comic books and collectibles.  People would con -- there were people that traded -- I do not trade rare coins.  I traded bullion.  The difference being

if gold is 1,900 an ounce, I know what my market spread should be. And if I'm a hundred dollars behind back or forward, I can't get hurt. You start trading rare coins, that's a viper pick that I know nothing about. You're dealing with things that the coin might have in intrinsic value of the metal of 1,900, but the coin because it's rare, it might be 50,000. If someone doesn't want it, the value is zero.

So I don't know enough about that market. I would never gamble in that market. I have never traded in that market. Bullion only and I understand bullion while I do not understand rare coins.

Q.   So what other things did you sell at the store that you opened?

A.   Majority of it was vintage toys, Lionel trains. Both of my uncles, like I said, that they were a couple, they had an extensive -- and when I say extensive, they would make a museum blush train collection, predominantly Lionel. And then, my Uncle Dale and Larry predominantly dealt with N Scale, which is much smaller, and they were made a model in Railroader, if you remember the magazine, 20, 30 times. They would come and take pictures of his layout that was literally 40-feet-by-40-feet in the basement. So that was the hobbies.

My uncle was good at three things. He was great

with trains.  He was great with vintage toys and he was an incredible fighter.  So a lot of the skills I acquired over the years, he was boxer, fought in the Golden Gloves several times and he was a high school wrestler that had placed at state several times.

Q.   When you operated this store and lived in California, did you at some point meet a man named Hanfu Lee?

A.   I did, but it was no wherever near the time that Hanfu Lee said.

Q.   Can you tell the jury how you met Dr. Lee and what was the relationship with him?

A.   My teeth.  I met him in 2008 doing veneers.  I played hockey, too, like my children and I had had some cracked teeth.  As you can see, one of them broke off.  So Hanfu Lee redid my veneers.  I think it was 27 or $28,000 at the time.

Q.   And how did your relationship with Dr. Lee develop from that first relationship?

A.   Dr. Lee and I were both -- I was Roman Catholic.  He was a pretty at that time Christian gentleman.  He went to a place called Faith Community Church in Covina, California.  I went to St. Timothy's in West LA, which was a considerable drive from where I lived, so he eventually convinced me to go to his church with him.  I make no attempt to hide what I went through in the past and I had

some issues.  Hanfu Lee put up my bail, put up my bond, forward those issues while I defended myself against a case that was dismissed with prejudice and I got an apology.  I did not sue, I did not create actions because I could not justify suing for money.  That was not going to bring Robby's mom back.  I was exonerated, I was cleared.  Hanfu and I remained friends.

The reason that friendship broke off was he started doing things that made me uncomfortable with clients.  He was building a church inside his office at 29 East Huntington.  Santa Anita called Arcadia PD, the Santa Anita Homeowners and Business Association and they had tried to block his project.  He had wanted me to lie.  Then he had decided that it was easy to borrow money from these people who knew who I was by telling them that, well, Kota Jadenne needs the money for legal expenses and these people said, well, I met Kota Jadenne.  He's your patient, the one that brought the dinosaur head that he talked about that I had been trying to get back for several years now.  They all wanted to know what the history was behind it, what the story was.

I was polite.  I tried to keep my manners.  Manners maketh man.  And I told him, I don't want anything to do with this.  If you're bribing people to build a project, that's on you, it has nothing to do with me.  He

and his brother had taken advantage of a friend of mine named Demetrius Kasparaitis (phonetic), whose father was a Rolex dealer.  They were buying these watches they referred to as new old stock and they were getting them between 40 and 50 cents on the dollar.  So his brother had put maybe three or $400,000 into these watches and made 80, $100,000 very easily.  Hanfu followed suit. Eventually, the relationship broke up when I didn't want to be a part of what he was doing with the finances on that project, that his brother decided to write the money he had made on watches and invest it on his watches off as a bad loan to the IRS.  I challenged that and defeated him in tax court.  He was reprimanded and he was fined and I was cleared and exonerated of it.  It was not a bad debt. The difference being -- I do not know if you know this but if you have a bad debt, it's considered income.  So those franchise export sent me a tax bill for his lies.  Hanfu would later try the same thing with me.

Q.    So we heard a lot of testimony about different investments that you and Dr. Lee did together in California and we saw handwritten notes discussing amounts lent, amounts owed.  Can you talk about you and Dr. Lee's business together and your investment endeavors together?

A.    Anytime I would buy a watch from Demetrius, I would get a promissory note from Dr. Lee.  For example, $14,700

stands out in my mind.  So when Dr. Lee would give me the $14,700, I would take it, take the watch back to Dr. Lee and tear that slip up or say paid.  The only business that I transacted with Dr. Lee was Rolex watches.  How many, I could not tell you.  It was more than 50, less than a hundred, but it was a considerable amount.

And then, there were certain watches that could not be bought or found anywhere else that had a premium of six, seven, $8,000.  Those would be purchased at Hing Wa Lee, which was a Chinese jewelry store.  I had a good relationship with them.  I would purchase the watches.  The customization is called PVD coating.  It is very popular with hunters and ex-military and kids.  It carries a considerable premium so by doing that, that's what he was, I'm guessing, referring to when he said it was being customized.

There were several watches that I'd given Dr. Lee that was not paid for.  There was several bills that I incurred because of his brother's actions and his actions later with the accountants Steven Giorgione and a man named Sanford Millar, who is a tax attorney.  He's out of -- I believe he's on Avenue of the Stars in Los Angeles, California.  I was never reimbursed for those costs until 2023.

Q.   What led you to move to Texas, Mr. Youngblood?

A.   I had properties in 2012 when I was dealing with my situation with court.  My wife received a bonus that was almost a million dollars.  But our house had gone up in Arcadia, California.  All three times I refinanced, I took that money out and put it into gold.  When my wife got her bonus, I believe some of the money went back to her mother and then, part of it, we agreed was going to go into rental properties and the other part went into gold again.  So that's predominantly what our investments were.  We had a very small amount in stock.  We had a small IRA but majority of it was in metal bullion only.

Q.   When did you move to Texas?  Do you recall the year?

A.   I cannot remember the exact date because I drove out December 24th, 2016.

Q.   And what did you do once you moved to Texas?

A.   I'd been a professional poker player since before 2016.  That tax year, I believe 2015, was the first time I filed and I take it very seriously and it's not what you see on TV.  It's a lot work.

Q.   And where in Texas did you choose to settle with your family?

A.   We had property in San Marcos.  We had property in Georgetown and we had property in Runnel Ridge in Manor.  We chose Manor because of the view of the golf course behind us.  I didn't know about the rattlesnakes, but I

know about it now.

Q.   Once you moved to Texas, did you meet a man named James or Jay Holloway?

A.   I did not meet him until two-and-a-half years later. I had a clock -- my grandfather and he had a friend whose name was Highland who owned a store in New York City. It's called Empire Coins something or other.  He was good friends with my grandfather for years.  He had given me a clock that was maybe 15 years ago.  They had passed away. It was left to me, shipped to me.  It sat in storage.  I decided to restore it and I could not get it into beat so a gentleman came to fix it.  I think hes called the clock doc.  He advertises online.  He came, took $150, but did not fix anything.  So he called James Holloway, I did not. He found James Holloway.

Q.   We saw pictures of your home earlier this morning and the agent referred to it being full of, I think he said, junk.

A.   Junk.

Q.   And knickknacks.

A.   I heard that comment, too.

Q.   Can you talk a little bit about how and why you choose to collect things?

A.   I don't know if I'd call it collect things, but as you saw the last nine days, I wore the same thing every

day.  So it's not unusual for me to do that in the world. What they didn't tell you was I used to weigh 238.  I weigh 166 now.  So there's not a lot that fits me anymore. So when I was in the free world, I was in pretty good shape, but I was about 70 pounds heavier than I am now.  I would buy my shirts, because I'm pretty active, black thermals and black hoodies at Salvation Army and Goodwill. I wore the same pair of jeans.  I have three or four pairs of them.  They were from Goodwill.  I went to Goodwill and I would bargain hunt.

Every piece of furniture in my house with the exception of that clock that they talked about and there was a very old desk upstairs that, for whatever reason, was not photoed.  Everything else came from Goodwill and Salvation Army except the fish tank.  The Persian rugs were not in that house.  They were locked away elsewhere because I didn't want anything happening to them.  Those were the most valuable things I owned, gold aside.

So I don't understand what the problem is with being thrifty.  I paid $2 for my shirts and people used to laugh at me and tell me I was a loser.  Okay.  I liked the person I was.  I'm pretty simple.  I played golf and I hung out with my kids.  I went to work because that's all Las Vegas is; it's work.  Boxers don't box on their day off.

And I played in card games here in private games, the same game for the last nine years in north Austin and the same game in south Austin and that was it. I didn't make myself social butterfly. I didn't hang out at parties. And my wife would be the first one to tell you that she can't get a hold of me. My son made a joke once, how do you get a hold of your dad? I go find him. And that how I was. I was simple.

I don't understand why I was mocked for having junk in my house. I liked my house. You know what I liked more? My dogs and they've been euthanized since I've been in here and that bothers me more than anything these people can do to me.

Q. We've heard everyone come in and comment on the fact that you always wear black.

A. I do.

Q. Can you tell the jury why it is you choose to always wear black?

A. I don't look good in anything else. My uncle wore black to answer your question. He always wore black Polo shirts, literally, Ralph Lauren and black Izods. I idolized my uncle.

Q. Can you talk a little bit about the tattoos you've heard so many people comment on that you have on your hands?

A.   I was not good at many things, but I was good at a couple of things.  Unarmed combat being one of them.  I was very good with survival skills and I was a very good tracker.  I hunted and fished since I was a kid.  The problem is I like animals too much.  I'm a very good shot but I don't hunt.  Survival, I would have no problem on naked and afraid and it's not trying to be facetious and I'm not trying to be funny.  I'm not the one you want to call if you want to fix an electronic.  I can't change my own oil.  I can't do laundry.  I can't cook.  But I can hunt, I can track, I can fish, and I can shoot the lights out left-handed or right-handed.

