UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA ) Docket No. A 23-CR-135(1) RP
                         )
vs.                      ) Austin, Texas
                         )
SAINT JOVITE YOUNGBLOOD  ) April 23, 2024


TRANSCRIPT OF TRIAL ON THE MERITS
BEFORE THE HONORABLE ROBERT L. PITMAN
Volume 7 of 7


APPEARANCES:

For the United States:   Mr. Dan Guess
                         Mr. Matt Harding
                         Assistant U.S. Attorneys
                         903 San Jacinto Boulevard,
                         Suite 334
                         Austin, Texas 78701




For the Defendant:       Mr. Jose I. Gonzalez-Falla
                         Ms. Charlotte A. Herring
                         Assistant Federal Public Defenders
                         Lavaca Plaza
                         504 Lavaca Street, Suite 960
                         Austin, Texas 78701


Court Reporter:          Ms. Lily Iva Reznik, CRR, RMR
                         501 West 5th Street, Suite 4153
                         Austin, Texas 78701
                         (512)391-8792


Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

2

**I N D E X**

|                                        | Page |
|----------------------------------------|------|
| Government's Closing Statements        | 26   |
| Defendant's Closing Statements         | 39   |
| Government's Closing Statements        | 57   |
| Verdict                                | 68   |

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's |  |  |
| #314 | 5 | 5 |
| Defendant's |  |  |
| #143 | 5 | 5 |
| #150 | 5 | 5 |

THE COURT: Good morning.

I trust you have received the final verdict form. My understanding, you might need to visit about some of it, but have there been any agreed changes at this point?

MR. HARDING: No agreed changes, your Honor, no.

MS. HERRING: No, your Honor.

THE COURT: All right. Does government have any objection to the final form?

MR. HARDING: The instruction, no, your Honor, of the verdict form.

THE COURT: Would you like to make objectins on the record?

MS. HERRING: Yes, your Honor. We did want to lodge an objection to the final causation instruction -- we had requested and expanded causation instruction and we understand the Court incorporated a line from the government's requested addition of causation, but we do not believe that the causation instruction as drafted addresses the specific facts of this case nor reflects the full scope of the law on causation. So that's the objection we have to the instructions.

THE COURT: And that's the only objection?

MS. HERRING: Yes, your Honor.

THE COURT: Okay. And I'll overrule that objection. So then, we'll go -- all right.

MR. HARDING:  Your Honor, before we begin, I'm sorry, we did reach an agreement you mentioned earlier. Several days ago now, the defense introduced a couple of pages from the Perardi deposition.  We asked for the entire deposition to be introduced.

THE COURT:  Yes.

MR. HARDING:  Offered for completeness.  We have now reached an agreement about the actual pages to be entered into evidence alongside them and I could tend them to the Court or have them submitted via Rachel or JERS, whichever.

MS. HERRING:  We've agreed on these being added to the pages submitted by defense separately.  I don't know -- are ours marked as admitted?  So I think what we would need to do, then, is we had tendered pages -- we call them Defense 143 and 150, which were our two-page selections.  So I don't know if the Court wants to just add this as a government additional exhibit or...

MR. HARDING:  That would be fine.

MS. HERRING:  If we could then have 143, 150 and the defense admitted as well as the government's.

MR. HARDING:  Which would be 314, the Government's Exhibit.

THE COURT:  Okay.  All right.  Anything else?

MR. GUESS:  Real quick, your Honor.  Arguing from

the podium, right?

THE COURT: Yes. I mean, you can stray a few feet but --

MR. GUESS: Okay. Just wanted to double check.

THE COURT: Main thing is to stay within range of the microphone.

MR. GUESS: Yes, sir.

MS. HERRING: And, your Honor, I was going to bring a laptop up to the podium so I can control the screen if that's all right.

THE COURT: Sure. Of course. Yeah, yeah. Okay. Anything else? We'll go ahead and bring the jury in then.

(Jury present.)

THE COURT: Good morning, ladies and gentlemen of the jury.

As I mentioned to you at the beginning of the trial, at any trial, there are, in effect, two judges. I'm one of the judges; the other is you, the jury. It's my duty to preside over the trial and determine what evidence is relevant under the law for your consideration. It is also my duty at the end of the trial to explain to you the rules of law that you must follow in arriving at your verdict.

First, I will give you some general instructions that apply in every case. And I will tell you that you

will receive a verbatim copy of what I'm reading to you now so you don't have to worry about writing this down. Each of you will receive a set of these instructions, but first, I will give you some instructions that apply in every case, for example, instructions about burden of proof and how to judge the believability of witnesses. Then I'll give you some specific rules of law about this particular case.  Finally, I will explain to you the procedure that you should follow in your deliberations.

Instruction No. 1.  Duty to follow instructions. You as jurors are judges of the facts, but in determining what actually happened in this case, that is, in reaching your decision as to those facts, it is your sworn duty to follow all the rules of the law as I explain them to you. You must follow my instructions as a whole.  You have no right to disregard or give special attention to any one instruction or to question the wisdom or correctness of any rule that I may state to you.

That is, you must not substitute or follow your own notion or opinion as to what the law ought to be.  It is your duty to apply the law as I explain it to you, regardless of the consequences.  It is also your duty to base your verdict solely upon the evidence without prejudice or sympathy.  That was the promise you made and the oath you took before being accepted by the parties as

jurors in this case and they have the right to expect nothing less.

Instruction No. 2.  Presumption of innocence. The government has charged Mr. Youngblood with violations of federal criminal law in a second superseding indictment, which I will refer to in these instructions simply as the indictment.  The indictment or formal charge against Mr. Youngblood is not evidence of guilt.  Indeed, Mr. Youngblood is presumed by the law to be innocent.  Mr. Youngblood begins with a clean slate.  The law does not require Mr. Youngblood to prove his innocence or prove -- or produce any evidence at all.

Instruction No. 3.  Burden of proof beyond a reasonable doubt.  The government has the burden of proving each element of each offense beyond a reasonable doubt, and if it fails to do so, you must acquit Mr. Youngblood.  The law does not require Mr. Youngblood to prove his innocence or to produce any evidence at all. The presumption of innocence alone is sufficient to acquit him unless you, the jurors, are satisfied beyond a reasonable doubt of Mr. Youngblood's guilt after careful and impartial consideration of all the evidence in the case.

Although the government's burden of proof is a strict or heavy burden, it is not necessary that Mr.

Youngblood's guilt be prove beyond all possible doubt. It's only required that the government's proof exclude any reasonable doubt concerning his guilt. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all of the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in making the most important decisions in your own affairs.

Instruction No. 4. Evidence. Excluding what is not evidence. As I told you earlier, it is your duty to determine the facts. In doing so, you must consider only the evidence presented during the trial. Evidence is the sworn testimony of witnesses, including stipulations and exhibits that I have admitted into evidence. Statements, arguments, questions and objections by the lawyers are not evidence. Testimony that I have excluded or told you to disregard is not evidence and must not be considered. Anything that you may have seen or heard outside this courtroom is not evidence and must be disregarded. You're to decide this case solely on the evidence presented here in the courtroom.

The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in doing so, to call your attention

to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in this case. What the lawyers say is not binding upon you.

During the trial, I sustained objections to certain questions and exhibits. You must disregard those questions and exhibits entirely. Do not speculate as to what the witness would have said if permitted to answer the question, or as to the contents of an exhibit. Also, certain testimony or other evidence has been ordered removed from the record and you have been instructed to disregard this evidence.

Do not consider any testimony or other evidence which has been removed from your consideration in reaching your decision. Your verdict must be based solely on the legally admissible evidence and testimony. Also, do not assume from anything that I may have said or done during the trial that I have any opinion concerning any of the issues in this case except for the instructions to you on the law, you should disregard anything that I may have said during the trial in arriving at your verdict.

Instruction No. 5. Evidence, inferences, direct and circumstantial evidence. In considering the evidence, you're permitted to draw such reasonable inferences from

the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.  You may consider both direct and circumstantial evidence.

You should not be concerned about whether the evidence is direct or circumstantial.  Direct evidence is the testimony of one who asserts actual knowledge of a fact such as an eyewitness.  Circumstantial evidence is proof of a chain of events and circumstances indicating that something is or is not a fact.  The law makes no distinction between the weight you may give to either circumstantial or direct evidence.

But the law requires you that after weighing all of the evidence, whether direct or circumstantial, that you be convinced of Mr. Youngblood's guilt beyond a reasonable doubt before you can find him guilty.

Instruction No. 6.  Credibility of witnesses.  I remind you that it is your job to decide whether the government has proved the guilt of Mr. Youngblood beyond a reasonable doubt.  In doing so, you must consider all the evidence.  This does not mean, however, that you must accept all the evidence as true or accurate.  You are the sole judges of the credibility or believability of each

witness and the weight to be given the witness' testimony. An important part of your job will be making judgment about the witnesses who testified in this trial.  You should decide whether you believe all, some, or none of what each witness had to say and how important the testimony was.

