UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA ) Docket No. A 23-CR-135(1) RP
                         )
vs.                      ) Austin, Texas
                         )
SAINT JOVITE YOUNGBLOOD  ) December 4, 2024


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE ROBERT L. PITMAN


APPEARANCES:

For the United States:   Mr. Dan Guess
                         Mr. Matt Harding
                         Assistant U.S. Attorneys
                         903 San Jacinto Boulevard,
                         Suite 334
                         Austin, Texas 78701


For the Defendant:       Mr. Jeff Senter
                         501 Congress Avenue, Suite 150
                         Austin, Texas 78701


Court Reporter:          Ms. Lily Iva Reznik, CRR, RMR
                         501 West 5th Street, Suite 4153
                         Austin, Texas 78701
                         (512)391-8792

Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Lindsey Wilkinson | 40 | 55 | | |
| Glen Morehead | 59 | 67 | | |
| Dale Snider | 69 | 84 | | |

**E X H I B I T S**

| | Offered | Admitted |
|---|---|---|
| Government's | | |
| #1 through 3 | 53 | 53 |

Defendant's

(None)

THE CLERK:  Court calls A-23-CR-135, United States vs. Saint Jovite Youngblood, for sentencing.

MR. HARDING:  Good morning, your Honor.

Matt Harding and Dan Guess for the United States.

THE COURT:  Mr. Harding.

MR. SENTER:  Good morning, Judge.

Jeff Senter for Mr. Youngblood.

THE COURT:  And good morning, Mr. Senter.  If you and Mr. Youngblood could please approach the podium.  Good morning, Mr. Youngblood.

THE DEFENDANT:  Good morning, sir.

THE COURT:  Mr. Youngblood, as you know, the purpose of this hearing today is for me to impose a sentence in your case.  In a few moments, I'll give you the opportunity to say anything that you'd like to say before I impose a sentence.  But first, let me check in with you to make sure that you believe you've had enough time with Mr. Senter, before today, to prepare for this sentencing hearing.

THE DEFENDANT:  Your Honor, they made it very difficult at Limestone because I was held in the life-in-danger unit because of several physical altercations I was involved in.  He came to see me several times and he was denied access to me.  He contacted me several times through the Zoom, but because of the process

of moving me, 45 minutes became seven or eight minutes. Having said that, he's been exceptional. He's gone out of his way to help me. I did not get the copy of my PSI in full until yesterday. I still do not have pages 3, 4, 5 and 6, but I have all of the paragraphs that were regarding this today and I have made notes on every single thing to discuss.

So to the best of my ability, I have tried to be ready, but it's not Mr. Senter's fault. It's been a rough ride, so to speak, so I have done what I can. I guess my answer to your question is yes.

THE COURT: Okay. Thank you.

Mr. Senter, do you believe you had enough time with Mr. Youngblood to prepare for this hearing today?

MR. SENTER: Judge, I have. We did make numerous attempts to go physically to Limestone County. Furthermore, there were numerous Zoom conferences conducted. Insofar as the report's concerned, Sergeant Kendricks at the Limestone County Detention Center was conveyed the report multiple times by e-mail and was only transmitted the first two or three pages to Mr. Youngblood recently. But the balance of the report's been...

THE COURT: So at this point, prior to the hearing, he did have access to the presentence investigation report?

MR. SENTER:  Yes.  That's correct.

THE COURT:  Did you have the opportunity to review that with him?

MR. SENTER:  Yes.  And we've talked about it.

THE COURT:  And have you talked about the sentencing guidelines and how those were applied in his case?

MR. SENTER:  Yes.  And he's awfully bright so he comprehends it pretty well.

THE COURT:  Very good.  I know that you filed no objection to the report itself; is that correct?

MR. SENTER:  That's correct, but Mr. Youngblood has several observations he's going to make.

THE COURT:  Okay.  But those aren't in the form of objections?

MR. SENTER:  No.

THE COURT:  Okay.  We'll wait and I'll give you the opportunity to do that now.  I just want to make sure that there are no formal legal objections at this time.

Any objection from the government?

MR. HARDING:  No, your Honor.  Although, as the Court knows, we do have some evidence to offer in support of our sentencing memorandum.  No objections to the presentence report.

THE COURT:  Okay.  Without objections then, I'll

adopt the findings of the presentence investigation report and make them part of the record for purposes of this hearing.

Mr. Youngblood, now I want to go over with you the potential sentence you face today, the maximum possible punishment that you face, and then, what the sentencing guidelines are recommending in your case.

For Counts 1, 2, 3 and 4, wire fraud and aiding and abetting wire fraud, the statute provides for a potential sentence of up to 20 years incarceration on each count to be followed by a period of supervised release of up to three years. The statute provides for a fine as to each of those counts of up to twice the loss involved in this case, which in this case, has been calculated to twice that number between $25,548,696 on Counts 1 through 4. Likewise, you'll be potentially subject to restitution in the amount of the actual loss that was identified in the presentence investigation report of $12,766,384.

Finally, you'll be subject to a $100 mandatory special assessment as to Counts 1 through 4, each count of $100 under the Victims of Crimes Act.

As to Count 5, the statute provides for the offense of engaging in monetary transaction in criminally derived property. The maximum possible punishment of up to 10 years incarceration, followed by a period of

supervised release of up to three years. The statute provides for a fine of up to $250,000, in addition to the $100 mandatory special assessment under the Victims of Crimes Act.

Each of the periods of custody that is provided for in the statute as to each of these counts could be ordered to be served either consecutively, that is, one after the other, or concurrently, that is, you'll be ordered to serve those sentences for those counts simultaneously.

Do you understand the maximum possible punishment that you're facing today?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now, the sentencing guidelines were applied in your case. The offense level was found to be a level 34 and your Criminal History a Category II. As a result, the guidelines recommend that I sentence you to a term of custody of between 168 and 210 months for each of the counts for which you were convicted, followed by a period of supervised release of between one and three years. The guidelines recommend a fine of between $35,000 and the maximum of $25,548,696, restitution in the amount of $12,766,384, and the $100 per count under the Victims of Crimes Act for a total of $500.

Do you understand what the federal sentencing

guidelines are recommending in your case?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Mr. Senter, I'd be happy to hear anything you'd like to say on behalf of your client at this time.

MR. SENTER:  Yes, Judge.

During my representation of Mr. Youngblood, I've come to know him.  He is a smart, intelligent gentleman. He is well-spoken.  He's well-intentioned.  Mistakes were made, we acknowledge that, however, not of this magnitude. Now, I trust Mr. Harding and Mr. Guess and know them not only professionally but as friends.  We just have a professional disagreement about the seriousness of the matter and the monetary value, I know those were all issues at trial.  I understand that.

But my hope and my trust is that you would grant the grace and the mercy to understand it from Mr. Youngblood's perspective, who is married and has two children, who's at least relative to me young and has a future.  If I could take the time for him based on my age and infirmity, I would do it, but we can't do it that way. But I urge you to consider it in that light.

THE COURT:  Mr. Youngblood, is there anything that you'd like to say?

THE DEFENDANT:  Yes, your Honor.

And I don't know what the protocol is to do this, but I've prepared as best as I can and it's going to take a minute because this is my life.

THE COURT:  Take your time.

THE DEFENDANT:  So with your permission.

THE COURT:  Yes, sir.

THE DEFENDANT:  I'm terrified but not for the reasons that you would suspect.  Terrified of what was done to my life so quickly, to my family and that I'm standing here.  You've always been respectful to me and I've been respectful to you since long before you were in position to judge me.  And I thanked you for the courtesy and the same respect you've shown me.  But what terrifies me about this is I lost everything (snaps fingers) like that for a crime I did not commit.

I sit here now in a life in whole danger after my thirty-sixth fight.  Everything from this Steve Toland and him discussing with his clients at Burnet and Waco about physically hurting me, harming me and putting a bounty on me -- this is not my opinion.  I've written letters to this court about it.  The marshals have investigated it and my counsel has spoken to witnesses that attested to it.

If you look at my hands or have someone photograph them, you will clearly see the damage on them.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

It's been terrifying what I've been put through. And unfortunately, perception becomes reality with this. Just as a matter of fact, this last time, four people were in the kitchen heard about this from what was said to Rojelio at Burnet. They came back with locks in a sock -- put them in their socks and went after me with them. Four people with combination locks. They lost. I got seged up and moved to life-in-danger. It has been like this since Waco. I've had these problems and you're aware of it since the conflict hearing.

That gentleman Rider was 25 years old and a confirmed runner for Jalisco. My problems with these cartels go back 16 years. It is documented. I went to the FBI for help. In 2009, 2010, 2011, I went to the field office in Rialto. I went to the field office in West Covina. I went to 11000 Wilshire, I went and asked and begged for help. I was held on something that was not my doing that I was eventually exonerated for and cleared on.

I met Jason York, for example, and Roseana and three other peace officers who protected my family and then, watched this man come up here and testify that he's a victim, too. A man that's never bought me a meal. A man that's never paid a bill of mine. A man when he needed equipment for his place out of Giddings, I financed

it at John Deere at a building 20 feet from his house and it was delivered to his home. Just as an example of how I've seen people that I was close to turn on me and they're just blatantly lying.

I've done many things in my life I'm not proud of. I didn't do this. Now I have to come in here and apologize for something I didn't do. I don't want to be a hypocrite. I went to trial. I testified. No one helped me. If I had known about the relationship of my previous counsel being friends with the same Steve Toland that was discussing my case with clients that I'm locked up with that was telling them he ripped off my friend Eric, he's a bad guy, he's got Jalisco ties, this is dangerous, your Honor.

You've got the FBI going to St. Nicholas Church in New York City and discussing the fact, hey, how do you know this guy. Like I was a member of Vory v Zakone, the Russian mob. I'm not making this up. They know I'm telling the truth. I'm not lying. They went and they harassed Dr. David Duke that I have some white supremacist ties. I'm married to a Chinese American. I didn't make this up. This is the kind of rumors that James Holloway and Eric Perardi are telling people. And these are the kinds of things that Mr. Toland, an officer of this court, comes in and says, look, this guy's a bad guy, he's an

A-hole.  He ripped my friend off.  He's got some -- this is an insult.  These are the same cartels that 13 years ago, burned my house to the ground with my best friend's mother in it.  24567 San Moritz, Crestline, California.  It was in every newspaper in the country.  I'm not making this up.

Then when I got out, pleading to a crime I did not commit, for a check that I supposedly wrote at a place I've never been.  There was 40 miles away, your Honor, when the transaction was occurring, I was visiting a man at Rancho Cucamonga Detention Center named Thomas Murphy, who was doing 248 years.  How could I have been at this transaction?  I wasn't is my point.  I'm not arrested on that charge, but it took years later and the only reason I was arrested, your Honor, is the FBI wanted me to testify against Mr. Murphy because they didn't think 248 years was enough.  I didn't.

Federal court will support what I just said.  They dragged me in there 2010.  I did not testify.  They dragged me in again in 2015 in state court when Paul Gale was my attorney.  I did not testify.  I did testify against two cops from San Bernardino Sheriff's Department and one of them was the partner of the very detective who arrested me.  These are facts.  And when I did get out, my house was burnt down a second time at 11131 Malone after

going to the Rialto field office and explaining that I had been threatened.  This is what I've been dealing with.

To sit here and paint me as extorting someone with a cartel, having friends with the cartel is a joke. It's an absolute joke and that's not a strong enough word. I love my family.  I love my wife.  I love my children. No one's here.  There's no pretty wife waiting.  If this was over today, I have nowhere to go.  Rent a car, rent a home.  I don't have a friend.  I don't have a wife.  I'm on my own and I'm trying to do the right thing.  But I have a hard time coming in here to a man that I respect that I understand controls my life and saying I did something I didn't do.

If I'd known some of these facts, I would not have not changed counsel at the conflict hearing.  But at that point, I weighed 174 pounds from 239.  I'm 147 now. That's 92 pounds from when I came in.  Took significant loss.  I didn't think I could wait to switch counsel and then, spend another six months until your schedule would have allowed -- I believe they had told me would be December.  That was terrifying to me.  In hindsight, I don't know right, wrong or indifferent.