So as far as unarmed combat, I took Taekwondo since I was six years old.  Majority of that was from kids martial arts in Westlake, Ohio.  Took American Campo Concepts from Tommy Chavez.  He was located at East Dorothy Road in Arcadia, California.  Took shoe fighting from some friends and my grappling game was pretty good because of my uncle and some of his friends.  My uncle was an incredible man.  I don't know how else to word it and watching him pass away and wither to nothing that year and a half was very difficult on me.  Ironically, the person that got me out of my house in the abuse from my father was my uncle.  He knocked my father out.

Q.   Have you told people that the tattoos that you have

that are visible relate to past military service?

A.    I told people that I had been attached to helping and had served with -- I taught classes for people that had been Delta.  I taught classes for people that had been recon marines.  I taught classes for people that were 82nd Airborne.  I taught people that had served in various other branches, including special activities group that had trained with central intelligence.  I never said I was an agent.  I've never represented to be law enforcement. And I've never once said that I was with units.  I told them I had been attached with, scouted with, and done simulations with.

Q.    You've brought up a few times that you didn't carry a cellphone and we've heard that from many other people.

A.    Yes.

Q.    Can you talk about why you don't like to carry a cellphone?

A.    I used to have a number that went to my store.  It was 626-443-4440 and I know you're not exposed to Google, but I would assume with a number that uncommon, it's probably easy to find.  The one time I carried a phone with me from the store there was being relayed to that -- and I'm not a tekkie, but I went to an appointment. Someone called the newspaper, the LA Times.  I remember very clearly, it was 2008 and he was selling silver coin

rounds.  I got triangulated from that call to see if industry -- do you remember Fry's Electronics?  They had one -- the main one was in City of Industry, California. Instead of the piano, I think this one -- that one had a bunch of gears and it was right by a place called The Crisscross.  So right there, they attempted to rob me. They attempted to hold me and my vehicle and it was only an LA Sheriff's Department going by that prevented me from being robbed and possibly hurt.  Since that day, I have not carried a cellphone.  I don't own a cellphone, I don't have a cellphone, and the only lines we had were T-Mobile. My wife's two lines, my children's two lines, and both are tablets.  Anyone that says they text me or call me, it's lying.

Q.    Fair to say you're pretty skeptical of programs you believe are run by Google?  Maybe cell tower tracking?

A.    Yes.  When I was friendly with Lane Holloway, Lane Holloway did the search -- the research of the ability to search out signals for that patio program for Amazon web services.  I am aware of how scary and terrifying the technology is.  I want nothing to do with it.  We did not have Wi-Fi in our home.

Q.    So going back to the Holloways for a minute, you brought up Jay Holloway.  At some point, did you end up also joining the Clock Association?

A.   I did.  I've been a member for two years.

Q.   Can you talk a little bit about that?

A.   The only meeting I ever went to was the Christmas party in 2021.  I paid the bill for the Christmas meal. I've never been to a clock meeting before that or after that.  I have a little card that has my name on it.  I get the weekly -- monthly magazine, excuse me.  And I get the -- I think it's every three months regional sends me something and one-time national and that's it.  I don't have any relationship with those people except hi, how are you, hi, Kota Jadenne, how are you.  That was the extent of it.  I treated them with respect because a lot of them deserved respect.

Q.   Did Jay Holloway help you join the clock --

A.   He did.  His wife did.  And I had an interest not because of the clocks but because of the watches.  I liked the watches.  I didn't necessarily have the fascination with the clocks that they did.

Q.   And how did your relationship with Jay Holloway develop over the years?

A.   He would bring me a lot of items if -- for example, I see him once a week.  I don't know where this everyday thing came from and he would ask me for evaluation.  A lot of them had old vintage toys.  A lot them had Lionel trains and he would ask me to sell it or dispose of it and

we would split the money 50-50.  He would write me a check, I would deposit it and that was that.

Q.   You heard a lot of the testimony from people who say that you told people to write checks to James Holloway so that he could cash those and give that money to you.  Is there anything you want to tell the jury about that?

A.   It's a stone-cold, flat-out lie.  I've never once taken money from James Holloway.  I've never once taken cash from Hanfu Lee with the exception of those Rolex watches.  I've never once taken a dollar from Gary and Dale Snider.  And I've certainly never once taken a dollar from Eric Perardi.  I don't know where this story about the golf club head cover came from because anyone that knows me, I'm a terrible golfer and I don't have covers on my gloves because I don't carry a wood.  If you golf, then you understand.  I have a two iron in my being, a seven iron in my bag, a wedge in my bag and a putter.

They used to make fun of me at ShadowGlen that I had four clubs in my bag.  Four.  I'm terrible.  There's no point carrying a wood if I can't hit it so why would I have a cover?  That the dumbest thing I've heard in a long time.

Q.   You brought up Eric Perardi's name.  I want to ask you a few questions about your relationship with Mr. Perardi.  We heard a lot of recordings last week about you

talking about this hit on his life, his ex-wife Rachel. And can you tell the jury about those calls and the things that you were telling Mr. Perardi why you were saying those things.

A.   Mr. Perardi's wife, I've met her, she said, twice.  I don't even think it's that.  I think I saw her one time at the rink and that was it.  I don't think I ever saw her again after that.  I don't believe anything she tells me. One of my friend's names is Robert Coventry.  He owns Starside Protection Services.  My dinosaur head, the one you heard Hanfu talk about, it was an Allosaurus head and I had other pieces of the skeleton was taken while it was in custody in Robert Coventry by an employee named John Suarez.  I have been searching to get it back.  It's quite valuable for several years now.  I paid a lot of money to try to get it back.

The point I bring this up is I spoke with people who used to work with and for Robert Coventry and they're the ones who provided me that information.  Robert Coventry does a lot of federal contracts and a lot of work for the bureau and other agencies.  I won't get into his business, but he has contacts on the border.  He has contacts south of the border.  And majority of the work that he does down there is cartel related.

Q.   We heard you say some names like Akiko, maybe Daniel

Woo.

A.    Akiko Kikuchi Rodriguez.

Q.    Do you know who those people are?

A.    She's an investigator in Mexico City.  I believe she has an office in a plaice called Michoacan.

Q.    So why were you talking to Mr. Perardi about any of those topics that we heard you on the recordings?

A.    Mr. Perardi gave me three names to have friends of mine look into, wanted clarification on who they were.  Two of them had criminal records.  They were not white-collar crime or anything harmless.  These people were people that had very serious charges, assault with a deadly weapon.  One of them had done time for manslaughter.  And the other one was Mr. Powell that you brought up.  I do not remember the specifics.  I gave the information to Mr. Perardi.  Akiko was of the opinion of Rachel and Rachel's circle was dangerous and any information I passed on was that.

Q.    Can you tell the jury about your relationship with Lane Holloway?

A.    Lane Holloway is James Holloway's son.  He would come over from time to time and I would see him from time to time.  We were friendly.  I would not say we were friends. I don't know where the story about bringing flowers to his wife came from because I think it's inappropriate to take

flowers to someone that's not your wife. But he would come over and talk to his dad. Lane disappeared from his father's life, I believe it was '22, and had no contact with his father. It was his father who had asked me what had happened with Daniel Saucedo, who was his father-in-law. You heard Lane's testimony that his father-in-law's boss was killed. When that happened, Daniel Saucedo retired shortly after. There were accusations against Daniel Saucedo. I'm not a federal investigator. You'd have to ask someone else about that. But I do know that three cousins of Danielle, his wife, did do time at TDC for narcotics. What the specifics were, I do not know. Once I found that out, I distanced myself from Lane Holloway. I have not spoken to Lane Holloway in two-and-a-half years. Not a phone call, not a text, not an e-mail, nothing.

Q.   Did you tell Eric Perardi that you were a federal agent?

A.   I did not.

Q.   What did you tell him about your connection to any federal agencies?

A.   I told him I have friends who I had grown up with their fathers that had served. I told them I had friend that had served in a capacity tied to certain agencies as investigators and if he needed me to look into something,

I would relay the information to them and that was it. That was the extent of it.

Q.   Why did you tell Eric Perardi and many others we've heard from that your son -- your oldest son Eventine had been killed by the cartel?

A.   I will never take that statement back.  I did not say he was killed.  I said he was found dead in Mexico.

Q.   Why did you say that?

A.   I'm embarrassed to say this.  If you have children, then you can hopefully understand what where I'm coming from.  I pulled my son from school, changed his car, changed his phone number, changed his address because his roommate in the dormitory was selling narcotics.  I wrote it off as just an anomaly.  I didn't think my son was capable of this.

Two years later, I had the same problem with the same son except this time, the scale was much grander and the allegations were much more severe.  It is a problem -- if I was released tomorrow, I don't know what I would say to my son.  I have a real problem.  I do not drink.  I do not smoke.  I do not do drugs.  I'm not perfect.  There's a million things wrong with me, but I don't have any of those kind of vices.

I'd put my money where my mouth was years before about how I felt with narcotics.  I stood up against

people that were tied to Jalisco. That's not my opinion, that's a fact. I went to them for help. They took field reports from me in West Covina. No one listened. West Covina, California, the Rialto office, no one listened. I went to internal affairs for San Bernardino Sheriff's Department 17 times, no one listened. I filed against all of those officers and the people involved. No one listened.

So to think that I would condone it with my son is ludicrous. His roommates lawyered up and went into their big daddy's pockets. My son did not. I pulled him out of college. He skipped the next semester and that was it. He went back without my permission. My wife sent him back and that has been a point of contention between her and I. I love my wife. I would do anything for my wife. But on my son, we fundamentally disagree on this issue because once, happenstance, twice is coincidence, he was going on a third time and that's enemy action.

Q. Mr. Youngblood, what happened to all of the money that James Holloway said he got from cashing checks and gave to you?