In making that decision, I suggest that you ask yourself a few questions.  First, did the witness impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with either the government or Mr. Youngblood?  Did the witness seem to have a good memory? Did the witness have the opportunity and ability to understand the question clearly and answer directly?  Did the witness' testimony differ from the testimony of other witnesses?

These are but a few of the considerations that will help you determine the accuracy of what each witness said.  The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness.  Your job is to think about the testimony of each witness you have heard and decide how much of what to believe about what each witness had to say.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

In making up your mind and reaching your verdict, do not make any decisions simply because there were more witnesses on one side than another.  Do not reach a conclusion on a particular point just because there were more witnesses testifying on that point.  You must always bear in mind that the law never imposes upon Mr. Youngblood the burden or duty of calling any witness or producing any evidence.

Instruction No. 7.  Impeachment by prior inconsistencies.  The testimony of a witness may be discredited by the showing that the witness testified falsely or by evidence that, at some other time, the witness said or did something or failed to say or do something that is inconsistent with testimony the witness gave at trial.

Earlier statements of a witness were not admitted into evidence to prove that the contents of those statements are true.  You may consider the earlier statements only to determine whether you think they're consistent or inconsistent with the trial testimony of the witness and, therefore, whether they affect the credibility of a witness.  If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves.

Instruction No. 8.  Credibility of witnesses, law enforcement officer.  You have heard the testimony of law enforcement officers.  The fact that a witness is employed as a law enforcement officer does not mean that his or her testimony necessarily deserves more or less consideration or greater or lesser weight than any other witness.  You must decide after reviewing all the evidence whether you believe the testimony of the law enforcement witness and how much weight, if any, it deserves.

Instruction 9.  Expert witnesses.  During the trial, you heard the testimony of Jason Rzepniewski who has expressed opinions concerning the approximate value or lack of value of certain physical objects and exhibits. If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters.

Merely because such a witness has expressed an opinion does not mean, however, that you must accept that opinion.  You should judge testimony -- you should judge such testimony like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves considering the witness' education and experience, the soundness of the reasons given for the

opinion, and all the other evidence in the case.

Instruction No. 10.  Transcripts of recorded conversations.  Certain exhibits have been identified as typewritten transcripts of oral conversations heard on tape recordings received in evidence as other exhibits. The typewritten transcripts also purport to identify speakers engaged in such conversations.  These typewritten transcripts have been admitted for the limited and secondary purpose of aiding you in following the content of those conversations as you listen to the tape recording and, also, to aid you in identifying the speakers.

You're specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or identity of the speakers is entirely up to you to determine based on your own evaluation of the testimony you've heard concerning the preparation of the transcript, and from your own examination of the transcript in relation to your hearing of the tape recording as the primary evidence of its own contents.

And if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.  It is what you hear on the tape -- if you determine that the transcript is in any respect incorrect or unreliable, you should disregard it

to that extent.  It is what you hear on the tape that is evidence, not the transcripts.

Instruction No. 11.  Summary of exhibits and testimony.  Certain charts and summaries of other records have been received into evidence.  They should be considered like any other evidence in this case.  You should give them only such weight as you think they deserve.  The charts and summaries include inferences or conclusions drawn from the records underlying them.  It is up to you to determine if those inferences or conclusions are accurate.

Summary testimony by a witness or charts and summaries prepared or relied upon by the witness has been received into evidence for purpose of explaining facts disclosed by testimony and exhibits which are also in evidence in this case.  If you find that such summary testimony and charts correctly reflects the other evidence in this case, you may rely upon them.  But if and to the extent that you find that they are not, in truth, summaries of the evidence in the case, you're to disregard them.  The best evidence of what occurred are the other underlying records themselves.

Instruction No. 12.  Use of notes taken by jurors.  Any notes that you have taken during this trial are only aids to your memory.  If your memory differs from

your notes, you should rely on your memory and not your notes. The notes are not evidence. If you've not taken notes, you should rely on your independent recollection of the evidence and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Instruction No. 13. On or about. The indictment charges that each offense was committed on or about a specific date. The government does not have to prove that each crime was committed on that exact date as long as the government proves a reasonable doubt -- excuse me, beyond a reasonable doubt that Mr. Youngblood committed each crime on dates reasonably near the dates stated in the indictment.

Instruction No. 14. Stipulation of fact. A stipulation is an agreement when there is no dispute about certain facts, the attorneys may agree or stipulate to those facts. You must accept a stipulated fact as evidence and treat that fact as having been proven here in court.

Instruction No. 15. Caution. Consider only the crime charged. You're here to decide whether the government has proved beyond a reasonable doubt that Mr. Youngblood is guilty of the crimes charged in the

indictment. Mr. Youngblood is not on trial for any act, conduct, or offense not alleged in the indictment. Neither are you to consider with the guilt -- excuse me, neither are you concerned with the guilt of any other person or persons not on trial in this case except as you may be otherwise instructed.

Instruction No. 16. Other acts. You've heard evidence of acts of Mr. Youngblood which may be similar to those charged in the indictment but which were committed on other occasions. You must not consider any of this evidence in deciding Mr. Youngblood committed the acts charged in the indictment. However, you may consider this evidence for other very limited purposes.

If you find beyond a reasonable doubt from other evidence in this case that Mr. Youngblood did commit the acts charged in the indictment, then you may consider evidence of the other acts allegedly committed on other occasions to determine whether Mr. Youngblood had the state of mind or intent necessary to commit the crime charged in the indictment, or whether Mr. Youngblood had a motive or the opportunity to commit the acts charged in the indictment, or whether Mr. Youngblood acted according to a plan or in preparation for the commission of a crime, or whether Mr. Youngblood committed the acts for which he's on trial by accident or mistake. These are the

limited purposes for which any evidence of other similar acts may be considered.

Instruction 17.  Caution, punishment.  If Mr. Youngblood is found guilty, it will be my duty to decide what punishment -- what the punishment will be.  You should not be concerned with punishment in any way.  It should not be in your consideration or discussion.

Instruction 18.  Single defendant, multiple counts.  A separate crime is charged in each count of the indictment.  Each count and the evidence pertaining to it should be considered separately.  The fact that you may find Mr. Youngblood guilty or not guilty as to one of the crimes charged in one count should not control your verdict as to any other count.

I'll now give you the legal instructions specific to the crimes charged in the indictment.

Substantive offense instructions.  Counts 1 through 4.  Wire fraud in 18 United States Code, Section 1343.

Instruction 19.  Counts 1 through 4 of the indictment charge Mr. Youngblood with fraud in violation of 18 United States Code, Section 1943.  That statute makes it a crime for anyone to use interstate or foreign wire communications in carrying out a scheme to defraud.  For you to find Mr. Youngblood guilty of this crime, you

must be convinced that the government has proved each of the following beyond a reasonable doubt.

First, that Mr. Youngblood knowingly devised or intended to devise any scheme to defraud, that is, Mr. Youngblood's scheme to obtain money from victims through false and fraudulent promises and representations that the funds obtained would be used to provide protection from violence by Mexican drug cartel members.  And Mr. Youngblood also represented that any money provided to him would be returned to the investor with a significant return on the investment money when, in fact, Mr. Youngblood used the majority of the money to gamble in Las Vegas and for his personal benefit.

Second, that the scheme to defraud employed false material representations, false material pretenses, or false material promises.

Third, that Mr. Youngblood transmitted, or caused to be transmitted, by way of wire communications in interstate or foreign commerce any writing, sign, signal, picture, or sound for the purpose of executing such scheme.

And fourth, that Mr. Youngblood acted with a specific intent to defraud.

A scheme to defraud means any plan or course of action intended to deprive another of money or property by

using false or fraudulent pretenses, promises, or representations.  A specific intent to defraud means a conscious knowing intent to deprive a person of money or property through deception.  A representation, pretense, or promise is false if it is known to be untrue or is made with reckless indifference to its truth or falsity.  A representation, pretense, or promise would also be false if it constitutes a half truth or effectively omits or conceals a material fact provided it is made with the intent to defraud.

A representation, pretense, or promise is material if it has a natural tendency to influence or is capable of influencing the decision of the person or entity to which it is addressed.  It is not necessary that the government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme.

What must be proved beyond a reasonable doubt is that Mr. Youngblood knowingly devised or intended to devise a scheme to defraud by means of false and fraudulent pretenses, representations, or promises that was substantially the same as the one alleged in the indictment.  It is also not necessary that the government prove that the material transmitted by wire communications was itself false or fraudulent, or that the use of the

interstate or foreign wire communication facility was intended as the specific or exclusive means of accomplishing the alleged fraud.