The physical problems from Waco aren't going away.  They took my plugs away.  They wouldn't let me bring them in here.  I have tinnitus, I have vertigo, and

I have migraines that don't stop.  I've been diagnosed by four different neurologists and two different physicians.  I didn't ask for 53 unanswered head shots from an angle.  I didn't even see the guy.  All because someone said yeah, he's a rat.  He's connected to the cartel so this particular man is a bag -- this is coming from an attorney discussing my case with another attorney who's talking to his client.  All these things were verified by a captain of Burnet holding and all these things were verified by multiple people that I'm, unfortunately, locked up with.  Couple of them, Mr. Senter has verified this with.

So I don't know what the protocol is that I'm supposed to do here.  I don't know what to say, what not to say.  I turned over a thousand pages of information of my notes.  I turned over 1,200 e-mails and did 30 hours of video about the very people that are lying about me.  I will not go quietly into the night and have my life destroyed.

I stand up here and I think of my dogs being euthanized.  I think of the fact that the very people that say they lost their house to Jack Rady.  Jack Rady was introduced to me by James Holloway.  Jack Rady took my house and his son is living in it.  The paperwork the FBI has in their hands shows that Jack Rady gave me money that went to James Holloway.  It didn't even go to me.  I never

saw a penny of it.

I watched Resorts World testify at my trial against me and telling me that I lost a million dollars in Las Vegas.  The same Resorts World whose president pled in front of the federal court on 6-6-124 for money laundering and wire fraud, Scott Sibella.  The same Scott Sibella who I played at his private poker game in November of '22 and refused $90,000 in prize money for seventh place out of 79 because it was -- I was uncomfortable with the promotional chips and how they wanted me to redeem them.  I didn't think it was legal.  I declined it.  These are the same people that came in and testified against me that I was a loser.  I was not.

I've had the same accountant for seven years.  He specialized in professional poker players.  He specializes in professional gaming.  To put that in perspective, the money I paid him, he's had everything itemized for years about me.  He has my logs and my ledgers.  If I was losing, why wouldn't I claim zero and not have to pay federal tax on it?  We had savings.  We had proof of my wife's income, substantial till to 2014 when she had to surrender her license.  And my income was substantial from RAS and from my businesses.  I've been attacked for marketing fake this, fake that.  I had 1,600 feedback on eBay and 601 on the other account with Youngblood Metals.

The very same bats that I'm told are not genuine were bought with attorney Mark Leonardo and myself in Jericho, Long Island.  Twenty-three of those baseballs, 21 he still has, were all genuine.  Two of them were Babe Ruth balls that were sold online and both were signed off on by PSADA and JSA that they were both real.  Why would I believe something else isn't real?  Yet, I'm told every time, you deal this, you deal that.

I heard a story of Mr. Snider about a high-end gold coin.  I don't trade in rare gold coins.  I buy bouillon.  My specialties were white metals, memorabilia and Star Wars.  There are people on your list of victims that I've never met more than once for dinner.  I wouldn't have recognized Glen Morehead if someone didn't tell me who he was.  They may think this is funny.  I don't.

At a certain point, common sense has to kick in.  Someone that I met one time gave someone a million dollars for me on 15 different transactions and that makes sense?  That's believable?  Eric Perardi writes 17 checks to James Holloway, very specific numbers on contracts.  Not getting the case up, but very specific on particular items and antiques have nothing to do with me.  Just as an example.

Jason York, we've been best friends for 10 years and you sit here and tell me after you get caught taking $192,000 from your mentally disabled brother-in-law

interstate, you blame that on me when the only money you've ever given me was a payment for a John Deere tractor that is open -- I had that account for 10 years with John Deere. It's hard to swallow some of the things being said about me, your Honor.

Mr. Senter speaks extremely highly of Mr. Harding and Mr. Guess. I want to apologize to them and I'm apologizing simply because he explained to me, they're doing their job and they have to paint a perspective based on what they believe of me. I understand that now and I am sorry. I apologize. You go to the same church, I'm aware. I have great respect for him, but they're wrong.

Am I a good person? No, I'm not. I've done things I'm not proud of. I didn't do this. Just like 13 years ago, the only trouble I've ever been in in my life, which I don't understand why it's points on my PSI. My lawyer said we're not objecting, we're going to point out. I was told from previous counsel that it would not count because it was expunged. I was exonerated in the case that followed that and Judge Mazurek went back and expunged it, and he said two things to me I never forgot. He said, number one, Mr. Youngblood, they didn't send you to jail. They sent you to die because your wife and all these people, they never expected to see you again.

And I've heard Mr. Harding say we feel bad for

Gloria. Well, that's fine. I felt bad, too, until I got served with divorce papers a couple of days ago. I'm not the one that wrote 17 prescriptions illegally to myself and lost my medical license in 2014. So I'm having a hard time swallowing that. But I love my wife with everything I am and it broke my heart her not coming here, not being here.

I love my son. But the fact is I would do the same thing for my son again that I did. My son's first roommate faced federal charges for narcotics distribution. He was expelled from UCSD La Jolla. To sit here and tell me that there was no drug problem is ridiculous. We moved him. Then two years later, he's got three more roommates, all three of them -- two of them get expelled and one of them, once again, faced state charges.

I have people coming to my home and asking me for money about my son and I paid it. Yet, I'm told I extorted and I watched people use what I went through to steal money from others. Well, you know what, my son's having problems. You, yourself, cut Jose off when he was cross-examining Lane Holloway. And I agree with you. It was inappropriate when Jose made a comment about pedophilia and all this and that. You got upset. I don't blame you.

What I don't understand is why he made the

comment to begin with.  Because what he should have asked him was, wait a minute, you're making a million dollars a year at Amazon, you work at home.  And one day, Jason York got on this stand and said he called Lane Holloway out for stealing bitcoin from a cartel member.  He said it in this court and testified to it.  Jason, himself, said Lane said it at a dinner at Saltgrass.

And then, a couple of weeks later, Lane Holloway quits this job a week before stock options, after making seven appearances to change his name and moves out of state.  What does that have to do with me?  And as another example, Marvin Knecht.  I see him as now, well, you know, he's a victim, too.  This is the same Marvin Knecht that protected me with Jason York and two other peace officers when my family and I were going through court 12 years ago.  Because if it was not real -- the cartel was not a danger and I didn't have a problem with San Bernardino, why were we paying them, four of them thousands of dollars a week to protect us?  And why were there police reports this high in Pasadena about the incidents?

It's an insult to me when Fay Mann is no longer with us, your Honor (speaks Latin).  She's dead.  September 24, 2011, they burned my house to the ground with her in it.  Then they come in and tell me my family is next and described the clothing my wife wears to bed

and my son's pajamas.

I sat there for 163 days, your Honor. I've never been in trouble about anything. I sat there and didn't see anything -- and this happened the day before my jury selection and I plea to something I didn't do and I get out. Then I'm harassed from that day forward and my second house is burnt and I'm told that I'm a liar? That doesn't make any sense to me.

I sit here and I look at -- I will help Mr. Guess and I will help Mr. Harding. I have nothing to do with the FBI because I'm convinced they're corrupt. I don't care what the punishment is, they're corrupt. And I base that on the fact that going back 2004 with the very Kevin Armstrong that wanted to testify against me here, when his house was broken into, he was a DHS agent living next door to me at 5627 Florinda. His wife, terrified for his safety, came and got me to go through his house at 11:30 at night. I did. Pulled the perpetrator -- a punk kid breaking in and it was handled. The next day comes up, kisses me on the cheek at a Halloween party, says thank you. Now the rumor started. Next thing you know, Mr. Armstrong moves.

Point I'm trying to make was that since that day, it's almost like a turn with the FBI. I didn't do anything wrong. All I did was help my neighbor. But I

sit here and I watch while, you know, you lied about this, you lied about that. Really? That's funny because every police report in Arcadia, every police report in Crestline says I told the truth. There's a stack this high with internal affairs about what I went through with the cartels and what I went through with San Bernardino Sheriff's Department. Thomas Murphy is doing 248 years right now. I'm not making that up.

I am not criminal before, I'm not criminal after. And then, you get to Hanfu Lee, it's even more hard to believe. His brother and he, I had said a hundred times, were buying new old-stock watches from Demetrius Kasparaitis (phonetic). He's on my eBay page that existed -- they have access to the old records. Marvin was picking these watches up in Phoenix and Detroit. When Hanfu came up here, you played two messages from Marvin Knecht. The first one saying if you don't pay the money you owe him, I'm not going to Detroit and picking this watch up. I thought that would be the end of it. I was wrong.

The second message was even worse for them, better for me. I've got the watches in my hand. I'm on my way to your office. This is the same Hanfu Lee that I was stealing $5 million from? I have no idea what you were talking about when my bond was blocked. I have no

idea when Judge Lane told me, "You're the worst person I've ever had in my court" before I opened my mouth. Check the transcripts, that's a quote. There's no presumption of innocence with you and then, he threw in the "you make more than I do as a federal judge as a poker player." That's what he told me.

And then, you sit there and you listen to Mr. Toland's comments to Rojelio that are recorded and I start wondering, wow, is he telling the truth that he sat there and had Judge Lane's ear? Is he telling the truth because he sure as hell is friends with Charlotte and Jose. If I had known that, I would not have kept counsel, but I didn't.

I sit here and watch Hanfu Lee, once again, I stole $5 million from 2000 to 2015, yet, in 2015, he christens me with the actor Terry Crew, the big, buffed-up black guy at Faith Community Church in Covina, California. Christens me, baptizes me as a Christian. He put up my bail for my court case, yet, I was ripping him off and stealing money? His brother and he made a fortune on those watches selling them to their dental friends.

The reason this is important is I took him to federal tax court. The FBI can verify this very easily. In federal tax court, he lost in 2017 and '18. Mr. Steven Giorgione, my same accountant, beat him. He files a

police report in 2019 with Arcadia. The very same person that I have never met in my life, never spoken to, don't know, who Charlotte calls as a witness as the defense who testifies against me. It's not what I was told when I was told the strategy for my trial.

I was told that there were 12 people coming to testify. Four federal agents, seven ex-police officers, a priest, and then, the other four were all people in the professional gambling world, they understand my business and understand my work. None of that was true. No one came to see me before my trial so there was no way to verify this.

Mr. Senter, who wasn't even representing, me, came eight times. I never saw them. And then, the time I did testify, I gave her 300 questions. She brought none of them. She asked me about the Sword of Shannara and she asked me what my language skills were.

I do apologize, your Honor, for one thing with you because whether you hammer me to the proverbial cross or give me a chance to fix my life, I cannot control that, but I want you to understand sincerity. There was one thing about the NDA, if you remember, we had discussed it about service and I was uncomfortable giving the answers. I spoke with some of the -- I trust and spoke with counsel about this particular issue and I wanted to clarify this

because I've been painted as, well, you didn't do this, it's not true.

In 5 of '89, my parents were out of the picture for a long time. I had been emancipated and that paperwork was filed by Bruce Tylor Wick in Cleveland, Ohio and Lakeland, Ohio when I was 15, 16 and 17. I went -- Staff Sergeant Funk was the gentleman's name, James Funk, and he was the United States Marine recruiter in North Olmsted, Ohio. I took the ASVAB, scored a 99. There is no hundred. And I took the physical. That was where my problem started.

Something you don't know, I have four toes. You want me to make my shoes off, I will. United States guidelines for the United States Army and United States Marine Corps. are five digits. It requires a battalion exception and it requires them interviewing me. I did this and I was declined for it and was sheep-digged to another contracted agency. So I couldn't understand how they could not have that record and could not have the record for 2001.

The reason they didn't have it is DD Form 149, entitled Application For Correction and/Or Deletion of Military Records under the provisions of Title 10, U.S. Code, Section 1552. That is why both of those are not showing in the computer those men testified to. I was

telling the truth then and I'm telling the truth now. I don't want to sit here and beat the proverbial dead horse, but when I'm being lied about and being attacked, my counsel's not helping me, no one's listening to me, I don't know how to defend myself.

And I'll finish this with Hanfu Lee and my comment as an example. He comes to my house, six years has passed. Jason was there, Eric was there. The Holloways were there. All of those people were at my estate sale, had access to everything in my house. I saw pictures of stuff in his home that is from my garage. I didn't give it to anyone.