A. I do not what Mr. Holloway did with the money he took from the people and it is much worse than what you have been told. I have heard it from other people. As far as what he did with the money, I heard stories that he

invested in art and shipped to it somebody named Judy up in Wisconsin that is a cousin of his and that he had shipped the rest to Retta in Birmingham, Alabama. That is Pat's sister.

I know that Fed Ex has traded between them. I know he had traded information with them about art. I know he purchased something that he thought was a Pizarro. He showed me a picture of it. It is not a Pizarro. I know enough to know that Pizarro, I believe, was a modernist from the 1890s and the picture he has is something to do with the crusades that's probably from the 1800s. If it's to be believed, he spent two or $3 million on that painting.

But I know one thing. Navy Federal Credit Union gave me a hard time cashing 10,000. I play poker for a living and I carry my 1099s and W-4s around that the agent was talking about because when I go through TSA, if I have $20,000 in cash, I get stopped all the time. I make no effort to hide the money. Everyone in that airport at Bergstrom airport knows what I do for a living, so they would ask me, how much cash do you have on you. 20,000, 30,000, 40,000, whatever the number was.

And the law is very clear on traveling domestically, get a supervisor, we don't need one. Do you have a W-4? I do. Here it is. The money that was

confiscated from me the day that I was arrested that I want back, that money was made by me in Oklahoma literally three days before I was charged. They have all the W-4s showing I won that money legitimately. Clark Snyder testified I won that money legitimately and they still confiscated it. So apparently, having proof of my income was worthless.

And I don't think people understand those charts that that lady put up because those charts are -- they're accurate but they don't include cash games. They don't include private games. They don't include games at any other hotel that's not on that card system. And if I start with $10,000, it's not uncommon to hit 70, 80, hundred-thousand dollars in jackpots and I could still be a loser. It's what I walk out the door with. If I walk out the door 9,000, I lost. But I don't get paid like that. And it's not my money being gambled. I work for somebody, too. I simply get a percentage of what he wins. I am good at my job. I'm not perfect, but it is not a 100 percent investment on my end.

Q. Mr. Youngblood, before the prosecutors cross-examine you, is there anything else that you want to share with the jury?

A. I guess the only thing I would want to share is imagine yourself in my position. It's a year ago, you've

got a wife and you've got your children and you go to work every day. I'm waiting for November to come because November, I would have met up with Victor Hsu, my boss. Because of COVID in 2021 and '22, it was very difficult for things to be normal in Las Vegas because you were shut in. You can't play a cash game at a poker table if you have to be six feet away. It's not possible.

So machines, I can expect a machine, not to bore you, was 98.98 percent return on a double double video poker machine. You play with the card, it adds approximately 1.4 percent. I'm not playing to win a hundred-thousand dollars a trip. I'm playing for that .38 percent above the hundred, that's my profit margin.

So when you saw all those numbers that shows 17 million, 10 million, coin in and then, you saw they like to show my tax returns, the coin loss, that's simply the rate that the machine I put in and that's the rate that was coming out, that's the value is in between. So if I put 17 million in and it cost me 17 million, 100,000 and I walked out and I got back 17 million 138, I won. The problem is the cards, if I'm using more than one card, it goes red.

Like, for example, a lot of the things that they told you that were technological weren't true. Remember the picture of me getting my back rubbed by my friend's

wife, I have problems with this shoulder. I had surgery three times. I wasn't playing video poker. I was playing so I could tip the waitresses and I could tip her with my free play. And ironically, by playing $20 of free play, they were paying me, I believe, $3,000 for that jackpot that you saw. That machine was a -- what they call a fireworks machine. Video poker is the ones that are flat and they're on the thing. That's what I played for a living. I'm a better cash game player.

The problem is I like to like work between 2:00 and 10:00 a.m. They keep showing you these videos early in the morning. There's a reason: Because no one bothers me. No one comes up to me and says, wow, how could you sit there. Because I could be down 10,000, I could be done 20,000, it's what I leave with that matters. That might take six hours. I would leave Sunday and I would come back Tuesday. There were times that I flew to Las Vegas and I came home an hour later on the next flight because I wasn't comfortable.

Victor Hsu provided the money every week for me to play, '20, '21, '22, '23. November 19th, I was to meet him and that was going to settle for the last three years because of COVID, travel restrictions were a problem in '20, '21 and '22. The reason that weekend is significant is that was the Formula 1 weekend. Playing with that card

gave me the ability to get comps.  I didn't use any of my comps, but you know who did?  Hanfu Lee.  His brother Ken Lee, the one that committed tax fraud and the IRS sanctioned him for it.  Eric Perardi, the entire hockey team, Adam Powell, Eric Swanson, my wife, David Bergstrom, one of the biggest real estate investors in Austin and the state of Texas.

You know how many times I asked for a comp?  It was a running joke.  Zero.  I got a room and we used the room to host private games, but they didn't tell you this on their drafts.  They didn't say this.  They painted it as I'm sitting there feeding the machine.  I fed the machine next to it so I could get a voucher so I could keep track of how much I won and so I didn't get robbed.  Because if I had the vouchers, I could put them in my wallet.  You saw me putting it into the wallet with only a certain amount of cash, I could keep track.  And more importantly, when Mr. Hsu would send a runner and say, where did you get this and how much did you win or lose, I could answer him.

I will have significant tax obligations, God willing I get out of here and you understand and believe me, because my income is not reflected because I was not paid on it.  Victor Hsu owes me a little but under $600,000 and that's what I was going to collect November

19th from him after the race was over November 18th.  That would be combination of my work from '20, '21, '22.

And in 2023, the Resorts World guy came up here and he told you a fabrication.  Their paperwork showed I was ahead 238,000, I believe.  They barred me from that hotel.  They barred me because I won $500,000 a week and a half earlier.  And yes, I do have the W-4 to substantiate that.  Of that 500,000, five percent goes to me, 25,000 of it.  That's my additional income.  The rest of that money goes to Victor Hsu and his syndicate.  It's not me.

My job primarily was to balance his bets for points and to balance his action in the sports book.  So he would tell me through someone else what to put.  They didn't care if they were whatever team you want to pick, the Oakland Raiders or whatever they're called now.  If there's half a million this way, 400 this way, all he wanted to do was balance it may make 10 percent in the middle.  I don't bet sports, but I have a ton of sports activity that's not reflected on the card.  But I don't bet the World Cup that I did for him.

My expertise is in poker, has been in poker for almost 10 years.  Am I perfect, no.  I've placed 41st at the Aussie Millions.  I've placed in the top hundred a couple of times in Vegas in the World Series and that's it.

But as far as that -- the story you got from Eric Perardi, I've never taken a dollar from Eric Perardi. I had a bunch of questions asked of me two years before these checks were written about James Holloway when he was finishing The Crossover, Eric Perardi asked me, does this man have the quality of investments he says he does? I have a lot of rich friends with too much money. My response was he has a lot of expensive clocks and they probably are several million dollars. He's got a whole entire house, 4,000 square foot of them, but I couldn't give you an idea of valuation. That was the extent of my relationship with those two doing business together.

Lane Holloway, I have no business interest with Lane Holloway. Gary Snider, I've never traded a comic book with Gary Snyder. I bought a comic book collection from a Gary Sertich once. I'm told they were Gary Sertich's. I've never physically been in the same room with Gary Sertich except for that Christmas party. I was there for that in 2021. That's it.

It was a complete run of Spiderman if you know who Spiderman is. Amazing Spiderman 1 through 300, I paid $9,400, I sold them. Clark Snyder sold them to the dealer for me, picked up the cash and dropped it off to James Holloway. James Holloway paid Gary Sertich. I have never once done business with the Sniders. I gave them a clock

once that they had said they wanted to purchase. It's a Hermle Astrological. I was never paid. My understanding when I was arrested was it was still in their house.

As far as Hanfu Lee, Hanfu Lee came to my house 10-16-2022 after not talking to me for six years and asked me to withdraw my complaint with the franchise tax board challenging his tax return --

MR. HARDING: At this point, your Honor, I object to the narrative. It's been going on a while.

THE DEFENDANT: He asked -- sorry, your Honor. He asked me to withdraw my complaint about the taxes --

MR. HARDING: I continue to object to the narrative.

THE DEFENDANT: I apologize.

THE COURT: We need to kind of sort of limit it. If you have any specific questions that you want to ask.

Q.   (BY MS. HERRING) Is there more that you want to tell the jury about the dispute you had with Mr. Lee? Is that what you would like to continue to explain?

A.   Yes.

Q.   The Judge just wants you to give a brief answer about that.

A.   Yes. Hanfu Lee owed me the balance of my legal bills from Sanford Millar, Steven Giorgione and accounting firms. The agreement was that I would withdraw my

complaint from the franchise tax board about his false $5 million bad loan that he had gotten a tax break on and the IRS.  They sent me a bill of $786,000 from the franchise tax board.  I challenged it.  I had already beaten his brother in federal tax court on similar -- Hanfu has now talked to his brother because they were both trying to get the upper hand on each other for their dad's estate.

Q.   And, Mr. Youngblood, did you ask Dr. Lee to wire you money?

A.   I did not ask him to wire me money.  Dr. Lee would go to my Covina Navy Federal and deposit money.  He had promised to make good on the money he owed me.  When he came to my home, he took four watches with him.  He took an 18-karat Submariner that I had purchased at Tourneau five years earlier in Las Vegas, Nevada.  He took a blue, what's called a Smurf 18-karat white gold that I had purchased from Vintage Contessa in Houston that was shipped to San Marino, California.  It was sold to Steve Wojak (phonetic) who sold it to me.  And he took two green referred to as the Hulk Submariners.  They were also sold to me from Steve Wojak.  He did not pay me for those items.  He was repaying me.  The watch that Marvin was going to pick up was in addition and I was not paid yet and I was not going to pick up that watch and go another $19,800 in the hole without being paid.  Which Marvin's

call clearly substantiated.