What must be proven beyond a reasonable doubt is that the use of the interstate or foreign wire communication facility was closely related to the scheme because Mr. Youngblood either wired something or caused it to be wired in interstate or foreign commerce in an attempt to execute or carry out the scheme. The alleged scheme need not actually have succeeded in defrauding anyone.

To cause interstate or foreign wire communication facilities to be used is to do an act with knowledge that the use of the wire communication facility will allow in the ordinary course of business -- excuse me, will follow in the ordinary course of business or where such use can reasonably be foreseen. It is sufficient that the defendant knew or could reasonably have foreseen the use of wire communication facilities. The interstate nature of the wire communication need not have been known by or reasonably foreseeable to the defendant.

Each separate use of interstate or foreign wire communications facilities in furtherance of a scheme to defraud by means of false or fraudulent pretenses, representations, or promises constitutes a separate

offense.

Count 5.  Engaging in monetary transactions and property derived from specified unlawful activity.

Instruction No. 20.  Title 18, United States Code, Section 1957, makes it a crime for a person to knowingly engage in, or attempt to engage in, a monetary transaction involving criminally derived property in excess of $10,000 that is derived from specific -- excuse me, from specified criminal activity.

For you to find Mr. Youngblood guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt. First, that Mr. Youngblood knowingly engaged in a monetary transaction.  Second, that the monetary transaction was of a value greater than $10,000.  Third, that the monetary transaction involved criminally deprived property. Fourth, that criminally deprived property was derived from specified unlawful activity, namely, wire fraud as alleged in Count 1 of the indictment.  Fifth, that Mr. Youngblood knew that the monetary transaction involved criminally derived property.  And six, that the monetary transaction took place within the United States.

The term "criminally deprived property" means any property constituting or derived from proceeds obtained from a criminal offense.  The government is not required

to prove that Mr. Youngblood knew that the offense from which the criminally derived property was derived constituted specified unlawful activity as defined by the statute creating this offense.  The government must prove, however, that Mr. Youngblood knew that the involved property was obtained or derived from the commission of a crime.

The term "specified unlawful activity" includes wire transfer in violation of 18 United States Code, Section 1343.

Instruction No. 21.  Knowingly, to act.  The word "knowingly" as that term has been used from time to time in these instructions mean that the act -- means that the act was done voluntarily and intentionally, not because of mistake or accident.

Instruction 22.  Commerce defined.  Commerce includes travel, trade, transportation and communication.

Instruction No. 23.  Interstate commerce defined. Interstate commerce means commerce or travel between one state, territory, or possession of the United States and another state, territory, or possession of the United States, including the District of Columbia.

Instruction No. 24.  Foreign commerce defined. Foreign commerce means commerce or travel between any part of the United States, including its territorial waters and

any other country, including its territorial waters.

Instruction No. 25.  Materiality.  As used in these instructions, a representation, statement, or pretense -- excuse me, a representation, statement, or pretense, or promise is material if it has a natural tendency to influence or is capable of influencing the decision of the person or entity to which it is addressed.

The government can prove materiality in either of two ways.  First, a representation, pretense, or promise is material if a reasonable person would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question.  The government need not prove that a reasonable person would have believed defendant's false statements but only that a reasonable person would have considered the issue of importance.

Second, a representation, pretense, or promise is material if the maker of the representation knows or has reason to know that its recipient regards or would likely to regard the matter as important in determining his or her choice of action even if a reasonable person would not.  In determining materiality, you should consider that naivete, carelessness, negligence, or stupidity of a victim does not excuse criminal conduct, if any, on the part of the defendant.

At this juncture, the lawyers will be given the opportunity to make their closing arguments in the case. As I have instructed you previously, the statements of lawyers are not evidence but are simply the opportunity that the lawyers have to give the perspective from their side of the case and to help you in evaluating the evidence that has been -- that you have heard in this trial.

Mr. Guess.

GOVERNMENT'S CLOSING STATEMENTS

MR. GUESS:  Thank you, your Honor.  Can I proceed, your Honor?

THE COURT:  You may.

MR. GUESS:  It's been a long week and two days. I appreciate each and every one of you for coming down and listening to what we had to put on because this is a very important case.  Look out there and see the victims in this case.  Yesterday, you heard that there was only one victim in this courtroom:  Saint Jovite Youngblood. Remember when he sat on that witness stand and told you who was a victim?  Don't believe that for a second.

Saint Jovite Youngblood is a predator in this case.  He's the person who took money based on false promises, pretenses, false stories, and that's what you heard on the course of several days of testimony.  Now I'm

going to talk to you today about, first, the jury instructions. We'll go over a few of those just so you could be clear about those because first time probably any of you have heard them.

Secondly, we'll go through some of the counts. So you have the government corroborated each and every statement made by each of the witnesses presented by the government. We'll talk about the credibility of the witnesses. And then, finally, I'll end up and talk to you a little bit about what Mr. Harding and I determined is the Youngblood method for getting money out of people.

So first off, the jury charge, you're going to get a copy of this, but I want to take you through a couple of the most important things. First, page 3 talks about the burden of proof beyond a reasonable doubt. I anticipate Ms. Herring's going to stand up here and tell you without hesitation, you must come to your decision without hesitation.

Think about it this way. Think about it in terms of a home mortgage when you go in to sign that dotted line and you're going to give 300,000, 500,000, a million, whatever the homeowner is going to be, don't tell me that no one's not a little bit nervous before you sign that. What happens when I lose my job? What happens when I get sick? But you sign that because reason and common sense

tell you that you are going to be able to make that mortgage payment and so, you do that.  Yeah, you think through it, but when you do it, when you sign that document, you've known you're going to be able to make those payments.  That's what beyond a reasonable doubt is.

Going on inferences, direct and circumstantial evidence, the credibility of witnesses, I want to get to that in a little bit, but we already know where the credible witnesses came from.  They came from the government.  They came from the testimony that you heard.

You'll also be talking then, beginning about page 11, about what is wire fraud.  And wire fraud is pretty simple, actually.  It's a scheme, which we already know about what that scheme was.  Your children, your family, they're going to be killed by the cartel.  Oh, and by the way, you might get some of that money back because I've got some valuable items.  I've got a flag back there.  So don't worry about it.  Everything is going to be good. You're going to get your money back.  You're going to be safe.

All that was a lie.  You're going to walk through some of these instructions and you'll see that the government has proved beyond a reasonable doubt that the use of wires was closely related to the scheme and that's what we proved.  Eric Perardi, Gary Snider, Hanfu Lee, all

of them wired money or had money that was wired that was caused by the lies, the scheme of Mr. Youngblood. The wire communications were in place.

Finally, we talked a little bit about materiality and, again, the idea there, in determining materiality, you should consider that naivete, carelessness, negligence, or stupidity of a victim does not excuse criminal conduct. Just like Mr. Harding talked to you about during jury selection. I get drunk on 6th Street, I walk down a dark alley and I get mugged. Is that my fault? Should I have been mugged? No. Same thing with this story. Sounds unbelievable. All of us here think to ourselves, how could that happen? How could we have fallen for that story? Yet, you know very intelligent people, accomplished people did fall for that story.

So those are the -- some of the instructions that I want you to focus in on and try to explain, hopefully you'll understand all that part of it. But let's go ahead and get right into it in terms of Count 1 through 5. Count 1 alleged that the wire fraud that was committed by Mr. Youngblood affected Eric Perardi. Now, you'll remember that Mr. Perardi was telling you that he had been tormented by Mr. Youngblood. That often things had been posted about him, about his business. Think about it.

Mr. Youngblood knows that Mr. Perardi is going

through that contentious divorce and we've never denied that Mr. Perardi sat up there on that witness stand and told you about that contentious divorce.  But what did Mr. Youngblood do?  Prodded that divorce.  He posted those awful things in order to fan the flames, the division between Mr. Perardi and his then-wife.  That was part of the scheme.  And months, he did that beginning at that Superbowl weekend in February '22 until, finally, the trap was set by Mr. Youngblood and told Mr. Perardi, leave town because you're going to be killed.  She wants your insurance money.  Eric Perardi did leave town.  He went to New Orleans and he went to Miami.

The first check he wrote was for $70,000.  Told Mr. Youngblood that he's going to have to wire it, move that money around.  I can't get it to you.  I've got to use wire facilities and, indeed, he did.  He called him. That was the use of a wire facility.  That was something in furtherance of the scheme.

Second check, $83,000 and remember, this one he wrote, he had to go back and make a different date on that check.  And you'll see from the evidence that was submitted that the checks were sometimes written but not cashed for a couple of weeks later.  As Mr. Perardi said. I was instructed by Mr. Youngblood to make those checks the way I did.  Which gets us to Count 1.

Talking about the $36,000 that was moved.  We already saw the wire.  You'll see there, there's a check that Mr. Perardi wrote, T.A.P. Development, $83,000.  You saw the wire transfer from the account.  Why did he do that?  Because Mr. Perardi told you from the witness stand, I had to make sure that the money was going to be there.