I go to their house, the Yorks, on the 16th after having my house raided by the FBI. July 16th. I have dinner with them. I drop off three very expensive silver sets Kiama Ray (phonetic) pattern. Not Kiama Ray. Kiama Ray is what my wife has. I can't remember the pattern name. It will come to me but they're famous sets. The point was they're about three, four, $5,000 apiece.

I dropped off some old Elvis recordings and some old 1960s demos. I never got those back. But the part that caught my attention was, well, he had a firearm, he threw it at a lake. I have all my weapons at my house. The FBI didn't seize them. Yet, I'm supposed to believe I took a firearm I've had for 25 years to Jason's house and

threw it in a lake?  That makes sense to people?  The reason I'm harping on the Jason York and Roseana York is simple.  This is a man that never paid for a meal that I had lunch with twice a week for 10 years.  We went to movies for 10 years.  Their miles, everybody from James Holloway to Hanfu Lee to the Yorks on my Southwest tickets, United and Frontier, I paid for most of their flights when they did travel because I didn't use my miles.  I didn't use my points.

The very same hockey team that I pulled my son from Eric's -- there was no relationship with us for a year.  Ask him why.  Because I was uncomfortable with the drinking, the partying, and the stuff going on.  My wife confronted Eric about it and if he says she didn't, he's a liar -- which made it very uncomfortable with me and the parents.  So did the fact that one parent face-planted at the turkey dinner that night high.  One fell through a table and one pick up a DUI.  This is the kind of stuff that I was rewarded for when I sat there and used all my points that I'd saved for 10 years at MGM to pay for it.  But I'm taking money from these people?  Why?  How?

But I go back to the Yorks, July 16th, we're best friends.  I'm at their house having dinner, yet, two days later, they're at the FBI office and the FBI comes to them and I'm the devil?  That's just one example.

Eric Perardi, at Easter, he's sending texts to James Holloway. James Holloway showed them to me with Marvin about wanting to kill himself. Comes to my house on the 26th of April, speaks to my wife and I about acquiring 400 grand to save his Crossover shares. I didn't have the 400 grand because I was helping my son with his problem.

So I told Eric what I could do. I said, look, I have $73,000 in cash. If you have someone that has the difference to loan me, I have some things of value, and if I could get them back and reacquire them -- I kept hearing about how I'm a liar about this art, about this dinosaur head. Hanfu Lee testified about the dinosaur head on this court on the stand.

And the art, the FBI investigated it and interviewed me four times over it. They came to my house two days before Thanksgiving in 2009. They took one of the paintings with them, brought it back and told me that it was a hundred-year-later reproduction. When I was arrested all those years ago, San Bernardino Sheriff's Department had them marked Youngblood property in their possession. When I was taken into custody. They released them to Roger Lee, Kathy Ann and Gloria. That's not my doing, your Honor. I've been trying to get that back for years. But one had nothing to do with the other.

So I simply said if you have someone that will loan me the difference, I have Robert Coventry, who is a federal liaison.  He owns Starside Protection Services in California, offered to do the work, sent people to China to try to recover the work.  The fee that he wanted was $150,000.  That was the best I could do.  I never once said, hey, the cartel, Jalisco, I can't stand these people.

Look at the marks on my hands for Christ sake.  This is what I've been dealing with in court because of these accusations.  I look at this.  Do you know what kind of time it takes to have those kind of scars on your hands?  It's ridiculous.  This is every day of my life now.  Is that going to get better in prison?  Do you know what it takes?  It takes an act of God to get into life-in-danger at where I'm at.  That's where I'm at.

All of this because people are representing that I'm a cartel member, that I'm connected to the mafia, that I'm a racist.  More importantly, that I'm a rat.  More importantly, that I'm this and I'm that.  But when someone at your conflict hearing -- your Honor, I sat there and I told you I could not understand who Jose Mora -- how he would know who Eric Perardi was.  How he could possibly know the name when I don't have any paperwork in my dorm about my case; and even that, would have said E.P.

This guy had details about that, about the house fire and everything else. I said this in the transcripts with you, your Honor, before my trial, before anything else that I couldn't understand how he was getting this information. I later found out that his attorney was a friend of Steve Toland. This is not my opinion. I passed seven polygraphs 12 years ago and was eventually exonerated for a crime I didn't commit. I'm right now, I'll take that polygraph right now. Polygraph them, too.

I've looked -- I look at Gary Snider sitting there, 235,000, the big brick of money that he bragged about that I'm charged with the wire, that they show on the big screen there James Holloway's deposit slip depositing cash, green cash into his account, but he said it was for Mr. Youngblood. For Mr. Youngblood to keep Lane's granddaughter -- the same Lane that you can't stand, the same Lane that you don't like, the same Lane that you don't talk to?

I mean, at a certain point, these are absurd. I don't understand what I'm supposed to do to defend myself. What more could I have done? As far as how they laundered the money and moved the money, I tell the gentlemen here, I don't have to like them and I assure you it's mutual, they don't like me, that's fine. I'll provide all the information for the gold dealer that they're using to

launder the money, the diamond dealer that they sent it to and their fences in California and Texas.  You want it, you got it.

But all I want is an apology saying, hey, you know what, you were right about this.  Because if you're right about one thing, you might be right about everything.  You could not take me seriously.  You could laugh at me, smile, that's fine.  But you underestimate the Dave Hesters and what's going on at Vintage Contessa.  Remember that name, the vintagecontessa.com in Houston Texas.  Remember miracle mile --

THE COURT:  Mr. Youngblood, you need to address your comments to me.

THE DEFENDANT:  I apologize, your Honor.  I want to help.  I have made my point about Hanfu, I believe.  The only reason Hanfu told what he did was he figured he could get off the hook about the franchise tax board that I had refuted a bad debt loan, your Honor.  And I have no idea what your skills are as a CPA.  I do not know.  But I did not know until it was pointed out to me, 14 percent was a tax bracket I was in the state of California.  When he pulled this for $5 million, they taxed me $700,000.

When I got that bill, it was sent to Steven Giorgione and Sanford Millar, Century of City, Avenue of the Stars.  He wrote a lot of the tax code for the last 20

years, the revisions.  I hired both of them.  They were very expensive.  Ken Lee and Hanfu Lee were defeated in federal tax court twice.  I was not on a radar with the FBI or Arcadia PD until a year later and two years later when he filed those bogus reports to try to cover himself. Even then, it took him four more years to show up at my home and ask me and my wife to drop our investigation because they were denying his write-off.

He then agreed to pay the $130,000 back, two watches that he still had, my American Express bill that Mr. Harding showed on the screen here under Hanfu's banking receipt for $23,000.  A card not present by the way.  So I was not there when he charged it.  He just took the money.  He took another watch from my house from Tourneau.  It was a 2016 gold Submariner worth about $30,000.  The receipt was with the watch in Tourneau who will verify that I had it.  The total was 137 and change. I did not have a Zelle account.  I did not provide the wire information.

But what I don't understand was out of 43 deposits and payments to me in the year 2023, I'm charged for 19,800.  The exact amount that Marvin says he was picking up a watch for.  That makes no sense to me.  My wife pulled $30,000 out of the account in payments from a week and a half, two weeks before that and 15,000 before

that.  She wasn't charged.  Yet, I'm told by previous counsel that the FBI, Mr. Noble specifically, held that over my wife's head and threatened her, well, we're on the fence with charging you.  We're on the fence with charging you.  I was told this repeatedly by Charlotte Herring.

This is the same Justin Noble that stood up in this court and said, I could have charged James Holloway with a number of crimes.  I chose not to.  Well, my question is the same now as it was when I testified.  Why not?  Then I read my PSI.  And I promise you, I will be short, concise and to the point, but this is what I've had to deal with.  And Mr. Holloway, himself, told the whole world that Lane Holloway was in trouble.  He openly advertised to all these people that Lane Holloway was in trouble.

So if you have the experiences that I had with the cartel that are documented by the FBI, the state of California, the judge in California, the police reports in Crestline, you would not take that seriously?  Of course I would take it seriously.  But I didn't know what to do and I'm not responsible for Lane Holloway's actions.  But to tell me that there was no drug tie to his actions and his wife's crazy.  She has three relatives that did time in TDC for drug trafficking.  Lane Holloway, himself, sat on this stand and said, and I quote, my father-in-law quit

his Border Patrol job at the Mexican border side because his boss was killed by the cartel. The same Lane that told Jason and Jason testified on this stand, yeah, I had a friend that was a cartel member connection and I took money from his bitcoin. He testified here and no one's held to that.

$192,000 missing from a trustee account from a brother-in-law that has mental disability. That's my doing because he took the money? That's ridiculous. Gary Snider, $235,000 transfer to himself, gives the money to James Holloway. That's my doing? So you lose $130,000 and four months later, you got another 135,000, then you give Mr. Holloway another $700,000, that doesn't make any sense to me, your Honor.

The point I was trying to make was at a certain point, once again, common sense has to kick in here. Paul Newman, Henry Gondorff from The Sting could not have done in a movie what I'm accused of doing in real life and that's not meant to be funny. That's sad. I'm supposed to believe that those people who I have met once, one time in my life, gave me a million dollars? They wired money and write checks to James Holloway 15 times. You gave that money to me because he says he gave it to me? That's a hard pill to swallow, your Honor, when everything's taken from me.

I've worked for Victor Hsu now for five years. I was due a considerable amount of money 11-19-23. I never saw it. I had a considerable amount of points tied up still that I could have cashed out at the Christmas shop at MGM that year. I'll never see it. Now I have the tax nightmare because I have deferred income from the cash games that no one ever asked me about.

But one hotel at the MGM properties out of 23 says I lost for the year. Well, where's the report from Wynn that barred me from playing there after knocking their heads off for the year? Where's the report from Resorts World for the number -- the highest jackpot they had in their history at that time? It's impossible for me to have been a loser that year because I know what my income was and what it wasn't, and the ledgers and the logs reflected that and Mr. Giorgione.

If you'll be so kind, your Honor, to give me the time, I will drop the rest of this because it's irrelevant and it would be redundant. I would like to address my PSI, specifically. Is that okay?

THE COURT: Yes.

THE DEFENDANT: And I've never done this so I tried to be perfect, but I don't think that's the case. They took my pages away when I came here because they were going through things. The one other thing that I will

mention, sir, there was a man on my victims list named Gary Serlick (phonetic). I wanted to point this one out, specifically. It was on this page and if you want me to read it, I'll be more than happy to. But Gary Serlick is an attorney. He's a member of the clock club, the same one that all these people belong to. I've met Gary Serlick once in my life at a Pappadeaux dinner for lunch for the clock club that I helped pay for.

I couldn't tell you if that was Gary Serlick. I don't know what he looks like anymore. It's been four years. Gary Serlick wired money not once, not twice, but three times to James Holloway. Wired it to James Holloway and said it's for me. I've never been to Gary Serlick's house. I've never been to Eric Perardi's house despite what this says. I've never been to his home. These people lied. Eric hid money from his ex-wife. James Holloway and he decided it was a license to steal because people feel bad for me because my son's in trouble. Look what happened with Kota Youngblood. He's had problems with Eventine.

Yes, I did and I have my son's back unconditionally. I love him, but he made mistakes and he brought the devil to my doorstep. But it was a great story for these people because they handed over their life savings. So when someone runs $8 million through their

account in three years, James Holloway, and pulls every penny out, that's a far cry from me running one-and-a-half million over three years through my account when my wife and I's income supported enough savings to cover that money over a 20-year period and then, sitting there and telling me that I'm the problem and I'm the thief.

Then a hundred-thousand dollars, two, $300,000, the first set of charges.  You supersede the charge with $235,000 on a man that I've never taken a penny from, Mr. Snider.  The only time I ever did business with Mr. Snider -- they have a clock still in their house.  It's a Hermle Celestial that's worth about $14,000 retail that I bought for 4,900 that they have that they never paid me for.  That's the extent of my business with Gary and Dale Snider.  I didn't do a loan with their daughter.  I've never taken a penny from them.

That's superseding charge number one.  Superseding charge number two being Hanfu Lee.  A man that I defeated in federal court twice, accuses me of stealing.  The very same man who baptized me and christened me.  The very same man that put up my bond, waited six years to confront me.  And that's the last part on that and I will get off this and go to the PSI.

THE COURT:  Before you talk about the PSI, there were no objections filed to the PSI.

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

THE DEFENDANT:  I don't know that the process was --

MR. SENTER:  That's correct, Judge.