Q.    I have no further questions for you.  The government's going to ask questions.

A.    Thank you.

CROSS-EXAMINATION

BY MR. HARDING:

Q.    Can we pull up Government's Exhibit 310, please?  Do you recall Government's Exhibit 310, Mr. Youngblood?

A.    I do.

Q.    You recall this was a demonstrative exhibit, a summary exhibit based on TFO Fiedler's testimony, correct?

A.    Uh-huh.

Q.    And you recall that this was based on recordings of your voice saying these things.

A.    Yes.

Q.    So just to go down the line once it pulls up, if we could dim the lights just a little bit.  Just while we're waiting -- there it is.  The recordings we've heard, they are all your voice.  This is you talking on all recordings we've heard throughout this trial.

A.    Yes.

Q.    Including the undercover audio with TFO Fiedler.

A.    Many, many months after all these supposed allegations against me, yes.

Q.    That's Government's Exhibit 31 and 32.  In

Government's Exhibit 31, you tell TFO Fiedler your son was killed six months ago by drug dealers, correct?

A.   I told the world my son was killed and because I wanted to protect my son.  That was a decision my wife made, I made, the family attorney made, and two people that are federal officers that are friends of the family made in connection to try to protect my son and keep him safe.  The other alternative was to pull him back here and bring him to U.T.  My wife did not want to do that.  That was not my decision.

Q.   Did you hear my question, Mr. Youngblood?

A.   I did.

Q.   What was my question?

A.   Your question was did I tell them that, my answer's yes.

Q.   It was a lie, correct?

A.   I protected my son.  Yes.

Q.   Did you hear my question?

A.   I take full responsibility for it.

Q.   Did you hear my question?

A.   Yes.  I take full responsibility.

Q.   What was my question to you?

A.   Did I tell people my son was killed, I did not --

Q.   That was not my question to you.  Was that a lie?

A.   Yes.

Q.   Okay.  You told TFO Fiedler in front of Eric Perardi that you were in the Army, correct?

A.   Told them I trained with the Army, yes.

Q.   Really?

A.   That I was in the Army.

Q.   You said you were in the Army.  You didn't say you trained with the Army?

A.   Yes.

Q.   So that's not true.  That was a lie.

A.   No.  I worked with them.  I trained several people that were members of the Army.  I was attached with various units of the Army.  I taught nothing but survival and tracking and I taught several hand-to-hand courses close-quarter combat.

Q.   I understand you have a story you want to tell, sir --

A.   I will not --

Q.   Please don't talk over me.  You've already had a chance to tell your story.  Now's my chance to ask you questions.

A.   I will not answer questions that would violate a nondisclosure agreement that I have signed before because I do not know what the ramifications would be.

Q.   Well, who's the --

A.   I will not answer those questions.

Q.   Okay.  Your testimony is you cannot answer the question whether you were in the Army because of a nondisclosure agreement you have.

A.   No.  My answer to you is I will not say that.  My answer simply is I will not say anything that will put me in bigger problems than anything you could do to me for violating an NDA.  I don't think it's relevant for what this is so if you have anything else to ask me.  Was I attached to these units?  Yes.  Did I help these units? Yes.  Did I train these units?  Yes.  Will I answer anything further that will incriminate myself by violating an NDA, I will not.

Q.   Well, sir, you understand your Fifth Amendment rights ceased when you took the stand.

A.   Understood.

Q.   And so, you actually have to answer that question. You can be compelled by the Judge to answer that question.

A.   Okay.

Q.   Your Honor, I'd ask that you compel him to answer the question.

        THE COURT:  I do order you to answer that question.

A.   Okay.  What is the exact question?

Q.   (BY MR. HARDING) Were you ever in the Army?

A.   No, because, technically, I did not sign the contract

for the six years commitment that I had the last time in 2010.  From there, I was sheep-digged to other people and worked appropriately with them.

Q.   When you said you were in the Army, that was a lie.

A.   Yes.

Q.   You were never in Delta Force.

A.   I trained with Delta Force.  I taught several classes with Delta Force.  I worked with Scott Greer, otherwise known as Dalton Fury, for almost four years.

Q.   That is an amazing story that we've heard before.  In fact, you know what, why don't we play it right now.  If we could have Government's Exhibit 52, please.  It's audio.

          (Audio file played.)

Q.   So you were a Tora Bora with Delta Force 2001 hunting Bin Laden?

A.   I was not with them at the time that the battle of Tora Bora took place in December.  I went a month and a half earlier with three people.  One's name was Jonathan DaVinci (phonetic), one's name was Harry Khachaturian (phonetic), and the third one's name was Nate Smith.  I was asked to look at the terrain and I was asked to give an evaluation.  That's all I did.  I gave my opinion, I wrote the opinion, I spoke with Mr. Greer about it and that was the extent of it.  I also spoke with Peter about

it and that was the extent of that.

Q. That must have been a pivotal moment in your life, very significant.

A. No.

Q. Really? Going to Afghanistan to hunt Bin Laden didn't have an effect on you?

A. It wasn't Afghanistan or Bin Laden that was the issue. It was the terrain. I'd done a lot of climbing when I was younger.

Q. Did this conversation with Major Greer actually happen?

A. I'm sorry?

Q. Did this conversation that you've related that you said that you had with Major Greer actually occur?

A. It did.

Q. How well did you -- so Scott Greer, Major Scott Greer is the person you're talking about.

A. Yeah. And your question is what, sir?

Q. You're talking about -- this is the conversation with Major Scott Greer.

A. Yes, indirectly through Harry.

Q. Who later took up the pen name Dalton Fury and wrote a book about it.

A. Yes.

Q. Would it shock you to know that his name is actually

Major Tom Greer?

A.    I went through Harry Khachaturian who I was introduced to from Jonathan DaVinci.  I wrote a paper.  I wrote an opinion.  That's it.  The conversation came with the four of us speaking and he asked me for clarification on what I thought.  I said if you're hunting for someone that's 60 years old at 14,000 feet and I can barely breathe and he's on a dialysis machine.  I find that hard to believe.

Q.    Have you read his book about that?

A.    I have not.

Q.    Okay.  Let's go back to Government's Exhibit 3, please.  Actually, while we're talking about this, if you could pull up Government's Exhibit 32, page 3.  If we could circle the middle here.  You say, I was Delta, correct?

A.    Yes.

Q.    You didn't say, I worked with Delta Force, or I was contracted with, or I accompanied.

A.    Yes.  I was in Delta so I was Delta.

Q.    For seven years you've spent with them.

A.    I taught for almost 13 years from 2003 to 2006 -- I'm sorry, '93 to '06.

Q.    If we could go to page 5.  And if we could start up here all way at the top and go down to -- just this top

part's fine.

You were in the Army? Yes, I was. Not true.

A. No. Not true.

Q. You were never in the 82nd Airborne?

A. That says 52nd. That's 504 PIR.

Q. I'm sorry. Were you in 52nd Airborne?

A. No.

Q. That doesn't exist, does it?

A. I trained and taught people that were 82nd Airborne. I trained and taught people who were 504 PIR.

Q. But that's not what you say.

A. No.

Q. So that's a lie.

A. I didn't know who Mr. Fiedler was and he was a hundred pounds heavier than I was at the time. He was intimidating. I was talking with Eric I don't know what this man's relationship is. I simply know that he's telling me X, Y and Z. I could not understand what his interest was to sit there on top of me and try to intimidate me. So I wanted him to understand that I was not someone that perhaps is just going to be run over by him.

Q. Your testimony is this is an intimidating conversation you're having?

A. No. I'm telling you Mr. Fiedler's a big man.

Q.   There's no doubt about that, but you would agree with me the tone of this conversation is not intimidating in the least --

A.   No.  We were friendly but I wanted to back him off and get back onto the case in point, which was either he was going to help me recover my dinosaur head or he was not.  And I had not asked anyone for money and if I could help Eric with his situation and recover significant money, I was going to do that and I tried to.  So either his answer was yes, I could loan you the 76 grand for a week or I can't.

Q.   So your testimony is that this entire conversation is about your dinosaur head?

A.   It's about borrowing money to help Eric get money back.  If I could get my money back and retrieve my goods, I was in a better position to help Eric.  I had already put --

Q.   I'm sorry to interrupt you.  I know you have a lot to say, but your testimony is you're borrowing money from Agent Fiedler to get money back for Eric so Eric can get you money back for your dinosaur head; is that correct?

A.   No.

Q.   Well, please, what is the purpose of you borrowing $76,000 --

A.   Several things --

Q.    Please let me finish so the court reporter can write it down.

A.    I understand.

Q.    What is the purpose of this meeting and you getting $76,000?

A.    A lot of items were taken from me when I had my problem in California.  My house was burnt down.  There was property taken into San Bernardino Sheriff's Department.  Several items of value, including that dinosaur head that I got back and lost again when Mr. Coventry lost it, a couple of paintings, several pieces of Khlebnikov silver and other things were gone.  The whole point was always to get my dinosaur head back.  It was worth significant money.  The whole point was to recover this Khlebnikov silver.  It was worth significant money. There were several watches in there, including a Richard Mille that were very expensive I never saw again.

So when someone told me I might know where your property is, do you have interest in recovering it, it's going to cost significant money, I told them if you can find someone that will loan it to me and I don't have to go through the other channels, go back, I will more than happy to try to help you.  The man never gave me the money and I never borrowed so I don't understand what I did wrong.

Q.   Well, I'm sure you don't want me to answer that in front of the jury, but you'd agree with me there's not a single word in either of any of the lead-up calls we listened to, this audio, any of the subsequent calls we listened to, not a single word about a dinosaur head, is there?

A.   Hanfu Lee brought it up in front of the jury the other day.

Q.   Yeah, maybe you had a dinosaur head at one point. What I'm saying is when we're talking about this conversation --

A.   I don't think --

Q.   -- that occurred on May 1st, 2023?

A.   I don't think it was relevant what my assets were or weren't for that.  The relevancy was a baseball bat and I had eight of them.  You guys took them into custody and I still haven't seen one of them.  That softball bat's not mine.  Where are the other seven?  Where are the H.E.B. bats.  I haven't seen any of them.