There's the cashed check 7-27.  There's Mr. Holloway's bank statement showing that that money had been taken out, confirmation and then, cashed.  Just like Mr. Perardi, just like Mr. Holloway, just like the entire scheme happened every single time.  And remember at this point, Mr. Perardi doesn't know who Mr. Holloway is.  Remember he told you, the first time he met James Holloway wasn't until August.  How is all of this kind of stuff happening?  Through the wires.  Through wire communications.

Mr. Perardi was in Miami, Florida when he had to write this check.  You'll remember that.  I left town because Kota told me I'm going to be killed.  The cartels are coming for me.  They're coming for my son.  I was in Miami, I Fed Ex-ed that check to Kota Youngblood through James Holloway.  The focus is not on Eric Perardi.  The focus is on Kota Youngblood and what was originally foreseeable to him.

Eric Perardi in Miami, Florida, I need that money. I've already drained you of 70,000, I drained you of another 86,000. $156,000 in the course of a couple of weeks and now, same period of time, I need another $83,000. Mr. Perardi told you the reason I made that wire was to make sure the money was there. The transfer from the personal account to the business account on 7-28.

Now, Ms. Herring, I imagine, is going to get up here and take you through that whole chart again, right? Oh, my God, look at this. Eric Perardi, how could this check have been for that specific wire transfer? Because it came a day late. Again, focus on Kota Youngblood here, right? What did Kota Youngblood know? He knew Eric Perardi was in Miami. He knew because Eric Perardi had told him on the telephone, I'm going to have to move this money around. I'm going to have to wire this money. That caused Eric Perardi to do this.

I also want you to think about 70,000 plus 83,000 plus 86,000. Almost $240,000, $236,000, whatever the number is, Eric Perardi doesn't have that just sitting around. Kota Youngblood knows that he's going to have to move that money. He anticipates, it's foreseeable to him that Mr. Perardi's going to wire money into that bank account so that he can get that money and go to Vegas.

Count 2, there's the wire transfer, $50,000.

Now, at this point, you're going to remember from Government's Exhibits No. 86 and 88, what did T.A.P. Development account looked like?  You remember Ms. Herring made a big deal.  Look at all that money.  My God, you got this sale of this medical office building dropped in over half a million dollars into that account.  By August when this wire's made, the T.A.P. account as you'll see in 8-15 was $38,000, the ending daily balance.

Mr. Perardi in order to meet that check for $54,000, that again was to protect your family, Eric, which he told you was the most important thing to him.  Let's move that money and that's what Eric Perardi did, corroborated by statements there.  You see that movement.  There's the check to James Holloway, again, at Kota's instructions, the Kyle project, let me hide it because, again, I have to hide it because Kota's telling me to hide it that way.  We see a cashed check.

Again, I'm going to go back to Count 2 when you think about what was going on there.  Eric Perardi being extorted essentially by Kota Youngblood to get the money, had to wire that money.  There is no reasonable doubt as to why Eric Perardi is doing this.  It's because of what Kota Youngblood had told him.  Kota Youngblood caused those wire communications to be made in furtherance of his scheme and his scheme was simple:  I want to get the

money.  I want to go to Vegas.

Count 3, as we walk through this again, very simple.  Gary Snider sat on that witness stand and told you what happened.  He invested with Kota Youngblood in some fictitious gold coin that his friend Jay Holloway convinced him was really true that Kota Youngblood said this is worth millions of dollars, Gary.  Dale Snider was also convinced beyond a reasonable doubt that that was a true statement and she and Gary were going to do this.

But I want you to think back when Gary stood up there on that witness stand and told you what happened in September.  Kota Youngblood was at his house, James Holloway had come over there in tears.  Kota Youngblood sat there and said, I can save Lane Holloway's daughter XXXXXX if you just give me $235,000.  You think Gary went to his kitchen drawer, pulled up $235,000?  No.  Gary told you how he got that money.  Went to the Fidelity account, cashed out $235,000, gave that money to Kota Youngblood -- or to James Holloway, eventually, to Kota Youngblood.

Remember this one was the one where -- the first transaction with Gary with the gold coin that went straight into James Holloway's account.  This one went into Gary's Wells Fargo account as you could see there from Government's Exhibit 204 and then, the cash withdrawal.  Walked out of that bank.  Gary explained what

that looked like.  Bigger than a shoe box, how heavy it was, how nervous it made him.  And those are corroborative facts.  But the real evidence came from that witness stand from the people that you heard.  Eric Perardi, Gary Snider, Dr. Hanfu Lee.

I didn't put up Dr. Lee's statement because we saw that just recently, but you'll remember it just seeing it yesterday with Mr. Harding through his cross-examination of Mr. Youngblood.  The $19,800 that was transmitted from Dr. Hanfu Lee's account straight into Kota Youngblood's account.

Use of the wire communications.  That's what it's all about.  And I want you focus in on the real defendant here, on the real criminal, and that's Kota Youngblood.  Kota Youngblood knew exactly what he was doing.  He knew that people were going to have to use different facilities.  They were going to use wire communications for him to fulfill his scheme.  Goes back as early to James Holloway.

Government's Exhibit 181.  Remember when Jay Holloway at this point had said, I had to drain my wife's IRA.  Remember he made all those trips to the bank because everything that took place with COVID restrictions.  He went to like ten different banks to get 200-and-some-odd-thousand dollars out.  And he told you, I

told Kota I was going to have to drain that IRA.  Just like Gary Snider told Kota he was going to drain that IRA or take money out of that IRA in order to make that happen.

So let's talk a little bit about the credibility of the witnesses.  The only credible witnesses, the ones who have been corroborated with testimony are the government's witnesses.  We brought up documents.  We've brought up everything that we could to show you what happened.  And think about it.

It was just about a year ago when Eric Perardi wandered in that office with those two agents right there and from that first -- May 1st undercover operation until he was arrested on July the 30th, they worked hard, they worked diligently to prove this case to show what was going on with the scheme concocted by Mr. Youngblood.  And they provided all the evidence that was necessary for us to prove those four counts and then, the money laundering count.

The count where once you make a specified unlawful activity, which is the wire fraud and it's more than $10,000, you've committed a money-laundering offense.  That's why there's proof beyond a reasonable doubt on all five of the counts submitted by the government.

Well, let's talk a little bit about the

credibility of the witnesses.  Now, again, I anticipate Ms. Herring's going to get up here and talk to you about Eric Perardi a lot again, right?  But think about Eric Perardi sat up there on that witness stand, was cross-examined for almost five hours.  He never left the story of "what."  I was doing this to protect my family.  Jay Holloway confirmed Eric only was concerned about protection of his family.

Now, Ms. Herring asked a lot of embarrassing questions of Mr. Perardi.  You're an older man, you got married to a younger woman.  You're cheating on your first wife when you married her.  You got dressed up as Prince Eric.  Why was all that asked?  Had nothing to do with the facts of the case.  It was simply to embarrass and shame Mr. Perardi.

Eric Perardi loved his children, loved hockey.  He was tormented by Kota Youngblood.  Fanning the flames of divorce.  Just turn that screw as tight as he could until he could get that money out of Eric Perardi.  And Eric sat up there and said, I did these transactions because I love my children and I wanted them protected.  That's why I committed -- that's why I moved that money around.  The credibility of Eric Perardi is not on trial here.

That's the man on trial here, Kota Youngblood.

Gary Snider, he's the neighbor we'd all love to have. He's the guy who put up $235,000 to protect someone's grandchild who is also tormented by him and it was all part of the Youngblood method just like Dr. Lee. The emergency, everything has to be done now, now, now. You can't wait. I've gotta have this money or someone's going to die. If we don't do it now, we're never going to get that investment back. The secrecy. Don't tell anyone about this, this is just between you and me.

Remember James, he's useful for some things but don't tell him about the Faberge. That only stays between you and me, Eric. The trust. The collateral that he gave. The fake. Facts fake everything. The flag, oh, that's my flag, it's worth millions of dollars. Jeff Bridgman told him who owned that flag. Paranoia. Think about what he's doing to every victim in this.

Splitting part of families. The alienation, the manipulation, the corruption and what was it all for? This. As he's tearing families apart, as he's stealing money, Kota Youngblood is sitting in the Aria Casino. This is June 13th. Where is Lane Holloway at this time? In an extended-stay hotel room with five people, one dog, and literally starving to death. No insulin, no medication, no school for his kids. Kota Youngblood sits there feeding in $100 bills that he schemed and scammed to

get from his victims.

And was he good at it?  No.  He was terrible at it.  Look at that, those red numbers from Ms. Sloma's chart.  Ladies and gentlemen, this is one of the most egregious -- and I'm going to use a word that Mr. Youngblood used on the witness stand a lot yesterday -- one of the most despicable scams that you're ever going to come across.