THE COURT:  There were no objections.  We're not going to go through the PSI.  The time to do that was to file objections if you have a problem with the presentence investigation report.  What we're not going to do is go line-by-line or even paragraph-by-paragraph or page-by-page through the PSR.  That ship has sailed.

I'm happy to hear anything you have to say before I impose your sentence.  We've all been listening for quite a while now to a lot of things.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  That that's not clear to me even what they have to do with, but I'm giving you your time.  But what we're not going to do is go through the presentence investigation report.

THE DEFENDANT:  I guess my question, your Honor, would be with the presentence investigation report, no one challenged, I'm not an attorney so I don't understand the process.

THE COURT:  You can have an attorney.  You've had attorneys --

THE DEFENDANT:  I understand that but I --

THE COURT:  Don't talk when I talk.

THE DEFENDANT:  I apologize, your Honor.

THE COURT:  You've had several attorneys throughout this process and you've always complained. Your attorneys have been competent, diligent, or well-respected by this court and they've done their job for you.  Your job today is not to be a lawyer.  Your job is to say anything you want me to consider before I pronounce your sentence.

Is there anything else you want to say?

THE DEFENDANT:  Your Honor, I never extorted anyone and I'm looking at an enhancement that increases my time for something that I'm not charged with.  I look at a charge that is a hundred thousand, 200,000, 300 -- $400,000 that I go to court for, and suddenly, it's 12 million.  And it goes from a level 18, 19 or 20 to a level 34.

I look at number of victims that there were no victims.  I didn't take anyone's money.  And that's another enhancement that I look at the last thing is another charge from 2011, like I said, that I was exonerated for and expunged, yet it takes me up to a level two instead of a level zero.  All of these things affect me.  That was the point to the entire PSI.

As far as what I wanted to say before sentencing, the only thing I would say is this.  I'm 53 years old in

two weeks.  My health is not the same.  That's obvious. I'm going to have to pay back restitution that most people would be terrified of.  I will work my fingers to the bone to try to make this right and pay back money I don't believe I owe, but I understand I have to.

Fourteen years ago, I didn't get the money back I paid, but I paid every single penny.  I was early to every single court appointment.  I wasn't a flight risk.  Never should have been denied.  You cannot defeat the 800-pound gorilla that is the federal government if you don't make bond.  It was game over when it was denied.

I don't know what else to do except try to get my point through.  I'm sorry for the time that I took up of yours and I'm sorry for the time I took up for this court. I did not commit this crime.  I am never going to say I did this crime.  I am telling this truth and anything I can do to help with the information I've given, I'll provide it.

THE COURT:  Thank you, sir.

THE DEFENDANT:  Appreciate it, your Honor.

THE COURT:  You may be seated.

MR. HARDING:  Government would call Agent Lindsey Wilkinson.

THE COURT:  Come forward, please.  Raise your right hand to be sworn, please.

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

LINDSEY WILKINSON, called by the Government, duly sworn.

<u>DIRECT EXAMINATION</u>

BY MR. HARDING:

Q.   Agent Wilkinson, once you're situated, if you could please state your name and spell your last name for the court reporter.

A.   My name is Lindsey Wilkinson, W-I-L-K-I-N-S-O-N.

Q.   Agent Wilkinson, we've been here for a while so I want to try to keep this as short as possible.  So I'll just start by asking you -- well, you were one of the co-case agents in this case and you investigated Mr. Youngblood now for coming on two years, fair to say?

A.   Yes.

Q.   Have you had a chance to review the sentencing memorandum that was filed by the government in this case?

A.   Yes.

Q.   Without going into specifics, are all the facts contained in there facts that you, Agent Noble, and other investigators discovered during your investigation of Mr.

Youngblood?

A.    Yes.

Q.    And are they accurate based on what you were told?

A.    Yes, they are.

Q.    I want to talk a little bit about the harm that Mr. Youngblood caused by these crimes and I want to kind of break it into past harm, present harm, future harm.  And we'll start with just what's in the presentence report with direct economic harm to victims of this particular scheme that was charged in this indictment.

      Can you estimate for the Court approximately how many victims and households there were related to this scheme alone?

A.    It was approximately 32 victims and 25 households.

Q.    And the presentence report in paragraph 88 has the restitution number, which is to say money owed to these victims as $12,766,384; is that right?

A.    Yes.

Q.    And based on your investigation, is that an accurate estimate?

A.    Yes.

Q.    Throughout your investigation of Mr. Youngblood these last two years, within that time period, did you know Mr. Youngblood to have any legitimate employment?

A.    No, I did not.

Q.    In terms of that estimate of losses and victims, is it fair to say that if you consider sort of the overall impact of Mr. Youngblood's conduct, that is a conservative estimate?

A.    Absolutely.  It would be much higher.

Q.    So going just outside of this particular scheme, let's talk about direct economic harm that Mr. Youngblood has caused in the past that were not directly related to this scheme.

      Can you give the Court an example of that sort of harm that Mr. Youngblood caused that's not captured in that 12 million number?

A.    So it's the scope of the scheme really focused on extortion in an investment conjunction and one example outside of that would be money he solicited for a sister's funeral when, in fact, the sister wasn't deceased at any point and he received money from victims for her funeral. Little outside the scope.

Q.    And this would be in that order of tens of thousands of dollars.

A.    Yes.

Q.    Fair to say that there was also a great deal of noneconomic or indirect economic harm caused by Mr. Youngblood as part of this scheme, as well?

A.    Yes.

Q.    And his overall conduct?

A.    Yes.

Q.    I want to talk about what I'll term sort of downstream losses or opportunity costs that weren't sort of direct harm caused by the scheme but sort of indirect. Can you give the Court some examples of that kind of loss to the victims?

A.    So a number of our victims experienced economic harm by taking out loans, they then had to pay interest on these loans.  Some of our victims had kind of the short sale of assets so sold them at inopportune times.  Several of them sold retirement assets so experienced large tax bills they were still paying off.  One individually, Holloway, since he fled in the middle of the night, he left his HOA fees unpaid, and when he came back, he faced a large HOA back bill as well as expenses they tacked on based on the behavior they saw, as well as a couple other, you know, losses of future opportunities that they could have had with the money.

Q.    And so, you know, we're talking about things like loss of credit score.  That is both a past harm and an ongoing harm?

A.    Yes.  Some of them are still suffering from lower credit scores.

Q.    And of course, none of this factors into that $12.7

*44*

million figure either?

A.   Correct.

Q.   Let's talk about reputational harm and I want to break this down into sort of business and personal.  Let's start with business.  Two that come to mind sort of quickly for me are Eric Perardi and Cedar Park Toyota. Can we just remind the Court -- I know the Court's already heard a fair amount about Mr. Perardi, but can you remind the Court some of the reputational harm that Mr. Perardi suffered as result of Mr. Youngblood's actions?

A.    Mr. Perardi was both attacked personally and his businesses were attacked online.  Specifically, The Crossover where numerous websites and articles related to the business hosting pedophiles and just damaging comments to the business, and it has created personal hardship and professional hardship for Mr. Perardi.

Q.    As you know, and I think as Mr. Perardi both testified and included in his victim impact statements, his business in large part is based on his ability to sell himself and people's trust in him, correct?

A.    Yes.

Q.    And based on what he's told you and what you've heard in this investigation, has that been damaged by Mr. Youngblood?

A.    It has.  And he also relies on being able to take

credit and use credit and that's been significantly damaged.

Q.    Again, this is not factored into the 12.7 million figure?

A.    Correct.

Q.    Let's talk about Toyota Cedar Park.  And just to remind the Court sort of how was Toyota Cedar Park tied into this?

A.    Toyota Cedar Park was brought in and in Mr. Youngblood's words, they were part of the drug cartel money-laundering ring connected in a way with Mr. Perardi's family.  They were damaged in the fact that they had a higher security team both for the physical presence of their stores, but also, they hired investigators to try and see who were posting online attacks on them.  They were looking into the employee who was slandered in these posts.  They spent a lot of time, effort and resources into the reputational damage caused to them.

Q.    And a lot of the posts were, you know, sort of commercially -- you know, commercial rating sites like Yelp and they said very negative things about safety and other things about the business, correct?

A.    Yes.

Q.    How about another victim that Mr. Youngblood kind of had both personal and professional economic -- or, excuse

me, reputational harm to?

A.   Yes.   There was one member of the Holloway family who wasn't as mentioned, but he received many e-mails to his office.   He was -- actually had an administrative inquiry at work accusing him of kind of sexual looking at child pornography and other accusations, which his work took very seriously.   But his spouse also received direct text messages, lewd text messages insinuating that he was cheating on her, and that was all derived as part of the scheme to put pressure on the Holloway family.

Q.   That was both -- I guess that's sort of business and personal.

A.   Yes, it was.

Q.   Let's turn then to sort of purely personal reputational harm and let's start again with the obvious example, the Sniders and the Holloways, and those flyers, derogatory posts about them.   Can you -- again, the Court's already heard this but summarize very briefly some of that harm?

A.   Yes.   There was thousands of flyers thrown throughout their neighborhoods accusing them of being bad, disingenuous people, just ugly verbiage and named them specifically and many of their friends.

Q.   When we talk about reputational harm, in particular, personal reputational harm, we've heard today from Mr.

Youngblood about the negative things he has to say about his wife. One thing he said here today, just a few minutes ago, was that Gloria's medical license was taken away because she prescribed drugs to people, I think the implication is, illegally. Is that fair to say?

A.    Yes.

Q.    Did you hear from other victims Mr. Youngblood had said that in the past to them, as well?

A.    Yes.

Q.    Can you tell the Court, summarize for the Court some of the other negative things that Mr. Youngblood has told victims about his wife?

A.    He told other victims that she was addicted to drugs, that she couldn't be trusted with money, and that was the crux of a lot of times, why the victim would have to hold money or hold a supposedly valuable object because he couldn't keep it around his wife who wasn't trustworthy with money.

Q.    Mr. Youngblood also mentioned a fire at a home -- a Crestview home. The first of the two fires he mentioned.

A.    Yes.

Q.    Did Mr. Youngblood or did victims tell you that Mr. Youngblood implied, or suggested, or outright stated that Gloria had something to do with that fire?

A.    Yes.

Q.   That was a fire where somebody died?

A.   Yes.

Q.   Let's talk about physical harm and let's talk, in particular, about Lane Holloway.  Can you remind the Court some of the physical harm that Lane Holloway suffered as a result of this case?

A.   So Lane Holloway at one point took his family, fled in the middle of the night, went to a series of extended-stay hotels until he settled in Florida at an extended-stay hotel where his entire family stayed in the small hotel room and they did not go to school.  He was not able to get medical treatment.  He was a diabetic and he needed insulin, which he did.  We had evidence that he made clear to Mr. Youngblood and he did not have access to that insulin for that entire about 10-month period.  And when he was discovered, he looked in bad health in my opinion.

Q.   Mr. Youngblood, a few moments ago, made a big deal out of the fact that he's lost a lot of weight.  Could you describe for the Court some of the weight that Mr. Lane Holloway lost as a result of not having access to his insulin?

A.   He lost a significant amount of weight.

Q.   Mr. Youngblood also made a big deal out of the marks on his hands that he suffered from fights in jail.  Did

Mr. Lane Holloway have marks on his hands as a result of Mr. Youngblood?

A.   He did.  He was told by Mr. Youngblood and he was convinced to tattoo a fake name that he changed his name to Elessedil on his hand, and he is working to get that removed through numerous tattoo removal sessions.

Q.   Just as a comparison between Mr. Youngblood and Mr. Lane Holloway, you had a chance to review -- well, can you describe very briefly the circumstances of how Lane Holloway was found in Florida?

A.   He was found by one of our federal agents out of our Jacksonville field office came upon him outside of his hotel room.

Q.   That's the hotel room he'd been staying with his family for an extended period of time?

A.   Yes.

Q.   Lost a lot of weight, in ill health, couldn't work, couldn't get medical care?

A.   Yes.

Q.   Did you have a chance to review what Mr. Youngblood was doing on that day?

A.   Yes.  I reviewed his financials for that day and expenses showed almost a thousand dollars of expenses, about 250 of which were from restaurants like Chic-fil-A, about -- excuse me, 250 were at the Shadow Glen Golf

Course, some amount, about 300, was from the Chic-fil-A and other restaurants, and about $600 to some kind of gaming chair website.  So about a thousand dollars in expenses that day.