Q.   So I've just gotta make sure I get this right.  This is some kind of conspiracy by the FBI to --

A.   Not at all, but I can't verify where my property is.

Q.   Well, you heard the agents testify -- in fact, you've heard three agents testify now that that bat, Government's Exhibit 1, was the bat that you handed to them on May 1st

--

A.    That's impossible --

Q.    -- 2023.   James Holloway handed to them --

A.    I was going to say that's impossible.   Don't put words in my mouth.   I was respectful to you, too, because that bat, I was not even there when he handed it to Eric Perardi nor was your Agent Fiedler because he was sitting in a pickup truck across the street.

Q.    Really?

A.    So to say that I -- yes really.

Q.    You weren't there when the bat was given to Agent Fiedler?

A.    I wasn't the one that gave it to him.   No, I was not there when he gave the bat to Agent Fiedler.

Q.    Do you recall the clip where he says --

A.    No.

Q.    -- 34 -- you say 34 inches, 34 ounces and you say not for sale and you said yeah --

A.    We're talking about two different things.   I'm talking about Holloway giving the bat to Perardi, Perardi driving over to Fiedler and the truck.   I was not there when that transaction took place.   They were at a pet store two streets over.

Q.    And your claim is that at some point, James Holloway swapped out the bat without your knowledge?

A.    I didn't say a word.  I'm not the one that wrapped the bats and that's not my handwriting.  James Holl --

Q.    You didn't wrap the bat?

A.    No, I did not.  James Holloway took those bats from my gun safe when I had my estate sale.  Eric Perardi was at my estate sale.  James Holloway was at my estate sale.  Clark Snyder was at my estate sale.  Gary Snider was at my estate sale.  Every one of them was at my house on 10-16-2022.  Even property that you recovered at Jason York's house was at my house.  My garage was full.  I was told that things were sold, I didn't see it.  But James Holloway took those bats because I did not have room.  I could not lock the firearms away and the bats.  I have not seen those bats since 10-16-22.  I saw that one wrapped and I did not wrap it and it is not my handwriting.  So yes, I will stand by what I said.

Q.    You recall a phone call that we played where you say, I didn't wrap that bat in 25 pounds of tape because it's a fucking fake.

A.    I wrapped it in an acrylic case with tape over it.  I haven't seen that kind of tape.  The tape that you were using, why would I possibly use that and have to cut it open and cut into the acrylic.  An acrylic case is this long specifically for bats and it's taped underneath that with a different kind of whatever the word would be, Saran

-- it's thicker than Saran wrap but thinner than that. That kind of tape is bubble wrapped that you would use for ceramics.  No, I did not wrap that and no, that is not my handwriting.

Q.    Just to be clear, is it your testimony that that is not the bat that was transferred to Joe Fiedler?

A.    That is not the bat that I gave James Holloway.

Q.    Well, you were present when it was handed to Joe Fiedler because you're on tape saying just 34 inches, 34 ounces and he says, not for sale, and you say, not for sale, which is written on that tape.

A.    If I'm not the one that taped it and I'm not the one that wrapped it, I don't know what bat was in there.  The assumption at the time was that it was the same bat I gave Mr. Holloway because I trusted Mr. Holloway.  But I have never heard from you or them where any of my property is until I got that.  I did not even know where my Dream Catcher was.

        And by the way, it's Red Cloud, not Sitting Bull. Not -- the point I'm trying to make is that's been missing from my home for at least two years.  I didn't even know Jason York had it.  And as far as the flag goes, I like Mr. Bridgman.  I have nothing negative to say about Mr. Bridgman, but that's a dispute between Mr. Bridgman and I for $12,000.  The worst thing Mr. Bridgman can say is Mr.

Youngblood's paid me $62,700 and was polite.  That's my property.  I don't understand why you have that.  Eric took that from my house and I was not there when he took it.  He took that from Gloria and said Kota Jadenne said, I can use it as collateral.

So if you want to tell me that I'm a bad person because of this right here with the PIR and everything else, I mis-worded myself and should have said more clearly I trained these people.  I taught these people and I helped these people.  But don't paint me as committing wire fraud when I didn't.  And don't paint me for not having proper ownership of these items.  And certainly don't paint me for being dumb enough to think that a softball bat that you could see, they could see, who would possibly confuse that?

Q.   I agree.  It would be difficult to confuse it if it was an accident.

A.   It was not my property and I didn't place it there.  And where are the other seven bats, your Honor -- sir?  Where are they?  No.  I'm asking a question and you mock me and you laugh at me.  Where are they?

Q.   Well, the reason --

(Crosstalk.)

A.   -- I didn't ask you where three of them are --

Q.   -- victims and pretended they were

valuable collateral --

A.   I didn't give the victims anything.  And there are no victims.  Those people took advantage of me.

Q.   You're the only victim here, correct?

A.   No, I'm not a victim.  I was dumb enough to trust James Holloway who took advantage of people and used my past to elicit other people's sympathy.  I'm not the victim nor were they.

Q.   We could go to page 7 with this document of 32, please?  So the very top, you're talking about your father who went to Camp Lejeune and joined the FBI.  You've acknowledged that's a lie, correct?

A.   I'm not acknowledging that's a lie.  Mr. Kerr was like a father to me.  He was a marine and then, went there to the FBI.  I lived in his house for four years.  No, it's not a lie.

Q.   Your not-biological father but someone you considered your father went to the FBI.

A.   Yes.

Q.   What exact division of the Department of Defense do you freelance for, sir?

A.   I taught for the Department of Defense for several people at different contracts.  I taught survival, tracking and I taught unarmed combat --

Q.   What are those entities within the department --

A.    Activities group and I taught a couple of times Cleveland Police Department, Brunswick Police Department --

Q.    Hold on.  Those are not with the Department of Defense, I think you'd agree.

A.    Brunswick Police Department -- can I finish, please? You interrupted me.

Q.    Actually, this is how this works.  You answer my questions.

A.    I am answering your question.

Q.    Well, I'm asking you which entities within the Department of Defense only --

A.    If you'll let me fish, I'll be more than happy to answer --

Q.    If it's an answer about the Department of Defense, absolutely.

A.    It was the Ohio National Guard and that asked me to teach a class four times.  My understanding is that falls under the Department of Defense, right?  My uncle's name is Nick Solar referred me to them.

Q.    And do you have contracts to show this?

A.    No, I did not.  They paid me $500 for each class.

Q.    Your testimony is the Department of Defense paid you with a handshake deal and cash.

A.    I didn't say that.  I said I was referred and I was

paid for my time.

Q.    By whom?

A.    Uncle Nick paid me the money.  I just taught the classes.  I don't understand what the issue would be.  I wasn't doing it for the money.  I taught them -- you can mock me but I was there to try to help and to teach.  I wasn't there to get rich.  I don't make my living by doing that.  I do it to try to help.  I also coach kids.  I teach classes still at Royce Gracie and Gracie Barra jiu-jitsu.  Does that mean I'm a liar because I don't get paid for it?

Q.    That is not what makes you a liar, sir, you're correct.  If we could go to page 17.

A.    I find your tactics despicable.

Q.    If we go to the bottom here.  This particular point.  So I know you must have accidently misspoke earlier about being associated with the Army but not in the Army.  Here, you say, I started 11 Bravo.  Ground pounder.  I earned it the hard way.  No one handed it to me.  I didn't have my degree at the time, so I get all the way to E-7 before I got to start second Lieu, Lieu, and then left as a captain when I finally quit.  One more day, I would have been an 0-4, but there was no reason to stay anymore.  Is this also a mistake, a slip of words?

A.    No, not at all.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Q.   This is a lie.

A.   I said it.

Q.   Correct, is it a lie?

A.   I said it several months after any and all of this would have happened and the conversation was over with him.  I don't know who he is.  He's asking a lot very personal questions and I was trying to make a point. Let's be done and let's move on because I didn't believe who he was either.

Q.   And so, you thought you had to lie about being an officer in the Army.

A.   I wanted to see what he was going to say because I waiting for him to slip up and respond.

Q.   You worked lies to this the whole time.

A.   No.  I knew he wasn't who he said he was.

Q.   This is page 17.  Let's go back to 310, please.  You acknowledged on direct you weren't born in Okinawa.

A.   I didn't say I wasn't born in Okinawa.  I said I was born in Fairview Park, Ohio.  My uncle was born in Okinawa.

Q.   Right.  But you'd agree with me during the conversation on May 1st, 2023, you tell Joe Fiedler, I was born in Okinawa.

A.   Yes.  My uncle was born in Okinawa.

Q.   Okay.  Was this another thing you were so intimidated

by Joe Fiedler, you had to make up a story about your uncle --

A.    No.   I just don't see what the relevance was.   You're absolutely right on this.

Q.    So you lied?

A.    I lied.

Q.    You've never as a child, according to your father's testimony, lived at any of these places --

A.    I lived in every single one of those places.   I was there for at least 30 days with my uncle.   I could go through the list with you right now, Moscow, Hong Kong, Johannesburg, Sudan, Morocco, Detroit, New York City, also Boston, Ohio, Raleigh, North Carolina.   You could add London, England to it.   You could add Osaka.   You could add Okinawa.   My uncle would stay for 30 to 35 days at a time so we would go to two places generally during my break when we were at school.   Every Easter vacation, I would go with my uncle for seven days and when I wasn't with him on Christmas break, I would go to Chicago to north side and spend the time with him and Uncle Dale.   Uncle Dale and Uncle Larry.

Q.    Could we play Government's Exhibit 63?

             (Audio file played.)