At the end of the day, Mr. Harding and I are going to ask you to come back with a verdict of guilty.  Guilty because you're not going to be telling Mr. Youngblood something that he doesn't already know.  Guilty because the evidence and the proof shows beyond a reasonable doubt that Kota Youngblood schemed and scammed his way to committing four counts of wire fraud and one count of money laundering.

DEFENDANT'S CLOSING STATEMENTS

MS. HERRING:  Despite what Mr. Youngblood and apparently all of the witnesses you heard from last week believed, we do not live in a country governed by Mexican cartels, the Russian mob, or Italian mafiosos.  We live in a country with a just system that guarantees each and every citizen will be tried only for the crimes they're charged with.  This is one of the instructions that Judge Pitman just read you.  It's part of our due process rights

as citizens of this country that we don't put our fellow citizens on trial because we think they're bad people. We don't put them on trial for wearing all black. We don't put them on trial because we think they're liars.

It's the first thing I told you when I stood up before you last Monday. Mr. Youngblood is not on trial for being a liar. You've heard a week's worth, six days worth of stories. Everyone has told a story. Has Mr. Youngblood told stories? Absolutely. Certainly he has, but so have the government's witnesses. And it is your job as jurors to weed through those stories to be the factfinders and to focus only on the crimes that Mr. Youngblood is charged with. Wire fraud. Once again, that is the only reason you have spent seven days at this courthouse.

Just to remind you, the four counts of wire fraud, the first two and Count 5, the money laundering count relate to Eric Perardi. Count 3 is Gary Snider and Count 4 is Hanfu Lee. The Judge read you the elements of wire fraud. You're going to have that in front of you when you go back to deliberate. And I want to highlight this third element, the element about causation. It's the government's burden to prove beyond a reasonable doubt that Mr. Youngblood caused wires to be transmitted for the purpose of executing a scheme.

And what does causation require?  These are part of your instructions, as well.  To cause is to do an act with knowledge.  It requires proof of action and knowledge on Mr. Youngblood's part.  And when Mr. Youngblood took the stand yesterday and he was cross-examined by the prosecutor, you didn't hear any questions to him about his knowledge, the wires.  You heard about his lack of military service and his tax returns, things that have no bearing on the counts on the charges that you're being asked to consider.

But this is what the government has to prove.  To prove to you that Mr. Youngblood caused wires to be transmitted and he caused them to be transmitted for the purpose of executing his scheme.  What do we know about the scheme in this case?  This case was about cash, right?  You heard that from every witness who took the stand.

The case agents, the very first day when I asked Agent Wilkinson this question:  In the beginning of your investigation, has it been your finding that Mr. Youngblood wanted to get his hands on cash as quickly as possible?  Yes.  James Holloway, that was my role, convert the checks to cash.  We heard it from the undercover when he went in, yep, knew I was going to have to pretend I was prepared to offer him cash.  You've heard that from witness after witness after witness.

What did Mr. Youngblood want?  He wanted cash. The government's also showed you what Mr. Youngblood got. Cash, right?  We've heard from financial analyst Ms. Sloma who gave you this chart.  She went through his records, two-and-a-half years of Mr. Youngblood's bank statements. She told you line-by-line.  She categorized every item and of the $1.3 million that moved through Mr. Youngblood's bank account in that two-and-a-half years, over a million dollars of it was cash deposit.  He wanted cash, he got cash.

The only wires, you'll recall, she told you that reached his account were from Hanfu Lee.  It's not charged with cash fraud, right?  It's charged with wire fraud.  So let's talk about the wires.  Counts 1 and Count 5, you should analyze together.  These are -- both relate to the wire transaction from Eric Perardi.  You're going to read -- the Judge read these to you but you should go back and look at the instructions on Count 5, that fourth element.

In order to engage in this analysis on that fourth element, you'll see that the criminally derived property has to be derived from specified unlawful activity, which is Count 1.  So if you find Mr. Youngblood not guilty on Count 1, you are also to find him not guilty on Count 5, and that's why I'm not going to spend time talking about Count 5 separately.

So let's go to Count 1, a transaction from Mr. Perardi. What do we know about how Eric Perardi moved his money? He wrote 17 checks to James Holloway, right? That's what you heard about. Check after check after check after check. And then, two wire transactions are charged. Wires are that he wired to himself, right? Wired from one of his accounts to another of his accounts. And then, he told us he gave cash to Mr. Youngblood on two occasions.

So how did Eric Perardi move money through his accounts? And I've included for you here in red that the defense exhibits that I'm referring to that show you this. But you'll recall that when Mr. Perardi talked about how he moves his money around, I drew for you on that chart, right, and we went through how the accounts piggyback on each other.

So he was drawing -- disbursing money from that home equity line of credit account he had, that community debt be taken out with Rachel, right, we heard from yesterday. He was disbursing that into Washington Federal account and he would wire that money to another personal account he had at Wells Fargo, and then, he could transfer that money to his T.A.P. Development, his business account, his separate property account.

You've gotten his asset sheet in evidence, you

can go back and look at that when he's acknowledged which of these are community property accounts during his divorce, which are separate property, right? But that's how Mr. Perardi was moving money and it's important because you have to trace the money through Mr. Perardi's account to analyze Count 1.

What you see in that transaction in Count 1 -- and again, I've got all the exhibits for you here -- is about that check, that $83,000 check. It was dated July 20th, Mr. Perardi said he wrote it on the 26th, not really the 20th. Doesn't actually matter the day, right? We know he wrote the check from T.A.P. Development, his business account, to James Holloway. And then, we also know that James Holloway cashed that check, that $83,000 check at 9:32 a.m. on July 27th. We know that from James Holloway's bank records. And we know that -- you'll recall, James Holloway told us, I knew it was coming Fed Ex. I had to get up early, go to the bank 9:00 a.m. Yes, he did cash that check at 9:32.

And we also know from Mr. Perardi's bank records, Mr. Perardi didn't initiate that disbursement from the HELOC, from the line of credit, till after James Holloway had cashed that check, till after the fraud on that count was complete, till after the cash was in hand, in James Holloway's hand, right? How did this wire further the

cashing of this check, Mr. Youngblood getting the money? It didn't.  It didn't even start until after the check had been cashed.

You have in Mr. Perardi's bank records that wire was initiated at 1:28 in the afternoon completed at 2:30. But what's more, the money from that HELOC didn't even reach the T.A.P. Development account, the business account, until the following day when he transferred it from one Wells Fargo account to the other, right?

On Count 1, James Holloway -- even if you, sure, believe Mr. Youngblood got that cash, fine, he had that cash before Mr. Perardi ever initiated the wire.  The wire didn't further the scheme to defraud.  But what else do you have?  What other evidence do you have?  You have other reasons Eric Perardi actually wired that $36,000, multiple other reasons.

We can look at what Eric Perardi said back in July of 2022 when he wasn't worried about what he needed to testify to to support the government's case.  What he put -- remember he said, I put the transfer notes in when I moved money between my Wells Fargo accounts.  What did he put in July of '22?  Why did he transfer that money? Lawyer fees.  What else do we know?  He owed lawyer fees, right?  You see he had a legal bill that's in evidence, $35,235 due July of 2022.  Well, that's real close to

$36,000 and you've told us you moved that money for lawyers' fees.

You also know to get even closer to get exactly to that $36,000 number, Mr. Perardi was court ordered by the Travis County divorce court to draw on that HELOC exactly $36,000 to prepay his wife's -- his ex-wife's rent on her new place. You have it right there, why Mr. Perardi made that wire and had nothing to do with Kota Youngblood. You saw he actually did use the money to write that check to cover the rent just like he was ordered to do.

If your mind wants to go a different direction, you've also got evidence in all of the texts between James Holloway and Eric Perardi that Mr. Perardi was interested in moving money not to Kota Youngblood but away from Rachel, right? Moving money out of the community asset into his separate property asset. You can review these texts, they're Defendant's Exhibit 88.

Why in the world was Eric Perardi telling an antique clock dealer in Elgin, Texas about the details of his divorce? Why does he feel the need to tell James Holloway it's all -- I want that money back on my clock investment. It's all money that she can't get, anyway. Why? Because that's what Eric Perardi is focused on doing with that money.

You see it in audios listening to Mr. Youngblood. Mr. Youngblood's obsession with Mr. Perardi winning his divorce, with burying Rachel, with putting them away, right?  He even says my loyalty's to you, Eric, not to Rachel.  Why does Mr. Youngblood get obsessed with this?  Because he thinks it's going to convince Mr. Perardi. Because it's Mr. Perardi's obsession, burying his ex-wife. You heard Agent Noble yesterday say over the course of their investigation, they didn't uncover any other source of information from Mr. Youngblood to get so fixated on this issue other than Mr. Perardi himself.