Q.    So based on your analysis while Mr. Lane Holloway is hiding in Florida thinking he is about to be murdered by the cartel and is relying solely on this man to keep him safe, Mr. Youngblood is playing golf and eating at restaurants and buying gaming chairs.

A.    Yes.

Q.    Let's talk about the emotional harm that Mr. Youngblood has caused in this case and let's start with the easy example of the Holloways, the whole Holloway family.  Can you describe, just in summary, some of the emotional harm that was caused by Mr. Youngblood with respect to the Holloways?

A.    The Holloway family, specifically, was isolated from one another and Mr. Youngblood had made each member feel like either a father, or grandfather figure, or brother figure.  He often ingratiated himself in this family, specifically, they became so isolated.  Even though the father and son were neighbors, they didn't speak.  The father missed the birth of his grandchild.  Several of the victims reported that they didn't get to go to the funeral of their -- of family members because a lot of

estrangement and harm.

Q.    Let's turn back to Gloria and their children and the emotional harm, some of the emotional harm that Mr. Youngblood has caused them.  First of all, many of the lies that we heard him tell people about his parents being murdered, his military service, those are lies he also told Gloria and the kids, correct?

A.    Yes.

Q.    Going back to that fire, that Crestview fire that Mr. Youngblood apparently believed that Gloria was somehow responsible for, did you also learn that Mr. Youngblood blamed Eventine?

A.    Eventine told me that he had grown up his entire life hearing that he was responsible in part for that fire.

        THE DEFENDANT:  He's eight years old for Christ sake.  He's eight years old.

        THE COURT:  Mr. Youngblood.

        THE DEFENDANT:  This is disgusting.  I apologize. My son was eight.

        THE COURT:  Mr. Youngblood, we can do this with or without you.

        THE DEFENDANT:  I apologize, your Honor.

Q.    (BY MR. HARDING) Why don't we go into a little bit more detail.  What exactly did Mr. Youngblood tell Eventine that made Eventine feel like he was responsible?

A.   Eventine was younger and his parents were in separated status.  So what Eventine reported to me was that Eventine was given the choice of which parent he'd like to live with and that he chose to live with his mother and that his father then held that over his head and said, because you made that choice, something to the effect no one was in the house that day and, you know, someone died in the house.  So this is something that has plagued Eventine for years as he reports that, you know, he always felt responsible because he was told by his father he made the choice to live with his mother and caused the fire.

Q.   During Mr. Youngblood's allocution, he said quite a few things, sort of reoccurring phrases that I want to just go over with you:  I'm not making this up.  I'm not making that up.  It's easy to verify this.  It's easy to verify that.  I've done many things I'm not proud of but I didn't do this.

During the course of your investigation, did you learn that Mr. Youngblood used phrases like that to foster trust amongst the victims?

A.   Yes.  And I've listened to a lot of hours of recordings of Mr. Youngblood's conversations with victims and that is frequent and present.

Q.   Was that essentially one of the techniques he used to

make them believe him when he might otherwise be saying something hard to believe?

A.   Yes.

Q.   So that's past harm.  Let's talk about the present or closer to present, anyway, after the trial or more contemporaneous.  You've had an opportunity since Mr. Youngblood's been in custody to listen to some of his jail calls; is that correct?

A.   Yes.

Q.   And in particular, jail calls on April 2nd of 2024, May 24th of 2024 and July 19th of 2024?

A.   Yes.

Q.   Your Honor, government will offer Government's Exhibits 1, 2 and 3, which are those jail calls -- snippets of those jail calls.

          THE COURT:  Mr. Senter.

          MR. SENTER:  Judge, no objection.

          THE COURT:  No objection, so admitted.

Q.   (BY MR. HARDING) We've heard it here today for quite a while.  Is it fair to say in those jail calls, Mr. Youngblood still portrays himself as the victim of this crime?

A.   Yes.

Q.   And is it fair to say that as he did here today, he accuses others of criminal activity against him?

A.    Yes.

Q.    Since Mr. Youngblood's already mentioned this, can you summarize the conspiracy that he believes exists between Judge Lane, Steve Toland, Justin Noble, and various others?

A.    Yes.  It stems from Mr. Youngblood's words from federal agent -- or federal FBI Special Agent Kevin Armstrong knowing Justin -- Special Agent Noble, my partner, many years ago, them cohorting together with Judge Lane as well as the defense counsel was brought in and Steve Toland, the defense attorney in the area, all culminating in conspiring to have him murdered.

Q.    If we could play Exhibit 1, please.

        (Audio file played.)

Q.    Mr. Youngblood is claiming that Steve Toland is trying to have him murdered?

A.    Yes.

Q.    On that jail call.  Okay.  Based on your review of any of these jail calls, have you determined or detected any indication that Mr. Youngblood has any remorse at all for his crimes?

A.    No.

Q.    Let's talk about his future.  Based on your review of Mr. Youngblood's jail calls, did you believe that after he's released from incarceration, he has any intention of

changing his ways?

A.   No.   Based on my investigation, it seems that every person he's ever met, he has either victimized, tried to victimize, or groomed to be a victim in the future, and that he has no reason to stop doing it if he was released.

Q.   Or any intention of reintegrating in society.

A.   None.

Q.   Could we please play clip two or Exhibit 2?

        (Audio file played.)

Q.   When Mr. Youngblood said he's asking for some -- to find someone to stake him, what do you understand that to mean?

A.   That he's going to take someone's money so that he can go gamble it in Vegas.

Q.   And if we could play Exhibit 3, please.

        (Audio file played.)

Q.   I just want to ask you one last question, Agent Wilkinson.   Do you believe there is any way to protect the public from future crimes of Mr. Youngblood other than by keeping him in prison?

A.   I do not.

Q.   I'll pass the witness, Judge.

                    CROSS-EXAMINATION

BY MR. SENTER:

Q.   Ms. Wilkinson, good to see you.

A.   Good morning, sir.

Q.   I'm Jeff Senter.  We've met before.

A.   Yes, sir.

Q.   I'm here on behalf of Mr. Youngblood.  My thought is I'd like to approach this from the end to the beginning.  Mr. Harding asked you if, in your opinion, Mr. Youngblood, -- I believe the words are, can be fair and honest in the future.  Is that a good way to say it?

A.   Yes, sir.

Q.   And now, we weren't parties to the phone call, but you agree with me based on your experience, profound and protracted discouragement and disappointment can lead one into a compromised state of mind.  You'd agree with that?

A.   I'm not sure I have the experience personally but...

Q.   Nor have I, but we're old enough and experienced enough to know that if you -- protracted discouragement or disappointment, or fear, or anxiety for a protracted period of time, it can result in.

A.   Yes.

Q.   Difficult behavior.  Now, as to whether he's capable of improving or reversing field becomes a matter of reversing the attitude because the attitude influences behavior, right?  The thinking and the attitude influences the behavior; isn't that right?

A.   It can, yes.

Q.   So when we say that we think there's not a good opportunity to recover or to grow, that presupposes there won't be any thought or attitude change, right?

A.   Yes.

Q.   And if there are changes in thinking and are changes in attitude, then it's probable the behavior will change, as well.

A.   If you accept responsibility and willingness to change.

Q.   Yes.  Exactly.  Exactly my point.

     Now, as to noneconomic damages, the essence is placing a value on what a noneconomic damage is, how disconcerting or how difficult a party may be placed in. So the fact is we can't really put a number on it.

A.   It is hard to put a number on someone being forced out of retirement and going back to work.

Q.   Yeah, yeah.  I mean, I understand that completely.

A.   Yes, sir.

Q.   We can make an observation about it.

A.   Yes.

Q.   But we may not be able to put a value on it.

A.   Yes.

Q.   Okay.  Now, in terms of the economic damages, those are hard and they're articulable and they're computable. There may be differences in the assessment, but that is

all behind us now and that's unlikely to be recreated, as well.

A.    Yes, sir.

Q.    Based on his current state of -- okay.  So that's economic damages.  Noneconomic damages.  Now, we'll call mental health damages, okay?  I don't have any more questions.  Thank you.

        MR. HARDING:  Your Honor, we have no further questions for Agent Wilkinson.

        THE COURT:  Thank you.  You may step down.  Do you have any other witnesses?

        MR. HARDING:  Mr. Guess would like to call a couple of victims.

        THE COURT:  Okay.

        MR. GUESS:  I call Glen Morehead, your Honor.

        THE COURT:  Mr. Morehead, if you'll come forward, please.  Good morning, sir.  If you'd raise your right hand.

        THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

        THE WITNESS:  Yes, I do.  Thank you.

        THE COURT:  You may be seated.

    GLEN MOREHEAD, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. GUESS:

Q.   Thank you, your Honor.

Mr. Morehead, would you state your name for the record and spell your last name for the court reporter?

A.   Yes.  My name is Glen Morehead, M-O-R-E-H-E-A-D.

Q.   And you're one of the victims of the scheme perpetrated by Mr. Youngblood; is that right?

A.   I am.  Yes, sir.

Q.   Tell me a little bit about your background, Mr. Morehead.

A.   Well, I spent 40 years as a telecommunications engineer and as part of what I chose to do in my spare time, I was reserve sheriff's deputy in Harris County for several years.  And I was also a firefighter and emergency medical first responder in Harris County for about eight-and-a-half years in northwest Harris County.

Q.   Do you consider yourself a person who's easily duped?

A.   I didn't.  I've always considered myself to have a fairly heavy sense of skepticism and not usually easily duped.  No, sir.

Q.   You said you had some experience working as a reserve sheriff with the Harris County Sheriff's Office.  Did you have an opportunity during that time to visit with lots of law enforcement officers and, again, get yourself familiar

a little bit with the criminal world?

A.   Yes, sir.  As part of the sheriff's academy, we had to go through the Texas Code of Criminal Procedures and had to handwrite most of it as part of kind of drilling it into our heads and spent quite a bit of time working in the jail, a little bit of time on patrol.  Spent on awful lot of time speaking to peace officers and found the whole environment stimulating and quite interesting.

Q.   You said that you worked 40 years in the telecommunication world.  When did you retire from that position?

A.   June 7th of 2022.

Q.   And at that point, had you and your wife saved up a little bit of money so you could have a comfortable retirement?

A.   We had finally hit the point that I wanted to hit, yes, and we had saved up a very, very comfortable nest egg.

Q.   And one of your hobbies involves clocks and watches; is that right?

A.   Yes, sir.  I got into that in 2009, sort of tripped across it at a presentation and got into it as a hobby and discovered that I loved it.  So yes.

Q.   Did you become friends with some people in what we call the clock guild?

A.   Yes.

Q.   Who are some of those people?

A.   Jay Holloway was one of my earlier friends.  I considered him to be one of my mentors in the clock-making world.  Gentleman named Dennis Warner is one of my mentors on the watch-making side.  I've known Gary Snider for many years and 20 or 30 others that are quite regular members in the guild.

Q.   These are people that you came to know as friends, people that you would trust, mentors as you've just described?

A.   That's correct.

Q.   At some point, did you meet the defendant in this case, Kota Youngblood?

A.   Yes, I did.

Q.   And do you see him in the courtroom with us today?

A.   Yes, I do.

Q.   Tell the Judge a little bit about when you met Mr. Youngblood and the circumstances behind that meeting.

A.   Jay Holloway came to me on November 6th of '22 asking me for whatever I could spare because he had a friend who needed some help.  And I've always been the kind of person that if someone comes to me and says help, my only response is what can I do.  And at that moment, I had about $6,600 cash in my safe and when I went and got the

cash and took it and handed it to Jay, no questions asked, no nothing. I just -- he asked me for help, I gave him what I could.

And then, couple of weeks later, he came back with a gentleman who I'd never seen before and brought him into my home and it was the prisoner here and they started into -- I was told that the prisoner's only son had been killed in an accident in Mexico and he needed financial help to get the body out of Mexico. And that was my first meeting with him of I don't know how many, in the teens easily, if not more than that. So that's how it started was when he came into my home and asked me for money.

Q. So Mr. Youngblood's allocution that he'd only met you one time, you don't believe that to be true?

A. I apologize to the Court for my reaction when he said that. I know that it's not appropriate to laugh in court but that's -- that is laughably false.