Q.    I believe what I really want -- let's talk about Victor Hsu.

A.   Okay.

Q.   According to you, Victor Hsu is the guy who stakes you in gambling.

A.   He does stake me.

Q.   And I assume we'll be hearing from Victor Hsu to corroborate that.

A.   I've tried contact Dee Wu and Victor Hsu.

Q.   Do you have any e-mails or any other --

        MS. HERRING:  Objecting to the shifting the burden to the defense, your Honor.

        MR. HARDING:  I'll rephrase.

Q.   (BY MR. HARDING) Is the only evidence we're going to hear today about your relationship with Victor Hsu what you say here on the stand?

A.   I don't understand the question because Victor Hsu funds my work and I was supposed to meet Victor Hsu.  You arrested me for a crime I did not commit.  You didn't arrest me for lying.  You didn't arrest me for my service or my teaching ability.  My family, my son -- you arrested me for very specific charges.  Wire fraud that I did not commit.

        So you're asking me Victor Hsu.  You tried to find Dee Wu.  You did not find her.  Dee Wu's husband runs the Sands Corporation in Singapore.  He's the one that referred me in 2010 all the way back to Victor Hsu.

Victor Hsu had tried to hire me in '16, '17, '18 and '19. I did not want to work for him.

Now, I finally go with him in 2020, COVID hits, it changed everything and it made it much more difficult for me. So as far as verify Victor Hsu, nobody wants to see him more than I do because I would get paid. And I spent three-and-a-half years working ultimately for free. But if you'd like to know how I'm paid, by all means, ask me.

Q. We'll talk about that. You've claimed that you made a lot of money playing poker and cash games at casinos and elsewhere.

A. You'd have to define a lot of money.

Q. Why don't you define it. How much have you made?

A. Are you asking me what my year -- the date was when I arrested are you asking me --

Q. 2022, say. How much did you make in 2022 playing cash games?

A. Playing cash games? Probably 55 or 60,000 additional to what I had.

Q. Okay.

A. And then, the cash games I played for him, probably another 200, but I was not paid. I turned the chips over to his runner. I was not compensated for it. He owes me exactly, if my math is correct, 603,000 when we even up

and I will file federally -- this has been discussed, by the way, with Steven Giorgione, who is an accountant out of Las Vegas, Nevada, Henderson that specializes in professional gamblers.  He's done my books for eight years.  Mr. Giorgione does my taxes.  Mr. Giorgione is the one that tells me how to file.  And Mr. Giorgione, who was recently acquired by SingerLewak, knows Victor Hsu.

So if you have any questions about him or the Wu family, you can also ask Mr. Giorgione.  I don't see how it's relevant to me.  I'm just the one that works for him.  How he reports his taxes is not my business.

Q.   Yeah.  Let's talk about your taxes just real quick, if we could pull up Exhibit 13, page 14.  If we could zoom in down here at lines 28 through 31.  You agree with me that in this tax year of 2018, you made taxable income -- or net profit, I should say, net profit of $88,651.

A.   I would, but you're not factoring in the fact that my wife and I had almost 635 ounces of gold so I was living off my savings.  This was enough to pay our bills and this was enough to substantiate our lifestyle.  I didn't have a lot of debt at the time.

Q.   My question is just is that your net profit in tax year 2018?

A.   I didn't work for Victor yet so yes.  Mr. Giorgione files my returns, I would have to think this is right.  I

signed it.

Q.   You also provided him all the information to file them, correct?

A.   Mr. Giorgione gets it directly from the casinos.  I do not provide anything except what my expenses are.

Q.   You never e-mailed him anything about your --

A.   I didn't say I didn't send him it.  I simply said that Mr. Giorgione gets it directly and verifies it with the casinos.

Q.   You recall earlier, we saw a page of this document that said that you were the one who estimated this income, correct?

A.   That's what it says on the bottom on the disclaimer -- on the part -- you'd have to show it to me, but I know the part you're talking about.  But Mr. Giorgione verified this with the casinos.  Every single one of them.

Q.   Well, that's impossible because the casinos only keep track of your winnings.  They don't keep track of your losses in terms of what they report to the IRS.

A.   That is not correct.

Q.   Really?

A.   Your chart that you just showed right there that keeps track to the IRS, yes.  Keeps track with the losses, no, that is incorrect.

Q.   You're saying that the casinos report your losses to

the IRS.

A.    No, it's not what I said.  I said the casino keeps track of what your losses are.

Q.    Absolutely.  So you're saying Mr. Giorgione got those records directly from the casino.

A.    I'm telling you Mr. Giorgione takes the copy that he gets from MGM's -- I forget what they call their card. Mine's called a Noir card but that's not what the program's called.  I believe Resorts World that did not exist at that time refers to it as a Genting card.  Those cards send a statement that shows your losses and net.  It also sends a disclaimer that says if you used multiple cards or you have a card and it's not active, it doesn't count.  And what you're not factoring in is other people play on my card.

Q.    Well, I'm not factoring anything, sir.  My question to you is you said to the IRS that was your net profit and is that accurate?

A.    My net profit and not my gross profit?

Q.    Net profit or loss, 88,651, is that accurate for tax year --

A.    I think so.

Q.    Okay.  So regardless of who's using your card, who isn't using your card, any other things you've got going on, all of your income for tax year 2018 is 88,000 and

change.

A.    I believe so.

Q.    Okay.  If we could move to page 41 of this same document.  We'll be even more generous this time.  Your total income for tax year 2020 was 93,000 -- 93,040, correct?

A.    Okay.

Q.    That's -- yes --

A.    I don't remember what the other income was on the schedule.  I believe it was a watch that I sold.

Q.    I'm not asking you where it came from.  I'm asking you is this, in fact, an accurate reflection of your total income?

A.    I turned everything to Mr. Giorgione.  You're asking me a question that I was not prepared for because I don't know what this is regarding.  I've sold several high-end watches and I reported them on my tax return like I'm supposed to.

So if it was a $90,000 cost and I made $2,000, it would show -- for the sake of argument, let's say it's $10,000 watch and I say I sold it for $10,000 and my cost was 8,000, I believe that that would be a capital gain of $2,000.  I don't know what this is because I sold several of them.  I was closing out so if this is what that is and that's one of the other watches, then that was what that

would be.  I cannot answer your question without having Mr. Giorgione.  He has records like this.  You're showing me one line on a return.  I don't know.  But it's quite possible that it was the Rolex watches or it was one of the other --

Q.  I'm not asking you where the money came from.  I'm asking you are your tax return --

A.  Well, I didn't know is there a cost or not.  That's my question.

Q.  I'm not talking about your net income.  I'm talking about your total income.  This is your total income, not even your net taxable income.  All the money you had coming in in tax year 2020 from all the sources you reported --

A.  This is 2020, not 2018?

Q.  Correct.

A.  And it's COVID.  So no.  Las Vegas was shut for nine months.  So I would say probably this is close because I did not have a chance to work as much.

Q.  Okay.  So you believe that number's accurate.

A.  Based on what you're showing me.  I'd have to see Mr. Giorgione's files, sir.

Q.  Well, these are your certified tax records.

A.  I understand that.  But you're showing me one line and I have the presumption that this is accurate.  I don't

see the itemization.  Mr. Giorgione is very anal.  It's this long.  I'd have to see the itemization of what's what.

Q.   Could we go to page 64, please?

A.    Please.

Q.   At the risk of going through this exact same belabored process, looking at line --

A.   I don't find any of this amusing.  I'm trying to help you.

Q.   I appreciate that --

A.   I'll answer the questions honestly.  I didn't hide behind the Fifth.

Q.   Line nine, was your total income in tax year 2021 $92,312?

A.   I've not been paid for 2021 or 2022 with Victor yet, so my answer would be yes because I've not due that money nor do I have to pay tax on it until I'm compensated.  So if you're asking me have I been paid in full, the answer's no.  Will I owe more when I meet up with him, yes, I will. Did I owe more at that time, to best of my knowledge, no. I think I had tickets that the FBI seized.  I never cashed them.  They're not income according to Mr. Giorgione.

Q.   I'm not asking you to justify other money you did or didn't have.  I'm asking you regardless of what you may be owed in the future and taxes you may owe in the future,

for tax year 2021, did you and your family -- because you filed joint returns with your wife, correct?

A.    I do, but my wife had significant savings like I said.

Q.    Well, that doesn't count as income.

A.    That's what I'm trying to get across to you is my wife and I kept our money in gold.  We were not having any financial issues so I didn't care to work five days a week like I was now trying to support my son because I didn't want to burn through what was our savings.  I sat here and was working on these numbers with COVID one day, one and a half days a week.  When I left, when you charged me, I was in Nevada five days a week working, literally, 24 hours a day.  Sometimes I wouldn't sleep.  So as hard as you may work at your job trying to get me, I was working trying to make a living for my family --

Q.    All that hard work netted you $92,000 -- 92,312 --

A.    I don't find any of this amusing.

Q.    I'm not amused either.  I really prefer that you just answer my questions.  But since we're in this position, I'll ask it again.  In tax year 2021, was your total income $92,000 --

A.    Without seeing Mr. Giorgione's notes and without seeing the itemization, I have to presume that what you're saying is correct.  Before you go, because I'm assuming

the exercise is going to be the next year, I have not seen it. My understanding was it was forwarded to my wife when I was charged and that she mailed it. I never signed it. So if you're about to show me a '22, I don't know what it said and I don't know what the net was so you'd be --

Q. Don't worry, I am not going to show you that. But you'd agree with me that of the years we've discussed up till now, your total income or your net income has been somewhere between 80 and $125,000 as reported to the IRS for those years.