Count 2 is the other Eric Perardi wire, the $50,000 wire.  You heard very little testimony about the specifics of this.  But we'd encourage you again look at what Eric Perardi said it was for at the time he moved the money, right?  Loans for legal fee, divorce, HELOC. That's what he wrote in his transfer notes at the time it happened.

And you'll recall, we walked through every disbursement Eric Perardi took from that line of credit, right, one-by-one, and what that showed is he just has a pattern.  He was disbursing regularly over the course of seven months, he disburses all $461,000 of that line of credit, right?  And now, suddenly, these two disbursements, these two wires happen to be caused by Mr.

Youngblood?  No.  You have the pattern.  He was moving money out of that line of credit and getting it over to T.A.P. Development, his business account.

And finally, you have in evidence what Mr. Perardi actually said again earlier, before he felt the need to try to support the government's version of this. You have his testimony and his divorce from January of this year where he was asked, right, he was asked how he used the money, what it was for.  He said the remainder of the funds were drawn out over time for lawyers' fees. Just like he said on his transfer notes.

Let's go to Gary Snider.  This is Count 3.  The $235,000 wire that Gary Snider withdrew from his brokerage account Fidelity, right, transferred to himself, wired to himself and pulled out as cash, gave to Jay Holloway. What was the story we heard from Gary Snider, right?  We heard that Gary Snider was a longtime friend, 20-plus-year friendship with Jay Holloway.  They were very close. Dinners together, travel together, knew each other's children, spent time together fixing clocks with each other.  We heard that Gary Snider trusted Jay Holloway, his good friend, his neighbor, right?  And we heard him talk about the first wire that he thought was for investment.  That's not the one that is a part of this case.  It's not charged.  That gold coin Mr. Youngblood

flashed for him at the dinner table, right?

And then, we heard the story, dramatic story the fateful night of September 30th when Jay Holloway, his neighbor, his friend arrives at his house in tears about his granddaughter, right, needing almost a quarter-million dollars and Gary Snider said, well, that's why I pulled that money out of Fidelity.  That's why that wire happened.  You have the text message that Gary Snider sent to Agent Noble explaining this story in the same vein, fateful night, September 30th.

And you had Gary Snider's testimony on direct exam when he was asked by the prosecutor, well, prior to you telling us now, you know, that you had this detailed discussion about your Fidelity account, at any point during those lunches that Mr. Youngblood sometimes attended, too, did your financial status come up?  No. Gary Snider said.  Had you ever had any conversations with Mr. Youngblood about the drug cartel?  No.

So that night when this came up and you had to -- you know, you heard about this kidnapping threat, did you ask Mr. Youngblood, well, why don't I just wire it to your account?  No.  Well, why not?  Because I trusted James Holloway.  And when he was asked by the prosecutor, was it just you and James Holloway that went to pick up that cash, he said yes.  We heard the long description.  You

heard it again this morning, right, how significant this was for Mr. Snider. Had you ever had a quarter-million dollars in your hand before, hundred dollar bills? No, of course not, right. Did it make you nervous? Yes, made my heart beat, right? Felt bigger than a shoebox. It's very stressful.

And he was asked specifically, what did you do with the cash? I handed it to Mr. Holloway. And after that, what happened to it? Well, he dropped me off and I believe, I believe James Holloway, my friend, went directly to wherever Mr. Youngblood was and gave it to him, right? What happened to that cash? You have this in evidence, Defense Exhibit 21, James Holloway deposited 235,000 cash into his own Wells Fargo account. And it didn't happen on the night of September 30th. James Holloway had that money, that quarter-million dollars in his own bank account by 12:30 in the afternoon on the 30th.

So when James Holloway told his good friend, his friend who trusted him, a sob story about needing a quarter-million dollars to save his granddaughter, maybe that story came from the master salesman himself who's been selling successfully for 30 years and sells so well that the FBI believed him, too. Who is conning who here?

Let's go to Count 4, Hanfu Lee. Hanfu Lee, as I

told you in opening, is a different situation and you're going to have to analyze it differently.  It's not about causation, that element of causation in this one because for Hanfu Lee, you know the wires went to Mr. Youngblood's bank account, right?  Their relationship is different.

And Hanfu Lee, you're going to have to think about materiality, that long instruction the Judge read.  You need to review it again because it's a nuanced instruction you have there.  But a representation, something -- a promise is material, right, if it has a natural tendency to influence someone.  And the government can prove that a couple of different ways, but a representation is material if a reasonable person would attach importance to it.

Why in the world would Hanfu Lee believe anything Mr. Youngblood told him in 2023 when Hanfu Lee went to Arcadia Police Department in 2019 and turned in this letter saying Mr. Youngblood is such a liar.  Hanfu Lee knew that.  He knew it, he'd been told it by the Arcadia policemen.  He'd been told it by his wife.  He'd been told it by the FBI in California.  He'd been told it by his Secret Service friend he told us about.  Hanfu Lee knew not to believe Mr. Youngblood.  How?  How is anything Mr. Youngblood tells him five years later in 2023 possibly going to influence him?  You need to question materiality.

What else did Hanfu Lee have?  This exhibit is 123 pages long, scrap after scrap after scrap of IOUs that have never been repaid.  Hanfu Lee knew Mr. Youngblood was a liar and knew not to rely on anything he said.

What's the other problem with Count 4?  The other problem with Count 4 is that the government has charged a specific scheme here, right?  The scheme is cartel threat and investment.  The money's going to protect you from the cartel and you're going to get a return on it.  That's the scheme alleged in the indictment and your instructions tell you that the government has to prove a scheme substantially the same as the one they've alleged.

Hanfu Lee, there's nothing about the cartel threat.  There's nothing about fear.  It's investment only.  It doesn't fit the scheme that's been charged.  Additionally, this wire that's alleged to be an $19,800 wire, the government charges that that was sent for payment to facilitate an investment in gold.

You heard from Agent Noble, you heard from Hanfu Lee, himself, that he told Agent Noble there were many reasons that Mr. Youngblood started asking for money in 2023:  Flights, pilots, gas, Rolexes, gold that was going to arrive eventually.  All of those reasons.  It wasn't just for gold.  And this $19,800, listen to the voicemails.  You've got three voicemails talking about

this exact transaction.

You've got a voicemail from Mr. Youngblood to Dr. Lee, right, saying I'm on the way, I've got him, Marvin Knecht, on the way to pick up the box, the watches. You've got a voicemail from Marvin Knecht on the day of that $19,800 wire, I'm on my way to Michigan to pick up the boxes with the watches. And you've got a voicemail from Marvin Knecht a few days later, hey, Doc, I've got the watches, right? The evidence you have shows you this was about -- that that wire was about Rolex watches, it wasn't about some general gold that was going to arrive.

And you have the fact that Hanfu Lee had done this Rolex investment thing with Mr. Youngblood before back in California. You've got his old receipts from 2012, 2013, 2014. Look at those receipts where Hanfu Lee told us he wrote Rolex on there. Same general amounts of money, 17,000, 18,000. He's just doing this investment again even though he knew Mr. Youngblood was a liar and had no way to rely on anything he told him.

The law doesn't allow the government to bring you only stories. They have to bring you proof, right? Proof is a hallmark, a bedrock principle in our system. They don't get to rest their case on words, on stories, on tall deals, on fantasy, right? They bear the burden to bring you proof and it is a heavy burden always, but it's the

heaviest of burdens in a criminal case like this one, proof beyond a reasonable doubt. They have to go all the way up and cross that top stair to get beyond a reasonable doubt. They have to eliminate doubts for you to get there.

Proof beyond a reasonable doubt requires you to use reason, requires you to use your common sense. Proof beyond a reasonable doubt is proof of such a convincing character that you would be willing to rely on it in the most important of your affairs. Medical decisions, medical decisions for your parents, for your children. Things that are most important to you in your life.

When we had jury selection, my colleague talked to you about where you felt, right, on the scale of emotion versus logic and reason and you all said that you are people who apply logic and reason, right, and that's what you have to do here. You spent a week listening to what happens when people turn off their logical brains and they turn off their reason, right?

When you turn off your logical brain like Eric Perardi, you somehow convince yourself the mother of your child is going to put a cartel hit on you for a life insurance policy that you don't even have, right? When you turn off your reason, you sap your retirement account because someone flashes a gold coin in front of you and

you think it might be worth $11 million.  When you turn off your logical brain like Hanfu Lee, you start throwing money at someone who's already taken $5 million in cash from you and you've never gotten anything back.

When you turn off logic and reason, you pull your kids out of school, you move to a hotel room in Florida, you quit your job at Amazon all because you saw a black car, you got a pink envelope in the mail from your mother-in-law that you didn't open and a table in your backyard was tilted?  It's scary what happens when you turn off logic and reason and you as jurors can't do that.  The system doesn't allow it.