Q. He'd been to your home.

A. He has been in my home well over 10 times, yes, and he's been in -- I don't know that he's been in my vehicle. I have been in his vehicle and in Mr. Holloway's vehicle with him. I have spoken face-to-face with him many times.

Q. One of the things that Mr. Youngblood when you met him discussed with you was his military background; is that right?

A.    If it wasn't the very first meeting, he mentioned very early on that he said that he had been a member of Delta and that he still had lots of contacts within the military and governmental security that permitted him to get information that wouldn't otherwise be available and gave him pathways to help with various things that where he could help people that needed help.

Q.    Did that have an impact on you, Mr. Morehead?

A.    I beg your pardon?

Q.    Did that have an impact on you?

A.    Yes, it did.

Q.    Military background and so forth?

A.    Yeah.  I've always prided myself on having a very deep sense of honor.  My mother gives me grief about it all the time.  But I made it clear right from the beginning that I was doing this out of my sense of honor, helping a friend because that's what I do.  And because of his presentation of himself as having been in one of the elite organizations and trying to help other people, that played heavily into my sense of honor, yes.

Q.    Eventually, you started giving out more money.  The $6,600 was just the first of many contributions to Jay Holloway that eventually went to Kota Youngblood; is that right?

A.    Yes, sir.

Q.   Eventually, how much money did you lose to the scam?

A.   All told, right around $1.3 million.

Q.   And what period of time was this -- beginning in November '22 through when did you last, if you can recall.

A.   We ran clear -- well, we took out the last loan we took out in April 2023.  That was when we ran clear out of the ability to get anymore.

Q.   So you were actually taking out personal loans to provide money to Mr. Youngblood?

A.   Approximately $300,000 worth, yes, sir.

Q.   At a certain point, Mr. Morehead, did you not ask yourself, why am I giving this guy money?  Why am I continuing to do this?

A.   Yes.  We started asking ourselves that after the prisoner and Jay would leave our home or come home from having a rendezvous with him, or whatever, my wife and I would have discussions about okay, what the heck are we doing?  The only thing that kept us in it was Jay Holloway's absolute conviction that everything we were being told was true.

Q.   And these involved cartel threats to Mr. Holloway, his family, other types of danger; is that right?

A.   That was one of the very early presentations, yes.

Q.   And again, was your understanding that Mr. Youngblood was the one who's protecting the Holloway family?

A.   He told us so in so many words, yes, sir, repeatedly.

Q.   At a certain point, were you just trying to get back to even on this whole deal?

A.   I told him right from the get-go that we started hearing that there was going to be additional moneys that was going to be available for when we started getting paid back.  And if I didn't say it every time, I said it nearly every time, I don't care about anything extra.  I just want to get my money back.  If we get anything extra, it's going to go to helping people.

Q.   Did Mr. Youngblood talk about some gold that he had in a vault on the Tortola Islands?

A.   Yes.

Q.   What did he tell you about that?

A.   He told us it was in a vault, told us that there were -- I'll call them machinations, for lack of a better term, to get the gold out of the vaults, get it to some place where it could be shipped off the island and brought into the U.S., different schemes to get it converted from one form to another to be brought into the U.S., made into pinball machine parts to be shipped into a pinball manufacturing, repair, refurbishing facility that he said he had bought in Las Vegas.

Q.   During the course when you're being defrauded out of this money, did your life change a little bit in the sense

of your -- your sense of security and your home?  What changed as far as that goes for you personally?

A.   We were told repeatedly that Jay's phone was being tracked by his sons, one or both of his sons and their compatriots, and because of the number of times Jay came to our home, that meant that our home and what we had was also in peril and it was to the point that I slept with my handgun on my bedside table for about four-and-a-half months.

Q.   You were terrified?

A.   Pretty close to it.  I was very, very concerned, yes. I wouldn't have slept with a gun next to me if I hadn't been really concerned.  Yes, sir.

Q.   Had you ever had that experience before where you're sleeping with a pistol next to your bedside table?

A.   When I was having nightmares after watching the movie Halloween and the only way to get rid of the nightmares was to have my service revolver next to my bed for a couple of nights, but that was in the 1980s.  And since then, no, sir, I've never had that experience.

Q.   Anything else you'd like to tell the Judge about your experience with Mr. Youngblood?

A.   Well, one of the things that I told myself, I wasn't going to cry about this.  I have never hated anyone in my entire life.  I told myself until I was in my 60s that I

was incapable of hate and to find that that's not the case is -- it's one of the most damnable experiences I've ever run into.  And a number of times when he was in our home, he would say hand to heart, or he would say on my dead son's soul or on my living son's life, I am telling the truth, or God strike me dead if I'm lying.  The last thing I'd like to say is, God, you're up.  Or get on.  Make it hurt and make it linger.

Q.   Are you working again, Mr. Morehead?  Are you back to work?  Are you working?

A.   I am working, yes, sir.

Q.   All right.  Is that part of your plan?

A.   I was planning to fix clocks and watches for friends and customers.  I loved being able to fix a timepiece for somebody who couldn't afford to have their timepiece fixed so that I could give it to them and watch them smile.  I have stuff that's been in my home since August of last year that I don't have time to get to because I'm working and I'm taking care of my elderly mother up north in Fort Worth.

Q.   Thank you.  No further questions of Mr. Morehead.

          THE COURT:  Mr. Senter, any questions?

                   CROSS-EXAMINATION

BY MR. SENTER:

Q.   Good morning, Mr. Morehead.

A.   Morning.

Q.   I'm Jeff Senter.  I'm here to represent Mr. Youngblood.  I have a few questions for you.

I understand you feel aggrieved and I'm sorry for it.  I'm curious if you can envision separating being aggrieved and being merciful and graceful.

A.   I can separate it, yes, sir.  Absolutely.

Q.   Okay.  Because I know that's not simple or everybody could do it.  But based on where we are now and what now Mr. Youngblood is enduring as a consequence of where we are now and based on your will and determination to help people, I think that's the words you used, can you envision a situation where you can extend grace and mercy to Mr. Youngblood?

A.   No.

Q.   Well, do you think that's something that will materialize over time?

A.   No.

Q.   So you think your view is fixed?

A.   Yes.

Q.   And is that consistent with being -- wanting to help people?

A.   Yes, and the reason for that is I can't help the people I want to help anymore except for a very, very limited basis.  That has been stripped from me.

Q.   And I understand that.  Nobody disputes that.  But we have one person here we can help.

A.    Nope.

Q.   Okay.  Judge, I pass the witness.

THE COURT:  Yes.  Thank you.

MR. GUESS:  No further questions.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thank you very much for the opportunity, your Honor.

MR. GUESS:  Just one more short witness, your Honor.  That's Dale Snider.

THE COURT:  Ms. Snider, if you'd come forward, please.  Good morning.  Before you take a seat, could you please raise your right hand to be sworn?

THE CLERK:  You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Please be seated.

DALE SNIDER, called by the Government, duly sworn.

DIRECT EXAMINATION

BY MR. GUESS:

Q.   Good morning, Ms. Snider.  Would you please state your name for the record and spell your last name for the

court reporter?

A.   Dale Snider, S-N-I-D-E-R.

Q.   Tell me a little bit about your background, Mrs. Snider.

A.   I'm old.  I don't know.

Q.   Are you married?

A.   Yes, 48 years.

Q.   And who's your husband?

A.   Gary Snider.

Q.   And he testified during the guilt-innocence phase of this trial; is that right?

A.   Yes.

Q.   Do you have children?

A.   Yes.  One daughter and a new dog.

Q.   How long have you lived here in the local area?

A.   Twenty-four years.

Q.   And when did you and your husband meet?

A.   We met in the service in the Air Force in Abilene, Texas.  He was on his last two years and I was just starting.  We were both crew chiefs on C-130s.

Q.   How long did you serve in the Air Force?

A.   Four years.

Q.   How about Gary?

A.   Four years.

Q.   Having served, did you have a respect and certainly a

deep appreciation for those who also served?

A.   My grandfather served.  My father served 20 years in the Navy.  My brother has served in the Army Reserves for the state of Florida.  I would say we have a high respect for service.

Q.   Is it something you would ever tell a lie about?

A.   No.

Q.   Tell me about your physical health.  How are you doing these days?

A.   I've had two knee replacements, one of them's over 15 years old.  I am diabetic but on insulin.  I have high blood pressure, cholesterol normal, but everything seems to be managed.

Q.   And your husband, how's his health?

A.   He has high blood pressure probably from being married to me, but it's another story.

Q.   Before meeting Kota Youngblood, what was your life like?

A.   We had had a very comfortable life.  Gary has worked in technology.  Both of us went on the GI bill and we got Bachelor's Degrees in Business Administration.  I worked intermittently part because my mother was ill and when my father died early, we lived with her for a while.  Then we had a child and Gary felt like he wanted me to stay home.  So we kept saving.  Everything we paid for in our houses,

we put forward in the next house.  So we live in a very nice house.

His jobs have gone up and we live comfortably. We looked forward to the time he was retired and we could travel.

Q.   And Gary had a hobby involving the clock guild; is that right?

A.   Correct.

Q.   In fact, you were neighbors with Jay and Pat Holloway; is that right?

A.   Yes.  He lived just around the corner from us and they were both on the HOA for our neighborhood so that's how we got to meet them first.  And then, we started going antiquing with them.  We took a few trips up to the Dallas area to see a show in an arboretum, overnight trips, stayed at hotels.  So we had a very, very comfortable -- sometimes it was twice a week, we would eat at their house, they would eat at our house, attend a lot of functions together.

Q.   And Gary worked on clocks with Jay at Jay's home; is that right?

A.   Correct.  Two days a week.

Q.   You also became familiar with Mr. Holloway's children, Lane and Seth and their daughter?

A.   Yes.  Yes.

Q.   In fact, Lane lived pretty close to you guys, as well, in the same neighborhood; is that right?

A.   Yeah.

Q.   Familiar that he had children and kind of person he was?

A.   We gave gifts to all of their grandchildren, gift cards from Pottery Barn For Kids and usually a book or something like this.  We tried to arrange -- Gary played Santa clause at Christmastime and we were arranging for Lane's children and some that they had over from Patricia's sister had her grandchild over and Gary was going to go down and, you know, just walk around the neighborhood to play Santa.  So, you know, we felt that close to these people.

        We had gone to holiday dinners either at our house or their house if it was -- they had their family, they usually invited us.

Q.   At a certain point, Mr. Youngblood enters into the picture; is that right?

A.   Correct.

Q.   What's your initial recollection of your meeting Mr. Youngblood and what you thought of him?

A.   Gary would come home with stories and Jay, of course, would talk about him and stuff like this.  Just his stories on his military background, a lot about his dog.

He had one dog Kingsley and he would tell us stories about that that would just, you know -- and he is a good storyteller. I will give him that. But he endears you in that way and I thought he was a proud man. He said he didn't ever want a man to pay for his dinner so he was always the first one to pick up the tabs for everybody's even though we kept saying no.

Q. We've already gone over the guilt-innocence phase some of the situations that arose between Mr. Youngblood, your husband and yourself. First, what I want to kind of talk to you about was this coin that he had that he impressed you and your husband with; is that right?

A. Yeah. Gary had gone over to Pat and Jay's house and was sitting in their breakfast area and so, he had done -- you know, he had gone over there because I just didn't care to go over. Then he came back home and he says, you gotta come over, you've gotta see this. Because Gary wouldn't do anything without me involved with it, especially when it's $190,000.

At the time, we could afford to lose it if it didn't pan out, but they were sure. I looked at Patricia Holloway and said, is this for real? And at this time, we trusted these people with our lives and I think it was reciprocated back to us. We had known he had done other deals with other people. We were never brought into it.

This was our first initial bringing into and it was supposed to be a deal that was going to be ended by the end of the year.  It was going to go on an auction sale.

Q.   So you were lured into this investment with the idea that it was going to return a significant amount of money to you and the other investors in a fairly short period of time?

A.   Correct.  It was supposed to be divided between the three groups, Kota, the Holloways and us, and it should have brought in maybe $11 million.

Q.   Did you do any research into seeing whether or not it's a legitimate coin or whether it appeared to be a good investment?