A. It's between 80 and a hundred thousand dollars until I'm settled with Mr. Hsu and Mr. Wu.

Q. Some point in the future, though.

A. The difference is substantial.

Q. Sure. Okay. That's fine.

A. You asked, let me answer it. April 2023, I was barred for hitting the biggest jackpot that Resorts had ever paid. My point is if you take my year to date, they admit that I was 200-and-some thousand ahead. I would have been 700,000 if they had added that last deposit. That doesn't mean I would have made 1,400,000 for the year. It simply means it would have been substantially higher --

Q. Mr. Youngblood, we have to cover some ground here and this is not getting us where we need to go.

THE COURT:  Actually, what we're going to do is we're way overdue for our second break.  So, ladies and gentlemen of the jury, we're going to take our second 20-minute break of the day.  Let's call it 1:20.  Take a break.  We'll be ready to come back at 1:40.  You remember the instructions and I ask you to continue to abide by those instructions.

(Jury not present.)

THE COURT:  Before we take a break, I just want to make a finding for the record that during his testimony, Mr. Youngblood referred to his, quote, chains. Both the U.S. Marshal Service and court personnel have been very careful throughout this trial to ensure that the jury did not have a view of the defendant's leg shackles, and I want the record to be very clear that there was no indication that the defendant had been shackled until he, not in response to any question, told the jury and even attempted to lift his legs over the barrier.  So to the extent that there's any question in the record about a reference to chains, that's -- I wanted that to be clear for the record.  So we'll now take a recess.

(Recess.)

THE COURT:  Ready for the jury?

MR. HARDING:  Yes, your Honor.

MS. HERRING:  Yes, your Honor.

(Jury present.)

MR. HARDING:  May I proceed, your Honor?

THE COURT:  You may.

Q.   (BY MR. HARDING) Mr. Youngblood, we've spent already a lot of time talking so I don't want to take up too much more.  If we could pull up Exhibit 258, page 3, please. We had just talked about how your total income for the past few years leading up to -- including 2021 was between 80 and $120,000.  You recall Katie Sloma testified about her financial analysis of your accounts?

A.   Yes, Mr. Harding, but you asked me --

Q.   We've taken up a lot of time so please just answer my questions, all right?  Do you remember this financial analysis?

A.   Yes, but you asked me a question about net income --

Q.   My question was do you remember it.

A.   It's net after all the other casinos that aren't --

Q.   Mr. Youngblood --

THE COURT:  If you've got a problem with him, I'll instruct him.

MR. HARDING:  Yes, your Honor.

THE COURT:  All right.  So if you could listen very carefully and answer directly and concisely, please.

THE DEFENDANT:  Okay.  Your Honor, because there's 30 other places that I've played that are not

reflected on that return.  Mr. Giorgione only uses what the net is and does not cite the total --

THE COURT:  I didn't ask you a question either. You have to listen to his question.  Your lawyer will have an opportunity to get up and ask you additional questions.

THE DEFENDANT:  Got it.

Q.  (BY MR. HARDING) Do you remember this financial analysis?

A.  I do.

Q.  You would agree with me that your total -- the 2021 column, the total deposits of about $600,000, correct? See that?

A.  Yes, the same money being recirculated after I win or lose whether it's 18,000, 20,000, Mr. Giorgione -- that's the reason I pay Mr. Giorgione who specializes in gamblers' bookkeeping.

Q.  Okay.  Well, let's look then at your expenditures. You'd agree those are going to be cumulative.  You had about $600,000 in expenditures in tax year 2021.

A.  Same money going in and out of the account.

Q.  Well, this is all money just going out, sir.

A.  I understand that.

Q.  And you'd agree with me the $600,000 --

A.  Deposits.

Q.  -- in expenditures is far in excess of your total

reported income.

A.    We had the savings, sir, if that's what your question is.

Q.    And what savings did you liquidate for that?

A.    I liquidated gold.  You can check on that with Sahara Coin.  You can check Las Vegas Coin & Jewelry.  You can check on it with Capital Coin here in Austin, Texas.

Q.    But you don't have any of those records.

A.    They would have all those records.

Q.    But the only evidence that we have here today about that is your word on it.

A.    I wasn't expecting the question.  I don't know how I could get the evidence from jail.  But they have to keep records for 10 years, so yes, it will have the record of all of the transactions.

Q.    You were arrested July 30th of 2023, correct?

A.    Correct.

Q.    And you knew this trial was set for months in advance.

A.    I can only ask for information so many times so many ways, sir.  I told my team what I thought I needed.  They took what they thought was needed.  I don't know how to answer them.  I'm not an attorney.

Q.    Well, you also had the ability to mail things and call from jail, correct?

A.    Correct.  I have no one putting money on my books, sir, so no.

Q.    So your testimony is you have attempted to get records to show these but were unable to do so.

A.    You have the ability to pull my phone calls.  I've made several contacts to my accountant.  I've made several contacts to try to contact as many --

Q.    Your Honor, I'd ask you instruct Mr. Youngblood.

A.    They didn't take my calls.

THE COURT:  I think he's answering your question.

A.    Sir, I did try to get the records that you're asking.  So I would disagree vehemently with what you're saying.  I called Mr. Giorgione.  The only person, ironically, that put $200 on my phone call was Mr. Giorgione, my accountant, put money on my books.  I called him at least 20 times from jail.  You have access to these tapes.  I did try to call Capital Coin, they wouldn't take my calls.  I did try to call Sahara Coin, they wouldn't take my calls.  I did try to call the other -- Las Vegas Coin & Jewelry, they didn't take my calls.

So yes, I would say that I made a huge effort to show what my revenue stream was.  My wife made almost 400,000 a year for 10 years of her career and that $880,000 payment --

MR. HARDING:  Your Honor, I think he's gone

beyond my question at this point.

THE DEFENDANT:  Sorry, your Honor.

THE COURT:  It's okay.

Q.   (BY MR. HARDING) When you did sell all of this gold, you said you did it through online means?

A.   No, I did not say that.

Q.   How did you do?

A.   I walked physically into the place and sold the gold. So when you told me they don't have records, I don't believe that.

Q.   And where did you have that gold stored?

A.   I stored that gold in my house in a safe, not that that's anyone's business, and the house doesn't exist anymore.

Q.   You'd agree with me, also, that your expenditures for tax year 2022 and tax year 2023 are far in excess of your reported income.

A.   Not in excess of our savings, no.

Q.   In excess of your reported income.

A.   I didn't hide any income.  It's not in excess of the income I'm owed considerably.  I could cover the 279.  But far my savings, no, it was not in excess.

Q.   And so, actually, your savings also made good the approximately $2 million in gambling losses --

A.   I didn't lose $2 million.  The records you have are

only the records from MGM. They're only the records from Resorts. It does not reflect anything that is a Caesars Palace. It does not reflect anything that is Indian casino. It does not reflect the south side cash game. It does not reflect the north side cash game. Mr. Giorgione on those totals that showed 17 million, that's probably only from MGM, that does not include any other ones and he openly said that he could not calculate those. He needed to depend on my logbooks, which I turned in to him that showed what my everyday gain and loss was. You have because you took them from any house, your department, an example, $667,000 in wins, three weeks before I was arrested. My net for that day on $667,000 in jackpots was a $3,710 win. You have those forms. You also have the W-4s showing that I started with $6,000, went to the Indian casino in Oklahoma, three days before. I changed my flight when you were going to arrest me on the 27th to the 30th. I inconvenienced the FBI. I had no idea I was in trouble. So my point was I went there and turned $6,000 into, I believe it was, 20,400. You have those records, too, and you still seized my money. You sent nine agents to go verify that I sold a desk and a clock in Salado --

Q.   Your testimony, sir, is that you made over $2 million in cash games and other untraceable assets during this

period of time.

A.   No.  My testimony is not that I made that.  My testimony is that those are not correct numbers.

Q.   Okay.  That's fine --

A.   No, it's not fine, because if I play at 30 casinos, you'd have to get a record like that of all 30 casinos. It's misleading what you're doing.  It's despicable.

Q.   Well, you understand that all casinos have to report winnings over $10,000.

A.   I could win $5,000 a hundred times, that's 500,000. Not all the time by playing $5 machines.  There's a lot of times, I play $10 and $5.  The maximum jackpot on a $5 machine is $10,000.  It wouldn't come into factor.

Q.   Well, you recall, then, that the testimony on terms of machines is that any jackpot over $1,600 has to be reported --

A.   He's incorrect.

Q.   The expert?

A.   Yes, your expert is wrong.  You can Google it right now, it's $1,200 is a reportable jackpot.  He's incorrect.

Q.   So if we have no records of you making more than $1,200 at any other casinos, what you're suggesting is you won less than that so many times, you made up $2 million.

A.   No.  You don't have any records of it because they would have reported it to the IRS, but that doesn't mean

they would have reported it to your lady doing the books. So I'll give you an example. You don't have the records from the casino that I went to on Choppytak (phonetic) that I won $15,000 on, I put $50 in and hit four aces with a kicker on a $5 machine that pays 10,000. Then I hit four fours with a kicker twice, that's $15,000. It's not reflected on that, that's just an example and that's on a $50 bet. But if I sit there and I have $50 million in coin in or in jackpots, I can expect with perfect play, perfect play .38 percent on my money with perfect play.

Q. When were you a financial analyst or a financial officer for Merrill Lynch?

A. I worked for Merrill Lynch under Kent Hageman. I used to sit there and balance his books.

Q. When, sir?

A. 1986, '87, '88, I was in high school. Then 1997, Santa -- I worked on Santa Monica.

Q. You balanced his books?

A. I balanced Mr. Hageman's personal books, yes.

Q. And you analyzed his finances?

A. I did his checkbook. I took care of his spending.

Q. So you're familiar with the banking systems, financial systems?

A. Not all financial systems.

Q. Banking systems?

A.   I don't see the humor.  This is serious.  This is my life.

Q.   Are you familiar with banking systems?

A.   Software, no.

Q.   No.  How banks do business.

A.   It would depend on the bank.  You're asking me a question, I can't speak for another bank.

Q.   How about a national bank?

A.   I don't bank at a national bank.  I bank at credit unions.

Q.   Do you know how national banks work?

A.   You'd have to be -- what's the question?

Q.   Well, let me ask you just directly, let's go to Government's Exhibit 247, page 2.  You recall, Mr. Youngblood, this is the list of payments that Hanfu Lee paid to you in 2023.  Do you remember that?