You are the factfinders in this case.  You have to be guided by evidence and by proof.  Our justice system only stands for all of us if you all rise to the occasion, right?  It's one of the -- this act of service that you've assumed is so important because jury duty in this country reflects the fact that we as community members trust each other.  Trust each other to apply logic and reason.  Trust each other to be the factfinders for people that we think deserve it and even people that we think don't because it's only by making the system work, by rising to this job you have that it protects us all.

The truth is, the proof in this case is that Mr. Youngblood wanted cash.  Cash is what he got.  And

although you've heard witnesses come in and try to retrofit these four wire transactions to meet the charges the government has brought in federal court, the evidence, the actual transactions themselves show you that that simply wasn't the case.  Mr. Youngblood didn't cause those wires.

You heard Gary Snider tell you a story about how he got this item in bubble wrap, right, and he had been told it was a Faberge egg and he just put it in his closet.  He never opened it till months -- year later. Thinks he's got this valuable egg.  When they go to open it on their back porch, it's not an egg, it's a coffee table size Russian book, right?  How does that happen? How do you think something that's supposed to be an egg is a coffee table book, right?  Because you don't unwrap it.

But that's not an option anymore.  You all have time to wrap this.  The government has not met its heavy burden here to prove these specific charges.  This case is full of doubt.  The wires that occurred, occurred for other reasons.  And Mr. Youngblood, although he told many stories and told many lies, did not cause those wires.  So we ask you to go back to the jury room, unwrap the facts of this case, look at each transaction carefully with the evidence that you're going to take back with you and return a verdict of not guilty on all counts.

GOVERNMENT'S CLOSING STATEMENTS

MR. HARDING:  Ms. Herring told you during opening statement, as she told you again here today, Mr. Youngblood is not on trial for being a liar.  That is not true.  He is absolutely on trial for being a liar.  On top of lying to these people for taking their money under false pretenses and for using that money to benefit himself.

One of the instructions I want to talk to you, about, if I can get it on the screen, and one that I would suggest to you is one of the most important in this entire case, a reasonable doubt is doubt based on reason and common sense after careful and impartial consideration of all of the evidence.

Throughout this case, you have seen Ms. Herring and Mr. Gonzalez-Falla show you a little bit of the evidence and then, make an insinuation, and through her closing statement, she did the exact same thing.  Not only did she show you only small parts of the evidence, she only focused on small parts of the law.

MS. HERRING:  I would object to the burden shifting, your Honor.

THE COURT:  Want to restate?

MR. HARDING:  She showed you only a portion of the evidence.  She's asking you to make sure --

MS. HERRING:  Your Honor, it's not the defense's burden to put on any evidence.  I object to this argument.

THE COURT:  Okay.  Overruled.  Go ahead.

MR. HARDING:  She is showing you what she wants you to see so you'll make a decision based on partial information because she knows her client is guilty if you look at all the evidence and all of the law.

So let's start -- we'll just go in reverse order.  We'll start with Hanfu Lee.  The arguments for Hanfu Lee are that basically he was too dumb for Mr. Youngblood to have committed a crime because anybody should have known better.  Well, the part of the materiality instruction that Ms. Herring clearly did not bother to show you is here.  The government need not prove that a reasonable person would have believed the false statements.  All Mr. Hanfu Lee has to believe is that it's a matter of importance.

And let me ask you, is it a matter of importance when Mr. Youngblood tells you, I will repay the $5 million I owed you in the past and also give you extra millions of dollars in gold?  Of course it is.  That is a matter that anyone considered important.  He doesn't have to believe it.  The instruction tells you, specifically, no matter how foolish he was in believing it, it makes no difference.  Material does not mean believable; it means

important.  Is the fact important?  Of course it is. Anybody, reasonable or unreasonable, when they're getting that information is going to consider it important.

Also, we're looking at a scheme here.  Wire fraud charges a scheme.  Ms. Herring wants you to look at, again, very small subsections of the transactions and very small subsections of the testimony and things that happened in this case and the law.  But if you look back at the jury instructions -- I'm not going to go through all of them but you look at all the wire fraud instructions, what is punished is a scheme to defraud.

And we have alleged the scheme to defraud not in the jury instructions, which she showed you, but in an indictment, which you will have back there to look at and we'll talk about that in a minute because -- in fact, we'll talk about it right now because the second argument that Ms. Herring made about Hanfu Lee was we have alleged something different in our indictment than what we proved at trial.

And she showed you the very brief summary that's contained in this paragraph.  This is a brief summary of what's contained in the indictment, but as the Judge also instructs you, it is not necessary the government prove all the details alleged in the indictment concerning the precise nature and purpose of the scheme.  So if we don't

get the precise nature and purpose of the scheme right, it doesn't mean he walks as long as it's substantially the same. And again, substantially the same is the one alleged in the indictment. Not the one summarized in the jury instructions.

So let's walk through briefly the indictment in this case. The indictment in this case alleges a scheme and see, it's titled the scheme and you'll have a copy of this. It was part of the scheme and artifice that he made false representations. Did he do that with Hanfu Lee? Check. It was part of the scheme that he obtain cash and assets from victims for his personal use and benefit? Check. It was part of the scheme that he transmitted and caused to be transmitted telephone calls, electronic communications involving the clearing of checks and transferred by wire. We know he called Hanfu Lee. We know he wired the money. Check.

It was part of the scheme that he represented the funds would be used to provide protection from violence by Mexican drug cartel leaders and that money provided to him would be returned to the investor with a return on investment. Yes, it was part of the scheme. Just because it was part of the scheme doesn't mean it has to be part of the scheme as to every single victim. You heard some people had much more in the way of investments. For

instance, Hanfu Lee, much more investment. Other people involved in the scheme had much more in the way of extortion: Lane Holloway. All still part of the same scheme. There's no requirement in any of these instructions that the scheme apply equally to every victim.

Moving on, the scheme Youngblood used the majority of money to gamble at a casino, check. This is 2023. It was part of the scheme that he let people hold items of value. Remember when Hanfu Lee came to Mr. Youngblood. Don't worry even if this gold thing doesn't work out, this flag's worth a ton of money. Securing his investment and initially, providing returns on some of the money.

Remember Hanfu Lee goes and confronts him at his house and he says, here, take my debit card and take 500 bucks in cash. These are lulling payments. We've alleged the scheme exactly or substantially the same as what happened to Dr. Lee.

Third argument is it was not Rolexes, but you'll recall, Dr. Lee said that's not true. And you listened to the voicemails. Yeah, Marvin's going to pick up Rolexes, but it's Youngblood who needs the money so we can all get paid and that was the gold.

I'm going to spend only a minute with Gary Snider

because you heard him testify.  You can judge his credibility.  But the only thing I want to point out is two things.  One, you'll recall from Gary Snider's testimony, he told Kota Youngblood I'm going to have to move money out of my Fidelity account to make this happen.  Because the first transaction, you'll recall, is for $150,000 and he said, look, I can't give it to you today.  I have to move this money.  And instead, he had to direct 40,000 in additional dollars in checks immediately as good-faith money.

So Mr. Youngblood when he's getting that 235,000 from Gary Snider, he knows full well where it's coming from because, again, Gary Snider told you, I told Mr. Youngblood I'm going to have to get this out of Fidelity.  And in fact, if you look at Defense Exhibit 133, that text message, that text message says in the header that fateful conversation that we talked about moving money out of Fidelity, no doubt that he knew exactly where that money was coming from.

Also, the notion that it went to James Holloway and disappeared is just another example of them showing you just a bit of the evidence because as he testified perhaps two lines later, and did you confirm with Kota Youngblood that he received that money?  Yes, I did.  Again, the defense wants to show you a bit of the evidence

to make you reach a verdict of not guilty.

The most important thing in this case, possibly, is related to causation.  And I agree with Ms. Youngblood on this -- Ms. Herring on this.  To cause interstate or foreign wire facilities to be used is you would have to knowledge that it will happen or that it can be reasonably foreseen.  So with respect to Eric Perardi, they are desperate to make you believe this was somehow related to a divorce.

And she's also in Count 1 trying to make you think, look, if the money from the wire happened somehow after the check was written, it can't be in furtherance of a scheme.  Remember, the scheme is not this transaction. The scheme is to take money from Eric Perardi.  The scheme is to take every last drop of money from Eric Perardi.

And so, when Mr. Youngblood is talking to Eric Perardi and Eric Perardi says, hey, I gotta move this money, what is Mr. Youngblood's intent?  His intent is to execute his scheme to take all that money from Eric Perardi.  There is no problem with causation here.  It's not it has to be necessary to cause this transaction. It's it as to be in furtherance of the scheme.  And the scheme that we've alleged went from 2021 to 2023 and involved all of the victims we talked about here today.

So don't let her confuse you by saying it has to

be this transaction specifically because that's not the law. I also just want to close by showing you a couple of examples of the selective evidence that they tried to show you in desperately trying to convince you this is about a divorce.