A.   I touched it.  That's all.  I mean, again, we trusted him because he said he dealt in metals, precious metals, and relied on him.  We relied on the Holloways and the faith.  They had been doing things with him that, you know, we didn't know the full extent of it so we kind of went on trust of the people we really did trust and the new person that that was his expertise, which I had said subsequently on the deals, this is your expertise that we're relying on.

Q.   Before the return on this money is due, an incident happened in October of that year and I'm going to ask you to describe what happened when Jay came to your house that

evening.

A.    Jay came.  It was dark.  We have a screen enclosure on our back of our house and we usually conducted a lot of things back there, you know, dinners out and stuff like this.  So when they came in the house, they really didn't like to talk about things in the house, so we would go to the back of the porch and mainly because our daughter was living -- is living with us and she had an upstairs bedroom.

Jay came in and you could see he was upset but we didn't know what was going on.  Shortly after, he started -- there's a problem with Lane and it wasn't a few minutes later that Kota came in.  You know, he's at the front door.  We're all just standing in the foyer.  And so, we migrated to the back and Jay started when he sat down at the table and he said XXXXXX, Lane's middle child, was going to be kidnapped by the cartel from the school and Jay started tearing up.  And when you see somebody that you love and that is a rock start breaking down and I looked at him and then, I looked at Kota and, Kota, you finished what went on and you told us about the cartel that I don't know anything about the cartel.  I've never taken drugs other than what's prescribed me.  And again, we relied on his expertise and he told us that this child, they would take the middle child because the older child

would have a memory.  And a baby, they didn't know what to do with.  So they went with the middle child.

And I had met XXXXXX and I met XXXXX and I couldn't believe what he said that they were going to go and do sex trade.  I know what that means and Jay just --he was just quivering.  So I believe it.  Anybody would believe it when you trust somebody else and they needed 235 million -- or 235,000.  We said -- I told him, I said you know, we're going to get it for you.  It's just going to take time.  And Gary went into our office, started going on the computer and started going through our accounts at Fidelity.

Jay didn't say much after that.  Everything that was said was from you, Kota Youngblood.  Don't shake your head.  I can't believe how you can torture people like that and sit there and claim you're innocent because you said that.  You stood and you told us and you watched Jay cry.  I couldn't believe it.  We got the money in a few days and we gave the money -- everything was always done through Jay.  You give it to him, but Kota was there most of the time to ask us for that money.

Q.   That wasn't the last time that you and Gary ended up giving money to Kota Youngblood, is it?

A.   No.  But he asked us repeatedly to save Pat and Jay because they had contracts out on them.  He kind of -- we

never had contracts, but he said people were watching our house and we always had to do something. You know, you need to protect yourself. You need to do this. But the money was always to, well, Jay has this problem. They're going to come after. If they don't get Jay, they're going to get Pat. It was always one of them. He knew that that was our Achilles heel that we would give so we drained.

Q. Everything; is that right?

A. Everything on the promise that it would be back next week. It would -- you would get it next week. You would get it by the end of the month and the end of the month and next week never came. But you're so far involved with it that you have to. And like Glen, we said just get us back whole. Just get us our money whole and it never came.

Q. Eventually, you end up selling the house that you had paid off.

A. It was one of those reverse mortgages and Jay came into our house in the foyer and he said, I thought about it last night and you can do the same thing that I did, only you're not going to sell your house, you're going to get your money back and we'll just do it. So we went through the same process and sold a house for little amount of money. It was paid for and, you know, $300,000 we got and they didn't take it all at once. It was done

in increments. So it took them a few months to get to that 300,000 but that's where we kept -- once we went through the loans, getting loans from various banks, taking a loan out on our paid-off vehicles, stuff like that. This is the last thing was our house and we eventually lost our house.

Q. Besides the money, there was also activity going on in the neighborhood regarding flyers. You recall some of those flyers; is that right?

A. Yeah. They started -- it started at Jay and Pat's house first and, I guess, at Seth's house. That's when we first heard about it and then, one night, it started at our house and it was only a short period of time, but it was five flyers and it started like the end of February and ended, I think, maybe about two weeks later in March. But Jay and Gary, the third night, they -- fourth night, they tried to stay in my daughter's car. She backed her car in so that they could look out the front and the two of them stayed until probably about 10:30 at night because it was dark. It was, you know, February and they didn't have any success.

As soon as Jay finally went home, the flyers came out and we were out there trying to pick them up because our reputation was solid in the neighborhood. It probably still is because nobody knows anything about this. But it

was the next night, we were determined to watch again and I was -- Gary had come in. He was sitting in the car and then, I was going to sit with him so he came in to tell Lindsey, our daughter, goodnight. And I went out in the car and I was watching our neighbors go by with their dogs and then, all of a sudden, somebody came by, came up our house -- we have a long driveway because we have a garage and then, the back -- the house. And this person came up and I couldn't believe it but I didn't think much about it. They turned into our driveway and then, I saw the motion of this (indicating) and saw the papers going.

Well, I got mad. You saw I had difficulty walking here. I'm trying to get out of a Mazda3 falling out. You know, it's a controlled fall and I got up. I was so mad and I'm yelling, hey, stop, stop. Then when I saw the person running, I realized I knew that person and I called him by name and I could not get up to him fast enough, but he had parked further down. He got in his car. I recognized his car.

Then we called Jay and Kota. Jay came over, picked up the flyers that we had picked up. And we saw Kota the next day. And, I mean, repeatedly on these things when we saw Kota, we said, you've gotta make this stop. If the house is being watched by somebody to protect us, they're not seeing anything. So we discovered

it was Lane Holloway that threw the last one and that's the only one that we saw.

Q.    Kota would come to your house very frequently during the course of this time to talk to you about different things; is that right?

A.    Oh, yeah.  You know, I mean, it was sometimes, you know, if you had a problem, Jay's gotta squeeze some -- you know, shake the trees is one of his phrases.  But we -- Kota came by our house.  You know, he rented a movie theater during the COVID and so that we all went to the movies.  Jay Holloway, Kota, Gary and I went to the movies and we were the only people in the theater.  I made him dinner, a lasagna dinner.  We talked about different things we were going to do once the money came in.

Q.    At different times, you'd be out on your back porch and once the FBI came to your home, did they ask you to leave your security cameras on in that porch area?

A.    Yes.

Q.    I'm going to ask that we play Government's Exhibit 193 from the trial, your Honor, just as a reminder of what Mr. Youngblood was like.

        Mrs. Snider, this is taken from your back porch.  Is this typical of the type of interaction you would have with Kota Youngblood?

        (Audio and video file played.)

Q.   That's just one of the clips that was played during the trial.  Is this pretty typical of how he was with you?

A.   They would come in.  As you can see, I was in my bathrobe.  I was reading and having my first cup of coffee.  Gary's still in his pajamas and so, they would come over unannounced and then, he would go into these somewhat tirades that, you know, his harm that was done to him.  And yes, this is typical.

And Jay is getting ready to leave because we keep telling him we don't have any more money.  The clock that he mentioned, I said take it back.  That was a Christmas gift from them.  He dropped it off in front of our house and then, they made the call and said there's a package out there and the box is huge.  It's a beautiful clock, but it's not one that we would have bought.  And this is what he would do is surprise, you know, it was always a grandiose thing.

And so, this is one of his that, you know, I gotta stand up, I gotta tell you how bad life is for me so that you feel sorry.  I mean, we already felt sorry for him and we felt sorry for us because we'd given him all our money.  By this time, we knew from the FBI, it's never a good thing when the FBI comes to your front door and says, you know, you've been scammed.  It's just devastating, and we put our trust in those two men and we

went down.

Q.   Is your life today different than you would have anticipated before this event took place?

A.   We're not going on a Viking Cruise on our 50th wedding anniversary overseas.  We're pretty much in lockdown because my husband's embarrassed by what went on so we can't talk to the family, we can't talk out.  We don't have money.  We have debts.  We owe money to the IRS.  We're still paying on a loan on one of the cars.  We don't have a home.  We are paying rent to live in our home.  And every day, we get to look at this beautiful home and we look at a clock that we don't want but we can't get rid of.

This is excruciating.  He complains about what he did.  This is what you did to us and it's all on mind games because that man still has control out of every one of these victims because every one of us is going through this because of your lies.  You are a liar and all I want from you is a long term so that he can't do this to somebody else.  And if you could possibly get L-I-A-R tattooed across his lips so that the next person that talks to him knows if his lips are moving, he's lying.

Q.   No further question, your Honor.

THE COURT:  Mr. Senter.

CROSS-EXAMINATION

BY MR. SENTER:

Q.   Ms. Snider, my name is Jeff Senter.

A.   Hello.

Q.   We've never met before.

A.   No.

Q.   But I'm pleased to see you here today and hear you. You know, I understand you're aggrieved and I understand your consternation. I understand, I sense it. It's understandable and legitimate so I'm with you.

Do you think you can find it within your soul to be merciful and forgiving?

A.   Not to him.

Q.   So when you search your soul, you don't think you can reach that state?

A.   No, sir, but it's not for me to judge his --

Q.   Right.

A.   What he gets.

Q.   Okay. Well, I had to ask you. Thank you, ma'am.

THE COURT:   Anything further?

MR. GUESS:   No, your Honor.

THE COURT:   Thank you. You may step down.

THE WITNESS:   Thank you.

THE COURT:   Do you have any other witnesses or evidence?

MR. HARDING:  No, your Honor.

THE COURT:  Is there anyone else who would like to speak today?  All right.  Mr. Harding.

MR. HARDING:  Your Honor, I don't believe -- I've spoken to Mr. Guess and neither of us can remember a time we have ever asked for an upward variance in any case before this court.  And I don't believe I've asked for an upward variance potentially in any court.  In this case, however, we are asking for a substantial upward variance. As you know from our sentencing memorandum, we're asking for 40 years, 480 months.  We believe that is appropriate under the circumstances, particularly under the 3553(a) factors.

The harm that Mr. Youngblood caused was enormous and it was harm that goes far beyond simple economic harm. The harm to these victims was economic certainly, both direct economic harm, and as Mrs. Snider just testified, these are debts people are still paying off.  They are still saddled with the economic harm that Mr. Youngblood inflicted upon them.  But beyond that, you've got emotional harm, reputational harm.

These are -- you know, with respect to Lane Holloway and his family, you have about every type of harm you can imagine.  That whole family was torn apart by Mr. Youngblood's lies.  Father wouldn't talk to son.  Brothers

wouldn't talk to each other.  Lane Holloway thought that Jay Holloway, his father, was trying to kill him and vice versa essentially by the end.

And if we could pull up 159.  I agree with Mr. Senter.  Mr. Youngblood is very smart.  He is very well-spoken.  There's no question about that.  Those are -- in most people, that is a benefit.  But in Mr. Youngblood, that is the -- those are his weapons.  Those are the tools he uses to defraud people, to take advantage of them, and to harm them.  And so, although I agree with him, he has all those traits, they are not positive attributes under these circumstances.

What's showing on the screen here, I believe, is really illustrative of the harm and this crime.  On the left, we have Lane Holloway when he first gets back from Florida, he's lost over 60 pounds because he has been told by Mr. Youngblood you can't get medical care, you can't have insulin, you can't get a job.  Lane Holloway almost dies believing that Mr. Youngblood's going to protect him.  Believing that Mr. Youngblood is the only person who can protect him and relying solely on Mr. Youngblood.

And what is Mr. Youngblood doing?  He's taken all this money and he's just putting it into the machine.  All of the harm he's causing, all of the tears you see, all of the sadness, all of the anger.  Can I ask all the victims

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

of Mr. Youngblood to please stand up at this time?  This is a small portion of all of the victims, but he committed all of these crimes and hurt all of those people so he could do this.  Simply to do this for his own self-gratification.

And the worst part of it all is with respect to Mr. -- with Lane Holloway is -- and this is true for many other victims but Lane Holloway's the easiest example -- it was not even necessary for him to do this to commit the fraud.  He did not have to tell Lane Holloway to quit his job, change his name, get a tattoo, and stay in Florida in hiding for 18 months without insulin.  That was purely malice and control.  That was the only reason he did this to make himself feel like a big man or to make himself feel like he was better than Lane Holloway.  I don't know, I'm not a psychologist, but it wasn't necessary to commit this fraud.  That's malice.