A.   He owed me money, yes.

Q.   You would agree with me that he wired you money on June 16th of 2023, correct?

A.   He did.  He was paying for money that he owed me. You had another ledger that showed the credit card that he charged without my permission, $23,907 on my Am Ex card.

Q.   You'd agree with me, then, that he did that on a couple of occasions in June, June 16th, June 20th and June 21st, he's wiring you money.

A.   He was satisfying a balance of almost $171,000.

Q.   Via wire transfer, correct?

A.   I don't know what he was doing it on money-wise.

Q.   Well, it says wire type --

A.   I don't carry a telephone, sir.  I don't look at how he paid me.  He just said he made the deposit.  I honestly don't know those were wire transfers.  I just know that he deposited money in my account.  Same thing with the $19,800, he owed me money.  I don't see what I did wrong if he owes me money.

Q.   You'd agree with me, though, it was reasonably foreseeable to you?

A.   No, I don't, because I didn't have a Zelle account until he started asking for Zelle.

Q.   That's all right then --

A.   It was not reasonably foreseeable, sir, because he went to my branch 99 times out of a hundred before this and deposited money in my Navy Federal account in West Covina, California.

Q.   So you knew when he deposited cash, but you had no idea when he wired you money -- -

A.   No, I wouldn't see the deposit until the next morning.

Q.   And it was just like magic.

A.   All he said is there was a deposit, sir.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Q.   Well, let me ask you --

A.   I'm being polite to you and I don't understand the lack of courtesy back.  I don't know how he was doing it.

Q.   Let me ask you this.  Dr. Lee lived in California. You knew that was where he lived.

A.   Dr. Lee's office is very close to the West Covina Navy Federal that they put there.  Dr. Lee told me he would make the deposits there.  Why would I think anything less?  Why would I foresee a wire transfer?

Q.   Well, I'm not asking about a wire transfer, sir.

A.   He'd never done it before.

Q.   Well, that's not true.  Clearly --

A.   Show me one before these that you're showing me that he ever sent me.  He never once wired me money before, ever.

Q.   Well, my question to you, sir, is this.  Dr. Lee lives in California, correct?

A.   Yes.

Q.   You know he's depositing money in California, correct?

A.   Okay.

Q.   You're withdrawing that money in Texas, correct?

A.   I bank in Texas, but my branch is from Mission Viejo, California.

Q.   But you are withdrawing money from a bank in Texas.

A.   Okay.

Q.   How do you imagine the information about the deposit makes its way to Texas?  Do you think it's a carrier pigeon, sir?

A.   I don't see the humor --

MS. HERRING:  Objection.  Calls for speculation.  How would you imagine calls for speculation --

A.   The American Express card that he charged --

THE COURT:  Hold it, when there's an objection I have to --

THE DEFENDANT:  I apologize, sir.

THE COURT:  It's okay.  Do you want to ask the question again?

Q.   (BY MR. HARDING) I will rephrase.

A.   Something about a pigeon.

Q.   It was something about a pigeon.  You know that that money is going to be transferred via wire communications, don't you?

A.   You mean like he used my American Express card without my permission and the card not present, that kind of electronic transfer?

Q.   No.  I'm talking about the electronic transfer where he puts money into a bank, however he does it, in one state, you draw it in another state.

A.   No.  It's not a wire.  It's not a wire.

Q.   You don't believe there's wire communication?  You don't think the internet is wire communication?

A.   That's not -- my branch is based in California where I opened the account.  He's making a deposit at a branch in California.  Where I pull is irrelevant.  He did not go and create a fed wire through New York to send that.

Q.   Well, your bank in Texas has to verify your balance, doesn't it?  And that balance gets updated from California and that balance update happens to be a communication, doesn't it, Mr. Youngblood?

A.   It is impossible for me to foresee that he's going to wire me money when he has never done it before these transactions.  And I haven't seen him in six years.  I didn't even know there was a Navy Federal branch in West Covina.

Q.   I'm not talking about wire transfer, sir.  I'm talking about wire communications.  You know that the information about his deposits in California are making their way to your bank in Texas via the internet --

A.   No, I would not agree with that because I would say that my home branch is Mission Viejo, California and that's going to be on their system at Navy Federal.  I would not agree with your statement.

Q.   And so, when you walk into the bank in Texas and withdraw that money, they're taking it on faith that you

have that balance.

A.   It's my home branch in California, sir.  I would disagree with you.

Q.   You think that there is no transmission of communication between the depository bank and the bank where you withdraw the money?

MS. HERRING:  Objection, your Honor.  He's already said he doesn't have personal knowledge and lacks knowledge to answer this question.

THE COURT:  I'll allow the question.

A.   It's not foreseeable for me to understand what a wire transfer is under that definition that you're giving.  That doesn't make sense to me.  I had no way of knowing he was going to wire me anything because he'd never done it before.  These transactions, never.  And he's owed me money.  He's traded hundreds of thousands of dollars in watches with me and every time, it was a check that he deposited or cash that he gave me back then that I signed a promissory for.  So no, I could not see it as foreseeable.  That's impossible.

Q.   (BY MR. HARDING) Absolutely.  When Dr. Lee testified that he told you he was liquidating his 401(k)s and brokerage accounts to pay the money that you asked him for, was that a lie?

A.   Yes, that was a lie.

Q.   When Eric Perardi said that he left town and went to New Orleans in Florida because you told him the cartel was after him, was that a lie?

A.   The only person that's had a problem with the Jalisco cartels is me, unfortunately, because of the actions of my oldest son.  I find your tactics despicable.  I can't speak for where Eric Perardi was, sir, and I have no idea what that receipt that he showed you was for.  I have no idea a check was sent.  I guarantee you, it was not sent to me and I certainly guarantee it was not sent at my bequest.

Q.   So it was a lie.

A.   So if you're asking me if James Holloway and Eric Perardi lies, the answer's yes.

Q.   So everything that James Holloway said was a lie, as well.

A.   Yes.

Q.   Everything Lane Holloway said was a lie.

A.   Yes.  I didn't change my name to Sir William or whatever it was he changed it to, move 2,000 miles away and go into hiding.  I have not spoken to him two-and-a-half years.  You have a question for Mr. Holloway, you should have asked him when he was here the other day.

Q.   You clearly don't like James Holloway.

A.    I don't like the fact that James Holloway took advantage of what I went through years ago, took advantage of people's sympathies and then, used that story to steal money, and I tried to explain that to him.  Just like I explained in the car.  No one would listen to me.  It does not make sense for me to do it when I could get the money from other means.  I don't need the headache, I don't need -- I'm not that smooth for somebody who's known me for a year, six months, met me once is going to give me $2 million.  It's a ridiculous statement, sir.

Q.    Could we please play Government's Exhibit 111A at the one-minute mark?

A.    It's ridiculous.

        (Audio file played.)

Q.    Pass the witness, Judge.

        MS. HERRING:  No further questions, your Honor.

        THE COURT:  All right.  Thank you.  You may step down.  All right.  Do you have any other witnesses?

        MS. HERRING:  No, your Honor.

        THE COURT:  Any rebuttal witnesses?

        MR. GUESS:  Nothing from the government, your Honor.  We'll close.

        THE COURT:  All right.  Let's have sidebar.

        (At the bench, on the record.)

        MS. HERRING:  Your Honor, I would re-urge the

motions under Rule 29 that I made previously. No further argument on those points.

THE COURT: And I'll overrule those motions. I don't think we'll have time for a charge conference and submit the case today, so I think unless you have an objection, we'll break for the day. Have our charge conference this afternoon and then, ask them to come back in the morning at 8:30 for closing arguments and instructions. Does that sound right?

MS. HERRING: That's fine, your Honor.

MR. GUESS: That sounds great.

(End of bench conference.)

THE COURT: All right. Ladies and gentlemen of the jury, the parties have had the opportunity now to put on the evidence that they intend for you to consider during your deliberations. And each side has rested, if I'm not mistaken. As a result, that initial phase of the trial is done and now, we need to work this afternoon to put together the Court's instructions to you.

Because we're not going to be able to do that and give the parties the opportunity to make their closing arguments today, I'm going to go ahead and release you for the afternoon. We'll do our work this afternoon and then, if you could come back tomorrow morning at 8:30, I'll give you instructions and the parties, if they choose, will

make their final arguments in the case and your deliberations will begin.

Again, as I've told you and I'm sure you're tired of hearing, it's particularly important now for you not to engage in any independent investigation of any kind about any issue in this case nor talk to anyone, including each other, about this case. We're almost to the end now and so, you've done so well following those instructions. I'll ask you to continue to do that and we'll see you tomorrow morning at 8:30 in the morning.

(Jury not present.)

THE COURT: All right. Bench conference.

(At the bench, on the record.)

THE COURT: My preference would be for an informal charge conference in chambers, but I'm happy to do it in any other way that you see fit.

MR. HARDING: Chambers is fine.

MS. HERRING: That's fine.

THE COURT: Do you need a break before we do that? Or do you just want to launch right into it?

MR. GUESS: It's up to you, Judge, whatever your schedule is.

MS. HERRING: I will say, I have not had a chance to read what the government handed me this morning when we started but --

THE COURT:  Okay.  Why don't we take a 15-minute break and then, come back to chambers and we'll just kind of have an informal charge conference if that's okay.

MS. HERRING:  Yes.  Thank you, your Honor.

THE COURT:  All right.

All right.  We will then be adjourned until 8:30 tomorrow morning.

(Recess.)

* * * * * *

UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS     )

   I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

   I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

   WITNESS MY OFFICIAL HAND this the 9th day of March, 2025.

*Lily Iva Reznik*

~~~~~~~~~~~~~~~~~~~~~~~~~
LILY I. REZNIK, CRR, RMR
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street,
Suite 4153
Austin, Texas 78701
(512)391-8792
SOT Certification No. 4481
Expires:  1-31-27