Government's Exhibit -- or excuse me, Defense Exhibit 112, this is the lawyer fee that is owed by Mr. Perardi in July of 2022. It is dated July 8th. You can see payment is due within ten days from receipt of this, which would be the 18th, which is nine days prior to this transaction.

And also, if you look further, Eric Perardi, he pays his lawyer fees with a credit card. He doesn't write checks about it. Again, Ms. Herring walked you through some of the evidence, but she doesn't want you to see that. Let's talk about --

THE COURT: Need to wrap up.

MR. HARDING: Yes, your Honor. One last thing.

THE COURT: Uh-huh.

MR. HARDING: This order that clearly caused the $36,000 to be transferred was entered July 28th, 2022. The wire it supposedly caused was sent the day before. That order could not be the cause of that wire because that order had not been entered yet. Ms. Herring is showing you a part of the evidence. At the end of this,

the only evidence -- the only verdict that is consistent with all the evidence and the actual law on this case is guilty on all five counts.  Thank you.

THE COURT:  Ladies and gentlemen of the jury, it is now your duty to begin your deliberations.  To reach a verdict whether it is guilty or not guilty, all of you must agree.  Your verdict must be unanimous on each count of the indictment.  Your deliberations will be secret and you will never have to explain your verdict to anyone.  It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so.

Each of you must decide the case for yourself but only after an impartial consideration of the evidence with your fellow jurors.  Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other affect your decision in any way.  During your deliberations, do not hesitate to reexamine your own opinions and change your mind if you're convinced that you were wrong.  But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times, you are the judges, the judges of the facts.  Your duty is to decide whether the government has proved Mr. Youngblood guilty beyond a

reasonable doubt.  When you go to the jury room, the first thing that you should do is to select one of your number as your foreperson or presiding juror who will help to guide your deliberations and will speak for you here at the courtroom.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic devices or media such as your cellphone, or a laptop, or any computer, or other device.  You must not communicate over any social media platform or in any other matter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

If you need to communicate with me during your deliberations, the presiding juror should write the message and give to it the courtroom security officer.  I will either reply in writing or bring you back into the courtroom to answer your message.  If you send a written message or question to the Court, however, do not volunteer any information as to how you are divided as to any count or issue at that particular time.

A verdict form has been prepared for your convenience.  For each of the Counts 1 through 5, the presiding juror will write the unanimous verdict of the

jury in the space provided either guilty or not guilty. You will then take the verdict form -- you will now take the verdict form to the jury room and when you've reached a unanimous agreement, you'll have your presiding juror complete, date and sign the verdict form and return it to the courtroom.

Bear in mind that you're never to reveal to any person, not even to me, how you stand, numerically or otherwise, on any count of the indictment until after you have reached a unanimous verdict.

Now I will partially release you from the orders that I have given you throughout this trial. You now have the obligation to discuss with each other the evidence in this case in an effort to reach a verdict but only when all of you are present in the jury room and only in the jury room. So as you retire to the jury room, if you take a break and all of you are not present, please cease your deliberations. Do not have any deliberations outside of the jury room.

And at this time, I will instruct the two alternate jurors, you will be segregated in a separate room. You are not to deliberate at this time. You are simply to wait with our appreciation to see whether or not your services will be needed in the event that any of the jurors need to be replaced in the jury.

So at this time, I will ask you then to retire to the jury room and begin your deliberations.

(Jury retires to deliberate.)

THE COURT:  All right.  So I am going to be going down to the first floor to preside in another jury trial. The jury is arriving right now.  As a consequence, we have some logistical issues in terms of responding to any notes that we might have.  I'm going to inform that -- the participants in that trial that we may have occasional interruptions.  But if we do get a note that requires my attention, I will, as soon as is practicable, take a break and come up here and will attend to that.

As usual, if you could make sure that you -- at least one member of each trial team is available within about ten minutes to respond to any question that we might have and we'll just do the best we can in keeping these two things going.

Anything we need to cover before we recess then?

MR. GUESS:  No, your Honor.

THE COURT:  Anything from --

MS. HERRING:  No, your Honor.

THE COURT:  All right.  Thank you very much.

(Recess.)

VERDICT

THE COURT:  We have received two notes from the

jury.  Jury Note No. 1 informed us that the foreperson is Gregory Reed.

And Jury Note No. 2 has informed us that the jury has reached a verdict.  Bring the jury in.

MR. GONZALEZ-FALLA:  Judge, could we approach?

(At the bench, on the record.)

MR. GONZALEZ-FALLA:  I know at the detention hearing, there was a large demonstration when he was ordered detained.  I know there's a large group of people here and I would just ask the Court to instruct the audience here to not make a lot of noise.

MR. GUESS:  I'll let you know, I just had Agent Noble tell them the same thing.  But I think it would be beneficial to have the Court say the same thing to reemphasize to that.

THE COURT:  Okay.

(End of bench conference.)

THE COURT:  I would just ask those of you who are in the audience, regardless of the verdict, if you could maintain decorum -- appropriate decorum for the courtroom, that will be greatly appreciated.

(Jury present.)

THE COURT:  Mr. Foreperson, has the jury reached a verdict?

THE JUROR:  We have, your Honor.

THE COURT:  If you could please pass the verdict form to the courtroom security officer.

All right.  I'll ask the defendant to stand, please.  And then, I'll ask the clerk to read the verdict.

THE CLERK:  In the case of A-23-CR-135, United States vs. Saint Jovite Youngblood, Count 1.  As to Count 1, the jury finds the defendant guilty.

As to Count 2, the jury finds the defendant guilty.

As to Count 3, the jury finds the defendant guilty.

As to Count 4, the jury finds the defendant guilty.

As to Count 5, the jury finds the defendant guilty.

Signed April 23rd at 1:15 by the jury foreperson.

THE COURT:  Thank you.  You may be seated.  Would anybody like the jury polled?

MS. HERRING:  Yes, your Honor.

THE COURT:  Okay.

THE CLERK:  Juror No. 1, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror No. 2, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror No. 3, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror No. 4, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror No. 5, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror No. 6, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror No. 7, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror No. 8, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror No. 9, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK:  Juror 10, is this your true and correct verdict?

THE JUROR:  Yes.

THE CLERK: Juror 11, is this your true and correct verdict?

THE JUROR: Yes.

THE CLERK: Juror 12, is this your true and correct verdict?

THE JUROR: Yes.

THE COURT: Ladies and gentlemen of the jury, and alternates, I want to on behalf of the parties and, in particular, on behalf of our community, I want to thank you for conducting yourself so admirably throughout this process. You have fulfilled your duties in every respect and I want to express our gratitude. I know that serving on a jury, especially a jury in a criminal case, is a particularly taxing experience and you have been attentive and you have been -- as I said, you have attended to your duties admirably and I appreciate that.

I'm now going to release you from your jury service and I'm going to release you from all of the instructions I've given you throughout this trial. You now are free to talk to anyone about this case, however, you don't have to talk to anyone. If you would like to stay around and talk to folks, including the attorneys in the case, you're free to do that, but we will also show you out the back way if you don't choose to do that. No one will approach you and seek to interact with you but I

do allow the parties to -- the lawyers to interact with jurors who do want to interact with them.

And so, again, that's completely up to you. If anyone does approach you, now or at any time in the future, you should let us know because that should not happen. Also, now you're released from my instructions regarding any independent investigation that you would like to undertake about anything that has arisen in this trial, any person, place, thing, or the law, and you are free to do that. Again, you are not required to talk to anyone about your service today and no one should be approaching you to do that.

With that, I'll just ask one more thing and that is as you assemble back in the jury room, all of you, if you could just wait one more minute for me to come and personally express my appreciation to you and answer any questions that you might have.

Is there anything else we need?

MR. GUESS: Nothing from the government, your Honor.

MS. HERRING: No, your Honor.

THE COURT: All right. Thank you.

(Jury exits.)

THE COURT: Thank you. Please be seated. All right.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Mr. Youngblood, I will set a date for your sentencing at the appropriate time after a presentence investigation report has been prepared.

Is there anything else from the government today?

MR. GUESS:  No, your Honor.

THE COURT:  Anything from defense?

MS. HERRING:  No, your Honor.

THE COURT:  All right.  Thank you all very much and we stand adjourned.

(Proceedings concluded.)

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

* * * * * *


UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS     )


   I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

   I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

   WITNESS MY OFFICIAL HAND this the 9th day of March, 2025.


                         ~~~~~~~~~~~~~~~~~~~~~~~~
                         LILY I. REZNIK, CRR, RMR
                         Official Court Reporter
                         United States District Court
                         Austin Division
                         501 West 5th Street,
                         Suite 4153
                         Austin, Texas 78701
                         (512)391-8792
                         SOT Certification No. 4481
                         Expires:  1-31-27