And we've presented many other instances in the sentencing memorandum of things of -- Mr. Youngblood is a lifelong con artist.  From the time he's a child stealing from his father until today, he is telling lies and he is always the victim.  By my count, based on his allocution, Jason and Roseana York were liars, James Holloway is a liar, Eric Perardi's a liar, Gary Snider's a liar, Hanfu Lee is a liar, Gary Snider stole from him, Steve Toland's

trying to have him murdered. Everyone is at fault and wrong except for this man.

And so, when Mr. Senter stands up here and says let's think about the defendant's future, yes, he does have a future, but that future if he's out of prison is victimizing people. Agent Wilkinson put it very well when she said he has never seen a person he hasn't tried to victimize, is currently victimizing, or is grooming to victimize. That is all he sees. He does not see people. He sees tools that he can use to his own benefit and that is all.

Looking at the 3553(a) factors, Judge, in particular, I think the seriousness of the offense is of paramount importance here. I think you could not think of a more serious offense far beyond your average fraud case for his economic harm, the types of harm that Mr. Youngblood inflicted on so many people is extraordinary and overwhelming.

When you talk about the history and characteristics of the defendant, again, a lifelong con artist who has basically done nothing of positive -- I won't say nothing of positive value. That's probably too strong. But we have a dedicated and a well-documented, decades-long history of fraud and crimes by this man and lies.

And then, the question is how do you protect the public?  The only way -- you know, this is not a crime where you need to be young and physically fit.  The only thing that Mr. Youngblood needs to commit this crime is the ability to talk.  So even if he's 60, 70, 80 years old, there is no reason he can't commit more of these crimes.

And based on what he's said here today and said on his jail calls, there is every reason to believe he will continue to commit these crimes because he thinks he's done nothing wrong.  He thinks these are criminals and he is the poor victim.  And under those circumstances, there is no reason to believe he will change anything about his conduct.  And the day he walks out of prison is the day he's going to start conning people again.

So that just leaves us to the last 3553(a) factor, which is the types of sentences available and I would suggest to the Court although 40 years is a substantial upward variance, it is in the middle of what is available to this court at sentencing.  From probation to 90 years is what is available to this court.  And we're asking for a sentence slightly below halfway of 40 years. We think it's appropriate under the circumstances.  We think it's a just punishment and we think it's -- provides justice for these victims and will protect the public

against future crimes of this defendant.  Thank you.

THE COURT:  Mr. Harding.

Mr. Senter, if you and Mr. Youngblood could approach the podium, please.  Mr. Senter, do you know of any legal reason why I should not impose sentence at this time?

MR. SENTER:  No, sir, I do not.

THE COURT:  Mr. Youngblood, this case has been pending a long time and has quite a history and I've been a witness at each point, including the trial and today's sentencing, and this is an extraordinary case.  I've been doing this a long time both as a lawyer and as a judge and it's extraordinary in many regards.

I guess I'll begin by saying what I'm about to do on the record is explain to you why I'm going to do what I'm going to do, and explain to any future court that will be reviewing this sentence I give you today.  But I don't think I need to explain to anybody else in this room why I'm about to do what I'm going to do because it's -- you said it.  It's time for some common sense.

It falls to me to make some sense out of this and it's hard.  Falls to me to provide some justice.  I can't, don't have the power to make right what you've done and to get back what these people have lost.  All I can do today is give them some sense of justice that there is a

consequence for what somebody like you does.  Your comments during the trial and your comments today have reenforced what everyone has always said about you, and I suppose the biggest question I have, at the end of the day, is whether or not you believe any of what you're saying.

Some people in the past have believed part or all of what you say, but nobody does anymore, and I wonder if you do, is it because there's some personality disorder here?  There's gotta be some explanation for what has happened here.  It is not my domain to judge the character of people.  It is not my domain to diagnose people with personality disorders or psychological trouble.  It's my domain to determine legal culpability and what has become manifestly clear throughout this trial, and especially today, is that whether or not it's the result of the personality disorder, and if it is, it does not absolve you from the moral and legal culpability for your actions.

To the contrary, I think you're fully aware of the consequences and nature of your actions and I hope there is some part of you -- I don't see any evidence of it, frankly, but I hope there's some part of you that has been reached by the expressions of pain of the people you've victimized.  I'm not convinced that there is a part of you.

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

THE DEFENDANT:  There isn't.

THE COURT:  I think that you're a pathological liar.  If you say anything else, we'll do the rest of this without you.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  We have listened to your nonsense throughout the trial.  We have listened to your nonsense today and you're the only one who doesn't get it.  You've gone on and on about things that have nothing to do with each other and you think, as has served you in the past, that if you just keep talking, it will be okay.

THE DEFENDANT:  May I ask one thing?

THE COURT:  You may not.  Today, it's had the opposite effect because the more you talk, the more I'm convinced that you're not only a pathological liar, but there's an aspect of your crimes that I have not seen before in my career as a prosecutor and as a judge and that is the gratuitous cruelty of it.  As the prosecutor --

THE DEFENDANT:  I don't have to listen to this, right?  I can -- could I disagree?  I disagree.  These people are lying.  Thank you.

THE COURT:  We'll send you the transcript.

(Defendant removed from courtroom.)

THE COURT:  For the record, I will continue the

sentencing. I don't believe that Mr. Youngblood is in a position to benefit from anything I have to say. Yes, sir.

MR. HARDING: We would like to add for the record that Mr. Youngblood is voluntarily absent from this proceeding at his request.

THE COURT: Absolutely. That is clear from the record and do you have any dispute with that, Mr. Senter?

MR. SENTER: You know me, Judge, I don't dispute that.

THE COURT: All right. As I was saying, I've been doing this a long time, I've seen a lot of people steal a lot of money from a lot of people. Seen a lot of con men, but there's an aspect of this one that is particularly disturbing and that is that there was more than taking money. There was feeding some sick psychological need that this man has to see other people suffer, and I'm sorry for those of you who were the objects of it. I wish that I could do more than what I can do today, but I can do this.

And to the extent that my record is being reviewed by judges who will stand in judgment of the sentence that I give today, I want to give them some context and perspective about the sentence that I'm giving today. First, I want them to read a transcript of the

trial in this case. I want them to read a transcript as they will of this hearing. I want them to look at my record of sentencing as a judge and I will say for the record that in my 18 years as a judge, 10 years as a district judge, I can count on one hand times that I've exceeded the guidelines and I have never given concurrent -- excuse me, consecutive sentences where that was not required by the law.

So just to give context to any reviewing panel about the seriousness of this case and how I perceive it, I believe that the 3553 factors clearly necessitate a sentence above the guidelines in this case. This case falls so clearly out of the heartland of cases that the guidelines were designed to provide an appropriate sentence for that I am going to be certainly guided by the factors that the government has identified in their sentencing memorandum.

I will say it. When I first asked what the government was asking for, it was astonishing and it is an astonishing ask. And I will say for the record for anyone reviewing that I started being very skeptical of that as an appropriate consequence, but the more I reflected on this case and having been very familiar with the facts of this case and now being -- having had the opportunity, once again, to watch Mr. Youngblood's astonishingly --

astonishing lack of accountability, of remorse, it begins to dawn on me -- and the government's comments have anticipated many of mine -- that there is no sentence that I can fashion certainly within the guidelines; but there's not a sentence that I can fashion less than what I am going to impose today that would achieve all of the purposes of the sentence.

The seriousness of the crime, not just the money but the stories that have been told over and over by witnesses at trial, by witnesses today and that have been recounted in the government's very thorough sentencing memorandum, those are real harms and those are harms that this court takes seriously as money out of someone's pocket.

Most importantly is what I think anyone who is an objective observer of Mr. Holloway -- excuse me, Mr. Youngblood's behavior both during this offense and today is that if anyone represents a danger -- a future dangerousness of re-offending, it is this man.  I think he is incapable of doing anything other than lying, lying in a way that yields money for him and results in pain to others.  And I am in a position to prevent that from happening again.

I believe he is the model of future dangerousness.  I believe his own statements during court

-- during recordings that were made during his detention demonstrate very clearly what we would expect from him and that is nothing less than what we've gotten in the past. As a consequence, I am going to follow the recommendation of the government in this case recognizing that it is a significant variance from the guidelines, but again, I believe that it is justified. And I believe that consistent with my obligation, it is imposing a punishment that is sufficient, but not more than necessary, to achieve the goals of sentencing.

I'm going to sentence Mr. Youngblood to a sentence of 240 months as to Count 1, 240 months as to Count 2, 240 months as to Count 3, 240 months as to Count 4, 120 months as to Count 5. The sentencing in Count 1 will be consecutive to those imposed in Counts 2 and 5. Sentencing in Count 3 will be served consecutive to those in 1 and 2. Is that correct?

MR. HARDING: Your Honor, I think you --

THE COURT: Sorry, consecutive to 3 and 4 as to Count 1.

MR. HARDING: Count 1 consecutive to 3 and 4.

THE COURT: Count 1 consecutive to 3 and 4 and Count 3 consecutive to 1 and 2. Count 2 consecutive to Counts 3 and 4 and Count 4 consecutive to 1 and 2. That will all be clear in the judgment. As to Count 5, that

will be served concurrent to all other counts for a total of 480 months incarceration.

In addition, should Mr. Youngblood serve that sentence successfully, I will order that he serve a period of supervised release of three years. While he's on supervised release, he is not to commit any other federal, state, or local crime. And he will comply with the mandatory and standard conditions that have been adopted by this court.

In addition, I will impose the following special conditions that he not make an application for any loan or enter into credit arrangement without first consulting with the probation office. That he disclose all assets and liabilities to the probation office and not transfer, sell, give away, or otherwise convey any asset without first consulting with the probation office. That he maintain a single checking account in his name, that he deposit all income from any source into that account and all other bank accounts must be disclosed. That he apply all moneys received from any finan -- any financial gain from any source to outstanding court-ordered financial obligation.

That he have no direct contact or indirect contact or communication with any person who has been a victim of these offenses or has previously provided funds,

loans, assets to him or any entity associated with him without prior consent of the probation office.  This extends to his family member -- family member of any such person or victim.  That he submit his self, his property to a search by the probation office in the event that they believe that he's violating any of these conditions.

He does not have the ability to pay so I will not impose a fine, but I will impose the $500 mandatory special assessment.  Consistent with the presentence investigation report, I will order that he pay restitution in the amount of $12,766,384 as will be described in the judgment in this case.

If he's not now able to pay the indebtedness, he will cooperate fully with the U.S. Attorney's Office, the Bureau of Prisons, and the probation office to make payment in full as soon as possible.  Any unpaid balance at the commencement of his term of supervised release will be paid on a schedule of monthly installments to be established.  I find that he does not have the ability to pay interest on those obligations and will waive interest requirement in the case.

I will order that he forfeit all right, title or interest to any property involved in the offense or traceable to the offense and that will be consistent with the government's motion that has been filed; is that

correct?

MR. HARDING:  My understanding is there's two motions, docket 130 and 131.

THE COURT:  All right.

MR. HARDING:  Thank you, your Honor.

THE COURT:  And has your client communicated any preference with regard to designation?

MR. SENTER:  Judge, as local as we can get it.  I think that's maybe the way to say it.

THE COURT:  All right.  Mr. Senter, will you communicate to your client that he has the right to appeal the sentence I've given him today?

MR. SENTER:  Yes, sir.

THE COURT:  And you will tell him the time limits that he has for doing so and how to go about preserving his right of appeal.  Will you do that?

MR. SENTER:  Yes, sir, I will.

THE COURT:  Okay.  Is there anything further from the government?

MR. HARDING:  No, your Honor.  Thank you.

THE COURT:  Mr. Senter, anything further?

MR. SENTER:  No, sir.

THE COURT:  All right.  This court will be adjourned.

(Proceedings concluded.)

LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

* * * * * *


UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS     )


    I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

    I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

    WITNESS MY OFFICIAL HAND this the 8th day of March, 2025.

*Lily Iva Reznik*

~~~~~~~~~~~~~~~~~~~~~~~~~~
*LILY I. REZNIK, CRR, RMR*
*Official Court Reporter*
*United States District Court*
*Austin Division*
*501 West 5th Street,*
*Suite 4153*
*Austin, Texas 78701*
*(512)391-8792*
*SOT Certification No. 4481*
*Expires:  1-31-27*


*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*